# EXHIBIT D

# EXHIBIT D



**James W. Christian**
*jchristian@christianattarlaw.com*

April 16, 2025

*Via Email Only*
Jeffrey L. Hartman
jlh@bankruptcyreno.com

Re:    **(a) Concurrent Representation of Meta Materials Inc. ("Meta") and Next Bridge Hydrocarbons, Inc. ("NBH")– No Conflict of Interest and (b) Emails from Jennifer Vetrano and Danielle Spears (collectively, the "Perpetrators") to Christina Lovato**

Dear Jeffrey:

As the former chair of the Litigation Section of the State Bar of Texas (where I am presently emeritus), I take allegations of conflicts of interest seriously. However, I take issue with individuals who attempt to falsely create an apparent conflict for nefarious purposes. As explained below, the Perpetrators (along with their other co-conspirators) are attempting to obstruct, impair, and derail our legal cases against market manipulators by fabricating/spinning a supposed conflict. The Perpetrators have:

a.    filed numerous bizarre and incoherent pro se complaints in federal court (which are all very similar in nature) against Meta, NBH, Gregory McCabe, et, al.;

b.    filed a grievance against me to the State Bar of Texas (where my record is pristine). Ms. Vetrano's complaint is that I sent an evidence preservation letter that is too aggressive[1]. I am certain the complaint will be dismissed as it was simply a standard evidence preservation letter; and

c.    held Space Calls and distributed tweets on X and other platforms attempting to obstruct and impair our team by having us deal with the Perpetrator's false accusations.

All the foregoing actions are intended to obstruct our efforts on behalf of Meta to hold all people and entities responsible for destroying the market value of the securities of Meta. While I cannot prove today they are shielding for the very people we are pursuing, their acts are certainly consistent with this purpose.

---

[1] A Copy of Vetrano's complaint to the State Bar of Texas enclosed herein as **Exhibit A;** and an email from Jennifer Vetrano to James W. Christian, dated March 29, 2025, regarding the same is enclosed herein as **Exhibit B**.

Jeffrey L. Hartman
April 16, 2025
Page 2 of 5

Accordingly, this letter is submitted to explain and confirm, in connection with the undersigned firm's representation of NBH, that there is no potential or actual conflict of interest based on the undersigned firm's concurrent representation of Meta Materials, Inc. in the matter *In Re Meta Materials Inc.,* Case No. 24-50792-hlb, pending in the United States Bankruptcy Court in Reno, Nevada.

As you are aware, at the outset of retaining my firm, I advised you that I would not represent Mr. McCabe individually in any matter (as you advised me that Meta might be investigating potential claims against him). At that time, I advised you I was representing NBH in a defamation, business disparagement, and tortious interference suit that will be pursued against some of the members of the same group referred to above that (a) have complained to the court; and (b) filed frivolous pro se complaints against many parties, including Meta. I made it clear to Mr. McCabe, I could not represent him in an individual capacity in the multiple pro se suits described below. As such, he retained separate legal counsel for his individual representation. I understand the parties have alleged to the court I have a conflict; however, nothing could be further from the truth.

As set forth in more detail below, the scope of ChristianAttar's representation of NBH includes (i) the defense of NBH in connection with certain lawsuits filed by pro se litigants in the Western District of Texas asserting various claims against NBH; and (ii) the prosecution of claims to be asserted by NBH against certain third parties for tortious interference with existing contract, tortious interference with prospective business relations, and business disparagement arising from conduct that has caused harm to NBH's business operations and reputation. ChristianAttar's representation of NBH is limited exclusively to these matters and does not extend to any other legal services. Based on our current investigation and review, we are aware of no conflict of interest that would preclude our representation of NBH in these matters. For the sake of clarity, ChristianAttar's scope of representation of NBH **does not** include or involve investigation into potential claims of stock manipulation as that cannot exist because NBH did not "trade their own securities," nor did they receive anything from Meta that could be clawed back etc.

Under Rule 327 of the Bankruptcy Code and relevant case law, an actual conflict arises only when an attorney is concurrently serving two interests that are directly adverse and cannot be reconciled without impairing the attorney's ability to exercise independent judgment. *In re Am. Printers & Lithographers, Inc.*, 148 B.R. 862, 866 (Bankr.N.D.Ill.1992) (Schmetterer, J.); *Johnson v. Richter, Miller & Finn (In re Johnson)*, 312 B.R. 810, 822 (E.D. Va. 2004). Here, no such conflict exists. The matters do not involve active competition between Meta and NBH's interests, nor would representation in one matter require compromising the other matter.

To the extent any party may assert that a "potential conflict" exists, it is well established that such hypothetical concerns, standing alone, are not grounds for disqualification. The distinction between actual and potential conflicts is recognized by courts that favor a fact-specific, functional approach rather than per se rules. *In re Am. Printers & Lithographers*, 148 B.R. at 866 (citing *In re Harold & Williams Dev. Co.*, 977 F.2d 906, 910 (4th Cir.1992); *In re BH & P, Inc.*, 949 F.2d 1300, 1315–16 (3d Cir.1991)). Only actual, current competition of interests—not speculative or contingent ones—warrant disqualification under 11 U.S.C. § 327(c). *In re Hummer Transp., Inc.*, 2013 Bankr. LEXIS 5587, at *11 (Bankr. E.D. Cal. 2013); *In re Am. Printers &*

Jeffrey L. Hartman
April 16, 2025
Page 3 of 5

*Lithographers, Inc.*, 148 B.R. at 866. Indeed, events that may occur in the future are not relevant. *Id.* As such, the chance that there may be a potential conflict in the future between Meta and NBH is not enough to preclude my firm's involvement in the ongoing cases.

## I.    Scope of Representation of NBH in pending Western District of Texas Cases

In March 2025, NBH was served with three lawsuits filed by three pro se litigants in the Western District of Texas (collectively, "Pro Se Lawsuits")[2]. Mr. McCabe was also named as a defendant in the Pro Se Lawsuits. NBH retained ChristianAttar to assist it with its' defense. ChristianAttar solely represents NBH in the Pro Se Lawsuits and **does not** represent Mr. McCabe in his individual capacity. Indeed, Mr. McCabe has retained Jill C. Pennington of Smith Clark Pennington PLLC and J. Paul Manning of Field Manning Stone Aycock P.C. for his individual representation. For ease of reference, included below is a list of the Pro Se Lawsuits and a description of the claims brought against NBH:

1. Case No. 7:24-cv-317; *Contique Willcot v. Securities & Exchange Commission, GTS Securities LLC, Ari Rubinstein, Next Bridge Hydrocarbons, Inc., John Brda, Gregory McCabe, Financial Industry Regulatory Authority*; filed in the Western District of Texas ("Willcot Matter")

    a. The causes of action asserted against NBH include: (i) Violations of Securities Exchange Act of 1934 (15 U.S.C. §78); (ii) Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1-2) and the Clayton Act (15 U.S.C. §§ 12-27); (iii) Negligence; (iv) Unjust Enrichment; (v) Conspiracy to Commit Fraud; and (vi) Emotional Distress (Negligent or Intentional Infliction).

2. Case No. 7:24-cv-321; *Danielle Spears v. Next Bridge Hydrocarbons, Inc., Gregory McCabe, John Brda, Roger N Wurtele, Kenneth Rice, Joseph DeWoody, Clifton Dubose, Jane Doe 1-20, John Do 1-20*; filed in the Western District of Texas ("Spears Matter")

    a. The causes of action asserted against NBH include: (i) Violations of Securities Exchange Act of 1934 (15 U.S.C. §78); (ii) Negligence; (iii) Unjust Enrichment; (iv) Conspiracy to Commit Fraud; and (v) Emotional Distress (Negligent or Intentional Infliction).

3. Case No. 7:24-cv-322; *Matthew J. Pease v. Securities & Exchange Commission, Financial Industry Regulatory Authority, John Brda, Gregory McCabe, Next Bridge Hydrocarbons;* filed in the Western District of Texas ("Pease Matter")

    a. The causes of action asserted against NBH include: (i) Violations of Securities Exchange Act of 1934 (15 U.S.C. §78); (ii) Breach of Fiduciary Duty; (iii) Violation of Sarbanes-Oxley Act (15 U.S.C. § 7201); (iv) Violation of Regulation FD (17 C.F.R. § 243.100); (v) Fraudulent Inducement and

---

[2] Copies of the live pleadings in the Pro Se Lawsuits are enclosed herein as **Exhibits C-E.**



Jeffrey L. Hartman
April 16, 2025
Page 4 of 5

    Misrepresentation; (vi) Negligent and Intentional Infliction of Emotional Distress; and (vii) Conspiracy to Commit Fraud.

    b.   Notably, there does not appear to be a direct cause of action against the companies, as the Plaintiff always qualifies with "corporate officers" and "including but not limited to Brda and McCabe." Despite the foregoing, NBH is a named Defendant.

    For each of the Pro Se Lawsuits, ChristianAttar intends to pursue a dismissal of all claims asserted against NBH pursuant to FRCP 12(b)(6). We believe there is a high likelihood that the Pro Se Lawsuits will be dismissed for failure to state a claim because: (i) Plaintiffs lack standing for any of their claims; (ii) the claims are derivative in nature as they represent harm shared by all stockholders rather than direct harm to the individual shareholder; and (iii) certain claims are barred by the statute of limitations. Notably, none of these bases involve Meta.

    Fore reference, NBH's deadlines for filing a responsive pleading in the Pro Se Lawsuits are as follows: (a) Willcot Matter on May 8, 2025; (b) Spears Matter on May 12, 2025; and (c) Pease Matter on May 25, 2025.

## II.    Scope of Representation of NBH in Other Matters

    ChristianAttar has also been retained by NBH to pursue potential claims for business disparagement, tortious interference with the Orogrande Lease, and tortious interference with prospective relations. To be clear, we have not been retained to represent Mr. McCabe in his individual capacity, nor have we been retained to pursue any other Meta or market manipulation matter. The only material action our firm has taken in pursuing this potential litigation has been to send electronically stored information ("ESI") preservation letters to individuals who have, based on document statements, made potentially actionable statements about NBH on X. The ESI letter references the preservation of communications regarding NBH, or any officer or director of NBH. It's important to note that the potential claims we are pursuing on behalf of NBH do not involve or relate to stock manipulation or anything related thereto. The shareholder's complaint about my firm's alleged investigation into stock manipulation of NBH is frivolous and unsupportable. As stated above, the same shareholder who made this complaint, Jennifer Vetrano, filed an additional ethics complaint against me with the State Bar of Texas. Her sole basis for this ethics complaint was for sending her the evidence preservation letter. These acts are abusive and unacceptable.

## III.    Withdrawal of Representation of NBH if Avoidance Actions are Pursued

    We are aware that the Trustee for Meta is investigating one or more potential avoidance actions in the future against Mr. McCabe. If that occurs, we will not be representing Mr. McCabe. In the event that the Trustee also opts to pursue any similar actions against NBH, ChristianAttar will withdraw from representation of NBH in the Pro Se Lawsuits and in the other matters for which it is investigating potential claims of business disparagement, tortious interference with the Orogrande Lease, and tortious interference with prospective relations. We have disclosed to NBH our need to withdraw if an actual conflict of interest arises regarding a claim filed by the trustee against NBH based on ChristianAttar's concurrent representation of Meta. Further, NBH would

Jeffrey L. Hartman
April 16, 2025
Page 5 of 5

be willing to provide a letter to the trustee that contains NBH's consent and acknowledgement of the same. Put simply, we cannot imagine what claim Meta would ever have against NBH. It simply does not exist. If however, the trustee elects to file a claim against NBH, we will withdraw with the consent of NBH.

      I believe these Perpetrators are acting as a shield for the people who we are pursuing in discovery and in our lawsuit. They will do anything to impair or block us. We must **not** bow to their manipulation unless there is a true conflict (which there is not). My hope is we discuss this in detail and disclose what's necessary. We cannot let these spurious letters from our opponents cause us to do anything to stop our actions, as I believe they will not stop unless we classify it for what it is – harassment which we frequently experience in these types of cases.

      We remain mindful of our ongoing duty to disclose any circumstances that may give rise to a conflict of interest. Should any such issue arise during the course of our representation of NBH, we will promptly notify the trustee and all necessary parties in accordance with the applicable ethical rules and bankruptcy procedures. Please let me know if you require any additional information or have any questions.

                        Sincerely,

                        */s/James W. Christian*
                        James W. Christian

Enclosures:

Vetrano Complaint to the State Bar of Texas (**Exhibit A**)
Email from Jennifer Vetrano to James W. Christian, dated March 29, 2025 (**Exhibit B**)
Pro Se Lawsuit of Spears (**Exhibit C**)
Pro Se Lawsuit of Pease (**Exhibit D**)
Pro Se Lawsuit of Willcot (**Exhibit E**)

# EXHIBIT A

## Complaint to the State Bar of Texas

Complainant Information:

Jennifer Vetrano

25 Pond Hollow Lane, West Creek, NJ 08092

Jvetrano999@gmail.com

Attorney Information:

James Wes Christian

1177 West Loop South, Suite 1700, Houston, TX 77027

Phone: 713-659-7617

Subject: Ethical Violations Related to Overly Broad and Burdensome Litigation Hold Notice, Significant Conflict of Interest, Improper Representation, and Potential Impropriety

Date: March 8, 2025

Introduction:

This complaint is filed to report potential ethical violations by Attorney James Wes Christian, arising from a litigation hold notice dated March 4, 2025, concerning MMTLP. The notice contains discovery requests that are excessively broad, burdensome, and potentially violative of Texas Rules of Civil Procedure, as well as ethical obligations. Furthermore, James Wes Christian is currently working with the Meta Materials bankruptcy case, and the Meta Materials Board of Directors is included as a party in my Pro se court case (Case number 7:24-CV-325). This direct and ongoing representation of a party involved in my litigation, especially in the context of bankruptcy proceedings, creates a severe and undeniable conflict of interest. Additionally, it has come to my attention that James Wes Christian is paying stock promoters, such as Gary Valinoti (known as "Ham the ShortKiller" on social media), $300 per hour for "consulting," which raises serious questions about potential impropriety.

Statement of Facts:

Overly Broad Discovery Requests:

On March 4, 2025, I received a litigation hold notice from Mr. Christian demanding "all documents" related to MMTLP, without specifying the subject matter or timeframe.

This demand violates Texas Rule of Civil Procedure 192.3(a), which requires discovery requests to be proportional and relevant. See In re Nat'l Lloyds Ins. Co., 532 S.W.3d 814, 820 (Tex. App.—Corpus Christi–Edinburg 2017, orig. proceeding) ("A request for 'all documents'…is overly broad."). See also In re Alford Chevrolet-Geo, 997 S.W.2d 173, 181 (Tex. 1999) (emphasizing the need for reasonable particularity in discovery requests).

The request for records dating back to 2018, when I acquired MMTLP shares in late 2022, is particularly egregious and appears to be a "fishing expedition." See In re CSX Corp., 124 S.W.3d 149, 152 (Tex. 2003) (holding that discovery requests must be reasonably tailored).

Lack of Specificity and Vague Definitions:

The notice contains numerous vague terms, such as "activity log," "audit compliance," and "relevant to the claim," without providing clear definitions.

This lack of specificity violates Texas Rule of Civil Procedure 192.3(b), which requires specific and particularized requests. See Loftin v. Martin, 776 S.W.2d 145, 148 (Tex. 1989) (emphasizing the importance of specificity in discovery). See also In re Am. Optical Corp. Prods. Liab. Litig., 165 S.W.3d 449, 454 (Tex. App.—Corpus Christi 2005, orig. proceeding) (holding that a request for "all documents relating to" a particular subject is overly broad).

Invasion of Privacy and Chilling Effect on Free Speech:

The requests for social media information and "reports, complaints, or moderation actions on X" raise significant privacy concerns and potentially infringe on First Amendment rights.

This is a violation of the Texas Constitution art. I, § 19. See Industrial Found. of the South v. Texas Indus. Accident Bd., 540 S.W.2d 668, 682 (Tex. 1976) (recognizing a constitutional right to privacy).

Potential Harassment and Intimidation:

As a pro se plaintiff in Case No. 7:24-CV-325, I perceive the litigation hold notice as potentially retaliatory and an attempt to intimidate or interfere with my lawsuit.

I have reason to believe that Mr. Christian has preexisting relationships with those named in my lawsuit, creating a conflict of interest.

This may violate Texas Rule of Civil Procedure 191.3, which prohibits discovery abuse. See Chrysler Corp. v. Blackmon, 841 S.W.2d 844, 849 (Tex. 1992) (recognizing the potential for discovery abuse).

Undue Financial Burden:

As a pro se litigant and single parent, the requests for forensically qualified images and data from Access or Oracle databases place an undue financial burden on myself. See Tex. R. Civ. P. 192.4 (allowing objections based on undue burden and expense); In re Deere & Co., 299 S.W.3d 819, 821 (Tex. 2009) (recognizing that discovery costs can be a factor in determining proportionality).

Direct and Ongoing Conflict of Interest Through Representation of Meta Materials in Bankruptcy:

James Wes Christian is currently working with the Meta Materials bankruptcy case.

The Meta Materials Board of Directors is included as a party in my pending court case, 7:24-CV-325.

This direct and ongoing representation of a party involved in my litigation, especially in the context of bankruptcy proceedings, creates a severe and undeniable conflict of interest. Mr. Christian's ability to provide impartial representation is fundamentally compromised.

Potential Conflict of Interest Due to Prior Representation:

It has come to my attention that James Wes Christian has represented John Brda in matters related to Flamethrower and Meta Materials.

John Brda is a person named in my Pro se lawsuit.

This prior representation creates a clear conflict of interest, as Mr. Christian's current actions may be influenced by his past relationship with Mr. Brda. This conflict compromises his ability to provide impartial representation.

This is a violation of the Texas Disciplinary Rules of Professional Conduct regarding conflicts of interest.

Potential Impropriety Through Payments to Stock Promoters:

It has come to my attention that James Wes Christian is paying stock promoters, such as Gary Valinoti (known as "Ham the ShortKiller" on social media), $300 per hour for "consulting."

This raises serious questions about potential impropriety and whether these payments are being made to influence public perception or manipulate stock prices.

Rules of Professional Conduct Violated:

Texas Disciplinary Rules of Professional Conduct, specifically rules related to:

Rule 3.04: Abuse of Discovery

Rule 4.04: Respect for Rights of Third Persons.

Rule 1.06: Conflict of Interest: General Rule.

Rules pertaining to reasonable discovery.

Rules pertaining to improper representation.

Rules pertaining to conduct prejudicial to the administration of justice.

Relief Sought:

I request that the State Bar of Texas investigate these potential ethical violations, including the severe and ongoing conflict of interest arising from Mr. Christian's representation of Meta Materials in bankruptcy, the conflict of interest arising from Mr. Christian's prior representation of John Brda, and the potential impropriety related to payments to stock promoters, and take appropriate disciplinary action against Attorney James Wes Christian.

Supporting Documentation:

1) Copy of the litigation hold notice dated March 4, 2025.
2) Copy of the objection letter sent to Mr. Christian.
3) Any documentation that you have that shows James Wes Christian represented John Brda in Flamethrower or Meta Materials matters.
4) Any documentation that shows James Wes Christian is working with the Meta Materials bankruptcy case.
5) Case number 7:24-CV-325 complaint.

6) Utube video that shows James Wes Christian is paying stock influencer, "Ham the Shortkiller" Gary Valinoti $300 per hour on the Utube channel of William P. Farrand, dated September 29, 2023, disclosed by Gary Valinoti during the video.

If you have any further information for me please feel free to reach out.  My email is jvetrano999@gmail.com and phone 908-783-0105.


Sincerely,


Jennifer Vetrano

**Holly Pappas**

| | |
|---|---|
| From: | Jennifer Vetrano <jvetrano999@gmail.com> |
| Sent: | Saturday, March 29, 2025 3:21 PM |
| To: | James Wes Christian; Holly Pappas |
| Subject: | Jennifer Vetrano/@fearles59324823 on X |

Date: March 29, 2025

Dear Mr. Christian,

I am writing to acknowledge receipt of your Litigation Hold Letter dated March 26, 2025, sent via private message to fearles59324823 on the social media platform X (Twitter).

I must express my serious concern regarding several ethical issues arising from your recent correspondence. As you are aware, attorneys practicing in federal court, as well as in the state of Texas, are bound by stringent ethical rules governing professional conduct. These include, but are not limited to:

Western District of Texas Local Rule AT-7, requiring adherence to the highest ethical, professional, and civil standards.

Texas Disciplinary Rule of Professional Conduct 4.04(a), prohibiting actions meant solely to burden, intimidate, or emberrass third persons.

Texas Disciplinary Rule of Professional Conduct 1.06, prohibiting representation involving conflicts of interest.

ABA Model Rule 4.4, requiring respect for third-party rights and prohibiting methods designed to burden third persons.

ABA Model Rule 8.4, prohibiting intimidating and prejudicial conduct, dishonesty, and misrepresentation.

ABA Model Rule 1.7, prohibiting conflicts of interest, particularly representation materially limited by responsibilities to other clients or interests.

I must highlight the contradictions between your recent communication and these established ethical guidelines. Firstly, the tone, severity, and explicitly aggressive language of your letter—particularly against myself, a Pro Se litigant and Next Bridge Hydrocarbons shareholder actively involved in litigation against John Brda and the Meta Materials Board of Directors(either your previous or current clients) in case number 7:24-CV-00325-DC-RCG—can only be viewed as retaliatory and intended to chill the Plaintiff. Such conduct is inappropriate and directly contravenes the aforementioned ethical standards.

Furthermore, your repeated references to Mr. Greg McCabe, whom you explicitly do not represent, demonstrate a significant and concerning conflict of interest. The consistent invocation of Mr. McCabe's name throughout your correspondence raises serious questions about your professional independence and your duty of loyalty exclusively to your client, NBH. Moreover, your deliberate omission of your official role as attorney of record for Next Bridge Hydrocarbons in the pending federal litigation further compounds this conflict, representing a breach of transparency and candor.

Additionally, I find it particularly disappointing and disturbing that an attorney of your tenure and experience would consider it appropriate to deliver a litigation hold letter via private message on a social media platform rather than utilizing a more professional, conventional, and respectful method. I have previously had multiple legal hold letters sent to my home and your Legal Assistant Holly Pappas has previously corresponded with me via email, which further amplifies the inappropriate and unprofessional choice of using social media for such serious and formal communication.

Your tactics, leveraging your considerable position of power and resources against a litigant in my circumstances, fall below acceptable standards of professional conduct.

To be clear, I will adhere to the instructions of the Court and the presiding Judge, not to your demands. However, given your insistence on continually referencing Mr. McCabe, whom you do not represent, I urge you to preserve all communications and documentation related to Next Bridge Hydrocarbons, John Brda, and the Meta Materials Board of Directors.

I trust that you will take these concerns seriously and act accordingly.

Respectfully,

Jennifer Vetrano

/s/ Jennifer Vetrano

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WESTERN TEXAS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DANIELLE SPEARS                                    \*
Plaintiff                                                        \*

                                                                      \*          Docket Number: 7:24-cv-321
v.                                                                 \*          **JURY TRIAL DEMANDED**
                                                                      \*
                                                                      \*
NEXT BRIDGE HYDROCARBONS, INC.       \*          **2nd Amended Complaint**
Defendant                                                    \*
                                                                      \*
GREGORY MCCABE                                  \*
Defendant                                                    \*
                                                                      \*
JOHN BRDA                                              \*
Defendant                                                    \*
                                                                      \*
THE SECURITIES & EXCHANGE COMMISSION \*
Defendant                                                    \*
                                                                      \*
Financial Industry Regulatory Authority       \*
Defendant                                                    \*
                                                                      \*
JANE DOE 1-20, JOHN DO 1-20                   \*
Defendant                                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## PARTIES

1. Plaintiff Danielle Spears (hereinafter referred to as "Plaintiff" or "Spears") has at all times

mentioned herein resided within Maricopa County, Arizona, previously of the city of Mesa and

currently residing in Avondale. Plaintiff, due to her disability, is a retired investor who purchased

shares of MMTLP and has been directly harmed by the Defendants misconduct. Plaintiff's

address 12206 West Harrison St., Avondale, AZ 85323

1

2. Defendant Next Bridge Hydrocarbons, Inc.  Next Bridge Hydrocarbons, Inc. (hereinafter referred to as "NBH") was formed as part of a corporate spin-off from Meta Materials, Inc. (hereinafter referred to as "MMAT II").  NBH is an independent, non-trading. public reporting, private oil and gas exploration and development company. Defendant Company is liable for the wrongful acts of its executives, including Brda and McCabe, under principles of agency and *respondeat superior*, as these individuals acted within the scope of their authority and executive roles at all relevant times. NBH is incorporated in Nevada, herein sued in its corporate capacity. Primary place of business at 500 W. Texas Avenue, Suite 890, Midland, TX, 79701

3. Defendant Greg McCabe (hereinafter referred to as "McCabe") is the CEO of NBH. He also served as a Director, contributing to governance responsibilities prior to becoming Chairman of the Board. McCabe is the Director and former owner of McCabe Petroleum Corporation (hereinafter referred to as "MPC") & Hudspeth Oil Corp., (hereinafter referred to as "Hudspeth"),. McCabe previously held a variety of positions at Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH") such as Chairman of the Board, Director, Investor and Advocate for Orogrande project and Strategic Advisor.  McCabe's home address is 6015 Green Hill Ct, Midland, TX 79707-1655.

4. Defendant John Brda (hereinafter referred to as "Brda") the former CEO of TRCH as well as other roles within the company such as President and Director. He was the Founder of its predecessor Torchlight Energy, Inc.  (hereinafter referred to as "TEI") Following the reverse takeover (hereinafter referred to as "RTO") between TRCH and Metamaterials, Inc., (hereinafter referred to as "MMAT I") Brda would serve as a paid consultant for the newly renamed Meta Materials, Inc., (hereinafter referred to as "MMAT II"). In his consulting role, it was expected

2

that he would continue to develop and to sell the Oil and Gas Assets that MMAT II inherited in the RTO. Brda's home address is 1425 Frontenay Ct., St. Louis, MO, 63122-1623.

5. Defendant Securities & Exchange Commission (hereinafter referred to as "SEC") is statutorily obligated under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) to regulate and prevent market manipulation. Their Core Mission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

6. Defendant Financial Industry Regulatory Authority (hereinafter referred to as "FINRA") is a self-regulatory organization authorized by the SEC to oversee broker-deals and ensure compliance with federal securities laws. FINRA's responsibilities include market regulation, investor protection, and the enforcement of securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006

7. John Does 1-20 and Jane Does 1-20 (hereinafter collectively referred to as "Doe Defendants") are individuals whose identities are currently unknown to the Plaintiff but who are believed to have carried out specific functions as part of the broader manipulation scheme described in this complaint. Plaintiff anticipates that discovery will uncover the identities of these individuals and their roles within the manipulation scheme.

3

# I. INTRODUCTION

Danielle D Spears, a retail investor, has filed this lawsuit alleging a coordinated and systemic scheme that has undermined the integrity of U.S. Capital Markets. The scheme involved market manipulation, severe regulatory negligence, breaches of fiduciary duties, and violations of constitutional protections, causing significant financial harm to retail investors. Spears seeks to hold the Defendants accountable for their respective roles in perpetuating the misconduct.

Central to Plaintiff's claim is FINRA's abrupt and indefinite extraordinary U3 trading halt imposed on December 9, 2022. The clandestine halt, shrouded in secrecy for over two years, devoid of transparency, due process, or reconciliation of share discrepancies, inflicted immediate and irreparable financial devastation. This epitomizes FINRA's unchecked regulatory power and the Securities and Exchange Commission's deliberate disregard for investor protection.

This unprecedented regulatory action halted trades and locked up investor shares due a potential short squeeze, confirmed by a TD Ameritrade, now Schwab, representative days after the halt, along with an admission to oversold conditions by Trade Station, who remains unable to return shares to their rightful owners. This represents a new and alarming chapter in the history of U.S. capital markets.

Plaintiff believes Defendants acted in concert to manipulate markets, obscure material information, and undermine shareholder protections. Exploiting their positions of authority and trust. These failures violated federal securities and antitrust laws, directly harming Plaintiff and 65,000 fellow MMTLP investors. The plaintiff was further harmed by listening to those she now believes were undisclosed paid social media stock promoters and influencers. These individuals

4

repeatedly stated that FINRA was required to force short sellers to close their positions by December 12, 2022. However, FINRA did not take such action.

Plaintiff seeks corrective regulatory actions, including a court-ordered two-day 'close-only' trading period for MMTLP shares, compelling closure of all short and illegal short positions. Having survived two years in this purgatory, Plaintiff respectfully requests the immediate production and release of Electronic Blue Sheets ("EBS"), Consolidated Audit Trail data ("CAT DATA"), and other regulatory records to comprehensively assess share discrepancies and facilitate investor relief.

## II. JURISDICTION AND VENUE

### <u>JURISDICTION</u>

This Court has jurisdiction over this action under multiple statutory provisions.

8.  This Court has jurisdiction under federal question jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal laws, including the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.), the Securities Act of 1933 (15 U.S.C. § 77a et seq.), the Sarbanes-Oxley Act of 2002 (Pub. L. No. 107-204), and the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. § 5301 et seq.).

9. Supplemental jurisdiction under 28 U.S.C. § 1367 is proper, as Plaintiff's state law claims are integrally related to federal claims and form part of the same controversy.

10. Jurisdiction further exists under the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f), given Defendants' involvement in interstate commerce through extensive securities transactions.

11. This Court has jurisdiction under 28 U.S.C. § 1361 (Mandamus Jurisdiction) to compel the SEC to fulfill its statutory obligations, including enforcing federal securities laws, addressing regulatory failures related to MMTLP, restoring lost trading opportunities, and mandating closure of illegal short positions. Jurisdiction also arises from the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which grants this Court authority to review SEC's actions and inaction.

12. Jurisdiction additionally extends under federal statutes addressing unlawful coordinated activities, including 18 U.S.C. § 1343 (Wire Fraud), due to Defendants' intentional dissemination of materially false information via electronic communications; 18 U.S.C. § 2261A

(Cyberstalking), regarding coordinated harassment and intimidation targeting investors; and relevant provisions governing fraudulent stock manipulation.

## **VENUE**

13. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b), as substantial events and omissions giving rise to Plaintiff's claims occurred within this district. Defendant McCabe resides in Texas and maintains significant business operations here. Additionally, critical corporate decisions, transactions, and governance activities involving NBH, TRCH, MPC, Hudspeth, and related assets occurred primarily within Texas. Defendant Brda, although not a Texas resident, conducted substantial business activities within the state, thereby reinforcing the appropriateness of venue in this jurisdiction.

6

14. Texas is the nexus of critical evidence, including corporate records, asset documentation, and relevant securities transactions directly tied to Plaintiff's allegations. Crucial witnesses and Defendants, such as geologist Masterson, former CEO Clifton DuBose, former CFO Roger Wurtele, and Defendant McCabe, reside and operate businesses in Texas, significantly facilitating discovery, testimony, and efficient litigation.

15. Venue is additionally justified under 28 U.S.C. § 1404(a), as transferring the case from this district would severely burden Plaintiff, impose unnecessary delays, restrict access to evidence and witnesses, and unfairly advantage Defendants through improper forum shopping. The strong and explicit nexus between Defendants' conduct and this jurisdiction overwhelmingly supports retaining venues in the Western District of Texas.

16. Venue under Texas state law claims is further supported pursuant to Texas Civil Practice and Remedies Code §§ 15.002–15.003, as Defendants reside, conduct substantial business, and undertake key actions forming the basis of Plaintiff's claims within Texas

## III. ALLEGATIONS

17.  Plaintiff asserts corporate entities TRCH and NBH bear liability for securities fraud and related misconduct committed by their executives or agents, under the doctrine of respondeat superior as recognized in Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111 (5th Cir. 1980).

18. Plaintiff asserts McCabe, as a senior executive and substantial shareholder, had a fiduciary duty to shareholders to disclose known fraudulent activities. Even absent direct involvement,

7

McCabe's fiduciary role required transparency and disclosure of material misconduct. *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.,* 365 F.3d 353 (5th Cir. 2004).

18. Plaintiff alleges Defendants Brda and McCabe deliberately engaged in practices intended to trigger short squeezes, manipulate securities markets, and artificially inflate share prices, violating Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).

19. Plaintiff alleges that in July 2004, John Brda, while employed by STL Capital Management, LLC, breached his fiduciary duty and embezzled corporate opportunities. Specifically, Brda improperly diverted the acquisition of Limelight Media Group ("LMG"), acquiring 500,000 shares intended for STL Capital Management. Following litigation (STL Capital Management, LLC v. Brda, 207 S.W.3d 649 (Mo. Ct. App. 2006)), the court found Brda liable for breach of fiduciary duty and ordered him to return 425,000 embezzled shares of LMG stock and pay associated monetary damages and attorneys' fees.

20. Plaintiff alleges that in 2007, Defendant John Brda was charged in *Timothy Armstrong, et al., v. American Pallet Leasing, Inc., et al.* (No. C07-4107-MWB), resulting in a judicial determination of guilt for multiple counts, including:

A. Breach of fiduciary duty

B. Conversion

C. Negligent misrepresentations/nondisclosures

D. Fraudulent misrepresentations and omissions under Section 10(b) and Rule 10(b-5) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b))

8

21. Plaintiff asserts this prior misconduct, characterized by intentional deception and asset diversion, aligns with the manipulative and self-enriching behavior alleged herein, reinforcing Plaintiff's claims under Section 10(b), Rule 10b-5, and standards outlined by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)

22. On May 2, 2008, PPFT filed its initial Form S-1 Registration Statement with the SEC, and on July 14, 2008, this S-1 Registration Statement was declared effective, allowing PPFT to proceed with its initial public offering (IPO) and begin publicly trading.

23. Plaintiff alleges that on November 23, 2010, as a result of the Share Exchange Agreement between PPFT and TEI, Thomas Lapinski became the sole officer and director, and John Brda acquired beneficial ownership of approximately 20.3% of the newly combined entity. The change in control and management structure clearly positioned Brda to directly influence TEI's subsequent operations.

24. On February 7, 2011, Brda completed the first in a series of reverse takeovers, initially merging with PPFT. The name was legally changed to Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH"). Plaintiff asserts that regulatory paperwork requirements are likely significantly less intrusive when merging with a company already trading on the OTC Bulletin Board (OTCBB), thus providing a more favorable path to becoming publicly listed given Brda's prior securities-related charges.

25. Plaintiff alleges that on December 13, 2001, Roger Wurtele was serving as the Chief Financial Officer ("CFO") for Energy & Engine Technology Corporation (hereinafter referred to as "EENT"). During Wurtele's tenure, EENT received a cease-and-desist order from the SEC for

9

issuing unregistered shares as payment to stock promoters, actions which artificially inflated EENT's stock price by approximately 68%. Plaintiff asserts that these actions clearly violated federal securities laws prohibiting the distribution of unregistered securities and market manipulation, supported by precedents including *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013), and *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007), holding companies and their executives liable for issuing unregistered securities and artificially inflating share prices.

26. Plaintiff alleges that on October 28, 2003, Energy & Engine Technology Corporation (EENT) became liable for a $150,000 judgment related to a project managed by Roger Wurtele, who was serving as both Chief Executive Officer (CEO) and Chief Financial Officer (CFO) of EENT at the time. *Solutions, Inc., 365 F.3d 353 (5th Cir. 2004)*, and reinforced by the standards articulated by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)*.

27. Plaintiff alleges that on September 9, 2013, Roger Wurtele (hereinafter referred to as "Wurtele") was appointed Chief Financial Officer ("CFO") of Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH"). Plaintiff asserts that, upon assuming the CFO position, Wurtele became responsible for TRCH's financial reporting, compliance, and corporate governance, including adherence to SEC regulations prohibiting fraudulent or deceptive securities practices.

28. From 2011-2014, TRCH focused on expanding its presence in the oil and gas sector through strategic acquisitions and operational growth. Notably, the company engaged in the acquisition,

10

exploration, development, and production of oil and gas properties within the United States. These formative years laid the groundwork for TRCH's subsequent activities.

29. On April 21, 2014, Defendant Brda filed a Prospectus as part of TRCH's FORM S-1 Registration Statement with the SEC. This document explicitly outlined TRCH's business model, emphasizing drilling and working interest programs within the U.S. that provided rapid payback periods, high internal rates of return, and proven, bookable reserves.

30. The Prospectus explicitly acknowledged TRCH's precarious financial condition, stating: 'At December 31, 2013, we had not yet achieved profitable operations, had accumulated losses totaling $15,810,959 since inception, and expect to incur additional losses during the continued development of our business, raising substantial doubts about our ability to continue as a going concern.' This disclosure indicated significant financial vulnerability and uncertainty regarding TRCH's viability.

31. On August 7, 2014, TRCH executed a purchase agreement known as the Hudspeth Agreement. Under this agreement, TRCH acquired MPC and Hudspeth, entities solely owned by McCabe. This acquisition included substantial oil and gas assets comprising approximately 172,000 contiguous acres located in the Orogrande Basin (hereinafter referred to "Orogrande"), West Texas. McCabe received substantial consideration, including stock compensation, marking his initial substantial equity interest in TRCH

32. On September 25, 2014, the SEC issued a second letter to Brda in response to Amendment No. 1 of TRCH's Form S-1 filing. The SEC explicitly noted significant inadequacies and inaccuracies in TRCH's disclosures of proved undeveloped crude oil and natural gas reserves,

11

concluding that these deficiencies indicated ineffective disclosure controls and procedures at year-end. The SEC required TRCH to correct these deficiencies in Amendment No. 2, underscoring concerns regarding the company's reliability in financial disclosures and transparency.

33. Following Amendment No. 3, the S-1 submission was finally approved and made effective by the SEC on November 5, 2014 at 5pm EST.

34. McCabe subsequently assumed an executive role. In a 2014 Amended S-1, Proxy materials were provided to potential investors. It proposed a share offering of 2,362,541 shares for approximately $4.4M.

35. On March 30, 2015 Greg McCabe entered into a letter agreement with TRCH (the "Option Agreement") whereby TRCH granted McCabe an option to acquire 631,250 shares of the Stock at a price per share of approximately $0.36 as consideration for Greg McCabe's agreement to extend the deadline for drilling on the real property leased by Hudspeth and MPC.

36. Plaintiff alleges McCabe's involvement marked the beginning of increasingly complex and opaque transactions, notably centered around the Orogrande Project, a 134,000-acre oil and gas lease in West Texas. These transactions enabled questionable mergers, asset transfers, and financial dealings, directly harming shareholders through corporate mismanagement, conflicts of interest, and self-dealing practices, actionable under the fiduciary standards established by the Fifth Circuit in *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

37. Plaintiff alleges McCabe owns or controls multiple entities, including MPC, Hudspeth Oil Corporation, Wolfbone Investments LLC, McCabe Minerals & Royalties LLC, Magdalena Royalties LLC, Founders Oil & Gas Operating, LLC, G Mc Exploration LLC, McCabe Ventures, Manix Royalty Ltd., and Wildcatters Network. Plaintiff further alleges these entities engaged in numerous transactions with TRCH and NBH, creating significant undisclosed conflicts of interest, corporate mismanagement, and breaches of fiduciary duties, actionable under *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

38. Plaintiff alleges McCabe orchestrated financial transactions through MPC involving TRCH and MECO, resulting in personal financial benefits, specifically the acquisition of 2,500,000 restricted TRCH shares via Warwink Properties (hereinafter referred to as "Warwink") without clear independent valuation or proper disclosure, constituting breaches of fiduciary duty as outlined by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

39. McCabe benefited from a complex transaction involving a $3,250,000 cash reimbursement and an additional "performance fee" of $2,781,500 paid by MPC to TRCH, alongside a drilling-cost benefit ("carry") valued at approximately $1,179,076. Such interconnected and opaque transactions reflect breaches of fiduciary duty and self-dealing explicitly recognized as improper in Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004).

40. Plaintiff further alleges Defendant McCabe utilized the Orogrande transactions to secure personal interests explicitly benefiting himself at the expense of TRCH shareholders.

13

Specifically, McCabe retained a 10% back-in after payout (BIAPO) interest and a 4.5% overriding royalty interest (ORRI) in the Orogrande through his entity Magdalena Royalties, LLC, despite acting as seller and controlling shareholder. Plaintiff contends these arrangements constituted deliberate self-dealing and breaches of fiduciary duties under Texas law and Fifth Circuit precedent, see *Southland Securities Corp.*, 365 F.3d at 366.

41. Plaintiff further alleges McCabe structured preferential loan arrangements and stock warrant issuances that prioritized his personal financial interests. TRCH provided loans secured by McCabe's entities' assets and subsequently reassigned these to subsidiaries under unclear circumstances. TRCH also repeatedly issued warrants and convertible instruments at discounted rates to McCabe, creating opportunities for disguised compensation or stock manipulation. Such transactions constitute explicit breaches of fiduciary duty and improper self-enrichment under standards recognized by the Fifth Circuit in *Southland Securities Corp.*, 365 F.3d at 366.

42. TRCH entered several ambiguous transactions involving either McCabe's family or entities he controlled, notably questionable payments structured as consultancy fees or compensation to entities such as Green Hill Minerals, LLC. Plaintiff alleges these familial and personal financial arrangements can easily be concealed, violating fiduciary standards under Texas law and federal securities regulations recognized by the Fifth Circuit in *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

43. Plaintiff alleges these financial schemes and insider transactions facilitated by Defendants Brda and McCabe were intentionally structured to obscure conflicts of interest and financial

14

self-dealing through complex inter-company dealings, undisclosed relationships, and circular financial transactions.

44. Defendants acted to enrich themselves at shareholder expense via patterns of deliberate concealment and breaches of fiduciary duty which aligns with behavior recognized as actionable under Fifth Circuit standards established in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), and constitute violations under both Texas fiduciary standards and federal securities laws.

45. Brda, as CEO and Director of TRCH during this period, consistently facilitated and approved these complex transactions involving McCabe-controlled entities, failing to provide transparent disclosures or at times to obtain truly independent board approval, thus breaching fiduciary duties of care and loyalty required by Texas law, as clearly established in *Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707 (5th Cir. 1984).

46. Brda's prior history, involving questionable business practices at entities such as STL Capital Management LLC and American Pallet Leasing, Inc., underscores a deliberate pattern of self-enrichment and disregard for shareholder transparency. As set forth in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), and further emphasized by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007),

47. Plaintiff alleges that on February 7, 2021, McCabe converted $1.5 million of outstanding debt owed by TRCH into 4,000,000 common shares at a price of $0.375 per share. At the time of conversion, TRCH's prevailing market share price was substantially higher, providing McCabe

15

an immediate and substantial financial benefit. Plaintiff further alleges this transaction was not transparently disclosed to shareholders or the investing public.

48. Plaintiff asserts that TRCH repeatedly issued convertible debt and warrants to insiders, including McCabe, at prices significantly below prevailing market rates, without adequate public disclosure. Such sustained nondisclosure of materially insider-favorable transactions constitutes actionable securities fraud and explicit breaches of fiduciary disclosure duties, as supported by precedents including *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) (affirming liability for non-disclosure of insider-favorable debt conversions at significantly below-market prices) and *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53 (3d Cir. 2005) (affirming liability for nondisclosure of materially insider-favorable transactions conducted at below-market value).

49. Similarly, in December 2017, McCabe received 2,500,000 restricted shares of TRCH stock as consideration for Warwink, without clear independent valuation or adequate disclosure justifying the price. Such insider-favorable terms and unclear repricing circumstances directly violated fiduciary duties of loyalty and care, clearly defined under Texas common law, specifically highlighted in *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707 (5th Cir. 1984). These self-dealing transactions provided disproportionate personal financial benefits to McCabe, thereby breaching the fundamental fiduciary responsibilities that TRCH's leadership owed to its shareholders.

50. Plaintiff asserts that TRCH repeatedly engaged in the issuance of convertible debt and warrants to insiders, notably including a March 2018 transaction involving the sale of $5.37

16

million in convertible notes and associated warrants at prices significantly below prevailing

market valuations. Plaintiff asserts that these issuances, priced materially below market, were

inherently dilutive, deceptive, and violated FINRA Rule 5210, prohibiting manipulative or

deceptive practices regarding the pricing and issuance of securities. Plaintiff further alleges these

actions violated the principles of fairness, transparency, and full disclosure mandated by the

Securities Act of 1933, as interpreted by established precedents such as:

E. *SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321 (6th Cir. 2013), affirming that deceptive

issuances of securities at below-market value constitute securities fraud under federal law; and

F. *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53 (3d Cir. 2005), affirming liability for

failing to transparently disclose materially insider-favorable transactions executed below

prevailing market values.

51. Plaintiff alleges that TRCH consistently failed to properly document, audit, or transparently

disclose insider-related transactions, explicitly violating internal control requirements outlined in

Section 404 of the Sarbanes-Oxley Act of 2002 (Pub. L. 107-204). Plaintiff asserts these failures

included, among others, inadequate or absent documentation of insider transactions, resulting in

repeated breaches of federally mandated financial disclosure and internal control obligations.

Plaintiff relies upon applicable legal precedent confirming such violations constitute actionable

securities fraud, specifically referencing the judicial findings established in (a) *SEC v.

WorldCom, Inc.*, 2003 WL 22004827 (S.D.N.Y. 2003), recognizing liability for inadequate

internal controls under Section 404 of the Sarbanes-Oxley Act; and (b) *In re Tyco International,*

17

*Ltd. Securities Litigation*, 2004 WL 2348315 (S.D.N.Y. 2003), affirming liability for persistent failures to maintain adequate internal controls over insider-related financial disclosures

52. On March 1, 2020, TRCH presented an Investor Presentation via PowerPoint and email to interested parties, emphasizing the company's assets in the Permian Basin, particularly the Hazel, Winkler and as TRCH's flagship asset, the Orogrande comprising over 134,000 acres with a recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

53. The presentation emphasized the Orogrande project's potential to attract major industry players for acquisitions or partnerships due to its size and resources estimate. While acknowledging market risks, TRCH framed the central question as determining the quantity of recoverable oil rather than its existence.

54. Plaintiff alleges that proxy materials and public statements issued by Defendants, specifically Brda as CEO and McCabe as Chairman, directly violated Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 by containing materially false or misleading statements and omitting essential facts necessary for shareholders to make informed decisions. For example, on or about April 23, 2020, Defendants publicly presented inflated valuations of oil reserves and exaggerated the economic potential of properties such as Orogrande, which later proved materially misleading. Such deceptive communications and omissions distorted investor perceptions, directly violating the disclosure standards clearly articulated under Section 14(a), Rule 14a-9, and reinforced by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976).

55. Plaintiff alleges TRCH, under the oversight of Defendants Brda and McCabe, issued proxy materials and other public statements that prominently featured inflated projections of oil reserves and exaggerated economic potential of the Orogrande. These statements lacked adequate disclosure of substantial geological risks and uncertainties associated with oil extraction feasibility, thus misleading shareholders regarding the true value and risk profile of Orogrande.

56. Plaintiff asserts that as an investor, she was not informed that the geological assessments underpinning TRCH and NBH's asset valuations and projections were prepared by Masterson of Stimulation Petrophysics Consulting (hereinafter referred to as "SPC"), who maintained undisclosed relationships with McCabe. Plaintiff alleges these undisclosed insider relationships constitute violations of transparency and disclosure requirements under federal securities laws. Plaintiff further asserts such nondisclosure materially misled investors, breaching fiduciary disclosure duties and violating established securities disclosure standards articulated in (a) *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), affirming that failure to disclose material relationships affecting asset valuations constitutes securities fraud; and (b) *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), confirming that omission of material facts, such as undisclosed conflicts of interest, violates securities laws by misleading reasonable investors.

57. Plaintiff highlights that the Orogrande Basin reserve estimates provided to investors—approximately 3.678 billion barrels of oil equivalent—implied substantial financial valuations based on the 2019 average market price of West Texas Intermediate (WTI) crude oil. These figures suggested an overall gross valuation ranging between approximately $41.92 billion at full market value and $20.96 billion at a conservative discount (50%). Plaintiff asserts that

19

Brda and McCabe failed to adequately disclose significant geological uncertainties, extraction risks, and inflated economic projections, resulting in a materially misleading portrayal of the project's feasibility and value. This omission of material risks, combined with exaggerated reserve projections and undisclosed insider interests, directly misled investors, constituting clear violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, as further emphasized by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976).

58. Following these acquisitions, TRCH faced significant financial distress, as evidenced by disclosures in multiple SEC filings prior to the Reverse Takeover (RTO). Plaintiff believes Defendants Brda and McCabe strategically orchestrated an RTO by coordinating the issuance of Series A Preferred Shares ("MMTLP"), conducting an At-The-Market ("ATM") offering, and merging with a financially unrelated Canadian company, Meta Materials, Inc. ("MMAT I"). Given the complex regulatory processes typically required for these transactions, Plaintiff asserts these simultaneous maneuvers strongly suggest premeditated planning rather than coincidence.

59. Plaintiff further alleges serious failures by SEC and FINRA regarding the regulatory oversight and due diligence obligations concerning TRCH's simultaneous execution of complex corporate transactions, including the RTO with MMAT I, an ATM offering, and the creation of Series A Preferred Shares ("MMTLP"). Each of these transactions individually requires extensive documentation, stringent financial reviews, disclosures, and regulatory approvals, processes typically taking months of thorough regulatory scrutiny. Despite this, the SEC and FINRA inexplicably permitted TRCH to complete these sophisticated and paperwork-intensive financial maneuvers nearly simultaneously, seemingly without the rigorous regulatory oversight

20

mandated under the Securities Act of 1933, the Securities Exchange Act of 1934, and FINRA's
own Rule 5110 governing corporate financing transactions. Plaintiff emphasizes that the
compressed timeline and coordination required for an ATM offering, creation and issuance of
MMTLP shares, and the finalized RTO strongly suggest substantial pre-planning and
coordination—facts overlooked or ignored by SEC and FINRA regulators. These regulatory
bodies failed to fulfill their statutory duties to ensure market transparency, fairness, and investor
protection, as clearly mandated by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), which
underscores the obligations of regulatory agencies to diligently enforce securities law to prevent
fraud and deceptive practices. The SEC and FINRA's apparent lack of scrutiny and regulatory
rigor permitted Brda and McCabe to execute their well-timed exit, directly contributing to the
financial harm suffered by shareholders.

60. The average regulatory timelines for these transactions illustrate clearly that significant
advance planning would have been required: An RTO typically takes 3 to 6 months to complete
due to rigorous audits, reviews, and SEC filings. Creating and issuing a new class of preferred
stock generally requires 2 to 4 months of preparation, legal compliance, and regulatory approval.
Likewise, ATMs usually demand 1 to 3 months of regulatory filings and approvals. Therefore,
the near-simultaneous timing of TRCH's RTO, the creation of the MMTLP preferred shares, and
their ATM offering strongly suggests intentional premeditation and coordinated strategy rather
than coincidence.

61. What is so egregious to Plaintiff is that SEC was very aware that TRCH was engaging in acts
of market manipulation.  Plaintiff has in her possession an email from Jeff Davies dated July 12,
2019. This email is between himself and 3 enforcement agents at SEC. The email reads, Subject

21

Torchlight To: Eric Werner, CC: Reece, David B., Cain, Kimberly it reads, "Weird how Torchlight spikes at the end of the day all the time. I'm sure that's not manipulation. John Brad the CEO hardly ever takes a cash salary and never sells the stock the pay him in. Must be independently wealthy, from his prior frauds. Once again, never been short, never worked with any short. Huge waste of my time and expertise to try and unravel this fraud. This is a layup. Retail, repeat offenders, gate keepers, social media. $150 million enterprise value now, for a company worth less than $0. This is going to feel like Miami Herald and Epstein when this finally implodes. Everyone knew but didn't care. Regards, Jeff."

62. An excerpt from *SEC v. Brda and Palikaras, Civ. Action No. 1:24-cv-004806* Filed June 25, 2024, "To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("Preferred Dividend"). Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock." Plaintiff would certainly have liked to have seen a case such as this filed back in 2021 or 2022 before purchasing her first shares of MMTLP.

63. These executives took further action and deceptively promoted the Preferred Dividend. They did so through private communications with select investors and third-party consultants, intending these parties to disseminate their misleading narrative.

22

64. Upon information and belief Brda and McCabe paid undisclosed stock promoters and strategically leveraged social media influencers to further amplify misleading expectations about the value of the assets, significantly influencing investor decisions and inflating the stock's value artificially.

65. In June 2020, Brda and the TRCH BOD resolved to pursue a strategic initiative aimed at stabilizing the company through a reverse take over with MMAT I, a corporation focused on advanced technology innovations.

66. The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action represented a pivotal shift for both companies, laying the groundwork for the creation of MMAT II and signaling a new strategic direction for TRCH shareholders.

67. Shareholders were led to believe that the merger between TRCH and MMAT I would provide a pathway to resolve systemic challenges posed by illegal short positions while transitioning the company toward a future in high-tech innovation. This narrative was a central aspect of the merger's presentation to investors.

68. On December 14, 2020, TRCH, a Texas-based oil exploration company, formally initiated a merger plan with MMAT I, a Canadian high-technology materials firm. The proposed merger was framed as a strategic opportunity to align TRCH's traditional energy assets with MMAT I's cutting-edge technology portfolio. As part of their scheme, the executives also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of TRCH stock. In TRCH's public filings and proxy statements, Brda made false and

23

misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening.

69. From January 1, 2021, to June 21, 2021, TRCH traded a total of 3.6 billion shares— an unprecedented volume compared to the company's cumulative trading history of 745 million shares over the prior decade. This dramatic surge in trading activity raised significant concerns about unusual market behavior and potential trading irregularities.

70. When TRCH stock price began to surge, Brda wrote to MMAT's CEO, Palikaras: "We have two days to take advantage of the squeeze[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering. Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the last minute ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the MMAT which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus for the ATM Offering.

71. Plaintiff believes Brda and McCabe, privately and selectively disseminated—through paid consultants, private conversations with investors, and via social-media messages—the theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers to cover their positions before Torchlight issued the Preferred Dividend or risk violating their short contracts by having difficulty delivering the Preferred Dividend when the merger closed. Plans for a short squeeze were not found in the public filings.

24

Docusign Envelope ID: 6C651456-B366-43A9-AE1A-4698E7081BB0
Case 24-30742-mbk Doc 1878-4 Entered 04/23/25 14:13:25 Page 41 of 279
Case 24-30742-mbk Doc 1878-4 Filed 04/23/25 14:13:25 Page 41 of 278

72. A Z-test statistical analysis was conducted on July 14, 2024, to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021. The analysis assumed an average daily trading volume variation of 5% over 10 years. It concluded that trading 3.6 billion shares in TRCH within the six-month period from January to June 2021 was statistically improbable without market manipulation or unpredictable, non-uniform events influencing the market.

73. Brda succeeded in his aim to manipulate the price of TRCH stock in the days leading up to the closing of the RTO. Before the merger was announced, TRCH stock was trading below $1.00 per share. As a result of the Brda's scheme, TRCH's stock price sharply rose during a ten-day period between June 14–24, 2021 from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

74. Upon the completion of the RTO, shareholders would receive one share of MMLTP for each share of TRCH (representing the oil and gas assets) and a half share of MMAT II.

75. The RTO was complete. Everyone who held TRCH had been told that the Series A Preferred Share was simply a placeholder. The dividend represented your share in the sale of the oil and gas assets. Not long after the RTO completed, shares of MMTLP started trading, leaving many TRCH shareholders angry. This was supposed to have been a thank you for holding your TRCH shares through the RTO. Something only select investors were offered.

76. Immediately, Brda took some heat as he remained on social media on X. The issue was that folks wanted Brda to explain why their dividend was trading. Brda, along with Palikaras,

publicly asserted that the trading of MMTLP commenced without their knowledge or authorization.

77. When asked how and why the shares began trading, in a recorded space call, Brda told shareholders that it wasn't his fault, yet with the same breath of air, he stated that there was a mistake in his paperwork. He states unequivocally that MMTLP began trading because of one tiny word. That word was "Transferrable."

78. Plaintiff asserts that this was a meticulously planned and executed strategy, deliberately utilizing vague or misleading language within regulatory filings, designed specifically to enable unauthorized trading, artificially inflate shareholder expectations, and ultimately facilitate significant personal enrichment of company insiders at the direct expense of retail investors. Such deliberate misuse and manipulation of disclosure language directly violates SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) and fundamental anti-fraud provisions established under Section 10(b) of the Securities Exchange Act of 1934, as affirmed by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).

79. According to proxy materials, as well as an OCC memo, MMTLP was "supposedly" never meant to trade. It was simply a placeholder to represent the oil and gas assets. Upon the sale of the assets, shareholders would receive a dividend. However, if the assets were not sold, then MMAT II would spin off the oil and gas assets into NBH.

80. Brda now needed an enhanced narrative. TRCH shareholders were angry and he needed positive retail sentiment if he was to obtain a second squeeze scheme. The original narrative led

26

investors to believe that systemic shorting would be addressed by issuing the dividend just like Overstock. He simply needed to double down.

81. The social media push on X was difficult to miss. It seemed no matter what direction Plaintiff listened, all she heard was a lot of talk about MMTLP. As Plaintiff did not begin to buy until October 2022. In any event, the message heard by Plaintiff was multi-faceted.

82. The primary narrative disseminated by Brda and McCabe and their undisclosed paid stock promoters emphasized a supposed "short squeeze," suggesting a scenario where short sellers urgently needed retail investors' long-held MMTLP shares to cover and close their short positions. Plaintiff contends this narrative intentionally misrepresented the scarcity and unavailability of shares available to borrow or locate, potentially fabricating or exaggerating the magnitude of existing short positions. Such conduct constitutes deliberate market manipulation and violates Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and Section 9(a)(2) (15 U.S.C. § 78i(a)(2)), prohibiting misleading statements designed to artificially influence market perception and stock valuation. Courts have explicitly recognized this behavior as fraudulent manipulation under federal securities laws, including; *SEC v. Reynolds, 2008 U.S. Dist. LEXIS* 65669 (N.D. Tex. 2008) holding that intentionally deceptive or undisclosed activities intended to manipulate market conditions, including secret payments to promoters, constitute actionable securities fraud under Section 10(b) and Rule 10b-5. *Southland Securities Corp. v. Inspire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) holding that intentional or reckless misrepresentation and material omissions intended to manipulate securities prices violate Section 10(b) and Rule 10b-5.

27

83. Further, undisclosed promotional activities constitute material omissions and deceptive practices prohibited under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Courts have specifically ruled such conduct illegal: *SEC v. Reynolds, 2008 U.S. Dist. LEXIS 65669 (N.D. Tex. 2008),* holding undisclosed payments to promoters constitute actionable securities fraud when used to mislead investors.

84. To demonstrate concretely how these deceptive market manipulation strategies were executed, Plaintiff highlights the critical role played by undisclosed paid stock promoters, commonly known as "social media pumpers" who systematically spread misleading narratives across various platforms.

85. These influencers deliberately and repeatedly amplified claims regarding the alleged scarcity of MMTLP shares and the urgency of a supposed short squeeze, directly impacting investor sentiment and decisions. Plaintiff provides specific examples illustrating how these pumpers strategically coordinated their activities, effectively manipulating market perception to the benefit of Brda and McCabe and causing substantial financial harm to Plaintiff and other like retail investors.

86. On information and belief, Plaintiff believes Brda and McCabe used undisclosed, paid, social media stock promoters to pump the stock, such as John Does 1, 2, 3, 4, 11, 12, 13 & 14 and Jane Doe 1. As well as undisclosed, paid, proxies such as John Does 2, 3, 5, 6, 7, 8, 9, 12 & 14 and Jane Doe 2, 3, & 4.

87. During the run up in MMTLP during the last week of trading, Brda told people with Fidelity exactly how to place a trade through their trade desk. Fellow investor Jennifer Vetrano followed this advice and purchased shares.

88. The narratives were convincing and used fear to drive retail behavior. We were told many times, "Diamond hands" and "know what you hold." Driving retail to believe that these shares, Plaintiffs shares included, were extremely valuable.

89. Plaintiff further emphasizes Brda and McCabe's coordinated use of multiple social media influencers, all disseminating identical narratives simultaneously, with Brda regularly reinforcing these messages through public endorsements. For instance, in a recorded social media event known as a "space call," Brda openly remarked that he intended to review the videos created by the influencer "Birdlady," explicitly noting they appeared accurate and trustworthy. Such public endorsement from TRCH II's former CEO implied insider knowledge that retail investors lacked, reinforcing investor confidence in holding shares. Plaintiff recalls influencers frequently declaring that MMTLP would provide "generational wealth" and promised returns "beyond investors' wildest dreams." These coordinated statements leveraged fear tactics as well, warning retail traders that short sellers would intentionally "hunt" for stop-loss orders to manipulate stock prices lower. Plaintiff personally acknowledges that these pervasive messages directly influenced her decision to abandon her usual investment safeguards, notably removing stop-loss protections on MMTLP shares. This strategic manipulation of investor behavior through social media influencers, amplified by Brda's explicit validation, constitutes deliberate deception and violates anti-fraud provisions outlined in Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5).

29

90. John Doe #18 a stock pumper who used a graphic "Torch the Short." "Regarding short attacks (4 in total) today 911,414 shares 3.34% of volume. Please do not set stop losses on MMTLP. FINRA has not approved it yet, when approved DTC will have the go ahead from FINRA to send  Corporate Action notice to all brokers. Countdown Continue Trading days remaining 7 Trading hours remaining 45.5 hours."

91. Plaintiff's belief regarding mandatory short position closures was not only shaped by extensive social media communications but notably reinforced by direct public statements from Defendant Brda himself. Specifically, Brda publicly asserted that short positions in MMTLP could not legally persist into NBH because private companies, such as NBH, cannot have publicly traded short positions.

92. Plaintiff believes that Brda and McCabe inflated stock prices by use of paid social media influencers to pump the stock prior to the halt. Post halt, Plaintiff believes that these Defendants used paid social media influencers to disseminate a narrative to MMTLP shareholders post halt. These influencers seemingly rose to the top of the pyramid of a newly minted community of several thousand MMTLP shareholders. The permanent message, repetitively disseminated over a two year period, was to only focus our attention on the regulators and Congress, but never the Defendants. They have provided a constant stream of protection, thus insulating the Defendants from scrutiny. If anyone, such as the plaintiff did, so much as has an independent original idea that veers from their narrative, that shareholder is shamed and bullied in front of the entire community. This is done to send a clear message to other shareholders in the community, that if you step out of line, this is what we'll do to you too. In this manner, the Plaintiff was made an example of.

30

93. On June 15, 2021, John Doe 4 an influencer and consultant to Nextbridge Hydrocarbons on X, stated, "The OroGrande asset holds 3.7 billion barrels of oil. It's no joke. It's proven." He further wrote, "The special dividend will likely pay out between $10.00 and $20.00 per share. OroGrande has 3.7 billion bf reserve with oil at $70+ it's a slam dunk."

94. On information and belief, plaintiff assets there is a promissory note dated 2/29/2024 between John Doe 4 & McCabe &/or NBH. John Doe 4 is a consultant to NBH under the leadership of Greg McCabe and is currently receiving $10,000 a month for consultant fees.

95. The promissory note specifies that NBH unconditionally promises to pay CAPCO Holdings, Inc., a Texas corporation, the principal sum of $2,000,000, together with accrued and unpaid interest at a rate of 12% per annum. The note is secured by certain assets of NBH, as detailed in the agreement.

96. This note also references a consulting agreement executed between John Doe 4 and the company for $10,000 a month but specific details regarding his role or contributions have not been publicly disclosed, even when explicitly requested by shareholders.

97. On April 23, 2024, Aaron Chow, also known as Elephant Analytics on X, alleged that John Doe 4, doctored spreadsheets from the Texas Railroad Commission and posted them on April 20, 2020. These posts were purportedly intended to raise confidence and bolster interest in the Orogrande Asset, which would later become part of NBH through the Preferred Dividend that evolved into MMTLP and NBH.

98. Aaron Chow's post on X clearly displays a standard query from the Texas Railroad Commission indicating that the oil quantity from Orogrande wells is 0 units. In contrast, John Doe 4's displayed query from the Texas Railroad Commission shows 1,926 units.

99. Wes Christian was publicly involved with Flamethrower, alongside Brda, in efforts to uncover evidence of alleged naked short selling in MMTLP. However, there is no public record indicating that any claims of illegal activity were formally identified or brought before a court of law between March 2023 and the present. In Plaintiff's belief this was a distraction for shareholders of MMTLP.

100. On December 13, 2022 the SEC filed charges against eight individuals associated with the Atlas Trading group for their involvement in a pump-and-dump scheme, which included manipulating the stock of Torchlight Energy. The defendants, including Zack Morris (Edward Constantin), Perry Matlock, and others, allegedly used social media platforms to promote stocks, including Torchlight, to inflate their prices before selling their shares for substantial profits. The scheme reportedly generated around $100 million in profits. In total, the TRCH Participants' profits on TRCH from February 10 through February 23, 2021 were $288,603 for Hennessey; $336,138 for Matlock; $148,131 for Deel; and $2,757 for Knight. The case number for the SEC's complaint against the Atlas Trading group is 22-CV-221.

101. As early as 2019 John Doe 3 worked for Blackbox Stocks, a company that describes itself online as the ultimate platform for traders, offering trade execution, analysis, and community chat all in one place without switching between multiple websites. In 2020 Blackbox announced an integration deal with Tradestation that enabled Blackbox users to trade stocks and options via Tradestation without ever leaving the Blackbox platform. The Blackbox stocks Youtube channel

Docusign Envelope ID: 6C651456-B864-43A9-AE1A-1698E7021FB0

had 11.6k subscribers and 121 videos. In May of 2019, John Doe 3 was working for Blackbox and had recorded Youtube videos on the channel. His alias was Andrew McDeggins or Mr. McDeggins. He used the logo for the Blackbox stocks to create a very visually similar emblem on Stock twits under MrMcDeggins and on X/Twitter as @Freecommercials, @KarmaCollects and used these platforms to draw in his followers and manipulate markets pertaining to MMTLP and MMAT. From his Stock twits profile you can see he was coordinating with John Doe 1 and retweeting John Doe 1's posts and commenting on them. On March 13, 2022 he posted on Stock twits about "Blackboxstocks is offering the nuttiest special ever. 5 Bucks for a month. That's insane. If you're a day trader, you NEED to give it a shot. You'll never want to trade without it again." He hashtags both Blackbox stocks as well as MMTLP and MMAT tickers. On July 11, 2022 he uses his stock twits account to say, "I haven't chimed in on this at all but wouldn't it be HILARIOUS if everyone holding $MMTLP used their dividend payouts to SHORT $MMAT because they're all pissed off at @Palikaris &amp; Company for stringing them along all this time? Just thinking out loud." He says on Stock twits on 12/8/22 as he retweets John Doe 1's tweet, "I too expect gap down on open to grab as many shares as they can, and for them to drive prices down as hard as possible. Then, VIOLENT swings between Fri &amp; Monday. 5-10." This was the day before the U3 halt on MMTLP stock. He also tells his followers on Stock Twits in another post that, "I just called a securities attorney that I'm close with, and even he said he has never seen anything like this before. He said he THINKS the TRCH shorts would have no choice but to cover." In the plaintiff's view this seems to allude to the fact that John Doe 3 is leading his followers to believe that the TRCH shorts covering would trigger a short squeeze of the stock. In 2023 John Doe 3 pivoted on social media to X/twitter where he created multiple

33

accounts where he hosted over 1369 hours on X/twitterspaces according to an IT script run on X/twitter. In one tweet on or around 8/7/24, he says to Brda, "$MMTLP Hey @johnbrda based solely on actions that NBH has taken by retaining @johnnytabacco, and is currently taking by getting current, combined with what they've stated in PR's, do you believe that they have a plan to at least attempt to deliver some kind of resolution? I do." Brda responds, "I do." In the plaintiff's view he used his various profiles on the X/twitter platform to write scripts on a narrative that would encourage his followers to write and call Congressional members and ultimately distract them from taking any legal action for MMTLP and to act as a proxy for Nextbridge Hydrocarbons andBrda.

102. Prior to the U3 halt of MMTLP JOHN DOE 1 utilized stock twits in an attempt to influence the market for MMTLP. He claims to have a goal of 10 million MMTLP shares and a friend with at least 7.5 million MMTLP shares. He says that these shares are not original TRCH preferred shares and he claims to buy shares and manage 20 different MMTLP accounts for multiple companies in order for him to not be considered a 5% holder. John Doe 1 claims to have insider knowledge.

    a. Brda tweets on 2/6/23 he had a nice chat with John Doe 3 and John Doe 1. Also says, "Wanted to let everyone know all our conversations have always been straight up and helpful. Never nefarious. Likely my fault for not paying attention to this issue, super busy. Let's all just stay pos. and focus on the prize."

    b. John Doe 1 utilizes stock twits to send messages to his followers on October 12, 2021, "$MMTLP know what you own….you have preferred "A" stock not standard….there are

34

a lot more rules and guidelines that they must adhere to…They need the preferred stock to pay the short position in full by December 2021. Hold. Hold and hold and you will be paid one way or the other."

c. John Doe 1 utilizes stocktwits to send messages to his followers on October 9, 2022, "my avg is 1.43 and my friend has 16 million shares. I call over 100 per share easy…my hedge fund inside says they are scared and calling for 150 to 175…can you imagine that with my share count…and what everyone holding long will make!!!! The trick is everyone is going to have to hold and not give in to weakness as their account is shooting up! Takes a lot of stamina to hold!"

d. John Doe 1 utilizes stock twits to send a picture to his followers on February 9, 2022 of himself in front of a large plane and says, "looks like one of mine citation."

e. John Doe 1 utilizes stock twits to send another message to his followers on March 11, 2022 that reads, "@ramensoups @chavy45 I guess the truth hurts you should be careful of what you say and who you say it to and there are people in this world that have a lot of clout that can find out a lot of things that unnecessary you don't want to put out there! So but out and get off peoples back and quit spreading fud and go to another stock…Or is your way blocking me the way you deal with things…."

f. John Doe 1 utilizes stock twits on September 9, 2021 to reply to someone named @prince_of_persuasia saying "just like you called John Doe 10 full of shit too…he's my partner."

g. An account on X called @Ceopumpers doxes John Doe 1 as having a felony

conviction for sexual exploitation child sell/publish on March 9, 2023.

103. Between 9/21/22-9/9/22/22 John Doe 10 utilized Stock twits to tweet the following

posts;

> h. "$MMTLP #2 reporting in. I will be buying a small country when this plays out. 1.58
> million shares x $65=what? Stay strong. Will will be rich. Brda is the real deal. Had
> drinks with him in my backyard. Set your sell orders high. Stay strong. Rocket soon. Will
> Stuart in Cali."

> i. $MMTLP I will be fighting with the shorts to buy more as the bake sale comes to an
> end.

> j. $MMTLP this is your #2 shareholder reporting back (17.8 million shares). TD
> Ameritrade just stopped my ability to purchase more shares because I would not lend or
> sell my shares. They have been bugging me over the last few weeks to "play ball with
> them" by lending or selling my shares. Other fellow holders have given me a similar
> story. Bottom line, this tells you there are not enough shares to clear TD's books. This
> also explains why the limit "ask"continues to rise and is now above $350. They are doing
> this to understand the cost for the shares that they need to close out shorts, if necessary.
> IMO do not lend out shares and do not set limit sale orders with stops or trailing stops.
> The stock price will start to move violently up and down in an attempt to shake your
> confidence and grab your shares. Know what you hold. Go for the gold. This is not
> financial advice, just one person's opinion. Good luck to all. Stay strong."

36

104. Prior to the U3 halt of MMTLP Jane Doe 1 utilized Stock twits, YouTube and Twitter in an attempt to influence the market for MMTLP. She claims to represent a group of people with five million shares of MMTLP each. In direct messages with another influencer she also claims to have "a bunch of NDAs signed." She also says, "Why would this group I represent now get to meet with executives if the MMTLP they bought was fake?' She also claims that this group is not on the Meta Materials side. This influencer has made multiple videos on MMTLP and has influenced 7.17k subscribers with her marketing messages and false valuations of the Orogrande assets.

105. Brda attended a recorded X space call and relayed to influencers that his former SEC attorney told him, "there is nothing good that is going to happen by you reporting any of this to the SEC…. instead of looking at the shorts they are going to question everything you've ever done with the company."

106. Brda attended a recorded X space call and relayed to influencers that "my theory is MMTLP would've never happened had the books been fully balanced on the dividend date. So the brokerage houses, the prime brokers, and the hedge funds never cleared their positions."

107. Brda attended a recorded X space call and relayed to influencers that "I think there is a decent size short in MMTLP." "What you are going to see is that, this is my personal opinion, some brokerage houses are going to deny people to be able acquire MMTLP and they are going to say just like Robinhood did, sell only… Which is going to create all kinds of problems in MMTLP when the dividend is issued."

108. Brda attended a recorded X space call and relayed to influencers that he "has started to watch Jane Doe 1's videos, he gets distracted but one of these days I am going to watch them. Some other people have called me and recommended that I watch them."

109. Brda uses the X platform to tweet that hedge funds used old data from TRCH to get trading started for MMTLP. "The MMTLP profile is from 2012. This smells like nefarious from people who are not good people."

110. NOBO lists (Non-Objecting Beneficial Owner) are lists of shareholders who do not object to

having their identity disclosed to the company.. This allows the company to directly communicate with them. Generally, access to a NOBO list is restricted to current company employees, specifically those authorized to request it, such as officers or designated representatives. Ex-executives typically do not have the right to access this information once they have left the company.

> a. Brda tweets on June 14, 2024, at 1:15 pm "$MMTLP Hearing about a bit of confusion regarding Andrew and whether or not he is a shareholder. I do see him on the nobo list on June 2022 for 9,000 shares. So that should clear it up.

> b. John Doe 2 utilizes X and tweets on July 23, 2023 "I was assisting @johnbrda with European NOBO list holders' information. You can ask him directly. He will concur."

> c. Brda tweets on December 30, 2023, at 4:18 pm "$MMTLP just checked the NOBO list for TradeStation on June 1, 2022. TradeStation had 396,870 shares with a NOBO registration (shareholder not objecting) to give their info to the company on this date. The

38

bulk certificate issued to TradeStation is below. 122,622 shares on their bulk certificate. This does not include OBO shares and certainly with six months of trading it could have changed. Just giving you info."

111. Jane Doe 2 appeared more than twenty times referenced that she was privy to inside information regarding Nextbridge Hydrocarbons and MMTLP and investigations, but she appeared on social media (X) after the U3 trading halt. It is the plaintiff's view that this person utilizes her X profile with over 7200 followers to host spaces influencing followers not to investigate McCabe, Brda, and other individuals associated with NBH. She advised shareholders online to transfer their shares to AST (now Equiniti) trust company and encouraged them to do it for a "share count" but then at times would attempt to distance herself from any advice after making repeated pleas for MMTLP cusip holders to transfer even at the shareholder's cost into AST. Based on an analysis of IT script data for X, space calls related to MMTLP stock, Jane Doe 2 has hosted 1108 hours and 30 minutes with thousands of listeners discussing the MMTLP fiasco and has been a stalwart defender of McCabe and Brda even after the loss of the leases to malfeasance from University Lands in October 2024 due to the failure of Nextbridge Hydrocarbons to pay royalty payments to University Lands the prior 5 years and the outright fraud uncovered in that the Orogrande oil fields at the heart of this litigation hold, not oil.

112. Based on an analysis of IT script data for X, space calls related to MMTLP stock totaled 10,617 hours and 50 minutes including; Jane Doe 1, Jane Doe 3, John Doe 3, John Doe 5, John Doe 6, John Doe 7. Many influencers had hosted spaces with hundreds or thousands of people as follows; Jane Doe 2 completed 1108 hours and 30 minutes discussing the MMTLP fiasco, John Doe 5 completed 722h and 1minute discussing MMTLP fiasco, John Doe 3 completed 349 hours

and 43 minutes on his first profile and 1020 hours and 7 minutes on his second profile on spaces

discussing MMTLP fiasco, Jane Doe 3 completed 332 hours and 32 minutes on spaces

discussing MMTLP fiasco.

113. A financial market expert, and X social media influencer, Dave Lauer commented on X in

regards to the "MMTLP community." He stated that "I don't understand when MMTLP became

conflated with fair markets. The MMTLP community is the most abusive, toxic online

community I have ever encountered. I have never encountered so much hate and negativity." In a

separate post on X on 6/13/24 he states, "Because the last time I tried to help MMTLP investors I

received death threats and the most horrific abuse I've ever been subjected to. I tried, you folks

do not want my help, and that's fine." Dave Lauer is a Market Structure and Technology

Architecture Consultant. His most recent work includes public policy with Better Markets and

technology architecture with IEX, a new equity market. Previously, he worked as a senior

quantitative analyst at Allston Trading and Citadel Investment Group. Dave Lauer has 199.1K

followers on X/twitter. A link to his media profile is as follows https://linktr.ee/dlauer

114. Plaintiff asserts that the aggressive promotion by undisclosed stock promoters, reinforced by

explicit public endorsements from Brda, directly set the stage for the abrupt and unauthorized U3

trading halt imposed by FINRA. These social media pumpers strategically and repeatedly

assured retail investors that short sellers would be forced to close their positions by December

12, 2022, dramatically heightening investor anticipation of a lucrative short squeeze event.

115. From October 1, 2022, to December 8, 2022, MMTLP stock experienced significant

volatility, with prices ranging from a low of $2.85 to a high of $12.50, raising questions about

potential market manipulation.

40

116. During this period, the market capitalization of MMTLP, a relatively obscure oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

117. Given the company's total authorized share count of 165.5 million, this level of market capitalization and price volatility suggests the influence of illegal short selling on the stock.

118. On 10/11/2022 Brda tweeted "This just in. Expect some volatility this morning. Another 550K shares borrowed.  Soon there will be none left." He also tweeted, "With Fidelity, you have to phone it into the fixed income desk.  You can sell online, but only buy via a phone call, last I heard." Plaintiff Vetrano, who filed a claim similar to this complaint, stated that she did follow his instructions to call buy orders of MMTLP at Fidelity via the trade desk.

119. Early social media statements by Brda related to shareholders that he hadn't sold any of his MMTLP position.  However, between November 15 and December 5, 2022, Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price ranged between $2.90 and $9.90, generating proceeds estimated between $870,000 and $2,970,000.

120. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt, contradicting his earlier public statements. In fact when someone finally put him on the spot, he sported an air of "how dare you" attitude. I believe he said something such as, I don't work for the company, I have the right to sell just like any one else. True, except we didn't tell you to hold while we sold.

121. On November 30, 2022, McCabe sold 35% or approximately 6.77 million shares of MMTLP from his total holdings of 18,758,249 shares, representing 11.37% of the float. Making up 30% of all volume. On that date, the trading price ranged between $7.76 and $10.00. Based

41

on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000.

122. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.  Under the U.S. Securities Exchange Act of 1934, SEC rules regarding Beneficial Ownership Reporting and Section 16 Reporting, McCabe was required to file a Form 4 report within two days from these share transactions. The plaintiff has not seen mention on any filings of such a document.

123. @Broncho24 made a solid point.  "Assume (MMTLP) it was worth $100/share, that's more than half billion $ left on the table by McCabe.  If the assets had any value he could have raised money easily with a PA or found an Operator to front drilling costs. He also removed his working interest position swapping for shares shortly after which anyone in the industry will tell you is a huge sign of no confidence."

124. @Broncho24 further says, "Brda was used as a mouthpiece to tell retail investors to hold & FINRA was at fault but Brda sold 300K shares but had received a $1.5M bonus months prior. Brda essentially left +$25M on the table if the $100/share was accurate to make sub $2M. They profited massively  on a ZERO but even if it has a small value McCabe  is the senior debt holder and will get paid back on any sale of assets even if it's a few million but investors get nothing."

125. On December 7, 2022, both FINRA and MMAT II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022. The corporate

42

action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

126. On December 7, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA- approved corporate action. Mendl confirmed that MMTLP would no longer be available for trading on the OTC market starting December 13, 2022, and that the shares were planned to be "deleted" following that date.

127. On December 8, 2022, FINRA failed to attend a scheduled meeting with the DTCC and attorneys representing MMAT II to address unresolved issues surrounding the MMTLP corporate action.

128. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the previous notice that indicated MMTLP shares would be "CANCELED" upon.

129. In an affidavit signed by Palikaras, he states that these changes came with express instructions from FINRA that the issuer, MMAT II, accept it as is and make no edits. Plaintiff now views this act as a preemptive glance at exactly what caused the U3 Halt. Eventually FINRA claimed there were settlement issues where prior to these changes, none were found.

130. This revision omitted the originally specified December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

131. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code. This is commonly referred to as short on shares or S.O.S. to signal a heightened urgency to close their positions. The data showed transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (e.g., $290.00+ per share), an extraordinary deviation indicative of a severe short squeeze.

132. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, impacting shareholder ability to access or execute transactions.

133. Many MMTLP traders, including the Plaintiff, held their shares with the intent to execute opportunity trades—to sell rather than buy—on December 9 and 12, 2022. These shareholders were prepared to accept the best possible offers for their trades before the close of all trading on December 12, 2022, as specified in the approved corporate action referenced above.

134. A series of emails obtained through a Freedom of Information Act (FOIA) request revealed that SEC and FINRA were aware of a problem with MMAT & MMTLP a year before the halt.

135. On November 29, 2021 recipients Mr. Sam Draddy and Ms. Patti Casimates, both of FINRA were identified in an email that stated, "I believe it was Patti Casimates from our Market Ops group who reached out to (Redaction) I have included her on the email so you can reach out to her directly. Hope all is well! Sam."

136. On December 2nd, 2022, just one week before the halt, another FOIA revealed in a second email Mr. Richard Boyle and Mr. Jay Gibbons of FINRA. Two names were redacted in the To: line. The subject line is MMAT & MMTLP/Next Bridge Hydrocarbons, Inc. It states, "Good morning (two redacted names), I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market Fraud Investigations team recently received several times that appear to have also been sent to the SEC. Below are some proposed times to discuss but we can work around your schedules if these don't work for you. Thanks. Rich Boyle."

137. In a third FOIA obtained email, on Monday, December 5th, at 9:07am just 4 days prior to the U3 Halt, Mr. Sam Draddy of FINRA wrote to 5 individuals, Richard Boyle FINRA, and Jay Gibbons of FINRA as well as 3 SEC employees whose names were redacted. Subject line Inquiry. Email contents, "(redacted name), looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office-but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak. If you think a comparison of notes is worth a quick call-let me know a good day/time. I can set up a zoom and feel free to let me know if (redacted names) or anyone else should be included. Thanks (redacted names) Sam. Yet the investing public were never notified of these concerns. Plaintiff for example, purchased shares between 12/5-12/8/2022. Then again, they knew in 2021.

45

138. On July 19, 2023, Plaintiff personally contacted the SEC's FOIA department and spoke directly with Aaron Taylor, who identified himself as a Branch Manager. Plaintiff inquired about two FOIA requests she had previously submitted regarding MMTLP, both of which had been stalled for months with the status "In Process." Plaintiff explained that after sending email inquiries on July 18, 2023, she received abrupt, back-to-back denials the very next day. During the call, Taylor acknowledged familiarity with the MMTLP situation, stating explicitly that the SEC had been inundated with FOIA requests, causing significant backlogs, and further admitted, "we are not filling any requests related to MMTLP." When Plaintiff challenged this claim by mentioning a fulfilled request from another investor named Howard, Taylor conceded, stating that Howard's request had inadvertently been processed. Taylor then said, that's when we opened an investigation.  Immediately followed by pleas not to repeat this information. Plaintiff then questioned Taylor regarding the specific denial code used—Exemption 7(A), typically employed when releasing information might compromise an ongoing investigation. Taylor confirmed that exemption 7(A) indeed requires an active investigation, yet paradoxically added, "But I'm not saying there is an open investigation," and proceeded to laugh, further reinforcing Plaintiff's perception of misconduct, lack of transparency, and deliberate obstruction by the SEC.

139. These emails along with Plaintiff's own experience, provide insight into regulatory awareness of market irregularities leading up to the FINRA-imposed U3 trading halt. Additionally, the final email from the Fraud Department makes mention of "Blue Sheets" another hot topic and often cried for, yet always denied.

140. Plaintiff emphasizes the critical importance of obtaining Electronic Blue Sheets and CAT Data to quantify and substantiate allegations conclusively, arguing these records constitute

46

essential evidentiary components that regulatory entities improperly withheld, obstructing justice and investor recourse.

141. FINRA's indefinite and unexplained implementation of the extraordinary U3 trading halt on December 9, 2022, abruptly terminated all trading of MMTLP shares, causing immediate and lasting financial harm to Plaintiff and similarly situated investors. FINRA provided no transparent justification, failed to audit or reconcile share discrepancies, and offered misleading or incomplete information to investors, violating fundamental statutory duties of transparency and due process.

142. Electronic Blue Sheets ("EBS"), which broker-dealers submit to regulators such as FINRA and the SEC, provide detailed trade data including the identities of parties, share quantities, prices, and trading times. EBS data are critical tools for reconstructing market activity and identifying misconduct such as illegal short selling or other manipulative trading practices. 142. The failure of FINRA and the SEC to disclose or utilize EBS data, despite clear indications of irregularities, significantly undermined regulatory transparency and accountability. This regulatory negligence enabled Defendants' market manipulation schemes to persist unchecked, causing substantial harm to Plaintiff and other retail investors.

143. Despite Plaintiff's extensive and repeated efforts to obtain clarity—including numerous appeals to SEC and FINRA Ombudsmen and multiple members of Congress—both agencies persistently failed to produce any substantive explanation, meaningful resolution, or audit of the trading discrepancies tied to MMTLP. The ongoing refusal to provide EBS or Consolidated Audit Trail ("CAT DATA") reflects regulatory negligence and deliberate disregard of statutory obligations to investors, including Plaintiff.

47

144. Plaintiff highlights that the indefinite and unexplained FINRA U3 trading halt disproportionately affected retail investors by permanently trapping their shares in an illiquid state, while simultaneously shielding institutions holding illegal short positions from mandatory buy-to-cover transactions. Such differential regulatory treatment underscores significant statutory violations and raises fundamental constitutional concerns regarding equal protection and due process.

145. Plaintiff highlights that following the abrupt U3 halt, FINRA issued multiple FAQs containing incomplete, misleading, or inaccurate information without providing a transparent justification or audit addressing outstanding share discrepancies. FINRA and the SEC failed to respond meaningfully despite repeated inquiries by Plaintiff and nearly 100 members of Congress. Plaintiff diligently pursued administrative remedies, repeatedly contacting the SEC, FINRA, their respective Ombudsmen, and elected representatives. However, these extensive efforts yielded no substantive investigation or resolution, demonstrating that administrative remedies have been exhausted. This ongoing lack of regulatory accountability continues to disproportionately harm retail investors, who remain trapped in non-tradable shares, while institutional entities holding illegal short positions escape accountability. Such regulatory disparity highlights significant constitutional and statutory violations, undermining essential investor protections and market transparency, necessitating judicial intervention

146. After FINRA's unexpected U3 trading halt, Defendant Brda faced substantially greater scrutiny compared to his previous experience following the Reverse Takeover ("RTO"). Unlike the earlier period, this halt prompted immediate outrage among approximately 65,000 retail investors, intensifying demands for transparency and accountability. Plaintiff asserts that

48

Defendant Brda's subsequent high-profile advocacy was driven primarily by the necessity to manage mounting investor dissatisfaction, mitigate reputational harm, and create an impression of proactive concern rather than achieve genuine resolution or accountability.

147. On January 18, 2023, Defendant Brda publicly announced the formation of "Flamethrower," described as a shareholders' advocacy group organized to investigate alleged market manipulation involving MMTLP stock.

148. Flamethrower's stated objective was to examine potential market manipulation by market makers, engage the broader shareholder community, gather relevant information, and publicly spotlight issues affecting MMTLP investors, thereby amplifying investor concerns regarding the spin-off of NBH from MMAT II.

149. Plaintiff acknowledges Flamethrower successfully drew increased public attention and media coverage to issues of potential market manipulation and regulatory oversight failures surrounding MMTLP. The group's advocacy efforts intensified public scrutiny and elicited responses from certain regulatory authorities.

150. Flamethrower retained counsel and relied upon shareholder contributions and engagement to document potential misconduct and mobilize public awareness. Attorney Wes Christian, ESQ., of Texas, publicly participated in this effort, lending additional credibility and momentum to Flamethrower's activities. In public remarks emphasizing the significance of alleged misconduct, associates of Defendant Brda dramatically asserted that revelations regarding MMTLP would surpass highly publicized market manipulation cases involving GameStop and AMC. Specifically, Christian publicly stated in an interview: "You're going to see the mother lode of

49

shares that have been issued—that don't exist—come to the forefront. It's going to pale GameStop; it is going to pale AMC," underscoring the magnitude of harm faced by MMTLP shareholders.

151. As of March 12, 2025, there is limited publicly available information regarding the current activities of Flamethrower. The last notable public mention of Flamethrower was in March 2023, discussing its formation and objectives. Leaving shareholders to wonder whether Flamethrower was truly looking to bring assistance to the MMTLP community or whether it was just another distraction to side track shareholders.

152. Plaintiff alleges Defendant McCabe deliberately misled shareholders in November 2023 by publicly advocating for the transfer of MMTLP shares to AST under false pretenses. McCabe assured shareholders, including Plaintiff, that such transfers would result in receiving equivalent shares in "NEWCO," a purported entity with distinct assets and improved interests. Relying on these representations, Plaintiff transferred all 100 shares to AST. Subsequently, Plaintiff learned that no legitimate plans for NEWCO existed and the promised asset transfers were materially false inducements. Furthermore, Plaintiff alleges McCabe and Brda possessed critical evidence that Charles Schwab had initiated the U3 trading halt due to extreme market volatility, yet deliberately withheld this material information. Such intentional concealment constitutes a breach of fiduciary duties under Texas law and federal securities statutes, as established in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) and Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353 (5th Cir. 2004).

153. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the SEC, FINRA

50

justified the halt by citing "extraordinary circumstances." This action left investors unable

to access their investments, with no clear resolution provided.

154. FINRA justified the U3 trading halt with the following statement:

"FINRA has determined that an extraordinary event has occurred or is ongoing that has caused

or has the potential to cause significant uncertainty in the settlement and clearing  process for

shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to

protect investors and the public interest."

155. In the same FINRA notice announcing the halt of MMTLP dated December 9, 2022,

FINRA clarified that the trading halt would remain in effect until the deletion of MMTLP,

scheduled for December 13, 2022.

156. While any subsequent reference to the FINRA U3 halt after December 13, 2022, is

acknowledged as technically accurate, Plaintiff emphasizes that from a practical perspective,

trading effectively ended on December 9, 2022. Despite the official lift date, no actionable

resolution or remedy has been provided as of December 4, 2024, leaving shareholders without

recourse for a total of 726 days.

157. FINRA's authority to issue such halts is derived from its statutory role under the

Securities Exchange Act of 1934, and the halt applied to securities trading across the U.S.

financial markets.

158. While the halt was ostensibly intended to address market irregularities, FINRA's

structure as a private entity wielding quasi-governmental powers without direct executive

oversight raises questions under the separation of powers doctrine.

51

159. As a privately governed organization, FINRA's Board of Governors is neither appointed by the President of the United States nor subject to the checks and balances typically applied to federal agencies. This structure prompts constitutional considerations relevant to FINRA's governance and actions.

160. From its establishment as an SRO (self-regulatory organization) under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers. These include the ability to enact rules, conduct investigations, and impose sanctions—functions typically reserved for federal agencies.

161. These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action with significant financial and legal implications for investors.

162. However, FINRA's governance by a private, membership-based Board of Governors raises structural questions about its authority to take such impactful actions. This board is neither appointed by the President of the United States nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

163. In the week following the FINRA U3 halt, Schwab sent emails to MMTLP shareholders, including Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares.

164. Although NBH submitted and received approval for its S-1 filings and amendments in 2022, position-close-only restrictions were not enforced for MMTLP shares prior to the U3 halt. Such

52

restrictions could have limited new short positions and helped stabilize the market during the transition.

165. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading.

166. Coulson further stated that resolving these short positions would be "easier if NBH shares became publicly trade-able," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

167. FINRA released its initial FAQ regarding the MMTLP corporate action and U3 trading halt on March 16, 2023, 97 days after the halt was imposed. The FAQ failed to clearly define the "extraordinary event" that justified the halt, leaving shareholders without sufficient clarity or explanation.

168. Despite receiving thousands of complaints from shareholders via Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remains, to date, FINRA's only significant communication with shareholders regarding the halt.

169. On February 20, 2023, Fleming, a TD Ameritrade (later Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on  December 9, 2022, was requested by broker-dealers to "protect ourselves," directly      acknowledging that institutional interests, rather than retail investor protection, were the primary motivation.

53

170. This conversation, recorded by TD Ameritrade (TDA) and later Schwab, was initially made available for playback at Traudt's request but was subsequently denied. *(Traudt v. Rubenstein, 2024)*

171. In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TD Ameritrade. Schwab also refused to release the audio. These repeated refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt. *(Traudt v. Rubenstein, 2024)*


172. On April 18, 2023, Clifton DuBose, CEO of NBH, sent a letter to FINRA requesting assistance in addressing unresolved issues arising from the MMTLP spin-off. The letter specifically asked for access to the Blue Sheets, which contain detailed trade data.

173. In the context of MMAT and its preferred shares MMTLP, Blue Sheets could provide critical insights into trading activities during the period of alleged market manipulation and synthetic share creation.

174. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counter-parties involved, and whether the transactions involved legitimate shares or synthetic ones.

175. Given allegations of naked short selling and the creation of synthetic shares, a regulatory analysis of Blue Sheets would expose discrepancies between the total volume of shares traded and the actual number of legitimate shares issued, or it could disprove such allegations.

54

176. If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

177. For instance, these records might highlight unusually high trade volumes that exceeded the total outstanding shares, corroborating claims of synthetic shares.

178. Furthermore, the data could reveal whether broker-dealers and market makers engaged in practices such as failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

179. The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

180. The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of trading activity, enabling allegations of irregularities, such as synthetic share creation or naked short selling, to be substantiated or dis-proven.

181. Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. Such transparency is essential to restoring investor trust and ensuring accountability for any wrongdoing.

182. Clifton DuBose, CEO of NBH, outlined concerns in his communication regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

183. The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

184. FINRA, however, did not concur with Du Bose's recommendations and failed to provide any meaningful remedy in its response letter dated June 7, 2023.

185. On January 15, 2024, NBH executives, including CEO Clifton DuBose and CFO Luke Hawkins, resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred amidst ongoing market uncertainty.

186. A supplemental FAQ was published by FINRA on November 6, 2023, 332 days after the trading halt. Like the initial FAQ, this document failed to clearly define the "extraordinary event" that warranted the halt.

187. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, the supplemental FAQ marked only the second significant communication from FINRA about the halt.

188. To date, these two FAQs remain FINRA's only substantive communications with shareholders regarding the trading halt.

189. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

190. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2022. Gensler appeared to vaguely acknowledge familiarity with

56

MMTLP.  He admitted he did not know the specific share count and suggested that the information might be publicly available. This was a false statement.

1915. Dissatisfied with the SEC's responses, Norman indicated plans to send another letter seeking detailed information.

192. On December 22, 2023, Representative Ralph Norman led an open letter addressed to FINRA and the SEC concerning the MMAT Series A Preferred Shares MMTLP. This letter was co-signed by 74 members of Congress.

193. On February 2, 2024, 6 days after the deadline on the open letter, Gensler, Chairman of the SEC responded by letter.  In this letter, Gensler stated that requests for information sought by FINRA, and for analyses performed by FINRA, are best answered by FINRA. Thus, Gensler, referred these members of Congress back to FINRA.

194. Within this same letter, Gensler directed Congress to the public disclosures from NBH to ascertain the shares outstanding. Thus avoiding all discussion of short interest, FTD's.

195. This same letter also stated that the blue sheets and the CAT data are kept confidential and are protected by exemptions to FOIA. It further went on to state that because the SEC performs enforcement investigations on a confidential basis, they cannot acknowledge the existence or non-existence of any investigations unless or until charges are filed.

196. On February 6, 2024 Representative Ralph Norman posted a copy of the response letter from the SEC. Stating that he'd "just received an empty response from the SEC,"  and that this was "COMPLETELY UNACCEPTABLE!!!"

197. On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

198. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, referencing over 40,000 letters from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

199. As of December 04, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

200. While these two letters, co-signed by 114 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

201. Brda and CEO George Palikaras of MMAT were charged by the SEC with securities fraud on June 25, 2024.

202. MMAT declared bankruptcy on August 9, 2024. Its final filing under CIK 0001431959 occurred on September 20, 2024.

203. On or about July 15, 2022, NBH received its own Central Index Key (CIK) number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK initially assigned to Pole Perfect, subsequently used by TRCH, then MMAT, and now NBH, while MMAT remains a legal entity.

204. On October 2, 2024, University Lands (hereinafter referred to as "UL") issued a formal termination letter to Hudspeth, citing breaches of the Development Unit Agreement (DUA) due to non-payment of annual royalties and Hudspeth's failure to fulfill its drilling obligations for the 2024 operational year. The termination highlighted Hudspeth's lack of concrete future development plans, further violating the agreement's terms. UL demanded the lease be released within 90 days, retaining the right to pursue legal remedies if Hudspeth failed to comply with environmental responsibilities, including plugging existing wells and land remediation.

205. In response to the October 2, 2024, lease termination, McCabe, Chairman and CEO of NBH, expressed disappointment with UL' decision, framing it as a setback for the company.

206. However, NBH has taken no formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This inaction has further fueled concerns about NBH's management and the viability of its core assets.

207. In early November 2024, a small group of investors got together and drafted a Shareholder Request for Information (RFI) in an effort to get answers from NBH regarding multiple issues, such as the lost UL Lease.

208. The RFI was sent separately by Plaintiff and approx. 9 other shareholders. The RFI letters were sent via email to the NBH Investor Relations website. The emails were confirmed as early as November 11, 2024. Additionally, these RFI's were sent by USPS Registered &/or Certified Mail to NBH's registered address at 6300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116. Investors were informed of receipt of these letters as early as November 13, 2024 via the USPS.

59

209. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide any response to the multiple letters sent via email and certified mail. These Request for Information (RFI) letters requested a response within a specified 14-day deadline.

210. Having gotten no response to the RFI, these same shareholders together with Spears drafted a formal demand for a Books and Records Check (BRC). This document condensed the questions asked on the RFI. Shareholders deliberately chose fewer questions and asked for less documentation than requested in the RFI. This decision was made to give McCabe every opportunity to meet the 3-day turn around deadline.

211. In an effort to offer transparency and clarity, the shareholders used a licensed Texas process server to serve McCabe with the BRC. Thus all parties would be aware of the exact deadline, given the 3-day deadline.

212. The first attempt of service was attempted at 6300 Ridglea Place, Suite 950, Fort Worth, TX 76116. NBH filed a 10-Q with the SEC on September 30, 2024 which provided this address.

213. On Sunday, November 17, 2024, Spears provided the BRC document to the licensed process server along with the address for service. On Monday, November 18, 2024, Spears was informed by the process server that the NBH was no longer located at the given address. This also added a new level of concern as the company moved without notifying investors, the SEC nor The Texas Secretary of State.

214. Spears then located a business address for McCabe Petroleum Corporation (MPC). The BRC, requesting lawful shareholder access to records held by NBH and McCabe, was finally served on November 19, 2024 when McCabe accepted service at 500 W Texas Ave Ste 890, Midland, TX 79701.

215. To date, no response has been received from McCabe or NBH to either the RFI or BRC further compounding shareholder concerns about transparency and corporate governance.

216. This lack of response obstructed the shareholder's ability to assess management practices, investigate share discrepancies, and address unresolved concerns, raising  significant questions about transparency and NBH's adherence to fiduciary obligations.

217. On November 22, 2024, Auxier, one of the shareholders represented by both the RFI and BRC, issued a Formal Demand Letter to NBH Board of Directors. This demand letter reiterated entitlement to corporate records under Texas Business Organizations Code Section 21.218 and applicable federal securities laws.

218. The demand letter specifically sought explanations regarding the withdrawal of the SEC S-1 filing, the termination of the University Lands Lease and justifications for a $2 million loan obtained at above-average interest rates.  Many other questions were asked. Auxier, Spears and the other investors are still waiting for answers.

219. On November 25, 2024, NBH issued an official communication via investor  relations email. Amid the announcements, they rather matter of factly added that the company had relocated its corporate offices from Fort Worth to Midland.

61

220. NBH offered no explanation as to why the company withheld this information from the SEC and investors. Nor was there any acknowledgment of what day the company made this move in office locations.

221. The announcement only offered "Midland" as the new address of the new location. This contradicted the last two NBH filings with the SEC which were filed September 30, 2024 and October 8, 2024. Both of these filings listed the Fort Worth address as its business location.

222. NBH's failure to provide the requested documentation or address substantive inquiries within the specified response period highlights serious concerns about corporate transparency and potential violations of fiduciary duties to its shareholders.

223. Throughout 2021 and 2024, regulatory bodies including SEC and FINRA did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

224. Throughout 2022 and 2023, regulatory bodies including FINRA, the SEC, and the DTCC failed to effectively coordinate in addressing market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed significantly to unresolved share reconciliation issues, investor confusion, and financial harm.

225. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

226. As of the present date, the SEC website has not assigned a CUSIP number for NBH and its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

227. This absence creates challenges in identifying and managing transactions involving NBHs' common stock, complicating compliance with financial reporting standards and market transparency.

228. The lack of a CUSIP number for NBH highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

229. It has been well established that over 18 different internal CUSIPs are or have been used to track MMTLP holdings in various Broker/ Dealers; such as Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.

230. TDA used internal CUSIP 6DA993019, and Schwab used internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/ EQ almost two years after the spin-off to NBH.

231. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single share not being reconciled highlights a significant issue.

232. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain non-reconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

63

233. The inability to reconcile all MMTLP shares to NBH shares, years later at AST/ EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

234. In January 2021, the Game stop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to Game stop's stock price surging over 1,000% within days.

235. Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

236 Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to  investigate systemic risks exposed by the volatility.

237. The Games top event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

238. In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on MMAT's Series A Preferred Shares (MMTLP) just two days before their planned transition into NBH, a private company.

239. Unlike Game stop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited

64

an "extraordinary event" to justify the halt but failed to provide a detailed  explanation at the time.

240. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

241. Unlike Game stop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

242. Contrasting the immediate regulatory response and public scrutiny surrounding the GameStop trading episode with the prolonged regulatory inaction and neglect experienced by MMTLP shareholders underscores significant disparities in governmental engagement and protection afforded to retail investors. Such inconsistency raises serious concerns regarding the fairness, transparency, and effectiveness of regulatory oversight in U.S. financial markets.

243. Institutional market participants, including broker-dealers and market makers, profited from illegal shorting during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

244. These institutional participants stand to make considerable profits by not closing their short positions, particularly when illegal short selling is used as a trading tactic. If NBH were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

65

245. The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets.

246. Institutional market participants engaged in trading practices involving the illegal shorting of MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

247. To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

248. This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

249. FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

250. Shareholders, including Plaintiff, have repeatedly requested comprehensive audits of MMTLP share discrepancies to differentiate legitimate shares from synthetic or improperly issued shares. However, as of December 4, 2024, no such comprehensive audit has been

performed, leaving critical questions unresolved regarding outstanding share counts and continued market irregularities.

251. Illegal short selling and trading irregularities during the MMTLP-to-NBH transitions have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

252. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass  safeguards designed to promote transparency and oversight.

253. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

254. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the non-delegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

## COUNT I:

### Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

1. Plaintiff alleges that Defendants McCabe and Brda knowingly disseminated materially false asset valuations and misleading narratives regarding short squeezes through explicitly identified social media influencers and proxy stock promoters. Plaintiff asserts these communications were timed to coincide with Defendants' substantial personal share sales, demonstrating direct personal gain, clearly satisfying scienter standards under the PSLRA.

2. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by engaging in manipulative practices, including undisclosed paid promotions, dissemination of false information, and failing to ensure market transparency, thereby undermining investor confidence, distorting market conditions, and violating federal securities laws.

3. Defendants violated Section 9(a) (15 U.S.C. § 78i(a)) by intentionally manipulating the price of MMTLP shares through artificial and deceptive trading conditions.

4. FINRA and the SEC violated Section 17(a) (15 U.S.C. § 78q(a)) by failing to maintain accurate records and transparency during the critical transition from MMTLP to NBH, causing direct financial harm to investors.

5. Brda and McCabe violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and share-count discrepancies, misleading investors and impairing their ability to make informed investment decisions.

6. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by

68

hiring, compensating, and orchestrating undisclosed paid proxies and promoters to deliberately disseminate false and misleading information, and coordinating cyberbullying, cyberstalking, and targeted harassment campaigns against investors, manipulating market conditions, suppressing dissent, and evading accountability.

7. Jane and John Does, acting as paid proxies and promoters under direction from Defendants Brda, McCabe, and NBH, violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by engaging in coordinated manipulative activities, including cyberbullying, cyberstalking, harassment, and deceptive information dissemination intended to suppress dissent, obstruct transparency, and manipulate investor decisions.

8. FINRA and the SEC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt timely and transparently, depriving shareholders of access to their investments and violating their constitutional due process rights.

9. FINRA and the SEC violated Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) by establishing and maintaining regulatory rules and practices, such as the U3 halt, that inadequately protected investors and allowed unchecked fraudulent activities, including illegal short selling, illegal short positions, and related manipulative practices, thereby undermining market integrity and investor confidence.

10. FINRA violated Section 19(c) (15 U.S.C. § 78s(c)) by implementing and enforcing regulatory actions, including the U3 halt, that directly conflict with its statutory mandate to protect investors and maintain orderly market conditions, causing substantial disruption and harm.

11. FINRA and the SEC violated Plaintiff's constitutional rights under the Fifth Amendment's

69

Due Process Clause (U.S. Const. amend. V), and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)),

by failing to provide adequate oversight, timely communication, transparency, or corrective

actions, thus depriving Plaintiff of protected property interests without due process of law.

12. Plaintiff asserts FINRA and the SEC exceeded discretionary regulatory boundaries by

engaging in or permitting deliberate acts that systematically ignored or suppressed evidence of

market manipulation, specifically evidenced through FOIA-obtained communications

acknowledging but neglecting to act on substantial market irregularities, thus breaching statutory

duties explicitly enumerated under the Securities Exchange Act and actionable under the APA

## COUNT II

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 15–23) – Against SEC and FINRA

1. FINRA violated Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 6(b)(5) of the

Exchange Act (15 U.S.C. § 78f(b)(5)) by colluding with market participants, including

broker-dealers, hedge funds, and market makers, to facilitate or negligently permit illegal short

selling activities and related anti-competitive practices, substantially restricting market

competition and causing financial harm to retail investors.

2. The SEC violated Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 19(c) of the

Exchange Act (15 U.S.C. § 78s(c)) by negligently allowing monopolistic conditions and

unchecked illegal short selling activities, thereby restricting competition, distorting market

70

pricing, and causing direct harm to retail investors.

3. FINRA violated Section 4 of the Clayton Act (15 U.S.C. § 15) and Section 10(b) (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), causing direct financial harm to Plaintiff and entitling Plaintiff to recover treble damages resulting from FINRA's facilitation and oversight failures related to illegal short positions, manipulative trading practices, and market disruptions.

4. Plaintiff alleges FINRA directly facilitated anticompetitive conditions by selectively enforcing trading halts, notably the unprecedented U3 halt on MMTLP, effectively aiding institutional short-sellers in manipulating market dynamics and restricting retail investors' ability to participate freely, thus constituting direct antitrust harm and violations clearly recognized under Sherman Act § 1.5. FINRA and the SEC violated Section 13 of the Clayton Act (15 U.S.C. § 23) and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to enforce fair trading practices and regulatory standards consistently, thereby permitting discriminatory treatment of retail investors, widespread illegal short positions, and facilitating monopolistic and abusive market activities causing substantial harm.


## COUNT III:


## Negligence – Against All Defendants


1. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by negligently permitting the unchecked proliferation of illegal short positions, directly harming investors and undermining market integrity.

2. Brda, McCabe, and NBH violated Section 13(b)(2)(A) (15 U.S.C. § 78m(b)(2)(A)) and Rule

13b2-1 (17 C.F.R. § 240.13b2-1) by negligently failing to maintain accurate financial records and transparency concerning MMTLP's true share structure and shareholder ownership, misleading investors and regulators.

3. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by negligently hiring and compensating undisclosed proxies and paid promoters who disseminated materially false, misleading, and incomplete information, causing investor confusion and financial harm.

4. Brda, McCabe, and NBH violated Section 13(b)(2)(B) (15 U.S.C. § 78m(b)(2)(B)) and Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by negligently failing to establish and enforce effective internal control mechanisms and oversight, facilitating widespread securities violations and fraudulent conduct detrimental to investors.

5. FINRA and the SEC violated Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) by negligently failing to enforce federal securities laws and regulations, allowing manipulative market practices and illegal short positions, directly harming investor confidence and market stability.

6. FINRA and the SEC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by negligently permitting persistent settlement failures, share-count discrepancies, and manipulative trading practices involving illegal short positions in MMTLP, resulting in direct financial harm to investors and undermining the integrity of securities markets.

## COUNT IV:

### Failure to Resolve the FINRA U3 Halt – Against All Defendants

1. The SEC and FINRA violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to promptly and transparently resolve the U3 trading halt on MMTLP shares, directly depriving investors of timely access to their investments and undermining market confidence.

2. The SEC and FINRA violated Plaintiff's constitutional rights under the Fifth Amendment and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to promptly lift, adequately explain, or address the U3 halt, resulting in denial of investors' protected property interests without due process, and causing ongoing financial harm and uncertainty.

3. The SEC and FINRA violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by neglecting their statutory duty to facilitate prompt and accurate clearance, settlement, and resolution of securities transactions impacted by the halt, allowing illegal short positions to remain unresolved and causing substantial investor losses.

4. FINRA violated Section 19(c) (15 U.S.C. § 78s(c)) by failing to establish or maintain regulatory practices capable of adequately protecting investors from prolonged harm due to the unresolved U3 halt, allowing illegal short positions to persist and severely disrupting market conditions.

5. The SEC violated Section 19(c) (15 U.S.C. § 78s(c)) by failing in its statutory oversight duties over FINRA, permitting prolonged regulatory inaction, unresolved illegal short positions, and sustained harm to investor confidence and market integrity.

6. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17

73

C.F.R. § 240.10b-5) by failing to take corrective action regarding the FINRA U3 halt despite

their clear knowledge of ongoing market manipulation, unresolved illegal short positions, and

investor harm.

7. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by

breaching their fiduciary duties through failure to meaningfully address or rectify the regulatory

disruptions from the U3 halt, thereby exacerbating investor harm, market uncertainty, and

financial losses related to ongoing illegal short positions.


## COUNT V:

### Unjust Enrichment – Against All Defendants

1. Defendants Brda, McCabe, and NBH violated Section 29(b) (15 U.S.C. § 78cc(b)) and Rule

10b-5 (17 C.F.R. § 240.10b-5) by unjustly enriching themselves through coordinated

promotional schemes and undisclosed compensation to paid proxies and promoters, thereby

inflating share prices and facilitating illegal short positions at investors' expense.

2. Defendants FINRA and the SEC violated Section 29(b) (15 U.S.C. § 78cc(b)) by unjustly

receiving and retaining fees, assessments, or other financial benefits while failing to enforce

securities laws effectively, directly enabling fraudulent market conditions and allowing illegal

short positions that harmed Plaintiff and other investors.

3. Defendants unjustly profited from investor harm caused by market manipulation, prolonged

trading halts, and illegal short selling, retaining monetary gains that resulted from artificially

distorted share prices, in violation of Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15

U.S.C. § 78cc(b)).

4. Jane and John Does violated Section 29(b) (15 U.S.C. § 78cc(b)) and Rule 10b-5 (17 C.F.R. §

240.10b-5) by unjustly enriching themselves through undisclosed payments received as proxies

and stock promoters, deliberately participating in deceptive schemes—including coordinated

cyberbullying, stalking, harassment, and targeted intimidation—to facilitate and maintain illegal

short positions, causing Plaintiff significant emotional distress, humiliation, and harm. Plaintiff

seeks disgorgement of all payments received by these individuals, asserting entitlement to such

proceeds as equitable compensation for damages.


## COUNT VI:

## Conspiracy to Commit Fraud – Against All Defendants

1. Defendants Brda, McCabe, NBH, and Jane and John Does violated Section 10(b) (15 U.S.C. §

78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by conspiring to disseminate materially false and

misleading information through undisclosed proxies and stock promoters, deliberately

misleading investors, artificially inflating share prices, and facilitating illegal short positions.

2. FINRA and the SEC violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by knowingly

or negligently conspiring with, or permitting conspiracy among, market participants to facilitate,

conceal, and perpetuate illegal short positions, directly harming Plaintiff and other investors.

3. Defendants violated 18 U.S.C. § 371 by conspiring among themselves, and with other entities

or individuals, to intentionally obstruct regulatory enforcement and oversight by the SEC and FINRA, facilitating illegal short positions, deceiving federal regulatory authorities, and undermining the integrity of the U.S. securities markets.

4. Defendants violated 18 U.S.C. § 1349 by participating in and facilitating an ongoing conspiracy involving wire communications, electronic dissemination of fraudulent information, and coordinated market manipulation schemes—including illegal short selling—designed to defraud investors, including Plaintiff, of property and financial interests.

5. Defendants Brda, McCabe, NBH, and undisclosed paid proxies (Jane and John Does) conspired to utilize cyberbullying, cyberstalking, and harassment as deliberate tools of market manipulation and investor suppression, furthering their fraudulent scheme and maintaining illegal short positions, in violation of Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5.

6. Plaintiff provides explicit evidence indicating Defendants coordinated through undisclosed paid proxies and influencers—clearly identified through financial arrangements, NDAs, and documented communication exchanges with Defendants McCabe and Brda—executing a common plan to manipulate market sentiment, thus constituting clear conspiracy under federal law.

## COUNT VII:

## Failure to Supervise – Against FINRA and SEC

1. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices, including illegal short selling and the creation of illegal short positions.

2. FINRA and the SEC violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to adequately implement, enforce, or supervise market access controls designed to detect, prevent, and eliminate illegal short selling and other abusive trading practices, resulting in substantial investor harm and widespread market manipulation.

3. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) and Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to adequately supervise regulatory personnel, allowing conflicts of interest and ineffective enforcement practices, including selective oversight and inadequate investigation of known illegal short positions, thereby enabling investor harm and market instability.

4. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to properly supervise broker-dealers and market makers engaging in prohibited trading practices, specifically illegal short selling and the establishment of illegal short positions, directly harming investors and undermining public trust.

5. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to properly supervise and enforce regulatory controls, negligently permitting broker-dealers and market makers to engage in illegal short selling and maintain illegal short positions, causing significant investor harm and systemic market disruption.

## COUNT VIII:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

1. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by intentionally orchestrating harassment, cyberbullying, and targeted intimidation campaigns through paid proxies, foreseeably causing significant emotional distress, humiliation, anxiety, and substantial disruption of Plaintiff's personal and social relationships.

2. Jane and John Does violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) through coordinated cyberstalking, harassment, and targeted emotional abuse, intentionally or negligently causing Plaintiff emotional harm, humiliation, anxiety, and degradation.

3. FINRA and the SEC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by recklessly failing to address, investigate, or mitigate market manipulation, illegal short positions, cyberbullying, and investor intimidation, foreseeably causing Plaintiff severe emotional distress and prolonged mental anguish through regulatory inaction and uncertainty surrounding the U3 halt.

4. Defendants collectively violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in negligent and intentional conduct designed to intimidate investors, suppress dissent, obstruct transparency, and facilitate illegal short positions, foreseeably causing Plaintiff severe emotional distress, social isolation, and reputational damage.

78

5. Plaintiff explicitly asserts Defendants orchestrated targeted, systematic social media harassment and cyberstalking, explicitly designed to silence legitimate investor concerns through direct intimidation and humiliation, supported by detailed documentation of specific public instances, causing direct and demonstrable emotional harm.

## COUNT IX

### Petition for Writ of Mandamus Against SEC

1. Plaintiff respectfully requests that this Court issue a Writ of Mandamus compelling the SEC and FINRA to immediately and fully perform their mandatory statutory duties pursuant to the Securities Exchange Act of 1934 (15 U.S.C. § 78), specifically enforcing federal securities laws prohibiting naked short selling and associated manipulative practices involving MMTLP shares.

2. Plaintiff alleges and asserts that both regulatory entities have consistently failed or refused to uphold their legal obligations, permitting unchecked market manipulation, investor harm, and widespread violations of federal securities laws. Given the demonstrated regulatory failures and the resulting lack of investor confidence, Plaintiff further requests that the Court appoint an impartial third-party Special Agent to independently oversee and administer a controlled two-day trading event, explicitly structured to reconcile and close all open positions that are not legitimate long shares in MMTLP securities.

79

3. Plaintiff believes this combined remedy—a Writ of Mandamus to compel enforcement coupled with independent third-party oversight—is essential and appropriate, providing necessary accountability, transparency, and protection to harmed investors, while restoring market integrity and trust.

4. Plaintiff further requests that this Court's Writ of Mandamus compel the SEC and FINRA to produce a full and complete accounting of all MMTLP shares—including long, short and illegally short as documented through comprehensive electronic blue sheet data. Plaintiff respectfully requests that this data be promptly provided to the Court-appointed impartial third-party Special Agent, ensuring transparency, accuracy, and effective reconciliation during the mandated two-day trading event.

5. Plaintiff respectfully submits this request mindful of the Court's jurisdiction and discretion, seeking remedies narrowly tailored to address specific harms directly caused by regulatory inaction, neglect, or complicity.

6. Plaintiff has no other adequate remedy at law to compel the SEC to act. The SEC's ongoing failure to fulfill its mandatory duties constitutes unlawful withholding of agency action under the Administrative Procedure Act (5 U.S.C. § 706), leaving Plaintiff with no alternative but to seek a Writ of Mandamus from this Court.

---

**Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of**

**1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):**

1. FINRA

    a. Reckless issuance of the U3 halt (December 9, 2022):

    FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or

    justification, despite clear knowledge of widespread illegal short positions and significant

    trading irregularities.

    b. Failure to resolve the U3 halt:

    FINRA neglected its statutory obligation to promptly and transparently resolve the halt,

    violating Section 19(c) (15 U.S.C. § 78s(c)) of the Securities Exchange Act, and causing

    prolonged financial and emotional harm to investors.

    c. Intentional inaction despite clear awareness:

    Despite documented evidence, public complaints, and clear indicators of extensive

    illegal short positions, FINRA intentionally failed to conduct meaningful investigations

    or enforce compliance with federal securities laws.

    d. Omission of material facts in public communications:

    FINRA knowingly or recklessly misled the market by failing to disclose the true reasons

    for the U3 halt or the corrective actions required to resolve ongoing illegal short positions

    and trading discrepancies.

2. SEC

    a. Failure to enforce compliance with federal securities laws:

81

The SEC negligently abandoned its oversight duties by failing to investigate or effectively address systemic market irregularities, including pervasive illegal short positions.

b. Complicity in FINRA's ongoing inaction:

The SEC allowed FINRA's U3 halt to persist indefinitely without mandating transparency or resolution, intentionally violating its statutory responsibilities under Sections 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) and 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) of the Securities Exchange Act.

c. Neglect of investor protection responsibilities:

Despite clear knowledge of investor harm caused by widespread illegal short positions, the SEC intentionally or recklessly failed to act in accordance with its explicit mission to protect retail investors and market integrity.

d. Deliberate regulatory apathy:

The SEC's failure to intervene, despite possessing authority and responsibility to supervise

FINRA, broker-dealers, and market makers, demonstrates intentional disregard and reckless indifference to systemic market manipulation involving illegal short positions.

3. Torchlight Energy Resources, Inc. (John Brda) and Next Bridge Hydrocarbons (Gregory McCabe)

a. Misrepresentation of asset valuations (Gregory McCabe):

82

McCabe knowingly or recklessly overstated the valuation of Orogrande Basin assets to artificially inflate shareholder expectations, attract investment capital, and facilitate illegal short selling activities detrimental to retail investors.

b. Encouraging trading despite known irregularities (John Brda):

Brda knowingly encouraged retail investors to purchase MMTLP shares while simultaneously offloading his own holdings, despite awareness of ongoing illegal short positions and severe market irregularities.

c. Failure to address known trading irregularities (Brda and McCabe):

Both Brda and McCabe intentionally or recklessly neglected their fiduciary obligations to investigate, disclose, and resolve known discrepancies related to illegal short positions, causing ongoing investor harm.

d. Misleading shareholders:

Leadership communications deliberately omitted critical information about known trading irregularities and illegal short positions, misleading shareholders regarding the true condition and value of their investments.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests judgment in his favor, providing relief as follows:

Declaratory Judgment:

83

1. Declare Defendants' actions violated the Securities Exchange Act of 1934 (15 U.S.C. § 78), specifically Sections 10(b), 9(a), 13(d), 17(a), 17A(a)(1), 15A(b)(6), 13(b)(2)(A), 13(b)(2)(B), and 19(c), Rule 10b-5 (17 C.F.R. § 240.10b-5), Rule 13b2-1, Rule 13b2-2, Rule 15c3-5, the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27).

2. Declare FINRA's handling of the U3 trading halt on December 9, 2022, violated Plaintiff's Fifth Amendment due process rights by depriving Plaintiff of access to investments without timely resolution or adequate transparency.

Injunctive Relief:

1. Plaintiff respectfully requests the appointment of an impartial third-party Special Agent, independent of SEC and FINRA, to oversee and administer a court-supervised two-day trading event explicitly structured to reconcile and forcibly close all open illegal short positions in MMTLP shares, with positions forcibly closed at the higher of the closing market price or a price set by this Court.

2. Plaintiff requests an order compelling the SEC and FINRA to produce comprehensive electronic "blue sheet" data identifying all MMTLP shares, including legitimate long, short, and illegal short positions, and to deliver this data promptly to the court-appointed Special Agent.

3. Plaintiff respectfully requests this Court issue an injunction requiring FINRA and SEC to permanently establish effective oversight mechanisms to prevent the proliferation of illegal short positions, enforce securities laws consistently, and enhance transparency and public accountability.

84

4. Plaintiff respectfully requests this Court mandate complete transparency, including a public accounting and disclosure of all records, communications, and actions related to the FINRA U3 halt. Plaintiff requests the identities and actions of all FINRA, SEC, and external entities involved be fully disclosed to ensure public accountability.

5. Plaintiff respectfully requests that this Court declare FINRA's existing operational and regulatory structure unconstitutional due to inherent conflicts of interest stemming from its funding model, and order comprehensive structural reform or its replacement with a constitutionally compliant regulatory body.

6. Plaintiff asserts injunctive relief is narrowly tailored, proposing an impartial Special Agent appointed explicitly to reconcile and forcibly close illegal short positions over a defined, supervised two-day trading period, justifying this extraordinary equitable remedy as necessary due to regulatory failure, irreparable investor harm, and ongoing market instability.

Declaratory and Injunctive Relief Regarding FINRA:

Plaintiff respectfully requests the Court declare FINRA's current structure unconstitutional due to inherent conflicts of interest stemming from its self-funding and self-regulating design, which significantly compromises its impartiality and effectiveness in protecting retail investors. Plaintiff further requests that the Court order comprehensive structural reforms, increased transparency measures, independent oversight, or, if necessary, the dissolution and replacement of FINRA with a constitutionally compliant regulatory body to ensure fair and impartial enforcement of securities laws.

Compensatory and Monetary Relief:

1. Plaintiff seeks compensatory damages in an amount determined at trial, including compensation for financial losses caused by Defendants' violations, loss of liquidity, suppressed share value, and associated harms directly attributable to Defendants' misconduct involving illegal short positions.

2. Plaintiff requests compensatory damages of no less than $500,000 for emotional distress and mental anguish caused by Defendants' prolonged misconduct, lack of transparency, prolonged U3 halt, and targeted harassment campaigns.

3. Plaintiff requests treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) for harm caused by Defendants' anti-competitive conduct, market manipulation, and maintenance of illegal short positions.

4. Plaintiff requests punitive damages sufficient to deter similar future misconduct by Defendants and others similarly situated.

5. Plaintiff respectfully requests the Court award Plaintiff disgorgement and divestiture of all illicit financial gains obtained by Defendants, including payments made to undisclosed proxies, promoters, and other parties involved in market manipulation and harassment campaigns.

Additional Relief:

6. Plaintiff respectfully requests that the Court recognize and compensate Plaintiff for significant burdens incurred in exhaustive attempts to seek resolution prior to litigation,

86

including extensive communications, complaints, and correspondence with the SEC, FINRA, DOJ, IRS, IC3, TD Ameritrade, Schwab, Senators, Congressional Representatives, state Attorneys General, and other governmental entities, as well as extensive collaborative efforts with fellow shareholders through social media platforms and direct communication channels.

7. Plaintiff requests a tax gross-up to fully offset any additional taxes arising from awarded damages or settlement payments.

8. Plaintiff requests reimbursement for all reasonable court costs, fees, and expenses incurred in pursuing this action, as deemed appropriate by the Court.

9. Plaintiff requests punitive damages sufficient to deter Defendants and similarly situated entities or individuals from future wrongful conduct involving market manipulation, investor intimidation, illegal short positions, and regulatory negligence.

10. Plaintiff requests any further relief that this Court deems just, proper, and equitable to fully remedy the harm caused by the Defendants' actions and regulatory failures, to restore market integrity, investor confidence, and Plaintiff's personal and financial well-being.

## VIII.    DEMAND FOR JURY TRIAL

1. The Plaintiff hereby demands a trial by jury for all claims and issues that may be tried as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: March 12, 2025

SIGN HERE

Signed by:

*Danielle Spears*

CAC0EAB17D654A1...

Danielle Spears, Pro Se

12206 West Harrison Street,

Avondale, AZ 85323


CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Danielle Spears, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 13, 2025

Signature:

Signed by:

*Danielle Spears*

CAC0EAB17D654A1...

Name: Danielle Spears

# EXHIBIT D

**FILED**

February 26, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____  J. Barker

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

|  |  |
|---|---|
| MATTHEW J. PEASE,<br><br>               Plaintiff,<br><br>v.<br><br>SECURITIES & EXCHANGE COMMISSION,<br>FINANCIAL INDUSTRY REGULATORY<br>AUTHORITY, JOHN BRDA, GREGORY MCCABE,<br>NEXT BRIDGE HYDROCARBONS, INC.<br><br><br><br>               Defendants. | Case No.:  7:24-CV-00322-DC<br><br>**COMPLAINT FOR<br>VIOLATIONS OF THE<br>FEDERAL SECURITIES<br>LAWS**<br><br>JURY TRIAL DEMANDED<br><br>SECOND AMENDED<br>COMPLAINT |

## I. <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| **II.** | **Jurisdiction and Venue** | **3** |
| **III.** | **Introduction** | **5** |
| **IV.** | **Parties** | **9** |
| **V.** | **Factual Background** | **11** |
| | Pre-Merger Activities | 11 |
| | Merger and Spin-Off | 15 |
| | Premature Inclusion in Schwab Total Stock Market Index Fund (SWTSX) | 22 |
| | Unauthorized Trading of MMTLP Shares | 23 |
| | Negligence by Transfer Agents | 25 |
| | Regulatory Awareness of Unauthorized Trading | 26 |
| | Systemic Trading Irregularities | 28 |
| | Misleading Public Statements and Social Media Influence | 32 |
| | Role of Software in Systemic Failures | 33 |

| | | |
|---|---|---|
| | Failure to Audit Software Systems | 34 |
| | U3 Trading Halt | 35 |
| | Post-Halt Inaction | 35 |
| | Systemic Bias in Regulatory Responses | 36 |
| | Congressional Concerns Over Regulatory Failures | 37 |
| | Ongoing Harm to Retail Investors | 38 |
| **VI.** | **Constitutional Challenges** | **38** |
| | Appointments Clause Violations (Article II) | 38 |
| | Nondelegation Doctrine Violations | 42 |
| **VII.** | **Market Manipulation and Regulatory Failures** | **45** |
| | Synthetic Share Creation and Naked Short Selling | 45 |
| | Failures to Deliver (FTDs) | 47 |
| | Obstruction Through Lack of Transparency | 49 |
| | Lack of Regulatory Oversight | 51 |
| **VIII.** | **Legal Framework and Precedents** | **53** |
| | Statutory Violations | 53 |
| | Regulation SHO | 54 |
| | Constitutional Claims | 55 |
| | Appointments Clause | 55 |
| | Nondelegation Doctrine | 56 |
| **IX.** | **Claims for Relief** | **60** |
| | Due Process Violations (SEC and FINRA) | 60 |
| | Nondelegation Doctrine Violations | 62 |
| | Appointments Clause Violations | 62 |
| | Market Manipulation (DTCC and OTC Markets) | 63 |
| | Breach of Fiduciary Duties (McCabe and Brda) | 63 |
| | Negligence (SEC, FINRA, DTCC) | 64 |
| | Breach of Contractual Obligations | 64 |
| **X.** | **Specific Acts of Scienter** | **65** |
| **XI.** | **Counts** | **70** |
| **XII.** | **Prayer for Relief** | **82** |
| **XIII.** | **Evidence and Supporting Documentation** | **84** |
| **XIV.** | **Conclusion** | **87** |
| **XV.** | **Demand for Jury Trial** | **91** |
| **XVI.** | **Certification of Plaintiff Pursuant to Federal Securities Laws** | **92** |

## II. **Jurisdiction and Venue**

1.      Jurisdiction is proper under 28 U.S.C. § 1331, as this action arises under federal law, including the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and the United States Constitution, including claims under the Appointments Clause, Nondelegation Doctrine, and the Due Process Clause of the Fifth Amendment.

2.      Supplemental jurisdiction over related state law claims is proper under 28 U.S.C. § 1367.

3.      Jurisdiction is also proper under 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists between the Plaintiff, a resident of New Hampshire, and the Defendants, who are based in states including Texas, New York, and Washington, D.C.

4.      Venue is appropriate in the United States District Court for the Western District of Texas, Midland Division, under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5.      Next Bridge Hydrocarbons, Inc. ("NBH"), a key defendant, is headquartered in Midland, Texas, and its operations are central to the events at issue. NBH maintains its principal place of business at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701. The corporate actions at issue, including the spin-off of MMTLP shares and the transition to NBH, were orchestrated and managed from this location.

6.      Gregory McCabe, a key individual defendant, resides and conducts business in Midland, Texas, and serves as the CEO and Chairman of NBH. His significant ties to this district further support venue here. McCabe's actions, including his role in the valuation and

management of NBH's assets, particularly the Orogrande Basin, occurred within this jurisdiction.

7.      John Brda, a key individual defendant and the former CEO of Torchlight Energy Resources, which was integral to the creation of NBH, has historical connections to Texas through Torchlight's operations. Torchlight's last known address was in Plano, Texas, and its legacy is tied to this district. Brda's actions, including his role in structuring the merger between Torchlight and Meta Materials, Inc., and the subsequent creation of MMTLP shares, are central to the claims in this case.

8.      The Orogrande Basin, a key asset tied to NBH, is located in Texas, and its valuation and management are central to the claims. The operations and decisions related to this asset occurred within this jurisdiction. The alleged misrepresentations about the value and potential of the Orogrande Basin, which form a core part of the Plaintiff's claims, were made and relied upon in Texas.

9.      The Securities and Exchange Commission ("SEC"), and the Financial Industry Regulatory Authority ("FINRA"), key defendants, operate across the United States and are not tied to any specific jurisdiction. These defendants' actions, including their failure to enforce federal securities laws, prevent market manipulation, and reconcile share discrepancies, directly contributed to the harm suffered by the Plaintiff and other investors in this district. Venue is proper for these defendants under 28 U.S.C. § 1391(b)(3), as they may be sued in any judicial district where they are subject to personal jurisdiction.

10.     The Western District of Texas, Midland Division, is uniquely positioned to adjudicate this case due to its familiarity with the local defendants, the regional economic impact of the claims, and the centrality of Texas-based events to the case. This district has a strong

interest in resolving disputes involving local entities and ensuring accountability for actions that directly affect its residents and economy.

11.     For the foregoing reasons, venue is proper in the United States District Court for the Western District of Texas, Midland Division, under 28 U.S.C. § 1391(b). This court is the most appropriate forum to adjudicate the Plaintiff's claims and provide meaningful relief to the affected investors.

### III. <u>Introduction</u>

12.     This case arises from systemic market manipulation, regulatory negligence, breaches of fiduciary duty, and constitutional violations that have eroded the integrity of U.S. financial markets. The Plaintiff, Matthew J. Pease, a retail investor and Information Technology professional, seeks to hold accountable quasi-governmental regulatory bodies, including the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission ("SEC"), whose combined failures allowed systemic fraud to persist unchecked.

13.     Regulatory communications, including FOIA-obtained emails, confirm that officials at both agencies were aware of extensive trading irregularities in MMTLP for over a year before the December 9, 2022, U3 halt but deliberately failed to intervene. These records reveal discussions about synthetic shares, excessive trading volume, and failures to deliver (FTDs), yet no corrective action was taken.

14.     By fostering an unregulated environment where broker-dealers and market makers exploited regulatory loopholes, the Defendants enabled the unchecked proliferation of synthetic shares and naked short selling. For instance, the Office of the Comptroller of the Currency (OCC) issued a letter that allowed market makers additional time to close out fails-to-deliver, creating an opportunity for exploitation. This systemic failure, exacerbated by regulatory

loopholes such as the market maker exemption, defrauded tens of thousands of investors, leaving them in financial limbo with no recourse.

15.     FINRA's imposition of an indefinite U3 trading halt—without transparency or an audit of outstanding share discrepancies—exacerbated the damage, violating due process and investor protections. The actions and inactions of FINRA and the SEC reflect not regulatory diligence, but scienter—intentional misconduct or reckless disregard for investor harm.

16.     Central to this case are the Non-Voting Series A Preferred Shares of Meta Materials, Inc. ("MMTLP"), which were issued as part of a corporate spin-off intended to provide private ownership in Next Bridge Hydrocarbons, Inc. ("NBH"). Instead of facilitating an orderly transition to private ownership, market participants, including broker-dealers, market makers, and transfer agents, engaged in manipulative practices such as synthetic share creation and naked short selling. These actions flooded the market with counterfeit shares, suppressed legitimate share prices, and deprived shareholders, including the Plaintiff, of the fair value of their investments.

17.     A defining moment occurred on December 9, 2022, when FINRA issued an extraordinarily rare U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This unilateral and indefinite halt froze all trading activity, leaving tens of thousands of investors, including the Plaintiff, unable to access their assets, reconcile their positions, or trade their shares. However, FOIA-released emails from November 29, 2021, show that FINRA and the SEC had been aware of trading irregularities in MMTLP for over a year before the halt but failed to take corrective action.

18.     These internal emails confirm that regulatory officials discussed concerns about synthetic shares, excessive trading volume, and failures to deliver (FTDs) in MMTLP. Yet,

despite this knowledge, FINRA took no action until the last possible moment, allowing market manipulation to persist unchecked before abruptly halting trading.

19.     The U3 halt raises serious constitutional concerns about the unchecked powers of private self-regulatory organizations. By allowing known market manipulation to continue while withholding critical information from investors, FINRA and the SEC crossed the line from negligence to complicity. Their conduct reflects not diligence, but scienter—intentional misconduct or reckless disregard for investor harm.

20.     As highlighted in key legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine, as there was no meaningful government oversight or statutory authority to justify its actions.

21.     Beyond FINRA's governance flaws, other regulatory bodies exacerbated the systemic failures in this case. The Securities and Exchange Commission ("SEC"), tasked with overseeing FINRA and ensuring market integrity, neglected its statutory duties by allowing the U3 halt to persist and failing to investigate widespread irregularities. The Depository Trust & Clearing Corporation ("DTCC"), responsible for clearing and settlement, permitted unresolved failures to deliver ("FTDs") and synthetic shares to proliferate, violating Section 17A of the Securities Exchange Act. Furthermore, the DTCC failed to maintain accurate records and reconcile share discrepancies, contributing to the proliferation of synthetic shares and hindering efforts to uncover the true extent of market manipulation. Together, these regulatory failures enabled institutional participants to manipulate the market and profit at the expense of retail investors, including the Plaintiff.

22.     Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons also played a significant role in enabling these systemic failures. Executives, including Gregory McCabe, John Brda, and Clifton DuBose, failed to address share discrepancies, trading irregularities, and systemic market manipulation. Instead, they misrepresented the financial prospects of key assets, such as the Orogrande Basin, and neglected their fiduciary duties to shareholders, including the Plaintiff.

23.     Nearly two years have passed since the U3 halt, and the Defendants have taken no meaningful steps to resolve these systemic failures or mitigate the harm caused to retail investors. Shareholders, including the Plaintiff, remain in financial and legal limbo, unable to trade their positions, reconcile their holdings, or recover the fair value of their investments. This prolonged inaction underscores critical vulnerabilities in the existing regulatory framework and highlights the urgent need for judicial intervention.

24.     The disparity between the regulatory response to the MMTLP case and other market disruptions, such as the GameStop trading episode, illustrates the inequities faced by retail investors. While GameStop shareholders benefited from swift regulatory and Congressional action, MMTLP investors have endured prolonged neglect. This inconsistency underscores systemic bias in favor of institutional participants and the urgent need for equitable treatment of all market participants under the law.

25.     Through this action, the Plaintiff seeks to hold the Defendants accountable for their roles in perpetuating systemic misconduct, breaches of fiduciary duty, and constitutional violations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm he has suffered.

26.     Equally important, this case seeks to challenge the structural and constitutional flaws within FINRA's governance and advocate for systemic reforms. These reforms include enforcing greater transparency, requiring accountability for regulatory bodies, and implementing mechanisms to prevent future abuses, such as synthetic share creation, prolonged trading halts, and failures to deliver.

27.     By addressing the systemic deficiencies and constitutional violations described herein, this Court has the opportunity to restore fairness, integrity, and transparency to U.S. financial markets. The Plaintiff urges the Court to hold the Defendants accountable for their actions, reaffirm the principles of constitutional governance, and protect the rights of retail investors whose trust in the financial system has been eroded.

## IV. <u>PARTIES</u>

28.     Matthew J. Pease (hereinafter referred to as "Plaintiff") is a resident of Amherst, New Hampshire, and a professional in the field of Information Technology. The Plaintiff is a retail investor who purchased shares of Meta Materials, Inc. (MMTLP) and Next Bridge Hydrocarbons, Inc. (NBH) and was harmed by systemic market manipulation, regulatory negligence, and breaches of fiduciary duty by the Defendants. Through this action, the Plaintiff seeks accountability for the Defendants' misconduct and redress for the financial and emotional harm he has suffered.

Defendants

29.     The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing federal securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549. The SEC is tasked with overseeing self-regulatory organizations (SROs), including the

9

Financial Industry Regulatory Authority (FINRA), and ensuring compliance with federal securities laws. In this case, the SEC's actions and inactions are central to the systemic market manipulation and regulatory failures that harmed the Plaintiff and other retail investors.

30.     The Financial Industry Regulatory Authority (hereinafter "FINRA") is a private, self-regulatory organization authorized by the SEC to oversee broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006. FINRA operates under delegated authority from the SEC and is responsible for enforcing compliance with its own rules, investigating misconduct, and imposing disciplinary actions. Despite its mandate, FINRA failed to properly audit and oversee the trading of MMTLP, allowing unauthorized transactions to persist without regulatory intervention. FINRA also failed to enforce trade settlement regulations, exacerbating systemic failures that resulted in millions of unsettled trades. Ultimately, FINRA imposed an indefinite U3 trading halt without reconciling market discrepancies, leaving retail investors trapped and unable to liquidate their holdings.

31.     Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") is a private oil and gas exploration company incorporated in Nevada and headquartered in Midland, Texas. NBH was formed as part of the corporate spin-off of Torchlight Energy Resources' oil and gas assets, with shareholders receiving preferred shares designated as MMTLP. In this case, NBH's role in the transition of MMTLP shares and its management of key assets, including the Orogrande Basin, are central to the harm suffered by the Plaintiff and other retail investors.

32.     Gregory McCabe (hereinafter "McCabe") is the Chief Executive Officer and Chairman of Next Bridge Hydrocarbons, Inc. (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701. McCabe

played a central role in the corporate actions that led to the creation of NBH, including the spin-off of Torchlight Energy Resources' oil and gas assets. In this case, McCabe's actions and representations regarding NBH's assets and the transition of MMTLP shares are central to the harm suffered by the Plaintiff and other retail investors.

33.     John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources, Inc. (Torchlight), a Texas-based oil and gas exploration company. Brda played a central role in structuring the merger between Torchlight and Meta Materials, Inc. (META I), which led to the creation of META II and the issuance of MMTLP shares. Following the merger, Brda transitioned into an executive consulting role with META II. In this case, Brda's actions and representations regarding the merger, spin-off, and transition of MMTLP shares are central to the harm suffered by the Plaintiff and other retail investors.

## V. **FACTUAL BACKGROUND**

### Pre-Merger Activities

34.     In the years leading up to the merger, Torchlight Energy Resources, Inc. ("Torchlight") was in severe financial distress, struggling with mounting debt, declining investor confidence, and operational challenges. To prevent bankruptcy, Torchlight's leadership, including Defendant John Brda, orchestrated a reverse merger with Meta Materials, Inc. ("META I"), a Canadian smart materials company. As part of this transaction, Torchlight's oil and gas assets were spun off into a newly created private entity, Next Bridge Hydrocarbons, Inc. ("NBH"). Shareholders were issued Non-Voting Series A Preferred Shares, designated as MMTLP, which were intended to represent private ownership in NBH. This structure was

11

marketed to investors as a strategic pivot to preserve value while transitioning from energy exploration to advanced materials technology.

35.     Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction. These statements, from NBH corporate officers and social media influencers regarding the probable reserve, inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

36.     Despite assurances that the spin-off would be handled properly, significant unresolved issues plagued the process. For example, Torchlight initially issued the MMTLP shares as restricted securities, which are typically not eligible for public trading without either SEC registration or an applicable exemption (e.g., Rule 144 or Section 3(a)(10)). However, these shares began trading publicly on OTC Markets on October 6, 2021—months before any formal authorization or compliance with regulatory requirements. Adding to the complexity, another

ticker symbol, MMATF, emerged around the fourth quarter of 2020, representing a duplicate of META I already trading on the Canadian Securities Exchange (CSE). This premature trading, along with the existence of the MMATF ticker, raises serious questions about whether corporate officers, including Defendant Brda, intentionally structured the issuance to allow unauthorized trading and create investor confusion, despite public assurances to the contrary.

37.     Further complicating matters, Torchlight experienced unprecedented trading volumes in the months leading up to the merger, raising concerns about unusual trading activity. From January 1, 2021, to June 25, 2021, Torchlight traded approximately 3.6 billion shares—a staggering increase compared to its cumulative trading volume of 745 million shares over the prior decade. This extreme trading activity far exceeded Torchlight's authorized float of 165 million shares, raising red flags about potential synthetic share creation, naked short selling, and other manipulative practices. Notably, this surge in trading volume occurred even before the merger and spin-off, suggesting that potential naked short selling and synthetic share creation were already at play, further setting the stage for the subsequent market manipulation surrounding MMTLP shares. Yet, no steps were taken to investigate or reconcile these discrepancies before issuing MMTLP shares, creating a foundation for systemic market manipulation.

38.     Additionally, internal communications suggest that Torchlight's leadership may have been aware of these irregularities but failed to disclose them to retail investors. For instance, emails and memos obtained through FOIA requests reveal discussions among executives about unresolved share discrepancies and the risks posed by excessive trading volumes. These communications highlight a pattern of selective disclosure, where material information was shared with certain institutional players while being withheld from retail

investors in violation of Regulation FD (17 C.F.R. § 243.100 et seq.). This unequal treatment created an uneven playing field, leaving retail investors vulnerable to systemic abuses.

39.    The lack of transparency extended to the valuation of Torchlight's assets, particularly the Orogrande Basin. Executives repeatedly misrepresented the basin's value, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these claims lacked independent verification, as no third-party certified reserve report was ever produced. By promoting exaggerated valuations while failing to address systemic risks, Torchlight's leadership induced investors to retain their MMTLP shares under false pretenses, further exacerbating the harm caused by the eventual U3 trading halt.

40.    Torchlight's financial instability posed substantial risks to shareholders, but company executives, including Defendant John Brda, failed to disclose key material information about these risks. In its public filings, Torchlight acknowledged significant debt, liquidity problems, and operational challenges but failed to fully inform retail investors of the potential consequences. For example, internal communications reveal that Torchlight's leadership was aware of unresolved share discrepancies, synthetic shares, and excessive trading volumes that far exceeded the authorized float. These issues were not disclosed to investors, leaving them unaware of the systemic risks affecting their investments. Additionally, Torchlight misrepresented the value of its flagship asset, the Orogrande Basin, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these claims lacked independent verification, as no third-party certified reserve report was ever produced. By promoting exaggerated valuations while failing to address systemic risks, Torchlight induced investors, including the Plaintiff, to retain their MMTLP shares under false pretenses. This

selective disclosure and lack of transparency directly contributed to the financial harm suffered by retail investors.

41.    Internally, Torchlight's leadership knew that the company was reliant on the merger with META I to avoid collapse. Instead of transparently disclosing these risks, Brda and other executives selectively released information to certain institutional players while withholding it from retail investors. This created an unequal playing field in direct violation of Regulation FD (17 C.F.R. § 243.100 et seq.), which prohibits selective disclosure of material nonpublic information.

42.    Additionally, Torchlight shareholders were repeatedly assured that the MMTLP spin-off would be handled properly and that share discrepancies would be resolved before the transition to NBH. However, no such reconciliation occurred, and unresolved failures to deliver ("FTDs") persisted throughout the merger and spin-off process.

<u>Merger and Spin-Off</u>

43.    On June 28, 2021, Torchlight completed a reverse merger with META I, forming Meta Materials, Inc. ("META II"). As part of this corporate action, Torchlight's oil and gas assets were spun off into a newly created private entity, Next Bridge Hydrocarbons, Inc. ("NBH"), and shareholders were issued Non-Voting Series A Preferred Shares ("MMTLP") to represent their ownership interest in NBH.

44.    However, the merger and spin-off were executed with serious material omissions. The proxy statement for the merger failed to address unresolved share discrepancies, including synthetic shares and naked short selling activity that had flooded the market prior to the merger. At the time of the merger, the actual number of MMTLP shares in circulation was unknown, as Torchlight had experienced record-high trading volumes of over 3.6 billion shares in early

2021—far exceeding its authorized float of 165 million shares. Internal discussions among Torchlight executives reveal that corporate officers may have intentionally structured the issuance of MMTLP shares to allow unauthorized trading, despite public assurances to the contrary. This timeline of events highlights the lack of transparency and intent to mislead investors.

45.     Torchlight's own proxy filings explicitly stated that MMTLP shares would not be publicly traded. Despite these clear corporate disclosures, OTC Markets improperly listed MMTLP for trading, enabling broker-dealers and market makers to execute transactions beginning on October 6, 2021, without any formal authorization from META II or its executives.

46.     This unauthorized trading activity occurred without SEC oversight, and neither FINRA nor the SEC took action to prevent or investigate these irregularities, despite their clear regulatory obligations. As a result, millions of retail investors unknowingly purchased an unregistered security, leaving them exposed to financial losses when regulatory failures later culminated in the U3 trading halt.

47.     As part of the merger, Torchlight's oil and gas assets were spun off into a separate private company, Next Bridge Hydrocarbons, Inc. ("NBH"), and existing shareholders received Non-Voting Series A Preferred Shares ("MMTLP") to reflect their ownership interest in NBH. These shares were explicitly designated as a "placeholder" for NBH equity and were never intended to be publicly traded.

48.     However, significant unresolved issues and discrepancies existed at the time of the spin-off. Despite repeated public assurances from corporate leadership and regulatory bodies, no formal audit or reconciliation of MMTLP shares was ever conducted. Shareholders were

never provided with a verified count of the total number of MMTLP shares in circulation, despite the fact that trading activity had long exceeded the legally authorized float of 165 million shares.

49.     Broker-dealers, clearinghouses, and regulators ignored red flags about synthetic share proliferation, failures to deliver ("FTDs"), and discrepancies in shareholder records. Internal communications, later revealed through FOIA requests and congressional inquiries, indicate that regulatory agencies were aware of these anomalies but failed to take corrective action.

50.     The lack of oversight resulted in retail investors being left with highly uncertain and potentially fraudulent securities, creating substantial financial harm and legal ambiguity.

51.     Defendant John Brda, who transitioned into an executive consulting role with Meta Materials, Inc. ("META II"), and Defendant Gregory McCabe, CEO of Next Bridge Hydrocarbons, Inc. ("NBH"), made repeated public statements that misrepresented the value, viability, and investment potential of NBH's assets, particularly the Orogrande Basin.

52.     In investor calls, public filings, and social media posts, Brda and McCabe consistently portrayed the Orogrande Basin as a high-value oil asset, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these assertions lacked independent verification, as no third-party certified reserve report was ever produced.

53.     Furthermore, both executives failed to disclose significant risks affecting the Orogrande asset, including infrastructure deficiencies, extraction challenges, regulatory barriers, and lease expirations that could render the project unviable. By withholding material information while promoting exaggerated valuations, Brda and McCabe induced investors, including Plaintiff, to retain their MMTLP shares under false pretenses.

54.     Throughout 2021 and 2022, Defendants Brda and McCabe repeatedly made misleading statements regarding the Orogrande Basin, claiming it contained "proven reserves" of approximately 3.7 billion barrels of recoverable oil. However, these statements were based on speculative internal assessments rather than any independently verified third-party audit.

55.     Despite lacking proper certification, Brda and McCabe aggressively promoted these claims across multiple platforms, including investor calls, SEC filings, social media posts, and shareholder meetings. Their statements gave the false impression that the Orogrande Basin was a fully developed and high-value asset, rather than an unproven speculative venture with significant operational challenges.

56.     As a result of these misleading representations, investors, including Plaintiff, were led to believe that their MMTLP shares represented ownership in a high-value energy asset with near-certain profitability. These exaggerated claims contributed to artificial market demand and price inflation for MMTLP shares, distorting investor expectations and decision-making.

57.     Brda and McCabe actively misrepresented the Orogrande Basin as a proven, high-value oil asset, creating false expectations about the worth of MMTLP shares. Their public statements and investor communications consistently suggested that the Orogrande reserves were confirmed, extraction-ready, and positioned for profitability. However, these representations concealed key facts that undermined the true viability of the asset, including:

a.     Unproven extraction feasibility – No commercial-scale drilling had ever been conducted, and no independent third-party reserve certification existed, making valuation claims speculative.

b.     Severe infrastructure limitations – The region lacked essential pipelines, refining capacity, and transportation infrastructure, making oil extraction costly and impractical.

c.   Regulatory and legal uncertainties – Leases were nearing expiration, environmental compliance concerns remained unresolved, and no clear legal framework ensured long-term production viability. These misrepresentations, including public claims that the Orogrande Basin contained 3.7 billion barrels of recoverable oil, induced shareholders, including Plaintiff, to retain their MMTLP shares under false pretenses.

58.   By misleading investors into believing Orogrande was a fully developed, highly valuable asset, Brda and McCabe induced Plaintiff and others to retain MMTLP shares under false pretenses.

59.   Beyond the misrepresentations about Orogrande's value, Brda and McCabe also failed to address systemic trading risks that directly impacted the marketability and legitimacy of MMTLP shares. These risks included:

a.   The unresolved issue of synthetic shares and failures to deliver ("FTDs") – Trading volumes consistently exceeded the legally authorized float of 165 million shares, indicating the presence of counterfeit shares and naked short selling. Persistent FTDs confirmed the inability of broker-dealers to deliver actual shares to investors.

b.   The lack of a CUSIP number for NBH shares – This omission made the shares non-tradeable after the transition, stranding investors in an unmarketable security.

c.   The failure of broker-dealers and clearinghouses to recognize NBH shares properly – This systemic breakdown led to shareholder positions being misclassified, further trapping investors.

60.   Prior to the merger, Torchlight had experienced record-breaking trading volumes, exceeding 3.6 billion shares in the first half of 2021—far beyond its authorized share count. This extreme volume, combined with persistent FTDs, strongly suggested the presence of synthetic

shares and uncovered short positions. By failing to disclose and address these risks, Brda and McCabe created a false sense of security, causing investors to hold MMTLP shares despite systemic market manipulation that insiders were well aware of.

61.     Internal communications obtained from corporate executives, regulatory bodies, and market participants reveal early awareness of trading irregularities and systemic failures that were not disclosed to investors. These communications include:

a.     Emails and memos from Torchlight and NBH executives, including John Brda and Gregory McCabe, discussing the valuation of the Orogrande Basin and the planned transition of MMTLP shares—while internally acknowledging unresolved market discrepancies.

b.     Regulatory discussions between FINRA and the SEC, indicating awareness of unauthorized trading activity and failures to enforce market rules.

c.     Broker-dealer communications demonstrating internal concerns about synthetic shares, excessive failures to deliver (FTDs), and share reconciliation issues—concerns that were never disclosed to the public.

62.     These records confirm that key decision-makers were aware of the systemic risks affecting MMTLP shares but failed to take corrective action, leaving investors exposed to undisclosed market manipulation. Brda and McCabe also failed to take any steps to reconcile outstanding share discrepancies, despite overwhelming evidence that the volume of MMTLP shares in circulation far exceeded the legally authorized float.

63.     By the time of the merger, Torchlight had traded over 3.6 billion shares in the first six months of 2021 alone—an amount far exceeding its legally authorized share count of 165 million shares. This extreme trading volume, which should have been impossible given the

official share count, strongly indicated the presence of synthetic shares, excessive short selling, and systemic market manipulation.

a.    Persistent Failures to Deliver (FTDs): Market data from broker-dealers and regulatory disclosures showed repeated FTDs, a recognized indicator of synthetic share creation.

b.    Share Reconciliation Failures: Investor account statements showed fluctuating balances, suggesting the presence of unbacked positions.

c.    Regulatory Inaction: Despite these red flags, neither FINRA, the SEC, nor clearinghouses took steps to investigate or address the discrepancies before the merger.

64.    By failing to acknowledge or intervene in this unprecedented level of trading activity, regulatory bodies and corporate executives enabled the artificial inflation of MMTLP shares, leaving investors exposed to a manipulated market. Despite clear evidence of persistent failures to deliver (FTDs) and unusually high trading volumes, the SEC did not enforce Regulation SHO's close-out requirements under 17 C.F.R. § 242.204. Broker-dealers and market makers were able to engage in repeated naked short selling, circumventing settlement obligations and exacerbating trading distortions. Additionally, FINRA failed to audit trading volumes or reconcile the total number of outstanding MMTLP shares before approving continued trading, leading to widespread discrepancies. As a result, retail investors unknowingly purchased shares that may have been synthetic or improperly located, exposing them to significant financial losses when the U3 halt was imposed.

65.    Despite clear indicators of synthetic shares and excessive trading volume, neither Brda, McCabe, FINRA, the SEC, nor the DTCC conducted an independent audit or took any steps to verify the true number of outstanding MMTLP shares before executing the spin-off. This

failure to investigate left retail investors in a state of prolonged financial and legal uncertainty, unable to determine whether their holdings were legitimate or part of a manipulated market.

a.   FINRA failed to enforce its own oversight responsibilities, despite receiving multiple complaints and warnings about unresolved share discrepancies.

b.   The SEC neglected its duty to ensure fair and transparent markets, allowing unregistered trading of MMTLP shares to continue without intervention.

c.   Broker-dealers and clearinghouses ignored systemic reconciliation issues, leading to conflicting share counts across different investor accounts.

d.   DTCC, as the central clearing agency, had a duty to prevent the unauthorized clearing of synthetic and naked shorted shares but failed to do so, facilitating widespread market manipulation. This failure violated DTCC's regulatory obligations under SEC Rule 15c3-3, which requires the safeguarding of customer securities to prevent fraudulent market activity.

66.   Had regulators and corporate officers acted responsibly, a thorough audit could have prevented further market manipulation and provided investors with transparency regarding the legitimacy of their holdings.

Premature Inclusion in Schwab Total Stock Market Index Fund (SWTSX)

67.   On July 31, 2021, months before MMTLP shares were authorized to trade publicly, these shares were recorded in the Schwab Total Stock Market Index Fund (SWTSX). This premature inclusion raises serious concerns about systemic irregularities in market infrastructure and the processes used to recognize and handle MMTLP shares.

a.    Index funds like SWTSX are designed to include only publicly traded securities that meet specific criteria such as liquidity, trading volume, or market capitalization. MMTLP did not meet these criteria at the time, yet it was still included in SWTSX.

b.    The inclusion of MMTLP in SWTSX suggests that synthetic shares may have already been created or that the recognition of these shares in financial systems bypassed standard procedures. This highly unusual market activity warrants an independent audit and investigation into Schwab's criteria and decision-making processes for including MMTLP shares in SWTSX before they were publicly tradable.

c.    Furthermore, this premature inclusion highlights potential regulatory failures, as neither FINRA nor the SEC intervened to address the clear discrepancy between MMTLP's actual status and its treatment as a publicly tradable security

68.    This highly unusual market activity warrants an independent audit and investigation into Schwab's criteria and decision-making processes for including MMTLP shares in SWTSX before they were publicly tradable.

Unauthorized Trading of MMTLP Shares

69.    On October 6, 2021, MMTLP shares began trading publicly on OTC Markets, despite explicit prohibitions outlined in Torchlight's proxy statement, which legally forbade public trading of the Series A Preferred Shares on any exchange.

a.    Market makers GTS Securities and Canaccord Genuity facilitated the unauthorized trading, allowing institutional traders to execute transactions despite the absence of formal SEC registration.

b.    The SEC requires that each public company have a unique Central Index Key (CIK) to ensure regulatory transparency. However, MMTLP traded under the same CIK

(0001431959) previously used by Pole Perfect, Torchlight, and META II, raising serious compliance concerns under Regulation S-T Rule 10(b) and Rule 10b-5.

    c.    FOIA-released emails confirm that FINRA and the SEC were aware of irregularities in MMTLP trading as early as November 2021. Despite this knowledge, no corrective action was taken, allowing the unauthorized trading and potential synthetic share creation to persist.

    70.    This unauthorized listing led to significant trading irregularities, exposing retail investors to artificial price manipulation and regulatory failures.

    71.    This activity occurred despite directives in Torchlight's proxy statement, which explicitly prohibited public trading of the Series A Preferred Shares on any exchange. Nevertheless, on October 7, 2021, MMTLP began trading on OTC Markets under the same Central Index Key (CIK) 0001431959, which was previously used by Pole Perfect, Torchlight, and META II.

    a.    SEC rules require that every publicly traded company have a unique CIK to prevent compliance ambiguity. However, MMTLP was allowed to trade under a recycled CIK, creating a regulatory loophole that violated SEC Regulation S-T Rule 10(b) and Rule 10b-5.

    b.    The use of a shared CIK prevented proper regulatory oversight, allowing broker-dealers to obscure synthetic shares, naked short selling, and excessive failures to deliver (FTDs).

    c.    This regulatory failure directly harmed investors by enabling misleading reporting and improper share reconciliation, leaving many shareholders unable to confirm the legitimacy of their holdings.

    72.    A detailed audit of this compliance failure is necessary to determine whether broker-dealers, market makers, or regulatory bodies deliberately overlooked these discrepancies.

73.     OTC Markets deflected responsibility for the unauthorized trading of MMTLP shares to FINRA, claiming it lacked the authority to halt trading. However, internal emails between FINRA and OTC Markets suggest that both entities were aware of potential issues before trading commenced.

a.     OTC Markets initially permitted the trading of MMTLP shares but later denied responsibility, shifting blame entirely to FINRA.

b.     FOIA-released emails confirm that both FINRA and OTC Markets discussed concerns about MMTLP's trading activity before it began, yet neither entity took action to prevent unauthorized trading.

c.     OTC Markets failed to monitor excessive trading volumes and abnormal price movements in MMTLP, despite internal policies requiring oversight of newly listed securities.

74.     By permitting trading and later avoiding accountability, OTC Markets enabled institutional participants to profit from the creation and trading of counterfeit shares at the expense of retail investors.

<u>Negligence by Transfer Agents</u>

75.     Transfer agents, including AST/EQ (Equiniti), failed in their fiduciary and statutory obligations during the MMTLP-to-NBH transition. Their negligence exacerbated share discrepancies and prevented investors from verifying their ownership or recovering the fair value of their investments.

a.     Nearly two years after the NBH spin-off, AST/EQ and NBH have failed to produce a publicly available reconciliation report confirming the total number of MMTLP shares converted to NBH shares.

25

b. Broker-dealers, including Charles Schwab and TD Ameritrade, have used at least 18 different internal CUSIP numbers to track unconverted MMTLP shares, yet AST/EQ has failed to demand a full reconciliation of these holdings.

c. NBH has not been assigned a CUSIP number for all its shares, making them untradeable and leaving investors in an unverified, illiquid position.

76.     This failure to reconcile outstanding shares and ensure accurate shareholder records has prolonged financial harm to investors and compounded the systemic failures of market participants.

<u>Regulatory Awareness of Unauthorized Trading</u>

77.     Emails obtained through a Freedom of Information Act (FOIA) request confirm that both the SEC and FINRA were aware of trading irregularities affecting MMTLP shares as early as November 29, 2021, yet deliberately failed to intervene. This pattern of inaction constitutes scienter under Rule 10b-5, as it demonstrates actual knowledge of fraudulent activities and a reckless disregard for investor harm. Instead of fulfilling their enforcement duties, Defendants enabled and facilitated illegal trading, violating Section 10(b) of the Securities Exchange Act of 1934.

a. FOIA emails from November 29, 2021, reveal internal discussions between FINRA and the SEC regarding concerns about MMTLP trading activity, nearly a full year before FINRA's December 2022 U3 halt.

b. Additional FOIA-released communications from December 5, 2022, confirm that senior regulators—including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, and Mr. Jay Gibbons—were actively monitoring fraudulent activities in MMTLP but failed to take corrective action.

c.  Thousands of investor complaints and FOIA disclosures repeatedly alerted regulators to fraud, yet these warnings were ignored, demonstrating a pattern of deliberate inaction.

d.  *This cannot be overstated. The difference between a regulator doing its job and a regulator knowingly leading investors into a burning house is clear: by allowing known market manipulation to persist while pretending to act only at the last moment, the regulators crossed the line from inaction to complicity. Their conduct reflects not diligence, but scienter—intentional misconduct or reckless disregard for investor harm*.

78.  The SEC and FINRA failed to prevent widespread market manipulation in the trading of MMTLP. Broker-dealers and market makers engaged in illegal naked short selling, flooding the market with shares that did not exist. These actions were in direct violation of Regulation SHO (17 C.F.R. § 242.204), which requires that short-sold shares be located and delivered within settlement deadlines. Despite clear evidence of excessive trading volume surpassing the legally authorized float, the SEC took no action to enforce Regulation SHO. Market participants were able to repeatedly sell synthetic shares, allowing trading volumes to far exceed the actual number of legitimate MMTLP shares in circulation. Data from the SEC's "Fails-to-Deliver" (FTD) reports show that MMTLP experienced persistent FTD spikes, meaning that thousands of shares were sold but never properly delivered. Brokerage firms and clearinghouses failed to reconcile these discrepancies, and the SEC did not intervene to correct these regulatory violations. The result was an artificial inflation of supply, downward price manipulation, and widespread investor harm. Retail investors were unknowingly purchasing shares that may not have actually existed, leading to massive losses when the U3 halt was imposed.

79.     Despite their legal obligations, FINRA and the SEC failed to address a fundamental issue at the heart of MMTLP's trading: the creation and circulation of synthetic shares. Synthetic shares—counterfeit securities that exist only as digital placeholders in brokerage systems—result from naked short selling, failures to deliver (FTDs), and systemic trading loopholes. Data and investor reports indicate that the total number of outstanding MMTLP shares far exceeded the legally authorized float. This imbalance arose due to the unauthorized sale of synthetic shares, which FINRA and the SEC were aware of yet failed to mitigate. By neglecting to audit or reconcile share counts before imposing the U3 halt, regulators ensured that these unresolved trading discrepancies would financially devastate investors.

<u>Systemic Trading Irregularities</u>

80.     During the period of unauthorized trading, systemic irregularities emerged, including synthetic share creation, naked short selling, and failures to deliver (FTDs), which distorted the market and harmed investors.

a.     Trading volumes for MMTLP frequently exceeded 100 million shares per day, despite an officially authorized float of only 165 million shares, indicating widespread synthetic share proliferation.

b.     Broker-dealers exploited exemptions under Regulation SHO to create synthetic shares and bypass statutory safeguards, allowing unbacked positions to circulate unchecked.

c.     This artificial inflation of share supply suppressed legitimate price discovery, preventing MMTLP shares from reaching their natural market value and causing significant financial harm to retail investors.

81.     These irregularities demonstrate a breakdown in market oversight, warranting further investigation into broker-dealer misconduct and regulatory failures.

82.     DTCC, responsible for clearing and settlement, failed to reconcile share discrepancies, enforce proper settlement standards, or take corrective action against synthetic share proliferation, allowing widespread market manipulation to persist unchecked.

a.  DTCC neglected its obligations under Section 17A of the Securities Exchange Act (15 U.S.C. § 78q-1), which mandates accurate recordkeeping and proper settlement of securities transactions.

b.  DTCC's failure to reconcile synthetic shares left investors in financial limbo, unable to confirm the legitimacy of their holdings.

c.  By failing to enforce proper settlement practices, DTCC created a marketplace where institutional participants could manipulate share counts without oversight, exposing retail investors to unchecked fraud.

83.     This failure allowed synthetic shares and market manipulation to thrive, leading to the destruction of investor capital and undermining trust in the financial system.

84.     DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), allowing broker-dealers to engage in prolonged failures to deliver (FTDs), naked short selling, and synthetic share creation, which devastated MMTLP investors.

a.  Between October 2021 and December 2022, unresolved FTDs accounted for over 20% of the total trading volume, creating a massive imbalance in the market and exposing retail investors to hidden risks.

b.  DTCC's inaction allowed synthetic shares to flood the market, artificially inflating supply and suppressing the legitimate share price of MMTLP, depriving investors of fair market value.

c.  Despite its legal obligation under Regulation SHO to force broker-dealers to close

out failed trades, DTCC knowingly allowed these violations to persist, benefiting

institutional traders at the expense of retail investors.

85.  This failure was not just a regulatory oversight—it was a deliberate refusal to

uphold basic market protections, allowing systemic fraud to continue unchecked.

86.  Defendant FINRA, tasked with overseeing broker-dealers and ensuring market

integrity, failed in its fundamental duty to investigate or address manipulative trading practices,

allowing institutional participants to profit at the expense of retail investors.

a.  FINRA failed to provide any notice—publicly or privately—before issuing the U3

halt on MMTLP trading on December 9, 2022, depriving investors of the ability to react or

seek legal recourse.

b.  On December 8, 2022, FINRA unilaterally revised the corporate action notice for

MMTLP, removing references to the December 14, 2022, pay date for NBH shares without

explanation, further compounding investor confusion and regulatory uncertainty.

c.  Despite clear violations of Regulation SHO by broker-dealers failing to close out

FTDs and short positions, FINRA took no enforcement action, allowing market manipulation

to persist unchecked.

87.  FINRA's deliberate regulatory failure, coupled with its lack of transparency,

enabled systemic fraud and inflicted lasting harm on MMTLP investors, warranting judicial

scrutiny.

88.  Publicly available trading data reveals that MMTLP's daily trading volumes

frequently exceeded 100 million shares—an impossible figure given the authorized float of only

165 million shares. This extreme trading activity is clear evidence of synthetic share proliferation and naked short selling, flooding the market with unbacked positions.

89.     Despite these statistical impossibilities, FINRA, the SEC, and DTCC failed to intervene, even though internal reports and real-time Blue Sheet data directly flagged synthetic share manipulation. These regulators possessed the tools, authority, and knowledge to prevent this fraud but deliberately chose not to act, allowing unchecked market manipulation to persist.

90.     This regulatory inaction was not mere incompetence—it was a conscious decision that directly enabled hedge funds, broker-dealers, and market makers to extract massive profits while retail investors suffered devastating financial losses. By refusing to enforce market protections, regulators created an environment where synthetic share proliferation, price suppression, and financial fraud could continue without consequence.

91.     Unlike other cases, such as GameStop (GME), where retail-driven volatility led to immediate regulatory intervention, MMTLP investors were ignored for nearly two years, suffering billions in collective financial losses.

92.     In January 2021, GameStop's stock surged over 1,000% amid a retail short squeeze, prompting swift SEC statements, broker-imposed trading restrictions, and Congressional hearings featuring testimony from Robinhood executives and hedge funds. Regulators moved rapidly to address volatility and ensure that institutional losses were contained.

93.     In contrast, when MMTLP investors faced an indefinite trading halt on December 9, 2022, regulators provided no immediate statements, no hearings were held, and no relief was offered. Despite tens of thousands of retail complaints, FINRA justified the halt as an

"extraordinary event" but failed to explain its reasoning, leaving investors trapped in an unresolved market failure.

94.     This clear pattern of regulatory neglect demands immediate accountability, as it reflects not just incompetence but an intentional failure to protect retail investors from systemic fraud.

95.     Regulators violated Sections 15A and 17A of the Securities Exchange Act by failing to enforce basic market protections, allowing synthetic shares and naked short selling to proliferate unchecked. Despite repeated warnings from investors, advocacy groups, and members of Congress, FINRA, the SEC, and DTCC deliberately ignored clear evidence of fraud, choosing to protect market manipulators over retail investors.

96.     This failure led to billions of dollars in investor losses, making regulatory accountability not just necessary, but legally imperative.

97.     These counterfeit shares flooded the market, artificially inflating supply and suppressing legitimate share prices.

98.     Retail investors, including the Plaintiff, were unable to reconcile their holdings or recover the fair value of their investments.

<u>Misleading Public Statements and Social Media Influence</u>

99.     Corporate executives, including John Brda and Gregory McCabe, made misleading public statements and social media posts promoting MMTLP shares while simultaneously selling their own holdings at significant profit.

100.     Brda repeatedly denied selling MMTLP shares while publicly encouraging others to buy and hold, only later admitting that he had offloaded a significant portion of his shares during the price increase leading up to the U3 halt. Similarly, McCabe sold approximately 6.8

million shares of MMTLP in late November 2022, generating an estimated $52 million to $68 million, while retail investors were misled into believing the stock was a long-term hold.

101.    These executives also misrepresented the value of the Orogrande Basin, claiming it contained 3.7 billion barrels of recoverable oil despite lacking an independent third-party reserve certification. Their misleading statements created a false impression of market stability, inducing retail investors to retain their shares while insiders secretly liquidated their positions. These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

<u>Role of Software in Systemic Failures</u>

102.    Modern financial systems rely heavily on sophisticated software to facilitate trading, enforce regulations, and manage compliance. These systems do not act independently—they operate based on human-coded instructions that reflect business and regulatory decisions. Therefore, any systemic irregularities or failures within these systems are directly traceable to the human choices underlying their development, implementation, and oversight.

103.    Despite the critical role of software systems in managing trading and compliance, Defendants FINRA, DTCC, and OTC Markets failed to conduct audits or provide transparency into how these systems were programmed and maintained. Algorithmic trading systems do not operate independently; they follow coded instructions that reflect deliberate business and regulatory decisions. FINRA's internal system logs, if audited, could have revealed timestamps, system configurations, and administrative decisions related to the U3 halt, yet no such transparency was provided. Regulators have an obligation to perform periodic system audits, but they failed to do so in this instance, leaving critical discrepancies unaddressed. The refusal to release internal trading system data further deprived investors of essential information needed to

understand how and why the halt occurred, underscoring a broader failure of regulatory oversight. Algorithmic trading systems may have been deliberately structured to enable or conceal manipulative practices, such as naked short selling and synthetic share creation, further distorting the market for retail investors.

104.     Investigating the decision-making processes behind these systems, including the individuals responsible for their design and oversight, is essential to determining liability for the systemic harm caused to investors. Given the opacity of these systems, judicial oversight is necessary to ensure that software-driven trading operations adhere to statutory obligations and do not facilitate market manipulation.

<u>Failure to Audit Software Systems</u>

105.     Despite the critical role of software systems in managing trading and compliance, Defendants FINRA, DTCC, and OTC Markets failed to conduct audits or provide transparency into how these systems were configured to handle MMTLP shares. For example, logs from FINRA's trading systems could have revealed how the U3 halt was implemented, including timestamps, configuration changes, and related communications from system administrators or developers. The absence of such audits obstructed efforts to identify the root causes of systemic failures, leaving retail investors without answers or recourse.

106.     Further, reports from investors indicate multiple instances of irregular trading behavior that appear linked to software-driven trading malfunctions. For example, system errors caused the automatic execution of market orders at prices drastically different from quoted bid-ask spreads. Additionally, software configurations allowed significant short-selling activity in MMTLP shares without appropriate reconciliation, exacerbating synthetic share creation. These failures highlight the need for rigorous audit procedures to ensure compliance with federal

securities laws and prevent software-driven market distortions. Without judicial oversight, these opaque systems will continue to enable manipulative trading practices that disproportionately harm retail investors.

### U3 Trading Halt

107. On December 9, 2022, Defendant FINRA imposed an indefinite U3 trading halt on MMTLP shares, citing an undefined "extraordinary event." This halt froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity. FINRA failed to provide proper notice, justification, or procedural safeguards, leaving tens of thousands of investors, including the Plaintiff, unable to access their assets or reconcile their positions. The U3 halt raised serious constitutional concerns, as FINRA, a private self-regulatory organization, exercised quasi-governmental authority without meaningful oversight or accountability. The halt violated the separation of powers, the Appointments Clause, and the Due Process Clause of the Fifth Amendment, depriving investors of their property rights without due process. The SEC, tasked with overseeing FINRA, failed to intervene or provide transparency, further compounding the harm to retail investors.

### Post-Halt Inaction

108. Following the U3 halt, Defendants FINRA and the SEC failed to take any corrective action to resolve the systemic failures or address the financial harm suffered by retail investors. FINRA failed to provide transparency regarding the halt, offering no justification or pathway for resolution, leaving investors in prolonged uncertainty. The SEC, tasked with regulatory oversight, allowed FINRA's actions to go unchecked and failed to enforce Regulation SHO (17 C.F.R. § 242.204), despite widespread failures to deliver (FTDs) and apparent naked short selling. As investor concerns grew, Congressional leaders—including Representative Ralph

35

Norman and Representative Pete Sessions—issued formal inquiries demanding explanations

from FINRA and the SEC regarding the market's irregularities. However, no meaningful

response was given, further eroding investor confidence. The failure of these agencies to act in a

timely and transparent manner directly contributed to investor losses, market instability, and an

erosion of trust in regulatory enforcement.

109.    Despite receiving thousands of complaints from shareholders through Schwab,

FINRA, the SEC, and Congressional Representatives, regulators failed to take action. Notably,

high-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W.

Cook, were aware of these trading irregularities as early as November 2021, yet did nothing to

intervene. Internal communications and congressional inquiries further demonstrate that retail

investors' concerns were systematically dismissed while regulatory agencies prioritized the

interests of institutional participants.

110.    Defendant NBH, the successor entity to Torchlight's oil and gas assets, also failed

to address the systemic trading irregularities or communicate effectively with shareholders.

Corporate officers, including Defendants John Brda and Gregory McCabe, misrepresented the

financial prospects of NBH's assets and neglected their fiduciary duties to shareholders.

<u>Systemic Bias in Regulatory Responses</u>

111.    The disparity between the regulatory response to the MMTLP case and other

market disruptions, such as the GameStop trading episode, illustrates the inequities faced by

retail investors. While GameStop investors benefited from swift regulatory and Congressional

action, MMTLP investors have endured nearly two years of neglect. This systemic bias

underscores broader vulnerabilities in regulatory frameworks and necessitates judicial

intervention to ensure equitable treatment of all market participants.

Congressional Concerns Over Regulatory Failures

112.    On June 5, 2024, over 70 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated demands for a full investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the unresolved trading discrepancies. It emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents detailing the financial distress caused by these regulatory failures. The letter specifically called for transparency, an independent audited share count, and a briefing on the SEC's findings. Additionally, the letter highlighted concerns about the impact of synthetic shares and unresolved failures to deliver (FTDs), which further exacerbated trading irregularities in MMTLP. This bipartisan intervention underscores the systemic nature of the trading issues and establishes the scienter element of Defendants' misconduct, as regulatory bodies were repeatedly made aware of investor harm yet failed to act.

113.    Similarly, on September 27, 2023, Representative Ralph Norman questioned SEC Chair Gary Gensler during a House Financial Services Committee hearing about MMTLP, pressing for clarity on the aggregate share count as of December 8, 2023. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information. These repeated congressional inquiries demonstrate that regulators were repeatedly made aware of investor harm yet failed to act, establishing scienter under Rule 10b-5. Specifically:

a.    The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.    The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.)

by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation

for its inaction regarding the U3 trading halt and related market irregularities.

### Ongoing Harm to Retail Investors

114.    As of the filing of this complaint, nearly two years after the U3 halt, shareholders,

including the Plaintiff, remain in financial and legal limbo, unable to trade their positions,

reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional

participants who engaged in manipulative practices, including naked short selling, remain

unaccountable. This prolonged inaction underscores critical vulnerabilities in the existing

regulatory framework and highlights the urgent need for judicial intervention. The SEC's failure

to enforce Regulation SHO (17 C.F.R. § 242.204) and DTCC's failure to reconcile share

discrepancies have exacerbated the harm to retail investors, leaving them without recourse or

transparency.

## VI. **CONSTITUTIONAL CHALLENGES**

### Appointments Clause Violations (Article II)

115.    FINRA's governance structure violates the Framers' deliberate design for federal

accountability under the Appointments Clause. As Alexander Hamilton warned in The Federalist

No. 76, "The sole and undivided responsibility of [appointing officers] to the President" was

intended to prevent "a mercenary, pliant" body of decision-makers. Yet FINRA—a private

entity—wields the quintessential authority of federal officers: halting public markets, levying

fines, and enforcing rules with the binding force of law.

116.     FINRA's governance structure further exacerbates these constitutional violations. Its Board of Governors, which exercises significant quasi-governmental authority, is composed primarily of unelected industry insiders who operate without any meaningful oversight or compliance with Article II's requirements. This composition directly contravenes the Framers' intent, as articulated in The Federalist No. 76, to prevent a 'mercenary, pliant' body of decision-makers. By allowing private industry representatives to wield regulatory power without Presidential appointment or Senate confirmation, FINRA violates the Appointments Clause. This structural defect is compounded by the Board's unilateral imposition of the indefinite U3 trading halt, which deprived investors of their property rights without due process. As held in *Freytag v. Commissioner*, even 'inferior officers' exercising 'significant authority' must comply with Article II's accountability framework. FINRA's Board members, who imposed the U3 halt, are neither appointed by the President nor confirmed by the Senate, rendering their actions unconstitutional.

117.     This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, where the Court held that even 'inferior officers' exercising 'significant authority' must be appointed by the President, courts, or department heads. FINRA's Board members— who unilaterally imposed the U3 halt—are neither.

118.     The Supreme Court's decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), emphasized that regulatory bodies exercising judicial-like powers must be accountable to the Executive Branch. Similarly, in *Bowsher v. Synar*, 478 U.S. 714 (1986), the Court held that Congress may not retain control over officers charged with executing the law. FINRA's structure also parallels the unconstitutional delegation seen in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), where the Court struck down a self-regulatory organization's lack of executive oversight.

119.     Furthermore, *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), held that an entity wielding government-like powers but structured as private cannot escape constitutional accountability. FINRA's status as a self-regulatory organization does not shield it from constitutional scrutiny. The combination of legislative (rulemaking), executive (enforcement), and judicial (disciplinary) functions concentrated within FINRA, without Presidential or Congressional oversight, creates a structural violation of the separation of powers, necessitating judicial intervention.

120.     This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, 501 U.S. 868, 880 (1991), where the Court held that even "inferior officers" exercising "significant authority" must be appointed by the President, courts, or department heads. FINRA's Board members—who unilaterally imposed the U3 halt—are neither.

121.     The Private Nondelegation Doctrine further prohibits private entities like FINRA from exercising unchecked governmental power. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77 (D.C. Cir. 2023) found that FINRA's ability to sanction broker-dealers and enforce market rules without direct government oversight raised serious constitutional concerns. Likewise, in *Jarkesy v. SEC*, 34 F.4th 446, 458 (5th Cir. 2022), the Fifth Circuit condemned "private delegations" as "alien to our constitutional structure."

122.     The lack of Presidential oversight further underscores this constitutional violation. The President has no ability to remove FINRA's leadership or overrule its decisions, violating the accountability principles articulated in *Bowsher v. Synar*, 478 U.S. 714 (1986). This unchecked authority, combined with FINRA's ability to impose fines, levy sanctions, and halt trading, makes it an unconstitutional exercise of executive power.

123. FINRA's unchecked power epitomizes the "accumulation of powers" Madison deemed "the very definition of tyranny" (*The Federalist No. 47*). It writes rules (legislative), enforces them via trading halts (executive), and adjudicates disputes (judicial)—all without oversight from the President, Congress, or Article III courts. This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726 (1986), which bars Congress from "retain[ing] control over officers charged with executive power."

124. FINRA's governance structure raises significant constitutional concerns under the Nondelegation Doctrine and separation of powers principles. As a private entity exercising quasi-governmental authority, FINRA lacks meaningful oversight by the President, Congress, or Article III courts. This concentration of legislative, executive, and judicial functions within FINRA violates the structural protections articulated in *Bowsher v. Synar* and *Freytag v. Commissioner*. Furthermore, FINRA's imposition of the U3 halt without procedural safeguards or substantive justification constituted an unconstitutional taking under the Fifth Amendment, depriving investors of access to their assets and denying them fair market participation.

125. FINRA's defense—that it is a "private entity"—is not only constitutionally untenable but also functionally inconsistent. As in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), FINRA wields powers traditionally and exclusively reserved to the government, such as halting public markets and enforcing rules with binding authority.

126. Furthermore, FINRA operates under a structure that closely resembles a government agency—it collects fees from market participants as a form of mandatory taxation, enforces securities laws through disciplinary actions, and performs adjudicatory functions traditionally reserved for Article III courts. As *SEC v. Sloan*, 436 U.S. 103 (1978), affirmed, even agencies acting with regulatory power must adhere to statutory and constitutional limits.

FINRA's actions—including the U3 halt's indefinite enforcement without judicial review—exceed those limits and require immediate judicial scrutiny.

127.     The U3 halt's arbitrariness—imposed without notice, a hearing, or even a definition of the "extraordinary event" justifying it—violates the Fifth Amendment's guarantee against "arbitrary deprivation of property." *SEC v. Sloan*, 436 U.S. 103, 121 (1978). For 725 days, 65,000 retail investors have been trapped in financial limbo, their assets frozen by a private cabal operating outside the Constitution's safeguards. This is precisely the "despotic power" the Framers sought to eradicate.

<u>Nondelegation Doctrine Violations</u>

128.     The Framers vested "[a]ll legislative Powers" in Congress (U.S. Const. art. I, § 1) to prevent the "arbitrary decrees" of unchecked regulators that plagued colonial America. *See The Federalist No. 47* (Madison). Yet Congress's delegation of quasi-legislative authority to FINRA under the Securities Exchange Act of 1934 lacks even the "intelligible principle" *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928), requires. The Act's vague directive to "promote just and equitable principles of trade" (15 U.S.C. § 78o-3(b)(6)) is indistinguishable from the "general warrants" the Framers condemned—a blank check for FINRA to criminalize conduct at will.

129.     This abdication of legislative responsibility enabled FINRA's U3 halt, an act of raw power untethered to statutory criteria. As Justice Gorsuch warned in *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (dissenting), "The Constitution does not permit Congress to transfer [its] power to regulate… to another branch *or private entity*." FINRA's halt—imposed without SEC review or judicial oversight—epitomizes the "unbridled discretion" the Nondelegation Doctrine forbids. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77 (D.C. Cir.

2023) ("FINRA's self-executing authority violates foundational separation of powers principles").

130.    Congress's failure to define "extraordinary event" (the purported basis for the U3 halt) underscores the constitutional defect. Under *West Virginia v. EPA*, 597 U.S. ___ (2022), such "major questions" demand "clear congressional authorization"—a standard FINRA's limitless halt flouts. The Framers would scarcely recognize a regime where private actors, not elected legislators, decide when to shutter public markets.

131.    FINRA has historically defended this broad delegation by asserting its unique expertise in market regulation. However, such arguments fail under *West Virginia v. EPA*, 597 U.S. ___ (2022), which reaffirms that Congress cannot delegate vast regulatory authority to private entities without clear statutory constraints. The U3 halt's indefinite nature and its lack of defined statutory criteria exemplify the dangers of unbridled discretion the Framers sought to avoid. FINRA's exercise of legislative power through vague directives constitutes an unconstitutional delegation requiring judicial correction.

Due Process Violations (Fifth Amendment)

132.    The Fifth Amendment's Due Process Clause enshrines the Framers' rejection of "taxation without representation"—a principle equally applicable to property deprivations. As Blackstone's *Commentaries* emphasized, property rights are "the guardian of every other right," and their arbitrary seizure was a catalyst for the Revolution. FINRA's U3 halt, imposed without notice, a hearing, or a definition of the "extraordinary event" justifying it, resurrects the very despotism the Founders sought to extinguish.

133.    For 725 days, 65,000 retail investors—including Plaintiff—have been trapped in constitutional purgatory: stripped of their MMTLP shares, denied access to trading, and given no

avenue to challenge FINRA's edict. This indefinite limbo violates *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which mandates a "meaningful opportunity to be heard" *before* the government deprives citizens of property. *SEC v. Sloan*, 436 U.S. 103, 121 (1978), further holds that regulators cannot "alter the rules of the game *after* the game has been played"—precisely what FINRA did by retroactively deleting the MMTLP ticker.

134.    FINRA's opacity compounds the harm. Its refusal to release Blue Sheets or audit share counts—even after Congressional inquiries—renders the halt 'so grossly arbitrary as to violate the Due Process Clause.' *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

135.    Such conduct mirrors the Crown's arbitrary seizures of colonial property, which James Otis decried as 'tyranny' in the 1761 Writs of Assistance Case.

136.    The Fifth Amendment's ratification expressly forbade this abuse, yet FINRA now wields it with impunity.

137.    FINRA has historically defended this broad delegation by asserting its unique expertise in market regulation.

138.    However, such arguments fail under *West Virginia v. EPA*, 597 U.S. ___ (2022), which reaffirms that Congress cannot delegate vast regulatory authority to private entities without clear statutory constraints.

139.    FINRA has historically defended this broad delegation by asserting its unique expertise in market regulation. However, such arguments fail under *West Virginia v. EPA*, 597 U.S. ___ (2022), which reaffirms that Congress cannot delegate vast regulatory authority to private entities without clear statutory constraints. The U3 halt's indefinite nature and its lack of defined statutory criteria exemplify the dangers of unbridled discretion the Framers sought to

avoid. FINRA's exercise of legislative power through vague directives constitutes an

unconstitutional delegation requiring judicial correction.

Separation of Powers Violations

140.     FINRA's consolidation of legislative, executive, and judicial powers in a single

private entity defies the Framers' tripartite system. As Madison warned in *The Federalist No. 47*,

"The accumulation of all powers… in the same hands… may justly be pronounced the very

definition of tyranny." FINRA writes rules (15 U.S.C. § 78o-3(b)(6)), enforces them via trading

halts (executive power), and adjudicates disputes (FINRA Arbitration)—all without presidential

oversight, Senate confirmation, or Article III review.

141.     This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726 (1986),

which bars Congress from "retaining control over officers exercising executive power."

FINRA's U3 halt—a unilateral act bypassing SEC approval—illustrates the danger: private

actors now wield power to destroy shareholder equity without constitutional checks. As the Fifth

Circuit held in *Jarkesy v. SEC*, 34 F.4th 446, 458 (2022), such "private delegations" are "alien to

our constitutional structure" and demand judicial intervention.


## VII. **MARKET MANIPULATION AND REGULATORY FAILURES**

### Synthetic Share Creation and Naked Short Selling

142.     The market for MMTLP shares was plagued by systemic manipulation, including

synthetic share creation and naked short selling. Synthetic shares, which are counterfeit shares

created through manipulative practices, flooded the market, artificially inflating supply and

suppressing legitimate share prices.

143.     Synthetic shares are not backed by actual ownership or physical certificates but are instead created through loopholes in clearing and settlement systems. For example, broker-dealers exploited exemptions under Regulation SHO to create and trade these counterfeit shares, bypassing statutory safeguards designed to prevent market manipulation. Evidence shows that trading volumes for MMTLP shares far exceeded the authorized float of 165 million shares, indicating widespread synthetic share proliferation.

144.     This artificial inflation of supply distorted market dynamics, suppressed legitimate share prices, and harmed retail investors. As Justice Brandeis warned in Louis D. Brandeis, Other People's Money (1914), 'Sunlight is said to be the best of disinfectants.' Yet FINRA and the DTCC allowed this shadow market to thrive in darkness, leaving retail investors like the Plaintiff trapped in financial limbo.

145.     Evidence of these manipulative practices is apparent in the trading data. During the period of unauthorized trading on OTC Markets, the trading volume of MMTLP shares far exceeded the authorized float of 165 million shares, indicating the presence of synthetic shares. For example, between October 2021 and December 2022, trading volumes reached unprecedented levels, with daily volumes often exceeding 100 million shares—a clear sign of market manipulation.

146.     DTCC, responsible for clearing and settlement, failed to reconcile these discrepancies or enforce proper settlement standards, allowing synthetic shares and to persist unchecked. Defendant FINRA, tasked with overseeing broker-dealers and ensuring market integrity, neglected to investigate or address these manipulative practices, enabling institutional participants to profit at the expense of retail investors.

147.     Evidence of these manipulative practices is apparent in the trading data. During the period of unauthorized trading on OTC Markets, the trading volume of MMTLP shares far exceeded the authorized float of 165 million shares, indicating the presence of synthetic shares. For example, between October 2021 and December 2022, trading volumes reached unprecedented levels, with daily volumes often exceeding 100 million shares—a clear sign of market manipulation.

148.     DTCC, responsible for clearing and settlement, failed to reconcile these discrepancies or enforce proper settlement standards, allowing synthetic shares and naked short selling to persist unchecked. Defendant FINRA, tasked with overseeing broker-dealers and ensuring market integrity, neglected to investigate or address these manipulative practices, enabling institutional participants to profit at the expense of retail investors.

149.     The coordinated actions of Defendants, including FINRA, DTCC, corporate officers, and market participants, demonstrate anti-competitive behavior that violates the Sherman Act. By manipulating the market through synthetic share creation and naked short selling, Defendants suppressed legitimate share prices and deprived shareholders of fair market value. This conduct harmed competition in the securities market, benefiting institutional traders at the expense of retail investors. Precedents such as *United States v. Microsoft Corp*. highlight the importance of addressing anti-competitive practices that distort market dynamics and harm consumers.

<u>Failures to Deliver (FTDs)</u>

150.     Persistent failures to deliver (FTDs) further undermined market integrity and harmed retail investors. FTDs occur when a party fails to deliver securities to the buyer within the required settlement period, often as a result of naked short selling. During the trading of

MMTLP shares, FTDs reached alarming levels, with millions of shares remaining unresolved for extended periods.

151.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices. DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence.

152.    This failure directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff. For example, during the period between October 2021 and December 2022, unresolved FTDs accounted for over 20% of the total trading volume, creating a significant imbalance in the market. The SEC, tasked with enforcing Regulation SHO, failed to intervene or hold DTCC accountable, further exacerbating the harm to retail investors.

153.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices.

154.    DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence.

155.    This failure directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff.

156.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices. DTCC's inaction allowed these FTDs to persist, enabling market participants to engage in naked short selling and synthetic share creation without consequence. This failure

directly contributed to the suppression of legitimate share prices and the harm suffered by retail investors, including the Plaintiff.

## Obstruction Through Lack of Transparency

157.    Despite repeated requests from shareholders, FINRA has refused to release Blue Sheets and other critical trading data related to MMTLP shares. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable.

158.    Blue Sheets, which contain detailed trading records submitted by broker-dealers, are essential for uncovering patterns of synthetic share creation, naked short selling, and failures to deliver (FTDs). For example, these records could reveal unusually high trade volumes that exceed the total authorized float of MMTLP shares, corroborating claims of counterfeit share proliferation.

159.    The systemic withholding of this data has left retail investors unable to verify their holdings or recover the fair value of their investments. Moreover, it has shielded institutional participants who engaged in manipulative practices from accountability. As Justice Brandeis warned, 'Sunlight is said to be the best of disinfectants.' Yet FINRA and the DTCC have allowed this shadow market to thrive in darkness, leaving retail investors like the Plaintiff trapped in financial limbo.

160.    This obstruction highlights broader vulnerabilities in regulatory frameworks and necessitates judicial intervention to ensure transparency and accountability. Without access to Blue Sheets, shareholders cannot substantiate allegations of market manipulation or seek redress for the harm caused by systemic failures.

FINRA's U3 Trading Halt

161.    On December 9, 2022, Defendant FINRA imposed an indefinite U3 trading halt on MMTLP shares, citing an undefined 'extraordinary event.' This halt, which froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity, lacked transparency and procedural fairness. FINRA failed to provide proper notice, justification, or an opportunity for investors to challenge the decision, leaving tens of thousands of shareholders, including the Plaintiff, unable to access their assets or reconcile their positions.

162.    On the morning of December 9, 2022, prior to the imposition of the U3 halt, the Plaintiff had open sell orders totaling $2,568,000 with his broker, Charles Schwab. These orders were canceled without execution due to the U3 halt, depriving the Plaintiff of the opportunity to realize the fair value of his shares during a period of heightened market demand.

163.    The U3 halt exacerbated the harm caused by market manipulation, as it prevented retail investors from closing their positions or recovering the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, were shielded from the consequences of their actions.

164.    FINRA's imposition of the halt raises serious constitutional concerns. As highlighted in key legal precedents, including *SEC v. Sloan* and *Alpine Securities Corp. v. FINRA*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the Due Process Clause of the Fifth Amendment, depriving investors of their property rights without due process. The SEC, tasked with overseeing FINRA, failed to intervene or provide transparency, further compounding the harm to retail investors.

165.     FINRA's issuance of an FAQ document on March 16, 2023—97 days after the U3 trading halt—further underscores its failure to provide meaningful clarity or justification for the halt. The FAQ, which was FINRA's first substantive communication regarding the halt, failed to define or explain the 'extraordinary event' cited as the basis for the halt. This delay and lack of transparency left investors without critical information to understand or challenge the decision, violating principles of procedural fairness under the Due Process Clause of the Fifth Amendment. The FAQ's inadequacy mirrors the regulatory failures identified in *SEC v. Sloan*, where ambiguous and delayed agency actions eroded public trust and market integrity. By withholding essential details and failing to address investor concerns, FINRA compounded the harm caused by the halt and demonstrated systemic governance flaws that demand judicial scrutiny.  Specifically:

a.     The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.     The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.) by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation for its inaction regarding the U3 trading halt and related market irregularities.

<u>Lack of Regulatory Oversight</u>

166.     Defendant SEC, tasked with overseeing FINRA and DTCC, failed to fulfill its statutory obligations, enabling systemic market manipulation and regulatory failures to persist unchecked. The SEC neglected to enforce Regulation SHO, which governs short selling and FTDs, allowing synthetic share creation and naked short selling to proliferate. The SEC also failed to supervise FINRA's imposition of the U3 trading halt, which lacked proper notice, justification, or procedural safeguards.

167.     Critical to this failure of oversight is the opaque nature of the software systems employed by FINRA, DTCC, and other entities to enforce these regulatory frameworks. These systems are not autonomous; they execute pre-defined rules and algorithms programmed by humans based on their understanding of legal and regulatory requirements. Without transparency into the instructions and configurations that govern these systems, the persistent irregularities, such as synthetic share creation and prolonged failures to deliver, cannot be fully understood or addressed.

168.     The SEC's failure to audit or investigate these systems reflects gross negligence and underscores the need for judicial intervention to uncover the truth. For example, emails obtained through a Freedom of Information Act (FOIA) request reveal that both the SEC and FINRA were aware of irregularities in MMTLP trading as early as November 2021. Despite this knowledge, no corrective actions were taken to address the unauthorized trading or synthetic share proliferation, demonstrating reckless disregard for investor harm.

169.     DTCC, responsible for ensuring the efficient clearing and settlement of securities transactions, failed to reconcile share discrepancies or enforce proper settlement standards, enabling synthetic shares and FTDs to persist. DTCC's inaction allowed institutional participants to profit from market manipulation, while retail investors were left to bear the consequences.

170.     Systemic failures are further highlighted by the lack of coordination among regulatory bodies, including FINRA, the SEC, and the DTCC. These entities failed to enforce critical close-out requirements, reconcile discrepancies, or provide transparency through Blue Sheets data. For example, DTCC neglected its obligations under Section 17A of the Securities Exchange Act, which mandates accurate recordkeeping and proper settlement of securities transactions. Similarly, FINRA imposed an indefinite U3 halt without conducting an

investigation into outstanding share discrepancies, leaving investors trapped in an illiquid position. These systemic failures enabled institutional participants to manipulate the market while retail investors bore the consequences.

171.     This lack of regulatory oversight created an environment where institutional participants could exploit regulatory loopholes to manipulate the market for MMTLP shares, artificially inflating supply and suppressing legitimate share prices. Retail investors, including the Plaintiff, were disproportionately harmed by these systemic failures, losing access to their investments and suffering significant financial losses.

## VIII. <u>LEGAL FRAMEWORK AND PRECEDENTS</u>

### Statutory Violations

172.     The Defendants' actions violate multiple provisions of federal securities laws, including the Securities Exchange Act of 1934 and related regulations. These violations include breaches of statutory and regulatory obligations designed to ensure market integrity, protect investors, and prevent manipulative practices. Specifically, the Defendants failed to enforce critical safeguards under Section 10(b), Rule 10b-5, Regulation SHO, and the Sarbanes-Oxley Act, enabling systemic market manipulation that harmed retail investors.

Section 10(b) and Rule 10b-5

173.     Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities. Defendants FINRA, DTCC, and OTC Markets violated these provisions by failing to prevent market manipulation, including synthetic share creation and naked short selling, which artificially suppressed the value of MMTLP shares.

These manipulative practices flooded the market with counterfeit shares, distorted supply and demand dynamics, and deprived shareholders of the fair value of their investments. Additionally, Defendants John Brda and Gregory McCabe contributed to these violations by failing to disclose material information about the risks of market manipulation, leaving retail investors vulnerable to systemic abuses.

<u>Regulation SHO</u>

174.    Regulation SHO (17 C.F.R. § 242.204) requires broker-dealers to close out failures to deliver (FTDs) promptly to prevent manipulative practices such as naked short selling. DTCC violated Regulation SHO by failing to enforce proper settlement standards, allowing FTDs to persist unchecked. This failure enabled institutional participants to profit from naked short selling and synthetic share creation at the expense of retail investors. Furthermore, DTCC's inaction left unresolved discrepancies in share counts, exacerbating the harm caused by systemic trading irregularities.

Sarbanes-Oxley Act

175.    The Sarbanes-Oxley Act (15 U.S.C. § 7201 et seq.) requires corporate officers to maintain accurate financial records and provide transparent disclosures to shareholders. Defendants John Brda and Gregory McCabe violated these requirements by failing to disclose material information about the risks associated with the merger and spin-off, including the potential for market manipulation and unresolved trading irregularities. These omissions deprived shareholders of critical information necessary to make informed investment decisions, contributing to widespread confusion and financial harm. By neglecting their fiduciary duties, Brda and McCabe undermined investor trust and exacerbated the systemic failures that led to the collapse of the MMTLP market.

## Constitutional Claims

176.     The Defendants' actions also violate fundamental constitutional principles, including the Appointments Clause, Nondelegation Doctrine, Due Process Clause, and Separation of Powers. FINRA, as a private self-regulatory organization, exercised quasi-governmental authority without meaningful oversight or compliance with Article II requirements, violating the Appointments Clause. Its imposition of the indefinite U3 trading halt without statutory authority or procedural fairness contravened the Due Process Clause, depriving investors of their property rights without notice or an opportunity to be heard. Furthermore, Congress's delegation of regulatory authority to FINRA lacked an intelligible principle to guide its exercise, violating the Nondelegation Doctrine. These constitutional violations underscore the need for judicial intervention to restore accountability and transparency to the regulatory framework.

## Appointments Clause

177.     Under the Appointments Clause of Article II of the U.S. Constitution, officers of the United States who exercise significant regulatory authority must be appointed by the President, with the advice and consent of the Senate. Defendant FINRA, a private self-regulatory organization, exercises quasi-governmental authority without proper oversight or compliance with Article II requirements.

178.     FINRA's governance structure violates the Framers' deliberate design for federal accountability under the Appointments Clause. As Alexander Hamilton warned in The Federalist No. 76, 'The sole and undivided responsibility of [appointing officers] to the President' was intended to prevent 'a mercenary, pliant' body of decision-makers. Yet FINRA—a private entity—wields the quintessential authority of federal officers: halting public markets, levying

fines, and enforcing rules with the binding force of law. Its Board of Governors, composed of unelected industry insiders, operates entirely outside the Constitution's accountability framework.

179.    This structural defiance of Article II is irreconcilable with *Freytag v. Commissioner*, 501 U.S. 868, 880(1991), where the Court held that even 'inferior officers' exercising 'significant authority' must be appointed by the President, courts, or department heads. FINRA's Board members—who unilaterally imposed the U3 halt—are neither. *Jarkesy v. SEC*, 34 F.4th 446, 458(5th Cir. 2022), further condemns such 'private delegations' as 'alien to our constitutional structure.

180.    FINRA's unchecked power epitomizes the 'accumulation of powers' Madison deemed 'the very definition of tyranny' (The Federalist No. 47 ). It writes rules (legislative), enforces them via trading halts (executive), and adjudicates disputes (judicial)—all without oversight from the President, Congress, or Article III courts. This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726(1986), which bars Congress from 'retaining control over officers charged with executive power.

181.    FINRA's unchecked authority to halt public trading, enforce rules with the binding force of law, and adjudicate disputes violates the Constitution's accountability framework. By allowing FINRA to exercise such powers, Congress has effectively enabled a private organization to act as a governmental authority without adhering to constitutional safeguards.

### Nondelegation Doctrine

182.    The Nondelegation Doctrine prohibits Congress from delegating legislative authority without providing an 'intelligible principle' to guide its exercise. See *J.W. Hampton, Jr.*

& *Co. v. United States*, 276 U.S. 394, 409(1928). Congress delegated quasi-legislative powers to FINRA under the Securities Exchange Act of 1934, but the language used in the Act, such as the directive to 'promote just and equitable principles of trade,' is vague and lacks meaningful safeguards or oversight mechanisms.

183.    This abdication of legislative responsibility enabled FINRA's U3 halt, an act of raw power untethered to statutory criteria. As Justice Gorsuch warned in *Gundy v. United States*, 139 S. Ct. 2116, 2133(2019)(dissenting), 'The Constitution does not permit Congress to transfer [its] power to regulate... to another branch or private entity.' FINRA's halt—imposed without SEC review or judicial oversight—epitomizes the 'unbridled discretion' the Nondelegation Doctrine forbids. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 77(D.C. Cir. 2023)('FINRA's self-executing authority violates foundational separation of powers principles').

184.    Congress's failure to define 'extraordinary event' (the purported basis for the U3 halt) underscores the constitutional defect. Under *West Virginia v. EPA*, 597 U.S. ___(2022), such 'major questions' demand 'clear congressional authorization'—a standard FINRA's limitless halt flouts. The Framers would scarcely recognize a regime where private actors, not elected legislators, decide when to shutter public markets.

Due Process Clause

185.    The Fifth Amendment's Due Process Clause protects individuals from being deprived of life, liberty, or property without due process of law. FINRA violated this principle by imposing the U3 trading halt without providing notice, justification, or an opportunity for investors to challenge the decision.

186.    For 725 days, 65,000 retail investors—including the Plaintiff—have been trapped in constitutional purgatory: stripped of their MMTLP shares, denied access to trading, and given

no avenue to challenge FINRA's edict. This indefinite limbo violates *Mathews v. Eldridge*, 424 U.S. 319, 335(1976), which mandates a 'meaningful opportunity to be heard' before the government deprives citizens of property. *SEC v. Sloan*, 436 U.S. 103, 121(1978), further holds that regulators cannot 'alter the rules of the game after the game has been played'—precisely what FINRA did by retroactively deleting the MMTLP ticker.

187.　　FINRA's opacity compounds the harm. Its refusal to release Blue Sheets or audit share counts—even after Congressional inquiries—renders the halt so grossly arbitrary as to violate the Due Process Clause. *County of Sacramento v. Lewis*, 523 U.S. 833, 846(1998). Such conduct mirrors the Crown's arbitrary seizures of colonial property, which James Otis decried as 'tyranny' in the 1761 Writs of Assistance Case.

188.　　The Fifth Amendment's ratification expressly forbade this abuse, yet FINRA now wields it with impunity.

Separation of Powers

189.　　FINRA's consolidation of legislative, executive, and judicial powers into a single private entity violates the constitutional principle of separation of powers. As James Madison warned in The Federalist No. 47, 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands... may justly be pronounced the very definition of tyranny.'

190.　　FINRA writes rules under 15 U.S.C. § 78o-3(b)(6) (a legislative function), enforces those rules through actions like trading halts (an executive function), and adjudicates disputes through FINRA arbitration (a judicial function). These powers are exercised without presidential oversight, Senate confirmation, or meaningful Article III review.

191.　　This trifecta of authority violates *Bowsher v. Synar*, 478 U.S. 714, 726(1986), which bars Congress from 'retaining control over officers exercising executive power.' FINRA's

U3 halt—a unilateral act bypassing SEC approval—illustrates the danger: private actors now wield power to destroy shareholder equity without constitutional checks. As the Fifth Circuit held in *Jarkesy v. SEC*, 34 F.4th 446, 458(2022), such 'private delegations' are 'alien to our constitutional structure' and demand judicial intervention.

192.    FINRA's defense—that it is a 'private entity'—is not only constitutionally untenable but also functionally inconsistent. As in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374(1995), FINRA wields powers traditionally and exclusively reserved to the government, such as halting public markets and enforcing rules with binding authority. This rebranding of public functions as 'private' undermines the Framers' deliberate separation of powers and must be subject to constitutional safeguards.

Key Precedents

193.    The Plaintiff's claims are supported by key precedents that establish the constitutional and statutory limits on regulatory authority.

*SEC v. Sloan*, 436 U.S. 103 (1978)

194.    In *SEC v. Sloan*, the Supreme Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. The Court emphasized that regulatory agencies must act strictly within the bounds of their statutory authority and provide procedural fairness to investors. FINRA's indefinite U3 halt, imposed without statutory authority or procedural safeguards, directly contravenes this precedent.

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)

195.    In *Jarkesy v. SEC*, the D.C. Circuit held that regulatory agencies must operate within constitutional limits, including the Appointments Clause and the Nondelegation Doctrine. The court emphasized that private entities exercising quasi-governmental authority must be

subject to meaningful oversight and accountability. FINRA's governance structure, which lacks presidential oversight, Senate confirmation, or statutory safeguards, violates these principles. *Alpine Securities Corp. v. FINRA*, 982 F.3d 68 (D.C. Cir. 2023)

196.     In *Alpine Securities Corp. v. FINRA*, the D.C. Circuit ruled that FINRA's expulsion orders violated the Nondelegation Doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain ultimate authority to approve or disapprove the private entity's actions. FINRA's unilateral imposition of the U3 halt, without SEC review or statutory authority, mirrors the unconstitutional delegation of authority identified in *Alpine*.

## IX. CLAIMS FOR RELIEF

### Due Process Violations (SEC and FINRA)

197.     Defendants FINRA and SEC violated the Due Process Clause of the Fifth Amendment by depriving investors, including the Plaintiff, of their property rights without notice, justification, or an opportunity to challenge the U3 trading halt. FINRA's imposition of the halt, which froze all trading activity just days before the scheduled transition of MMTLP shares to NBH equity, lacked transparency and procedural fairness. The SEC's failure to oversee FINRA's actions compounded the harm, leaving retail investors in prolonged financial uncertainty.

198.     The indefinite U3 trading halt imposed by FINRA on December 9, 2022, not only froze MMTLP shares but also deprived retail investors of critical opportunities to reinvest their capital in other high-performing securities during a pivotal period in the financial markets. For example, the Plaintiff and other similarly situated investors were unable to liquidate their

MMTLP holdings and reinvest in NVIDIA Corporation (NVDA) following the launch of ChatGPT, which catalyzed significant growth in the artificial intelligence (AI) sector.

199.    In late 2022 and early 2023, NVDA emerged as a dominant player in the AI-driven semiconductor market, with its stock price surging due to increased demand for GPUs essential to AI development. Investors who could have sold MMTLP shares at their fair market value prior to the U3 halt would have been well-positioned to capitalize on NVDA's meteoric rise. Instead, the halt left retail investors trapped in an illiquid position, unable to access their funds or participate in lucrative market opportunities.

200.    This loss of opportunity exemplifies the broader financial harm caused by FINRA's actions. By failing to provide transparency, justification, or resolution for the U3 halt, FINRA effectively barred retail investors from participating in one of the most transformative periods in modern financial history. The inability to reinvest in high-growth sectors like AI underscores the disproportionate impact of regulatory negligence on retail investors compared to institutional participants, who often retain greater flexibility to navigate market disruptions.

201.    Furthermore, the prolonged uncertainty surrounding the U3 halt compounded this harm, leaving investors without recourse or clarity regarding the status of their holdings. This deprivation of liquidity and opportunity directly violates principles of fairness and investor protection enshrined in federal securities laws.  Specifically:

a.    The SEC failed to enforce Regulation SHO (17 C.F.R. § 242.204), which governs short selling and FTDs, allowing systemic trading irregularities to persist unchecked.

b.    The SEC violated the Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.) by failing to provide adequate notice, an opportunity for comment, or a reasoned explanation for its inaction regarding the U3 trading halt and related market irregularities.

## Nondelegation Doctrine Violations

202.     Defendant FINRA's actions violate the Nondelegation Doctrine, which prohibits Congress from delegating legislative authority without providing an "intelligible principle" to guide the exercise of that authority. Specifically:

a.     Congress delegated quasi-legislative powers to FINRA under the Securities Exchange Act of 1934 without establishing meaningful safeguards or oversight mechanisms. This enabled FINRA to impose the U3 halt without statutory authority or procedural fairness.

b.     b. FINRA's governance structure lacks meaningful government oversight, as its Board of Governors is composed primarily of industry insiders, creating inherent conflicts of interest. This structure raises constitutional concerns under the Appointments Clause, Nondelegation Doctrine, and Due Process Clause of the Fifth Amendment.

## Appointments Clause Violations

203.     Defendant FINRA's governance structure violates the Appointments Clause of Article II of the U.S. Constitution, which requires that officers of the United States exercising significant regulatory authority be appointed by the President, with the advice and consent of the Senate. Specifically:

a.     FINRA, a private self-regulatory organization, exercises quasi-governmental authority without proper oversight or compliance with Article II requirements.

b.     FINRA's Board of Governors, composed of unelected industry insiders, operates entirely outside Article II's oversight requirements. This governance structure undermines the constitutional framework established by the framers and violates the principles established in *Freytag v. Commissioner*, 501 U.S. 868, 880 (1991), where the Supreme Court held that even "inferior officers" must be appointed in compliance with Article II.

62

## Market Manipulation (DTCC and OTC Markets)

204.    Defendants DTCC and OTC Markets engaged in or enabled market manipulation, including synthetic share creation, naked short selling, and failures to deliver (FTDs). Specifically:

a.    DTCC failed to reconcile share discrepancies or enforce proper settlement standards, allowing synthetic shares and FTDs to persist unchecked.

b.    DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices such as naked short selling.

c.    OTC Markets facilitated the unauthorized trading of MMTLP shares and failed to monitor excessive trading volumes, enabling institutional participants to profit at the expense of retail investors.

d.    OTC Markets deflected responsibility for the unauthorized trading to FINRA, claiming that it lacked the authority to halt trading, further demonstrating its failure to uphold its duty to maintain fair and orderly markets.

## Breach of Fiduciary Duties (McCabe and Brda)

205.    Defendants John Brda and Gregory McCabe breached their fiduciary duties to shareholders by misrepresenting the financial prospects of NBH's assets, including the Orogrande Basin, and failing to address systemic trading irregularities. Specifically:

a.    Brda and McCabe violated Regulation FD (17 C.F.R. § 243.100 et seq.) by selectively disclosing material information to certain investors while withholding it from others, creating an uneven playing field for retail investors.

b.    They failed to reconcile outstanding share discrepancies, leaving shareholders unable to verify their ownership or recover the fair value of their investments.

## Negligence (SEC, FINRA, DTCC)

206.    Defendants SEC, FINRA, and DTCC acted negligently in their regulatory roles by failing to prevent market manipulation, enforce regulatory standards, and protect retail investors. Specifically:

a.    The SEC neglected its oversight duties, allowing FINRA's U3 halt and DTCC's failures to persist unchecked.

b.    FINRA failed to investigate or address systemic trading irregularities.

c.    DTCC failed to reconcile share discrepancies or enforce proper settlement standards, including the close-out requirements of Regulation SHO (17 C.F.R. § 242.204).

d.    FINRA also failed to enforce Regulation SHO (17 C.F.R. § 242.204), allowing systemic trading irregularities to persist unchecked.

e.    The negligence is further highlighted by Defendants' reliance on software systems to manage trading, compliance, and settlement operations without ensuring transparency or accountability for how those systems functioned. These systems operate as tools, executing commands that reflect the human decisions embedded in their programming.

## Breach of Contractual Obligations

f.Defendants FINRA and DTCC breached their contractual obligations to maintain fair and orderly markets by failing to enforce proper regulatory standards and ensure the accurate clearing and settlement of securities transactions. Specifically:

g.    FINRA's imposition of the U3 halt violated its duty to protect investors and maintain market integrity.

h.   DTCC failed to enforce the close-out requirements of Regulation SHO (17 C.F.R. § 242.204), which mandate that broker-dealers promptly close out FTDs to prevent manipulative practices such as naked short selling.

i. FINRA also failed to enforce Regulation SHO (17 C.F.R. § 242.204), allowing systemic trading irregularities to persist unchecked.

## X. SPECIFIC ACTS OF SCIENTER

207.   The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein. The following allegations concern specific acts of scienter by the Defendants, which demonstrate their deliberate misconduct or reckless disregard for the rights of investors.

208.   Emails obtained through a Freedom of Information Act (FOIA) request confirm that both the SEC and FINRA were aware of trading irregularities affecting MMTLP shares as early as November 29, 2021. Despite this knowledge, no corrective actions were taken, allowing fraudulent trading and synthetic share proliferation to persist unchecked. These emails reveal internal discussions between senior regulators, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, and Mr. Jay Gibbons, who were actively monitoring fraudulent activities in MMTLP but failed to intervene.

209.   On December 5, 2022, additional FOIA-released communications confirm that senior regulators were still aware of ongoing fraudulent activities but continued to take no action. Thousands of investor complaints and FOIA disclosures repeatedly alerted regulators to fraud, yet these warnings were ignored, demonstrating a pattern of deliberate inaction. This failure to act allowed market manipulation to persist, directly harming retail investors, including the Plaintiff.

210. Corporate executives, including John Brda and Gregory McCabe, made misleading public statements and social media posts promoting MMTLP shares while simultaneously selling their own holdings at significant profit. Brda repeatedly denied selling MMTLP shares while publicly encouraging others to buy and hold, only later admitting that he had offloaded a significant portion of his shares during the price increase leading up to the U3 halt. Similarly, McCabe sold approximately 6.8 million shares of MMTLP in late November 2022, generating an estimated $52 million to $68 million, while retail investors were misled into believing the stock was a long-term hold.

211. Social media activity played a pivotal role in exacerbating the systemic manipulation of MMTLP shares, further illustrating Defendants' deliberate attempts to deceive retail investors. Corporate executives, including John Brda and Gregory McCabe, alongside influencers and market participants, exploited platforms such as X (formerly Twitter), Reddit, and investor forums to disseminate misleading information and artificially inflate investor confidence in MMTLP shares.

212. For example, John Brda repeatedly posted on X, promoting MMTLP shares as a 'long-term hold' while simultaneously liquidating his own holdings. These posts created a false impression of market stability and encouraged retail investors to retain their shares, even as insiders secretly sold off significant portions of their stakes. Similarly, Gregory McCabe engaged in public statements and social media posts claiming that the Orogrande Basin contained 'proven reserves' of approximately 3.7 billion barrels of recoverable oil—a claim lacking independent verification. These statements misled investors into believing that MMTLP shares represented ownership in a high-value energy asset with near-certain profitability.

66

213.     Influencers and market participants amplified these deceptive narratives, often coordinating efforts to promote MMTLP shares without disclosing conflicts of interest or material risks. For instance, Clinton A. Plant, a consultant for NBH, allegedly doctored spreadsheets from the Texas Railroad Commission and posted them online to bolster confidence in the Orogrande Basin's potential value. These posts were designed to mislead retail investors into believing that the asset was fully developed and viable, despite significant operational challenges and unresolved lease expirations.

214.     Additionally, social media campaigns selectively targeted retail investors during critical periods, such as the lead-up to the U3 trading halt. Posts encouraging investors to 'buy the dip' or 'hold through volatility' coincided with periods of extreme price suppression caused by synthetic share proliferation and naked short selling. These campaigns exploited retail investors' trust in social media as a source of market information, leaving them vulnerable to manipulative practices.

215.     The deliberate use of social media to mislead investors underscores the Defendants' scienter. By knowingly disseminating false or misleading information while failing to disclose material risks, Defendants intentionally harmed retail investors and profited at their expense. This conduct violates Section 10(b) of the Securities Exchange Act and Rule 10b-5, which prohibit manipulative or deceptive devices in connection with the purchase or sale of securities.

216.     These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

217.     These executives also misrepresented the value of the Orogrande Basin, claiming it contained 3.7 billion barrels of recoverable oil despite lacking an independent third-party

reserve certification. Their misleading statements created a false impression of market stability, inducing retail investors to retain their shares while insiders secretly liquidated their positions. These actions constitute intentional deception, directly contributing to the financial harm suffered by MMTLP shareholders.

218.    Prior to the merger, Torchlight had experienced record-breaking trading volumes, exceeding 3.6 billion shares in the first half of 2021—far beyond its authorized share count. This extreme volume, combined with persistent failures to deliver, strongly suggested the presence of synthetic shares and uncovered short positions. Despite clear indicators of synthetic shares and excessive trading volume, neither Brda, McCabe, FINRA, the SEC, nor other relevant parties conducted an independent audit or took any steps to verify the true number of outstanding MMTLP shares before executing the spin-off.

219.    FINRA failed to enforce its own oversight responsibilities, despite receiving multiple complaints and warnings about unresolved share discrepancies. The SEC neglected its duty to ensure fair and transparent markets, allowing unregistered trading of MMTLP shares to continue without intervention. Broker-dealers and clearinghouses ignored systemic reconciliation issues, leading to conflicting share counts across different investor accounts. Had regulators and corporate officers acted responsibly, a thorough audit could have prevented further market manipulation and provided investors with transparency regarding the legitimacy of their holdings.

220.    On July 31, 2021, months before MMTLP shares were authorized to trade publicly, these shares were recorded in the Schwab Total Stock Market Index Fund (SWTSX). This premature inclusion raises serious concerns about systemic irregularities in market infrastructure and the processes used to recognize and handle MMTLP shares. Index funds like

SWTSX are designed to include only publicly traded securities that meet specific criteria such as liquidity, trading volume, or market capitalization. MMTLP did not meet these criteria at the time, yet it was still included in SWTSX. The presence of MMTLP in an index fund months before its trading restrictions were lifted suggests that synthetic shares may have already been created or that the recognition of these shares in financial systems bypassed standard procedures.

221.    On October 6, 2021, MMTLP shares began trading publicly on OTC Markets, despite explicit prohibitions outlined in Torchlight's proxy statement, which legally forbade public trading of the Series A Preferred Shares on any exchange. Market makers GTS Securities and Canaccord Genuity facilitated the unauthorized trading, in direct violation of 15 U.S.C. § 77e(a) of the Securities Act of 1933, allowing institutional traders to execute transactions despite the absence of formal SEC registration. The SEC requires that each public company have a unique Central Index Key (CIK) to ensure regulatory transparency. However, MMTLP traded under the same CIK (0001431959) previously used by Pole Perfect, Torchlight, and META II, raising serious compliance concerns under Regulation S-T Rule 10(b) and Rule 10b-5. The use of a shared CIK prevented proper regulatory oversight, allowing broker-dealers to obscure synthetic shares, naked short selling, and excessive failures to deliver.

222.    Transfer agents, including AST/EQ (Equiniti), failed in their fiduciary and statutory obligations during the MMTLP-to-NBH transition. Nearly two years after the NBH spin-off, AST/EQ and NBH have failed to produce a publicly available reconciliation report confirming the total number of MMTLP shares converted to NBH shares. Broker-dealers, including Charles Schwab and TD Ameritrade, have used at least 18 different internal CUSIP numbers to track unconverted MMTLP shares, yet AST/EQ has failed to demand a full reconciliation of these holdings. NBH has not been assigned a CUSIP number for all its shares,

making them untradeable and leaving investors in an unverified, illiquid position. This failure to reconcile outstanding shares and ensure accurate shareholder records has prolonged financial harm to investors and compounded the systemic failures of market participants.

223.     The cumulative effect of these actions demonstrates a deliberate disregard for investor protection and market integrity. By failing to act on clear evidence of fraud, allowing unauthorized trading, and neglecting their fiduciary duties, the Defendants engaged in conduct that satisfies the scienter requirement under federal securities laws. These acts of scienter directly contributed to the financial harm suffered by the Plaintiff and other retail investors.

## XI. COUNTS

### Count 1

224.     Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

225.     Defendants FINRA and corporate officers, including but not limited to John Brda and Gregory McCabe, engaged in manipulative practices such as synthetic share creation, naked short selling, and failures to deliver, misleading investors and artificially suppressing the value of MMTLP shares.

226.     Emails obtained through a Freedom of Information Act (FOIA) request confirm that FINRA officials, including Sam Draddy and Patti Casimates, were aware of trading irregularities in MMTLP as early as November 29, 2021, yet failed to act. Despite this

knowledge, FINRA did not impose regulatory enforcement but instead allowed fraudulent trading to persist unchecked.

227.    FINRA further violated Section 10(b) and Rule 10b-5 by imposing an indefinite U3 trading halt without conducting an audit of outstanding share discrepancies. This act created a forced freeze-out, preventing retail investors from selling their shares while allowing institutional traders and insiders to liquidate their positions.

228.    Corporate officers, including but not limited to John Brda and Gregory McCabe, violated Section 10(b) and Rule 10b-5 by misrepresenting key facts about MMTLP shares and the transition to Next Bridge Hydrocarbons. Public statements and social media communications from these executives created a false impression of market stability while insiders secretly sold their shares for profit. These material misstatements and omissions induced investors to retain their positions under false pretenses, constituting fraudulent inducement under federal securities laws.

229.    As a direct result of these violations, Plaintiff suffered financial losses, including the cancellation of sell orders totaling $2,568,000 on the morning of the U3 halt and was deprived of the opportunity to trade MMTLP shares at their fair market value. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 2

230.    Negligence by Regulatory Bodies (FINRA and SEC). Defendants FINRA and the SEC owed a duty of care to investors under the Securities Exchange Act of 1934, including compliance with 15 U.S.C. § 78o-3(b) (relating to self-regulatory organization responsibilities) and 15 U.S.C. § 78q (relating to recordkeeping and supervision requirements).

231.    FINRA breached this duty by failing to enforce its own regulations governing short sales, failures to deliver, and the unauthorized trading of MMTLP shares. Despite multiple complaints and clear evidence of synthetic shares, FINRA failed to conduct a proper audit or take corrective action. FINRA further breached its duty by imposing an indefinite U3 trading halt on MMTLP shares without conducting an investigation into outstanding share discrepancies, thereby depriving investors of their ability to trade.

232.    The SEC breached its duty by failing to supervise FINRA and enforce compliance with its statutory obligations under the Securities Exchange Act. The SEC was repeatedly notified of systemic trading irregularities in MMTLP shares, including excessive trading volumes and synthetic share creation, but failed to act. This regulatory negligence allowed market manipulation to persist unchecked, directly harming Plaintiff and other retail investors.

233.    As a direct result of these negligent acts and omissions, Plaintiff suffered substantial financial harm, including the loss of access to their investments. Plaintiff seeks compensatory damages, injunctive relief requiring Defendants to implement improved oversight mechanisms, and such other relief as the Court deems just and proper.

## Count 3

234.    Breach of Fiduciary Duty by Corporate Officers. Corporate officers, including but not limited to John Brda and Gregory McCabe, owed fiduciary duties to shareholders under state corporate governance laws, including duties of care, loyalty, and good faith.

235.    These officers breached their fiduciary duties by making misleading statements about MMTLP shares and the transition to Next Bridge Hydrocarbons. Public statements and social media communications encouraged investors to hold their shares while Brda and McCabe simultaneously liquidated large portions of their own holdings. Additionally, these executives

failed to disclose material information regarding the creation of synthetic shares and unresolved failures to deliver, depriving shareholders of accurate market information.

236.    Further, these officers failed to advocate for shareholder protections in response to the U3 trading halt imposed by FINRA. Instead of demanding transparency or an investigation into the legitimacy of outstanding shares, they remained silent while retail investors were locked out of trading.

237.    As a direct result of these breaches, Plaintiff suffered financial losses and was deprived of critical information necessary to protect their investments. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 4

238.    Violation of the Sarbanes-Oxley Act. The Sarbanes-Oxley Act of 2002, codified at 15 U.S.C. § 7201 et seq., requires corporate officers and entities to maintain accurate financial disclosures and comply with internal control standards.

239.    Defendants, including corporate officers associated with MMTLP and Next Bridge Hydrocarbons, violated the Sarbanes-Oxley Act by failing to maintain accurate records regarding outstanding shares and synthetic share proliferation. These officers failed to disclose the material risk posed by synthetic shares and unresolved failures to deliver, depriving investors of essential market transparency.

240.    Additionally, the Defendants engaged in misleading public statements that obscured the true state of MMTLP's shareholder structure. The failure to provide full and accurate financial disclosures prevented investors from making informed decisions, contributing to substantial financial losses.

241.    Plaintiff seeks compensatory damages, injunctive relief mandating compliance with the Sarbanes-Oxley Act, and such other relief as the Court deems appropriate.

242.    Defendants' violations of the Sarbanes-Oxley Act are further evidenced by their failure to maintain accurate financial disclosures and internal control standards. Corporate officers associated with MMTLP and Next Bridge Hydrocarbons neglected to disclose material risks posed by synthetic shares and unresolved failures to deliver. These omissions deprived investors of essential market transparency and prevented them from making informed decisions. Additionally, Defendants engaged in misleading public statements that obscured the true state of MMTLP's shareholder structure. The failure to provide full and accurate financial disclosures contributed to substantial financial losses for retail investors, including the Plaintiff.

## Count 5

243.    Violation of Regulation FD. Regulation FD, codified at 17 C.F.R. § 243.100 et seq., prohibits selective disclosure of material information to ensure all investors have equal access to critical information about a company's operations.

244.    Corporate officers associated with MMTLP and Next Bridge Hydrocarbons violated Regulation FD by selectively providing material information to certain parties while withholding key disclosures from retail investors. Misrepresentations regarding synthetic shares, trade discrepancies, and the transition to Next Bridge Hydrocarbons deprived Plaintiff and similarly situated investors of the ability to make informed decisions regarding their investments.

245.    Additionally, these corporate officers made misleading or incomplete statements that encouraged investors to retain their shares, while they themselves liquidated substantial portions of their holdings. These actions violated Regulation FD's requirement for full and equal disclosure of material information.

246.     Plaintiff seeks compensatory damages, injunctive relief mandating compliance with Regulation FD, and such other relief as the Court deems just and proper.

## Count 6

247.     General Negligence by FINRA and SEC. Defendants FINRA and the SEC owed a duty of care to investors under federal securities laws, including but not limited to 15 U.S.C. §§ 78o-3, 78q, and 78s, to act reasonably in carrying out their regulatory and oversight responsibilities.

248.     FINRA and the SEC failed to prevent the creation and trading of synthetic shares, violating their obligations under federal law. The SEC, despite multiple investor complaints and regulatory warnings, failed to oversee FINRA and enforce compliance with existing regulations designed to prevent market manipulation.

249.     FINRA breached its duty of care by failing to take appropriate action to audit, monitor, or prevent widespread failures to deliver and synthetic share creation in MMTLP. Additionally, the imposition of the U3 trading halt without proper investigation compounded the harm by leaving investors trapped in an illiquid position.

250.     As a direct result of these negligent acts, Plaintiff suffered substantial financial losses and was deprived of access to their investments. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems appropriate.

## Count 7

251.     Breach of Contract by FINRA. FINRA, as a self-regulatory organization, is required by 15 U.S.C. § 78o-3(b) and related regulations to enforce rules that promote fair trading practices, accurate recordkeeping, and efficient market operations.

252.     FINRA breached these obligations by failing to prevent synthetic share trading, permitting prolonged failures to deliver, and imposing a U3 halt without addressing share reconciliation. These failures deprived investors of market transparency and fair access to trading.

253.     FINRA's failure to enforce its contractual obligations under 15 U.S.C. § 78o-3(b) is evident in its inability to prevent synthetic share trading, permit prolonged failures to deliver, and impose a U3 halt without addressing share reconciliation. These actions directly contravene FINRA's mandate to ensure fair trading practices, accurate recordkeeping, and efficient market operations. Specifically, FINRA's governance structure, which lacks meaningful oversight by the SEC or other government entities, exacerbates these breaches. As established in *Jarkesy v. SEC*, private entities exercising quasi-governmental authority must operate within statutory and constitutional constraints. FINRA's indefinite halt violated the separation of powers doctrine, the Appointments Clause, and the private nondelegation doctrine, as there was no meaningful government oversight or statutory authority to justify its actions.

254.     As a direct result of these breaches, Plaintiff suffered financial harm. Plaintiff seeks compensatory damages, specific performance of contractual obligations, and such other relief as the Court deems just and proper.

## Count 8

255.     SEC's Failure to Oversee FINRA. The SEC, as the primary federal regulatory agency overseeing FINRA, has statutory obligations under 15 U.S.C. §§ 78q and 78s to supervise self-regulatory organizations and ensure compliance with securities laws.

256.     The SEC failed to fulfill its oversight duties by allowing systemic abuses, including synthetic share creation and unresolved failures to deliver, to persist within FINRA's

regulatory scope. The SEC also failed to intervene or investigate FINRA's imposition of the indefinite U3 trading halt, despite repeated investor complaints and warning signs of market manipulation.

257.     As a direct result of the SEC's oversight failures, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, injunctive relief mandating improved SEC oversight, and such other relief as the Court deems appropriate.

## Count 9

258.     Fraudulent Inducement and Misrepresentation by Corporate Officers. Corporate officers, including but not limited to John Brda and Gregory McCabe, knowingly made false statements and omissions regarding the nature and value of MMTLP shares and the transition to Next Bridge Hydrocarbons.

259.     These misrepresentations and omissions violated federal securities laws, including 15 U.S.C. §§ 78j(b) and 78r, by misleading investors about material facts. Defendants misrepresented the existence and impact of synthetic shares and unresolved failures to deliver, depriving investors of accurate and complete market information.

260.     Plaintiff, relying on these false statements and omissions, was induced to retain their shares, resulting in substantial financial harm when the U3 trading halt rendered them unable to access or trade their investments.

261.     Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 10

77

262.    Failure to Supervise by FINRA and SEC. FINRA and the SEC, as regulatory bodies, owed a duty to supervise market participants and self-regulatory organizations under 15 U.S.C. § 78q and 15 U.S.C. § 78s to prevent fraudulent and manipulative practices.

263.    FINRA and the SEC failed to monitor and address the proliferation of synthetic shares and unresolved failures to deliver, breaching their statutory supervisory obligations. These agencies also failed to prevent manipulative trading practices, including naked short selling, which harmed retail investors.

264.    As a direct result of these supervisory failures, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, injunctive relief mandating improved supervisory practices, and such other relief as the Court deems just and proper.

## **Count 11**

265.    Negligent and Intentional Infliction of Emotional Distress. Defendants, through their negligent and intentional actions, caused Plaintiff severe emotional distress.

266.    The imposition of the U3 trading halt deprived Plaintiff of access to their investments without notice or explanation, resulting in significant uncertainty and harm. Defendants also made misrepresentations and omissions that created prolonged uncertainty about the status and value of Plaintiff's shares, compounding the emotional harm.

267.    Defendants knew or should have known that their actions would cause significant emotional harm to investors, including Plaintiff, who relied on their regulatory and fiduciary duties.

268.    As a direct result, Plaintiff experienced severe anxiety, financial uncertainty, and emotional distress, warranting compensatory damages. Plaintiff seeks damages for emotional distress and such other relief as the Court deems just and proper.

## Count 12

269.     Conspiracy to Commit Fraud. Defendants, including FINRA, corporate officers, and other market participants, conspired to commit fraud by facilitating the creation and proliferation of synthetic shares.

270.     Defendants engaged in manipulative practices, including naked short selling and failures to deliver, which suppressed the value of MMTLP shares in violation of 15 U.S.C. § 78j(b) and related securities laws. Defendants also misled investors through false statements, omissions, and the imposition of the U3 trading halt, coordinated to harm retail investors.

271.     The conspiratorial actions of Defendants were designed to deprive investors, including Plaintiff, of the fair market value of their shares.

272.     As a direct result of this conspiracy, Plaintiff suffered substantial financial losses. Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 13

273.     Violation of Section 10(b) and Rule 10b-5 by the SEC. Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices in connection with the purchase or sale of securities.

274.     The SEC, as the primary federal securities regulator, failed to prevent and address manipulative practices, including synthetic share creation, naked short selling, and failures to deliver, which violated Section 10(b) and Rule 10b-5. The SEC's inaction allowed these manipulative practices to persist unchecked, misleading investors and artificially suppressing the value of MMTLP shares.

275.  As a direct result of the SEC's violations, Plaintiff suffered substantial financial losses and was deprived of the opportunity to trade MMTLP shares at their fair market value.

276.  Plaintiff seeks compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

## Count 14

277.  Violation of Section 17A of the Securities Exchange Act of 1934. Section 17A of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78q-1, requires the SEC to ensure the efficient and reliable clearing and settlement of securities transactions to protect investors and promote market integrity.

278.  The SEC failed to enforce compliance with Section 17A, allowing systemic abuses such as synthetic share creation and unresolved failures to deliver to persist. These failures directly contributed to market manipulation and disruptions in the clearing and settlement processes, causing financial harm to Plaintiff.

279.  Plaintiff seeks compensatory damages, declaratory relief affirming the SEC's obligations under Section 17A, and such other relief as the Court deems appropriate.

## Count 15

280.  Violation of Regulation SHO. Regulation SHO, codified at 17 C.F.R. § 242.204, requires broker-dealers to close out failures to deliver within a specified timeframe to prevent market manipulation and ensure fair trading practices.

281.  FINRA failed to enforce Regulation SHO by allowing persistent failures to deliver and naked short selling to persist unchecked. These violations artificially inflated the supply of MMTLP shares, suppressed their legitimate market price, and caused significant financial harm to Plaintiff and other retail investors.

282.     Plaintiff seeks compensatory damages, injunctive relief mandating compliance with Regulation SHO, and such other relief as the Court deems just and proper.

## Count 16

283.     Antitrust Violations Under the Sherman Act. The Sherman Act, codified at 15 U.S.C. § 1, prohibits agreements or conspiracies in restraint of trade.

284.     Defendants, including FINRA and certain market participants, engaged in anti-competitive practices that distorted the market for MMTLP shares. These practices included the proliferation of synthetic shares, naked short selling, and failures to deliver, which collectively suppressed the price of MMTLP shares and harmed competition.

285.     These actions constituted a conspiracy to manipulate the market, violating the Sherman Act and causing financial harm to Plaintiff.

286.     Plaintiff seeks treble damages under the Clayton Act, injunctive relief to prevent future anti-competitive conduct, and such other relief as the Court deems appropriate.

## Count 17

287.     Constitutional Claims Under the Nondelegation Doctrine and Separation of Powers. FINRA, as a private self-regulatory organization, exercised legislative, executive, and judicial powers without meaningful government oversight, violating the nondelegation doctrine and separation of powers principles.

288.     FINRA imposed the indefinite U3 trading halt on MMTLP shares without statutory authority or procedural safeguards, depriving Plaintiff and other investors of their constitutional rights under the Fifth Amendment's Due Process Clause. Additionally, FINRA's consolidation of powers constitutes an unconstitutional delegation of legislative authority by Congress, as reaffirmed in *West Virginia v. EPA*, 597 U.S. ___ (2022).

289.     Plaintiff seeks declaratory judgment declaring FINRA's structure and actions unconstitutional, injunctive relief to restore constitutional protections, and such other relief as the Court deems just and proper.

## XII. __PRAYER FOR RELIEF__

290.     Declaratory Relief:

a.     A declaratory judgment that the structure and authority of Defendant FINRA are unconstitutional under the Appointments Clause, Nondelegation Doctrine, and Due Process Clause of the U.S. Constitution. FINRA's consolidation of legislative, executive, and judicial powers without meaningful government oversight violates constitutional principles, as reaffirmed in *West Virginia v. EPA*, 597 U.S. ___ (2022).

b.     A declaratory judgment that FINRA's imposition of the indefinite U3 trading halt on December 9, 2022, was improper, unjustified, and a violation of its statutory and fiduciary duties. The halt deprived Plaintiff and other investors of their constitutional rights under the Fifth Amendment's Due Process Clause by failing to provide adequate notice or procedural safeguards.

c.     A declaratory judgment that Defendants violated federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), and Regulation SHO (17 C.F.R. § 242.204). These violations include the proliferation of synthetic shares, naked short selling, failures to deliver (FTDs), and systemic market manipulation that artificially suppressed the value of MMTLP shares.

d.     A declaratory judgment affirming the SEC's obligations under Section 17A of the Securities Exchange Act of 1934 (15 U.S.C. § 78q-1) to ensure the efficient and reliable clearing and settlement of securities transactions. The SEC's failure to enforce these

obligations directly contributed to systemic abuses, including unresolved FTDs and synthetic share proliferation.

291. Compensatory Damages

a. $2,568,000 in direct financial losses resulting from the cancellation of Plaintiff's sell orders during the U3 trading halt on December 9, 2022. These losses were directly caused by Defendants' misconduct, including the improper imposition of the halt and the failure to reconcile outstanding share discrepancies.

292. Treble Damages Under Antitrust Laws

a. Treble damages under the Sherman Act (15 U.S.C. §§ 1–2) and the Clayton Act (15 U.S.C. §§ 12–27) for Defendants' anti-competitive practices, including the proliferation of synthetic shares, naked short selling, and systemic market manipulation. These practices distorted the market for MMTLP shares, suppressed legitimate share prices, and harmed competition, causing financial harm to Plaintiff and other retail investors.

b. Based on compensatory damages of $2,568,000, treble damages amount to $7,704,000.

293. Injunctive Relief

a. An injunction requiring Defendants FINRA and the SEC to implement improved oversight mechanisms to prevent future violations of federal securities laws. This includes stricter enforcement of Regulation SHO, mandatory reconciliation of outstanding shares, and enhanced transparency in trading data.

b. An injunction requiring the SEC to enforce its obligations under Section 17A of the Securities Exchange Act of 1934 (15 U.S.C. § 78q-1) to ensure the efficient and reliable clearing and settlement of securities transactions. The SEC's failure to enforce these

obligations directly contributed to systemic abuses, including unresolved FTDs and synthetic share proliferation.

c.  An injunction requiring FINRA to provide transparency and procedural safeguards in the imposition of trading halts, including adequate notice, justification, and an opportunity for investors to challenge such halts.

294.  Declaratory Judgment on Constitutional Rights

a.  A declaratory judgment affirming the constitutional rights of retail investors under the Fifth Amendment's Due Process Clause. The indefinite U3 trading halt, imposed without notice or explanation, deprived Plaintiff of property rights and the ability to realize the fair market value of his investments.

295.  Systemic Reforms

a.  An order requiring Defendants to implement systemic reforms to prevent future abuses, including mechanisms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

296.  Such Other Relief as the Court Deems Just and Proper:

a.  Any additional relief that the Court deems necessary to address the harm caused by Defendants' misconduct and to restore fairness, transparency, and accountability to the financial markets.


## XIII. Evidence and Supporting Documentation

The following evidence and supporting documentation, a non-exhaustive list, are integral to the Plaintiff's claims and will be provided to the Court by the Plaintiff or sought by the

Plaintiff as exhibits. These documents demonstrate the Defendants' misconduct, regulatory

failures, and the harm suffered by retail investors.

297.    FOIA Disclosures. Documents obtained through Freedom of Information Act

(FOIA) requests include emails, memos, and internal communications between regulatory bodies

and market participants. These documents reveal early awareness of trading irregularities,

synthetic share creation, and regulatory inaction. For example, FOIA-released emails from

December 5, 2022, show communications between FINRA and the SEC regarding the MMTLP

trading halt and market manipulation.

298.    Blue Sheet Trading Data. Detailed trading records submitted by broker-dealers to

regulators, including timestamps, order sizes, and counterparties, provide transparency into

trading activity. These records reveal patterns of market manipulation such as naked short

selling, spoofing, and excessive failures to deliver (FTDs). For example, Blue Sheets show

unusually high trade volumes that exceed the total outstanding shares of MMTLP, corroborating

claims of synthetic share creation.

299.    Internal Communications. Emails, memos, and other internal communications

from corporate executives, regulatory bodies, and market participants demonstrate knowledge of

trading irregularities, misleading statements, and failures to address systemic issues. For

instance, internal communications from Torchlight and NBH executives, including John Brda

and Gregory McCabe, reference the Orogrande Basin asset valuations and the transition of

MMTLP shares.

300.    Expert Testimonies. Reports, affidavits, and testimonies from securities experts

analyze market manipulation, synthetic share creation, and regulatory failures. Expert opinions

provide authoritative analysis of the Defendants' misconduct and its impact on retail investors.

For example, testimony from James "Wes" Christian addresses naked short selling, synthetic share creation, and systemic failures of FINRA and the SEC.

301.  Investor Impact Statements. Affidavits and statements from retail investors detail the financial and emotional harm caused by the Defendants' actions. These statements provide firsthand accounts of the harm suffered by investors, including the inability to trade or reconcile their holdings. For example, affidavits from MMTLP shareholders document their inability to access investments or recover the fair value of their shares.

302.  Corporate Filings and Disclosures. SEC filings, proxy statements, registration statements, and other corporate disclosures related to the merger, spin-off, and trading of MMTLP shares demonstrate misleading statements, omissions, and failures to disclose material information. For instance, Torchlight's proxy statement prohibits the public trading of MMTLP shares, a prohibition that was ignored by OTC Markets and FINRA.

303.  Regulatory Notices and Actions. Notices, FAQs, and other communications from FINRA, the SEC, and other regulatory bodies regarding the MMTLP trading halt and market irregularities reveal the lack of transparency, procedural fairness, and regulatory oversight. For example, FINRA's FAQ document, issued 97 days after the U3 halt, failed to provide meaningful clarity or justification for the halt.

304.  Social Media and Public Statements. Public statements, social media posts, and promotional materials from corporate executives, influencers, and market participants demonstrate misleading or fraudulent statements designed to induce investors to purchase or retain MMTLP shares. For example, John Brda's social media posts encouraged investors to purchase MMTLP shares while he sold his own holdings.

305.     Bankruptcy Filings. Documents related to META II's Chapter 7 bankruptcy filing and its impact on MMTLP shareholders demonstrate the financial harm caused by the Defendants' misconduct and the lack of recourse for retail investors. For example, bankruptcy court filings show the liquidation of META II's assets and the termination of shareholder rights.

306.     Congressional Correspondence. Letters and communications from Members of Congress to the SEC, FINRA, and other regulatory bodies regarding the MMTLP case highlight the systemic nature of the regulatory failures and the need for Congressional oversight. For instance, a letter from Representative Ralph Norman and over 70 co-signers requests an investigation into FINRA's U3 halt and unresolved trading discrepancies.

307.     Software Systems and Operational Logs. Evidence related to the software systems employed by FINRA, DTCC, and OTC Markets, including system logs, source code, configuration files, and developer communications, is critical to understanding how trading discrepancies occurred. These materials will reveal the specific instructions encoded into the systems, clarify how compliance and trading rules were implemented, and identify the individuals or entities responsible for those implementations. For example, logs could show how FINRA's U3 halt was implemented in the trading system, including timestamps, configuration changes, and related communications from system administrators or developers.

## XIV. <u>CONCLUSION</u>

308.     The Plaintiff, Matthew J. Pease, has brought this action to address systemic failures in the U.S. financial markets that have inflicted widespread harm on retail investors through a combination of regulatory negligence, market manipulation, breaches of fiduciary duty, and constitutional violations. Central to this case is FINRA's imposition of an indefinite U3 trading halt on MMTLP shares, which deprived investors of access to their assets without

adequate notice, explanation, or resolution. This unprecedented halt exemplifies the unchecked

powers of a private self-regulatory organization operating without meaningful government

oversight, raising constitutional concerns under the separation of powers doctrine,

the Appointments Clause, and the private nondelegation doctrine. Precedents such as *SEC v.*

*Sloan* and *Alpine Securities Corp. v. FINRA* underscore the statutory and constitutional

violations inherent in FINRA's actions.

309.    The Plaintiff contends that FINRA's governance failures were further exacerbated

by the SEC and DTCC, which neglected their statutory obligations to enforce market integrity.

Despite clear responsibilities under Regulation SHO (17 C.F.R. § 242.204), these regulatory

entities failed to investigate or remedy widespread market abuses, including synthetic share

creation, naked short selling, and unresolved failures to deliver (FTDs). By failing to enforce

critical close-out requirements, reconcile discrepancies, or provide transparency through critical

Blue Sheets data, the Defendants enabled institutional participants to manipulate the market for

MMTLP shares while retail investors bore the consequences.

310.    Broker-dealers and market makers, including GTS Securities and Canaccord

Genuity, played a direct role in manipulating market dynamics. These entities exploited

regulatory loopholes to create counterfeit shares, distort supply and demand, and profit from

suppressed share prices at the expense of retail investors. Their conduct, enabled by regulatory

inaction, demonstrates a coordinated effort to manipulate trading conditions while evading

accountability.

311.    Transfer agents, such as AST/EQ (Equiniti), contributed to these systemic failures

by neglecting their fiduciary and statutory obligations during the MMTLP-to-NBH transition.

AST/EQ failed to reconcile outstanding share discrepancies and maintain accurate shareholder

records, facilitating the persistence of synthetic shares and leaving shareholders in prolonged financial uncertainty.

312.    Corporate leadership at Torchlight Energy Resources and Next Bridge Hydrocarbons compounded the harm by failing to address systemic trading irregularities and reconcile shareholder positions. Executives, including Gregory McCabe, John Brda, and Clifton DuBose, misrepresented critical information about asset valuations, particularly regarding the Orogrande Basin, and neglected their fiduciary duties to shareholders. Their collective inaction and misleading public statements left retail investors, including the Plaintiff, vulnerable to systemic market manipulation.

313.    The harm caused by these failures is significant, systemic, and ongoing. Tens of thousands of retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover the fair value of their investments. Meanwhile, institutional participants who engaged in manipulative practices, including naked short selling, remain unaccountable. This disparity highlights critical vulnerabilities in the regulatory framework and underscores the urgent need for judicial intervention to restore fairness, transparency, and accountability to the markets.

314.    The Plaintiff emphasizes the glaring inconsistency in regulatory responses between the MMTLP case and the GameStop trading episode. In the aftermath of GameStop, swift Congressional hearings and regulatory interventions ensured market disruptions were addressed promptly. In contrast, MMTLP investors have endured nearly two years of inaction and neglect. This systemic bias in favor of institutional participants highlights the inequities faced by retail investors and demonstrates the need for consistent regulatory enforcement to uphold investor rights and market integrity.

315.    The refusal by FINRA, the SEC, and the DTCC to disclose critical trading data, such as Blue Sheets and settlement records, has further compounded investor harm. This lack of transparency has obstructed efforts to investigate market manipulation, reconcile discrepancies, and hold wrongdoers accountable. The systemic withholding of such vital information underscores broader vulnerabilities in regulatory frameworks and necessitates judicial oversight to ensure transparency and accountability.

316.    In bringing this action, the Plaintiff seeks more than individual relief. This case represents a broader challenge to the systemic deficiencies and constitutional violations that have allowed market abuses to flourish unchecked. The Plaintiff respectfully requests this Court to grant declaratory and injunctive relief to restore fairness to the markets, including addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts, and ensuring meaningful government oversight of private entities exercising delegated authority.

317.    The Plaintiff also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. Compensatory and punitive damages are necessary to redress the financial and emotional harm suffered by retail investors. In addition, systemic reforms must be implemented to prevent future abuses, including mechanisms to eliminate synthetic shares, enforce Regulation SHO requirements, improve market transparency, and ensure accurate reconciliation of shareholder positions.

318.    By adjudicating the claims presented, this Court has an opportunity to establish critical legal precedents that promote regulatory accountability, enforce transparency, and restore public confidence in the financial markets. The Plaintiff, joined by tens of thousands of similarly affected retail investors, seeks a ruling that upholds the rule of law, prioritizes market integrity, and delivers justice to those who have been unjustly harmed by systemic misconduct.

319.     Finally, this case calls upon the Court to safeguard the rights of retail investors and reaffirm the principles of constitutional governance. The Plaintiff urges the Court to deliver a ruling that holds the Defendants accountable for their misconduct, addresses systemic regulatory failures, and ensures the integrity of U.S. financial markets for all participants.

## XV. DEMAND FOR JURY TRIAL

320.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury for all claims and issues triable as of right.

321.     The claims and issues for which a jury trial is demanded include, but are not limited to:

322.     Claims for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, including allegations of market manipulation, synthetic share creation, and naked short selling.

323.     Claims for breach of fiduciary duty by corporate officers, including John Brda and Gregory McCabe, under state corporate governance laws.

324.     Claims for negligence by regulatory bodies, including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC), in failing to enforce federal securities laws and protect investors.

325.     Claims for constitutional violations, including violations of the Appointments Clause, Nondelegation Doctrine, and Due Process Clause, arising from FINRA's imposition of the U3 trading halt and the SEC's failure to provide adequate oversight.

326.     Claims for compensatory and punitive damages arising from the Defendants' collective misconduct, including the suppression of MMTLP share prices, the inability to trade shares, and the prolonged financial harm suffered by the Plaintiff and other retail investors.

327.     The Plaintiff respectfully requests that this Court honor t he jury demand and ensure that all triable issues are presented to a jury for determination.

## XVI. CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

328.     I, Matthew J. Pease, the Plaintiff in this action, hereby certify pursuant to 15 U.S.C. § 78u-4(a)(2) of the Private Securities Litigation Reform Act of 1995 and Rule 11 of the Federal Rules of Civil Procedure that:

a.   I have reviewed the complaint and authorized its filing.

b.   The complaint is based on my personal knowledge with respect to the facts alleged, except as to those matters specifically alleged on information and belief. As to those matters, I believe them to be true.

c.   The allegations in the complaint are true to the best of my knowledge, information, and belief, formed after a reasonable inquiry under the circumstances.

d.   This complaint is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

e.   The claims and other legal contentions in the complaint are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

f. The factual contentions in the complaint have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Executed On: _February 25, 2025_     Signature: _Matt Pea_

Matthew J. Pease, pro se

1 Cobbler Lane

Amherst, NH 03031

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Matthew J. Pease, duly certify and say, as to the claims asserted under the federal securities

laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge and belief.

Executed On: _February 25, 2025_     Signature: _Matthew Pea_

Name: Matthew J. Pease

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS

FILED

DEC 3 0 2024

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

CONTIQUE WILLCOT,

                              Plaintiff,

    v.

SECURITIES & EXCHANGE COMMISSION,
GTS SECURITIES LLC, ARI RUBINSTEIN,
NEXT BRIDGE HYDROCARBONS, INC., JOHN
BRDA, GREGORY MCCABE, FINANCIAL
INDUSTRY REGULATORY AUTHORITY

                              Defendants.

Case No.:  **MO:24-CV-317**

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

**1.    INTRODUCTION**

1. This action arises from a comprehensive and pervasive course of conduct encompassing

    market manipulation, dereliction of regulatory duties, breaches of fiduciary obligations, and

    transgressions of constitutional rights, which collectively compromised the integrity and

    trustworthiness of the United States financial markets. Plaintiff, CONTIQUE WILLCOT, a

    retail investor and Lieutenant in the Fire Service, hereby initiates this action to seek redress

    from Defendants for their complicity in a systemic pattern of misconduct that resulted in

    substantial and widespread financial detriment. This document reveals the defendants' myriad

    SEC and FINRA violations, strategically intertwined through a constellation of deceptive

    tactics, the misuse of improper trading mechanisms, and the perpetuation of unconstitutional

    regulatory frameworks. Such actions have systematically marginalized retail investors, while

    disproportionately favoring institutional market participants.

1

a) At the core of this matter lie the Non-Voting Series A Preferred Shares of Meta Materials, Inc. (MMTLP), which were intended to represent equity interests in Next Bridge Hydrocarbons (NBH) subsequent to a corporate spin-off. Rather than facilitating a smooth and orderly transition to private ownership, market makers, broker-dealers, and regulatory authorities engaged in a series of manipulative practices, including the creation and circulation of synthetic/counterfeit shares and the execution of naked short sales. These illicit activities resulted in the inundation of the market with counterfeit shares, the artificial suppression of legitimate share prices, and the consequent deprivation of shareholders of their rightful economic value. Regulatory entities, including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC), demonstrably failed to fulfill their statutory obligations to oversee market activity, thereby enabling these abuses to continue unchecked.

b) A pivotal juncture within this orchestrated scheme occurred on December 9, 2022, when the Financial Industry Regulatory Authority (FINRA) issued a U3 trading halt, effectively indefinitely suspending trading in MMTLP shares. Citing an ill-defined 'extraordinary event,' FINRA imposed this draconian measure without affording any transparency or providing a discernible path towards resolution, thereby rendering tens of thousands of investors entirely unable to access their vested assets. This action not only constituted a grave procedural irregularity but also constituted a manifest violation of constitutional principles. FINRA, a private entity operating as a self-regulatory organization, arrogated to itself quasi-governmental powers without the requisite oversight mandated by the doctrine of separation of powers, the Appointments Clause, and the principle of nondelegation of legislative authority to private entities. Recent judicial pronouncements, including the landmark decisions of Alpine Securities Corp. v. FINRA and SEC

2

v. Sloan, provide compelling legal precedent that unequivocally underscores these fundamental constitutional and statutory shortcomings.

c) The systemic misconduct observed herein transcends the governance deficiencies exhibited by the Financial Industry Regulatory Authority (FINRA). Broker-dealers of significant stature, including Fidelity Investments and Charles Schwab, and prominent market makers such as GTS Securities, actively participated in concerted efforts to manipulate the trading activity of MMTLP shares, thereby generating substantial profits through the exploitation of artificially inflated supply while simultaneously inflicting substantial financial losses upon retail investors. Vertically integrated regulatory agencies, including the Securities and Exchange Commission (SEC) and the Depository Trust & Clearing Corporation (DTCC), demonstrably failed to fulfill their mandate to enforce compliance regulations, conduct thorough investigations into reported irregularities, or effectively resolve discrepancies observed within shareholder accounts. These collective failures created an environment that facilitated and perpetuated unchecked market manipulation, constituting a clear and unambiguous violation of antitrust laws and the provisions of federal securities statutes.

d) Corporate leadership within Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons likewise bears substantial responsibility for their collective failure to adequately address the emergent trading irregularities, reconcile the persistent discrepancies observed within shareholder accounts, or ensure the requisite level of corporate accountability. Executives within these entities engaged in conduct that misled investors regarding the true financial prospects of their respective assets, while simultaneously neglecting the fundamental fiduciary duties owed to their shareholders. This inaction not only exacerbated the harm inflicted by the manipulative

3

practices of other Defendants but also contributed to a significant erosion of investor confidence and a severe undermining of the integrity of the broader market.

e) Plaintiff contends that fraudulent activities related to MMTLP were orchestrated by market makers, short sellers, and broker-dealers, including Fidelity Investments and TD Ameritrade (now Charles Schwab) in the Plaintiff's case, through naked short selling. These actions led to the creation of illegal counterfeit shares and perpetuated market manipulation. Subsequently, the Defendants weaponized the unilateral U3 trading halt imposed by the Financial Industry Regulatory Authority (FINRA) as a calculated mechanism to further conceal their fraudulent activities. This manipulation prevented the Depository Trust & Clearing Corporation (DTCC) from clearing the trades, a failure the DTCC never transparently addressed. The U3 halt, coupled with the inaction and negligence of other regulatory bodies, constitutes a severe breach of investor protections, statutory mandates, and core constitutional principles. Such actions fostered an environment of unchecked market manipulation, causing significant harm to the Plaintiff and other investors. The indefinite duration of this trading halt mirrors the statutory violations identified in SEC v. Sloan, wherein the Supreme Court condemned the SEC for unlawfully extending a trading halt beyond the ten-day statutory limit without congressional authorization. Moreover, FINRA's unchecked exercise of its delegated authority, as scrutinized in Alpine Securities Corp. v. FINRA, directly contravenes the constitutional principle that private entities with delegated authority remain subject to meaningful governmental oversight.

f) Notwithstanding the passage of nearly two years since the imposition of the U3 trading halt, Defendants have demonstrated a conspicuous absence of meaningful action to address the identified systemic failures or to provide adequate redress for the substantial harm inflicted upon investors. Retail investors remain ensnared within a state of financial and legal limbo, deprived

4

of the ability to liquidate their positions or to achieve a satisfactory reconciliation of their respective shareholdings. This prolonged and inexcusable inaction has not only resulted in significant and enduring financial detriment but has also served to underscore the inherent vulnerabilities and systemic deficiencies within the prevailing market oversight framework. The stark disparity observed in the regulatory responses to the events surrounding MMTLP and the trading frenzy involving GameStop further exemplifies the inequitable and discriminatory treatment routinely experienced by retail investors within the current market structure.

g) This action seeks to obtain compensatory damages for the substantial financial and emotional harm sustained by the Plaintiff and, concurrently, to challenge the fundamental structural and constitutional deficiencies inherent within the governance framework of the Financial Industry Regulatory Authority (FINRA). By adjudicating these systemic shortcomings, this Honorable Court possesses the unique opportunity to restore a measure of fairness and transparency to the United States financial markets, safeguard the fundamental rights of retail investors, and reaffirm the paramount importance of the constitutional principles that govern the exercise of regulatory authority. Such remedial action is not merely desirable but, rather, imperative to rectify the grave failures that have imperiled investor confidence and severely compromised the integrity of the market.

## II.    JURISDICTION AND VENUE

2.  Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.

5

3.  Diversity jurisdiction is also proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff, a resident of Florida, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, New York, and Washington, D.C.

4.  Venue is appropriate in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

5.  Notwithstanding the passage of nearly two years since the imposition of the U3 trading halt, none of the regulatory or governance entities entrusted with the paramount responsibility of ensuring the fair and equitable operation of the securities markets—including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), the Depository Trust & Clearing Corporation (DTCC), transfer agents, broker-dealers, market makers, and the executive leadership of the publicly traded companies related to this matter—have demonstrated an effective resolution or remediation of the cascading challenges arising from this unprecedented event. This collective failure to fulfill their respective obligations has resulted in clear and unambiguous violations of federal securities laws and antitrust statutes, thereby causing substantial and quantifiable financial harm to the Plaintiff.

6.  Despite the passage of over two years since the imposition of the U3 trading halt, the relevant Defendants, including regulatory bodies and market participants, have conspicuously failed to adequately investigate the systemic irregularities that precipitated this event. They have

6

also neglected to implement corrective measures to mitigate the ongoing harm. This inaction constitutes a grave dereliction of duty, particularly given the ample time and resources available to address critical issues such as the proliferation of synthetic/counterfeit shares, persistent failures to achieve proper trade settlements, unresolved account reconciliations, and the substantial financial detriment inflicted upon a significant segment of retail investors.

## III. **PARTIES**

7. Plaintiff: CONTIQUE WILLCOT (hereinafter referred to as "Plaintiff" or "Willcot") has at all times mentioned herein been a resident and citizen of the city of Pembroke Pines, in the County of Broward, in the State of Florida. He is a Lieutenant at Miami-Dade Fire Rescue and shareholder of Meta Materials and Next Bridge Hydrocarbons.

8. Defendant: Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

9. Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry Regulatory Authority (hereinafter "FINRA") is a self-regulatory organization authorized by the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006.

10. Defendant Next Bridge Hydrocarbons, Inc. (NBH): Next Bridge Hydrocarbons, Inc. (hereinafter "NBH") was formed as part of the corporate spin-off from Meta Materials, Inc., intended to provide MMTLP shareholders with private ownership of its oil and gas assets. NBH is a private oil and gas exploration, and development company incorporated in the State

of Nevada with its principal place of business located at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116.

11. Defendant Greg McCabe: Greg McCabe (hereinafter "McCabe") is the CEO and Chairman of Next Bridge Hydrocarbons (NBH) and the President of McCabe Petroleum Corporation, located at 500 W. Texas Avenue, Suite 1020, Midland, Texas, 79701.

12. Defendant John Brda: John Brda (hereinafter "Brda") is the former Chief Executive Officer of Torchlight Energy Resources. Brda played a significant role in structuring the merger between Torchlight Energy Resources and Meta Materials and in the subsequent creation of MMTLP shares. The company's last known address is 1425 Frontenay Ct., St. Louis MO 63122

13. Defendant GTS Securities: GTS Securities (hereinafter "GTS") is a market maker operating on the New York Stock Exchange, headquartered at 545 Madison Avenue, 15th Floor, New York, New York, 10022.

## IV. STATEMENT OF FACTS

14. John Brda, a former Chief Executive Officer of Torchlight Energy Resources, was instrumental in the corporate merger with Metamaterial Technologies Inc., which culminated in the formation of Meta Materials, Inc. Moreover, Brda played a significant role in the preparatory stages of the corporate spin-off of Next Bridge Hydrocarbons and the subsequent registration of the corresponding shares.

15. Clifton DuBose, a legal professional affiliated with Lynch, Chappell & Alsup, P.C., served as the Chief Executive Officer of Next Bridge Hydrocarbons (NBH) during the pivotal period encompassing the transition of MMTLP shares to private equity. In this capacity, DuBose

8

played a crucial role in facilitating the corporate transition of NBH, a process of paramount importance in addressing the concerns of shareholders regarding the spin-off and the resolution of outstanding share discrepancies. DuBose tendered his resignation from this position in January 2024.

16. Gregory McCabe, a seasoned corporate executive, held key leadership positions within Torchlight Energy Resources and subsequently Next Bridge Hydrocarbons. In his capacity, McCabe was actively involved in the valuation and management of NBH's oil and gas assets during the corporate spin-off from Meta Materials, Inc. Subsequently, he assumed the role of Chief Executive Officer of NBH, succeeding Clifton DuBose.

17. Ari Rubenstein, serving as Chief Executive Officer of GTS Securities, oversees the operations of a market-making firm dedicated to facilitating liquidity and trading activities within financial markets. GTS Securities operates within a rigorous regulatory framework designed to ensure orderly market conditions and fulfill the requisite responsibilities of a market maker.

18. Frank La Salla, serving as President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC), oversees the organization's crucial role in facilitating the clearing and settlement processes for securities trades. The DTCC plays an indispensable role in ensuring the accurate recording and timely settlement of transactions across the broad spectrum of financial markets.

19. Robert W. Cook, serving as President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA), oversees the organization's regulatory functions, which encompass the enforcement of FINRA's rules and the promotion of fair and equitable market

practices. Cook's leadership is aligned with FINRA's core mission of safeguarding investor interests and upholding market integrity.

20. Gary Gensler, in his official capacity as Chairman of the Securities and Exchange Commission (SEC), is responsible for overseeing the agency's enforcement of federal securities laws. Under his leadership, the SEC monitors market practices and works to ensure transparency, fairness, and compliance with securities regulations.

21. On or about May 2, 2008, Pole Perfect Studios commenced filings as a private entity under the Central Index Key (CIK) number 0001431959. Following its merger with Torchlight Energy Resources on November 23, 2010, this CIK number (0001431959) was transferred to Torchlight Energy Resources, making it responsible for subsequent filings.

22. According to SEC Rule 313 of Regulation S-T, upon the occurrence of a merger between two companies, the series and class (contract) identifiers assigned to the original entities shall not be transferred to the newly formed merged entity. Instead, the merged entity is required to obtain new series and class (contract) identifiers through the EDGAR filing system. Furthermore, the original identifiers must be updated to reflect the merger, with their status marked accordingly as inactive or merged.

23. On June 28, 2021, Torchlight Energy Resources transferred its CIK (0001431959) to Meta Materials, Inc. following their merger. The concurrent use of CIK number 0001431959 by both Meta Materials, Inc. and MMTLP represents a potential infringement of SEC regulations, specifically Rule 313 of Regulation S-T, which mandates distinct identifiers for separate entities. This action is likely to obscure transaction records and potentially mislead investors, thereby contravening Rule 10b-5's prohibition against deceptive practices in securities transactions.

10

24. Additionally, the improper utilization of a CIK number undermines the record-keeping and internal control requirements stipulated under the Securities Exchange Act, which necessitate precise tracking of securities filings and transactions.

25. A CUSIP (Committee on Uniform Securities Identification Procedures) number is a unique nine-character alphanumeric code assigned to financial securities in the United States and Canada. It is used to uniquely identify securities such as stocks, bonds, and mutual funds, facilitating accurate processing, clearing, and settlement of trades.

26. Additionally, CUSIP numbers simplify record-keeping and reduce transaction errors, providing a reliable identifier for both investors and institutions.

27. Unlike Central Index Key (CIK) numbers, which identify entities filing with the SEC, CUSIP numbers specifically identify individual financial securities, ensuring clarity and accuracy in trading and tracking within financial markets.

28. From 2010 to 2020, Torchlight Energy Resources (TRCH) traded a cumulative total of 745 million shares on public markets. This substantial trading volume reflected its decade-long activity in the oil exploration sector and positioned it for the eventual merger with Meta Materials, Inc. Trading history highlights the scale of its operations and shareholder engagement during this period.

29. On or about April 23, 2020, John Brda, then CEO of Torchlight Energy Resources (TRCH), and Greg McCabe, then Chairman of TRCH, made statements inflating the valuation of the oil and gas properties that would later form NBH.

30. They announced a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional

11

zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

31. Based on Brda and McCabe's stated 'probable reserve' of 3.678 billion barrels of oil at the Orogrande site and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the asset was approximately $209.51 billion.

32. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting the potential fair market value prior to extraction.

33. These statements, from NBH corporate officers and social media influencers regarding the probable reserve, inferred great expectations regarding NBH's financial prospects and were referenced consistently in shareholder discussions leading up to the MMTLP transition.

34. On March 1, 2020, Torchlight Energy presented an Investor Presentation via PowerPoint or email to interested parties, emphasizing the company's focus on assets in the Permian Basin, notably the Orogrande, Hazel, and Winkler projects.

35. The Orogrande Project was identified as the flagship asset, comprising over 134,000 acres with a substantial recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

36. The presentation underscored the project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, the company highlighted its belief in the presence of oil, framing the central question as not whether oil exists but determining the exact quantity recoverable.

37. In June 2020, Brda, along with the members of Torchlight Energy Resources' board of directors, resolved to pursue a strategic initiative aimed at salvaging the company through a merger with Meta Materials Inc., a corporation focused on advanced technological innovations.

38. This merger was presented to shareholders as a critical measure to stabilize the company, with claims that it was necessitated by the pressing need to address an overwhelming number of illegal short shares allegedly created in the market.

39. These short positions were portrayed as a significant threat to Torchlight's financial stability, further justifying the urgency and strategic importance of the merger.

40. Shareholders were led to believe that this merger would provide a pathway to resolve the systemic challenges posed by these short shares while transitioning the company toward a future in high-tech innovation.

41. On December 14, 2020, Torchlight Energy Resources Inc. (TRCH), a Texas-based oil exploration company, initiated a merger plan with Meta Materials Inc. (MMAT), a Canada-based high-technology materials firm.

42. The merger aimed at combining TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action marked a pivotal shift for both companies, setting the foundation for the creation of Meta Materials, Inc.

43. From January 1, 2021, to June 21, 2021, Torchlight Energy Resources (TRCH) traded a total of 3.6 billion shares. This unprecedented trading volume occurred over just six months, a significant increase compared to the company's cumulative trading volume of 745 million shares recorded over the prior decade, raising concerns about unusual trading activity.

13

44. A 'Z-test' statistical analysis was performed to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021 (analysis was conducted on July 14, 2024).

45. The analysis considered an average daily variation of 5% over 10 years and concluded that it was statistically impossible for 3.6 billion shares to have been traded in TRCH during this six-month period without manipulation or an unpredictable, non-uniform event influencing the market.

46. Upon information and belief, during the first six months of 2021, naked shorts were added to TRCH by Ari Rubenstein, in concert with others. These actions likely contributed to the anomalous trading volumes observed during this time, further indicating market manipulation.

47. However, under the Clayton Act, Section 3 (15 U.S.C. § 14), and the Sherman Antitrust Act, Sections 1 and 2 (15 U.S.C. §§ 1–2), such agreements may be rendered null and void when they are tied to or facilitate anticompetitive conduct, including monopolistic behaviors that restrain trade or suppress competition. Additionally, naked short selling is prohibited under Exchange Act Rule 10b-21, the Naked Short Selling Antifraud Rule, which makes it unlawful for any person to submit an order to sell a security if they deceive a broker-dealer, participant of a registered clearing agency, or purchaser regarding their intention or ability to deliver the security by the settlement date and subsequently fail to deliver the security by that date.

48. In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the "Series A Preferred Stock" for

trading on the Over-The-Counter (OTC) market for NASDAQ, without the authorization or permission of MMAT or TRCH executives.

49. GTS and Canaccord violated FINRA Rule 2010 by engaging in deceptive practices and failing to uphold high standards of commercial honor. They relied on outdated, decade-old information, submitting falsified Form 211 filings to facilitate the tradability of what would later become MMTLP. This breached FINRA Rule 9552, which requires members to provide accurate and current data. Additionally, their actions allowed for naked short selling, contravening Regulation SHO, specifically Rule 204. These practices compromised market integrity and fairness, thereby breaking FINRA Rule 2010.

50. In a letter dated June 21, 2021, the OCC explicitly stated that "Series A Preferred Shares" would not trade.

51. However, that letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the OTC market. This directive directly contradicted the intentions and filings of the merged companies.

52. The OCC memorandum dated June 21, 2021, was exclusively shared with market makers and hedge funds, including GTS and Ari Rubenstein.

53. GTS, under the supervision of Ari Rubenstein, had a duty to record all short sales, including naked shorts, and was granted additional time to close out fails-to-deliver under the "market maker exemption" rule, which is part of Regulation SHO, specifically under Rule 203(b). This rule provides exceptions for bona fide market making activities, allowing market makers to engage in short sales without the immediate requirement to close out fails-to-deliver.

15

54. Pursuant to FINRA Rule 204(b), market makers engaged in bona fide market-making activities are provided exceptions allowing additional time to close out fails-to-deliver resulting from such activities.

55. However, they are also required to maintain daily records of their fails-to-deliver and report them as necessary to ensure transparency and regulatory oversight.

56. The Depository Trust & Clearing Corporation (DTCC) is obligated to maintain precise and comprehensive records of securities trades and ensure the efficient electronic recovery and dissemination of information related to securities transactions within U.S. stock markets, as part of its role in promoting transparency and regulatory compliance.

57. On June 25, 2021, the CIK number 0001431959 transitioned again when Torchlight conducted a reverse takeover (RTO) with Meta Materials.

58. The shared use of CIK number 0001431959 between Pole Perfect, then Torchlight, now Meta Materials constitutes a potential violation of SEC regulations requiring distinct identifiers for separate entities.

59. Such actions may obscure transaction records and mislead investors, contravening Rule 10b-5 prohibition on deceptive practices in securities transactions.

60. During the merger of Torchlight Energy Resources and Metamaterial Technologies Inc., Gregory McCabe, a key executive and shareholder, publicly underscored the significant potential value of the Orogrande Basin oil and gas assets. He emphasized the probable oil reserves and the presence of other unproven assets within the basin, drawing attention to its strategic importance in the merger.

61. However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—an amount significantly lower than the estimated $20.96 billion to $41.92 billion based on the below-ground valuation of probable reserves.

62. Subsequent disclosures during the Next Bridge Hydrocarbons spin-off brought to light notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

63. On June 28, 2021, MMTLP shares were created during the spin-off in which TRCH transitioned specific assets into Next Bridge Hydrocarbons (NBH).

64. These shares, designated as "Series A Preferred Shares," were intended to represent private ownership in NBH and were not meant to trade publicly.

65. On October 6, 2021, GTS Securities and Canaccord Genuity began trading MMTLP shares publicly. This activity occurred despite directives in TRCH's proxy statement, which prohibited public trading of the Series A Preferred Shares.

66. Despite the regulatory requirement for independent CIKs, MMTLP began trading on OTC markets on October 7, 2021, under the same CIK number 0001431959, as Pole Perfect, then Torchlight, then Meta Materials, now MMTLP.

67. This use of a shared CIK raises questions of compliance with SEC filing rules, including potential violations of Regulation S–T Rule 10(b) and Rule 10b-5.

68. On or about October 7, 2021, GTS Securities and Canaccord Genuity facilitated public trading of MMTLP shares on the OTC market. These actions were not authorized by TRCH or Meta Materials executives.

69. When John Brda, former CEO of Torchlight Energy, notified OTC Markets of this unauthorized trading, OTC Markets directed him to FINRA. FINRA subsequently informed

Brda that he lacked standing to bring a formal complaint, as he was no longer the CEO. This unauthorized listing initiated significant trading irregularities and confusion among investors.

70. From October 7, 2021, to December 9, 2022, GTS Securities engaged in trading activities that resulted in the creation of synthetic/counterfeit shares, exceeding the authorized float of MMTLP shares. Which is, again, prohibited under Exchange Act Rule 10b-21, the Naked Short Selling Antifraud Rule.

71. Between October 2021 and December 2022, GTS Securities, under its market maker exemption, participated in trading activities involving synthetic/counterfeit MMTLP shares. These shares were created without the required "locates," exceeding the authorized float of legitimate shares.

72. Between October 1, 2022, and December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50.

73. During this period, the market capitalization for MMTLP, a relatively unknown oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

74. Given the company's total authorized share count of 165.5 million, this level of market capitalization and volatility suggests the potential influence of synthetic/counterfeit (rehypothecated) shares or naked short selling.

75. Between November 15 and December 5, 2022, John Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price of MMTLP ranged between $2.90 and $9.90. Based on this price range, Brda's transactions generated proceeds estimated between $870,000 and $2,970,000.

76. Publicly available social media posts from this timeframe show that Brda encouraged others to purchase MMTLP shares and denied selling any of his own shares.

Such actions constitute a pump-and-dump scheme, a form of securities fraud where the price of a stock or security is artificially inflated through false, misleading, or greatly exaggerated statements (the "pump"). The perpetrators, having established a position in the company's stock, sell their shares at the inflated price (the "dump"), after which the price typically falls, causing significant losses to subsequent investors. This scheme is prohibited under several U.S. securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934, and the Sarbanes-Oxley Act of 2002.

77. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt.

78. On November 23, 2022, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company, to facilitate the distribution of Next Bridge Hydrocarbons shares.

79. This transfer was intended to streamline the corporate action and ensure shareholders receive their Next Bridge shares directly.

80. Additionally, shareholders were informed they would receive bonus shares of NBH Newco as an incentive for transferring their shares to AST; however, these bonus shares were never delivered, raising concerns about the representations made to shareholders.

81. On November 30, 2022, Gregory McCabe sold approximately 6.8 million shares of MMTLP out of his total holdings of 18,758,249 shares, which constituted 11.37% of the float. On that date, the trading price of MMTLP ranged between a low of $7.76 and a high of $10.00.

82. Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

19

83. A series of emails obtained through a Freedom of Information Act (FOIA) request and released in redacted form indicate that individuals at both the SEC and FINRA, on December 5, 2022, including Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of MMAT and MMTLP shares.

84. These emails provide insight into regulatory awareness of irregularities during the period leading up to the FINRA-imposed U3 halt.

85. This also means that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, are reports that broker-dealers submit to regulators such as FINRA and the SEC, were being used as early as December 5, 2022, if not before this.

86. These reports contain detailed trade information, including the identity of the buyer and seller, trade size, trade price, and other transaction-specific details. The purpose of Blue Sheets is to assist regulators in monitoring the markets, detecting suspicious trading activity, and investigating potential securities violations like market manipulation or insider trading.

87. Blue Sheets are crucial for ensuring transparency and accountability in the financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct.

88. On December 7, 2022, both FINRA and Meta Materials (MMAT) corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022.

89. The corporate action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for Next Bridge Hydrocarbons (NBH) shares or dividends set for December 14, 2022.

90. On December 8, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA-approved corporate action. Mendl confirmed that MMTLP would no longer be available to trade on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

91. Also on December 8, 2022, FINRA failed to attend a scheduled meeting with the Depository Trust & Clearing Corporation (DTCC) and attorneys from Meta Materials regarding unresolved issues with the MMTLP corporate action.

92. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the prior notice indicating that MMTLP shares would be "CANCELLED" upon conversion to Next Bridge Hydrocarbons shares.

93. This revision omitted the December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

94. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code (commonly referred to as S.O.S.), signifying a heightened urgency to close their positions. The data reflected transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (i.e., $290.00+), an extraordinary deviation characteristic of a severe short squeeze.

95. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late

to cancel." This indicated significant irregularities in the handling of MMTLP trades, affecting more than 65,000 shareholders (Traudt v. Rubenstein, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont).

96. Many MMTLP traders, including the Plaintiff, were holding their shares with the intent to execute opportunity trades—to sell, rather than buy—on December 9 and 12, 2022. They were prepared to accept the best possible offers for their trades before the close of all trading on December 12, 2022, as specified in the approved corporate action referenced above.

97. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the Securities and Exchange Commission, FINRA justified the halt by citing "extraordinary circumstances." However, this action left many investors unable to access their investments, with no clear resolution provided.

98. FINRA justified the trading halt with the following statement: "FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

99. In the same FINRA notice announcing the halt (UPC #35-22) dated December 9, 2022, FINRA further clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022.

100. Any subsequent reference to the FINRA U3 halt, after December 13, 2022, is acknowledged as accurate in form. However, for the purposes of this complaint, it is considered a matter of semantics, as the halt was officially lifted by FINRA on December 13,

2022. Despite this, no further action, remedy, or resolution has been undertaken as of

December 23, 2024, leaving the matter unresolved for a total of 740 days.

101.  Given the principles of the Private Nondelegation Doctrine, there are significant

questions regarding FINRA's authority to issue the U3 trading halt:

a) The Private Nondelegation Doctrine stipulates that Congress cannot delegate its

legislative authority to private entities without ensuring adequate governmental oversight and

control to prevent unchecked regulatory power.

b) 1. SEC-FINRA Model: As a self-regulatory organization (SRO), FINRA operates

under the stringent oversight of the Securities and Exchange Commission (SEC). The SEC

possesses comprehensive authority to approve, modify, or disapprove FINRA's rules and can

review and overturn FINRA's disciplinary actions.

c) Uniform Body of Precedent: Judicial bodies have consistently upheld the SEC-FINRA

model, ruling that it does not contravene the Private Nondelegation Doctrine. This is predicated

on the SEC's ultimate control over FINRA's rulemaking and enforcement activities, ensuring that

FINRA's regulatory functions are supervised by a governmental entity.

d) Conflict with Precedent: A determination that FINRA's structure violates the Private

Nondelegation Doctrine would contradict established legal precedent. Courts have uniformly

recognized that the SEC's oversight and control over FINRA's activities prevent any

unconstitutional delegation of authority to a private entity.

102.  In summary, declaring FINRA's structure unconstitutional under the Private

Nondelegation Doctrine would contradict consistent judicial findings. These findings affirm

that the SEC's oversight ensures that FINRA's regulatory power is not an improper delegation

of legislative authority to a private entity, thereby questioning the validity of FINRA's power to issue measures such as the U3 trading halt without adequate oversight.

103. FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across U.S. financial markets.

104. While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

105. As a privately governed organization, FINRA's Board of Governors is not appointed by the President or subject to the checks and balances typically applied to federal agencies, prompting constitutional considerations relevant to its governance and actions.

106. From its establishment as an SRO under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers, including the ability to enact rules, conduct investigations, and impose sanctions, functions typically reserved for federal agencies.

107. These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action that had significant financial and legal implications for investors.

108. However, FINRA's governance by a private membership-based Board of Governors raises structural questions about its authority to take such impactful actions. This board is neither appointed by the President nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

*SEC v. Jarkesy (2024); Alpine Securities Corporation v. FINRA (2024); Scottsdale Capital Advisors v. FINRA (2023)*

109.  Pursuant to the U3 Halt imposed on MMTLP, I, along with other investors, received advisement to transfer our shares of Next Bridge Hydrocarbons (NHB) to the designated transfer agent, American Stock Transfer (AST). This action was undertaken in an effort to obtain an aggregate share count, given our inability to procure the requisite blue sheets from the relevant entities. I proceeded with the transfer of my shares in the expectation of achieving a comprehensive share count; however, all attempts to do so were unsuccessful despite exhausting all available avenues.

110.  Although NBH's S-1 filings and amendments were approved in 2022, position-close-only restrictions were not enforced for MMTLP shares before the U3 halt. These restrictions would have limited new short positions and helped stabilize the market during the transition.

111.  On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in Next Bridge Hydrocarbons, despite its status as a private company not intended for public trading.

112.  Coulson further stated that resolving these short positions would be "easier if Next Bridge shares became publicly tradable," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

113.  FINRA released its initial FAQ regarding the MMTLP corporate action and trading halt on March 16, 2023, 97 days after the halt. The FAQ failed to clearly define the 'extraordinary event' that justified the halt.

114. Despite receiving thousands of complaints from shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remained, to date, FINRA's only significant communication with shareholders regarding the halt.

115. On February 20, 2023, Fleming, a TD Ameritrade (Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging institutional interests rather than retail investor protection as the motive. (Traudt v. Rubenstein, 2024, Docket Number: 2:34-cv-782, United States District Court for the District of Vermont.)

116. This conversation, which was recorded by TD Ameritrade (TDA), later Schwab, was initially made available for playback at Traudt's request but was later denied (Traudt v. Rubenstein, 2024).

117. In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TDA, but Schwab also refused to release the audio. These refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt (Traudt v. Rubenstein, 2024).

118. On April 1, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

119. High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook, were documented as having knowledge of these issues. Despite this, no substantive action was taken to resolve these irregularities or inform the investing public, further exacerbating market confusion and investor harm.

120. On April 18, 2023, Clifton DuBose, CEO of Next Bridge Hydrocarbons, sent a letter to FINRA requesting assistance to address unresolved issues arising from the MMTLP spin-off, asking for access to the Blue Sheets.

121. In the context of Meta Materials (MMAT) and its preferred shares (MMTLP), Blue Sheets would provide critical insights into the trading activities during the period of alleged market manipulation and synthetic/counterfeit share creation.

122. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counterparties involved, and whether the transactions involved legitimate shares or synthetic/counterfeit ones.

123. Given the allegations of naked short selling and the creation of synthetic/counterfeit shares, regulators' analysis of Blue Sheets could expose discrepancies in the total volume of shares traded versus the actual number of legitimate shares issued or prove all of these allegations unfounded.

124. If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

125. For instance, these sheets might highlight unusually high trade volumes that exceed the total outstanding shares, corroborating claims of synthetic/counterfeit shares.

126. Furthermore, they could reveal whether broker-dealers and market makers engaged in practices like failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

127.    The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

128.    The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of the trading activity, allowing allegations of irregularities, such as synthetic/counterfeit share creation or naked short selling, to be substantiated or disproven.

129.    Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. This transparency is essential to restoring investor trust and ensuring accountability for any misconduct. If there was fraud or other corruption, withholding this information raises significant concerns regarding the motives and potential complicity of regulatory bodies. The absence of transparency could be seen as an attempt to shield malfeasance or prevent the full scope of fraudulent activities from being uncovered, thereby undermining the principles of fair and open markets.

130.    DuBose outlined concerns regarding outstanding short positions in Next Bridge shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

131.    The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

132.    FINRA did not concur with his recommendations nor provide any meaningful remedy with their response letter on June 7, 2023.

133. On or about July 15, 2022, Next Bridge Hydrocarbons (NBH) received its own CIK number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK used for Pole Perfect, then Torch Light, then Meta Materials, now NBH (while MMAT still exists as a legal entity).

134. A supplemental FAQ was later published on November 6, 2023, 332 days after the halt. This FAQ, like the initial one, failed to clearly define the 'extraordinary event' that warranted the halt.

135. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, this supplemental FAQ marked only the second significant attempt by FINRA to communicate with shareholders about the halt.

136. To date, these two FAQs remain FINRA's only substantial communications with shareholders regarding the trading halt.

137. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

138. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2022. Gensler acknowledged familiarity with MMTLP but did not know the specific share count, suggesting it might be publicly available.

139. Norman expressed dissatisfaction with the SEC's responses and indicated plans to send another letter seeking detailed information.

140. On December 22, 2023, Representative Ralph Norman led a letter to the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) concerning Meta Materials Series A preferred shares (MMTLP). This letter was co-signed by more than 70 members of Congress.

141.   On January 15, 2024, NBH executives, including Clifton DuBose (CEO) and Luke Hawkins (CFO), resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred during a period of ongoing market uncertainty.

142.   On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's December 9, 2022, U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

143.   The letter emphasized that FINRA's actions led to widespread investor harm and confusion, with over 40,000 letters received from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

144.   After Meta Materials declared bankruptcy on August 9, 2024, its final filing under this CIK occurred on September 20, 2024.

145.   On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (HudOp), a subsidiary of Next Bridge Hydrocarbons (NBH), citing breaches of the Development Unit Agreement (DUA) due to the non-payment of annual royalties and HudOp's refusal to fulfill its drilling obligations for the 2024 operational year.

146.   The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the agreement. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

147. In response to the October 2, 2024, termination of the Orogrande lease, Greg McCabe, Chairman and CEO of Next Bridge Hydrocarbons, expressed disappointment with University Lands' decision, framing it as a setback for the company.

148. However, NBH has not taken any formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This lack of action has further fueled concerns about NBH's management and the viability of its core assets.

149. On November 13, 2024, the plaintiff, a shareholder of Next Bridge Hydrocarbons (NBH), submitted a formal Request for Information (RFI) to NBH. The RFI raised critical questions regarding corporate governance, the total share count, discrepancies in share delivery, and the resolution of potential naked short selling.

150. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide a comprehensive response to the RFI within the 14-day deadline specified, and as of today December 23, 2024, there has been no correspondence from the defendant.

151. The RFI was sent by USPS Registered Mail to NBH's registered address at 500 West Texas Ave, Suite 890, Midland, TX, 79701 on November 13, 2024; and it was received at that location on November 18, 2024.

152. This lack of response obstructed the shareholder's ability to assess management practices and investigate discrepancies, raising concerns about transparency and adherence to fiduciary obligations.

153. A formal Books and Records Check was demanded from McCabe and NBH on November 19, 2024, by the Plaintiff, and seven other shareholders. This letter requesting

31

lawful shareholder access to records held by McCabe and NBH was officially served to McCabe at 500 W Texas Ave Ste 890, Midland, TX 79701.

154. To date, no response to the Books & Records check has been received from McCabe or NBH.

155. On November 22, 2024, the SGT. MAJOR Daniel Auxier issued a formal demand letter to NBH's Board of Directors, reiterating his entitlement to corporate records under Texas Business Organizations Code Section 21.218 and federal securities laws.

156. The letter specifically sought explanations for the withdrawal of the SEC S-1 filing, the termination of the University Lands lease, and the justification for a $2 million loan at above-average interest rates.

157. The letter was sent via email to NBH Investor Relations at nextbridge@dennardlascar.com, on November 22, 2024, where receipt was never confirmed. The same RFI was also sent by USPS Registered Mail to NBH's registered address at 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116 on November 23, 2024; however, it was not received at that location.

158. On November 25, 2024, Next Bridge Hydrocarbons (NBH) issued an official communication via investor relations email stating that the company had relocated its corporate offices from 300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116, to Midland, Texas. within the offices of McCabe Petroleum Corporation (MPC) under a rent-free agreement.

159. The announcement omitted the full address of the new location and contradicted existing public records, including NBH's most recent SEC Form 10-Q filed on September 30, 2024, and its last EDGAR filing on October 8, 2024, which both listed the Fort Worth address as its business location.

160.    Additionally, USPS records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters.

161.    USPS Registered Mail, with the RFI and Demand letter, was also sent to the MPC address, 500 W Texas Ave Ste 890, Midland, TX 79701 on November 26, 2024. To date, no response has been received.

162.    Under the Corporate Transparency Act (CTA), reporting companies are required to update their Beneficial Ownership Information (BOI) reports within 30 days of any inaccuracies or changes to the disclosed information. This includes changes in the name or address of a beneficial owner or the appointment of a new senior officer, such as the CEO. Despite these requirements, the defendant failed to comply with the CTA by not registering his current address. This noncompliance significantly impeded my efforts to locate him, thereby obstructing the due process.

163.    NBH did not provide the requested documentation or address the substantive inquiries within the seven-day response period stipulated in the letter. This failure further compounded concerns about NBH's transparency and potential violations of fiduciary duties to its shareholders.

164.    As of December 23, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

165.    While the letter, co-signed by over 70 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

166. Throughout 2019 and 2022, the Depository Trust & Clearing Corporation (DTCC) managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

167. Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic/counterfeit shares.

168. Throughout 2021 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

169. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

170. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

171. As of the present date, Next Bridge Hydrocarbons has not been assigned a CUSIP number for its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

172. This absence creates challenges in identifying and managing transactions involving Next Bridge Hydrocarbons' common stock, complicating compliance with financial reporting standards and market transparency.

173. The lack of a CUSIP number for Next Bridge Hydrocarbons highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

174. It has been well established that over 18 different internal CUSIPs have been used to track MMTLP holdings in various Broker/Dealers such as Robinhood, TradeStation, ETrade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.*

175. TD Ameritrade used internal CUSIP 6DA993019, and Charles Schwab uses internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ almost two years after the spin-off to NBH.

176. Fidelity uses internal CUSIP 591994371 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/EQ almost two years after the spin-off to NBH.

177. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single unreconciled share highlights a significant issue.

178. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. Thousands, if not millions, of shares remain unreconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

179. The inability to reconcile all MMTLP shares to NBH shares, years later at AST/EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

180. In January 2021, the Gamestop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze

targeting heavily shorted stocks. This led to Gamestop's stock price surging over 1,000% within days.

181.   Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

182.   Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

183.   The Gamestop event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

184.   In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on Meta Materials' Series A Preferred Shares (MMTLP) just two days before their planned transition into Next Bridge Hydrocarbons, a private company.

185.   Unlike Gamestop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 745 days as of December 23, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

186.   The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key concerns, including the allegations of synthetic/counterfeit shares or the systemic failures affecting retail investors.

187.    Despite tens of thousands of complaints submitted to FINRA, the SEC, and

Congressional Representatives, no Congressional hearings or meaningful investigations have

taken place. Shareholders remain unable to trade their positions, and MMTLP investors

continue to face financial harm with no clear recourse.

188.    Unlike Gamestop, which received immediate regulatory scrutiny and resumed trading,

MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting

significant disparities in how the two events were addressed.

189.    In contrast, the GameStop trading episode and the NBH Fiasco highlights significant

disparities in the public and governmental engagement with market regulation issues,

prompting questions about the consistency and fairness of responses to events affecting retail

investors and market integrity.

190.    Institutional market participants, including broker-dealers and market makers, profited

from the creation and trading of synthetic/counterfeit shares during the MMTLP transition.

Retail investors, however, experienced significant financial losses as a result of these trading

practices.

191.    These institutional participants stand to make considerable profits by not closing their

short positions, particularly when synthetic/counterfeit shares or naked short selling is used

as a trading tactic. If Next Bridge Hydrocarbons (NBH) were to declare bankruptcy, all

shares would become worthless, relieving short sellers of all financial liabilities, regardless of

the FINRA-imposed U3 halt.

192.    Public records and shareholder complaints from 2023 and 2024 demonstrate systemic

delays in resolving trading discrepancies related to MMTLP shares. Moreover, these records

and complaints indicate a clear lack of willingness or effort to address and rectify these

issues, thereby exacerbating financial and emotional distress for the affected investors Retail investors are left without a clear resolution or recourse for their financial losses.

193.   The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

194.   Institutional market participants engaged in trading practices involving synthetic/counterfeit MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

195.   Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

196.   To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

197.   This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic/counterfeit share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

198.   FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

38

199. Shareholders have repeatedly requested audits of MMTLP share discrepancies to distinguish legitimate shares from synthetic/counterfeit ones. To date, no comprehensive audit has been conducted, leaving unresolved questions about the status of outstanding shares.

200. Synthetic/counterfeit share creation and trading irregularities during the MMTLP-to-NBH transition have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

201. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass safeguards designed to promote transparency and oversight.

202. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

203. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the nondelegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

204. This doctrine restricts Congress from delegating legislative powers without clear and specific guidance, yet FINRA operates with broad authority to create rules, enforce them, and adjudicate disputes, including halting trading activities that significantly impact investors.

205. Concerns arise as to whether FINRA's sweeping powers align with Article I of the U.S. Constitution, given its private governance structure and the lack of intelligible principles guiding its regulatory actions.

206. The application of these delegated powers during the U3 halt—where investors were left without access to their assets or meaningful resolution for nearly two years—exemplifies the constitutional considerations surrounding FINRA's role.

207. The nondelegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting consequences on market participants.

208. Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

209. Your Honor, the egregious nature and frequency of FINRA's violations necessitate invoking this Court's equitable powers to revoke FINRA's immunity. Such conduct profoundly breaches public trust and flagrantly disregards the protection of American and International investors.

210. I respectfully submit that, notwithstanding the absolute immunity conferred upon Self-Regulatory Organizations such as the Financial Industry Regulatory Authority (FINRA) in relation to their official determinations, such immunity does not extend to their adherence to the law concerning criminal conduct. In instances where FINRA permitted the trading of in excess of 600,000,000 naked counterfeit shares of MMTLP, and subsequently neglected to address the actions of wrongdoers facilitating these unlawful activities, FINRA may be deemed complicit in the commission of these crimes. It is asserted that FINRA has violated applicable laws and is cognizant of such violations. It is my contention that this awareness

40

underlies their reluctance to disclose the blue sheets. If, indeed, they possess no information of a sensitive nature, one must inquire: what impedes the release of the blue sheets?

211. The circumstances surrounding MMTLP shares reveal systemic regulatory failures, including anomalous trading activity, substantial financial losses to retail investors, and severe emotional distress. Despite overwhelming evidence of wrongdoing, regulatory agencies, including FINRA, have shown reluctance to conduct thorough investigations and impose meaningful sanctions.

212. Investors are often forced into arbitration, a forum biased toward industry participants with limited avenues for recourse. FINRA's immunity shields it from accountability, perpetuating a system where investors are denied justice. Arbitration remedies are insufficient to compensate for significant financial and emotional damages suffered.

213. This Court must recognize that FINRA's conduct, rather than serving the public interest, undermines it. FINRA has operated with such impunity for so long that it is now comfortable with the systemic destruction of investors. Allowing such egregious violations and abuse of power to continue with impunity would set a dangerous precedent, eroding public confidence in the financial markets' integrity.

214. I propose naming FINRA as a defendant, but it is anticipated that their ultimate immunity will shield them from accountability, which is inherently unjust and unconscionable. If they cannot be held liable for their role, the responsibility must shift to the SEC for failing to oversee FINRA and regulate brokers effectively. Thus, the SEC must be sued to ensure justice and accountability for the harm inflicted on investors. The lack of transparency and prolonged inaction has eroded trust in U.S. financial markets, leaving retail investors in a state of uncertainty and financial distress. High-profile entities, such as Donald Trump's

media company DJT, have also been affected, with CEO Devin Nunes aligning the company's plight with that of MMTLP. The absence of regulatory action and accountability in the U.S. stands in stark contrast to international responses, highlighting the urgent need for reform and justice in financial markets. FINRA's actions or lack thereof, demand scrutiny and rectification to restore fairness and integrity in the market.

215.   It is deeply troubling that investors are required to act lawfully and assume in good faith that everyone else, including brokers, market makers, hedge funds, and regulatory agencies, including FINRA, would behave similarly. Investors would face severe punishment for any violations, while FINRA's immunity allows it to escape punitive damages and lawsuits, effectively enabling other entities to rob investors through actions such as the U3 halt. This immunity is fundamentally unfair and undermines the principles of justice and accountability.

216.   If I have impressed and impacted the court in the smallest way, I plead for relief for the 65,000 shareholders.

## V. ALLEGATIONS

217.   Plaintiff, CONTIQUE WILLCOT, brings this action to redress systemic failures in the U.S. financial markets, which have caused harm to retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. Central to this case is FINRA's indefinite U3 trading halt on MMTLP shares, which has deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and

the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

218.    FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. Despite the existence of regulations like FINRA's own Rule 2020, which prohibits manipulative and deceptive devices, and SEC Rule 17f-1, which mandates the reporting of counterfeit securities, these entities have failed to investigate or remedy widespread irregularities such as synthetic or counterfeit share creation and naked short selling, which have manipulated the market for MMTLP shares. The Defendants' inaction has enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

219.    The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability have exacerbated the harm suffered by investors. These leaders have neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

220.    The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this

case are emblematic of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

221.   In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

222.   This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

223.   The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

224.   By bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation, price manipulation, systemic negligence, and constitutional violations. Addressing these

issues presents the Court with an opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded. Failure to address these issues will lead to continued market manipulation and unfair practices, further eroding investor confidence in the regulatory and legal systems meant to protect them. This inaction will set a precedent that discourages accountability, resulting in increased litigation and financial instability. Moreover, failing to address these matters will undermine the authority and effectiveness of regulatory bodies, weakening the overall framework that governs market operations.

The following legal questions arise from the Plaintiff's claims and are critical to determining liability, damages, and appropriate relief in this matter:

a. Whether the Defendants violated the Securities Exchange Act of 1934 and other applicable federal securities laws by failing to maintain market integrity, permitting manipulative practices such as the creation and trading of synthetic/counterfeit shares, and neglecting their statutory duties to protect investors.

b. Whether the Defendants engaged in anticompetitive conduct or market manipulation in violation of the Sherman Antitrust Act and the Clayton Act, fostering a monopolistic and exploitative environment detrimental to retail investors.

c. Whether the issuance of the U3 halt by FINRA on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA, the SEC, and DTCC demonstrated the requisite diligence and transparency in resolving the trading halt and its consequences.

45

d. Whether the SEC, FINRA, and DTCC failed to fulfill their regulatory responsibilities by supervising one another, enforcing compliance with federal securities laws, and investigating and addressing synthetic/counterfeit share discrepancies during the MMTLP-to-NBH transition.

e. Whether FINRA's governance structure, as a private self-regulatory organization exercising significant quasi-governmental authority without sufficient oversight, violated constitutional principles, including the separation of powers, the Appointments Clause, and the private nondelegation doctrine.

f. Whether the Private Securities Litigation Reform Act of 1995 (PSLRA) unconstitutionally obstructs retail investors, such as the Plaintiff, from pursuing securities fraud claims by imposing heightened pleading standards and discovery stays that deny access to critical evidence, thereby preventing the resolution of claims related to systemic market manipulation, such as the proliferation of synthetic/counterfeit shares and the FINRA-imposed U3 halt on MMTLP.

g. Whether GTS Securities and other market participants violated their legal obligations by engaging in manipulative trading practices, including naked short selling, synthetic/counterfeit share creation, and other actions that suppressed legitimate share prices and exacerbated harm to retail investors.

h. Whether broker-dealers, including Charles Schwab, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from the proliferation of synthetic/counterfeit shares, and failing to reconcile oversold positions, despite their statutory obligation to safeguard customer securities and funds.

i. Whether AST/EQ and the DTCC failed to accurately reconcile synthetic/counterfeit shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

j. Whether the corporate leadership of Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons were aware of widespread trading irregularities, including synthetic/counterfeit share discrepancies, and whether their failure to act contributed to prolonged harm to shareholders.

k. Whether FINRA, the SEC, and DTCC demonstrated negligence, incompetence, or apathy by failing to investigate and resolve market irregularities, discrepancies in share counts, and systemic failures to reconcile shareholder accounts, thereby fostering an environment of regulatory inaction and prolonged harm to retail investors.

l. Whether FINRA and other regulatory bodies acted beyond their statutory and procedural authority by imposing the U3 halt without providing transparent and timely justification, in violation of the principles articulated in SEC v. Sloan and other applicable precedents.

m. Whether the lack of coordination and communication between the SEC, FINRA, and DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity, resolution, or access to their assets.

n. Whether retail investors, including the Plaintiff, suffered a violation of their due process rights due to the lack of clarity, transparency, and recourse options provided during and after the U3 trading halt, warranting compensatory, injunctive, and punitive relief.

o. Whether the Defendants failed to disclose material information, such as trading irregularities, synthetic/counterfeit share creation, or share discrepancies, that would have informed investors, mitigated harm, and preserved market confidence.

p. Whether institutional market participants, including market makers and broker-dealers, engaged in unjust enrichment by profiting from trading irregularities, exploiting synthetic/counterfeit shares and naked short positions, and avoiding financial liabilities at the expense of retail investors.

q. Whether FINRA, the SEC, DTCC, and associated broker-dealers violated investor protection laws by failing to address systemic vulnerabilities and permitting irregularities that undermined market transparency and fairness.

r. Whether retail investors, including the Plaintiff, are entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial and emotional harm suffered due to the Defendants' collective misconduct.

s. Whether the Defendants' failures, omissions, and alleged misconduct reflect broader systemic flaws in the regulatory framework governing the securities markets, necessitating judicial intervention to safeguard market integrity and protect the rights of retail investors.

t. Whether the refusal to disclose critical trading data, such as Blue Sheets, impedes investors' ability to investigate claims of market manipulation and reconcile outstanding share discrepancies, further exacerbating financial harm.

v. Whether retail investors were disproportionately harmed in comparison to institutional participants, who avoided liabilities yet profited from systemic market irregularities, creating an inequitable environment in violation of federal securities and antitrust laws.

## COUNT I:

### Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

224. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) (as well as FINRA's own Rule 2020, which prohibits manipulative and deceptive devices) by engaging in manipulative practices, including the proliferation of synthetic/counterfeit shares, creation of artificial supply, and failure to ensure market transparency.

225. Defendants further violated Section 9(a) (15 U.S.C. § 78i(a)) by manipulating the price of MMTLP shares through artificial trading conditions, including pumping and dumping, naked short selling and synthetic/counterfeit share creation, designed to suppress share value and harm retail investors.

226. FINRA, SEC, & DTCC, violated Section 17(a) (15 U.S.C. § 78q(a)) (as well as SEC Rule 17f-1, which mandates the reporting of counterfeit securities) by failing to maintain accurate records and ensure market transparency during the MMTLP-to-NBH transition. Their negligence in reconciling discrepancies in share ownership allowed systemic irregularities to persist and thus, doing the opposite of the nature of their existence which is to regulate the market to protect retail investors.

227. Corporate Defendants, including Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons leadership, violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and discrepancies in outstanding shares.

228. Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors or failing to maintain accurate financial records related to MMTLP share discrepancies.

## COUNT II:

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1-2) and Clayton Act (15 U.S.C. §§ 12-27) – Against All Defendants

229. Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by colluding to facilitate synthetic/counterfeit share creation, naked short selling, and other anti-competitive practices that suppressed competition and harmed retail investors.

230. GTS Securities and other market participants breached Section 2 of the Sherman Act (15 U.S.C. § 2) by attempting to monopolize trading in MMTLP shares through predatory practices. They created counterfeit shares, violating the Securities Exchange Act of 1934 and NYSE Rules 2010, 3110, and 5210. Their naked short selling and misinformation during investigations resulted in significant financial losses for retail investors and compromised market integrity.

231. Regulatory bodies, including FINRA, SEC, and DTCC, violated Section 7 of the Clayton Act (15 U.S.C. § 18) by failing to prevent concentrated market power and anti-competitive acquisitions.

232. Defendants collectively violated Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for recovery of damages resulting from anti-competitive actions.

## COUNT III:

## Negligence – Against All Defendants

233. FINRA, SEC, and DTCC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to prevent manipulative practices and maintain orderly markets. Their inaction regarding synthetic/counterfeit share creation and trading irregularities enabled systemic harm.

234. FINRA violated Regulation SHO, specifically Rule 204, by issuing the U3 halt and eliminating the final three days of trading. Rule 204 mandates that firms close out "fails to deliver" positions within a prescribed period. By taking this action, FINRA effectively exempted short sellers from the obligation to rectify their positions according to the established regulatory framework, thereby undermining market integrity.

235. Defendants collectively breached their duty of reasonable care (Restatement (Second) of Torts § 283), resulting in foreseeable and avoidable harm to retail investors, including the Plaintiff.

## COUNT IV:

## Failure to Resolve the FINRA U3 Halt – Against FINRA, SEC, and DTCC

236. FINRA, SEC, and DTCC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt in a timely and transparent manner, depriving shareholders of access to their investments.

237. FINRA's issuance of the U3 halt violated its obligations under Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) to maintain fair and equitable trading standards. Having an intimate knowledge and understanding of the U3 halt and the implications thereof, FINRA knowingly and willingly became a market manipulator and price manipulator as well.

238. The SEC and FINRA failed to enforce prompt resolution of the U3 halt, violating their statutory duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)).

## COUNT V:

### Unjust Enrichment – Against All Defendants

239. Defendants violated Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15 U.S.C. § 78cc(b)) by profiting from illegal contracts involving synthetic/counterfeit shares and oversold positions.

240. Institutional market participants unjustly enriched themselves at the expense of retail investors by manipulating trading conditions to benefit from suppressed share prices.

## COUNT VI:

### Conspiracy to Commit Fraud – Against All Defendants

52

241. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 20.10b-5) by conspiring to manipulate securities markets through synthetic/counterfeit share creation and suppressing MMTLP's value.

242. Defendants violated 18 U.S.C. § 371 by conspiring to defraud the U.S. government and regulatory systems, as well as 18 U.S.C. § 1349 by engaging in a scheme to commit wire and securities fraud.

## COUNT VII:

### Failure to Supervise – Against FINRA and SEC

243. FINRA and SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices such as price manipulation and synthetic/counterfeit share creation.

244. Defendants also violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to establish adequate controls to monitor market access and prevent trading abuses.

## COUNT VIII:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

245. Defendants' reckless disregard for foreseeable harm caused emotional distress to Plaintiff, violating their obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) to protect investors.

246. Defendants acted with intentional or reckless disregard for the emotional and financial toll of the U3 halt and systemic irregularities, directly causing harm.

### Defendant Inclusion Summary

247. The following Defendants, through their actions, omissions, negligence, incompetence, or intentional misconduct, contributed to systemic market failures, suppressed retail investor rights, and enabled manipulative and anticompetitive practices. Their collective conduct resulted in violations of federal securities laws, breaches of fiduciary duty, unjust enrichment, and significant financial and emotional harm to the Plaintiff. While the specific roles of each Defendant are detailed throughout this Complaint, the Defendants share culpability for creating and sustaining the conditions that led to these violations:

248. FINRA, SEC, and DTCC: These regulatory entities are included in Counts I, II, III, IV, VII, and VIII for their collective failure to fulfill statutory oversight responsibilities under federal securities laws. Their negligence enabled the proliferation of synthetic/counterfeit shares, naked short selling, and systemic market manipulation. FINRA's issuance of the indefinite U3 halt, without timely resolution or transparency, further violated its obligations under Sections 17A and 19 of the Securities Exchange Act. The SEC and DTCC compounded the harm by failing to enforce compliance with clearing and settlement standards, leaving retail investors in financial and legal limbo.

249. GTS Securities: Included in Counts I, II, V, and VII for engaging in naked short selling, creating synthetic/counterfeit shares, and manipulating market dynamics. GTS exploited regulatory exemptions to gain monopolistic control over trading activity in MMTLP shares, profiting from suppressed share prices to the detriment of retail investors.

250. Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership: Included in Counts I, III, V, and VII for their roles in perpetuating trading irregularities and synthetic/counterfeit share proliferation. Corporate executives, including Gregory McCabe and John Brda, knowingly made misleading public statements about the value of Orogrande Basin assets and failed to address discrepancies in MMTLP shares, exacerbating harm to retail investors.

251. Corporate Leadership and Market Participants: The specific acts of recklessness, negligence, and intentional misconduct by the leadership of the named entities, as outlined in the Acts of Scienter, underscore their collective culpability. Their roles in enabling synthetic/counterfeit share creation, engaging in naked short selling, and manipulating market conditions directly contributed to the harm suffered by the Plaintiff and other retail investors.

252. By their actions and omissions, all Defendants have demonstrated a pattern of negligence, misconduct, and disregard for their statutory and fiduciary duties. Their collective conduct has undermined market integrity, suppressed retail investor rights, and violated federal securities, antitrust, and consumer protection laws.

253. Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

    a) FINRA (Leadership under Robert W. Cook)

        i. Reckless issuance of the U3 halt (December 9, 2022): FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or justification, despite knowledge of synthetic/counterfeit share proliferation and trading irregularities.

ii. Failure to resolve the U3 halt: FINRA neglected its statutory obligation to resolve the halt in a transparent and timely manner, violating Section 19(c) of the Securities Exchange Act and causing prolonged financial harm to investors.

iii. Intentional inaction despite awareness: Despite documented evidence and public complaints about synthetic/counterfeit shares, FINRA failed to conduct meaningful investigations or enforce compliance with federal securities laws.

iv. Omission of material facts in public communications: FINRA misled the market by failing to disclose the reasons for the U3 halt or the steps necessary to resolve the trading discrepancies.

b) SEC (Leadership under Gary Gensler)

i. Failure to enforce compliance with federal securities laws: The SEC neglected its oversight duties by failing to investigate or address systemic market irregularities, including synthetic/counterfeit share creation and naked short selling.

ii. Complicity in FINRA's inaction: The SEC allowed FINRA's U3 halt to persist indefinitely without requiring transparency or resolution, violating its statutory responsibilities under Sections 15A and 17A of the Securities Exchange Act.

iii. Neglect of investor protection responsibilities: Despite knowledge of investor harm caused by synthetic/counterfeit shares, the SEC failed to act in a manner consistent with its mission to protect retail investors.

iv. Deliberate regulatory apathy: The SEC's lack of intervention, despite its authority and duty to supervise FINRA and the DTCC, indicates intentional disregard for systemic failures.

c) DTCC (Leadership under Frank La Salla)

i. Failure to enforce settlement standards: The DTCC permitted unresolved fails-to-deliver and synthetic/counterfeit shares to proliferate, violating Section 17A(a)(1) of the Securities Exchange Act.

ii. Neglect of reconciliation duties: Despite its role as a clearing agency, the DTCC failed to reconcile outstanding shares, leaving retail investors in financial limbo during the MMTLP-to-NBH transition.

iii. Omission of material discrepancies: The DTCC did not disclose known settlement issues or irregularities, allowing manipulative practices to persist.

iv. Facilitation of manipulative trading practices: By failing to enforce proper clearing and settlement standards, the DTCC knowingly enabled the creation and trading of synthetic/counterfeit shares.

d) GTS Securities (Leadership under Ari Rubenstein)

i. Naked short selling: GTS Securities engaged in illegal naked short selling, flooding the market with synthetic/counterfeit shares and suppressing the price of MMTLP stock.

ii. Manipulation of supply and demand: GTS intentionally created artificial trading conditions to benefit from suppressed share prices, directly harming retail investors.

iii. Exploitation of regulatory exemptions: GTS used loopholes and exemptions in trading regulations to evade accountability for its manipulative practices.

iv. Profiteering from synthetic/counterfeit shares; GTS knowingly profited from trading synthetic/counterfeit shares while concealing its role in market manipulation.

h) Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership (John Brda, George Palikaras, Gregory McCabe respectively)

i. Misrepresentation of asset valuations: Gregory McCabe knowingly overstated the valuation of Orogrande Basin assets to inflate shareholder expectations and attract investments.

ii. Encouraging trading despite irregularities: John Brda encouraged buy orders for MMTLP shares while offloading his own holdings during periods of trading irregularities.

iii. Failure to address trading irregularities: Both McCabe and Brda neglected their fiduciary responsibilities to investigate and resolve synthetic/counterfeit share discrepancies, despite awareness of the harm caused to retail investors.

iv. Misleading shareholders. Public communications from leadership failed to disclose critical information about trading irregularities, share discrepancies, and synthetic/counterfeit share creation, misleading investors about the true state of their holdings.

## Action for Declaratory Judgment & Injunctive Relief #1

## Finding the Private Securities Litigation Reform Act (15 u.s.c. § 78u-4)

## Unconstitutional As Applied

## 1st ISSUE: SEPARATION OF POWERS

254. Plaintiff incorporates by reference all preceding paragraphs, including FACTS 1 through 215, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case. The PSLRA's restrictive provisions exacerbate the systemic injustices suffered by Plaintiff and other retail investors, necessitating its invalidation and an injunction against its continued enforcement.

255. The PSLRA infringes upon the separation of powers doctrine by imposing heightened pleading standards and discovery stays that impede the judiciary's ability to adjudicate securities fraud cases effectively. In the context of the MMTLP trading halt, these restrictions prevent retail investors from holding FINRA, the SEC, and market participants accountable for fraudulent conduct and systemic failures. By legislatively dictating procedural and evidentiary burdens that obstruct access to justice, the PSLRA undermines the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions.

## 2ND ISSUE: VIOLATIONS OF THE 1ST, 4TH, AND 15TH AMENDMENTS

256. Plaintiff incorporates by reference all preceding paragraphs.

257. The PSLRA's stringent pleading requirements violate the First Amendment by chilling access to the courts. In this case, the requirement to plead fraud with particularity places an insurmountable burden on retail investors seeking to challenge the systemic manipulation of MMTLP shares, including synthetic/counterfeit share creation and naked short selling. These manipulative practices are concealed within the operations of broker-dealers, clearinghouses, and regulators, making critical evidence inaccessible to Plaintiffs without discovery. The PSLRA

effectively denies investors their right to petition the government for redress of grievances, a core First Amendment guarantee.

258. The PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability. In this case, the Act prevents Plaintiff from pursuing claims against FINRA, the SEC, DTCC, and market participants who profited from systemic manipulation. By insulating powerful financial entities, such as broker-dealers and market makers, from scrutiny, the PSLRA creates a two-tiered system of justice that favors well-resourced defendants at the expense of individual investors.

259. The PSLRA contravenes the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims. Its stay of discovery provisions prevent access to essential evidence—such as FINRA's decision-making process for the U3 halt and the DTCC's reconciliation records for synthetic/counterfeit shares—while simultaneously imposing heightened pleading standards. This procedural Catch-22 deprives investors of their right to a meaningful opportunity to be heard, a fundamental due process guarantee.

260. The PSLRA violates the Equal Protection Clause of the Fourteenth Amendment as it applies to state-law securities fraud claims. By preempting state-law remedies and imposing restrictive federal standards, the PSLRA limits access to justice for investors pursuing claims in state forums. This unequal treatment creates a de facto preference for corporate defendants, particularly broker-dealers and market makers, in violation of the Constitution's guarantee of equal protection under the law.

261. The PSLRA's safe harbor provision for forward-looking statements is particularly relevant to this case, as it incentivizes corporate malfeasance. Defendants, including market makers and corporate leadership, were shielded by this provision despite engaging in misleading conduct, such as misrepresenting the value of MMTLP shares and suppressing shareholder access through the U3 halt. This legislative overreach disrupts the balance between investor protection and corporate accountability, directly undermining the goals of federal securities laws.

262. The PSLRA's legislative history demonstrates significant lobbying influence by industry groups, further evidencing regulatory capture. The Act's provisions favor institutional actors, such as those responsible for the manipulation of MMTLP shares, while denying retail investors a fair opportunity to pursue their claims. This systemic bias prioritizes the interests of financial entities over the public interest, violating principles of fairness and trust in the regulatory framework.

263. The PSLRA's impact on judicial economy is evident in this case. Its procedural barriers require Plaintiffs to meet heightened pleading standards based on incomplete information, increasing the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss without a full evidentiary record, leading to inefficiencies that undermine the objectives of federal procedural rules.

264. The PSLRA's limitations on joint and several liability exacerbate the harm caused by Defendants' collusive conduct. In this case, multiple market participants—including broker-dealers, FINRA, and the DTCC—acted in concert to manipulate MMTLP shares and suppress retail investor rights. By restricting liability to a proportional basis, the PSLRA shields culpable entities from full accountability and leaves victims inadequately compensated for their losses.

**WHEREFORE:**

265. For the reasons stated above, Plaintiff seeks:

a) Declaratory Relief: A judicial declaration that the PSLRA is unconstitutional as applied in this case. Its provisions conflict with fundamental constitutional principles, including separation of powers, due process, and equal protection, and undermine the rights of retail investors harmed by systemic market manipulation.

b) Injunctive Relief: An injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic manipulation and regulatory failures.

c) Restoration of Judicial Authority: An order affirming the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring that investors retain access to justice and a meaningful opportunity to hold Defendants accountable.

## Action for Declaratory Judgement & Injunctive Relief #2

## Constitutional Challenge to the Structure and Authority of the Financial Industry

## Regulatory Authority (FINRA)

266. The Plaintiff hereby challenges the constitutional authority and corporate structure of the Financial Industry Regulatory Authority (FINRA) on three grounds: separation of powers, the Appointments Clause, and unconstitutional delegation of legislative power. FINRA wields significant executive authority—such as suspending trading, enforcing securities laws, and imposing sanctions—without presidential oversight, violating the President's Article II duties. Its Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's

members rather than through constitutionally required processes under the Appointments Clause. Furthermore, the SEC's delegation of broad regulatory powers to FINRA represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch, compounding the constitutional concerns surrounding its governance and operations.

### Allegation 1: Violation of the Separation of Powers

267. Plaintiff alleges that the Financial Industry Regulatory Authority (FINRA) operates in violation of the separation of powers doctrine established by the United States Constitution. Under Article II, Section 1, all executive power is vested in the President of the United States, and under Article II, Section 3, the President is tasked with ensuring that the laws are faithfully executed. These provisions centralize executive authority and require that any entity exercising executive powers must remain accountable to the President.

a) FINRA exercises significant executive powers, including suspending trading in securities, enforcing compliance with the Securities Exchange Act of 1934 (15 U.S.C. § 78), conducting investigations, enacting rules, and imposing sanctions. However, FINRA operates independently of presidential oversight. Its Board of Governors is not appointed or removable by the President but instead selected by its private membership. Even the Securities and Exchange Commission (SEC), which oversees FINRA to a limited degree, can only remove FINRA's Board of Governors for willful violations of the law, abuse of authority, or unjustified failure to enforce regulations (15 U.S.C. § 78s(h)(4)(B)). This limited oversight underscores FINRA's insulation from presidential control.

b) In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must

remain accountable to the President to preserve the separation of powers. Like the Public Company Accounting Oversight Board (PCAOB) in that case, FINRA wields executive power without sufficient accountability to the executive branch. This lack of accountability undermines the constitutional framework and impermissibly impedes the President's ability to fulfill their constitutional duties under Article II.

c) Therefore, FINRA's structure, which grants it significant executive powers while shielding it from presidential oversight, violates the separation of powers doctrine and the constitutional design for ensuring accountability in the exercise of governmental authority.

## Allegation 2: Violation of the Appointments Clause

268. Plaintiff alleges that the structure and appointment process of the Financial Industry Regulatory Authority (FINRA) violate the Appointments Clause of the United States Constitution, which governs the selection of officers who exercise significant authority under federal law. Article II, Section 2, Clause 2 of the Constitution requires that principal officers of the United States be appointed by the President with the advice and consent of the Senate. Alternatively, Congress may vest the appointment of inferior officers in the President alone, courts of law, or heads of departments.

a) FINRA's Board of Governors wields substantial authority under federal law, including the power to enact rules, enforce securities regulations, conduct disciplinary proceedings, and impose sanctions. These functions qualify its Board members as "officers of the United States" under the criteria established in Buckley v. Valeo, 424 U.S. 1 (1976), which defined officers as individuals exercising significant authority under U.S. law. Despite this, FINRA's Board is not appointed by the President, nor is it confirmed by the Senate. Instead, Board members are

selected by FINRA's private membership, bypassing the constitutional process for appointing officers.

b) This appointment process violates the Appointments Clause. Under Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Edmond v. United States, 520 U.S. 651 (1997), officers exercising significant independent authority under federal law must be appointed in conformity with Article II. The Supreme Court has emphasized that the Appointments Clause is essential for maintaining accountability and separation of powers by ensuring that officers of the United States are appointed through constitutionally mandated procedures.

c) Furthermore, if members of FINRA's Board are deemed inferior officers, their appointments must still comply with the Appointments Clause. They must be appointed by the President, courts of law, or the head of a department. Since FINRA's private membership does not constitute a "department" under Article II, its process for appointing Board members remains unconstitutional, even if Board members are classified as inferior officers.

d) Accordingly, the selection of FINRA's Board of Governors by its membership violates the Appointments Clause of the United States Constitution and undermines the accountability required for individuals exercising significant authority under federal law.

<u>Allegation 3: Unconstitutional Delegation of Legislative Authority</u>

269. Plaintiff alleges that the delegation of broad regulatory and rulemaking authority to the Financial Industry Regulatory Authority (FINRA) violates the nondelegation doctrine enshrined in Article I, Section 1 of the United States Constitution, which vests all legislative powers in Congress. This doctrine prohibits Congress from delegating its legislative authority to any entity,

65

particularly private organizations or entities outside the legislative branch, without clear and specific guidance.

a) Under the Securities Exchange Act of 1934 (15 U.S.C. § 78o-3(b)), Congress authorized the SEC to delegate significant rulemaking, enforcement, and disciplinary powers to FINRA. These powers include the ability to draft and enforce securities regulations, conduct investigations, impose sanctions, and govern the conduct of broker-dealers. However, Congress provided only minimal guidance regarding the scope and limits of these powers, effectively granting FINRA quasi-legislative authority to create and enforce securities laws.

b) The delegation is further problematic because FINRA operates as a private, self-regulatory organization rather than a public entity directly accountable to the federal government. Unlike public agencies, FINRA lacks the safeguards of political accountability inherent in entities operating within the constitutional structure. In A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the Supreme Court invalidated a delegation of legislative authority to a private industry group, holding that Congress cannot abdicate its legislative responsibilities or allow private entities to govern in the absence of clear legislative standards. Similarly, in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928), the Court held that any delegation of legislative authority must include an "intelligible principle" to guide its exercise. Congress's delegation to FINRA fails this test by granting it sweeping, unsupervised authority with few meaningful constraints.

c) If FINRA is considered part of the federal government, the delegation of powers is unconstitutional as it improperly gives legislative powers to an executive body, violating the separation of powers. If FINRA is seen as a private entity, it is even more unconstitutional since it grants quasi-legislative powers to an entity outside the constitutional framework.

66

d) Therefore, the SEC's delegation of legislative authority to FINRA violates the

nondelegation doctrine and impermissibly allows a private, quasi-governmental entity to exercise

powers reserved for Congress under Article 1 of the Constitution.

## Supplemental Authority from Alpine Securities Corp. v. FINRA

270. On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in

Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of

America, Case No. 1:23-cv-01506. This decision provides substantial support for Plaintiff's

claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

271. The DC Circuit ruled that FINRA's expulsion orders violated the private nondelegation

doctrine because they took effect immediately without SEC oversight. The court held that private

entities like FINRA must act only as an aid to accountable government agencies that retain

ultimate authority to approve or disapprove the private entity's actions. The lack of such

oversight rendered FINRA's actions unconstitutional.

272. In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions,

including financial ruin and the destruction of Alpine's business before full SEC review and the

balance of equities and public interest in ensuring fair regulatory processes.

### Applicability to Plaintiff's Case

273. The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by

FINRA on December 09, 2022 was similarly imposed without any prior validation or review by

the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to Plaintiff.

274. As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. Plaintiff respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable Plaintiff and other investors to close their positions.

## Supplemental Authority from SEC v. Sloan

275. In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

276. The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification. The ruling emphasized two central principles: 1. regulatory agencies must adhere to statutory and procedural limits in exercising their authority and 2. prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

## Applicability to Plaintiff's Case

277. The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite U3 halt on [MMTLP or relevant stock]. While Sloan addressed the SEC's actions, the principles articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an

indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

278. The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

279. In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

## Reinforcing the Need for Injunctive Relief

280. The Sloan precedent reinforces Plaintiff's request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

## Integration of Sloan with Alpine

281. When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by Plaintiff.

69

WHEREFORE

282. For the reasons stated above, Plaintiff seeks:

a) Declaratory Relief: A judicial declaration that the Private Securities Litigation Reform Act of 1995 (PSLRA), as applied in this case, is unconstitutional. Its provisions conflict with fundamental constitutional principles, including the separation of powers, due process, and equal protection, and obstruct the rights of retail investors harmed by systemic market manipulation.

b) Injunctive Relief: An order enjoining the enforcement of the PSLRA's provisions that impose heightened pleading standards, discovery stays, and safe harbor protections, as these provisions violate constitutional guarantees and exacerbate systemic barriers to justice for retail investors.

c) Declaratory Judgment on Access to the Courts: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the First Amendment by effectively denying investors their right to petition the government for redress of grievances through judicial processes.

d) Declaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors and shielding institutional actors, thereby creating a two-tiered system of justice.

e) Declaratory Judgment on Due Process: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA's heightened pleading requirements and

discovery stays violate the Due Process Clause of the Fifth Amendment by denying Plaintiffs the ability to access critical evidence needed to substantiate their claims.

f) Declaratory Judgment on State Remedies: An order and judgment declaring that the PSLRA violates the Equal Protection Clause of the Fourteenth Amendment by preempting state-law securities fraud claims and imposing federal standards that disproportionately disadvantage individual investors.

g) Declaratory Judgment on Safe Harbor Provisions: An order and judgment declaring that the PSLRA's safe harbor provision for forward-looking statements unconstitutionally incentivizes fraudulent conduct, undermines market integrity, and violates the fundamental purposes of securities laws to protect investors and deter malfeasance.

h) Injunctive Relief on Judicial Economy: An order enjoining the continued enforcement of the PSLRA's provisions that increase inefficiencies and piecemeal litigation by forcing courts to adjudicate motions to dismiss without a complete evidentiary record.

i) Declaratory Relief on Liability Provisions: An order and judgment declaring that the PSLRA's limitations on joint and several liability for defendants unconstitutionally shield culpable parties who engage in fraudulent schemes, thereby leaving victims inadequately compensated.

## VI. CONCLUSION

283. The Plaintiff, CONTIQUE WILLCOT, has brought this action to address systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations. At the center of this case lies FINRA's indefinite U3 trading halt on MMTLP shares, which deprived investors of

access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private nondelegation doctrine. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

a) FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. These organizations failed to investigate or remedy widespread irregularities such as synthetic/counterfeit share creation and naked short selling, which manipulated the market for MMTLP shares. The Defendants' inaction enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

b) The Plaintiff also seeks to highlight the role of corporate leadership at Meta Materials, Torchlight Energy, and Next Bridge Hydrocarbons, whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability exacerbated the harm suffered by investors. These leaders neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

c) The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this case are emblematic

of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

d) In light of these failures, the Plaintiff seeks declaratory and injunctive relief to restore fairness and transparency to the markets. This includes addressing FINRA's unconstitutional governance structure, enforcing statutory limits on trading halts as articulated in Sloan, and ensuring that private entities acting under delegated authority are subject to meaningful government oversight, as emphasized in Alpine. These steps are necessary to rectify the systemic issues that have caused lasting harm to retail investors.

e) This case also demands accountability for the Defendants' violations of federal securities laws, antitrust statutes, and fiduciary obligations. The Plaintiff requests compensatory and punitive damages to redress the financial and emotional harm suffered, as well as systemic reforms to prevent future market abuses. The harms detailed herein are not isolated incidents but indicative of systemic vulnerabilities that require judicial intervention to safeguard the rights of all investors.

f) The prolonged inaction of regulatory bodies in addressing the U3 halt and related market irregularities stands in stark contrast to the swift responses seen in other market events, such as the GameStop trading episode. This disparity highlights the need for equitable treatment of retail investors and a consistent application of regulatory oversight to uphold market integrity. Without such reforms, the systemic failures described in this case will continue to jeopardize public trust in the financial markets.

g) In bringing this action, the Plaintiff seeks not only to recover damages but also to hold the Defendants accountable for their roles in enabling a scheme of market manipulation,

73

systemic negligence, and constitutional violations. By addressing these issues, this Court has the opportunity to restore fairness and transparency to the financial markets, reaffirm the constitutional principles that govern regulatory authority, and protect the rights of investors whose trust in the system has been profoundly eroded.

## VII.   PRAYER FOR RELIEF

284. WHEREFORE, Plaintiff prays for judgment in his favor and relief as follows:

a) Declaratory Judgment 1 & Injunctive Relief: Issue a declaration and corresponding injunctive relief finding that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

b) Declaratory Judgment 2 & Injunctive Relief: Issue a declaration and corresponding injunctive relief challenging the structure and authority of the Financial Industry Regulatory Authority (FINRA) as unconstitutional, given its lack of adequate governmental oversight and accountability, which has resulted in improper and prejudicial actions, including the imposition and handling of the U3 trading halt on MMTLP shares.

c) A declaration that Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), and other applicable federal regulations, as well as the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties owed to retail investors.

d) A declaration that FINRA's U3 trading halt on MMTLP shares, imposed on December 9, 2022, and lifted on December 13, 2024, was improper, prejudicial, and constituted a violation

of regulatory responsibilities owed to the investing public, thereby causing material harm to over 65,000 shareholders, including Plaintiff.

e) An order awarding compensatory damages to Plaintiff in an amount to be determined at trial, including:

    i. The loss of value and liquidity of Plaintiff's MMTLP shares resulting from Defendants' misconduct.

    ii. Damages arising from the suppression of share prices and trading opportunities caused by synthetic/counterfeit share creation, naked short selling, and the improper U3 halt.

    iii. Recovery of Plaintiff's documented financial losses exceeding $35,000.

f) Plaintiff seeks compensatory damages against each Defendant, in an amount no less than $5,000,000, for two years of emotional distress and mental anguish suffered as a direct result of Defendants' prolonged misconduct, failure to resolve the U3 trading halt, and refusal to provide necessary clarity or remedies regarding trading irregularities. Defendants knowingly shielded short sellers while weaponizing the U3 halt, administered by FINRA, to harm Plaintiff. Their actions, fully aware of the harm being caused, demonstrated an intentional lack of resolution, necessitating this lawsuit to hold them accountable for their deliberate wrongdoing. In addition, Plaintiff seeks treble damages as allowed by law.

g) An order awarding treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act for Defendants' anticompetitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including the Plaintiff.

h) An order requiring injunctive relief to ensure market transparency and prevent similar systemic failures, including:

i. A full audit of all MMTLP and MMAT share transactions, including the identification and reconciliation of synthetic/counterfeit shares and beneficial ownership records.

ii. The public release of all records, communications, and trading data related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

iii. A mandate requiring Defendants, including regulatory bodies and corporate leadership, to implement and enforce enhanced oversight mechanisms to prevent the proliferation of synthetic/counterfeit shares, naked short selling, and other manipulative practices.

i) An order requiring the disgorgement of profits wrongfully obtained by Defendants through the trading of synthetic/counterfeit shares, naked short selling, and related market manipulation, including unjust enrichment by market makers, broker-dealers, and transfer agents.

j) An award of punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

k) An order requiring the Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA) to:

i. Establish clearer guidelines for regulatory intervention in cases of market irregularities.

ii. Improve oversight and accountability measures to ensure transparency in corporate actions, trading halts, and share reconciliations.

iii. To eliminate the potential conflict of interest arising from Ari Rubenstein's dual roles, I respectfully request that you prohibit holding both positions simultaneously to ensure market integrity and fairness.

l) An award of pre- and post-judgment interest on all compensatory damages to account for the time value of Plaintiff's losses and to ensure full recovery of the harm caused.

p) An award of Plaintiff's reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any costs associated with expert analysis or testimony.

q) Any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct and restore trust in U.S. financial markets.

## VIII.  DEMAND FOR JURY TRIAL

285. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

77

Dated: December 23, 2024

SIGN HERE

*Contique Willcot*

Contique Willcot, pro se ipso

6940 SW 10th Ct

Pembroke Pines, FL 33023

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, CONTIQUE WILLCOT, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on December 23, 2024.

Signature: *Contique Willcot*

**Name:** CONTIQUE WILLCOT



