UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

RECEIVED
AND FILED    BRR

JUN 2 3 2025

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

| | |
|---|---|
| In re:<br>META MATERIALS INC.,<br><br>Debtor | Case No.: 24-50792-hlb<br>(Chapter 7)<br><br>**MOTION BY SCOTT TRAUDT, THIRD-PARTY INTERVENOR AND MOVANT TO DISQUALIFY FROM SERVICE TO THE TRUSTEE ATTORNEY JAMES WESLEY CHRISTIAN AND CHRISTIANATTAR LAW FIRM ET. Al. AS SPECIAL COUNSEL AND TO DECLARE THE RETENTION AGREEMENTS AND OTHER NON-DISCLOSURE AGREEMENTS ENTERED INTO AND THROUGH THE TRUSTEE AND CHRISTIAN ATTAR AS VOID *AB INITIO*; MOTION TO EXCEED PAGE LENGTH BY 5 PAGES** |

## I.    Introduction

***NOTE: This matter is set for a 9 July 2025 hearing before this court via ZOOM or telephone for 2:30pm PST.***

Now comes Scott Traudt ("Movant" or "Traudt"), non-party in interest in the instant action

motioning this court for an order disqualifying Wes Christian ("Christian") and aborting his

contract as advisor and/or special counsel to Trustee Christina W. Lovato ("Lovato"), and his law

firm, ChristianAttar, along with associated firms Christian, Smith and Jewell and Christian

Levine (should Christian still maintain any association or ownership interest in those two firms),

in this instant bankruptcy action.

Movant also moves this court to grant an additional 5 pages of text to this motion through

a separate filing submitted to accompany this motion.

i

Movant owns 305 shares of Meta Materials Series A Preferred Shares and purchased these shares through TD Ameritrade ("TDA") on or about 30 November 2022 for approximately $3,000. Movant is currently a plaintiff in *Traudt v. Rubenstein et. al.* Case No. 2:24-cv-0782 US Dist. Ct. VT and also *Traudt v. Gensler* Case No. 2:24-cv-01360 US Dist. Ct. VT which is an action for a Writ of Mandamus to restart trading for 2 days of pay to close only in MMTLP which was trade-halted by the Financial Industry Regulatory Authority ("FINRA") on 9 December 2022 under murky circumstances at best. Movant is also being sued by Christian in *Christian v. Traudt* 129th Jud. Dist. Ct Harris County (Houston) Cause No. 202508460 filed on 6 February 2025 (**Appendix A – Affidavit of Scott Traudt**). Christian is suing Traudt for defamation in that action, but Movant maintains that all allegations and inferences about and drawn from Christian's ethics challenged practice of law are accurate and are certainly on full display in the matter before this court.[1] Movant's counsel in that matter has filed a motion to dismiss and is seeking costs and sanctions under the Texas Citizens Participation Act against Christian.

Christian must be disqualified for legal malpractice, breach of contract, fraud by omission, and ethical violations, contravening 11 U.S.C. § 327(a), Nevada Rules of Professional Conduct (NRPC), and his retention agreement (Doc. 98-1). Christian's failure to issue subpoenas against Sabby Management LLC ("Sabby") - a prime suspect in Meta Materials Inc. ("MMAT")

---

[1] Traudt has been a strident critic of the management and ownership of Next Bridge Hydrocarbons ("NBH") and Wes Christian's stock market conspiracy theories which he has parlayed into a virtual social media cottage industry. Christian portrays himself as a crusader for the small investor but he is anything but, and in this instant matter he is the proverbial Trojan Horse anchoring efforts to insure a public accounting of the devastation that took place among MMAT and MMTLP shareholders stays buried.

stock manipulation with a history of SEC charges and offshore financial activities or pursue letters rogatory against Sabby's offshore (Cayman Islands) affiliates, his conflicted representation of Next Bridge Hydrocarbons, Inc. ("NBH"), his baseless attacks on *pro se* litigants, his failure to present solid data to the MMAT trustee (relying on corrupted or at the very least suspicious data from Share Intelligence LLC ("ShareIntel"), and his frequent firm changes obstruct the bankruptcy process, breaching fiduciary duties and harming the estate.[2] Specific relief is requested to remedy these violations under 11 U.S.C. § 105(a).

(Intentionally blank as setoff to TABLE OF CONTENTS and TABLE OF AUTHORITIES)

---

[2] MMAT did two successive PR's on 27 June 2023 and then another on 29 June 2023. The first, on the 27th retaining "Christian, Jewell, and Smith." ( See https://metamaterial.com/meta-materials-retains-christian-smith-and-jewell-following-shareintel-trading-analysis/). Then on the 29th they applauded "ChristianAttar" "fighting illegal trading practices." (See https://metamaterial.com/meta-materials-applauds-christianattar-for-teaming-up-with-warshaw-burstein-to-investigate-allegations-of-naked-short-selling/). If the MMAT management couldn't keep track of who they were actually employing, it doesn't bode well that they did any true diligence on the Wes Christian brand. Or past performance. It begs the question: why so many name changes for all of Christian's enterprises?

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...iv

Sabby's role in the MMAT death spiral and Christian's failure to investigate/subpoena records of trades from Sabby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Christian's contractual and ethical violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

The symbiotic relationship between ShareIntel and Christian has corrupted information in this case and raises ethics concerns . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Failure to address "multiples of the 2.65 million shares" and ethical breach . . . . . . . . . . . . . . . .12

Confidentiality conflict and protection of McCabe . . . . . . . . . . . . . . . . . . . . . . . . . ...12

Can Christian testify under oath while serving as advisor? . . . . . . . . . . . . . . . . . . . . . . . . . .13

Conclusion: Broadridge has the data...why no subpoena from Christian? . . . . . . . . . . . . . . . . ....... 13

Christian has protected TDA-Charles Schwab Inc. in the past and taken no action to uncover fraud with TDA even when clear and convincing evidence was presented to his "Flamethrower LLC" in June, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Conflicts of interest and NBH r4epresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

ChristianAttar law firm is a creditor to MMAT and is listed as such in the 9 August 2024

MMAT bankruptcy filings and thus Wes Christian has committed a "fraud upon the court" in any filings herein where he declares he is a "disinterested" party under US bankruptcy laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Christian delivers a legal first: an "insanity offense" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

**Caselaw (in order of appearance):**

1. *SEC v. Mintz*, No. 2:23-cv-03201 (D.N.J.) - Pages 2, 6

2. *In re Sabby Management LLC*, SEC Admin. Proc. File No. 3-16881 (Oct. 13, 2015) - Page 2

3. *U.S. v. Cayman Nat'l Sec. Ltd.*, No. 1:16-cr-00184 (S.D.N.Y. 2016) - Page 3

4. *Day v. Zubel*, 112 Nev. 972, 976, 922 P.2d 536, 538 (1996) - Page 3

5. *Viasat, Inc. v. Space Sys.*, No. 12-CV-0260-H (WVG), 2013 U.S. Dist. LEXIS 196700, 2013 WL 12061801 (S.D. Cal. Jan. 14, 2013) - Page 4

6. *In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252 (B.A.P. 9th Cir. 1987) - Page 7

7. *Willcot v. SEC*, No. 7:24-cv-317 (W.D. Tex.) - Page 7

8. *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998) - Pages 9, 10, 13

9. *In re AroChem Corp.*, 176 F.3d 610 (2d Cir. 1999) - Page 12

10. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985) - Page 12

11. *In re Whitney Place Partners*, 147 B.R. 619 (Bankr. N.D. Ga. 1992) - Page 13

12. *In re Hummer Transp., Inc.*, 2013 Bankr. LEXIS 5587 (Bankr. E.D. Cal. 2013) - Page 16

13. *In re Magnesium Corp. of Am.*, No. 01-14312 (MKV), 2016 WL 8732315 (Bankr. S.D.N.Y. Apr. 18, 2016) - Page 18, 19

14. *In re Tevis*, 347 B.R. 679, 688 (9th Cir. BAP 2006) - Page 20

15. *In re Pillowtex, Inc.*, 304 F.3d 246, 252 (3d Cir. 2002) - Pages 20, 24

16. *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995) - Page 20, 21

17. *In re eToys, Inc.*, 331 B.R. 176, 195 (Bankr. D. Del. 2005) - Pages 21, 24

18. *In re BH & P Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991) - Pages 21, 24

19. *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997) - Page 24

**US Statutes:**

1. 11 U.S.C. § 327(a) - Pages ii, 7, 9, 10, 20, 21, 24

2.  11 U.S.C. § 105(a) - Pages iii, 21. 24

3.  11 U.S.C. § 1507(b) - Page 4

4.  11 U.S.C. § 1107(a) - Page 8

5.  15 U.S.C. § 78ff - Page 5

6.  18 U.S.C. § 1350 - Page 5

7.  18 U.S.C. § 1621 - Pages 19, 24

8.  11 U.S.C. § 101(14) - Page 20

9.  11 U.S.C. § 327(c) - Page 16

**American Bar Association Rules Cited:**

1.  ABA Model Rule 1.9 - Pages 12, 13

2.  ABA Model Rule 1.6 - Page 12, 13

3.  ABA Model Rule 3.7 - Pages 13

**Nevada Bar Rules Cited (NRPC):**

1.  NRPC 1.1 (Competence) - Pages 3, 24

2.  NRPC 1.3 (Diligence) - Pages 3, 24

3.  NRPC 3.1 (Meritorious Claims) - Pages 7, 24

4.  NRPC 1.7 - Pages 16, 21, 24

5.  NRPC 3.3 - Pages 17, 24

6.  NRPC 8.4 - Pages 21, 24

7.  NRPC 3.3(a)(1) (Candor) - Page 21

8.  NRPC 8.4(c) (Dishonesty, Fraud, Deceit) - Page 21

9.  NRPC 1.7(a)(2) (Conflicts) - Page 21

10. NRPC 8.4(d) (Conduct Prejudicial to Justice) - Page 21

11. NRPC 3.3(d) (Ex Parte Candor) – Page 21

(Page left blank for setoff purposes)

### 1. Sabby's role in the MMAT death spiral and Christian's failure to investigate/subpoena records of trades from Sabby

Sabby, a hedge fund notorious for predatory naked short selling, purchased 12,962,963 MMAT warrants on June 28, 2022, exercisable at $1.75 by December 28, 2022, and exercised them on or about December 5–6, 2023, just before MMAT's 100-to-1 reverse split, exploiting a favorable deal from MMAT's board.[3] Upon information and belief, the MMAT board of directors agreed to a potentially illegal deal to reduce Sabby's exercise price for these warrants to far less than the contracted $1.75, and upon information from this MMAT insider they were reduced to .095 cents per share on or about 5 to 6 December 2023.[4] (MMAT's BOD had another offering in which they were .0391 cents per share in February 2024 that took place after the 100 to 1 reverse split.[5] (**Appendix B – MMAT 10-K Excerpt Dated March 28 2024**). This sweetheart deal with the MMAT BOD further implicates Sabby in manipulative conduct.[6]

---

[3] These numbers come from a former MMAT employee in a position to know these numbers and dates interviewed by Traudt on or about 6 May 2025 and at times thereafter. MMAT did a press release on this offering. See https://metamaterial.com/meta-materials-announces-50-million-registered-direct-offering/hss_channel-lcp-3102525/

[4] In the March 28, 2024 MMAT end of year report, it identifies certain warrant price reductions taking place authorized by the BOD on December 4, 2023.

[5] Traudt believes Sabby exercised their warrants at the 5 December 2023 .095 cents per share. See https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000095017024038010/mmat-20231231.htm at page 90 to see the far reduced offering price of .0391 cents per share dated contained in the MMAT 10-K dated March 28 2024 offered after the Sabby deal.

[6] MMAT's BOD's had offers at far more favorable terms at that time for raising money, yet chose to dilute the daylights out of MMAT stock at that juncture in what would be the death knell for any survivability of MMAT. Two home offices had each offered financing at $20 million (November 2023) and $60 million (September 2023 – with a clause stating no shorting could be allowed of MMAT stock).

1

On June 12, 2023, the Securities and Exchange Commission (SEC), the federal agency

responsible for enforcing securities laws, filed a lawsuit against Sabby and its principal, Hal D.

Mintz, in *SEC v. Mintz*, No. 2:23-cv-03201 (D.N.J.), alleging fraudulent trading practices from 2017 to 2019 *against 10 separate companies* (**Appendix C – *SEC v. Mintz* Complaint**). The complaint charged that Sabby and Mintz "tried to conceal their fraudulent trading, including by using securities acquired after the trades to make it appear to brokers executing the trades that they had complied with the requirement to have borrowed or located the shares prior to their trades" (Compl. at 3, ¶ 6). Sabby's failure to file a share recovery petition in this court, despite its massive warrant holdings, strongly suggests it exercised these warrants late to cover illicit short positions, consistent with the SEC's allegations in *Mintz*. *Traudt suggests to this court that Sabby made potentially $75 million or more shorting MMAT stock in the run up to the MMAT bankruptcy.*[7]

Sabby's shabby history of SEC scrutiny predates 2023, including a 2015 settlement for violating Rule 105 of Regulation M, requiring disgorgement of $184,747.10 and penalties for improper short selling before stock offerings (*In re Sabby Management LLC*, SEC Admin. Proc. File No. 3-16881, Oct. 13, 2015). Sabby's ability to conceal naked shorts offshore, through Cayman Islands subsidiaries like Sabby Volatility Warrant Master Fund Ltd., facilitated by firms such as Ogier Fiduciary Services Cayman and Captiva (Cayman) Ltd., should have aroused Christian's supposed "expertise" and "experience" in these types of trades and circumstances.

---

[7] Sabby's and the MMAT BOD's conduct in this matter are the subject of SEC whistleblower filing #17480-992-152-841 dated 24 May 2025.

Nothing was done.[8] These entities, operating under the Cayman Islands' lenient regulations, enable Sabby to obscure trading activities from U.S. regulators, as evidenced by prior Cayman-based financial misconduct cases (*U.S. v. Cayman Nat'l Sec. Ltd.*, No. 1:16-cr-00184 (S.D.N.Y. 2016)).

Given Sabby's documented history, its suspicious warrant exercise, the potentially illegal board deal, and its offshore capabilities, issuing subpoenas to Sabby was an obvious and critical step. Subpoenas under Federal Rule of Bankruptcy Procedure 2004 could have compelled Sabby's trading records, communications, and warrant transaction details, potentially exposing manipulation that devastated MMAT's value.[9] Christian's five-page resume (Doc. 1878, Ex. A) boasts decades of expertise in securities fraud litigation, claiming proficiency in uncovering market manipulation. Yet, his failure to issue these basic subpoenas, while targeting nine other entities, starkly contradicts his claimed expertise, constituting legal malpractice under Nevada law, which requires reasonable care (*Day v. Zubel*, 112 Nev. 972, 976, 922 P.2d 536, 538 (1996)), and violating Nevada Rule of Professional Conduct ("NRPC") 1.1 (Competence) and 1.3 (Diligence).

---

[8] "Based on initial analysis, we believe this has the potential to become the motherload of counterfeit shares." – Wes Christian, speaking of his analysis of the counterfeiting situation in MMAT on 29 June 2023 in the MMAT press release. Yet none were identified in any of his reports to the trustee…just "spoofed" shares. This ties in with Traudt's later arguments about the books being either cooked at ShareIntel or the recipes were inherently defective from the gitgo.

[9] MMAT's share price had its last split adjusted peak in October, 2022 at a split adjusted (approximate) of $191.00 (**Appendix D – Historical Stock Price Graph of MMAT**). It appears from trading records that massive shorting began in earnest after that peak, and the share price collapse accelerated after Sabby did its warrant exercise on 5-6 December 2023.

Or Christian could just be protecting the MMAT BOD's members who are quite likely going to be second-guessed not just by shareholders but by the SEC for engaging in warrant sales with Sabby while Sabby was being sued civilly in a US District Court for securities market manipulation and other misconduct (in other words: they had to know they were setting MMAT up for failure with toxic dilution with Sabby). Perhaps Christian did not want to bite the hand that feeds him, even if indirectly.

In short: how and why did he miss this obvious prime candidate for the illegalities and fraud he was retained to investigate (Sabby and Mintz) by the trustee?

Moreover, Christian's failure to pursue letters rogatory—formal requests for judicial assistance from foreign courts, such as those in the Cayman Islands—to obtain discovery from Sabby's subsidiaries further compounds his negligence. Letters rogatory could have been sought under 11 U.S.C. § 1507(b) for cross-border assistance or Federal Rule of Bankruptcy Procedure 2004 for examination and document production. The court should apply the general discovery principles set out in Rule 26.  "Courts routinely issue letters rogatory where the movant makes a reasonable showing that the evidence sought may be material, or may lead to the discovery of material evidence." *Viasat, Inc. v. Space Sys.,* No. 12-CV-0260-H (WVG), 2013 U.S. Dist. LEXIS 196700, 2013 WL 12061801, at *3 (S.D. Cal. Jan. 14, 2013). Such requests

could have compelled Sabby's offshore records, potentially exposing manipulation, yet Christian's omission undermines the estate's recovery, constituting fraud by omission.[10]

Upon information and belief, MMAT shareholders may have claims for shareholder suppression as the February 2024 MMAT BOD allegedly created voting rights on a par structure of one warranted share to equal 1000 common shares, thereby insuring prior smaller retail investors were crushed and had zero voting rights, overwhelmed by Sabby et. al.'s massive warrant purchases.[11]

The nuts and bolts of this deal clearly point to nefarious intent on the part of the MMAT BOD and warrant holders. Assigning 1,000 voting rights per share to a warrant deal in a Nevada-incorporated company under duress, effectively transferring control to warrant holders, may violate federal securities laws and Nevada corporate law, constituting shareholder suppression. Under the Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5, such a deal could be fraudulent if it deceives shareholders about governance without proper disclosure, potentially

---

[10] FINRA Rule 4560 mandates that U.S. member firms report gross short positions in all customer and proprietary accounts for equity securities with a U.S. symbol, as of designated settlement dates. However, the rule does not require reporting of short positions held by separate legal entities, such as foreign subsidiaries, that are not reflected on the U.S. firm's books and records. This allows firms to transfer short positions to offshore entities, like subsidiaries in jurisdictions such as the Cayman Islands, effectively removing them from U.S. reporting obligations. Since these foreign entities are not subject to FINRA's jurisdiction, their short positions remain unreported under Rule 4560. Regulation SHO Rule 203, which governs locate and delivery requirements for short sales, does not address the transfer of positions to offshore entities, thus not closing this gap. This structure can enable U.S. financial entities to move short positions off their US books by holding them through foreign subsidiaries, evading FINRA's reporting requirements.

[11] This information on the share structure of 1/1000 for special warrant holders came from a source that was deep within the MMAT hierarchy and will testify to this in any hearing granted.

6

incurring civil penalties or felony charges (up to 7 years under 15 U.S.C. § 78ff) for intentional

fraud. Similarly, Section 17(a) of the Securities Act of 1933 prohibits undisclosed control-

shifting terms in securities offerings, while SEC proxy rules (Section 14) mandate transparency

for material voting changes. Sarbanes-Oxley Act (SOX) violations may arise from false

disclosures, with felony penalties up to 20 years (18 U.S.C. § 1350), particularly if, as alleged,

MMAT shareholder and Next Bridge Hydrocarbons (NBH) CEO Greg McCabe wildly

overstated well values and had consultant Clinton Plant disperse false well production data for

NBH wells used as collateral in NBH and MMAT financing deals, misrepresenting asset values

in SEC filings.[12] **(Appendix E - Clinton Plant Fraudulent Social Media Posts**

**Misrepresenting Oil Reserves in the Orogrande Wells Operated by NBH).**[13] Under Nevada

Revised Statutes (NRS) Chapter 78, directors' fiduciary duties (NRS 78.138) require acting in

good faith and in the best interests of the corporation, which may include shareholders' interests;

a duress-driven deal diluting voting power could breach this duty if it involves bad faith or

intentional misconduct. NRS 78.211 and 78.390 require proper board authorization for share

---

[12] McCabe to this date refuses to sign off on SEC requested statements where McCabe had assessed in the NBH financials on file that the Orogrande oil wells were valued at approximately $43 million. Since McCabe refuses to certify those numbers under oath, and on 26 August 2023 the last well showed no oil, it stands to reason that the MMAT BOD and Christian knew that any loans to NBH were incapable of being collateralized, meaning: the warrant holders knew the company was going to implode, and they wouldn't have to cover their short positions at anything less than a massive profit. See NBH's PR on the SEC requests: https://cdn.prod.website-files.com/6169e69d0075ec7c66221a8b/67b7dfa2615039d4727a628e_SEC%20Delay%20Updates%20final.pdf

[13] Christian, as corporate counsel for NBH, as the lead attorney supposedly exploring fraud in MMAT and MMTLP for Flamethrower LLC, and as someone who raises funds and is attuned to social media, knew that Plant was falsifying NBH production records but took no action.

issuances and shareholder approval for amendments to the articles of incorporation that alter

voting rights, such as creating new share classes. NRS 78.345 recognizes dilution as potentially

oppressive in closely held corporations if it unfairly prejudices shareholders, allowing courts to

consider dissolution as a remedy.

### 2. Christian's contractual and ethical violations

Christian's Retention Agreement, dated October 30, 2024, tasked him with investigating

"stock fraud and/or manipulation" by culpable defendants to recover damages for the Meta

Materials Inc. estate (Doc. 98-2, ¶ 1.01, Page 2). His failure to subpoena Sabby's trading data for

long and short sales around the December 4–6, 2023, warrant exercises may breach this duty,

potentially constituting "material breach" or "gross negligence" per Schedule I (Page 12).

Schedule I defines "Cause" as a "material breach" of a material term, uncured within 14 days of

notice, or "gross negligence" in pursuing claims (Page 12). Paragraph 1.01 requires investigating

"all culpable defendants" as "reasonably determined by Attorneys" (Page 2). Sabby's warrant

exercises must be viewed through their alleged naked shorting without locates, as charged

in *SEC v. Mintz* (2023), which accused Sabby of artificially deflating stock prices to buy shares

cheaply, potentially including dilutive schemes like death spiral financing that harmed Meta

Materials. Subpoenaing Sabby's trading data would reveal sale prices and locations, confirming

if warrant exercises covered illegal shorts. This omission may violate the agreement's aim to

maximize litigation proceeds (¶ 2.01, Page 3). If grossly negligent or a material breach,

termination is permitted under ¶ 9.01 (Page 8) ("The act of firing, replacing, or terminating

Attorneys Cause is the equivalent of withdrawal for Good Reason"). Neglecting Sabby could

8

also hold an adverse interest under 11 U.S.C. § 327(a), harming recovery (*In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252 (B.A.P. 9th Cir. 1987)).

