Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

*Attorneys for Non-Party Citadel Securities LLC*

Michael R. Hogue, Esq. (NSBN 12400)
10845 Griffith Peak Drive, Suite 600
GREENBERG TRAURIG, LLP
Las Vegas, Nevada 89135
Telephone: (702) 938-6909
hoguem@gtlaw.com

*Attorneys for Non-Party Anson Funds Management LP*

Jarrod L. Rickard, Esq. (NSBN 10203)
SEMENZA RICKARD LAW
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803
jlr@semenzarickard.com

*Attorneys for Non-Party Virtu Financial, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>META MATERIALS, INC.,<br><br>              Debtor. | Case No.: 24-50792-gs<br>Chapter 7<br><br>**NON-PARTY CITADEL SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL, LLC'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR FOR A PROTECTIVE ORDER** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT .................................................................................... 1

II. ARGUMENT ............................................................................................................. 3

    A.  The Trustee Lacks Standing Because Third-Party Stock Trades Are Not
        Property of the Estate ................................................................................ 3

        1.  The Debtor, and Hence the Trustee, Has No Cognizable Interest in
              Third-Party Stock Trades ................................................................ 3

        2.  The Trustee Cannot Bring the Claims Because They Belong to
              Investors, not the Estate ................................................................. 6

        3.  MMTLP and TRCH Cannot Constitute Estate Property ................. 8

        4.  *In Pari Delicto* Provides Another Independent Bar To Standing .... 9

    B.  The Trustee Cannot Satisfy Securities Law Standing Requirements ........ 11

    C.  The Trustee's Subpoenas Constitute Impermissible Harassment .............. 13

        1.  The Trustee Identified Litigation Targets Before Serving
              Subpoenas .................................................................................... 13

        2.  The *Genius* Lawsuit Confirms the Subpoenas are Unnecessary and
              Impermissible ............................................................................... 15

III. CONCLUSION ...................................................................................................... 17

The Non-Parties[1] respectfully submit this supplemental brief in response to the Court's request during the October 30, 2025 hearing (the "Hearing") for supplemental briefing addressing certain new issues and questions raised during the Hearing, including the threshold question of whether the Trustee has standing to pursue the discovery she seeks or assert the claims she contemplates.[2]

## I.    PRELIMINARY STATEMENT

The Subpoenas should be quashed and/or a protective order issued on three independent grounds beyond those already asserted in the Motion.

*First*, as a threshold matter, the Trustee lacks standing because stock owned by and traded among third parties is not estate property. During the Hearing, the Court asked whether "the debtor's equity" constitutes "the debtor's property." Hr'g Tr. 24:14-16. The answer is no. When third-party shareholders trade stock among themselves, the corporation whose stock is traded is not involved and has no property interest in those transactions—the stock is an asset belonging to the shareholders, not the corporation. Any claims arising from trades among shareholders belong to those shareholders alone, not the Debtor—as the Trustee herself confirmed when she explained that her contemplated litigation would "provide recovery for the shareholders." ECF No. 98-1 at 2.

Further, the facts of this bankruptcy proceeding and other litigation relating to the Debtor independently trigger the *in pari delicto* bar. Because the Debtor and its insiders allegedly manipulated the market, paying millions to settle charges brought by the U.S. Securities & Exchange Commission ("SEC") for inflating stock prices through a fraudulent "short squeeze," the Trustee (who stands in the Debtor's shoes) cannot pursue third parties for (purportedly) the same conduct.

---

[1]    Capitalized terms not defined in this supplemental brief have the meanings provided in the *Motion to Quash and/or for a Protective Order* [ECF No. 2088] ("Motion"). This supplemental memorandum of law is accompanied by the Declaration of Peter H. Fountain, separately filed contemporaneously herewith pursuant to Local Rule 9014(c)(2).

[2]    A copy of the transcript from the Hearing is attached hereto as Ex. 3.

*Second*, the Trustee cannot satisfy federal securities law standing requirements. Section 10(b) and Rule 10b-5 limit private actions to purchasers and sellers of securities. The Debtor has not claimed to be either the purchaser or the seller for any of the transactions for which she seeks discovery. In addition, reliance—an essential element of these claims—requires a showing that the Debtor purchased or sold securities believing the market was free of manipulation. Here, because the Debtor itself distorted the market through its own manipulation, it cannot through the Trustee establish the reliance necessary to assert securities law claims against the Non-Parties.

*Third*, the Subpoenas constitute impermissible harassment. The Trustee's billing records reveal a year-long campaign to identify litigation targets and develop theories of liability before serving the Subpoenas. By August 2024, the Trustee was developing "damages models" and conducting conflicts checks for her "list of potential defendants." Further, the Trustee does not need the Non-Parties' information. Indeed, the cases that the Trustee's counsel raised at the Hearing—*Harrington*, *Northwest Biotherapeutics*, and *Mullen Automotive*—survived motions to dismiss using only public data. And two weeks after the Hearing, the Trustee's same counsel filed *Genius Group Ltd. v. Citadel Securities LLC and Virtu Americas LLC*, alleging identical manipulation claims against two of the same Non-Parties here based entirely on "publicly available information." No. 25-cv-09546, ECF No. 1 at 1 (S.D.N.Y. Nov. 14, 2025). This further confirms what the Non-Parties have argued: the Trustee's counsel already possesses sufficient information to attempt to assert claims against the Non-Parties (assuming the Trustee even had standing to bring those claims, which she does not). The claimed need for voluminous records including internal trading data is pretextual—the Subpoenas seek to inappropriately gain a litigation advantage by abusing the applicable scope and process limitations in this Court to prematurely obtain information unavailable through proper civil procedures.

