UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

RECEIVED
AND FILED

MAG

FEB 11 2026

In re:
META MATERIALS, INC.,
Debtor

Case No. 24-50792
Chapter 7

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

## MOTION FOR DETERMINATION AND CLARIFICATION OF RECORD REGARDING DISCLOSURES, CONFLICTS OF INTEREST, DATA ACQUISITION, VERIFICATION OF SUBPOENA COMPLIANCE, LITIGATION FUNDING, AND PRESERVATION OF EVIDENCE

### TABLE OF CONTENTS

INTRODUCTION..................................................................1

JURISDICTION.................................................................. 2

INCORPORATION OF PRIOR SUBMISSIONS................................ 2

COMPLIANCE WITH COURT-DIRECTED MEET AND CONFER....................... 3

FACTUAL BACKGROUND......................................................... 4

A. Parties and Relevant Entities................................................ 4

B. FINRA self-revised the META corporate action and imposed a U3 halt
effective through deletion of MMTLP...................................... 6

C. FINRA's Public Admissions Regarding Remaining Short Positions and the
Absence of Reconciliation................................................ 7

D. Regulation SHO, Threshold Securities, and Unresolved Failures to Deliver............. 9

E. Prepetition Retentions and Public Investigative Representations........................... 10

F. Postpetition Retention and Record Inconsistencies (Trustee / Court Record)................ 12

G. ShareIntel / Wenger: Prior Relationships, Data Custody, Access, and Disclosures...... 13

H. Data Provenance and Funding: "Firm's Analysis" Metrics and Undisclosed
Financial and Access Pathways........................................... 16

I. Broadridge Data, Subpoena Scope, and Unresolved Shareholder-Position
Reconciliation............................................................... 17

J. Regulatory Record-Retention Obligations and Risk of Irreversible Evidence Loss…... 18

K. Control and Access to Investigative Data and Denial of Information to Shareholders..19

L. Prior Shareholder Requests for Information and Failure of Informal Disclosure Channels………………………………………………………... 21

M. Litigation Funding Disclosure and Current Operative Funding Structure…………22

N. Clarification Regarding Litigation Funding Governance, Venue and Trust Administration……………………..…………………………………… 23

O. Clarification Regarding Representations of Litigation Funding Sources and "Deemed" Contributions…………………………………………... 24

P. Disclosure of Flamethrower, LLC, Next Bridge Hydrocarbons, and Related Relationships Bearing on Conflicts of Interest and Data Provenance………………… 25

Q. Meet-and-Confer Efforts and Inability to Obtain Clarification Without Court Intervention……………………………………………………… 27

R. Need for Court Determination and Supervisory Clarification……………………… 27

LEGAL STANDARD……………………………………………… 28

ARGUMENT…………………………………………………… 29

I. Clarification Is Required Regarding Rule 2014 and § 327 Disclosures……………… 29

II. Clarification Is Required Regarding Shareholder Data Acquisition and Representations……………………………………………………… 29

III. Contemporaneous Communications with Wenger Support the Need for Clarification…………………………………………………… 29

IV. The Court Should Act to Prevent Irreparable Loss of Evidence………………… 30

RELIEF REQUESTED………………………………………… 30

CONCLUSION………………………………………………… 31

1

## INTRODUCTION

Movant Danielle Spears ("Movant"), appearing pro se, respectfully files this Motion pursuant to the requirement that requests for court action be presented by properly noticed motion. This Motion seeks limited, non-merits threshold determinations and clarification of the Court's record concerning discrete issues referenced in Dkt. 1988, Dkt. 2174, and Dkt. 2413, now presented in a procedurally proper posture permitting supervisory determination. Those materials are cited solely to identify the existence of factual materials already filed on the docket; no prior request for relief is renewed, and this Motion presents the issues in a procedural posture permitting supervisory determination.

This Motion does not seek reconsideration of any prior rulings and does not request relief previously denied, including reset of the bankruptcy administration, appointment of a neutral fiduciary or special master, or removal of the Trustee. Rather, Movant seeks limited determinations and disclosures necessary to permit the Court to exercise its supervisory authority under 11 U.S.C. §§ 105, 327, and 704 and Federal Rule of Bankruptcy Procedure 2014, including clarification regarding disclosure compliance, the existence and verification of third-party data relied upon in connection with the estate's securities-related investigation, the status of subpoena issuance and responses, litigation funding arrangements, and the preservation of potentially material evidence bearing on estate claims, liabilities, or recoveries.

Movant does not request adjudication of the merits of any underlying dispute. The relief sought is confined to clarification of the record and determination of threshold issues necessary to ensure that estate administration proceeds on a complete, accurate, and verifiable factual foundation and that potentially material evidence is preserved.

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157. The Motion concerns administration of the estate and the Court's supervision of estate professionals, including compliance with disclosure obligations and preservation of potentially material evidentiary assets and information relevant to potential estate causes of action. The Motion is a core matter under 28 U.S.C. § 157(b)(2), including § 157(b)(2)(A) and (O).

The Court has authority under 11 U.S.C. § 105(a) to enter orders necessary or appropriate to carry out the provisions of the Code, including enforcing disclosure obligations, supervising court-approved professionals, and directing reasonable steps to preserve potentially material evidence and information relevant to estate administration and potential estate claims.

## INCORPORATION OF PRIOR SUBMISSIONS

Movant previously filed factual and evidentiary submissions in Docket Nos. 1988, 2174, and 2413 raising issues concerning disclosure obligations, professional relationships, investigative representations, litigation funding, data acquisition, and preservation of potentially material evidence. Those submissions are cited solely to identify the existence of factual materials already filed on the docket; no argument, request for relief, or exhibit is incorporated by reference except as expressly stated herein; Movant does not incorporate prior arguments or requests for relief by reference.

Movant does not seek reconsideration of any prior ruling or adjudication of the merits of any underlying dispute, and seeks no finding of wrongdoing by any party. This Motion is filed to present the identified issues in a procedural posture permitting determination, consistent with the requirement that requests for court action be presented by properly captioned motion.

3

## COMPLIANCE WITH COURT-DIRECTED MEET AND CONFER

At the hearing on the Trustee's First Interim Application for Compensation, the Court directed Movant to confer with Trustee's counsel regarding the issues raised and advised that any matters not resolved through that process should be presented to the Court by motion if a ruling was sought. Movant complied with that instruction and participated in a conference with Trustee's counsel.

Trustee Lovato did not attend the conference, and discussion of several material issues could not be completed or substantively addressed. Certain topics were deferred or left unresolved despite Movant's good-faith effort to raise them, and no follow-up responses or clarifications were provided thereafter.

Accordingly, Movant now files this Motion seeking judicial determination and clarification of the unresolved issues identified below.

## FACTUAL BACKGROUND

### A. Parties and Relevant Entities

1. **META Materials, Inc. ("META")** is the Chapter 7 debtor in this case and the issuer of both its common stock, which traded under the symbol MMAT, and its Series A Preferred Stock, which was publicly traded under the symbol MMTLP.

2. **Torchlight Energy Resources, Inc. ("Torchlight")** is a non-debtor entity formerly operating as an oil and gas company whose common stock traded under the symbol TRCH. META Materials, Inc. is the successor entity resulting from a reverse merger between META I and Torchlight. Upon consummation of the reverse merger, Torchlight shareholders received one share of META's Series A Preferred Stock for each share of

4

TRCH held. That Series A Preferred Stock subsequently traded on over-the-counter markets under the symbol MMTLP. The Series A Preferred Stock was issued by META to represent Torchlight shareholders' economic interest in the oil and gas assets formerly held by Torchlight.

3. **Next Bridge Hydrocarbons, Inc. ("NBH")** is a non-debtor entity formed in connection with the spin-off of the oil and gas assets held by META. NBH is a public reporting company whose shares resulted from the conversion of META's Series A Preferred Stock previously traded under the symbol MMTLP, and which do not trade on any public exchange.

4. **Flamethrower, LLC ("Flamethrower")** is a non-debtor entity publicly associated with John Brda. Mr. Brda was the former Chief Executive Officer of Torchlight and, following the reverse merger, served as a consultant to META in connection with the sale or spin-off of Torchlight's oil and gas assets.

5. **James "Wes" Christian ("Mr. Christian")** is an attorney who has practiced through multiple affiliated law firms, including Christian Smith & Jewell, Christian Levine Law Group, and Christian Attar. Through those firms, Mr. Christian has, at various times, been retained by META, NBH, and Flamethrower in connection with investigations and legal matters relating to trading activity in TRCH, MMAT, and MMTLP. Mr. Christian has submitted sworn declarations in this bankruptcy case and in other federal proceedings concerning such matters. NBH publicly announced its retention of Mr. Christian on February 18, 2024, and Mr. Christian subsequently appeared as counsel for NBH in *Spears v. NBH*, Case No. 24-cv-321, upon being granted pro hac vice admission on March 26, 2025.

5

6. **Shareholder Intelligence Services, Inc. ("ShareIntel")** is a firm retained in connection with trading-data and shareholder-position analysis relating to TRCH, MMAT and MMTLP. David Wenger is associated with ShareIntel and has submitted declarations in this case describing his firm's role and addressing issues of disinterestedness.

7. **Broadridge Financial Solutions, Inc. ("Broadridge")** is a financial-services company whose business includes shareholder-position reconciliation, proxy services, and securities-ownership data management. Broadridge is listed as a creditor in this case in the approximate amount of $355,000.

8. **The Financial Industry Regulatory Authority ("FINRA")** is a self-regulatory organization responsible for regulatory oversight of broker-dealers and the processing of corporate actions. On December 9, 2022, FINRA imposed a U3 trading and quotation halt on MMTLP in connection with a corporate action issued by META relating to the conversion of MMTLP into shares of Next Bridge Hydrocarbons, Inc. In its published notice, FINRA expressly stated that trading in MMTLP would not resume and that the halt would remain in effect through the deletion of the MMTLP symbol. Trading in MMTLP was never reopened prior to deletion, and market activity in MMTLP therefore ceased and was not resumed prior to deletion while the security remained under a U3 halt. FINRA has since made public statements concerning short interest, clearance, and settlement issues relating to MMTLP and has opposed discovery efforts concerning its role in the halt and the events leading to the symbol's deletion.

9. **TD Ameritrade, Inc.** was a broker-dealer through which MMTLP securities were traded prior to its acquisition by **Charles Schwab & Co., Inc. ("Schwab")**. Schwab has acknowledged custodial responsibility for certain records formerly maintained by TD

6

Ameritrade and has indicated that certain categories of legacy records are no longer accessible following system migration.

**B. FINRA self-revised the META corporate action and imposed a U3 halt effective through deletion of MMTLP**

10. On December 6, 2022, FINRA published issuer META's corporate action notice stating that MMTLP shares would be **canceled** effective December 13, 2022.

11. On December 8, 2022, FINRA published a revised corporate action notice removing the pay date and substituting the term 'deleted' for 'canceled.' In a sworn affidavit, META's then-Chief Executive Officer Georgios Palikaras testified that META was not consulted regarding the revision, did not approve the revised language, and was directed by FINRA to accept the revised notice without discussion.

12. On December 9, 2022, FINRA imposed a U3 trading and quotation halt on MMTLP. In its Uniform Practice Advisory (UPC #35-22), FINRA stated that the **"trading and quoting halt will end concurrent with the deletion of the symbol"** effective December 13, 2022, and that the halt was imposed pursuant to Rule 6440(a)(3) based on FINRA's determination that an extraordinary event had occurred or was ongoing creating significant uncertainty in the settlement and clearance process for MMTLP.

13. Trading in MMTLP did not occur during the market sessions on December 9 and December 12, 2022, and the market was never reopened prior to the issuer's cancellation of the shares and FINRA's deletion of the trading symbol.

14. By imposing a U3 trading and quotation halt that remained in effect through cancellation and subsequent deletion of the MMTLP symbol, FINRA eliminated ordinary market mechanisms through which positions could be traded, closed, or

otherwise market-resolved. As a result, both long shareholders and holders of short positions with settled positions as of December 12, 2022 were converted, with long positions receiving one share of Next Bridge Hydrocarbons, Inc. for each share of MMTLP held, and short positions being transitioned into obligations associated with non-tradable Next Bridge shares, without an opportunity for market-based close-out.

15. As FINRA later acknowledged in its published Frequently Asked Questions, the MMTLP shares were canceled by the issuer, and the symbol was not immediately deleted as represented. FINRA further acknowledged that deletion of the symbol occurred only after investors raised the issue, and that FINRA's website was updated later than normal due to a coding issue introduced in connection with a system migration.

