UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE: | Case No. 24-50792-gs |
| | Chapter 7 |
| META MATERIALS, INC., | |
| | 300 Booth Street |
| | Reno, NV 89509 |
| Debtor. | |
| | Friday, February 20, 2026 |
| | 1:31 p.m. |

TRANSCRIPT OF DOC# 2088 MOTION TO QUASH NON-PARTY CITADEL SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL, LLCS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR FOR A PROTECTIVE ORDER FILED BY RYAN J. WORKS ON BEHALF OF CITADEL SECURITIES LLC;
DOC# 2551 MOTION TO QUASH FILED BY JACQUELYN NICOLE SCHELL ON BEHALF OF THE NASDAQ STOCK MARKET LLC;
DOC# 98 STATUS CONFERENCE RE: EX PARTE APPLICATION TO EMPLOY CHRISTIAN ATTAR AND KASOWITZ BENSON TORRES LLP AS SPECIAL LITIGATION COUNSEL FILED BY JEFFREY L. HARTMAN ON BEHALF OF CHRISTINA W. LOVATO;
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Natalie Clarke, CRD |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

For the Trustee, Christina W. Lovato:

Hartman & Hartman
By: JEFFREY L. HARTMAN, ESQ.
510 West Plumb Lane, Ste. B
Reno, NV 89509
(775) 324-2800

Schneider Wallace Cottrell Konecky LLP
By: DAVID D. BURNETT, ESQ.
1050 30th Street NW
Washington, DC 20007
(510) 740-2939

SBW Law Group
By: CLAYTON BRUST, ESQ.
3600 Mayberry Drive
Reno, NV 89509
(775) 299-4051

Christian Attar
By: JAMES W. CHRISTIAN, ESQ.
1177 W. Loop South, Suite 1700
Houston, TX 77027
(713) 659-7617

CHRISTINA W. LOVATO, ESQ.
P.O. Box 18417
Reno, NV 89511
(775) 851-1424

For Citadel Securities LLC:

McDonald Carano
By: JIMMY F. DAHU, ESQ.
2300 West Sahara Ave. Suite 1200
Las Vegas, NV 89102
(702) 873-4100

Quinn Emanuel Urquhart & Sullivan LLP
By: PETER H. FOUNTAIN, ESQ.
CHRISTOPHER D. KERCHER, ESQ.
MADELEINE P. ZABRISKIE, ESQ.
295 5th Ave
New York, NY 10016
(212) 849-7000

Sullivan & Cromwell LLP
By: C. MICHELLE CHEN, ESQ.
1700 New York Ave NW #700
Washington, DC 20006
(202) 956-7500

APPEARANCES (Continued):

| | |
|---|---|
| For Anson Funds Management LP: | Greenberg Traurig LLP<br>By: MICHAEL R. HOGUE, ESQ.<br>10845 Griffith Peak Dr, Ste 600<br>Las Vegas, NV 89135<br>(702) 792-3773 |
| | Greenberg Traurig LLP<br>By: ALAN J. BRODY, ESQ.<br>500 Campus Drive, Suite 400<br>Florham Park, NJ 07932<br>(973) 443-3543 |
| | Greenberg Traurig LLP<br>By: SYLVIA E. SIMSON, ESQ.<br>One Vanderbilt Avenue<br>New York, NY 10017<br>(212) 801-9275 |
| For The NASDAQ Stock Market LLC: | Ballard Spahr<br>By: JAMES B. ZACK, ESQ.<br>1301 2nd Ave #2800<br>Seattle, WA 98101<br>(206) 223-7403 |
| For Virtu Financial LLC: | Davis Wright Tremaine<br>By: MICHAEL V. RELLA, ESQ.<br>1251 Avenue of the Americas<br>21st Floor<br>New York, NY 10020<br>(212) 880-3973 |
| For Scott Traudt: | SCOTT TRAUDT (PRO SE)<br>191 Kibling Hill Rd.<br>Stafford, VT 05072<br>(802) 318-0429 |
| For Danielle Spears: | DANIELLE SPEARS (PRO SE)<br>12206 W. Harrison St.<br>Avondale, AZ 85323<br>(480) 476-1091 |

(Proceedings commence at 1:31 p.m.)

THE CLERK: Good afternoon. This is Natalie Clarke speaking from the courtroom. We are now on record for the Court's 1:30 calendar with the Honorable Gary Spraker presiding.

THE COURT: Okay. Thank you, Madam Clerk. Let me ask just by a nod of heads on those participating remotely, can you hear me okay? Yeah? Okay. We had some problems earlier this morning, so good.

All right.

MR. CHRISTIAN: Yes, Your Honor. We can hear you.

THE COURT: Perfect.

MR. CHRISTIAN: Thank you.

THE COURT: Thank you. All right. We are here for the 1:30 miscellaneous calendar. Matters today all arise in Meta Materials, Inc.

We have several matters, the first being a continued hearing on a motion to quash non-party, filed by non-party Citadel Securities, Anson Funds Management, LP, and Virtu Financial, LLC. Second matter is a related motion to quash filed by The NASDAQ Stock Market, LLC, as well as a status conference regarding the application to employ by Christian Attar and Kasowitz Benson Torres, LLP, based upon the Court's sua sponte entry of a request to discuss that matter. And finally, we have a scheduling conference in Meta Materials,

Inc. v. NASDAQ Stock Market, LLC, which we'll get to in the ordinary course of this.

Before we begin, primary focus today is -- will be on the motions to quash. I want to say that for the benefit of all parties participating. I want to get to the financing arrangement, which is really the issue with the employment application, if and when we have time. But we're going to start, and I want to focus on the motions to quash.

This is the second hearing on the motions to quash as to the non-parties, as they're referred to. I reviewed the supplemental briefing that has been received. The NASDAQ has, by circumstances, kind of fallen in line with that briefing. I've reviewed that as well, understand that by and large. So I'm about as well prepared, I think.

The problem is you covered a lot of ground. So we'll see where that takes us. But with that introduction, let's go ahead and get appearances, if I could.

Mr. Hartman, you're like one of the few that I recognize. So why don't we let you start, and just -- even if it's not your motion.

MR. HARTMAN: Good morning, Your Honor -- or good afternoon. Jeff Hartman for the trustee, who is present on the phone, and Clay Brust here in the courtroom.

THE COURT: Thank you, Mr. Brust.

Mr. Dahu, I recognize you as well. Come on up and

make your appearances.

MR. DAHU: Good afternoon, Your Honor. Good to see you again. Jimmy Dahu, McDonald Carano, local counsel for Citadel Securities. And we also have in the courtroom Peter Fountain from Quinn Emanuel, Christopher Kercher from Quinn Emanuel, Madeleine Zabriskie from Quinn Emanuel, and we also have client representative Michelle Chen for Citadel Securities.

THE COURT: Excellent.

MR. BRODY: Good afternoon, Your Honor. Alan Brody from Greenberg Traurig on behalf of movant Anson Funds Management, LP. Your Honor, on Zoom also are my partners Michael Hogue and Sylvia Simson. Also on Zoom is our client from Anson Funds, Laura Salvatori.

THE COURT: Thank you very much.

MR. BRODY: Thank you, Your Honor.

MR. RELLA: Good afternoon, Your Honor. Michael Rella from Davis Wright Tremaine for movant Virtu Financial.

THE COURT: Thank you.

MR. CHRISTIAN: Good afternoon, Your Honor. Wes Christian for Meta Materials appearing remotely via Zoom.

THE COURT: Thank you, Mr. Christian. Let's go ahead and jump to Mr. Zack so he can sit back down.

MR. ZACK: Good afternoon, Your Honor. James Zack appearing on behalf of The NASDAQ Stock Market LLC.

THE COURT: Thank you.

Mr. Hogue, I saw -- go ahead, Mr. Christian, did you want --

MR. HOGUE: I apologize for --

MR. BURNETT: (Indiscernible) David Burnett, so I wanted to make sure.

THE COURT: All right. Thank you.

Mr. Hogue.

MR. HOGUE: And yes, Judge Spraker, I did want to make my appearance. I apologize. I had some weird audio glitch and it went to off-phone but wouldn't let me disconnect for some reason. Michael Hogue on behalf of non-party Anson Funds.

THE COURT: Thank you. All right.

MR. BURNETT: And good afternoon, Your Honor. David Burnett from Schneider Wallace on behalf of the trustee.

THE COURT: Thank you, Mr. Burnett. All right.

MS. SIMSON: Good afternoon, Your Honor. My partner, Alan Brody, already introduced me, but Sylvia Simson, Greenberg Traurig, also on behalf of Anson Funds.

THE COURT: Thank you. Good afternoon.

MS. SIMSON: Good afternoon.

THE COURT: I think that's everyone. Did we hit everyone? Okay. All right. We've got our appearances.

My intent is to let NASDAQ kind of take the first

shot at this to catch us up. I've initially heard from the non-parties as to the motion to quash. It just seems in my mind kind of fair to let NASDAQ have a say here as they're new to this environment. So counsel for NASDAQ, whichever wants to proceed.

MR. ZACK: Good afternoon, Your Honor. James Zack for NASDAQ. NASDAQ's motion requests that the Court quash two subpoenas that were served by the trustee for Meta Materials. The subpoenas contain one identical substantive request. So in that regard, most of these arguments will cover both of those subpoenas equally.

The subpoenas should be quashed because first, under Rule 2004, the request scope is improper. Second, under Rule 2004, the request purpose is improper. Third, under Rule 45, the request is procedurally improper outside of Rule 2004. And fourth, under Rule 2005, the request is unduly burdensome, irrelevant, and overbroad.

So I'll start with the Rule 2004 scope. Rule 2004 permits the trustee to examine an entity only if it relates to certain enumerated topics. The trustee has identified two of those enumerated topics as the basis for its request, the debtor's property and the debtor's financial condition. And NASDAQ's position is that the request does not actually relate to either of those, the debtor's property or the debtor's financial condition, for at least three reasons.

First, the request is not limited to the debtor's own assets or conduct. The request seats records related to all third-party stock trades for a four-year period. It goes far beyond the debtor's own assets or conduct. The debtor doesn't have a general property interest in its own shares of stock. And in our briefing we cited --

THE COURT: Unless it's selling it and there's somehow wrongdoing in the sale of that, I assume.

MR. ZACK: Even accepting that premise, that would be a small subsection of the --

THE COURT: We're not into subsections here, though, are we? I mean, this is 2004.

MR. ZACK: No, no, meaning a small subsection of the broad request --

THE COURT: Of requested?

MR. ZACK: -- that's made here. So even if we were talking about trades that involve the debtor specifically, you know, issuing or selling its own stock, the request goes far beyond that to request four years of all trades, including third parties. And we cited a few cases which make it clear that when third parties are trading a corporation's stock, that's not considered a property of the corporation.

THE COURT: I understand that, and we'll get into that much more. I take your point. I think that was made fairly persuasively at the original hearing, and that is an

item of concern.

Just for organizing the argument, I am focusing on Meta as Meta. So assuming that they sold stock during the relevant time, do you concede or do you acknowledge that there could be claims for the manipulation of the market during the periods for which they were selling, which would give rise potentially to causes of action, which would be the property of the estate?

MR. ZACK: Well, not necessarily for a few reasons. First of all, it's not even clear from the record whether we're talking about stock issuance versus secondary sales --

THE COURT: Again, we're in 2004. It's not a motion to dismiss.

MR. ZACK: That's fair. And -- but to -- my second point is that the trustee has not even articulated any actual claims to this point. The trustee asserts that it's uncertain whether any claims even exist.

We're talking about, quote/unquote, "potential claims" related to stock manipulation. So it's vague and speculative. Potential claims we're talking about, even looking at the schedules, it's about as vague as you can get.

THE COURT: But that's --

MR. ZACK: And so the issue here is Rule 2004, extremely broad, but is it limitless, right? If we're just talking about potential stock manipulation claims, what

publicly traded debtor doesn't come into bankruptcy then with the right under Rule 2004 to conduct this full fishing expedition for potential claims based on all trading records of its stock over the last four years when the trustee has not even articulated an actual claim, just saying we want to start from the beginning with looking at all trades? There's really no limits on Rule 2004 in that situation.

THE COURT: So what's the best case you got for that position in a situation like this?

MR. ZACK: Well, it's not necessarily a case so much as the trustee's own language in its opposition, saying that it's exploring any wrongdoing and potential claims that may exist, and the trustee has not yet determined whether any complaints will be filed against any parties related to the stock manipulation investigation.

And so you have a company like NASDAQ who has thousands of publicly traded companies listed on its exchange, and if one of those companies were to file bankruptcy, I'm not sure where this case is distinguishable from any of those, in which case a trustee would just be able to come in on the first day of the case with a 2004 examination asking for NASDAQ or a similarly situated exchange to have to produce such a broad range of all order activity over such a broad period.

THE COURT: I think that cuts both ways, because in a different case where there was no prior involvement, where does

the trustee start? I mean, if the trustee is told that there was concerning activity prepetition, where does the trustee start? So I --

MR. ZACK: The --

THE COURT: This is a classic 2004 situation, and I understand it's all about line drawing, and I'm willing to hear all about that, but I don't know why the trustee can't, if there is a concern that they may have causes of action arising from market manipulation at a time when they ostensibly were in the market selling their stock.

MR. ZACK: It is a line drawing issue ultimately on that point, Your Honor, but then there's also my third point, which is the trustee would lack standing to prosecute potential claims that may exist anyways. And that's where we --

THE COURT: As to the sale of Meta shares?

MR. ZACK: Well, as to stock manipulation claims on behalf of shareholders.

THE COURT: No, but if it was the issuer and seller of shares, that's their shares they're selling, and if the prices were being deflated artificially, wouldn't that give rise to the causes of action, which generically have been, you know, put forth on alleged spoofing and naked short sales?

MR. ZACK: Our position is that under the Ninth Circuit law that we cited in our brief, extending that to the trustee's position as a bankruptcy trustee for the entity that

had, of course, issued its own stock but was not necessary -- but the claims themselves are on behalf of shareholders.

THE COURT: This comes -- this brings up a point that I've been meaning to get to, but given the amount I have not. What law controls? What choice of law are we looking at?

MR. ZACK: With regard to potential stock manipulation claims?

THE COURT: You know, right, I mean, whose law would control?

MR. ZACK: My understanding is that those are federal securities claims that the trustee's at least suggested would be the basis for its claims.

THE COURT: So it would be Ninth Circuit law?

MR. ZACK: I do think Ninth Circuit law would be applicable, yeah.

THE COURT: Okay.

