## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In the matter of:<br><br>MOTION TO QUASH SUBPOENAS TO<br>NONPARTY FINANCIAL INDUSTRY<br>REGULATORY AUTHORITY, INC. | Mi   Case: 1:25−mc−00129<br>Assigned To : AliKhan, Loren L.<br>Assign. Date : 8/6/2025<br>Description: Civ. Misc. |

### NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.'S
### MOTION TO QUASH SUBPOENAS
### OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER

Nonparty Financial Industry Regulatory Authority, Inc. ("FINRA") respectfully moves this Court pursuant to Rules 45 and 26 of the Federal Rules of Civil Procedure for an order quashing the subpoenas for the production of documents and a Rule 2004 examination (the "Subpoenas") issued to FINRA in *In re Meta Materials, Inc.*, Bk No. 24-50792-hlb (Bankr. D. Nev.) (the "*Meta Materials* Bankruptcy"). As set forth more fully in the accompanying Memorandum of Points and Authorities, the Subpoenas should be quashed because they unduly burden nonparty FINRA with requests for information pertaining to speculative, potential claims that have not been filed, which information could be obtained from more convenient sources, and which information is irrelevant, unhelpful, privileged, and would otherwise pose an undue burden and significant expense on nonparty FINRA. Fed. R. Civ. P. 45. In the alternative, FINRA seeks a protective order precluding the discovery or otherwise limiting the scope of the discovery. Fed. R. Civ. P. 26(c).

This Motion is based on the concurrently filed Memorandum of Points and Authorities and the exhibits thereto including the supporting Declarations of Stephanie Dumont and Troy Eads, as well as the filings in the above-captioned matter, the *Meta Materials* Bankruptcy, and the Securities and Exchange Commission's actions against Meta Materials, Inc., John Brda, and George Palikaras, which filings are subject to judicial notice. Fed. R. Evid. 201.



**RECEIVED**

AUG 0 6 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Pursuant to Local Civil Rule 7(m), counsel for nonparty FINRA and counsel for Christina Lovato, chapter 7 trustee (the "Trustee"), for the estate of Meta Materials, Inc., met-and-conferred regarding this Motion on August 4, 2025, but could not resolve their disagreements. The Trustee opposes this Motion. A proposed order is submitted herewith.

Dated: August 6, 2025

Respectfully submitted,

/s/ David S. Norris
David S. Norris (DC Bar No. 1024996)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Tel.: (202) 457-6000 | Fax: (202) 457-6315
david.norris@squirepb.com

*Counsel for Nonparty Financial Industry Regulatory Authority, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document is being served this day via email and mail on counsel for Christina Lovato, chapter 7 trustee, for the estate of Meta Materials, Inc.

/s/ David S. Norris
David S. Norris

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| In the matter of:<br><br>MOTION TO QUASH SUBPOENAS TO<br>NONPARTY FINANCIAL INDUSTRY<br>REGULATORY AUTHORITY, INC. |

Miscellaneous Action No.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
NONPARTY FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.'S
MOTION TO QUASH SUBPOENAS
OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**

David S. Norris (DC Bar No. 1024996)
**SQUIRE PATTON BOGGS (US) LLP**
2550 M Street, NW
Washington, DC 20037
Tel.: (202) 457-6000 | Fax: (202) 457-6315
david.norris@squirepb.com

*Counsel for Nonparty
Financial Industry Regulatory Authority, Inc.*

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

INDEX OF EXHIBITS.................................................................................................... ii

TABLE OF AUTHORITIES ........................................**Error! Bookmark not defined.**

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 4

I.  FINRA's Role in Regulating the National Securities Markets. ............................ 4

II.  Meta Materials' Alleged Market Manipulation and Bankruptcy. ........................ 4

    A.  The First "Short Squeeze"—Metamaterial, Inc. Merges with Torchlight. .............. 4

    B.  The Second "Short Squeeze"—Meta Materials Spins Off MMTLP. ..................... 5

    C.  The SEC Asserts Charges Against Meta Materials and the Former CEOs. .............. 6

    D.  Meta Materials Files for Bankruptcy. ..................................................................... 7

ARGUMENT .................................................................................................................... 8

I.  The Subpoenas Must Be Quashed Because They Unduly Burden Nonparty FINRA. ........ 8

    A.  The Subpoenas Unduly Burden Nonparty FINRA with Speculative Requests to Discover Potential Yet Unfiled Claims. ................................................................. 9

    B.  The Subpoenas Unduly Burden Nonparty FINRA with Discovery Requests that Are Barred by the PSLRA Discovery Stay. ..................................................... 12

    C.  The Subpoenas Unduly Burden Nonparty FINRA with Irrelevant Requests. ....... 13

    D.  The Subpoenas Unduly Burden Nonparty FINRA with Discovery that Can Be Obtained from a More Convenient Source—the Suspected Wrongdoers. 17

    E.  The Subpoenas Unduly Burden Nonparty FINRA with Requests for Information that Would Not Be Helpful. ................................................................. 20

II.  The Subpoenas Seek Privileged and Confidential Documents. .......................... 21

    A.  The Court Must Quash the Subpoenas' Request for Privileged Information Protected by the Investigative File Privilege. ........................................................ 21

    B.  The Court Must Quash the Subpoenas' Request for Protected Consolidated Audit Trail or "CAT" Data. .................................................................................... 23

    C.  The Subpoenas Impose an Undue Burden on FINRA with Requests for Attorney-Client Privileged Materials. .................................................................... 25

III.  The Subpoenas Would Impose Significant Expense on FINRA ....................... 26

CONCLUSION................................................................................................................ 27

## INDEX OF EXHIBITS

Exhibit 1 – Subpoena to Produce Documents, Information, or Objections, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev.) (the "Document Subpoena")

Exhibit 2 – Subpoena for Rule 2004 Examination, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev.) (the "Testimony Subpoena")

Exhibit 3 – Declaration of Stephanie Dumont (the "Dumont Decl.")

Exhibit 4 – Declaration of Troy Eads (the "Eads Decl.")

Exhibit 5 – *Ex Parte* Application to Employ Christian Attar, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Oct. 31, 2024) (Doc. 98) (the "Application")

Exhibit 6 – SEC, *SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations* (last updated July 2, 2025), *available at* https://www.sec.gov/newsroom/press-releases/2024-77 ("*SEC Charges Meta*")

Exhibit 7 – Order, *In re Meta Materials, Inc.*, SEC No. 3-21976 (June 25, 2024) (the "SEC-Meta Settlement Order")

Exhibit 8 – Compl., *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. filed June 25, 2024)

Exhibit 9 – Prospectus, Next Bridge Hydrocarbons, Inc. ("Next Bridge"), File No. 333-266143 (effective Nov. 18, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm (the "Prospectus")

Exhibit 10 – Next Bridge, *Next Bridge Hydrocarbons, Inc. Announces Completion of Spin-Off From Meta Materials Inc.* (Dec. 20, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1936756/000119983522000845/ex_99-1.htm

Exhibit 11 – SEC's Statement in Support of Consolidated Audit Trail, LLC's Objection to Rule 2004 Motion, *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (Bankr. S.D. Tex. filed Mar. 22, 2024) (Doc. 2076)

Exhibit 12 – *Ex Parte* Motion for Order Requiring Custodian of Records for FINRA to Appear for Examination, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Mar. 6, 2025) (Doc. 1620)

Exhibit 13 – Order, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Mar. 10, 2025) (Doc. 1642)

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashland Inc. v. Morgan Stanley & Co.*,
    652 F.3d 333 (2d Cir. 2011)...................................................................13, 14, 15

*ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................2, 16

*In re Bennett Funding Group, Inc.*,
    203 B.R. 24 (Bankr. N.D.N.Y. 1996) .................................................................10

*Black v. Sheraton Corp.*,
    564 F.2d 531 (D.C. Cir. 1977).............................................................................21

*In re Carnegie Int'l Corp. Sec. Litig.*,
    107 F. Supp. 2d 676 (D. Md. 2000) ....................................................................12

*Cartica Mgmt., LLC v. CorpBanca, S.A.*,
    50 F. Supp. 3d 477 (S.D.N.Y. 2014)...................................................................14

*Dell Inc. v. DeCosta*,
    233 F. Supp. 3d 1 (D.D.C. 2017)........................................................................26

*Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*,
    339 F.R.D. 334 (D.D.C. 2021).....................................................................2, 17, 18

*In re Enron Corp.*,
    281 B.R. 836 (Bankr. S.D.N.Y. 2002) ................................................................10

*In re Fannie Mae Sec. Litig.*,
    362 F. Supp. 2d 37 (D.D.C. 2005) ......................................................................12

*Flatow v. Islamic Republic of Iran*,
    201 F.R.D. 5 (D.D.C. 2001).................................................................................15

*G & E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*,
    317 F.R.D. 313 (D.D.C. 2016).........................................................................3, 26

*Gulf Coast Energy LLC v. Bank of Am. Corp.*,
    2014 WL 12616133 (S.D. Tex. Dec. 2, 2014)..................................................3, 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).............................................................................................16

*Hensley v. TD Ameritrade Inc.*,
  2023 WL 12068975 (W.D. Wash. Oct. 2, 2023) ............................................................13, 25

*Hensley v. TD Ameritrade, Inc.*,
  No. 3:23-cv-05159 (W.D. Wash. filed Feb. 28, 2023) ..........................................................25

*Hofman v. FINRA*,
  2023 U.S. Dist. LEXIS 81166 (C.D. Cal. May 8, 2023) ....................................................13, 25

*In re Interpictures, Inc.*,
  86 B.R. 24 (Bankr. E.D.N.Y. 1988) .........................................................................................11

*Khorassani v. FINRA*,
  223 A.D.3d 589 (N.Y. App. 2024) ....................................................................................10, 13

*In re Lucille Holdings Pte. Ltd.*,
  2022 WL 1421816 (D.D.C. May 5, 2022) ...........................................................................9, 18

*In re Meta Materials, Inc.*,
  SEC No. 3-21976 (June 25, 2024) .......................................................................................1, 7

*In re Motion to Compel Subpoena to Dep't of Veterans Affs.*,
  257 F.R.D. 12 (D.D.C. 2009) ..............................................................2, 3, 9, 10, 17, 18

*In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*,
  659 F. Supp. 3d 54 (D.D.C. 2023) .........................................................................................19

*Nu Image, Inc. v. Does 1-23,322*,
  799 F. Supp. 2d 34 (D.D.C. 2011) ....................................................................................9, 10

*Phillips & Cohen, LLP v. Thorpe*,
  300 F.R.D. 16 (D.D.C. 2013) ............................................................................................9, 10

*Rolo v. SEC*,
  No. 3:24-cv-02053 (D. Conn. filed Apr. 1, 2025) (Doc. 49-3) .............................................13

*Ross v. Bolton*,
  106 F.R.D. 22 (S.D.N.Y. 1985) .............................................................................................22

*Rossman v. EN Eng'g, LLC*,
  467 F. Supp. 3d 586 (N.D. Ill. 2020) .....................................................................................17

*In re Sealed Case*,
  856 F.2d 268 (D.C. Cir. 1988) .........................................................................................21, 22

*SEC v. Brda*,
  2024 WL 4817475 (S.D.N.Y. Nov. 18, 2024) ...............................................................*passim*

*SEC v. Brda,*
   No. 4:24-cv-01048 (E.D. Tex.) ..................................................................................7

*SEC v. McGinn,*
   2011 WL 13136028 (N.D.N.Y. Jan. 5, 2011) ..........................................................22

*Stevens v. InPhonic, Inc.,*
   662 F. Supp. 2d 105 (D.D.C. 2009) ........................................................................12

*Tawil v. FINRA,*
   2023 WL 7131840 (N.D. Fla. July 26, 2023) ....................................................13, 25

*United States v. All Assets Held at Bank Julius Baer & Co.,*
   202 F. Supp. 3d 1 (D.D.C. 2016) ..............................................................................9

*In re Vital Pharms., Inc.,*
   2025 WL 1189882 (Bankr. S.D. Fla. Apr. 23, 2025) ..............................................11

*Watts v. SEC,*
   482 F.3d 501 (D.C. Cir. 2007) ......................................................................8, 13, 17, 20

*In re World Com, Inc. Sec. Litig.,*
   234 F. Supp. 2d 301 (S.D.N.Y. 2002) ................................................................12, 13

*In re WorldCom, Inc. Sec. Litig.,*
   336 F. Supp. 2d 310 (S.D.N.Y. 2004) ......................................................................14

*Wyoming v. USDA,*
   208 F.R.D. 449 (D.D.C. 2002) ..........................................................................17, 18

**Statutes**

15 U.S.C. § 78o-3(b)(6) ..................................................................................................4

15 U.S.C. §§ 78q, 78s ....................................................................................................4

15 U.S.C. § 78u-4(b)(3)(B) ........................................................................................2, 12

**Other Authorities**

17 C.F.R. § 240.10b-17 ..................................................................................................4

17 C.F.R. § 242.613 ................................................................................................3, 23, 24

81 Fed. Reg. 84696, 84698 (November 16, 2016) No. 34-79318 ..................................23

CAT NMS Order, 81 Fed. Reg. at 84706 ......................................................................24

Fed. R. Bankr. P. 2004 ..........................................................................................10, 11, 23

Fed. R. Bankr. P. 9016 ................................................................................10

Fed. R. Civ. P. 26 .................................................................................. *passim*

Fed. R. Civ. P. 45 .................................................................................. *passim*

FINRA, *About FINRA—How FINRA Serves Investors and Members* (last viewed
Aug. 5, 2025), *available at* https://www.finra.org/about/how-finra-serves-
investors-and-members ............................................................................18

FINRA, *Equity Short Interest Data* (last visited Aug. 5, 2025), *available at*
https://www.finra.org/finra-data/browse-catalog/equity-short-interest/data; ...........................20

FINRA Rule 6400 ....................................................................................4

FINRA Rule 6490 ....................................................................................4

FINRA, *Short Sale Volume* (last visited Aug. 5, 2025), *available at*
https://www.finra.org/finra-data/browse-catalog/short-sale-volume; .....................................20

FINRA, *OTC (ATS & Non-ATS) Transparency* (last visited Aug. 5, 2025),
*available at* https://www.finra.org/filing-reporting/otc-transparency; ...................................21

## INTRODUCTION

According to the Securities and Exchange Commission ("SEC"), Meta Materials, Inc. ("Meta Materials") and the former CEOs of its predecessor companies orchestrated an illegal "short squeeze." *SEC v. Brda*, 2024 WL 4817475, at *1 (S.D.N.Y. Nov. 18, 2024). The scheme the SEC alleges is complex. *See id.* But, in short, the SEC alleges that the former CEOs devised a scheme to issue "a preferred stock dividend ('the Preferred Dividend')" in connection with a reverse merger. *Id.* The former CEOs then "spread[] a narrative to investors that short sellers would not be able to obtain the Preferred Dividend" following the merger "thus pressuring short sellers to close their positions and artificially raising the price" of the company's common stock. *Id.* The SEC alleges the scheme worked and that Meta Materials' predecessor raised "$137.5 million" by selling its common stock into the inflated values shortly before the merger. *Id.* The SEC's case against the former CEOs is currently pending. *See id.* Meta Materials settled charges with the SEC last year. Order, *In re Meta Materials, Inc.*, SEC No. 3-21976 (June 25, 2024), Ex. 7 hereto.

Approximately a month after settling with the SEC, Meta Materials filed for bankruptcy. Petition, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Aug. 9, 2024). Despite the SEC's allegations that Meta Materials' predecessors made $137.5 million through an illegal short squeeze, the Chapter 7 trustee (the "Trustee") apparently suspects illegal short selling harmed Meta Materials. The Trustee has employed special counsel to "investigate potential claims and, if meritorious, pursue litigation related to suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing.'" *Ex Parte* Application to Employ Christian Attar, *In re Meta Materials*, No. 24-50792-hlb (Bankr. D. Nev. filed Oct. 31, 2024) (Doc. 98) (the "Application"), Ex. 5 hereto. The Trustee has now issued two subpoenas to FINRA (the "Subpoenas")—seeking nine categories of documents and testimony (fifteen including subparts)—to discover information to support potential claims. Subpoenas, Exs. 1 & 2 hereto.

The Subpoenas are improper and must be quashed under Rule 45 for numerous reasons. As a threshold matter, it is axiomatic that subpoenas cannot be used for a fishing expedition to try and discover potential claims. *See, e.g.*, *In re Motion to Compel Subpoena to Dep't of Veterans Affs.*, 257 F.R.D. 12, 17 (D.D.C. 2009) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim."). Yet here, the express purpose of the Subpoenas is to "investigate **potential** claims … [of] **suspected** stock manipulation." Application, *In re Meta Materials*, No. 24-50792-hlb (Doc. 98). The discovery stay under the Private Securities Litigation Reform Act (the "PSLRA") also bars subpoenas to nonparties until the discovery stay has lifted. 15 U.S.C. § 78u-4(b)(3)(B).

The Subpoenas also must be quashed because they seek irrelevant information. A claim for illegal market manipulation requires damages "caused by reliance on assumption of an efficient market free of manipulation." *E.g.*, *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Yet Meta Materials itself has already settled charges with the SEC for allegedly manipulating the market through an illegal "short squeeze." *Brda*, 2024 WL 4817475 at *1. The SEC's allegations that Meta Materials and its predecessors allegedly made $137.5 million through illegal market manipulation render it speculative how Meta Materials could allege that it "reli[ed] on an assumption of an efficient market free of manipulation." *ATSI Comm'cns*, 493 F.2d at 801.

The Subpoenas must be quashed for other reasons, as well. Litigants cannot unduly burden nonparties with discovery requests that can be obtained from the parties to the litigation. *See, e.g.*, *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 339–40 (D.D.C. 2021) (quashing subpoenas; movants could "shift discovery burden from third parties to the primary parties"). Yet, by seeking "[r]ecords provided to FINRA" by the firms the Trustee "suspect[s]" of illegal trading, the Subpoenas unduly burden nonparty FINRA with requests that

could be obtained from the firms suspected of wrongdoing. *See* Subpoena Request Nos. 1–5, 8; *In re Motion to Compel Subpoena to Dep't of Veterans Affs.*, 257 F.R.D. 12, 19 (D.D.C. 2009) ("Until [plaintiff] at least makes the effort [to obtain discovery from parties] … this Court cannot possibly determine whether any subpoena to DVA, no matter how limited, is still unduly burdensome ….").

The Subpoenas are improper for numerous other reasons. The Subpoenas impermissibly seek privileged and protected material, including FINRA's "investigative records" that are protected by the investigative file privilege, Consolidated Audit Trail data that can only be used for regulatory purposes by law, and attorney-client privileged documents. *See, e.g., Gulf Coast Energy LLC v. Bank of Am. Corp.*, 2014 WL 12616133, at *2 (S.D. Tex. Dec. 2, 2014) (quashing subpoena to FINRA for materials protected by the investigative file privilege); 17 C.F.R. § 242.613(e)(2). And the Subpoenas would impose a significant expense on FINRA, as responding to just a few of the fifteen requests would require FINRA to collect, process, and produce approximately ***25 million*** records. *See* Declaration of Troy Eads ("Eads Decl.") ¶ 4, Ex. 4 hereto; *G & E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 317 F.R.D. 313, 315 (D.D.C. 2016) ("[T]he court 'must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.'").

For all these reasons, as set forth in greater detail below, FINRA respectfully requests that this Court quash the Subpoenas pursuant to Rule 45, or, in the alternative, issue a protective order pursuant to Rule 26 to preclude the discovery sought.

## BACKGROUND

### I.    FINRA's Role in Regulating the National Securities Markets.

FINRA is a self-regulatory organization ("SRO") headquartered in Washington, D.C., and registered with the SEC as a national securities association under the Maloney Act of 1938, 15 U.S.C. §§ 78o-3 *et seq.*, amending the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a– 78rr. As an SRO, FINRA is part of the Exchange Act's comprehensive plan for regulating the national securities markets. *See* 15 U.S.C. §§ 78q, 78s. The Exchange Act requires FINRA to establish rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, … and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6). The Exchange Act also mandates that FINRA investigate and discipline member firms and their associated persons for violations of FINRA rules and the federal securities laws. *Id.*

FINRA performs several regulatory functions to oversee the over-the-counter ("OTC") market in which equity securities not listed on a national securities exchange may be traded and quoted. FINRA adopts rules regarding quoting and trading in OTC equity securities. *See* FINRA Rule 6400 *et seq.* FINRA reviews, processes, and announces information about corporate actions regarding OTC equity securities. *See* 17 C.F.R. § 240.10b-17; FINRA Rule 6490. FINRA is also authorized to halt trading and quoting of OTC equity securities if necessary to protect investors and the public interest. FINRA Rule 6440.

### II.    Meta Materials' Alleged Market Manipulation and Bankruptcy.

#### A.    The First "Short Squeeze"—Metamaterial, Inc. Merges with Torchlight.

Torchlight Energy Resources, Inc. ("Torchlight") was a Texas company engaged in oil and gas exploration and production. *SEC v. Brda*, 2024 WL 4817475 at *1. Torchlight was listed on the Nasdaq stock exchange under the ticker symbol "TRCH." *Id.*

According to the SEC, Torchlight's CEO John Brda ("Brda") "developed a scheme" to address "Torchlight's deteriorating financial condition" by manufacturing a "short squeeze." *Id.* The alleged plan was for Torchlight to execute a reverse merger with a company that "desired Torchlight's NASDAQ listing but *not* its oil and gas assets." *Id.* In the reverse merger, Torchlight would issue "a preferred stock dividend ('the Preferred Dividend'), through which the proceeds from the sale of Torchlight's oil and gas assets would be allocated to Torchlight's legacy shareholders." *Id.* Torchlight would "promote the Preferred Dividend in the hopes of spreading a narrative to investors that short sellers would not be able to obtain the Preferred Dividend thus **pressuring short sellers to close their positions and artificially raising the price of Torchlight common stock.**" *Id.* (emphasis added). Torchlight would then "capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an at-the-market offering." *Id.*

Torchlight ultimately executed the reverse merger with Meta Materials' predecessor, Metamaterial, Inc. ("Meta I") and its then CEO George Palikaras ("Palikaras"), resulting in the creation of Meta Materials. *Id.* at *2. The SEC alleges that Brda and Palikaras "successfully manipulated the price of Torchlight's stock in June 2021, in advance of the merger." *Id.* at *3. "Before the merger, Torchlight's stock was trading below $1 per share," yet Torchlight ultimately sold 16.2 million shares shortly before the merger at an average price of $8.50, raising $137.5 million. *Id.* Following the reverse merger, Torchlight's common stock TRCH converted into common stock of Meta Materials, which traded under the ticker "MMAT." *Id.*

**B.    The Second "Short Squeeze"—Meta Materials Spins Off MMTLP.**

The Preferred Dividend created during the reverse merger traded on the OTC market under the ticker MMTLP. Prospectus at 23, Next Bridge Hydrocarbons, Inc. ("Next Bridge"), File No. 333-266143 (effective Nov. 18, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm (hereinafter "Prospectus"), Ex. 9 hereto.

But Meta Materials never sold the oil and gas assets represented by MMTLP (the SEC alleges it never intended to). Compl. ¶ 75, *SEC v. Brda*, No. 1:24-cv-04806 (S.D.N.Y. filed June 25, 2024), Ex. 8 hereto. Meta Materials announced instead that it would spin out the oil and gas assets into a separate company, Next Bridge. *Id.* ¶¶ 78–81. Next Bridge then announced that anyone who held MMTLP shares as of the date of the spinoff would be entitled to receive one share of Next Bridge common Stock for each share of MMTLP. Prospectus at 5, Ex. 9 hereto.

Next Bridge's Prospectus suggested that the spinoff would trigger yet another short squeeze. *See id.* The Prospectus stated that Next Bridge shares would "not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation." *Id.* "[I]f any investors have sold shares of MMTLP short, … such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution." *Id.* at 24. "If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share … **may rise significantly but not be representative of the value of the underlying shares.**" *Id.* (emphasis added).

On December 14, 2022, Next Bridge completed the spinoff and the MMTLP shares were cancelled by the issuer (Meta Materials). *See* Next Bridge, Next Bridge Hydrocarbons, Inc. Announces Completion of Spin-Off From Meta Materials Inc. (Dec. 20, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1936756/000119983522000845/ex_99-1.htm, Ex. 10 hereto (hereinafter "*Next Bridge Announces Spin-Off Completion*").

### C.   The SEC Asserts Charges Against Meta Materials and the Former CEOs.

The SEC filed charges against Meta Materials, Brda, and Palikaras related to the first short squeeze. SEC, *SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations* (last updated July 2, 2025), *available at* https://www.sec.gov/newsroom/press-releases/2024-77, Ex. 6 hereto (hereinafter "*SEC Charges Meta*"). Meta Materials settled

the SEC's charges against it in an administrative proceeding through an offer of settlement, in which Meta Materials agreed that the SEC found it had violated the federal securities laws. *Id.* Meta Materials was ordered to cease and desist from further violations, pay a $1,000,000 penalty, and "cooperate in a Commission investigation and related enforcement action." Order, *In re Meta Materials, Inc.*, SEC No. 3-21976 (June 25, 2024) ("SEC-Meta Settlement Order"), Ex. 7 hereto.

The SEC commenced its action against Brda and Palikaras in the U.S. District Court for the Southern District of New York. *Brda*, 2024 WL 4817475, at *1. The SEC alleges Brda and Palikaras engaged in market manipulation in violation of the Securities Act of 1933 (the "Securities Act") and the Exchange Act, as well as aiding and abetting Meta Materials' securities violations. The case has been transferred to and is currently pending in the U.S. District Court for the Eastern District of Texas. *SEC v. Brda*, No. 4:24-cv-01048 (E.D. Tex.).

The SEC is conducting a separate "investigation regarding subsequent events related to Meta Materials (MMTLP)." *SEC Charges* Meta, Ex. 6 hereto.

**D.      Meta Materials Files for Bankruptcy.**

About a month after settling charges with the SEC, Meta Materials filed a voluntary petition for Chapter 7 Bankruptcy in the U.S. Bankruptcy Court for the District of Nevada. Petition, *In re Meta Materials, Inc.*, No. 24-50792-hlb (filed Aug. 9, 2024). In October 2024, the Trustee employed special counsel to "investigate potential claims and, if meritorious, pursue litigation related to suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing.'" Application, *In re Meta Materials*, No. 24-50792-hlb, Ex. 5 hereto. The Application says the claims relate to a "preliminary investigation into activities related to a merger in which Meta Materials ('MMAT'), acquired Torchlight Energy Resources ('TRCH')." *Id.*

On July 22, 2025, the Trustee issued the Subpoenas to FINRA. Subpoenas, Exs. 1 & 2.

## ARGUMENT

I.   **The Subpoenas Must Be Quashed Because They Unduly Burden Nonparty FINRA.**

Rule 45 imposes a duty on parties issuing subpoenas to "avoid imposing undue burden or expense" on nonparties. Fed. R. Civ. P. 45(d)(1). District courts "must enforce this duty" by sanctioning any "party or attorney who fails to comply." *Id.* District courts also "must quash or modify a subpoena that … subjects a person to undue burden." *Id.* 45(d)(3).

"The Rule 45 'undue burden' standard requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties." *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) (citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight" under Rule 45). Rule 26 also "requires district courts in '[a]ll discovery' to consider a number of factors potentially relevant to the question of undue burden, including: whether the discovery is 'unreasonably cumulative or duplicative;' whether the discovery sought is 'obtainable from some other source that is more convenient, less burdensome, or less expensive;' and whether 'the burden or expense of the proposed discovery outweighs its likely benefit.'" *Id.* (quoting Fed. R. Civ. P. 26(b)(1)–(2)). Under Rule 26, a district court may also issue a protective order "for good cause" that "forbid[s] the disclosure or discovery" or "limit[s] the scope of disclosure or discovery" to protect a person from "undue burden." Fed. R. Civ. P. 26(c).

As set forth below, the Subpoenas must be quashed under Rule 45 or a protective order should issue under Rule 26 for numerous reasons, including that the Subpoenas seek: (1) discovery for speculative and unfiled claims; (2) premature discovery that is barred by the PSLRA; (3) irrelevant information; (4) duplicative or cumulative information that can be obtained from more convenient sources; and (5) unhelpful information that is outweighed by the burden or expense on nonparty FINRA.

**A.    The Subpoenas Unduly Burden Nonparty FINRA with Speculative Requests to Discover Potential Yet Unfiled Claims.**

Under the Federal Rules of Civil Procedure, litigants "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. P. 26(b)(1), Adv. Comm. Notes to 2000 Amendment. It is thus axiomatic that litigants cannot use subpoenas to discover potential but unfiled claims. *E.g.*, *In re Motion to Compel Subpoena to Dep't of Veterans Affs.*, 257 F.R.D. 12, 17 (D.D.C. 2009) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim.").

This Court routinely quashes (or refuses to enforce) subpoenas seeking information for unfiled claims. *E.g.*, *id.* (quashing subpoena; "That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request."); *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 17 (D.D.C. 2013) (quashing subpoena for "documents for use in a yet-to-be-filed lawsuit" because "the Subpoena is a naked attempt to gather information for use in evaluating" a potential claim); *Nu Image, Inc. v. Does 1-23,322*, 799 F. Supp. 2d 34, 41 (D.D.C. 2011) ("[I]t is not appropriate, and there is not good cause, to take third-party discovery in this case solely to obtain information that will be used in another lawsuit ...."). This Court similarly refuses to permit any discovery that relates to unfiled claims and defenses. *See, e.g.*, *United States v. All Assets Held at Bank Julius Baer & Co.*, 202 F. Supp. 3d 1, 9 (D.D.C. 2016) ("Claimant cannot lead a fishing expedition to find material that might possibly become relevant to an as-yet unpleaded defense."); *In re Lucille Holdings Pte. Ltd.*, 2022 WL 1421816, at *13 (D.D.C. May 5, 2022) ("[I]nvestigat[ing] whether litigation is possible in the first place ... is not an appropriate [basis] to compel discovery.").

Here, the Subpoenas improperly seek to unduly burden nonparty FINRA with discovery requests relating to "**potential** claims." Application, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Oct. 31, 2024). The Trustee applied to employ special litigation counsel to "investigate **potential** claims … related to **suspected** stock manipulation." *Id.* Before the Trustee has asserted claims, nonparty discovery is improper. *See, e.g., In re Motion to Compel Dep't of Veterans Affs.*, 257 F.R.D. at 17; *Phillips*, 300 F.R.D. at 17; *Nu Image*, 799 F. Supp. 2d at 41; *accord Khorassani v. FINRA*, 223 A.D.3d 589, 590 (N.Y. App. 2024) (allegation that "certain equities [] declined in value in late 2022 as a result of unspecified market manipulation … fall far short of the showing necessary to obtain pre-action disclosure").

Bankruptcy Rule 2004 does not permit an end-run around the nonparty protections in Rule 45. *See, e.g., In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002) ("[C]ourts have expressed concern that Rule 2004 examinations [should] not be used as a tactic to circumvent the safeguards of the Federal Rules of Civil Procedure."). While the bankruptcy rules may generally permit discovery relating to the assets and administration of the estate, Bankruptcy Rule 2004 expressly adopts and incorporates the protections for nonparties in Rule 45. Fed. R. Bank. P. 2004(c) (incorporating Rule 9016 into Rule 2004 requests); Fed. R. Bankr. R. 9016 ("Fed. R. Civ. P. 45 applies in a bankruptcy case."). Rule 45's mandatory prohibition against unduly burdening nonparties with fishing expeditions to discover potential claims applies to the improper Subpoenas issued to FINRA. *See, e.g., In re Enron Corp.*, 281 B.R. at 841; *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ("[C]ourts are wary of attempts to utilize Fed. R. Bank. P. 2004 to avoid the restrictions of the Fed. R. Civ. P. …").

Nor are the Subpoena requests even permissible under Bankruptcy Rule 2004. Bankruptcy Rule 2004 provides that "the **court** may order the examination of any entity" on "a party in

- 10 -

interest's motion." Fed. R. Bank. P. 2004. But the local rules for the U.S. Bankruptcy Court for the District of Nevada expressly provide that the "[p]roduction of documents may **not** be obtained via an order under Fed. R. Bankr. P. 2004." Bankr. D. Nev. L-R 2004(c). When the Trustee applied *ex parte* to examine FINRA pursuant to Rule 2004, the Trustee nonetheless sought an order compelling FINRA to produce three categories of documents. *Ex Parte* Motion for Order Requiring Custodian of Records for FINRA to Appear for Examination, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Mar. 6, 2025) (Doc. 1620), Ex. 12 hereto. **But the bankruptcy court specifically <u>denied</u> the motion as to the document requests**, removing from its order any requirement that FINRA produce records pursuant to Rule 2004. *See* Order, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Mar. 10, 2025) (Doc. 1642), Ex. 13 hereto. Yet the Subpoenas improperly purport to require FINRA to produce a now-expanded **nine** categories of documents, well beyond the three categories the Trustee sought from the bankruptcy court yet did not receive. *See* Rule 2004 Subpoena, Ex. 2 hereto. Not only did the bankruptcy court reject the Trustee's request to obtain these documents pursuant to Rule 2004, but Rule 2004 does not permit unfettered discovery into speculative, potential claims, anyways. *See, e.g., In re Vital Pharms., Inc.*, 2025 WL 1189882, at *4 (Bankr. S.D. Fla. Apr. 23, 2025) (Rule 2004 requests cannot be predicated on "[s]pecualtive" claims or to support a fishing expedition into "potential … litigation claims rather than a genuine concern for the administration of the estate"); *In re Interpictures, Inc.*, 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1988) (rejecting a Rule 2004 examination sought "for the purpose of discovery in a pending or proposed proceeding" as "beyond the scope of Bankruptcy Rule 2004").

**B.    The Subpoenas Unduly Burden Nonparty FINRA with Discovery Requests that Are Barred by the PSLRA Discovery Stay.**

Under the PSLRA, a private litigant alleging securities fraud must establish the sufficiency of their complaint before they can obtain discovery. 15 U.S.C. § 78u-4(b)(3)(B). Private litigants thus must file claims and survive a motion to dismiss before issuing discovery requests. *Id.*; *In re Fannie Mae Sec. Litig.*, 362 F. Supp. 2d 37, 38 (D.D.C. 2005) ("[D]iscovery in securities actions is permitted only after the court has sustained the legal sufficiency of the complaint."). The PSLRA discovery stay is intended to eliminate burdensome discovery before a private litigant demonstrates they can allege a cognizable claim. *In re World Com, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (PSLRA discovery stay "minimiz[es] the incentives to plaintiffs to file frivolous securities class actions" hoping to "find during discovery some suitable claim not alleged in the complaint"); *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 119 (D.D.C. 2009) ("The purpose of the PSLRA's heightened pleading requirements is to impose special burdens on plaintiffs in order to deter 'nuisance filings, the targeting of deep-pocket defendants, and vexatious discovery requests.'").

