Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

*Attorneys for Non-Party Citadel Securities LLC*

Michael R. Hogue, Esq. (NSBN 12400)
10845 Griffith Peak Drive, Suite 600
GREENBERG TRAURIG, LLP
Las Vegas, NV 89135
Telephone: (702) 938-6909
hoguem@gtlaw.com

*Attorneys for Non-Party Anson Funds Management LP*

Jarrod L. Rickard, Esq. (NSBN 10203)
SEMENZA RICKARD LAW
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
Telephone: (702) 835-6803
jlr@semenzarickard.com

*Attorneys for Non-Party Virtu Financial, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>META MATERIALS, INC.,<br><br>Debtor. | Case No. 24-50792-gs<br>Chapter 7<br><br>**NON-PARTY CITADEL SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL, LLC'S RESPONSE TO THE TRUSTEE'S SUPPLEMENTAL BRIEF** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION .................................................................................1

II.     THE TRUSTEE STILL HAS NOT ESTABLISHED STANDING........................2

      A.      The Majority of Schedule A Transactions Are Not Market Sales ...............3

      B.      The Remaining Transactions Do Not Come Close to Meeting the Applicable Standard ...........................................................................4

      C.      The Rice Declaration Does Not Fill These Gaps .........................................6

III.    EVEN IF SHE HAD STANDING, THE TRUSTEE FAILS TO ESTABLISH THE REQUIRED DEBTOR-FACING NEXUS ...........................................................10

IV.     EVEN IF SHE HAD STANDING, THE TRUSTEE HAS NOT ESTABLISHED "GOOD CAUSE" .....................................................................................12

V.      CONCLUSION ................................................................................19

1    The Non-Parties[1] respectfully submit this supplemental response brief[2] in support of their

2    motion to quash and/or for a protective order (ECF No. 2088) and in opposition to the Trustee's

3    Supplemental Brief Regarding Sales of Meta Materials Inc. Shares to the Marketplace (ECF

4    No. 2610, "Supp. Br.").

5    **I.    INTRODUCTION**

6         After three rounds of briefing and two hearings, the Trustee still has not established the

7    existence of *any* cause of action belonging to the estate that would justify the Rule 2004 discovery

8    sought from the Non-Parties.  The Court asked the Trustee to identify specific sales of the Debtor's

9    own stock and to articulate the claims those sales could support.  The Trustee's supplemental filing

10   claims to do so—presenting 161 "trading days" that purportedly correspond to days the Debtor

11   "sold stock or made related stock transactions which could have been affected by third-party

12   manipulation."  But the Trustee does not identify a single day on which the Debtor sold stock at

13   market prices—either on the 161 so-called "trading days" or on any other day.  Nor does she

14   identify a single day on which any form of purported "manipulation" allegedly occurred.  Despite

15   having had every opportunity to do so, the Trustee has still not done what the Court asked: identify

16   specific sales by the Debtor at market prices on specific days affected by purported market

17   manipulation.  Accordingly, the Court should quash the Subpoenas for lack of standing.

18        Even if the Trustee could establish standing, however, that alone is not enough.  The

19   Subpoenas should still be quashed for the independent reason that the Trustee has not established

20   the required nexus between the Non-Parties and the Debtor.  Trading Meta stock in the secondary

21   market with third-party shareholders does not amount to dealings with the Debtor—and yet that is

22   all that is alleged against Citadel Securities and Virtu.  As to Anson Funds, while the Trustee points

23   to trading in the secondary market *as well as* one *purchase* of shares by Anson Funds from the

24

25

---

26   [1]   Capitalized terms not defined in this supplemental brief have the meanings provided in the Motion to Quash and/or for a Protective Order [ECF No. 2088] ("Motion").

27   [2]   This Reply is supported by the Supplemental Declaration of Peter H. Fountain ("Fountain Decl.") separately filed contemporaneously herewith pursuant to Local Rule 9014(c)(2).

28

1    Debtor in a single underwritten offering, that purchase is actually the opposite of the manipulative

2    selling pressure the Trustee claims to be investigating.

3          Finally, even if the Trustee could establish both standing and a nexus to the Non-Parties

4    (which she has not), she has not established the required "good cause."  As the Court has heard,

5    the Trustee already possesses the information sought or is in the process of obtaining it from other

6    third parties.  She has never explained what unique information the Non-Parties possess, and her

7    own counsel has demonstrated—by filing the same claims against the same parties in other

8    courts—that the data she purports to need is unnecessary to bring a suit.  The Subpoenas should

9    be quashed in full.

10   **II.    THE TRUSTEE STILL HAS NOT ESTABLISHED STANDING**

11         At the February 20, 2026 hearing ("Hearing"), the Court pressed on the fundamental

12   threshold question: does the Debtor have a cause of action that belongs to the estate?  The Trustee's

13   counsel responded that the claims they are "intending to pursue" are "based on standing, based on

14   sales of shares by the issuer during the actual period that were manipulated, causationally

15   connected to the [alleged] illegal acts of the defendants."  Hr'g Tr. 71:3-6, 72:7.[3]  The Court agreed

16   with this framing, turning its analysis to whether "the issuance of shares that are being sold and

17   affected" could support standing.  *Id.* at 76:5-7.  In other words, the Court asked the Trustee to

18   show *which* sales by the Debtor occurred during *which* periods of alleged manipulation.  The

19   Trustee still has not made that showing.  Instead, the Trustee filed the Declaration of Kenneth L.

20   Rice ("Rice Declaration") attaching Schedule A—a jumbled assortment of capital-markets

21   transactions spanning four years—and asks the "Court and its staff" to "verify" the entries and

22   construct the Trustee's standing argument.  ECF No. 2611 at 5.  But this Court has already

23   explained that it is not the Court's job to build the Trustee's case for her.  Hr'g Tr. 94:3-4 ("I don't

24   even know which SEC filings to take judicial notice of, nor is it my job to go search.").  Rightly

25   so—the burden is on the Trustee, not the Court.  And when Schedule A is parsed (which the Non-

26

27

28   [3]  The transcript from the Hearing is attached as Exhibit 4 to the brief.