Christian's April 16, 2025, letter to Trustee's counsel (Doc. 1878-4) accuses *pro se* litigants—Jason Rolo, Danielle Spears, Matthew Pease, Jennifer Vetrano, Contique Wilcott, and Traudt —of being "perpetrators" who "obstruct, impair, and derail" the bankruptcy by filing "bizarre and incoherent" lawsuits, such as *Willcot v. SEC*, No. 7:24-cv-317 (W.D. Tex.) (Doc. 1878-4 page 2 paragraph 1.a). He claims, without evidence, that these actions shield market manipulators, violating NRPC 3.1 (Meritorious Claims) by asserting baseless allegations.[14] Ironically, Christian's own conduct—omitting Sabby from investigation and deflecting scrutiny onto *pro se* litigants—obstructs the estate's pursuit of justice, constituting fraud by omission. His accusations that pro se litigants "harass" the court (Doc. 1878-4, page 6 paragraph 2) hypocritically reflect his own misconduct, harming creditors and parties in interest prejudiced by misrepresentations in court documents (Doc. 1878-4 specific allegations against six pro se litigants with zero factual basis presented merely unfounded speculations). That one of these pro se litigants (Traudt) approached Christian with damning information about TDA and MMTLP trading on or about June 11, 2023 that Christian refused to use or even acknowledge to recover on behalf of the 65,000 MMTLP shareholders is addressed later in this submittal.

---

[14] Christian's 5 page resume might be a bit overstated on the intellectual prowess line items or reasonable facsimile thereof; for Christian to assert that a firefighter injured in the line of duty (Wilcott), a medical services administrator (Vetrano), a retiree on full disability from a drunk driving accident she was a victim of (Spears), a transport driver (Rolo), a computer nerd (Pease), and a commercial fisherman who occasionally moonlights as a security contractor on government and privately funded overseas projects (Traudt) are the types of people that hedge funds would hire to do their dirty work in a US District Court anywhere shows that perhaps Christian needs better conspiracy theory training.

9

### 3. The symbiotic relationship between ShareIntel and Christian has corrupted information in this case and raises ethics concerns

Christian runs afoul of other ethics issues regarding his use of ShareIntel data and information known only to NBH CEO and majority owner Greg McCabe (under avoidance investigation in this matter by trustee Lovato) and Christian due to Christian's Flamethrower LLC work and also from representing NBH and McCabe.[15] There's a critical discrepancy in short interest data presented to the trustee. These issues undermine the bankruptcy proceedings and raise questions about Christian's ability to continue as the Trustee's advisor if compelled to testify. ShareIntel has been paid $30,000 and now $60,000 by the trustee for work in this matter.

### A. Failure to address "multiples of the 2.65 million shares" and ethical breach

In a January 23, 2024, NBH press release, McCabe disclosed a short interest of 2.65 million shares in MMTLP, per FINRA data and critically stated that an unnamed shorter approached him to buy *multiples of the 2.65 million shares* to cover their position (**Appendix F - – NBH 23 January 2024 Letter to Colby**). This suggests the short interest could be significantly higher—potentially 5.3 million, 7.95 million, or more—indicating a massive discrepancy in the market data in MMTLP. However, the Trustee's summary (Doc 98-1 page 1 paragraph 3), filed October 31, 2024, prepared by Christian, only addresses 55 million MMAT and 92 million TRCH shares impacted by "spoofing," completely ignoring the short interest and McCabe's claim of "multiples." Under 11 U.S.C. § 1107(a), special counsel must exercise due

---

[15] Flamethrower LLC was started by John Brda, a former Torchlight Energy (TRCH) CEO who is currently charged with market manipulation by the SEC in *SEC v. Brda*, No. 4:24-cv-00654, S.D. Tex., filed July 2024. It was partnered with Warshaw-Burnstein LLC in NY, NY. Christian was heralded as they guy who'd get to the bottom of the destruction and trade halt in MMTLP, a claim made in numerous prior cases that always ended in nothing.

10

diligence to protect the estate's interests. Christian's failure to investigate this glaring discrepancy—whether ShareIntel missed this substantial short interest or McCabe misrepresented the data—constitutes a breach of duty. If ShareIntel missed it, their reliability is questionable at best.  If McCabe misrepresented the data, Christian's omission suggests he may be protecting McCabe, a former client, violating 11 U.S.C. § 327(a)'s requirement that special counsel be "disinterested persons."

In *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998), the Third Circuit held that disqualification of a professional under 11 U.S.C. § 327(a) requires an actual or potential conflict of interest, not merely an appearance of impropriety. The court stated, "We hold that the bankruptcy court erred as a matter of law in concluding that an 'appearance of conflict' can serve as a basis for the disapproval of a professional's employment under section 327(a)." This precedent applies to argue that Christian, legal advisor to the trustee Lovato in the Meta Materials Inc. (MMAT) bankruptcy case involving MMTLP, is conflicted due to his failure to disclose accurate short position information, compounded by his knowledge of Gregory McCabe's refusal to answer shareholder inquiries from Scott Traudt, suggesting an intent to protect McCabe and others with significant short positions.

On October 10, 2024, Movant sent an email to McCabe, demanding answers about MMTLP short positions post-U3 trading halt on December 9, 2022. Movant asked, "What entity, broker, trader, or representative of any such group approached you about buying shares to cover their short positions?" and "To the best of your knowledge, or from any data provided to you, what is your estimate of the short positions in total that remained unclosed in MMTLP on 9 December 2022 after the U3 trade halt?" (**Appendix G - 10 October 2024 Email Queries to**

11

**McCabe from Traudt**) McCabe refused to respond. Christian, with access to ShareIntel's touted share count capabilities, knew or should have known the accuracy of these numbers. His failure to disclose this data or address McCabe's refusal suggests he prioritized McCabe's interests over the estate's, creating an actual conflict under *In re Marvel*.

Section 327(a) mandates that professionals be disinterested and free from adverse interests. Christian's silence, especially after McCabe's reported sale of 6.77 million MMTLP shares before the December 8, 2022, trading halt, netting anywhere from $20 million to $70 million, indicates a conflict. Accurate short position data is critical for Lovato to assess creditor claims, yet Christian's inaction shielded McCabe from scrutiny. Traudt's questions highlight the materiality of the information Christian withheld: identifying who sought to cover shorts and estimating unclosed positions could have revealed the extent of market manipulation affecting both MMAT and MMTLP shareholders, directly impacting the estate's recovery efforts. Unlike *In re Marvel*, where no conflict existed due to severed ties, Christian's failure to verify ShareIntel's data *or lack thereof* or report McCabe's noncooperation creates a potential conflict by undermining his duty to the estate.

Christian's reliance on ShareIntel's inaccurate data, without correction after McCabe's Next Bridge Hydrocarbons (NBH) disclosures regarding millions of shorts unclosed and who owned them, suggests ineffective or potentially fraudulent representation. His knowledge of Traudt's unanswered shareholder inquiries further evidences a conflict, implying allegiance to McCabe over the estate's interests, breaching duties of candor and loyalty.

Applying *In re Marvel*, Christian's conduct warrants disqualification. His nondisclosure of accurate shorting data and silence on McCabe's refusal to address Traudt's shareholder

12

inquiries constitute a substantive conflict, not a mere appearance of impropriety. This compromises the estate's interests, justifying Christian's removal as legal advisor to Lovato to ensure impartial administration.

Even more importantly, former MMAT CEO George Palikaras (responding to a post by Movant on "X") stated on 25 April 2025 *"[T]hat is the $1.4 billion question. First, a small correction: the initial ShareIntel data covered only the MMAT CUSIP. It was later extended to include TRCH and MMTLP; however, to my understanding, ShareIntel was unable to obtain full MMTLP data which is an important part will be addressed by the current investigation."*

Based on all available inferences, why ShareIntel could not get data raises serious questions about the trustee's use of $60,000 to now purchase more data from ShareIntel, more than likely on Christian's counsel. It also raises the question of why the trustee is paying for data that should be "frozen in time" with the cessation of MMAT trading in August, 2024 with the bankruptcy filing…by continuing to use ShareIntel is this process being corrupted by bad data? Or even more conspiratorially: is ShareIntel being paid $60,000 after already being paid $30,000 to keep ShareIntel onside with a planned course of events charted by Christian et. al.?

ShareIntel's business ethics are challenged by Suzanne Trimbath, PHD, who has written extensively about market fraud. On 29 March, 2024, Trimbath stated in a post on X that: "I was never associated with ShareIntel, especially after they tried to bribe me into recommending their services to my clients." Attempts to contact ShareIntel and buy its data by members of the *pro se* community (Spears) have failed, and it appears that its office in Rowayton, CT is unoccupied. **(Appendix H – Photo of ShareIntel's Offices.)** (On or about 5 June 2025, an associate of Jason Rolo (one of the pro se litigants demonized by Christian in his emotional rantings and ravings to

13

Lovato and Atty. Jeff Hartman) visited the ShareIntel offices in Rowayton, CT. They were devoid of personnel, activity, and appeared to be closed.)

## B. Confidentiality conflict and protection of McCabe

Christian's prior representation of McCabe creates a conflict under ABA Model Rule 1.9, which prohibits representing a new client (the Trustee) in a substantially related matter that may be adverse to a former client (McCabe) without informed consent. If McCabe shared the shorter's identity or details about the "multiples of the 2.65 million shares" during their attorney-client relationship, Christian is bound by ABA Model Rule 1.6 to maintain confidentiality. However, his duty to the estate requires investigating this discrepancy, which could lead to claims against the shorter or scrutiny of McCabe's statements and possible claims by the estate against McCabe. Christian's failure to disclose this prior factual assertion by McCabe or the potential discrepancy suggests he may be prioritizing McCabe's interests over the estate's, violating 11 U.S.C. § 327's disinterestedness requirement. In *In re AroChem Corp.*, 176 F.3d 610 (2d Cir. 1999), the court disqualified counsel for undisclosed conflicts that compromised their impartiality, a principle that's incontrovertibly over the target here.

## C. Can Christian testify under oath while serving as advisor?

The Trustee may compel Christian to testify under oath about the shorter's identity and the "multiples of the 2.65 million shares" McCabe referenced, but this would disqualify him as advisor. Under *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985), the Trustee controls the debtor's privilege and can waive it to benefit the estate, potentially overriding McCabe's confidentiality if the information is deemed an estate asset. If the shorter's identity or the true short interest is critical to the estate's recovery, Christian could be compelled

14

to testify. However, ABA Model Rule 3.7, the "lawyer-witness rule," prohibits a lawyer from acting as an advocate in a matter where they are a necessary witness, except in limited circumstances (e.g., uncontested issues). In *In re Whitney Place Partners*, 147 B.R. 619 (Bankr. N.D. Ga. 1992), the court disqualified counsel who was a material witness, as their dual role compromised impartiality. If Christian testifies, he cannot continue as the Trustee's advisor, as his role as a witness conflicts with his advocacy duties. Traudt intends to call both McCabe and Christian as witnesses in this matter and Traudt's counsel in *Christian v. Traudt* will more than likely be calling both of them too about this short count, conflicts, Christian's sanctions in S.D.N.Y for filing frivolous, unsupported lawsuits, and why he pays a disgraced social media influencer who was fined $4.6 million for fraud (Gary Valinoti) $300 an hour to "find him clients," *inter alia*.[16] So the Rubicon has already been crossed as Christian will have to give testimony relevant to this bankruptcy case and the Texas SLAPP case he brought against Traudt.

## D. Conclusion: Broadridge has the data…why no subpoena from Christian?

Christian's failure to address McCabe's claim of "multiples of the 2.65 million (short) shares" in MMTLP, potential protection of McCabe, and prior representation of McCabe and work with Flamethrower LLC for John Brda ( "Brda")) violate 11 U.S.C. § 327, ABA Model

---

[16] See https://www.sec.gov/enforcement-litigation/litigation-releases/lr-19407, the SEC file on Valinoti and decision regarding securities fraud. He still is working with Christian today and has appeared on numerous podcasts together always as part of the same kind of pump-and-dump operations the SEC smashed Valinoti for committing.

Rules 1.6, 1.9, and 3.7, and precedents like *In re Marvel* and *In re Whitney*.[17] The Trustee can

compel Christian to testify, but this would disqualify him as advisor. The court must investigate

Christian's conduct to protect the estate's integrity. Christian ignored an easier way to get the

data rather than ShareIntel which shows Christian and ShareIntel's proprietor may have financial

incentives to work together divorced from the exigent circumstances of Christian's duties in this

bankruptcy. Having said that, it is worth noting that Broadridge has all the data they need on

MMTLP and MMAT.[18]

Broadridge Financial Solutions, Inc., located at 51 Mercedes Way, Edgewood, NY 11717,

is a leading fintech provider that supports the stock market through technology, operations, and

data analytics, processing over $10 trillion in daily securities trades. They maintain

comprehensive trade data for securities like Meta Materials Inc. (MMAT) and Meta Materials

Preferred Shares (MMTLP), including records of short sales, long positions, spoofing, and

potential counterfeiting. Directing funds to ShareIntel for such data is inappropriate when a

---

[17] In *Securities and Exchange Commission v. John David Brda and Georgios Palikaras*, Case No. 4:24-cv-01084, filed in the U.S. District Court for the Eastern District of Texas on November 26, 2024, after transfer from the Southern District of New York, the SEC alleges that Brda and Palikaras, former CEOs of Meta Materials Inc., orchestrated a market manipulation scheme raising $137.5 million via an at-the-market offering in June 2021, pre-merger with Torchlight Energy Resources Inc. and Metamaterial Inc., by issuing the MMTLP dividend, promoting a false "short squeeze," and misrepresenting oil and gas asset sales, violating antifraud and disclosure rules. Meta Materials settled for $1 million, while Brda and Palikaras face ongoing litigation for injunctions, bars, penalties, and disgorgement. Palikaras held no MMTLP shares and had nothing to do with Flamethrower; Brda's connection through Flamethrower LLC with Greg McCabe and Wes Christian raises questions about Christian's role in this matter as Brda's SEC lawsuit and McCabe's investigation for potential avoidance in this matter cast suspicion on Christian's true motives and loyalties in this bankruptcy.

[18] BroadridgeICS, POB 416423, Boston MA 02111 is listed as a creditor in the MMAT 9 August 2024 bankruptcy filing in this court.

16

subpoena to Broadridge can efficiently provide this detailed trading information from their robust systems, especially since ShareIntel most likely sources its data from Broadridge's extensive records…which explains why ShareIntel supposedly has no MMTLP data or could find none.

**4. Christian has protected TDA-Charles Schwab Inc. in the past and taken no action to uncover fraud with TDA even when clear and convincing evidence was presented to his "Flamethrower LLC" in June, 2023.**

It is altogether disturbing that this court has on its docket a stipulated protective order (Doc 1934 dated 14 May 2025) for subpoenaed data to be provided to the trustee in this matter regarding TDA/Schwab et. al. It appears that once again Christian is protecting TDA/Schwab, and he knows that any and all data regarding TDA/Schwab's trading numbers in MMAT and MMTLP would be useful to MMTLP shareholders going into arbitration or litigation with TDA/Schwab or possibly bringing derivatives actions in this court against MMAT. This protective order effectively shuts down an avenue for evidence for shareholders.

Before Brda was sued for market manipulation, *inter alia*, by the SEC, Traudt emailed John Brda on 11 June 2023 (and numerous times after) regarding a 20 March 2023 phone call Traudt had with a TDA stock broker (Camerion "Ron" Fleming) after learning that Brda and Christian were running some sort of investigation using an LLC Brda created (Flamethrower). Ostensibly its purpose was to expose the corruption and fraud that led to the U3 halt in MMTLP; the reality is it was nothing more than a smokescreen to deter litigation from MMTLP shareholders because, here Traudt summarizes the play: make it look like the "pros" were doing something to get money back for MMTLP investors now out of 100% of their holdings with the

17

U3 halt. And one of those "pros" was Christian.[19] It did nothing but showed that Wes Christian was supposedly doing something to aid shareholders. It was all smoke and mirrors. To date, this alliance trumpeted in a PR aligning Christian's then law firm Christian Levine with Warshaw Burnstein LLP (18 January 2023) has brought no share counts, no numbers, no short or naked shorting evidence even though Christian and ShareIntel could have grabbed it anytime they wanted if their obscene levels of self-promotion are to be believed **(Appendix J – Warshaw Burnstein PR)**. In other words, Christian could have had numbers in 2023 and had proof from the provided summary by Traudt of his 20 March 2023 *recorded* phone call with Fleming that TDA/Schwab was up to no good (admitting that MMTLP was trading at 100X the lit market price in alternative trading systems and that TDA had requested the halt to protect itself.) Brda was passing Traudt's information to Christian and Traudt made the simple deduction that Christian would use Traudt's information to issue subpoenas on behalf of NBH to get the TDA/ Schwab data. Then nothing happened. *By February 2024, Traudt abandoned getting Christian to try and do anything, and Christian refused to communicate at all with Traudt even when the evidence would have made for a simple affidavit creating the foundation for a subpoena duces tecum to TDA.* **(Appendix K – Traudt Call Summary Showing TDA Knew MMTLP was at**

---

[19] Christian supposedly hires social media influencers to manipulate the "meme" stock crowd and to conduct information operations. One suspect in particular (Julianne Jay, 30 Pacific Street, Depoe Bay, OR 97341) has had approximately 900 of hours on X doing "space calls" since the MMTLP trading halt. Her daily menu is: McCabe is an angel and did nothing wrong, and Christian will always be there fighting for the small investor despite all evidence to the contrary. Furthermore, Heather Roberts of Naked Truth Inc. has direct messaged Danielle Spears (one of the pro se's Christian vilifies) confirming that Christian gets social media types to sign NDA's with him so he can control the narrative. **(Appendix I – DM from Roberts to Spears).** Roberts employed Christian at The Naked Truth Inc.

least $290 a Share in Alternative Trading Systems and Email Correspondence to Brda and

Christian).

The MMTLP situation would have improved for 65,000 shareholders in MMTLP. But it

didn't happen because Christian is truly a Trojan Horse in these proceedings.

## 5. Conflicts of Interest and NBH Representation

James Christian's decision to represent Next Bridge Hydrocarbons, Inc. (NBH) in

multiple pro se lawsuits (Doc 1878-4, Page 4, Paragraph 1) placed him in a perilous conflict with

the interests of Meta Materials, Inc. (MMAT), the bankrupt estate he was duty-bound to protect.

By simultaneously representing NBH, whose officers like Gregory McCabe could face

avoidance actions from MMAT's trustee, Christian risked betraying the estate's pursuit of justice

for defrauded shareholders. This dual role violates Nevada Rule of Professional Conduct 1.7,

which forbids conflicts of interest, and 11 U.S.C. § 327(c), which bars attorneys from serving

adverse parties (see *In re Hummer Transp., Inc.*, 2013 Bankr. LEXIS 5587, at *11 (Bankr. E.D.

Cal. 2013)). Christian's bold claim that no conflict existed (Doc 1878-4, Page 3, Paragraph 1) is

not just misleading—it's a breach of his duty to be honest with the court under Nevada Rule of

Professional Conduct 3.3. His eventual promise to withdraw from NBH's representation if

avoidance actions arise (Doc 1878-4, Page 5, Paragraph 1), spurred by relentless complaints

from shareholders like Rolo, Spears, Pease, and Vetrano, comes too late to undo the damage.

Worse, he failed to fully disclose his NBH ties from the start (Doc 1878-4, Page 3, Paragraph 2),

flouting Federal Rule of Bankruptcy Procedure 2014's requirement for a complete statement of

connections.

19

Christian was also not admitted *pro hac vice* until recently after 7 month of work for the trustee (!) to this court to practice in Nevada and only on 25 May 2025 did file an application to practice in Nevada to the bar. In that application, Christian did not tell the Nevada Bar about his prior sanctions in the US District Court for the Southern District of NY for filing frivolous lawsuits – he was sanctioned as part of a $65,000 punishment handed out by federal judges.

Finally, Doc 98 page 2 paragraph 4 ("Ex Parte Application By Chapter 7 Trustee etc.") states that: "Importantly, the Firms have arranged for a litigation-funding source of approximately $11,000,000 which eliminates any risk to the Estate for payment out-of-pocket expenses such as travel, discovery, depositions, and expert witnesses." On 6 June 2025, Traudt emailed Atty. Jeffrey L. Hartman ("Hartman"), legal advisor to the trustee, asking him to confirm the source of those funds (**Appendix L – Traudt Email to Hartman 6/6/2025**) as in another document dated 30 October 2024 (Doc. 98-2 Page 3 Paragraph 1) Christian "anticipated" that Parabellum Capital LLC or an affiliated outfit would be the source.

Traudt argues that there is a horrific risk that a counterparty interest risk has been ignored by the trustee and also by design by Christian here; a litigation funding agreement with an undisclosed source raises red flags: if the funder has ties to a counterparty (e.g., a shorter of MMAT's stock), the lawyer's financial dependence on the funder could compromise their disinterestedness. Federal Rule of Bankruptcy Procedure 2014(a) mandates that attorneys file a verified statement disclosing "any connections" with parties in interest, including those that might affect their impartiality. An undisclosed funding source is a "connection" that must be revealed to allow the court to evaluate potential conflicts, especially in a case as contentious

20

as *In Re Meta Materials*, where pro se litigants like Vetrano and Spears have already alleged conflicts (Doc 1878-4, Page 2, Paragraph 2).

The Bankruptcy Code's emphasis on disclosure extends to litigation funding. While third-party litigation funding is permissible in bankruptcy to finance trustee litigation (e.g., to pursue avoidance actions or fraud claims), courts require transparency to prevent abuse. Nondisclosure risks the estate's interests being subordinated to a funder's profit motives, such as pressuring the lawyer to settle claims prematurely or avoid pursuing certain defendants. In *In Re Meta Materials*, where the trustee is investigating avoidance actions against NBH insiders (Doc 1878-4, Page 5, Paragraph 1) such as McCabe, an undisclosed funder with ties to NBH could steer the lawyer away from these claims, leaving creditors empty-handed. The court, as the guardian of the bankruptcy process, must know the funder's identity to ensure the estate's pursuit of justice isn't hijacked.

In *In re Magnesium Corp. of Am.,* No. 01-14312 (MKV), 2016 WL 8732315 (Bankr. S.D.N.Y. Apr. 18, 2016)., a bankruptcy trustee auctioned a $50 million interest in a $213 million judgment to litigation funder Gerchen Keller for $26.2 million, with the process approved by the court after open bidding. The transparency of the auction ensured no hidden conflicts, as the court and creditors could assess the funder's interests. This case sets a precedent for *In Re Meta Materials*: a secret funding deal, unlike the open process in *Magnesium Corp.*, deprives the court of oversight and risks undisclosed counterparty influence. The *Magnesium Corp.* court's approval hinged on the deal benefiting creditors, a determination impossible without knowing the funder's identity.

21

This court and trustee need to know who is loaning $11.8 million for a bankruptcy proceeding against a company that has been strip mined already. (Doc 98-2 Page 3 Paragraph 2.01) The stage is set for some sort of bad operator to pay big coin here to make sure trade data, insider trades, avoidance, sweetheart deals get buried while inflated debtor claims get paid and retail investors get obliterated financially.

**6. ChristianAttar law firm is a creditor to MMAT and is listed as such in the 9 August 2024 MMAT bankruptcy filings and thus Wes Christian has committed a "fraud upon the court" in any filings herein where he declares he is a "disinterested" party under US bankruptcy laws.**

Christian committed perjury under 18 U.S.C. § 1621, perpetrated fraud upon the court, and violated multiple Nevada Rules of Professional Conduct (NRPC) by falsely declaring his firm's disinterestedness despite its status as a creditor of Meta Materials Inc. ChristianAttar is listed as an unsecured creditor in the debtor's Schedules of Assets and Liabilities (Doc 9, Schedule E/F, filed 08/09/2024) at 2302 Fannin St., Suite 500, Houston, TX 77002, likely for unpaid legal fees from prepetition services analyzing stock manipulation (Doc 98-1, filed 10/31/2024). **(Appendix M – Excerpt From 9 August 2024 MMAT Bankruptcy Filing)**. Yet, Christian knowingly misrepresented his firm's status in two declarations under penalty of perjury and an email, violating federal bankruptcy law and ethical standards.