For these reasons, and those set forth in the Non-Parties' prior briefing, the Subpoenas should be quashed and/or a protective order issued.

## II.    ARGUMENT

### A.    The Trustee Lacks Standing Because Third-Party Stock Trades Are Not Property of the Estate[3]

#### 1.    The Debtor, and Hence the Trustee, Has No Cognizable Interest in Third-Party Stock Trades

During the Hearing, the Court specifically inquired as to whether "the debtor's equity" constitutes "the debtor's property." Hr'g Tr. 24:14-16. It does not. *See, e.g.*, *Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 596 (9th Cir. 2004) ("[U]nissued stock is not an interest of the debtor corporation in property; it is merely equity in the corporation itself."); *Uranga v. Geib (In re Paso Del Norte Oil Co.)*, 755 F.2d 421, 424 (5th Cir. 1985) ("It is widely recognized . . . that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders."); *31 Tozer Rd., LLC v. Greenberg (In re 31 Tozer Rd., LLC)*, 2018 WL 340028, at *2 (D. Mass. Jan. 9, 2018) ("A debtor corporation does not have a property interest in its own equity, and the purchase of equity is not an act against the debtor or the debtor's property.").

It is well-settled that shares of stock traded among third-party investors (specifically, transactions in secondary markets in which the issuer is not a party) are not property of the corporation. This stock represents ownership interests in the company—which are owned by the stockholders themselves—and are accordingly not the property of the company. *See, e.g.*, *Hansen v. Finn (In re Curry & Sorensen, Inc.)*, 57 B.R. 824, 829 (B.A.P. 9th Cir. 1986) ("A share of capital stock represents a unit of ownership interest and has no extrinsic value to the corporation itself. Since an action directed at recovery of corporate stock could only affect equitable ownership of the corporation and would not restore property to the estate or avoid an estate obligation, then it is not a transfer subject to question under Section 548.") (internal citations omitted); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("Tender offers contemplate transfers of stock by

---

[3]  At the Hearing, the Court recognized the importance of the standing issue: "the movants have articulated that this will never inure to the debtor's benefit, and they have raised a standing issue . . . . [H]aving traveled this road this far, I think it's important to get that clarity to see where that road ends for this motion." Hr'g Tr. 74:5-12.

stockholders to a third party and do not themselves implicate the internal affairs of the target company.").[4]

The Trustee's investigation thus rests on a fundamental and threshold legal error: the Trustee incorrectly assumes that the Debtor's publicly-traded stock, or trades of that stock among third-party investors in the secondary market, constitute property of the bankruptcy estate. It does not, and any alleged causes of action related to stock trades belong to the investors that traded the stock—not the Debtor. The Bankruptcy Code imposes a fundamental limitation on a trustee's authority: a trustee may only pursue causes of action that constitute property of the estate under 11 U.S.C. § 541(a)(1). A bankruptcy estate's "property" includes "all legal or equitable interests *of the debtor* in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). This is a straightforward limitation: the estate's interest in legal claims encompasses "only those actions that the *debtor could have brought* prior to or when she filed her bankruptcy petition." *In re Ross*, 548 B.R. 632, 639 (Bankr. E.D.N.Y. 2016), *aff'd sub nom. Mendelsohn v. Ross*, 251 F. Supp. 3d 518 (E.D.N.Y. 2017) (emphasis added); *see also In re Litig. Prac. Grp. P.C.*, 2025 WL 2984609, at *3-4 (Bankr. C.D. Cal. Oct. 22, 2025) ("To have standing, [the] Trustee is required to identify an estate-owned cause of action that authorizes a trustee to proceed") (collecting cases in the Ninth Circuit). Moreover, the Bankruptcy Code expressly limits a trustee to "interests of the debtor in property," as the bankruptcy "trustee's rights are no greater than the rights of [the] debtor." *Sugarman v. Taylor* (*In re Yellow Cab Coop., Inc.*), 602 B.R. 357, 361 (Bankr. N.D. Cal.

---

[4]    Just as the Trustee lacks standing to bring claims concerning stock owned by third parties, the Court lacks jurisdiction to hear these claims because they do not involve property of the estate. *See In re Paso Del Norte Oil Co.*, 755 F.2d at 424 ("Ownership of the debtor's stock as between third parties being the sole issue in dispute, the bankruptcy court lacked jurisdiction to resolve the dispute since neither the debtor nor its property was involved."); *see also id.* ("[I]f, as in [this court's prior opinion in] *In re Texas Consumer Finance*, the bankruptcy court 'has no jurisdiction to order or restrain disposal of [the debtor's] stock,' … then, a fortiori, it could not have jurisdiction to determine the validity of a stock transfer which was consummated before the corporation was a debtor. Neither dispute concerns the debtor or its property."); *In re Journal-News Corp.*, 193 F.2d 492 (2d Cir. 1951) ("But the debtor has no property interest in the shares of its stock owned by its stockholders. Consequently the court had no jurisdiction to restrain disposal of their stock.").