16. Taken together, these facts reflect that the conversion of MMTLP into NBH occurred without a complete, contemporaneous, and publicly disclosed reconciliation of issued shares, open positions, and settlement obligations. The record does not demonstrate that all short positions, fails to deliver, or other settlement liabilities were resolved through market processes prior to cancellation and deletion. As a result, the record does not establish that the spin-out transferred assets without unresolved obligations, or that NBH equity reflects solely fully reconciled equity interests rather than embedded settlement liabilities. Clarification and reconciliation are therefore necessary for the Court to determine whether the spin-out can be relied upon for estate valuation or distribution purposes.

**C. FINRA's Public Admissions Regarding Remaining Short Positions and the Absence of Reconciliation**

8

17. In its published Frequently Asked Questions dated March 16, 2023 and November 6, 2023, FINRA acknowledged that **short positions in MMTLP remained outstanding at the time of the U3 trading halt** and that such positions were not required to close through market trading prior to the cancellation of MMTLP and deletion of the trading symbol.

18. FINRA's statements did not specify whether the referenced short positions represented fully settled contractual short interest, unresolved fails to deliver, broker-dealer net positions, or other settlement obligations, nor did FINRA disclose whether such positions had been subject to mandatory close-out, cash settlement, or other resolution prior to their transition into NBH.

19. FINRA further stated that remaining short positions in MMTLP were **transitioned into NBH**, a security that is non-tradable, non-DTC-eligible, and without a trading symbol. FINRA identified the number of such short positions as approximately **2.65 million**, but has not publicly disclosed the methodology used to derive that figure, nor whether it reflects gross or net positions, broker-dealer self-reporting, clearing data, or reconciliation against issuer share counts.

20. FINRA has not publicly disclosed whether the identified short positions reconcile with the number of MMTLP shares validly issued by META, whether any excess claims existed at the time of cancellation, or whether settlement obligations associated with such short positions were resolved through cash settlement, buy-ins, or other clearing mechanisms prior to their transition into NBH.

21. Issuer-side communications referenced in the record indicate that post-halt demand to acquire MMTLP shares materially exceeded FINRA's publicly stated short figure, further

9

underscoring the absence of a transparent, end-to-end reconciliation of issued shares, long positions, short obligations, and settlement liabilities.

22. As a result, while FINRA has acknowledged the existence and transition of remaining MMTLP short positions, the public record does not establish that the conversion into NBH reflected solely valid, reconciled equity interests rather than unresolved settlement obligations carried forward without market reconciliation. Clarification and reconciliation are therefore necessary for the Court to determine the nature and effect of the short positions carried forward into NBH and their impact on the valuation and validity of the spin-out.

### D. Regulation SHO, Threshold Securities, and Unresolved Failures to Deliver

23. Regulation SHO governs failures to deliver ("FTDs") in equity securities and establishes close-out obligations when persistent settlement failures occur. Under Rule 203(b)(3), if a security is designated as a threshold security due to significant and persistent FTDs, clearing participants are required to close out such fails by purchasing securities of like kind and quantity within prescribed timeframes.

24. Publicly available FINRA OTC Threshold List data reflects that MMTLP appeared on the OTC threshold list for extended periods prior to the December 2022 U3 trading halt, including multiple consecutive settlement days in 2021 and 2022. Archived threshold list records, together with contemporaneous investor-captured screenshots, indicate that MMTLP was flagged for Rule 4320 / Regulation SHO purposes for a substantial number of days prior to cancellation.

25. In its published Frequently Asked Questions, however, FINRA later stated that it had identified errors in its threshold list data for certain OTC securities and that MMTLP

threshold designations were removed or corrected following internal review, without publicly disclosing the methodology, timing, or reconciliation underlying that determination. FINRA has not publicly disclosed the nature of the asserted error, the date on which any correction was made, or the methodology used to determine that MMTLP did not meet threshold criteria at the relevant times.

26. The public record does not reflect whether any FTDs associated with MMTLP were formally closed out pursuant to Regulation SHO prior to the U3 trading halt, nor whether any such obligations were extinguished, netted, cash-settled, or otherwise resolved through market processes prior to the cancellation of MMTLP and transition into Next Bridge Hydrocarbons, Inc.

27. Because trading in MMTLP was halted and never reopened prior to cancellation and deletion, ordinary market-based mechanisms for resolving settlement failures were not available after December 8, 2022. As a result, unresolved questions remain regarding whether FTDs and related settlement obligations were carried forward into the non-tradable Next Bridge security, or otherwise remained outstanding without a public reconciliation.

28. Clarification is therefore necessary for the Court to determine whether Regulation SHO close-out obligations were triggered, satisfied, waived, or rendered impracticable by the halt-through-deletion sequence imposed by FINRA.

### E. Prepetition Retentions and Public Investigative Representations

29. Following the FINRA U3 trading halt pursuant to which MMTLP was halted until deleted, various non-debtor entities and the Debtor issued public statements concerning prepetition retention of counsel and consultants by non-debtor entities and the Debtor to

investigate alleged market manipulation involving Torchlight Energy Resources, Inc. ("TRCH"), META Materials, Inc. ("MMAT"), and META's Series A Preferred Stock ("MMTLP"), including its subsequent conversion into shares of Next Bridge Hydrocarbons, Inc. ("NBH").

30. On January 18, 2023, Flamethrower, LLC ("Flamethrower") publicly announced that it had retained Warshaw Burstein LLP and Christian Levine Law Group, together with consulting experts, to investigate alleged market manipulation and "phantom" shares relating to TRCH, MMTLP, and NBH. Flamethrower, publicly associated with John Brda, described itself as a shareholder consortium formed to fund investigative and discovery efforts relating to these securities. (See Dkt. 1988 p. 50; Dkt. 2174-2 p. 60)

31. The bankruptcy record, however, does not disclose the identity of Flamethrower's members beyond Mr. John Brda, a former Torchlight executive, nor does it disclose whether other members held or later acquired economic interests in NBH or related transactions, including individuals publicly associated with TRCH and NBH governance, such as Mr. Gregory McCabe. Absent disclosure of Flamethrower's membership and funding participants, the Court cannot determine whether individuals with interests in NBH or related assets financed investigative efforts, had access to trading or shareholder-position analytics, or otherwise occupied positions giving rise to potential conflicts of interest requiring disclosure and review.

32. On June 27, 2023, META publicly announced that it had retained Christian, Smith & Jewell, and on June 29, 2023 clarified that the firm was operating as Christian Attar, formerly known as Christian, Smith & Jewell (Dkt. 1988 p. 52). Those press releases stated that Christian was retained together with Warshaw Burstein LLP, identifying

Partner Alan Pollack, to investigate allegations of naked short selling of MMAT stock. The announcements further represented that META, after conducting a preliminary trading analysis in collaboration with Shareholder Intelligence Services, Inc. ("ShareIntel"), had identified seemingly material trade imbalances in MMAT trading relative to META's public float and average trading volume. Mr. Christian was quoted as stating that the matter had the potential to become the "motherlode of counterfeit shares" and that the scale and complexity warranted exhaustive investigation.

33. On May 20, 2024, META issued a further press release stating that its retained counsel had conducted an "exhaustive investigation" and "undertaken in-depth due diligence," concluding that META had "meritorious" claims for market manipulation against several parties. Mr. Christian was quoted as stating that META had an "actionable case in connection with its MMAT/MMTLP claims." META's Chairman further stated that all available data had been obtained and that META was equipped to act and pursue legal proceedings. (Dkt. 1988 p. 55)

34. In subsequent public statements, interviews, and online forums beginning in or around January 2023, Mr. Christian repeatedly used emphatic language, including the phrase "motherlode," suggesting the existence of underlying trading and shareholder-position data. (Dkt. 2174-2 p. 68-71)

35. In a recorded public interview conducted in or around June 23, 2024, however, Mr. Christian characterized the term 'motherlode' as a 'gut feeling,' differing from earlier public representations implying that concrete, obtained, and verified data existed.

## F. Postpetition Retention and Record Inconsistencies (Trustee / Court Record)

13

36. Following the commencement of this Chapter 7 case, the Trustee retained Mr. Christian as special litigation counsel and made representations to the Court regarding investigative scope, data acquisition, subpoenas, and potential claims relating to MMAT and MMTLP.

37. In related federal litigation involving NBH, Mr. Christian moved to withdraw as counsel for NBH on the stated ground that there was 'good cause' due to a 'potential appearance of a conflict of interest,' identifying the source of the potential conflict as his role as special litigation counsel to the Chapter 7 Trustee in this bankruptcy case. The record does not clarify what disclosures, if any, were made to the Court or parties in interest regarding the overlap between Mr. Christian's representation of NBH and his court-approved role for the estate.

38. In a sworn declaration filed by Mr. Christian on or about June 17, 2025 in separate litigation, Mr. Christian stated that consulting experts were engaged and that he, co-counsel, and at least five retained experts attempted to obtain records intended to prove market manipulation involving META and MMAT. He further stated that those efforts were unsuccessful because sufficient evidence could not be obtained and subpoenas could not be issued absent the filing of a lawsuit, and that cooperation could not be obtained from multiple organizations without subpoena power. (Dkt. 2174-4, p. 4-10). The June declaration does not identify the experts retained, the scope or dates of their work, the specific securities investigated, the entities from which records were sought, the nature of the records requested, who funded or authorized those engagements, who had access to any resulting records, or whether the Trustee was made aware of these details, thereby preventing verification of the declaration's assertions and precluding

meaningful evaluation of potential conflicts of interest under Federal Rule of Bankruptcy Procedure 2014.

39. In that same declaration, Mr. Christian stated that, under authority conferred on the Trustee pursuant to Fed. R. Bankr. P. 2004, he and co-counsel had subpoenaed more than ten entities in connection with the investigation. The docket reflects notices of issuance for nine subpoenaed entities prior to August 21, 2025, excluding an amended subpoena issued to Virtu Financial, LLC, and further reflects that several subpoena recipients, including FINRA, Nasdaq, Citadel, Virtu, and Anson Funds, filed motions to quash or otherwise object. The record, however, does not disclose which subpoenas resulted in document production, what materials (if any) were obtained, which disputes were resolved, remain pending, or resulted in no production, or how any such outcomes were incorporated into the investigative conclusions described by special counsel.

40. In a subsequent sworn declaration dated August 21, 2025, Mr. Christian stated that consulting experts were engaged, that DTCC records were compared to Broadridge data, that correspondence to FINRA was processed, and that preservation letters were sent. He further stated that Christian Levine and Warshaw Burstein ultimately determined that evidence was insufficient to file claims under Section 10(b)(5) of the Securities Exchange Act of 1934. (Dkt. 2140 and Dkt. 2143)

41. The record does not disclose how DTCC and Broadridge data were compared, particularly in light of Mr. Christian's earlier sworn statement that necessary data could not be obtained. This inconsistency is compounded by the fact that subpoenas were issued to DTCC and broker-dealers, but not to Broadridge, the primary provider of issuer-level shareholder-position reconciliation data.

15

**G. ShareIntel / Wenger: Prior Relationships, Data Custody, Access, and Disclosures**

42. The Trustee retained David Wenger and/or ShareIntel, at the recommendation of special litigation counsel Christian, to provide trading data and analytics on a bi-weekly basis using estate funds. Mr. Wenger submitted declarations asserting disinterestedness in connection with that retention. (Dkt. 1925)

43. Those declarations do not disclose any prior professional relationship between Mr. Wenger and Mr. Christian, any prepetition work performed for META, NBH, or Flamethrower, or any prior investigative involvement relating to TRCH, MMAT, MMTLP, or NBH.

44. Movant attempted to obtain clarification regarding the existence, scope, and custody of investigative data by communicating directly with Mr. Wenger. In an April 9, 2024 communication, Mr. Wenger stated that he could neither confirm nor deny the existence of trading or shareholder-position data, and further stated that any such data would be controlled by META and could not be independently purchased. He further indicated that, if any such data existed, access would be controlled through Christian.

45. In a subsequent conversation in June 2024, Mr. Wenger stated that he could not legally speak with shareholders regarding the investigation and declined to answer whether he continued to work with META.

46. These communications reflect that investigative data, if obtained, has been treated as company-controlled and inaccessible to shareholders, and that informal efforts to determine what data exists, who controls it, and whether it has been relied upon in representations to the Court have been unsuccessful.

47. Movant wrote and emailed Meta requesting answers to a variety of questions and received no response.

## H. Data Provenance and Funding: "Firm's Analysis" Metrics and Undisclosed Financial and Access Pathways

48. In the Trustee's application to employ special counsel and related litigation funding materials, the "Firm's analysis" is described as identifying over 55 million shares of MMAT and 92 million shares of TRCH allegedly impacted by spoofing or related manipulative trading activity, affecting more than 65,000 retail shareholders. The record does not disclose the data sources, datasets, analytical methodologies, or reconciliation inputs used to generate these figures.