MR. ZACK: And I understand that that particular argument overlaps a lot with what the other parties are saying because everybody's in the same position of arguing that even if this related to the debtor's own assets and even if the trustee had articulated some sort of a claim that goes beyond, you know, the line drawing problem that I think we actually do have in this case, that the trustee wouldn't even have standing for the claims that it's trying to allude to.

I can touch next on the improper purpose of Rule 2004

in this case.

THE COURT: Sure. Go ahead.

MR. ZACK: And it's an interesting one because on the one hand, we're just talking about how the trustee represents that it's so early in its process, hasn't articulated claims, vague, speculative, potential claims, don't know if we're going to file a complaint. And yet then we turn to the improper purpose side, which looks at whether Rule 2004 is being used to circumvent the procedural safeguards provided to litigants by the civil rules, specifically whether the trustee is already in a position to file an action against certain individuals and defendants.

And the trustee's record starts to contradict itself, because what we actually have here is a trustee who was able to complete a -- has the benefit of a pre-bankruptcy investigation conducted by the trustee's own special counsel, which in the trustee's own words says they were engaged in and identified over 55 million shares of MMAT and 92 million shares of TRCH that were impacted by fraudulent activity and that the target defendant's manipulation of those shares not only harmed the company but also caused significant financial losses for shareholders.

So in this case the trustee's insistence that it needs records from NASDAQ to, quote/unquote, "obtain market-wide trading data which may show patterns of manipulative

trading behavior such as spoofing," is the exact investigation that the trustee already undertook pre-bankrupt -- or the trustee's special counsel.

THE COURT: Why does NASDAQ get to decide when that was enough?

MR. ZACK: These are the trustee's own words. This is the trustee saying what it needs from NASDAQ.

THE COURT: Trustee hasn't said it's got enough to determine.

MR. ZACK: What the trustee is saying it needs from NASDAQ aligns with what the trustee is saying that it already has. So in this case, you have the trustee who's already completed a pre-bankruptcy investigation and seems very far down that road to filing these lawsuits and so it starts to get crossing that line from Rule 2004 as an investigatory tool as an improper litigation preparation tool.

THE COURT: What is the improper litigation preparation tool? What is that line?

MR. ZACK: Well, it circumvents the idea of filing a lawsuit.

THE COURT: That's the pending proceeding, but there's no proceeding pending, correct?

MR. ZACK: There's no proceeding pending, correct, and that's where this is different than the pending proceeding absolute bar to 2004. This is improper purpose of 2004 in

anticipation of a proceeding that is already, you know, effectively on its way.

THE COURT: And which one -- which other cases do you rely upon as the best --

MR. ZACK: Primarily the GHR Energy Corp. case, which speaks to when the requesting party is already in a position to file an action against certain of the individuals and entities. And then secondarily, I believe we cited the Enron case for a similar proposition.

And going even further, though, in this case the trustee has already engaged at least four law firms, I've actually lost track of it on the docket, to prosecute the anticipated litigation, and they've already obtained over $11 million of litigation financing from improper party.

THE COURT: We'll get to that.

MR. ZACK: Well, it weighs on the preparation that's gone on here and how far they are on that GHR kind of standard of are they in a position to file an action against certain of the individuals and entities. And I think it's indicative that if they have $11.8 million of financing committed that, they're pretty far on that way to thinking that they have claims that go beyond the representations that they're exploring potential claims and haven't decided yet whether they have any.

So again, contradictory statements here where it's either, you know, the scope of Rule 2004 is being exceeded or

2004 is being used for an improper purpose. And on the improper purpose point I just want to make one more point there. The broad pre-litigation discovery under Rule 2004 is not actually necessary to plead a claim for stock manipulation. There are many instances where manipulation claims are prosecuted by investors outside of bankruptcy without the benefit of Rule 2004 discovery.

We cited in our briefing a Second Circuit case that speaks to this idea specifically for stock manipulation cases where the pleading standards are, you know, I guess adjusted in a sense to understand the reality of how those claims can be plead.

THE COURT: I would like to think that a Chapter 7 trustee has a little higher level of duty before taking that decision.

MR. ZACK: In a sense, yes, but the Chapter 7 trustee in this case is relying on special counsel, who, you know --

THE COURT: I understand.

MR. ZACK: -- to their credit holds themselves out as perhaps one of the country's foremost experts on stock manipulation claims, has apparently been very successful on those for decades, and my understanding is that it's not always been a prerequisite to pass the pleading stage, let alone succeed on those claims, that the trustee's special counsel has always had the benefit of Rule 2004. And I believe it would

carry through that if you took the trustee at their word, the trustee's special counsel would no longer be able to assert any stock manipulation claims outside of the bankruptcy context because admittedly they would be unacceptable to meet the pleadings schedule.

THE COURT: No, that -- you're going a little too far with that. You had me going along for quite a bit. You're kind of -- that one went a little out of bounds.

MR. ZACK: Well, I guess it comes back to the question of is Rule 2004 discovery absolutely necessary to plead stock manipulation claims?

THE COURT: don't know if that's the standard for good cause.

MR. ZACK: The trustee's special counsel has shown it's not.

THE COURT: Where is that the standard for good cause?

MR. ZACK: For good cause, in other words, the purpose not being --

THE COURT: -- of 2004, absolutely necessary.

MR. ZACK: I believe it's the trustee's own arguments that the Twombly and Iqbal standards cannot be met absent the 2004 discovery in this case.

THE COURT: I understand that's an argument, but I'm asking you. The requirement here, the standard to be met is

good cause. And if the trustee believes that she needs that through that and is pursuing or investigating a securities cause of action for depressed valuations or manipulated valuations, why does it have to be absolutely necessary?

MR. ZACK: Well, I'll take out the words absolutely necessary, and my understanding is that the trustee's argument in this case is that it is necessary. It is literally the difference between them being able to make the claims or not is what they argue.

THE COURT: That's the argument. Set aside that argument, though, and where am I to draw the line? Again, I am resisting the motion to dismiss analysis in the Rule 2004. I think this is a different kettle of fish.

MR. ZACK: Well, I -- it seems like we agree then that the --

THE COURT: Right.

MR. ZACK: Twombly and Iqbal standards don't actually necessitate 2004 discovery because the claims can obviously be brought outside 2004 context.

THE COURT: I am not here to decide that at this time, you know.

MR. ZACK: Sure.

THE COURT: So --

MR. ZACK: So, you know, we've covered the improper scope, the improper purpose. I'd like to touch on Rule 45

procedurally.

First of all, there's two subpoenas here. One was effectively issued pursuant to Rule 2004. One was effectively issued under Rule 45.

THE COURT: Rule 45.

MR. ZACK: That's an oversimplification. But the subpoena that was issued only under Rule 45 as a technicality should be quashed because there's no pending action.

And then the subpoena that's issued under Rule 2004, because we've argued and encouraged the Court to agree with us that there's not an actual basis under Rule 2004 either on the scope or purpose arguments, it essentially negates the Rule 2004 option for that document request subpoena, leaving it bare under Rule 45 and meeting the same fate of no action.

I think Your Honor had the benefit of our briefing on how you get there under the bankruptcy rules, the Patel case, the other cases that have effectively said you have Rule 2004, you have the four things that qualify as an action in the bankruptcy case. If you don't have any of them, the subpoena should be quashed.

So this is a bit of a hypothetical argument on the 2004 subpoena that Your Honor would agree with us, that there's not actually a 2004 basis and would therefore --

THE COURT: Right.

MR. ZACK: -- also quash it under Rule 45. But it's

actually a very real argument immediately on the Rule 45 subpoena itself that that should be quashed under that rule.

THE COURT: Sticking with the procedural part of this argument, did you have a chance to review the Court's tentative decision as to the Local Rule, and did you care to address that?

MR. ZACK: Yes, Your Honor. Certainly reserve all arguments in the sense that that's a tentative ruling. Understand that where the Court's mostly coming from is federal rules control over, you know, jurisdictional rules. I think it's a bit validating that everybody was a little confused about the Nevada rules, and whether --

THE COURT: Including Joe Sakagawa (phonetic). Yeah.

MR. ZACK: -- whether it goes so far as to prohibit certain actions, and certainly there was some case law that indicated that. I'm not going to take up too much time today arguing that orally. I'd say that, you know, we do touch on it in our briefing. And that ultimately the better argument here for our side is what I've just --

THE COURT: Right.

MR. ZACK: -- outlined, which is there's really not a 2004 basis for the 2004 subpoena. It becomes kind of a bare Rule 45 subpoena itself, and therefore is clearly procedurally improper. And then the same for the one that's just issued under Rule 45 anyways.

I'd like to wrap up by touching on the sort of standard Rule 45 protections of anybody that gets a subpoena for document production. And those apply to both subpoenas equally, because they are ultimately issued by virtue of Rule 45. And that's unduly burdensome, irrelevant, and overbroad.

The burden is real here for NASDAQ, and it's real in two distinct ways. First, there's a general burden on NASDAQ that the Court should consider. And that's -- you know, I was kind of getting into that earlier, but this idea that there's thousands of companies listed on NASDAQ stock exchange, so NASDAQ should not be subjected to producing effectively unlimited trading records every time a listed company enters bankruptcy, or, you know, is even --

THE COURT: That's not what we're establishing here. I'm sorry, I understand the slope is slippery, but we're at one point at the top of that slope.

MR. ZACK: Well, that's fair, but I think that that's a -- as I said, it's a general consideration on the burden. So it's not necessarily the only thing that needs to control the outcome here, but it's something for the Court to consider is how could the decision here not open that door then. The specific burden --

THE COURT: And conversely, if I deny it, then they'll never be able to get any -- a publicly traded entity that files bankruptcy and is concerned about market

manipulation will never be able to get this information.

MR. ZACK: Not necessarily, and that actually goes to my second point, which is the specific burden on NASDAQ in this case, because as Your Honor is aware, NASDAQ actually did produce six months of records. Those six months were not necessarily selected by NASDAQ. They were selected in consultation with the trustee regarding which is the most important period to produce records for.

And so with regard to the specific burden for the Court to consider with regard to NASDAQ, it's not starting from that starting point of NASDAQ should or should not have to be able to respond to either, you know, an unlimited record request or not at all. It's actually in the scope of this specific matter, should NASDAQ be required to provide an additional three and a half years above the six months that it's already provided. And the interesting thing about that analysis is that with NASDAQ having already provided the most important six months of material, the need on the trustee's side is greatly diminished for the remaining material, whereas the burden for NASDAQ is seven times the burden than it's already shouldered.

And so I can understand that we're not trying to make the argument that the trustee waived any right to continue requesting that by the, you know, consensual production of six months of documents. But also NASDAQ certainly didn't waive

that by producing six months, it would not argue that there's a considerably larger burden to have to go back and do seven times the work.

THE COURT: But another six months would be okay?

MR. ZACK: We would prefer not to even have another six months, but Your Honor can see it's a scale of weighing the burden on NASDAQ versus the need for the trustee. The need for the trustee continues to go down as the burden for NASDAQ, you know, remains high.

On the relevance, this is an interesting one that's just -- it's really not spoken to in much detail in the trustee's briefing. And so, you know, admittedly, we're making some assumptions here. But the trustees already identified -- on the relevance piece, the trustees already identified, you know, 55 million shares of one stock, 92 million shares of another stock, and speaks to wanting data from NASDAQ to be able to see if there's a pattern of market manipulation, which seems to align with the investigation that they've already conducted.

But going a step further, if the trustee's actually seeking the identities of investors who are suspected to have engaged in market manipulation, the trustee's request for MPIDs, which is market participant identifiers, would not accomplish that. Exchanges like NASDAQ don't have the visibility into who's placing the orders beyond the executing

brokers. And we did also cite a case for Your Honor where a court essentially acknowledged the same about MPIDs.

So on the relevance piece, it's hard to see how the broad records request to NASDAQ doesn't just overlap with the investigation that the trustee already conducted, and to the extent that the trustee is arguing they would get additional information regarding identifying the actual investors, that's not within the materials that would be provided.

THE COURT: Can you remind me again what was actually produced for the six months then?

MR. ZACK: I believe it was -- in fact, the trustee could better explain any deficiencies that they found in the six months. But --

THE COURT: No, I'm just -- I --

MR. ZACK: Oh.

THE COURT: I'm trying to process a lot of things, so it's --

MR. ZACK: Essentially, NASDAQ produced six months of the trading records that it has for, you know, the identified stocks. And I think that's two pieces for the trustee probably to speak to more than myself, but it's, you know, where do they stand on the six-month production and why do they need the three-and-a-half years of additional production.

But again, the information that they're getting from NASDAQ isn't going to answer that question if that's the

question they're attempting to --

THE COURT: It's not going to identify the actual participants is what you're saying.

MR. ZACK: Exactly. And that's where that's not just me saying that, but there's, you know, case law that we cited from the Southern District of New York that has effectively said the same thing about that information.

My last argument is, you know, that the request is overbroad. It is all relevant records, any type, four-year period. It all kind of relates back to what we've been discussing, which is if Your Honor is somewhere between quashing the subpoenas altogether or ordering some sort of additional compliance, what is reasonable and is this request tailored to a reasonable breadth or is it overbroad? We think it's overbroad under Rule 45 and Rule 2004, but ultimately just the wording of the request itself would at least need to be revised by the Court or by the trustee, even if Your Honor were to ultimately rule in their favor on a lot of these other issues.

You know, I would argue the four-year period is also overbroad, as I already have.

THE COURT: All right. Thank you. Anything else at this time?

MR. ZACK: I think I'd just summarize, you know, again that, you know, Rule 2004's scope we don't believe

permits this request. Rule 2004's purpose is being violated based on where the specific trustee is in the course of their investigating claims. Procedurally, Rule 45 would then require both subpoenas to be quashed and ultimately, even if Your Honor disagreed with all those points, you know, we've raised valid points on the burden imposed on NASDAQ broadly, and in this case the relevance of the actual information that the trustee is seeking versus what it already has and the overbreadth of the language of the request itself.

THE COURT: Thank you.

MR. ZACK: Thank you, Your Honor.

THE COURT: All right. Who would like to take the shot for the non-parties?

MR. FOUNTAIN: Good afternoon, Your Honor. Peter Fountain for Citadel Securities.

THE COURT: Thank you, Mr. Fountain.

MR. FOUNTAIN: I'll speak today on behalf of the non-parties. You may also hear from my co-counsel, Mr. Brody, on certain issues.

Before I begin, Your Honor, I have a brief housekeeping issue, which is just that we learned that the United States District Court for the District -- for D.C. transferred the FINRA motion in as well. That was another motion to quash that was pending similar --

THE COURT: Right.

MR. FOUNTAIN: -- to those filed by these parties. I just wanted to make sure the Court was aware of that.