The PSLRA discovery stay applies to nonparty subpoenas. *See, e.g.*, *In re Carnegie Int'l Corp. Sec. Litig.*, 107 F. Supp. 2d 676, 679 (D. Md. 2000) ("**There is no distinction between discovery of non-parties and parties** for the PSLRA discovery stay.") (emphasis added).

The PSLRA discovery stay provides an independent basis to quash the Subpoenas. The PSLRA prohibits a *plaintiff* who has *filed litigation* from seeking pre-answer discovery against *defendants to that litigation* to prevent speculative fishing expeditions. *In re Fannie Mae Sec. Litig.*, 362 F. Supp. 2d at 38. Here, the Trustee *has not filed* any claims on behalf of Meta Materials, and the Subpoenas impose burdensome discovery requests *on a nonparty* to identify "potential claims." *See* Application, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Oct.

- 12 -

31, 2024); *see also In re World Com, Inc. Sec. Litig.*, 234 F. Supp. 2d at 305 (plaintiff cannot file a lawsuit to "find during discovery some suitable claim not alleged in the complaint").

In addition, while the Trustee has yet to file any private securities claims on behalf of Meta Materials, a number of private securities claims have already been filed against FINRA and have been dismissed on the pleadings. *See, e.g.*, *Hofman v. FINRA*, 2023 U.S. Dist. LEXIS 81166, *18 (C.D. Cal. May 8, 2023); *Tawil v. FINRA*, 2023 WL 7131840, at *2 (N.D. Fla. July 26, 2023); *Hensley v. TD Ameritrade Inc.*, 2023 WL 12068975, at *1 (W.D. Wash. Oct. 2, 2023). FINRA has also moved to stay discovery in some of those cases that remain pending. *E.g.*, Motion to Stay at 3 n.2, *Rolo v. SEC*, No. 3:24-cv-02053 (D. Conn. filed Apr. 1, 2025) (Doc. 49-3); *accord Khorassani*, 223 A.D.3d at 590 (denying pre-suit discovery into MMTLP matters). This is further reason why pre-suit discovery on nonparty FINRA—who has been subject to private securities claims—is improper under the PSLRA.

**C.    The Subpoenas Unduly Burden Nonparty FINRA with Irrelevant Requests.**

The Subpoenas also impose an undue burden on nonparty FINRA because "the burden or expense of the proposed discovery outweighs its likely benefit" as the Subpoenas seek irrelevant information. *Watts*, 482 F.3d at 508.

1.    The Subpoenas Seek Irrelevant Information Regarding MMTLP.

The Trustee told the bankruptcy court that it is investigating claims for "suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing'" of MMAT and TRCH shares. Application, *In re Meta Materials*, No. 24-50792-hlb, Ex. 5 hereto. These are not causes of action under federal law but presumably would serve as a theory of liability for market manipulation claims under §§ 9 or 10(b) of the Exchange Act. 15 U.S.C. §§ 78i; 78(j).

To state a claim for market manipulation, the plaintiff must have bought and sold a security due to a manipulative act. *E.g.*, *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 n.2 (2d

Cir. 2011). "Typically, a 'holder' of securities lacks standing to prosecute a claim under the federal securities laws." *Id.*; *see also Cartica Mgmt., LLC v. CorpBanca, S.A.*, 50 F. Supp. 3d 477, 485 (S.D.N.Y. 2014) (private civil remedies for violations of §§ 9 and 10 of the Exchange Act "were expressly limited to purchasers or sellers of securities"); *In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 319 (S.D.N.Y. 2004) ("Because a 'holder' claim is not 'verifiable by documentation' and depends entirely on 'oral recollection,' a 'holder' cause of action is likely to encourage frivolous and 'vexatious litigation' that is difficult to resolve on the merits without a trial.").

Here, as discussed *supra* (at 4), the SEC alleges Meta Materials and the former CEOs of Meta I, Torchlight, and Meta Materials—Brda and Palikaras—issued the Preferred Dividend, which later traded as MMTLP, to create a "short squeeze" narrative. *Brda*, 2024 WL 4817475, at *1. The SEC alleges that Brda and Palikaras promoted the narrative that "short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions and artificially raising the price of Torchlight common stock." *Id.* Approximately 18 months after the Meta Materials merger, the MMTLP shares were spun off into Next Bridge, and Next Bridge suggested (like Brda and Palikaras before it) the spinoff might trigger a short squeeze. Prospectus at 5, File No. 333-266143, Ex. 9 hereto ("[I]f any investors have sold shares of MMTLP short, … such investors may feel compelled to buy shares of MMTLP to cover such sales … [and MMTLP] may rise significantly but not be representative of the value of the underlying shares."). That spinoff was completed in December 2022, Meta Materials cancelled the MMTLP shares, and prior holders of MMTLP now hold common stock in Next Bridge. *Next Bridge Announces Spin-Off Completion*, Ex. 10 hereto.

- 14 -

It is thus unclear and entirely speculative how **Meta Materials** could assert stock manipulation claims relating to **MMTLP**. Meta Materials was not a retail investor who bought and sold MMTLP. Nor was MMTLP a common or treasury stock of Meta Materials. Meta Materials may have "held" some of the Preferred Dividend following the reverse merger, but "a 'holder' of securities lacks standing to prosecute a claim under the federal securities laws." *Ashland*, 652 F.3d at 337 n.2. Nor is it clear whether or why Meta Materials itself would have traded MMTLP during the short squeeze that its spinoff partner Next Bridge announced might occur. Put simply, without specific allegations from Meta Materials in an actual lawsuit, it is entirely speculative whether Meta Materials could assert private securities litigation claims relating to MMTLP. *See, e.g., Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 8 (D.D.C. 2001) ("[I]nasmuch as the subpoena in its current form seeks information relating to assets which the plaintiff has no right to attach, the subpoena is overbroad in violation of Rule 45.").

In fact, when the Trustee applied to retain special counsel to investigate potential market manipulation claims, the Trustee **did not even mention MMTLP**. *See* Application, *In re Meta Materials, Inc.*, No. 24-50792-hlb (Bankr. D. Nev. filed Oct. 31, 2024). Instead, the Trustee told the bankruptcy court it was investigating "activities related to a merger in which Meta Materials ('MMAT'), acquired Torchlight Energy Resources ('TRCH'), both of which were listed on NASDAQ." *Id.* ¶ 2. This is the same reverse merger for which the SEC alleged Meta Materials and the former CEOs engaged in stock manipulation. *Brda*, 2024 WL 4817475, at *1. Thus, there is no legitimate basis for the Subpoenas to demand nonparty FINRA to produce documents and testimony relating to MMTLP.

2.    The Subpoenas Seeks Irrelevant Information About MMAT and TRCH.

To state a claim for market manipulation, a private plaintiff must allege: (1) manipulative acts; (2) damage (3) caused by reliance on assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Comm'cns*, 493 F.3d at 101; *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014). Manipulation complaints "must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Comm'cns*, 493 F.3d at 101.

Here, it is entirely speculative whether or how Meta Materials could plead stock manipulation claims as to MMAT or TRCH. The Trustee has retained special counsel to investigate potential claims relating to the Torchlight-Meta I reverse merger, which is the same merger that is the subject of Meta Materials' settlement with the SEC. SEC-Meta Settlement Order, Ex. 7 hereto. Specifically, Meta Materials consented to the entry of an SEC Cease-and-Desist Order against it that included findings by the SEC that Meta Materials "raised $137.5 million in an at-the-market offering" in which Meta Materials "artificially inflated the value of its common stock by structuring a merger" between Torchlight and Meta I "specifically designed to cause a 'short squeeze.'" *Id.* ¶ 2. Having settled such charges, it is speculative whether or how Meta Materials could allege with particularity that it was damaged by selling its stock in "reliance on assumption of an efficient market free of manipulation." *ATSI Comm'cns*, 493 F.3d at 101.

In addition, Brda and Palikaras, the former CEOs of Meta I, Torchlight, and Meta Mateirals are currently defendants in an SEC action alleging they "schem[ed] to manipulate the stock price." *Brda*, 2024 WL 4817475 at *1. This includes allegations that Brda and Palikaras "issu[ed] false or misleading statements and omissions about the Preferred Dividend in Torchlight's public filings and proxy statements" and "aggressively used social media" to promote the narrative that "short

- 16 -

sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions and artificially raising the price of Torchlight common stock." *Id.* at *1–*2. It is thus (again) speculative whether Meta Materials could plead that it "reli[ed] on [an] assumption of an efficient market free of manipulation" when the former CEOs are alleged to have engaged in such manipulation themselves.

### D. The Subpoenas Unduly Burden Nonparty FINRA with Discovery that Can Be Obtained from a More Convenient Source—the Suspected Wrongdoers.

Rule 45 requires district courts to consider "whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive" or is otherwise "cumulative or duplicative." *Watts*, 482 F.3d at 508. The cornerstone of this obligation is that litigants cannot unduly burden nonparties with requests for information that can be obtained from the actual parties to the litigation. *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 339–40 (D.D.C. 2021) (quashing subpoenas because movants could "shift discovery burden from third parties to the primary parties"); *Wyoming v. USDA*, 208 F.R.D. 449, 455 (D.D.C. 2002) (quashing subpoenas; "the plaintiff [could] obtain the information needed ... from the federal defendants"); *In re Motion to Compel Dep't of Veterans Affs.*, 257 F.R.D. at 19 ("Until [Plaintiff] at least makes the effort [to obtain documents from the parties] ... I must conclude that the subpoena constitutes an undue burden to the [nonparty] and order it quashed."); *accord Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 590 (N.D. Ill. 2020) (citing cases) ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative.").

The Subpoenas here unduly burden FINRA with requests for information that can be obtained from the firms or brokers suspected to have engaged in the wrongdoing, who presumably will be defendants in any litigation the Trustee files on Meta Materials' behalf. For example:

- 17 -

- Requests 1–5 seek records that firms "provided to FINRA." Subpoena Request No. 1–2 (requesting "**[r]ecords provided to FINRA** … in the original format received by FINRA"); Subpoena Request Nos. 3–5 (seeking "[r]ecords utilized in the production of report data … **for each ATS/firm with trade reporting obligations**");

- Request 8 seeks communications brokers sent to FINRA. Subpoena Request No. 8 (seeking "communications … between FINRA … and **any prime broker, broker, dealer, market-maker or hedge fund** concerning Meta and/or MMTLP issues");

- Request 9 seeks "[a]ll data records **provided to FINRA** by member firms." Subpoena Request No. 9(i).

The Trustee can and must seek this information from a more convenient source—the "firms" or "brokers" who supposedly "provided" these records or communications to FINRA to avoid unduly burdening a nonparty. *See Wyoming*, 208 F.R.D. at 455 (quashing subpoenas; plaintiff had "not shown that it has made reasonable attempts to obtain the information elsewhere before asking for this extraordinarily broad discovery request of the non-party witnesses"); *Diamond Servs.*, 339 F.R.D. at 339–40; *In re Motion to Compel Dep't of Veterans Affs.*, 257 F.R.D. at 19.

In fact, the Trustee could substantially narrow the discovery sought in the Subpoenas by directing them to the suspected wrongdoers. *E.g., In re of Lucille*, 2022 WL 1421816 at *11 ("[A] clear identification of the likely claims[ and] parties … will aid in determining the … relevancy and burdensomeness, such as whether the requested discovery is likely to be available from a [more convenient source]."). FINRA has more than 3,250 member firms who employ more than 625,000 registered representatives. *See, e.g.*, FINRA, *About FINRA—How FINRA Serves Investors and Members* (last viewed Aug. 5, 2025), *available at* https://www.finra.org/about/how-finra-serves-investors-and-members. As the primary examining authority for the broker-dealer

- 18 -

industry, FINRA conducts routine examinations and other investigations to ensure member conduct complies with FINRA rules and the federal securities laws, it surveils the national securities markets, and it disciplines member firms and registered representatives. The Subpoenas require nonparty FINRA to search for records and communications with all of its members and their registered representatives instead of properly directing the requests to particular defendants or the suspected wrongdoers to produce just their communications with nonparties. *E.g.*, Subpoena Request No. 8 (requesting "communications ... by and between FINRA ... and any prime broker, broker, dealer, market-maker or hedge fund concerning Meta and/or MMTLP issues").

A cursory examination of the Subpoenas' discovery requests to nonparty FINRA demonstrate they are overly broad and unduly burdensome in other respects. For example:

- The Requests Are Not Limited to Particular Defendants or Suspected Wrongdoer: The Subpoenas' require nonparty FINRA to search for and produce communications and records with all 3,250 member firms or 625,000 registered representatives instead of Trustee narrowing the discovery requests to the actual defendants in a lawsuit or to the suspected wrongdoers.

- The Requests Are Not Limited to the At-Issue Conduct: The Subpoenas demand discovery relating to three separate stocks (MMAT, TRCH, and MMTLP) over a four-year period. *See* Subpoenas at 1. The Subpoenas do not even limit their scope to the particular conduct that the Trustee told the bankruptcy court it was investigating—"activities related to a merger in which Meta Materials ('MMAT'), acquired Torchlight Energy Resources ('TRCH')." *See* Application, *In re Meta Materials*, No. 24-50792-hlb, Ex. 5 hereto; *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 60 (D.D.C. 2023) (requests seeking "virtually every document" over several year period were unduly burdensome).

- 19 -

- • <u>The Requests Are Not Limited to a Relevant Time Period</u>: Relatedly, the "merger in which Meta Materials … acquired Torchlight" that the Trustee told the bankruptcy court it was investigating completed in June 2021. Yet the Subpoenas are not limited to this relevant time period and instead seek documents through 2024, years following the completion of the merger.

**E.      The Subpoenas Unduly Burden Nonparty FINRA with Requests for Information that Would Not Be Helpful.**

Not only are the documents and testimony the Subpoenas seek irrelevant, but the massive amounts of data and records sought by the Subpoenas would not even be helpful for the prospective claims and what exists is otherwise publicly available. *Watts*, 482 F.3d at 508 (subpoena must be quashed if "the burden or expense of the proposed discovery outweighs its likely benefit").

The Trustee has stated it is investigating whether specific financial firms or broker dealers engaged in "naked shorting" or "spoofing." Application, *In re Meta Materials*, No. 24-50792-hlb, Ex. 5 hereto. The Subpoenas thus specifically and repeatedly seek records provided "by firms" "including broker and account details." *E.g.,* Subpoena Request Nos. 1–5, 8. But FINRA generally does not collect or maintain account level data from member firms, and in many situations, FINRA collects data from ***clearing*** firms rather than at the individual firm or broker level. *See* Declaration of Stephanie Dumont (the "Dumont Decl.") ¶ 20, Ex. 3 hereto. For example, FINRA does not have data at the individual firm or broker level in response to Subpoena Request 1. *Id.*

In addition, FINRA already publishes much of the existing data. FINRA publishes data on short interest data. FINRA, *Equity Short Interest Data* (last visited Aug. 5, 2025), *available at* https://www.finra.org/finra-data/browse-catalog/equity-short-interest/data; Subpoena Request No. 1 (seeking "Short Interest Reporting Data"). FINRA publishes short sale volumes reported through a Trade Reporting Facility or "TRF"). FINRA, *Short Sale Volume* (last visited Aug. 5, 2025), *available at* https://www.finra.org/finra-data/browse-catalog/short-sale-volume; Subpoena

Request No. 2 (seeking "[r]ecords provided to FINRA through a FINRA trade reporting facility (TRF)"); Subpoena Request No. 3 (seeking [r]ecords utilized in the production of report data involving daily short sale aggregated volume … reported to a FINRA trade reporting facility"). FINRA also publishes data on OTC trades. FINRA, *OTC (ATS & Non-ATS) Transparency* (last visited Aug. 5, 2025), *available at* https://www.finra.org/filing-reporting/otc-transparency; Subpoena Request Nos. 4–5 (seeking "monthly" and "weekly" "aggregate trade data for OTC (ATS and non-ATS) trading data"). The Subpoenas thus seek information that "can be derived or summarized utilizing data that FINRA already makes public." Dumont Decl. ¶ 20, Ex. 3 hereto.

## II.    The Subpoenas Seek Privileged and Confidential Documents.

Pursuant to Rule 45, the Court "must quash" a subpoena that "requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3). In addition, the Court may quash a subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." *Id.* The Subpoenas must and should be quashed on these grounds for three separate reasons.

### A.    The Court Must Quash the Subpoenas' Request for Privileged Information Protected by the Investigative File Privilege.

The Subpoenas must be quashed pursuant to Rule 45 because they seek information exempt from disclosure under the investigative file privilege. Fed. R. Civ. P. 45(d)(3).

The investigative file privilege is based on the "public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources." *Black v. Sheraton Corp.*, 564 F.2d 531, 545 (D.C. Cir. 1977). The D.C. Circuit has applied the privilege to the SEC's investigative files. *In re Sealed Case*, 856 F.2d 268 (D.C. Cir. 1988) (investigatory privilege applies to SEC). And other courts have consistently held the privilege applies to FINRA's investigatory files due to the importance of FINRA's regulatory and investigatory functions as an

SRO. *See, e.g., Gulf Coast Energy*, 2014 WL 12616133, at *2 ("FINRA is not required to produce documents or responses subject to … the investigative file privilege."); *SEC v. McGinn*, 2011 WL 13136028, at *5–*8 (N.D.N.Y. Jan. 5, 2011) (quashing subpoena; "courts have applied the investigative privilege to FINRA"); *Ross v. Bolton*, 106 F.R.D. 22, 24 (S.D.N.Y. 1985) (investigative privilege applied to FINRA's predecessor, the NASD; the "strong public interest in maintaining the integrity of effective industry self-regulation … would clearly be undermined by making NASD's files fair game for any of the thousands of private securities fraud litigants across the country who wish to shortcut their own discovery efforts and instead to reap the benefits of [NASD's] ongoing, statutorily governed work").

To invoke the privilege, three requirements need to be met: "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case*, 856 F.2d at 271.

Here, the investigative file privilege applies. The Subpoena expressly seeks all "investigative records associated with any FINRA investigation concerning Meta and/or MMTLP." Subpoena Request No. 6. The Subpoenas also seek other internal FINRA records relating to FINRA investigations. *See* Subpoena Requests Nos. 7–8. These are an improper attempt to obtain privileged "investigative records." *Id.* FINRA has submitted herewith a declaration from Stephanie Dumont, head of FINRA's Market Regulation and Transparency Services Department, in which Ms. Dumont asserts the privilege. Dumont Decl. ¶¶ 11–16, Ex. 3 hereto. As Ms. Dumont's Declaration makes clear, FINRA's assertion of the investigative file privilege is based on actual considerations by Ms. Dumont, who provides specific reasons the

privilege applies. *Id.* Specifically, the Subpoenas expressly request "investigative records" arising from FINRA investigations conducted pursuant to its self-regulatory obligations. *Id.* In addition, disclosure of FINRA's investigative files would interfere with FINRA's ability to effectively complete its investigations and would frustrate FINRA's mission to protect investors and safeguard market integrity. *Id.*

**B.    The Court Must Quash the Subpoenas' Request for Protected Consolidated Audit Trail or "CAT" Data.**

The Subpoena also seeks Consolidated Audit Trail or "CAT" data. *See, e.g.*, Subpoena Request No. 12 (seeking "[e]ach reportable CAT event" and records "managed by FINRA's CAT HelpDesk."). The Court must quash this impermissible request for "privileged or other protected matter" pursuant to Fed. R. Civ. P. 45(d)(3).

CAT data is protected by law, and it is critically important to the SEC and SROs like FINRA. *See* 17 C.F.R. § 242.613. CAT data allows regulators to track activity throughout the U.S. markets in National Market System ("NMS") securities, and CAT data captures vast amounts of confidential and sensitive customer and order information in NMS securities to "enhance the ability of SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws." Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-79318, 81 Fed. Reg. 84696, 84698 (November 16, 2016) ("CAT NMS Order"); Dumont Decl. ¶¶ 9–25, Ex. 3 hereto.

Given the critical importance of CAT data, the SEC has previously intervened against attempts by private litigants to gain access to CAT data. *See, e.g.*, SEC's Statement in Support of Consolidated Audit Trail, LLC's Objection to Rule 2004 Motion, *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (Bankr. S.D. Tex. filed Mar. 22, 2024) (Doc. 2076), Ex. 11 hereto. As the SEC

stated in that case, "no request by a private litigant for CAT data would be appropriate." *Id.* at 9. "Protective orders would not be sufficient to" protect CAT data. *Id.* at 7. The SEC thus confirmed its position that requests for CAT data must be quashed pursuant to Rule 45. *Id.* at 7–9. (The Court ultimately denied the motion for production of CAT data for lack of standing. Order at 1, *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (Bankr. S.D. Tex. filed Oct. 15, 2024) (Doc. 2488).)

Moreover, SEC Rule 613(e)(2) provides that "access to and use of" CAT data may only be **"for the purpose of performing [] respective regulatory and oversight responsibilities** pursuant to the federal securities laws, rules, and regulations." 17 C.F.R. § 242.613(e)(2) (emphasis added). Accordingly, FINRA is not a proper party from whom CAT data can be obtained pursuant to a subpoena. The SEC-approved CAT NMS Plan provides that "access to and use of the CAT Data" is **"solely for the purpose of performing [the plan participants']** **respective regulatory and oversight responsibilities** pursuant to the federal securities laws, rules and regulations or any contractual obligations." 7 CAT NMS Plan, § 6.5(c)(i); *see also* CAT NMS Order, 81 Fed. Reg. at 84706 ("[A]ccess to and use of the CAT Data stored in the Central Repository [will be provided to plan participants] **solely for the purpose of performing their** **respective regulatory and oversight responsibilities** pursuant to the federal securities laws, rules and regulations or any contractual obligations."); Dumont Decl. ¶ 25, Ex. 3 hereto. The CAT NMS Plan therefore imposes a legal obligation on FINRA to only use CAT data for regulatory and oversight purposes, and any disclosure of CAT data for any other purpose, including responding to a subpoena, would be a violation of the CAT NMS Plan. 17 C.F.R. § 242.613(h)(2). FINRA therefore has "never produced CAT Data in response to a subpoena issued by private parties in civil litigation." Dumont Decl. ¶ 25, Ex. 3 hereto.

- 24 -

C.    **The Subpoenas Impose an Undue Burden on FINRA with Requests for Attorney-Client Privileged Materials.**

The Subpoenas are also unduly burdensome because they request attorney-client privileged materials. Request 7 seeks all "communications" and "notes considered in the preparation" of any "public communications by FINRA (e.g. Notices, FAQs) concerning Meta and/or MMTLP issues." Subpoena Request No. 7. This Request seeks, *inter alia*, FINRA's internal documents regarding two FAQs that FINRA published regarding the MMTLP trade halt in March and November 2023. *See* Dumont Decl. ¶¶ 9–10 & Exs. B & C thereto.

By the time FINRA issued the first FAQ on March 16, 2023, at least three separate litigants had filed lawsuits against FINRA relating to the MMTLP trading halt. The first MMTLP-related lawsuit was filed against FINRA on December 12, 2022. *Tawil v. FINRA*, 4:22-cv-00440 (N.D. Fla. filed Dec. 12, 2022). Two additional lawsuits were filed in December 2022 and February 2023, respectively. *Hofman v. FINRA*, 2:23-cv-00881 (removed to C.D. Cal. Feb. 6, 2023; originally filed in Superior Court in the County of Los Angeles, CA, Dec. 15, 2022); *Hensley v. TD Ameritrade, Inc.*, No. 3:23-cv-05159 (W.D. Wash. filed Feb. 28, 2023). All three courts ultimately dismissed the claims against FINRA, but the dismissals were months *after* FINRA published the first FAQ. *Hofman v. FINRA*, 2023 U.S. Dist. LEXIS 81166, *18 (C.D. Cal. May 8, 2023); *Tawil v. FINRA*, 2023 WL 7131840, at *2 (N.D. Fla. July 26, 2023); *Hensley v. TD Ameritrade Inc.*, 2023 WL 12068975, at *1 (W.D. Wash. Oct. 2, 2023).

In light of the pending litigation, the drafting and preparation of the FAQs was done by FINRA's attorneys. Thus, virtually every document and communication related to the preparation of the FAQs are privileged. The Subpoenas' demand that FINRA wade through the innumerable privileged materials on a fishing expedition in the hopes that FINRA identifies some unprivileged materials that are relevant to hypothetical claims that have not been filed imposes an undue burden.

*See, e.g., Dell Inc. v. DeCosta*, 233 F. Supp. 3d 1, 3-4 (D.D.C. 2017) (finding discovery requests to be "overbroad and unduly burdensome" when a third party was expected to review thousands of privileged documents).

## III.    The Subpoenas Would Impose Significant Expense on FINRA

If a court orders compliance with a subpoena over a nonparty's objection, "the court 'must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.'" *G & E Real Est., Inc. v. Avison Young-Washington, D.C., LLC*, 317 F.R.D. 313, 315 (D.D.C. 2016) (citing Fed. R. Civ. P. 45(d)(2)(B)(ii)). Cost-shifting under Rule 45 is mandatory whenever the expense of compliance is "significant." *Id.* ("[I]f expenses are significant, the district court must shift the expenses above the level of 'significance' to the party serving the subpoena."). This Court has previously held that compliance costs of $3,148.44 are "significant." *Id.* at 320–21 (ordering subpoenaing party to pay $3,148.44 in "significant" compliance costs).

If this Court does not quash the Subpoenas entirely, then, at minimum cost shifting is mandatory to protect FINRA from the significant compliance expenses. The Subpoenas seek fifteen (15) separate categories of information (including subparts) for three separate stocks over four years of trading. *See* Subpoenas at 1–3. Responding to just a *few* of these fifteen requests will require the collection and production of *millions* of records. *See* Eads Decl. ¶ 4, Ex. 4 hereto. Specifically, Request 2 demands "[r]ecords provided to FINRA through a FINRA trade reporting facility" for TRCH, MMAT, or MMTLP. Subpoena Request No. 2. There are approximately *23.5 million* such records for TRCH and MMAT for the period of September 21, 2020, to August 21, 2024. Eads Decl. ¶ 4, Ex. 4 hereto. There are also over 1 million OTC Reporting Facility ("ORF") records for MMTLP for the period June 28, 2021, to December 14, 2022 in response to Request Nos. 3–4. *Id.* This equates to approximately *25 million* records that must be collected, exported, and produced to respond to just these three requests. *See id.* . Further, given the size of the

responsive data, FINRA's Market Regulation and Transparency Services Department would have to manually upload the responsive data onto a secured hard drive. *Id.*

FINRA presently does not know how much it would cost to produce data responsive to all 15 categories of requests, but the cost will undoubtedly be substantial. To determine the cost to produce the internal documents and communications sought by the Subpoenas (*e.g.*, Requests 6–8), FINRA would have to identify the custodians who may have responsive documents, collect emails and records from those custodians, load those documents into an e-discovery database, and review the records for responsiveness, privilege, and personal confidential information. It would likely take months just to collect and load such records into an e-discovery database, and then an additional time and expenses to review and produce the records. If FINRA is ordered to produce such communications and additional records, FINRA respectfully requests the opportunity to provide supplemental information regarding the cost to the Court for appropriate cost shifting under Rule 45. Fed. R. Civ. P. 45(d)(2)(B)(ii).

## **CONCLUSION**

For the foregoing reasons, this Court should quash the Subpoenas pursuant to Rule 45 or, in the alternative, issue a protective order pursuant to Rule 26 precluding or otherwise limiting the discovery sought. A proposed order is filed herewith.

Dated: August 6, 2025

Respectfully submitted,

/s/ *David S. Norris*
David S. Norris (DC Bar No. 1024996)
**SQUIRE PATTON BOGGS (US) LLP**
2550 M Street, NW
Washington, DC 20037
Tel.: (202) 457-6000 | Fax: (202) 457-6315
david.norris@squirepb.com

*Counsel for Nonparty Financial Industry Regulatory Authority, Inc.*

- 27 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document is being served this day via email and mail on counsel for Christina Lovato, chapter 7 trustee, for the estate of Meta Materials, Inc.

*/s/ David S. Norris*
David S. Norris

EXHIBIT 1

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

## District of Nevada

In re META MATERIALS INC.,

Debtor

*(Complete if issued in an adversary proceeding)*

_____

Plaintiff

v.

_____

Defendant

Case No. 24-50792-hlb

Chapter 7

Adv. Proc. No.  _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: The Custodian of Records for FINANCIAL INDUSTRY REGULATORY AUTHORITY  | 1700 K St NW, Washington DC 20006

*(Name of person to whom the subpoena is directed)*

☑ *Production*:  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: see "Items to be Produced" attached hereto, along with the attachment "Definitions and Instructions"

| PLACE   Esquire Deposition Solutions 1717 K Street NW, Suite 900 Washington DC 20006 | DATE AND TIME   August 6, 2025 OR as arranged with Trustee Lovato's counsel (see contact info below) |
|---|---|

☐ *Inspection of Premises*:  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

/s/ Clayton P. Brust

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*  Christine Lovato, Chapter 7 Trustee  ,  who issues or requests this subpoena, are:

Clayton P. Brust, Esq. | Robison, Sharp, Sullivan & Brust, 71 Washington Street, Reno, NV 89503 | cbrust@rssblaw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____
_____
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

 My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

        I declare under penalty of perjury that this information is true and correct.

Date:  _____

                                                    _____
                                                               *Server's signature*

                                                    _____
                                                               *Printed name and title*

                                                    _____
                                                               *Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## DEFINITIONS AND INSTRUCTIONS

### DEFINITIONS

1.      "Acceptable Records" means records of such messages in the original format such data was saved (e.g., FIX log files or ASCII text).

2.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and Local Civil Rule 26.3, and shall also be used to Include any "communication," as defined by Local Civil Rule 26.3. By definition, non-identical copies of the same document are different original documents, and different types of media containing identical information are different original documents.

3.      "ESI" or "electronically stored information," is defined to be any portion of data available only on a computer or other device capable of storing electronic data. ESI Includes, but is not limited to, email (whether conducted intra-company using company email addresses or conducted through an individual, non-company account, e.g., Bloomberg, Gmail, Yahoo!, or AOL), spreadsheets, databases, word processing documents, images, presentations, application files, executable files, log files, and all other files present on any type of device capable of storing electronic data. Devices capable of storing ESI Include, but are not limited to: servers, desktop computers, portable computers, handheld computers, flash memory devices, wireless communication devices, pagers, workstations, minicomputers, mainframes, and all other forms of online or offline storage, whether on or off company premises. ESI is meant to Include instant messages (such as Cisco Jabber, IBM Sametime, ICQ, Kik, BBM, and similar types of messages), cell phone text messages (SMS messages and MMS messages), and other similar types of messages. For any document kept in electronic form, the term "document" Includes all metadata associated with the document.

### INSTRUCTIONS

You are required to produce all non-privileged Documents in Your possession, custody, or control, including information in the possession, custody, or control of any of Your attorneys, directors, officers, agents, employees, representatives, associates, division affiliates, partnerships,

1

parents or subsidiaries, and persons under their control.

1.      Each Document requested shall be produced in its entirety, including, without limitation, attachments, enclosures, cover letters, memoranda and appendices. If a Document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

2.      Each Document is to be produced along with all non-identical versions thereof in their entirety, without abbreviation or redaction.

3.      All Documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all attachments and enclosures.

4.      Unless otherwise stated in a specific request, these Requests seek responsive information and Documents authored, generated, disseminated, drafted, produced, reproduced, received, obtained, or otherwise created or distributed, concerning, or in effect during Relevant Time Period.

5.      If You object to part of a request, You must specifically state the basis of Your objections in accordance with Rule 34 of the Federal Rules of Civil Procedure, and produce all Documents called for by the portion of the request to which You do not object. In further accordance with Rule 34 of the Federal Rules of Civil Procedure, each objection must state whether any responsive materials are being withheld on the basis of that objection.

6.      If there are no Documents responsive to any particular request, the response shall state so in writing.

7.      In the event that any Document called for by these Requests is withheld on the basis of a claim of privilege or immunity, that Document is to be identified as required by Local Civil Rule 26.2.

8.      Each request herein shall be construed independently. No request shall be construed by reference to any other request for the purpose of limiting the scope of the answers to such request.

9.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, You shall produce responsive Documents as they have been kept in the usual course of business or shall organize

2

and label them to correspond to the enumerated requests of the demand.

10.     Documents, including ESI, will be produced pursuant to the ESI Protocol agreed to by the parties and/or ordered by the Court.

11.     These Requests shall be deemed continuing requests so as to require supplemental responses if You obtain or discover additional Documents between the time of initial production and the time of the trial. Such supplemental Documents must be produced promptly upon discovery. Plaintiffs specifically reserve the right to seek supplementary

## ITEMS TO BE PRODUCED

These requested records are in respect to Meta (including trading activity for tickers TRCH and MMAT), MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP.

Please note that all records requested below are for the timeframes of (i) Meta over the period from September 21, 2020 to August 21, 2024, and (ii) MMTLP over the period from June 28, 2021 to December 14, 2022.

**1.     Short Interest Reporting Data**

(i)     Records provided to FINRA by firms required to report short interest positions in all customer and proprietary accounts in all equity securities twice a month. Records should be provided in the original format received by FINRA, including broker and account details.

(ii)     Any additional records FINRA utilized in the production of its short interest report data.

**2.     FINRA Trade Reporting Facility (TRF) Data**

(i)     Records provided to FINRA through a FINRA trade reporting facility (TRF) or FINRA's Alternative Display Facility (ADF). Records should be provided in the original format received by FINRA including broker and account detail.