2

Parties have now done), it is clear that the Trustee has failed to satisfy her burden of establishing standing.

A.     **The Majority of Schedule A Transactions Are Not Market Sales**

The threshold question is whether the Debtor sold shares at market-determined prices that were artificially depressed by alleged manipulation.  The Trustee claims the "'Treasury Shares Sold Category' in [Schedule A] refers to shares sold or issued from Meta's own treasury."  ECF No. 2611 at 4.  But this is misleading at best, because the majority of the transactions in Schedule A are not sales at market prices at all:

**Debt Conversions.**  The TRCH debt conversions (Event A-1) involved stock issued to specific creditors—such as the Straz Foundation and McCabe Petroleum—to satisfy existing debt obligations.  *Id.* at 4, 7.  The conversion prices were fixed at non-market prices, set by the terms of the relevant agreements.  *Id.* (with reference to cited 10-Q Q1 2021).  This was a contractually determined conversion ratio—a price set by the Debtor's agreement, not by prevailing market conditions.  Any purported market manipulation that affected the market price could not affect a pre-determined conversion price fixed by contract.

**Dividend Distributions.**  The MMTLP preferred shares (Event A-4) were a special dividend distribution—this was not a sale of stock and the Debtor received no proceeds whatsoever; a transaction that generated no proceeds to the issuer cannot form the basis of a damages claim.  *Id.* at 4.

**Acquisitions.**  The Plasma App and Optodot acquisitions (Events C-1 and C-2) were negotiated private M&A transactions in which shares served as non-cash consideration; these were bilateral deals with agreed-upon valuations, not open-market sales susceptible to intraday market manipulation.  *Id.* at 4-6.

**Warrant Issuances and Repricings.**  The warrant issuances and repricings likewise involved no cash proceeds to the Debtor; the exercise-price adjustments were triggered by down-round provisions in the warrant agreements—contractual mechanics, not market transactions.  Indeed, the warrant repricings (Events F-3 and F-4) involved no new share issuances and no

proceeds of any kind—they were automatic price adjustments triggered by contractual down-round provisions in earlier offerings. *Id.* at 8.

### B.    The Remaining Transactions Do Not Come Close to Meeting the Applicable Standard

Certain of the Schedule A transactions arguably involved sales into the market; these are the registered direct offerings (Events C-3, F-2, and G-1); the Ladenburg ATM (Event E-1); the CMPO (Event E-2); and the Lincoln Park equity line of credit (Event F-1). But these fare no better. For any of these sales to support a purported market manipulation claim, the Trustee would need to allege that the sales occurred at prices possibly affected by spoofing or other manipulation. She has not even attempted to do so. To be clear, this is not a motion to dismiss argument. The Non-Parties are not challenging the sufficiency of the Trustee's allegations—those allegations are absent entirely.

As this Court acknowledged at the Hearing, *see* Hr'g Tr. 95:23-96:5, spoofing is a short-term form of market manipulation. Courts have consistently held that its effects on a stock's price are transient. *See, e.g.*, *Nw. Biotherapeutics Inc. v. Canaccord Genuity LLC*, 2025 WL 368717, at *12, 21 (S.D.N.Y. Jan. 31, 2025) ("*Northwest Bio*") (recognizing that "the literature indicates that the effects of spoofing are relatively brief" and dismissing claims related to sales not on the same day as the alleged spoofing); *Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024) (rejecting allegation that spoofing had a "persistent and long-lasting impact" and granting motion to dismiss). For transactions not at market prices, *Northwest Bio* requires an identified "formulaic" connection between the sale price and the price allegedly impacted by manipulation. *See* 2025 WL 368717, at *6-*7. The Trustee has not argued that there was any such connection for any transaction in Schedule A.

**Registered Direct Offerings.** The registered direct offerings (Events C-3, F-2, and G-1) were each at fixed prices untethered from the prevailing market price. *See* ECF No. 2583 at 10. The $50M RDO (Event C-3) was priced at $1.35 per share when the closing price was $1.15. ECF No. 2611 at 3-4 (with reference to cited 10-Q Q2 2023). The $6M RDO (Event F-2) was at a set price of $8.00 per share (post-split), a sum untethered from the prevailing market price. *Id.* (with

reference to cited 8-K, Dec. 4, 2023; 10-K FY 2023).  And the $3.4M RDO (Event G-1) was priced at $4.04 per share, a sum again untethered from the prevailing market price.  *Id.* (with reference to cited 10-K FY 2023; 8-K, Jun. 24, 2024).  These sales thus lack the requisite "connection" between the sale price and the market price.  *See, e.g.*, *Northwest Bio*, 2025 WL 368717, at *6-7, *21.  In any event, a seller that voluntarily contracts to sell at non-market prices cannot plausibly claim damages from alleged short-term manipulation of the market price.  And where the offering price exceeds the market price—as with the $50M RDO—the seller received *more* than the prevailing market price, leaving no cognizable injury.