Christian's October 27, 2024, declaration (Doc 99, referenced in Doc 1878-4, Page 3, Paragraph 1) claimed ChristianAttar "does not hold any interest adverse to the Meta Materials, Inc. chapter 7 estate" and has "no connections" with creditors or parties-in-interest. He reiterated this in an amended declaration on April 23, 2025 (Doc 1878-4, Page 3, Paragraphs 1–2), asserting the firm is a "disinterested person" under 11 U.S.C. § 101(14), and in an April 16,

2025, letter to trustee's counsel Jeffrey L. Hartman (Doc 1878-4, Page 3, Paragraph 1), denying adverse interests or creditor ties. These claims are false. ChristianAttar's status as a creditor (Doc 9 dated 9 August 2024, Page 3, Paragraph 9) creates an adverse interest, as 11 U.S.C. § 101(14) excludes creditors from being disinterested, incentivizing the firm to prioritize its claim over other creditors, violating 11 U.S.C. § 327(a)'s requirement for disinterested professionals. In *In re Tevis*, 347 B.R. 679, 688 (9th Cir. BAP 2006), held a creditor-attorney was disqualified for holding an adverse interest, stating, "A creditor…has a direct conflict with the estate's interest in maximizing distribution to all creditors." This supports disqualification of ChristianAttar. *In re Pillowtex, Inc.*, 304 F.3d 246, 252 (3d Cir. 2002), reinforces that "any professional with an interest adverse to the estate" must be excluded, compelling the court to disqualify ChristianAttar.[20]

Christian's statements satisfy perjury's elements: (1) falsity, as the creditor listing in Document 9 contradicts his claims; (2) under oath, per the declarations' penalty of perjury; (3) knowingly false, as Christian, a senior partner, likely knew of his firm's prepetition work and Document 9's public filing; and (4) material, as disinterestedness is critical for court approval of counsel under § 327(a). *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995). The *In re Park-Helena Corp.* court disqualified a firm for nondisclosure of creditor connections, violating Federal Rule of Bankruptcy Procedure 2014 and 11 U.S.C. § 327(a).

Christian's repeated misrepresentations across declarations and email constitute a scheme to deceive the court in order to secure employment as special counsel for stock manipulation

---

[20] ChristianAttar is also included on the master creditor list (See https://ncrs.uscourts.gov/query/cmecf/index.adp page 49).

23

litigation (Doc 98-1). This undermines judicial integrity, as the court relies on truthful disclosures to enforce § 327(a) (*In re eToys, Inc.*, 331 B.R. 176, 195 (Bankr. D. Del. 2005)). His fraud risks biased litigation, harming creditors and the estate.

Christian breached NRPC 3.3(a)(1) (candor) by lying about creditor status, NRPC 8.4(c) (dishonesty, fraud, deceit), NRPC 1.7(a)(2) (conflicts, as creditor status creates a personal interest adverse to the estate), and NRPC 8.4(d) (conduct prejudicial to justice) by obstructing fair administration (Nev. Sup. Ct. R. 153, 166, 168). His failure to disclose under Federal Rule of Bankruptcy Procedure 2014(a) further violates NRPC 3.3(d) (ex parte candor).

Christian's operation under multiple firm names—ChristianAttar; Christian, Smith and Jewell, and Christian-Levine—raises additional concerns under NRPC 8.4 (Misconduct), suggesting potential efforts to evade accountability or conflicts, further undermining his fiduciary duty to the estate (*In re BH & P Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)).

The court must disqualify Christian and ChristianAttar, void their retention agreement *ab initio* under 11 U.S.C. § 105(a) for fraud (*In re BH & P Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)), refer Christian to the U.S. Trustee (cameron.m.gulden@usdoj.gov) for perjury.

## 7. Christian delivers a legal first: an "insanity offense"

Most if not all lawyers and jurists have heard of and seen employed from time to time something called the "insanity defense" wherein a lawyer makes the case that his client on trial can't stand trial because he's legitimately nuts or mentally impaired in some way. Generally defense counsel trots out some psychologist that makes the case based on interviews, analysis, a few psyche evals giving him enough confidence to go under oath and tell the court that "Defendant John Doe" isn't competent.

24

Case 24-50792-hlb    Doc 2041    Entered 06/24/25 09:49:53    Page 31 of 226

In the instant matter, Christian states in a letter to the trustee's counsel Jeffrey L. Hartman

the following (Doc 1878-4 Page 2):

> *Dear Jeffery:*
>
> *As the former chair of the Litigation Section of the State Bar of Texas (where I am presently emeritus), I take allegations of conflicts of interest seriously. However, I take issue with individuals who attempt to falsely create an apparent conflict for nefarious purposes. As explained below, the Perpetrators (along with their other co-conspirators) are attempting to obstruct, impair, and derail our legal cases against market manipulators by fabricating/spinning a supposed conflict.*
>
> *The Perpetrators have:*
>
> *a. filed numerous bizarre and incoherent pro se complaints in federal court (which are all very similar in nature) against Meta, NBH, Gregory McCabe, et. al.;*
>
> *b. filed a grievance against me to the State Bar of Texas (where my record is pristine). Ms. Vetrano's complaint is that I sent an evidence preservation letter that is too aggressive. I am certain the complaint will be dismissed as it was simply a standard evidence preservation letter; and*
>
> *c. held Space Calls and distributed tweets on X and other platforms attempting to obstruct and impair our team by having us deal with the Perpetrator's false accusations.*
>
> *ALL the foregoing actions are intended to obstruct our efforts on behalf of Meta to hold all people and entities responsible for destroying the market value of the securities of Meta. While I cannot prove today they are shielding for the very people we are pursuing, their acts are certainly consistent with this purpose.*

…which he followed up with (Doc 1878-4 Page 6) by calling pro se people, well, *criminals*. (Christian needs to be disbarred for this sort of innuendo-laced legal obscenity.):

> *Page 5 of 5*
>
> *Put simply, we cannot imagine what claim Meta would ever have against NBH. It simply does not exist. If however, the trustee elects to file a claim against NBH, we will withdraw with the consent of NBH.*
>
> *I believe these Perpetrators are acting as a shield for the people who we are pursuing in discovery and in our lawsuit. They will do anything to impair or block us. We must not bow to their manipulation unless there is a true conflict (which there is not). My hope is we discuss this in detail and disclose what's necessary. We cannot let these spurious letters from our opponents cause us to do anything to stop our actions, as I believe they will not stop unless we classify it for what it is –*

25

*harassment which we frequently experience in these types of cases.* (Emphasis of italics and underlining is added.)

In essence, a case of almost crystalline projection is presented by Christian; he is the man paying or incentivizing social media influencers to manipulate, has them under NDA's, and he has zero evidence at all – another bar code violation – that Traudt, Vetrano, Wilcott, Pease, Spears, or Rolo are "acting as a shield for the people who we are pursuing…" This joker is attempting to position himself as some sort of self-appointed arbiter of what is right and just even though he can't walk in any direction in this case without having conflict. And more to the point, when all Rolo, Vetrano, Pease, and Spears raised were points about conflict, Christian brought his southern fried lunacy to the forefront with conspiracy theories about the "perpetrators" (the *pro se* litigators who have committed no crimes whatsoever and don't deserve that moniker).

In essence, he has raised an "Insanity Offense" to deal with us, more or less admitting to the court in the absence of hard facts he'll simply lie. This is his modus operandi, and it stands to reason if he will lie about the little things, he'l surely bang out whoppers if there's cash ion the barrelhead – and there is, apparently. Based on his retention agreement, he could conceivably make $22 million plus just in fees before he takes 28% of the remaining carcass of MMAT.

## Prayer for Relief

WHEREFORE, Scott Traudt, non-party in interest, respectfully requests that this Honorable Court grant the following relief, as James W. Christian and ChristianAttar's actions—holding an adverse interest as a creditor (Doc 9, Schedule E/F, filed 08/09/2024), committing perjury and fraud upon the court, failing to investigate Sabby Management LLC, maintaining conflicts with Next Bridge Hydrocarbons, Inc. (NBH), relying on unreliable ShareIntel data, and violating

NRPC 1.1, 1.3, 1.7, 3.1, 3.3, 8.4, 11 U.S.C. § 327(a), (c) and Federal Rule of Bankruptcy

Procedure 2014, harming the estate:

1. **Disqualify Christian and Christian Attar**: Disqualify James W. Christian, ChristianAttar, and associated firms (e.g., Christian, Smith and Jewell; Christian Levine) from serving as special counsel, as their creditor status and NBH conflicts violate § 327(a) (*In re Pillowtex, Inc.*, 304 F.3d 246, 252 (3d Cir. 2002)).

2. **Void Retention Agreement**: Declare the October 30, 2024, retention agreement (Doc 98-2) void *ab initio* under § 105(a) for fraud, due to Christian's false disinterestedness claims (Doc 1878) (*In re BH & P Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)).

3. **Remove Protective Orders**: Vacate protective orders shielding TD Ameritrade/Charles Schwab, Inc. data to enable shareholder arbitration and estate recovery, given Christian's failure to pursue TDA evidence, and any and all other protective orders in this matter. (*In re eToys, Inc.*, 331 B.R. 176, 195 (Bankr. D. Del. 2005)).

4. **Impose Sanctions**: Order monetary sanctions against Christian and ChristianAttar for perjury, fraud, and bad-faith conduct, including $60,000 paid to ShareIntel, under § 105(a) (*In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997)).

5. **Refer for Investigation**: Refer Christian to the U.S. Trustee (cameron.m.gulden@usdoj.gov) for perjury investigation under 18 U.S.C. § 1621 and to the Nevada and Texas Bars for NRPC violations.

6. **Identify Litigation Funding Source of $11 Million**: Force Christian to disclose who is providing this funding for the MMAT bankruptcy proceedings.

**PROPOSED ORDERS ARE ATTACHED AS PART OF APPENDIX N.**

Such other relief as the court deems just is requested to protect the estate and ensure justice.

Dated: June 14th, 2025

Scott Traudt, *pro se*
Intervenor/Movant
191 Kibling Hill Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named parties and others with interests in this matter and at the addresses delineated below either by 1st Class mail or via email on this 14th day of June, 2025.

Scott Traudt, *pro se*
Intervenor/Movant
191 Kibling Hill Road
Strafford, VT 05072

**U.S. Department of Justice** PO Box 18417, Reno, NV 89511
Christina W. Lovato – trusteelovato@att.net ; NV26@ecfcbis.com
**Office of the U.S. Trustee**
U.S. TRUSTEE - RN - 7 USTPRegion17.RE.ECF@usdoj.gov
**Hartman & Hartman** 510 W. Plumb Lane Ste. B, Reno, NV 89509
Jeffrey L. Hartman – notices@bankruptcyreno.com; abg@bankruptcyreno.com
**Parsons Behle and Latimer 800 West Main Street Suite 1300, Boise, ID 83702**
Kaycee Royer – kroyer@parsonsbehle.com docketphx@perkinscoie.com
**Perkins Coie LLP** 2525 E. Camelback Road, Suite 500, Phoenix, AZ 85016
Bradley Cosman – bcosman@perkinscoie.com
**Holland & Hart LLP** 3110 N. Central Av., Suite D-1160 (Ground) Phoenix, AZ 85012
Andrea Driggs – ajdriggs@hollandhart.com3
**ChristianAttar** 1177 W. Loop S., Ste.1700, Houston, TX 77027
James "Wes" Christian – jchristian@christianattarlaw.com
**Kasowitz Benson Torres LLP** 1633 Broadway, New York, NY 10019
Steven Tountas – stountas@kasowitz.com legal-notices@kasowitz.com
**Kasowitz Benson Torres LLP**
Lilit Asadourian – lasadourian@kasowitz.com
**Schneider Wallace Cottrell Konecky LLP** 2000 Powell Street, Ste. 1400, Emeryville, CA 94608

28

Ryan R.C. Hicks – rhicks@schneiderwallace.com
Jason H. Kim – jkim@schneiderwallace.com
**Schneider Wallace Cottrell Konecky LLP** 1050 30th Street NW, Washington DC 20007
David D. Burnett – dburnett@schneiderwallace.com
**Cooper Levenson** 3016 W. Charleston Blvd. Ste. 195, Las Vegas, NV 89102
Michael R. Brunet – mbrunet@cooperlevenson.co m
**Kaempfer Crowell** 50 W. Liberty, St. Ste. 700, Reno, NV 895014
Louis M. Bubala – lbubala@kcnvlaw.com cdroessler@kcnvlaw.com ;
kmilks@kcnvlaw.com
**Johnson & Gubler, P.C.** 8831 West Sahara Ave., Las Vegas, NV 89117
Matthew L. Johnson – mjohnson@mjohnsonlaw.com
annabelle@mjohnsonlaw.com kristi@mjohnsonlaw.com kathra@mjohnsonlaw.com
admin@mjohnsonlaw.co m
**Robison, Sharp, Sullivan & Brust** 71 Washington St., Reno, NV 89503
Clayton P. Brust cbrust@rssblaw.com
Kent R. Robison krobison@rssblaw.com
Hannah E. Winston hwinston@rssblaw.com
Russell J. Carr rcarr@rssblaw.com

29

# APPENDIX LIST

Appendix A – Affidavit of Scott Traudt

Appendix B – MMAT 10-K Excerpt Dated March 28 2024

Appendix C – *SEC v. Mintz* Complaint

Appendix D – Historical Stock Price Graph of MMAT

Appendix E – Clinton Plant Fraudulent Social Media Posts Misrepresenting Oil Reserves in the Orogrande Wells Operated by NBH

Appendix F – NBH 23 January 2024 Letter to Colby

Appendix G – 10 October 2024 Email Queries to McCabe from Traudt

Appendix H – Photo of ShareIntel's Offices

Appendix I – Warshaw Burnstein PR

Appendix J – DM for Roberts to Spears

Appendix K - Traudt Call Summary Showing TDA Knew MMTLP was at least $290 a Share in Alternative Trading Systems and Email Correspondence to Brda and Christian

Appendix L – Traudt Email to Hartman 6/6/2025

Appendix M – Excerpt From 9 August 2024 MMAT Bankruptcy Filing

Appendix N – Proposed Orders

# APPENDIX A

# APPENDIX A

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:                                    | Case No.: 24-50792-hlb
META MATERIALS INC.,                      | (Chapter 7)
                                          |
         Debtor                           |
                                          |
                                          |
                                          |
                                          |
                                          |
                                          |
_____     |

## **AFFIDAVIT OF SCOTT TRAUDT**

I, Scott Traudt, being duly sworn, depose and state as follows:

1. Personal Information: My name is Scott Traudt, and I reside at 191 Kibling Hill Rd., Strafford, VT 05072. I am over the age of 18 and competent to make this affidavit.

2. Purpose of Affidavit: I am submitting this affidavit in connection with the bankruptcy proceedings of *In re: Meta Materials*, pending in the United States Bankruptcy Court for the District of Nevada, Case No. 24-50792-hlb. The statements herein are based on my personal knowledge, unless otherwise stated, and are offered in support of my motion to disqualify Wes Christian as advisor to the trustee of this bankruptcy proceeding.

3. Statement of Facts:

a. I purchased 305 shares of MMTLP on 30 November 2022 using my TD Ameritrade account.

b. I have been sent to arbitration involving Schwab regarding my claim for damages against Schwab in the loss of 100% of my investment in MMTLP by ruling of the court in *Traudt v. Rubenstein*, Case No. 2:24-cv-0782, U.S. District Court, Vermont.

c. The protective order that the trustee entered into with TDA/Schwab insures I, and other shareholders similarly situated, will not have access to data and trading records that would assist us in litigation or arbitration hearings.

d. Wes Christian was retained by Heather Roberts, the owner of Naked Truth Inc., in 2022, ostensibly to investigate fraud and stock market manipulation in the stock tickers GME (Gamestop) and AMC (AMC Entertainment Holdings Inc.). Roberts has told me on

1

numerous times that Wes Christian used Non-Disclosure Agreements (NDA's) with social media people for a variety of financial and narrative controlling reasons. I hereby attach a direct message on X received by Danielle Spears from Roberts confirming such (see "Spears-Roberts Exchange"). Spears has confirmed the authenticity of this DM.

e. On 10 October 2024, I sent an email ("10 October Email to McCabe" - attached hereto) to NBH CEO Greg McCabe inquiring as to who the shorter was who approached him to purchase the "multiples" of the 2.65 million shares FINRA reported as still short after the trade halt in MMTLP.

f. McCabe responded with personal attacks and non-answers via email then emailed and had posted on X statements that I was "compromised" and a "dark force" to a Jenifer Kapela for having the audacity to ask him for answers regarding short position holders (see attached "McCabe Defames Traudt and Hides Partial Short Share Count").

g. Christian has been a part of numerous fundraising events using "Go Fund Me" online as part of organized groups such as Naked Truth Inc. These funds were supposedly used to finance his activities on behalf of retail shareholders.

h. Disgraced stock pump and dump kingpin Gary Valinoti, who in 2005 had to pay $4.3 million in fines and costs to the SEC for running a stock manipulation scheme (see attached "SEC v. Valinoti" press release), claimed on a YouTube.com video that Wes Christian pays him $300 an hour to get him clients which is illegal under Texas law. Christian has never denied this relationship to the best of my knowledge. That video is available at https://x.com/Outlier_999/status/1921302956873318645/video/2.

i. Christian sent me as legal representative of NBH a "litigation hold letter" on 28 February 2025 warning me that I might be the target of more litigation from NBH. He was already suing me for defamation in Texas. At least 8 other litigation hold letters were sent to other shareholders of MMTLP or critics of either himself or McCabe. (see "Litigation hold Letter").

j. The oil field assets of the Orogrande leased by NBH had a final report of 26 November 2023 showing their final well was dry and that the Orogrande holdings were worthless. Christian knew or should have known from his Flamethrower investigation that these assets if used to secure any loans to NBH from MMAT were worthless. (See "NBH Drilling Records" attached hereto.)

4. Truthfulness: I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief, pursuant to 28 U.S.C. § 1746.
FURTHER AFFIANT SAYETH NAUGHT.

Date: 20 MAY 2025

Signature: Scott Traudt

Scott Traudt    Scott TRAUDT

2

NOTARY ACKNOWLEDGMENT
STATE OF VERMONT
COUNTY OF ORANGE

On this _____ day of May, 2025, before me, a Notary Public, personally appeared Scott Traudt, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public _Jessica Gokey_ / _Jess Gokey_
My Commission Expires: 01/31/25
Notary Seal

3

# Spears-Roberts Exchange

**🕳 TRUTH  Naked Truth . Info – Nonprofit Organization** ✅    ⓘ



Jul 24, 2024, 10:16 AM

This is true

Smoke and mirrors

Wes had NDA with many of them paid to push an agenda   Brainwashing is easy.  Add, do you really think all the people in the spaces are there?  NO

Jul 24, 2024, 10:23 AM

Just who was shorting during all of it...... Look back at overstock, repeat repeat repeat offenders of the same acts   Movies so appears they raised over 200k close t2 300k and no a fall out between Kristina and Mark keeps it from moving forward. Mark Faulk sent me his book... "The Naked Truth"  oh and let's see Roger Hamilton using The Naked Truth, I've seen the light and Dark of Wes and my eyes opened at Occupy and we've been gathering since then.   You can't make this stuff up.  FBI "criminal, we need the criminal" attys advising "where is the criminal act" in what they are doing..........  It's insanity  How many movies has Wes used Occupy WallStreet  Occupy 2 and the one he sold to us with Peter and Sean Stone Paradigm of Money, 13k we provided and they gave us a contract for us to sell the move.... I was going through cancer or the support with promise to reimburse would have never been paid to guess what the company the president paid it to "Sleight of Hand"   GO FIGURE  What a crock of complete fraudsters!!!

Jul 24, 2024, 10:29 AM    ↓

# 10 October 2024 Email to McCabe

**[5] Questions regarding short purchasers post U3 trade halt in MMTLP (Traudt)**

| | |
|---|---|
| **From** 🔒 sct545 <SCT545@proton.me> | ☆ ◁ 📎  Oct 10, 2024 |
| **To** gregmccabe@aol.com,  sctraudt@gmail.com | ⌄ |

Greg:

Based on the lease loss announced 8 October 2024, I hope you will please take some action here by answering my simple questions and not defer to your attorneys as you have in the past.

1. What entity, broker, trader, or representative of any such group approached you about buying shares to cover their short positions? You referenced this in a 23 January 2024 letter to a Mr. Colby. (See attached)
2. What is the number this entity asked to purchase as you stated it was "multiples" of the 2.65 million already admitted to by FINRA CEO Robert Cook?
3. Have you had further contact with these individuals to attempting to buy shares from you?
4. To the best of your knowledge, or from any data provided to you, what is your estimate of the short positions in total that remained unclosed in MMTLP on 9 December 2022 after the U3 trade halt?

It is essential for you to know that FINRA has filed a motion to dismiss in my case *Traudt v. Rubenstein* (2:24-cv-00782) in US District Court (Vermont). Part of FINRA's position is that there were no shorts (beyond Cook's 2.65 million) and therefore my claims must fail as this "short squeeze never materialized." I have evidence otherwise. Your numbers will be critical in court now, not later.

My case is designed to get over several motions to dismiss/stays for arbitration and once it does I intend to turn it over for class action certification on behalf of the surviving MMTLP shareholders. Not aiding here in my efforts is tantamount to condemning the MMTLP people left with cusips for MMTLP to once again fend for themselves while you provide what appear to be more illusory promises of efforts on our behalf down the road.

In short, Confucius once sagely observed "better a certain enemy than an uncertain friend." You appear to be more the latter at this point.

Time to push your lawyers aside and lead, and assist me now so I can take the fight to FINRA and the SEC, and other bad actors in this whole fiasco of fraud, regulatory capture, and predatory actions by brokers and market makers.

I need these questions answered by 15 October 2024.

Sincerely
Scott Traudt
Strafford VT

Sent with Proton Mail secure email.

# McCabe Defames Traudt and Hides Partial Short Share Count

gregmccabe                                                                                6:23 AM
to me ▾

Jennifer,

A friend of mine says that when someone tells you who they are, you better listen. Through his words and actions, Scott Traudt has told me loud and clear that he is a man NOT to be trusted. To answer your first question, yes, I did respond to Scott's email of October 10th (see my response below). For Scott to post that I told him in a phone conversation that my interests were not aligned with the Next Bridge shareholders is simply a bold-faced lie. What I told him was actually the exact opposite. My email response below should make it quite clear that Scott intentionally lied to the community. When someone is caught in such a blatant falsehood, you must consider his motivations.

Keep in mind, my response to him was 11 days ago when I still considered Scott merely an entertaining novelty act, and I wanted to help him as long as it didn't conflict with the best interests of all of my shareholders. Since my rejection of his request, he has gone off the rails and started proposing things that are irrational, spurious, and suspiciously detrimental to Next Bridge shareholders.