2019) (quotations and citation omitted).  Because the Debtor could not have brought the claim, neither can the Trustee.

The Trustee's own authority confirms her lack of property interest here.  During the Hearing, the Trustee's counsel cited *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (Bankr. S.D. Tex. Apr. 4, 2023), ECF No. 334, attached hereto as Exhibit 5), as purported evidence that trustees may seek trading-related information, *see* Hr'g Tr. 67:14-23.  But *Sorrento* actually stands for the opposite point: it involved stock in a separate, non-debtor company in which the Debtor itself held a majority equity interest—an actual asset of the bankruptcy estate.  *Sorrento*, ECF No. 330 ¶ 13, attached hereto as Exhibit 4.  In other words, the debtor in *Sorrento* was a third-party shareholder of a non-debtor company, and the debtor needed to identify other shareholders in that separate company to ensure proper delivery of proxy materials for a shareholder meeting that directly affected the debtor's ability to govern and protect its own investment in that separate, non-debtor company.  *Id.*  Unlike in *Sorrento*, the trades at issue here involve stock in Meta Materials bought and sold by third parties in secondary market transactions in which Meta Materials was not involved, and so the estate has no property interest in that stock.  *Sorrento* thus confirms that a trustee may investigate trading activity only when the debtor has an actual property interest in a non-debtor's stock at stake—precisely what is missing here.

The Trustee's "financial condition" argument fails for the same reason.  Specifically, the Trustee contends that trading activity in Meta Materials' stock affects the "financial condition" of the Debtor and therefore falls within Rule 2004's scope.  *See* Hr'g Tr. 73:6-10 (asserting the third-party trading "probably causationally . . . caused the whole company to go into bankruptcy").  But this conflates effect on stock with ownership of stock.  If the Trustee's theory were correct—that any secondary market trading among third parties affecting stock price relates to the debtor's "financial condition" and thus justifies Rule 2004 discovery—then every publicly traded debtor could subpoena every market participant who ever traded its securities, an absurd result.  This is not the law, and courts have rejected similarly expansive theories.  *See, e.g.*, *In re J&R Trucking, Inc.*, 431 B.R. 818, 822-23 (Bankr. N.D. Ind. 2010) (denying Rule 2004 examination where it was employed as "a private collection device").

Without a property interest in third-party stock trades, the Trustee lacks standing to pursue the underlying claims related to such trades or to compel discovery regarding those trades.

### 2. The Trustee Cannot Bring the Claims Because They Belong to Investors, not the Estate

The Trustee's application to retain litigation counsel further establishes that investors, not the estate, own the claims. The Trustee expressly stated that the litigation would "provide recovery for the shareholders." ECF No. 98-1 at 1-2. This admission is dispositive under Ninth Circuit bankruptcy precedent establishing that this Debtor has no property interest with which to confer standing on the Trustee. *See supra* at 3.

Tellingly, the Trustee cannot identify any injury to the Debtor itself. The Trustee asserts in conclusory fashion that alleged "market manipulation led to serious financial losses for the Debtor" and that "manipulative acts of certain defendants … caused the whole company to go into bankruptcy." ECF No. 2206, Trustee's Opposition Brief ("Opp'n") at 4-5, ¶ 6; Hr'g Tr. 73:4-8. The Trustee does not, however, describe such losses. Nor could she, as the Debtor's stock that is owned and traded by third parties is not the Debtor's property—it belongs to investors that bought and sold the stock on the open market. The alleged harm to investors who traded Meta Materials stock and purportedly suffered losses when buying or selling that stock is a shareholder injury, not a Debtor injury. Without an injury to the estate, the Trustee has no claim to vindicate.

In the Ninth Circuit, "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors and may only assert claims held by the bankrupt corporation itself." *In re Berjac of Oregon*, 538 B.R. 67, 84 (D. Or. 2015) (citing *Smith v. Arthur Andersen LLP,* 421 F.3d 989, 1002 (9th Cir. 2005)) (dismissing claim by plaintiff trustee); *see also Caplin v. Marine Midland Grace Trust Company of New York*, 406 U.S. 416, 428–433 (1972) (explaining that the trustee lacked standing to assert claims on behalf of the debtor's creditors relating to notes issued by the debtor); *Wyle v. Howard, Weil, Labouisse, Freidrichs Inc. (In re Hamilton Taft & Co.)*, 176 B.R. 895, 902 (N.D. Cal. 1995) ("A debtor's bankruptcy trustee . . . is not authorized to pursue every action that creditors of the debtor might pursue.").

Courts police this standing requirement to prevent bankruptcy trustees from pursuing claims that actually belong to investors. *See Williams v. Cal. First Bank*, 859 F.2d 664, 666 (9th Cir. 1988) (Trustee lacked standing to assert federal securities law claims assigned to the estate because "the investors plainly remain the real parties in interest in these actions"). That is because it is the investors who are actually harmed, not the trustee, and the investors may pursue their individual claims outside of this bankruptcy case. *See Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) ("But there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct—not derivative—claim against the third party, which only the creditor himself can enforce."). Similarly, where a claim "is entirely derived from the creditor investors, and would not exist but for their existence and involvement in the bankruptcy," the Trustee "does not have standing to pursue t[he] claim." *Hoskins v. Citigroup, Inc.* (*In re Viola*), 469 B.R. 1, 8 (B.A.P. 9th Cir. 2012), *aff'd*, 583 Fed. Appx. 669 (9th Cir. July 16, 2014).