49. The same figure, "approximately 65,000 retail shareholders," has appeared publicly in reference to Torchlight Energy Resources, Inc., META Materials, Inc., and Next Bridge Hydrocarbons, Inc. The record does not disclose whether these statements refer to a single, continuous shareholder population carried through the merger, spin-out, and conversion transactions, or to distinct shareholder bases at different stages. Absent clarification of the underlying data sources and methodologies, the Court cannot determine whether this figure reflects verified shareholder-position data or represents an estimate reused across multiple entities and contexts.

50. The record further does not disclose who financed the acquisition or analysis of the data underlying these metrics, whether such analytics were obtained through ShareIntel, through work funded by Flamethrower or other third parties, or through some other mechanism. Nor does the record disclose who received, accessed, or relied upon any reports, datasets, or analytical outputs underlying the "Firm's analysis."

51. Public statements and communications in the record indicate that Flamethrower was formed to fund investigative and discovery efforts relating to alleged manipulation of TRCH, MMTLP, and related securities, including the acquisition of information and analytics. The record does not disclose the identity of Flamethrower's members, the extent to which Flamethrower funded or facilitated data acquisition later relied upon by special counsel, or whether any such data or analyses were shared with Flamethrower members, NBH, or other third parties.

52. Movant further notes that NBH's capital structure and reported indebtedness have been the subject of insider-level transactions involving Mr. McCabe, including the reported purchase of NBH notes receivable for a fraction of face value and subsequent reporting of materially larger outstanding balances. The existence of such insider-benefiting debt transactions heightens the materiality of determining whether any Flamethrower-funded analytics, ShareIntel datasets, or investigative outputs were shared with NBH leadership or persons holding NBH-related economic interests, because access to non-public analytics could bear directly on valuation, strategy, and the integrity of estate decision-making.

53. Absent disclosure of these funding arrangements, data-access pathways, and dissemination chains, the Court cannot determine whether disclosures concerning relationships, compensation, investigative coordination, and data acquisition have been complete, or whether any undisclosed arrangements bear on disinterestedness, conflicts of interest, or the integrity of investigative and litigation decision-making.

**I. Broadridge Data, Subpoena Scope, and Unresolved Shareholder-Position Reconciliation**

54. The claims register in this case reflects that Broadridge Financial Solutions, Inc. ("Broadridge") is a creditor of the estate in the approximate amount of $355,103.22. Broadridge's business includes shareholder-position data, reconciliation services, and related analytics.

55. Despite repeated public and sworn statements that Broadridge shareholder-position data could not be obtained absent a subpoena, the record reflects that no subpoena was issued to Broadridge, even though Broadridge is the primary provider of issuer-level shareholder-position reconciliation data.

56. The Trustee has represented that subpoenas were issued in connection with the estate's investigation of alleged market manipulation involving META Materials, Inc. securities, including MMTLP and Torchlight Energy Resources, Inc. Those subpoenas were directed to FINRA, DTCC, and multiple broker-dealers, but not to Broadridge.

57. The record does not disclose what services or data, if any, were provided by Broadridge in exchange for the amount reflected in the claims register, when such services were rendered, or whether any such services related to shareholder-position reconciliation for MMAT, MMTLP, NBH, or were relied upon in representations made to the Court.

58. The absence of a Broadridge subpoena, coupled with the existence of a substantial Broadridge creditor claim, creates an unresolved ambiguity as to whether shareholder-position data was obtained, reviewed, relied upon, or remains outstanding, and whether representations regarding the scope and exhaustiveness of the investigation were based on complete reconciliation inputs, and whether any such data was preserved.

**J. Regulatory Record-Retention Obligations and Risk of Irreversible Evidence Loss**

19

59. Broker-dealer record-retention obligations are governed by SEC Rule 17a-4(b) and FINRA Rule 4511, which generally require preservation of order-handling records, customer communications, and related materials for a minimum of three years, after which routine destruction may occur absent preservation directives. December 9, 2025 marked the expiration of multiple routine retention periods applicable to broker-dealer records relating to MMTLP trading prior to the FINRA U3 trading halt of December 9, 2022.

60. Movant requested her own books and records from Charles Schwab & Co., Inc., which had acquired TD Ameritrade, Inc. (Dkt. 1988 p. 63-65) Schwab produced transactional records and account statements but declined to produce customer message-center communications, "too-late-to-cancel" orders, or internal order-handling records, stating that such data was no longer accessible following system migration.

61. Schwab further asserted general objections based on possession, custody, and control, and declined to reconstruct records, produce metadata, or provide privilege logs for unavailable materials. (Dkt. 1988 p. 66)

62. In addition, the Trustee issued subpoenas to FINRA and multiple broker-dealers, several of which moved to quash or otherwise resisted production. These disputes concern records directly bearing on the FINRA U3 trading halt of MMTLP on December 9, 2022.

63. These facts demonstrate that potentially material evidence has already been lost through routine business practices and that additional evidence relating to MMTLP trading, settlement, and broker-dealer communications remains at risk of irreversible destruction absent court supervision and clarification.

**K. Control and Access to Investigative Data and Denial of Information to Shareholders**

64. Movant attempted to obtain information regarding the existence, scope, and control of trading data and investigative materials relating to MMTLP by communicating directly with David Wenger, whose firm was retained in connection with trading-data analytics at the recommendation of special counsel.

65. During an initial communication on April 9, 2024, Mr. Wenger stated that he could neither confirm nor deny the existence of trading data but indicated that any data obtained by ShareIntel or special counsel was controlled by META and that access to such data would require going through the company. Mr. Wenger further stated that Movant could not independently purchase any such data.

66. During a subsequent telephone call on June 27, 2024, Mr. Wenger asked Movant whether she was a shareholder. When Movant confirmed that she was, Mr. Wenger stated that he could not legally speak to shareholders regarding the investigation. When asked whether he was still working with META, Mr. Wenger stated that he could not answer that question and again directed Movant to META. Mr. Wenger further stated that he had legal obligations that he could not violate.

67. These communications reflect that investigative data relating to MMAT and MMTLP, if obtained, is treated as company-controlled and inaccessible to shareholders, and that informal efforts to obtain clarification regarding the existence, scope, or custody of such data were unsuccessful.

68. As a result, Movant and similarly situated shareholders have been unable to determine what investigative materials exist, who possesses them, under what authority they were obtained, or whether such materials have been relied upon in representations made to the

Court, regulators, or the public, further underscoring the need for court clarification and oversight.

## L. Prior Shareholder Requests for Information and Failure of Informal Disclosure Channels

69. While META Materials, Inc. was still operating as a public company, Movant and a group of confirmed shareholders made formal, good-faith requests for information directed to the Board of Directors and Investor Relations. These requests, including a written demand transmitted in or around March 2024, sought clarification regarding corporate governance, investigative efforts relating to MMAT and MMTLP, share issuances, and the status of any litigation or regulatory actions.

70. Despite the scope and specificity of those requests, Movant did not receive any substantive written response. No clarification was provided regarding the matters raised, and no alternative avenue for obtaining the requested information was offered.

71. As a result, shareholders entered the Chapter 7 proceeding without access to material information concerning the Debtor's investigation, governance decisions, or the handling of MMAT and MMTLP-related issues. The absence of meaningful pre-bankruptcy disclosure, coupled with the unavailability of informal disclosure channels post-petition, underscores the necessity of court-supervised clarification to ensure a complete and reviewable record.

72. Movant also transmitted a written communication to the Company concerning voting materials, leadership changes, and the status of ongoing investigations while still a shareholder, raising concerns regarding the removal of the prior chief executive officer, the subsequent hiring and near-immediate resignation of an interim chief executive, and

22

the absence of accurate or complete information provided to shareholders in connection with those events. That communication likewise received no substantive response. Movant does not speculate as to the reasons for the interim executive's departure, but notes that the absence of any disclosure or explanation to shareholders further reflects the breakdown of informal disclosure channels prior to the commencement of this Chapter 7 case.

## M. Litigation Funding Disclosure and Current Operative Funding Structure

73. The record reflects that litigation funding has been referenced in connection with the investigation and potential prosecution of claims relating to MMAT and MMTLP; however, the nature, scope, and current operative status of any such funding arrangements remain unclear.

74. In connection with the retention of special litigation counsel, the Trustee represented that a litigation funding source had been arranged to cover costs associated with investigation and potential litigation. Subsequent filings, including applications to employ additional counsel, characterized later arrangements as "materially similar" to prior agreements. However, the record does not disclose the identity of any funder, the terms of any funding agreement, whether any such agreement remains in effect post-petition, or whether one or more funding arrangements exist concurrently or sequentially.

75. The absence of a disclosed funding agreement prevents the Court and parties in interest from determining which entity, if any, currently provides litigation funding, what economic interests attach to that funding, whether funding terms prioritize certain claims or securities over others, and whether any funder exercises influence over investigative scope, litigation strategy, or settlement decisions.

23

76. Without clarification, the Court cannot assess whether required disclosures under 11 U.S.C. §§ 327 and 328 and Federal Rule of Bankruptcy Procedure 2014 have been satisfied, nor can it determine whether litigation decisions are being made solely in the best interests of the estate and its stakeholders.

## N. Clarification Regarding Litigation Funding Governance, Venue, and Trust Administration

77. In addition to the absence of clarity regarding the identity, scope, and operative status of any litigation funding arrangements, Movant respectfully seeks clarification regarding certain governance and venue provisions reflected on the face of the litigation funding documents referenced in the record in both (Dkt. 98-2) and in (Dkt. 1956-1).

78. Specifically, both of the litigation funding agreements designate Harris County, Texas as the forum for resolution of disputes arising under those agreements, notwithstanding that this bankruptcy case is pending before this Court in the District of Nevada. Movant seeks clarification as to whether, and to what extent, disputes concerning litigation funding for estate causes of action are intended to be adjudicated outside this Court, and how such provisions comport with the Court's supervisory authority over estate administration, professional retention, and litigation strategy.

79. In addition, based on the filings relating to the second litigation funding arrangement associated with the retention of Schneider Wallace Cottrell Kim, LLP, it appears that Mr. Christian Attar is designated as the manager of the trust administering that funding structure as well. Further Movant does not ask the Court to make any finding regarding the propriety of that arrangement at this time, but seeks clarification as to:

24

(a) the authority pursuant to which such trust management was approved;

(b) whether alternative governance structures were considered by the Trustee; and

(c) how the administration of a litigation funding trust by estate special counsel is intended to operate consistently with the disclosure, disinterestedness, and supervisory requirements imposed by the Bankruptcy Code and this Court.

80. Further, Movant has been unable to obtain disclosure of the identity of any litigation funder or the scope and amount of any funding commitment associated with the litigation funding arrangements referenced in the record. Movant raises this issue not to allege noncompliance, but because such information is necessary for the Court to evaluate disinterestedness, disclosure, and supervision under 11 U.S.C. §§ 327 and 328 and Federal Rule of Bankruptcy Procedure 2014. Without knowing who provides litigation funding and the extent of any economic commitment, the Court and parties in interest cannot meaningfully assess whether any funding-related interests, incentives, or connections exist that bear on estate litigation strategy or settlement decisions.

81. Movant raises these issues solely for purposes of clarification and supervision, particularly in light of the Court's forthcoming hearing on litigation funding, and not to seek merits-based relief or adjudication of conflicts at this stage.

## O. Clarification Regarding Representations of Litigation Funding Sources and "Deemed" Contributions

82. The litigation funding agreement filed at Dkt. 98-2 reflects a stated "Commitment" of $11,800,000. However, Section 2.03 of that agreement further provides that **$500,000 of the Commitment is "allocated to this matter from the Harrington**

**case and deemed spent as of the date hereof on account of methodologies learned in the Harrington case."**

83. Based on the record before the Court, the Harrington Global matter remains an active case pending in Case No. 1:2021-cv-00761. Movant seeks clarification as to whether the referenced $500,000 constitutes an actual post-petition funding contribution made available to this estate, or whether it represents prior work, experience, or "education" obtained in a separate proceeding.

84. Movant raises this issue not to challenge counsel's experience or qualifications, but because, under the Bankruptcy Code, estate funding and compensation structures must reflect actual value provided to the estate, and the Court must be able to distinguish between present funding contributions and pre-petition or cross-case experience. See 11 U.S.C. §§ 328 and 330.

85. Clarification of this issue is particularly important in advance of the Court's hearing on litigation funding, as the characterization of such amounts may bear on the Court's understanding of the resources available to the estate and the accuracy of disclosures regarding funding commitments. The Court's authority to require such clarification arises under 11 U.S.C. § 105(a).