THE COURT: Was not, so thank you.

MR. FOUNTAIN: Yes.

THE COURT: Have -- what is the overlap between the D.C. proceedings? How far did they get? And where are they versus where we are today?

MR. FOUNTAIN: I'm not an expert on those, Your Honor, but my --

THE COURT: Yeah.

MR. FOUNTAIN: -- understanding is that the Court in D.C. adjudicated the transfer issues, similar --

THE COURT: Similar with --

MR. FOUNTAIN: -- but not the merits issues --

THE COURT: To New York?

MR. FOUNTAIN: -- such that they are similarly situated to NASDAQ at this time.

THE COURT: All right. Thank you for bringing that to the Court's attention. We'll try to figure out how to wrap that in at the conclusion.

MR. FOUNTAIN: Thank you, Your Honor. I'll proceed with argument if that's all right.

THE COURT: Please.

MR. FOUNTAIN: Okay. Your Honor, as you noted, we were here before you in October. The Court asked a threshold

question at that time. The briefs are now in. We have answered that question, Your Honor, and the trustee has not.

The authority that we've cited establishes a black letter principle of corporate law, and this is to quote directly from the In Re: Paso del Norte case. It is widely recognized that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders. And because third-party transactions among shareholders of Meta stock do not involve the property of the estate, any claims that could relate to those transactions would be the property of those shareholders. They would not be --

THE COURT: So let me pose the same question I asked Mr. Zack as to the scenario where Meta was selling its shares, so not resold or re-traded, but was selling as issuing. Wouldn't that give rise to a potential cause of action?

MR. FOUNTAIN: Your Honor, there's sort of three layers to that. And to take them in turn, the first is just to note that on the briefing, there's been no establishment that any stock was

THE COURT: Except that they attached documents regarding the issuance and prospectus. And for a period of time which seems to fall within at least the four years, that is at issue here.

MR. FOUNTAIN: And I want to take these one at a time

and not lose sight of the question. The prospectus though, Your Honor, is an offering for the sale of stock. A prospectus is a document that's filed with the SEC. It does not self-evidence that any stock was sold. You can file a prospectus with the SEC and not sell any stock, right?

THE COURT: I thought some of those documents did reference a sales stock.

MR. FOUNTAIN: What they put forward was a prospectus, Your Honor. That prospectus itself, you know, says that there's going to be, I believe, 620,000 shares of stock sold. What I'm saying is the prospectus does not establish that those sales took place.

THE COURT: But I have a memory, and again, I've been covering a lot of ground, and I'm just coming from a different city and a different -- so excuse if it's a little vague, but I thought it did reference a 2023 sale of stock.

MR. FOUNTAIN: Your Honor, I don't have the pages memorized either coming in from New York.

THE COURT: Fair. I mean, if it's a -- yeah.

MR. FOUNTAIN: But -- so I think there would be a few things that we would say to that, coming back then to the Court's prior question.

But as to the prospectus, there are still infirmities with it. The first is that the prospectus is talking about a below-market price sale of stock. And so if these claims are

that spoofing occurred, spoofing is a short-term form of market manipulation that affects the market price of a security for a short period of time.

If what the trustee is claiming is that it sold stock, that would not only need to be at the same time the spoofing occurred, because of the short-term nature of spoofing, it would also need to occur at a market price, such that it could be affected by that spoofing. And so these registered offerings, these prospectuses that talk about direct sales, those direct sales are at below-market prices. And so they couldn't possibly have been affected by any alleged manipulation.

We're in the dark, Your Honor, as to what they believe actually occurred with respect to the market manipulation, and we'll talk about that as well. But there are a number of affirmatives with the prospectus and the type of sales that they are talking about, such that even if the prospectus evidenced a sale, it wouldn't be enough.

And that's their own case law. That is the Northwest Bio case that they cite indicates as much.

THE COURT: Well, and then you're getting into lost causation, right? I mean, that's really what you're arguing.

MR. FOUNTAIN: Well, it's a question of whether they have a securities claim that belongs to the estate. And what they've said, Your Honor, is that they have 65,000 shareholders

that were injured. But they haven't talked about linking or even attempting to link estate issuances, sales by the debtor, to any alleged market manipulation. We think that it goes to the threshold question that Your Honor identified in the last instance. And so that was the first level of that, right? You know, what would happen if they alleged a sale? We don't believe they did.

But I think there are other perspectives here that are really important to consider, right? Even if there was a sale alleged, it would need to be a sale at the price affected by spoofing. That is the, you know, short-term market manipulation argument. They would need to establish the other standing level elements of a securities claim. That includes reliance. Here we have an instance.

THE COURT: But we're not at that. Again, we're slipping into the motion to dismiss.

MR. FOUNTAIN: Your Honor, respectfully, what we would say is that in the context of the good cause that the debtor needs to establish, the Court is required to consider the totality of the circumstances. And so elements of a securities claim that could never be pled like market efficiency or the fact that there is the in pari delicto bar need to factor directly into the Court's analysis of good cause.

The Landis case specifically talks about how its

totality of the circumstances. We think that it also involves an analysis of the harassment angle here, an analysis of what relationship our client's internal emails could possibly have to these unarticulated claims of market manipulation.

THE COURT: That last statement kind of gets to the point that Mr. Zack was alluding to in the dichotomy between the arguments that are being presented here, some very high-level macro. And then, as Mr. Zak ended his argument, there's the micro, the burden. I'm hearing your argument of harassment and those which are much more micro. So I think just to kind of let you know where I'm coming from, in my mind I am keeping those in different areas just for analysis sake, quite honestly.

MR. FOUNTAIN: And, of course, respect Your Honor's view on that. The only addition I would make to it, Your Honor, is that the Landis case, for example, talks about the good cause analysis that the Court is required to conduct. And it says that when there is a close relationship between the entity that receives the Rule 2004 subpoena and the debtor, for example, they're a creditor, right, the analysis the Court does of good cause and the document requests is all part and parcel. So it doesn't separate out that analysis. And it says when the creditor and the debtor have a loose relationship, right, that factors into the good cause analysis as well.

But what it comes back to is a critical principle

that is established in Landis and in the In re Mastro case that they rely on, which is that there needs to be a connection between the debtor and the entity that receives a Rule 2004 subpoena. That is an independent requirement in addition to standing.

And respectfully, at no point have they ever articulated any connection between Meta Materials and our clients. We are a market maker. We buy and sell securities in the open market.

Meta Materials does not say that it was a participant in any of those transactions. We go back to the prospectus that Your Honor noted. While not a sale, even then, they don't say your client was the buyer or somehow involved in that. There's no connection between our clients and the debtor. And Your Honor asked Mr. Zack earlier, how could it be then that the trustee would pursue his investigation if he can't get these pieces of data from you all?

And the answer to that is that they need to begin with entities that have some relationship with the debtor. That, we believe, is established in the Mastro case and the Landis case.

I'll proceed if that --

THE COURT: Go ahead.

MR. FOUNTAIN: Yeah. Thank you, Your Honor.

THE COURT: Absolutely. No problem.

MR. FOUNTAIN: And so, Your Honor, they have had an opportunity to establish sales of stock. We'll talk at length about the prospectus and why it isn't that.

But, Your Honor, fundamentally, they bear the burden here of good cause. They have had a tremendous amount of time to investigate this. We've prepared a small demonstrative, which I'm happy to hand up a copy of to Your Honor if that'd be okay.

THE COURT: Sure, if you have a copy, that'd be great.

MR. FOUNTAIN: I've -- we also shared this with the trustee's counsel in advance.

THE COURT: Thank you. You may approach.

MR. FOUNTAIN: May I approach?

THE COURT: Thank you.

MR. FOUNTAIN: Your Honor, this evidence is, from our perspective, that there has been an investigation that is long running and, in their own words, is complete. The same counsel representing the trustee here announced in July of 2024 that they had meritorious claims for market manipulation against several parties.

And the timeline here, we think, is telling. They investigate for a more than one year period. They then file for bankruptcy and disclose short-selling litigation, which is another form of market manipulation, as one of the estate

assets. They then later, and I know Your Honor is going to get to this, disclose the litigation funding after that investigation. They file these Rule 2004 motions, and then they file, after that, an application to retain share intel. And, in fact, they actually announced almost two years earlier that they had retained share intel.

And what share intel does is provide public trading data, the exact same type of data that they claim to need from the non-parties, to allow them to analyze market manipulation claims. And you could infer from this, Your Honor, that when they announced there were meritorious claims for market manipulation, that was relying on the share intel data, the same data that they're seeking from us.

And so, Your Honor, they have had a tremendous amount of time to investigate this. They've had access to the debtor's records. They've had cooperation from the debtor's CEO. They've had $11 million in litigation funding.

And at this time, Your Honor, there are several questions that are unanswered. Did the debtor sell its own stock? If so, when? What is the asserted connection between the debtor and our clients? Why is discovery from these non-parties specifically necessary for the claims they allege that they have? And why is pre-litigation discovery required here at all when the same counsel have filed the same claims in other litigations without pre-litigation discovery?

Your Honor, they've had a lot of access to the debtor. And so this idea that they need more discovery here raises more questions than it answers. And, Your Honor, because the trustee bears the burden here, the failure to answer these questions, and in particular the first question when invited to do so by the Court, is a reason to quash the subpoenas.

Your Honor, I want to touch on something else that you said during your colloquy with Mr. Zack. And that is what the trustee has done instead of answering these questions. Rather than answer these questions, Your Honor, they assert, and this is in their supplemental response brief, Rule 2004 is a proper investigatory tool for third-party transactions involving property not owned by the debtor.

And unsurprisingly, Your Honor, there's no case law supporting that. They don't identify any. And Your Honor said, you know, there's slippery slope questions, but we might not be there yet. But they are asking this Court to create a new rule, which is the rule that they put on Page 9 of their supplemental response brief, about what the trustee is permitted to do with respect to property that is not owned by the debtor.

That has been a fundamental threshold limitation on Rule 2004, and they seek here to subvert it. And it's not surprising, Your Honor, that they have no case law supporting

their proposition. And that is because they are advocating for a use of Rule 2004 that has no precedent at all. No court has ever permitted Rule 2004 subpoenas in the way that they are seeking to use them here.

You asked for long, detailed, heavy citations. I've been through a lot of the case law, Your Honor, to answer the Court's questions. None of it looks remotely like what's going on here.

The In re: SunEdison case you asked earlier, you know, what is an analogous case? The In re: SunEdison case talked about the slippery slope that could come from saying that anything could affect the financing, the financial liabilities of a debtor. And the SunEdison case, just as Your Honor did, requested supplemental briefing on that Rule 2004 issue. In the SunEdison case, the trustee there was unable to identify any authority supporting the broad use of Rule 2004 that it was seeking to do. And as a result, that court quashed the subpoenas.

And so I turn to the Mastro case. And this is Ninth Circuit authority, Your Honor. And it imposes a limitation on Rule 2004, limiting it to third parties who have dealings with the debtor.

And Landis, Your Honor, similarly talks about Rule 2004 being used for the debtor-creditor relationship. These are fundamental limitations that aren't alleged to exist here.

There is no contract alleged to exist. There's no commercial relationship. And when we look at the case law that they've cited, the Mastro case, for example, that was a debtor who had defrauded -- that involved using a Rule 2004 subpoena with respect to a individual who had defrauded the debtor.

The Profilet case that they're looking at, they say this supports their argument. But in Profilet, it did relate to an issuance of sales -- a sale of stock. And the Rule 2004 subpoena was being used to go after individuals who had defrauded the entity in connection with that sale. And so there is a debtor-facing nexus in every single one of these cases that is wholly absent here.

Your Honor's decision in In re Lee adds another barrier to this. It talks about only those persons possessing knowledge of the debtor's acts, conduct, or financial affairs, so far as this relates to a debtor's proceeding of bankruptcy, would be appropriate targets of a Rule 2004 examination. There is no argument that has ever been advanced that our clients have any knowledge of the debtor's acts, conducts, or financial affairs. At most, the allegation is that we traded shares with third-party shareholders on the public markets, not that we had any interaction with Meta Materials, not that we have any knowledge of Meta Materials.

And so we would respectfully submit, Your Honor, that the trustee cannot satisfy the dealing requirement from Mastro,

the debtor-creditor relationship articulated in Landis, or Lee's knowledge requirement.

And it brings us to a policy concern, and one that Mr. Zack articulated as well. Our client is a market maker. We trade securities, every security, all day, every day. And if a Rule 2004 subpoena can properly issue in a public company bankruptcy, based on the idea that the stock was theoretically manipulated, we could be subject to Rule 2004 discovery in every single case. And it's not just Citadel Securities, the market maker. Every broker-dealer, every exchange, these names that trade in every public symbol, would be subject to the new rule that the trustee is attempting to articulate.

There are other reasons that the subpoenas fail as well, but I'm happy to pause there and answer any questions that the Court may have.

THE COURT: No, I'm following. Go ahead with your arguments. We may ultimately swing back around. So go ahead and make them, and then we'll --

MR. FOUNTAIN: Yes. Happy to, Your Honor. I think that, you know -- I don't think there's any meaningful dispute at this point that the stock that is owned by shareholders, not by the estate, is property of those shareholders, not the estate. So I'm not going to spend a lot of time on that.

THE COURT: Okay.

MR. FOUNTAIN: Some of the additional arguments I

would like to spend time on include the reliance argument. You know, Your Honor asked, you know, is it premature? We don't think so for the reasons I've articulated, but I think it's worth noting that there is no explanation of how reliance is not lacking here. That's not something that the trustee articulates in its brief. It concedes that it would be unable to establish reliance on an efficient market free of manipulation because there is a settled order from the SEC finding that the debtor itself engaged in market manipulation, and that was prior to any of the alleged manipulation that they are seeking here.

And importantly, Your Honor, that market manipulation by the debtor was also in connection with the debtor's alleged issuance of stock, right? It was for the purposes of raising money. And I think that goes as well to the in pari delicto bar, Your Honor.

In pari delicto, of course, relates to the good cause analysis and whether the trustee can properly pursue these Rule 2004 subpoenas. In the AgriBio Tech case, they found that that would be imputed to the trustee. The only answer that the trustee asserts to that in their briefing is the adverse interest exception.

But, Your Honor, that is plainly inapplicable here because the adverse interest exception applies only when insiders have acted adversely to the corporation. For example,

they looted the corporation or they engaged in embezzlement.

Here, that's not what happened. The debtor's insiders, the CEO with which they're working as part of the investigation, has been -- well, the SEC's findings are with respect to the company, the lawsuit against the CEO remains ongoing, but raised $137 million for the company through market manipulation, through what the SEC has found with securities fraud.