(ii)     Any additional records FINRA utilized in the production of Monthly Short Sale Transaction data which provides detailed trade activity of all short sale trades executed and reported to a FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

**3.     Reg SHO Daily Short Sale Volume Report Data**

(i)     Records utilized in the production of report data involving daily short sale aggregated volume by security for all short sale trades executed and reported to a

1

FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

**4.    Monthly OTC Summary Report Data**

(i)    Records utilized in the production of report data involving monthly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

**5.    Weekly OTC Summary Report Data**

(i)    Records utilized in the production of report data involving weekly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

**6.    FINRA Investigative Files**

(i)    All data records, communications, notes, and investigative records associated with any FINRA investigation concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**7.    FINRA Investigative Files**

(i)    All data records, communications, notes considered in the preparation of all public communications by FINRA (e.g. Notices, FAQs) concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**8.    FINRA Electronically Stored Communications**

(i)    All electronically accessible communications (emails, text, message, IM messages, letters or any other forms of electronically accessible communication by and between FINRA (including its employees, directors, officers or other agents) and any prime broker, broker, dealer, market-maker or hedge fund concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**9.      Order, Quotations, and Execution Records**

(i)      All data records provided to FINRA by member firms reflecting the lifespan transactions of orders in Meta and/or MMTLP from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

(ii)     Each reportable CAT event with respect to each quote and order in Meta, such as origination, modification, cancellation, routing, and execution as required by SEC Rule 613 (FINRA Rule 6800 series).

(iii)    All data records retained by FINRA related to the dissemination of quotations in MMTLP published on an Inter-Dealer quotation System (IDQS) in OTC equity securities. The data records should include the quotations in MMTLP received by FINRA, in the original format received, as well as the published quotation data based on such records.

(iv)     All data records retained by FINRA related to the dissemination of executions in MMTLP published on Trade Data Dissemination Service (TDSS). The data records should include the executions received by FINRA, in the original format received, as well as the published trade report data based on such records.

(v)      All data records retained by FINRA related to the administration of Meta and/or MMTLP through the CAIS subsystem and/or managed by FINRA's CAT HelpDesk.

3

# EXHIBIT 2

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of <u>NEVADA</u>

In re <u>META MATERIALS, INC.,</u>

                Debtor

Case No. <u>24-50792-hlb</u>

Chapter _____

## SUBPOENA FOR RULE 2004 EXAMINATION

To: The Custodian of Records for FINANCIAL INDUSTRY REGULATORY AUTHORITY  | 1700 K St NW, Washington DC 20006
_____
*(Name of person to whom the subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure.  A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| Esquire Deposition Solutions<br>1717 K Street NW, Suite 900<br>Washington DC 20006 | August 6, 2025 OR as arranged with Trustee Lovato's counsel (see contact info below) |

The examination will be recorded by this method: <u>stenographic and/or audiovisual means</u>

☑ *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

**See attachment titled "Items to be Produced" along with the attachment "Definitions and Instructions"**

       The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

           CLERK OF COURT

                                    OR    /s/ Clayton P. Brust

     _____       _____
      *Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
<u>Christina Lovato, Chapter 7 Trustee</u>  , who issues or requests this subpoena, are:

Clayton P. Brust | Robison, Sharp, Sullivan & Brust, 71 Washington Street, Reno, NV 89503 | cbrust@rssblaw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____
_____
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:  _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

  My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


        I declare under penalty of perjury that this information is true and correct.

Date: _____


                                        _____
                                                    *Server's signature*


                                        _____
                                                    *Printed name and title*


                                        _____
                                                    *Server's address*


Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## DEFINITIONS AND INSTRUCTIONS

### DEFINITIONS

1.      "Acceptable Records" means records of such messages in the original format such data was saved (e.g., FIX log files or ASCII text).

2.      "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A) and Local Civil Rule 26.3, and shall also be used to Include any "communication," as defined by Local Civil Rule 26.3. By definition, non-identical copies of the same document are different original documents, and different types of media containing identical information are different original documents.

3.      "ESI" or "electronically stored information," is defined to be any portion of data available only on a computer or other device capable of storing electronic data. ESI Includes, but is not limited to, email (whether conducted intra-company using company email addresses or conducted through an individual, non-company account, e.g., Bloomberg, Gmail, Yahoo!, or AOL), spreadsheets, databases, word processing documents, images, presentations, application files, executable files, log files, and all other files present on any type of device capable of storing electronic data. Devices capable of storing ESI Include, but are not limited to: servers, desktop computers, portable computers, handheld computers, flash memory devices, wireless communication devices, pagers, workstations, minicomputers, mainframes, and all other forms of online or offline storage, whether on or off company premises. ESI is meant to Include instant messages (such as Cisco Jabber, IBM Sametime, ICQ, Kik, BBM, and similar types of messages), cell phone text messages (SMS messages and MMS messages), and other similar types of messages. For any document kept in electronic form, the term "document" Includes all metadata associated with the document.

### INSTRUCTIONS

You are required to produce all non-privileged Documents in Your possession, custody, or control, including information in the possession, custody, or control of any of Your attorneys, directors, officers, agents, employees, representatives, associates, division affiliates, partnerships,

1

parents or subsidiaries, and persons under their control.

1.      Each Document requested shall be produced in its entirety, including, without limitation, attachments, enclosures, cover letters, memoranda and appendices. If a Document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

2.      Each Document is to be produced along with all non-identical versions thereof in their entirety, without abbreviation or redaction.

3.      All Documents that respond, in whole or in part, to any portion of any request shall be produced in their entirety, including all attachments and enclosures.

4.      Unless otherwise stated in a specific request, these Requests seek responsive information and Documents authored, generated, disseminated, drafted, produced, reproduced, received, obtained, or otherwise created or distributed, concerning, or in effect during Relevant Time Period.

5.      If You object to part of a request, You must specifically state the basis of Your objections in accordance with Rule 34 of the Federal Rules of Civil Procedure, and produce all Documents called for by the portion of the request to which You do not object. In further accordance with Rule 34 of the Federal Rules of Civil Procedure, each objection must state whether any responsive materials are being withheld on the basis of that objection.

6.      If there are no Documents responsive to any particular request, the response shall state so in writing.

7.      In the event that any Document called for by these Requests is withheld on the basis of a claim of privilege or immunity, that Document is to be identified as required by Local Civil Rule 26.2.

8.      Each request herein shall be construed independently. No request shall be construed by reference to any other request for the purpose of limiting the scope of the answers to such request.

9.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, You shall produce responsive Documents as they have been kept in the usual course of business or shall organize

2

and label them to correspond to the enumerated requests of the demand.

10.    Documents, including ESI, will be produced pursuant to the ESI Protocol agreed to by the parties and/or ordered by the Court.

11.    These Requests shall be deemed continuing requests so as to require supplemental responses if You obtain or discover additional Documents between the time of initial production and the time of the trial. Such supplemental Documents must be produced promptly upon discovery. Plaintiffs specifically reserve the right to seek supplementary

## ITEMS TO BE PRODUCED

These requested records are in respect to Meta (including trading activity for tickers TRCH and MMAT), MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP.

Please note that all records requested below are for the timeframes of (i) Meta over the period from September 21, 2020 to August 21, 2024, and (ii) MMTLP over the period from June 28, 2021 to December 14, 2022.

**1.    Short Interest Reporting Data**

    (i)    Records provided to FINRA by firms required to report short interest positions in all customer and proprietary accounts in all equity securities twice a month. Records should be provided in the original format received by FINRA, including broker and account details.

    (ii)    Any additional records FINRA utilized in the production of its short interest report data.

**2.    FINRA Trade Reporting Facility (TRF) Data**

    (i)    Records provided to FINRA through a FINRA trade reporting facility (TRF) or FINRA's Alternative Display Facility (ADF). Records should be provided in the original format received by FINRA including broker and account detail.

    (ii)    Any additional records FINRA utilized in the production of Monthly Short Sale Transaction data which provides detailed trade activity of all short sale trades executed and reported to a FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

**3.    Reg SHO Daily Short Sale Volume Report Data**

    (i)    Records utilized in the production of report data involving daily short sale aggregated volume by security for all short sale trades executed and reported to a

1

FINRA trade reporting facility or FINRA's Alternative Display Facility (ADF)

**4.    Monthly OTC Summary Report Data**

    (i)    Records utilized in the production of report data involving monthly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

**5.    Weekly OTC Summary Report Data**

    (i)    Records utilized in the production of report data involving weekly aggregate trade data for OTC (ATS and non-ATS) trading data for each ATS/firm with trade reporting obligations under FINRA rules.

**6.    FINRA Investigative Files**

    (i)    All data records, communications, notes, and investigative records associated with any FINRA investigation concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**7.    FINRA Investigative Files**

    (i)    All data records, communications, notes considered in the preparation of all public communications by FINRA (e.g. Notices, FAQs) concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**8.    FINRA Electronically Stored Communications**

    (i)    All electronically accessible communications (emails, text, message, IM messages, letters or any other forms of electronically accessible communication by and between FINRA (including its employees, directors, officers or other agents) and any prime broker, broker, dealer, market-maker or hedge fund concerning Meta and/or MMTLP issues and/or the trading of such issues thereof

**9.     Order, Quotations, and Execution Records**

(i)     All data records provided to FINRA by member firms reflecting the lifespan transactions of orders in Meta and/or MMTLP from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

(ii)    Each reportable CAT event with respect to each quote and order in Meta, such as origination, modification, cancellation, routing, and execution as required by SEC Rule 613 (FINRA Rule 6800 series).

(iii)   All data records retained by FINRA related to the dissemination of quotations in MMTLP published on an Inter-Dealer quotation System (IDQS) in OTC equity securities. The data records should include the quotations in MMTLP received by FINRA, in the original format received, as well as the published quotation data based on such records.

(iv)    All data records retained by FINRA related to the dissemination of executions in MMTLP published on Trade Data Dissemination Service (TDSS). The data records should include the executions received by FINRA, in the original format received, as well as the published trade report data based on such records.

(v)     All data records retained by FINRA related to the administration of Meta and/or MMTLP through the CAIS subsystem and/or managed by FINRA's CAT HelpDesk.

3

# EXHIBIT 3

In the matter of:

MOTION TO QUASH SUBPOENAS TO
NONPARTY FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.

Miscellaneous Action No.

I, Stephanie Dumont, declare as follows:

1.      I am an Executive Vice President and head of the Market Regulation and Transparency Services Department ("the Department") at the Financial Industry Regulatory Authority, Inc. ("FINRA").  I have worked in the securities industry for more than 30 years.  I have been in my current position at FINRA for over four years.  Prior to my current role, I was a Senior Vice President and Director of Capital Markets Policy in FINRA's Office of General Counsel for 22 years.

2.      I submit this declaration and accompanying exhibits in support of FINRA's Motion to Quash third-party subpoenas issued to FINRA in this proceeding ("the Motion").  This declaration is based upon my personal knowledge and based on records I reviewed that are maintained and kept in the ordinary course of FINRA's business, and I would testify to these facts if called upon to do so.

## **Background Information**

3.      FINRA is a private self-regulatory organization ("SRO") registered as a national securities association with the Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  As an SRO, FINRA is authorized, with oversight from the SEC, to investigate and discipline FINRA member firms and their associated persons for violations of FINRA rules and the federal securities laws.

4.      The Department oversees the national securities markets to protect investors and to safeguard market integrity.  The Department also has certain limited and specified regulatory responsibilities for the over-the-counter ("OTC") market.

5.      As part of its statutory mandate, the Department conducts routine surveillance of the national securities markets and conducts reviews and investigations of member firms and their associated persons. The Department utilizes innovative automated surveillance to assess billions of market events each day, and it reviews and analyzes other data that firms are required by FINRA rules to report to FINRA.

6.      FINRA is not a government agency, and its examinations and investigations are confidential and non-public.  FINRA does not voluntarily disclose materials from its examination or investigative files except to the SEC, other regulators, or law enforcement, pursuant to specific regulatory or law enforcement requests.

7.      In December 2022, FINRA published notice on its website of a corporate action submitted to FINRA by Meta Materials, Inc. for processing pursuant to SEC Rule 10b-17 and FINRA Rule 6490.  Pursuant to the corporate action, record holders on December 12, 2022, of an OTC equity security that was trading on the OTC markets under the symbol MMTLP would be entitled to receive one share of Next Bridge Hydrocarbons, Inc. ("Next Bridge") for each MMTLP share they held, and the MMTLP shares would be cancelled by the issuer ("Meta Materials Corporate Action").

8.      On December 9, 2022, pursuant to FINRA Rule 6440, FINRA directed its member firms to halt quoting and trading in MMTLP because it determined that it was necessary to protect investors and the public interest where an extraordinary event had caused or had the potential to cause significant uncertainty in the settlement and clearance process for shares in

MMTLP.  FINRA also announced that the trading halt would end concurrent with the deletion of the MMTLP symbol on December 13, 2022.  A true and accurate copy of the notice explaining the trading halt is attached as Exhibit A.

9.      In March 2023, FINRA published an *Investor Insights* article on its website explaining FINRA's role in corporate actions generally and answering questions about the Meta Materials Corporate Action and the trading halt that FINRA imposed on December 9, 2022.  A true and accurate copy of the March 2023 *Investor Insights* article is attached as Exhibit B.

10.      In November 2023, FINRA published another *Investor Insights* article on its website supplementing the information provided in March 2023.  A true and accurate copy of the November 2023 *Investor Insights* article is attached as Exhibit C.

## Assertion of Investigative File Privilege

11.      As the head of the Department, I am asserting the investigative file privilege over the documents and information sought in Requests 6, 7, and 8 in the third-party subpoenas issued to FINRA ("the Subpoenas").

12.      The Department has initiated a number of investigations related to the trading of the MMTLP security. Certain of these investigations remain open and ongoing.

13.      As the head of the Department, I have supervisory responsibility for investigations related to the trading of the MMTLP security, and the records maintained in those investigative files.

14.      I am familiar with the open and ongoing investigations as well as the documents, data, and communications contained in FINRA's files maintained for those open and ongoing investigations.

15.     The information maintained in FINRA's investigative files is not publicly available, and disclosure of the information maintained in FINRA's investigative files would be prejudicial to FINRA for various reasons, including because it would prematurely reveal the direction and scope of FINRA's investigations, FINRA's opinion as to what conduct is important to investigate, and confidential sources of information maintained in those files.

16.     The disclosure of documents, data, and communications maintained in FINRA's investigative files would interfere with FINRA's ability to complete its investigations and would frustrate FINRA's mission of protecting investors and safeguarding market integrity.

## Details About Requested Market Data

17.     FINRA rules require member firms to submit various types of data to FINRA to support FINRA's surveillance, regulatory, and oversight responsibilities.

18.     The data that FINRA member firms submit to FINRA is non-public and confidential.

19.     FINRA, however, does publish high-level, aggregate data regarding trading activity in the industry on its website to support market transparency and investor education.

20.     FINRA generally does not possess several of the categories of data sought in the Subpoenas at the individual firm or broker level. For example, the short interest reporting data sought in Request 1 of the Subpoenas is reported to FINRA by clearing firms, and it is not available, publicly or otherwise, at the individual firm or broker level. Similarly, the Trade Reporting Facility data sought in Request 2 of the Subpoenas is collected at the market participant level and does not contain account level details. Finally, I am informed and believe that the Weekly OTC Summary Report data sought in Request 5 of the Subpoenas can be derived or summarized utilizing data that FINRA already makes publicly available.

### Request for Order, Quotation, and Execution Records

21.     Request 9 in the Subpoenas calls for "[a]ll data records provided to FINRA by member firms reflecting the lifespan transactions of orders in Meta and/or MMTLP from origination to completion capturing all relevant information . . . with precision timestamps." Subparagraphs in the request reference "reportable CAT event[s]," "the CAIS subsystem," and "FINRA's CAT HelpDesk." *See* Subpoenas ¶¶ 9(ii), (v).

22.     In 2012, the SEC adopted Rule 613 under Regulation NMS, which required the national securities exchanges and national securities associations (the "Plan Participants") to submit an NMS Plan ("the NMS Plan") to create, implement, and maintain a Consolidated Audit Trail ("CAT").  17 C.F.R. § 242.613.

23.     The CAT collects data about every order, cancellation, modification, and trade execution for all NMS securities and unlisted equities across all U.S. markets ("CAT Data").

24.     SEC Rule 613 requires that "[a]ll plan sponsors and their employees . . . agree to use appropriate safeguards to ensure the confidentiality of [CAT Data] and agree not to use such data for any purpose other than surveillance and regulatory purposes."  17 C.F.R. 242.613(e)(4)(i)(A).

25.     In 2016, the SEC approved the NMS Plan, which provides that "access to and use of the CAT Data stored in the Central Repository [will be provided to Plan Participants and the SEC] solely for the purpose of performing their respective regulatory and oversight responsibilities pursuant to the federal securities laws, rules and regulations or any contractual obligations."  Release No. 34-79318, 81 Fed. Reg. 84696, 84706 (Nov. 16, 2016).

26.     Accordingly, FINRA may only use CAT Data for limited surveillance, regulatory, and oversight purposes. Based upon extensive use restrictions and confidentiality requirements

imposed upon FINRA, FINRA is not authorized to release or provide CAT Data for any other purpose. To my knowledge, FINRA has heretofore never produced CAT Data in response to a subpoena issued by private parties in civil litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on August 6, 2025

Stephanie Dumont

# EXHIBIT A



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: [https://otce.finra.org/otce/dailyList](https://otce.finra.org/otce/dailyList).

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that **"…immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled**."  Available here: [https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm](https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm).

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

# EXHIBIT B

# FAQ: MMTLP Corporate Action and Trading Halt

▾ **finra.org**/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt

March 16, 2023



FINRA has received a number of questions relating to a corporate action and trading halt in the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials) that traded under the symbol MMTLP. This *Investor Insights* article provides general information about how corporate actions and trading halts are processed as well as specific information related to MMTLP.

## Corporate Actions—FINRA's Role

A corporate action occurs when a company makes a change that has or could have an impact on its stock and shareholders. Corporate actions include issuing a dividend, engaging in a stock split, or effecting a merger.

When a company decides to engage in a corporate action that affects a security listed on a national securities exchange, the company must provide notice to the listing exchange and comply with all applicable listing standards and rules of the exchange concerning that security. In contrast, when a company decides to engage in a corporate action that affects an unlisted security that trades in the over-the-counter (OTC) market, federal law requires that the company submit notice of the corporate action to FINRA, and FINRA reviews the submission and publishes a notification about the corporate action to the marketplace

(unless the submission is deemed deficient by FINRA). This function helps to keep investors and the market informed of corporate actions affecting OTC securities and of relevant dates.

A company can have both listed and unlisted securities, so different rules can apply to the same company depending on which security is the subject of a corporate action. In any event, FINRA does not initiate, approve, or conduct the underlying corporate action that the company is making, and the company itself is responsible for making sure the corporate action complies with all applicable laws and regulations.

FINRA regulates broker-dealers that facilitate investor access to the securities markets, including the OTC market. However, unlike securities exchanges that list securities, FINRA does not establish listing standards or otherwise regulate the companies that issue OTC securities.

## The MMTLP Corporate Action

Meta Materials' Series A Preferred Shares were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted. These unlisted shares later began trading in the OTC market under the symbol MMTLP (further discussion below).

On July 15, 2022, the company filed a Form S-1 registration statement with the Securities and Exchange Commission (SEC) to register the issuance of the common stock of Next Bridge Hydrocarbons, Inc. (Next Bridge), which at that time was a wholly owned subsidiary of Meta Materials. As disclosed in the registration statement, Meta Materials would distribute to MMTLP shareholders one share of Next Bridge common stock per one share of MMTLP held, and would cancel the Series A Preferred Shares trading under the symbol MMTLP. According to the Form S-1 filed, immediately after the corporate action, Next Bridge would be an independent public reporting company. After several amendments, the registration statement for the Next Bridge shares became effective on November 18, 2022.

On November 23, 2022, Meta Materials issued an announcement regarding the Next Bridge / MMTLP corporate action, stating that each holder of its Series A Preferred Shares—MMTLP—as of December 12, 2022, would become entitled to receive one share of the common stock of Next Bridge for every one share of MMTLP held. Meta Materials also stated that the Next Bridge shares would be distributed to MMTLP shareholders on December 14, 2022, at which time all MMTLP shares would be automatically cancelled and MMTLP holders would cease to have any rights with respect to those shares. In addition, the company stated that the Next Bridge shares received in the distribution would not be eligible for electronic transfer through The Depository Trust Company (DTC) (or through any other established clearing corporation).

As required by federal law, Meta Materials also notified FINRA of the Next Bridge / MMTLP corporate action. Consistent with the information provided by Meta Materials, on December 6 and 8, 2022, FINRA provided public notice of the corporate action on FINRA's website. FINRA's corporate action notice stated that the Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022, and further clarified that any purchasers after December 8, 2022, (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the corporate action distribution. FINRA's corporate action notice also stated that the MMTLP symbol would be deleted effective December 13, 2022  (*i.e.*, when an issuer cancels shares, FINRA will likewise delete the symbol; see the company's announcement stating that the MMTLP shares were to be cancelled as of the December 14, 2022, distribution date of the Next Bridge shares).

On December 9, 2022, FINRA halted trading in MMTLP. One of FINRA's roles in regulating the activities of broker-dealers trading OTC equity securities is exercising the authority to require such firms to halt quoting and trading activities when FINRA determines that doing so is necessary to protect investors and the public interest. Since imposing the halt, FINRA has received questions regarding the MMTLP trading halt and its impact on investors. Below are answers to some questions FINRA has received.

**1. Why did FINRA halt trading in MMTLP?**

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were the facts that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

**2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge distribution?**

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

### 3. Has the MMTLP trading halt ended?

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

### 4. How were MMTLP shares publicly quoted and traded in the first place?

The answer to the question of whether a security is tradeable is determined by the application of federal law, including any applicable SEC rules. Where a security is or becomes tradeable, a public market for the security may develop—as it did with MMTLP.

FINRA does not approve a company's issuance of securities or approve or determine when broker-dealers or customers may begin trading those securities. However, once a broker-dealer executes a transaction in an unlisted security, the firm is required by FINRA rules to

report the executed transaction to FINRA. And where a symbol does not yet exist for the security, the broker-dealer must request a symbol from FINRA. Because the issuer obtained a CUSIP for the Series A Preferred Shares, FINRA assigned the MMTLP symbol in 2021 upon request by a broker-dealer to facilitate electronic reporting of an executed transaction that occurred in the security.

This trade reporting process is separate from the process by which a broker-dealer begins quoting a security in compliance with SEC Rule 15c2-11. Rule 15c2-11 requires a broker-dealer, prior to quoting a security on its own behalf, to review specified information about the company that issued the security (unless an exception applies). In some cases, a broker-dealer also must file a form with FINRA—a Form 211. In this case, FINRA did not receive a Form 211. Instead, broker-dealers relied on an exception to SEC Rule 15c2-11 that permits broker-dealers to publish a quotation for unsolicited customer orders.

**5. Did FINRA cancel the MMTLP shares? Did FINRA delete the MMTLP symbol?**

FINRA did not cancel the MMTLP shares. The issuer, Meta Materials, cancelled the shares effective December 14. In fact, FINRA does not and cannot cancel any securities that are issued by a company—this was an action of the issuer. However, just as FINRA assigns symbols to unlisted securities, FINRA also can unassign or "delete" a symbol, for example, where it is no longer needed to quote or trade a security. In this case, FINRA deleted the MMTLP symbol on December 13 in light of the imminent cancellation of the shares as announced by the company in connection with the Next Bridge / MMTLP corporate action.

On December 8, FINRA amended its original December 6 corporate action announcement to clarify, among other things, that it would be deleting the MMTLP symbol on December 13 rather than cancelling the shares (because the issuer itself was responsible for cancelling the Series A Preferred Shares). Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.

**6. What happened to investors who did not sell their MMTLP shares prior to the trading halt?**

Investors who had settled positions in MMTLP on December 12 were holders entitled to receive shares of Next Bridge as part the Next Bridge / MMTLP corporate action. Thus, applying the standard settlement cycle of T+2, an investor who did not sell MMTLP by December 8 would receive Next Bridge shares in the distribution—and this would be the case even had FINRA not halted trading on December 9.

As described in the Next Bridge prospectus filed with the SEC, Next Bridge anticipated that the distribution process for the Next Bridge shares would take about two weeks and would be effected by its transfer agent, American Stock Transfer & Trust Company LLC. Transfer agents work for securities issuers to record changes of securities ownership, maintain security holder records, cancel and issue certificates, and distribute dividends. SEC rules

and regulations include registration and other requirements for registered transfer agents. FINRA does not regulate transfer agents and does not have a role in distributing securities as part of a corporate action.

*See also* Question #10 regarding what investors should do if they have not received their Next Bridge shares and Question #11 regarding whether the Next Bridge shares are tradeable.

## 7. What would have happened to any trades executed after December 8 had FINRA not halted trading in MMTLP?

As mentioned above, applying the T+2 settlement cycle, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. Any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC. There also was concern that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 may not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution), and that the MMTLP shares purchased would imminently be cancelled.

## 8. Is there public data concerning short sale activity in MMTLP?

Yes, there are several data sets published by FINRA and the SEC about short sale activity that include data for MMTLP.

***Short Interest Data:*** "Short interest" in a security is a snapshot of the total open short positions existing on the books and records of broker-dealers for that security on a given settlement date. FINRA's short interest reports reflect short positions held both in customer and proprietary accounts and are published twice each month. FINRA published short interest reports for MMTLP from October 15, 2021, through November 30, 2022 (the last short interest reporting settlement date available for MMTLP). These reports are available on **FINRA's website**. Short interest reports for Next Bridge are not available on FINRA's website because firms report short interest by security symbol and Next Bridge does not have a symbol. FINRA is considering how it might enhance the usefulness of the short interest information available to investors, which could include changes to the content and frequency of the short interest reporting.

***Short Sale Volume:*** FINRA also publishes daily short sale volume data by security for OTC equity securities. Importantly, while the two data sets are related in that short sale volume activity may ultimately result in a reportable short interest position, they are not the same. In

fact, a particular short sale will not necessarily result in a short position that is later reported in FINRA's short interest report. For example, while the total short sale volume for transactions in MMTLP that settled from November 16, 2022, through November 30, 2022, was 7,413,679 shares, the published short interest for MMTLP on settlement date November 30, 2022, was 4,658,068 shares.

Differences in the two data sets are expected and occur for a variety of reasons; for example, where a short sale has been covered (either on the same day or at another time prior to the short interest reporting settlement date), which means that there is no longer a short position to report as short interest by the reporting settlement date. As another example, the daily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest.

*Fails-to-Deliver:* The SEC publishes data on the total quantity of "fails-to-deliver" per security as of each reporting settlement date. As the SEC has explained, a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of

the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

**9. What happens if short positions in MMTLP were not closed out before FINRA halted trading?**

Broker-dealers have operational conventions in place for adjusting short positions following a corporate action. In this instance, FINRA understands that firms have adjusted short positions in MMTLP to reflect an equal size short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP now reflects a short position of 100 shares of Next Bridge). In other words, the corporate action did not compel short positions to be closed or extinguish any obligations associated with outstanding short positions.

**10. What should investors do if they believe they have not received their Next Bridge shares?**

If you held a settled position in MMTLP on December 12, 2022, your account should reflect your position in Next Bridge. Your broker-dealer is required to maintain possession or control of your shares in compliance with federal law. You also may request a transfer of shares from the broker-dealer's name to your name; however, this transfer may take time to achieve and your broker-dealer or the transfer agent may charge a fee for this service. If you believe that your shares are not properly reflected in your account or your broker-dealer has not been willing to transfer your shares pursuant to your instructions, you should contact your broker-dealer to understand the status of your Next Bridge shares.

Your broker-dealer may reflect your Next Bridge shares in your account using a numeric or alphanumeric identifier. Different firms may use different identifiers because an official CUSIP number, which is an identifier assigned by CUSIP Global Services at the request of the issuer—not FINRA— has not, to date, been assigned to Next Bridge common stock. The absence of an official CUSIP number does not affect the status of the Next Bridge shares reflected in your account. If you believe that your broker-dealer has not provided a satisfactory explanation to your questions, you may submit an investor complaint to FINRA.

**11. Are the Next Bridge shares tradeable?**

As discussed above, Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of 165,523,363 shares of common stock in connection with the Next Bridge / MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are freely tradeable under federal law.

As of the date of this article, the Next Bridge shares neither have a CUSIP number nor a security symbol. If Next Bridge were to obtain a CUSIP number, that would facilitate secondary market trading. Broker-dealers would be able to request that FINRA assign a symbol to the Next Bridge shares in connection with quoting and trading activity (where such request is consistent with FINRA rules and policies and with federal law). However, even without a CUSIP number, any trades in Next Bridge shares executed by a broker-dealer must be reported by the firm to FINRA for regulatory purposes through a file submission process.

As part of its mission, FINRA provides resources on its website to assist retail investors through the investment process. As relevant to the questions around trading in MMTLP, FINRA has published Investor Insight articles addressing short interest and short sale volume data, as well as corporate actions and the mechanics and risks of trading OTC securities. Visit FINRA's For Investors webpage for more information.

*Note: This article was modified on March 27, 2023, to remove references to the registration of the MMTLP shares, which raised questions that are not relevant to the main focus of this article. The registration status of the MMTLP shares is determined under the Securities Act of 1933 and applicable SEC rules and interpretive guidance thereunder, and not FINRA rules.*

EXHIBIT C

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

> **finra.org**/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt

November 6, 2023



## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

## 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

## 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to

shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

**14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?**

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total

open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially —by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *position*. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data *and* that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17] While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8— were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

### 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16,

2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

### 17. Why did FINRA halt trading in MMTLP before December 12?

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP

not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased would imminently be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

**18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?**

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a

corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

**19. How can a holder of Next Bridge common stock liquidate their securities?**

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares —as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[26]

[1] *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.

[2] "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

[3] In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

[4] "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

[5] *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

[6] Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA, perform functions that include serving as a central securities depository and operating a centralized system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly on the books of the transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

[7] *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

[8] *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

[9] For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act

Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory or law enforcement requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been available because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding], hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on

the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations.
*See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

[16] While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

[17] *See* SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

[18] On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

[19] *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

[20] *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%20(2.16.2023)%20(Final).pdf.

[21] Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

[22] *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

[23] *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

[24] It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public notice by FINRA.

[25]
*See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

26 *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

# EXHIBIT 4

In the matter of:

MOTION TO QUASH SUBPOENAS TO
NONPARTY FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.

Miscellaneous Action No.

I, Troy Eads, declare as follows:

1.      I am a Senior Director Data Lead in the Market Data & Analytics unit in Market

Regulation and Transparency Services Department ("MRTS") at the Financial Industry

Regulatory Authority, Inc. ("FINRA"). I have worked at FINRA since 2014 in FINRA's

Technology Department and MRTS.

2.      I submit this Declaration in support of FINRA's Motion to Quash Subpoenas or, In the

Alternative, for a Protective Order ("Motion"). This declaration is based upon my personal

knowledge and based on records I reviewed that are maintained and kept in the ordinary course

of FINRA's business, and I am informed of and believe the facts and information set forth in this

Declaration to be true. I would testify to these facts if called upon to do so.

3.      In my role at FINRA, I am familiar with FINRA's data systems and research FINRA's

internal sources for purposes of ascertaining stored data accessibility and collectability, as well

as the related resources required to access and collect it. I performed this research with respect to

the subpoenas at issue in the Motion.

4.      To the best of my knowledge and belief, just the Trade Reporting Facility ("TRF") data

alone sought for the symbols MMAT and TRCH for the requested time period of September 21,

2020 through August 21, 2024 amounts to a volume of approximately 23.5 million records. In

addition, the MMTLP symbol OTC Reporting Facility ("ORF") data for the time period of June

28, 2021 through December 14, 2022 (the time period for which FINRA has such data) alone

amounts to an additional volume in excess of one million records. In the aggregate, just the TRF and ORF data requested in Exh. 2 categories 2 through 4, therefore totals close to 25 million records FINRA would be required to collect, process and produce. Given the substantial volume, MRTS would have to download the data onto secured hard drives, a function that would have to be performed manually.

   I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on August 6, 2025

_____
Troy Eads

# EXHIBIT 5

Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com
Attorney for Christina Lovato, Trustee

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.: 24-50792-hlb |
| META MATERIALS INC., | (Chapter 7) |
| Debtor. | ***EX PARTE* APPLICATION BY CHAPTER 7 TRUSTEE TO EMPLOY THE LAW FIRMS OF CHRISTIAN ATTAR AND KASOWITZ BENSON TORRES LLP AS SPECIAL LITIGATION COUNSEL** |
| | Hearing Date: N/A<br>Hearing Time: |

Pursuant to 11 U.S.C. § 328(a) and F.R.Bankr.P. 2014, Christina Lovato, the duly appointed and acting chapter 7 trustee ("Trustee"), requests an order authorizing the employment of law firms of Christian Attar, and Kasowitz Benson Torres LLP (together the "Firms"), to act as special counsel for the Chapter 7 estate of Meta Materials, Inc., ("Debtor" or "Estate"). The Firms will investigate potential claims and, if meritorious, pursue litigation related to suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing.'

This Application is supported by the separately filed Declarations of James W. Christian and Stephen W. Tountas. In support of this Application, the Trustee represents as follows:

1. Debtor Meta Materials Inc. filed a chapter 7 petition on August 9, 2024 ("Petition Date"), and Christina Lovato was duly appointed as the Chapter 7 trustee ("Trustee").

2. In fulfilling her duties under § 704, and based upon her investigation of the events leading up to the filing of the Chapter 7 case, the Trustee has learned that, prior to the filing of the

1

case, the Christian Attar firm began a preliminary investigation into activities related to a merger in which Meta Materials ("MMAT"), acquired Torchlight Energy Resources ("TRCH"), both of which were listed on NASDAQ.[1] A summary of the potential litigation is attached to this Application as Exhibit A.

3.      The Trustee believes retention of counsel specializing in this particular area of the law, involving the purchase and sale of securities, is necessary to represent the Estate's interest in recovery for the benefit of creditors and, potentially, for equity.

4.      The Firms will undertake the engagement on a contingency basis of Thirty Percent ("30%"). Importantly, the Firms have arranged for a litigation-funding source of approximately $11,000,000 which eliminates any risk to the Estate for payment out-of-pocket expenses such as travel, discovery, depositions, and expert witnesses. The engagement agreement for both Christian Attar and the Kasowitz firms is attached as Exhibit B.

5.      To the best of the Trustee's knowledge, the Firms do not represent any interests adverse to the Estate in the matters upon which they are to be engaged and are disinterested as that term is defined in 11 U.S.C. § 101(14). There are no present connections which the Firms and/or their employees have with the Estate, any of its creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

---

[1] National Association of Securities Dealers Automatic Quotation System.