**Confidentially Marketed Public Offering.**  The confidentially marketed public offering (Event E-2)—the $25M CMPO—involved direct, non-public offers to institutional investors at a fixed combined price of $0.30 per share and accompanying warrant.  ECF No. 2611 at 4, 7.  This was a negotiated transaction with pre-selected buyers, not an open-market sale at a price determined by the prevailing market price.

**Equity Line of Credit.**  The Lincoln Park equity line of credit (Event F-1) was a negotiated agreement under which Lincoln Park agreed to purchase MMAT shares at 97% of the lower of (i) the lowest sale price on the purchase date, and (ii) the arithmetic average of the three lowest closing sale prices in the preceding ten business days.  ECF No. 2611 at 3-4 (with reference to cited 10-K FY 2023).  This formula is designed to guarantee Lincoln Park a discount to the lowest available prices.

**ATM.**  That leaves the Ladenburg ATM (Event E-1)—the only transaction in Schedule A that involved sales at prevailing market prices.  As an initial matter, the Trustee does not allege that this event is tied to any of the Non-Parties.[4]  And even here, the Trustee has not identified a single specific day on which she sold stock.  Instead, she merely identifies a window in February-March 2023 in which the sales *could have* occurred (which would be impossible since, according to the underlying 10-Q, the relevant agreement was not entered into until April 2023).  Nor does

---

[4]  Indeed, the only event the Trustee alleges is tied to any of the Non-Parties is purportedly E-2 as to Anson Funds.  *See* ECF No. 2611 at 4.

1    she allege that manipulation occurred on any of those (unspecified) days.  As described in

2    *Northwest Bio*, the Trustee must match specific sales to purported manipulation with the requisite

3    temporal proximity.  2025 WL 368717, at *7.  She has not done so.

4         The Trustee's other asserted theories of misconduct—naked short selling, "not being a

5    bona fide market maker," and short-and-distort schemes, Hr'g Tr. 62:11-12, 72:15-79:24—do not

6    alter the standing analysis.  Each of these theories posits that third-party conduct artificially

7    depressed the market price of Meta stock.  But the standing question is the same regardless of the

8    mechanism: the Debtor must allege that it sold its own stock at a price that was affected by the

9    alleged misconduct.  Whether the price was depressed by spoofing, naked short selling, or any

10   other form of manipulation, the Debtor would have standing only if it was selling its own stock

11   (property or assets of the Debtor) into the manipulated market at the affected time.  After three

12   rounds of briefing, the Trustee has not even attempted to link the timing of any stock sale by the

13   Debtor, or the price at which it was sold, to any of these four manipulation theories.

14        **C.    <u>The Rice Declaration Does Not Fill These Gaps</u>**

15        The Rice Declaration offers no assertion that any sale occurred at a price affected by third-

16   party manipulation, identifies no connection between any transaction and Citadel Securities or

17   Virtu, identifies only one public offering participation as any connection to Anson Funds (and as

18   noted above, Event E-2 was not an open-market sale at the prevailing market price), and provides

19   no basis for concluding that a damages claim belongs to the estate.  In fact, the Rice Declaration

20   does nothing more than authenticate a table of SEC filings.  If the Debtor's own former COO and

21   CFO—who has firsthand knowledge about the transactions—cannot connect them to the purported

22   manipulation the Trustee alleges, the Trustee has no basis to pursue that connection through

23   discovery from the Non-Parties.

24        The Trustee's reliance on Torchlight and MMTLP transactions is independently fatal to a

25   significant portion of her request.  As a threshold issue, the Trustee waived any argument as to

26   these two stocks by failing to respond to the Non-Parties' arguments about them in prior briefing.

27   ECF No. 2583 at 5:8-18; *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp.

28   2d 1125, 1132 (C.D. Cal. 2011) (explaining "failure to respond in an opposition brief to an

argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.") (citation and quotations omitted).    Merely adding them into the Rice Declaration at this late stage is insufficient to resurrect them.

Furthermore, TRCH stopped trading in June 2021 when Torchlight completed its reverse merger with Metamaterial Inc.  *See* ECF No. 2425 at 9:10-12.  The Trustee's counsel asserted that Torchlight's claims transferred to the estate via the merger, Hr'g Tr. 69:13-15, but has never explained why that would be so—not at the Hearing, and not in the filing that was specifically ordered to address standing.    That failure is dispositive.    The Trustee bears the burden of establishing good cause, and an unbriefed assertion by counsel at oral argument does not carry that burden.[5]  As for MMTLP, the problem is more fundamental: the MMTLP preferred shares were a dividend distribution, not a sale.    The Debtor received no proceeds.    Moreover, FINRA halted trading in MMTLP in December 2022, and MMTLP was subsequently converted into shares of a private company, Next Bridge Hydrocarbons, Inc.—more than eighteen months before the bankruptcy filing.  *See* ECF No. 2425 at 9:1-8.  A security that generated no proceeds to the issuer and ceased to exist years before the petition date cannot supply standing or good cause.    Yet Schedule B devotes 32 of its 161 trading days to TRCH and MMTLP—such that nearly 20% of the Trustee's purportedly "narrowed" request rests on securities that cannot support a claim belonging to the estate.[6]  ECF No. 2611 at Schedule B.