As to your other question, ironically, my interactions with Scott followed virtually the same sequence of events that occurred with Mark Basile. They both asked for special favors from me that were to their singular benefit and could potentially damage my shareholders. After I rejected these self-serving requests, Scott and Mark have both conducted themselves in a way that shows a complete disregard for Next Bridge shareholders. Explain to me how one more frivolous lawsuit against Next Bridge would possibly help shareholders.

In my mind, Scott and Mark's actions can only mean one of two things: 1) their fragile egos could not handle my rejections, or 2) **they have been compromised.** While we may never know the truth, their bizarre and downright illogical attacks against the company and me leads me to believe the latter. Again, when someone repeatedly makes outlandish and harmful attacks against Next Bridge, you must consider their motivations.

For Mark Basile to be compromised would not be a big shock to me; he appears to be a serial ambulance chaser, albeit a quite unsuccessful one. Think about it; what professional attorney would spend so much time on social media stirring up chaos and controversy in the Next Bridge community? Simply pathetic and embarrassing!! I can only surmise that he slept through his legal ethics class.

Scott, on the other hand, really disappoints me if he has been compromised. I naively thought that Scott had a stronger moral compass. This was another failure on my part to adequately judge a person's true character. As to Scott's recent claims that I have not been responding to his asinine requests, that is actually correct. Now that I know his nefarious motives are counter to the benefit of my shareholders, he will not be getting any more responses from me.
Greg

----- Forwarded Message -----
**From:** greg ████████
**To:** Scott <sot646@proton.me>
**Cc:** sctraudt ████████
**Sent:** Thursday, October 10, 2024 at 09.26.04 AM CDT
**Subject:** Re: Questions regarding short purchasers post U3 trade halt in MMTLP (Traudt)

Scott,
I am a big fan of yours and thoroughly enjoy reading your filings. That being said, I take issue with your inferences in this letter. First off, unlike you, I don't have the luxury of doing what I want, when I want, and how I want, with no regard for how my actions may affect others. I have a board of directors I must answer to and, more importantly, I have at **least 65,000 shareholders,** of which you are one, that I must consider in each and every decision I make. Furthermore, your insinuation that the summation of my efforts is nothing more than making "illusory promises for the future" is confirmation of how little you understand what I have done for the shareholders since taking over as the unpaid CEO back in January. Moving forward, I suggest you save the witty back-handed slaps for the courtroom and your filings, and communicate with me like a member of the same team victimized by a flawed system. I will call you later today to discuss...after I speak with my attorneys.
Greg

On Thursday, October 10, 2024 at 07:25:13 AM CDT, Scott <sot646@proton.me> wrote:

Greg:

Based on the lease loss announced 8 October 2024, I hope you will please take some action here by answering my simple questions and not defer to your attorneys as you have in the past.

1. What entity, broker, trader, or representative of any such group approached you about buying shares to cover their short positions? You referenced this in a 23 January 2024 letter to a Mr. Colby. (See attached)
2. What is the number this entity asked to purchase as you stated it was "multiples" of the 2.65 million already admitted to by FINRA CEO Robert Cook?
3. Have you had further contact with these individuals in attempting to buy shares from you?
4. To the best of your knowledge, or from any data provided to you, what is your estimate of the short positions in total that remained unclosed in MMTLP on 9 December 2022 after the U3 trade halt?

It is essential for you to know that FINRA has filed a motion to dismiss in my case *Traudt v. Rubenstein* (2:24-cv-00782) in US District Court (Vermont). Part of FINRA's position is that there were no shorts (beyond Cook's 2.65 million) and therefore my claims must fail as this "short squeeze never materialized." I have evidence otherwise. Your numbers will be critical in court now, not later.

My case is designed to get over several motions to dismiss/stays for arbitration and once it does I intend to turn it over for class action certification on behalf of the surviving MMTLP shareholders. Not aiding here in my efforts is tantamount to condemning the MMTLP people left with cusips for MMTLP to once again fend for themselves while you provide what appear to be more illusory promises of efforts on our behalf down the road.

In short, Confucius once sagely observed "better a certain enemy than an uncertain friend." You appear to be more the latter at this point.

Time to push your lawyers aside and lead, and assist me now so I can take the fight to FINRA and the SEC, and other bad actors in this whole fiasco of fraud, regulatory capture, and predatory actions by brokers and market makers.

I need these questions answered by 16 October 2024.

Sincerely,
Scott Traudt
Strafford VT

Sent with Proton Mail secure email.

# SEC v. Valinoti

# Gary L. Valinoti

# U.S. SECURITIES AND EXCHANGE COMMISSION

## Litigation Release No. 19407 / September 29, 2005

### *Securities and Exchange Commission v. Gary L. Valinoti,* Civil Action No. 1:05CV01922 (D.D.C.) (JR)

### SEC Sues Former CEO and President of Jag Media Holdings, Inc. for Making Unregistered Sales and Transfers of Securities

On September 29, 2005, the Commission filed a civil injunctive action in the United States District Court for the District of Columbia against Gary L. Valinoti, the former CEO, president and chairman of the board of directors of Jag Media Holdings, Inc. ("Jag Media"), for making unregistered sales and transfers of securities of the company in violation of Section 5 of the Securities Act of 1933 ("Securities Act").

The Commission's complaint alleges that a privately-held company, of which Valinoti was an officer, reverse merged with a publicly-traded shell company in March 1999 to become JagNotes.com (subsequently renamed Jag Media). The complaint further alleges that an officer of the publicly-traded shell company arranged for 250,000 shares of the shell company to be sold to Valinoti in connection with the merger. According to the complaint, the sale of 250,000 shares to Valinoti was not registered with the Commission, as required under Section 5 of the Securities Act.

The Commission's complaint further alleges that Valinoti improperly realized $1.83 million by selling 130,000 of his 250,000 shares on the Nasdaq over-the-counter bulletin board ("OTCBB") between March and April 1999. The complaint also alleges that, between April and June 1999, Valinoti: (i) transferred 112,000 of his 250,000 shares as consideration for an ownership interest in another company; and (ii) transferred an additional 6000 shares to a public relations firm as compensation for services rendered to JagNotes.com. The sales and transfers for value, the complaint alleges, were not registered with the Commission, as required under Section 5 of the Securities Act. According to the complaint, within one year of having received the 118,000 shares from Valinoti, the transferees subsequently sold them on the OTCBB for approximately $1.1 million.

Without admitting or denying the allegations of the complaint, Valinoti agreed to settle the Commission's charges by consenting to the entry of a final judgment that would permanently enjoin him from violating Section 5 of the Securities Act and hold him liable to disgorge approximately $2.9 million in illicit gains and to pay $1.39 million in pre-judgment interest thereon. In partial discharge of approximately $571,700 of Valinoti's $2.9 million disgorgement obligation, the final judgment would also order Valinoti to: (i) pay $50,000 in cash; (ii) direct the cancellation of his existing holdings of Jag Media securities, valued at approximately $421,700 for settlement purposes; and (iii) relinquish his existing options to purchase shares of the company, which were granted to him by Jag Media and are valued at approximately $100,000 for settlement purposes.

# Litigation Hold Letter



## CHRISTIANATTAR

**James W. Christian**
*jchristian@christianattarlaw.com*

February 28, 2025

***Via FedEx: 772400422406***
***Via Certified Mail Return Receipt: 9589 0710 5270 2796 8703 52***
***Via Regular Mail***
Scott Traudt
191 Kibling Hill Rd,
Strafford, VT 05072

Re:     Pre-Litigation Document Preservation Related to Potential Claims Involving Next Bridge
        Hydrocarbons, Inc.

<u>**DEMAND FOR PRESERVATION OF ELECTRONICALLY
STORED INFORMATION**</u>

To Whom it May Concern:

The undersigned has been retained as litigation counsel by Next Bridge Hydrocarbons, Inc. (hereinafter "Plaintiff" or "NBH") to investigate and commence litigation against all parties who have engaged in a scheme of harassment, business disparagement, libel, slander, tortious interference, conspiracy, obstruction of justice and violations of the Administrative Procedures Act. We write to advise Scott Traudt that litigation is being considered against certain individuals with respect to this matter. You may become a party or witness in this dispute and therefore, you have an obligation to preserve all documents and electronically stored information ("ESI," as further defined below) that may relate in any way to the subject matter of this dispute (the "Claims").

We hereby request that you, individually, or on behalf of any entities you control ("You") preserve all documents, tangible things, and electronically stored information potentially relevant to the Claims such as documents, communications, and any other relevant materials including but not limited to:

1.  All communications (emails, text messages, internal messaging systems, etc.) regarding NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe

2.  All Twitter (now X) data, including but not limited to:

    - Direct messages (sent and received) related to NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe



**www.christianattarlaw.com**
1177 West Loop S, Ste 1700 | Houston, Texas 77027 | Phone: 713.659.7617| Fax: 713.659.7641

Scott Traudt
February 28, 2025
Page 2

- Public and private posts, tweets, replies, retweets, and quote tweets referencing NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe

- Account activity logs referencing NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe

- Any reports, complaints, or moderation actions related to content involving referencing NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe

3. Any third-party communications (including correspondence with regulators or law enforcement) mentioning Plaintiff referencing NBH (including its board members, directors, officers, employees or agents) or Gregory McCabe

4. Metadata and logs associated with the above records, including timestamps, authorship, and any modifications

You should anticipate that files and much of the information relevant to Plaintiff's Claims are stored on your computers and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information ("ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, or optically stored on a computer, hard drive, cell phone, flash drive, CD, DVD or other electronic storage device as:

- Digital communications (e.g., e-mail, voice mail, text messaging, instant messaging);
- Word processed documents (e.g., Word or WordPerfect documents and drafts);
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., WAV and .MP3 files);
- Space Call Recordings;
- Webinars Recording;
- Podcasts Recordings;
- Video and Animation (e.g., AVI and .MOV files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files (e.g., Zip, .GHO)



Scott Traudt
February 28, 2025
Page 3

ESI resides not only in areas of electronic, magnetic, and optical storage media reasonably accessible to you, but also in areas that may not reasonably be accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if it does not anticipate having to produce such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary for Plaintiff to determine the nature and extent of any claims.

**Preservation Requires Immediate Intervention**

You must act immediately to preserve potentially relevant ESI including, without limitation, information from January 1, 2018 to present.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI.

**Suspension of Routine Destruction**

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents, files, and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your devices that, in routine operation, operate to cause the loss of potentially relevant ESI.  Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity or other criteria;
- Using data or media wiping, disposal, erasure or encryption utilities or devices;
- Overwriting, erasing, destroying or discarding back up media;
- Re-assigning, re-imaging or disposing of systems, servers, devices or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and
- Executing drive or file defragmentation or compression programs.

**Guard Against Deletion**

You should anticipate that others may seek to hide, destroy, or alter ESI and act to prevent or guard against such actions. Especially where devices have been used for Internet access or

Scott Traudt
February 28, 2025
Page 4

personal communications, You should anticipate that users may seek to delete or destroy information they regard as personal, confidential, or embarrassing and, in so doing, may also delete or destroy potentially relevant ESI. This concern is not one unique to you. It is simply an event that occurs with such regularity in electronic discovery efforts that any custodian of ESI and their counsel are obliged to anticipate and guard against its occurrence.

**Preservation by Imaging**

You should take affirmative steps to prevent anyone with access to its data and archives from seeking to modify, destroy, or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like). With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space, and the swap file.

With respect to your hard drives and storage devices, the demand is made that you immediately obtain, authenticate, and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by you during the period from January 1, 2018 to present, as well as recording and preserving the system time and date of each such computer:

- Any Agents, Partners, or Collaborators of you concerning matters of NBH or its Officers, Directors, Shareholders, or Agents, including but not limited to Greg McCabe.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

The term "computer" shall include any computer, hard drive, cell phone, flash drive, CD, DVD, or other devices capable of storing ESI.

**Preservation in Native Form**

You should anticipate that certain ESI, including but not limited to Word documents, spreadsheets, and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, You should preserve ESI in such native forms, and it should not select methods to preserve ESI that remove or degrade the ability to search its ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation.

Scott Traudt
February 28, 2025
Page 5

You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible

**Metadata**

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

**Servers**

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino, G-mail) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downloaded or must be online 24/7. If you question whether the preservation method it pursues is one that we will accept as sufficient, please call us to discuss it.

**Home Systems, Laptops, Online Accounts and Other ESI Venues**

Though we expect that You will act swiftly to preserve data on all devices, it should also determine if any home or portable systems may contain potentially relevant data. To the extent that you sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and your PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if you used online or browser-based e-mail accounts or services (such as AOL, Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

**Ancillary Preservation**

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices,

Scott Traudt
February 28, 2025
Page 6

naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI.

You must preserve any cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

**Paper Preservation of ESI is Inadequate**

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

**Agents, Attorneys and Third Parties**

Your preservation obligation extends beyond ESI in its care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, You must notify any current or former representative, agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and it must take reasonable steps to secure its compliance.

**System Sequestration or Forensically Sound Imaging**

We suggest that, You, removing your ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation step.

In the event You deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," we mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. A forensically sound preservation method guards

Scott Traudt
February 28, 2025
Page 7

against changes to metadata evidence and preserves all parts of the electronic evidence, including in the so-called "unallocated clusters," holding deleted files.

**Preservation Protocols**

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if it will furnish an inventory of the systems and media to be preserved. Else, if you will promptly disclose the preservation protocol it intends to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If You do not currently have such expertise at its disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics.

**Do Not Delay Preservation**

I am available to discuss reasonable preservation steps; however, You should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which Plaintiff is entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

**Confirmation of Compliance**

Please confirm as soon as practically possible and no later than March 14, 2025, that You have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If You have not undertaken the steps outlined above, or have taken other actions, please describe what it has done to preserve potentially relevant evidence.

Sincerely, 

James Wes Christian

# NBH Drilling Records



| Section | Lease | WELL API | Operator | Tracking | Notes | Operator Map | Depth | NBH | Profile | Date Approved | Completion Date | Permit Depth | Recomplete | Confirmed | Oil | Gas / mcf | BOE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E19 | | 22900002 | | | Dry Hole | Standard Oil | 0 | Yes | | | | | | | | | |
| C19 | | 22900015 | | | Dry Hole | Magnolia Petro | 3950 | Yes | | | | | | | | | |
| A3 | | 22830005 | | | Dry Hole | Texaco A-3 | | No | | | | | | | | | |
| D27 | 232266 | 22830006 | | | Plugged Gas | Texaco | 4145 | No | Vertical | | | | | | | | |
| C45 | | 22900029 | | | Plugged Gas | Trail Mount | 3127 | No | | | | | | | | | |
| A3 | | 22900025 | | | Dry Hole | Brown, H.I. Jr | | Yes | Ver / Direc. Sidetrack | 3/24/97 | | 3850 | | | | | |
| D5 | 230022 | 22930227 | | | Plugged Gas | Trail Mount | 5820 | No | | 12/29/00 | | 10000 | | | | | 19276 |
| A38 | | 22930231 | | | Permitted | Hudspeth | | Yes | | 7/18/01 | | 10000 | | | | | |
| A35 | 56234 | 22930235 | | | Dry Hole | Trail Mount | 8500 | Yes | | 3/12/03 | | 7000 | | | | | |
| B1 | | 22930236 | | | Dry Hole | Trail Mount | 0 | Yes | | 3/21/03 | | 10000 | | | | | |
| A26 | | 22930237 | | | Permitted | Hudspeth | | Yes | | 3/27/03 | | 10000 | | | | | |
| B31 | | 22930238 | | | Permitted | Hudspeth | | Yes | | 3/27/03 | | 10000 | | | | | |
| B43 | | 22930233 | | | Permitted | Hudspeth | | Yes | | 3/29/03 | | 8000 | | | | | |
| E12 | | 22930257 | | | Permitted | Hudspeth | | Yes | | 7/31/07 | | 7000 | | | | | |
| C49 | 240574 | 22930262 | | | Plugged Gas | Trail Mount | 6500 | Yes | | 10/22/07 | | 7000 | | | | | 69 |
| C47 | 240570 | 22930263 | | | Plugged Gas | Trail Mount | 7000 | No | | 10/22/07 | | 7000 | | | | | 730 |
| C50 | | 22930264 | | | Dry Hole | Trail Mount | 7000 | No | | 10/30/07 | | 7000 | | | | | |
| A11 | 47469 | 22930276 | | | Shut-in Oil | Torchlight | 6090 | Yes | | 8/5/15 | | 9000 | | | | | |
| B19 | 48551 | 22930275 | | | Shut-in Oil | Founders | 6105 | Yes | vertical | 4/8/16 | | 6500 | | | | | |
| A26 | 62121 | 22930276 | | | Shut-in Oil | Founders | 6435 | Yes | vertical | 4/26/17 | | 6500 | | | | | |
| A39 | | 22930277 | | | Shut-in Oil | Maverick | | Yes | vertical | 9/17/18 | | 4200 | | | | | |
| A11 | 47469 | 22930278 | | | Shut-in Oil | Maverick | 3994 | Yes | vertical | 9/24/18 | | 8500 | | | | | |
| A24 | 56873 | 22930278 | | | Shut-in Oil | Maverick | 6720 | Yes | vertical | 9/27/18 | | 6500 | | | | | |
| A35 | 52121 | 22930276 | | | Shut-in Oil | Maverick | 5435 | Yes | Horizontal | 9/30/19 | | 6500 | | YES | | 16mmcfd | 2024 NAPE PENN |
| A35 | | 22930235 | | | Shut-in Oil | Maverick | 5751 | Yes | Horizontal | 10/19/19 | | 8500 | | YES | 1500/day | 11mmcfd | 2024 NAPE PENN |
| A26 | 62121 | 22930280 | | | Shut-in Oil | Maverick | 7450 | Yes | vertical | 10/21/19 | | 8500 | | | | | |
| A24 | 56873 | 22930282 | | 410815 | Shut-in Oil | Hudspeth | 6660 | Yes | vertical | 9/24/21 | | 6500 | | YES | | | 2024 NAPE Fusselman |
| B10 | 56876 | 22930281 | | 410815 | Shut-in Oil | Hudspeth | 7431 | Yes | Vertical | 9/24/21 | | 8500 | | YES | | | |
| B10 | 56876 | 22930282 | | 410815 | Shut-in Oil | Hudspeth | 4035 | Yes | vertical | 9/24/21 | | 4350 | | | | | |
| A39 | 56241 | 22930283 | | 410815 | Shut-in Oil | Hudspeth | 3994 | Yes | Re Entry | 11/4/21 | | 4350 | | | | | |
| A11 | 47469 | 22930279 | | 410815 | Shut-in Oil | Hudspeth | 8108 | Yes | Re Entry | 11/5/21 | | 7999 | | | | | |
| A24 | 56873 | 22930284 | | 410815 | Shut-in Oil | Hudspeth | | Yes | Horizontal | 2/24/22 | | 8500 | | YES | | | 2024 NAPE Fusselman |
| B48 | | 22930286 | | 410815 | Permitted | Hudspeth | | Yes | | 8/20/22 | | 7999 | | | | | |
| E23 | 58741 | 22930285 | 309861 | 410815 | Shut-in Oil | Hudspeth | 4392 | Yes | Vertical | 10/2/22 | | 7999 | | YES | | | 2024 NAPE Devonian |
| B10 | 56876 | 22930287 | | 410815 | Shut-in Oil | Hudspeth | 4361 | Yes | vertical | 10/12/22 | | 7999 | | YES | | | 2024 NAPE Wolfcamp |
| A26 | 62121 | 22930288 | | 410815 | Permitted | Hudspeth | | Yes | | 10/12/22 | | 7999 | | | | | |
| B46 | | 22930289 | | 410815 | Permitted | Hudspeth | | Yes | | 10/21/22 | | 7999 | | | | | |
| A35 | 56234 | 22930290 | | 410815 | Shut-in Oil | Hudspeth | 4932 | Yes | Vertical | 11/8/22 | 1/8/23 | 7999 | | YES | | | 2024 NAPE Wolfcamp |
| A39 | 56241 | 22930291 | | 410815 | Shut-in Oil | Hudspeth | 4035 | Yes | vertical | 11/8/22 | 1/31/23 | 7999 | | YES | | | 2024 NAPE Wolfcamp |
| E23 | 58741 | 22930292 | 309864 | 410815 | Shut-in Oil | Hudspeth | 6267 | Yes | Vertical | 1/25/23 | 11/8/23 | 7099 | | YES | | | 2024 NAPE Miss |
| E23 | 58741 | 22930294 | 307615 | 410815 | Permitted | Hudspeth | 2100 | Yes | Vertical | 7/18/23 | 11/20/23 | 7099 | 10/2/24 | YES | 2500mcfd | Producer | 2024 NAPE Permian |
| E23 | 58741 | 22930295 | 307612 | 410815 | Permitted | Hudspeth | 1670 | Yes | Vertical | 11/13/23 | | 7099 | 10/2/24 | YES | | | 2024 NAPE Permian |
| E23 | 58741 | 22930296 | 410815 | | Permitted | Hudspeth | | Yes | Vertical | 45131 | | 7999 | | | | | |
| E23 | 58741 | 22930295 | 410815 | | Permitted | Hudspeth | | Yes | Vertical | 9/27/23 | | 7999 | | | | | |
| E23 | 58741 | 22930297 | 410815 | | Permitted | Hudspeth | | Yes | Vertical | 9/27/23 | | 7999 | | | | | |
| E15 | 61047 | 22930299 | 410815 | 309893 | Permitted | Hudspeth | 2302 | Yes | Vertical | 11/13/24 | 11/20/23 | 7999 | 10/3/24 | YES | ~2500mcfpd | | 2024 NAPE Permian |

# APPENDIX B

# APPENDIX B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## FORM 10-K
### WASHINGTON, DC 20549

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2023

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM            TO

Commission File Number: 001-36247

# Meta Materials Inc.

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Nevada | 74-3237581 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 60 Highfield Park Drive, | |
| Dartmouth, Nova Scotia, Canada | B3A 4R9 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (902) 482-5729

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MMAT | Nasdaq Capital Market |

## 28. Subsequent Events

### Release Agreement with Mr. McCabe

On January 21, 2024, we entered into the Release Agreement with Mr. McCabe pursuant to which we and Mr. McCabe agreed to terminate the SPA. Under the terms of the Release Agreement, Mr. McCabe was relieved of any obligation to make additional stock purchases under the SPA The terms of the Release Agreement require (i) a payment of $700,000 by Mr. McCabe to us, (ii) assignment to us of all stock purchases made by Mr. McCabe under the SPA and (iii) an additional payment of $700,000 by Mr. McCabe to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the shares were reassigned to META and subsequently cancelled.

### Reverse Stock Split

On January 26, 2024, we filed a Certificate of Change with the Nevada Secretary of State to effect the previously announced one-for-one hundred reverse split of the Company's issued and outstanding common stock, and the Reverse Stock Split became effective in accordance with the terms of the Certificate of Amendment at 12:01 a.m. Pacific Time on January 29, 2024. The Reverse Stock Split was approved by the board in accordance with Nevada law.