*Williams* and *In re Viola* are both instructive. Prior to declaring bankruptcy, the debtor in *Williams* financed its business with investment contracts and notes sold to third parties. *Williams*, 859 F.2d at 665. Once the Chapter 7 trustee was appointed, he brought claims on behalf of the estate and the investors against California First Bank for "state and federal securities law violations arising from the Bank's participation in, knowledge of, or approval of the debtor's 'Ponzi' scheme." *Id.* California First Bank moved to dismiss for lack of standing. *Id.* On appeal, the Ninth Circuit agreed that the trustee had no standing because, despite the fact the estate was a party to the claims, "the investors plainly remain the real parties in interest in these actions" as they would receive the benefits of a favorable judgment, even if the Trustee may have recouped administrative costs. *Id.* at 666. In *In re Viola*, the trustee similarly lacked standing to bring a claim for aiding and abetting fraudulent transfers against defendants alleged to have facilitated the transfers. 469 B.R. at 7. Applying *Williams*, the Ninth Circuit concluded that because "any recovery of funds from the . . . defendants will go straight to the investors" and because the trustee "cannot bring a claim on behalf of the estate against the bank," the trustee lacked standing. *Id.* at 8-9.

7

The Trustee here—like the trustees in *Williams* and *In re Viola*—seeks to pursue claims for alleged securities law violations that would compensate investors for losses they purportedly suffered in trading the Debtor's securities in the secondary market. *See generally*, ECF No. 98-1; Hr'g Tr. 71:13-16 (discussing Section 10b-5 claims). The Ninth Circuit's reasoning applies with equal force here: any recovery would flow directly to the shareholders who (allegedly) lost value when trading Meta Materials stock at (allegedly) manipulated prices, not to the estate. The Trustee therefore lacks standing to bring such claims.

### 3. MMTLP and TRCH Cannot Constitute Estate Property

The Subpoenas seek information about three stock symbols: MMAT, MMTLP, and TRCH. As demonstrated above, stock owned by third parties is not estate property. Regardless, MMTLP and TRCH cannot constitute estate property for the independent reasons that the Trustee has disclaimed any interest in MMTLP, and both MMTLP and TRCH had ceased to exist before the filing of the Debtor's bankruptcy petition. In any event, the Debtor is admittedly insolvent— so it therefore had no equity (including in MMAT) when it filed for bankruptcy under Chapter 7 of the Bankruptcy Code.

MMTLP was Meta Materials, Inc. Series A Preferred Stock, provided as a dividend representing 100 percent of the common stock of Next Bridge Hydrocarbon ("NBH"), a subsidiary of Meta Materials. ECF No. 2138 at 4:11-24. The Trustee, however, has repeatedly disclaimed any interest in MMTLP, arguing that owners of MMTLP stock "do[] not have constitutional standing to participate in this chapter 7 case" because they represent "interests in NBH, a legally separate entity." ECF No. 2138 at 5:1-15. The Trustee has made similar representations to other courts. In the FINRA motion to quash proceedings, an MMTLP shareholder sought to intervene. The Trustee opposed the motion to intervene on the basis that the shareholder "is not an interested party" and consequently "lacks standing" to intervene in the discovery dispute between the Trustee and FINRA. ECF No. 2234, Fountain Suppl. Decl. ("Reply Exhibits") Ex. 1 at 8. Tellingly, the Trustee affirmatively stated that the "*In re Meta Materials* bankruptcy only involves the ticker MMAT." *Id.* These statements are judicial admissions and alone are a basis for finding the Trustee lacks standing and quashing the subpoenas.

The history of MMTLP further underscores that it is not estate property.  In December 2022, each holder of MMTLP received one share of NBH in exchange for each share of MMTLP held as of the record date.  ECF No. 2138 at 5:4-7.  Once the exchange was completed, "all shares of [MMTLP] were automatically cancelled," MMTLP was "no longer tradeable," and holders of that stock "ceased to have any rights."  *Id.* at 5:7-11.  MMTLP thus ceased to exist nearly two years before the bankruptcy petition was filed.  Because the Bankruptcy Code limits estate property to "interests of the debtor in property *as of the commencement of the case*," 11 U.S.C. § 541(a)(1) (emphasis added), MMTLP cannot be estate property.

The same defect applies with even more force to TRCH, which is the predecessor to MMAT.  Reply Exhibits, Ex. 2 at 12.  TRCH, which was previously listed on the Nasdaq, stopped trading in June 2021 when the Meta Materials-Torchlight Energy Resources merger closed, more than three years before the bankruptcy petition date.  *Id.; see also* ECF Nos. 98 at 2, 98-1 at 1.  TRCH, therefore, had not existed for more than three years before Meta Materials (the Debtor) filed for bankruptcy.  TRCH, and any claims related to it, cannot be property of the estate.