## P. Disclosure of Flamethrower, LLC, Next Bridge Hydrocarbons, and Related Relationships Bearing on Conflicts of Interest and Data Provenance

86. The record reflects that James "Wes" Christian, through one or more law firms and affiliated entities, represented or advised multiple parties connected to the events at issue, including META Materials, Inc., Next Bridge Hydrocarbons, Inc., and Flamethrower,

LLC, in matters relating to alleged market manipulation, shareholder-position analysis, and investigative efforts concerning MMAT and MMTLP.

87. Despite this overlapping representation, the bankruptcy record does not disclose the full scope of relationships, compensation arrangements, or contractual engagements between special counsel, his firms or employees, META Materials, Inc., Next Bridge Hydrocarbons, Inc., Flamethrower, LLC, ShareIntel, or any litigation funder, nor does it disclose whether any such arrangements involved investigation, advocacy, communications, or information dissemination relating to MMAT or MMTLP.

88. The record further reflects that ShareIntel and David Wenger were retained at the recommendation of special counsel to provide trading analytics, yet disclosures do not address whether Mr. Christian and Mr. Wenger had any prior professional relationship, shared investigative involvement, or coordinated access to data prior to the bankruptcy filing. These omissions prevent the Court from assessing whether required disclosures under Fed. R. Bankr. P. 2014 have been satisfied.

89. In addition, in a sworn declaration filed by Mr. Christian in separate litigation, Mr. Christian stated that ShareIntel was unable to obtain Broadridge shareholder-position data absent a subpoena. The bankruptcy record, however, does not clarify what data, if any, was obtained by ShareIntel, special counsel, META, Next Bridge Hydrocarbons, Inc., or Flamethrower LLC, when such data was obtained, from whom, and under what authority, or whether any investigative conclusions were based on incomplete or substitute data sources.

90. Movant does not allege improper conduct. Rather, Movant seeks clarification sufficient to permit the Court to determine whether disclosures concerning relationships,

27

compensation, investigative coordination, and data acquisition have been complete, and whether any undisclosed arrangements or inconsistencies bear on disinterestedness, conflicts of interest, or the integrity of investigative and litigation decision-making.

## Q. Meet-and-Confer Efforts and Inability to Obtain Clarification Without Court Intervention

91. Consistent with the Court's guidance, Movant undertook good-faith efforts to obtain clarification of the issues raised herein through informal communication with estate counsel prior to filing this Motion.

92. Movant participated in a meet-and-confer conference with counsel for the Trustee on two occasions. The first occasion was following the October 16, 2025 hearing and the second occasion was on December 31, 2025 and subsequently transmitted follow-up written communications seeking clarification regarding investigative scope, litigation funding, access to data, and the handling of MMTLP-related issues. Movant also requested information and documentation relevant to fee applications and investigative representations.

93. Despite these efforts, Movant received no response to either follow-up email or requests for information. Informal requests did not resolve the ambiguities identified in the record, and no alternative mechanism for obtaining the requested information was provided.

94. Accordingly, Movant brings this Motion not as an adversarial challenge, but because informal channels have proven insufficient and Court intervention is necessary to clarify the record and ensure effective oversight.

## R. Need for Court Determination and Supervisory Clarification

95. The issues presented in this Motion reflect unresolved ambiguities concerning investigative scope, data acquisition, evidence preservation, litigation funding, and disclosure of relationships bearing on disinterestedness and conflicts of interest.

96. Taken together, these ambiguities prevent the Court and parties in interest from determining whether MMAT- and MMTLP-related matters are receiving appropriate attention, whether investigative efforts are based on complete and reliable information, and whether estate administration is proceeding in a manner calculated to achieve the greatest possible recovery for stakeholders.

97. Movant does not seek findings of fault or premature adjudication of claims. Rather, Movant respectfully requests that the Court exercise its supervisory authority to determine what disclosures, clarifications, or reporting are necessary to ensure a complete, transparent, and reviewable record.

98. Absent such clarification, material questions will remain unanswered, evidence may continue to be lost, and the estate risks proceeding without the benefit of informed judicial oversight.

Movant raises these issues not to relitigate prior submissions, but because material time-based preservation risks have now matured, and the Court's supervisory role is implicated in a way that was not ripe at the time of earlier filings.

## LEGAL STANDARD

Professionals employed by the estate must be "disinterested persons" and must disclose all connections with the debtor, creditors, and parties in interest so that the Court may independently assess materiality. 11 U.S.C. § 327; Fed. R. Bankr. P. 2014. The duty of disclosure is ongoing and construed broadly.

The bankruptcy court has authority under 11 U.S.C. § 105(a) and duties under § 704 to protect

estate assets, including potential causes of action and the evidence necessary to pursue them, and

to prevent irreparable loss through foreseeable spoliation.

## ARGUMENT

### I. Clarification Is Required Regarding Rule 2014 and § 327 Disclosures

Given the recommendation, retention, and compensation of Mr. Wenger/ShareIntel at the

direction of special counsel, and the absence of disclosure regarding prior relationships,

prepetition work, and regulatory affiliations, the Court should determine whether supplemental

disclosures are required so that the Court, not the professionals themselves, may assess

materiality and disinterestedness.

### II. Clarification Is Required Regarding Shareholder Data Acquisition and Representations

The record reflects irreconcilable statements regarding whether Broadridge shareholder data was

obtained, whether it could be obtained only by subpoena, whether any such data was treated as

company-controlled, and how META represented its investigation as exhaustive. The presence of

a $355,000 Broadridge creditor claim makes clarification unavoidable. The Court should

determine what data or services were purchased, when, and how those facts relate to

representations made to the Court and to shareholders.

### III. Contemporaneous Communications with Wenger Support the Need for Clarification

Movant's contemporaneous DMs documenting her phone calls with Mr. Wenger are reliable

records of what she was told at the time regarding data access and control. They do not establish

liability but demonstrate the need for clarification regarding who possessed data, under what

authority, and why independent access was denied.

## IV. The Court Should Act to Prevent Irreparable Loss of Evidence

The record demonstrates actual loss of broker-dealer communications and order-handling records through routine retention and migration practices. The universe of relevant custodians, approximately 105 broker-dealers, is already identified. Without court supervision, additional evidence will be lawfully but irretrievably destroyed, materially prejudicing the estate regardless of the merits of any future litigation.

## RELIEF REQUESTED

Movant respectfully requests that the Court enter an order:

1. **Determining whether supplemental disclosures are required** under Fed. R. Bankr. P. 2014 and 11 U.S.C. §§ 327 and 328 by special counsel and other estate professionals, including clarification of prior professional relationships, prepetition investigative involvement, and any regulatory or advisory affiliations bearing on disinterestedness.

2. **Determining whether supplemental disclosure is required** under Fed. R. Bankr. P. 2014 regarding relationships, compensation arrangements, investigative coordination, or data acquisition involving special counsel, his firms or employees, META Materials, Inc., Next Bridge Hydrocarbons, Inc., Flamethrower, LLC, ShareIntel, David Wenger, or any litigation funder, including clarification of what trading or shareholder-position data was obtained, by whom, from what source, and when.

3. **Determining what litigation funding arrangements, if any, are currently operative,** including whether one or more funding structures exist, whether such arrangements remain in effect post-petition, and whether the terms of any funding agreement have been fully disclosed to the Court.

4. **Determining whether disclosure of the ownership, control, and relationships of Flamethrower, LLC is required** to permit evaluation of potential conflicts of interest, disinterestedness, and the integrity of investigative and litigation decision-making.

5. **Determining whether representations made regarding the scope and exhaustiveness of investigative efforts** relating to MMAT and MMTLP require clarification of the underlying methodology, data sources, and reconciliation inputs relied upon, including the nature of any services provided by Broadridge Financial Solutions, Inc.

6. **Directing the Trustee to clarify the scope of the estate's investigation** as it relates to MMTLP and Torchlight Energy Resources, Inc., including whether such matters fall within the Trustee's investigative and fiduciary duties.

7. **Directing the Trustee to identify and confirm the universe of broker-dealers and other custodians that engaged in trading, custody, settlement, or clearance of MMTLP,** and to take reasonable and immediate steps to preserve potentially material evidence held by such custodians, including but not limited to customer communications, order-handling records, cancellation records, internal messaging systems, and compliance communications relating to MMTLP.

8. **Alternatively, directing the Trustee to report to the Court** what preservation steps have already been taken and what categories of data have been lost or remain at risk.

9. **Granting such other and further relief as the Court deems just and proper** to ensure a complete, transparent, and reviewable record.

## CONCLUSION

This Motion seeks clarification, disclosure, and preservation, not findings of fault or adjudication of the merits. It is presented so the Court may exercise its supervisory role on a complete and

32

accurate record and prevent irreparable loss of evidence essential to the estate's potential causes

of action.

Respectfully submitted this 9th day of February, 2026.

Danielle Spears, Pro Se Movant
Avondale, AZ 85323
paymmtlpnow@gmail.com

I hereby certify that a true copy of the foregoing was sent to all named parties with interests in this matter and at the addresses delineated below either by first-class mail or by email, this 9th day of February, 2026.

2/9/26

Danielle Spears. Pro Se Movant
Avondale, AZ 85323
paymmtlpnow@gmail.com


**US Dept. of Justice PO Box 18417. Reno. NV 8951**
USTPRegion17.RE.ECF@usdoj.gov
cameron.m.gulden@usdoj.gov
trusteelovato@att.net
jlh@bankruptcyreno.com
notices@bankruptcyreno.com
abg@bankruptcyreno.com
nv26@ecfcbis.com
jchristian@christianattarlaw.com
bcosman@perkinscoie.com
docketphx@perkinscoie.com
ajdriggs@hollandhart.com
kroyer@parsonsbehle.com
dburnett@schneiderwallace.com
rhicks@schneiderwallace.com
jkim@schneiderwallace.com
stountas@kasowitz.com
legal-notices@kasowitz.com
mbrunet@cooperlevenson.com
lbubala@kcnvlaw.com
cdroessler@kcnvlaw.com
kmilks@kcnvlaw.com
mjohnson@mjohnsonlaw.com
annabelle@mjohnsonlaw.com
kristi@mjohnsonlaw.com
kathra@mjohnsonlaw.com
admin@mjohnsonlaw.com
cbrust@rssblaw.com
krobison@rssblaw.com
hwinston@rssblaw.com
rcarr@rssblaw.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:
META MATERIALS. INC..                    Case No. 24-50792
Debtor                                   Chapter 7

I, Danielle Spears, declare as follows:

1.  I am the Movant and an equity interest holder in META Materials, Inc. in the
    above-captioned Chapter 7 case. I submit this declaration based on my personal
    knowledge, review of court filings, written communications, and direct
    conversations described herein.

2.  This declaration is submitted solely to provide factual context regarding my efforts
    to obtain clarification of investigative scope, data access, subpoena activity, litigation
    funding, and preservation of potentially material evidence relating to MMAT and
    MMTLP, and to document why court clarification is necessary.

3.  I do not offer opinions regarding liability, intent, or wrongdoing by any party. The
    facts stated herein are presented to assist the Court in understanding the existing
    record and unresolved ambiguities.

4.  On December 31, 2025, I participated in a conference call with counsel for the
    Chapter 7 Trustee, including Jeffrey Hartman, Esq., and others. The purpose of the
    call was to address questions I had raised concerning investigative scope, access to

data, and disclosures reflected in the docket.

5.  Trustee Christina Lovato did not attend the conference call. During the call, several issues I raised were deferred or not substantively addressed, including questions concerning the existence and custody of shareholder-position data, the status of subpoena responses, and litigation funding arrangements.

6.  Following the conference call, I sent written follow-up communications seeking clarification on the same topics. I did not receive responses resolving the issues identified.

7.  Separately, on April 9, 2024, I contacted David Wenger of Shareholder Intelligence Services, Inc. to inquire about how a shareholder might obtain trading or shareholder-position data relating to MMTLP.

8.  During that communication, Mr. Wenger stated that he could neither confirm nor deny the existence of such data and indicated that any data obtained by ShareIntel or counsel would be controlled by META Materials, Inc. He further stated that I could not independently purchase such data.

9.  In a subsequent telephone call on June 27, 2024, Mr. Wenger asked whether I was a shareholder. When I confirmed that I was, he stated that he could not legally speak with shareholders regarding the investigation. When asked whether he was still

working with META, he declined to answer and again directed me to the company.

10. Based on these communications, I was unable to determine what investigative data exists, who possesses it, under what authority it was obtained, or whether it has been relied upon in representations made to the Court or others.