And it relates as well, Your Honor, to the question you posed about, well, what is the trustee supposed to do in these circumstances? If they believe there is market manipulation, they should look internally to the individuals and the entities that the SEC has issued a settled order said engaged in market manipulation. They shouldn't seek four years of internal emails from our client.

Just a few more points I'd like to hit, Your Honor. Your Honor, one of the questions that remains unanswered is why us? Why is the trustee seeking information from Citadel Securities, from Virtu, from Anson Funds? And that is a question that has remained unanswered.

And, Your Honor, the reason that we believe it's remained unanswered is because they don't want to announce that they view us as litigation targets. They have all but done so in their pleadings. They've told NASDAQ it is not a litigation target, something they would not say to us. But that's because

they understand that under the Transmar case, the DeFore (phonetic) case, and Mr. Zack also pointed you to the Enron and GHR cases, once a party -- once a trustee identifies a litigation target, Rule 2004 is inappropriate.

And this goes as well, Your Honor, to the totality of the circumstances analysis that you will do, because Rule 2004 should not be permitted to be used as an end run around the procedural safeguards of Rule 45. And it's notable, Your Honor, I know we'll talk about the litigation financing later, but that $11.8 million of litigation financing involved $500,000 from another case, Harrington, in which they sought discovery from our client and from Virtu. And so it is the same game that they're trying to play here.

There's one other item I'll raise, and then I will stop briefly, Your Honor, which is the Genius lawsuit. And so two weeks after our hearing in October, the same counsel filed the same market manipulation claims against our client and Virtu, using only publicly available information. There has been no articulation of why that situation is different from this situation, why they needed discovery, pre-litigation discovery from our clients and not from the Genius -- not from our clients in the Genius case.

And it goes to a fundamental question, Your Honor, which is, of course, every plaintiff would like to have pre-litigation discovery from a defendant in a lawsuit.

That's -- as a plaintiff, you know, we can all agree on that, but Rule 2004 cannot and should not be used for that purpose. And, you know, to your point -- to that point, Your Honor, I just -- there are unanswered questions that we think need to be answered before these subpoenas should be permitted to proceed. I'll stop there, Your Honor.

Mr. Brody, did you want to add anything?

THE COURT: Thank you.

MR. FOUNTAIN: Yeah.

MR. BRODY: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. BRODY: Alan Brody, Greenberg Traurig, on behalf of Anson Funds, one of the co-movants. Your Honor, I'm going to be brief because you've heard it. You've heard it. And honestly, Your Honor, my co-movant, Mr. Fountain, truthfully laid out our entire argument in a fantastic way.

And he also truly answered the question or the statement where we left off at the last hearing. When Your Honor recognized, and I'm going to do as best as a quote as I can, there's a fundamental disagreement of whether the debtor is the issuer for the cause of action. You know that needs to get played out a little bit in this discussion because that -- that's just too fundamental to the causes of action as I see it.

Your Honor, I'm just a bankruptcy lawyer. I know

that Rule 2004 relates to and only to the debtor's act, the debtor's conduct, the debtor's property. But what you've heard last time, what you've heard even more today because of where we left off, is who owns the stock at the time of the alleged market manipulation is the gate key issue.

I like to think of it as there's a when and a whether. When, when was -- when did the debtor issue stock that was during this alleged market manipulation?

Now, we also -- here the stock that was traded was owned by non-debtor investors, and sold between non-debtor investors. At the last hearing, Mr. Christian appropriately admitted, so I get the point. If you don't have standing, then you shouldn't be entitled to 2004. Now, to be fair to Mr. Christian, he also said that he doesn't think that's the case. Okay.

Yet, at the last hearing, the Court directed the trustee, at least, that's how I read the transcript, the Court directed the trustee to provide a list of the causes of action that the debtor has for market manipulation of its stock. That's what Your Honor said, of its stock. The trustee has failed to identify a single stock sale -- a sale of stock by the debtor at the time the alleged manipulation allegedly occurred. And that is the when, that's the gate key issue here that was recognized by that court. And it's a low dispositive, and you've heard Mr. Fountain through that. And as such, those

trades themselves cannot be property of the state.

Now, Your Honor, we've heard a lot of cases.

THE COURT: but it -- let's back that up because --

MR. BRODY: Sure.

THE COURT: -- I assume I'm going to hear no, it is not property of the estate. But assuming that there is some sale that is subject to the downward pressure created by other sales of which it is not the issuer, that would be the evidence, wouldn't that?

MR. BRODY: Your Honor, no, because the trustee has not put forth, has not identified any of those stock that the debtor -- that the debtor issued, that the debtor traded during that market manipulation. And it's only when they sell that stock. If there was market manipulation when they sold the stock, that's their argument.

I'm not saying that's because you still have the whether, which is the connection that Mr. Fountain had discussed. But you don't get the when. And if that's the case, then it's two non-debtor traders. I trade stock. I buy stock. I own NVIDIA stock, for example. I sell NVIDIA stock. Okay. That's between me and whoever I'm selling or buying from, not NVIDIA. That doesn't affect -- that's not NVIDIA's asset.

THE COURT: But it does affect it if you run algorithms to inflate the sales that depress the sales of

NVIDIA's stock.

MR. BRODY: Only if the debtor then sold --

THE COURT: Agreed.

MR. BRODY: -- some of the stock.

THE COURT: I understand that point.

MR. BRODY: There has to be a time when the debtor sold that stock. You're connecting all those third-party trades to when the debtor sold the stock.

Your Honor, I hear what you're saying. But they have failed to identify that the debtor sold stock that was somehow affected by any of that market manipulation. They haven't at all.

They cite to cases, and, Your Honor, the cases that they rely on for this. Your Honor had asked counsel for NASDAQ, Counselor Mr. Fountain, what cases do you cite? Your Honor, I love the cases that the trustee cited. I love Sorrento. I love Northwest Biometrics. Because both of those cases that are heavily, heavily relied upon by the trustee, you know, are opposite.

For example, the trustee in their reply brief, they started at the introduction with Northwest Bio. That the -- they started with the -- with their argument saying Northwest Bio. Yet, and I'm going to quote the trustee's brief because they have the best sentence. In Northwest Bio -- this is the trustee's reply brief at Page 2. "In Northwest Bio, the Court

specifically held that an issuing company plausibly alleges damages where market manipulation (in that case, like here, spoofing it), depresses the stock price at the time the company is selling its own shares," end quote.

They haven't identified any shares sold by Meta at any of those times. They haven't. The evidence is that the debtor is selling its own stock at the time of alleged manipulation. They haven't done that. They haven't provided that as well.

Sorrento is completely different. Sorrento was dealt with an at -- with another entity that Sorrento owned its shares. Another entity.

In Sorrento, the debtor owned a 52 percent interest in another corporate entity. That ownership was an actual asset. No different than my ownership in NVIDIA stock. Okay. There, there was a 2004 subpoena served because the debtor needed information with respect to proxy materials for meeting, directly affecting the debtor's investment in that other entity. But that's not the case here. The discovery is not the case here at all.

This is not an asset of the case, Your Honor. Sorrento confirms that the trustee may investigate trading activity only when, so when, the debtor has an actual property interest in the non-debtor stock at stake. That's precisely what is missing.

The connection, the whether, the whether, Mr. Fountain can -- went through and I'm not going to, Your Honor. I try not to be duplicative, Your Honor. Okay.

But here the stock traded between the non-debtor investors, certainly not property of the estate. It is not an asset of the estate. It is not the debtor's property, which is required by 2004. The debtor lacks standing. Rule 2004 cannot be used to pursue discovery in service of the claims the trustee has no standing to bring.

Mr. Christian was corrected last year, I think, because the hearing was in 2025. If you don't have standing, then you are not entitled to Rule 2004. Thank you.

THE COURT: Thank you very much. Anything to add?

MR. FOUNTAIN: Your Honor, I don't think I could add anything beyond the comprehensive argument we've already laid.

THE COURT: I appreciate that. Thank you.

MR. FOUNTAIN: Thank you.

THE COURT: All right. So that concludes from the movants then.

As for the trustee, who would like to proceed, Mr. Brust?

MR. BRUST: Your Honor, I'll go briefly and then defer over to Mr. Burnett and Mr. Christian. But just to bring this back into focus, we can talk all day about what the debtor is not going after, and that's what they're doing. They're

trying to say, we want to recover for damage to the shareholders. That is not the focus of what this discovery is intended at.

THE COURT: I ask, though, what is the cause of action?

MR. BRUST: The cause of action will be explained by Mr. Christian. It's been his life's work. But generally my understanding of the cause of action is when the market manipulation occurs, it depresses the stock. And the depressed stock --

THE COURT: But if you are not selling the stock, what do you care?

MR. BRUST: We care because it depresses the value of our company.

THE COURT: And how did that affect the -- how did that affect Meta?

MR. BRUST: It affects Meta's ability to go get financing to get people to invest in it.

THE COURT: What is the case where there was no issuance of stock and it affected the, like, the ability for lending or credit?

MR. BRUST: I believe that the BioPharm case has -- touches on that, where there's the one day where their stock was affected. But I have to, again -- I should probably turn this over --

THE COURT: And the -- and also --

MR. BRUST: Yeah.

THE COURT: -- the more expansive use of the effect was specifically denied.

MR. BRUST: That's true --

THE COURT: Right?

MR. BRUST: -- based on the causation. Yeah.

THE COURT: So that would seem to cut against. Because I haven't heard anything about one day in the -- you know, because that assumed there was a sale within that day, right?

MR. BRUST: That's true.

THE COURT: It closed at the end. It was the average. So --

MR. BRUST: And --

THE COURT: I'm still hearing sale as to the basis for a cause of action, which would be property of the estate, warranting the 2004.

MR. BRUST: And partially where we're skipping to with that is a motion to dismiss or a motion for summary judgment.

THE COURT: No, we're really at the good cause. And I'm trying to keep careful tab on where the good cause ends and the motion to dismiss. And that's why I think the reliance of in pari delicto falls on the side of motion to dismiss.

But if I'm not hearing, and I've given you a specific chance to cite me the case, and you give me Northwest, the Bio, I'll go back and look at that after this argument again. But I'm telling you, I read that as a sale of stock. And it's all tied to that rather than it affected bad credit because our share prices were down.

MR. BRUST: And I need to --

THE COURT: Defer?

MR. BRUST: -- defer that over to Mr. Christian.

THE COURT: Yeah. Understand.

MR. BRUST: He's the -- he has the expertise in that. If there's anything else the Court wants to hear about the Rule 45, that type of stuff, I think the tentative ruling is good --

THE COURT: Everything else flows from that. I do agree --

MR. BRUST: I agree.

THE COURT: -- with the movants that that is the key question for me to wrap my head around. What is the interest within the estate that warrants this expansive fishing for you?

MR. BRUST: And I think Mr. Christian can answer that.

THE COURT: Excellent.

MR. BRUST: Thanks.

THE COURT: All right. Then, Mr. Christian, are you up next or would you go to Mr. Burnett?

MR. CHRISTIAN: I think, let's go to Mr. Burnett because to stay in order, Your Honor, with your permission, NASDAQ stood up first and he's going to do that one. I'm going to handle the consolidated arguments by Citadel, Virtu, and Anson Funds.

THE COURT: All right. Thank you.

Mr. Burnett, if you would.

MR. BURNETT: Yes. Yes. Thank you, Your Honor.

Again, David Burnett from Schneider Wallace on behalf of the trustee. I will speak specifically to NASDAQ. I have been involved in the meet and confers with all these parties going back a year.

So, you know, the high-level point here is that everything that NASDAQ's counsel is saying is really disconnected from the facts. So let me just remind us of where we are.

So we served these subpoenas about a year ago on all these parties. With NASDAQ, my colleagues and I had productive conversations with NASDAQ's in-house counsel. The parties, the trustee and NASDAQ, agreed to a protective order last May, which is ECF 1949. NASDAQ voluntarily agreed to produce six months of trading data with very little fuss. I mean, it was all done by email and a couple calls. They produced the data for a six-month time period. They agreed, they described that as an initial production.

There are many emails from Joanne Pedone, the in-house counsel, describing it as just an initial production. Our experts reviewed that data and said it looked fine, with the exception of needing one additional field to identify the order type. But at that point, NASDAQ hired outside counsel, and they put the brakes on and refused to work with us any further. And then, as you know, outside counsel filed a motion to quash in New York, which was then transferred here.

So NASDAQ's arguments as to burden and relevance and overbreadth really need to be taken with a heavy grain of salt in the context of the fact that NASDAQ has already produced six months of data. They agreed to a protective order. They've shown that they're able to produce that data. And all we're talking about are spreadsheets. We're not asking for emails. We're not asking for letters and PowerPoints. You know, this does not require document-by-document review for relevance and privilege. You know, it's not --

THE COURT: I feel like -- if I can interrupt, because my understanding is that the request was for all relevant records regarding orders for Meta, MMTLP, et al. So is the agreement then the relevant records is limited to what?

MR. BURNETT: Just spreadsheets. That is all that we've asked for is just spreadsheets.

THE COURT: Spreadsheets of trades?

MR. BURNETT: Spreadsheets of trades. So the same

type of spreadsheets that they've produced for six months, we just want them to expand that to four years and include the order type field. So we're not asking for emails, letters, you know, memos, things like that are normally a part of document production.

So it's really discreet and narrow. It's as narrow as a document request could be. And the burden of producing four years should be identical to the burden of six months, because as we assume, you know, all they have to do is plug the search criteria into their databases of trades and generate a larger spreadsheet. And, you know, there's -- like I said, there's no individual review of millions of documents or anything. It should just be a handful of documents like they produced last time.

And, you know, so that's why we're sort of confused by NASDAQ's recalcitrance because it would be so easy for them to just give us the additional spreadsheet. You know, the initial production was very easy. A supplemental production of the additional three and a half years' worth would be very easy.

NASDAQ tellingly has not articulated what the burden is exactly. They haven't said it would cost X number of dollars or, you know, X number of hours. They just, you know, throw out the boilerplate term burden, which any party objecting to any discovery can say. But, of course, you know,

it can't be that any discovery is burdensome because then there would be no discovery in any case. So that's the point on burden, Your Honor.

On relevance, as Your Honor has noted, a lot of their arguments and the other non-parties' arguments get into, you know, motion to dismiss, even motion for summary judgment type arguments. All that we're looking at here is whether the trustee has established good cause for this information, and we believe certainly the trustee has.

So what -- where we are is that the trustee, in consultation with counsel and experts, has determined that it's worth looking into the potential of market manipulation in shares of Meta stock in the years leading up to the bankruptcy. And that's pursuant to the trustee's duty to investigate the financial affairs of the debtor per 11 U.S.C. 704.