1    WHEREFORE, the Trustee requests that employment of the law firms of Christian Attar

2    and Kasowitz Benson Torres LLP be approved by this Court, effective as of the date of the order

3    approving employment, for the purpose and on the terms and conditions set forth above.

4    DATED: October 31, 2024.

HARTMAN & HARTMAN

5

6

7    /s/ Jeffrey L. Hartman
     Jeffrey L. Hartman, Esq., Attorney for
8    Christina Lovato, Trustee

9

10   APPROVED

11   /s/ Christina Lovato
     Christina Lovato, Trustee
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT A

# EXHIBIT A

## SUMMARY OF POTENTIAL LITIGATION

The Trustee is seeking authority to employ special counsel to investigate and, if meritorious, pursue litigation related to suspected stock manipulation through illegal trading practices such as 'naked short selling' and 'spoofing'. In general, naked short-selling refers to the practice of selling shares that an investor doesn't own and hasn't borrowed. Short-selling naked often begins with the intention of finding the shares to borrow, but the short seller is unable to do so. In general, spoofing is the practice of flooding a market with orders to buy or sell that are canceled before they go through. The goal is to manipulate the price of the security by artificially creating, or depressing demand, which the spoofer can then use to make a profit.

These types of manipulative orders create a false impression of market activity, misleading other traders into making poor trading decisions. The result is an artificial suppression (or inflation) of stock prices, allowing the manipulators to significantly profit at the expense of legitimate shareholders. These practices, illegal under U.S. securities laws, disrupt the natural balance of supply and demand in financial markets and leads to artificially altered stock prices.

In the case of Meta Materials, Inc. (the "Company"), (Nasdaq: MMAT) and its predecessor Torchlight Energy Resources, Inc. (Nasdaq: TRCH), the potential defendants or 'targets' engaged in persistent and extensive spoofing, placing millions of "Baiting Orders." It is believed this artificial sell-side pressure misled market participants into selling their shares at depressed prices, allowing the defendants to profit from purchasing stock at prices far below their actual value. The manipulation led to extreme financial losses for the Company, as it sold shares at artificially low prices which led to extreme financial losses for more than 65,000 retail shareholders. Prepetition, the Company engaged a group of specialist advisors, including Christian Attar (the "Firm"), whose analysis identified over 55 million shares of MMAT and 92 million shares of TRCH that were impacted by this fraudulent activity, highlighting the scale of the manipulation that occurred persistently and over several years. The Firm is teaming with Kasowitz Benson & Torres LLP ("Kasowitz"), to pursue this litigation and the combined experience of the two firms in investigating and prosecuting market manipulation cases, and their outstanding 24+ year track record of recovering substantial damages, demonstrate their qualifications to represent the Estate in pursuing claims against the target defendants.

**Potential For Financial Recovery**: The magnitude of the manipulation indicates the potential for a substantial financial recovery. The tens of millions of shares affected by this illegal activity resulted in significant financial harm to the Company and its shareholders. By engaging the Firm, the Trustee is positioning the Estate to possibly recover a portion of the lost value, which will directly benefit the creditors and equity holders. A successful litigation outcome could result in tens of millions of dollars in recovery, providing much-needed funds to the Estate, creditors and equity holders.

**Experienced Legal Representation**: Christian Attar and Kasowitz bring significant expertise to this case. With a long history of successfully litigating complex securities fraud cases,

particularly those involving illegal trading strategies like spoofing, they are uniquely positioned to handle the investigation and litigation of these matters. The Christian Attar and Kasowitz firms have previously secured numerous eight figure settlements and judgments, often against large financial institutions that engaged in similar market manipulation schemes. This experience will ensure that the Trustee has the best possible legal representation to maximize the potential recovery.

**Ongoing Regulatory And Legal Focus On Spoofing**: Spoofing has become a primary focus for financial regulators such as the U.S. Securities and Exchange Commission (SEC) and the Department of Justice (DOJ). Both agencies have been actively prosecuting spoofing cases and have developed a strong legal framework for addressing these manipulative practices. For example, TD Bank was recently assessed a $20M fine related to spoofing.[1] This increased, regulatory focus enhances the likelihood of success in this case. The Firms are well-versed in working within this regulatory environment, and their expertise in navigating the evolving legal landscape surrounding spoofing will be invaluable to the case.

**No Cost To The Estate Unless Recovery Is Successful**: An important consideration for the court is that Christian Attar and Kasowitz teams work on a contingency basis, meaning the Estate will not incur any upfront legal costs. This structure eliminates financial risk to the Estate while maximizing the potential for recovery. If the litigation is successful, the fees will be paid out of the recovered funds, ensuring that the creditors and Estate bear no unnecessary financial burden during the proceedings.

**Significant Impact On Shareholders**: The target defendants' manipulation of MMAT and TRCH shares not only harmed the Company but also caused significant financial losses for shareholders, with the majority of the 65,000+ shareholders being retail investors. The litigation will seek to recover damages on behalf of the Estate, but potentially, it will also provide recovery for the shareholders who were directly impacted by the fraudulent market activity.

**Strategic Timing And Leverage**: Given that Meta Materials is currently in Chapter 7 liquidation, now is the ideal time to pursue investigation and potential litigation. The timing of this action could create leverage in settlement negotiations, as the target defendants may seek to avoid the additional legal exposure that comes with prolonged litigation. Engaging the Firms now allows the Trustee to capitalize on the current momentum and maximize the potential recovery while the legal and regulatory environment remains favorable.

In conclusion, engaging the Firms represents a significant opportunity for the Trustee to pursue potential recovery for the Meta Materials Estate. With significant potential for financial recovery, minimal risk to the Estate, and the involvement of experienced legal professionals who have a proven track record of success, this litigation can directly benefit the creditors of the Estate and shareholders.

---

[1] https://www.wsj.com/finance/regulation/td-securities-to-pay-sec-more-than-6-5-million-in-spoofing-charges-probe-0e39f248

# EXHIBIT B

# EXHIBIT B

**THIS CONTRACT IS SUBJECT TO ARBITRATION
UNDER THE TEXAS GENERAL ARBITRATION STATUTE**

## POWER OF ATTORNEY
## AND CONTINGENT FEE CONTRACT

This agreement ("Agreement" or "Retention Agreement") is made by and between Christina W. Lovato in her capacity as chapter 7 trustee for the estate of META MATERIALS INC. pending in the United States Bankruptcy Court, District of Nevada as case no. 24-50792-hlb (referred to as "Client", and "Plaintiff") on the one hand, and James W. Christian of CHRISTIAN ATTAR and Stephen W. Tountas of KASOWITZ BENSON TORRES LLP, (referred to as "Attorneys") on the other hand.

In consideration of the mutual promises herein contained, the parties hereto agree as follows:

### I.  PURPOSE OF REPRESENTATION

1.01     The Client hereby retains and employs Attorneys to investigate and, if appropriate, sue for and recover all damages and compensation due Client, under any and all claims and\or causes of action Client may have against all culpable defendants (the "Defendants" and each, individually, a "Defendant") as reasonably determined by Attorneys in connection with stock fraud and\or manipulation by Defendants involving the stock of META MATERIALS INC. (hereafter referred to as "the Litigation"). Client further retains and employs Attorneys to compromise and/or settle the Claims and causes of action that may be asserted on behalf of the Client, which compromise or settlement will be subject to Bankruptcy Court approval.

1.02     It is specifically agreed and understood that Attorneys' representation is limited to the Client, and that Attorneys are not representing nor expect to represent any other person or entity other than the Client, except future clients that may join in Plaintiff's shareholder action.  It is expressly agreed and understood that Attorneys' obligations are limited to representing Client in the specific matters described in Paragraph 1.01, and Client does not expect Attorneys to perform any other duties or to take any other action except as specified in Paragraph 1.03.

1.03     It is specifically agreed and understood that Attorneys are not representing Client with regard to any claim that may be brought against it and Client is not aware of any counterclaims that could be brought against Client.  Related Litigation includes a separate lawsuit brought by the Defendants in other forums or jurisdictions that would be a compulsory counterclaim if filed in the Litigation.  If the Client wishes Attorneys to represent it with regard to any other lawsuit or with regard to any counterclaim, then Client agrees that she must execute a new or separate Power of Attorney and Fee Contract pertaining to such representation.

1.04     It is specifically agreed and understood that Attorneys' representation is limited to legal representation only.  Attorneys are not responsible for providing business, insurance, tax, or accounting advice, even if related to the Claims or Litigation Proceeds.

## II.  FEES, EXPENSES, AND LITIGATION PROCEEDS

2.01    The estimated budget for the expenses of the Litigation is $11,800,000 (the "Commitment"). Exhibit A is a general estimate of the expenses anticipated to be incurred in litigating these cases. Attorneys shall operate on a partial contingency and shall arrange for payment of third-party expenses related to the Litigation up to the amount of the Commitment. Client understands and agrees that Attorneys intend to seek financing for all or any portion of the Commitment from the Funder, and Attorneys anticipate Funder to be an affiliate of Parabellum Capital LLC. Client acknowledges that the Attorneys are operating on a partial contingency and arranging for payment of expenses related to the Litigation is not possible without financing from Funder, and Client shall execute any documents reasonably requested by Attorneys in connection with the financing of the Commitment, including, without limitation, a Litigation Proceeds Distribution Agreement. In consideration of the services rendered and to be rendered to Client by Attorneys, Client does hereby assign, grant and convey to Attorneys the following present undivided interests in all Litigation Proceeds and all of Client's Claims and Causes of Action for and as a reasonable fee for Attorneys' services, and said contingent attorneys' fee will be figured as follows on any recovery, settlement, or other receipt of Litigation Proceeds (collectively, the "Compensation"):

(i)      *First*, (A) 90% of Litigation Proceeds shall be distributed to Attorneys and (B) 10% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to the Commitment.

(ii)     *Second*, (A) 60% of Litigation Proceeds shall be distributed to Attorneys and (B) 40% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one times (1X) the amount of the Commitment.

(iii)    *Third*, (A) 50% of Litigation Proceeds shall be distributed to Attorneys and (B) 50% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one and one quarter times (1.25X) the amount of the Commitment.

(iv)     Fourth, (A) 30% of all remaining Litigation Proceeds shall be distributed to Attorneys and (B) 70% of all remaining Litigation Proceeds shall be distributed to Client.

In the event that the legal fees and expenses of the Litigation are anticipated to exceed $11,800,000, Client and Attorneys shall work together in good faith to agree on the financing of such additional amounts. The Client shall have no liability to the Funder in the event the Litigation is unsuccessful.

2.02    Intentionally Omitted.

2.03    Client acknowledges that $500,000 of the Commitment is allocated to this matter from the Harrington case and deemed spent as of the date hereof on account of methodologies

learned in the Harrington case with respect to illegal methods used by Defendants to manipulate the stock.

     2.04    A settlement or recovery may involve (in addition to a cash payment) other matters received by or obtained for Client. Just as one example, Client may recover or obtain shares of stock already issued or transferred to one or more Defendants. As another example, Client may be compensated by means of stock issued by certain publicly traded defendants. All such amounts constitute Litigation Proceeds which are distributable in accordance with Section 2.01 above.

     2.05    It is further agreed that the Compensation as set forth and calculated in Paragraph 2.01 and assignment of undivided interest set forth in Paragraph 3.01 shall not be offset, reduced nor affected by any judgment, if any, rendered against Client by any counterclaim or otherwise.

     2.06.   The budget set forth above excludes appeals and judgment enforcement proceedings, budgets for which shall be negotiated by the Parties if necessary.

     2.07.   The Compensation is not set by law but is negotiable between an attorney and client. The Attorneys acknowledge that the potential Compensation constitutes fair and adequate consideration to compensate the Attorneys for its representation of Client in the Litigation and its obligation to bear the risk of the Commitment in accordance with this Retention Agreement.

     2.08    Attorneys may enter into one or more separate agreements pursuant to which Attorneys allow Funder to obtain a portion of the Litigation Proceeds distributable to Attorneys under this Paragraph 2.01.

### III. ASSIGNMENT OF INTEREST

     3.01    In consideration of Attorneys' services, the Client hereby conveys and assigns to Attorneys and agrees to pay to Attorneys an undivided interest in and to all of Client's claims and causes of action to the extent of the percentages set out in Paragraph 2.01 resulting in a net contingency fee of not more than 30% to Attorneys after payment of all other amounts contemplated by Paragraph 2.01.

     3.02    If there is any type of settlement whereby the Client is to receive or be paid future payments, then the settlement will be reduced to present value, and the settlement will be arranged whereby there will be sufficient cash at the time of the settlement to pay the attorneys' fees which will be figured on the present value of the settlement or recovery including the present value of future payments. Such discounting will be computed at a market discount rate.

     3.03    All sums due and to become due are payable at the office of ChristianAttar in Harris County, Texas. Client hereby authorizes the Attorneys to endorse and negotiate any check, draft, or negotiable instrument on behalf of the Client, to deposit the same in Attorneys' trust account, and to distribute such funds pursuant to the terms of this Agreement.

## IV.  APPROVAL NECESSARY FOR SETTLEMENT

4.01   No settlement of any nature shall be made without Client's approval. Attorneys shall have full authority to sign papers or documents regarding a settlement after Client's and Bankruptcy Court approval.  Client will consult with Attorneys and Attorneys will keep Client fully advised of all settlement offers and counteroffers.

4.02    Attorneys are authorized and empowered to act as Client's sole negotiator in any and all settlement negotiations concerning this case, but it is expressly agreed and understood that no settlement of Client's Claim shall be made by Attorneys without Client's approval.  Client shall immediately notify in writing Attorneys of any settlement offer or proposal or "feeler" made to Client by anyone other than Attorneys.  Client agrees not to engage in any settlement discussion with any Defendant or its insurer or attorney or representative except by and through Attorneys. There will be no talk about settlement unless Attorneys are present and doing the talking for Client. Whenever a settlement offer is made by or on behalf of any Defendant, Client agrees to strongly consider in good faith the opinions and recommendations of Attorneys before accepting or rejecting the settlement offer, whether such settlement offer was made to Client through the Attorneys or in some other way.  Client agrees not to unreasonably withhold consent to a settlement offer, which in the judgment of Attorneys is a fair and reasonable basis for the disposition of Client's Claim or else Attorneys shall have the right to withdraw pursuant to Paragraph 9 from further representing Client.  In deciding whether to consent or not to a settlement offer, Client agrees never to ask, insist or seek that Attorneys cut or reduce their fees or expenses to which Attorneys are entitled to receive under this Agreement, and such conduct will constitute unreasonably withholding consent.

4.03    Attorneys are hereby granted a power of attorney so that they may have full authority to prepare, sign and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to conclude this representation including settlement and\or reducing to possession any and all monies or other things of value due to the Client under his claim as fully as the Client could so do in person.  Attorneys are also authorized and empowered to act as Client's negotiator in any and all settlement negotiations concerning the subject of this Agreement.

## V.  REPRESENTATIONS, WARRANTIES, AND COVENANTS

5.01    It is understood and agreed that Attorneys cannot warrant or guarantee the outcome of the case and Attorneys have not represented to the Clients that the Client will recover all or any of the funds so desired.  Further, Attorneys cannot warrant or guarantee they can procure a Funder to fund the Litigation Expenses.  In the event Attorneys are not successful in procuring a Funder, Client and Attorneys will sit down and determine how the matter can move forward. Client realizes that Attorneys will be investigating the law and facts applicable to Client's Claim and\or Causes of Action, on a continuing basis and should Attorneys learn something which in the opinion of Attorneys make it impractical for Attorneys to proceed with the handling of Client's Claim or the Litigation, if any, then Attorneys may withdraw from further representation of Client by sending written notice to Client's last known address.

5.02    In addition to any other representations and warranties in this Agreement, Client hereby represents and warrants that:

i.      Client legally and beneficially owns 100% of the Claims and has not assigned, transferred, or encumbered any right, title, or interest in or to the Claims other than as set forth in this Agreement.

ii.     Client has the unfettered right to pursue the Claims against Defendants, including, but not limited to, the exclusive right to (a) prosecute litigation, (b) enforce all rights, and (c) recover all damages in connection with the Claims, subject to possible setoff by Defendants.

iii.    Client is not aware of any other claims the Meta Materials Inc. estate may have against Defendants that arise from the transactions and occurrences underlying the Litigation, other than the Claims disclosed to Attorneys to be asserted in the Litigation.

iv.     Client did not intentionally omit any material information she possesses with respect to the Claims in connection with the Attorneys' analysis thereof.

v.      Subject to Bankruptcy Court approval, Client has full authority to enter into this Agreement and bind Client to all of its terms, none of which will (a) violate any other agreement of Client, (b) violate any applicable law, or (c) require any notice or approval of any third party.

vi.     Other than those claims disclosed to Attorneys to be asserted by Defendants against Client as of the Effective Date, Client is not aware of any compulsory or permissive claims that could be brought by one or more of the Defendants against Client, and Client has used reasonable best efforts to disclose in writing to the Attorneys all transactions or agreements she currently has or has had with any Defendant.

vii.    Client has consulted with independent legal counsel (separate from the Attorneys) regarding this Agreement and is fully advised with respect to Client's obligations and rights with respect hereto. Client acknowledges that Client has had sufficient time to review and consult with other attorneys considering this Agreement.

viii.   Client acknowledges that litigation is unpredictable and the Attorneys make no assurances as to any results or outcome of the Claims or Litigation.

ix.   Client acknowledges that, although the Attorneys may offer opinions concerning the possible results of the Litigation, the Attorneys cannot guarantee any particular result. Client acknowledges that the Attorneys have made no promises on such a subject and that any opinion offered by the Attorneys in the future will not constitute a guarantee.

5.03   In addition to the covenants set forth elsewhere in this Agreement, Client hereby covenants that so long as this Agreement remains in effect:

i.   Client shall not assign, transfer, or encumber any right, title, or interest in the Litigation Proceeds without the prior written consent of Attorneys.

ii.   Client shall (a) fully comply with all reasonable requests of the Attorneys in the pursuit of recovery in the Litigation, and (b) reasonably seek to maximize the monetary value of the Claims; *provided that* Client may defer to the advice of Attorneys, including with respect to settlement. For example, and without limitation, Client agrees (a) to allow the Attorneys reasonable and timely access to Client and his records to facilitate the provision of legal services by the Attorneys, (b) to use reasonable best efforts to provide the Attorneys with all information and documents in the possession of Client or any entities or persons affiliated with Client, (c) to fully cooperate with the Attorneys in the prosecution of the Claims and Litigation, (d) to appear on reasonable notice, and at Client's expense, for any and all depositions and court appearances at which Client's attendance is reasonably required or ordered, and (e) to comply with all reasonable requests of the Attorneys in connection with the preparation and presentation of the Claims and Litigation.

iii.   Client shall not knowingly, without the prior written consent of the Attorneys, which consent may be withheld in the Attorneys' sole and absolute discretion, take any action or inaction or permit any Person controlling, controlled by, or under common control with him ("Affiliates") or his agents, to take any action or inaction that will in any way create any circumstance which may or could: (a) interfere with the Attorneys' ability to pursue the Claims, (b) diminish the expected recovery of the Claims, or (c) provide, either directly or indirectly, a defense to the Claims.

iv.   Client shall not accept any proposed compromise or settlement of the Claims with any individual, entity, group, or organization ("Person") without first consulting with and making full disclosure to the Attorneys. Client shall cooperate in good faith regarding any proposed compromise or settlement of the Claims. Client and the

Attorneys shall not offer or accept a settlement without one another's mutual discussion.

## VI.    INTENTIONALLY OMITTED

## VII.  COOPERATION OF CLIENT

7.01    Client agrees to cooperate with Attorneys at all times and to comply with all reasonable requests of Attorneys.  Client further agrees to keep Attorneys advised of his/her whereabouts at all times, and to provide Attorneys with any changes of address, phone number or business affiliation.

7.02    Attorneys or either of them may, at his/her option, withdraw from the case and cease to represent the Client should Client fail to comply with any portion of this Agreement or should Attorneys or either of them decide that he or she cannot continue to be involved in this case.  Such withdrawal will be effective by mailing written notice to Client's last known address.

## VIII. ASSOCIATION OF OTHER ATTORNEYS

8.01    Attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client.  Client understands that Attorneys are limited liability partnerships with a number of attorneys.  Several of those attorneys may work on Client's case.

## IX.  WITHDRAWAL OR REPLACEMENT OF ATTORNEYS

9.01    Attorneys accept employment on the condition that if, after investigation, research, and analysis, it ever appears to Attorneys that (a) Client's Claim is probably not recoverable, or (b) the pursuit of Client's Claim is no longer economically feasible or advisable, the Attorneys may with withdraw (such withdrawal, a "Reduced Success Withdrawal"),.  Attorneys may also withdraw if (1) Client fails to reasonably assist and cooperate with Attorneys or Client's conduct makes it unreasonably difficult for Attorneys to carry out their representation effectively; (2) Client fails or refuses to comply with this Agreement; (3) Client fails or refuses to comply with a matter regarding settlement set out in Paragraph 4, including, without limitation, its obligation to act in good faith in settlement discussions or when making settlement decisions; (4) sues Attorneys or threatens to do so or files a grievance or threatens to do so; (5) Client abandons prosecution of the Claims other than on account of the reasons set forth in (a) and (b) of the previous sentence, or (6) a legally prohibited conflict of interest has arisen; each of the foregoing (1) – (6) shall constitute "Good Reason".  Attorneys may withdraw from the representation of Client without further obligation or liability by first sending Client written notice by U.S. Mail, Certified Return Receipt, to Client's last known address that personally gives Client 30 days to hire new attorneys.  The act of firing, replacing, or terminating Attorneys Cause is the equivalent of withdrawal for Good Reason.

9.02    Since Attorneys will quite likely have done much work and\or paid or incurred liability for huge amounts of Litigation Expenses should Attorneys be fired or replaced by Client other than for Cause or should Attorneys withdraw for Good Reason, there must be fair provisions

for repayment to Attorneys its hard dollars and/or time spent developing the case. If Attorneys withdraw for Good Reason or are replaced other than for Cause, Client will hire another law firm ("new attorneys") to handle their claims by an agreement that the Client or new attorneys shall first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; and the Attorneys will be paid as attorneys' fees at the time of settlement or recovery a percentage of the contingent fees provided for in Paragraph 2.01 above (with credit applied to avoid double recovery) with the new attorneys to share in the portion of Litigation Proceeds allocated to Client pursuant to Paragraph 2.01. In the event Attorneys withdraw other than for Good Reason or should Client replace or fire Attorneys for Cause, Client will hire a new attorney to replace Attorneys and to handle Client's Claim by an agreement that requires new attorneys and\or Client to first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; or else Attorneys will have a first lien on any settlement or recovery requiring that all Litigation Expenses that Attorneys paid or incurred liability to pay are to be repaid and reimbursed first out of any settlement or recovery and that, as attorney fees, Attorneys will be paid at the time of settlement or recovery all of its Litigation Expenses included the reasonable value of the legal services it provided to Client; and any further recovery under 2.01(ii)-(iv) shall be proportionally reduced.. For the avoidance of doubt, if Attorneys are terminated (whether or not for Cause) or withdraw (whether or not for Good Reason) Attorneys shall have no further obligations toward the Commitment or the funding of any Litigation Expenses.

9.03    Notwithstanding Paragraph 9.02 or anything herein to the contrary, in the event of a Reduced Success Withdrawal, then the amounts and percentages distributable to the Attorneys under Paragraph 2.01 shall be proportionally reduced to reflect the percentage that the Litigation Expenses at the time of such Reduced Success Withdrawal bears against the Commitment.

## X.  TEXAS LAW TO APPLY

10.01  This Agreement shall be construed under and in accordance with the laws of the State of Texas, and the rights, duties and obligations of Client and of Attorneys regarding Attorneys' representation of Client and regarding anything covered by this Agreement shall be governed exclusively by the laws of the State of Texas law without regard to choice-of-law or conflict-of-law principles.

## XI.  ARBITRATION

11.01  Any and all disputes, controversies, claims or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by Attorneys to Client or (4) the relationship between Attorneys and Client, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association. Client shall not file a class action against Attorneys or seek to assert any claim or demands against Attorneys by or through a class action, either as the named plaintiff or as a member of the class, but rather shall submit his/her claims or demands to binding arbitration pursuant to the provisions of this ARTICLE XI. For the avoidance of doubt, any and all gateway issues of arbitrability are delegated to the arbitrators. Any such arbitration

proceeding shall be conducted in Harris County, Texas. This arbitration provision shall be enforceable in either federal or state court in Harris County, Texas pursuant to the substantive federal laws established by the Federal Arbitration Act. Any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered by any federal or state court in Harris County, Texas having jurisdiction.

## XII. BANKRUPTCY PROVISIONS

12.01   All parties acknowledge that Client is the chapter 7 trustee under Case No. 24-50792 in Reno, Nevada. As such, all obligations hereunder are conditioned on the Bankruptcy Court approving all terms and conditions.

## XIII.  PARTIES BOUND

13.01   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representative, successors and assigns.

## XIV.  LEGAL CONSTRUCTION

14.01   In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. Capitalized Terms used but not defined herein shall have the meanings set forth on Schedule I hereto.

## XV.  DISPOSITION OF FILES

15.01   The files of the Client will be retained for two (2) years after Attorneys' representation has been completed, and then will be discarded, except for information that Attorneys may need in the future. Client shall, however, promptly pick up all material furnished to Attorneys, and Attorneys shall have no responsibility for retaining Client's information and documents after the case has been closed for forty-five (45) days.

15.02   If the arrangement between Attorneys and Client is terminated for any reason, then Client shall be entitled to all or any part of Client's papers and property that Client desires. Attorneys shall be entitled to a copy of all or part of the file, at Attorneys' expense.

15.03   Independent Determination of Fairness and Reasonability. Client acknowledges that (a) Attorneys did not act as counsel to Client in preparing or negotiating this Agreement; (b) Client has made sufficient investigation to determine that this Agreement is fair and reasonable; (c) this Agreement was the subject of arm's length negotiation between Client and Attorneys; (d) Client has had ample opportunity to review the Agreement independently and with separate counsel; and (e) Client is entering into this Agreement freely and voluntarily.

## XVI. PRIOR AGREEMENTS SUPERSEDED

16.01   This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreement between the parties respecting the within subject matter.

I certify and acknowledge that I have had the opportunity to read this Agreement.  I further state that I have voluntarily entered into this Agreement fully aware of its term and conditions.

Signed and accepted this 30th day of October, 2024.


*CLIENT:* META MATERIALS INC.

BY:  */s/ Christina W. Lovato*
　　　Christina W. Lovato, Trustee

CHRISTIANATTAR

James. W. Christian

KASOWITZ BENSON TORRES LLP

Stephen W. Tountas

## SCHEDULE I TO RETENTION AGREEMENT

## <u>DEFINITIONS</u>

"<u>Business Deal</u>" shall mean any agreement involving the Claims entered into by Client and any Person, whereby such Person provides a direct or indirect benefit to Client including, without limitation, any transaction with any Defendant.

"<u>Cause</u>" shall mean either (a) the Attorneys are in material breach of any material term of the Retention Agreement, which is not cured within fourteen (14) calendar days after the Attorneys' receipt of written notice from Client (such written notice must set forth with specificity such breach), or (b) the Attorneys have has committed gross negligence or willful misconduct in pursuit of the Claims.

"<u>Claims</u>" shall mean all current and future claims, suits, causes of action, and other rights of Client which are or may be asserted or alleged in the Litigation, or arising from, relating to, or based on the Litigation or any transactions or occurrences underlying the Litigation.

"<u>Litigation Expenses</u>" means any out-of-pocket expenses (and not in-house costs) incurred by any of the Attorneys in connection with the Litigation, or otherwise reflected in the budget, as well as the hourly fees of the Attorneys (based on lodestar).

"<u>Litigation Proceeds</u>" shall mean the gross total economic value of any compensation (whether tangible, intangible, monetary, or otherwise) to which Client or Client's Affiliates, successors, and/or assigns (including any party on behalf of any of the foregoing) become entitled, receive, or are relieved from making related to the Claims (including, without limitation, any Business Deal, and/or Court-awarded fees/costs). For the sake of clarity, Litigation Proceeds shall not be offset, without limitation, due to taxes and tax withholding. All non-cash Litigation Proceeds shall be valued based on their fair market value as determined by a third-party appraiser.

## EXHIBIT A
### Budget

| Milestone (Hourly Fees) | Law Firm Payment (flat fees) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Payment at closing for all research, memo, due diligence: | $250,000.00 | | | | | | | $250,000.00 |
| Filing of complaint: | $150,000.00 | | | | | | | $150,000.00 |
| Draft reply, Sur-reply, research, attend hearing, etc. (motion to dismiss) | $200,000.00 | | | | | | | $200,000.00 |
| Commencement of discovery (provided that MTD is at least partially successful): | $150,000.00 | | | | | | | $150,000.00 |
| Various motions to compel, objections, hearings, etc...: | $75,000.00 | | | | | | | $75,000.00 |
| Taking all depositions, motions to compel, etc...Meet and Confer | $150,000.00 | | | | | | | $150,000.00 |
| Completion of general discovery: | $200,000.00 | | | | | | | $200,000.00 |
| Amount of expert discovery, including discovery preparation, draft reports, review evidence, etc | $200,000.00 | | | | | | | $200,000.00 |
| Completion of all discovery, including experts: | $300,000.00 | | | | | | | $300,000.00 |
| Commencement of summary judgment briefing and motions: | $300,000.00 | | | | | | | $300,000.00 |
| After successful ruling on motion for summary judgment | $200,000.00 | | | | | | | $200,000.00 |
| Prepare witnesses: | $200,000.00 | | | | | | | $200,000.00 |
| Draft direct and cross examination questions: | $200,000.00 | | | | | | | $200,000.00 |
| Prepare exhibit list: | $100,000.00 | | | | | | | $100,000.00 |
| Draft all briefs: | $150,000.00 | | | | | | | $150,000.00 |
| Prepare for and attend pre-trial hearings: | $100,000.00 | | | | | | | $100,000.00 |
| Prepare jury charge and charge conference: | $50,000.00 | | | | | | | $50,000.00 |
| Attend trial (3 associate lawyers): | $510,000.00 | | | | | | | $510,000.00 |
| Additional fees for expanded discovery issues | $1,800,000.00 | | | | | | | $1,800,000.00 |
| **TOTAL HOURLY FEES:** | **$5,285,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$5,285,000.00** |

| Milestone (Costs) | Law Firm Payment (capped amount) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Court reported deposition experts: | $250,000.00 | | | | | | | $250,000.00 |
| Flights, hotels, meals, etc...: | $175,000.00 | | | | | | | $175,000.00 |
| Liability experts: Spoofing and NSS | $2,500,000.00 | | | | | | | $2,500,000.00 |
| Damage experts: | $2,000,000.00 | | | | | | | $2,000,000.00 |
| Two focus groups: | $150,000.00 | | | | | | | $150,000.00 |
| Special master for discovery/Mediator | $200,000.00 | | | | | | | $200,000.00 |
| Third party data: | $200,000.00 | | | | | | | $200,000.00 |
| SEC/DTC expert: | $150,000.00 | | | | | | | $150,000.00 |
| Consulting | $100,000.00 | | | | | | | $100,000.00 |
| Multi-media preparation | $40,000.00 | | | | | | | $40,000.00 |
| Contingency for expenses: | $750,000.00 | | | | | | | $750,000.00 |
| **TOTAL COSTS (CAP):** | **$6,515,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$6,515,000.00** |
| **TOTAL COSTS (CAP):** | **$11,800,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$11,800,000.00** |

# EXHIBIT 6



**U.S. Securities and Exchange Commission**

Home / Newsroom / Press Releases / SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations

PRESS RELEASE

# SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations

**FOR IMMEDIATE RELEASE** | 2024-77

Washington D.C., June 25, 2024 — The Securities and Exchange Commission today filed charges against Meta Materials Inc. and its former CEOs, John Brda and George Palikaras. The company has agreed to settle the SEC's charges in an administrative proceeding, while the SEC's litigation against Brda and Palikaras will proceed in federal district court.

The SEC's complaint against Brda and Palikaras alleges that, as a result of a concerted market manipulation scheme, Meta Materials, a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada, raised $137.5 million from investors in an at-the-market (ATM) offering in June 2021 immediately prior to the merger of Brda's Torchlight Energy Resources Inc. and Palikaras' Metamaterial Inc. that formed Meta Materials.

The SEC's complaint, filed in U.S. District Court for the Southern District of New York, alleges that Brda and Palikaras planned and conducted the manipulative scheme that included, among other things, issuing a preferred stock dividend immediately before the merger. The complaint alleges that Brda and Palikaras told certain investors and consultants — and hinted via social media — that the dividend would force short sellers to exit their positions and trigger a "short squeeze" that would artificially raise the price of the company's common stock. The SEC further alleges that Brda and Palikaras also misrepresented the company's efforts to sell its oil and gas assets and distribute proceeds to preferred stockholders, giving investors a false impression of the value of the dividend. While investors held or bought the company's common stock to receive the dividend, the complaint alleges, the company was cashing in by selling $137.5 million in an ATM offering at prices that the company, Brda, and Palikaras knew were temporarily inflated by their manipulative scheme. "We have two days," the complaint alleges Brda told Palikaras after the first day of the ATM offering, "to take advantage of the squeeze…"

"The conduct we allege was a sophisticated, yet brazen plan by a public company and its former CEOs to purposely mislead investors in the company's stock," said Eric Werner, Director of the SEC's Fort Worth

Regional Office. "This conduct is particularly alarming because it involves public-company CEOs who were more concerned with 'burning the shorts' than creating long-term value for shareholders."

The SEC's complaint charges Brda and Palikaras with violating the antifraud and proxy disclosure provisions of the federal securities laws, and charges Brda with aiding and abetting Meta Materials's violations of the reporting, internal accounting controls, and books and records provisions. The complaint seeks permanent injunctions, officer-and-director bars, and civil penalties from both defendants. The complaint also seeks disgorgement with pre-judgment interest from Brda.

The SEC also instituted a separate administrative proceeding against Meta Materials, entering a settled order finding that Meta Materials violated the antifraud, reporting, internal accounting controls, and books and records provisions of the federal securities laws. Without admitting or denying the findings, Meta Materials was ordered to cease and desist from violations of the relevant provisions of the federal securities laws and to pay a $1,000,000 penalty.