---

[5]    The Rice Declaration asserts in conclusory fashion that "any damages for 10(B)(5) claims by potential defendants associated with Torch Shares legally belonging to Torchlight, is now owned by META pursuant to the merger." ECF No. 2611 at pp. 2:4-11, ¶ 5.  But the sole document Rice cites for this proposition—the June 28, 2021 Form 8-K (the "8-K")—says nothing about the assignment of causes of action or potential litigation rights.    The Trustee has not identified any provision of the Arrangement Agreement that effectuated the transfer of such claims (or damages for such claims), and the 8-K itself notes that its description of the Arrangement Agreement "does not purport to be complete."  *Id.*  A legal conclusion contained in the declaration of a lay witness, supported only by citation to a document that does not contain the proposition for which it is cited, does not establish that pre-merger causes of action transferred to the surviving entity.

[6]    At the Hearing, the Court again pressed on these issues, asking the Trustee to explain the connection to TRCH and MMTLP.  Hr'g Tr. 69:17-70:18, 83:1-84:3.  The Trustee's supplemental brief does not provide that explanation.

7

But the deficiencies run deeper.  First, the Trustee's presentation of the 161 "trading days" is highly misleading.  The Trustee asserts that "[t]he 161 trading days in Schedule B represent the specific days when Meta sold shares or conducted other transactions."  Supp. Br. at 5:15-16.  The Trustee's Schedule A, in turn, lists date ranges that suggest each transaction corresponds to a defined set of the 161 requested trading days. ECF No. 2611 at 3-4.  The Schedule A chart appears designed to create the impression that all 161 days are days on which the Debtor sold stock, when in fact most of the 161 days are so-called "bracketing days" or "peak anomaly days" on which the Debtor does not appear to have sold any shares at all.  Supp. Br. at 6:9-12.[7]

The following table maps each of the Trustee's 161 requested trading days to the Schedule A events listed by the Trustee.  The first four columns are taken directly from Schedule B to the Rice Declaration.  ECF No. 2611 at 9.  The fifth and sixth columns are the Non-Parties' response.

| Window | Period | Days | Schedule A Events | Responses | Market Price Sale Days |
|--------|--------|------|-------------------|-----------|------------------------|
| A | Jan–Jun 2021 | 17 | A-1, A-3, A-4 | A-1 is a non-market-price debt conversion of TRCH. A-3 is not described anywhere in Schedule A or the Rice Declaration. A-4 is the MMTLP preferred dividend—it is not a sale. | 0 |
| B | Jul–Oct 2021 | 15 | A-5, B-1 through B-3 | None of A-5, B-1, B-2, or B-3 is described anywhere in Schedule A or the Rice Declaration. | 0 |
| C | Dec 2021–Aug 2022 | 39 | C-1, C-2, C-3 | C-1 (Plasma App) and C-2 (Optodot) are private M&A transactions at negotiated valuations—not open-market sales by the Debtor. C-3 is the $50M RDO priced at $1.35/share—a negotiated | 0 |

---

[7]  Raising further questions about the Trustee's claims, the examples in Schedule A are a subset of Schedule B, and the count of days for the listed examples within Schedule A does not add up to 161. ECF No. 2611 at 3-4, 9.

| Window | Period | Days | Schedule A Events | Responses | Market Price Sale Days |
|--------|--------|------|-------------------|-----------|------------------------|
| | | | | transaction and again not an open-market sale of stock by the Debtor. | |
| D | Nov 2022–Jan 2023 | 30 | D-1, D-2 | Neither D-1 nor D-2 is described anywhere in Schedule A or the Rice Declaration. | 0 |
| E | Feb–Jun 2023 | 26 | E-1, E-2 | E-1 is the Ladenburg ATM—the only transaction in Schedule A involving sales at prevailing market prices.  But the Trustee has not identified which specific days within the Feb-Mar 2023 window the Debtor actually sold its own shares, or what manipulation allegedly occurred on those days.[8]<br>E-2 is the $25M CMPO — a confidentially marketed offering to pre-selected institutional investors (which the Trustee alleges included Anson or one of its affiliates) at a fixed combined price of $0.30/share. | Unspecified |
| F | Sep–Dec 2023 | 21 | F-1, F-2, F-3, F-4 | F-1 is the Lincoln Park equity line of credit at prices designed to guarantee the buyer a discount (97% of the lower of two different lowest prices).<br>F-2 is the $6M RDO at $8.00/share—another non-market price direct offering.<br>F-3 and F-4 are warrant repricings only—no new shares, no proceeds, purely automatic contractual adjustments. | 0 |
| G | Feb–Mar 2024 | 13 | G-1, G-3 | G-1 is the $3.4M RDO at $4.04/share—another non-market price direct offering.<br>G-3 is not described anywhere in Schedule A or the Rice Declaration. | 0 |

---

[8]   This uncertainty is exacerbated by the fact that the timeframe alleged, "Feb-Mar 2023," is inconsistent with the underlying 10-Q which states that the Debtor entered into an underwriting agreement *on April 14, 2023*.

In short, out of 161 days, the only transaction that even arguably involved a market-price sale of stock by the Debtor is the Ladenburg ATM (Event E-1, 10 days in Window E)—and even there, the Trustee has not identified any specific sale dates.  Multiple events referenced in Schedule B (A-3, A-5, B-1 through B-3, D-1, D-2, G-3) are never described at all and so cannot possibly be sufficient to establish a relevant sale of stock by the Debtor.  The Trustee is asking for troves of proprietary trading data from three Non-Parties based on vague references to SEC filings and a schedule for which the vast majority of days correspond to non-market transactions, undescribed events, or warrant repricings that involved no shares sold and no proceeds.