At the Effective Time, every one hundred shares of common stock issued and outstanding were automatically combined into one share of common stock, without any change in the par value per share. The exercise prices and the number of shares issuable upon exercise of outstanding stock options, equity awards and warrants, and the number of shares available for future issuance under the equity incentive plans have been adjusted in accordance with their respective terms. The Reverse Stock Split affected all stockholders uniformly and will not alter any stockholder's percentage interest in our common stock. We did not issue any fractional shares in connection with the Reverse Stock Split. Instead, fractional shares were rounded up to the next largest whole number. The Reverse Stock Split did not modify the relative rights or preferences of the common stock. The new CUSIP number for the common stock following the Reverse Stock Split is 59134N302.

### February 2024 Offering

On February 19, 2024, we entered into a securities purchase agreement with an institutional investor, providing for the issuance and sale by us, in a registered direct offering, of (i) 600,000 shares of our common stock, par value $0.001, (ii) pre-funded warrants to purchase up to 250,000 shares of Common Stock, and (iii) warrants to purchase up to an aggregate of 850,000 shares of Common Stock. Each share of Common Stock and Pre-Funded Warrant was offered and sold together with an accompanying Warrant at a combined price of $4.04 per share of Common Stock or $4.039 per Pre-Funded Warrant, as applicable. Each Pre-Funded Warrant and Warrant is exercisable at any time on or after the date of issuance to purchase one share of Common Stock at a price of either $0.001 per share, in

89

89

the case of the Pre-Funded Warrants, or $3.91 per share, in the case of the Warrants. The Pre-Funded Warrants expire when they are exercised in full, and the Warrants expire five years from the date of issuance.

The February 2024 Offering closed on February 21, 2024. We received net proceeds of approximately $3.0 million from the Offering, after deducting placement agent fees and estimated offering expenses payable by us.

On February 19, 2024, in connection with, and as a condition to, the February 2024 Offering, we entered into the Letter Agreement with the institutional investor in the February 2024 RDO Offering, pursuant to which we agreed to amend certain of the amended June 2022 Warrants and the December 2023 Warrants held by the investor. The Letter Agreement applies to (i) June 2022 Warrants representing an aggregate of 74,074 shares of Common Stock and (ii) December 2023 Warrants representing an aggregate of 25,000 shares of Common Stock, in each case, after giving effect to the 1-for-100 reverse stock split the Company effected on January 29, 2024.

Pursuant to the Letter Agreement, the exercise price per share of the amended June 2022 Warrants and December 2023 Warrants will automatically be reduced (if and only if such new exercise price on the repricing date is lower than the exercise price of the June 2022 Warrants and the December 2023 Warrants then in effect) to be the Minimum Price (as defined in Nasdaq Listing Rule 5635(d)) of the Common Stock on June 6, 2024.

# APPENDIX C

# APPENDIX C

Daniel J. Maher
Edward J. Reilly
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Phone: (202) 551-4737 (Maher)
Email: Maherd@sec.gov (Maher)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | : | |
| *Plaintiff,* | : | |
| **v.** | : | |
| | : | **CASE NO.    2:23-CV-3201** |
| **HAL D. MINTZ, and** | : | |
| **SABBY MANAGEMENT LLC,** | : | |
| | : | **JURY TRIAL** |
| | : | **DEMANDED** |
| | : | |
| *Defendants.* | : | |
| | : | |
| | : | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission"), for its Complaint against defendants Hal D. Mintz ("Mintz"), whose last known address is 7012 Fisher Island Drive, Miami Beach, Florida 33109, and Sabby Management LLC ("Sabby"), whose last known address is 115 Hidden Hills Drive, Spicewood, Texas 78669 (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      This complaint arises from a long running fraudulent scheme involving abusive "naked" short selling, order mismarking, and other violative trading, orchestrated by Defendants Sabby Management LLC ("Sabby"), a registered investment adviser and recidivist, and its principal, Hal D. Mintz ("Mintz").  From at least March 2017 through May 2019, Mintz, a highly

experienced trader, through Sabby, used his knowledge to game the markets and carry out

Defendants' fraudulent scheme by repeatedly circumventing trading rules involving at least 10

issuers on behalf of two private funds managed by Defendants ("the Private Funds").

2.      Defendants' fraudulent scheme involved at least two forms of abusive trading.

First, Defendants knowingly or recklessly mismarked sales of securities as "long" even though

the sales did not qualify as long sales because the Private Funds did not own and were not

deemed to own the securities being sold and did not have a net long position in the securities

being sold.  As a result, Defendants should have marked those sales as "short."  Failing to mark

the sales correctly was a violation of applicable order marking rules.  Because Defendants' sales

were actually short sales that they tried to disguise as long sales, and Defendants had not

"located" (*i.e.*, borrowed, arranged to borrow, or had reasonable grounds to believe that the

securities could be borrowed) the shares that they sold, the sales further failed to comply with the

locate requirements of Regulation SHO.  17 C.F.R. § 242.200 – § 204.204.  Second, Defendants

engaged in additional abusive trading in which they marked and sold shares "short" when they

knew or were reckless in not knowing that they had not borrowed or located the shares.  These

trades also failed to comply with the locate requirements of Regulation SHO.  Further, in each

instance in which Defendants additionally failed to make timely delivery of shares, their trading

also constituted "naked" short selling, which was a further violation of Regulation SHO,

described in more detail below.

3.      Defendants engaged in this fraudulent trading scheme because it was more

profitable than following the order marking and locate rules.  As explained in greater detail

below, Defendants would not have been able to carry out their short sales, and thus could not

have profited as they did, if they had followed the rules governing long and short sales.  As a

result of their misconduct, Defendants obtained at least $2 million in ill-gotten trading profits for themselves and the Private Funds.

4.      On occasion, Defendants additionally used their violative sales to deflate artificially the price at which Defendants were able to convert their securities into stock. Through these abusive sales, Defendants acquired more stock at a cheaper price.

5.      Defendants took multiple steps to conceal their fraudulent scheme and misconduct. They knew or were reckless in not knowing their misconduct violated rules requiring traders to properly mark long sales and short sales and to obtain locates for short sales. Defendants repeatedly made false statements to the brokers executing their trades, including falsely representing that they had locates for their short sales when, in fact, they did not. As well, Defendants repeatedly submitted fraudulent order instructions to the brokers, identifying their sales as "long" in an attempt to disguise their naked short sales and their short sales for which they had not obtained locates, when they knew that they were required to identify these orders as "short" sales. But for these misrepresentations, the brokers would not have executed these trades since the trades failed to comply with Regulation SHO.

6.      In an additional attempt to hide their failure to obtain locates for their short sales and satisfy their settlement obligations, Defendants in some instances would acquire the required stock *after* their short sales, typically by purchasing the stock from the issuer or otherwise acquiring it through conversion of other securities. Defendants knew or were reckless in not knowing that these practices failed to comply with applicable trading rules that require, with very narrow exceptions not applicable here, a short seller to locate the stock *prior* to the short sale.

7.      While Defendants were often able to conceal from the market their fraudulent trading scheme, on some occasions, Defendants were unable to deliver securities in time to

3

cover their short sales, causing "fails-to-deliver." Each instance in which Defendants' mismarked long sales and shorts sales without locates resulted in fails-to-deliver, Defendants' conduct also constituted naked short selling.

8.      As a result of the conduct described above and more fully below, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5 and 10b-21 thereunder [17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.10b-21]. Additionally, Sabby violated Sections 204 and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b–4 and 80b–6] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7], and Mintz aided and abetted those violations.

9.      Without an injunction, Defendants are likely to continue to violate the federal securities laws.

10.      The Commission seeks permanent injunctions; disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon; and civil money penalties.

## JURISDICTION AND VENUE

11.      The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (e)].

12.      The Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa] and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

13.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue is proper in the District of New Jersey pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because many of the acts and transactions constituting violations of the Exchange Act and the Advisers Act occurred in this district, including materially false and misleading order instructions and other materially false and misleading representations made to brokers.  In addition, during the relevant period, Sabby's principal place of business was in this district.

## THE DEFENDANTS

15.     Hal D. Mintz, age 52, is a resident of Miami, Florida.  During the relevant period, he was the principal and managing partner of Sabby Management LLC and, at all times, had primary responsibility for making investment decisions, including daily securities trading decisions, for the Private Funds described below.  He has served in this capacity since the firm was established in 2011.  Because of his position, Sabby is liable for Mintz' conduct alleged herein.  Mintz is a highly experienced, prolific trader and has worked in the securities industry since at least 1996.

16.     Sabby Management LLC, is a Delaware limited liability company established in 2011.  During the relevant period, it maintained a principal office in Saddle River, New Jersey, and had approximately five employees.  It has been registered as an investment adviser with the Commission since July 12, 2013.  Its business consists primarily of managing two private funds: the Sabby Healthcare Master Fund, LTD and the Sabby Volatility Warrant Master Fund, LTD (collectively "the Private Funds").  Defendants are compensated for their management of the

5

Private Funds through management fees as well as performance fees tied to the investment returns earned by the Private Funds. Sabby has previously been sanctioned by the Commission in connection with improper short sales. On October 14, 2015, the Commissioned instituted a settled cease-and-desist proceeding finding that Sabby violated Rule 105 of Regulation M of the Exchange Act on two occasions. The Commission imposed a cease-and-desist order, disgorgement of $184,747.10 plus prejudgment interest, and a civil penalty of $91,669.95.

## OTHER RELEVANT ENTITIES

17.     Sabby Healthcare Master Fund, LTD. (the "Healthcare Fund") is a Cayman Islands entity established in 2011. It is a master hedge fund managed by Sabby and has two feeder funds, one onshore and the other in the Cayman Islands. At the beginning of the relevant period, it had approximately $400 million in gross asset value. As of its most recent public disclosure, it had approximately $16 million in gross asset value and 28 beneficial owners. During the relevant period, the Healthcare Fund's trading strategies and investment decisions were made by Defendants. As of September 30, 2022, Mintz held a 7.3% interest in the Healthcare Fund.

18.     The Sabby Volatility Warrant Master Fund, LTD. (the "Warrant Fund") is a Cayman Islands entity established in 2011. It is a master private equity fund managed by Sabby, with three feeder funds, two in the Cayman Islands and one onshore. At the beginning of the relevant period, it had approximately $60 million in gross asset value. As of its most recent public disclosure, it had approximately $182 million in gross asset value and 73 beneficial owners. During the relevant period, the Warrant Fund's trading strategies and investment decisions were made by Defendants. As of September 30, 2022, Mintz held a 39.9% interest in the Healthcare Fund.

6

19.     Issuer 1 is a publicly traded Nevada corporation with its principal place of business in Palo Alto, California.  During the relevant period, Issuer 1's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Stock Market LLC.  It files annual reports with the Commission pursuant to Sections 13 and 15(d) of the Exchange Act.

20.     Issuer 2 was a publicly traded Washington corporation with its principal place of business in San Diego, California.  During the relevant period, Issuer 2's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange.  It filed annual reports with the Commission pursuant to Sections 13 and 15(d) of the Exchange Act.  Subsequent to the relevant period, Issuer 2 completed a merger with another company to form a new company under a different name.

21.     Prime Broker 1 is a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund.

22.     Prime Broker 2 is a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund.

23.     Executing Broker-Dealer A is a broker-dealer used by Defendants to execute trades on behalf of both the Warrant Fund and the Healthcare Fund.

## BACKGROUND ON REGULATION SHO

24.     Regulatory requirements applicable to short sales of equity securities are generally found in Regulation SHO, 17 C.F.R. § 242.200 – § 204.204, which the Commission adopted to address its concerns regarding persistent fails to deliver and potentially abusive "naked" short selling.  A "naked" short sale generally refers to selling short without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard

settlement period. All sellers of securities should promptly deliver, or arrange for delivery of, securities and all buyers of securities have a right to expect prompt delivery of securities purchased. In enacting Regulation SHO, the Commission was concerned about the negative effect that fails to deliver may have on the markets and shareholders. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending, and sellers that fail to deliver securities on the settlement date may attempt to use this additional freedom to engage in trading activities to improperly depress the price of a security.

## TERMINOLOGY USED IN THIS COMPLAINT

### *Regulation SHO*

25.     Rule 200(g) of Regulation SHO requires broker-dealers to mark all sale orders of equity securities as "long," "short," or "short exempt." 17 C.F.R. § 242.200(g).

26.     Before accepting a short sale order or effecting a short sale for its own account, Rule 203(b)(1) of Regulation SHO requires (with very limited exceptions not applicable here) a broker-dealer to locate the securities being sold; *i.e.*, the broker-dealer must: (i) borrow the securities; (ii) enter into a bona fide arrangement to borrow the securities; or (iii) have reasonable grounds to believe that the securities can be borrowed so that they can be delivered on the date delivery is due. This provision is generally referred to as the "locate" requirement under Regulation SHO. The source of the locate must be documented. Broker-dealers usually charge customers a fee for borrowing securities.

27.     Ownership of a security convertible into, or exchangeable for, the security being

sold, is not a borrow or arrangement to borrow the security being sold. Ownership of a security convertible into, or exchangeable for, the security being sold would also not provide reasonable grounds to believe the security being sold can be borrowed.

### *Deemed to Own*

28.     Under Regulation SHO, a seller is "deemed to own" a security only if it has a net long position in a security. 17 C.F.R. § 242.200(c).

29.     A seller may be deemed to own a security if, for example, (i) the person purchased, or has entered into an unconditional contract, binding on both parties thereto, to purchase it, but has not yet received the security; or (ii) the person owns a security convertible into or exchangeable for it *and has tendered* such security for conversion or exchange.

30.     For purposes of order marking rules under Regulation SHO, a seller of convertible securities (*i.e.*, other securities that are convertible into the underlying stock being sold) is not "deemed to own" the underlying common stock until the seller has tendered such convertible security for conversion or exchange.

### *Short Selling*

31.     A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

32.     Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

### Naked Short Selling

33.     In a "naked" short sale, a seller does not borrow or arrange to borrow securities intime to make delivery to the buyer within the standard settlement period.

### Long Selling

34.     "Long selling" occurs when the seller owns the security being sold and has a reasonable expectation that he can deliver the security in time for settlement.

35.     Under Regulation SHO, an order to sell may be marked "long" only if two conditions are met. *First*, the seller must be "deemed to own" the security pursuant to Rule 200(a) through (f) of Regulation SHO. 17 C.F.R. § 242.200. A seller is deemed to own a security only to the extent that it has a net long position in a security. *Second*, to mark a sale long, the broker-dealer must either: (i) have possession or control of the security to be delivered; or (ii) reasonably expect that the security will be in its physical possession or control no later than the settlement of the transaction. 17 C.F.R. § 242.200(g). If a seller does not deliver the security in time for settlement, a buyer may not get what it purchased in a timely manner, eroding trust and confidence in the markets, and potentially depriving market participants of the benefits of their bargain.

### Failure to Deliver

36.     Regulation SHO was designed, in part, to reduce "failures to deliver," which occur when a seller fails to deliver securities that it has sold by the settlement date. Failures to deliver may negatively impact the market and shareholders. *See Amendments to Regulation SHO,* Exch. Act Rel. No. 34-60388 (July 27, 2009). Further, sellers that fail to deliver securities

10

on the settlement date may, as here, attempt to use this additional freedom to engage in trading activities to depress improperly the price of a security. *See id.* at 6-7. Further, by not borrowing securities and, therefore, risking that it will not be able to make delivery within the standard settlement period, the seller benefits by not incurring the costs of borrowing shares.

## FACTUAL ALLEGATIONS

### I.      SABBY'S OPERATIONS

37.     As managing partner of Sabby, Mintz had primary responsibility for making investment decisions for the Private Funds. Sabby's investment strategy involved, in part, participating in secondary offerings by issuers, which frequently included common stock and/or convertible securities of the issuer.

38.     Mintz also had primary responsibility under Sabby's policies and procedures for knowing whether the Private Funds had a net short or long position in an issuer's stock and whether each sale of an issuer's stock was a short sale or a long sale. In addition, he was responsible for ensuring that Sabby's trading records were consulted in order to confirm this information before submitting any trades.

39.     In particular, before a short sale order could be placed, Sabby's policies and procedures required Mintz or his trading designee to consult Sabby's trading records, including (i) a list of available locates provided on a daily basis from Prime Broker 1 ("Locate Availability List"); (ii) Sabby's trading log to see how many shares of the issuer had been sold short so far that day; and (iii) short sales executed through brokers not reflected in Sabby's trading log.

40.     Mintz was also responsible for reporting any instance where a locate was not properly obtained, for reviewing all short sale reports for accuracy, and for ensuring that all orders, including short sale orders, were marked correctly.

11

## II.     VIOLATIVE SHORT SELLING IN THE SECURITIES OF ISSUER 1

41.     In June 2018, Defendants engaged in a scheme to circumvent Regulation SHO requirements in connection with the short sales of millions of shares of the common stock of Issuer 1. As more fully described below, Defendants' scheme including short selling without having locates in place and naked short selling in which they not only failed to have locates but also failed to timely deliver the securities being sold. Defendants' goals were two-fold. First, Defendants knowingly or recklessly used their violative short selling to push down artificially the price of Issuer 1's stock so that Defendants could lower the price at which Defendants were able to exercise their Issuer 1 convertible securities, thus obtaining more stock upon conversion.

42.     Second, regardless of whether Defendants succeeded in driving down Issuer 1's stock price by their improper short selling, Defendants knew or were reckless in not knowing they could profit additionally from selling Issuer 1's stock in violation of Regulation SHO's locate requirements. As set forth more fully below, their fraudulent trading scheme worked as follows: first, they entered into a securities purchase agreement with Issuer 1 on behalf of the Warrant Fund that, for a brief period, effectively allowed Defendants to exercise convertible preferred securities in exchange for Issuer 1's stock at an approximately 20% discount to the market price. Then, *prior to* exercising the convertible securities, they entered short sales orders without first obtaining a locate, circumventing Regulation SHO. Almost immediately *after* those short sales, they executed their conversion rights to acquire Issuer 1 stock and attempted, albeit unsuccessfully, to use those shares to cover their short sales. In this manner, Defendants locked in an approximate 20% spread. In other words, by short selling without first obtaining a locate, they effectively were able to sell at market price and then acquire the shares at a 20% discount to market price, earning substantial illicit proceeds. Defendants would not have been able to do this

12

if they had followed the rules that required locates for their short sales because they would not have been able to obtain locates in sufficient quantity, if at all.

43.       As part of the scheme, Defendants knowingly or recklessly submitted materially false and misleading order instructions to executing broker-dealers for the long sale of millions of shares of Issuer 1's common stock on behalf of the Warrant Fund when it did not have a net long position in the stock.  Defendants also submitted order instructions for the short sale of millions of shares of Issuer 1's common stock on behalf of the Warrant Fund while knowingly or recklessly making materially false and misleading representations to executing broker-dealers that, through their prime brokers, Defendants had obtained locates for Issuer 1's common stock in connection with the short sales.

44.       After making these materially false and misleading statements in connection with their short sales, Defendants tendered for conversion millions of shares of convertible Issuer 1 securities.  As described more fully below, the fraudulent scheme allowed Defendants to generate hundreds of thousands of dollars in ill-gotten gains for the Warrant Fund and led to Defendants' failure to deliver millions of shares of Issuer 1.

**Defendants' Fraudulent Trading and Ill-gotten Profits**

45.       In April 2018, Defendants, on behalf of the Warrant Fund, entered into a securities purchase agreement with Issuer 1 through which Defendants acquired preferred securities that could be converted into Issuer 1's common stock at a conversion price of $0.46 per share.  The agreement contained a provision that, on June 25, 2018, the conversion price of the preferred securities would be adjusted to 80% of the volume-weighted average price ("VWAP") of Issuer 1's common stock on the preceding trading day, June 22, 2018 ("the reset provision").

46.     The reset provision gave Defendants a financial incentive to push down the price of Issuer 1's common stock before June 22, 2018 in order to receive more common stock upon conversion.

47.     This was a strategy Defendants had employed previously and which Mintz explained in a February 2018 exchange with a representative of an executing broker-dealer in connection with Defendants' trading in another security:

> MINTZ: the deal that was just done that had a pricing mechanism
> MINTZ: that I made
> MINTZ: that for 5 days
> MINTZ: we got the lowest daily vwap [volume-weighted average price] minus 10%
> MINTZ: so incentive was to sell as much as possible
> MINTZ: during that point
> MINTZ: set a low price
> MINTZ: for our shares and warrants
> MINTZ: then let it go back up
> MINTZ: to monetize the warrants
> MINTZ: that we got at 5.3c
> MINTZ: stock was 40c predeal
> MINTZ: so now that pricing is set
> MINTZ: not going to be slamming stock

48.     With two trading days remaining before the reset provision took effect, Defendants intentionally began naked short selling Issuer 1's common stock, putting downward pressure on Issuer 1's stock price.

49.     On June 21, 2018, the Warrant Fund began the day with a net long position of 286 shares of Issuer 1's common stock.  Defendants knew or were reckless in not knowing about the Warrant Fund's net long position, as it was reflected in Sabby's contemporaneous trading records, and Sabby's policies required Mintz to know this information before placing trades. Throughout the day, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers materially false and misleading order instructions for the long sale of 1,126,033 shares

14

of Issuer 1's common stock that executed at prices between approximately $0.29 and $0.33 per share.

50.    Defendants knew, or were reckless in not knowing, that the sale of all but 286 shares should have been marked as short sales because the Warrant Fund did not have a sufficient net long position in the common stock of Issuer 1 at the time Defendants submitted the orders.

51.    That same day, June 21, 2018, Defendants, on behalf of the Warrant Fund, submitted order instructions to executing broker-dealers for the short sale of an additional 569,184 shares of Issuer 1's common stock that executed at prices between approximately $0.29 and $0.30 per share. Defendants falsely represented to the executing broker-dealers that Defendants had obtained locates for Issuer 1's common stock in connection with these short sales. At the time, Defendants knew or were reckless in not knowing that they had not located any shares available to be borrowed, as reflected in Sabby's contemporaneous trading records.

52.    Defendants' trading comprised 52% of trading in Issuer 1's common stock on June 21, 2018, and the price of Issuer 1's stock fell from $0.34 to $0.29 per share over the course of the day, a 14.7% drop

53.    On June 22, 2018, the Warrant Fund began the day with a net short position in Issuer 1's common stock of 1,694,931 shares. Throughout the day, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers order instructions for the long sale of 3,288,203 shares of Issuer 1's common stock that executed at prices between approximately $0.18 and $0.34 per share. As Defendants knew or were reckless in not knowing, these instructions were materially false and misleading in designating the sales as "long" sale orders,

rather than short sales, because the Warrant Fund did not have a net long position in Issuer 1's common stock at the time Defendants submitted the orders.

54.     That same day, June 22, 2018, Defendants, on behalf of the Warrant Fund, submitted to executing broker-dealers order instructions for the short sale of an additional 3,991,688 shares of Issuer 1's common stock that executed at prices between approximately $0.19 and $0.33 per share. Defendants made materially false and misleading representations to the executing broker-dealers in the order instructions that Defendants had obtained locates for Issuer 1's common stock in connection with these short sales, when Defendants knew or were reckless in not knowing that they had not located any shares available to be borrowed, as reflected in Sabby's contemporaneous trading records.

55.     Defendants' trading comprised 42% of trading in Issuer 1's common stock on June 22, 2018, and the price of Issuer 1's stock fell from $0.31 to $0.19 per share over the course of the day, a 38.7% drop. After Defendants' trading on June 21 and 22, 2018, the Warrant Fund had a net short position of 8,974,822 shares in Issuer 1's stock.