### 4. *In Pari Delicto* Provides Another Independent Bar To Standing

The *in pari delicto* doctrine also independently bars any potential claims related to these stocks and trades of those stocks among third parties.  The Trustee stands in the shoes of the Debtor:  the Trustee's claims are "no stronger than they were when actually held by the debtor," and are, "of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor" itself.  *Official Comm. of Unsecured Creditors v. R.G. Lafferty & Co., Inc.*, 267 F.3d 340, 356-57 (3d Cir. 2001) (quotations and citations omitted); *see also Schnelling v. Thomas (In re Agribiotech, Inc.)*, 2005 WL 4122738, at \*5-8 (D. Nev. Apr. 1, 2005) (holding that the *in pari delicto* doctrine applies to bankruptcy trustees).  The *in pari delicto* doctrine has been applied by bankruptcy courts to bar trustees from pursuing claims on behalf of bankruptcy estates.  *See, e.g.*, *In re HVI Cat Canyon, Inc.*, 658 B.R. 558, 585 (Bankr. C.D. Cal. 2024) (dismissing claim, noting that because defendant "could assert the in pari delicto defense against the Debtor, she may assert it against the Trustee.").

The doctrine mandates dismissal of claims when the Debtor "participated in the wrongdoing that was a substantial cause of the alleged damages." *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 512, 522 (D. Del. 2012) (applying *in pari delicto* defense to dismiss claims without leave to amend).  And, the doctrine may be applied broadly in market manipulation cases—the debtor and defendant need not have engaged in identical schemes for *in pari delicto* to bar the claim.  *See Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1091 (2d Cir. 1997) (applying the doctrine even where the "violation of the CEA by [appellee] in this case is of a different quality than the market manipulation in which [appellant] participated, the lack of an identical nature does not destroy the defense.").  Even when insiders, such as a "manager" of a company "perpetrated the [] scheme," a trustee "is barred from recovering from others for its own wrongdoing." *Donell v. Fid. Nat. Title Agency of Nevada, Inc.*, 2012 WL 1669421, at *6 n.4 (D. Nev. May 11, 2012).

Here, the Debtor and its insiders orchestrated the market manipulation the Trustee now attempts to attribute to others.  As the Trustee herself has admitted, the SEC "filed charges against Meta Materials and its leadership, alleging that they manipulated the company's stock in 2021 by improperly issuing a stock dividend prior to a merger between Meta Materials' predecessor companies." Reply Exhibits, Ex. 2 at 10.  Meta Materials settled its charges with the SEC in 2024. *See SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations*, U.S. Securities and Exchange Commission (June 25, 2024), https://www.sec.gov/newsroom/press-releases/2024-77, attached hereto as Exhibit 1  According to the SEC Order Instituting Cease-and-Desist Proceedings, in June 2021, the Debtor raised $137.5 million in an at-the-market offering by engaging "in a scheme to inflate the price of its stock and defraud investors through numerous material misstatements and omissions about the potential value of a stock dividend to be issued as part of the merger."  Administrative Proceeding No. 3-21976, https://www.sec.gov/files/litigation/admin/2024/33-11292.pdf., attached hereto as Exhibit 2.  In fact, that manipulation allowed the Debtor to sell 16.2 million shares "for tens of millions of dollars more than it could have absent its efforts to inflate its stock price." *Id.*

The SEC's charges against the CEOs of Meta Materials and Torchlight Energy Resources, Inc. proceeded in federal district court.  *See generally*, *SEC v. Brda*, 2024 WL 4817475, at *1

(S.D.N.Y. Nov. 18, 2024).  Their misconduct, and knowledge of the scheme, are imputed to the corporation.  *See Tsatas v. Airborne Wireless Network, Inc.*, 2025 WL 973840, at *20 (D. Nev. Mar. 31, 2025) (explaining a corporate officer's actions and knowledge are imputed to the corporation unless the "'agent's actions [are] completely and totally adverse to the corporation.'" (quoting *Glenbrook Cap. Ltd. P'ship v. Dodds (In Re AMERCO Derivative Litig.),* 252 P.3d 681, 695 (Nev. 2011)).  The Trustee has been working with former CEO George Palikaras (one of the individuals whom the SEC has sued) so closely they have considered a "joint privilege agreement." ECF No. 2265-6, Sept. 27, 2024.  Relatedly, the Debtor also settled a class action case alleging violations of federal securities laws on behalf of investors in Meta Materials securities.  *In re Meta Materials Inc. Sec. Litig.*, 1:21-cv-07203 (E.D.N.Y. Jan. 3, 2022).  The Debtor therefore cannot pursue third parties for conduct in which it and its insiders participated—and accordingly, neither can the Trustee.

## B.    The Trustee Cannot Satisfy Securities Law Standing Requirements

Even if the Trustee's investigation concerned property of the estate—which it does not—she also lacks standing to bring claims against the Non-Parties under the federal securities laws. To bring a market manipulation claim, the Trustee would need to show the Debtor was a "purchaser[] or seller[]" of securities.  *See Beckett v. Brinx Res., Ltd.*, 2014 WL 1394160, at *3 (D. Nev. Mar. 24, 2014) ("[O]nly those persons claiming damages in connection with the purchase or sale of securities may bring an action under Section 10(b) or Rule 10b–5.").  She would also be required to show "reliance on an assumption that the market was free of manipulation. . . ." *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1236 (C.D. Cal. 2015) (quotations and citation omitted).  The Trustee has not and cannot show either of the foregoing, each of which independently deprives her of standing.