11. I also requested my own books and records from Charles Schwab & Co., Inc., which had acquired TD Ameritrade, Inc. Schwab produced transactional records and account statements but declined to produce customer message-center communications, internal order-handling records, or certain cancellation-related materials, stating that such data was no longer accessible following system migration.

12. Schwab further declined to reconstruct unavailable records or provide metadata or privilege logs for data no longer accessible.

13. I am aware, based on the docket, that the Trustee issued subpoenas to FINRA and multiple broker-dealers, several of which moved to quash or otherwise resisted production. The record does not reflect which subpoenas resulted in document production, what materials were produced, or what categories of data were not obtained.

14. I am also aware that Broadridge Financial Solutions, Inc. is listed as a creditor of the estate. Despite public and sworn statements indicating that shareholder-position data could only be obtained by subpoena, I am not aware of any subpoena issued to Broadridge, nor does the record disclose what services or data Broadridge provided in exchange for the amount reflected in the claims register.

15. As a result of these unresolved issues, I have been unable to determine whether investigative representations made regarding the scope and exhaustiveness of the MMAT/MMTLP investigation were based on complete, reconciled shareholder-position data.

16. Broker-dealer record-retention periods applicable to MMTLP trading prior to December 9, 2022 have now expired or are expiring, and some potentially material records have already been lost through routine business practices.

17. During that call, I raised concerns regarding MMTLP-related data, including broker-dealer message-center communications, trading records, and third-party data sources. I pointed out that certain regulatory retention requirements had already been triggered. I asked specifically what if anything the estate was doing to ensure no loss of data and messages.

18. During that call, Mr. Hartman stated, in substance, that:

(a) MMTLP was not his focus or concern in the administration of the estate; and

(b) that regulatory document retention requirements may have "wiggle room"; and

(c) that there were limited hours and personnel to conduct the necessary work directed solely at META, leaving little to no room for MMTLP related work.

19. I make no legal conclusion regarding whether those statements were correct. I include them solely because they bear directly on the risk of evidence loss. Without court clarification and supervision, additional potentially material evidence relating to MMTLP trading, settlement, and communications may be irretrievably lost.

20. The FINRA trading halt of MMTLP occurred on or about December 9, 2022. As of December 2025, approximately three years have elapsed since that event.

21. Based on communications I have received from brokerage firms and custodians, including written responses to inquiries, certain customer message-center communications and related records are no longer available or are subject to deletion after defined retention periods.

22. I am informed and believe that such message-center communications are often among the first categories of records to be deleted once retention periods expire.

23. I am not aware of any docketed order directing preservation of:

(a) broker-dealer message-center communications,

(b) internal communications relating to MMTLP trading, or

(c) third-party datasets referenced in public statements.

24. Based on my review of the docket and communications with estate representatives, I am not aware of any subpoena having been issued to Broadridge Financial Solutions, despite repeated references to Broadridge in public discussions.

25. I am also not aware of any docketed filing identifying:

(a) the custodians of any trading datasets described as "comprehensive" or "historical,"

(b) the scope of such datasets, or

(c) whether such data has been independently verified.

26. My concern is not the substance of any investigation, but whether the current record sufficiently documents what data exists, who controls it, and whether it is being preserved.

27. In reviewing the Trustee's interim fee application and related billing records, I observed numerous entries reflecting reliance on information provided by George Palikaras, the former Chief Executive Officer of the Debtor.

28. I raise this fact not as a fee objection and not to challenge Mr. Palikaras's intent, but because the extent of reliance on a former officer bears on:

    (a) investigative independence,

    (b) completeness of disclosures, and

    (c) the Court's supervisory role in ensuring transparency.

29. I do not ask the Court to make any finding regarding Mr. Palikaras's conduct. I raise this issue solely to explain why clarification of process and documentation is necessary.

30. In discussions with Mr. Scott Traudt and through communications with Mr. Palikaras, I became aware of the existence of a list of approximately 150 oil and gas companies that were allegedly contacted regarding potential oil & gas asset sales at the time of the Reverse Merger between META and Torchlight Energy Resources, Inc.

31. Requests for production of that list were made and declined. I include this fact not to seek production in this motion, but because it illustrates unresolved gaps in the factual record that may affect future estate determinations.

32. During the call, Mr. Traudt raised questions regarding litigation funding arrangements referenced on the docket. Mr. Hartman stated that there was only one litigation funding plan. I interjected that I may have misunderstood prior docket statements indicating that two arrangements were "materially the same." Mr. Hartman stated that this characterization was a "red herring." Mr. Traudt then asked

3

whether one funding arrangement superseded another, and Mr. Hartman responded

that it did.

I do not make any characterization or claim as to Mr. Hartman's use of the term "red

herring," but note that the exchange did not provide the clarification I was seeking

regarding the litigation funding arrangements.


33. I submit this declaration to assist the Court in determining whether:

(a) additional clarification is required regarding preservation,

(b) supplemental disclosures may be necessary, and

(c) further motion practice should be directed or limited.


34. I respectfully submit that the issues described above have become materially

time-sensitive and were not ripe at the time of earlier filings.


I declare under penalty of perjury under the laws of the United States

that the foregoing is true and correct.


Executed on: February 9th, 2026

Danielle Spears, Pro Se Movant

12206 West Harrison Street

Avondale, AZ 85323

MARICOPA COUNTY

# EXHIBIT 2

## DECLARATION EXHIBIT LIST

1. Declaration of Danielle Spears

2. Declaration of Scott Traudt

3. Email dated 12/18/2025 to Jeffrey L Hartman RE:

    a. Thank you for explaining Request for Notice

    b. Request for Video Conference with Hartman & Lovato

    c. Copy of the 12 page document Mr. Burnett discussed in the Fee Application Hearing that was in response to a Pro Se.

4. Email dated 1/3/2026 to Jeffrey L Hartman RE:

    a. The McCabe Transaction Potential clawback of a $24.4M loan made to NBH by Meta Materials, which was sold to Greg McCabe for a total of $6.7M.

    b. Broadridge Shareholder Data - Again suggesting that this data would potentially benefit the estate by identifying the shareholders of not only Meta Materials, but also of MMTLP/NBH, potentially enabling proper bar notice and confirming the extent to which both MMAT & MMTLP were oversold.

    c. Traudt - Fleming / TD Ameritrade Audio in which broker, Cameron Fleming of TDA allegedly admitted that TDA called for the halt because MMTLP was trading at 100X dark pools and lit markets, suggesting potential trading prices of $290-$1250 a share (the high $12.50 and low $2.90 during the last two days of trading of MMTLP). This could be a potentially provable logic behind FINRA's Motion to Quash.

5. Email dated 1/3/2026 to Jeffrey L Hartman RE: Request for nine documents found within the First Interim Fee Application.

6. Email dated 1/7/2026 to Jeffrey L Hartman RE: Follow up on the conference call ..eauling between myself and Mr. Brust as agreed to during the New Years Eve conference call.

7. Books and Records Request mailed to Charles Schwab & Co., Inc on December 23, 2023. Schwab bought TD Ameritrade and my TD Ameritrade account therefore migrated to Schwab after the halt. I requested Share Reconcillation Reports, Trade Confirmations & Fail-To-Deliver (FTD) reports, Account statements and Internal and External Communications.

8. Schwab responded in the negative objecting to the Subpoena of all documents even though it was not issued as a subpoena.

9. Official Form 410 Proof of Claim form filed by Broadridge Financial Solutions in the amount of $355,103.22.

10. SEA Rule 17a-4 and related interpretations.

11. FINRA Rule 4511 General Requirements of Books and Records

12. FINRA Rule 4512 Customer Account Information Retention Rules and Compliance

13. FINRA Rule 4513 Records of Written Customer Complaints records retention

# EXHIBIT 1

DISTRICT OF NEVADA

| In re: | | Case No.: 24-50792-hlb |
| META MATERIALS INC., | | (Chapter 7) |
| | | |
| Debtor. | | **AFFIDAVIT OF SCOTT TRAUDT** |
| | | **FEBRUARY 7, 2026** |
| | | |

## AFFIDAVIT OF SCOTT TRAUDT

## STATE OF VERMONT COUNTY OF ORANGE

I, Scott Traudt, being of sound mind and over the age of 18, residing at 191 Kibling Hill Rd., Strafford, VT 05072, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. I have personal knowledge of the matters set forth herein.
2. I am the sender of the emails referenced below, which were sent by me to Atty. Jeff Hartman, attorney for the bankruptcy trustee Cristina Lovato in the bankruptcy case styled In Re Meta Materials Inc., Case No. 24-50792, pending in the United States Bankruptcy Court for the District of Nevada.
3. The following exhibits attached hereto are true, correct, and authentic copies of the emails I sent to Atty. Jeff Hartman (and, where applicable, related recipients such as Atty. Robin O'Neil). These documents have not been altered in any way and accurately reflect the communications I transmitted.
   o Exhibit A: Dec 10, 2025 email (to Jeffrey, Robin O'Neil) re: request for emails/letters from Greg McCabe and Wes Christian referenced in Doc 2265, fee application records, redactions in billing, and call summaries - Entered under Federal Rule of Evidence 901(b)(1) (Testimony of a Witness with Knowledge).
   o Exhibit B: Jun 6, 2025 email re: question regarding litigation funding source in In Re Meta Materials Inc. - Entered under Federal Rule of Evidence 901(b)(1) (Testimony of a Witness with Knowledge).
   o Exhibit C: Dec 30, 2025 email re: 150 companies list / interested purchasers of TRCH/Next Bridge Orogrande wells - Entered under Federal Rule of Evidence 901(b)(1) (Testimony of a Witness with Knowledge).
   o Exhibit D: Jan 5, 2026 email: Traudt data request re: 150 Suitors List and Wes Christian-related emails - Entered under Federal Rule of Evidence 901(b)(1) (Testimony of a Witness with Knowledge).
   o Exhibit E: Jan 20, 2026 email: Follow up on New Year's Eve talks re: 150 company list and Schwab/TDA subpoena for audio recording - Entered under Federal Rule of Evidence 901(b)(1) (Testimony of a Witness with Knowledge).
   o Exhibit F: Jeff's response to Traudt January 20, 2026 follow up (which was Exhibit E, above).

4. All of the aforementioned emails have been forwarded to Danielle Spears at times pr̶ to Februar̶ ̶. ̶ ̶.

Executed on this 7th day of February, 2026, at Strafford, Vermont.

SIGNED                                          NOTARY

Scott Traudt                                    NOTARY

DATE: Feb 7, 2026                               DATE: 2/7/26



Emails and letters from Greg McCabe    ✕    🖨    ↗
and Wes Christian referenced in Doc.
2265 in case 24-50792-gs (Meta
bankruptcy)   ✳ Inbox ✕

Dec 10



≝ AI Overview                                                    ⌄



**Scott Traudt** <sctraudt@gma...   ✉ Dec 10, 2025, 6:39 AM   ☆   ☺   ↩   ⋮
to Jeffrey, roneil ⌄

Jeff:

You filed a request for $188,224.80 for costs and labor on November 18, 2025 in the
Meta bankruptcy case. I have reviewed it and I need records from that case.

Under U.S. bankruptcy law, specifically 11 U.S.C. § 107(a), all papers filed in a
bankruptcy case and the court's dockets are public records open to examination by
any entity at reasonable times without charge. If the emails and letters from Greg
McCabe and Wes Christian (or his firm, Christian Attar) have been filed on the docket
(e.g., as exhibits or referenced attachments in pleadings like your fee application), I
have a right as a member of the public to inspect and copy them via PACER or in
person at the clerk's office. It appears they are not. However, if they are not docketed
but held in your or the trustee's records, as trustee's counsel under 11 U.S.C. § 327,
you have a duty to disclose estate-related information to interested parties upon
request, per 11 U.S.C. § 704(a)(7), which requires the trustee to furnish such
information unless the court orders otherwise.

As a party in interest—having intervened in this case (e.g., via motions objecting to
Christian's representation) and with a related state court appeal involving Christian's
conduct tied to this bankruptcy—I am entitled to inspect these communications
concerning potential conflicts, Next Bridge issues, and McCabe's involvement, as they
relate to the estate's administration. If needed, I can seek a Bankruptcy Rule 2004

order for examination and production, but informal disclosure is preferred to avoid
unnecessary court involvement; please provide copies or access promptly to fulfill
these statutory obligations.

I also seek an explanation as to why so many of the references in your billing
statement involving Christian are redacted?