So to carry out that investigation that the trustee has a duty to do, we've determined that it would be helpful to have this discovery from these parties, including NASDAQ. The reason why NASDAQ is it is a stock trading exchange. It has market-wide data. And so for our experts to be able to do a market-wide analysis of stock manipulation, we need market-wide data.

And indeed, even Citadel, Anson, and Virtu, in their opening brief on their motion to quash, they suggested that the trustee should get data from NASDAQ and FINRA. They said

NASDAQ and FINRA function more like centralized repositories for the data the trustee is requesting, and any relevant information, to the extent there is any, would be captured in those other productions. So we agree with Citadel, Anson, and Virtu that because NASDAQ has market-wide data, that's a great source of information for our experts and counsel to be able to conduct this investigation for the trustee.

We don't need to show at this point who any potential dependents are, what our causes of action are. That's the point of this investigation, to look into that. So those arguments are all premature.

And as Your Honor said, if not this case, then when? You know, we need this data from NASDAQ as a trading exchange that has market-wide data to be able to investigate the financial affairs of the debtor. And if this very low bar to discovery can't be met here, then I can't see any case where any trustee would be entitled to get discovery from NASDAQ to conduct this sort of investigation.

A lot of NASDAQ's arguments are based on speculation about, you know, what the trustee may find or what it's looking for. But, you know, with all due respect, that's the trustee and counsel's and expert's role to conduct that investigation. You know, it's -- that's all subject to attorney work product and privilege, and we don't have to show all our cards to be able to conduct its investigation.

NASDAQ's counsel, just like Citadel's counsel referred to a reference to 55 million shares. That was based on a very preliminary early investigation based only on public data. We're looking now for more information to do a more in-depth investigation. We're not saying that the whatever work we did before was sufficient. We're saying that we would like this additional data to be able to do a deeper analysis.

Yeah, finally, Your Honor, it's -- effectively what NASDAQ and the other parties are doing are they are obstructing the trustee's investigation. The trustee has a duty to investigate the financial affairs of the debtor. We're trying to help the trustee do that. And all these parties are obstructing that investigation.

I don't have anything further unless Your Honor has any questions.

THE COURT: No, thank you. I appreciate that.

All right, then. Mr. Christian, I think we're to you.

MR. CHRISTIAN: Yes. Thank you, Judge Spraker. Well, let's -- let me first talk about a couple of white elephants that I think have evolved in this room today.

So one is, it is my understanding, and I can't -- since I'm an officer in court, I can't promise you that that's the case, but it's my understanding that the prospectus and the other documents we filed with you do have sales by the

corporation associated with that. But just to put that issue aside, I would ask that the Court take judicial notice of the SEC filings that have been done.

And according to our consulting experts, just to give you specific facts, on June 24th, 2021, the company issued 145,563,667 shares of stock. And in the reposed period, which is five years looking back, the company has issued pre-split, because the company did have a split, but pre-split less than 800 million shares. And if necessary, we'd be happy to provide the Court those documents, but I will tell you they would fill up half your courtroom because those SEC filings are substantial.

But the proposition that the Court -- or that the opposing counsel is making, that we haven't sold shares, is simply not true. So I'd ask the Court to take judicial notice of that. In fact, the Court wants an accurate count of that, which, and I apologize, I did not understand that the Court wanted, you know, all that detail. But we are certainly able to provide it, and I can (audio interference) that your court clerks from Edgar and SEC (indiscernible) get the filings in the past five years, and you'll see hundreds of millions of shares that have been issued that we say are at artificially depressed prices. So that's the first issue in rebuttal to what's been spoken.

Secondly, there's been many discussions about, which

really is a motion to dismiss argument, but I want to address it with the Court because I do think it gets to this argument of being reasonable as to this 2004. I was a party to the investigation that preceded representing the trustee in bankruptcy, and that is true. We did look at -- but what we looked at, Judge Spraker, at length with numerous experts, is public data.

And yes, we did find disparity in the number of shares the corporation issued, but we have no idea who, I'm going to call them respectfully, counterfeit shares, shares that we believe were sold electronically but not delivered. We don't know who the parties are that did that.

Twombly and Iqbal requires us as an officer of the Court to actually plead with specificity. So part of this investigation is to get that level of data because otherwise, why would the trustee hire me and my two colleagues in these other two firms to go file a case if I don't have the facts sufficient to plead with specificity to beat a motion to dismiss? So that is what that investigation was about, and yes, the public filings that the companies made are in the record. They are what they are.

I will also bring to the Court's attention, and with all due respect to Mr. Brody and Mr. Zack and Mr. Fountain, I was a lawyer in the Sorrento case who intervened on behalf of an interested party, and I'll represent this Court, and we

provided you a copy of the order that Judge Jones in that case subpoenaed an endless number of brokers to provide trading data to look at the same type of claim. Ultimately, for various reasons, the Court did not pursue those claims. That firm who handled that portion of that was not me. I came in later. But that order is there as a precedent to look at, you know, can you issue this type of discovery in a 2004 situation?

Next, Mr. Fountain brought up another point as it relates to, well, and all the counsel did, and Profilet, I agree in that case, which is clear on standing, as is Northwest Bios, so I hope we're past the standing issue, and for the record, we represent Meta, okay? That's our client. That's who's in our fee agreement, and so that should be crystal clear. These other statements about shareholders and others -- these type of things, I don't really understand the basis for that.

But nonetheless, just to clear the record, that is our client, and that is who we are conducting this investigation for. But, yes, in the Profilet case, there was a relationship there.

But think about this, Judge Spraker. So if Mr. Fountain is correct that anybody else who committed market manipulation who had nothing to do with the debtor, you know, could not be culpable for manipulating the issuer's stock who's in bankruptcy, probably because of the manipulation, at least

in part. So I don't believe that applies.

So at the end of the day, I believe that our investigation is to go look at whatever claims are there, and I'm going to articulate what I think specifically some of the claims could be. That's the key word, could be. There could be all types of claims here. I agree with my colleague, Mr. Burnett.

Opposing counsel wants to pigeonhole what the claims are. Well, how can I pigeonhole what the claims are if I don't have the records? For example, Judge Spraker, as it relates to spoofing, and spoofing essentially for the most part occurs by market makers. And market makers, Judge Spraker, are supposed to have pretty much as many sales as they do buys. Look at them as a bookie. They need to be 50/50.

Well, guess what? In the cases we've handled, and I can't get into the details of those, but in general, that book is typically grossly imbalanced. Why? Because they're not a market maker. So well, that's the cause of action right there, because if, in fact, a market maker is not a bona fide market maker and they're short selling, then they need to borrow the stock. The only exemption they have -- they, a market maker, has under Reg SHO, is they're a bona fide market maker.

Well, that's a claim, but I can't understand that claim until I get records. And for the record, as I sit here today, I cannot assure this Court or my client that we have

claims against Citadel, Virtu, and Anson. What I can tell this Court, which I hope the Court will agree is logical, is that in every case we've handled, including this case, we start with the entities that have traded the most volume of our stock that we believe has been manipulatable. Guess what? Citadel, Virtu, and Anson make up a large portion of that number. Okay?

So at the end of the day, it's my belief that the necessity of getting these records is critical to any claims that the trustee may have, and I don't know what all those claims are.

Another example would be a naked short selling claim, selling shares but not delivering them. I don't know what shares Northwest -- I mean, Virtu sold, Citadel sold, as it relates to whether they delivered it or not. I don't have the records. The same thing for Anson funds.

Another claim could be that someone has loaned them stock and they haven't returned it, which in effect causes shares to artificially be issued that don't exist and culminates in a fail.

In addition, there is spoofing that we've already talked about, so -- and there's also -- so there's market manipulation claims under 10(b)(5), which the Court can see in <u>Northwest Bio</u>, they can see in the <u>Profilet</u> case and others. That is based on shares sold by the corporation at an artificially depressed price.

There may be other claims there. There could be 9(a) claims for fraud. There could be other claims. I don't know. There could be claims, you know, against the directors or whoever. You know, Mr. Fountain brought that up. These could be claims that could be pursued by the trustee.

We're not isolating anybody. We're starting with the entity's, Judge, that traded most of the securities during the relevant time period that sometimes, in my opinion and our consulting expert's opinion, doesn't make sense. So I think that's a huge issue.

So at the end of the day, it's my belief that also it's not burdensome. Here's why. As it relates -- and I'm addressing only Citadel, Virtu, and Anson funds. Under the consolidated audit trail system, and this docket -- I mean this document can be found as Docket Number 2251 in your court. It's already been filed.

There is a list of items that electronically Citadel and Virtu have to send to the consolidated audit trail entity, which is a separate LLC that is affiliated, I'm going to use that word, with FINRA. It was created several years ago, but long before this -- the time period in question here. And in doing So they have to give the very data we're seeking.

For example, Judge, if -- in order to look at a spoofing claim, and does the Court understand what spoofing is or do you not want me to waste time explaining that issue to

understand the claim?

THE COURT: For today, I have a sufficient understanding of it.

MR. CHRISTIAN: Okay. All right. Thank you, Your Honor.

So we would have to see the timestamps on when these sales that were subsequently taken down, basically fraudulent appearing sales to make everybody think there's a run on the bank, on the stock, that are later canceled.

Of course, you know, the spoofer sells at the top before all these sale orders are posted, and they go buy-in once it drops 20 percent and, you know, make the spread. So there is no way I can get that data from anybody, you know, other than either Consolidated Audit Trail or the records of the Citadel and Virtu themselves. It can't be burdensome, Judge, if all we're asking them to do is to produce the records they've already produced at Consolidated Audit Trail.

There's a protective order in place. Simply get us those records, no exceptions. And for now, to make this less burdensome for the Court, we'll eliminate email so we can take that out of play because I agree with the Court that that gets a little more burdensome.

And the reality is we've spent a year on this, Judge. Time is ticking. And so at the end of the day, we'll eliminate that request for now if we can get the Consolidated Audit Trail

data, which has already been sent because they're required to do it by law, Okay, by the rules. So at the end of the day, I don't think the burdensome argument works either.

So from our perspective, we're at an investigation, Judge. We need to see what the claims are. We need this data. Otherwise, we will be prejudiced.

I'm not the expert necessarily in 2004, but I can tell you what happened in Sorrento because I was a lawyer there and we could produce that order from Judge Jones if you wanted. I think you already have it. And so at the end of the day, any other questions about the bankruptcy law, which, you know, I'm not too good at, frankly, I've handled a bunch of litigation in bankruptcy but not, you know, an expert on 2004, I would ask Mr. Brust or Mr. Hartman to address that.

But -- so if the Court has any questions, I'd be happy to answer them.

THE COURT: Okay.

MR. CHRISTIAN: But that -- those are my responses to the Court's questions.

THE COURT: At the October hearing, I believe that there was a discussion and you made an offer to reduce the scope of the 2004 in duration. I believe it was 160 days, quite honestly.

MR. CHRISTIAN: I think that's (audio interference), Judge. And we would, again, to move this along, Your Honor,

(audio interference) and move this forward, we would stick (audio interference) for this round but reserve rights (audio interference) showing good cause of coming back to the Court for (indiscernible).

THE COURT: Okay. I think that's a fairly important point that got garbled. Okay. Could you -- we had some garble or some interference in the transmission. Can you just state that again because I think it's an important point I want to make clear?

MR. CHRISTIAN: Yes, Your Honor. What I was saying is on behalf of the trustee, we would be happy to stick with those dates that are on the record previously, in our previous hearing. I think it is around 160 days. But we would reserve the right, Judge, upon showing good cause, to come back to the Court further and get discovery for additional dates, but again, for good cause. So we will agree to start with those dates in order to minimize the burden and also move this along.

And I would ask specifically, Judge, if the Court is inclined to go forward, because ultimately, not in the immediate future, but in the -- down the road here, reasonably, quickly, certainly, this year, most likely, we have to look at (audio interference) mid-year. So at the end of the day, we need this discovery specifically ordered if the Court is inclined to do so by a date certain, because we need that in order to see what claims the estate has.

THE COURT: Mr. Brust?

MR. BRUST: Yeah, you broke up a little bit there, Mr. Christian.

I think the point that he's trying to make is I think around August 9th would be a deadline for claims to be filed, so we need the information basically as soon as possible so that the experts, Mr. Christian and his firm, can evaluate it. We just wanted to make sure the Court was cognizant of that.

THE COURT: Do you know the scope of the 160-day duration from when to when?

MR. BRUST: Mr. Christian, do you know? Is that -- go ahead.

MR. CHRISTIAN: I believe it's over a four-year period. And I apologize, Judge. I did not come prepared to give you that date, but whatever's on the record previously, which we did articulate in detail, we'll stick with that 100 percent.

THE COURT: Well, my understanding is you wanted from September 21, 2020, through August 21st, 2024, for Meta and Torchlight, and from June 28th, 2021, through December 14, 2022, as MMTLP. So I don't know what the 160 days out of those dates are.

MR. CHRISTIAN: Well, we'll be happy to provide those again to the Court, Judge, but I'll look back at the transcript, and I thought I articulated those before. But we

will get those to you by, you know, Monday or Tuesday at the latest.

THE COURT: Okay.

MR. CHRISTIAN: And I will agree that it's around roughly 160 days of that, you know --

THE COURT: Yeah, you may have said 161 if I'm pushing my memory, but, I mean, around that is correct. We do not have that, and we did not see that in preparing for this. We saw the offer, but not the date, so I'd appreciate that.

How do you feel about who -- what trades are at issue? I understand, at least we'll get to a further discussion on Meta. What about Torchlight?

MR. CHRISTIAN: Well, here is the way we see it on Torchlight, Judge. By virtue of the merger, the claims of Torchlight are now owned by the bankruptcy estate. So ultimately, you're --

THE COURT: But that's for pre-merger trading in Torchlight, then?

MR. CHRISTIAN: Yes, sir. Yes, Your Honor.

THE COURT: That would not be the same 160 days, then, correct?

MR. CHRISTIAN: I believe it would, but I'll check that, and if it's different, we will put that in writing to the Court, but I think it is the same 160 days.

THE COURT: Because I don't understand how you --

post-merger, how you get trading in Torchlight and Meta.

MR. CHRISTIAN: Well, because you get trading in Torchlight pre-merger, which now that claim is owned by Meta, and then after that you get Meta and you get MMTLP, because MMTLP is a shared --

THE COURT: Is a special dividend of Torchlight, I understood.

MR. CHRISTIAN: A special dividend if you own one share of Torchlight that -- so in the merger, in the -- if you own one share of Torchlight, you've got a share of Meta, and you got a preferred share of Meta, which converted into this MMTLP, ultimately to a private corporation. So at the end of the day, that's how that would work.