The SEC's investigation was conducted by Christopher Rogers and Ty Martinez of the SEC's Fort Worth Regional Office under the supervision of Samantha Martin, B. David Fraser, and Mr. Werner. The SEC's litigation against Brda and Palikaras will be conducted by Patrick Disbennett and supervised by Keefe Bernstein.

A separate Commission investigation regarding subsequent events related to Meta Materials (MMTLP) remains ongoing. If you are an individual with information related to this investigation or any other related suspected fraud and you wish to contact the SEC staff, please submit a tip at SEC.gov (https://www.sec.gov/tcr).

###

Last Reviewed or Updated: July 2, 2024

## RESOURCES

- **SEC Complaint**
- **SEC Order**

# EXHIBIT 7

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 11292 / June 25, 2024**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 100415 / June 25, 2024**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21976**

| | |
|---|---|
| **In the Matter of**<br><br>    **META MATERIALS, INC.**<br>    **(f/k/a TORCHLIGHT**<br>    **ENERGY RESOURCES,**<br>    **INC.)**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Meta Materials, Inc. ("Respondent").

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

# III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

1.      In June 2021, Respondent raised $137.5 million in an at-the-market offering (the "ATM Offering"). Leading up to the offering and in connection with a merger, Respondent engaged in a scheme to inflate the price of its stock and defraud investors through numerous material misstatements and omissions about the potential value of a stock dividend to be issued as part of the merger. As a result of its fraudulent conduct, Respondent sold 16.2 million shares during its ATM Offering for tens of millions of dollars more than it could have absent its efforts to inflate its stock price.

2.      Respondent artificially inflated the value of its common stock by structuring a merger between its predecessor entities (Torchlight Energy Resources and Metamaterial Inc.) to include an unregistered preferred stock dividend that would not be immediately publicly tradeable (the "Preferred Dividend"), specifically designed to cause a "short squeeze." Respondent privately and selectively disseminated—through paid consultants, private conversations with investors, and via social-media messages—the theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers in Respondent's stock to cover their positions before Torchlight issued the Preferred Dividend or risk violating their short contracts by having difficulty delivering the Preferred Dividend when the merger closed. But Respondent never disclosed in its public filings its intent to cause a short squeeze, and it waited until the last minute to announce the ATM Offering to capitalize on what Respondent believed would be a short-term price inflation of its stock.

3.      In support of its scheme, Respondent made false and misleading statements about the Preferred Dividend, which entitled its holders to receive the net proceeds of the sale of Respondent's oil and gas assets. In its public filings, Respondent misrepresented the status of its efforts to market and sell those assets while concealing a planned spin-off of the assets into a new entity. Further, in May 2021, Respondent's incoming Chief Executive Officer baselessly claimed that the value of the Preferred Dividend could be between $1 and $20 per share when, in fact, a valuation study by Respondent's investment bankers only supported a per-share value range of $0.03 to $0.83.

4.      Respondent's scheme occurred against the backdrop of a lax internal control environment. Respondent failed to devise and maintain internal accounting controls and make and keep adequate books and records by failing to account properly for the disposition of corporate assets or the recognition of legitimate expenses related to a series of payments made to stock promoters who rendered services to the company without any documentation. In addition, Respondent paid consulting fees designed to conceal the recruitment and compensation of a team

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity at the same time that Respondent touted in its public statements its intention to make efforts to sell the oil and gas assets and distribute the net proceeds to Preferred Dividend holders.

## Respondent

5.     Meta Materials, Inc. ("Meta II" or "Respondent") is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021 through a reverse merger between: (i) Torchlight Energy Resources, Inc. ("Torchlight"), a publicly traded Texas corporation headquartered in Plano, Texas that purported to be in the business of oil and gas exploration and production, then listed on the Nasdaq under the ticker symbol "TRCH"; and (ii) Metamaterial, Inc. ("Meta I"), a Canadian headquartered company then listed on the Canadian Securities Exchange and focused on early-stage applied materials technology research and development. Today, Meta II's common stock, which trades under the Nasdaq ticker symbol "MMAT," is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Concurrent with the merger, Torchlight issued the Preferred Dividend to Torchlight shareholders of record as of June 24, 2021, and Torchlight shares became Class A Preferred Shares of Meta II after the merger closed.

## Other Relevant Individuals

6.     John A. Brda, age 59, resides in St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. Post-merger, Brda held a consulting role with Meta II through late 2022.

7.     Georgios "George" Palikaras, age 42, is a Greek citizen who resides in Halifax, Nova Scotia, Canada. From 2011 to 2021, Palikaras was Meta I's President & CEO. Upon Meta II's creation, Palikaras became President & CEO of Meta II and served on its board of directors ("Board"). In October 2023, Meta II terminated Palikaras and he subsequently resigned from the Board.

## Background

### Torchlight's Plan to Use a Preferred Dividend to Cause a Short Squeeze

8.     In early 2020, after selling off essentially all of its revenue-generating oil and gas properties, Torchlight faced an uncertain future: its stock traded below $1.00 per share, Nasdaq issued a delisting warning, and its auditors issued a going-concern warning. In response to Torchlight's predicament, Brda, Torchlight's CEO, implemented a plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but not its remaining oil and gas assets;

3

- Issue a Preferred Dividend in the form of preferred stock that would not be listed or traded on any exchange as part of the merger structure, ostensibly to allocate proceeds from the sale of Torchlight's remaining oil and gas assets to legacy Torchlight shareholders;

- Market and promote the Preferred Dividend to emphasize to the market that short sellers would have difficulty obtaining the Preferred Dividend without owning Torchlight stock, thus pressuring short sellers to close their positions or obtain Torchlight stock before the record date for the Preferred Dividend ("Record Date"), temporarily inflating the price of Torchlight's common stock;

- Leverage the resulting inflated common stock price to raise capital through an ATM Offering and remove debt through debt conversion; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's remaining oil and gas leases.

9. Brda explained his plan—including the use of the Preferred Dividend to pressure short sellers—to members of Torchlight's Board of Directors, its investment banker, and several prospective merger partners, including Palikaras and the Meta I Board of Directors. From its earliest conception, in brainstorming the plan with Torchlight's Chairman and its lead banker in June 2020, Brda explained that, "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover." Also in June 2020, Brda explained to a potential merger partner that he expected Torchlight's stock price to increase "temporarily because of the short squeeze" while acknowledging that the resulting price increase would be "unsustainable." In initial merger discussions, Brda explained to Palikaras how the deal structure could create a short squeeze and the plan to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

**Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative**

*Brda Caused Torchlight to Make Public Statements to "Play Up" the Preferred Dividend*

10. Torchlight never directly disclosed in any public filing the full scope of Brda's plan to use the Preferred Dividend to create a short squeeze. In Torchlight's 2020 Form 10-K filed March 18, 2021, Torchlight disclosed that "[t]he market price of our common stock may be influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." However, Torchlight did not publicly disclose that the Preferred Dividend could cause a short squeeze, much less that the Preferred Dividend was designed to create a short squeeze or that the ATM Offering was conducted to "take advantage of the squeeze." Instead, Torchlight's 2020 Form 10-K stated that "we have no reason to believe our shares would be the target of a short squeeze," which was directly contrary to the statements that Respondent and its executives made privately about the Preferred Dividend and the plan to create a short squeeze.

4

11.     Instead, in reports filed with the Commission and in public statements, Brda and Torchlight focused attention on the Preferred Dividend and the supposed net profits from the sale of Torchlight's oil and gas assets that Preferred Dividend holders could expect to receive, highlighting the Preferred Dividend in the announcement of the merger, the announcement of a final signed merger agreement, and the proxy filings concerning the merger. Torchlight also emphasized in its proxy filings that the Preferred Dividend would not be registered, would not be listed on any national exchange, and would not be "freely transferrable" unless an exemption applied. Brda believed that once short sellers understood it would be difficult acquire the Preferred Dividend in the market, they would be forced to cover their short positions in Torchlight because they would otherwise have difficulty obtaining the Preferred Dividend to comply with the terms of their short contracts, which would require them to deliver the proceeds or equivalent value of an in-kind dividend like Torchlight's Preferred Dividend. The company planned to leverage this short-covering activity by issuing shares via an ATM Offering and removing debt through equity conversions. But neither Torchlight nor Brda explained the full plan in public; rather, they selectively disseminated portions of the plan through consultants, via hints dropped on social media, and to select investors.

*Torchlight and Brda Used Consultants to Spread Their Short Squeeze Theory to Investors*

12.     Torchlight paid individual consultants to communicate with Torchlight's current or potential shareholders. Through these consultants—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated selective information about the merger to investors. For example, Brda emailed two of the consultants a slide presentation containing the plan to "[p]lay up the dividend to make sure the shorts understand their dilemma."

13.     On the day that Torchlight and Meta I announced their letter of intent to merge, Brda forwarded the consultants a draft press release announcing the merger, complaining that the stock price had not moved enough, "I think people don't understand the dividend properly." On September 21, 2020, Brda forwarded to two consultants the press release that Torchlight issued that day, announcing that it had entered into a letter of intent with Meta I to merge, and the following exchange occurred:

**Brda:** We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.

**Consultant:** Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?

**Brda:** I think people don't understand the dividend properly.

**Consultant:** I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

14.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote, "[w]e all knew [the shorts] would come

5

after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them."

15.    Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Torchlight kept no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative in Communications with Select Investors and Select Prospective Investors*

Virtual Investor Conference

16.    During Spring 2021, Brda and Palikaras conducted meetings with investors through conferences organized by Torchlight's financial advisors. From March 16-18, 2021, Brda and Palikaras met with a series of institutional investors at a virtual investor conference. During these meetings, Brda and Palikaras pitched the justification for the merger to one investor group at a time, and Brda explained to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze and Torchlight's plan to conduct a substantial ATM Offering concurrent with the merger close. In contrast, Torchlight never disclosed in its public filings the Preferred Dividend's potential impact on short sellers, and it waited to publicly disclose the ATM Offering until June 16, 2021.

Italian Investor Call

17.    In May 2021, Torchlight's investor relations firm set up several virtual meetings with a group of Italian shareholders that Torchlight believed held more than one million shares of its common stock. Brda attended one of the meetings, and Palikaras attended another. The stated purposes of the meetings were to solicit the Italian shareholders' proxy votes in favor of the merger and to encourage the investors to hold the common stock of the post-merger company. During his May 13, 2021 meeting with Italian shareholders (the "Italian Investor Call"), Palikaras described the plan to use the Preferred Dividend to create a short squeeze on several occasions, for example:

And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing…** As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … **the close**, **it's called a short squeeze**… (emphasis added).

18.    On June 7, 2021, a user posted on social media a screenshot purporting to show that the user recorded the Italian Investor Call. The user claimed they participated in the call and summarized their takeaways, including that the Preferred Dividend would "create a short squeeze as there are many short stocks to cover before the merger!!" Three days later, a Reddit user posted a partial audio recording of Palikaras's comments during the Italian Investor Call, including the plan to create a short squeeze.

6

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative, Including on Social Media*

19.     Palikaras and Brda also used Twitter to tout the Preferred Dividend and short squeeze theory. For instance, on June 7, 2021, one week before Torchlight announced the Record Date, Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze…yet. Just my two cents. ***Once it happens*** that's ok as it is fact, but [if you do it] before you are putting yourself at risk for potentially speculative content." (emphasis added).

20.     Six days later, the day before Torchlight announced the Record Date, Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets and public statements designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock:



21.     Palikaras's tweet received several public replies connecting the tweet to the short squeeze theory. For example, one user responded, "You should set the price of the shorts the price of TRCH at the end of the short squeeze." Another wrote, "We definitely get the reference 'Shorts Are Getting Burne[d].'"

22.     The next day, on June 14, 2021, Torchlight issued a press release announcing the Record Date (June 24, 2021), kicking off the sequence of events that culminated in the ATM Offering.

**Torchlight, Brda, and Palikaras Misrepresented the Value of the Preferred Dividend**

23.     To support their efforts to manipulate the market for Torchlight's common stock and encourage investors to buy or hold Torchlight's common stock, Torchlight and Brda misrepresented the likelihood of a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. They encouraged investors to buy or hold Torchlight's common stock by: (1) Torchlight and Brda giving the false impression in public filings and statements that Torchlight would undertake commercially reasonable efforts to sell the oil and gas assets; (2) Torchlight and Brda referencing the net proceeds that would be distributed to Preferred Dividend holders following the sale; and (3) Palikaras providing a wholly unsupported per-share value estimate (between $1 and $20) of net proceeds payable to Preferred Dividend shareholders that became a widely circulated talking point on social media.

*Torchlight and Brda Misrepresented Ongoing "Commercially Reasonable Efforts" to Sell Torchlight's Oil and Gas Assets and Distribute "Net Proceeds" in Proxy Filings and Forms 8-K*

24.     In public filings leading up to the merger, particularly in its preliminary and final proxy materials soliciting shareholder approval, Torchlight bolstered the potential value of the Preferred Dividend by misrepresenting that it would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to Class A Preferred Shareholders within six months of the merger closing. In total, Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets seven or eight times in each version of the proxy filings. And, references to the net proceeds to be distributed to preferred shareholders repeatedly appeared in press releases throughout the period that the merger was pending, including press releases dated April 15, 2021, May 3, 2021, and June 14, 2021 subsequently attached to current reports filed with the Commission.

25.     In reality, Torchlight had no prospects to sell the oil and gas assets. Torchlight made no effort to lay the groundwork for a sale when it made the aforementioned statements. The company's records contain no evidence of any communications with specific prospects from any time in 2020 or 2021. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of very large oil companies would be viable candidates to purchase Torchlight's assets. Even Brda acknowledged that only "very specialized buyers" would be interested in Torchlight's assets and that it would take from up to a year to a year and a half to complete the sale considering the due diligence a specialized buyer would need to undertake. Torchlight's long-time investment banker, who was not retained to sell the oil and gas assets, believed that it could take two to three years to complete such a sale.

26.     To the contrary, as early as December 2020, Brda had already begun planning a spin-off of the oil and gas assets into a new entity. Just days after Torchlight and Meta I signed the definitive agreement for the merger, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity, "Next Bridge Hydrocarbons, Inc." Then, in January 2021, Brda and Torchlight began paying $20,000 a month (through an

8

intermediary who received "consulting fees" for doing no actual work) to individuals who would form the initial management team of Next Bridge Hydrocarbons.

27.    By August 17, 2021, less than 60 days after the merger closed, Meta II's board voted to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible. Then, in December 2022, Meta II spun out the oil and gas assets into a new company—Next Bridge Hydrocarbons—the same entity name that Brda identified when he first began to plan for a spin-off transaction in December 2020.

*Palikaras's False Claim About the Value of the Preferred Share Dividend*

28.    On the May 13, 2021 Italian Investor Call, where Palikaras described the short squeeze to a select group of investors, he also made false and misleading statements about Torchlight's efforts to sell its oil and gas assets, and the potential values of a cash distribution of the net proceeds from that sale.

29.    During the call, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that those buyers were "top tier," when, in fact, Torchlight had not identified any potential buyers and Palikaras admitted that he had no knowledge of potential buyers or active negotiations.

30.    Palikaras also mentioned on the Italian Investor Call that, "according to the analysis," the value of the Preferred Dividend could be between $1-$20 per share. The $1-$20 range was wholly unsupported by a valuation study performed by Torchlight's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share. Palikaras's reference to an "analysis" gave investors the misleading impression that his value range was supportable when it was not.

31.    These statements by Palikaras quickly became a topic of discussion on social media, continuing to drive mentions throughout the ATM offering period. A common refrain on social media was that the company's CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share.

32.    After the merger, Meta II's VP of Business Development emailed Palikaras and other Meta II leadership about an investor complaint citing the $1-$20 dividend range. In the email, the VP stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares."

*Torchlight, Brda, and Palikaras Misled Investors about the Preferred Dividend.*

33.    The false and misleading statements by Torchlight, Brda, and Palikaras made investors believe that Meta II could quickly monetize the oil and gas assets and distribute the net proceeds to Preferred-Dividend holders post-merger. This belief incentivized Torchlight shareholders to acquire or hold the common stock through the Record Date so they would be

eligible to receive the Preferred Dividend. On July 21, 2021, just weeks after the merger closed, Meta II's CFO emailed Palikaras about the importance of demonstrating to the marketplace that Meta II took steps to diligently pursue a purchaser for the oil and gas assets before proceeding to a spin-off given the "preferred holders who are expecting to see cash for their shares."

34.     As it became clear that Meta II would not immediately pay Preferred Dividend holders any net proceeds and that no Torchlight asset sale (or net proceeds therefrom) were forthcoming, investors began to complain. One investor emailed Palikaras directly on August 15, 2021, suggesting that Meta II issue stock to Preferred Dividend holders "somewhere near the middle of the proposed $1 - $20 dividend range" to "help take the sting away."

**Torchlight's Market Manipulation Scheme Caught Fire**

35.     Brda and Palikaras privately celebrated as Torchlight's stock became a hot topic of conversation on social media in the days before the merger. Users on platforms from Twitter to Stocktwits to YouTube to Reddit discussed the merger, the Preferred Dividend, and the short squeeze. On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY," which succinctly summed up the plan: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain, "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras's "shorts-in-flames" tweet from the day before.

36.     Social media users posted the hashtag and versions of the graphic dozens of times in the days surrounding the Record Date announcement. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock by June 22, 2021 to benefit from the supposed short squeeze and the Preferred Dividend worth $1-$20 per share, using other hashtags, subreddits, and iterations on the short squeeze theory.

37.     Palikaras celebrated the "#TORCHDAY" campaign's impact on the price of Torchlight's stock and what it portended for the plan to use the ATM Offering to capitalize on the attention, texting Brda: "To the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." (emphasis in original). Brda agreed: "I think we can get there, just need to have diamond hands."

38.     The trading volume in Torchlight's common stock dramatically escalated as the merger approached. In May 2021, the average trading volume was five million shares per day. But, between the announcement of the Record Date on June 14 and the deadline to purchase Torchlight stock in order to obtain the Preferred Dividend on June 22, the average trading volume exceeded 80 million shares per day.

39.     On June 14, 2021, the day after Palikaras made his "shorts-in-flames" tweet, Torchlight issued a press release, announcing the Record Date of June 24, 2021. Palikaras issued a

tweet, linking the press release and promoting the June 24th record date: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Investors following Torchlight understood Palikaras's tweet to mean that the supposed key to ensuring the short squeeze and obtaining the Preferred Dividend that Palikaras touted would be worth $1—$20 per share was to buy or hold Torchlight stock by or through June 22, 2021. Torchlight's stock price immediately reacted, jumping from $3.58 to $5.07. It would reach $10.88 in the days leading up to the June 25 merger close.

### Torchlight Profited from Its Manipulation of Torchlight's Stock Price Using the ATM Offering

40. Torchlight's Board, Meta I's Board, Brda, and Palikaras discussed their intention to raise funds at artificially inflated prices in a series of exchanges that occurred on the eve of the ATM Offering. As Torchlight's stock price rose after the announcement of the Record Date, Brda demanded a *quid pro quo* from Meta I: Torchlight (and Brda) would not go forward with the long-planned ATM Offering unless a portion of the funds raised by the ATM Offering would  go toward drilling oil wells to maintain Torchlight's oil and gas leases.

41. In a memo to the Meta I team, Brda explained that Torchlight's Board would not agree to conduct the ATM Offering without assurances that they would receive the *quid pro quo* that they requested:

> We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… *Otherwise, we have no inclination to raise capital now* as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added)

42. Palikaras and Meta I's CFO recommended to Meta I's Board that they approve conducting the ATM Offering, stating "all [Meta's advisers] *strongly recommended we take as much of the money as we can ahead of the closing*." (emphasis added). And although the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

43. Although Meta I did not formally agree to Brda's demands, Meta II ultimately did enter into an agreement with Brda post-merger regarding an amount to fund drilling for the oil and gas assets—consistent with Brda's original plan and part of his scheme.

44. The day after Torchlight's stock price increased dramatically in response to the news of the Record Date announcement, Torchlight executed a sales agreement with an investment bank to conduct the ATM Offering. As a result of the ATM Offering, Torchlight sold 16.2 million shares of common stock between June 18 and June 24, at an average price of $8.50 per share,

raising $137.5 million. Over 95% of that volume was sold prior to the "T plus 2" date of June 22, 2021.

45.    Torchlight's stock reached its highest price around the "T plus 2 date" of June 22, 2021 just as Torchlight, Brda, and Palikaras predicted. But after closing at $9.92/share on June 21st, and $7.00/share on June 22nd, the stock price fell dramatically. On June 25, 2021, the Preferred Dividend payment date, the stock closed at $4.95/share. The following Monday (June 28th), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98/share (after accounting for the reverse split, less than half its prior day close).

46.    The communications by Brda and Palikaras during the ATM Offering reflected their intent to take advantage of the manipulated stock price. On Friday, June 18, after Torchlight sold two million shares on the first day of active selling on the ATM Offering, Brda texted Palikaras, "[w]e have two days to take advantage of the squeeze, today should have been a 5 million share day at 6 [dollars per share]…" (emphasis added). Palikaras responded, "[f]ill her up[.]" Another member of Torchlight's Board wrote to Brda, asking his input about transacting in the stock, "I won't move if I have information that isn't public, but if this short squeeze goes high enough I don't want to miss it if I can participate legally." (emphasis added).

## Violations

47.    As a result of the conduct described above, Respondent violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities; Section 17(a)(1) of the Securities Act, which prohibits the use of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of securities; and Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities . . . directly or indirectly . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

48.    As a result of the conduct described above in Paragraphs 24 through 26, Respondent violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities … directly or indirectly… to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading."

49.    As a result of the conduct described above, Respondent violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit the use of a proxy statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

12

50.     As a result of the conduct described above, Respondent violated Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-11 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and current reports as the Commission may require, and mandate that the reports contain such further material information as may be necessary to make the required statements not misleading.

51.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

52.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 10b-5(a), 10b-5(c), 12b-20, 13a-11, and 14a-9 thereunder.

B.     Respondent shall pay a civil penalty of $1,000,000 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.  Payment shall be made in the

13

following installments: $250,000 within 30 days after entry of this order; $250,000 within 120 days after entry of this order; $250,000 within 210 days after entry of this order; and the remaining balance within 300 days after entry of this order. Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Meta Materials, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to B. David Fraser, Associate Director, Division of Enforcement, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Unit 18, Fort Worth, TX 76102.

C.    Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change

14

the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

      D.    Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $1,000,000 based upon its agreement to cooperate in a Commission investigation and related enforcement action. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

      By the Commission.

Vanessa A. Countryman
Secretary

15

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

  v.

JOHN BRDA,
GEORGIOS PALIKARAS,

        Defendants.

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

## COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

## I.    SUMMARY

1.    Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.    Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3.     To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4.     As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5.     Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6.      As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7.      Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8.      When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger—Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9. By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10. For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.     JURISDICTION AND VENUE

11. The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12. This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13. Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

4

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

### III.     **DEFENDANTS**

15.     Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

## IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

## V.     FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

6

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.    As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B. Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26.     To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing—Torchlight's primary asset aside from its oil and gas leases.

27.     Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

**C. Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32. By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33. In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

11

34.     Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35.     Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36.     Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

37.     Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.     Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.     Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.     Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41. To illustrate, Torchlight's definitive proxy statement described the purported "reasons" and "factors" that Torchlight's board (including Brda) considered in both approving the merger and Preferred Dividend and recommending that shareholders approve the same. The proxy statement repeatedly states that the supposed "reason" for approving and proposing the Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and subsequent public filings that the reason—or at least a reason—that Torchlight and Brda considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze and/or to temporarily increase Torchlight's stock price.

42. Similarly, Torchlight's definitive proxy statement also stated that "[t]he *anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas assets] after the consummation of the [merger]." (emphasis added). Again, this statement was false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

14

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.    Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.    Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.     The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

**E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

51. In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52. Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53. Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

21

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59. Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60. For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61. As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted** … **This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe … there will be **a potential jump towards the close**, **it's called a short squeeze**… (emphasis added).

62.     In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.     For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.     On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65.    Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.    Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

### F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

67.    As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

**i.** ***Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.***

68.     In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69.     Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

70. Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71. As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72. In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73. By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company will use commercially reasonable efforts to sell the O&G Assets [within six months of the merger closing]. Torchlight stockholders of record as of the Series A Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of Series A Preferred Stock.… Holders of shares of Series A Preferred Stock may receive Asset Sale Dividends from any Asset Sale Transactions consummated [within six months of the merger closing], and may also receive a Spin-Off Dividend of any Remaining Assets that have not been sold in an Asset Sale Transaction [within six months of the merger closing].

74. These statements were made repeatedly in Torchlight's proxy materials. The company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75. These statements and representations made by Brda in Torchlight's public filings, proxy statements, and press releases were false and misleading at the time they were made. As Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas assets and had taken no actions to lay the groundwork for a sale when the statements were made. Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise, during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76. Without any identified buyers or ongoing negotiations, Brda knew, or was severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.     In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.     Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity")**. He did not publicly disclose these plans.

79.     Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80.     By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81.     Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

### ii.   Palikaras made false statements about the value of the Preferred Dividend.

82.     On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs

83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83.     First, Palikaras claimed that Torchlight was speaking to "the right potential

buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless

in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in

sworn testimony during the SEC's investigation that, at the time he made the statement, he had

no knowledge of potential buyers or active negotiations.

84.     Second, Palikaras claimed that, based on "the analysis," the value of the Preferred

Dividend could be between $1–$20 per share.

85.     As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share

range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting

his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's

third-party asset valuation, which implied an estimated asset value of less than $1.00 per share.

Palikaras' reference to an "analysis" also gave investors the misleading impression that his value

range was supportable, when it was not.

86.     By at least June 11, 2021, a partial audio recording of the Italian Investor Call had

been posted to social media, which included Palikaras' false and misleading statements

referenced above. Palikaras' statements quickly became a topic of discussion on social media in

the days leading up to the merger closing. A common refrain on social media was that the

company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth

$20 per share. Palikaras and Brda were aware of the discussions on social media and the

existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.     After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.     Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

## G. Defendants Succeeded In Manipulating The Price Of Torchlight Stock.

89.     As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.     On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend—which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93.     Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94.     The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95.     Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96.     Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97.     Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

### H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.    Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99.    Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price*… I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100.    Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101.    Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

102.    Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103.    More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104.    Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… ***We have two days to take advantage of the squeeze***, today should have been a 5 million share day at 6[.]" (emphasis added).

105.    Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106.    Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107.    Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

### I. Brda Profited From The Fraudulent Scheme.

108.     Brda profited off his fraudulent scheme and false and misleading statements to investors.

109.     On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.     Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111.     Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

## VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
***(Against All Defendants)***

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116.     With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.  With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

***(Against All Defendants)***

118.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119.     Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120.     Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts
  necessary in order to make the statements made, in light of the circumstances
  under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would
  operate, as a fraud or deceit upon any person.

122.    With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted

with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.    By reason of the foregoing, Defendants have violated, and unless enjoined will

continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]**

*(Against All Defendants)*

124.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if

fully set forth hereunder.

125.    As further described and alleged in paragraphs 39-46 and 67-81 above,

Torchlight's proxy statements contained false or misleading statements and/or omissions of

material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval

via the proxy statements containing false or misleading statements or omissions of material fact.

126.     As further described and alleged in paragraphs 82-88 above, Palikaras  solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.     By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.     With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

129.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**
***(Against Brda)***

130.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.     At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.     As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.     As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134.    By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135.    By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136.    By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

### FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**

*(Against Brda)*

137.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138.    As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.     As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.     Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.     By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

142.     By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143.     By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

### VII.     PRAYER FOR RELIEF

144.     WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

• Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

• Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

• Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.  <u>JURY DEMAND</u>

145.  The SEC demands trial by jury in this action on all issues so triable.

Dated: June 25, 2024          Respectfully submitted,

/s/ *Patrick Disbennett*
Patrick Disbennett (*pro hac vice* application pending)
Christopher Rogers (*pro hac vice* application pending)

U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

46

# EXHIBIT 9

424B4 1 d302576d424b4.htm 424B4

**Table of Contents**

**Filed pursuant to Rule 424(b)(4)**
**File No. 333-266143**

Prospectus

# Next Bridge Hydrocarbons, Inc.

### Common Stock
**(par value $0.0001)**

---

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of 165,472,241 shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next Bridge Hydrocarbons, Inc. (the "Company," "Next Bridge," "we," "us" or "our") held by Meta immediately prior to the Spin-Off. As of the date hereof, Meta holds 165,523,363 shares of Common Stock, of which 165,472,241 shares will be distributed in the Spin-Off and will be 100% of the outstanding shares of capital stock of the Company following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution.

At the time of the Spin-Off, Meta will distribute 165,472,241 of the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock and contemporaneously cancel any remaining shares of Common Stock it holds. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of Common Stock. The Distribution will be made in book-entry form by a distribution agent. Fractional shares of Common Stock will not be distributed in the Spin-Off.

The Spin-Off will be effective as of close of business, New York City time, on December 14, 2022. Immediately after the Spin-Off, the Company will be an independent public reporting company, provided, the Common Stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

None of the Series A Preferred Stockholders are required to vote on or take any other action in connection with the Spin-Off. We are not asking you for a proxy, and we request that you do not send us a proxy. The Series A Preferred stockholders will not be required to pay any consideration for the Common Stock they receive in the Spin-Off; immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled.

Meta currently owns all the outstanding shares of Common Stock of the Company, and we have not sought to have the shares of Common Stock traded on any exchange. Accordingly, there is currently no public market for the Common Stock, and there is no current expectation for a public market to develop for the Common Stock.

---

**In reviewing this Prospectus, you should carefully consider the matters described in the section titled "Risk Factors" beginning on page 7 of this Prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**This Prospectus is not an offer to sell, or a solicitation of an offer to buy, any securities.**

**The date of this Prospectus is November 18, 2022**

**Table of Contents**

Table of Contents

| | |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | i |
| DEFINITIONS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 7 |
| THE SPIN-OFF | 26 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 29 |
| USE OF PROCEEDS | 36 |
| DETERMINATION OF OFFERING PRICE | 36 |
| CAPITALIZATION | 36 |
| BUSINESS | 37 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 47 |
| MANAGEMENT | 58 |
| EXECUTIVE COMPENSATION | 65 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 69 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 70 |
| DESCRIPTION OF OUR CAPITAL STOCK | 74 |
| LEGAL MATTERS | 78 |
| EXPERTS | 78 |
| WHERE YOU CAN FIND MORE INFORMATION | 79 |
| INDEX TO FINANCIAL STATEMENTS | 80 |

**Table of Contents**

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This Prospectus contains certain forward-looking statements and information relating to our business that are based on the beliefs of our management as well as assumptions made by and information currently available to our management. When used in this communication, the words "may," "anticipate," "believe," "estimate," "expect," "intend," "plan," "forecasts," "projections," and similar expressions are intended to identify such forward-looking statements. Forward-looking statements include, without limitation, the statements regarding our strategy, future plans for development and production and other strategic options, future expenses and costs and future liquidity and capital resources. Forward looking statements involve a number of risks, assumptions and uncertainties which may cause actual results to differ materially from those contained in this Prospectus. In light of these risks, uncertainties and assumptions, the future events and trends discussed in this Prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

Such statements reflect our current views with respect to future events, the outcome of which is subject to certain risks, including, among others:

- general competitive conditions, including actions our competitors may take to grow their businesses;

- changes to payment terms, the discount or margin on products or other terms with our suppliers;

- risks associated with data privacy, information security and intellectual property;

- work stoppages or increases in labor costs;

- our ability to attract and retain employees;

- development costs of our current or future properties;

- timing and success of our drilling activities;

- amount and timing of future production of oil and natural gas;

- our ability to successfully implement our strategic initiatives, including amount, nature and timing of capital expenditures;

- the usual hazards associated with the oil and natural gas industry, including fires, well blowouts, pipe failure, spills, explosions and other unforeseen hazards;

- the numerous uncertainties inherent in estimating quantities of oil and natural gas reserves and actual future production rates and associated costs;

- operating costs including lease operating expenses, administrative costs and other expenses;

- the volatility of prices and supply of, and demand for, oil and natural gas;

- changes in regulatory requirements and legislation governing our business, including sustainability;

- the amount of our indebtedness and ability to comply with covenants applicable to any future debt financing;

- our ability to access the credit and capital markets to satisfy future capital and liquidity requirements on acceptable terms;

- if we are not able to successfully execute on our future operating plans, we may not be able to continue as a going concern;

- adverse results from litigation, governmental investigations or tax-related proceedings or audits;

- changes in accounting standards;

- impact and cost of energy conservation and other sustainability efforts;

- exploration and development risks, which could lead to environmental damage, injury and loss of life or the destruction of property;

i

**Table of Contents**

- proximity and capacity of oil, natural gas and other pipelines, transportation and support infrastructure to production facilities;

- availability of consumables and raw materials and drilling and processing equipment;

- adverse weather conditions, natural disasters or other events;

- the ability to successfully estimate the impact of litigation matters;

- our ability to initiate and maintain discussions with third parties regarding strategic options;

- the potential adverse impact on our business resulting from the Spin-Off; and

- the other risks and uncertainties detailed in the section titled "Risk Factors."

Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results or outcomes may vary materially from those described as anticipated, believed, estimated, expected, intended or planned. Subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements in this paragraph. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise after the date of this Prospectus except to the extent required by law.

ii

**Table of Contents**

## DEFINITIONS

The following are abbreviations and definitions of terms commonly used in the oil and gas industry and in this prospectus. Natural gas equivalents and crude oil equivalents are determined using the ratio of six Mcf to one barrel. All references to "us", "our", "we", or "Next Bridge" mean Next Bridge Hydrocarbons, Inc. and where applicable, its consolidated subsidiaries.

"**Bbl**" means a barrel of U.S. 42 gallons of oil.

"**BOE**" means one barrel of oil equivalent.

"**Completion**" means the installation of permanent equipment for the production of oil or gas.

"**Condensate**" means natural gas in liquid form produced in connection with natural gas wells.

"**Exploratory well**" means a well drilled to find a new field or to find a new productive reservoir in a field previously found to be productive of oil or natural gas in another reservoir or to extend a known reservoir.

"**Gross**" when used with respect to acres or wells, production or reserves refers to the total acres or wells in which we or another specified person has a working interest.

"**MBbls**" means one thousand barrels of oil.

"**Mcf**" means one thousand cubic feet of natural gas.