Finally, *Northwest Bio* establishes that this is only half of the equation: any spoofing claims asserted by the Trustee would accrue only when the manipulative acts happened sufficiently close in time to the sale by the Debtor of its own stock—as described in that case, at least on the same day(s) the spoofing is alleged to have occurred.  2025 WL 368717, at *13-15, *21.  The Court does not need to make any motion to dismiss adjudication to observe that the Trustee is seeking discovery for dates that she knows cannot be the subject of any future claims.  In sum, even if the Trustee had identified when the Debtor sold stock at market prices, she still says nothing about when the market was allegedly manipulated, as would be required for a claim belonging to the estate to exist.

## III.  EVEN IF SHE HAD STANDING, THE TRUSTEE FAILS TO ESTABLISH THE REQUIRED DEBTOR-FACING NEXUS

Even if the Trustee could establish that the Debtor had standing (and she has not), the Subpoenas would still fail because the Trustee has not established any connection between the Non-Parties and the Debtor.  At the Hearing, the Court recognized the centrality of this question, asking the Non-Parties to address "where to draw the line" on the required nexus between subpoena recipients and the Debtor.  Hr'g Tr. 95:16-19.

The line the Court inquired about is well established.  Rule 2004 examinations are limited to "third parties who have had dealings with the debtor."  *In re Mastro*, 585 B.R. 587, 597 (B.A.P. 9th Cir. 2018) (citation and quotations omitted).  This Court's own authority holds that third parties subject to examination are "only those persons possessing knowledge of the debtor's acts, conduct,

1   or financial affairs." *In re Lee, 2021 WL 2283910,* at \*3 (B.A.P. 9th Cir. June 3, 2021) (citation

2   and quotations omitted); *see also In re Dinubilo,* 177 B.R. 932, 940 (E.D. Cal. 1993) (similar).

3   The Trustee has never alleged that Citadel Securities or Virtu had any dealings with the Debtor,

4   possessed knowledge of the Debtor's financial affairs, or had any relationship with the Debtor

5   whatsoever.  As to Anson Funds, the sole alleged connection—purchasing shares from the Debtor

6   in a single underwritten offering (Event E-2, which is not an event involving sales at prevailing

7   market prices)—is the opposite of the manipulative conduct the Trustee is investigating.  The

8   Trustee simply has not justified the sweeping discovery the Subpoenas demand.

9           Indeed, rather than establish the required nexus, the Trustee asks the Court to accept her

10  counsel's representation that they "start with the entities that have traded the most volume of our

11  stock" and that "Citadel, Virtu, and Anson make up a large portion of that number."  Hr'g Tr. 63:3-

12  6.  That is not the connection to the Debtor required for Rule 2004 discovery.  Instead, it is an

13  admission that the Trustee is targeting these Non-Parties based merely on the volume at which

14  they traded stock—stock *that does not even belong to the Debtor* and thus cannot support a claim

15  by the estate.  *See Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) ("Rule 2004 may

16  not be used as a device to launch into a wholesale investigation of a non-debtor's private business

17  affairs.").  After three rounds of briefing and two hearings at which the Court requested sufficient

18  detail regarding a debtor-facing nexus, the Trustee has offered nothing more than a belief that high-

19  volume traders are worth investigating.  That is plainly insufficient to establish the nexus required

20  for Rule 2004 discovery from non-parties (or to burden those Non-Parties with overly broad

21  subpoenas seeking proprietary trading data).

22          Crediting the Trustee's theory would have significant policy implications.  If trading

23  volume alone supplies the required connection to pursue Rule 2004 discovery, then heavy traders

24  such as the Non-Parties—including market makers like Citadel Securities and Virtu, who trade in

25  virtually every listed security—could be subject to Rule 2004 subpoenas in every public company

26  bankruptcy where anyone suspects market manipulation.  No court has adopted such an expansive

27  theory.  *See, e.g.*, *In re SunEdison, Inc.*, 572 B.R. 482, 491 (Bankr. S.D.N.Y. 2017) (Rule 2004

28  "does not reach so far as to allow a debtor to take discovery from participants in third-party

11

litigation involving claims it does not own or defenses it will not assert simply because the outcome may affect the value of an asset the debtor does own."). And no court has done so for good reason: because that is not how Congress intended Rule 2004 to be used.

As to Anson Funds, the Trustee's belated reliance on a single, non-public transaction underscores the overbreadth of the Subpoenas. If the connection between Anson and the Debtor is one confidentially marketed offering for one security on one day, the Trustee has not explained—and cannot explain—why she is entitled to trading data, order-routing information, and position records across three different securities for four years (or per the latest submission, for at least 161 trading days). The Subpoenas are untethered from the single transaction with Anson Funds or its affiliates that the Trustee finally identifies. It also merits noting that the Trustee should already have the deal documents relating to any participation by Anson Funds or its affiliates, rendering such a request duplicative and an unnecessary burden on a non-party.[9]

## IV. EVEN IF SHE HAD STANDING, THE TRUSTEE HAS NOT ESTABLISHED "GOOD CAUSE"

The Trustee's Supplement asserts that "legal standing gives good cause to the Trustee's Subpoenas to the Non-Parties." Supp. Br. at 1:25-26. That conflates two distinct requirements.[10] Once a motion to quash is filed, the party seeking Rule 2004 discovery bears an independent burden of proving "good cause" by demonstrating that the examination is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the

---

[9]   The misdirection of the Trustee's investigation is further underscored by what she has chosen *not* to investigate. The SEC charged the Debtor itself with market manipulation—finding that Meta Materials "violated the antifraud, reporting, internal accounting controls, and books and records provisions of the federal securities laws" and raised $137.5 million through a scheme to inflate its stock price. SEC Administrative Proceeding No. 3-21976 (June 25, 2024). The SEC's lawsuit against the Debtor's former CEOs remains pending. *SEC v. Brda*, No. 4:24-cv-01048 (E.D. Tex.). If the Trustee is genuinely investigating the financial condition of the Debtor, the investigation should begin with the insiders the SEC has already found engaged in fraud—not with the Non-Parties.