56.     After the close of trading markets on June 22, 2018, Defendants calculated the adjusted conversion rate for the Warrant Fund's Issuer 1 preferred securities – based on 80% of VWAP on June 22, 2018 – to be $0.1779 per share, down from the original rate of $0.46 per share.

57.     At or around 5:31 PM Eastern Time on June 22, 2018, Defendants, on behalf of the Warrant Fund, submitted a conversion notice to Issuer 1 to convert $1,797,017 worth of preferred securities into 10,101,280 shares of Issuer 1 common stock at a conversion rate of $0.1779 per share. The effective date of the conversion was June 25, 2018.

16

58.     Defendants intended to use these shares to satisfy the delivery obligations for their June 21 and 22, 2018 sales of Issuer 1 common stock and to try to conceal their violative short sales for which they had failed to obtain locates.  However, as Defendants knew or were reckless in not knowing all along, the use of these converted shares to cover their sales would not and did not in any way cure their violative trading.  Delivery of those shares did not cure the fact that they had mismarked their trades as long sales when they were not "deemed to own" the shares or did not have a net long position in Issuer 1 at the time they submitted the mismarked orders.  Similarly, delivery of those shares did not cure their violations of the locate requirements of Regulation SHO because they had placed short sales without actually having obtained a locate, and as Defendants knew or were reckless in not knowing, they could not use the fact that they held convertible securities that could be exchanged for Issuer 1 stock to satisfy the locate requirement.

59.     If Defendants had converted $1,797,017 worth of Issuer 1 preferred securities prior to the adjustment of the conversion rate, effective June 25, 2018, the conversion would have yielded only 3,906,560 shares of Issuer 1 common stock.  Instead, by tendering the convertible securities *after* Issuer 1's stock price plummeted by over 60% and the conversion rate was adjusted downward, Sabby's conversion of $1,797,017 worth of preferred securities at the price of $0.1779 per share resulted in approximately 10.1 million shares of common stock.

60.     Beyond the additional shares Defendants obtained from the decline in Issuer 1's stock price between June 21 and June 22, Defendants locked in a 20% profit through their short selling without obtaining locates in violation of the requirements of Rule 203(b)(1) of Regulation SHO.  As explained above, the conversion price of Defendants' preferred Issuer 1 securities was adjusted downward to 80% of VWAP on June 22, 2018, effectively giving

17

Defendants a right to convert these securities in exchange for Issuer 1 stock at an approximate 20% discount to the market price. Defendants knowingly or recklessly chose to sell short shares of Issuer 1 on June 21 and 22 without obtaining locates, and, immediately *after* those sales, Defendants exercised their conversion rights in exchange for the Issuer 1 shares needed to cover their short sales. Through this fraudulent scheme, Defendants, in effect, sold short shares of Issuer 1 at market price and subsequently acquired shares at an approximate 20% discount to the market price, earning substantial illicit proceeds of $480,000 for the Warrant Fund. Defendants profited personally in connection with this trading from the management and performance fees they obtained from managing the Warrant Fund. As well, Mintz profited from his ownership interest in the Warrant Fund.

### Defendants' False and Misleading Statements to Executing Broker-Dealer A

61. Defendants made repeated material misrepresentations to Executing Broker-Dealer A and engaged in other deceptive conduct described below to try to conceal their illegal trading. Defendants knew or were reckless in not knowing that Executing Broker-Dealer A relied on their false and misleading statements in executing their abusive naked short sales.

62. Between June 21 and 22, 2018, Defendants made repeated misrepresentations to Executing Broker-Dealer A regarding their orders for the sale of Issuer 1's securities. After Defendants' initial submission on June 21, 2018, of false and misleading order instructions to Executing Broker-Dealer A for the long sale of one million shares of Issuer 1, Mintz had a telephone call with representatives of Executing Broker-Dealer A. In response to questioning by the representatives of Executing Broker-Dealer A about the validity of how the trade was marked, Mintz conceded that the improperly marked long sale should have been marked as a short sale, which Executing Broker-Dealer A changed to a short sale order for one million shares

18

of Issuer 1. Subsequently, Defendants withdrew a second false long sale order and resubmitted the order as a short sale order for one million shares of Issuer 1. By designating the sales as short sales, however, Defendants were obligated under Regulation SHO to obtain a locate.

63. Later, on June 21, 2018, a representative of Executing Broker-Dealer A made multiple requests to Defendants to confirm the source of their locate for both one million short sales orders. Initially, Mintz falsely stated that the locate for the first order was provided by Prime Broker 1, and that the locate for the second order was provided by Prime Broker 2. Later that day, he reversed and falsely stated that Prime Broker 2 provided the locate for the first order and Prime Broker 1 provided the locate for the second.

64. Because Sabby's policies required Mintz to verify a security's locate availability before short selling and, as reflected in Sabby's contemporaneous trading records, there were no locates, Mintz knew or was reckless in not knowing that neither prime broker had locates available for *any* shares of Issuer 1.

65. On the morning of June 22, 2018, a Director of Compliance of Executing Broker-Dealer A sent an email to Sabby requesting contact information for Prime Broker 1 and Prime Broker 2 or, alternatively, documentation confirming that Defendants had obtained locates from Prime Broker 1 and Prime Broker 2 in connection with Defendants' short sales.

66. Later that day, the Director of Compliance of Executing Broker-Dealer A attempted to speak with a representative of Sabby, but their call was disconnected. Shortly after the call, at around 12:30 PM, the Director of Compliance of Executing Broker-Dealer A sent an email to Defendants again demanding documentation of the locates or documentation showing that Defendants had tendered the preferred securities of Issuer 1 for conversion *prior* to submitting the short sale orders.

67.    At or around 6:06 PM on Friday, June 22, 2018, in an attempt to mislead Executing Broker-Dealer A on the sequence of events, a representative of Sabby sent an email to the Director of Compliance of Executing Broker-Dealer A that included a copy of Sabby's conversion notice tendered to Issuer 1 at or around 5:31 PM, well *after* Defendants had submitted the short sale orders.

68.    Upon reviewing this email on Monday, June 25, 2018, the Director of Compliance of Executing Broker-Dealer A recognized that the conversion notice failed to satisfy his request for documentation of Defendants' locates *or* documentation showing that Defendants had tendered the preferred securities of Issuer 1 for conversion *prior* to submitting the short sale orders.  Subsequently, on June 25, 2018, the Director of Compliance sent another email to Defendants requesting evidence of locates *prior* to the sales.  Defendants ignored this request.

69.    On the morning of June 26, 2018, a representative of Executing Broker-Dealer A sent another email to Defendants, renewing the Director of Compliance's request for documentation.  Shortly after, a representative of Sabby responded by email, stating, "Shares will be delivered today. Thank you for your patience."

70.    However, Defendants failed to deliver shares of Issuer 1's common stock until June 28, 2018, and failed to satisfy their settlement obligation in connection with their short sales of Issuer 1's common stock on June 21 and 22, 2018.  As a result of this late delivery, by June 27, 2018, the Warrant Fund's abusive naked short sales caused fails-to-deliver of approximately nine million shares of Issuer 1.

71.    In testimony, Mintz has admitted that he was aware: (1) of the Warrant Fund's opening position in the common stock of Issuer 1 on June 21 and 22, 2018 at the time of the

relevant trades (*i.e.*, that the Warrant Fund had only 286 shares of Issuer 1 on June 21 and a net short position of 1,694,931 shares on June 22); (2) that Defendants had not tendered for conversion the convertible securities prior to placing the trades; and (3) that Defendants' trades in Issuer 1 were mismarked.

### III.    VIOLATIVE SHORT SELLING IN THE SECURITIES OF ISSUER 2

72.    In January 2018, Defendants engaged in a fraudulent scheme to circumvent Regulation SHO by selling short tens of thousands of shares of Issuer 2's common stock without obtaining locates. As more fully described below, Defendants intended to profit by short selling Issuer 2's common stock without obtaining locates and subsequently acquiring the common stock of Issuer 2 at a cheaper price than if they had followed the locate requirements of Rule 203(b)(1) of Regulation SHO.

73.    Between January 8 and 9, 2018, Defendants submitted instructions to executing broker-dealers for the short sale of Issuer 2's common stock on behalf of the Private Funds while knowingly or recklessly making materially false and misleading representations that they had obtained locates for shares of Issuer 2's common stock in connection with these short sales.

74.    *After* submitting the violative short sale orders, on January 10, 2018, Defendants entered into a securities purchase agreement with Issuer 2 through which Defendants, on behalf of the Private Funds, acquired one million shares of Issuer 2's common stock. Defendants attempted to use these shares to satisfy the delivery obligations and conceal their failure to have obtained locates for their short sales, but the shares were not delivered until January 12, 2018, and Defendants caused fails-to-deliver of thousands of shares of Issuer 2. As Defendants knew or were reckless in not knowing, the use of after-acquired shares to cover their short sales for

which they had not obtained a locate at the time of their short sale order could not cure their failure to comply with the locate requirements of Rule 203(b)(1) of Regulation SHO.

## The January 8 and 9, 2018 Trading

75.　On January 8, 2018, the Warrant Fund and the Healthcare Fund began the day with net short positions in Issuer 2 of 49,333 and 60,870 shares, respectively, as reflected in Sabby's contemporaneous trading records.

76.　At 6:30 AM Eastern Time on that day, Defendants were informed by Prime Broker 1 that their request for a 250,000 share locate for Issuer 2's shares was denied.

77.　Notwithstanding this denial, at 8:38 AM, Defendants knowingly or recklessly submitted to an executing broker-dealer two short sale orders – a short sale of 14,147 shares of Issuer 2 on behalf of the Warrant Fund and another short sale of 14,148 shares of Issuer 2 on behalf of the Healthcare Fund, for a total of 28,295 shares of Issuer 2 to be sold short.

78.　As part of the order instructions, Defendants falsely represented to the executing broker-dealer that Prime Broker 2 had provided a locate in connection with the short sales. As Defendants knew or were reckless in not knowing, at the time of the order, no locate had been provided to Defendants by either Prime Broker 1 or Prime Broker 2.

79.　At 9:31 AM, Defendants again requested a locate from Prime Broker 1 and were denied.

80.　At 9:32 AM, however, Prime Broker 2 granted Defendants a locate for 30,000 shares of Issuer 2. While enough to cover the earlier aggregate 28,295 short sale order of Issuer 2's shares on behalf of the Private Funds, the locate was untimely given that it was granted *after* the short sale orders had been placed.

81.     At 12:23 PM, Prime Broker 2 granted Defendants an additional locate for 25,000 shares of Issuer 2.  Defendants immediately submitted two short sale orders to an executing broker dealer for 25,000 shares on behalf of each Fund, for a total of 50,000 shares to be sold short.  As Defendants knew or were reckless in not knowing, while Prime Broker 2's 25,000 share locate was sufficient to cover one of the Fund's short sales, it was insufficient to cover both.

82.     At 4:40 PM, Defendants submitted a third short sale order instruction to an executing broker-dealer on behalf of the Healthcare Fund for yet an additional 25,000 shares of Issuer 2.  However, only 2,594 shares were actually sold at $1.95 per share.  As part of the order instructions, Defendants again falsely represented that Prime Broker 2 had provided a locate in connection with the short sales, even though they knew or were reckless in not knowing that the locates provided by Prime Broker 2 were insufficient to cover Defendants' short sales.

83.     By placing short sale orders prior to receiving any locates or without sufficient locates, and then failing to deliver shares on a timely basis, Defendants naked short sold 25,889 shares of Issuer 2.

84.     On January 9, 2018, the Warrant Fund and the Healthcare Fund began the day with net short positions of 88,480 and 102,615 shares, respectively, in Issuer 2.

85.     As had occurred on the previous day, Defendants were informed at 6:30 AM by Prime Broker 1 that their request for a locate of 250,000 shares of Issuer 2 was denied.

86.     At 7:54 AM, Defendants requested a locate for Issuer 2's shares from Prime Broker 2 and were also denied.

87.     At 7:57 AM, Defendants submitted another request to Prime Broker 1 and were granted a locate of 5,000 shares of Issuer 2.

88.     At 8:00 AM, a Sabby employee informed Mintz that a locate for 5,000 shares of Issuer 2 had been granted.

89.     Despite knowing that only 5,000 shares of Issuer 2 had been located, at 8:02 AM Defendants submitted to an executing broker-dealer order instructions to sell short 450,000 shares of Issuer 2 without sufficient locates on behalf of the Healthcare Fund, resulting in the sale of 1,400 shares that executed at prices between $1.50 and $1.80 per share.

90.     At the same time, Defendants submitted a separate order on behalf of the Warrant Fund for the short sale of 250,000 shares without sufficient locates to an executing broker-dealer, resulting in the sale of 1,674 shares that executed at approximately $1.52 per share.

91.     In the instructions for both orders, Defendants misleadingly identified Prime Broker 1 as the source of the locate for the 450,000 short sale order and the 250,000 short sale order, even though Defendants knew or were reckless in not knowing that Prime Broker 1 had only provided a limited locate of 5,000 shares.

92.     At 11:02 AM, a Sabby employee informed Mintz that the Warrant Fund and Healthcare Fund had not obtained any additional locates for Issuer 2's securities.  Despite knowing this, Defendants nevertheless submitted additional order instructions to executing broker-dealers for short sales in Issuer 2's stock between 12:41 PM and 1:21 PM.  In the order instructions, Defendants again, acting knowingly or recklessly, falsely represented that Prime Broker 1 had provided locates.  These orders resulted in 35,216 shares sold short by Defendants, with no locate, that executed at a price of approximately $1.52 per share.

93.     On the following day, January 10, 2018, Defendants, on behalf of the Private Funds, entered into a securities purchase agreement with Issuer 2 to buy one million shares of the company's common stock at $1 per share.  Defendants attempted to use these shares to

settle their short sales without locates executed on January 8 and 9, 2018. However, as

Defendants knew or were reckless in not knowing, regardless of the subsequent securities

purchase agreement, Defendants did not have sufficient locates at the time of their short sale

orders and their trades were in violation of the locate requirements of Regulation SHO.

94.    Despite trying to use the securities obtained through the securities purchase

agreement to settle their short sales, by January 11, 2018, Defendants' short sales in Issuer 2

caused fails-to-deliver of at least 33,000 shares of Issuer 2.

95.    As described above, Defendants naked sold short over 30,000 shares of Issuer 2

that were executed at prices between $1.50 and $1.95 per share, and subsequently purchased

Issuer 2 shares at a price of $1 per share. By naked short selling Issuer 2's common stock at

market price and subsequently acquiring shares of Issuer 2 through the securities purchase

agreement at a substantially cheaper price per share, Defendants gained ill-gotten proceeds of

approximately $134,000, and net profits of $49,000 for the Private Funds. Defendants profited

personally in connection with this trading from the management and performance fees they

obtained from managing the Private Funds. As well, Mintz profited from his ownership interest

in the Private Funds.

## IV.    ADDITIONAL ABUSIVE TRADING

96.    Defendants engaged in similar abusive trading in the securities of at least eight

additional issuers.

97.    The frequency of Defendants' abusive trading and the similarity of the

misconduct across Defendants' trading, as well as Sabby's prior history of short sale violations

in connection with Rule 105 of Regulation M, demonstrate that these violations were not errors,

but, in fact, part of a fraudulent scheme to circumvent trading rules.

98. Defendants' additional abusive trading, the details of which are set forth more fully in Appendix A to this Complaint, took place between March 15, 2017 and May 6, 2019. As set forth in Appendix A, in each instance, Defendants knowingly or recklessly either submitted (a) materially false and misleading trade order instructions to executing broker-dealers for long sales on behalf of the Private Funds when the Private Funds did not have a net long position in the security and were not deemed to own the securities; or (b) submitted short sale trade instructions to executing broker-dealers for short sales on behalf of the Private Funds while making materially false and misleading representations that Defendants had obtained locates in connection with the short sales when in fact they had not obtained locates.

99. Defendants engaged in this fraudulent trading scheme because it was profitable to do so and more profitable than following the requirements of Regulation SHO. Defendants profited from the difference between the higher price of their abusive sales (naked short sales; short sales without locates; and/or mismarked long sales) and the cheaper price they subsequently paid to acquire the stock or exercise convertible securities in exchange for stock. Had Defendants complied with the applicable trading rules – including owning a security before submitting a long sale order or borrowing or locating a security before submitting a short sale order – they would not have secured the same profits. As a result of their fraudulent scheme, Defendants obtained at least $2 million in illegal trading profits for themselves and the Private Funds.

## V. SABBY'S INADEQUATE BOOKS AND RECORDS

100. Pursuant to Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2], Sabby, as an investment adviser, was required to make and keep certain books and records related to its advisory business. Among other records, Rule 204-

2 requires investment advisers to keep accurate records relating to orders to purchase or sell any security.

101.     During the relevant period, Sabby failed to keep accurate books and records with respect to certain orders to sell securities, as detailed above, when Defendants mismarked those sales as long when those sales should have been marked as short and when Defendants represented in their order instructions that they had obtained locates for short sales, when in fact Defendants had not.

102.     Mintz, having primary oversight over investment decisions, including daily securities trading decisions, for the Private Funds, was responsible for the entry of these inaccurate orders and knew or was reckless in not knowing that the information was false, and as such, aided and abetted Sabby's violations.

## VI.     SABBY'S INADEQUATE COMPLIANCE POLICIES AND PROCEDURES

103.     Pursuant to Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7], Sabby was required to have policies and procedures reasonably designed to prevent violations of the Advisers Act and to implement those policies and procedures.

104.     However, during the relevant period, Sabby failed to enforce and otherwise implement compliance with its existing procedures, including those designed to ensure accurate books and records.  As alleged above, Defendants continuously mismarked short sale orders as long sales and inaccurately represented in their order instructions that they had locates for short sales when they did not.

105.     Sabby's policies and procedures relating to Regulation SHO assigned Mintz, or his trading designee, responsibility for determining whether the Private Funds had a net long or

short position in a security. This responsibility included determining prior to each sale whether it was a long or short sale.

106.     Under Sabby's policies and procedures, Mintz was responsible as well for ensuring that Sabby's locate availability list, trading log, and other trading records were consulted before execution of any trades, and Mintz was responsible for reporting any instance where a locate was not properly obtained, for reviewing all short sale reports for accuracy, and for ensuring that all orders, including short sale orders, were marked correctly.

107.     Mintz, however, failed to implement and comply with these procedures and continuously created inaccurate trading records and submitted mismarked trades. He therefore aided and abetted Sabby's compliance failures, including those related to its inadequate books and records.

108.     For its part, Sabby failed to implement procedures to ensure that Mintz complied with his obligations as set forth above and thus prevent violations of the Advisers Act

## THIS ACTION IS TIMELY FILED

109.     Defendants agreed to toll any statute of limitations applicable to the claims alleged herein during the period from December 2, 2022 through March 22, 2023 and the period from March 30, 2023 through June 30, 2023.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Mintz and Sabby)

110.     Paragraphs 1 through 109 are realleged and incorporated by reference.

111.     Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of

interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent scheme described herein, including the knowing or reckless circumventing of Regulation SHO through mismarking orders, failing to obtain locates for short sales and failing to timely deliver shares as required by applicable rules, and submitting materially false and misleading order instructions and making other false and misleading statements to executing broker-dealers as described in paragraphs 41 through 99.

112.     By reason of the foregoing, Defendants violated and, unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## Second Claim for Relief
### Violations of Section 10(b) of the Exchange Act and Rule 10b-21 Thereunder
### (Against Mintz and Sabby)

113.     Paragraphs 1 through 109 are realleged and incorporated by reference.

114.     The common stock of Issuer 1 and Issuer 2 are each a "security" within the meaning of Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] and are each an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act [15 U.S.C. § 78c(a)(11)].

115.     Defendants directly and indirectly, singly or in concert, knowingly or recklessly, in connection with the purchase and sale of securities, by use of the means and instrumentalities

of interstate commerce, or of the mails or of the facilities of a national securities exchange, have submitted an order to sell an equity security while deceiving a broker or dealer, a participant of a registered clearing agency, or a purchaser about their intention or ability to deliver the security on or before the settlement date, and failed to deliver the security on or before the settlement date, including, but not limited to Defendants' sales of Issuer 1's securities described in paragraphs 41 through 71 and Issuer 2's securities described in paragraphs 72 through 95.

116. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-21 thereunder [17 C.F.R. § 240.10b-21].

### Third Claim for Relief
### Violations of Section 204 of the Advisers Act and Rule 204-2 Thereunder
### (Against Sabby)

117. Paragraphs 1 through 109 are realleged and incorporated by reference.

118. During the relevant period, Sabby acted as investment adviser to the Private Funds.

119. Accordingly, Sabby was legally obligated to "make and keep true, accurate and current" books and records prescribed by the Commission relating to Sabby's investment advisory business and to "furnish such copies" of those records as the Commission requires, pursuant to Section 204(a) of the Advisers Act [15 U.S.C. § 80b–4] and Rule 204-2 thereunder [17 C.F.R. §§ 275.204-2].

120. Sabby, by use of the mails and the means and instrumentalities of interstate commerce, directly or indirectly, created and maintained false books and records when, as described above, Defendants submitted mismarked orders to sell securities long when those

orders should have been marked as short sales and when Defendants falsely represented in the order instructions that they had obtained locates for short sales, when in fact they had not.

121. By reason of the foregoing, Sabby, directly or indirectly violated and, unless restrained and enjoined, is reasonably likely to continue to violate Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. §§ 275.204-2].

### Fourth Claim for Relief
### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder
### (Against Sabby)

122. Paragraphs 1 through 109 are realleged and incorporated by reference.

123. Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] provides that it is unlawful for an investment adviser to engage in an act, practice, or course of business which is fraudulent, deceptive, or manipulative. It further states that the SEC shall issue rules to define and prescribe measures to prevent such misconduct. Rule 206(4)-7 issued under the Advisers Act [17 C.F.R. §275.206(4)-7] requires investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules. Investment advisers must also review the adequacy of those policies and procedures and the effectiveness of their implementation, at least annually.

124. As described in paragraphs 37 through 40, Sabby's policies and procedures assigned Mintz, or his trading designee, responsibility for determining whether the Private Funds had a net long or short position in a security. In addition, Mintz was responsible for consulting Sabby's trading records before trade execution, ensuring trades were marked properly, reviewing short sale reports for accuracy, and reporting instances where a locate was not properly obtained.

125. Sabby, however, failed to implement, as well as enforce compliance with its existing procedures, including those designed to ensure accurate books and records. As alleged

31

above, Defendants, by use of the mails and the means and instrumentalities of interstate commerce, directly or indirectly, continuously mismarked short sale orders as long sales and inaccurately represented in their order instructions that they had locates for short sales when they did not.

126.     By reason of the foregoing, Sabby, directly or indirectly violated and, unless restrained and enjoined, is reasonably likely to continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

### Fifth Claim for Relief
### Aiding and Abetting Violations of Sections 204 and 206(4) of the Advisers Act and Rules 204-2 and 206(4)-7 Thereunder
### (Against Mintz)

127.     Paragraphs 1 through 109 are realleged and incorporated by reference.

128.     As a result of the conduct alleged herein, and in particular paragraphs 37 through 40 and paragraphs 100 through 108, Mintz aided and abetted Sabby's violations of Sections 204 and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7] by knowingly or recklessly providing substantial assistance to Sabby, which, while registered as an investment adviser under Section 203 of the Advisers Act [15 U.S.C. § 80b-3], by use of the mails and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in fraudulent, deceptive, or manipulative practices or courses of business, and failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder by Sabby and its supervised persons.