On October 31, 2024, the Trustee stated that her investigation is in aid of potential "litigation related to suspected stock manipulation."  *See* ECF 98-1 at 1.  At the Hearing, she clarified that she seeks to bring Section 10(b) and Rule 10b-5 claims.  *See* Hr'g Tr. 39:15-45:4. But the Trustee cannot satisfy the standing requirements for either claim.

Under Section 10(b), it is "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  To assert a claim under this provision, the Trustee must plead:

> (1) . . . use or employ[ment of] any manipulative or deceptive device or contrivance; (2) scienter, *i.e.* wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . . as "transaction causation;" (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the manipulative or deceptive device or contrivance and the loss.

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (citation omitted).  Two defects, each dispositive, deprive the Trustee of any such standing.

*First*, it is a black letter requirement that "the plaintiff class for purposes of [Section] 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32 (1975); *see also Beckett*, 2014 WL 1394160, at *3 ("[O]nly those persons claiming damages in connection with the purchase or sale of securities may bring an action under Section 10(b) or Rule 10b–5.").  Because the Trustee, standing in the shoes of the Debtor, was neither a purchaser nor a seller of the securities at issue, she lacks standing for any claims.  *Slaughter v. Lab'y Med. Consultants, Ltd.*, 2011 WL 1486228, at *2 (D. Nev. Apr. 19, 2011) ("Only a purchaser or seller of securities has standing to bring action under section 10(b) and Rule 10b–5.").

Importantly, the Debtor must have been the purchaser or seller "of the stock in question." *Blue Chip*, 421 U.S. at 742.  In other words, to have standing, the Trustee would need to be able to allege that Meta Materials did more than merely *hold* the stock because "[t]ypically, a 'holder' of securities lacks standing to prosecute a claim under the federal securities laws." *Ashland Inc. v. Morgan Stanley & Co.,* 652 F.3d 333, 337 n.2 (2d Cir. 2011); *see also Brown v. Kinross Gold, U.S.A.*, 343 F. Supp. 2d 957, 962-63 (D. Nev. 2004) (No standing where plaintiffs "did not tender any shares" and instead "still own their shares of Preferred.").  Further, to the extent the Trustee continues to argue that the "issuer that sold the shares . . . [is] the seller in this case" or that "they're

12

1  the only seller," Hr'g Tr. 44:7-8, 73:1, that argument is unsupported.  Once the stock was issued

2  and purchased by another party, it ceased to be property of the Debtor.  *See supra* at 3-5.

3      *Second*, the Trustee also has no standing due to the Debtor's own misconduct.  Like the *in*

4  *pari delicto* doctrine discussed above, Section 10(b) and Rule 10b-5 have a similar limitation that

5  deprives the Trustee of standing.  An essential element of any market manipulation claim is that

6  the purchases and sales were made in reliance on "an assumption of an efficient market free of

7  manipulation."  *ScripsAmerica*, 119 F. Supp. 3d at 1249 (quotations and citation omitted).  That

8  assumption does not plausibly exist here. Having paid millions in settlements concerning its own

9  market manipulation, *see supra* at 10, the Trustee cannot establish the fundamental requirement

10  that the Debtor was relying on an assumption of market efficiency.

11      *Finally*, the Trustee's reliance on other securities cases, including *Profilet v. Cambridge*

12  *Financial Corp.*, 231 B.R. 373 (Bankr. S.D. Fla. 1999), continues to be unavailing.  As explained

13  in the Reply, *Profilet* involved a debtor that allegedly was itself defrauded in connection with the

14  sale of its own securities.  *Id.* at 377-78.  Here, not only was the Debtor not a purchaser or seller

15  of the securities at issue, but to the extent any fraud occurred, it was committed *by the Debtor*

16  against its own shareholders.  Under these circumstances, there is no standing for a market

17  manipulation claim.

18      **C.    The Trustee's Subpoenas Constitute Impermissible Harassment**

19      Rule 2004 is not without limits and "may not be used for the purposes of abuse or

20  harassment."  *In re Art & Architecture Books of 21st Century*, 2019 WL 9243053, at *6 (Bankr.

21  C.D. Cal. Dec. 6, 2019) (quotations and citation omitted).  The Trustee's own statements, billing

22  records, and recent litigation filings demonstrate that the Subpoenas constitute such harassment.

23      **1.    The Trustee Identified Litigation Targets Before Serving Subpoenas**

24      The Trustee's billing records reveal that her "investigation" is actually a carefully

25  orchestrated litigation campaign targeting specific Non-Parties identified over a year ago,

26  transforming Rule 2004 from a legitimate discovery device into a tool of harassment.  As early as

27  August 2024, the Trustee was developing "potential damage[s] models for stock manipulation,"

28  ECF No. 2265-6, Aug. 23, 2024, conducting conflicts checks for her "list of potential defendants,"

ECF No. 2265-5, Sept. 10, 2024, and reviewing "the stock fraud packet from Wes Christian's office," ECF No. 2265-6, Sept. 23, 2024—all while the Non-Parties continue to be told by the Trustee that no definitive decisions about litigation targets have been made. *E.g.*, Hr'g Tr. 37:13 ("I don't even think that decision has been made yet."). By November 2024, months before the Subpoenas were even served, counsel was drafting a motion to compel. ECF No. 2266-1, Nov. 20, 2024. By February 2025, the Trustee was monitoring "a civil action filed against Anson Funds, one of the Rule 2004 targets" while adding "Citadel Securities and Virtu . . . to the list." ECF No. 2265-6, Feb. 4 & 24, 2025.