If you could provide me a summary of the calls referenced that would be cool too.

| 09/10/24 | JLH | Review nondisclosure agreement between Meta Materials and Maxwave Capital in connection with, or relation to, Authentix and 24 M transactions. E-mail and telephone conference with Eric Browndorf re: same. | 0.50 | $262.50 |
| | JLH | ... phone conference with Wes Christian re: market ~~...~~ | 0.70 | $367.50 |
| 04/16/25 | JLH | Telephone conference with Eric Browndorf re: the Next Bridge issues with Christian Attar. Letter from Greg ████ o Trustee Lovato. Another filing objecting to Christian Attar representation of Next Bridge. | 0.50 | $262.50 |
| | | Lou Bubala re: terms. | | |
| 04/23/25 | JLH | Review the amended Rule 2014 declaration from Wes Christian. Make revisions and forward to Trustee Lovato for reveiw and approval. Forward to Wes Christian for review and approval. | 0.50 | $262.50 |
| 04/06/25 | JLH | Lengthy e-mail from George Palikaras re: potential litigation involving NextBridge and McCabe and potentail conflict issues. Forward to Clay Brust for follow up discussion. | 0.70 | $367.50 |
| 04/04/25 | JLH | E-mail from Holly Pappas with the draft stipulated protective order relating to Schwab, TD Ameritrade and Trade Station - to be used as a template for all protective orders relating to additional discovery targets. E-mail from Haim Bodek re: specific technical additions/suggestions for the draft protective order. Review and respond to litigation team with revisions re: specific bankruptcy processes/procedures in pre litigation practice, i.e. distinctions between 2004 exams and depositions, etc. Respond that Wes Christian or Steve Tountas | 1.30 | $682.50 |

| | JLH | E-mail exchange with Clay Brust and Wes Christian re: extension agreement with Virtu on document/information production. | 0.10 | $52.50 |
|---|---|---|---|---|
| | JLH | Telephone conference with Wes Christian re: the Next Bridge representation issue. Review and provide edits to the proposed protective order involving Schwab, Trade Station and TD Ameritrade (possibly Think or Swim). | 0.30 | $157.50 |
| 04 /10/25 | JLH | Review and comment on e-mail from Holly Pappas at Christian Attar with the latest draft version of the proposed protective order for Schwab, TD Ameritrade, Trade Station and Think or Swim. E-mail from Joel Wertman with proposed redline modifications to the draft protective order with Schwab, TD Ameritrade, Trade Station, et al. E-mail to Christian Attar with procedure following approval | 0.70 | $367.50 |

| Invoice #: | | 8310 | | Page | 20 |
|---|---|---|---|---|---|
| | | by all counsel of the stipulated form of protective order. | | | |
| | JLH | E-mail to Wes Christian requesting position on the Next Bridge issues and allegations of conflict by possible shareholders. | 0.20 | $105.00 | |
| 04 /07/25 | JLH | E-mail from Robison's office re: incorrect service address for NASDAQ. E-mail to Wes Christian re: the response to an all-hands call on the Anson subpoena and status on the NASDAQ and Citadel responses. E-mail exchanges re: Depository Trust Company request for extension. | 0.30 | $157.50 | |
| | JLH | Lengthy call with George Palikaras re: NextBridge issue, ☐ Canada issue, potential McCabe [...] and [...] tr[...] specifics on multiple items, including Financial | 1.00 | $525.00 | |



| 09 /10/24 | JLH | Review nondisclosure agreement between Meta Materials and Maxwave Capital in connection with, or relation to, Authentix and 24 M transactions. E-mail and telephone conference with Eric Browndorf re: same. | 0.50 | $262.50 |
| | JLH | ... phone conference with Wes Christian re: market ... | 0.70 | $367.50 |

Please review these sections attached above, identify the emails and letters referenced by McCabe and Christian, and email them to me please.

For any assertion of privilege, let me know and I'll spin up another motion for Judge Spraker to compel release.

Sincerely,

Scott Traudt

Strafford VT

**One attachment** · Scanned by Gmail ⓘ    ⚡ Add to Drive

Review nondisclosure agreement between Meta
Materials and Maxwave Capital in connection with,
or relation to, Authentix and 24 M transactions.
E-mail and telephone conference with Eric
Browndorf re: same.

... phone conference with Wes Christian re: market ...



---------- Forwarded message ----------
From: **Scott Traudt** <sctraudt@gmail.com>
Date: Fri, Jun 6, 2025 at 10:20 AM
Subject: Question regarding litigation funding in "In Re Meta Materials Inc."
To: <notices@bankruptcyreno.com>
Cc: Danielle Spears <spldbrat351964@gmail.com>, Jennifer Vetrano <jvetrano999@gmail.com>, contique willcot <contiq9@yahoo.com>, Matthew Pease <matt@matthewpease.com>, Jason <mastcab1@gmail.com>


Atty. Hartman:

I will be filing a motion to intervene in this case and to disqualify Wes Christian from any and all representation but before I file I need to check the accuracy of claims made by Christian in the docket. Also understand that Christian has filed a frivolous SLAPP suit against me and as of yesterday approached me via counsel to agree to a dismissal of the case, but I refused and he has been presented with a $500,000 demand by my counsel in the matter. Upon information and belief, Christian can expect there will be a multitude of lawsuits against him for conduct in this bankruptcy case.

The most important one is:  who is the source of the $11.8 million in litigation funding (or reasonably approximate amount) referenced in this 30 October 2024 filing?

Did Parabellum Capital provide the loan? Or an affiliate? Or someone else?

Was the funding source devoid of counterparty interest? Did you investigate this in keeping with the requirements of 11 U.S.C. § 1106(a)(3)?

See attached,

Scott Traudt
Strafford VT
802-318-0429


christian payday.pdf (170K)                                                    ✕





**Scott Traudt** <sctraudt@g...   Tue, Dec 30, 2025, 10:14 AM       

to Jeffrey ▼

Jeff:

George Palikaras told me the estate has a list of approximately 150 companies that Greg McCabe submitted to George and META execs that showed parties interested in buying the Orogrande wells from NBH.

I tend to think this was not accurate.

I'd like a copy of that file via email so I can begin investigating whether it was fictiona or not, as it would appear if NBH falsified that interest then there was no legally binding spin off and:

1. MMTLP shares are now MMAT shares with all associated rights.
2. I have a derivatives and RICO lawsuit against NBH in Nevada accordingly.

I am free to talk by phone.

Scott Traudt
802-318-0429



# Traudt data request

Summarize this email

**Scott Traudt** <sctraudt@gmail.com>                    Mon, Jan 5, 3:22 PM
to Jeffrey

Jeff:

I'd really like a copy of the "150 Suitors List" or whatever we want to call it that we discussed New Years eve that was created by Greg McCabe to prove to Meta that his wells were sought after.

George has it, I'd like it, and I'd also like any and all emails you've created or responded to regarding Wes Christian's issues representing Next Bridge and acting as special counsel in this bankruptcy



**From:** Scott Traudt <sctraudt@gmail.com>
**Sent:** Tuesday, January 20, 2026 4:55 AM
**To:** Jeffrey L. Hartman <jlh@bankruptcyreno.com>
**Subject:** Follow up on New Year's Eve talks

Jeff:

Please let me know if you are going to supply me with that 150 or so company list supplied to MMAT by McCabe and/or John Brda that provided the validation of the spinoff value. An answer today is needed otherwise I will file a motion to force its release.

I'd also need to know if your records subpoena did include demands from Schwab/TDA for my audio recording with Fleming that took place on March 20, 2023.

Thanks,

Scott Traudt
802-318-0429
Strafford VT

JAN 20



Ex. F



**Jeffrey L. Hartman**                                        Tue, Jan 20, 1:13 PM    ☆   ☺   ↩   ⋮
to me, Kent, Lovato ▾

Scott:

I have consulted with Trustee Lovato's litigation counsel regarding your request.  We have concluded that the Trustee will not provide the information.  Should you choose to seek a Court order on this issue, we will oppose the request and ultimately the Court will decide the issue.

Jeff Hartman

JAN 20

# EXHIBIT 3

 Gmail

**Danielle Spears <paymmtlpnow@gmail.com>**

---

## Video Conference

Danielle Spears <paymmtlpnow@gmail.com>                    Thu, Dec 18, 2025 at 1:00 PM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>, Christina Lovato <trusteelovato@att.net>, Scott Traudt
<sctraudt@gmail.com>

Good afternoon,
First, thank Mr. Hartman for explaining the Request for Notice to me.  I am still very much learning and I really appreciate
the assistance.  I'll get the Request for Notice sent out by Friday.
Second, Mr. Traudt and I would really appreciate it if we could schedule a video conference with you both. We each have
questions about several things.  Maybe the conference need only be with Mr. Hartman, but I wanted to be respectful and
ask you both.  If you agree that a conference might serve us all well, please respond with open dates and times that
would work for you both and we'll make it happen.
Lastly, Mr. Hartman, may I please get a copy of the 12 page document that Mr. Burnett spoke of today.  He said it was
in response to a pro se.  If you could please email me that document I'd appreciate it.
Respectfully,
Danielle Spears

# EXHIBIT 4

 Gmail

Danielle Spears <paymmtlpnow@gmail.com>

---

## Conference call

---

**Danielle Spears** <paymmtlpnow@gmail.com>                                      Sat, Jan 3, 2026 at 11:02 AM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>

Hi Jeff,

Thank you again for meeting with us. I appreciate the time you took and the opportunity to speak directly.

I recognize that I provided a large volume of information, and I want to acknowledge your point that it can be difficult to be succinct. This matter has unfolded for me over more than three years, largely in real time, and it traces back even further. As a result, I carry a significant amount of detail, context, and chronology that is difficult to condense in a short discussion. I appreciate your patience, and I apologize if the presentation felt fragmented.

I do believe that if there were an opportunity to walk through the full timeline in a more structured setting, the overall picture—and the significance of certain omissions—would become much clearer. There is simply a substantial amount of ground to cover.

I want to clarify one point in particular. My concerns regarding Mr. Christian are not personal in nature. They are directly tied to MMTLP and to specific issues that, in my view, bear directly on potential asset recovery for the estate. When I raise these issues, my intent is not to assign personal fault, but to highlight material avenues that appear not to have been fully pursued or disclosed.

Specifically:

1. **The McCabe transaction** — There appears to be a "sweetheart" arrangement that may support a clawback of approximately $17 million or more.

2. **Broadridge shareholder data** — Subpoenaing this data would, as you know, immediately identify the full shareholder list, enable proper notice, allow for a new bar date, and confirm the extent to which both MMAT and MMTLP were oversold.

3. **Traudt–Fleming / TD Ameritrade (now Schwab) audio** — This recording includes a broker-dealer admission that MMTLP was trading at approximately 100x. Given that MMTLP traded as low as $2.90, that implies at least $290 per share; at higher prices exceeding $12, the implied exposure exceeds $1,200 per share.

While MMAT was undoubtedly manipulated, it is minor by comparison to MMTLP. The scale of MMTLP exposure is where the real recovery potential appears to lie.

From a bankruptcy perspective, if the estate were able to resolve even a portion of this exposure, whether framed as settlement of approximately 165 million shares or a much larger short position potentially exceeding 600 million shares, the financial implications would be extraordinary. At $300–$1,200 per share, the numbers speak for themselves.

In my view, this explains why broker-dealers, and particularly FINRA, have fought so aggressively to prevent this data from being examined. The use of "halted until deleted" effectively allowed short positions to avoid being covered, to the direct detriment of retail investors. If it were established that even a single security was oversold multiple times over and then administratively erased to conceal that fact, the regulatory consequences would be severe.

TradeStation has already publicly acknowledged that it does not possess sufficient shares to cover MMTLP. I also possess FOIA materials reflecting communications between the FIF (a broker consortium) and the SEC in which they expressly stated that they did not have the shares to cover MMTLP either. This is not speculative, it is documented.

This is precisely the data that has remained buried for more than three years.

I look forward to the upcoming conference call with Mr. Brust, as I believe it will provide an opportunity to articulate clearly why FINRA has opposed his efforts. In my assessment, once subpoenas sought MMTLP and Torchlight Energy Resources data, the META bankruptcy became an adversary to regulators and to every major broker-dealer involved in selling MMTLP.

Thank you again for your time and consideration. I appreciate your willingness to engage on these issues, and I look forward to continuing the discussion.

Respectfully,
Danielle
[Quoted text hidden]

# EXHIBIT 5

# M Gmail

Danielle Spears <paymmtlpnow@gmail.com>

---

## Interim fee application (Dkt. 2265-6)

**Danielle Spears <paymmtlpnow@gmail.com>**                          Sat, Jan 3, 2026 at 11:08 AM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>
Cc: Scott Traudt <sctraudt@gmail.com>

Good morning Mr. Hartman.

Based on the interim fee application (Dkt. 2265-6), I am requesting copies of the following non-privileged documents that are specifically referenced in the billing entries. These include:

1. The November 1, 2024 email from Eric Browndorf regarding Texas litigation involving Next Bridge and Greg McCabe;

2. The April 6, 2025 email from George Palikaras concerning potential litigation, conflicts, and McCabe-related issues;

3. Any follow-up email sent to or received from George Palikaras requesting additional information, as referenced on April 7, 2025.