The shares sold by Torchlight, that claim belongs to Meta within the actionable time period, and then the shares of Meta, which those Torchlight shares were converted into, and the shares of MMTLP would be based on the sale of those shares within the actual time period by the corporation.

THE COURT: All right. Mr. Brust, I want to come back to that point with you in a little bit, but I want to go back to what Mr. Christian has been talking about.

Mr. Christian, in your view, are there claims owned by Meta as the bankruptcy estate where there were no sales of stock by Meta as the issuer?

MR. CHRISTIAN: I would say generally yes, although I

haven't researched whether there's other causes of action, but I will represent to the Court this. The cases we have handled that have been successful and that we've moved forward on are based on standing, based on sales of shares by the issuer during the actual period that were manipulated, causationally connected to the illegal acts of the defendants.

THE COURT: Okay. That is why it is so critical for me, not being the expert in securities, but, you know, having some knowledge of bankruptcy, to understand when those sales by Meta as the issuer occurred, given the timing of the request for the scope. To the extent that we're limited to 160, 161 days, that is the critical period. Because the argument that is being made is if there were no sales by Meta as issuer at that time, it could not be harmed by the market manipulation because no money was coming back to the company.

Now, you know, Mr. Brust was positing, well, it may have affected the credit worthiness and the ability to obtain credit. I have not seen that cause of action. I've seen a lot of causes of action. I have not seen that one. That kind of sounds like almost the deepening insolvency theories that were 20, 30 years ago.

So I need some cornerstone here to understand what the estate could be shooting for as a cause of action. I get Section 9, Section 10(b), but those seem tied to actually having shares being sold in the market that may have been

depressed by the market manipulation.

MR. CHRISTIAN: I would agree with that, Judge. The only issue, which, of course, Mr. Fountain and I both and my colleagues are intimately familiar with, is, you know, the duration of that damage is a different issue. But, yes, I would agree with you that for purposes of the claims that we're intending to pursue as we sit here today and what we're looking at is sales that were made during the actual time period by the corporation that were artificially depressed due to, I've listed at least four of the illegal manipulative acts, potentially, that we could make a cause of action out of in a 10(b)(5), 9(a) case. Yes.

THE COURT: Well, what are those four actions, if you can remind me?

MR. CHRISTIAN: Yes, Your Honor. So it would be selling shares you don't deliver, which, as you can imagine --

THE COURT: Okay.

MR. CHRISTIAN: -- when supply exceeds demand, the price goes down. Secondly, it would be spoofing, which is placing these fake sale orders and taking them away to artificially depress the price and make the spread.

It would be, number three, not being a bona fide market maker. And market makers can trade on their own behalf for price variance. They can trade on behalf of their clients, which is an agent trade. If they shorted the stock, even if

they mismarked it long or short, and they're not a bona fide (audio interference) and they didn't borrow the stock, that would then go out. But then (indiscernible) --

THE COURT: Mr. Christian, we have more trouble with your connection.

MR. CHRISTIAN: -- (indiscernible) it would ultimately (audio interference) the Court. The other thing would be (audio interference), for example --

THE COURT: Mr. Christian, can you hear me?

MR. CHRISTIAN: -- (indiscernible) or people that report on the company --

THE COURT: I don't think so.

MR. CHRISTIAN: -- that issue bad --

THE COURT: Mr. Christian, we --

MR. CHRISTIAN: Yes, yes, Your Honor?

THE COURT: -- kind of lost most of your fourth point and on.

MR. CHRISTIAN: I couldn't -- I can't hear. Am I breaking up?

THE COURT: You are breaking up.

MR. CHRISTIAN: Can you hear me now?

THE COURT: Now we can.

MR. CHRISTIAN: Hello?

THE COURT: We can hear you, but you're not moving on the video --

MR. CHRISTIAN: Can you hear me, Judge?
THE COURT: -- suggesting -- can you hear us?
All right. I think we've got a problem.
Mr. Brust, Mr. Hartman, Mr. Burnett, you want to text or try to get in contact with Mr. Christian. It might be best if he just disconnects and try to reconnect.
Mr. Brust, maybe we can --
MR. BRUST: Yeah.
THE COURT: -- fill the time. But I think it looks like he's dropped and will reconnect. But if you want to fill the time until we get him back.
MR. BRUST: Sure, Your Honor. If the Court desires, we can produce a report of the sales for that 160 day.
THE COURT: But you understand the Court's concern. I thought we had discussed this and I made it fairly clear at the last one. And I agree that -- with the movants that I did not get the specificity that I was looking for or the development of the theories as --
MR. CHRISTIAN: Can you hear me now, Judge?
THE COURT: I am, Mr. Christian. We're going to -- do you want to finish our discussion or do you want to let Mr. Christian finish?
MR. BRUST: I think to the point of the specificity of the claims for relief, those really go to Mr. Christian.
THE COURT: All right.

MR. BRUST: If that's what --

THE COURT: But you understand what I'm looking for in a supplement?

MR. BRUST: I do.

THE COURT: Okay. And it does need to be supported by the -- by some evidence of that, ideally. And so --

MR. BRUST: And maybe, as Mr. Christian stated before, we didn't know the granularity that you wanted on that. We thought you wanted to know are there claims for relief that can be brought by Meta for manipulation of its stock. And that was where we went to 10(b) and 9(a).

THE COURT: Right.

MR. BRUST: But the -- I understand. The next step is --

THE COURT: It wasn't tied to the scope of the 2004, though. There's something in there that looks like there's perspectives for the ability to sell stock in 2022, '24, it looks like. It wasn't clear when the shares were being actually sold as to match it up into the 2020 through 2024 period for the scope of the 2004.

And there is some desire on my part to understand the universe. You know, your retention mentioned fraudulent transfers. I'm not hearing anything about fraudulent transfers in this as it relates to the 2004.

So I'm understanding that it is only market

manipulation, and I'm probably using that term wrongly. But those are the causes of action, the fraud that results from that for securities litigation. The cases you have provided me do discuss those, right?

And again, they are tied to the issuance of shares that are being sold and affected. So that frames my construct in looking at the scope and the purpose of the 2004. If there's something else, I haven't understood that.

MR. BRUST: These 2004 statements that are at issue here are not related to other aspects of the retention of my firm --

THE COURT: That's what I assumed.

MR. BRUST: -- or Mr. Robison.

THE COURT: Sure.

MR. BRUST: Those are going to be more preference avoidance actions --

THE COURT: Of course.

MR. BRUST: -- maybe some of that. And there might be more 2004s that we're requesting shortly.

THE COURT: Understood.

MR. BRUST: But yeah, these are more related to the claims that Mr. Christian will be bringing.

THE COURT: Well, and to the extent that there is one for affecting financing, you know, the ability to borrow, credit worthiness, that has not come through. Because really

what I --

MR. BRUST: Yes.

THE COURT: -- understand this for is going against the market manipulations. We need to see all the trades to see when the spikes are, to see when there may have been manipulation. And who is generating the manipulation if those were --

MR. CHRISTIAN: That's correct.

THE COURT: Yeah. If those were suspicious trades.

MR. BRUST: That's why I quickly deferred to Mr. Christian --

THE COURT: Okay.

MR. BRUST: -- when we started. Yeah.

THE COURT: No problem.

So Mr. Christian, did I have that right as what you're hoping to get out from this?

MR. CHRISTIAN: Your Honor, I have to admit, I'm incredibly impressed at your understanding of this quickly. You and I are 100 percent aligned on the scope and what we're looking for.

THE COURT: Okay.

MR. CHRISTIAN: Yes.

THE COURT: Good. And while you were gone, you mentioned the selling the shares, not own, spoofing, not being bona fide market makers, and there was a fourth one you were

getting to when you cut out.

MR. CHRISTIAN: I apologize, Judge. So the fourth claim that we've been able to look at is -- and this appeared in the Overstock case, if your law clerks want to look at it, Overstock.com. Essentially, there are companies, they're called analyst companies.

Well, in that case, the analyst company was in bed with a trader, and those traders were paying money to the analyst firm to give Overstock an F, an F, an F, and essentially taking a short position before the analyst report went out that gave Overstock an F. And ultimately, it was our contention, and the case did settle. Some of that is a record at a, you know, sizable number.

And basically, as a result of that, we pled that the analyst firm was in bed with the short seller, and ultimately, we call it basically short and distort. So you send out distorted information that says the company's garbage, and you, in essence, rig the market to give the short seller a profit, because once that report goes out, everybody's going to start selling, which then puts more selling pressure on and pretty much guarantees the short seller that they are going to make money.

THE COURT: Okay.

MR. CHRISTIAN: So that would be the fourth point.

THE COURT: All right. So I think I have -- and

again, to cut right to the chase, you believe that Meta was selling its own shares during this 160-ish day period that you're going to focus on?

MR. CHRISTIAN: Well, I believe in the preceding five years, according to our consulting expert, they sold a pre-split short of 800 million shares of their own stock at depressed prices, pre-split. And how I overlay that over those days, that's a different issue. But we're starting with those days because we think those are the days that are going to illustrate the most damage, Judge.

So I hate to bifurcate the response, but you get my point. In other words, I'm trying to be less burdensome to the defendants and make it more appropriate for the Court to give me those 61 days. But the number of shares sold that I'm reciting to you was in the five-year repose period, which would give us a cause of action.

But we do believe, according to our, again, preliminary analysis, just to be transparent, that those 161 days or whatever that number is that will get you that number, are the key days where the company suffered the most damages while they were selling shares. But I can't say that that's the only way they were -- the only time they were selling shares because the number I've given you on shares sold is over the five-year repose period, if that makes sense.

THE COURT: It does, but then you are going to argue

for an expansion of your Northwest decision as to the damages, is really what I'm hearing at that point in time.

MR. CHRISTIAN: That's possible, Your Honor, but, of course, I'm dealing in the dark right now, which, again, is why we want to investigate this. But I'm trying to do it in an efficient way and make our best guess as to where we think the most damage is and the most group -- the largest group of illegal acts associated with that damage.

Just to make it simple, when we look at the highest volume days, if the corporation sold a million shares (audio interference) every time with two or three million shares on a day, (audio interference) we will look at that here, it's starting to complex that. But, you know, typically that increased volume where the sales greatly exceed the bias, the price goes down. So that --

THE COURT: But if the price goes down --

MR. CHRISTIAN: -- that is indeed --

THE COURT: But sir, if the price goes down when you don't have the debtor's shares on the market, how does that harm the debtor? What is the cause of action?

MR. CHRISTIAN: Well, here -- right, here's a good example. The cause of action would be market manipulation. Here's an example. Let's say that there have been, I'm just making the number up, 200 million shares that were electronically sold by potential defendants over the five-year

period. That stock is still out there. That stock was illegitimately, in effect, issued almost like an issuer, except they're not, you know, they're not technically an issuer. They're a broker that are selling shares they don't deliver.

Well, those shares ultimately permanently impact the price because instead of the corporation having 50 million shares, I'm making it up, they have 250 million shares because 200 million shares have been sold but not delivered. So that isn't just isolated to those dates. So we're -- the issue is --

THE COURT: But if they haven't been delivered and they're false shares, the company still has the shares that it issued.

MR. CHRISTIAN: It has the shares, but it -- that it issued, but ultimately it's got all kinds of issues because at the proxy meeting all these shareholders show up that can't vote, and ultimately by virtue of issuing those shares, they have artificially diluted the percentage that each shareholder owns, and associated with that is a depression in the price. So if someone is selling shares they don't deliver, Your Honor, and ultimately that depressed the price on that day, that sticks with the company more or less to deal with down the road for its duration, which of course is no longer because it's in bankruptcy.

So these are expert issues, and it really gets down

to -- and to solve the issue, to fast forward for the Court, what we do ultimately once we get past motion to dismiss and then discovery and before our summary judgment, we will do an event study. That event study and regression analysis will tell us all the reasons for which the stock went down.

And to be transparent with the Court, I haven't handled the case in this space, I do many types of cases, but in this space I haven't handled a case where the defendants were the only party responsible for the stock -- the price going down. No, there are other reasons the stock goes down. The corporation may have had bad finances. They may have whatever. We are able to ferret that out, but ultimately we will attribute by an event study and a regression analysis the amount of damage attributable to each defendant for the illegal acts they committed, whether it's spoofing, naked short selling, not borrowing the shares, not being a bona fide market maker, et cetera.

And so it's really more of a damage question. But from a liability perspective, we've got to find out what bad acts happened within the five years. We believe most of those occurred within those 61 days (audio interference). But I can't -- you know, (audio interference) even if I'm wrong, or once we get discovery (audio interference) then we'll have to deal with that and come back to the Court. And I understand it will be more difficult for us to look at expanding that.

THE COURT: All right. I don't think we finished our discussion as to Torchlight and MMTLP.

MR. CHRISTIAN: (Indiscernible), Your Honor?

THE COURT: I'm sorry? Mr. Christian, I missed what you just said.

MR. BURNETT: I think we've lost him again, Your Honor.

THE COURT: Yep.

MR. BURNETT: Oh, there he is.

THE COURT: I think so. I wanted to get back to the Torchlight and MMTLP aspects of these requests. I take it that goes back to your broader view of whatever happened in the past five years affected Meta. Is that the basis?

MR. CHRISTIAN: Yes, Your Honor.

THE COURT: All right. Okay.

Mr. Hartman, I saw you stand up. I want to give you your --

MR. HARTMAN: Just a minor issue, Your Honor. I'm confident that we can provide the sale transactions for that 161-day period.

THE COURT: Okay. I would appreciate a little more detail as to the 161 why Torchlight on the pre and then the special dividend out of Meta that results from that, why that is a concern of the debtor --

MR. HARTMAN: Yes, Your Honor.

THE COURT: -- as to any cause of action.

MR. HARTMAN: Yes.

THE COURT: All right. Thank you.

MR. HARTMAN: Now, just to keep it moving, what's -- today's the 20th. We can do it by the end of February.

THE COURT: That would be good, because we need to keep this moving.

MR. HARTMAN: Right.

THE COURT: So Mr. Fountain?

MR. FOUNTAIN: We would respectfully ask an opportunity to brief any new issues that are raised.

THE COURT: Absolutely. You'll have, let's say, effectively a ten-day turnaround.

MR. FOUNTAIN: Thank you, Your Honor.

THE COURT: All right. So I guess then we'll come back with reply as to who wants to go at the table. I think we've hopefully leveled out the field with NASDAQ. So however you want to.

MR. FOUNTAIN: Jimmy, do you mind?

MR. ZACK: (Indiscernible).

MR. FOUNTAIN: Thank you.