"**Net**" when used with respect to acres or wells, refers to gross acres of wells multiplied, in each case, by the percentage working interest owned by us.

"**NGL**" refers to natural gas liquids, which is composed exclusively of carbon and hydrogen.

"**Oil**" means crude oil or condensate.

"**Operator**" means the individual or company responsible for the exploration, development, and production of an oil or gas well or lease.

"**Proved developed reserves**" means reserves that can be expected to be recovered through existing wells with existing equipment or operating methods.

"**Proved developed non-producing**" means reserves (i) expected to be recovered from zones capable of producing but which are shut-in because no market outlet exists at the present time or whose date of connection to a pipeline is uncertain or (ii) currently behind the pipe in existing wells, which are considered proved by virtue of successful testing or production of offsetting wells.

"**Proved developed producing**" means reserves expected to be recovered from currently producing zones under continuation of present operating methods. This category includes recently completed shut-in gas wells scheduled for connection to a pipeline in the near future.

"**Proved reserves**" means the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements.

**Table of Contents**

"**Proved undeveloped reserves**" means reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage are limited to those drilling locations offsetting productive wells that are reasonably certain of production when drilled or where it can be demonstrated with certainty that there is continuity of production from the existing productive formation.

"**Recompletion**" means the completion for production of an existing well bore in another formation from which the well has been previously completed.

"**Royalty**" means an interest in an oil and gas lease that gives the owner of the interest the right to receive a portion of the production from the leased acreage (or of the proceeds of the sale thereof), but generally does not require the owner to pay any portion of the costs of drilling or operating the wells on the leased acreage. Royalties may be either landowner's royalties, which are reserved by the owner of the leased acreage at the time the lease is granted, or overriding royalties, which are usually reserved by an owner of the leasehold in connection with a transfer to a subsequent owner.

"**SEC**" means the United States Securities and Exchange Commission.

"**Working interest**" means an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations. The share of production to which a working interest owner is entitled will always be smaller than the share of costs that the working interest owner is required to bear, with the balance of the production accruing to the owners of royalties. For example, the owner of a 100% working interest in a lease burdened only by a landowner's royalty of 12.5% would be required to pay 100% of the costs of a well but would be entitled to retain 87.5% of the production.

iv

**Table of Contents**

## PROSPECTUS SUMMARY

*This summary highlights certain information contained elsewhere in this Prospectus and may not contain all of the information that is important to you. To understand fully and for a more complete description of the terms and conditions of the Distribution, you should read this Prospectus in its entirety, including the information presented under the section titled "Risk Factors" and the consolidated financial statements and related notes, and the documents to which you are referred. See "Where You Can Find More Information." Except where the context otherwise requires, or where otherwise indicated, references to the "Company," "Next Bridge," "we," "us," or "our" refer to Next Bridge Hydrocarbons, Inc. and its consolidated subsidiaries, including Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Oil Corporation, a Texas corporation, Hudspeth Operating, LLC, a Texas limited liability company, and Torchlight Energy, Inc., a Nevada corporation. "Meta" refers to Meta Materials, Inc. and its consolidated subsidiaries.*

### The Company

We were incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. as a wholly owned subsidiary of Meta, and changed our name to Next Bridge Hydrocarbons, Inc. pursuant to our Amended and Restated Articles of Incorporation filed on June 30, 2022.

### *Background*

On December 14, 2020, Meta (formerly known as Torchlight Energy Resources, Inc., "Torchlight") and its subsidiaries, Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc., "Exchangeco") and 2798831 Ontario Inc. ("Callco"), both Ontario corporations, entered into an Arrangement Agreement (the "Arrangement Agreement") with Metamaterial Inc., an Ontario corporation headquartered in Nova Scotia, Canada, to acquire all of the outstanding common shares of Metamaterial, Inc. by way of a statutory plan of arrangement (the "Arrangement") under the Business Corporations Act (Ontario), on and subject to the terms and conditions of the Arrangement Agreement, as amended. On June 28, 2021, following the satisfaction of the closing conditions set forth in the Arrangement Agreement, the Arrangement was completed.

In furtherance of the Arrangement, Torchlight (which subsequently changed its name to Meta Materials, Inc.) declared a dividend, on a one-for-one basis, of shares of Series A Non-Voting Preferred Stock of Meta (the "Series A Preferred Stock") to holders of record of Torchlight's common stock as of June 24, 2021. The holders of the Series A Preferred Stock are entitled to receive certain dividends based on the net proceeds of the sale of any assets that are used or held for use in Meta's oil and natural gas exploration business and may also receive a pro rata dividend of equity in a spin-off entity to which Meta will transfer any remaining assets of such business. Meta has not sold to a third party any assets related to the historical oil and natural gas business and has transferred the subsidiary companies, the holders of the oil and natural gas assets, to us prior to the Spin-Off.

### *Business Overview*

We are an energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in Oklahoma.

We plan to operate our business through our wholly owned subsidiaries transferred to us from Meta, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation, Torchlight Hazel, LLC, a

1

**Table of Contents**

Texas limited liability company, and Hudspeth Operating, LLC, a Texas limited liability company. In addition, we may consider strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties; however, we are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options. We currently have six full-time employees, and we employ consultants for various roles as needed.

As of December 31, 2021, we had interests in three oil and gas projects: the Orogrande Project in Hudspeth County, Texas, the Hazel Project in Sterling, Tom Green, and Irion Counties, Texas, and the Hunton wells in partnership with Kodiak in Central Oklahoma. (the "Oklahoma Properties"). See the description under "Current Projects" below under Note 4, "Oil & Natural Gas Properties," of the financial statements included with this Prospectus for information and disclosure regarding these projects, which description is incorporated herein by reference.

### *Emerging Growth Company Status*

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As an emerging growth company, we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public reporting companies that are not emerging growth companies. These provisions include:

- Exemption from the auditor attestation requirement in the assessment of our internal control over financial reporting; and

- Reduced disclosure of certain financial information requirements related to executive compensation, including the requirements to hold a non-binding advisory vote on executive compensation and to provide information relating to the ratio of total compensation of its Chief Executive Officer to the median of the annual total compensation of all of our employees.

We may take advantage of these exemptions for up to five years or such earlier time that we are no longer an emerging growth company. We would cease to be an emerging growth company if we have more than $1.235 billion in annual revenues as of the end of a fiscal year, if we are deemed to be a large-accelerated filer under the rules of the SEC, or if we issue more than $1.235 billion of non-convertible debt over a three-year-period.

The JOBS Act permits emerging growth companies to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public reporting companies. Following the consummation of the Spin-Off, we will elect to avail ourselves of the extended transition period. During the extended transition period, it may be difficult to compare our financial results with the financial results of a public reporting company that complies with accounting pronouncements when effective.

### *Smaller Reporting Company*

We are a "smaller reporting company" as defined by Rule 12b-2 of the Securities Exchange Act of 1934 (the "Exchange Act"). As a "smaller reporting company," the disclosure we will be required to provide in our SEC filings are less than it would be if we were not considered a "smaller reporting company." Specifically, "smaller reporting companies" are able to provide simplified executive compensation disclosures in their filings; if annual revenue is less than $100 million, may be exempt from the provisions of Section 404(b) of the Sarbanes-Oxley Act of 2002 requiring that independent registered public accounting firms provide an attestation report on the effectiveness of internal control over financial reporting; and have certain other decreased disclosure obligations in their SEC filings, including, among other things, being permitted to provide two years of audited financial statements in annual reports rather than three years. Decreased disclosures in our SEC filings due to our status as a "smaller reporting company" may make it harder for investors to analyze our results of operations and financial prospects.

**Table of Contents**

*Market Opportunity*

The market for oil and natural gas that we will produce depends on factors beyond our control, including the extent of domestic production and imports of oil and natural gas, the proximity and capacity of natural gas pipelines and other transportation facilities, demand for oil and natural gas, the marketing of competitive fuels, and the effects of state and federal regulation. The oil and natural gas industry also competes with other industries in supplying the energy and fuel requirements of industrial, commercial, and individual consumers.

Our oil production is expected to be sold at prices tied to the spot oil markets. Our natural gas production is expected to be sold under short-term contracts and priced based on first of the month index prices or on daily spot market prices. We will rely on our operating partners to market and sell our production.

*Regulatory Framework*

Our oil and natural gas development operations are subject to stringent and complex federal, state, tribal, regional and local environmental, health and safety laws and regulations governing, among other factors, worker safety and health, the discharge and disposal of substances into the environment, and the protection of the environment and natural resources. Numerous governmental entities, including the Environmental Protection Agency ("EPA") and analogous state and local agencies, (and, under certain laws, private individuals) have the power to enforce compliance with these laws and regulations and any permits issued under them. These laws and regulations may, among other things: (i) require permits to conduct exploration, drilling, water withdrawal, wastewater disposal and other production related activities; (ii) govern the types, quantities and concentrations of substances, including emissions of $CO_2$, methane and certain other greenhouse gases ("GHG"), that may be disposed or released into the environment or injected into formations in connection with drilling or production activities, and the manner of any such disposal, release, or injection; (iii) limit or prohibit construction or drilling activities or require formal mitigation measures in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; (iv) require investigatory and remedial actions to mitigate pollution conditions arising from the Company's operations or attributable to former operations; (v) impose safety and health restrictions designed to protect employees and others from exposure to hazardous or dangerous substances; and (vi) impose obligations to reclaim and abandon well sites and pits.

Certain existing environmental and occupational safety and health laws and regulations to which our business operations are subject including, the Clean Air Act, as amended (the "CAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the federal Resource Conservation and Recovery Act, Federal Water Pollution Control Act of 1972 as amended by the Oil Pollution Act of 1990, EPA rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of a leak detection and repair ("LDAR") program under the CAA's New Source Performance Standards in 40 C.F.R. Part 60, Subpart OOOOa ("Quad Oa"), the federal Occupational Safety and Health Act and other state equivalent laws and regulations. For further discussion of the risks to our results of operations arising out of our environmental regulatory compliance, see "Risks Related to Our Business", including the following risk factors "—*Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict*," "—*Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays*," and "—*Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce*".

*Corporate Information*

Our executive office is located at 6300 Ridglea Place, Suite 950, Fort Worth, Texas 76116, and our telephone number is (817) 438-1937. We intend to have an internet website, nextbridgehydrocarbons.com. Information contained on or accessible through our website, when available, shall not be deemed a part of this prospectus and shall not be incorporated by reference herein.

**Table of Contents**

**Summary of the Spin-Off**

| | |
|---|---|
| Distributing Company | Meta Materials, Inc., a Nevada corporation, which holds all of our Common Stock issued and outstanding prior to the Distribution. After the Distribution, the holders of the Series A Preferred Stock will own all of our Common Stock and Meta Materials, Inc. will not own any shares of our Common Stock. |
| Distributed Company | Next Bridge Hydrocarbons, Inc., a Nevada corporation, is a wholly owned subsidiary of Meta immediately prior to the Distribution. At the time of the Distribution, we will hold, directly or through our wholly owned subsidiaries, the assets and liabilities of the oil and natural gas business of Meta. After the Spin-Off, we will be an independent non-trading public reporting company. |
| Distributed Securities | 165,472,241 shares of our Common Stock owned by Meta, which will be 100% of our Common Stock issued and outstanding following cancellation of 51,122 shares of Common Stock contemporaneously with the Distribution. |
| | Each holder of Series A Preferred Stock will receive one share of our Common Stock for every one (1) share of Series A Preferred Stock held on the Record Date. The distribution agent will distribute only whole shares of our Common Stock in the Distribution. Shares of Common Stock that remain held by Meta following the Distribution, if any, shall be cancelled contemporaneously with the Spin-Off. |
| Record Date | The Record Date is the close of business on December 12, 2022. |
| Distribution Date | The Distribution Date is the close of business on December 14, 2022. |
| The Distribution | On the Distribution Date, Meta will release the shares of our Common Stock to the distribution agent to distribute to Series A Preferred stockholders. The distribution agent will distribute our shares in book-entry form, and thus we will not issue any physical stock certificates, other than upon request. We expect that it will take the distribution agent up to two weeks to electronically issue shares of our Common Stock to you or your bank or brokerage firm on your behalf by way of direct registration in book-entry form. You will not be required to make any payment, surrender or exchange your shares of Series A Preferred Stock or take any other action to receive your shares of our Common Stock, although your shares of Series A Preferred Stock will be cancelled as of the Distribution Date. |
| Conditions to the Spin-Off | The Spin-Off is subject to the satisfaction, or the Meta board of directors' waiver, of the following conditions: |
| | • the Meta board of directors shall have authorized and approved the Spin-Off and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to the holders of Meta's Series A Preferred Stock; |

4

**Table of Contents**

|  | • the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party thereto; |
|---|---|
|  | • the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC; |
|  | • no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Spin-Off shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Spin-Off; |
|  | • all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and |
|  | • any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived. |
|  | The fulfillment of the foregoing conditions will not create any obligation on the part of Meta to effect the Spin-Off. We are not aware of any material federal, foreign or state regulatory requirements with which we must comply, other than SEC rules and regulations, state "blue sky" laws, or any material approvals that we must obtain, other than the SEC's declaration of the effectiveness of the Registration Statement and applicable filings or notices required in compliance with applicable state securities or "blue sky" laws, in connection with the Spin-Off. Meta has the right not to complete the Spin-Off if, at any time, the Meta board or directors determines, in its sole and absolute discretion, that the Spin-Off is not in the best interests of Meta or its stockholders or is otherwise not advisable. |
| Trading Market | All of our outstanding shares of Common Stock are currently beneficially owned by Meta and our Common Stock is currently not listed for trading on any stock exchange or market and we have not sought to be traded on any exchange or market. The shares of Common Stock will not be eligible for electronic transfer through the Depository Trust Company or any other established clearing corporation. Accordingly, there currently is no public trading market for the Common Stock and there is no current expectation for a public market to develop. |
| U.S. Federal Income Tax Consequences to Series A Preferred Stockholders | U.S. federal income tax treatment of the issuance of our Common Stock to holders of the Series A Preferred Stock will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes, and U.S. and non-U.S. holders could be subject to tax as a result of the Spin-Off and the cancellation all shares of the Series A Preferred Stock. Accordingly, holders of Series A Preferred Stock are |

**Table of Contents**

|  |  |
|---|---|
|  | encouraged to consult their own tax advisors as to the specific U.S. federal, state and local, and non-U.S. tax consequences of the Distribution to such stockholders. |
| Transfer Agent | American Stock Transfer & Trust Company LLC. |
| Risk Factors | Our business faces both general and specific risks and uncertainties. Our business also faces risks relating to the Spin-Off. Following the Spin-Off, we will also face risks associated with being an independent company. Accordingly, you should read carefully the information set forth under the heading "Risk Factors." |

**Table of Contents**

## RISK FACTORS

*You should carefully consider all of the information in this Prospectus and each of the risks described below, which we believe are the principal risks that we face. Some of the risks relate to our business, others to the Spin-Off and the ownership of our Common Stock. The risks and uncertainties described below are not the only ones faced by us. Additional risks and uncertainties not presently known or that are currently deemed immaterial also may impair our business operations. If any of the following risks occur, our business, financial condition, operating results and cash flows and the value of our Common Stock could be materially adversely affected.*

**Risks Relating to Our Business**

***We have a limited operating history relative to larger companies in our industry and may not be successful in developing profitable business operations.***

We have a limited operating history relative to larger companies in our industry. Our business operations must be considered in light of the risks, expenses and difficulties frequently encountered in establishing a business in the oil and natural gas industry. As of the date of this Prospectus, we have generated limited revenues and have limited assets. We have an insufficient history at this time on which to base an assumption that our business operations will prove to be successful in the long-term. Our future operating results will depend on many factors, including:

- our ability to raise adequate working capital;

- the success of our development and exploration;

- the demand for oil and natural gas;

- the level of our competition;

- our ability to attract and maintain key management and employees; and

- our ability to efficiently explore, develop, produce or acquire sufficient quantities of marketable oil or natural gas in a highly competitive and speculative environment while maintaining quality and controlling costs.

To achieve profitable operations in the future, we must, alone or with others, successfully manage the factors stated above, as well as continue to develop ways to enhance our production efforts. Despite our best efforts, we may not be successful in our exploration or development efforts or obtain required regulatory approvals. There is a possibility that some, or all, of the wells in which we obtain interests may never produce oil or natural gas.

***We have limited capital and will need to raise additional capital in the immediate future.***

Following the Spin-Off, we will require additional capital to maintain operations and to expand our exploration and development programs. We may be unable to obtain additional capital when required or on favorable terms. Future acquisitions, exploration, development, production and marketing activities, as well as our administrative requirements (such as salaries, insurance expenses and general overhead expenses, as well as legal compliance costs and accounting expenses) will require a substantial amount of additional capital and cash flow.

We may pursue sources of additional capital through various financing transactions or arrangements, including joint venturing of projects, debt financing, equity financing, or other means. We may not be successful in identifying suitable financing transactions in the time period required or at all, and we may not obtain the capital we require by other means. If we do not succeed in raising additional capital, our resources may not be sufficient to fund our planned operations.

Our ability to obtain financing, if and when necessary, may be impaired by such factors as the capital markets (both generally and in the oil and natural gas industry in particular), our limited operating history, the location of

7

**Table of Contents**

our oil and natural gas properties and prices of oil and natural gas on the commodities markets (which will impact the amount of asset-based financing available to us, if any) and the departure of key employees. Further, if oil or natural gas prices on the commodities markets decline, our future revenues, if any, will likely decrease and such decreased revenues may increase our requirements for capital. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, is not sufficient to satisfy our capital needs (even to the extent that we reduce our operations), third parties may be reluctant to provide the services we need in order to operate and we may be required to cease our operations, divest our assets at unattractive prices or obtain financing on unattractive terms.

Any additional capital raised through the sale of equity may dilute the ownership percentage of our stockholders. Raising any such capital could also result in a decrease in the fair market value of our equity securities because our assets would be owned by a larger pool of outstanding equity. The terms of securities we issue in future capital transactions may be more favorable to our new investors, and may include preferences, superior voting rights and the issuance of other derivative securities, and issuances of incentive awards under equity employee incentive plans, which may have a further dilutive effect.

We may incur substantial costs in pursuing future capital financing, including investment banking fees, legal fees, accounting fees, securities law compliance fees, printing and distribution expenses and other costs. We may also be required to recognize non-cash expenses in connection with certain securities we may issue, which may adversely impact our financial condition.

*We may not achieve or maintain profitable operations, and therefore, may not be able to continue as a going concern.*

The Company has a history of net losses from operations and negative cash flow from operating activities. We will need to raise additional working capital to continue our normal and planned operations. We will also need to generate and sustain significant revenue levels in future periods in order to become profitable, and, even if we do, we may not be able to maintain or increase our level of profitability. During the three and nine months ended September 30, 2022, we incurred a net loss of $2,164,187 and $4,764,293, respectively, and used cash of $6,067,015 for operating activities for the nine months ended September 30, 2022. At September 30, 2022, we had an accumulated deficit of $72,951,809 and had a working capital deficit of $19,385,284 compared with a working capital deficit of $13,307,453 as of December 31, 2021. These factors raise doubt regarding our ability to continue as a going concern. Because we have incurred significant net losses, our auditors have issued a "going concern" audit qualification. A "going concern" qualification indicates that the financial statements have been prepared assuming we will continue as a going concern and do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets, or the amounts and classification of liabilities that may result if we do not continue as a going concern. Therefore, you should not rely on our consolidated balance sheet as an indication of the amount of proceeds that would be available to satisfy claims of creditors, and potentially be available for distribution to stockholders, in the event of liquidation.

*There can be no assurance that our financing strategy or strategic alternatives will result in a transaction satisfactory to holders of our Common Stock.*

After the Spin-Off, we may consider various strategic alternatives, including partnering with third parties, a potential sale of some or all of our assets, a merger transaction, and potential financing alternatives. Even if a partnering transaction, sale, merger or financing transaction were to be consummated, it may not return any value to holders of our Common Stock. Regardless of whether we execute a partnership, sale, merger or financing transaction, the adverse pressures negatively impacting our business that we have been or are currently experiencing may continue or intensify, including the risk that we may not be able to continue as a going concern. We are not currently engaged in any negotiations or discussions with third parties in respect of any strategic options.

[Table of Contents](#)

***We are mainly concentrated in one geographic area, which increases our exposure to many of the risks enumerated herein.***

Operating in a concentrated area increases the potential impact that many of the risks stated herein may have upon our ability to perform. For example, we have greater exposure to regulatory actions impacting Texas, natural disasters in the geographic area, competition for equipment, services and materials available in the area and access to infrastructure and markets. In addition, the effect of fluctuations on supply and demand may become more pronounced within specific geographic oil and natural gas producing areas such as the Permian Basin, which may cause these conditions to occur with greater frequency or magnify the effect of these conditions. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***Because of the speculative nature of oil and natural gas exploration, there is risk that we will not find commercially exploitable oil and natural gas and that our business will fail.***

The search for commercial quantities of oil and natural gas as a business is extremely risky. We cannot provide investors with any assurance that any properties in which we obtain a mineral interest will contain commercially exploitable quantities of oil and/or natural gas. The exploration expenditures to be made by us may not result in the discovery of commercial quantities of oil and/or natural gas. Problems such as unusual or unexpected formations or pressures, premature declines of reservoirs, invasion of water into producing formations and other conditions involved in oil and natural gas exploration often result in unsuccessful exploration efforts. If we are unable to find commercially exploitable quantities of oil and natural gas, and/or we are unable to commercially extract such quantities, we may be forced to abandon or curtail our business plan, and as a result, any investment in us may become worthless.

***Litigation may adversely affect our business, financial condition, and results of operations.***

Certain of our subsidiaries are subject and from time to time in the normal course of our business operations, may become subject to litigation that may result in liability material to our financial statements as a whole or may negatively affect our operating results if changes to our business operations are required. The cost to defend such litigation may be significant and may require a diversion of our resources. There also may be adverse publicity associated with litigation that could negatively affect customer perception of our business, regardless of whether the allegations are valid or whether we are ultimately found liable. Insurance may not be available at all or in sufficient amounts to cover any liabilities with respect to these or other matters. A judgment or other liability in excess of our insurance coverage for any claims could adversely affect our business and the results of our operations. For additional discussion of pending litigation matters, see "Management's Discussion and Analysis of Financial Condition and Results of Operations— Legal Proceedings."

***Strategic relationships upon which we may rely are subject to change, which may diminish our ability to conduct our operations.***

Following the Spin-Off, our ability to successfully acquire oil and natural gas interests, to build our reserves, to participate in drilling opportunities and to identify and enter into commercial arrangements with customers will depend on developing and maintaining close working relationships with industry participants and our ability to select and evaluate suitable properties and to consummate transactions in a highly competitive environment. These realities are subject to change and our inability to maintain close working relationships with industry participants or continue to acquire suitable property may impair our ability to execute our business plan.

To continue to develop our business, we will endeavor to use the business relationships of our management to enter into strategic relationships, which may take the form of joint ventures with other private parties and contractual

9

**Table of Contents**

arrangements with other oil and natural gas companies, including those that supply equipment and other resources that we will use in our business. We may not be able to establish these strategic relationships, or if established, we may not be able to maintain them. In addition, the dynamics of our relationships with strategic partners may require us to incur expenses or undertake activities we would not otherwise be inclined to in order to fulfill our obligations to these partners or maintain our relationships. If our strategic relationships are not established or maintained, our business prospects may be limited, which could diminish our ability to conduct our operations.

***Our acreage must be drilled before lease expiration in order to hold the acreage by production. In the highly competitive market for acreage, failure to drill sufficient wells in order to hold acreage will result in a substantial lease renewal cost, or if renewal is not feasible, loss of our lease and prospective drilling opportunities.***

Our leases on oil and natural gas properties typically have a primary term of four to five years, after which they expire unless, prior to expiration, drilling obligations are fulfilled or production is established within the spacing units covering the undeveloped acres. As of September 30, 2022, we had leases representing approximately 134,066 net acres in the Orogrande Basin in West Texas expiring in 2022 if we fail to drill five wells as obligated, for which there can be no assurance will be met. Unless we are able to negotiate an extension on these leases, these leases in the Orogrande Basin are also subject to expiration in 2023 in the event we fail to drill an additional five wells during the 2023 calendar year. We will require additional capital to drill these wells, and we may not be able to obtain additional capital when required in order to drill these wells, or on favorable terms. As of September 30, 2022, we have leases representing 645 net acres in the Eastern edge of the Midland Basin in West Texas, which are currently held by production by active wells. In the event that we fail to meet our drilling obligations in the Orogrande Basin, whether because we are unable to obtain additional capital when required or otherwise, or if production ceases in the Midland Basin, our leases will expire. If we have to renew such leases on new terms, we could incur significant cost increases, and we may not be able to renew such leases on commercially reasonable terms or at all. In addition, on certain portions of our acreage, third-party leases may become immediately effective if our leases expire. As such, our actual drilling activities may materially differ from our current expectations, which could adversely affect our business.

***The price of oil and natural gas has historically been volatile. If it were to decrease substantially, our projections, budgets, and revenues would be adversely affected, potentially forcing us to make changes in our operations.***

Following the Spin-Off, our future financial condition, results of operations and the carrying value of any oil and natural gas interests we acquire will depend primarily upon the prices paid for oil and natural gas production. Oil and natural gas prices historically have been volatile and likely will continue to be volatile in the future, especially given current world geopolitical conditions. Cash flows from operations are highly dependent on the prices that we receive for oil and natural gas. This price volatility could affect the amount of our cash flows available for capital expenditures and our ability to borrow money or raise additional capital. The prices for oil and natural gas are subject to a variety of additional factors that are beyond our control. These factors include:

- the level of consumer demand for oil and natural gas;

- the domestic and foreign supply of oil and natural gas;

- the ability of the members of the Organization of Petroleum Exporting Countries ("OPEC") to agree to and maintain oil price and production controls;

- the price of foreign oil and natural gas;

- domestic governmental regulations and taxes;

- the price and availability of alternative fuel sources;

- weather conditions;

- market uncertainty due to political conditions in oil and natural gas producing regions, including the Middle East; and

- worldwide economic conditions.

10

**Table of Contents**

These factors as well as the volatility of the energy markets generally make it extremely difficult to predict future oil and natural gas price movements with any certainty. Declines in oil and natural gas prices affect our revenues and could reduce the amount of oil and natural gas that we can produce economically. Accordingly, such declines could have a material adverse effect on our financial condition, results of operations, oil and natural gas reserves and the carrying values of our oil and natural gas properties. If the oil and natural gas industry experiences significant price declines, we may be unable to make planned expenditures, among other things. If this were to happen, we may be forced to abandon or curtail our business operations, which would cause the value of an investment in us to decline or become worthless.

In early March 2020, the market experienced a precipitous decline in oil prices in response to concerns about oil demand due to the economic impact of COVID-19 and anticipated increases in supply from Russia and OPEC, particularly Saudi Arabia. Generally, demand for oil declined substantially following the initial onset of the COVID-19 pandemic, but has recovered over the past year. These trends materially, adversely affected our results of operations, cash flows and financial condition during the last two years.

If oil or natural gas prices reverse again and go on a downward trend or drilling efforts are unsuccessful, we could be required to record additional write-downs of our oil and natural gas properties. Write-downs may occur when oil and natural gas prices are low, or if we have downward adjustments to our estimated proved reserves, increases in our estimates of operating or development costs, deterioration in drilling results or mechanical problems with wells where the cost to redrill or repair is not supported by the expected economics.

Under the full cost method of accounting, capitalized oil and natural gas property costs less accumulated depletion and net of deferred income taxes may not exceed an amount equal to the present value, discounted at 10%, of estimated future net revenues from proved oil and natural gas reserves plus the cost of unproved properties not subject to amortization (without regard to estimates of fair value), or estimated fair value, if lower, of unproved properties that are subject to amortization. Should capitalized costs exceed this ceiling, an impairment would be recognized.

The Company recognized an impairment charge of $2,108,301 in 2020 due to an adjustment required by this ceiling test.

***Because of the inherent dangers involved in oil and natural gas operations, there is a risk that we may incur liability or damages as we conduct our business operations, which could force us to expend a substantial amount of money in connection with litigation and/or a settlement.***

The oil and natural gas business involves a variety of operating hazards and risks such as well blowouts, pipe failures, casing collapse, explosions, uncontrollable flows of oil, natural gas or well fluids, fires, spills, pollution, releases of toxic gas and other environmental hazards and risks. These hazards and risks could result in substantial losses to us from, among other things, injury or loss of life, severe damage to or destruction of property, natural resources and equipment, pollution or other environmental damage, cleanup responsibilities, regulatory investigation and penalties and suspension of operations. In addition, we may be liable for environmental damages caused by previous owners of property purchased and leased by us. In recent years, there has also been increased scrutiny on the environmental risk associated with hydraulic fracturing, such as underground migration and surface spillage or mishandling of fracturing fluids including chemical additives. This technology has evolved and continues to evolve and become more aggressive. We believe that recent designs have seen improvement in, among other things, proppant per foot, barrels of water per stage, fracturing stages, and clusters per fracturing stage. Nonetheless, substantial liabilities to third parties or governmental entities may be incurred, the payment of which could reduce or eliminate the funds available for exploration, development or acquisitions or result in the loss of our properties and/or force us to expend substantial monies in connection with cleanup, litigation or settlements. In addition, we will need to quickly adapt to the evolving technology, which could take time and divert our attention to other business matters. We currently have no insurance to cover such losses and liabilities, and even if insurance is obtained, it may not be adequate to cover any losses or liabilities. We cannot predict the

11

**Table of Contents**

availability of insurance or the availability of insurance at premium levels that justify our purchase. The occurrence of a significant event not fully insured or indemnified against could materially and adversely affect our financial condition and operations. We may elect to self-insure if management believes that the cost of insurance, although available, is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. The occurrence of an event not fully covered by insurance could have a material adverse effect on our financial condition and results of operations.

***The market for oil and natural gas is intensely competitive, and competition pressures could force us to abandon or curtail our business plan.***

The market for oil and natural gas exploration services is highly competitive, and we only expect competition to intensify in the future. Numerous well-established companies are focusing significant resources on exploration and are currently competing with us for oil and natural gas opportunities. Other oil and natural gas companies may seek to acquire oil and natural gas leases and properties that we have targeted. Additionally, other companies engaged in our line of business may compete with us from time to time in obtaining capital from investors. Competitors include larger companies which, in particular, may have access to greater resources, may be more successful in the recruitment and retention of qualified employees and may conduct their own refining and petroleum marketing operations, which may give them a competitive advantage. Actual or potential competitors may be strengthened through the acquisition of additional assets and interests. Additionally, there are numerous companies focusing their resources on creating fuels and/or materials which serve the same purpose as oil and natural gas but are manufactured from renewable resources.

As a result, we may not be able to compete successfully and competitive pressures may adversely affect our business, results of operations, and financial condition. If we are not able to successfully compete in the marketplace, we could be forced to curtail or even abandon our current business plan, which could cause any investment in us to become worthless.

***Inflation may adversely affect us by increasing costs beyond what we can recover through price increases and limit our ability to enter into future traditional debt financing.***

Inflation can adversely affect us by increasing costs of critical materials, equipment, labor, and other services. In addition, inflation is often accompanied by higher interest rates. Continued inflationary pressures could impact our profitability. Inflation may also affect our ability to enter into future traditional debt financing, as high inflation may result in an increase in cost.

***We may not be able to successfully manage growth, which could lead to our inability to implement our business plan.***

Any growth of the Company may place a significant strain on our managerial, operational and financial resources, especially considering that we currently only have a small number of executive officers, employees and advisors. Further, as we enter into additional contracts, we will be required to manage multiple relationships with various consultants, businesses and other third parties. These requirements will be exacerbated in the event of our further growth or in the event that the number of our drilling and/or extraction operations increases. Our systems, procedures and/or controls may not be adequate to support our operations or that our management will be able to achieve the rapid execution necessary to successfully implement our business plan. If we are unable to manage our growth effectively, our business, results of operations and financial condition will be adversely affected, which could lead to us being forced to abandon or curtail our business plan and operations.

***Developing oil and natural gas wells and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect future production from our oil and natural gas properties. Any delays, reductions or cancellations in development and producing activities could materially, adversely impact the value of your shares of Common Stock.***

Recovery of undeveloped reserves and the development of developed non-producing reserves requires substantial capital expenditures and successful drilling operations of our oil and natural gas properties. All of the recent

12

Table of Contents

development costs related to our Hazel Project were paid by Masterson Hazel Partners LP ("MHP"). We granted MHP the option to acquire the Hazel Project in exchange for it conducting, and paying for, development activity sufficient to maintain the Hazel mineral leases in good standing (the "Option Agreement"). The Option Agreement provided that if MHP declined to exercise the option to acquire the property, we would be obligated to reimburse them for their cost of the development activity to the extent that the wells produced revenues beyond the date of the option's lapse until the total amount of development expenses are reimbursed. MHP declined to exercise the option effective September 30, 2021. The 2021 reserve data included in the reserve report of our independent petroleum engineer assumes a certain amount of capital expenditures will be made to develop such reserves, and the present value of such reserves was adjusted based on our obligation to assign revenue from the Hazel Project to MHP. Additionally, 33.5% of the development expenses for the Orogrande Project are borne by the non-operating working interest owners of such properties.

The development of such reserves may in the future take a long period of time and may require higher levels of capital expenditures than anticipated, which, for the Orogrande Project, are borne in part by the non-operating working interest owners of such properties. Delays in the development of the reserves, increases in drilling and development costs (including expenses related to secondary and tertiary recovery techniques) of such reserves or decreases or continued volatility in commodity prices will reduce the future net revenues of the estimated possible reserves and may result in some projects becoming uneconomic. In addition, delays in the development of reserves could force us to reclassify certain of the proved reserves as unproved reserves.