[10]   The Trustee asserts that "this proceeding has moved past the question of whether Rule 2004 discovery is appropriate." Supp. Br. at 2:26-27. That is incorrect. The Court's tentative ruling addressed only the Local Rule 2004(c) argument. The Court has not yet ruled on the failure to establish good cause, lack of standing, overbroad scope, or any other ground for quashing.

examiner undue hardship or injustice.[11]  *See Bank of Am., N.A. v. Landis*, 2011 WL 6104495, at *6 (D. Nev. Dec. 7, 2011); *In re Lee*, 2021 WL 2283910, at *4 (B.A.P. 9th Cir. June 3, 2021).  The burden to establish good cause for Rule 2004 discovery is "an affirmative one" and particularly difficult to establish when seeking it from non-parties to the bankruptcy proceeding who have not been "involved in the debtor's business affairs."  *Wilcher*, 56 B.R. at 434-35 (holding that one property acquisition is insufficient for Rule 2004 discovery).  The Trustee fails to satisfy this standard here for three independent reasons.

*First*, good cause requires an "articulated connection between the information that is sought and the estate."  Oct. 30, 2025 Hr'g Tr., ECF No. 2426, Ex. 3, 16:23-24 ("Oct. Hr'g Tr.").  The Trustee has never made that showing.  As previously briefed, before serving a single subpoena, the Trustee hired four law firms, accumulated an $11.8 million litigation war chest (including $500,000 from another case where the same counsel unsuccessfully sought similar discovery from Citadel Securities and Virtu), identified "potential defendants," developed "damages models," and conducted conflicts checks.  ECF Nos. 2088 at 4:4-20, No. 2265-5, No. 2265-6.

Were there any remaining doubt, in May 2024—three months before the bankruptcy filing—the Debtor issued a follow-up press release announcing that counsel had "conducted an exhaustive investigation and undertaken in-depth due diligence" and "concluded that META has meritorious claims for market manipulation against several parties."  Fountain Decl. Ex. 3.  The Trustee's counsel now asks this Court to believe that the very same investigation, conducted by the very same lawyers, is still too "preliminary" to identify whether claims exist—let alone against whom. That newer position, articulated only when opposing the Motion, is irreconcilable with counsel's own other public statements.  The investigation was complete before the bankruptcy was filed.  What the Trustee seeks now is not investigation; it is litigation discovery dressed in Rule 2004 clothing.

---

[11]  The Non-Parties continue to maintain that the *in pari delicto* doctrine and the reliance element independently bar the Trustee's claims, and that these defenses are relevant to the good-cause analysis under *Landis*.  *See* ECF No. 2583 at 7:10-11:9; ECF No. 2425 at 9:15-11:12.  The Court indicated at the Hearing that it views these issues as falling "on the side of motion to dismiss."  Hr'g Tr. 51:24-25.  The Non-Parties respectfully disagree and preserve their position on this point.

At the Hearing, when the Non-Parties pointed out that the Trustee's counsel would not deny that the Non-Parties are litigation targets, the Court responded: "Sure." Hr'g Tr. 95:15. But the legal consequences of that concession remain unaddressed. Where a subpoena recipient has been identified as a litigation target, Rule 2004 is improper—full stop. *See* ECF No. 2088 at Ex. 16 (*In re Transmar Commod. Grp.*, Hr'g Tr. 22:7-11 (Bankr. S.D.N.Y. 2017)) (Rule 2004 discovery is "not permitted" where recipient is "identified … as a litigation target"); *In re Defoor Ctr., LLC*, 634 B.R. 630, 639-40 (Bankr. M.D. Fla. 2021) (denying Rule 2004 examination where it would confer an "unfair strategic advantage" prior to commencement of litigation and refusing to condone end-run of the "pending proceeding rule"). The proper vehicle for discovery from parties who may be liable to the estate is an adversary proceeding with the procedural safeguards of the Federal Rules of Civil Procedure—not Rule 2004. *Wilcher*, 56 B.R. at 434 (quashing Rule 2004 subpoena and noting that unlike Rule 2004, the Federal Rules provide for "numerous procedural safeguards against unfairness to the party from which discovery is sought"); *In re GHR Energy Corp.*, 35 B.R. 534, 537-38 (Bankr. D. Mass. 1983) (Rule 2004 cannot be employed to "circumvent the procedural safeguards provided [to] a litigant" in ordinary civil litigation); *see also, e.g.*, *In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002) (same). This is a threshold legal bar, and the Non-Parties respectfully submit it must be resolved before any discovery is compelled.

*Second*, the Trustee cannot demonstrate necessity because she already possesses, or is in the process of obtaining, the same categories of information she seeks here from centralized, market-wide sources. The Trustee has subpoenaed Nasdaq, the DTCC, and FINRA—each of which possesses market-wide trading data for the very same securities during the very same time period. Oct. Hr'g Tr. 17:8-16. Nasdaq has produced six months of trading records. ECF No. 2551 at 5. The DTCC has offered to produce reports on Meta market activity. ECF No. 2206 at pp. 5-6 ¶ 12. And the Trustee is actively litigating to compel FINRA to produce broker-level trading data. ECF No. 2234, Ex. 2 at 34, 36. The Trustee has also subpoenaed Charles Schwab, TD Ameritrade, and TradeStation, who have already made responsive productions. ECF No. 2206 at pp. 5-6 ¶ 12. Data from these retail broker-dealers will reveal the ultimate individual investors in

Meta—information that is not included in the Non-Parties' data.  Together, these sources capture trading volumes, prices, settlement data, and fail-to-deliver records across the market—the same categories of information the Subpoenas seek from the Non-Parties.