129.     By reason of the foregoing, Mintz, directly or indirectly, aided and abetted, and, unless restrained and enjoined, will again aid and abet violations of Sections 204 and 206(4) of

the Advisers Act [15 U.S.C. §§ 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2 and 275.206(4)-7].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

1.     Finding that Mintz and Sabby violated the federal securities laws and regulations alleged in this Complaint;

2.     Permanently restraining and enjoining Mintz and Sabby from violating the federal securities laws and regulations alleged in this Complaint;

3.     Ordering Mintz and Sabby to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), (7)];

4.     Ordering Mintz and Sabby to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and/or Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

5.     Granting such other and further equitable relief to the Commission as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.

Dated: June 12, 2023          Respectfully submitted,

Of Counsel:
Amy L. Friedman
Christopher R. Mathews

    _s/ Daniel J. Maher_____
Daniel J. Maher (Mass. Bar ID No. 654711)
Edward J. Reilly (VA Bar ID No. 82562)
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Phone: (202) 551-4737 (Maher)
Email: Maherd@sec.gov (Maher)

## DESIGNATION OF AGENT FOR SERVICE UNDER LOCAL CIVIL RULE 101.1(f)

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the following designation for the receipt of service of all notices or papers in this action at the following address:

United States Attorney's Office
District of New Jersey
Attention: David E. Dauenheimer
Deputy Chief, Government Fraud Unit
970 Broad Street, Suite 700
Newark, NJ 07102-2534

Dated: June 12, 2023

         Respectfully submitted,

    _s/ Daniel J. Maher_____
Daniel J. Maher (Mass. Bar ID No. 654711)
Edward J. Reilly (VA Bar ID No. 82562)
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Phone: (202) 551-4737 (Maher)
Email: Maherd@sec.gov (Maher)

34

APPENDIX A

| Issuer | Fund(s) Engaged in Trading | Locates | Number of Occasions Locates Denied | Total Naked Short Sales Orders With False Representations Concerning Locates | Short Sale Orders Mismarked as Long Sales | Total Naked Short Sales Shares & Proceeds | Profit After Acquiring Shares For Delivery | Date Range | Reset Provision |
|---|---|---|---|---|---|---|---|---|---|
| Issuer 1 | Warrant Fund and Healthcare Fund | | | 67,760 | 1,100 | 68,860 $438,578 | $202,810 | 3/15/2017 – 3/17/2017 | No |
| Issuer 2 | Warrant Fund and Healthcare Fund | | | 877,540 | 0 | 877,540 $1,470,521 | $347,270 | 7/26/2017 | No |
| Issuer 3 | Warrant Fund and Healthcare Fund | 45 | | 280,150 | 0 | 280,150 $727,818 | $307,390.75 | 7/28/2017 – 7/31/2017 | No |
| Issuer 4 | Warrant Fund | | | 0 | 381,642,544 | 381,642,544 $922,689 | $204,169.89 | 6/25/2018 – 7/6/2018 | No |
| Issuer 5 | Warrant Fund | | | 0 | 527,778 | 527,778 $412,241 | $81,691 | 7/11/2018 – 7/12/2018 | Yes. Naked short sold 400,150 shares in advance of a warrant conversion price reduction effective July 12, 2018, and exercised warrants *after* the conversion price reduction. |
| Issuer 6 | Warrant Fund | | | 7,638,623 | 0 | 4,596,514 $329,597 | $83,222 | 7/20/2018 – 7/23/2018 | No |

**APPENDIX A**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Issuer 7 | Warrant Fund | | | | 210,939 | 0 | 196,262 $343,226 | $341,184 | 2/25/2019 – 3/5/2019 | No |
| Issuer 8 | Warrant Fund | | | | 119,181 | 0 | 119,181 $944,101. | $345,242. | 5/1/2019 – 5/6/2019 | No |

2

# APPENDIX D

# APPENDIX D



# APPENDIX E

# APPENDIX E



# Clint Plant · 2nd

CAPCO Holdings LLC

Seguin, Texas, United States · Contact info

500+ connections

 Greg McCabe is a mutual connection

**Connect**   Message   More

 **CAPCO HOLDINGS**

 **University of Houston-Downtown**

## Activity

650 followers

Clint Plant commented on a post · 1mo

Congrats Chris

Clint Plant commented on a post · 1mo

Congrats Jenni!

Show all comments →

## Experience

 **President**
CAPCO HOLDINGS
Jul 2023 - Present · 1 yr 4 mos
United States · Remote

⬦ Investments, Ranchhand and +3 skills

 **General Manager**
Cadrex Manufacturing Solutions · Full-time
Oct 2022 - Jul 2023 · 10 mos
Seguin, Texas, United States · On-site

 **President**
E.P.M.P., LTD.
May 1984 - Apr 2023 · 39 yrs

E.P.M.P., LTD. is a contract manufacturer of fabricated sheet metal for several fortune 500 OEM's. Primary areas of operations are in the HVAC, Electrical, Lighting, Traffic Control & Gas Pumps. Oil & Gas Enclosures, Treator...



**Aaron Chow (Elephant Analytics)**
@aaronmchow

He's probably going to try to lie his way out of it, but anyone can check via the Texas RRC website to confirm that he made it up.

Top half is the query I just ran. Bottom half is CPLANT's screenshot where he claimed 1,926 barrels of oil from the same query. $MMTLP

7:11 PM · 4/23/24 From Earth · **1.4K** Views



**CPLANT** ✓ @TheTrndisuFrnd · Apr 20, 2022

For all you NO OIL doubters AND FUDDERS chew on this for awhile  The past year there has been 9,314 bbls of oil reported from the University Maverick A24 well alone This year is 3,576 bbls Let me remind you that this well has not yet been converted to a horizontal well $MMTLP

Delores Williams and 4 others

💬 29          🔁 6          ♡ 95          📊                    🔖    ⬆

**CPLANT** ✓ @TheTrndisuFrnd · Apr 20, 2022

This is a vertical well that has not been frac'd or completed yet either. Which for smooth brains means that it is flowing like Jed's find

**what in tarnation?**

⏸  GIF

💬 1          🔁 1          ♡ 24          📊                    🔖    ⬆

**CPLANT** ✓ @TheTrndisuFrnd

Add University Hueco A39 to the list at 1,926 bbls



**RRC ONLINE SYSTEM**

**Oil & Gas Production Data Query**

Production Data | FAQs | PDQ Help

**General Production Query** | Specific Lease Query

## General Production Query Results

| Query Path: | Search Criteria > County HUDSPETH, Operator: HUDSPETH OPERATING, LLC |

Date Range: | Jan ∨ | 2000 ∨ | to | Oct ∨ | 2024 ∨ | Submit |

View by: Monthly Totals | **Annual Totals** | County | Field | Lease | District

**Operator Name: HUDSPETH OPERATING, LLC, Operator No: 410815**
County Statewide Onshore
Annual Totals, Jan 2000 - Oct 2024

| Date | Oil (BBL) | Casinghead (MCF) | GW Gas (MCF) | Condensate (BBL) |
|------|-----------|------------------|--------------|------------------|
| 2019 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 |
| Total | 0 | 0 | 0 | 0 |

Disclaimer | RRC Interactive Home | RRC Home | Contact



**Platinum** ✓
@PlatnumSparkles

Proof that all these screenshots are FAKE - Let's start with Lease # 08-56373.
Is it 9,314 or is it 0?



1:19 PM · 1/1/25 · **2.3K** Views

💬 3      🔁 9      ❤️ 17      🔖 2      ⬆️

Most relevant replies ⌄



**Platinum** ✓ @PlatnumSparkles · 1/1/25
webapps2.rrc.texas.gov/EWA/specifict e...



**Jeff Davies, the Energy OG** ✓ · 4/22/24
Want to know how far the social media pump-and-dump job on NBH / SMMTLP went?

These are photoshopped screenshots of the Texas RailRoad Commission O&G query system @txrrc

Fake, never happened.  This dude gotta be in on it.

FYI @slocumfortexas

@SEC_Enforcement



💬 21      🔁 30      ❤️ 41      📊 21K      🔖      ⬆️

**RRC ONLINE SYSTEM**

**Oil & Gas Data Query**

Query Menu | Help

**Specific Lease Query Results**

Query Path:  Search Criteria > District: 08

Date Range:  [Jan ▼][2021 ▼] to [Apr ▼][2022 ▼]   [ Submit ]

Related Links
OAG Directive
CAS Everetime Schedule
Offshore Certification

Production and Total Disposition. | Disposition Details. | County Production

**Search Criteria:**
Lease Name:  UNIVERSITY MAVERICK A24 , Lease No.: 56373
Well Type: Oil
District: 08
County Production
Date Range: Jan 2021 - Apr 2022

[ Return ]

1 results                                    Page: 1 of 1                                                 Page Size: View All ▼

| County Name | Oil (BBL) | Casinghead (MCF) |
|---|---|---|
| HUDSPETH | 9,314 | 0 |
| **Total** | **9,314** | **0** |

[ Download ]                                                                    [ Return ]

RRC Home | RRC Online | Search

# APPENDIX F

# APPENDIX F



**NEXT BRIDGE**
HYDROCARBONS

January 23, 2024

Mr. Robert Colby
Executive Vice President
and Chief Legal Officer

Mr. Colby,

Next Bridge Hydrocarbons has been gathering a significant amount of data regarding the imbalance in our shareholder ledger. As stated in our press release, the very early results of our data gathering suggests a number considerably higher than the 2.65mm shares of aggregate short interest stated in FINRA's most recent FAQ.

Per your request, the investment banking firm representing Next Bridge on our proposed S-1 has received several inbound calls from financial institutions needing to buy our shares to get their books in balance. One of the inquiries was of a size so large that I requested to be on a call with this group. From this call, I now have knowledge of an admitted shareholder imbalance from one single financial institution that is multiples more that 2.65mm shares. We continue to collect additional data regarding imbalances from multiple sources.

There is a significant disconnect between our growing data and FINRA's stated number of 2.65mm shares of outstanding short interest. I believe this highlights the need for a more exhaustive review of the total shares in all accounts and through all categories of security, long or short, onshore or offshore, and by parties registered with FINRA or not. The ultimate goal of this investigation is to make sure that every shareholder who purchased a share of MMTLP has the corresponding one-for-one share of Next Bridge Hydrocarbons. Furthermore, any party that sold shares short of MMTLP, or was short Torchlight Energy and carried that short position through the merger with Meta Materials, and, for whatever reason, has not provided the corresponding sold share to the rightful owner, needs to consummate the final step of the "short" transaction, and purchase those shares they sold without a borrow and deliver them to the rightful owners.



**NEXT BRIDGE**
HYDROCARBONS

It has been over 13 months since the U-3 Halt and the anger and frustration of the Next Bridge retail community has only grown. I believe we are at a critical juncture to solve this problem. All relevant parties need to have a meeting and determine the best means to get a complete and accurate share count, as well as a plan of action to address this serious problem of shares sold, yet never delivered, that is manifestly unfair to the purchaser and to our company. Instead of a phone call between us, I strongly suggest an in-person meeting as soon as possible with appropriate members of FINRA, the SEC, and Next Bridge Hydrocarbons. This proposed meeting will give us our best opportunity to address these issues that is fair and causes as little disruption as possible to the markets.

Please let me know your thoughts. Thank you again for your time.

Sincerely,

Greg McCabe
Chairman and Chief Executive Officer
Next Bridge Hydrocarbons, Inc.

# APPENDIX G

# APPENDIX G

**[5] Questions regarding short purchasers post U3 trade halt in MMTLP (Traudt)**

From  sct545 <SCT545@proton.me>                                    ☆ ◁ ⊘  Oct 10, 2024

To    gregmccabe@aol.com, scttraudt@gmail.com

Greg:

Based on the lease loss announced 8 October 2024, I hope you will please take some action here by answering my simple questions and not defer to your attorneys as you have in the past.

1. What entity, broker, trader, or representative of any such group approached you about buying shares to cover their short positions? You referenced this in a 23 January 2024 letter to a Mr. Colby. (See attached)
2. What is the number this entity asked to purchase as you stated it was "multiples" of the 2.65 million already admitted to by FINRA CEO Robert Cook?
3. Have you had further contact with these individuals to attempting to buy shares from you?
4. To the best of your knowledge, or from any data provided to you, what is your estimate of the short positions in total that remained unclosed in MMTLP on 9 December 2022 after the U3 trade halt?

It is essential for you to know that FINRA has filed a motion to dismiss in my case *Traudt v. Rubenstein* (2:24-cv-00782) in US District Court (Vermont). Part of FINRA's position is that there were no shorts (beyond Cook's 2.65 million) and therefore my claims must fail as this "short squeeze never materialized." I have evidence otherwise. Your numbers will be critical in court now, not later.

My case is designed to get over several motions to dismiss/stays for arbitration and once it does I intend to turn it over for class action certification on behalf of the surviving MMTLP shareholders. Not aiding here in my efforts is tantamount to condemning the MMTLP people left with cusips for MMTLP to once again fend for themselves while you provide what appear to be more illusory promises of efforts on our behalf down the road.

In short, Confuscius once sagely observed "better a certain enemy than an uncertain friend." You appear to be more the latter at this point.

Time to push your lawyers aside and lead, and assist me now so I can take the fight to FINRA and the SEC, and other bad actors in this whole fiasco of fraud, regulatory capture, and predatory actions by brokers and market makers.

I need these questions answered by 15 October 2024.

Sincerely
Scott Traudt
Strafford VT

Sent with Proton Mail secure email.

# APPENDIX H

# APPENDIX H



# APPENDIX I

# APPENDIX I

Warshaw Burstein, Christian Levine Law Group Retained by Shareholder Group to Investigate Market Manipulation Scheme

Contact Us

Newsroom    Services & Solutions

Sign In    Sign Up

Resources    For Journalists

Jan 18, 2023 2:13 PM Eastern Standard Time

# Warshaw Burstein, Christian Levine Law Group Retained by Shareholder Group to Investigate Market Manipulation Scheme

Warshaw Burstein, LLP

**RELEASE SUMMARY**

Warshaw Burstein, LLP and Christian Levine Law Group have been retained by a shareholder group to investigate market manipulation schemes.

Share       

NEW YORK--(BUSINESS WIRE)--Warshaw Burstein, LLP, a full-service law firm in New York City, today announced that along with the Christian Levine Law Group and several industry consulting experts, it has been retained by Flamethrower, LLC ("Flamethrower") to investigate whether tens of thousands of unsuspecting investors were

**RELEASE VERSIONS**

English

fraudulently sold hundreds of millions of unauthorized, "phantom" shares of Next Bridge Hydrocarbons, Inc. by market makers, broker dealers and other third parties.

This investigation will also focus on whether fraud was committed in connection with the listing of Metamaterials, Inc.'s ("MMTLP") shares and whether Torchlight, Inc. and MMTLP were targeted by broker dealers, market makers and other third parties who employed a scheme or device to manipulate their share prices.

Flamethrower, a consortium of shareholders, is committed to investigating and prosecuting every company or individual who engaged in a market manipulation scheme that targeted these companies and will seek to hold them financially liable for their unlawful conduct.

## Contacts

Media:
Mollie Fullington for Warshaw Burstein, LLP
mcf@mulberrystreetstrategies.com

**CONTACTS**

Media:
Mollie
Fullington
for Warshaw
Burstein, LLP
mcf@mulb...

# APPENDIX J

# APPENDIX J

## Naked Truth . Info – Nonprofit Organization ✓ 

Jul 24, 2024, 10:16 AM

This is true

Smoke and mirrors

Wes had NDA with many of them paid to push an agenda   Brainwashing is easy.  Add, do you really think all the people in the spaces are there?   NO

Jul 24, 2024, 10:23 AM

Just who was shorting during all of it...... Look back at overstock, repeat repeat repeat offenders of the same acts   Movies so appears they raised over 200k close t2 300k and no a fall out between Kristina and Mark keeps it from moving forward. Mark Faulk sent me his book... "The Naked Truth"  oh and let's see Roger Hamilton using The Naked Truth, I've seen the light and Dark of Wes and my eyes opened at Occupy and we've been gathering since then.   You can't make this stuff up.  FBI "criminal, we need the criminal" attys advising "where is the criminal act" in what they are doing..........  It's insanity  How many movies has Wes used Occupy WallStreet  Occupy 2 and the one he sold to us with Peter and Sean Stone Paradigm of Money, 13k we provided and they gave us a contract for us to sell the move.... I was going through cancer or the support with promise to reimburse would have never been paid to guess what the company the president paid it to "Sleight of Hand"   GO FIGURE  What a crock of complete fraudsters!!!

Jul 24, 2024, 10:29 AM

# APPENDIX K

# APPENDIX K

Scott Traudt
191 Kibling Hill Rd.
Strafford VT 05072
802-318-0429
SCT545@proton.me

18 October 2023

To: John Brda, Wes Christian
Re: 20 March 2023 recorded phone call with TD Ameritrade representative Ron Fleming

Gentlemen:

I dialed into TDA's 800-669-3900 account services number around 4:50pm EST on 20 March 2023 to inquire about my tax paperwork that TDA had regarding my stock trading. I do remember some confusion as to terminology in the conversation where I asked about K2's and also other tax records. At all times, I only spoke with Ron Fleming. I was not transferred to anybody else. Apparently his full name is Cameron Fleming, and he goes by Ron.

After the tax issues were resolved, I inquired broadly about the MMTLP ticker, which I owned shares of purchased via TDA in November or early December 2022 (I will get an exact date on this as well as exact times and Verizon phone records showing the call was actually made and for how long.)

Fleming seemed to me that with some prodding he might discuss what he knew about the U3 halt issued 8 December 2022 in MMTLP by FINRA. Fleming has a Series 7, 9, and 65 set of broker licenses at TDA according to TDA. (These emails will be sent as supporting documents.)

During the conversation, he made mention of three issues that I thought clearly showed that trading was not shut down to protect small investors ("retail") but the broker dealers and potentially those shorting this:

(I am summarizing and paraphrasing here – only items in quotes I have vivid recollections of his words.)

1. He stated that it was trading at 100X (dark pools) and people were crazy to think broker-dealers would pay out on that.

2. He stated that the broker-dealers and others (?) had to protect themselves.

3. The U3 was done "because the share price bore no relation to the actual share value." (Or something pretty close to that.)

I will get the rest of the documents together and forward as soon as they are ready, but no later than Friday night.

Sincerely,

Scott Traudt

6/12/25, 10:30 AM                                    (205) All mail | SCT545@proton.me | Proton Mail

## Re: Heads up on TDA

| From | john brdallc.com <john@b dallc.com> |
|------|-------------------------------------|
| To | sct545<SCT545@pro o .me> |
| Date | Monday, October 23rd, 2023 at 8:14 AM |

Get Outlook for iOS

**From:** SCT <SCT545@proton.me>
**Sent:** Monday, October 23, 2023 4:17:16 AM
**To:** john brdallc.com <john@brdallc.corn>
**Subject:** Heads up on TDA

John - TDA has sent warnings to TDA users that they will lose their message center communications when it transfers to Schwab under the new management plan. I am not sure if the audio recordings will migrate or whether there might be "glitches" in doing that.

I'll call them today, and I believe that legally they haver to keep them but there's always loopholes for these people.

Scott

Sent with Proton Mail secure email.

https://mail.proton.me/u/4/almost-all-mail/CiOq-FUAxRE_2vY10jKoaFyRf0WJC_yznABnxusW6_p2V9FXuxcHdBNHRvzZa_XASs-7VI3TAfbBcQzbEj-c-w==/kB…    1/1

## TDA

| | |
|---|---|
| From | **sct545** <SCT545@proton.me> |
| To | john brdallc.com<john@brdallc.com> |
| Date | Monday, December 4th, 2023 at 9:35 AM |

John – is Wes going to use my info?

Scott

Sent from Proton Mail mobile

## Vermont filing

| | |
|---|---|
| From | sct545 <SCT545@proton.me> |
| To | john brdallc.com<john@brdallc.com> |
| Date | Friday, February 2nd, 2024 at 2:13 PM |

John – I'm going in pro se against TDA (Schwab) as they refuse to play back the March 20 convo between myself and Fleming.

If you or Wes want to chat before I do this, let me know.

Scott

Sent from Proton Mail mobile

## Re: Vermont filing

| | |
|---|---|
| From | john brdallc.com <john@ rdallc om> |
| To | sct545<SCT545@proto ne >, James Wes Christian<jchristian@christianattarlaw.com> |
| Date | Friday, February 2nd, 2024 at 2:36 PM |

Let me send to Wes, and I will let you know.  I saw your post.


JB




---

**From:** SCT <SCT545@proton.me>
**Date:** Friday, February 2, 2024 at 1:14 PM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Vermont filing

John - I'm going in pro se against TDA (Schwab) as they refuse to play back the March 20 convo between myself and Fleming.

If you or Wes want to chat before I do this, let me know.

Scott


Sent from Proton Mail mobile

# Re: Vermont filing

| | |
|---|---|
| **From** | sct545 <SCT545@proton.me> |
| **To** | john brdallc.com<john@brda.lc.com>, James Wes Christian<jchristian@christianattarlaw.com> |
| **Date** | Friday, February 2nd, 2024 at 3:09 PM |

My thinking is to do the minimum filing needed to get the recording and then subpoena 3rd party FINRA for the MMTLP bluesheets.

Vermont has super liberal judges.


Sent from Proton Mail mobile


-------- Original Message --------
On Feb 2, 2024, 2:36 PM, john brdallc.com < john@brdallc.com> wrote:

> Let me send to Wes, and I will let you know.  I saw your post.
>
>
> JB
>

**From:** SCT <SCT545@proton.me>
**Date:** Friday, February 2, 2024 at 1:14 PM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Vermont filing

John - I'm going in pro se against TDA (Schwab) as they refuse to play back the March 20 convo between myself and Fleming.

If you or Wes want to chat before I do this, let me know.

Scott

## Re: Last call

| From | john brdallc.com <john@brdallc.com> |
| --- | --- |
| To | sct545<SCT545@proton.me>, James Wes Christian<jchristian@christianattarlaw.com> |
| Date | Tuesday, February 6th, 2024 at 1:02 PM |

Scott, let me see if I can get Wes to chime in.  Wes, this is in regard to a recorded conversation that Scott had with his broker, where they told him they got advanced notice of the halt.

JB

**From:** SCT <SCT545@proton.me>
**Date:** Tuesday, February 6, 2024 at 6:53 AM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Last call

John:

If anybody wants to weigh in, today is the day.

Scott

Sent from Proton Mail mobile

# Re: introduction

| | |
|---|---|
| From | sct545 <SCT545@proton.me> |
| To | john brdallc.com<john@brdallc.com> |
| CC | James Wes Christian<james.ware@christianattarlaw.com> |
| Date | Thursday, September 5th, 2024 at 5:24 PM |

Hello all:

Attempting to shut down FINRA.

https://drive.google.com/file/d/18X9LvpNf8qISLkxhJDNi3P7cEgEyuIFa/view?usp=share_link

Scott

Sent with Proton Mail secure email.