This timeline demonstrates the Subpoenas were not issued to investigate potential claims but to improperly obtain litigation discovery against litigation targets before suing them. The Trustee identified her targets, developed her theories, and calculated her damages before serving a single subpoena. She used Rule 2004 not for investigation but as a backdoor to obtain discovery she could not otherwise access without first filing an adversary proceeding.

The Trustee's own cited cases refute her claimed need for the Non-Parties' voluminous internal trading data. During the Hearing, the Trustee's counsel cited *Harrington Global Opp. Fund, Ltd. v. CIBC World Markets Corp.*, No. 1:21-cv-00761 (S.D.N.Y. Jan 27, 2021) ("*Harrington*"), *Northwest Biotherapeutics Inc. v. Canaccord Genuity LLC*, 1:22-cv-10185 (S.D.N.Y. Dec. 1, 2022) ("*Northwest Bio*"), and *Mullen Automotive, Inc. v. IMC Financial Markets*, 1:23-cv-10637 (S.D.N.Y. Dec. 6, 2023) ("*Mullen Automotive*"), as evidence that spoofing claims can be brought against market makers. Hr'g Tr. 39:1-23, 42:6-9. But all three of these complaints were based solely on publicly available trading data. *E.g.*, *Harrington*, 585 F. Supp. 3d 405, 421 (S.D.N.Y. 2022) (noting plaintiff's complaint relied on data from its own pre-suit investigation); *Northwest Bio*, 2025 WL 368717, at *6 (S.D.N.Y. Jan. 31, 2025), *report and recommendation adopted,* 2025 WL 934319 (S.D.N.Y. Mar. 26, 2025) (complaint relied on public "data available from OTC Link."). And all three survived motions to dismiss. *See id.*; *Mullen Automotive*, 2025 WL 951501, at *3 (S.D.N.Y. Mar. 28, 2025) (finding plaintiffs "ple[d] the scheme with particularity" based on public data used in the complaint). These cases demonstrate that the Trustee does not need anything more than the publicly available data it already has.

14

The Trustee's counsel referred to *Harrington* as the "ringleader" of these cases,  Hr'g Tr. 39:1-2.  But the *Harrington* plaintiff is a hedge fund that alleged that it had bought and sold the Concordia securities at issue, *Harrington*, 585 F. Supp. 3d at 411-12—nothing like the Debtor here, an insolvent company that has not alleged that it purchased or sold its own securities at issue. Counsel also failed to mention that, in *Harrington*, the plaintiff sought discovery from two of the instant Non-Parties, which was denied.  *E.g.*, Motion at 15:1-3.  In *Northwest Bio*, the company alleged that transactions it undertook in its own stock (*i.e.*, as a buyer or seller) were impacted by alleged spoofing.  *Northwest Bio*, 2025 WL 368717, at *6.  The Court narrowed the case to only the specific alleged spoofing episodes that had occurred on trading days on which the plaintiff alleged it had sold its own stock at a price impacted by the purported spoofing.  *Id.*  The court in *Mullen Automotive* likewise focused on whether the plaintiffs were in fact the sellers of the Mullen Automotive shares.  *Mullen Automotive*, 2025 WL 951501, at *2.  Contrary to the Trustee's representations, these cases only confirm the impropriety of the Subpoenas and that the Trustee lacks standing.

### 2.    The *Genius* Lawsuit Confirms the Subpoenas are Unnecessary and Impermissible

Post-Hearing developments provide additional reasons to quash the Subpoenas. On November 14, 2025—just two weeks after the Hearing—members of the Trustee's litigation team filed *Genius Group Ltd. v. Citadel Securities LLC and Virtu Americas LLC*, No. 1:25-cv-09546 (S.D.N.Y. Nov. 14, 2025) (which was presumably drafted before the Hearing).  The complaint (a copy of which is attached hereto as Exhibit 6) was filed by Wes Christian of Christian Attar, the same attorney representing the Trustee here, and names two of the three Non-Parties as defendants: Citadel Securities and Virtu.  The complaint alleges the same manipulation theories the Trustee has articulated in this case and covers an overlapping time period.  For example, Mr. Christian alleged both during the Hearing and in the *Genius* complaint:

- The Non-Parties engaged in "naked short sale[s]."  *Compare* Hr'g Tr. 42:12-21; *with Genius*, ECF No. 1 ¶ 46 ("Defendants engaged in widespread 'naked short-selling.'");

- The Non-Parties are "abusing" their status as bona fide market makers "in these cases." *Compare* Hr'g Tr. 42:22-43:2; *with Genius*, ECF No. 1 ¶ 48 (alleging "the data demonstrates that the vast majority of [one Non-Parties'] off-exchange trading was . . . inconsistent with bona fide market-making.");

- The Non-Parties are "disseminat[ing] . . . false information in the marketplace" to effectuate their alleged manipulation. *Compare* Hr'g Tr. 45:2-3 *with Genius*, ECF No. 1 ¶ 46 (describing the Non-Parties' "effort to send false information regarding supply and demand to the market . . .").