4. The April 9, 2025 email from Christian Attar scheduling a meet-and-confer with Schwab, TD Ameritrade, TradeStation, and ThinkorSwim,

5. The April 9, 2025 email from Wes Christian stating that Next Bridge was not named as a defendant in the Vetrano litigation.

6. The letter from Greg McCabe to Trustee Lovato referenced in the April 16, 2025 billing entry,

7. The letter objecting to Christian Attar's representation of Next Bridge referenced in that same April 16, 2025 entry.

8. The June 13, 2025 memorandum and exhibits from Wes Christian noted as responding to the Spears motion to strike,

9. The July 28, 2025 billing entry referencing PACER research, please provide the list of cases identified during the PACER search relating to Danielle Spears.

If any requested item is unavailable or withheld on the basis of privilege, please let me know. I am happy to coordinate timing if needed.

Respectfully,
Danielle Spears

# EXHIBIT 6

 Gmail

**Danielle Spears <paymmtlpnow@gmail.com>**

## Conference call

**Danielle Spears** <paymmtlpnow@gmail.com>
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>

Wed, Jan 7, 2026 at 1:35 PM

Good afternoon Jeff,
I am following up on the conference call you were going to set up with myself and Mr. Brust. Please let me know what his availability is, so I can block that time on my calendar asap.
Thank you,
Danielle
[Quoted text hidden]

# EXHIBIT 7

Danielle D Spears                                                    12/17/2024
12206 W Harrison Street
Avondale, AZ 85323

**RECEIVED**

DEC 2 3 2024
TPLP
**TEXAS**

Charles Schwab & Co., Inc.
Legal Compliance Department
3000 Schwab Way
Westlake, TX 76262-8104

RE: Formal Request for Books and Records Related to MMTLP Share Reconciliation

To Whom It May Concern,

I am writing as a client who transferred 100 shares of MMTLP from TD Ameritrade to Charles
Schwab during Schwab's acquisition of TD Ameritrade. I have significant concerns regarding the
handling, reconciliation, and tracking of MMTLP shares during this transition, including potential
overselling, failure-to-deliver (FTD) obligations, and discrepancies in share accounting.

Pursuant to FINRA Rules 4511, 3110, 4370, and 4530, as well as SEC Rules 17a-3, 17a-4,
15c3-3, and Regulation SHO, I formally request the following books and records that Schwab is
obligated to maintain and produce:

**Specific Records Requested:**
1. **Share Reconciliation Reports:** All documents showing the reconciliation, tracking, and
   movement of MMTLP shares during Schwab's acquisition of TD Ameritrade.
   Any internal or external audits conducted to verify share count, settlement status, and
   allocation.

2. **Trade Confirmations and Failure-to-Deliver (FTD) Reports:**
   Detailed records reflecting purchases, sales, and settlement of MMTLP shares in my
   account. All FTD notices under SEC Regulation SHO Rule 204 related to MMTLP
   shares during the acquisition period.

3. **Account Statements:**
   Historical account statements from TD Ameritrade and Charles Schwab showing
   ownership, transfers, and all activity related to my 100 shares of MMTLP.

4. **Internal and External Communications:**
   Any written, electronic, or recorded communications between Schwab, TD Ameritrade,
   FINRA, the SEC, and third parties concerning:
        The handling and reconciliation of MMTLP shares,
        Share overselling,
        Failure-to-deliver (FTD) obligations, or

Other discrepancies affecting MMTLP shareholders during the acquisition process.

**Legal Basis for My Request:**
Schwab, as a FINRA member and registered broker-dealer, is obligated under the following legal and regulatory framework to provide accurate records and safeguard customer assets:

**FINRA Rule 4511:** Requires broker-dealers to maintain and produce books and records for at least 6 years.
**FINRA Rule 3110:** Requires broker-dealers to supervise and document compliance with securities laws, ensuring accurate tracking of shares during major transitions like acquisitions.
**FINRA Rule 4370:** Mandates that Schwab's Business Continuity Plan (BCP) address disruptions during acquisitions to protect customer accounts.
**FINRA Rule 4530:** Requires Schwab to report customer complaints, FTD issues, or violations of securities laws to FINRA.
**SEC Rule 17a-3 and 17a-4:** Requires Schwab to maintain and provide trade confirmations, reconciliation reports, account statements, and internal communications for audit and transparency purposes.
**SEC Regulation SHO Rule 204:** Obliges Schwab to promptly resolve and document failure-to-deliver positions.
**SEC Rule 15c3-3 (Customer Protection Rule):** Requires Schwab to safeguard and segregate customer securities, ensuring proper control of my 100 shares of MMTLP.
**Sarbanes-Oxley Act (SOX) Section 802:** Prohibits alteration, destruction, or concealment of documents material to securities transactions.
**UCC Article 8:** Guarantees my legal right to possession and control of investment securities. These rules, taken together, establish Schwab's clear responsibility to reconcile, document, and disclose all relevant information about my shares of MMTLP.

**Obligation to Respond Truthfully and Completely:**
Schwab is legally required to respond to this request in good faith, producing the requested documents in full. If Schwab asserts that any records are unavailable, incomplete, or privileged, I request a detailed written explanation identifying the specific grounds for such claims, including citations to applicable laws or regulations.

**Notice of Further Action:**
Should Schwab fail to comply with this request or provide an incomplete response, I reserve my right to take the following actions:

**File a Formal Complaint with FINRA:**
A complaint will include claims of non-compliance with FINRA Rules 4511, 3110, 4370, and 4530, as well as violations of SEC rules regarding books, records, and failure-to-deliver obligations.

**Seek Court Intervention:**
I will pursue legal action to compel Schwab to produce the requested records and to recover damages for any harm caused by the mishandling of MMTLP shares.

**Escalate to the SEC:**
File a complaint with the SEC Office of Compliance Inspections and Examinations (OCIE) regarding Schwab's potential violations of Regulation SHO and record-keeping rules.

**Response Deadline:**
This request is made for a proper purpose: to investigate potential misconduct, overselling, and mishandling of my shares. I expect a complete, substantive response within 30 calendar days, no later than **1/17/2025.**

Please send your response, including all requested documents, to my contact information provided above.

Failure to comply with this request will result in immediate escalation as outlined above. I trust Schwab will act in accordance with its regulatory obligations and fiduciary duties to its customers.

Thank you for your prompt attention to this matter.

Sincerely,

Danielle D Spears
Account # 59939916
Former TD Ameritrade Client
Current Schwab client via acquisition

Dated: 12/17/2024

# EXHIBIT 8

## NOTICE OF GENERAL OBJECTIONS AND RESERVATIONS

Charles Schwab & Co., Inc. ("Schwab") hereby objects to the Subpoena issued to it in the above-referenced action as follows:

1.  Schwab objects to the Subpoena to the extent it purports to seek information and/or documents protected from discovery based on the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or substantive right, such as the right of privacy. Any inadvertent or unintentional disclosure of documents subject to a claim of privilege shall not be deemed a waiver, in whole or in part, of any such privilege; once put on notice of the inadvertent or unintentional disclosure of a protected document, the receiving party shall return the document(s) and not use such document(s) in any manner.

2.  Schwab objects to the Subpoena to the extent it seeks to impose obligations beyond those required by the forum or jurisdiction from which the Subpoena was issued.

3.  Schwab objects to the Subpoena to the extent it purports to impose an unreasonable timeframe for compliance.

4.  Schwab objects to the Subpoena to the extent that it is overbroad, unduly burdensome and/or vague, particularly insofar as any request seeks to impose a company-wide search for "All" documents, correspondence, records, reports, electronically stored data including but not limited to e-mail, telephone calls, etc., or other materials.

5.  Schwab objects to the Subpoena to the extent that it includes Definitions that are overbroad and/or vague.

6.  Schwab objects to the Subpoena to the extent that it does not contain a specific Relevant Time Period relating to the dispute or proceeding.

7.  Schwab objects to the Subpoena to the extent that it dictates the format of Schwab's production of records insofar as those formats may be different from the format(s) Schwab uses to archive and/or store its documents.

8.  Schwab objects to the Subpoena to the extent it purports to seek information and/or documents containing proprietary and/or commercially sensitive (confidential) information relating to Schwab's business, internal policies, programs, and guidelines, without adequate protection against improper use or disclosure.

9.  Schwab objects to the Subpoena to the extent it purports to seek documentation containing its customers' private, non-public and/or confidential information without adequate protection against improper use or disclosure.

10. Schwab objects to the Subpoena to the extent it seeks information and/or documents that are neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence.

11. Schwab objects to the Subpoena to the extent that it demands the production of records that are already in the possession, custody, or control of the requesting party, or are otherwise publicly available.

12. Schwab objects to the Subpoena to the extent it demands the production of duplicative or ancillary documents relating to transactions or activities described in Schwab's account statements.

13. Schwab objects to the Subpoena insofar as it seeks documents from business entities other than the entity to which the subpoena is addressed, such as parent companies, subsidiaries, affiliates, etc.

14. Schwab objects to the Subpoena to the extent it purports to seek documents that are not within Schwab's possession, custody, or control and/or to the extent the Subpoena calls for the creation of a compilation, report, summary, or other document not created or maintained in the ordinary course of business.

15. Schwab objects to the Subpoena to the extent it purports to impose on Schwab the obligation of creating a privilege log or other list identifying documents withheld from production on the basis of privilege or other objections.

# EXHIBIT 9

**Fill in this information to identify the case:**

Debtor 1   META MATERIALS INC.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **District of Nevada**

Case number:  24-50792

FILED
U.S. Bankruptcy Court
District of Nevada
8/27/2024
Mary A. Schott, Clerk

## Official Form 410
## Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1:   Identify the Claim

**1. Who is the current creditor?**

Broadridge Financial Solutions

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Broadridge Financial Solutions

Name

1155 long Island Avanue
Edgewood, NY 11717

Contact phone

Contact email
Creditadrninistration@broadridge.com

Where should payments to the creditor be sent? (if different)

Broadridge Financial Solutions

Name

PO BOX 416423

BOSTON, MA 02241

Contact phone

Contact email
Creditadrninistration@broadridge.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)            Filed on
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

Official Form 410                        Proof of Claim                        page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☐ No<br>☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: | 134N |

7. **How much is the claim?**   $ _355103.22_   **Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

_services performed_

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $ _____

**Amount of the claim that is secured:**   $ _____

**Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate** (when case was filed)   _____ %

☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

11. **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

☑ No
☐ Yes. *Check all that apply:*

| | | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    8/27/2024
                    MM / DD / YYYY

/s/ Noella Goolamier
Signature

Print the name of the person who is completing and signing this claim:

Name    Noella Goolamier
        First name    Middle name    Last name

Title   Process Manager

Company    Broadridge Financial Solutions
           Identify the corporate servicer as the company if the authorized agent is a servicer

Address    1155 long Island Avanue
           Number   Street
           Edgewood, NY 11717
           City   State   ZIP Code

Contact phone    _____    Email    Creditadrninistration@broadridge.com

# EXHIBIT 10

# SEA Rule 17a-4 and Related Interpretations

Publication Date: August 11, 2025

*Interpretations are marked in blue background beneath the rule text to which they relate.*

**17a-4 Records to be preserved by certain exchange members, brokers and dealers.**

This section applies to the following types of entities: A member of a national securities exchange who transacts a business in securities directly with others than members of a national securities exchange; a broker or dealer who transacts a business in securities through the medium of a member of a national securities exchange; a broker or dealer, including an OTC derivatives dealer as that term is defined in § 240.3b-12, registered pursuant to section 15 of the Act (15 U.S.C. 78o); a security-based swap dealer registered pursuant to section 15F of the Act (15 U.S.C. 78o-10) that is also a broker or dealer, including an OTC derivatives dealer, registered pursuant to section 15 of the Act; and a major security-based swap participant registered pursuant to section 15F of the Act that is also a broker or dealer, including an OTC derivatives dealer, registered pursuant to section 15 of the Act. Section 240.18a-5 (rather than this section) applies to the following types of entities: A security-based swap dealer registered pursuant to section 15F of the Act that is not a broker or dealer, including an OTC derivatives dealer, registered pursuant to section 15 of the Act; and a major security-based swap participant registered pursuant to section 15F of the Act that is not a broker or dealer, including an OTC derivatives dealer, registered pursuant to section 15 of the Act.