THE COURT: Thank you, Mr. Zack.

MR. FOUNTAIN: May I proceed?

THE COURT: Please do.

MR. FOUNTAIN: Thank you, Your Honor. The

presentation that we just heard was wholly new but also makes clear, very clear, the policy concerns that we were talking about with respect to the expanded scope of Rule 2004 that the trustee is asking this Court to authorize.

THE COURT: And what I'm concerned about it is, right, you are potentially a target. Your clients are a target because they're market makers. And from what I'm hearing Mr. Christian say is a concern that the market makers may have engaged in trades that did not, what's the right word, were not -- I don't want to say legitimate because that may be too far, but may have suppressed the value while they were trading. And for that, they need to know the trades.

And to do that, okay, they can go to NASDAQ and get the gross, but they also want to know how many your client did and how many the other non-moving -- the non-parties did. Why wouldn't that be, so long as there is some inkling that there could be, you know, a sale there which would give rise to a cause of action, why isn't that a proper use of 2004?

MR. FOUNTAIN: What I have not heard from the trustee and what would be required for that is for them to say that they believe that our clients engaged in market manipulation with respect --

THE COURT: No.

MR. FOUNTAIN: -- to the stock.

THE COURT: No, because you engaged in the market.

So it may not have been you. It may have been the entity next to you or other, but you engaged in the market. So to understand the totality of that, you have to understand the trades.

MR. FOUNTAIN: Your Honor, it would be the entities that actually engaged in those trades, right, that we're on the other end of the trades with Meta Materials, the counterparties to those trades. Our clients only engaged in trades with third-party stockholders who were owning their own property, which is not property of the estate.

THE COURT: That may have been trying to drive prices down.

MR. FOUNTAIN: Your Honor, first of all, there is no articulated basis that our clients were trying to do anything like that.

THE COURT: Oh, we're way before that.

MR. FOUNTAIN: And that would be --

THE COURT: That's the whole point.

MR. FOUNTAIN: Respectfully, Your Honor, that's not the case, because the good cause inquiry that this Court needs to engage in requires them to articulate relevance. And when we went to them and said, what is the relevance, they said it is work product. And what I heard today --

THE COURT: That's why we're having continued hearings, though.

MR. FOUNTAIN: Absolutely. And I still haven't heard an articulated --

THE COURT: Because you're right. I did not accept that. But it has moved on. And this is not a preclusive event.

MR. FOUNTAIN: All right.

THE COURT: Right? So if I say no, you did not establish it because you said it was work product. We're going to be back here by the end of the month with a new one. And that makes no sense.

MR. FOUNTAIN: Your Honor, respectfully, a lot of what we heard today was new. We heard about new causes of action.

THE COURT: I don't think it was. I mean, I get that. It wasn't spelled out. You know, it kind of was. I mean, all you have to do is take the Northwest Bio and overlay it. And that's what this is.

The spoofing is the generation of sales within, I'm going to say Meta, because I still don't understand Torchlight and MMTLP, if I'm get -- I did get it right. So I don't understand. So let's focus on Meta. If Meta was in the market for its shares, then I get the cause of action. All right. And I hate to blame this on the fog of litigation, but if I can get it, I think it's there as to the cause of action.

MR. FOUNTAIN: I think you're making precisely the

right point, Your Honor, which is that they have talked about a market manipulation spoofing claim. That is the one that was in their briefing, and we've engaged in that. We've explained the Northwest Bio case, and I'm about to do that more.

But as to the other causes of action that Mr. Christian was talking about today, we have not had an opportunity to engage in those. We have not had an --

THE COURT: Well, I want to include -- lump in the short sale as well, right? Because I think that's just the other side of the coin with the spoofing. But I see that truly being the core of this.

MR. FOUNTAIN: So spoofing is an unlawful market practice. Short selling is not unlawful.

THE COURT: Yeah, I'm not going to get into the esoteric -- especially with people who do this all the time, on the naked short sales. You've got to give me a little more time to catch up with you as to those specifics. But I understand those can be the basis of the Section 9 and 10(b) claims under the Securities Act.

So in the cases that's cited seem to at least allow that possibility. And that's all we're here right now is possibility.

MR. FOUNTAIN: Your Honor, I think that there's a couple of things here. What we're hearing about causes of action is new. And, you know, it is notable and there is

significant disagreement between the parties about what cause of action with respect to spoofing could belong to the estate.

I'm going to talk about the Northwest Bio case and why their articulation of it is different from what that court actually found. That court rejected the idea that spoofing could have long-term effects on the market. And so when they've said there's 161 days, right, they would need to tick in tie --

THE COURT: But that's why Mr. Hartman's point is so critical. All right. We just heard Mr. Hartman say that he believes that they can establish that they were selling within a 160-day period.

MR. FOUNTAIN: And we should have an opportunity, a full and fair opportunity, to respond to that just as we should the opportunity to respond to their arguments about new causes of action, Your Honor. This is --

THE COURT: There are no new causes of action. All we're doing is trying to get to the market manipulation for spoofing and short sales.

MR. FOUNTAIN: Okay. Then I understand that, Your Honor. And so let me address a couple of other things that were said. One is just with respect to where I began, the policy concerns. They say that market makers are trading the most, and that's why we're going after their information. That is not good cause for a Rule 2004 subpoena. You did a lot of

something, and so we are going to target you. It cannot be the case.

The Sun-Edison case talks specifically about how there needs to be limiting factors that go into the Rule 2004 analysis. Mr. Christian said that he couldn't tell his client who was engaged in the market manipulation. They are trying to have it both ways, Your Honor. They are suggesting that our clients allegedly engaged in market manipulation, and therefore they need discovery from us specifically. And at the same time, they are saying we don't know who possibly could do it.

And, Your Honor, where I think we should look for the answer to that question is their comments in Meta's press release issued by Mr. Christian in which he said Meta has meritorious claims for market manipulation against several parties. Several parties. They knew two years ago who the defendants are. They have far crossed the line into identifying litigation targets. That's the Transmar case. With respect to --

THE COURT: Look, again, let's bring this -- maybe we can shift this to a more bankruptcy friendly. When the Ponzi scheme files and blows up, everybody knows. Right? And I understand the fraudulent transfers. I can get -- if you're saying Ponzi, we're going fraudulent transfers. And yet, you spend at least a year doing your 2004s to construct the finances, to establish the Ponzi, to find out who the

professionals are, their role, and all of that. This has the same overtones.

MR. FOUNTAIN: I'm glad you raised the Ponzi scheme example because I've thought about it a lot since the October hearing. Why a Ponzi scheme is categorically different from what's going on here is because in a Ponzi scheme there is a relationship between the entities that are receiving the 2004 subpoenas and the debtor.

THE COURT: Not necessarily the banks.

MR. FOUNTAIN: Yes, the banks will hold the funds. There's no allegation that we had any dealings.

THE COURT: No, the banks that the monies went to. Yeah.

MR. FOUNTAIN: Exactly. And, Your Honor, there's no allegation that we were counter-parties to these -- they say they sold stock?

THE COURT: You don't have to be counter-parties.

MR. FOUNTAIN: But to the --

THE COURT: You don't --

MR. FOUNTAIN: In the Ponzi scheme example you're giving, Your Honor, there is a relationship between those entities and the debtor.

THE COURT: The relationship is the trading of the Meta stock.

MR. FOUNTAIN: And, Your Honor, to begin where we

started, the Meta stock is not the property of the estate. It's owned by shareholders.

THE COURT: It is if it's held by Meta.

MR. FOUNTAIN: Your Honor, if it's issued, right, if we engage in those sales, theoretically we would have a relationship with debtor, but our client --

THE COURT: No, no, no.

MR. FOUNTAIN: -- is not alleged to have done that.

THE COURT: But you're selling the shares to third parties from third parties that are going to influence the sale of the shares of the debtor.

MR. FOUNTAIN: Your Honor, this is exactly the slippery slope that was rejected in the SunEdison case. The SunEdison case talks about how anything, a competitor, for example, will have a impact on the financial affairs of a debtor, and there needs to be a line that the Court can draw. SunEdison is very clear on that.

And I think, Your Honor, this isn't the only new argument that we've heard from them today about these new causes of action that we haven't had an opportunity to brief. Your Honor I thought it was very clear that you wanted long, detailed --

THE COURT: Yeah.

MR. FOUNTAIN: -- citations in your briefing. But we're hearing for the first time today about these stock sales,

and we'll have the opportunity to brief it, Your Honor. But on this record we don't think it can fairly be considered.

There's also no explanation, Your Honor, for why sales that are at fixed prices below the market price could possibly have been affected by short-term market manipulation, spoofing, that they allege is occurring.

Your Honor, with respect to the 161 sale days, in the Northwest Bio case, and I'll get to that in a little bit more detail, in the Northwest Bio case the Court specifically said that you had to tie the spoofing to the sale of stock, and it had to be within 24 hours. So unless their argument is that they are selling stock on each of these 161 days --

THE COURT: But we're not there yet. We're not at the end of the race. We're not at the filing of the complaint. That's the problem. And --

MR. FOUNTAIN: Your Honor, I think your point at the last hearing, right, is that this is a threshold question, whether the stock that was affected is the property of the estate. And that goes to the question that I'm trying to drive at, perhaps inarticulately. But it has to be --

THE COURT: No, you're being very articulate. I'm just --

MR. FOUNTAIN: I appreciate that. It has to be the property of the estate, and there's been no attempt to link those two things, right? We heard for the first time you can

take judicial notice of SEC filings. It's not something that we have an opportunity to analyze here, because it wasn't --

THE COURT: I don't even know which SEC filings to take judicial notice of, nor is it my job to go search. So I get that point.

MR. FOUNTAIN: Okay.

THE COURT: But that's why I had the discussion with Mr. Brust and Mr. Christian and Mr. Hartman. So I agree. I did ask for detail. That detail is lacking.

MR. FOUNTAIN: Right. And, you know, provided that we have an opportunity to respond, and I recognize the Court's given us that, I really appreciate it. There's two other points that I want to make, and then I will address questions that the Court may have.

One is a question that is unanswered to this day, at least to my understanding, is why they need information from Citadel Securities, right, from Virtu, from Anson Funds. They say they traded a lot of shares. They say they were in the market.

Your Honor, at ECF-1922, they have an application to retain share intel. And among the other things that they say, utilizing share intel's patent-pending processes, companies can proactively track equity flows and identify suspicious, aberrant, and/or unusual trading activity. So if the reason that they have our stock, and I think as you articulated, was

to look for the spikes in the trading data, that is precisely what they are asking you to approve funding for share intel to do. That doesn't depend on our proprietary information.

THE COURT: I think they want to know if your client caused a spike.

MR. FOUNTAIN: But share intel should have that information. It will have -- I mean, we don't have full visibility, and perhaps that's something they should, you know, share as well, so that we understand whether this is duplicative of, I won't call it discovery, but services that they're obtaining and spending funds to get, right?

And, you know, why do they want to know whether our client caused a spike? Because they want to name us as a defendant in the lawsuit.

THE COURT: Sure.

MR. FOUNTAIN: And the sure, Your Honor, that's exactly what the law says cannot be the case.

THE COURT: That's what you say to draw the line. I need to get further clarity on where to draw the line.

MR. FOUNTAIN: And I'll be very brief, but the Transmar case, the GHR case, the Enron case, even the Millennium case, Your Honor, we think speak to these issues.

The last thing I'll say, Your Honor, is that the Northwest Bio case expressly rejected this idea that spoofing can have long-term effects on the market. And so this idea --

THE COURT: I get that idea.

MR. FOUNTAIN: Okay.

THE COURT: I get that point.

MR. FOUNTAIN: Then I won't elaborate further on it.

THE COURT: Thank you very much.

MR. FOUNTAIN: Thank you, Your Honor.

THE COURT: All right. Mr. Zack, you seem next to go. I would like -- when -- to Mr. Zack, to hear the response to Mr. Burnett's characterization that it's as easy as printing out spreadsheets.

MR. ZACK: Yes, Your Honor, and I'll keep this limited to those NASDAQ-specific points. But I want to start with the narrative of that for a period NASDAQ was acting pro se in good faith at negotiating.

THE COURT: I don't think that matters, but if you --

MR. ZACK: So I just want to say I trust that Your Honor is not persuaded that that weighs against NASDAQ.

THE COURT: I see how that's one way or another.

MR. ZACK: You know, the -- but the implication there was that NASDAQ was so easily and willingly complying and then NASDAQ retained counsel and stopped wanting to comply. The facts are kind of the opposite is NASDAQ provided six months of data when the trustee came back from (indiscernible) and NASDAQ retained counsel and has put its resources more towards the motion to quash in two different jurisdictions.

Procedurally, we're in a bit of a tight spot because there was this letter brief procedure in New York, which is sort of a preliminary type motion that has limited evidentiary backing. We duplicated that essentially as our motion in this court.

You know, as it goes to the specifics of the burden on NASDAQ, I will admit that the record doesn't necessarily include, like, admissible evidence on specifically what burdens it faces. It's more general in regard to NASDAQ has produced the most important six months. NASDAQ doesn't feel that it should incur the burden of producing another three and a half years and that NASDAQ is concerned with the broader burden of any time somebody comes in and asks for four years of these records.

So if Your Honor would like NASDAQ to supplement the record with more detail on what that burden actually entails, we could certainly do that because --

THE COURT: If you don't mind, that brings up a question of clarification in light of the willingness to limit the other subpoenas for the 161.

MR. ZACK: I was going to ask about that too.

THE COURT: I don't see Mr. Christian.

Mr. Burnett, do you have a sense of where the trustee is about if you're limiting the non-moving parties to the 160-day period, that seems like it may be covered by the prior

production. What does that do to the NASDAQ? And can we basically hold that in abeyance then until we get this round out of the way?

MR. BURNETT: I'll -- Mr. Christian is more familiar with the 161-day period. What I'll say is that, again, all we're asking for is a production of that four-year period. It should be no more burdensome to produce from a four-year period than it is from a six-month period or from 161 individual days because all we're talking about is a spreadsheet that's bigger or smaller than another spreadsheet.

THE COURT: My assumption from your argument that I'm drawing is that it really is just to run a wider computer search. Is that what you're getting at?

MR. BURNETT: That's correct. Yeah. And I mean, my understanding, my assumption is that NASDAQ has voluminous electronic, you know, databases and it can run queries by punching in the criteria, which in this case is the tickers that we're looking for, the scope of fields of data that we're looking for, and the date range. I can't think of any other criteria that would matter, and that should just require, you know, some employee who's familiar with that database to plug in those criteria and generate a spreadsheet, send it to the outside counsel and send it to us.

THE COURT: And that's for the other entities in addition to the debtor?