In addition, the process of developing oil and natural gas wells and producing oil and natural gas from our properties is subject to numerous risks beyond our control. The ability to carry out operations or to finance planned development expenses could be materially and adversely affected by any factor that may curtail, delay, reduce or cancel development and production, including:

- delays imposed by or resulting from compliance with environmental and other governmental or regulatory requirements, including permitting requirements, limitations on or resulting from wastewater discharge and disposal of exploration and production wastes, including, subsurface injections, as well as additional regulation with respect to GHG emissions;

- pressure or irregularities in geological formations;

- restricted access to land for drilling or to existing pipeline infrastructure;

- lack of available gathering, transportation and processing facilities, including availability on commercially reasonable terms, or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines;

- equipment failures or accidents;

- failure of secondary recovery operations to perform as expected;

- unexpected operational events and drilling conditions;

- declines in oil or natural gas prices;

- limitations in the market for oil or natural gas;

- pipe or cement failures;

- casing collapses;

- shortages, unavailability or high cost of drilling rigs, tubular materials, equipment, supplies, personnel and services;

- lost or damaged drilling and service tools;

- loss of drilling fluid circulation;

13

**Table of Contents**

- uncontrollable flows of oil and natural gas, water or drilling fluids;

- blowouts, explosions fires and natural disasters;

- environmental hazards, such as oil and natural gas leaks, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;

- adverse weather conditions, such as drought, floods, blizzards, tornados and ice storms; and

- title problems or legal disputes regarding leasehold rights.

***Our operations are heavily dependent on current environmental regulation, changes in which we cannot predict.***

Oil and natural gas activities that we will engage in, including production, processing, handling and disposal of hazardous materials, such as hydrocarbons and naturally occurring radioactive materials (if any), are subject to stringent regulation. We could incur significant costs, including cleanup costs resulting from a release of hazardous material, third-party claims for property damage and personal injuries fines and sanctions, as a result of any violations or liabilities under environmental or other laws. Changes in or more stringent enforcement of environmental laws could force us to expend additional operating costs and capital expenditures to stay in compliance.

Various federal, state and local laws regulating the discharge of materials into the environment, or otherwise relating to the protection of the environment, directly impact oil and natural gas exploration, development and production operations, and consequently may impact our operations and costs. These regulations include, among others, (i) regulations by the Environmental Protection Agency and various state agencies regarding approved methods of disposal for certain hazardous and non-hazardous wastes; (ii) the Comprehensive Environmental Response, Compensation, and Liability Act and analogous state laws which regulate the removal or remediation of previously disposed wastes (including wastes disposed of or released by prior owners or operators), property contamination (including groundwater contamination), and remedial plugging operations to prevent future contamination; (iii) the Clean Air Act and comparable state and local requirements which regulate air emissions; (iv) the Oil Pollution Act of 1990 which contains numerous requirements relating to the prevention of and response to oil spills into waters of the United States; (v) the Resource Conservation and Recovery Act which is the principal federal statute governing the treatment, storage and disposal of hazardous wastes; (vi) the Federal Water Pollution Control Act and comparable state and local requirements which regulate discharges to federal and state waters; and (vii) state regulations and statutes governing the handling, treatment, storage and disposal of naturally occurring radioactive material.

We believe that we will be in substantial compliance with applicable environmental laws and regulations in reliance on our contractual relationship with Maverick Operating LLC, who operates our oil and natural gas properties and is primarily responsible for compliance with applicable environmental regulatory with respect to the operating activities of our oil and natural gas properties. We cover all costs associated with the related insurance coverage for such environmental regulatory compliance. To date, other than the cost of insurance, we have not expended any amounts to comply with such regulations, and we do not currently anticipate that future compliance will have a materially adverse effect on our consolidated financial position, results of operations or cash flows. However, if we are deemed to not be in compliance with applicable environmental laws, we could be forced to expend significant funds to be in compliance, which would have a materially adverse effect on our financial condition.

***Government regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Several states, including Texas, and local jurisdictions, have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances, impose more stringent operating

14

**Table of Contents**

standards and/or require the disclosure of the composition of hydraulic fracturing fluids. The Texas Legislature adopted legislation, effective September 1, 2011, requiring oil and natural gas operators to publicly disclose the chemicals used in the hydraulic fracturing process. The Texas Railroad Commission adopted rules and regulations implementing this legislation that apply to all wells for which the Texas Railroad Commission issues an initial drilling permit after February 1, 2012. The law requires that the well operator disclose the list of chemical ingredients subject to the requirements of OSHA for disclosure on an internet website and also file the list of chemicals with the Texas Railroad Commission with the well completion report. The total volume of water used to hydraulically fracture a well must also be disclosed to the public and filed with the Texas Railroad Commission. Also, in May 2013, the Texas Railroad Commission adopted rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The rules took effect in January 2014. Additionally, on October 28, 2014, the Texas Railroad Commission adopted disposal well rule amendments designed, among other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Texas Railroad Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Texas Railroad Commission has used this authority to deny permits and temporarily suspend operations for waste disposal wells and, in September 2021, the Texas Railroad Commission curtailed the amount of water companies were permitted to inject into some wells in the Permian Basin, and has since indefinitely suspended some permits there and expanded the restrictions to other areas. These restrictions on use of produced water and a moratorium on new produced water disposal wells could result in increased operating costs, requiring us or our service providers to truck produced water, recycle it or pump it through the pipeline network or other means, all of which could be costly. We or our service providers may also need to limit disposal well volumes, disposal rates and pressures or locations, or require us or our service providers to shut down or curtail the injection of produced water into disposal wells. These factors may make drilling and completion activity in the affected parts of the Permian Basin less economical and adversely impact our business, results of operations and financial condition.

***Climate change laws and regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce***.

The EPA previously published its findings that emissions of GHGs present a danger to public health and the environment because such gases are, according to the EPA, contributing to warming of the Earth's atmosphere and other climatic changes. Based on these findings, the EPA has adopted various rules to address GHG emissions under existing provisions of the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis, which includes certain of our operations. In addition, in June 2016, the EPA finalized rules to reduce methane emissions from new, modified or reconstructed sources in the oil and natural gas sector, including implementation of an LDAR program to minimize methane emissions, under the CAA's New Source Performance Standards Quad Oa. However, the EPA has taken several steps to delay implementation of the Quad Oa standards. The agency proposed a rulemaking in June 2017 to stay the requirements for a period of two years and in October 2018, the EPA proposed revisions to Quad Oa, such as changes to the frequency for monitoring fugitive emissions at well sites and changes to requirements that a professional engineer certify when meeting certain Quad Oa requirements is technically infeasible. In September 2020, the EPA finalized amendments to Quad Oa that rescind requirements for the transmission and storage segment of the oil and natural gas industry and rescind methane-specific limits that apply to the industry's production and processing segments, among other things. On June 30, 2021, Congress issued a joint resolution pursuant to the Congressional Review Act disapproving the September 2020 rule, and on November 15, 2021, EPA issued a proposed rule to revise the Quad Oa regulations that, if finalized, would require methane emissions reductions and implementation of a fugitive emissions monitoring and repair program. EPA has also announced its intention to issue a supplemental proposal in 2022 that may expand on or modify the 2021 proposal in response to public input. It is possible that these rules will continue to require oil and natural gas operators to expend material sums.

15

Table of Contents

In addition, in November 2016, the U.S. Department of the Interior Bureau of Land Management ("BLM") issued final rules to reduce methane emissions from venting, flaring, and leaks during oil and natural gas operations on public lands that are substantially similar to the EPA Quad Oa requirements. However, on December 8, 2017, the BLM published a final rule to temporarily suspend or delay certain requirements contained in the November 2016 final rule until January 17, 2019, including those requirements relating to venting, flaring and leakage from oil and natural gas production activities. Further, in September 2018, the BLM published a final rule to revise or rescind certain provisions of the 2016 rule. On July 21, 2020, a Wyoming federal court vacated almost all of the 2016 rule, including all provisions relating to the loss of gas through venting, flaring, and leaks, and on July 15, 2020, a California federal court vacated the 2018 rule. While, as a result of these developments, future implementation of the EPA and BLM methane rules is uncertain, given the long-term trend towards increasing regulation, future federal GHG regulations of the oil and natural gas industry remain a possibility. We may be required to expend significant costs to obtain the necessary equipment (pollution control equipment and optical gas imaging equipment for LDAR inspections) and personnel trained to assist with inspection and reporting requirements to ensure we are in compliance with these rules.

***We may incur increasing attention to environmental, social and governance ("ESG") matters that may impact our business.***

Businesses across all industries are facing increasing scrutiny from stakeholders related to their ESG practices. If we do not adapt to or comply with investor or stakeholder expectations and standards, which are evolving, or if we are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition and/or the value of our Common Stock could be materially and adversely affected. Increasing attention to climate change, increasing societal expectations on businesses to address climate change, and potential consumer use of substitutes to energy commodities may result in increased costs, reduced demand for our hydrocarbon products, reduced profits, increased investigations and litigation, and negative impacts on our ability to access capital markets.

In addition, organizations that provided information to investors on corporate governance and related matters have developed rating processes for evaluating business entities on their approach to ESG matters. Currently, there are no universal standards for such scores or ratings, but the importance of sustainability evaluations is becoming more broadly accepted by investors and shareholders. Such ratings are used by some investors to inform their investment and voting decisions. Additionally, certain investors use these scores to benchmark businesses against their peers. If we are perceived as lagging, our investors may engage with such third party organizations to require improved ESG disclosure or performance.

***Our estimates of the volume of reserves could have flaws, or such reserves could turn out not to be commercially extractable. As a result, our future revenues and projections could be incorrect.***

Estimates of reserves and of future net revenues prepared by different petroleum engineers may vary substantially depending, in part, on the assumptions made and may be subject to adjustment either up or down in the future. Our actual amounts of production, revenue, taxes, development expenditures, operating expenses, and quantities of recoverable oil and natural gas reserves may vary substantially from the estimates. Oil and natural gas reserve estimates are necessarily inexact and involve matters of subjective engineering judgment. In addition, any estimates of our future net revenues and the present value thereof are based on assumptions derived in part from historical price and cost information, which may not reflect current and future values, and/or other assumptions made by us that only represent our best estimates. If these estimates of quantities, prices and costs prove inaccurate, we may be unsuccessful in expanding our oil and natural gas reserves base with our acquisitions. Additionally, if declines in and instability of oil and natural gas prices occur, then write downs in the capitalized costs associated with any oil and natural gas assets we obtain may be required. Because of the nature of the estimates of our reserves and estimates in general, reductions to our estimated proved oil and natural gas reserves and estimated future net revenues may not be required in the future, and/or that our estimated

16

**Table of Contents**

reserves may not be present and/or commercially extractable. If our reserve estimates are incorrect, we may be forced to write down the capitalized costs of our oil and natural gas properties.

***Decommissioning costs are unknown and may be substantial. Unplanned costs could divert resources from other projects.***

We may become responsible for costs associated with abandoning and reclaiming wells, facilities and pipelines which we use for production of oil and natural gas reserves. Abandonment and reclamation of these facilities and the costs associated therewith is often referred to as "decommissioning." We accrue a liability for decommissioning costs associated with our wells but have not established any cash reserve account for these potential costs in respect of any of our properties. If decommissioning is required before economic depletion of our properties or if our estimates of the costs of decommissioning exceed the value of the reserves remaining at any particular time to cover such decommissioning costs, we may have to draw on funds from other sources to satisfy such costs. The use of other funds to satisfy such decommissioning costs could impair our ability to focus capital investment in other areas of our business.

***We may have difficulty distributing production, which could harm our financial condition.***

In order to sell the oil and natural gas that we are able to produce, if any, the operators of the wells we obtain interests in may have to make arrangements for storage and distribution to the market. We will rely on local infrastructure and the availability of transportation for storage and shipment of our products, but infrastructure development and storage and transportation facilities may be insufficient for our needs at commercially acceptable terms in the localities in which we operate. This situation could be particularly problematic to the extent that our operations are conducted in remote areas that are difficult to access, such as areas that are distant from shipping and/or pipeline facilities. These factors may affect our and potential partners' ability to explore and develop properties and to store and transport oil and natural gas production, increasing our expenses.

Furthermore, weather conditions or natural disasters, actions by companies doing business in one or more of the areas in which we will operate, or labor disputes may impair the distribution of oil and/or natural gas and in turn diminish our financial condition or ability to maintain our operations.

***The marketability of any future production will be dependent upon transportation and other facilities, certain of which we do not control. When these facilities are unavailable, our operations can be interrupted and any revenues reduced.***

The marketability of any future production depends in part upon the availability, proximity and capacity of transportation facilities owned by third parties. The oil produced will be transported from the wellhead to our tank batteries by our gathering system. Our purchasers would then transport the oil by truck to a pipeline for transportation. Our natural gas production will generally be transported by our gathering lines from the wellhead to an interconnection point with the purchaser. We do not control these trucks and other third-party transportation facilities and our access to them may be limited or denied. Insufficient production from our wells to support the construction of pipeline facilities by our purchasers or a significant disruption in the availability of our or third-party transportation facilities or other production facilities could adversely impact our ability to deliver to market or produce our production and thereby cause a significant interruption in our operations.

We may be required to flare a portion of our natural gas production for a number of reasons, including the fact that (i) our well is not yet tied into the third-party gathering system, (ii) the pressures on the third-party gathering system are too high to allow additional production from our well to be transported or (iii) our production is prorated due to high demand on the third-party gathering system. We may flare additional gas from time to time.

17

**Table of Contents**

Also, the transfer of our oil and natural gas through third-party pipelines may be curtailed or delayed if it does not meet the quality specifications of the pipeline owners. Our access to transportation options, including trucks owned by third parties, can also be affected by U.S. federal and state regulation of oil and natural gas production and transportation, general economic conditions and changes in supply and demand. If, in the future, we are unable, for any sustained period, to implement acceptable delivery or transportation arrangements or encounter production-related difficulties, we may be required to shut in or curtail production. Any such shut in or curtailment, or an inability to obtain favorable terms for delivery of our production, would adversely affect our financial condition and results of operations.

### Our business will suffer if we cannot obtain or maintain necessary licenses.

Our operations will require licenses, permits and in some cases renewals of licenses and permits from various governmental authorities. Our ability to obtain, sustain or renew such licenses and permits on acceptable terms is subject to change in regulations and policies and to the discretion of the applicable governments, among other factors. Our inability to obtain, or our loss of or denial of extension, of any of these licenses or permits could hamper our ability to produce revenues from our operations.

### Challenges to our properties may impact our financial condition.

Title to oil and natural gas interests is often not capable of conclusive determination without incurring substantial expense. While we have made and intend to make appropriate inquiries into the title of properties and other development rights we have acquired and intend to acquire, title defects may exist. In addition, we may be unable to obtain adequate insurance for title defects, on a commercially reasonable basis or at all. If title defects do exist, it is possible that we may lose all or a portion of our right, title and interests in and to the properties to which the title defects relate. If our property rights are reduced, our ability to conduct our exploration, development and production activities may be impaired. To mitigate title problems, common industry practice is to obtain a title opinion from a qualified oil and natural gas attorney prior to the drilling operations of a well.

### We rely on technology to conduct our business, and our technology could become ineffective or obsolete.

We rely on technology, including geographic and seismic analysis techniques and economic models, to develop any reserve estimates and to guide our exploration, development and production activities. We and our operator partners will be required to continually enhance and update our technology to maintain its efficacy and to avoid obsolescence. The costs of doing so may be substantial and may be higher than the costs that we anticipate for technology maintenance and development. If we are unable to maintain the efficacy of our technology, our ability to manage our business and to compete may be impaired. Further, even if we are able to maintain technical effectiveness, our technology may not be the most efficient means of reaching our objectives, in which case we may incur higher operating costs than we would were our technology more efficient.

### The loss of key personnel would directly affect our efficiency and profitability.

Our future success is dependent, in a large part, on retaining the services of our planned management team. Our executive officers possess a unique and comprehensive knowledge of our industry and related matters that are vital to our success within the industry. The knowledge, leadership and technical expertise of these individuals would be difficult to replace. The loss of one or more of our officers could have a material adverse effect on our operating and financial performance, including our ability to develop and execute our long-term business strategy. We do not maintain key-man life insurance with respect to any employees. We have entered into employment agreements with certain of our executive officers effective immediately following the Spin-Off. Three of our executives were party to prior employment agreements with one of our subsidiaries, which have been terminated and superseded by the agreements as described in more detail under the heading "Executive Compensation" elsewhere in this Prospectus.

18

**Table of Contents**

***We have limited management and staff and are dependent upon partnering arrangements and third-party service providers.***

After the Spin-Off we plan to have six full-time employees, including our Chief Executive Officer and Chief Financial Officer. The loss of these individuals would have an adverse effect on our business, as we have very limited personnel. We leverage the services of other independent consultants and contractors to perform various professional services, including engineering, oil and natural gas well planning and supervision, and land, legal, environmental and tax services. We also pursue alliances with partners in the areas of geological and geophysical services and prospect generation, evaluation and prospect leasing. Our dependence on third-party consultants and service providers create a number of risks, including but not limited to:

- the possibility that such third parties may not be available to us as and when needed; and

- the risk that we may not be able to properly control the timing and quality of work conducted with respect to our projects.

If we experience significant delays in obtaining the services of such third parties or they perform poorly, our results of operations and stock price could be materially adversely affected.

***Certain of our directors and officers have significant duties with, and spend significant time serving, entities that may compete with us in seeking acquisitions and business opportunities and, accordingly, may have conflicts of interest in allocating time or pursuing business opportunities.***

Certain of our directors and officers, who are responsible for managing the direction of our operations and acquisition activities, hold positions of responsibility with other entities that are in the business of identifying and acquiring oil and natural gas properties. The existing positions held by these directors and officers may give rise to fiduciary or other duties that are in conflict with the duties they owe to us. These directors and officers may become aware of business opportunities that may be appropriate for presentation to us as well as to the other entities with which they are or may become affiliated. Due to these existing and potential future affiliations, they may present potential business opportunities to other entities prior to presenting them to us, which could cause additional conflicts of interest. They may also decide that certain opportunities are more appropriate for other entities with which they are affiliated, and as a result, they may elect not to present those opportunities to us. These conflicts may not be resolved in our favor. For additional discussion of our management's business affiliations and the potential conflicts of interest of which our stockholders should be aware, see "Certain Relationships and Related Party Transactions."

***Our business and operations may be adversely affected by the COVID-19 pandemic and may be adversely affected by other similar outbreaks.***

As a result of the COVID-19 pandemic or other adverse public health developments, including voluntary and mandatory quarantines, travel restrictions, and other restrictions, we have experienced delays, disruptions and temporary suspensions of our operations. In addition, our financial condition and results of operations may be adversely affected by the COVID-19 pandemic in the future.

The timeline and potential magnitude of the COVID-19 outbreak continue to be unknown. The continuation or amplification of the COVID-19 pandemic could continue to more broadly affect the United States and global economy, including our business and operations, and the demand for oil and natural gas. Other contagious diseases in the human population could have similar adverse effects. The potential impact from COVID-19 is difficult to predict, therefore, the extent to which it will negatively affect our operating results, or the duration of any potential business disruption is uncertain. The magnitude and duration of any impact will depend on future developments and new information that may emerge regarding the duration of COVID-19 pandemic, the severity of any variants thereof, rate of vaccinations and other actions taken by authorities to contain its impact or otherwise treat the disease, all of which are beyond our control.

19

**Table of Contents**

*Terrorist attacks or cyber-incidents could result in information theft, data corruption, operational disruption and/or financial loss.*

Like most companies, we have become increasingly dependent upon digital technologies, including information systems, infrastructure and cloud applications and services, to operate our businesses, to process and record financial and operating data, communicate with our business partners, analyze mine and mining information, estimate quantities of coal reserves, as well as other activities related to our businesses. Strategic targets, such as energy-related assets, may be at greater risk of future terrorist or cyber-attacks than other targets in the United States. Deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties, or cloud-based applications could lead to corruption or loss of our proprietary data and potentially sensitive data, delays in production or delivery, difficulty in completing and settling transactions, challenges in maintaining our books and records, environmental damage, communication interruptions, other operational disruptions and third-party liability. Our insurance may not protect us against such occurrences. Consequently, it is possible that any of these occurrences, or a combination of them, could have a material adverse effect on our business, financial condition, results of operations and cash flows. Further, as cyber incidents continue to evolve, we may be required to expend additional resources to continue to modify or enhance our protective measures or to investigate and remediate any vulnerability to cyber incidents. We plan to adopt plans and policies to address precautions with respect to data security and appropriate responses in case of a reported breach.

**Risks Relating to the Spin-Off**

*The Spin-Off could result in significant tax liability to Meta and its stockholders.*

The Spin-Off and cancellation of all shares of Meta's Series A Preferred Stock together will not qualify for non-recognition of gain or loss for U.S. federal income tax purposes. Series A Preferred stockholders could be subject to tax as a result of the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock together for U.S. federal income tax purposes for a U.S. holder (as defined further below) will depend on whether the Spin-Off and such cancellation qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Internal Revenue Code of 1986, as amended (the "Code"). If the Spin-Off and cancellation of all shares of the Series A Preferred Stock together qualify as a sale or exchange of the Series A Preferred Stock, the U.S. holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the Spin-Off and such cancellation together, and such U.S. holder's adjusted tax basis in the Series A Preferred Stock surrendered in the Spin-Off and such cancellation. The treatment of the Spin-Off and cancellation of all shares of the Series A Preferred Stock for U.S. federal income tax purposes for a non-U.S. holder (as defined further below) likewise will depend on whether the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock under Section 302 of the Code. If the Spin-Off and such cancellation together qualify as a sale or exchange of the Series A Preferred Stock, gain recognized from the Spin-Off by a non-U.S. holder generally will not be subject to U.S. federal income taxation. If the Spin-Off and such cancellation together do not qualify as a sale or exchange of Series A Preferred Stock, a non-U.S. holder will be treated as receiving a distribution from Meta, which distribution will be treated as a dividend to the extent the distribution is paid out of Meta's current or accumulated earnings and profits (as determined under U.S. federal income tax principles) and will be subject to any applicable withholding. If a Series A Preferred stockholder is subject to withholding tax in connection with the Spin-Off (including nonresident withholding tax or backup withholding tax, each as described further under the heading "Material U.S. Federal Income Tax Considerations" below), Meta has the right to reduce the amount of Common Stock deliverable to such stockholder in the Spin-Off in order to pay such withholding tax.

Meta will generally recognize gain equal to the fair market value of our Common Stock in excess of Meta's adjusted tax basis in such Common Stock at the time of the Spin-Off. To the extent such gain gives rise to unreimbursed federal, state or other tax liabilities, such liabilities could adversely affect Meta's liquidity or capital reserves.

**Table of Contents**

See below under the headings "Notes to Unaudited Pro-Forma Condensed Combined Financial Statements" and "Material U.S. Federal Income Tax Considerations" for more information.

***We may be unable to achieve some or all of the benefits that we expect to achieve from the Spin-Off.***

We believe that, as an independent company, we will be able to, among other things, better focus our financial and operational resources on our specific business, implement and maintain a capital structure designed to meet our specific needs, design and implement corporate strategies and policies that are targeted to our business, more effectively respond to industry dynamics and create effective incentives for our management and employees that are more closely tied to our business performance. However, by separating from Meta, we may be more susceptible to market fluctuations and have less leverage with suppliers, and we may experience other adverse events. In addition, we may be unable to achieve some or all of the benefits that we expect to achieve as an independent company in the time we expect, if at all. The completion of the Spin-Off will also require significant amounts of our management's time and effort, which may divert management's attention from operating and growing our business.

***We may be unable to make, on a timely or cost-effective basis, the changes necessary to operate as an independent company, and we may experience increased costs after the Spin-Off.***

Meta has provided us with various corporate services. Following the Spin-Off, Meta will have no obligation to provide us with assistance other than as described under "Certain Relationships and Related Party Transactions—Agreements with Meta." These arrangements do not account for every service that we have received from Meta in the past. Accordingly, following the Spin-Off, we will need to provide internally or obtain from unaffiliated third parties the services we currently receive from Meta. We may be unable to replace these services in a timely manner or on terms and conditions as favorable as those we receive from Meta. We may be unable to successfully establish the infrastructure or implement the changes necessary to operate independently or may incur additional costs. If we fail to obtain the services necessary to operate effectively or if we incur greater costs in obtaining these services, our business, financial condition and results of operations may be adversely affected.

***We have limited operating history as an independent company, and our historical financial information is not necessarily representative of the results we would have achieved as an independent company and may not be a reliable indicator of our future results.***

We derived the historical financial information included in this Prospectus from Meta's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent company during the periods presented or those that we will achieve in the future. This is primarily because of the following factors:

- Prior to the Spin-Off, we operated as part of Meta's broader corporate organization, and Meta performed various corporate functions for us. Our historical financial information reflects allocations of corporate expenses from Meta for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent company.

- We will enter into certain transactions with Meta that did not exist prior to the Spin-Off, such as the Tax Matters Agreement, which may cause us to incur new costs.

- Our historical financial information does not reflect changes that we expect to experience in the future as a result of our separation from Meta, including changes in our cost structure, personnel needs, tax structure, financing and business operations. As part of Meta, we enjoyed certain benefits from Meta's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we will lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses or access capital markets on terms as favorable to us as those we obtained as part of Meta prior to the Spin-Off.

**Table of Contents**

Following the Spin-Off, we will also be responsible for the additional costs associated with being an independent company, including costs related to corporate governance, investor and public relations and public reporting. In addition, certain costs incurred by Meta, including executive oversight, accounting, treasury, tax, legal, human resources, occupancy, procurement, information technology and other shared services, have historically been allocated to us by Meta; but these allocations may not reflect the future level of these costs to us as we begin to provide these services ourselves. Therefore, our historical financial statements may not be indicative of our future performance as an independent company. We cannot assure you that our operating results will continue at a similar level when we are an independent company. For additional information about our past financial performance and the basis of presentation of our financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the notes thereto included elsewhere in this Prospectus.

***Our contracts may contain provisions requiring the consent of third parties in connection with the Spin-Off. If these consents are not obtained, we may be unable to enjoy the benefit of these contracts in the future.***

Our contracts may contain provisions that require the consent of third parties to the Spin-Off. Failure to obtain such consents on commercially reasonable and satisfactory terms may impair our entitlement to the benefit of these contracts in the future.

***The 2021 Note with Meta contains restrictive covenants that limit our operations.***

In 2021, we borrowed $15 million pursuant to the terms of the 2021 Note (defined below). If we are not in compliance with the covenants of the 2021 Note, or if we are in default under the 2021 Note, it is unlikely that Meta will offer to extend any additional loans or debt financing under the 2021 Note or otherwise, which may affect our business as a going concern. The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note. This restriction may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

The 2021 Note is secured by a security interest in shares of common stock of Meta and a 25% working interest in the Orogrande Prospect as defined in the Security Agreement (defined below), each held by the Pledgor (defined below) or the Pledgor's affiliate. Any default that is not waived could permit Meta, as lender, to exercise rights and remedies with respect to all of the collateral that is securing the 2021 Note, and/or other rights and remedies under applicable law.

Our ability to meet these restrictive covenants or to avoid defaults can be impacted by events beyond our control. The 2021 Note provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, Meta as our lender could elect to declare all amounts outstanding under the 2021 Note to be immediately due and payable. If the outstanding debt under the 2021 Note was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

***Our Loan Agreement with Meta contains restrictive covenants that limit our operations.***

As of August 2022, we borrowed an aggregate principal amount of $5.0 million pursuant to the terms of the Loan Agreement (defined below), which is the maximum principal balance available under the Loan Agreement. The Loan Agreement contains various restrictive covenants and other restrictions, which include, among other things, restrictions on:

- our ability to transfer all or part of our business or property, except for inventory in the ordinary course of business, surplus or obsolete equipment, permitted liens, and transfers of cash permitted by the agreement;

[Table of Contents](#)

- our ability to liquidate or dissolve or merge or consolidate with another entity, or acquire another entity;

- our ability to incur additional debt beyond certain limits or encumber our assets; and

- our ability to pay dividends or make investments, other than permitted investments.

These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or industry or take future actions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" for additional information.

Our ability to meet these restrictive covenants can be impacted by events beyond our control. The Loan Agreement provides that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence and during the continuance of an event of default, Meta as the lender could elect to (i) declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable, (ii) terminate any remaining commitment to make loans under the Loan Agreement, and/or (iii) exercise certain other rights and remedies anticipated under the Loan Agreement. The events of default under the Loan Agreement include, among other things (subject to grace periods in certain instances), payment defaults, breaches of covenants or representations and warranties, a change in control or certain material adverse effects as defined in the Loan Agreement, material judgments and attachments, cross defaults with certain of our other material indebtedness, and bankruptcy and insolvency events with respect to us and our subsidiaries. If the outstanding debt under the Loan Agreement was to be accelerated, we may not have sufficient cash on hand to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Common Stock.

*We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements with Meta.*

We have negotiated agreements with Meta including the 2021 Note, Loan Agreement, Distribution Agreement and Tax Matters Agreement, while we are still part of Meta. Accordingly, these agreements may not reflect terms that would have resulted from arms-length negotiations between unaffiliated parties. The terms of the agreements being negotiated relate to, among other things, loans for working capital, allocations of assets, liabilities, rights, indemnifications and other obligations between Meta and us. We may have received better terms from third parties because third parties may have competed with each other to win our business. See "Certain Relationships and Related Party Transactions" for more information.

### Risks Relating to our Common Stock

*Our Common Stock is not eligible with the Depository Trust Company ("DTC"), which may result in brokerage firms being unwilling to hold or trade the stock.*

A significant number of the holders of the Series A Preferred Stock hold such shares in "street name" brokerage accounts. Our shares of Common Stock will not become eligible with DTC to permit our shares of Common Stock to trade electronically. If an issuer is not "DTC-eligible," then its capital stock cannot be electronically transferred between brokerage accounts, which means that brokerage firms may be unwilling to hold or trade our Common Stock, restricting all trades by holders of our Common Stock following the Spin-Off, and the brokerage firms may return all such shares from the brokerage accounts to the beneficial holders.

*The price per share of Meta's Series A Preferred Stock traded on the over-the-counter ("OTC") market under the symbol MMTLP may not accurately reflect the value of a share of our Common Stock that you will receive in the Distribution.*

Before the Distribution, Meta's Series A Preferred Stock was traded on the OTC market under the trading symbol "MMTLP", although such shares of MMTLP were not eligible for broker-dealer quotations. The OTC

23

[Table of Contents](#)

market does not constitute an established stock exchange, and as a result, the historical trading prices for the shares of MMTLP may not be a reliable benchmark on which to determine the value of the shares of our Common Stock you will receive in the Distribution.

Additionally, securities of certain companies have recently experienced significant and extreme volatility in stock price due to short sellers of shares of securities, known as a "short squeeze." These short squeezes have caused extreme volatility in both the stock prices of those companies and in the market and have led those companies' securities to trade at a significantly inflated price per share that is disconnected from the underlying value of the company. In particular, if any investors have sold shares of MMTLP short, then in connection with the Distribution such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution. If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share as shown on the OTC market may rise significantly but not be representative of the value of the underlying shares of our Common Stock that you will receive in the Distribution.

### *No trading market for our Common Stock is expected to develop.*

There is presently no public market for our shares of Common Stock and our shares are not expected to become DTC eligible for electronic trading to third parties. There is no expectation that a trading market will develop or be sustained. Accordingly, you may have to hold the shares of Common Stock indefinitely.

### *We do not intend to pay any cash dividends in the foreseeable future and, therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.*

We do not intend to pay cash dividends on our Common Stock in the foreseeable future. We expect to retain future earnings, if any, for reinvestment in our business. Also, any credit agreements, which we may enter into, may restrict our ability to pay dividends. Whether we pay cash dividends in the future will be at the discretion of our board of directors (the "Board") and will be dependent upon our financial condition, results of operations, cash requirements, future prospects and any other factors our Board deems relevant. Therefore, any return on your investment in our Common Stock must come from increases in the fair market value of the Common Stock.

### *Your percentage ownership in the Company may be diluted in the future, including in our plan to issue our Common Stock for the working interests in our Orogrande Project.*

Your percentage ownership in the Company may be diluted in the future because of equity awards that we expect to grant to our directors, officers and other employees and current holders of working interests in our Orogrande Project. Prior to the Spin-Off, we approved an incentive plan that will provide for the grant of Common Stock-based equity awards to our directors, officers and other employees. In addition, we may issue equity as all or part of the consideration paid for acquisitions and strategic investments that we may make in the future or as necessary to finance our ongoing operations.

### *We may issue preferred stock with terms that could adversely affect the voting power or value of our Common Stock.*

Our Board has the authority to cause us to issue, without any further vote or action by the stockholders, shares of preferred stock in one or more series, to designate the number of shares constituting any series, and to fix the rights, preferences, privileges and restrictions thereof, including dividend rights, voting rights and terms of redemption, redemption price or prices and liquidation preferences of such series. The terms of one or more classes or series of preferred stock could adversely impact the voting power or value of our Common Stock. For example, we might afford holders of preferred stock the right to elect some number of our directors in all events or upon the occurrence of specified events or the right to vote on specified transactions. Similarly, the repurchase or redemption rights or liquidation preferences we might assign to holders of preferred stock could affect the residual value of our Common Stock.

**Table of Contents**

**Risks Relating to Our Status as a Public Reporting Company**

***We are an emerging growth company and a smaller reporting company, subject to less stringent reporting and regulatory requirements of other publicly reporting companies and this status may have an adverse effect on our ability to attract interest in our Common Stock.***

We are an emerging growth company as defined in the JOBS Act. As long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting and regulatory requirements that are applicable to other public reporting companies that are not emerging growth companies. We cannot predict if investors will find our Common Stock less attractive if we choose to rely on these exemptions.

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company provided: (1) the market value of our common stock held by non-affiliates is less than $250 million as of the end of the prior June 30th, or (2) our annual revenues are less than $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates is less than $700 million as of the prior June 30th. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public reporting companies difficult or impossible.

***We may be required to file reports with the SEC only for the fiscal year in which the registration statement for the Spin-Off becomes effective and may no longer be subject to the reporting obligations under the Exchange Act thereafter.***

By registering the shares of Common Stock in connection with the Spin-Off, we become subject to the reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. We would be obligated to continue these reporting obligations for subsequent reporting periods if on the last day of our fiscal year in which the Registration Statement of which this prospectus forms a part becomes effective we have more than $10 million in assets and either 2,000 or more record holders or 500 or more record holders who are not "accredited investors." It is unclear whether the number of our record holders following the Spin-Off will meet one or both of these thresholds, in which case, we may become exempt from such reporting requirements after the year ending December 31, 2022. If we were to decide not to continue reporting, you will not have access to updated information regarding our business, financial condition and results of operation. Although we may and intend to continue to file such reports with the SEC, such filings will be voluntary.