Even the Trustee admits the "inefficient" and "burdensome" nature of seeking information from multiple parties when the same information can be obtained from a singular source.  *See* ECF 2624 at 36 ("[T]he Subpoenas [to FINRA] seek data provided to FINRA by *all market participants*, everyone FINRA has data for.…  None of those individual broker-dealers have marketwide data like FINRA has.  FINRA has 3,250 member firms …, so *FINRA is effectively telling the Trustee to serve thousands of subpoenas, on every market participant who provided data to FINRA*, rather than getting that information from a single source, FINRA.  …  Doing so would be incredibly inefficient and burdensome to the Trustee, effectively impossible.").  As the Trustee tacitly concedes, there is no "good cause" to pursue these Subpoenas because it is "burdensome" and "inefficient" to seek information from multiple parties (like the Non-Parties), when sufficient information "from a single source" that has "3,250 member firms" will provide all the information the Trustee requires.  If the Trustee cannot satisfy *Iqbal* and *Twombly* after (i) multiple years of investigation by legal experts on market manipulation; (ii) an $11.8 million war-chest (for which the Trustee has yet to file an appropriate motion, as the Court requested at the Hearing); (iii) six months of data from Nasdaq; and (iv) records from the DTCC, then there is no "good cause" to proceed further, particularly as to the Non-Parties.

What's more, the Trustee has already obtained the very information she still claims to need years ago.  In June 2023—nearly three years before the Hearing—the Debtor retained Shareholder Intelligence Services, LLC ("ShareIntel"), a service designed to "identify the markers and participants to potential illegal naked short selling."  ECF No. 1925 at 1:25-27; ECF No. 2584, Ex. 1.  ShareIntel allegedly provides "a broker-by-broker analysis of imbalances . . . of Meta shares which a broker has sold or purchased" in the prior "several years," "enabl[ing] the historical tracking of movement of Meta shares to identify suspicious, aberrant, and/or unusual trading activity."  ECF No. 1922 at 2:8-16.  Based on ShareIntel's analysis, the Debtor announced in May 2024 that it had identified "meritorious claims for market manipulation against several parties."

*See id.*; Fountain Decl. Ex. 3.  The Trustee did not seek court approval to retain ShareIntel until May 2025, ECF No. 1922, nearly two years after the engagement began—confirming that the analysis was already complete and in the Trustee's possession well before the Subpoenas were served.  The Trustee cannot credibly claim she needs the Non-Parties' proprietary trading data to identify suspicious trading activity when she has allegedly had a broker-by-broker analysis designed for that exact purpose since 2023—and relied on that data to publicly declare that she had already found the facts supporting her forthcoming claims.

Discovery from non-parties is justified only when the subpoenaing party demonstrates a need that cannot be met from other sources.  *See In re Defor Ctr., LLC*, 634 B.R. at 639-40 (denying Rule 2004 where debtor already possessed preliminary information needed); *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement*, 2016 WL 159842, at *3 (D. Ariz. Jan. 14, 2016) (quashing subpoena where the party "can easily obtain the same information without burdening the nonparty").  The Trustee has never explained—despite being asked repeatedly, both in meet-and-confer discussions and at both hearings before this Court—what "specific and unique" information the Non-Parties possess that these other sources do not.  ECF No. 2206 ¶ 6; *see also* ECF No. 2088-8 at 13.  The Trustee's silence on this point is dispositive.  *See In re Mathews*, 2018 WL 5024167, at *2 (D. Del. Oct. 17, 2018) (noting that the Chapter 7 trustee "does not have unlimited power to investigate anything he wishes without articulating a proper basis for the examination" and that he "has not sufficiently explained how the Rule 2004 investigation relates to the specific documents he seeks, nor how the requested documents relate to any potential claim.").

Indeed, the Trustee's only attempt to distinguish the Non-Parties' data came at the October 30 hearing, when Mr. Christian asserted the Non-Parties are "obligated to show what shares have they not delivered."  Oct. Hr'g Tr. 47:6-8.  But fail-to-deliver data is publicly reported by the SEC—the Trustee does not need the Non-Parties' internal records to obtain it.  More fundamentally, the Trustee has never alleged—in any filing or at any hearing—that any Non-Party had any failures to deliver in Meta securities, or that they maintained any short position at any time

1  when the Debtor was selling its own stock.  Again, this is not a motion to dismiss argument—it is

2  an argument highlighting the absence of any support by the Trustee for her Subpoenas.