On Friday, August 16th, 2024 at 7:07 PM, john brdallc.com <john@brdallc.com> wrote:

> Scott, meet Wes.  Wes meet Scott Traut.
>
> You guys can take it from here.
>
> JB
>
> **John A. Brda**
>
> **Managing Member**
>
> 
>
> *314-920-0890*
>
> *john@brdallc.com*
>
> *https://calendly.com/john-brda*

**TD Ameritrade**

Unread  🔔 Notifications     My Profile ▾     Support ▾     Log out

My Portfolio ▾   Trade ▾   Research ▾   Transfers ▾   Products & Services ▾   Education Center ▾     🔍 Search

# Message center

## Client services - Taxes

From: Message Center Client Services
To: scott545303
Date: 5:48pm ET 3/22/2023

Dear Scott,

Thank you for choosing TD Ameritrade, my name is Grant Wells and it's my pleasure to assist you with this!

I read through some of your previous messages to us and to answer one of your questions, yes we keep call recordings, however to my knowledge we can't provide them directly to clients. We can however request a manager to go through the recording in order to establish what was said. Furthermore, it could even be possible for you to listen to the call with the manager together but I do not know that for a fact.

If you request to speak with a manager, we could put you in touch with one and they can look into a call recording if you have any complaints/concerns of what information was given in a conversation with us.

In regards to us deleting messages you send to us, I don't believe we can do that as we are required to save written correspondence with clients due to industry regulations. It could also be the case that you're in the "Inbox" section of the message center and not the "Sent" section. I've actually had this same problem with finding previous messages I have sent to TDA before, so if this is the case it's not just you!

If you are in the Sent section of the message center and still don't see any previous messages you've sent us, that sound like it would be more of a technical issue, which you can call us at 1-800-669-3900 and try to walk you through troubleshooting steps live. Additionally we can try to help you through this message center but for tech issues, phone calls are generally.

If you ever have any questions, please feel free to reach out to us! We thank you for your continued business with us as we strive to help you accomplish your financial goals!

Best Regards,

Grant Wells
Client Services
TD Ameritrade
1-800-669-3900

 **Ameritrade**

Unread  🔔 Notifications     My Profile ▾    Support ▾    Log out

My Portfolio ▾   Trade ▾   Research ▾   Transfers ▾   Products & Services ▾   Education Center ▾     🔍 Search

# Message center

### Re: Re: Re: Re: Client services - Other

From: phoenix545
To: Message Center Client Services
Date: 5:52am ET 3/22/2023

Can you send me a file showing my trades for the last 6 months?

Or where can I find it?

A printed copy mailed to me would be fine.

Thanks,

Scott

============================================
From: Message Center Client Services
To: scott545303
Date: 8:05am ET 3/20/2023

Dear Scott,

My name is William and I'm happy to assist you!

Thank you for reaching out. I show that total cost for those 305 shares of MMTLP was $2,934.95, or $9.6228 per share. You can see that on your end from the website under My Account > Cost Basis > Unrealized Gain/Loss.

If you have any other questions or issues, please reply to this message or call us at 1-800-669-3900 and one of our Representative would be happy to get you taken care of. We value you as a client and we're always happy to assist in any way we can.

Sincerely,

William Connelly
Client Services



Ok. I am still considering suing TDA and immediately asking for the audio recording in full and a 3rd party subpoena for the MMTLP bluesheets.

Need one more week to get clear of other issues then I think a complaint in US District Court (Burlington VT) may be in the cards.

I think the more we stay on the attack, the more the pressure builds.

Be cool,

Scott


Sent from Proton Mail mobile


-------- Original Message --------
On Dec 4, 2023, 9:36 AM, john brdallc.com < john@brdallc.com> wrote:

    ...



My thinking is to do the minimum filing needed to get the recording and then subpoena 3rd party FINRA for the MMTLP bluesheets.

Vermont has super liberal judges.

Sent from Proton Mail mobile

-------- Original Message --------
On Feb 2, 2024, 2:36 PM, john brdallc.com < john@brdallc.com> wrote:

...

Let me send to Wes, and I will let you know.  I saw your post.

JB

**From:** SCT <SCT545@proton.me>
**Date:** Friday, February 2, 2024 at 1:14 PM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Vermont filing



**From** 🔒 john brdallc.com <john@brdallc.com>

**To** sct545

⭐ 🗓 Dec 4, 2023

Agreed!

Get Outlook for iOS

**From:** SCT <SCT545@proton.me>
**Sent:** Monday, December 4, 2023 9:45:29 AM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Re: TDA

Ok. I am still considering suing TDA and immediately asking for the audio recording in full and a 3rd party subpoena for the MMTLP bluesheets.

Need one more week to get clear of other issues then I think a complaint in US District Court (Burlington VT) may be in the cards.

I think the more we stay on the attack, the more the pressure builds.

Be cool,

Scott

Sent from Proton Mail mobile

-------- Original Message --------
On Dec 4, 2023, 9:36 AM, john brdallc.com < john@brdallc.com> wrote:

I hope so. It's good info

Get Outlook for iOS

**From:** SCT <SCT545@proton.me>
**Sent:** Monday, December 4, 2023 9:35:03 AM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** TDA

John – is Wes going to use my info?

Scott

Sent from Proton Mail mobile



From 🔒 sct545 <SCT545@proton.me>    ☆ ✈ Jun 11, 2024

To    sctraudt@gmail.com

Sent from Proton Mail Android

...

-------- Original Message --------
On 10/22/23 6:18 PM, john brdallc.com wrote:

Thanks Scott. Will let you know next steps

Get Outlook for iOS

**From:** SCT <SCT545@proton.me>
**Sent:** Sunday, October 22, 2023 7:00:53 AM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Traudt Verizon and TDA records

John:

Apologies for the delay, long hours all week as we are (isn't everyone) short staffed at the fuel outfit I work at for oil, propane.

Attached is all the records pertaining to the call - the Verizon march call logs and the TDA admission they have the audio recorded. They get squarely about what's in it, of course.

Standing by,

Scott

Sent with Proton Mail secure email.

# [8] introduction



**From**  john brdallc.com <john@brdallc.com>    Aug 16, 2024

**To**  sct545,  James Wes Christian

Scott, meet Wes.  Wes meet Scott Traut.

You guys can take it from here.

JB

*John A. Brda*

*Managing Member*



*314-920-0890*

*john@brdallc.com*

*https://calendly.com/john-brda*

# APPENDIX L

# APPENDIX L

   

←    🗑 ⓘ 🗑 ✉ ⬇ ⋮      4 of 11,056   ‹   ›

## Question regarding litigation funding in "In Re Meta Materials Inc."  ⟊    ✕ 🖨 ↗

 **Scott Traudt** <sctraudt@gmail.com>     ✇ 10:20 AM (3 hours ago)   ☆  ↩ ⋮

to notices, Danielle, Jennifer, contique, Matthew, Jason ⌄

Atty. Hartman:

I will be filing a motion to intervene in this case and to disqualify Wes Christian from any and all representation but before I file I need to check the accuracy of claims made by Christian in the docket. Also understand that Christian has filed a frivolous SLAPP suit against me and as of yesterday approached me via counsel to agree to a dismissal of the case, but I refused and he has been presented with a $500,000 demand by my counsel in the matter. Upon information and belief, Christian can expect there will be a multitude of lawsuits against him for conduct in this bankruptcy case.

The most important one is:  who is the source of the $11.8 million in litigation funding (or reasonably approximate amount) referenced in this 30 October 2024 filing?

Did Parabellum Capital provide the loan? Or an affiliate? Or someone else?

Was the funding source devoid of counterparty interest? Did you investigate this in keeping with the requirements of 11 U.S.C. § 1106(a)(3)?

See attached,

Scott Traudt
Strafford VT
802-318-0429

**One attachment** • Scanned by Gmail ⓘ      



 christian payday.... 

## II. FEES, EXPENSES, AND LITIGATION PROCEEDS

2.01    The estimated budget for the expenses of the Litigation is $11,800,000 (the "Commitment"). Exhibit A is a general estimate of the expenses anticipated to be incurred in litigating these cases. Attorneys shall operate on a partial contingency and shall arrange for payment of third-party expenses related to the Litigation up to the amount of the Commitment. Client understands and agrees that Attorneys intend to seek financing for all or any portion of the Commitment from the Funder, and Attorneys anticipate Funder to be an affiliate of Parabellum Capital LLC. Client acknowledges that the Attorneys are operating on a partial contingency and arranging for payment of expenses related to the Litigation is not possible without financing from Funder, and Client shall execute any documents reasonably requested by Attorneys in connection with the financing of the Commitment, including, without limitation, a Litigation Proceeds Distribution Agreement. In consideration of the services rendered and to be rendered to Client by Attorneys, Client does hereby assign, grant and convey to Attorneys the following present undivided interests in all Litigation Proceeds and all of Client's Claims and Causes of Action for and as a reasonable fee for Attorneys' services, and said contingent attorneys' fee will be figured as follows on any recovery, settlement, or other receipt of Litigation Proceeds (collectively, the "Compensation"):

(i)     *First*, (A) 90% of Litigation Proceeds shall be distributed to Attorneys and (B) 10% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to the Commitment.

(ii)    *Second*, (A) 60% of Litigation Proceeds shall be distributed to Attorneys and (B) 40% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one times (1X) the amount of the Commitment.

(iii)   *Third*, (A) 50% of Litigation Proceeds shall be distributed to Attorneys and (B) 50% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one and one quarter times (1.25X) the amount of the Commitment.

(iv)    Fourth, (A) 30% of all remaining Litigation Proceeds shall be distributed to Attorneys and (B) 70% of all remaining Litigation Proceeds shall be distributed to Client.

In the event that the legal fees and expenses of the Litigation are anticipated to exceed $11,800,000, Client and Attorneys shall work together in good faith to agree on the financing of such additional amounts. The Client shall have no liability to the Funder in the event the Litigation is unsuccessful.

2.02    Intentionally Omitted.

2.03    Client acknowledges that $500,000 of the Commitment is allocated to this matter from the Harrington case and deemed spent as of the date hereof on account of methodologies

# APPENDIX M

# APPENDIX M

United States Bankruptcy Court
District of Nevada

In re     Meta Materials Inc.                                          Case No.   24-50792
_____                               Chapter    7
                                           Debtor(s)

# VERIFICATION OF CREDITOR MATRIX

I, the Chief Executive Officer of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:     08/09/2024                            Signed by:

                                                *Uzi Sasson*
                                                1B8FAEEE2D9D4C6...
                                                Uzi Sasson/Chief Executive Officer
                                                Signer/Title

ARDUCAM TECHNOLOGY CO., LIMITED
4TH FLOOR, BUILDING C10, EAST DISTRICT
ZIDONG INTERNATIONAL CREATIVE PARK,
NO. 2 ZIDONG ROAD, QIXIA DISTRICT,
NANJING, JIANGSU, 210000


ASTRO CHEMICALS, INC
126 MEMORIAL DRIVE
SPRINGFIELD, MA 01104


BDO USA, LLP
ONE INTERNATIONAL PLACE
4TH FLOOR
BOSTON, MA 02110


BORDEN LADNER GERVAIS LLP
WORLD EXCHANGE PLAZA
100 QUEEN STREET SUITE 1300
OTTAWA ON, CANADA K1P 1J9


BRIAN M LEAVITT
DBA PROCESS
INNOVATIONS
PO BOX 70734
NORTH DARTMOUTH, MA 02747-0703


BROADRIDGE ICS
PO BOX 416423
BOSTON, MA 02241-6423


BROWN RUDNICK LLP
ONE FINANCIAL CENTER
BOSTON, MA 02111


BROWNSTEIN HYATT FARBER
SCHRECK LLP
675 15TH STREET, SUITE 2900
DENVER, CO 80202


CHRISTIAN ATTAR
2302 FANNIN ST., SUITE 500
HOUSTON, TX 77002

209 of 226

CHRIS BRITTEN
3711 N PURDUE AVE
FRESNO, CA 93727-7946

CHRIS MUELLER
449 MARMORA AVE
TAMPA, FL 33606-3821

CHRISTIAN ATTAR
1177 WEST LOOP S, STE 1700
HOUSTON, TX 77027-9031

CHRISTINE BYRNE
5227 NY-22
RHINIA NY 12501

CHRISTOFI KONTOS
189 VICTORIA DR
CLARK, NJ 07066-2035

CHRISTOPHER HOLGUIN
3595 S ORION CIR
APT V
WEST VALLEY CITY, UT 84119-6130

CHRISTOPHER K TAYLOR
1609 ABBEY OAK DR
VIENNA, VA 22182-1972

CHRISTOPHER MADISON
4829 ORINDA AVE
VIEW PARK, CA 90043-1605

CHRISTOPHER WALLACE
3000 S HULEN
SUITE 124 NUMBER 153
FORT WORTH, TX 76109-1914

CO Match GmbH
Wilhelmstra?e 118
Berlin, 10963

CRE INVESTMENTS LLC
4260 COURT DRIVE
SANTA CRUZ, CA 95062-5213

CYRUS ENTERPRISES, LLC
5801 PIEDMONT DR
ENGLEWOOD, CO 80111-1132

Christian Attar
2302 Fannin St., Suite 500
Houston, TX 77002-9136

Consilio LLC
1828 L Street NW Suite 1070
Washington, DC 20036-5146

Cornell University
c/o Adam Pence
118 Sage Place
Ithaca, NY 14850

Cornerstone Research Inc.
Two Embarcadero Center 20th Floor
San Francisco, CA 94111-3922

Cornerstone Research, Inc.
2 Embarcadero Ctr FX 20
San Francisco, CA 94111-3922

D&L MOTORS INC
130 MAIN STREET
FREDERICTON NEW BRUNSWICK E3A1C7
CANADA

D. F. KING & CO., INC.
48 Wall Street
New York, NY 10005-2922

DANIEL GEORGE HAAS
901 MARLBORO RD
LOTHIAN, MD 20711-2414

DAVID A STRAZ JR FOUNDATION TRUST
C/O SEACOST BANK RENAI CRABTREE
1031 W MORSE BLVD STE 323
WINTER PARK, FL 32789-3750

DAVID MOSHER
35 KESTREL COURT
HALIBUT BAY B3V1P5
CANADA

DAVID SOKOLOVE
6231 PGA BOULEVARD, SUITE 104
BOX 388
PALM BEACH GARDENS, FL 33418-4033

DAVID W AVISON
31D LIBERTY SQUARE RD
BOXBORO, MA 01719-1641

DEANNA EVERHART
331 W WALLACE ST
APT 311
BURGAW, NC 28425-5240

DEBRA A PAULISON
828 E LEMON ST
LAKELAND, FL 33801-5157

DECOMPIEGNE PROPERTY COMPANY
NO 20 LTD
500 W TEXAS AVENUE STE 940
MIDLAND, TX 79701-4292

DECOT HOLDINGS LTD
403 RUSSELL HILL ROAD,
TORONTO, ONTARIO M5P2S8
CANADA

DIG MEDIA INC.
1200-736 GRANVILLE ST
VANCOUVER BRITISH COLUMBIA V6Z1G3
CANADA

DLA Piper LLP (US)
650 South Exeter Street
Suite 1100
Baltimore, MD 21202-4576

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Broadridge Financial Solutions
1155 long Island Avenue
Edgewood, NY 11717

Brownstein Hyatt Farber Schreck LLP
675 15th Street, Suit 2900
Denver, CO 80202

Mediant Communications Inc.
PO Box 29976
New York, NY 10087-9976

WRIGHT-PATT CREDIT UNION, INC.
3560 PENTAGON BLVD.
BEAVERCREEK, OH 45431

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u) 350 ARBOR, LLC

(u) CHRISTIAN ATTAR

(u) GREAT AMERICAN GLOBAL PARTNERS, INC

(u) HMH ARBOR, LLC

(u) KASOWITZ BENSON TORRES LLP

(u) KP ARBOR, LLC

(u) ROBISON, SHARP, SULLIVAN & BRUST

(u) SCHNEIDER WALLACE COTTRELL KONECKY LLP

(u) WVP ARBOR, LLC

(du) 350 ARBOR, LLC

(u) ARDUCAM TECHNOLOGY CO., LIMITED
4th floor, Building C10, East District
Xidong International Creative Park, No.
Xidong Road, Qixia District.
Nanjing, Jiangsu, 210000

(d) Amster, Rothstein & Ebenstein LLP
405 Lexington Avenue
48th Floor
New York, NY 10174-0002

(d) BLACK HILLS PROPERTIES, LLLP
8449 GREENWOOD DRIVE
NIWOT, CO 80503-7245

(d) David Chester
c/o JOHNSON & GUBLER, P.C.
8831 W. Sahara Avenue
Las Vegas, NV 89117-5865

(u) Georgios Palikaras

(du) HMH ARBOR, LLC

(u) IOANNIS PAPAGIANNIS
FLAT 84 GREENHILL
PRINCE ARTHUR ROAD
CAMDEN NW3 5TZ LONDON

(d) Infinite Equity Inc.
PO Box 720151
San Francisco, CA 94172-0151

# APPENDIX N

# APPENDIX N

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| In re:                          | Case No.: 24-50792-hlb
| META MATERIALS INC.,            | (Chapter 7)
|                                 |
|          Debtor                 |
|                                 |
|                                 |
|                                 |
|                                 | **ORDER GRANTING MOTION TO DISQUALIFY**
|                                 | **JAMES W. CHRISTIAN AND CHRISTIANATTAR**
|                                 | **LAW FIRM**
|                                 |
|                                 |
|                                 |
|                                 |
|                                 |
|                                 |
| _____|

Upon consideration of the Motion by Scott Traudt, Third-Party Intervenor and Movant, to

Disqualify James W. Christian and Christian Attar Law Firm as Special Counsel, and pursuant to

11 U.S.C. § 327(a) and Federal Rule of Bankruptcy Procedure 2014, the Court finds that James

W. Christian and Christian Attar Law Firm hold adverse interests due to their status as creditors

of the Debtor (Doc. 9, Schedule E/F, filed 08/09/2024) and conflicts arising from representation

of Next Bridge Hydrocarbons, Inc., rendering them not disinterested persons.

**IT IS HEREBY ORDERED** that James W. Christian, Christian Attar Law Firm, and associated

firms, including Christian, Smith and Jewell and Christian Levine, are disqualified from serving

as special counsel to the Trustee in this bankruptcy case.

**DATED**: June ___, 2025

**SIGNED:**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| In re:
| META MATERIALS INC.,
|
|      Debtor
|
|
|
|
|
|
|
|
_____|

| Case No.: 24-50792-hlb
| (Chapter 7)
|
|
|
| **ORDER DECLARING RETENTION AGREEMENT**
| **VOID AB INITIO**
|
|
|
|

Upon consideration of the Motion by Scott Traudt to Declare the Retention Agreement Void, and

pursuant to 11 U.S.C. § 105(a), the Court finds that the retention agreement dated October 30,

2024 (Doc. 98-2) between the Trustee and Christian Attar Law Firm was procured through

fraudulent misrepresentations of disinterestedness (Doc. 1878), undermining the integrity of the

bankruptcy process.

**IT IS HEREBY ORDERED** that the retention agreement dated October 30, 2024, is declared

void ab initio.

**DATED**: June ___, 2025

**SIGNED:**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                 | Case No.: 24-50792-hlb
META MATERIALS INC.,                   | (Chapter 7)
                                       |
        Debtor                         |
                                       |
                                       |
                                       | **ORDER VACATING PROTECTIVE ORDERS**
                                       |
                                       |
                                       |
                                       |
                                       |
_____|

Upon consideration of the Motion by Scott Traudt to Vacate Protective Orders, and pursuant to

11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9018, the Court finds that

protective orders shielding discovery data, including those related to TD Ameritrade/Charles

Schwab, Inc. (Doc. 1934, dated 05/14/2025), impede the Trustee's ability to pursue estate claims

and shareholder interests, contrary to the equitable administration of the bankruptcy estate.

**IT IS HEREBY ORDERED** that all protective orders in this case, including Doc. 1934, are

vacated to facilitate discovery and estate recovery.

**DATED**: June ___, 2025

**SIGNED:**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| In re: | | Case No.: 24-50792-hlb |
|---|---|---|
| META MATERIALS INC., | | (Chapter 7) |

Debtor

**ORDER IMPOSING SANCTIONS AGAINST
JAMES W. CHRISTIAN AND
CHRISTIANATTAR LAW FIRM**

Upon consideration of the Motion by Scott Traudt to Impose Sanctions, and pursuant to 11 U.S.C. § 105(a), the Court finds that James W. Christian and ChristianAttar Law Firm engaged in bad-faith conduct by misrepresenting their disinterestedness (Doc. 1878) and causing the estate to incur $60,000 in payments to ShareIntel for unreliable data, harming the estate's interests.

**IT IS HEREBY ORDERED** that James W. Christian and Christian Attar Law Firm shall pay monetary sanctions in the amount of $60,000 to the estate within 30 days of this order.

**DATED**: June ___, 2025

**SIGNED**:

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                     | Case No.: 24-50792-hlb
META MATERIALS INC.,                       | (Chapter 7)
                                           |
        Debtor                             |
                                           |
                                           |
                                           | **ORDER REFERRING JAMES W. CHRISTIAN**
                                           | **FOR INVESTIGATION**
                                           |
                                           |
                                           |
                                           |
                                           |
                                           |
                                           |
                                           |
_____|

Upon consideration of the Motion by Scott Traudt to Impose Sanctions, and pursuant to 11

U.S.C. § 105(a), the Court finds that James W. Christian and Christian Attar Law Firm engaged

in bad-faith conduct by misrepresenting their disinterestedness (Doc. 1878) and causing the

estate to incur $60,000 in payments to ShareIntel for unreliable data, harming the estate's

interests.

**IT IS HEREBY ORDERED** that James W. Christian and Christian Attar Law Firm shall pay

monetary sanctions in the amount of $60,000 to the estate within 30 days of this order.

**DATED**: June ___, 2025

**SIGNED:**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                    | Case No.: 24-50792-hlb
META MATERIALS INC.,                      | (Chapter 7)
                                          |
        Debtor                            |
                                          |
                                          | **ORDER COMPELLING DISCLOSURE**
                                          | **OF LITIGATION FUNDING SOURCE(S)**
                                          |
                                          |
                                          |
                                          |
_____|

Upon consideration of the Motion by Scott Traudt to Compel Disclosure of the Litigation

Funding Source, and pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure

2014, the Court finds that the identity, amount, and disposition of litigation funding arranged by

James W. Christian, as referenced in Doc. 98-2, are material to ensuring transparency and

preventing conflicts of interest in the administration of the bankruptcy estate, particularly given

allegations of undisclosed counterparty interests.

**IT IS HEREBY ORDERED** that James W. Christian, Trustee Christina W. Lovato, and

Attorney Jeffrey L. Hartman shall, within **7 days** from the date of this order's authorization, file

with this Court and serve upon Movant Scott Traudt a verified statement disclosing: (1) the name

of the company or entity providing the litigation funding referenced in Doc. 98-2; (2) the total

amount of funds provided to date; and (3) the disposition and use of those funds, including any

disbursements or allocations.

**DATED**: June ___, 2025

**SIGNED:**