Most significantly, the *Genius* complaint further confirms what the Non-Parties have argued all along: the Trustee's counsel can—and has, in other contexts and jurisdictions—bring these same claims using only publicly available information, without any need for the invasive and burdensome discovery demanded here. The *Genius* complaint is explicit about its evidentiary foundation. Plaintiff Genius Group alleges that its complaint is "based on the investigation conducted by and through Plaintiff's attorneys, which include, among other things, a review and analysis of publicly available information relating to Genius; and statistical and economic analyses of trading data relating to Genius securities." *Genius*, ECF No. 1 at 1. The complaint states that "[d]etecting manipulative trading schemes is challenging when relying solely on publicly available data," *id.* at ¶ 33, but nonetheless proceeds to allege across 36 pages—with supporting charts and graphs—purported spoofing periods, trading patterns, short positions, and damages calculations. *E.g.*, *id.* at ¶¶ 45, 50, 54, 56.

The filing of the *Genius* complaint directly refutes the Trustee's central justification for the Subpoenas. The Trustee has insisted here that she needs "internal information from third parties, like the [Non-Parties], to provide trading data to further aid the investigation" because "publicly available information alone is not adequate to identify culpable parties and provide sufficient allegations about their wrongdoing." Opp'n at 18:8-22. And the Trustee has argued that "the publicly available information underlying the reference in the Summary of Potential Litigation does not provide detailed trade data that may inform the Trustee of potential claims with the requisite particularity to survive Rule 12 scrutiny." *Id.* at 18:24-27. Yet the *Genius* complaint— filed by the very same lawyers making these arguments—demonstrates their belief that such claims

*can* be pled with specificity using public information alone.  During the Hearing, the Trustee argued that market-wide data from NASDAQ, DTCC, and FINRA could not substitute for party-specific discovery.  *See* Hr'g Tr. 17:4-21. The *Genius* complaint is only the latest case which proves that *no* non-public data is required for the Trustee to assert her claims.

Rule 2004 prohibits this type of abuse, and an inference of harassment is unavoidable:  as courts have cautioned, Rule 2004 cannot be employed to "circumvent the procedural safeguards provided [to] a litigant" in ordinary civil litigation.  *In re GHR Energy Corp.*, 35 B.R. 534, 538 (Bankr. D. Mass. 1983); *In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002) ("Rule 2004 examinations [may] not be used as a tactic to circumvent the safeguards of the Federal Rules of Civil Procedure.").  The Trustee cannot have it both ways, on the one hand telling this Court public information is insufficient to bring claims while simultaneously filing complaints alleging market manipulation based on public information in other courts.  Put differently, she cannot argue that the discovery sought here is necessary to investigate "potential claims" when her counsel has already filed suit asserting those exact claims without such discovery.  The *Genius* lawsuit demonstrates that the Subpoenas serve no legitimate bankruptcy administration purpose and instead represent an attempt to gain a litigation advantage through the bankruptcy process that the Trustee's counsel could not obtain through proper civil discovery procedures.

For these additional reasons, the Subpoenas should be quashed and/or a protective order entered with respect thereto.

III.    **CONCLUSION**

The Non-Parties respectfully request that the Court quash the Subpoenas in their entirety and/or enter a Protective Order prohibiting the Trustee from seeking the subject discovery from the Non-Parties.

Respectfully submitted,

DATED:  December 16, 2025

**McDONALD CARANO LLP**

*/s/ Ryan J. Works*
Ryan J. Works, Esq. (NSBN 9224)
Jimmy F. Dahu, Esq. (NSBN 17061)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
rworks@mcdonaldcarano.com
dahu@mcdonaldcarano.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Peter H. Fountain, Esq. (admitted *pro hac vice*)
Madeleine Zabriskie, Esq. (admitted *pro hac vice*)
295 Fifth Avenue
New York, NY 10016
peterfountain@quinnemanuel.com
madeleinezabriskie@quinnemanuel.com

*Attorneys for Non-Party Citadel Securities LLC*

**GREENBERG TRAURIG, LLP**

*/s/ Michael R. Hogue*
Michael R. Hogue, Esq. (NSBN 12400)
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
hoguem@gtlaw.com

Sylvia E. Simson, Esq. (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY 10017
Sylvia.Simson@gtlaw.com

Alan J. Brody, Esq. (admitted *pro hac vice*)
500 Campus Drive, Suite 400
Florham Park, NJ 07932
brodya@gtlaw.com

*Attorneys for Non-Party Anson Funds Management LP*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SEMENZA RICKARD LAW**

By */s/ Jarrod L. Rickard*
Jarrod L. Rickard, Esq., (NSBN 10203)
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
jlr@semenzarickard.com

**DAVIS WRIGHT TREMAINE, LLP**

Michael Rella, Esq. (admitted *pro hac vice*)
Shanaye Carvajal, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
michaelrella@dwt.com
shanayecarvajal@dwt.com

*Attorneys for Non-Party Virtu Financial, LLC*