17a-4(a) Every member, broker or dealer subject to § 240.17a-3 must preserve for a period of not less than 6 years, the first two years in an easily accessible place, all records required to be made pursuant to § 240.17a-3(a)(1) through (3), (5), and (21) and (22), and analogous records created pursuant to § 240.17a-3(e).

## 17a-4(a)/01 Records Maintained at Branches

Records that have originated in a branch office and are required to be maintained in "an easily accessible place," may be maintained at a branch office, provided the broker-dealer agrees to transmit to its main office at the request of the Commission or other examining authorities the original or copies of the records within 36 hours. Records maintained at foreign branches are subject to the same requirements. The laws of the foreign country in which the branch is domiciled shall not in any way encumber the requirement that records be kept in "an easily accessible place" pursuant to this paragraph.

(SEC Letter to NASD, November 2, 1983)
(SEC Release 34-28243, May 29, 1991)
(NYSE Interpretation Memo 94-6, December 1994)

17a-4(b) Every member, broker or dealer subject to § 240.17a-3 must preserve for a period of not less than three years, the first two years in an easily accessible place:

17a-4(b)(1) All records required to be made pursuant to § 240.17a-3(a)(4), (6) through (11), (16), (18) through (20), and (25) through (31), and analogous records created pursuant to § 240.17a-3(e).

17a-4(b)(2) All check books, bank statements, cancelled checks and cash reconciliations.

17a-4(b)(3) All bills receivable or payable (or copies thereof), paid or unpaid, relating to the member, broker or dealer's business as such.

17a-4(b)(4) Originals of all communications received and copies of all communications sent (and any approvals thereof) by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such, including all communications which are subject to rules of a self-regulatory organization of which the member, broker or dealer is a member regarding communications with the public. As used in this paragraph (b)(4), the term *communications* includes sales scripts and recordings of telephone calls required to be maintained pursuant to section 15F(g)(1) of the Act (15 U.S.C. 78o-10(g)(1)).

# EXHIBIT 11

FINRA RULES  >   4000 FINANCIAL AND OPERATIONAL RULES  >   4500. BOOKS, RECORDS AND REPORTS
4510. BOOKS AND RECORDS REQUIREMENTS

# 4511. General Requirements

| The Rule | Notices |

**(a)** Members shall make and preserve books and records as required under the FINRA rules, the Exchange Act and the applicable Exchange Act rules.

**(b)** Members shall preserve for a period of at least six years those FINRA books and records for which there is no specified period under the FINRA rules or applicable Exchange Act rules.

**(c)** All books and records required to be made pursuant to the FINRA rules shall be preserved in a format and media that complies with SEA Rule 17a-4.

Adopted by SR-FINRA-2010-052 eff. Dec 5, 2011.

**Selected Notice:** 11-19.

---

Disclaimer: The summary and associated topics are only available for 50 FINRA Rules and have been added as part of the FINRA Rulebook Search Tool™ ("FIRST™") prototype. FIRST is for information purposes only and does not provide regulatory or compliance advice. You should always review the relevant rule text and reference guidance to understand your regulatory obligations. Usage or reliance on FIRST is not a defense to a failure to comply with the FINRA rules. Learn More

## SUMMARY TOPICS ⓘ

| | |
|---|---|
| Customer Type (CT) (2) | ∨ |
| Firm Type (FT) (8) | ∨ |
| Numerical References (NR) (v) | ∨ |
| Obligations & Duties (OD) (1) | ∨ |
| Security Type (ST) (2) | ∨ |

# EXHIBIT 12

FINRA RULES > 4000. FINANCIAL AND OPERATIONAL RULES > 4500. BOOKS AND RECORDS REQUIREMENTS
4510. BOOKS AND RECORDS REQUIREMENTS > 4500. BOOKS, RECORDS AND REPORTS

## 4512. Customer Account Information

Rule    Notices

(a) Each member shall maintain the following information:

(1) for each account:

(A) customer's name and residence;

(B) whether customer is of legal age;

(C) name(s) of the associated person(s), if any, responsible for the account, and if multiple individuals are assigned responsibility for the account, a record indicating the scope of their responsibilities with respect to the account, provided, however, that this requirement shall not apply to an institutional account;

(D) signature of the partner, officer or manager denoting that the account has been accepted in accordance with the member's policies and procedures for acceptance of accounts;

(E) if the customer is a corporation, partnership or other legal entity, the names of any persons authorized to transact business on behalf of the entity; and

(F) subject to Supplementary Material .06, name of and contact information for a trusted contact person age 18 or older who may be contacted about the customer's account, provided, however, that this requirement shall not apply to an institutional account.

(2) for each account other than an institutional account, and accounts in which investments are limited to transactions in open-end investment company shares that are not recommended by the member or its associated persons, each member shall also make reasonable efforts to obtain, prior to the settlement of the initial transaction in the account, the following information to the extent it is applicable to the account:

(A) customer's tax identification or Social Security number;

(B) occupation of customer and name and address of employer; and

(C) whether customer is an associated person of another member; and

(3) for discretionary accounts maintained by a member, in addition to compliance with subparagraph (1) and, to the extent applicable, subparagraph (2) above, and Rule 3260, the member shall maintain a record of the dated, signature of each named, associated person of the member authorized to exercise discretion in the account. This recordkeeping requirement shall not apply to investment discretion granted by a customer as to the price at which or the time to execute an order given by a customer for the purchase or sale of a definite amount or quantity of a specified security. Nothing in this Rule shall be construed as allowing members to maintain discretionary accounts or exercise discretion in such accounts except to the extent permitted under the federal securities laws.

(b) A member need not meet the requirements of this Rule with respect to any account that was opened pursuant to a prior FINRA rule until such time as the member updates the information for the account either in the course of the member's routine and customary business or as otherwise required by applicable laws or rules.

(c) For purposes of this Rule, the term "institutional account" shall mean the account of:

(1) a bank, savings and loan association, insurance company or registered investment company;

(2) an investment adviser registered either with the SEC under Section 203 of the Investment Advisers Act or with a state securities commission (or any agency or office performing like functions); or

(3) any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million.

---

**VERSIONS**

May 08, 2019 onwards ⌄

---

**SUMMARY TOPICS** ⓘ

⚠ Disclaimer: The summary and details are only available for 40 FINRA Rules and is a beta version applied as part of the FINRA Rulebook Search Tool ("FIRST") (prototype, FIRST is for informational purposes only and does not provide regulatory or compliance advice. You should always review the relevant rule text and related guidance as it is necessary to your regulatory obligations or compliance usage or reliance. If you have a question on a rule and how to comply with the FINRA rules, Learn More

Account Information & Management (ACC) (10)    ⌄

Customer Type (CT) (2)    ⌄

Firm Type (FT) (8)    ⌄

Monetary Value (MV) (1)    ⌄

Numerical References (NR) (1)    ⌄

Obligations & Duties (OD) (11)    ⌄

Regulatory Process (RP) (3)    ⌄

Security Type (ST) (2)    ⌄

**• • • Supplementary Material: ———**

**.01 Customer Account Information Retention Periods.** For purposes of this Rule, members shall preserve a record of any customer account information that subsequently is updated for at least six years after the date that such information is updated. Members shall preserve a record of the last update to any customer account information, or the original account information, if there are no updates to the account information, for at least six years after the date the account is closed.

**.02 Additional Customer Account Records Under the Exchange Act.** Members should be aware that they may be required to make and preserve additional customer account records as required under Section 17(a) of the Exchange Act and the applicable associated Exchange Act rules.

**.03 Compliance With Rule 2070.** With respect to paragraph (a)(2)(B) of this Rule, members should be aware that a customer having a financial interest in, or controlling trading in, an account is an employee of FINRA.

**.04 "Maintain" and "Preserve."** For purposes of Rule 4512 only, as a general matter, the term "maintain" is used to reflect customer account information that is current or in use. The term "preserve" is used to reflect customer account information that is no longer current or in use.

**.05 Supervision of Accounts.** Nothing in paragraph (a)(1)(C) of this Rule obviates a member's obligation to supervise an account that it services, including determining the associated persons responsible for the account and ensuring that such persons are appropriately qualified and registered, and to comply with the requirements of Rule 2090 (effective July 9, 2012). With respect to a member's obligation to supervise an account, it is incumbent upon the member to design appropriate mechanisms to determine the associated persons responsible for the account, ensure that such persons are appropriately qualified and registered, and have the ability to provide such information to FINRA or SEC staff upon request.

**.06 Trusted Contact Person**

(a) With respect to paragraph (a)(1)(F) of this Rule, at the time of account opening, a member shall disclose in writing, which may be electronic, to the customer that the member or an associated person of the member is authorized to contact the trusted contact person and disclose information about the customer's account to address possible financial exploitation, to confirm the specifics of the customer's current contact information, health status, or the identity of any legal guardian, executor, trustee or holder of a power of attorney, or as otherwise permitted by Rule 2165. With respect to any account that was opened pursuant to a prior FINRA rule, a member shall provide this disclosure in writing, which may be electronic, when updating the information for the account pursuant to paragraph (b) of this Rule either in the course of the member's routine and customary business or as otherwise required by applicable laws or rules.

(b) The absence of the name of contact information for a trusted contact person shall not prevent a member from opening or maintaining an account for a customer, provided that the member makes reasonable efforts to obtain the name of and contact information for a trusted contact person.

(c) With respect to any account subject to the requirements of SEA Rule 17a-3(a)(17) to periodically update customer records, a member shall make reasonable efforts to obtain or, if previously obtained, to update where appropriate the name of and contact information for a trusted contact person consistent with the requirements of SEA Rule 17a-3(a)(17).

**Selected Notices:** 11-19, 17-11, 19-13.

Amended by SR-FINRA-2019-009 eff. May 8, 2019.
Amended by SR-FINRA-2018-040 eff. May 6, 2019.
Amended by SR-FINRA-2016-039 eff. Feb. 5, 2018.
Amended by SR-FINRA-2010-070 eff. Dec. 5, 2011.
Adopted by SR-FINRA-2010-052 eff. Dec. 5, 2011.

# EXHIBIT 13

# 4513. Records of Written Customer Complaints

**The Rule**    Notices

(a) Each member shall keep and preserve in each office of supervisory jurisdiction either a separate file of all written customer complaints that relate to that office (including complaints that relate to activities supervised from that office) and action taken by the member, if any, or a separate record of such complaints and a clear reference to the files in that office containing the correspondence connected with such complaints. Rather than keep and preserve the customer complaint records required under this Rule at the office of supervisory jurisdiction, the member may choose to make them promptly available at that office, upon request of FINRA. Customer complaint records shall be preserved for a period of at least four years.

(b) For purposes of this Rule, "customer complaint" means any grievance by a customer or any person authorized to act on behalf of the customer involving the activities of the member or a person associated with the member in connection with the solicitation or execution of any transaction or the disposition of securities or funds of that customer.

**Selected Notice:** 11-19.

Adopted by SR-FINRA-2010-052 eff. Dec. 5, 2011.

---

## FINRA

Site Map    Privacy Policy    Terms of Use    Translate    Contact Us

**About Us** — Rules & Guidance
**Careers** — Registration, Exams & CE
**BrokerCheck** — Events & Training
**Data** — Filing & Reporting
**Media Center** — Compliance Tools
**For Firms** — For Investors

**General Inquiries**
301-590-6500

**Securities Helpline for Seniors®**
844-574-3577 (Mon-Fri 9am-5pm ET)

**File a Regulatory Tip**
To report on abuse or fraud in the industry

**Arbitration & Mediation**
FINRA operates the largest securities dispute resolution forum in the United States

**File an Investor Complaint**
File a complaint about fraud or unfair practices

**Small Firm Help Line**
833-26-FINRA (Mon-Fri 9am-5pm ET)

**Office of the Ombuds**
Report a concern about FINRA at 888-700-00...

    

© 2026 FINRA. All Rights Reserved.

---

4511. CUSTOMER ACCOUNT INFORMATION    UP    4516. AUTHORIZATION RECORDS FOR NEGOTIABLE INSTRUMENTS DRAWN FROM A CUSTOMER'S ACCOUNT >

**SUMMARY TOPICS** ●

Customer Type (CT) (2)    ⌄
Firm Type (FT) (5)    ⌄
Numerical References (NR) (1)    ⌄
Obligations & Duties (OD) (6)    ⌄
Regulatory Process (RP) (2)    ⌄
Security Type (ST)(2)    ⌄

Disclaimer: The summary and detailed topics are only available for 4000 and 9000 Series Rules. This summary is prepared by FINRA and is not a part of the rule text. FINRA has provided this summary for information purposes only and does not approve any regulatory or compliance advice. You should always review the relevant Rule text and consult your legal or compliance advisor for an understanding of your obligations. Usage or reliance on this tool's results does not establish a failure to comply with the FINRA rules. Learn More