MR. BURNETT: Correct. It would be market-wide data, which is what we are seeking on behalf of the trustee for our experts and counsel to do an analysis of market-wide trading.

THE COURT: Okay. Back to you, Mr. Zack.

MR. ZACK: Well --

THE COURT: Thank you, Mr. Burnett.

MR. ZACK: -- you know, having acknowledged that the record doesn't necessarily include much detail from NASDAQ on what the burden is, I think the record also shouldn't be based on the trustee's counsel's assumptions --

THE COURT: I'm just trying to get some information, Mr. Zack.

MR. ZACK: -- of what some employee --

THE COURT: Yeah.

MR. ZACK: -- at NASDAQ does or doesn't need to do to do this. So, you know, to my earlier point, if Your Honor would like, we could certainly supplement the record, and I do believe that part of that was just the limited procedure of that letter motion carrying through to this Court.

And then also on the 160 days, you know, I have that circled. Unfortunately we weren't able to hear what the 160-day period is to know whether that aligns.

THE COURT: It hasn't been set yet.

MR. ZACK: Right, exactly. But, you know, it does -- at least I think Your Honor picked up on, if we've produced 180

days, that, you know, maybe is -- at least at this stage that should be seen as having incurred enough of a burden, and, you know, we can quash the rest of the subpoenas.

THE COURT: I try not to dwell on this point too much, but yes, this is your first opportunity before me as far as this. But being two, and now obviously going into another round of this, I would like to have had this information before, but I do think it's important that I get that information.

So if we're going to take this time by the end of February to -- for the trustee to supplement, if you could supplement that by the end of February, and then we'll give the trustee ten days to respond from what you provide.

MR. ZACK: Sure.

THE COURT: So thank you.

THE BURNETT: Your Honor, can I be heard on that point?

THE COURT: Mr. Burnett, go ahead.

THE BURNETT: Yeah, I'd just like to point out, you know, NASDAQ's counsel points to the fact that their initial letter brief was transferred over. But after we -- the trustee, filed an opposition to the motion to quash, NASDAQ had its opportunity to file a reply, which it did on February 13th. That's Docket 2592. And they have a section --

THE COURT: Yeah.

MR. BURNETT: -- where they talk about burden, but they don't give any of that specificity. So they've already had that opportunity to --

THE COURT: I understand, but the trustee has had the opportunity to explain to me the cause of action, and quite honestly, they have not.

MR. BURNETT: Right.

THE COURT: So I don't see the harm in extending that courtesy to NASDAQ for this. So --

MR. BURNETT: Yes, Your Honor.

MR. ZACK: I also suspect if we had submitted a declaration on reply, there would be issues raised with that as well.

THE COURT: I -- you never can tell with bankruptcy.

MR. ZACK: It's a tough procedure either way with the way that this came to this Court.

THE COURT: Understood, and we've got (indiscernible) on the wings. So I'm -- but I am cognizant of, let's see, August 9th, 2026 is a two-year statute of limitations. So this will be done in plenty of time, one way or another, if discovery is going to be -- I mean, Mr. Fountain, apologize, if Rule 2004 is going to be granted, then it needs to be done in time to serve the purpose. So the more that we have to continue this, it's shortening that fuse. So if the parties can figure this out, all the better. I'm assuming they cannot.

But I need the appropriate information to make the right decision. Because I think quite honestly, I see both sides of this argument.

So a long-winded way of trying to send a message or a discussion beyond you, Mr. Zack. But thank you.

MR. ZACK: Sure. If Your Honor doesn't have any more questions, that's all I have.

THE COURT: I do not.

MR. ZACK: Thank you.

THE COURT: Mr. Brody.

MR. BRODY: Good afternoon again, Your Honor. Alan Brody, Greenberg Traurig, on behalf of Anson. Your Honor, I'm going to be extremely brief.

Your Honor, I'm just going to raise two points, and they're actually connected. The first is nobody knows what stock was sold by the debtor better than the debtor itself. Mr. Christian represented the debtor. Mr. Christian represented the trustee. I'm glad to finally hear, I believe that was a statement, that we're finally going to get the dates that the debtor sold the stock during the relevant time period. Because that goes to the heart of everything.

It's also connected to something Your Honor brought up, which is sort of looking at this in the scheme of a Ponzi scheme. Your Honor, I was fortunate last week to have been in Las Vegas where I was on a panel on bankruptcy fraud at the TMA

Distressed Investing Conference. And, Your Honor, this is not a Ponzi scheme. This is nothing like a Ponzi scheme. Because what's important in a Ponzi scheme, and it's important here, is in a Ponzi scheme you have certain causes of action by the trustee, by the liquidating trust, by the debtor, such as fraudulent conveyances, by Madoff.

You've got a number of different causes of action by the debtor. Putting a sign in pari delicto, as Your Honor said, that will be determined at a motion to dismiss itself. But then you have other causes of action that have -- in which the debtor, the trustee, the liquidating trust, whoever the plaintiff is in that action, that would include Madoff, still has to have standing. It has to be their cause of action and not the cause of action of the investors.

And that goes back to what we originally said, back to the shares of stock sold by Meta. We've been asking since the meet and confer. We've been asking from the beginning. I'm glad that I think we're going to finally get that and have an opportunity to respond.

So my point, Your Honor, is even in the Ponzi schemes, the causes of action, the trustee still needs standing, Your Honor. Thank you.

THE COURT: Thank you. All right.

MR. FOUNTAIN: Nothing further, Your Honor.

THE COURT: Thank you. I appreciate that. All

right.

So I believe that we will have the first round of supplemental by the trustee as to the causes of action and the shares of Meta sold by the end of February. That will be a week from today. Then the movants will have the opportunity to file by March 10th. Mr. Zack will file the supplement regarding burdens by February 27th, and the trustee will have until March 10th to respond to that filing.

I don't think we are going to set a continued hearing at this time. Part of my concern about the deadline is that I am tentatively thinking of taking this under submission at that point. I've heard the arguments. I understand them. I think I just need a little factual development to be able to flesh them out.

That said, as I indicated before, my concern about the macro issues standing, the cause of action and all of that, predominates. Mr. Zack has made quite a bit of what I consider the micro issues, which is the burden and that such, and I honestly see that a little differently for NASDAQ as to the non-parties. That weighs, but I need to get something out. So if I could even get something out when I'm calling the macro issues, I would like to do that.

If we have to come back on the micro issues, maybe we do, maybe we don't. I don't -- I can't tell you right now where I am on that. So --

MR. FOUNTAIN: Thank you, Your Honor. All I was going to add is, you know, we didn't spend time here addressing some of the burden comments that were made. It sounded like there was a, I wouldn't call it a proffer, but something about emails that were said, and so that is something we would like the opportunity to address.

THE COURT: Yeah. Let me kind of play with that because as part of the trustee supplement, I think they're going to also give the details as 160, it's 161, whatever that is, whatever the reduced amount of time is, and then also I would ask just to clarify in writing that withdrawing the request for emails from any Rule 2004, that may affect how I see things too. So your response can address some of that as well within the burden aspect based upon the reduction of the Rule 2004, if you could direct it towards that.

MR. FOUNTAIN: Thank you, Your Honor, and I'm sure you have no doubt we will still address the burden, but I do appreciate that.

THE COURT: Sure. Mr. Brody?

MR. BRODY: Your Honor, I apologize. I just want to confirm the trustee settlement date. You said a week, so that would be they have to provide on the 27th, the 28th being a Saturday.

THE COURT: Yeah, I --

MR. BRODY: So I want to make sure I have the dates

correct, because I know my date.

THE COURT: The 27th, yeah. If you want to give them to the 28th, that's unusual to schedule something for a Saturday, but, you know, maybe that's --

MR. BRODY: Whatever Your Honor wants.

THE COURT: -- the beginning of the issue.

MR. HARTMAN: It'll be done by the 27th, Your Honor.

MR. BRODY: Thank you, Your Honor.

THE COURT: Thank you, Mr. Hartman.

All right. With that, I think that's all we'll do for today on that. I may get out of short scheduling order, just to confirm that on Monday. Let's pick up in the time we have left then the discussion about the litigation financing.

And, Mr. Hartman, I appreciate -- watch you're walking up. I appreciate your status. I went back and read the application. My concern is that while it's referenced in the application and it's actually woven into the terms of employment and the compensation, I still don't have a comfort level as to what the litigation financing is, and quite honestly, within the bankruptcy construct, where it is coming from for purposes of allaying any concerns regarding disinterestedness, adverse interest, and such, if that makes sense.

MR. HARTMAN: I understand.

THE COURT: Okay.

MR. HARTMAN: So I guess the question is, I mean, do you want me to set a hearing on, let's say, I mean, I looked at it. It's not a 363 issue because it's not property of the estate. It's not -- I don't think it's a 364 issue.

THE COURT: But it's coming from property of the estate to pay it back.

MR. HARTMAN: Well, if there's a recovery.

THE COURT: Right.

MR. HARTMAN: Right. But that's part of the contingent fee arrangement.

THE COURT: Right.

MR. HARTMAN: So I'm happy to file something that addresses your questions. I just don't know exactly what to call it.

THE COURT: That's -- my sense is, given what little I've come to appreciate in this case, a motion might be the best way to do it.

MR. HARTMAN: I'm happy to file a motion. I might not have any Code section for the authority, but I'll ask anyway.

THE COURT: No, well, and I think it's complicated in the fact that it was embedded into -- I mean, it was a material part of the employment.

MR. HARTMAN: Right.

THE COURT: I just need to understand it better. And

I keep hearing of it, and I don't understand if it was all self-financed, if it's from others, what the relationship of the 500 from Harrington was. If you can walk through that, then I think we can see where that takes us and put it more to bed on a more identified basis on the docket.

MR. HARTMAN: Certainly.

THE COURT: So yeah, that's all.

MR. HARTMAN: So you just want it on regular notice or how --

THE COURT: Sure.

MR. HARTMAN: Okay.

THE COURT: I think that would be fine.

MR. HARTMAN: Okay. I'll try and get that on file next week.

THE COURT: All right. Thank you.

MR. HARTMAN: All right. Thank you.

THE COURT: For today, then, I don't know if anybody else wants to say anything about that at this time. I think it can generally probably wait until we get the motion to see on a more informed basis.

MR. FOUNTAIN: That works for the non-parties, Your Honor.

THE COURT: All right. Thank you.

All right, then. As to the status on the adversary, my understanding is that resulted from the transfer over from

Southern District of New York. I don't know why it was put into an adversary, but it was.

We've moved it over here now, Mr. Zack. Are you okay with -- I don't know how you terminate that adversary or what exactly, but it would be terminated as moot in light of the contested matter before us? And honestly, I guess it's Mr. Hartman, so.

MR. ZACK: Yes, Your Honor. We were equally surprised that that's how it showed up here. We were kind of awaiting to see --

THE COURT: How it goes on.

MR. ZACK: -- what would appear on what docket and all that. If it's something that NASDAQ should take the lead on, some sort of, like, dismissal order, I'm sure we could stipulate to something to wipe it out.

THE COURT: You know, honestly, it might be a stipulation to dismiss as moot in light of the transfer over to the main case.

MR. ZACK: Sure. We can propose some language in order to the trustee.

MR. HARTMAN: That's acceptable, Your Honor.

THE COURT: I think that would clarify the docket fine. Thank you very much.

MR. ZACK: Okay.

THE COURT: All right. I think we've exhausted

everything we need to discuss today. I want to say thank you for attending. I do appreciate this. My sense was that this was sufficiently significant that it warranted being in person. I understand people are everywhere here. So I do understand the effort and the cost that came. But I think from time to time, especially in these large matters, it warrants it to be in person. So I did appreciate that, and I think I got, you know, the benefit of that.

So unless anybody else has anything else to add, that will conclude the hearing for today. Wish everybody --

MR. BURNETT: Your Honor, I --

THE COURT: Oh, go ahead, Mr. Burnett.

MR. BURNETT: Sorry. One last thing. This is David Burnett. What would you like to do with regard to FINRA? The latest that I've seen is in the DC matter, there was a docket entry yesterday saying that the case was transferred to the bankruptcy. But I have not seen that yet on our docket.

THE COURT: Right. I have not seen it either. Let me get back to Alaska and let that docket catch up to that. I can contact the clerk's office, too, to see where that is in the processing.

MR. BURNETT: I can tell you that you asked earlier at the beginning what was done in that case. In that case, the parties fully briefed the motion to quash issues with lengthy briefs, not just letter briefs. And then the Court asked for

supplemental briefings specific to the Rule 45(f) transfer issue.

So from our perspective, and counsel for FINRA is not here today, but from our perspective, that issue has been fully briefed.

THE COURT: Okay. Are you in discussions with opposing counsel on that matter?

MR. BURNETT: We have not spoken to them yet. We were waiting to see what Your Honor would like to do.

THE COURT: I would be interested in you conferring with them to see how they feel about it. Unfortunately, they're now one step behind NASDAQ on that and two hearings down. But my guess is much of the arguments have been made, if not all of them.

If there are specific items raised in that instance, I'm not opposed to hearing it, but I would like to, again, keep this moving. So ultimately, I'll need to hear what FINRA wants to do in regards to bringing it over here if they want their own stand-alone motion or not. But it is not likely to -- at least my initial thought is, it's not likely to derail this.

If it can happen within the next 17, 20 days in light of the supplemental briefing, that's great. I have some conflicts, like I will be in chambers on Monday. I will be out of action for the rest of that week. So I could probably have the chambers get a scheduling order out, but that's about the

level I'm going to be at next week, unfortunately. The week after, possibly, we can do something. So --

MR. BURNETT: Okay.

THE COURT: But if you could coordinate -- if the parties could all coordinate to figure out how it is, it's all the same issues. So I would like to do it as efficiently as possible so the parties can find out what they need to do and take the appropriate actions any way it goes.

MR. BURNETT: Okay. Understood, Your Honor. We'll reach out to FINRA's counsel.

THE COURT: Thank you for bringing that up, Mr. Burnett.

All right. With that, I'll let everyone get to the weekend. We're adjourned. I hope you all have a good weekend. Thank you.

MR. FOUNTAIN: Thank you, Your Honor.

MR. BURNETT: Thank you, Your Honor.

(Proceedings concluded at 3:57 p.m.)

* * * * *

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Heidi Jolliff
______________________________

HEIDI JOLLIFF, AAERT NO. 2850 DATE: February 27, 2026

ACCESS TRANSCRIPTS, LLC

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Alicia J. Jarrett
______________________________

ALICIA JARRETT, AAERT NO. 428 DATE: February 27, 2026

ACCESS TRANSCRIPTS, LLC