25

**Table of Contents**

**THE SPIN-OFF**

**Background**

In June 2020 the board of directors of Torchlight began to pursue strategic alternatives for Torchlight due to the permeating financial climate of the oil and gas industry in 2020. In July 2020 Torchlight engaged Roth Capital Partners, LLC as its financial advisor in connection with a strategic transaction. After discussions with various companies, Torchlight began discussions with Metamaterial, Inc. in September 2020 concerning a potential strategic transaction.

After several months of negotiations, in December 2020 Torchlight and Metamaterial, Inc. entered into the Arrangement Agreement. Within the Arrangement Agreement, the oil and gas properties of Torchlight (the "O&G Assets") were effectively allocated to the legacy Torchlight stockholders, which became the Series A Preferred stockholders of Torchlight (which was subsequently renamed "Meta Materials, Inc."). Concurrent with the negotiation and execution of the Arrangement Agreement was the Certificate of Designation of Preferences, Rights and Limitations of the Series A Preferred Stock. Pursuant to the Certificate of Designation, upon a sale of the O&G Assets, the proceeds from any such transaction are to be distributed to the Series A Preferred stockholders, or Meta was to pursue a spin-off. In lieu of a sale of the O&G Assets, the Meta board has now determined to pursue the Spin-Off.

**Reasons for the Spin-Off**

The Meta board of directors considered the Spin-Off to be strategic so that Meta can concentrate on its core business.

**When and How You Will Receive Shares of Common Stock**

Meta will distribute to the holders of its Series A Preferred Stock, as a pro rata dividend, one share of our Common Stock for every share of Series A Preferred Stock outstanding as of December 12, 2022 (the "Record Date").

Prior to the Spin-Off, Meta will deliver all of the issued and outstanding shares of our Common Stock to the distribution agent. American Stock Transfer & Trust Company LLC (the "Transfer Agent") will serve as distribution agent in connection with the Distribution and as transfer agent and registrar for our Common Stock.

If you own Series A Preferred Stock of Meta as of the close of business on December 12, 2022, the shares of our Common Stock that you are entitled to receive in the Distribution will be issued to your account as follows:

- *Registered stockholders*. If you own your shares of Series A Preferred Stock directly through Meta's transfer agent, American Stock Transfer & Trust Company LLC, you are a registered stockholder. In this case, the distribution agent will credit the whole number of shares of our Common Stock you receive in the Distribution by way of direct registration in book-entry form to a new account with the Transfer Agent. Registration in book-entry form refers to a method of recording share ownership where no physical stock certificates are issued to stockholders, as is the case in the Distribution. You will be able to access information regarding your book-entry account holding our shares at the Transfer Agent.

Commencing on or shortly after the Distribution Date, the Transfer Agent will mail to you an account statement that indicates the number of whole shares of our Common Stock that have been registered in book-entry form in your name. We expect it will take the Transfer Agent up to two weeks after the Distribution Date to complete the distribution of the shares of our Common Stock and mail statements of holdings to all registered stockholders. You or your bank, broker or other nominee may request that the Transfer Agent issue to you a physical stock certificate representing your shares of Common Stock.

- "*Street name*" *or beneficial stockholders*. Most Meta stockholders own their shares of Series A Preferred Stock beneficially through a bank, broker or other nominee. In these cases, the bank, broker

26

**Table of Contents**

or other nominee holds the shares in "street name" and records your ownership on its books. If you own your shares of the Series A Preferred Stock through a bank, broker or other nominee, your bank, broker or other nominee will credit your account with the whole shares of our Common Stock that you receive in the Distribution on or shortly after the Distribution Date; however, our shares of Common Stock will not be eligible for electronic trading through DTC or any other established clearing corporation. Therefore, we encourage you to contact your bank, broker or other nominee to instruct such bank, broker or other nominee to transfer the shares of Series A Preferred Stock to our transfer agent on or prior to the Record Date such that each such holder of Series A Preferred Stock is the registered holder of the distributed shares of Common Stock in book-entry form in a new account with our Transfer Agent.

If you sell shares of Series A Preferred Stock on or before the Record Date, you will not be entitled to receive the shares of Common Stock in the Distribution in respect of such shares of Series A Preferred Stock sold. We expect all trading of the shares of Series A Preferred Stock to be suspended as of the Distribution Date.

We are not asking holders of Meta Series A Preferred Stock to take any action in connection with the Spin-Off. No approval of any holders of Meta's capital stock is required for the Spin-Off. We are not asking you for a proxy and request that you not send us a proxy. We are also not asking you to make any payment or surrender or exchange any of your shares of Meta Series A Preferred Stock for shares of our Common Stock. As of the Distribution Date, all of the shares of Series A Preferred Stock will be automatically cancelled and the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares.

**Number of Shares You Will Receive**

On the Distribution Date, you will receive one share of our Common Stock for every share of Meta Series A Preferred Stock you hold on the Record Date. No fractional shares of Common Stock will be issued.

**Results of the Spin-Off**

After the Spin-Off, we will be an independent company. Immediately following the Spin-Off, we expect to have approximately 64,000 holders of shares of our Common Stock. In computing the number of holders of record, all broker-dealers and clearing corporation holding shares on behalf of its customers, the holders of the Series A Preferred Stock, is counted as a single shareholder. A significant number of shares of our Common Stock are held in either nominee name or street name brokerage accounts, and consequently, we are unable to determine the exact number of beneficial owners of our Common Stock.

We have entered into a Distribution Agreement and certain other agreements with Meta related to the Spin-Off. These agreements will govern the relationship between us and Meta up to and after completion of the Spin-Off and allocate between us and Meta various assets, liabilities, rights and obligations, including employee benefits, intellectual property and tax-related assets and liabilities. We describe these arrangements in greater detail under "Certain Relationships and Related Party Transactions—Agreements with Meta."

**Conditions to the Spin-Off**

We expect that the separation will be effective on the Distribution Date, provided that the following conditions shall have been satisfied or waived by Meta:

- the Meta board of directors shall have authorized and approved the Distribution and not withdrawn such authorization and approval, and shall have declared the dividend of our Common Stock to Meta stockholders;

- the Distribution Agreement and the ancillary agreements contemplated by the Distribution Agreement shall have been executed by each party to those agreements;

27

**Table of Contents**

- the SEC shall have declared effective our Registration Statement on Form S-1, of which this Prospectus is a part, under the Securities Act, and no stop order suspending the effectiveness of our Registration Statement shall be in effect and no proceedings for that purpose shall be pending before or threatened by the SEC;

- no order, injunction or decree issued by any governmental authority of competent jurisdiction or other legal restraint or prohibition preventing consummation of the Distribution shall be in effect, and no other event outside the control of Meta shall have occurred or failed to occur that prevents the consummation of the Distribution;

- all necessary actions and filings with regard to applicable state securities or "blue sky" laws shall have been taken; and

- any material third party consents necessary to consummate the Spin-Off shall have been obtained or waived.

**Reasons for Furnishing this Prospectus**

We are furnishing this Prospectus solely to provide information to Meta Series A Preferred Stockholders who will receive shares of our Common Stock in the Distribution. You should not construe this Prospectus as an inducement or encouragement to buy, hold or sell any of our securities or any securities of Meta. We believe that the information contained in this Prospectus is accurate as of the date set forth on the cover. Changes to the information contained in this Prospectus may occur after that date, and neither we nor Meta undertake any obligation to update the information except in the normal course of our and Meta's public disclosure obligations and practices and except as required by applicable law.

28

Remaining Pages of Prospectus Excerpted

# EXHIBIT 10

EX-99.1 2 ex_99-1.htm PRESS RELEASE DATED DECEMBER 20, 2022

**Exhibit 99.1**



*NEWS RELEASE*

### NEXT BRIDGE HYDROCARBONS, INC. ANNOUNCES
### COMPLETION OF SPIN-OFF FROM META MINERALS, INC.

**FT. WORTH – December 20, 2022 – Next Bridge Hydrocarbons, Inc.** ("Next Bridge", "our", or the "Company") announced today that the spin-off of all of the issued and outstanding shares of common stock of Next Bridge by Meta Materials, Inc. ("Meta"), was successfully completed on December 14, 2022. The Company has posted a Frequently Asked Questions document regarding the spin-off on its website at https://www.nextbridgehydrocarbons.com/investors, which includes all publicly available information.

The Company also announced that its transfer agent, American Stock Transfer & Trust Company, LLC ("AST"), is in the process of mailing statements of holdings to all registered stockholders.

- If you are a **registered holder of record** (on the books of Next Bridge maintained by AST) of the MMTLP Series A Preferred Stock as of December 12, 2022 (the "Record Date"), you are considered the holder of record with respect to those shares, and AST will mail statements of holdings to all registered stockholders after the distribution is complete. No action is required for registered holders to register their shares. Registered holders may contact AST directly at:

  By Mail:                                          AST Shareholder Services Call Center:
  American Stock Transfer & Trust Company, LLC      Toll Free: 800.937.5449
  ATTN: Operations Center, Reorganization Dept.     Local & International: 718-921-8124
  6201 15th Avenue                                  Hours: 8 a.m. – 8 p.m. ET Monday-Friday
  Brooklyn, New York 11219                          Help@astfinancial.com

- If your MMTLP Series A Preferred Stock are held in an account at a broker, bank, broker-dealer, custodian, or other similar organizations, then you are the **beneficial owner of shares** held in "street name." You should contact your custodial institution directly if you wish to have your shares registered.

The Company anticipates meeting its reporting obligations under the Exchange Act, which includes filings of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K for reporting periods ending on or before December 31, 2022. The Company has also established an "Investor Form" on the Company's website, which is to be used for internal purposes only.

1

**About Next Bridge Hydrocarbons, Inc.**

The Company is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project consisting of 134,000 contiguous gross acres we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas. In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas, and two minor well interests in Oklahoma. Please visit www.nextbridgehydrocarbons.com for more information.

This press release may contain "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described herein. Although the Company believes the expectations in such statements to be reasonable, there can be no assurance that such expectations will prove to be correct. Information concerning the assumptions, uncertainties and risks that may affect the actual results can be found in the Company's filings with the Securities and Exchange Commission ("SEC") available on the Company's website or the SEC's website at sec.gov.

Contact:
Dennard Lascar Investor Relations
NextBridge@dennardlascar.com

2

EXHIBIT 11

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | Case No. 23-90085 (CML) |
| Debtors. | (Jointly Administered) |

**THE U.S. SECURITIES AND EXCHANGE COMMISSION'S
STATEMENT IN SUPPORT OF CONSOLIDATED AUDIT TRAIL, LLC'S
OBJECTION TO SCILEX HOLDING COMPANY'S
MOTION FOR ENTRY OF AN ORDER COMPELLING THE PRODUCTION OF
BOOKS AND RECORDS FROM CONSOLIDATED AUDIT TRAIL, LLC PURSUANT
TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
(Related to Dkt. No. 1878)

The U.S. Securities and Exchange Commission (the "Commission"), a statutory party to these proceedings[2] and the federal agency responsible for regulating and enforcing compliance with the federal securities laws, submits this Statement in Support of Consolidated Audit Trail, LLC's Objection to Scilex Holding Company's Motion for Entry of an Order Compelling the

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

[2] As a statutory party in corporate reorganization proceedings, the Commission "may raise and may appear and be heard on any issue." 11 U.S.C. §1109(a).

1

Production of Books and Records from Consolidated Audit Trail, LLC Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Motion").[3]

## I.    INTRODUCTION

The consolidated audit trail ("CAT") is of critical importance to the Commission and to self-regulatory organizations ("SROs")[4] in their regulation and oversight of the nation's securities markets.  Because of the vast amount of confidential data captured in CAT for these purposes, maintaining the confidentiality of CAT data is of utmost importance.  Toward this end, the Commission has required that CAT data be used only for regulatory and oversight responsibilities pursuant to the federal securities laws, rules, and regulations.  It should not be used in private litigation.  Therefore, the Commission respectfully requests that the Court deny Scilex's Motion.

## II.   CAT DATA SHOULD BE USED ONLY FOR REGULATORY AND OVERSIGHT PURPOSES

### A.  CAT Data Should Be Kept Confidential

1.      CAT allows regulators to track activity throughout the U.S. markets in National Market System ("NMS") securities.  CAT captures customer and order event information for orders in NMS securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution.  CAT data "substantially enhance[s] the ability of SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws."  Joint Industry Plan; Order Approving the National Market System

---

[3] The Motion filed by Scilex Holding Company ("Scilex") is docket number 1878.  Consolidated Audit Trail, LLC's Objection to the Motion is docket number 2075.

[4] SROs include registered stock exchanges (e.g., the New York Stock Exchange (NYSE)) and registered securities associations (e.g., the Financial Industry Regulatory Authority (FINRA)).

Plan Governing the Consolidated Audit Trail, Release No. 34-79318, 81 Fed. Reg. 84696, 84698

(November 16, 2016) ("CAT NMS Plan Approval Order") (quotations omitted).

2.      Rule 613, which was adopted by the Commission in 2012, required the creation of

CAT and mandated that SROs develop a "national market system plan to govern the creation,

implementation, and maintenance of a consolidated audit trail and central repository" ("CAT

NMS Plan").  17 CFR § 242.613(a)(1).  The SROs subsequently filed the CAT NMS Plan, and

the Commission approved it in the November 16, 2016, CAT NMS Plan Approval Order.[5]

3.      Since its inception, the Commission has sought to balance the value of CAT data

for regulatory and oversight purposes with the risk of consolidating vast amounts of confidential

information by requiring strong privacy and confidentiality protections.  *See, e.g., Consol. Audit*

*Trail*, Release No. 34-67457, at 45782 (July 18, 2012) ("Rule 613 Adoption Release") (stating

the Commission "believes that maintaining the confidentiality of customer and other information

reported to the central repository is essential. Without adequate protections, market participants

would risk the exposure of highly-confidential information about their trading strategies and

positions."); CAT NMS Plan Approval Order, 81 Fed. Reg. at 84758 ("[T]he CAT is designed to

---

[5] The CAT NMS Plan takes the form of a limited liability agreement establishing a company jointly owned by the participating SROs (the "participants," also referred to as the "plan sponsors" in Rule 613) through which they conduct the activities related to CAT.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84699.  Pursuant to an amendment to the CAT NMS Plan, the limited liability company is named Consolidated Audit Trail, LLC ("CAT LLC").  Joint Industry Plan; Notice of Filing and Immediate Effectiveness of Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-87149 (September 27, 2019), 84 Fed. Reg. 52905 (Oct. 3, 2019).  The CAT NMS Plan obliges a "plan processor" to develop and implement policies, procedures, and control structures related to the CAT system that are consistent with Rule 613(e)(4) (ensuring the security and confidentiality of CAT data), among other provisions.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84704.  Pursuant to the CAT NMS Plan, the participants must report specified CAT data that is received, consolidated, and retained in a "central repository" overseen by the plan processor.  *Id.*, 81 Fed. Reg. at 84706-07.

be a regulatory tool. . . . [T]he Commission also believes that limiting the use of CAT Data for regulatory and surveillance purposes is reasonable at this time, given the vast scope of the CAT Data and need to ensure the security and confidentiality of the CAT Data.").

4.      In accord with protecting the confidentiality of CAT data, Commission regulations provide that CAT LLC is subject to strict limits on how and by whom CAT data is used.  Rule 613(e)(4) expressly requires that the plan processor "[e]nsure the security and confidentiality of all information reported to the central repository by requiring that: (A) All plan sponsors and their employees, as well as all employees of the central repository, agree to use appropriate safeguards to ensure the confidentiality of such data and agree not to use such data for any purpose other than surveillance and regulatory purposes."  17 CFR § 242.613(e)(4)(i)(A).[6]  Rule 613(e)(4) further requires that rules be adopted and enforced that "[r]equire information barriers between regulatory staff and non-regulatory staff with regard to access and use of data in the central repository" and that "[p]ermit only persons designated by plan sponsors to have access to the data in the central repository."  17 CFR § 242.613(e)(4)(i)(B).

5.      Similarly, the Commission's rule provides that access to and use of CAT data should be for the purpose of performing regulatory and oversight responsibilities.  Rule 613(e)(2) states that, "Each [Participant] and the Commission shall have . . . access to and use of the data reported to and consolidated by the central repository . . . *for the purpose of performing its*

---

[6] Rule 613(e)(4) clarifies that this language should not be "construed to prevent a plan sponsor from using the data that it reports to the central repository for regulatory, surveillance, commercial, or other purposes as otherwise permitted by applicable law, rule, or regulation."  17 CFR § 242.613(e)(4).  However, this exception only applies to plan sponsors (SROs) and with respect to the data plan sponsors have retained independently of their CAT reporting obligations; the exception does not apply to CAT LLC's employees or data.

*respective regulatory and oversight responsibilities* pursuant to the federal securities laws, rules, and regulations." 17 CFR § 242.613(e)(2) (emphasis added).

6.      Consistent with the requirements of Rule 613, the Commission-approved CAT NMS Plan provides that "access to and use of the CAT Data" is "solely for the purpose of performing [the plan participants'] respective regulatory and oversight responsibilities pursuant to the federal securities laws, rules and regulations or any contractual obligations."[7]  CAT NMS Plan, § 6.5(c)(i) (available at https://www.catnmsplan.com/sites/default/files/2023-09/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-9.06.23.pdf); *see also* CAT NMS Plan, §§ 6.5(f)(i)(A) (requiring individuals who have access to CAT data to agree "to use appropriate safeguards" and to use CAT data only for approved purposes), 6.5(g) (requiring plan participants to have policies and procedures to "ensure the confidentiality of CAT Data" and limit the use of CAT data "solely for surveillance and regulatory purposes").  The CAT NMS Plan Approval Order similarly states that "access to and use of the CAT Data stored in the Central Repository [will be provided to the Participants and the SEC] *solely for the purpose of performing their respective regulatory and oversight responsibilities* pursuant to the federal securities laws, rules and regulations or any contractual obligations."  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84706 (emphasis added).[8]

---

[7] Regarding the reference to "contractual obligations," some plan participants contract with other plan participants to provide regulatory services via regulatory services agreements.

[8] *See also id.*, 81 Fed. Reg. at 84764 ("The Commission takes very seriously concerns about maintaining the security and confidentiality of CAT Data and believes that it is imperative that all CAT users, including the Commission, implement and maintain a robust security framework with appropriate safeguards to ensure that CAT Data is kept confidential and used only for surveillance and regulatory purposes.").

7.      A violation of the CAT NMS Plan is a violation of Rule 613,[9] so CAT LLC and the plan participants have a legal duty to keep CAT data confidential and to use it only for regulatory and oversight purposes.

### B.  Disclosure of CAT Data to Private Entities Would Significantly Compromise CAT Data

8.      Allowing disclosure of CAT data to private entities creates a significant risk of improper disclosure of this highly confidential information.  Since private parties were not intended recipients of CAT data, they are not subject to the numerous security and confidentiality requirements with which SROs must comply.  *See, e.g.*, CAT NMS Plan Approval Order, 81 Fed. Reg. at 84724 (requiring SRO participants to "establish, maintain and enforce written policies and procedures reasonably designed to ensure the confidentiality of the CAT Data," "adopt and enforce policies and procedures that implement effective information barriers between each Participant's regulatory and nonregulatory Staff with regard to CAT Data, permit only persons designated by Participants to have access to the CAT Data stored in the Central Repository; and impose penalties for Staff noncompliance with any of its or the Plan Processor's policies and procedures with respect to information security.").  Private parties also may not have the infrastructure or ability to protect CAT data with the same level of security protections that the Commission and SROs have put in place.

9.      Requests like Scilex's, if granted, would result in the release of a vast amount of data.  Scilex is seeking over two years' worth of data, and that data will include, for each trade in Scilex stock, information relating to the price, size, time, and venue of trades, firm-designated

---

[9] *See* 17 CFR § 242.613(h)(2) ("[a]ny failure by a national securities exchange or national securities association to comply with the provisions of the national market system plan approved by the Commission shall be considered a violation of this section.").

identifiers and confidential customer identifiers, as well as numerous other aspects of orders, executions, and allocations, such as order type information.  And to the extent that Scilex's open-ended request for "all other data not listed" includes customer and account information, sensitive identifying information of any entity or individual that ordered, traded, or was allocated Scilex securities would be disclosed, including, but not limited to, legal names, addresses, years of birth, Employer Identification Numbers, and unique customer identifiers currently available only to regulators.

10.     As delineated in the CAT NMS Plan Approval Order, if the security of CAT data were compromised, the resulting costs could be significant, including (a) damage to market participants' trading profits and client relationships as a result of the disclosure of confidential trading strategies or positions, and (b) damage to business profits as a result of the disclosure of proprietary information about non-public business relationships.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84874.

11.     Protective orders would not be sufficient to assure that CAT data was kept in computer systems with all the protections that the Commission and the SROs have implemented for CAT data.

12.     Because CAT data is confidential data that, by law, is gathered and maintained solely for regulatory and oversight use, it should not be available to litigants who are seeking to use it for other purposes and who are unlikely to be able to protect the data pursuant to the confidentiality and security requirements imposed on CAT participants and the Commission.

### C.   CAT Data Constitutes "Protected Matter" under Rule 45 of the Federal Rules of Civil Procedure

13.     Rule 2004 exams are enforced through subpoenas issued in accordance with Rule 45.  *See* Fed. R. Bankr. Proc. 2004(c) (production "may be compelled as provided in Rule

7

9016"); Fed. R. Bankr. Proc. 9016 (stating that Rule 45 of the Federal Rules of Civil Procedure applies in bankruptcy cases). Rule 45 provides, in relevant part, that a court must quash or modify a subpoena that "requires disclosure of privileged *or other protected matter*, if no exception or waiver applies." Fed. R. Civ. Proc. 45(d)(3)(A))(iii) (emphasis added); *see also id.* at (d)(3)(B)(i) (providing that a court may quash or modify a subpoena if it requires disclosing confidential commercial information).

14.     "[P]rivacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336 (11th Cir. 2020); *see also Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 526–27 (N.D. Ga. 2012) (quashing a plaintiff's request for nonparty educational records based in part on the privacy rights protected by the Family Educational Rights and Privacy Act of 1974, which "does not provide a privilege preventing disclosure of student records, [but nevertheless] seeks to protect the confidentiality of educational records").

15.     Given that the Commission's regulations, the CAT NMS Plan, and other Commission statements evidence a critical government policy of protecting the confidentiality of CAT data, CAT data is a "protected matter," and Scilex's Motion should be denied on this basis. *See, e.g., In re Subpoena Dated June 18, 2020*, No. 20-MC-82327-BER, 2021 WL 7540812, at *5 (S.D. Fla. Apr. 14, 2021) (holding that where, "for important Governmental policy reasons, the FDA uses contractual provisions and agency regulations to limit disclosure of clinical testing data until after a final report is issued," "these restrictions bring the subpoenaed materials within the definition of 'protected' material within the meaning of Fed. R. Civ. P. 45(d)(3)(A)(iii) until the final study report is issued"); *Shetayh v. State Farm Fire & Cas. Co.*, No. 5:20-CV-00693,

2020 WL 6817325, at *4 (E.D. Pa. Nov. 20, 2020) (quashing a subpoena to a district attorney's office, in part, because the court found that documents relating to a criminal investigation were confidential and therefore a "protected matter" under Rule 45; in doing so, the court considered the state's statute evidencing confidentiality concerns and imposing confidentiality duties relating to investigative materials, despite the inapplicability of state privileges in federal court).

### D. Private Litigants Like Scilex Cannot Show Good Cause for CAT Data and Should Turn to Alternate Sources for Discovery

16.     The Commission believes that no request by a private litigant for CAT data would be appropriate.  However, if a disclosure that was not for a regulatory or oversight purpose were to be considered, any party seeking CAT data should be required to show that the party's need outweighs the need to protect CAT data.  Such a party would need to make a clear showing that CAT data is relevant and necessary to the party's litigation position, that it cannot obtain it from another source, and that it has administrative, technical, and physical safeguards sufficient to protect CAT data from any unauthorized disclosure.  *See Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C. Cir. 1968) (in ruling on Rule 2004 motions "a determination on good cause requires that all reasonable alternatives be explored."); *Jordan*, 947 F.3d at 1336 ("confidentiality concerns can factor into a decision whether to quash a subpoena").

17.     In this case, Scilex has not made and cannot make such showing.  It seeks eight categories of data for a two-year period, including a broad category of "other data" and does not provide any reason to believe that naked short selling occurred or that other, less intrusive, sources of information were not available to determine if naked short selling occurred.

18.     Moreover, Scilex does not have the capacity to analyze the vast amounts of CAT data it is seeking.  CAT collects hundreds of billions of records per day.  Unlike other data private parties may obtain, the raw CAT data that would be produced would be so voluminous

and contain so much proprietary information that it would be essentially meaningless in the

absence of specific technical expertise to process, query, and analyze the records.  And, because

the expertise necessary to query the data and properly interpret query output is both evolving and

non-public, it does not exist outside of the Commission and the SROs.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Commission requests that the Court deny the Motion.


Dated:  March 22, 2024

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By: <u>/s/ Melinda Hardy</u>
Melinda Hardy
Assistant General Counsel
(202) 551-5149
hardym@sec.gov
Esther Cheng
Senior Counsel
(202) 551-5092
chenges@sec.gov
100 F Street, NE
Washington, D.C. 20549

EXHIBIT 12

Jeffrey L. Hartman, Esq. – NSB #1607
HARTMAN & HARTMAN
510 W. Plumb Lane
Suite B
Reno, NV 89509
Tel: 775-324-2800
Fax: 775-324-1818
Email: notices@bankruptcyreno.com

Kent R. Robison, Esq. – NSB #1167
Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@rssblaw.com
         cbrust@rssblaw.com
         hwinston@rssblaw.com

*Attorneys for Christina Lovato, Trustee*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.: 24-50792-hlb |
| | (Chapter 7) |
| META MATERIALS INC., | |
| Debtor. | **EX PARTE MOTION FOR ORDER REQUIRING CUSTODIAN OF RECORDS FOR FINANCIAL INDUSTRY REGULATORY AUTHORITY TO APPEAR FOR EXAMINATION PURSUANT TO F.R.BANKR.P. 2004 AND TO PRODUCE RECORDS** |
| | Hearing Date: N/A |
| | Hearing Time: N/A |

Pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Rule 2004, Christina Lovato, Chapter 7 Trustee for the Estate of Meta Materials Inc. ("Trustee"), by and through her undersigned counsel, respectfully applies to this Court for an *Ex Parte* Order requiring the Custodian of Records of Financial Industry Regulatory Authority ("FINRA"), to appear as set forth in a subpoena to be issued pursuant to Federal Rule of Bankruptcy Procedure 9016, at a time, place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon no less than fourteen (14) calendar days written notice by the Trustee for examination, regarding the Debtor's assets, liabilities, and financial condition.

This Motion is supported by the following Memorandum of Points and Authorities.

1

DATED this  6th  day of March, 2025.

ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503

_____*/s/ Clayton P. Brust*_____
KENT R. ROBISON, ESQ.
CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509

## MEMORANDUM OF POINTS AND AUTHORITIES

F.R.Bankr.P. 2004 provides, in relevant part, that upon motion of any party in interest, the court may order the examination of the debtor or any other entity regarding the acts, conduct, property, liabilities and financial conditions of the debtor, or any other matter which affects the administration of the debtor's estate or the debtor's right to a discharge.  Rule 2004 further provides that production of documents may be compelled at this examination.

The Trustee seeks to conduct oral examination relating to the Debtors' assets, liabilities, and financial affairs to ascertain the facts and circumstances surrounding potential manipulation of Debtor's share prices from September 21, 2020 through August 7, 2024, and how the manipulation affected Debtor's financial condition for possible recovery on behalf of Debtor's estate.  The Trustee also seeks to compel production of the following documents from FINRA  (all documents of which are for the time frame of September 21, 2020 through August 7, 2024, and in respect to Meta, MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP):

1.     FINRA OATS or comparable Data ("OATS"): data records reflecting the lifespan transactions of orders from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

2.     Short Interest Data (Broker Level): Records reflecting the total short interest

2

shares reported to FINRA, twice a month, with broker level detail.

3.     All communications (emails, text, message, IM messages, letters or any other

forms of communication by and between FINRA (including its employees,

directors, officers or other agents) and any prime broker, broker, dealer, market-

maker or hedge fund) concerning any aspect of the shares of Meta and/or

MMTLP.

The requested discovery from the Custodian of Records of FINRA is well within the scope

of examination permitted under F.R.Bankr.P. 2004, which includes:

> [t]the acts, conduct, or property or … the liabilities and financial
> condition of the debtors, or … any matter which may affect the
> administration of the debtor's estate, or to the debtor's right to a
> discharge.  In a …reorganization case under chapter 11 of the Code,
> … the examination may also relate to the operation of any business
> and the desirability of its continuance, the source of any money or
> property acquired or to be acquired by the debtor for purposes of
> consummating a plan and the consideration given or offered
> therefore, and any other matter relevant to the case or to the
> formulation of a plan.

WHEREFORE, the Trustee respectfully requests that this Court enter its Order authorizing

the examination of the Custodian of Records of FINRA, as described herein.  A proposed Order is

attached as **Exhibit 1**.

DATED this  6th  day of March, 2025.

ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503

_____/s/ Clayton P. Brust_____
KENT R. ROBISON, ESQ.
CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509

*Attorneys for Christina Lovato, Trustee*

# EXHIBIT 1

# EXHIBIT 1

1

2

3

4

5

6

7                    **UNITED STATES BANKRUPTCY COURT**

8                          **DISTRICT OF NEVADA**

9  | In re                                    | Case No.: 24-50792-hlb
10 | META MATERIALS INC.,                     | (Chapter 7)

11 | Debtor.                                  | **[PROPOSED] ORDER GRANTING EX
                                               PARTE MOTION FOR ORDER
12                                             REQUIRING CUSTODIAN OF
                                               RECORDS FOR FINANCIAL INDUSTRY
13                                             REGULATORY AUTHORITY TO
                                               APPEAR FOR EXAMINATION
14                                             PURSUANT TO F.R.BANKR.P. 2004**

15

16                                             Hearing Date:   N/A
                                               Hearing Time:  N/A
17

18        This Court having reviewed the *Ex Parte Motion For Order Requiring Custodian Of*

19 *Records For Financial Industry Regulatory Authority to Appear for Examination Pursuant to*

20 *F.R.Bankr.P. 2004* (the "Motion") submitted by Christina Lovato, the Chapter 7 Trustee, and for

21 good cause appearing;

22        **IT IS HEREBY ORDERED** that the Motion is GRANTED; and

23        **IT IS FURTHER ORDERED** that the Custodian of Records of Financial Industry

24 Regulatory Authority, through an appropriate designee(s) shall appear for examination regarding

25 the Debtor's assets, liabilities, and financial condition, before a certified court reporter at a time,

26 place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon

27 no less than fourteen (14) calendar days written notice by the Trustee for examination; and

28        **IT IS FURTHER ORDERED** that oral examination shall continue from day to day, as

1

necessary.

**IT IS FURTHER ORDERED** that Financial Industry Regulatory Authority shall produce the following documents (time range from September 21, 2020 through August 7, 2024, and in respect to Meta, MMTLP, or other CUSIPs or legend identifiers pertaining to Meta or MMTLP):

1. FINRA OATS or comparable Data ("OATS"): data records reflecting the lifespan transactions of orders from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

2. Short Interest Data (Broker Level): Records reflecting the total short interest shares reported to FINRA, twice a month, with broker level detail.

3. All communications (emails, text, message, IM messages, letters or any other forms of communication by and between FINRA (including its employees, directors, officers or other agents) and any prime broker, broker, dealer, market-maker or hedge fund) concerning any aspect of the shares of Meta and/or MMTLP.

Respectfully Submitted By:

*/s/ Clayton P. Brust*

Kent R. Robison, Esq. – NSB #1167
Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@rssblaw.com
           cbrust@rssblaw.com
           hwinston@rssblaw.com

*Attorneys for Christina Lovato, Trustee*

2

EXHIBIT 13



_____
Honorable Hilary L. Barnes
United States Bankruptcy Judge

Entered on Docket
March 10, 2025

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re

META MATERIALS INC.,

Debtor.

Case No.: 24-50792-hlb
(Chapter 7)

**ORDER GRANTING EX PARTE MOTION FOR ORDER REQUIRING CUSTODIAN OF RECORDS FOR FINANCIAL INDUSTRY REGULATORY AUTHORITY TO APPEAR FOR EXAMINATION PURSUANT TO F.R.BANKR.P. 2004**

Hearing Date:  N/A
Hearing Time:  N/A

This Court having reviewed the *Ex Parte Motion For Order Requiring Custodian Of Records For Financial Industry Regulatory Authority to Appear for Examination Pursuant to F.R.Bankr.P. 2004* (the "Motion") submitted by Christina Lovato, the Chapter 7 Trustee, and for good cause appearing;

**IT IS HEREBY ORDERED** that the Motion is GRANTED; and

**IT IS FURTHER ORDERED** that the Custodian of Records of Financial Industry Regulatory Authority, through an appropriate designee(s) shall appear for examination regarding the Debtor's assets, liabilities, and financial condition, before a certified court reporter at a time, place and date to be mutually agreed upon by the parties, or if no such agreement is reached, upon no less than fourteen (14) calendar days written notice by the Trustee for examination; and

/ / /

1

**IT IS FURTHER ORDERED** that oral examination shall continue from day to day, as necessary.

Respectfully Submitted By:


    */s/ Clayton P. Brust*
Kent R. Robison, Esq. – NSB #1167
Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@rssblaw.com
        cbrust@rssblaw.com
        hwinston@rssblaw.com

*Attorneys for Christina Lovato, Trustee*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

In the matter of:

MOTION TO QUASH SUBPOENAS TO
NONPARTY FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.

Miscellaneous Action No.

**[PROPOSED] ORDER**

The Court, having considered Nonparty Financial Industry Regulatory Authority, Inc.
Motion to Quash Subpoenas Or, In the Alternative, for a Protective Order (the "Motion"), the
papers filed in support of and in opposition thereto, arguments of counsel, and all other materials
presented to the Court, and good cause appearing,

**IT IS HEREBY ORDERED** that the Motion is Granted.

The subpoenas issued to Nonparty Financial Industry Regulatory Authority, Inc. in the *In
re Meta Materials, Inc.*, Bk No. 24-50792-hlb (Bankr. D. Nev.) are **HEREBY QUASHED**
pursuant to Federal Rules of Civil Procedure 45 and 26.

**IT IS SO ORDERED**.