3         Furthermore, the Trustee's assertion that this data would not be burdensome to produce is

4  incorrect.  Compiling, reviewing, and exporting even 161 days of proprietary trading data would

5  pose a substantial burden.  As just one example, the Trustee's arguments concerning the purported

6  lack of burden to produce CAT data, Supp. Br. at 6:18-25, are incorrect and irrelevant.  The Trustee

7  *did not even request CAT data in the Subpoenas*.  *See* ECF Nos. 2088-1, 2088-3, 2088-5.  Even if

8  she had, CAT data captures highly confidential and sensitive customer and order information.  In

9  fact, that data is so sensitive, and consequently so critical to regulators, that the SEC has

10 successfully intervened against attempts by private litigants to access CAT data, including in cases

11 relied upon by the Trustee's counsel.  *See, e.g.*, *In re Sorrento Therapeutics, Inc.*, No. 23-90085

12 (Bankr. S.D. Tex. filed Mar. 22, 2024) (ECF No. 2076), Fountain Decl. Exhibit 1 (explaining

13 "[p]rotective orders would not be sufficient to" protect such data and no such "request by a private

14 litigant for CAT data would be appropriate."); *see also id.* at ECF No. 2488, Fountain Decl. Exhibit

15 2 (quashing party-in-interest Scilex's request for CAT data under Rule 2004).

16        The regulatory framework governing CAT data confirms this understanding.  Federal

17 regulations limit the use of CAT data to "the purpose of performing [] respective regulatory and

18 oversight responsibilities pursuant to the federal securities laws, rules, and regulations."  17 C.F.R.

19 § 242.613(e)(2).  The Trustee should not be permitted to use Rule 2004 to circumvent the

20 applicable regulations to obtain highly sensitive data for her pre-litigation purposes.  *See In re*

21 *Mathews*, 2018 WL 5024167, at *3 (quashing Rule 2004 subpoenas because, among other reasons,

22 they sought "disclosure of private third-party personal and financial information not related to the

23 bankruptcy case").

24        Should the Court decline to quash the Subpoenas in their entirety, the Non-Parties

25 respectfully request the opportunity to submit supplemental briefing and declarations addressing

26 the specific burden and confidentiality concerns associated with producing CAT data and other

27 proprietary trading information—as the Court has already afforded Nasdaq, *see* ECF No. 2609

28

(Nasdaq's supplemental declaration regarding burden)—particularly as CAT data was *never sought in the Subpoenas and therefore has not previously been at issue in this proceeding*.

*Third*, the Trustee's own conduct demonstrates that the Subpoenas are unnecessary to satisfy any applicable pleading standard.  The Trustee's counsel—Christian Attar and Kasowitz—have repeatedly filed market manipulation complaints against Citadel Securities and Virtu in other courts, alleging identical spoofing and naked-short-selling theories, based entirely on publicly available information.  *See, e.g.*, *Genius Group Ltd. v. Citadel Securities LLC*, No. 1:25-cv-09546 (S.D.N.Y. Nov. 14, 2025) (complaint filed two weeks after the October 30 hearing, naming Citadel Securities and Virtu as defendants, based on "a review and analysis of publicly available information"); *Northwest Bio*, 2025 WL 368717, at *12 (S.D.N.Y. Jan. 31, 2025) (Kasowitz represents plaintiff; complaint alleges specific sales, dates, prices, and damages—all without pre-suit discovery); *Mullen Automotive, Inc. v. IMC Financial Markets*, 2025 WL 951501 (S.D.N.Y. Mar. 28, 2025) (Trustee's counsel pled market manipulation scheme "with particularity" using only public data; survived motion to dismiss).  If the Trustee's own lawyers can satisfy the pleading requirements of the PSLRA using publicly available data in case after case, the Trustee cannot simultaneously claim she needs the Non-Parties' proprietary, confidential trade data to "fully evaluate" whether to bring suit here.  The Trustee does not need Rule 2004 to do what her counsel has already shown she can do without it.

/ / /

/ / /

/ / /

1

## V.     __CONCLUSION__

2        The Non-Parties respectfully request that the Court quash the Subpoenas in their entirety

3 and/or issue a protective order with respect thereto.

4        DATED:  March 9, 2026

5

6              **McDONALD CARANO LLP**

7              */s/ Ryan J. Works*

8              Ryan J. Works, Esq. (NSBN 9224)
Jimmy F. Dahu, Esq. (NSBN 17061)

9              2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

10            rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

11              **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

12            Christopher D. Kercher, Esq. (admitted *pro hac vice*)

13            Peter H. Fountain, Esq. (admitted *pro hac vice*)
Madeleine Zabriskie, Esq. (admitted *pro hac vice*)

14            295 Fifth Avenue
New York, NY 10016

15            christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com

16            madeleinezabriskie@quinnemanuel.com

17            *Attorneys for Non-Party Citadel Securities LLC*

18             **GREENBERG TRAURIG, LLP**

19             */s/ Michael R. Hogue*

20            Michael R. Hogue, Esq. (NSBN 12400)
10845 Griffith Peak Drive, Suite 600

21            Las Vegas, NV 89135
hoguem@gtlaw.com

22            Sylvia E. Simson, Esq. (admitted *pro hac vice*)

23            One Vanderbilt Avenue
New York, NY 10017

24            Sylvia.Simson@gtlaw.com

25            Alan J. Brody, Esq. (admitted *pro hac vice*)
500 Campus Drive, Suite 400

26            Florham Park, NJ 07932
brodya@gtlaw.com

27            *Attorneys for Non-Party Anson Funds Management LP*

28

**SEMENZA RICKARD LAW**

*/s/ Jarrod L. Rickard*
Jarrod L. Rickard, Esq., (NSBN 10203)
10161 Park Run Dr., Ste. 150
Las Vegas, Nevada 89145
jlr@semenzarickard.com

**DAVIS WRIGHT TREMAINE, LLP**
Michael Rella, Esq. (admitted *pro hac vice*)
Shanaye Carvajal, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
michaelrella@dwt.com
shanayecarvajal@dwt.com

*Attorneys for Non-Party Virtu Financial, LLC*