1 | Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
2 | McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
3 | Las Vegas, Nevada 89102
Telephone: (702) 873-4100
4 | rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com
5 |
*Attorneys for Non-Party Citadel Securities LLC*
6 | Michael R. Hogue, Esq. (NSBN 12400)
10845 Griffith Peak Drive, Suite 600
7 | GREENBERG TRAURIG, LLP
Las Vegas, NV 89135
8 | Telephone: (702) 938-6909
hoguem@gtlaw.com
9 |
*Attorneys for Non-Party Anson Funds Management LP*
10 |
Jarrod L. Rickard, Esq. (NSBN 10203)
11 | SEMENZA RICKARD LAW
10161 Park Run Dr., Ste. 150
12 | Las Vegas, Nevada 89145
Telephone: (702) 835-6803
13 | jlr@semenzarickard.com

14 | *Attorneys for Non-Party Virtu Financial, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re | Case No. 24-50792-gs |
|---|---|
| META MATERIALS, INC., | Chapter 7 |
| Debtor. | **DECLARATION OF PETER H. FOUNTAIN IN SUPPORT OF NON-PARTY CITADEL SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL, LLC'S RESPONSE TO THE TRUSTEE'S SUPPLEMENTAL BRIEF** |

I, Peter H. Fountain, declare as follows:

1.      I am an attorney at the law firm of Quinn Emanuel Urquhart & Sullivan, LLP and am a member in good standing of the State Bar of New York.  I am counsel for Non-Party Citadel Securities LLC ("Citadel Securities") in this matter.

2.      My application for *pro hac vice* admission before this Court has been granted.

3.      I have personal knowledge of the facts set forth below and, if called as a witness, could

1    and would competently testify as to those facts.

2        4.    In *In re Sorrento*, No. 23-90085 (Bankr. S.D. Tex.), a party-in-interest moved for a

3    Rule 2004 order to compel the production of books and records from Consolidated Audit Trail, LLC

4    ("CAT").  On March 22, 2024, the Securities and Exchange Commission filed a statement in support

5    of CAT's objection to the request.  A true and correct copy of that statement is attached as Exhibit 1

6    hereto.  On October 15, 2024, the court denied the party-in-interest's motion.  A true and correct copy

7    of that order is attached as Exhibit 2 hereto.

8        5.    On May 20, 2024, Meta Materials, Inc. issued a press release with the title "Meta

9    Materials Announces Update on Naked Short Selling Investigation."  A true and correct copy of the

10   press release is attached as Exhibit 3 hereto.

11       6.    On February 20, 2026, the Court held a hearing ("Hearing") on the parties'

12   supplemental briefing.  A true and correct copy of the Hearing transcript is attached as Exhibit 4

13   hereto.

14       I declare under penalty of perjury under the laws of the State of New York that the foregoing

15   is true and correct to the best of my knowledge.

16       Executed on this 9th day of March, 2026, in New York, New York.

17

18                                  */s/ Peter H. Fountain*
                                     Peter H. Fountain
19                                   Quinn Emanuel Urquhart & Sullivan, LLP
                                     295 Fifth Avenue
20                                   New York, NY 10016
                                     peterfountain@quinnemanuel.com
21
22                                   *Attorney for Non-Party Citadel Securities LLC*

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | Case No. 23-90085 (CML) |
| Debtors. | (Jointly Administered) |

## THE U.S. SECURITIES AND EXCHANGE COMMISSION'S STATEMENT IN SUPPORT OF CONSOLIDATED AUDIT TRAIL, LLC'S OBJECTION TO SCILEX HOLDING COMPANY'S MOTION FOR ENTRY OF AN ORDER COMPELLING THE PRODUCTION OF BOOKS AND RECORDS FROM CONSOLIDATED AUDIT TRAIL, LLC PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

(Related to Dkt. No. 1878)

The U.S. Securities and Exchange Commission (the "Commission"), a statutory party to these proceedings[2] and the federal agency responsible for regulating and enforcing compliance with the federal securities laws, submits this Statement in Support of Consolidated Audit Trail, LLC's Objection to Scilex Holding Company's Motion for Entry of an Order Compelling the

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

[2] As a statutory party in corporate reorganization proceedings, the Commission "may raise and may appear and be heard on any issue." 11 U.S.C. §1109(a).

Production of Books and Records from Consolidated Audit Trail, LLC Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Motion").[3]

## I.    INTRODUCTION

The consolidated audit trail ("CAT") is of critical importance to the Commission and to self-regulatory organizations ("SROs")[4] in their regulation and oversight of the nation's securities markets.  Because of the vast amount of confidential data captured in CAT for these purposes, maintaining the confidentiality of CAT data is of utmost importance.  Toward this end, the Commission has required that CAT data be used only for regulatory and oversight responsibilities pursuant to the federal securities laws, rules, and regulations.  It should not be used in private litigation.  Therefore, the Commission respectfully requests that the Court deny Scilex's Motion.

## II.    CAT DATA SHOULD BE USED ONLY FOR REGULATORY AND OVERSIGHT PURPOSES

### A.  CAT Data Should Be Kept Confidential

1.    CAT allows regulators to track activity throughout the U.S. markets in National Market System ("NMS") securities.  CAT captures customer and order event information for orders in NMS securities, across all markets, from the time of order inception through routing, cancellation, modification, or execution.  CAT data "substantially enhance[s] the ability of SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws."  Joint Industry Plan; Order Approving the National Market System

---

[3] The Motion filed by Scilex Holding Company ("Scilex") is docket number 1878.  Consolidated Audit Trail, LLC's Objection to the Motion is docket number 2075.

[4] SROs include registered stock exchanges (e.g., the New York Stock Exchange (NYSE)) and registered securities associations (e.g., the Financial Industry Regulatory Authority (FINRA)).

Plan Governing the Consolidated Audit Trail, Release No. 34-79318, 81 Fed. Reg. 84696, 84698

(November 16, 2016) ("CAT NMS Plan Approval Order") (quotations omitted).

    2.    Rule 613, which was adopted by the Commission in 2012, required the creation of

CAT and mandated that SROs develop a "national market system plan to govern the creation,

implementation, and maintenance of a consolidated audit trail and central repository" ("CAT

NMS Plan").  17 CFR § 242.613(a)(1).  The SROs subsequently filed the CAT NMS Plan, and

the Commission approved it in the November 16, 2016, CAT NMS Plan Approval Order.[5]

    3.    Since its inception, the Commission has sought to balance the value of CAT data

for regulatory and oversight purposes with the risk of consolidating vast amounts of confidential

information by requiring strong privacy and confidentiality protections.  *See, e.g., Consol. Audit

Trail*, Release No. 34-67457, at 45782 (July 18, 2012) ("Rule 613 Adoption Release") (stating

the Commission "believes that maintaining the confidentiality of customer and other information

reported to the central repository is essential. Without adequate protections, market participants

would risk the exposure of highly-confidential information about their trading strategies and

positions."); CAT NMS Plan Approval Order, 81 Fed. Reg. at 84758 ("[T]he CAT is designed to

---

[5] The CAT NMS Plan takes the form of a limited liability agreement establishing a company
jointly owned by the participating SROs (the "participants," also referred to as the "plan
sponsors" in Rule 613) through which they conduct the activities related to CAT.  CAT NMS
Plan Approval Order, 81 Fed. Reg. at 84699.  Pursuant to an amendment to the CAT NMS Plan,
the limited liability company is named Consolidated Audit Trail, LLC ("CAT LLC").  Joint
Industry Plan; Notice of Filing and Immediate Effectiveness of Amendment to the National
Market System Plan Governing the Consolidated Audit Trail, Release No. 34-87149 (September
27, 2019), 84 Fed. Reg. 52905 (Oct. 3, 2019).  The CAT NMS Plan obliges a "plan processor" to
develop and implement policies, procedures, and control structures related to the CAT system
that are consistent with Rule 613(e)(4) (ensuring the security and confidentiality of CAT data),
among other provisions.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84704.  Pursuant
to the CAT NMS Plan, the participants must report specified CAT data that is received,
consolidated, and retained in a "central repository" overseen by the plan processor.  *Id.*, 81 Fed.
Reg. at 84706-07.

be a regulatory tool. . . . [T]he Commission also believes that limiting the use of CAT Data for

regulatory and surveillance purposes is reasonable at this time, given the vast scope of the CAT

Data and need to ensure the security and confidentiality of the CAT Data.").

4.      In accord with protecting the confidentiality of CAT data, Commission

regulations provide that CAT LLC is subject to strict limits on how and by whom CAT data is

used.  Rule 613(e)(4) expressly requires that the plan processor "[e]nsure the security and

confidentiality of all information reported to the central repository by requiring that: (A) All plan

sponsors and their employees, as well as all employees of the central repository, agree to use

appropriate safeguards to ensure the confidentiality of such data and agree not to use such data

for any purpose other than surveillance and regulatory purposes."  17 CFR §

242.613(e)(4)(i)(A).[6]  Rule 613(e)(4) further requires that rules be adopted and enforced that

"[r]equire information barriers between regulatory staff and non-regulatory staff with regard to

access and use of data in the central repository" and that "[p]ermit only persons designated by

plan sponsors to have access to the data in the central repository."  17 CFR

§ 242.613(e)(4)(i)(B).

5.      Similarly, the Commission's rule provides that access to and use of CAT data

should be for the purpose of performing regulatory and oversight responsibilities.  Rule 613(e)(2)

states that, "Each [Participant] and the Commission shall have . . . access to and use of the data

reported to and consolidated by the central repository . . . ***for the purpose of performing its***

---

[6] Rule 613(e)(4) clarifies that this language should not be "construed to prevent a plan sponsor
from using the data that it reports to the central repository for regulatory, surveillance,
commercial, or other purposes as otherwise permitted by applicable law, rule, or regulation."  17
CFR § 242.613(e)(4).  However, this exception only applies to plan sponsors (SROs) and with
respect to the data plan sponsors have retained independently of their CAT reporting obligations;
the exception does not apply to CAT LLC's employees or data.

***respective regulatory and oversight responsibilities*** pursuant to the federal securities laws, rules, and regulations."  17 CFR § 242.613(e)(2) (emphasis added).

6.      Consistent with the requirements of Rule 613, the Commission-approved CAT NMS Plan provides that "access to and use of the CAT Data" is "solely for the purpose of performing [the plan participants'] respective regulatory and oversight responsibilities pursuant to the federal securities laws, rules and regulations or any contractual obligations."[7]  CAT NMS Plan, § 6.5(c)(i) (available at https://www.catnmsplan.com/sites/default/files/2023-09/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-9.06.23.pdf); *see also* CAT NMS Plan, §§ 6.5(f)(i)(A) (requiring individuals who have access to CAT data to agree "to use appropriate safeguards" and to use CAT data only for approved purposes), 6.5(g) (requiring plan participants to have policies and procedures to "ensure the confidentiality of CAT Data" and limit the use of CAT data "solely for surveillance and regulatory purposes").  The CAT NMS Plan Approval Order similarly states that "access to and use of the CAT Data stored in the Central Repository [will be provided to the Participants and the SEC] ***solely for the purpose of performing their respective regulatory and oversight responsibilities*** pursuant to the federal securities laws, rules and regulations or any contractual obligations."  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84706 (emphasis added).[8]

---

[7] Regarding the reference to "contractual obligations," some plan participants contract with other plan participants to provide regulatory services via regulatory services agreements.

[8] *See also id.*, 81 Fed. Reg. at 84764 ("The Commission takes very seriously concerns about maintaining the security and confidentiality of CAT Data and believes that it is imperative that all CAT users, including the Commission, implement and maintain a robust security framework with appropriate safeguards to ensure that CAT Data is kept confidential and used only for surveillance and regulatory purposes.").

7.      A violation of the CAT NMS Plan is a violation of Rule 613,[9] so CAT LLC and the plan participants have a legal duty to keep CAT data confidential and to use it only for regulatory and oversight purposes.

**B. Disclosure of CAT Data to Private Entities Would Significantly Compromise CAT Data**

8.      Allowing disclosure of CAT data to private entities creates a significant risk of improper disclosure of this highly confidential information.  Since private parties were not intended recipients of CAT data, they are not subject to the numerous security and confidentiality requirements with which SROs must comply.  *See, e.g.*, CAT NMS Plan Approval Order, 81 Fed. Reg. at 84724 (requiring SRO participants to "establish, maintain and enforce written policies and procedures reasonably designed to ensure the confidentiality of the CAT Data," "adopt and enforce policies and procedures that implement effective information barriers between each Participant's regulatory and nonregulatory Staff with regard to CAT Data, permit only persons designated by Participants to have access to the CAT Data stored in the Central Repository; and impose penalties for Staff noncompliance with any of its or the Plan Processor's policies and procedures with respect to information security.").  Private parties also may not have the infrastructure or ability to protect CAT data with the same level of security protections that the Commission and SROs have put in place.

9.      Requests like Scilex's, if granted, would result in the release of a vast amount of data.  Scilex is seeking over two years' worth of data, and that data will include, for each trade in Scilex stock, information relating to the price, size, time, and venue of trades, firm-designated

---

[9] *See* 17 CFR § 242.613(h)(2) ("[a]ny failure by a national securities exchange or national securities association to comply with the provisions of the national market system plan approved by the Commission shall be considered a violation of this section.").

identifiers and confidential customer identifiers, as well as numerous other aspects of orders, executions, and allocations, such as order type information.  And to the extent that Scilex's open-ended request for "all other data not listed" includes customer and account information, sensitive identifying information of any entity or individual that ordered, traded, or was allocated Scilex securities would be disclosed, including, but not limited to, legal names, addresses, years of birth, Employer Identification Numbers, and unique customer identifiers currently available only to regulators.

10. As delineated in the CAT NMS Plan Approval Order, if the security of CAT data were compromised, the resulting costs could be significant, including (a) damage to market participants' trading profits and client relationships as a result of the disclosure of confidential trading strategies or positions, and (b) damage to business profits as a result of the disclosure of proprietary information about non-public business relationships.  CAT NMS Plan Approval Order, 81 Fed. Reg. at 84874.

11. Protective orders would not be sufficient to assure that CAT data was kept in computer systems with all the protections that the Commission and the SROs have implemented for CAT data.

12. Because CAT data is confidential data that, by law, is gathered and maintained solely for regulatory and oversight use, it should not be available to litigants who are seeking to use it for other purposes and who are unlikely to be able to protect the data pursuant to the confidentiality and security requirements imposed on CAT participants and the Commission.

**C. CAT Data Constitutes "Protected Matter" under Rule 45 of the Federal Rules of Civil Procedure**

13. Rule 2004 exams are enforced through subpoenas issued in accordance with Rule 45.  *See* Fed. R. Bankr. Proc. 2004(c) (production "may be compelled as provided in Rule

9016"); Fed. R. Bankr. Proc. 9016 (stating that Rule 45 of the Federal Rules of Civil Procedure applies in bankruptcy cases).  Rule 45 provides, in relevant part, that a court must quash or modify a subpoena that "requires disclosure of privileged *or other protected matter*, if no exception or waiver applies."  Fed. R. Civ. Proc. 45(d)(3)(A))(iii) (emphasis added); *see also id.* at (d)(3)(B)(i) (providing that a court may quash or modify a subpoena if it requires disclosing confidential commercial information).

14.     "[P]rivacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege."  *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336 (11th Cir. 2020); *see also Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 526–27 (N.D. Ga. 2012) (quashing a plaintiff's request for nonparty educational records based in part on the privacy rights protected by the Family Educational Rights and Privacy Act of 1974, which "does not provide a privilege preventing disclosure of student records, [but nevertheless] seeks to protect the confidentiality of educational records").

15.     Given that the Commission's regulations, the CAT NMS Plan, and other Commission statements evidence a critical government policy of protecting the confidentiality of CAT data, CAT data is a "protected matter," and Scilex's Motion should be denied on this basis. *See, e.g., In re Subpoena Dated June 18, 2020*, No. 20-MC-82327-BER, 2021 WL 7540812, at *5 (S.D. Fla. Apr. 14, 2021) (holding that where, "for important Governmental policy reasons, the FDA uses contractual provisions and agency regulations to limit disclosure of clinical testing data until after a final report is issued," "these restrictions bring the subpoenaed materials within the definition of 'protected' material within the meaning of Fed. R. Civ. P. 45(d)(3)(A)(iii) until the final study report is issued"); *Shetayh v. State Farm Fire & Cas. Co.*, No. 5:20-CV-00693,

2020 WL 6817325, at \*4 (E.D. Pa. Nov. 20, 2020) (quashing a subpoena to a district attorney's office, in part, because the court found that documents relating to a criminal investigation were confidential and therefore a "protected matter" under Rule 45; in doing so, the court considered the state's statute evidencing confidentiality concerns and imposing confidentiality duties relating to investigative materials, despite the inapplicability of state privileges in federal court).

### D. Private Litigants Like Scilex Cannot Show Good Cause for CAT Data and Should Turn to Alternate Sources for Discovery

16.     The Commission believes that no request by a private litigant for CAT data would be appropriate.  However, if a disclosure that was not for a regulatory or oversight purpose were to be considered, any party seeking CAT data should be required to show that the party's need outweighs the need to protect CAT data.  Such a party would need to make a clear showing that CAT data is relevant and necessary to the party's litigation position, that it cannot obtain it from another source, and that it has administrative, technical, and physical safeguards sufficient to protect CAT data from any unauthorized disclosure.  *See Freeman v. Seligson*, 405 F.2d 1326, 1336 (D.C. Cir. 1968) (in ruling on Rule 2004 motions "a determination on good cause requires that all reasonable alternatives be explored."); *Jordan*, 947 F.3d at 1336 ("confidentiality concerns can factor into a decision whether to quash a subpoena").

17.     In this case, Scilex has not made and cannot make such showing.  It seeks eight categories of data for a two-year period, including a broad category of "other data" and does not provide any reason to believe that naked short selling occurred or that other, less intrusive, sources of information were not available to determine if naked short selling occurred.

18.     Moreover, Scilex does not have the capacity to analyze the vast amounts of CAT data it is seeking.  CAT collects hundreds of billions of records per day.  Unlike other data private parties may obtain, the raw CAT data that would be produced would be so voluminous

and contain so much proprietary information that it would be essentially meaningless in the absence of specific technical expertise to process, query, and analyze the records.  And, because the expertise necessary to query the data and properly interpret query output is both evolving and non-public, it does not exist outside of the Commission and the SROs.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Commission requests that the Court deny the Motion.


Dated: March 22, 2024

<div style="margin-left:40%;">

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By: /s/ Melinda Hardy
Melinda Hardy
Assistant General Counsel
(202) 551-5149
hardym@sec.gov
Esther Cheng
Senior Counsel
(202) 551-5092
chenges@sec.gov
100 F Street, NE
Washington, D.C. 20549

</div>

# EXHIBIT 2

# EXHIBIT 2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 15, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-90085 |
| SORRENTO THERAPEUTICS, INC., | § | |
| *et al.*, | § | |
| Debtors. | § | Jointly Administered |
| | | CHAPTER 11 |

**ORDER DENYING MOTION FOR ENTRY OF AN ORDER
COMPELLING THE PRODUCTION OF BOOKS
AND RECORDS FROM CONSOLIDATED AUDIT TRAIL, LLC**
(RE: ECF NO. 1878)

For the reasons stated on the record at the October 15, 2024 hearing, Scilex Holding Company's Motion for Entry of an Order Compelling the Production of Books and Records from Consolidated Audit Trail, LLC is denied.

Signed on

Christopher Lopez
United States Bankruptcy Judge

# EXHIBIT 3

# EXHIBIT 3

Back to the Newsroom





# Meta Materials Announces Update on Naked Short Selling Investigation

Monday, 20 May 2024 04:14 PM

Topic: **Company Update**

**HALIFAX, NS / ACCESSWIRE / May 20, 2024 /** Meta Materials Inc. (the "Company" or "META") (NASDAQ:MMAT), an advanced materials and nanotechnology company, today announced an update on the short selling investigation undertaken in June of 2023.

In an initial press release from late June 2023, META outlined its preliminary analysis of potential naked short selling, and retained well-known analytics firm, Shareholder Intelligence Services, LLC to review trading patterns of the Company's common stock. Based on this analysis, and with zero tolerance for illegal naked short selling and other stock manipulation, META employed the services of law firms, Christian Attar and Warshaw Burstein (collectively "Lawyers") to determine merit of such claims.

Since June 2023, the Lawyers have conducted an exhaustive investigation and undertaken in-depth due diligence. *The Lawyers have now concluded that META has meritorious claims for market manipulation against several parties.* "I believe META has an actionable case in connection with its MMAT/MMTLP claims. We look forward to working with the company," noted James "Wes" Christian, partner with Christian Attar.

Noted META Board Chairman, Jack Harding, "We needed all available data (unearthed by these esteemed securities law firms) at our disposal to delineate stock manipulation, and by which parties. We are now equipped with the necessary information to act and will be further sharing these findings with regulatory agencies. Simultaneously, we expect to file legal proceedings in the coming quarters against the responsible financial service firms." META looks forward to releasing additional press releases as more information becomes available.

**About Meta Materials Inc.**

Meta Materials Inc. (META) is an advanced materials and nanotechnology company. We develop new products and technologies using innovative sustainable science. Advanced materials can improve everyday products that surround us, making them smarter and more sustainable. META® technology platforms enable global brands to develop new products to improve performance for customers in aerospace and defense, consumer electronics, 5G communications, batteries, authentication, automotive and clean energy. Learn more at www.metamaterial.com.



**Media and Investor Inquiries**

Investor Relations
Meta Materials Inc.
media@metamaterial.com
ir@metamaterial.com

**Forward Looking Information**

This press release includes forward-looking information or statements within the meaning of Canadian securities laws and within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995, regarding the Company, which may include, but are not limited to, statements with respect to the costs associated with the workforce reduction, the expected timing of implementing and completing the workforce reduction, and the Company's review and evaluation of potential strategic alternatives. Often but not always, forward-looking information can be identified by the use of words such as "pursuing", "potential", "predicts", "projects", "seeks", "plans", "expect", "intends", "anticipated", "believes" or variations (including negative variations) of such words and phrases, or statements that certain actions, events or results "may", "could", "should", "would" or "will" be taken, occur or be achieved. Such statements are based on the current expectations and views of future events of the management of the Company and are based on assumptions and subject to risks and uncertainties. Although the management of the Company believes that the assumptions underlying these statements are reasonable, they may prove to be incorrect. The forward-looking events and circumstances discussed may not occur and could differ materially as a result of known and unknown risk factors and uncertainties affecting the Company. For a discussion of these risks and uncertainties, and other important factors, see the section entitled "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2024, and in subsequent filings with the Securities and Exchange Commission ("SEC"), as well as discussions of potential risks, uncertainties and other important factors in the Company's subsequent filings with the SEC. Forward-looking statements speak only as of the date on which they are made and the Company does not undertake any obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events, or otherwise, except to the extent required by law.

**SOURCE:** Meta Materials Inc.

## Solutions

Public Companies

Private Companies

Agencies

Legal

Resellers & Market Research

## Public Relations Products

Access PR Platform

Press Release Distribution

Media Database

Media Pitching

Media Monitoring

Media and Industry Targeting

## Investor Relations Products

Access IR Platform

IR Website

ADA Compliance

Earnings Calls

Earnings Press Releases

Investor Days

## All Access

All Access

Conference & Event Software

## Professional Services

Service Plans

Platform Add-ons

## Blogs

Press Release Topics

Media Outreach & Engagement Optimization

Competitor Comparisons

IR Websites Best Practices

Earnings Call, Checklists & Preparation

Earnings Press Release Tips

Investor Day Recommendations

## Resources

Press Release Templates

Press Release Examples

## FAQs

Product

Platform

Company

## About Us

Who We Are

Meet the Team

Investor Relations

Careers

## Our Brands

ACCESS Newswire

Newswire.com

Pressrelease.com

## Contact Us

+1 888-808-2227

Sales

Customer Support

Editorial

Billing Contact

Distribution Partner Inquiry

©2025 ACCESS Newswire Inc. All rights reserved.  Terms of Service  |  Privacy Policy

# EXHIBIT 4

# EXHIBIT 4

```
                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF NEVADA (RENO)

                                    .
 IN RE:                             .   Case No. 24-50792-gs
                                    .   Chapter 7
 META MATERIALS, INC.,              .
                                    .   300 Booth Street
                                    .   Reno, NV 89509
                   Debtor.          .
                                    .   Friday, February 20, 2026
 . . . . . . . . . . . . . . . .    .   1:31 p.m.
```

     TRANSCRIPT OF DOC# 2088 MOTION TO QUASH NON-PARTY CITADEL
SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL,
LLCS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR FOR
 A PROTECTIVE ORDER FILED BY RYAN J. WORKS ON BEHALF OF CITADEL
                        SECURITIES LLC;
 DOC# 2551 MOTION TO QUASH FILED BY JACQUELYN NICOLE SCHELL ON
             BEHALF OF THE NASDAQ STOCK MARKET LLC;
  DOC# 98 STATUS CONFERENCE RE: EX PARTE APPLICATION TO EMPLOY
   CHRISTIAN ATTAR AND KASOWITZ BENSON TORRES LLP AS SPECIAL
  LITIGATION COUNSEL FILED BY JEFFREY L. HARTMAN ON BEHALF OF
                     CHRISTINA W. LOVATO;
              BEFORE THE HONORABLE GARY SPRAKER
            UNITED STATES BANKRUPTCY COURT JUDGE




APPEARANCES CONTINUED.

Audio Operator:          Natalie Clarke, CRD

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

      Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

```
                 UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF NEVADA (RENO)

                                .
IN RE:                          .   Case No. 24-50792-gs
                                .   Chapter 7
META MATERIALS, INC.,           .
                                .
                                .
             Debtor.            .
. . . . . . . . . . . . . . .   .
                                .   Adv. No. 26-05001-gs
META MATERIALS, INC.,           .
                                .
             Plaintiff,         .
                                .
    v.                          .   300 Booth Street
                                .   Reno, NV 89509
THE NASDAQ STOCK MARKET, LLC,   .
                                .   Friday, February 20, 2026
             Defendant.         .   1:31 p.m.
. . . . . . . . . . . . . . .   .
```

```
   TRANSCRIPT OF DOC# 1 SCHEDULING CONFERENCE RE: ADVERSARY CASE
26-05001. ORDER OF META MATERIALS INC. AGAINST THE NASDAQ STOCK
              MARKET LLC. FEE AMOUNT 52.00
            BEFORE THE HONORABLE GARY SPRAKER
            UNITED STATES BANKRUPTCY COURT JUDGE
```

```
APPEARANCES CONTINUED.

Audio Operator:        Natalie Clarke, CRD

Transcription Company: Access Transcripts, LLC
                       10110 Youngwood Lane
                       Fishers, IN 46048
                       (855) 873-2223
                       www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

2

APPEARANCES:

For the Trustee,     Hartman & Hartman
Christina W. Lovato:  By:  JEFFREY L. HARTMAN, ESQ.
                            510 West Plumb Lane, Ste. B
                            Reno, NV 89509
                            (775) 324-2800

                            Schneider Wallace Cottrell Konecky
                            LLP
                            By:  DAVID D. BURNETT, ESQ.
                            1050 30th Street NW
                            Washington, DC 20007
                            (510) 740-2939

                            SBW Law Group
                            By:  CLAYTON BRUST, ESQ.
                            3600 Mayberry Drive
                            Reno, NV 89509
                            (775) 299-4051

                            Christian Attar
                            By:  JAMES W. CHRISTIAN, ESQ.
                            1177 W. Loop South, Suite 1700
                            Houston, TX 77027
                            (713) 659-7617

                            CHRISTINA W. LOVATO, ESQ.
                            P.O. Box 18417
                            Reno, NV 89511
                            (775) 851-1424

For Citadel Securities  McDonald Carano
LLC:                 By:  JIMMY F. DAHU, ESQ.
                            2300 West Sahara Ave. Suite 1200
                            Las Vegas, NV 89102
                            (702) 873-4100

                            Quinn Emanuel Urquhart & Sullivan LLP
                            By:  PETER H. FOUNTAIN, ESQ.
                                   CHRISTOPHER D. KERCHER, ESQ.
                                   MADELEINE P. ZABRISKIE, ESQ.
                            295 5th Ave
                            New York, NY 10016
                            (212) 849-7000

3

```
APPEARANCES (Continued):


For Anson Funds          Greenberg Traurig LLP
Management LP:           By:  MICHAEL R. HOGUE, ESQ.
                         10845 Griffith Peak Dr, Ste 600
                         Las Vegas, NV 89135
                         (702) 792-3773

                         Greenberg Traurig LLP
                         By:  ALAN J. BRODY, ESQ.
                         500 Campus Drive, Suite 400
                         Florham Park, NJ 07932
                         (973) 443-3543

                         Greenberg Traurig LLP
                         By:  SYLVIA E. SIMSON, ESQ.
                         One Vanderbilt Avenue
                         New York, NY 10017
                         (212) 801-9275

For The NASDAQ Stock     Ballard Spahr
Market LLC:              By:  JAMES B. ZACK, ESQ.
                         1301 2nd Ave #2800
                         Seattle, WA 98101
                         (206) 223-7403

For Virtu Financial      Davis Wright Tremaine
LLC:                     By:  MICHAEL V. RELLA, ESQ.
                         1251 Avenue of the Americas
                         21st Floor
                         New York, NY 10020
                         (212) 880-3973

For Scott Traudt:        SCOTT TRAUDT (PRO SE)
                         191 Kibling Hill Rd.
                         Stafford, VT  05072
                         (802) 318-0429

For Danielle Spears:     DANIELLE SPEARS (PRO SE)
                         12206 W. Harrison St.
                         Avondale, AZ 85323
                         (480) 476-1091

Also Present:            MICHELLE CHEN
```

```
 1          (Proceedings commence at 1:31 p.m.)
 2              THE CLERK:  Good afternoon.  This is Natalie Clarke
 3    speaking from the courtroom.  We are now on record for the
 4    Court's 1:30 calendar with the Honorable Gary Spraker
 5    presiding.
 6              THE COURT:  Okay.  Thank you, Madam Clerk.  Let me
 7    ask just by a nod of heads on those participating remotely, can
 8    you hear me okay?  Yeah?  Okay.  We had some problems earlier
 9    this morning, so good.
10              All right.
11              MR. CHRISTIAN:  Yes, Your Honor.  We can hear you.
12              THE COURT:  Perfect.
13              MR. CHRISTIAN:  Thank you.
14              THE COURT:  Thank you.  All right.  We are here for
15    the 1:30 miscellaneous calendar.  Matters today all arise in
16    Meta Materials, Inc.
17              We have several matters, the first being a continued
18    hearing on a motion to quash non-party, filed by non-party
19    Citadel Securities, Anson Funds Management, LP, and Virtu
20    Financial, LLC.  Second matter is a related motion to quash
21    filed by The NASDAQ Stock Market, LLC, as well as a status
22    conference regarding the application to employ by Christian
23    Attar and Kasowitz Benson Torres, LLP, based upon the Court's
24    sua sponte entry of a request to discuss that matter.  And
25    finally, we have a scheduling conference in Meta Materials,
```

5

1 | Inc. v. NASDAQ Stock Market, LLC, which we'll get to in the

2 | ordinary course of this.

3 | Before we begin, primary focus today is -- will be on

4 | the motions to quash.  I want to say that for the benefit of

5 | all parties participating.  I want to get to the financing

6 | arrangement, which is really the issue with the employment

7 | application, if and when we have time.  But we're going to

8 | start, and I want to focus on the motions to quash.

9 | This is the second hearing on the motions to quash as

10 | to the non-parties, as they're referred to.  I reviewed the

11 | supplemental briefing that has been received.  The NASDAQ has,

12 | by circumstances, kind of fallen in line with that briefing.

13 | I've reviewed that as well, understand that by and large.  So

14 | I'm about as well prepared, I think.

15 | The problem is you covered a lot of ground.  So we'll

16 | see where that takes us.  But with that introduction, let's go

17 | ahead and get appearances, if I could.

18 | Mr. Hartman, you're like one of the few that I

19 | recognize.  So why don't we let you start, and just -- even if

20 | it's not your motion.

21 | MR. HARTMAN:  Good morning, Your Honor -- or good

22 | afternoon.  Jeff Hartman for the trustee, who is present on the

23 | phone, and Clay Brust here in the courtroom.

24 | THE COURT:  Thank you, Mr. Brust.

25 | Mr. Dahu, I recognize you as well.  Come on up and

1    make your appearances.

2              MR. DAHU:  Good afternoon, Your Honor.  Good to see

3    you again.  Jimmy Dahu, McDonald Carano, local counsel for

4    Citadel Securities.  And we also have in the courtroom Peter

5    Fountain from Quinn Emanuel, Christopher Kercher from Quinn

6    Emanuel, Madeleine Zabriskie from Quinn Emanuel, and we also

7    have client representative Michelle Chen for Citadel

8    Securities.

9              THE COURT:  Excellent.

10             MR. BRODY:  Good afternoon, Your Honor.  Alan Brody

11   from Greenberg Traurig on behalf of movant Anson Funds

12   Management, LP.  Your Honor, on Zoom also are my partners

13   Michael Hogue and Sylvia Simson.  Also on Zoom is our client

14   from Anson Funds, Laura Salvatori.

15             THE COURT:  Thank you very much.

16             MR. BRODY:  Thank you, Your Honor.

17             MR. RELLA:  Good afternoon, Your Honor.  Michael

18   Rella from Davis Wright Tremaine for movant Virtu Financial.

19             THE COURT:  Thank you.

20             MR. CHRISTIAN:  Good afternoon, Your Honor.  Wes

21   Christian for Meta Materials appearing remotely via Zoom.

22             THE COURT:  Thank you, Mr. Christian.  Let's go ahead

23   and jump to Mr. Zack so he can sit back down.

24             MR. ZACK:  Good afternoon, Your Honor.  James Zack

25   appearing on behalf of The NASDAQ Stock Market LLC.

7

```
 1            THE COURT:  Thank you.

 2            Mr. Hogue, I saw -- go ahead, Mr. Christian, did you

 3  want --

 4            MR. HOGUE:  I apologize for --

 5            MR. BURNETT:  (Indiscernible) David Burnett, so I

 6  wanted to make sure.

 7            THE COURT:  All right.  Thank you.

 8            Mr. Hogue.

 9            MR. HOGUE:  And yes, Judge Spraker, I did want to

10  make my appearance.  I apologize.  I had some weird audio

11  glitch and it went to off-phone but wouldn't let me disconnect

12  for some reason.  Michael Hogue on behalf of non-party Anson

13  Funds.

14            THE COURT:  Thank you.  All right.

15            MR. BURNETT:  And good afternoon, Your Honor.  David

16  Burnett from Schneider Wallace on behalf of the trustee.

17            THE COURT:  Thank you, Mr. Burnett.  All right.

18            MS. SIMSON:  Good afternoon, Your Honor.  My partner,

19  Alan Brody, already introduced me, but Sylvia Simson, Greenberg

20  Traurig, also on behalf of Anson Funds.

21            THE COURT:  Thank you.  Good afternoon.

22            MS. SIMSON:  Good afternoon.

23            THE COURT:  I think that's everyone.  Did we hit

24  everyone?  Okay.  All right.  We've got our appearances.

25            My intent is to let NASDAQ kind of take the first
```

1  shot at this to catch us up.  I've initially heard from the

2  non-parties as to the motion to quash.  It just seems in my

3  mind kind of fair to let NASDAQ have a say here as they're new

4  to this environment.  So counsel for NASDAQ, whichever wants to

5  proceed.

6              MR. ZACK:  Good afternoon, Your Honor.  James Zack

7  for NASDAQ.  NASDAQ's motion requests that the Court quash two

8  subpoenas that were served by the trustee for Meta Materials.

9  The subpoenas contain one identical substantive request.  So in

10 that regard, most of these arguments will cover both of those

11 subpoenas equally.

12             The subpoenas should be quashed because first, under

13 Rule 2004, the request scope is improper.  Second, under Rule

14 2004, the request purpose is improper.  Third, under Rule 45,

15 the request is procedurally improper outside of Rule 2004.  And

16 fourth, under Rule 2005, the request is unduly burdensome,

17 irrelevant, and overbroad.

18             So I'll start with the Rule 2004 scope.  Rule 2004

19 permits the trustee to examine an entity only if it relates to

20 certain enumerated topics.  The trustee has identified two of

21 those enumerated topics as the basis for its request, the

22 debtor's property and the debtor's financial condition.  And

23 NASDAQ's position is that the request does not actually relate

24 to either of those, the debtor's property or the debtor's

25 financial condition, for at least three reasons.

1          First, the request is not limited to the debtor's own

2    assets or conduct.  The request seats records related to all

3    third-party stock trades for a four-year period.  It goes far

4    beyond the debtor's own assets or conduct.  The debtor doesn't

5    have a general property interest in its own shares of stock.

6    And in our briefing we cited --

7          THE COURT:  Unless it's selling it and there's

8    somehow wrongdoing in the sale of that, I assume.

9          MR. ZACK:  Even accepting that premise, that would be

10    a small subsection of the --

11          THE COURT:  We're not into subsections here, though,

12    are we?  I mean, this is 2004.

13          MR. ZACK:  No, no, meaning a small subsection of the

14    broad request --

15          THE COURT:  Of requested?

16          MR. ZACK:  -- that's made here.  So even if we were

17    talking about trades that involve the debtor specifically, you

18    know, issuing or selling its own stock, the request goes far

19    beyond that to request four years of all trades, including

20    third parties.  And we cited a few cases which make it clear

21    that when third parties are trading a corporation's stock,

22    that's not considered a property of the corporation.

23          THE COURT:  I understand that, and we'll get into

24    that much more.  I take your point.  I think that was made

25    fairly persuasively at the original hearing, and that is an

1  item of concern.

2          Just for organizing the argument, I am focusing on

3  Meta as Meta.  So assuming that they sold stock during the

4  relevant time, do you concede or do you acknowledge that there

5  could be claims for the manipulation of the market during the

6  periods for which they were selling, which would give rise

7  potentially to causes of action, which would be the property of

8  the estate?

9          MR. ZACK:  Well, not necessarily for a few reasons.

10  First of all, it's not even clear from the record whether we're

11  talking about stock issuance versus secondary sales --

12          THE COURT:  Again, we're in 2004.  It's not a motion

13  to dismiss.

14          MR. ZACK:  That's fair.  And -- but to -- my second

15  point is that the trustee has not even articulated any actual

16  claims to this point.  The trustee asserts that it's uncertain

17  whether any claims even exist.

18          We're talking about, quote/unquote, "potential

19  claims" related to stock manipulation.  So it's vague and

20  speculative.  Potential claims we're talking about, even

21  looking at the schedules, it's about as vague as you can get.

22          THE COURT:  But that's --

23          MR. ZACK:  And so the issue here is Rule 2004,

24  extremely broad, but is it limitless, right?  If we're just

25  talking about potential stock manipulation claims, what

1  publicly traded debtor doesn't come into bankruptcy then with

2  the right under Rule 2004 to conduct this full fishing

3  expedition for potential claims based on all trading records of

4  its stock over the last four years when the trustee has not

5  even articulated an actual claim, just saying we want to start

6  from the beginning with looking at all trades?  There's really

7  no limits on Rule 2004 in that situation.

8           THE COURT:  So what's the best case you got for that

9  position in a situation like this?

10          MR. ZACK:  Well, it's not necessarily a case so much

11  as the trustee's own language in its opposition, saying that

12  it's exploring any wrongdoing and potential claims that may

13  exist, and the trustee has not yet determined whether any

14  complaints will be filed against any parties related to the

15  stock manipulation investigation.

16          And so you have a company like NASDAQ who has

17  thousands of publicly traded companies listed on its exchange,

18  and if one of those companies were to file bankruptcy, I'm not

19  sure where this case is distinguishable from any of those, in

20  which case a trustee would just be able to come in on the first

21  day of the case with a 2004 examination asking for NASDAQ or a

22  similarly situated exchange to have to produce such a broad

23  range of all order activity over such a broad period.

24          THE COURT:  I think that cuts both ways, because in a

25  different case where there was no prior involvement, where does

1   the trustee start?  I mean, if the trustee is told that there

2   was concerning activity prepetition, where does the trustee

3   start?  So I --

4           MR. ZACK:  The --

5           THE COURT:  This is a classic 2004 situation, and I

6   understand it's all about line drawing, and I'm willing to hear

7   all about that, but I don't know why the trustee can't, if

8   there is a concern that they may have causes of action arising

9   from market manipulation at a time when they ostensibly were in

10  the market selling their stock.

11          MR. ZACK:  It is a line drawing issue ultimately on

12  that point, Your Honor, but then there's also my third point,

13  which is the trustee would lack standing to prosecute potential

14  claims that may exist anyways.  And that's where we --

15          THE COURT:  As to the sale of Meta shares?

16          MR. ZACK:  Well, as to stock manipulation claims on

17  behalf of shareholders.

18          THE COURT:  No, but if it was the issuer and seller

19  of shares, that's their shares they're selling, and if the

20  prices were being deflated artificially, wouldn't that give

21  rise to the causes of action, which generically have been, you

22  know, put forth on alleged spoofing and naked short sales?

23          MR. ZACK:  Our position is that under the Ninth

24  Circuit law that we cited in our brief, extending that to the

25  trustee's position as a bankruptcy trustee for the entity that

13

 1  had, of course, issued its own stock but was not necessary --

 2  but the claims themselves are on behalf of shareholders.

 3          THE COURT:  This comes -- this brings up a point that

 4  I've been meaning to get to, but given the amount I have not.

 5  What law controls?  What choice of law are we looking at?

 6          MR. ZACK:  With regard to potential stock

 7  manipulation claims?

 8          THE COURT:  You know, right, I mean, whose law would

 9  control?

10          MR. ZACK:  My understanding is that those are federal

11  securities claims that the trustee's at least suggested would

12  be the basis for its claims.

13          THE COURT:  So it would be Ninth Circuit law?

14          MR. ZACK:  I do think Ninth Circuit law would be

15  applicable, yeah.

16          THE COURT:  Okay.

17          MR. ZACK:  And I understand that that particular

18  argument overlaps a lot with what the other parties are saying

19  because everybody's in the same position of arguing that even

20  if this related to the debtor's own assets and even if the

21  trustee had articulated some sort of a claim that goes beyond,

22  you know, the line drawing problem that I think we actually do

23  have in this case, that the trustee wouldn't even have standing

24  for the claims that it's trying to allude to.

25          I can touch next on the improper purpose of Rule 2004

14

1    in this case.

2              THE COURT:  Sure.  Go ahead.

3              MR. ZACK:  And it's an interesting one because on the

4    one hand, we're just talking about how the trustee represents

5    that it's so early in its process, hasn't articulated claims,

6    vague, speculative, potential claims, don't know if we're going

7    to file a complaint.  And yet then we turn to the improper

8    purpose side, which looks at whether Rule 2004 is being used to

9    circumvent the procedural safeguards provided to litigants by

10   the civil rules, specifically whether the trustee is already in

11   a position to file an action against certain individuals and

12   defendants.

13             And the trustee's record starts to contradict itself,

14   because what we actually have here is a trustee who was able to

15   complete a -- has the benefit of a pre-bankruptcy investigation

16   conducted by the trustee's own special counsel, which in the

17   trustee's own words says they were engaged in and identified

18   over 55 million shares of MMAT and 92 million shares of TRCH

19   that were impacted by fraudulent activity and that the target

20   defendant's manipulation of those shares not only harmed the

21   company but also caused significant financial losses for

22   shareholders.

23             So in this case the trustee's insistence that it

24   needs records from NASDAQ to, quote/unquote, "obtain market-

25   wide trading data which may show patterns of manipulative

15

```
 1  trading behavior such as spoofing," is the exact investigation
 2  that the trustee already undertook pre-bankrupt -- or the
 3  trustee's special counsel.
 4            THE COURT:  Why does NASDAQ get to decide when that
 5  was enough?
 6            MR. ZACK:  These are the trustee's own words.  This
 7  is the trustee saying what it needs from NASDAQ.
 8            THE COURT:  Trustee hasn't said it's got enough to
 9  determine.
10            MR. ZACK:  What the trustee is saying it needs from
11  NASDAQ aligns with what the trustee is saying that it already
12  has.  So in this case, you have the trustee who's already
13  completed a pre-bankruptcy investigation and seems very far
14  down that road to filing these lawsuits and so it starts to get
15  crossing that line from Rule 2004 as an investigatory tool as
16  an improper litigation preparation tool.
17            THE COURT:  What is the improper litigation
18  preparation tool?  What is that line?
19            MR. ZACK:  Well, it circumvents the idea of filing a
20  lawsuit.
21            THE COURT:  That's the pending proceeding, but
22  there's no proceeding pending, correct?
23            MR. ZACK:  There's no proceeding pending, correct,
24  and that's where this is different than the pending proceeding
25  absolute bar to 2004.  This is improper purpose of 2004 in
```

16

1  anticipation of a proceeding that is already, you know,

2  effectively on its way.

3          THE COURT:  And which one -- which other cases do you

4  rely upon as the best --

5          MR. ZACK:  Primarily the GHR Energy Corp. case, which

6  speaks to when the requesting party is already in a position to

7  file an action against certain of the individuals and entities.

8  And then secondarily, I believe we cited the Enron case for a

9  similar proposition.

10          And going even further, though, in this case the

11  trustee has already engaged at least four law firms, I've

12  actually lost track of it on the docket, to prosecute the

13  anticipated litigation, and they've already obtained over $11

14  million of litigation financing from improper party.

15          THE COURT:  We'll get to that.

16          MR. ZACK:  Well, it weighs on the preparation that's

17  gone on here and how far they are on that GHR kind of standard

18  of are they in a position to file an action against certain of

19  the individuals and entities.  And I think it's indicative that

20  if they have $11.8 million of financing committed that, they're

21  pretty far on that way to thinking that they have claims that

22  go beyond the representations that they're exploring potential

23  claims and haven't decided yet whether they have any.

24          So again, contradictory statements here where it's

25  either, you know, the scope of Rule 2004 is being exceeded or

1  2004 is being used for an improper purpose.  And on the

2  improper purpose point I just want to make one more point

3  there.  The broad pre-litigation discovery under Rule 2004 is

4  not actually necessary to plead a claim for stock manipulation.

5  There are many instances where manipulation claims are

6  prosecuted by investors outside of bankruptcy without the

7  benefit of Rule 2004 discovery.

8           We cited in our briefing a Second Circuit case that

9  speaks to this idea specifically for stock manipulation cases

10 where the pleading standards are, you know, I guess adjusted in

11 a sense to understand the reality of how those claims can be

12 plead.

13          THE COURT:  I would like to think that a Chapter 7

14 trustee has a little higher level of duty before taking that

15 decision.

16          MR. ZACK:  In a sense, yes, but the Chapter 7 trustee

17 in this case is relying on special counsel, who, you know --

18          THE COURT:  I understand.

19          MR. ZACK:  --  to their credit holds themselves out

20 as perhaps one of the country's foremost experts on stock

21 manipulation claims, has apparently been very successful on

22 those for decades, and my understanding is that it's not always

23 been a prerequisite to pass the pleading stage, let alone

24 succeed on those claims, that the trustee's special counsel has

25 always had the benefit of Rule 2004.  And I believe it would

18

1  carry through that if you took the trustee at their word, the

2  trustee's special counsel would no longer be able to assert any

3  stock manipulation claims outside of the bankruptcy context

4  because admittedly they would be unacceptable to meet the

5  pleadings schedule.

6          THE COURT:  No, that -- you're going a little too far

7  with that.  You had me going along for quite a bit.  You're

8  kind of -- that one went a little out of bounds.

9          MR. ZACK:  Well, I guess it comes back to the

10  question of is Rule 2004 discovery absolutely necessary to

11  plead stock manipulation claims?

12          THE COURT:   don't know if that's the standard for

13  good cause.

14          MR. ZACK:  The trustee's special counsel has shown

15  it's not.

16          THE COURT:  Where is that the standard for good

17  cause?

18          MR. ZACK:  For good cause, in other words, the

19  purpose not being --

20          THE COURT:  -- of 2004, absolutely necessary.

21          MR. ZACK:  I believe it's the trustee's own arguments

22  that the Twombly and Iqbal standards cannot be met absent the

23  2004 discovery in this case.

24          THE COURT:  I understand that's an argument, but I'm

25  asking you.  The requirement here, the standard to be met is

19

```
 1  good cause.  And if the trustee believes that she needs that
 2  through that and is pursuing or investigating a securities
 3  cause of action for depressed valuations or manipulated
 4  valuations, why does it have to be absolutely necessary?
 5          MR. ZACK:  Well, I'll take out the words absolutely
 6  necessary, and my understanding is that the trustee's argument
 7  in this case is that it is necessary.  It is literally the
 8  difference between them being able to make the claims or not is
 9  what they argue.
10          THE COURT:  That's the argument.  Set aside that
11  argument, though, and where am I to draw the line?  Again, I am
12  resisting the motion to dismiss analysis in the Rule 2004.  I
13  think this is a different kettle of fish.
14          MR. ZACK:  Well, I -- it seems like we agree then
15  that the --
16          THE COURT:  Right.
17          MR. ZACK:  Twombly and Iqbal standards don't actually
18  necessitate 2004 discovery because the claims can obviously be
19  brought outside 2004 context.
20          THE COURT:  I am not here to decide that at this
21  time, you know.
22          MR. ZACK:  Sure.
23          THE COURT:  So --
24          MR. ZACK:  So, you know, we've covered the improper
25  scope, the improper purpose.  I'd like to touch on Rule 45
```

20

1   procedurally.

2            First of all, there's two subpoenas here.  One was

3   effectively issued pursuant to Rule 2004.  One was effectively

4   issued under Rule 45.

5            THE COURT:  Rule 45.

6            MR. ZACK:  That's an oversimplification.  But the

7   subpoena that was issued only under Rule 45 as a technicality

8   should be quashed because there's no pending action.

9            And then the subpoena that's issued under Rule 2004,

10  because we've argued and encouraged the Court to agree with us

11  that there's not an actual basis under Rule 2004 either on the

12  scope or purpose arguments, it essentially negates the Rule

13  2004 option for that document request subpoena, leaving it bare

14  under Rule 45 and meeting the same fate of no action.

15           I think Your Honor had the benefit of our briefing on

16  how you get there under the bankruptcy rules, the Patel case,

17  the other cases that have effectively said you have Rule 2004,

18  you have the four things that qualify as an action in the

19  bankruptcy case.  If you don't have any of them, the subpoena

20  should be quashed.

21           So this is a bit of a hypothetical argument on the

22  2004 subpoena that Your Honor would agree with us, that there's

23  not actually a 2004 basis and would therefore --

24           THE COURT:  Right.

25           MR. ZACK:  -- also quash it under Rule 45.  But it's

21

1  actually a very real argument immediately on the Rule 45

2  subpoena itself that that should be quashed under that rule.

3           THE COURT:  Sticking with the procedural part of this

4  argument, did you have a chance to review the Court's tentative

5  decision as to the Local Rule, and did you care to address

6  that?

7           MR. ZACK:  Yes, Your Honor.  Certainly reserve all

8  arguments in the sense that that's a tentative ruling.

9  Understand that where the Court's mostly coming from is federal

10 rules control over, you know, jurisdictional rules.  I think

11 it's a bit validating that everybody was a little confused

12 about the Nevada rules, and whether --

13          THE COURT:  Including Joe Sakagawa (phonetic).  Yeah.

14          MR. ZACK:  -- whether it goes so far as to prohibit

15 certain actions, and certainly there was some case law that

16 indicated that.  I'm not going to take up too much time today

17 arguing that orally.  I'd say that, you know, we do touch on it

18 in our briefing.  And that ultimately the better argument here

19 for our side is what I've just --

20          THE COURT:  Right.

21          MR. ZACK:  -- outlined, which is there's really not a

22 2004 basis for the 2004 subpoena.  It becomes kind of a bare

23 Rule 45 subpoena itself, and therefore is clearly procedurally

24 improper.  And then the same for the one that's just issued

25 under Rule 45 anyways.

22

```
 1            I'd like to wrap up by touching on the sort of

 2   standard Rule 45 protections of anybody that gets a subpoena

 3   for document production.  And those apply to both subpoenas

 4   equally, because they are ultimately issued by virtue of Rule

 5   45.  And that's unduly burdensome, irrelevant, and overbroad.

 6            The burden is real here for NASDAQ, and it's real in

 7   two distinct ways.  First, there's a general burden on NASDAQ

 8   that the Court should consider.  And that's -- you know, I was

 9   kind of getting into that earlier, but this idea that there's

10   thousands of companies listed on NASDAQ stock exchange, so

11   NASDAQ should not be subjected to producing effectively

12   unlimited trading records every time a listed company enters

13   bankruptcy, or, you know, is even --

14            THE COURT:  That's not what we're establishing here.

15   I'm sorry, I understand the slope is slippery, but we're at one

16   point at the top of that slope.

17            MR. ZACK:  Well, that's fair, but I think that that's

18   a -- as I said, it's a general consideration on the burden.  So

19   it's not necessarily the only thing that needs to control the

20   outcome here, but it's something for the Court to consider is

21   how could the decision here not open that door then.  The

22   specific burden --

23            THE COURT:  And conversely, if I deny it, then

24   they'll never be able to get any -- a publicly traded entity

25   that files bankruptcy and is concerned about market
```

23

1   manipulation will never be able to get this information.

2           MR. ZACK:  Not necessarily, and that actually goes to

3   my second point, which is the specific burden on NASDAQ in this

4   case, because as Your Honor is aware, NASDAQ actually did

5   produce six months of records.  Those six months were not

6   necessarily selected by NASDAQ.  They were selected in

7   consultation with the trustee regarding which is the most

8   important period to produce records for.

9           And so with regard to the specific burden for the

10  Court to consider with regard to NASDAQ, it's not starting from

11  that starting point of NASDAQ should or should not have to be

12  able to respond to either, you know, an unlimited record

13  request or not at all.  It's actually in the scope of this

14  specific matter, should NASDAQ be required to provide an

15  additional three and a half years above the six months that

16  it's already provided.  And the interesting thing about that

17  analysis is that with NASDAQ having already provided the most

18  important six months of material, the need on the trustee's

19  side is greatly diminished for the remaining material, whereas

20  the burden for NASDAQ is seven times the burden than it's

21  already shouldered.

22          And so I can understand that we're not trying to make

23  the argument that the trustee waived any right to continue

24  requesting that by the, you know, consensual production of six

25  months of documents.  But also NASDAQ certainly didn't waive

1   that by producing six months, it would not argue that there's a

2   considerably larger burden to have to go back and do seven

3   times the work.

4          THE COURT:  But another six months would be okay?

5          MR. ZACK:  We would prefer not to even have another

6   six months, but Your Honor can see it's a scale of weighing the

7   burden on NASDAQ versus the need for the trustee.  The need for

8   the trustee continues to go down as the burden for NASDAQ, you

9   know, remains high.

10         On the relevance, this is an interesting one that's

11  just -- it's really not spoken to in much detail in the

12  trustee's briefing.  And so, you know, admittedly, we're making

13  some assumptions here.  But the trustees already identified --

14  on the relevance piece, the trustees already identified, you

15  know, 55 million shares of one stock, 92 million shares of

16  another stock, and speaks to wanting data from NASDAQ to be

17  able to see if there's a pattern of market manipulation, which

18  seems to align with the investigation that they've already

19  conducted.

20         But going a step further, if the trustee's actually

21  seeking the identities of investors who are suspected to have

22  engaged in market manipulation, the trustee's request for

23  MPIDs, which is market participant identifiers, would not

24  accomplish that.  Exchanges like NASDAQ don't have the

25  visibility into who's placing the orders beyond the executing

 1   brokers.  And we did also cite a case for Your Honor where a

 2   court essentially acknowledged the same about MPIDs.

 3            So on the relevance piece, it's hard to see how the

 4   broad records request to NASDAQ doesn't just overlap with the

 5   investigation that the trustee already conducted, and to the

 6   extent that the trustee is arguing they would get additional

 7   information regarding identifying the actual investors, that's

 8   not within the materials that would be provided.

 9            THE COURT:  Can you remind me again what was actually

10   produced for the six months then?

11            MR. ZACK:  I believe it was -- in fact, the trustee

12   could better explain any deficiencies that they found in the

13   six months.  But --

14            THE COURT:  No, I'm just -- I --

15            MR. ZACK:  Oh.

16            THE COURT:  I'm trying to process a lot of things, so

17   it's --

18            MR. ZACK:  Essentially, NASDAQ produced six months of

19   the trading records that it has for, you know, the identified

20   stocks.  And I think that's two pieces for the trustee probably

21   to speak to more than myself, but it's, you know, where do they

22   stand on the six-month production and why do they need the

23   three-and-a-half years of additional production.

24            But again, the information that they're getting from

25   NASDAQ isn't going to answer that question if that's the

26

1  question they're attempting to --

2           THE COURT:  It's not going to identify the actual

3  participants is what you're saying.

4           MR. ZACK:  Exactly.  And that's where that's not just

5  me saying that, but there's, you know, case law that we cited

6  from the Southern District of New York that has effectively

7  said the same thing about that information.

8           My last argument is, you know, that the request is

9  overbroad.  It is all relevant records, any type, four-year

10 period.  It all kind of relates back to what we've been

11 discussing, which is if Your Honor is somewhere between

12 quashing the subpoenas altogether or ordering some sort of

13 additional compliance, what is reasonable and is this request

14 tailored to a reasonable breadth or is it overbroad?  We think

15 it's overbroad under Rule 45 and Rule 2004, but ultimately just

16 the wording of the request itself would at least need to be

17 revised by the Court or by the trustee, even if Your Honor were

18 to ultimately rule in their favor on a lot of these other

19 issues.

20          You know, I would argue the four-year period is also

21 overbroad, as I already have.

22          THE COURT:  All right.  Thank you.  Anything else at

23 this time?

24          MR. ZACK:  I think I'd just summarize, you know,

25 again that, you know, Rule 2004's scope we don't believe

```
 1   permits this request.  Rule 2004's purpose is being violated
 2   based on where the specific trustee is in the course of their
 3   investigating claims.  Procedurally, Rule 45 would then require
 4   both subpoenas to be quashed and ultimately, even if Your Honor
 5   disagreed with all those points, you know, we've raised valid
 6   points on the burden imposed on NASDAQ broadly, and in this
 7   case the relevance of the actual information that the trustee
 8   is seeking versus what it already has and the overbreadth of
 9   the language of the request itself.
10            THE COURT:  Thank you.
11            MR. ZACK:  Thank you, Your Honor.
12            THE COURT:  All right.  Who would like to take the
13   shot for the non-parties?
14            MR. FOUNTAIN:  Good afternoon, Your Honor.  Peter
15   Fountain for Citadel Securities.
16            THE COURT:  Thank you, Mr. Fountain.
17            MR. FOUNTAIN:  I'll speak today on behalf of the non-
18   parties.  You may also hear from my co-counsel, Mr. Brody, on
19   certain issues.
20            Before I begin, Your Honor, I have a brief
21   housekeeping issue, which is just that we learned that the
22   United States District Court for the District -- for D.C.
23   transferred the FINRA motion in as well.  That was another
24   motion to quash that was pending similar --
25            THE COURT:  Right.
```

```
 1              MR. FOUNTAIN:  -- to those filed by these parties.  I
 2   just wanted to make sure the Court was aware of that.
 3              THE COURT:  Was not, so thank you.
 4              MR. FOUNTAIN:  Yes.
 5              THE COURT:  Have -- what is the overlap between the
 6   D.C. proceedings?  How far did they get?  And where are they
 7   versus where we are today?
 8              MR. FOUNTAIN:  I'm not an expert on those, Your
 9   Honor, but my --
10              THE COURT:  Yeah.
11              MR. FOUNTAIN:  -- understanding is that the Court in
12   D.C. adjudicated the transfer issues, similar --
13              THE COURT:  Similar with --
14              MR. FOUNTAIN:  -- but not the merits issues --
15              THE COURT:  To New York?
16              MR. FOUNTAIN:  -- such that they are similarly
17   situated to NASDAQ at this time.
18              THE COURT:  All right.  Thank you for bringing that
19   to the Court's attention.  We'll try to figure out how to wrap
20   that in at the conclusion.
21              MR. FOUNTAIN:  Thank you, Your Honor.  I'll proceed
22   with argument if that's all right.
23              THE COURT:  Please.
24              MR. FOUNTAIN:  Okay.  Your Honor, as you noted, we
25   were here before you in October.  The Court asked a threshold
```

```
 1  question at that time.  The briefs are now in.  We have

 2  answered that question, Your Honor, and the trustee has not.

 3          The authority that we've cited establishes a black

 4  letter principle of corporate law, and this is to quote

 5  directly from the In Re: Paso del Norte case.  It is widely

 6  recognized that a corporation, even if a debtor in bankruptcy,

 7  has no property interest in the shares of its stock owned by

 8  shareholders.  And because third-party transactions among

 9  shareholders of Meta stock do not involve the property of the

10  estate, any claims that could relate to those transactions

11  would be the property of those shareholders.  They would not

12  be --

13          THE COURT:  So let me pose the same question I asked

14  Mr. Zack as to the scenario where Meta was selling its shares,

15  so not resold or re-traded, but was selling as issuing.

16  Wouldn't that give rise to a potential cause of action?

17          MR. FOUNTAIN:  Your Honor, there's sort of three

18  layers to that.  And to take them in turn, the first is just to

19  note that on the briefing, there's been no establishment that

20  any stock was

21          THE COURT:  Except that they attached documents

22  regarding the issuance and prospectus.  And for a period of

23  time which seems to fall within at least the four years, that

24  is at issue here.

25          MR. FOUNTAIN:  And I want to take these one at a time
```

1   and not lose sight of the question.  The prospectus though,

2   Your Honor, is an offering for the sale of stock.  A prospectus

3   is a document that's filed with the SEC.  It does not

4   self-evidence that any stock was sold.  You can file a

5   prospectus with the SEC and not sell any stock, right?

6           THE COURT:  I thought some of those documents did

7   reference a sales stock.

8           MR. FOUNTAIN:  What they put forward was a

9   prospectus, Your Honor.  That prospectus itself, you know, says

10  that there's going to be, I believe, 620,000 shares of stock

11  sold.  What I'm saying is the prospectus does not establish

12  that those sales took place.

13          THE COURT:  But I have a memory, and again, I've been

14  covering a lot of ground, and I'm just coming from a different

15  city and a different -- so excuse if it's a little vague, but I

16  thought it did reference a 2023 sale of stock.

17          MR. FOUNTAIN:  Your Honor, I don't have the pages

18  memorized either coming in from New York.

19          THE COURT:  Fair.  I mean, if it's a -- yeah.

20          MR. FOUNTAIN:  But -- so I think there would be a few

21  things that we would say to that, coming back then to the

22  Court's prior question.

23          But as to the prospectus, there are still infirmities

24  with it.  The first is that the prospectus is talking about a

25  below-market price sale of stock.  And so if these claims are

1    that spoofing occurred, spoofing is a short-term form of market

2    manipulation that affects the market price of a security for a

3    short period of time.

4           If what the trustee is claiming is that it sold

5    stock, that would not only need to be at the same time the

6    spoofing occurred, because of the short-term nature of

7    spoofing, it would also need to occur at a market price, such

8    that it could be affected by that spoofing.  And so these

9    registered offerings, these prospectuses that talk about direct

10   sales, those direct sales are at below-market prices.  And so

11   they couldn't possibly have been affected by any alleged

12   manipulation.

13          We're in the dark, Your Honor, as to what they

14   believe actually occurred with respect to the market

15   manipulation, and we'll talk about that as well.  But there are

16   a number of affirmatives with the prospectus and the type of

17   sales that they are talking about, such that even if the

18   prospectus evidenced a sale, it wouldn't be enough.

19          And that's their own case law.  That is the Northwest

20   Bio case that they cite indicates as much.

21          THE COURT:  Well, and then you're getting into lost

22   causation, right?  I mean, that's really what you're arguing.

23          MR. FOUNTAIN:  Well, it's a question of whether they

24   have a securities claim that belongs to the estate.  And what

25   they've said, Your Honor, is that they have 65,000 shareholders

32

1  that were injured.  But they haven't talked about linking or

2  even attempting to link estate issuances, sales by the debtor,

3  to any alleged market manipulation.  We think that it goes to

4  the threshold question that Your Honor identified in the last

5  instance.  And so that was the first level of that, right?  You

6  know, what would happen if they alleged a sale?  We don't

7  believe they did.

8         But I think there are other perspectives here that

9  are really important to consider, right?  Even if there was a

10  sale alleged, it would need to be a sale at the price affected

11  by spoofing.  That is the, you know, short-term market

12  manipulation argument.  They would need to establish the other

13  standing level elements of a securities claim.  That includes

14  reliance.  Here we have an instance.

15         THE COURT:  But we're not at that.  Again, we're

16  slipping into the motion to dismiss.

17         MR. FOUNTAIN:  Your Honor, respectfully, what we

18  would say is that in the context of the good cause that the

19  debtor needs to establish, the Court is required to consider

20  the totality of the circumstances.  And so elements of a

21  securities claim that could never be pled like market

22  efficiency or the fact that there is the in pari delicto bar

23  need to factor directly into the Court's analysis of good

24  cause.

25         The Landis case specifically talks about how its

1   totality of the circumstances.  We think that it also involves

2   an analysis of the harassment angle here, an analysis of what

3   relationship our client's internal emails could possibly have

4   to these unarticulated claims of market manipulation.

5            THE COURT:  That last statement kind of gets to the

6   point that Mr. Zack was alluding to in the dichotomy between

7   the arguments that are being presented here, some very high-

8   level macro.  And then, as Mr. Zak ended his argument, there's

9   the micro, the burden.  I'm hearing your argument of harassment

10  and those which are much more micro.  So I think just to kind

11  of let you know where I'm coming from, in my mind I am keeping

12  those in different areas just for analysis sake, quite

13  honestly.

14           MR. FOUNTAIN:  And, of course, respect Your Honor's

15  view on that.  The only addition I would make to it, Your

16  Honor, is that the Landis case, for example, talks about the

17  good cause analysis that the Court is required to conduct.  And

18  it says that when there is a close relationship between the

19  entity that receives the Rule 2004 subpoena and the debtor, for

20  example, they're a creditor, right, the analysis the Court does

21  of good cause and the document requests is all part and parcel.

22  So it doesn't separate out that analysis.  And it says when the

23  creditor and the debtor have a loose relationship, right, that

24  factors into the good cause analysis as well.

25           But what it comes back to is a critical principle

1  that is established in Landis and in the In re Mastro case that

2  they rely on, which is that there needs to be a connection

3  between the debtor and the entity that receives a Rule 2004

4  subpoena.  That is an independent requirement in addition to

5  standing.

6          And respectfully, at no point have they ever

7  articulated any connection between Meta Materials and our

8  clients.  We are a market maker.  We buy and sell securities in

9  the open market.

10          Meta Materials does not say that it was a participant

11  in any of those transactions.  We go back to the prospectus

12  that Your Honor noted.  While not a sale, even then, they don't

13  say your client was the buyer or somehow involved in that.

14  There's no connection between our clients and the debtor.  And

15  Your Honor asked Mr. Zack earlier, how could it be then that

16  the trustee would pursue his investigation if he can't get

17  these pieces of data from you all?

18          And the answer to that is that they need to begin

19  with entities that have some relationship with the debtor.

20  That, we believe, is established in the Mastro case and the

21  Landis case.

22          I'll proceed if that --

23          THE COURT:  Go ahead.

24          MR. FOUNTAIN:  Yeah.  Thank you, Your Honor.

25          THE COURT:  Absolutely.  No problem.

1           MR. FOUNTAIN:  And so, Your Honor, they have had an

2   opportunity to establish sales of stock.  We'll talk at length

3   about the prospectus and why it isn't that.

4           But, Your Honor, fundamentally, they bear the burden

5   here of good cause.  They have had a tremendous amount of time

6   to investigate this.  We've prepared a small demonstrative,

7   which I'm happy to hand up a copy of to Your Honor if that'd be

8   okay.

9           THE COURT:  Sure, if you have a copy, that'd be

10  great.

11          MR. FOUNTAIN:  I've -- we also shared this with the

12  trustee's counsel in advance.

13          THE COURT:  Thank you.  You may approach.

14          MR. FOUNTAIN:  May I approach?

15          THE COURT:  Thank you.

16          MR. FOUNTAIN:  Your Honor, this evidence is, from our

17  perspective, that there has been an investigation that is long

18  running and, in their own words, is complete.  The same counsel

19  representing the trustee here announced in July of 2024 that

20  they had meritorious claims for market manipulation against

21  several parties.

22          And the timeline here, we think, is telling.  They

23  investigate for a more than one year period.  They then file

24  for bankruptcy and disclose short-selling litigation, which is

25  another form of market manipulation, as one of the estate

36

1  assets.  They then later, and I know Your Honor is going to get

2  to this, disclose the litigation funding after that

3  investigation.  They file these Rule 2004 motions, and then

4  they file, after that, an application to retain share intel.

5  And, in fact, they actually announced almost two years earlier

6  that they had retained share intel.

7          And what share intel does is provide public trading

8  data, the exact same type of data that they claim to need from

9  the non-parties, to allow them to analyze market manipulation

10  claims.  And you could infer from this, Your Honor, that when

11  they announced there were meritorious claims for market

12  manipulation, that was relying on the share intel data, the

13  same data that they're seeking from us.

14          And so, Your Honor, they have had a tremendous amount

15  of time to investigate this.  They've had access to the

16  debtor's records.  They've had cooperation from the debtor's

17  CEO.  They've had $11 million in litigation funding.

18          And at this time, Your Honor, there are several

19  questions that are unanswered.  Did the debtor sell its own

20  stock?  If so, when?  What is the asserted connection between

21  the debtor and our clients?  Why is discovery from these

22  non-parties specifically necessary for the claims they allege

23  that they have?  And why is pre-litigation discovery required

24  here at all when the same counsel have filed the same claims in

25  other litigations without pre-litigation discovery?

37

1          Your Honor, they've had a lot of access to the

2    debtor.  And so this idea that they need more discovery here

3    raises more questions than it answers.  And, Your Honor,

4    because the trustee bears the burden here, the failure to

5    answer these questions, and in particular the first question

6    when invited to do so by the Court, is a reason to quash the

7    subpoenas.

8          Your Honor, I want to touch on something else that

9    you said during your colloquy with Mr. Zack.  And that is what

10   the trustee has done instead of answering these questions.

11   Rather than answer these questions, Your Honor, they assert,

12   and this is in their supplemental response brief, Rule 2004 is

13   a proper investigatory tool for third-party transactions

14   involving property not owned by the debtor.

15         And unsurprisingly, Your Honor, there's no case law

16   supporting that.  They don't identify any.  And Your Honor

17   said, you know, there's slippery slope questions, but we might

18   not be there yet.  But they are asking this Court to create a

19   new rule, which is the rule that they put on Page 9 of their

20   supplemental response brief, about what the trustee is

21   permitted to do with respect to property that is not owned by

22   the debtor.

23         That has been a fundamental threshold limitation on

24   Rule 2004, and they seek here to subvert it.  And it's not

25   surprising, Your Honor, that they have no case law supporting

38

1  their proposition.  And that is because they are advocating for

2  a use of Rule 2004 that has no precedent at all.  No court has

3  ever permitted Rule 2004 subpoenas in the way that they are

4  seeking to use them here.

5          You asked for long, detailed, heavy citations.  I've

6  been through a lot of the case law, Your Honor, to answer the

7  Court's questions.  None of it looks remotely like what's going

8  on here.

9          The In re: SunEdison case you asked earlier, you

10  know, what is an analogous case?  The In re: SunEdison case

11  talked about the slippery slope that could come from saying

12  that anything could affect the financing, the financial

13  liabilities of a debtor.  And the SunEdison case, just as Your

14  Honor did, requested supplemental briefing on that Rule 2004

15  issue.  In the SunEdison case, the trustee there was unable to

16  identify any authority supporting the broad use of Rule 2004

17  that it was seeking to do.  And as a result, that court quashed

18  the subpoenas.

19          And so I turn to the Mastro case.  And this is Ninth

20  Circuit authority, Your Honor.  And it imposes a limitation on

21  Rule 2004, limiting it to third parties who have dealings with

22  the debtor.

23          And Landis, Your Honor, similarly talks about Rule

24  2004 being used for the debtor-creditor relationship.  These

25  are fundamental limitations that aren't alleged to exist here.

 1   There is no contract alleged to exist.  There's no commercial

 2   relationship.  And when we look at the case law that they've

 3   cited, the Mastro case, for example, that was a debtor who had

 4   defrauded -- that involved using a Rule 2004 subpoena with

 5   respect to a individual who had defrauded the debtor.

 6        The Profilet case that they're looking at, they say

 7   this supports their argument.  But in Profilet, it did relate

 8   to an issuance of sales -- a sale of stock.  And the Rule 2004

 9   subpoena was being used to go after individuals who had

10   defrauded the entity in connection with that sale.  And so

11   there is a debtor-facing nexus in every single one of these

12   cases that is wholly absent here.

13        Your Honor's decision in In re Lee adds another

14   barrier to this.  It talks about only those persons possessing

15   knowledge of the debtor's acts, conduct, or financial affairs,

16   so far as this relates to a debtor's proceeding of bankruptcy,

17   would be appropriate targets of a Rule 2004 examination.  There

18   is no argument that has ever been advanced that our clients

19   have any knowledge of the debtor's acts, conducts, or financial

20   affairs.  At most, the allegation is that we traded shares with

21   third-party shareholders on the public markets, not that we had

22   any interaction with Meta Materials, not that we have any

23   knowledge of Meta Materials.

24        And so we would respectfully submit, Your Honor, that

25   the trustee cannot satisfy the dealing requirement from Mastro,

40

1   the debtor-creditor relationship articulated in Landis, or

2   Lee's knowledge requirement.

3          And it brings us to a policy concern, and one that

4   Mr. Zack articulated as well.  Our client is a market maker.

5   We trade securities, every security, all day, every day.  And

6   if a Rule 2004 subpoena can properly issue in a public company

7   bankruptcy, based on the idea that the stock was theoretically

8   manipulated, we could be subject to Rule 2004 discovery in

9   every single case.  And it's not just Citadel Securities, the

10  market maker.  Every broker-dealer, every exchange, these names

11  that trade in every public symbol, would be subject to the new

12  rule that the trustee is attempting to articulate.

13         There are other reasons that the subpoenas fail as

14  well, but I'm happy to pause there and answer any questions

15  that the Court may have.

16         THE COURT:  No, I'm following.  Go ahead with your

17  arguments.  We may ultimately swing back around.  So go ahead

18  and make them, and then we'll --

19         MR. FOUNTAIN:  Yes.  Happy to, Your Honor.  I think

20  that, you know -- I don't think there's any meaningful dispute

21  at this point that the stock that is owned by shareholders, not

22  by the estate, is property of those shareholders, not the

23  estate.  So I'm not going to spend a lot of time on that.

24         THE COURT:  Okay.

25         MR. FOUNTAIN:  Some of the additional arguments I

41

1  would like to spend time on include the reliance argument.  You

2  know, Your Honor asked, you know, is it premature?  We don't

3  think so for the reasons I've articulated, but I think it's

4  worth noting that there is no explanation of how reliance is

5  not lacking here.  That's not something that the trustee

6  articulates in its brief.  It concedes that it would be unable

7  to establish reliance on an efficient market free of

8  manipulation because there is a settled order from the SEC

9  finding that the debtor itself engaged in market manipulation,

10  and that was prior to any of the alleged manipulation that they

11  are seeking here.

12          And importantly, Your Honor, that market manipulation

13  by the debtor was also in connection with the debtor's alleged

14  issuance of stock, right?  It was for the purposes of raising

15  money.  And I think that goes as well to the in pari delicto

16  bar, Your Honor.

17          In pari delicto, of course, relates to the good cause

18  analysis and whether the trustee can properly pursue these Rule

19  2004 subpoenas.  In the AgriBio Tech case, they found that that

20  would be imputed to the trustee.  The only answer that the

21  trustee asserts to that in their briefing is the adverse

22  interest exception.

23          But, Your Honor, that is plainly inapplicable here

24  because the adverse interest exception applies only when

25  insiders have acted adversely to the corporation.  For example,

1  they looted the corporation or they engaged in embezzlement.

2          Here, that's not what happened.  The debtor's

3  insiders, the CEO with which they're working as part of the

4  investigation, has been -- well, the SEC's findings are with

5  respect to the company, the lawsuit against the CEO remains

6  ongoing, but raised $137 million for the company through market

7  manipulation, through what the SEC has found with securities

8  fraud.

9          And it relates as well, Your Honor, to the question

10 you posed about, well, what is the trustee supposed to do in

11 these circumstances?  If they believe there is market

12 manipulation, they should look internally to the individuals

13 and the entities that the SEC has issued a settled order said

14 engaged in market manipulation.  They shouldn't seek four years

15 of internal emails from our client.

16         Just a few more points I'd like to hit, Your Honor.

17 Your Honor, one of the questions that remains unanswered is why

18 us?  Why is the trustee seeking information from Citadel

19 Securities, from Virtu, from Anson Funds?  And that is a

20 question that has remained unanswered.

21         And, Your Honor, the reason that we believe it's

22 remained unanswered is because they don't want to announce that

23 they view us as litigation targets.  They have all but done so

24 in their pleadings.  They've told NASDAQ it is not a litigation

25 target, something they would not say to us.  But that's because

1  they understand that under the Transmar case, the DeFore

2  (phonetic) case, and Mr. Zack also pointed you to the Enron and

3  GHR cases, once a party -- once a trustee identifies a

4  litigation target, Rule 2004 is inappropriate.

5       And this goes as well, Your Honor, to the totality of

6  the circumstances analysis that you will do, because Rule 2004

7  should not be permitted to be used as an end run around the

8  procedural safeguards of Rule 45.  And it's notable, Your

9  Honor, I know we'll talk about the litigation financing later,

10  but that $11.8 million of litigation financing involved

11  $500,000 from another case, Harrington, in which they sought

12  discovery from our client and from Virtu.  And so it is the

13  same game that they're trying to play here.

14       There's one other item I'll raise, and then I will

15  stop briefly, Your Honor, which is the Genius lawsuit.  And so

16  two weeks after our hearing in October, the same counsel filed

17  the same market manipulation claims against our client and

18  Virtu, using only publicly available information.  There has

19  been no articulation of why that situation is different from

20  this situation, why they needed discovery, pre-litigation

21  discovery from our clients and not from the Genius -- not from

22  our clients in the Genius case.

23       And it goes to a fundamental question, Your Honor,

24  which is, of course, every plaintiff would like to have

25  pre-litigation discovery from a defendant in a lawsuit.

44

```
 1   That's -- as a plaintiff, you know, we can all agree on that,
 2   but Rule 2004 cannot and should not be used for that purpose.
 3   And, you know, to your point -- to that point, Your Honor, I
 4   just -- there are unanswered questions that we think need to be
 5   answered before these subpoenas should be permitted to proceed.
 6   I'll stop there, Your Honor.
 7            Mr. Brody, did you want to add anything?
 8            THE COURT:  Thank you.
 9            MR. FOUNTAIN:  Yeah.
10            MR. BRODY:  Good afternoon, Your Honor.
11            THE COURT:  Good afternoon.
12            MR. BRODY:  Alan Brody, Greenberg Traurig, on behalf
13   of Anson Funds, one of the co-movants.  Your Honor, I'm going
14   to be brief because you've heard it.  You've heard it.  And
15   honestly, Your Honor, my co-movant, Mr. Fountain, truthfully
16   laid out our entire argument in a fantastic way.
17            And he also truly answered the question or the
18   statement where we left off at the last hearing.  When Your
19   Honor recognized, and I'm going to do as best as a quote as I
20   can, there's a fundamental disagreement of whether the debtor
21   is the issuer for the cause of action.  You know that needs to
22   get played out a little bit in this discussion because that --
23   that's just too fundamental to the causes of action as I see
24   it.
25            Your Honor, I'm just a bankruptcy lawyer.  I know
```

45

1   that Rule 2004 relates to and only to the debtor's act, the

2   debtor's conduct, the debtor's property.  But what you've heard

3   last time, what you've heard even more today because of where

4   we left off, is who owns the stock at the time of the alleged

5   market manipulation is the gate key issue.

6          I like to think of it as there's a when and a

7   whether.  When, when was -- when did the debtor issue stock

8   that was during this alleged market manipulation?

9          Now, we also -- here the stock that was traded was

10  owned by non-debtor investors, and sold between non-debtor

11  investors.  At the last hearing, Mr. Christian appropriately

12  admitted, so I get the point.  If you don't have standing, then

13  you shouldn't be entitled to 2004.  Now, to be fair to

14  Mr. Christian, he also said that he doesn't think that's the

15  case.  Okay.

16         Yet, at the last hearing, the Court directed the

17  trustee, at least, that's how I read the transcript, the Court

18  directed the trustee to provide a list of the causes of action

19  that the debtor has for market manipulation of its stock.

20  That's what Your Honor said, of its stock.  The trustee has

21  failed to identify a single stock sale -- a sale of stock by

22  the debtor at the time the alleged manipulation allegedly

23  occurred.  And that is the when, that's the gate key issue here

24  that was recognized by that court.  And it's a low dispositive,

25  and you've heard Mr. Fountain through that.  And as such, those

46

1   trades themselves cannot be property of the state.

2           Now, Your Honor, we've heard a lot of cases.

3           THE COURT:  but it -- let's back that up because --

4           MR. BRODY:  Sure.

5           THE COURT:  -- I assume I'm going to hear no, it is

6   not property of the estate.  But assuming that there is some

7   sale that is subject to the downward pressure created by other

8   sales of which it is not the issuer, that would be the

9   evidence, wouldn't that?

10          MR. BRODY:  Your Honor, no, because the trustee has

11  not put forth, has not identified any of those stock that the

12  debtor -- that the debtor issued, that the debtor traded during

13  that market manipulation.  And it's only when they sell that

14  stock.  If there was market manipulation when they sold the

15  stock, that's their argument.

16          I'm not saying that's because you still have the

17  whether, which is the connection that Mr. Fountain had

18  discussed.  But you don't get the when.  And if that's the

19  case, then it's two non-debtor traders.  I trade stock.  I buy

20  stock.  I own NVIDIA stock, for example.  I sell NVIDIA stock.

21  Okay.  That's between me and whoever I'm selling or buying

22  from, not NVIDIA.  That doesn't affect -- that's not NVIDIA's

23  asset.

24          THE COURT:  But it does affect it if you run

25  algorithms to inflate the sales that depress the sales of

47

1   NVIDIA's stock.

2            MR. BRODY:  Only if the debtor then sold --

3            THE COURT:  Agreed.

4            MR. BRODY:  -- some of the stock.

5            THE COURT:  I understand that point.

6            MR. BRODY:  There has to be a time when the debtor

7   sold that stock.  You're connecting all those third-party

8   trades to when the debtor sold the stock.

9            Your Honor, I hear what you're saying.  But they have

10  failed to identify that the debtor sold stock that was somehow

11  affected by any of that market manipulation.  They haven't at

12  all.

13           They cite to cases, and, Your Honor, the cases that

14  they rely on for this.  Your Honor had asked counsel for

15  NASDAQ, Counselor Mr. Fountain, what cases do you cite?  Your

16  Honor, I love the cases that the trustee cited.  I love

17  Sorrento.  I love Northwest Biometrics.  Because both of those

18  cases that are heavily, heavily relied upon by the trustee, you

19  know, are opposite.

20           For example, the trustee in their reply brief, they

21  started at the introduction with Northwest Bio.  That the --

22  they started with the -- with their argument saying Northwest

23  Bio.  Yet, and I'm going to quote the trustee's brief because

24  they have the best sentence.  In Northwest Bio -- this is the

25  trustee's reply brief at Page 2.  "In Northwest Bio, the Court

48

1   specifically held that an issuing company plausibly alleges

2   damages where market manipulation (in that case, like here,

3   spoofing it), depresses the stock price at the time the company

4   is selling its own shares," end quote.

5          They haven't identified any shares sold by Meta at

6   any of those times.  They haven't.  The evidence is that the

7   debtor is selling its own stock at the time of alleged

8   manipulation.  They haven't done that.  They haven't provided

9   that as well.

10         Sorrento is completely different.  Sorrento was dealt

11  with an at -- with another entity that Sorrento owned its

12  shares.  Another entity.

13         In Sorrento, the debtor owned a 52 percent interest

14  in another corporate entity.  That ownership was an actual

15  asset.  No different than my ownership in NVIDIA stock.  Okay.

16  There, there was a 2004 subpoena served because the debtor

17  needed information with respect to proxy materials for meeting,

18  directly affecting the debtor's investment in that other

19  entity.  But that's not the case here.  The discovery is not

20  the case here at all.

21         This is not an asset of the case, Your Honor.

22  Sorrento confirms that the trustee may investigate trading

23  activity only when, so when, the debtor has an actual property

24  interest in the non-debtor stock at stake.  That's precisely

25  what is missing.

49

```
 1            The connection, the whether, the whether,
 2   Mr. Fountain can -- went through and I'm not going to, Your
 3   Honor.  I try not to be duplicative, Your Honor.  Okay.
 4            But here the stock traded between the non-debtor
 5   investors, certainly not property of the estate.  It is not an
 6   asset of the estate.  It is not the debtor's property, which is
 7   required by 2004.  The debtor lacks standing.  Rule 2004 cannot
 8   be used to pursue discovery in service of the claims the
 9   trustee has no standing to bring.
10            Mr. Christian was corrected last year, I think,
11   because the hearing was in 2025.  If you don't have standing,
12   then you are not entitled to Rule 2004.  Thank you.
13            THE COURT:  Thank you very much.  Anything to add?
14            MR. FOUNTAIN:  Your Honor, I don't think I could add
15   anything beyond the comprehensive argument we've already laid.
16            THE COURT:  I appreciate that.  Thank you.
17            MR. FOUNTAIN:  Thank you.
18            THE COURT:  All right.  So that concludes from the
19   movants then.
20            As for the trustee, who would like to proceed,
21   Mr. Brust?
22            MR. BRUST:  Your Honor, I'll go briefly and then
23   defer over to Mr. Burnett and Mr. Christian.  But just to bring
24   this back into focus, we can talk all day about what the debtor
25   is not going after, and that's what they're doing.  They're
```

50

1  trying to say, we want to recover for damage to the

2  shareholders.  That is not the focus of what this discovery is

3  intended at.

4          THE COURT:  I ask, though, what is the cause of

5  action?

6          MR. BRUST:  The cause of action will be explained by

7  Mr. Christian.  It's been his life's work.  But generally my

8  understanding of the cause of action is when the market

9  manipulation occurs, it depresses the stock.  And the depressed

10 stock --

11         THE COURT:  But if you are not selling the stock,

12 what do you care?

13         MR. BRUST:  We care because it depresses the value of

14 our company.

15         THE COURT:  And how did that affect the -- how did

16 that affect Meta?

17         MR. BRUST:  It affects Meta's ability to go get

18 financing to get people to invest in it.

19         THE COURT:  What is the case where there was no

20 issuance of stock and it affected the, like, the ability for

21 lending or credit?

22         MR. BRUST:  I believe that the BioPharm case has --

23 touches on that, where there's the one day where their stock

24 was affected.  But I have to, again -- I should probably turn

25 this over --

51

```
 1              THE COURT:  And the -- and also --
 2              MR. BRUST:  Yeah.
 3              THE COURT:  -- the more expansive use of the effect
 4  was specifically denied.
 5              MR. BRUST:  That's true --
 6              THE COURT:  Right?
 7              MR. BRUST:  -- based on the causation.  Yeah.
 8              THE COURT:  So that would seem to cut against.
 9  Because I haven't heard anything about one day in the -- you
10  know, because that assumed there was a sale within that day,
11  right?
12              MR. BRUST:  That's true.
13              THE COURT:  It closed at the end.  It was the
14  average.  So --
15              MR. BRUST:  And --
16              THE COURT:  I'm still hearing sale as to the basis
17  for a cause of action, which would be property of the estate,
18  warranting the 2004.
19              MR. BRUST:  And partially where we're skipping to
20  with that is a motion to dismiss or a motion for summary
21  judgment.
22              THE COURT:  No, we're really at the good cause.  And
23  I'm trying to keep careful tab on where the good cause ends and
24  the motion to dismiss.  And that's why I think the reliance of
25  in pari delicto falls on the side of motion to dismiss.
```

52

```
 1           But if I'm not hearing, and I've given you a specific

 2   chance to cite me the case, and you give me Northwest, the Bio,

 3   I'll go back and look at that after this argument again.  But

 4   I'm telling you, I read that as a sale of stock.  And it's all

 5   tied to that rather than it affected bad credit because our

 6   share prices were down.

 7           MR. BRUST:  And I need to --

 8           THE COURT:  Defer?

 9           MR. BRUST:  -- defer that over to Mr. Christian.

10           THE COURT:  Yeah.  Understand.

11           MR. BRUST:  He's the -- he has the expertise in that.

12   If there's anything else the Court wants to hear about the Rule

13   45, that type of stuff, I think the tentative ruling is good --

14           THE COURT:  Everything else flows from that.  I do

15   agree --

16           MR. BRUST:  I agree.

17           THE COURT:  -- with the movants that that is the key

18   question for me to wrap my head around.  What is the interest

19   within the estate that warrants this expansive fishing for you?

20           MR. BRUST:  And I think Mr. Christian can answer

21   that.

22           THE COURT:  Excellent.

23           MR. BRUST:  Thanks.

24           THE COURT:  All right.  Then, Mr. Christian, are you

25   up next or would you go to Mr. Burnett?
```

53

 1          MR. CHRISTIAN:  I think, let's go to Mr. Burnett

 2   because to stay in order, Your Honor, with your permission,

 3   NASDAQ stood up first and he's going to do that one.  I'm going

 4   to handle the consolidated arguments by Citadel, Virtu, and

 5   Anson Funds.

 6          THE COURT:  All right.  Thank you.

 7          Mr. Burnett, if you would.

 8          MR. BURNETT:  Yes.  Yes.  Thank you, Your Honor.

 9          Again, David Burnett from Schneider Wallace on behalf

10   of the trustee.  I will speak specifically to NASDAQ.  I have

11   been involved in the meet and confers with all these parties

12   going back a year.

13          So, you know, the high-level point here is that

14   everything that NASDAQ's counsel is saying is really

15   disconnected from the facts.  So let me just remind us of where

16   we are.

17          So we served these subpoenas about a year ago on all

18   these parties.  With NASDAQ, my colleagues and I had productive

19   conversations with NASDAQ's in-house counsel.  The parties, the

20   trustee and NASDAQ, agreed to a protective order last May,

21   which is ECF 1949.  NASDAQ voluntarily agreed to produce six

22   months of trading data with very little fuss.  I mean, it was

23   all done by email and a couple calls.  They produced the data

24   for a six-month time period.  They agreed, they described that

25   as an initial production.

54

 1            There are many emails from Joanne Pedone, the in-

 2   house counsel, describing it as just an initial production.

 3   Our experts reviewed that data and said it looked fine, with

 4   the exception of needing one additional field to identify the

 5   order type.  But at that point, NASDAQ hired outside counsel,

 6   and they put the brakes on and refused to work with us any

 7   further.  And then, as you know, outside counsel filed a motion

 8   to quash in New York, which was then transferred here.

 9            So NASDAQ's arguments as to burden and relevance and

10   overbreadth really need to be taken with a heavy grain of salt

11   in the context of the fact that NASDAQ has already produced six

12   months of data.  They agreed to a protective order.  They've

13   shown that they're able to produce that data.  And all we're

14   talking about are spreadsheets.  We're not asking for emails.

15   We're not asking for letters and PowerPoints.  You know, this

16   does not require document-by-document review for relevance and

17   privilege.  You know, it's not --

18            THE COURT:  I feel like -- if I can interrupt,

19   because my understanding is that the request was for all

20   relevant records regarding orders for Meta, MMTLP, et al.  So

21   is the agreement then the relevant records is limited to what?

22            MR. BURNETT:  Just spreadsheets.  That is all that

23   we've asked for is just spreadsheets.

24            THE COURT:  Spreadsheets of trades?

25            MR. BURNETT:  Spreadsheets of trades.  So the same

55

1  type of spreadsheets that they've produced for six months, we

2  just want them to expand that to four years and include the

3  order type field.  So we're not asking for emails, letters, you

4  know, memos, things like that are normally a part of document

5  production.

6         So it's really discreet and narrow.  It's as narrow

7  as a document request could be.  And the burden of producing

8  four years should be identical to the burden of six months,

9  because as we assume, you know, all they have to do is plug the

10 search criteria into their databases of trades and generate a

11 larger spreadsheet.  And, you know, there's -- like I said,

12 there's no individual review of millions of documents or

13 anything.  It should just be a handful of documents like they

14 produced last time.

15        And, you know, so that's why we're sort of confused

16 by NASDAQ's recalcitrance because it would be so easy for them

17 to just give us the additional spreadsheet.  You know, the

18 initial production was very easy.  A supplemental production of

19 the additional three and a half years' worth would be very

20 easy.

21        NASDAQ tellingly has not articulated what the burden

22 is exactly.  They haven't said it would cost X number of

23 dollars or, you know, X number of hours.  They just, you know,

24 throw out the boilerplate term burden, which any party

25 objecting to any discovery can say.  But, of course, you know,

1   it can't be that any discovery is burdensome because then there

2   would be no discovery in any case.  So that's the point on

3   burden, Your Honor.

4          On relevance, as Your Honor has noted, a lot of their

5   arguments and the other non-parties' arguments get into, you

6   know, motion to dismiss, even motion for summary judgment type

7   arguments.  All that we're looking at here is whether the

8   trustee has established good cause for this information, and we

9   believe certainly the trustee has.

10         So what -- where we are is that the trustee, in

11  consultation with counsel and experts, has determined that it's

12  worth looking into the potential of market manipulation in

13  shares of Meta stock in the years leading up to the bankruptcy.

14  And that's pursuant to the trustee's duty to investigate the

15  financial affairs of the debtor per 11 U.S.C. 704.

16         So to carry out that investigation that the trustee

17  has a duty to do, we've determined that it would be helpful to

18  have this discovery from these parties, including NASDAQ.  The

19  reason why NASDAQ is it is a stock trading exchange.  It has

20  market-wide data.  And so for our experts to be able to do a

21  market-wide analysis of stock manipulation, we need market-wide

22  data.

23         And indeed, even Citadel, Anson, and Virtu, in their

24  opening brief on their motion to quash, they suggested that the

25  trustee should get data from NASDAQ and FINRA.  They said

1  NASDAQ and FINRA function more like centralized repositories

2  for the data the trustee is requesting, and any relevant

3  information, to the extent there is any, would be captured in

4  those other productions.  So we agree with Citadel, Anson, and

5  Virtu that because NASDAQ has market-wide data, that's a great

6  source of information for our experts and counsel to be able to

7  conduct this investigation for the trustee.

8         We don't need to show at this point who any potential

9  dependents are, what our causes of action are.  That's the

10 point of this investigation, to look into that.  So those

11 arguments are all premature.

12        And as Your Honor said, if not this case, then when?

13 You know, we need this data from NASDAQ as a trading exchange

14 that has market-wide data to be able to investigate the

15 financial affairs of the debtor.  And if this very low bar to

16 discovery can't be met here, then I can't see any case where

17 any trustee would be entitled to get discovery from NASDAQ to

18 conduct this sort of investigation.

19        A lot of NASDAQ's arguments are based on speculation

20 about, you know, what the trustee may find or what it's looking

21 for.  But, you know, with all due respect, that's the trustee

22 and counsel's and expert's role to conduct that investigation.

23 You know, it's -- that's all subject to attorney work product

24 and privilege, and we don't have to show all our cards to be

25 able to conduct its investigation.

58

1           NASDAQ's counsel, just like Citadel's counsel
2    referred to a reference to 55 million shares.  That was based
3    on a very preliminary early investigation based only on public
4    data.  We're looking now for more information to do a more
5    in-depth investigation.  We're not saying that the whatever
6    work we did before was sufficient.  We're saying that we would
7    like this additional data to be able to do a deeper analysis.

8           Yeah, finally, Your Honor, it's -- effectively what
9    NASDAQ and the other parties are doing are they are obstructing
10   the trustee's investigation.  The trustee has a duty to
11   investigate the financial affairs of the debtor.  We're trying
12   to help the trustee do that.  And all these parties are
13   obstructing that investigation.

14           I don't have anything further unless Your Honor has
15   any questions.

16           THE COURT:  No, thank you.  I appreciate that.

17           All right, then.  Mr. Christian, I think we're to
18   you.

19           MR. CHRISTIAN:  Yes.  Thank you, Judge Spraker.
20   Well, let's -- let me first talk about a couple of white
21   elephants that I think have evolved in this room today.

22           So one is, it is my understanding, and I can't --
23   since I'm an officer in court, I can't promise you that that's
24   the case, but it's my understanding that the prospectus and the
25   other documents we filed with you do have sales by the

59

1  corporation associated with that.  But just to put that issue

2  aside, I would ask that the Court take judicial notice of the

3  SEC filings that have been done.

4         And according to our consulting experts, just to give

5  you specific facts, on June 24th, 2021, the company issued

6  145,563,667 shares of stock.  And in the reposed period, which

7  is five years looking back, the company has issued pre-split,

8  because the company did have a split, but pre-split less than

9  800 million shares.  And if necessary, we'd be happy to provide

10 the Court those documents, but I will tell you they would fill

11 up half your courtroom because those SEC filings are

12 substantial.

13         But the proposition that the Court -- or that the

14 opposing counsel is making, that we haven't sold shares, is

15 simply not true.  So I'd ask the Court to take judicial notice

16 of that.  In fact, the Court wants an accurate count of that,

17 which, and I apologize, I did not understand that the Court

18 wanted, you know, all that detail.  But we are certainly able

19 to provide it, and I can (audio interference) that your court

20 clerks from Edgar and SEC (indiscernible) get the filings in

21 the past five years, and you'll see hundreds of millions of

22 shares that have been issued that we say are at artificially

23 depressed prices.  So that's the first issue in rebuttal to

24 what's been spoken.

25         Secondly, there's been many discussions about, which

60

1  really is a motion to dismiss argument, but I want to address

2  it with the Court because I do think it gets to this argument

3  of being reasonable as to this 2004.  I was a party to the

4  investigation that preceded representing the trustee in

5  bankruptcy, and that is true.  We did look at -- but what we

6  looked at, Judge Spraker, at length with numerous experts, is

7  public data.

8          And yes, we did find disparity in the number of

9  shares the corporation issued, but we have no idea who, I'm

10  going to call them respectfully, counterfeit shares, shares

11  that we believe were sold electronically but not delivered.  We

12  don't know who the parties are that did that.

13          Twombly and Iqbal requires us as an officer of the

14  Court to actually plead with specificity.  So part of this

15  investigation is to get that level of data because otherwise,

16  why would the trustee hire me and my two colleagues in these

17  other two firms to go file a case if I don't have the facts

18  sufficient to plead with specificity to beat a motion to

19  dismiss?  So that is what that investigation was about, and

20  yes, the public filings that the companies made are in the

21  record.  They are what they are.

22          I will also bring to the Court's attention, and with

23  all due respect to Mr. Brody and Mr. Zack and Mr. Fountain, I

24  was a lawyer in the Sorrento case who intervened on behalf of

25  an interested party, and I'll represent this Court, and we

61

1  provided you a copy of the order that Judge Jones in that case

2  subpoenaed an endless number of brokers to provide trading data

3  to look at the same type of claim.  Ultimately, for various

4  reasons, the Court did not pursue those claims.  That firm who

5  handled that portion of that was not me.  I came in later.  But

6  that order is there as a precedent to look at, you know, can

7  you issue this type of discovery in a 2004 situation?

8          Next, Mr. Fountain brought up another point as it

9  relates to, well, and all the counsel did, and Profilet, I

10  agree in that case, which is clear on standing, as is Northwest

11  Bios, so I hope we're past the standing issue, and for the

12  record, we represent Meta, okay?  That's our client.  That's

13  who's in our fee agreement, and so that should be crystal

14  clear.  These other statements about shareholders and others --

15  these type of things, I don't really understand the basis for

16  that.

17          But nonetheless, just to clear the record, that is

18  our client, and that is who we are conducting this

19  investigation for.  But, yes, in the Profilet case, there was a

20  relationship there.

21          But think about this, Judge Spraker.  So if

22  Mr. Fountain is correct that anybody else who committed market

23  manipulation who had nothing to do with the debtor, you know,

24  could not be culpable for manipulating the issuer's stock who's

25  in bankruptcy, probably because of the manipulation, at least

1  in part.  So I don't believe that applies.

2          So at the end of the day, I believe that our

3  investigation is to go look at whatever claims are there, and

4  I'm going to articulate what I think specifically some of the

5  claims could be.  That's the key word, could be.  There could

6  be all types of claims here.  I agree with my colleague,

7  Mr. Burnett.

8          Opposing counsel wants to pigeonhole what the claims

9  are.  Well, how can I pigeonhole what the claims are if I don't

10  have the records?  For example, Judge Spraker, as it relates to

11  spoofing, and spoofing essentially for the most part occurs by

12  market makers.  And market makers, Judge Spraker, are supposed

13  to have pretty much as many sales as they do buys.  Look at

14  them as a bookie.  They need to be 50/50.

15          Well, guess what?  In the cases we've handled, and I

16  can't get into the details of those, but in general, that book

17  is typically grossly imbalanced.  Why?  Because they're not a

18  market maker.  So well, that's the cause of action right there,

19  because if, in fact, a market maker is not a bona fide market

20  maker and they're short selling, then they need to borrow the

21  stock.  The only exemption they have -- they, a market maker,

22  has under Reg SHO, is they're a bona fide market maker.

23          Well, that's a claim, but I can't understand that

24  claim until I get records.  And for the record, as I sit here

25  today, I cannot assure this Court or my client that we have

63

1  claims against Citadel, Virtu, and Anson.  What I can tell this

2  Court, which I hope the Court will agree is logical, is that in

3  every case we've handled, including this case, we start with

4  the entities that have traded the most volume of our stock that

5  we believe has been manipulatable.  Guess what?  Citadel,

6  Virtu, and Anson make up a large portion of that number.  Okay?

7          So at the end of the day, it's my belief that the

8  necessity of getting these records is critical to any claims

9  that the trustee may have, and I don't know what all those

10  claims are.

11          Another example would be a naked short selling claim,

12  selling shares but not delivering them.  I don't know what

13  shares  Northwest -- I mean, Virtu sold, Citadel sold, as it

14  relates to whether they delivered it or not.  I don't have the

15  records.  The same thing for Anson funds.

16          Another claim could be that someone has loaned them

17  stock and they haven't returned it, which in effect causes

18  shares to artificially be issued that don't exist and

19  culminates in a fail.

20          In addition, there is spoofing that we've already

21  talked about, so -- and there's also -- so there's market

22  manipulation claims under 10(b)(5), which the Court can see in

23  Northwest Bio, they can see in the Profilet case and others.

24  That is based on shares sold by the corporation at an

25  artificially depressed price.

64

1            There may be other claims there.  There could be 9(a)

2    claims for fraud.  There could be other claims.  I don't know.

3    There could be claims, you know, against the directors or

4    whoever.  You know, Mr. Fountain brought that up.  These could

5    be claims that could be pursued by the trustee.

6            We're not isolating anybody.  We're starting with the

7    entity's, Judge, that traded most of the securities during the

8    relevant time period that sometimes, in my opinion and our

9    consulting expert's opinion, doesn't make sense.  So I think

10   that's a huge issue.

11           So at the end of the day, it's my belief that also

12   it's not burdensome.  Here's why.  As it relates -- and I'm

13   addressing only Citadel, Virtu, and Anson funds.  Under the

14   consolidated audit trail system, and this docket -- I mean this

15   document can be found as Docket Number 2251 in your court.

16   It's already been filed.

17           There is a list of items that electronically Citadel

18   and Virtu have to send to the consolidated audit trail entity,

19   which is a separate LLC that is affiliated, I'm going to use

20   that word, with FINRA.  It was created several years ago, but

21   long before this -- the time period in question here.  And in

22   doing So they have to give the very data we're seeking.

23           For example, Judge, if -- in order to look at a

24   spoofing claim, and does the Court understand what spoofing is

25   or do you not want me to waste time explaining that issue to

65

1   understand the claim?

2          THE COURT:  For today, I have a sufficient

3   understanding of it.

4          MR. CHRISTIAN:  Okay.  All right.  Thank you, Your

5   Honor.

6          So we would have to see the timestamps on when these

7   sales that were subsequently taken down, basically fraudulent

8   appearing sales to make everybody think there's a run on the

9   bank, on the stock, that are later canceled.

10          Of course, you know, the spoofer sells at the top

11   before all these sale orders are posted, and they go buy-in

12   once it drops 20 percent and, you know, make the spread.  So

13   there is no way I can get that data from anybody, you know,

14   other than either Consolidated Audit Trail or the records of

15   the Citadel and Virtu themselves.  It can't be burdensome,

16   Judge, if all we're asking them to do is to produce the records

17   they've already produced at Consolidated Audit Trail.

18          There's a protective order in place.  Simply get us

19   those records, no exceptions.  And for now, to make this less

20   burdensome for the Court, we'll eliminate email so we can take

21   that out of play because I agree with the Court that that gets

22   a little more burdensome.

23          And the reality is we've spent a year on this, Judge.

24   Time is ticking.  And so at the end of the day, we'll eliminate

25   that request for now if we can get the Consolidated Audit Trail

66

1  data, which has already been sent because they're required to

2  do it by law, Okay, by the rules.  So at the end of the day, I

3  don't think the burdensome argument works either.

4          So from our perspective, we're at an investigation,

5  Judge.  We need to see what the claims are.  We need this data.

6  Otherwise, we will be prejudiced.

7          I'm not the expert necessarily in 2004, but I can

8  tell you what happened in Sorrento because I was a lawyer there

9  and we could produce that order from Judge Jones if you wanted.

10  I think you already have it.  And so at the end of the day, any

11  other questions about the bankruptcy law, which, you know, I'm

12  not too good at, frankly, I've handled a bunch of litigation in

13  bankruptcy but not, you know, an expert on 2004, I would ask

14  Mr. Brust or Mr. Hartman to address that.

15          But -- so if the Court has any questions, I'd be

16  happy to answer them.

17          THE COURT:  Okay.

18          MR. CHRISTIAN:  But that -- those are my responses to

19  the Court's questions.

20          THE COURT:  At the October hearing, I believe that

21  there was a discussion and you made an offer to reduce the

22  scope of the 2004 in duration.  I believe it was 160 days,

23  quite honestly.

24          MR. CHRISTIAN:  I think that's (audio interference),

25  Judge.  And we would, again, to move this along, Your Honor,

67

1   (audio interference) and move this forward, we would stick

2   (audio interference) for this round but reserve rights (audio

3   interference) showing good cause of coming back to the Court

4   for (indiscernible).

5           THE COURT:  Okay.  I think that's a fairly important

6   point that got garbled.  Okay.  Could you -- we had some garble

7   or some interference in the transmission.  Can you just state

8   that again because I think it's an important point I want to

9   make clear?

10          MR. CHRISTIAN:  Yes, Your Honor.  What I was saying

11  is on behalf of the trustee, we would be happy to stick with

12  those dates that are on the record previously, in our previous

13  hearing.  I think it is around 160 days.  But we would reserve

14  the right, Judge, upon showing good cause, to come back to the

15  Court further and get discovery for additional dates, but

16  again, for good cause.  So we will agree to start with those

17  dates in order to minimize the burden and also move this along.

18          And I would ask specifically, Judge, if the Court is

19  inclined to go forward, because ultimately, not in the

20  immediate future, but in the -- down the road here, reasonably,

21  quickly, certainly, this year, most likely, we have to look at

22  (audio interference) mid-year.  So at the end of the day, we

23  need this discovery specifically ordered if the Court is

24  inclined to do so by a date certain, because we need that in

25  order to see what claims the estate has.

68

```
 1              THE COURT:  Mr. Brust?

 2              MR. BRUST:  Yeah, you broke up a little bit there,

 3  Mr. Christian.

 4              I think the point that he's trying to make is I think

 5  around August 9th would be a deadline for claims to be filed,

 6  so we need the information basically as soon as possible so

 7  that the experts, Mr. Christian and his firm, can evaluate it.

 8  We just wanted to make sure the Court was cognizant of that.

 9              THE COURT:  Do you know the scope of the 160-day

10  duration from when to when?

11              MR. BRUST:  Mr. Christian, do you know?  Is that --

12  go ahead.

13              MR. CHRISTIAN:  I believe it's over a four-year

14  period.  And I apologize, Judge.  I did not come prepared to

15  give you that date, but whatever's on the record previously,

16  which we did articulate in detail, we'll stick with that 100

17  percent.

18              THE COURT:  Well, my understanding is you wanted from

19  September 21, 2020, through August 21st, 2024, for Meta and

20  Torchlight, and from June 28th, 2021, through December 14,

21  2022, as MMTLP.  So I don't know what the 160 days out of those

22  dates are.

23              MR. CHRISTIAN:  Well, we'll be happy to provide those

24  again to the Court, Judge, but I'll look back at the

25  transcript, and I thought I articulated those before.  But we
```

69

 1  will get those to you by, you know, Monday or Tuesday at the

 2  latest.

 3          THE COURT:  Okay.

 4          MR. CHRISTIAN:  And I will agree that it's around

 5  roughly 160 days of that, you know --

 6          THE COURT:  Yeah, you may have said 161 if I'm

 7  pushing my memory, but, I mean, around that is correct.  We do

 8  not have that, and we did not see that in preparing for this.

 9  We saw the offer, but not the date, so I'd appreciate that.

10          How do you feel about who -- what trades are at

11  issue?  I understand, at least we'll get to a further

12  discussion on Meta.  What about Torchlight?

13          MR. CHRISTIAN:  Well, here is the way we see it on

14  Torchlight, Judge.  By virtue of the merger, the claims of

15  Torchlight are now owned by the bankruptcy estate.  So

16  ultimately, you're --

17          THE COURT:  But that's for pre-merger trading in

18  Torchlight, then?

19          MR. CHRISTIAN:  Yes, sir.  Yes, Your Honor.

20          THE COURT:  That would not be the same 160 days,

21  then, correct?

22          MR. CHRISTIAN:  I believe it would, but I'll check

23  that, and if it's different, we will put that in writing to the

24  Court, but I think it is the same 160 days.

25          THE COURT:  Because I don't understand how you --

70

1    post-merger, how you get trading in Torchlight and Meta.

2            MR. CHRISTIAN:  Well, because you get trading in

3    Torchlight pre-merger, which now that claim is owned by Meta,

4    and then after that you get Meta and you get MMTLP, because

5    MMTLP is a shared --

6            THE COURT:  Is a special dividend of Torchlight, I

7    understood.

8            MR. CHRISTIAN:  A special dividend if you own one

9    share of Torchlight that -- so in the merger, in the -- if you

10   own one share of Torchlight, you've got a share of Meta, and

11   you got a preferred share of Meta, which converted into this

12   MMTLP, ultimately to a private corporation.  So at the end of

13   the day, that's how that would work.

14           The shares sold by Torchlight, that claim belongs to

15   Meta within the actionable time period, and then the shares of

16   Meta, which those Torchlight shares were converted into, and

17   the shares of MMTLP would be based on the sale of those shares

18   within the actual time period by the corporation.

19           THE COURT:  All right.  Mr. Brust, I want to come

20   back to that point with you in a little bit, but I want to go

21   back to what Mr. Christian has been talking about.

22           Mr. Christian, in your view, are there claims owned

23   by Meta as the bankruptcy estate where there were no sales of

24   stock by Meta as the issuer?

25           MR. CHRISTIAN:  I would say generally yes, although I

1    haven't researched whether there's other causes of action, but

2    I will represent to the Court this.  The cases we have handled

3    that have been successful and that we've moved forward on are

4    based on standing, based on sales of shares by the issuer

5    during the actual period that were manipulated, causationally

6    connected to the illegal acts of the defendants.

7               THE COURT:  Okay.  That is why it is so critical for

8    me, not being the expert in securities, but, you know, having

9    some knowledge of bankruptcy, to understand when those sales by

10   Meta as the issuer occurred, given the timing of the request

11   for the scope.  To the extent that we're limited to 160, 161

12   days, that is the critical period.  Because the argument that

13   is being made is if there were no sales by Meta as issuer at

14   that time, it could not be harmed by the market manipulation

15   because no money was coming back to the company.

16              Now, you know, Mr. Brust was positing, well, it may

17   have affected the credit worthiness and the ability to obtain

18   credit.  I have not seen that cause of action.  I've seen a lot

19   of causes of action.  I have not seen that one.  That kind of

20   sounds like almost the deepening insolvency theories that were

21   20, 30 years ago.

22              So I need some cornerstone here to understand what

23   the estate could be shooting for as a cause of action.  I get

24   Section 9, Section 10(b), but those seem tied to actually

25   having shares being sold in the market that may have been

72

1   depressed by the market manipulation.

2           MR. CHRISTIAN:  I would agree with that, Judge.  The

3   only issue, which, of course, Mr. Fountain and I both and my

4   colleagues are intimately familiar with, is, you know, the

5   duration of that damage is a different issue.  But, yes, I

6   would agree with you that for purposes of the claims that we're

7   intending to pursue as we sit here today and what we're looking

8   at is sales that were made during the actual time period by the

9   corporation that were artificially depressed due to, I've

10  listed at least four of the illegal manipulative acts,

11  potentially, that we could make a cause of action out of in a

12  10(b)(5), 9(a) case.  Yes.

13          THE COURT:  Well, what are those four actions, if you

14  can remind me?

15          MR. CHRISTIAN:  Yes, Your Honor.  So it would be

16  selling shares you don't deliver, which, as you can imagine --

17          THE COURT:  Okay.

18          MR. CHRISTIAN:  -- when supply exceeds demand, the

19  price goes down.  Secondly, it would be spoofing, which is

20  placing these fake sale orders and taking them away to

21  artificially depress the price and make the spread.

22          It would be, number three, not being a bona fide

23  market maker.  And market makers can trade on their own behalf

24  for price variance.  They can trade on behalf of their clients,

25  which is an agent trade.  If they shorted the stock, even if

73

```
 1   they mismarked it long or short, and they're not a bona fide

 2   (audio interference) and they didn't borrow the stock, that

 3   would then go out.  But then (indiscernible) --

 4            THE COURT:  Mr. Christian, we have more trouble with

 5   your connection.

 6            MR. CHRISTIAN:  -- (indiscernible) it would

 7   ultimately (audio interference) the Court.  The other thing

 8   would be (audio interference), for example --

 9            THE COURT:  Mr. Christian, can you hear me?

10            MR. CHRISTIAN:  -- (indiscernible) or people that

11   report on the company --

12            THE COURT:  I don't think so.

13            MR. CHRISTIAN:  -- that issue bad --

14            THE COURT:  Mr. Christian, we --

15            MR. CHRISTIAN:  Yes, yes, Your Honor?

16            THE COURT:  -- kind of lost most of your fourth point

17   and on.

18            MR. CHRISTIAN:  I couldn't -- I can't hear.  Am I

19   breaking up?

20            THE COURT:  You are breaking up.

21            MR. CHRISTIAN:  Can you hear me now?

22            THE COURT:  Now we can.

23            MR. CHRISTIAN:  Hello?

24            THE COURT:  We can hear you, but you're not moving on

25   the video --
```

74

1              MR. CHRISTIAN:  Can you hear me, Judge?

2              THE COURT:  -- suggesting -- can you hear us?

3              All right.  I think we've got a problem.

4              Mr. Brust, Mr. Hartman, Mr. Burnett, you want to text

5    or try to get in contact with Mr. Christian.  It might be best

6    if he just disconnects and try to reconnect.

7              Mr. Brust, maybe we can --

8              MR. BRUST:  Yeah.

9              THE COURT:  -- fill the time.  But I think it looks

10   like he's dropped and will reconnect.  But if you want to fill

11   the time until we get him back.

12             MR. BRUST:  Sure, Your Honor.  If the Court desires,

13   we can produce a report of the sales for that 160 day.

14             THE COURT:  But you understand the Court's concern.

15   I thought we had discussed this and I made it fairly clear at

16   the last one.  And I agree that -- with the movants that I did

17   not get the specificity that I was looking for or the

18   development of the theories as --

19             MR. CHRISTIAN:  Can you hear me now, Judge?

20             THE COURT:  I am, Mr. Christian.  We're going to --

21   do you want to finish our discussion or do you want to let

22   Mr. Christian finish?

23             MR. BRUST:  I think to the point of the specificity

24   of the claims for relief, those really go to Mr. Christian.

25             THE COURT:  All right.

75

```
 1              MR. BRUST:  If that's what --
 2              THE COURT:  But you understand what I'm looking for
 3   in a supplement?
 4              MR. BRUST:  I do.
 5              THE COURT:  Okay.  And it does need to be supported
 6   by the -- by some evidence of that, ideally.  And so --
 7              MR. BRUST:  And maybe, as Mr. Christian stated
 8   before, we didn't know the granularity that you wanted on that.
 9   We thought you wanted to know are there claims for relief that
10   can be brought by Meta for manipulation of its stock.  And that
11   was where we went to 10(b) and 9(a).
12              THE COURT:  Right.
13              MR. BRUST:  But the -- I understand.  The next step
14   is --
15              THE COURT:  It wasn't tied to the scope of the 2004,
16   though.  There's something in there that looks like there's
17   perspectives for the ability to sell stock in 2022, '24, it
18   looks like.  It wasn't clear when the shares were being
19   actually sold as to match it up into the 2020 through 2024
20   period for the scope of the 2004.
21              And there is some desire on my part to understand the
22   universe.  You know, your retention mentioned fraudulent
23   transfers.  I'm not hearing anything about fraudulent transfers
24   in this as it relates to the 2004.
25              So I'm understanding that it is only market
```

1  manipulation, and I'm probably using that term wrongly.  But

2  those are the causes of action, the fraud that results from

3  that for securities litigation.  The cases you have provided me

4  do discuss those, right?

5          And again, they are tied to the issuance of shares

6  that are being sold and affected.  So that frames my construct

7  in looking at the scope and the purpose of the 2004.  If

8  there's something else, I haven't understood that.

9          MR. BRUST:  These 2004 statements that are at issue

10 here are not related to other aspects of the retention of my

11 firm --

12          THE COURT:  That's what I assumed.

13          MR. BRUST:  -- or Mr. Robison.

14          THE COURT:  Sure.

15          MR. BRUST:  Those are going to be more preference

16 avoidance actions --

17          THE COURT:  Of course.

18          MR. BRUST:  -- maybe some of that.  And there might

19 be more 2004s that we're requesting shortly.

20          THE COURT:  Understood.

21          MR. BRUST:  But yeah, these are more related to the

22 claims that Mr. Christian will be bringing.

23          THE COURT:  Well, and to the extent that there is one

24 for affecting financing, you know, the ability to borrow,

25 credit worthiness, that has not come through.  Because really

```
 1   what I --

 2             MR. BRUST:  Yes.

 3             THE COURT:  -- understand this for is going against

 4   the market manipulations.  We need to see all the trades to see

 5   when the spikes are, to see when there may have been

 6   manipulation.  And who is generating the manipulation if those

 7   were --

 8             MR. CHRISTIAN:  That's correct.

 9             THE COURT:  Yeah.  If those were suspicious trades.

10             MR. BRUST:  That's why I quickly deferred to

11   Mr. Christian --

12             THE COURT:  Okay.

13             MR. BRUST:  -- when we started.  Yeah.

14             THE COURT:  No problem.

15             So Mr. Christian, did I have that right as what

16   you're hoping to get out from this?

17             MR. CHRISTIAN:  Your Honor, I have to admit, I'm

18   incredibly impressed at your understanding of this quickly.

19   You and I are 100 percent aligned on the scope and what we're

20   looking for.

21             THE COURT:  Okay.

22             MR. CHRISTIAN:  Yes.

23             THE COURT:  Good.  And while you were gone, you

24   mentioned the selling the shares, not own, spoofing, not being

25   bona fide market makers, and there was a fourth one you were
```

1  getting to when you cut out.

2         MR. CHRISTIAN:  I apologize, Judge.  So the fourth

3  claim that we've been able to look at is -- and this appeared

4  in the Overstock case, if your law clerks want to look at it,

5  Overstock.com.  Essentially, there are companies, they're

6  called analyst companies.

7         Well, in that case, the analyst company was in bed

8  with a trader, and those traders were paying money to the

9  analyst firm to give Overstock an F, an F, an F, and

10  essentially taking a short position before the analyst report

11  went out that gave Overstock an F.  And ultimately, it was our

12  contention, and the case did settle.  Some of that is a record

13  at a, you know, sizable number.

14         And basically, as a result of that, we pled that the

15  analyst firm was in bed with the short seller, and ultimately,

16  we call it basically short and distort.  So you send out

17  distorted information that says the company's garbage, and you,

18  in essence, rig the market to give the short seller a profit,

19  because once that report goes out, everybody's going to start

20  selling, which then puts more selling pressure on and pretty

21  much guarantees the short seller that they are going to make

22  money.

23         THE COURT:  Okay.

24         MR. CHRISTIAN:  So that would be the fourth point.

25         THE COURT:  All right.  So I think I have -- and

79

1  again, to cut right to the chase, you believe that Meta was

2  selling its own shares during this 160-ish day period that

3  you're going to focus on?

4          MR. CHRISTIAN:  Well, I believe in the preceding five

5  years, according to our consulting expert, they sold a

6  pre-split short of 800 million shares of their own stock at

7  depressed prices, pre-split.  And how I overlay that over those

8  days, that's a different issue.  But we're starting with those

9  days because we think those are the days that are going to

10  illustrate the most damage, Judge.

11          So I hate to bifurcate the response, but you get my

12  point.  In other words, I'm trying to be less burdensome to the

13  defendants and make it more appropriate for the Court to give

14  me those 61 days.  But the number of shares sold that I'm

15  reciting to you was in the five-year repose period, which would

16  give us a cause of action.

17          But we do believe, according to our, again,

18  preliminary analysis, just to be transparent, that those 161

19  days or whatever that number is that will get you that number,

20  are the key days where the company suffered the most damages

21  while they were selling shares.  But I can't say that that's

22  the only way they were -- the only time they were selling

23  shares because the number I've given you on shares sold is over

24  the five-year repose period, if that makes sense.

25          THE COURT:  It does, but then you are going to argue

80

1  for an expansion of your Northwest decision as to the damages,

2  is really what I'm hearing at that point in time.

3          MR. CHRISTIAN:  That's possible, Your Honor, but, of

4  course, I'm dealing in the dark right now, which, again, is why

5  we want to investigate this.  But I'm trying to do it in an

6  efficient way and make our best guess as to where we think the

7  most damage is and the most group -- the largest group of

8  illegal acts associated with that damage.

9          Just to make it simple, when we look at the highest

10 volume days, if the corporation sold a million shares (audio

11 interference) every time with two or three million shares on a

12 day, (audio interference) we will look at that here, it's

13 starting to complex that.  But, you know, typically that

14 increased volume where the sales greatly exceed the bias, the

15 price goes down.  So that --

16         THE COURT:  But if the price goes down --

17         MR. CHRISTIAN: -- that is indeed --

18         THE COURT:  But sir, if the price goes down when you

19 don't have the debtor's shares on the market, how does that

20 harm the debtor?  What is the cause of action?

21         MR. CHRISTIAN:  Well, here -- right, here's a good

22 example.  The cause of action would be market manipulation.

23 Here's an example.  Let's say that there have been, I'm just

24 making the number up, 200 million shares that were

25 electronically sold by potential defendants over the five-year

81

1    period.  That stock is still out there.  That stock was

2    illegitimately, in effect, issued almost like an issuer, except

3    they're not, you know, they're not technically an issuer.

4    They're a broker that are selling shares they don't deliver.

5           Well, those shares ultimately permanently impact the

6    price because instead of the corporation having 50 million

7    shares, I'm making it up, they have 250 million shares because

8    200 million shares have been sold but not delivered.  So that

9    isn't just isolated to those dates.  So we're -- the issue

10   is --

11          THE COURT:  But if they haven't been delivered and

12   they're false shares, the company still has the shares that it

13   issued.

14          MR. CHRISTIAN:  It has the shares, but it -- that it

15   issued, but ultimately it's got all kinds of issues because at

16   the proxy meeting all these shareholders show up that can't

17   vote, and ultimately by virtue of issuing those shares, they

18   have artificially diluted the percentage that each shareholder

19   owns, and associated with that is a depression in the price.

20   So if someone is selling shares they don't deliver, Your Honor,

21   and ultimately that depressed the price on that day, that

22   sticks with the company more or less to deal with down the road

23   for its duration, which of course is no longer because it's in

24   bankruptcy.

25          So these are expert issues, and it really gets down

82

1    to -- and to solve the issue, to fast forward for the Court,

2    what we do ultimately once we get past motion to dismiss and

3    then discovery and before our summary judgment, we will do an

4    event study.  That event study and regression analysis will

5    tell us all the reasons for which the stock went down.

6           And to be transparent with the Court, I haven't

7    handled the case in this space, I do many types of cases, but

8    in this space I haven't handled a case where the defendants

9    were the only party responsible for the stock -- the price

10   going down.  No, there are other reasons the stock goes down.

11   The corporation may have had bad finances.  They may have

12   whatever.  We are able to ferret that out, but ultimately we

13   will attribute by an event study and a regression analysis the

14   amount of damage attributable to each defendant for the illegal

15   acts they committed, whether it's spoofing, naked short

16   selling, not borrowing the shares, not being a bona fide market

17   maker, et cetera.

18          And so it's really more of a damage question.  But

19   from a liability perspective, we've got to find out what bad

20   acts happened within the five years.  We believe most of those

21   occurred within those 61 days (audio interference).  But I

22   can't -- you know, (audio interference) even if I'm wrong, or

23   once we get discovery (audio interference) then we'll have to

24   deal with that and come back to the Court.  And I understand it

25   will be more difficult for us to look at expanding that.

83

```
 1            THE COURT:  All right.  I don't think we finished our
 2   discussion as to Torchlight and MMTLP.
 3            MR. CHRISTIAN:  (Indiscernible), Your Honor?
 4            THE COURT:  I'm sorry?  Mr. Christian, I missed what
 5   you just said.
 6            MR. BURNETT:  I think we've lost him again, Your
 7   Honor.
 8            THE COURT:  Yep.
 9            MR. BURNETT:  Oh, there he is.
10            THE COURT:  I think so.  I wanted to get back to the
11   Torchlight and MMTLP aspects of these requests.  I take it that
12   goes back to your broader view of whatever happened in the past
13   five years affected Meta.  Is that the basis?
14            MR. CHRISTIAN:  Yes, Your Honor.
15            THE COURT:  All right.  Okay.
16            Mr. Hartman, I saw you stand up.  I want to give you
17   your --
18            MR. HARTMAN:  Just a minor issue, Your Honor.  I'm
19   confident that we can provide the sale transactions for that
20   161-day period.
21            THE COURT:  Okay.  I would appreciate a little more
22   detail as to the 161 why Torchlight on the pre and then the
23   special dividend out of Meta that results from that, why that
24   is a concern of the debtor --
25            MR. HARTMAN:  Yes, Your Honor.
```

84

```
 1              THE COURT:  -- as to any cause of action.
 2              MR. HARTMAN:  Yes.
 3              THE COURT:  All right.  Thank you.
 4              MR. HARTMAN:  Now, just to keep it moving, what's --
 5    today's the 20th.  We can do it by the end of February.
 6              THE COURT:  That would be good, because we need to
 7    keep this moving.
 8              MR. HARTMAN:  Right.
 9              THE COURT:  So Mr. Fountain?
10              MR. FOUNTAIN:  We would respectfully ask an
11    opportunity to brief any new issues that are raised.
12              THE COURT:  Absolutely.  You'll have, let's say,
13    effectively a ten-day turnaround.
14              MR. FOUNTAIN:  Thank you, Your Honor.
15              THE COURT:  All right.  So I guess then we'll come
16    back with reply as to who wants to go at the table.  I think
17    we've hopefully leveled out the field with NASDAQ.  So however
18    you want to.
19              MR. FOUNTAIN:  Jimmy, do you mind?
20              MR. ZACK:  (Indiscernible).
21              MR. FOUNTAIN:  Thank you.
22              THE COURT:  Thank you, Mr. Zack.
23              MR. FOUNTAIN:  May I proceed?
24              THE COURT:  Please do.
25              MR. FOUNTAIN:  Thank you, Your Honor.  The
```

85

1   presentation that we just heard was wholly new but also makes

2   clear, very clear, the policy concerns that we were talking

3   about with respect to the expanded scope of Rule 2004 that the

4   trustee is asking this Court to authorize.

5          THE COURT:  And what I'm concerned about it is,

6   right, you are potentially a target.  Your clients are a target

7   because they're market makers.  And from what I'm hearing

8   Mr. Christian say is a concern that the market makers may have

9   engaged in trades that did not, what's the right word, were

10  not -- I don't want to say legitimate because that may be too

11  far, but may have suppressed the value while they were trading.

12  And for that, they need to know the trades.

13         And to do that, okay, they can go to NASDAQ and get

14  the gross, but they also want to know how many your client did

15  and how many the other non-moving -- the non-parties did.  Why

16  wouldn't that be, so long as there is some inkling that there

17  could be, you know, a sale there which would give rise to a

18  cause of action, why isn't that a proper use of 2004?

19         MR. FOUNTAIN:  What I have not heard from the trustee

20  and what would be required for that is for them to say that

21  they believe that our clients engaged in market manipulation

22  with respect --

23         THE COURT:  No.

24         MR. FOUNTAIN:  -- to the stock.

25         THE COURT:  No, because you engaged in the market.

86

1   So it may not have been you.  It may have been the entity next

2   to you or other, but you engaged in the market.  So to

3   understand the totality of that, you have to understand the

4   trades.

5            MR. FOUNTAIN:  Your Honor, it would be the entities

6   that actually engaged in those trades, right, that we're on the

7   other end of the trades with Meta Materials, the counterparties

8   to those trades.  Our clients only engaged in trades with

9   third-party stockholders who were owning their own property,

10  which is not property of the estate.

11           THE COURT:  That may have been trying to drive prices

12  down.

13           MR. FOUNTAIN:  Your Honor, first of all, there is no

14  articulated basis that our clients were trying to do anything

15  like that.

16           THE COURT:  Oh, we're way before that.

17           MR. FOUNTAIN:  And that would be --

18           THE COURT:  That's the whole point.

19           MR. FOUNTAIN:  Respectfully, Your Honor, that's not

20  the case, because the good cause inquiry that this Court needs

21  to engage in requires them to articulate relevance.  And when

22  we went to them and said, what is the relevance, they said it

23  is work product.  And what I heard today --

24           THE COURT:  That's why we're having continued

25  hearings, though.

87

```
 1              MR. FOUNTAIN:  Absolutely.  And I still haven't heard

 2    an articulated --

 3              THE COURT:  Because you're right.  I did not accept

 4    that.  But it has moved on.  And this is not a preclusive

 5    event.

 6              MR. FOUNTAIN:  All right.

 7              THE COURT:  Right?  So if I say no, you did not

 8    establish it because you said it was work product.  We're going

 9    to be back here by the end of the month with a new one.  And

10    that makes no sense.

11              MR. FOUNTAIN:  Your Honor, respectfully, a lot of

12    what we heard today was new.  We heard about new causes of

13    action.

14              THE COURT:  I don't think it was.  I mean, I get

15    that.  It wasn't spelled out.  You know, it kind of was.  I

16    mean, all you have to do is take the Northwest Bio and overlay

17    it.  And that's what this is.

18              The spoofing is the generation of sales within, I'm

19    going to say Meta, because I still don't understand Torchlight

20    and MMTLP, if I'm get -- I did get it right.  So I don't

21    understand.  So let's focus on Meta.  If Meta was in the market

22    for its shares, then I get the cause of action.  All right.

23    And I hate to blame this on the fog of litigation, but if I can

24    get it, I think it's there as to the cause of action.

25              MR. FOUNTAIN:  I think you're making precisely the
```

88

1  right point, Your Honor, which is that they have talked about a

2  market manipulation spoofing claim.  That is the one that was

3  in their briefing, and we've engaged in that.  We've explained

4  the Northwest Bio case, and I'm about to do that more.

5         But as to the other causes of action that

6  Mr. Christian was talking about today, we have not had an

7  opportunity to engage in those.  We have not had an --

8         THE COURT:  Well, I want to include -- lump in the

9  short sale as well, right?  Because I think that's just the

10  other side of the coin with the spoofing.  But I see that truly

11  being the core of this.

12         MR. FOUNTAIN:  So spoofing is an unlawful market

13  practice.  Short selling is not unlawful.

14         THE COURT:  Yeah, I'm not going to get into the

15  esoteric -- especially with people who do this all the time, on

16  the naked short sales.  You've got to give me a little more

17  time to catch up with you as to those specifics.  But I

18  understand those can be the basis of the Section 9 and 10(b)

19  claims under the Securities Act.

20         So in the cases that's cited seem to at least allow

21  that possibility.  And that's all we're here right now is

22  possibility.

23         MR. FOUNTAIN:  Your Honor, I think that there's a

24  couple of things here.  What we're hearing about causes of

25  action is new.  And, you know, it is notable and there is

89

1  significant disagreement between the parties about what cause

2  of action with respect to spoofing could belong to the estate.

3            I'm going to talk about the Northwest Bio case and

4  why their articulation of it is different from what that court

5  actually found.  That court rejected the idea that spoofing

6  could have long-term effects on the market.  And so when

7  they've said there's 161 days, right, they would need to tick

8  in tie --

9            THE COURT:  But that's why Mr. Hartman's point is so

10  critical.  All right.  We just heard Mr. Hartman say that he

11  believes that they can establish that they were selling within

12  a 160-day period.

13            MR. FOUNTAIN:  And we should have an opportunity, a

14  full and fair opportunity, to respond to that just as we should

15  the opportunity to respond to their arguments about new causes

16  of action, Your Honor.  This is --

17            THE COURT:  There are no new causes of action.  All

18  we're doing is trying to get to the market manipulation for

19  spoofing and short sales.

20            MR. FOUNTAIN:  Okay.  Then I understand that, Your

21  Honor.  And so let me address a couple of other things that

22  were said.  One is just with respect to where I began, the

23  policy concerns.  They say that market makers are trading the

24  most, and that's why we're going after their information.  That

25  is not good cause for a Rule 2004 subpoena.  You did a lot of

90

1   something, and so we are going to target you.  It cannot be the

2   case.

3        The Sun-Edison case talks specifically about how

4   there needs to be limiting factors that go into the Rule 2004

5   analysis.  Mr. Christian said that he couldn't tell his client

6   who was engaged in the market manipulation.  They are trying to

7   have it both ways, Your Honor.  They are suggesting that our

8   clients allegedly engaged in market manipulation, and therefore

9   they need discovery from us specifically.  And at the same

10  time, they are saying we don't know who possibly could do it.

11       And, Your Honor, where I think we should look for the

12  answer to that question is their comments in Meta's press

13  release issued by Mr. Christian in which he said Meta has

14  meritorious claims for market manipulation against several

15  parties.  Several parties.  They knew two years ago who the

16  defendants are.  They have far crossed the line into

17  identifying litigation targets.  That's the Transmar case.

18  With respect to --

19       THE COURT:  Look, again, let's bring this -- maybe we

20  can shift this to a more bankruptcy friendly.  When the Ponzi

21  scheme files and blows up, everybody knows.  Right?  And I

22  understand the fraudulent transfers.  I can get -- if you're

23  saying Ponzi, we're going fraudulent transfers.  And yet, you

24  spend at least a year doing your 2004s to construct the

25  finances, to establish the Ponzi, to find out who the

```
 1   professionals are, their role, and all of that.  This has the
 2   same overtones.
 3             MR. FOUNTAIN:  I'm glad you raised the Ponzi scheme
 4   example because I've thought about it a lot since the October
 5   hearing.  Why a Ponzi scheme is categorically different from
 6   what's going on here is because in a Ponzi scheme there is a
 7   relationship between the entities that are receiving the 2004
 8   subpoenas and the debtor.
 9             THE COURT:  Not necessarily the banks.
10             MR. FOUNTAIN:  Yes, the banks will hold the funds.
11   There's no allegation that we had any dealings.
12             THE COURT:  No, the banks that the monies went to.
13   Yeah.
14             MR. FOUNTAIN:  Exactly.  And, Your Honor, there's no
15   allegation that we were counter-parties to these -- they say
16   they sold stock?
17             THE COURT:  You don't have to be counter-parties.
18             MR. FOUNTAIN:  But to the --
19             THE COURT:  You don't --
20             MR. FOUNTAIN:  In the Ponzi scheme example you're
21   giving, Your Honor, there is a relationship between those
22   entities and the debtor.
23             THE COURT:  The relationship is the trading of the
24   Meta stock.
25             MR. FOUNTAIN:  And, Your Honor, to begin where we
```

1  started, the Meta stock is not the property of the estate.

2  It's owned by shareholders.

3            THE COURT:  It is if it's held by Meta.

4            MR. FOUNTAIN:  Your Honor, if it's issued, right, if

5  we engage in those sales, theoretically we would have a

6  relationship with debtor, but our client --

7            THE COURT:  No, no, no.

8            MR. FOUNTAIN:  -- is not alleged to have done that.

9            THE COURT:  But you're selling the shares to third

10 parties from third parties that are going to influence the sale

11 of the shares of the debtor.

12            MR. FOUNTAIN:  Your Honor, this is exactly the

13 slippery slope that was rejected in the SunEdison case.  The

14 SunEdison case talks about how anything, a competitor, for

15 example, will have a impact on the financial affairs of a

16 debtor, and there needs to be a line that the Court can draw.

17 SunEdison is very clear on that.

18            And I think, Your Honor, this isn't the only new

19 argument that we've heard from them today about these new

20 causes of action that we haven't had an opportunity to brief.

21 Your Honor I thought it was very clear that you wanted long,

22 detailed --

23            THE COURT:  Yeah.

24            MR. FOUNTAIN:  -- citations in your briefing.  But

25 we're hearing for the first time today about these stock sales,

1  and we'll have the opportunity to brief it, Your Honor.  But on

2  this record we don't think it can fairly be considered.

3          There's also no explanation, Your Honor, for why

4  sales that are at fixed prices below the market price could

5  possibly have been affected by short-term market manipulation,

6  spoofing, that they allege is occurring.

7          Your Honor, with respect to the 161 sale days, in the

8  Northwest Bio case, and I'll get to that in a little bit more

9  detail, in the Northwest Bio case the Court specifically said

10  that you had to tie the spoofing to the sale of stock, and it

11  had to be within 24 hours.  So unless their argument is that

12  they are selling stock on each of these 161 days --

13          THE COURT:  But we're not there yet.  We're not at

14  the end of the race.  We're not at the filing of the complaint.

15  That's the problem.  And --

16          MR. FOUNTAIN:  Your Honor, I think your point at the

17  last hearing, right, is that this is a threshold question,

18  whether the stock that was affected is the property of the

19  estate.  And that goes to the question that I'm trying to drive

20  at, perhaps inarticulately.  But it has to be --

21          THE COURT:  No, you're being very articulate.  I'm

22  just --

23          MR. FOUNTAIN:  I appreciate that.  It has to be the

24  property of the estate, and there's been no attempt to link

25  those two things, right?  We heard for the first time you can

94

1   take judicial notice of SEC filings.  It's not something that

2   we have an opportunity to analyze here, because it wasn't --

3            THE COURT:  I don't even know which SEC filings to

4   take judicial notice of, nor is it my job to go search.  So I

5   get that point.

6            MR. FOUNTAIN:  Okay.

7            THE COURT:  But that's why I had the discussion with

8   Mr. Brust and Mr. Christian and Mr. Hartman.  So I agree.  I

9   did ask for detail.  That detail is lacking.

10           MR. FOUNTAIN:  Right.  And, you know, provided that

11  we have an opportunity to respond, and I recognize the Court's

12  given us that, I really appreciate it.  There's two other

13  points that I want to make, and then I will address questions

14  that the Court may have.

15           One is a question that is unanswered to this day, at

16  least to my understanding, is why they need information from

17  Citadel Securities, right, from Virtu, from Anson Funds.  They

18  say they traded a lot of shares.  They say they were in the

19  market.

20           Your Honor, at ECF-1922, they have an application to

21  retain share intel.  And among the other things that they say,

22  utilizing share intel's patent-pending processes, companies can

23  proactively track equity flows and identify suspicious,

24  aberrant, and/or unusual trading activity.  So if the reason

25  that they have our stock, and I think as you articulated, was

1  to look for the spikes in the trading data, that is precisely

2  what they are asking you to approve funding for share intel to

3  do.  That doesn't depend on our proprietary information.

4          THE COURT:  I think they want to know if your client

5  caused a spike.

6          MR. FOUNTAIN:  But share intel should have that

7  information.  It will have -- I mean, we don't have full

8  visibility, and perhaps that's something they should, you know,

9  share as well, so that we understand whether this is

10 duplicative of, I won't call it discovery, but services that

11 they're obtaining and spending funds to get, right?

12         And, you know, why do they want to know whether our

13 client caused a spike?  Because they want to name us as a

14 defendant in the lawsuit.

15         THE COURT:  Sure.

16         MR. FOUNTAIN:  And the sure, Your Honor, that's

17 exactly what the law says cannot be the case.

18         THE COURT:  That's what you say to draw the line.  I

19 need to get further clarity on where to draw the line.

20         MR. FOUNTAIN:  And I'll be very brief, but the

21 Transmar case, the GHR case, the Enron case, even the

22 Millennium case, Your Honor, we think speak to these issues.

23         The last thing I'll say, Your Honor, is that the

24 Northwest Bio case expressly rejected this idea that spoofing

25 can have long-term effects on the market.  And so this idea --

96

```
 1              THE COURT:  I get that idea.

 2              MR. FOUNTAIN:  Okay.

 3              THE COURT:  I get that point.

 4              MR. FOUNTAIN:  Then I won't elaborate further on it.

 5              THE COURT:  Thank you very much.

 6              MR. FOUNTAIN:  Thank you, Your Honor.

 7              THE COURT:  All right.  Mr. Zack, you seem next to

 8  go.  I would like -- when -- to Mr. Zack, to hear the response

 9  to Mr. Burnett's characterization that it's as easy as printing

10  out spreadsheets.

11              MR. ZACK:  Yes, Your Honor, and I'll keep this

12  limited to those NASDAQ-specific points.  But I want to start

13  with the narrative of that for a period NASDAQ was acting pro

14  se in good faith at negotiating.

15              THE COURT:  I don't think that matters, but if you --

16              MR. ZACK:  So I just want to say I trust that Your

17  Honor is not persuaded that that weighs against NASDAQ.

18              THE COURT:  I see how that's one way or another.

19              MR. ZACK:  You know, the -- but the implication there

20  was that NASDAQ was so easily and willingly complying and then

21  NASDAQ retained counsel and stopped wanting to comply.  The

22  facts are kind of the opposite is NASDAQ provided six months of

23  data when the trustee came back from (indiscernible) and NASDAQ

24  retained counsel and has put its resources more towards the

25  motion to quash in two different jurisdictions.
```

 1            Procedurally, we're in a bit of a tight spot because

 2   there was this letter brief procedure in New York, which is

 3   sort of a preliminary type motion that has limited evidentiary

 4   backing.  We duplicated that essentially as our motion in this

 5   court.

 6            You know, as it goes to the specifics of the burden

 7   on NASDAQ, I will admit that the record doesn't necessarily

 8   include, like, admissible evidence on specifically what burdens

 9   it faces.  It's more general in regard to NASDAQ has produced

10   the most important six months.  NASDAQ doesn't feel that it

11   should incur the burden of producing another three and a half

12   years and that NASDAQ is concerned with the broader burden of

13   any time somebody comes in and asks for four years of these

14   records.

15            So if Your Honor would like NASDAQ to supplement the

16   record with more detail on what that burden actually entails,

17   we could certainly do that because --

18            THE COURT:  If you don't mind, that brings up a

19   question of clarification in light of the willingness to limit

20   the other subpoenas for the 161.

21            MR. ZACK:  I was going to ask about that too.

22            THE COURT:  I don't see Mr. Christian.

23            Mr. Burnett, do you have a sense of where the trustee

24   is about if you're limiting the non-moving parties to the

25   160-day period, that seems like it may be covered by the prior

98

1  production.  What does that do to the NASDAQ?  And can we

2  basically hold that in abeyance then until we get this round

3  out of the way?

4          MR. BURNETT:  I'll -- Mr. Christian is more familiar

5  with the 161-day period.  What I'll say is that, again, all

6  we're asking for is a production of that four-year period.  It

7  should be no more burdensome to produce from a four-year period

8  than it is from a six-month period or from 161 individual days

9  because all we're talking about is a spreadsheet that's bigger

10  or smaller than another spreadsheet.

11          THE COURT:  My assumption from your argument that I'm

12  drawing is that it really is just to run a wider computer

13  search.  Is that what you're getting at?

14          MR. BURNETT:  That's correct.  Yeah.  And I mean, my

15  understanding, my assumption is that NASDAQ has voluminous

16  electronic, you know, databases and it can run queries by

17  punching in the criteria, which in this case is the tickers

18  that we're looking for, the scope of fields of data that we're

19  looking for, and the date range.  I can't think of any other

20  criteria that would matter, and that should just require, you

21  know, some employee who's familiar with that database to plug

22  in those criteria and generate a spreadsheet, send it to the

23  outside counsel and send it to us.

24          THE COURT:  And that's for the other entities in

25  addition to the debtor?

99

1          MR. BURNETT:  Correct.  It would be market-wide data,

2   which is what we are seeking on behalf of the trustee for our

3   experts and counsel to do an analysis of market-wide trading.

4          THE COURT:  Okay.  Back to you, Mr. Zack.

5          MR. ZACK:  Well --

6          THE COURT:  Thank you, Mr. Burnett.

7          MR. ZACK:  -- you know, having acknowledged that the

8   record doesn't necessarily include much detail from NASDAQ on

9   what the burden is, I think the record also shouldn't be based

10  on the trustee's counsel's assumptions --

11         THE COURT:  I'm just trying to get some information,

12  Mr. Zack.

13         MR. ZACK:  -- of what some employee --

14         THE COURT:  Yeah.

15         MR. ZACK:  -- at NASDAQ does or doesn't need to do to

16  do this.  So, you know, to my earlier point, if Your Honor

17  would like, we could certainly supplement the record, and I do

18  believe that part of that was just the limited procedure of

19  that letter motion carrying through to this Court.

20         And then also on the 160 days, you know, I have that

21  circled.  Unfortunately we weren't able to hear what the

22  160-day period is to know whether that aligns.

23         THE COURT:  It hasn't been set yet.

24         MR. ZACK:  Right, exactly.  But, you know, it does --

25  at least I think Your Honor picked up on, if we've produced 180

1  days, that, you know, maybe is -- at least at this stage that

2  should be seen as having incurred enough of a burden, and, you

3  know, we can quash the rest of the subpoenas.

4          THE COURT:  I try not to dwell on this point too

5  much, but yes, this is your first opportunity before me as far

6  as this.  But being two, and now obviously going into another

7  round of this, I would like to have had this information

8  before, but I do think it's important that I get that

9  information.

10         So if we're going to take this time by the end of

11  February to -- for the trustee to supplement, if you could

12  supplement that by the end of February, and then we'll give the

13  trustee ten days to respond from what you provide.

14         MR. ZACK:  Sure.

15         THE COURT:  So thank you.

16         THE BURNETT:  Your Honor, can I be heard on that

17  point?

18         THE COURT:  Mr. Burnett, go ahead.

19         THE BURNETT:  Yeah, I'd just like to point out, you

20  know, NASDAQ's counsel points to the fact that their initial

21  letter brief was transferred over.  But after we -- the

22  trustee, filed an opposition to the motion to quash, NASDAQ had

23  its opportunity to file a reply, which it did on February 13th.

24  That's Docket 2592.  And they have a section --

25         THE COURT:  Yeah.

```
 1              MR. BURNETT:  -- where they talk about burden, but
 2   they don't give any of that specificity.  So they've already
 3   had that opportunity to --
 4              THE COURT:  I understand, but the trustee has had the
 5   opportunity to explain to me the cause of action, and quite
 6   honestly, they have not.
 7              MR. BURNETT:  Right.
 8              THE COURT:  So I don't see the harm in extending that
 9   courtesy to NASDAQ for this.  So --
10              MR. BURNETT:  Yes, Your Honor.
11              MR. ZACK:  I also suspect if we had submitted a
12   declaration on reply, there would be issues raised with that as
13   well.
14              THE COURT:  I -- you never can tell with bankruptcy.
15              MR. ZACK:  It's a tough procedure either way with the
16   way that this came to this Court.
17              THE COURT:  Understood, and we've got (indiscernible)
18   on the wings.  So I'm -- but I am cognizant of, let's see,
19   August 9th, 2026 is a two-year statute of limitations.  So this
20   will be done in plenty of time, one way or another, if
21   discovery is going to be -- I mean, Mr. Fountain, apologize, if
22   Rule 2004 is going to be granted, then it needs to be done in
23   time to serve the purpose.  So the more that we have to
24   continue this, it's shortening that fuse.  So if the parties
25   can figure this out, all the better.  I'm assuming they cannot.
```

102

1  But I need the appropriate information to make the right

2  decision.  Because I think quite honestly, I see both sides of

3  this argument.

4        So a long-winded way of trying to send a message or a

5  discussion beyond you, Mr. Zack.  But thank you.

6        MR. ZACK:  Sure.  If Your Honor doesn't have any more

7  questions, that's all I have.

8        THE COURT:  I do not.

9        MR. ZACK:  Thank you.

10        THE COURT:  Mr. Brody.

11        MR. BRODY:  Good afternoon again, Your Honor.  Alan

12  Brody, Greenberg Traurig, on behalf of Anson.  Your Honor, I'm

13  going to be extremely brief.

14        Your Honor, I'm just going to raise two points, and

15  they're actually connected.  The first is nobody knows what

16  stock was sold by the debtor better than the debtor itself.

17  Mr. Christian represented the debtor.  Mr. Christian

18  represented the trustee.  I'm glad to finally hear, I believe

19  that was a statement, that we're finally going to get the dates

20  that the debtor sold the stock during the relevant time period.

21  Because that goes to the heart of everything.

22        It's also connected to something Your Honor brought

23  up, which is sort of looking at this in the scheme of a Ponzi

24  scheme.  Your Honor, I was fortunate last week to have been in

25  Las Vegas where I was on a panel on bankruptcy fraud at the TMA

1  Distressed Investing Conference.  And, Your Honor, this is not

2  a Ponzi scheme.  This is nothing like a Ponzi scheme.  Because

3  what's important in a Ponzi scheme, and it's important here, is

4  in a Ponzi scheme you have certain causes of action by the

5  trustee, by the liquidating trust, by the debtor, such as

6  fraudulent conveyances, by Madoff.

7          You've got a number of different causes of action by

8  the debtor.  Putting a sign in pari delicto, as Your Honor

9  said, that will be determined at a motion to dismiss itself.

10  But then you have other causes of action that have -- in which

11  the debtor, the trustee, the liquidating trust, whoever the

12  plaintiff is in that action, that would include Madoff, still

13  has to have standing.  It has to be their cause of action and

14  not the cause of action of the investors.

15          And that goes back to what we originally said, back

16  to the shares of stock sold by Meta.  We've been asking since

17  the meet and confer.  We've been asking from the beginning.

18  I'm glad that I think we're going to finally get that and have

19  an opportunity to respond.

20          So my point, Your Honor, is even in the Ponzi

21  schemes, the causes of action, the trustee still needs

22  standing, Your Honor.  Thank you.

23          THE COURT:  Thank you.  All right.

24          MR. FOUNTAIN:  Nothing further, Your Honor.

25          THE COURT:  Thank you.  I appreciate that.  All

104

1   right.

2           So I believe that we will have the first round of

3   supplemental by the trustee as to the causes of action and the

4   shares of Meta sold by the end of February.  That will be a

5   week from today.  Then the movants will have the opportunity to

6   file by March 10th.  Mr. Zack will file the supplement

7   regarding burdens by February 27th, and the trustee will have

8   until March 10th to respond to that filing.

9           I don't think we are going to set a continued hearing

10  at this time.  Part of my concern about the deadline is that I

11  am tentatively thinking of taking this under submission at that

12  point.  I've heard the arguments.  I understand them.  I think

13  I just need a little factual development to be able to flesh

14  them out.

15          That said, as I indicated before, my concern about

16  the macro issues standing, the cause of action and all of that,

17  predominates.  Mr. Zack has made quite a bit of what I consider

18  the micro issues, which is the burden and that such, and I

19  honestly see that a little differently for NASDAQ as to the

20  non-parties.  That weighs, but I need to get something out.  So

21  if I could even get something out when I'm calling the macro

22  issues, I would like to do that.

23          If we have to come back on the micro issues, maybe we

24  do, maybe we don't.  I don't -- I can't tell you right now

25  where I am on that.  So --

105

1          MR. FOUNTAIN:  Thank you, Your Honor.  All I was
2  going to add is, you know, we didn't spend time here addressing
3  some of the burden comments that were made.  It sounded like
4  there was a, I wouldn't call it a proffer, but something about
5  emails that were said, and so that is something we would like
6  the opportunity to address.

7          THE COURT:  Yeah.  Let me kind of play with that
8  because as part of the trustee supplement, I think they're
9  going to also give the details as 160, it's 161, whatever that
10 is, whatever the reduced amount of time is, and then also I
11 would ask just to clarify in writing that withdrawing the
12 request for emails from any Rule 2004, that may affect how I
13 see things too.  So your response can address some of that as
14 well within the burden aspect based upon the reduction of the
15 Rule 2004, if you could direct it towards that.

16         MR. FOUNTAIN:  Thank you, Your Honor, and I'm sure
17 you have no doubt we will still address the burden, but I do
18 appreciate that.

19         THE COURT:  Sure.  Mr. Brody?

20         MR. BRODY:  Your Honor, I apologize.  I just want to
21 confirm the trustee settlement date.  You said a week, so that
22 would be they have to provide on the 27th, the 28th being a
23 Saturday.

24         THE COURT:  Yeah, I --

25         MR. BRODY:  So I want to make sure I have the dates

106

1  correct, because I know my date.

2          THE COURT:  The 27th, yeah.  If you want to give them

3  to the 28th, that's unusual to schedule something for a

4  Saturday, but, you know, maybe that's --

5          MR. BRODY:  Whatever Your Honor wants.

6          THE COURT:  -- the beginning of the issue.

7          MR. HARTMAN:  It'll be done by the 27th, Your Honor.

8          MR. BRODY:  Thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Hartman.

10         All right.  With that, I think that's all we'll do

11  for today on that.  I may get out of short scheduling order,

12  just to confirm that on Monday.  Let's pick up in the time we

13  have left then the discussion about the litigation financing.

14         And, Mr. Hartman, I appreciate -- watch you're

15  walking up.  I appreciate your status.  I went back and read

16  the application.  My concern is that while it's referenced in

17  the application and it's actually woven into the terms of

18  employment and the compensation, I still don't have a comfort

19  level as to what the litigation financing is, and quite

20  honestly, within the bankruptcy construct, where it is coming

21  from for purposes of allaying any concerns regarding

22  disinterestedness, adverse interest, and such, if that makes

23  sense.

24         MR. HARTMAN:  I understand.

25         THE COURT:  Okay.

```
 1              MR. HARTMAN:  So I guess the question is, I mean, do

 2   you want me to set a hearing on, let's say, I mean, I looked at

 3   it.  It's not a 363 issue because it's not property of the

 4   estate.  It's not -- I don't think it's a 364 issue.

 5              THE COURT:  But it's coming from property of the

 6   estate to pay it back.

 7              MR. HARTMAN:  Well, if there's a recovery.

 8              THE COURT:  Right.

 9              MR. HARTMAN:  Right.  But that's part of the

10   contingent fee arrangement.

11              THE COURT:  Right.

12              MR. HARTMAN:  So I'm happy to file something that

13   addresses your questions.  I just don't know exactly what to

14   call it.

15              THE COURT:  That's -- my sense is, given what little

16   I've come to appreciate in this case, a motion might be the

17   best way to do it.

18              MR. HARTMAN:  I'm happy to file a motion.  I might

19   not have any Code section for the authority, but I'll ask

20   anyway.

21              THE COURT:  No, well, and I think it's complicated in

22   the fact that it was embedded into -- I mean, it was a material

23   part of the employment.

24              MR. HARTMAN:  Right.

25              THE COURT:  I just need to understand it better.  And
```

108

```
 1  I keep hearing of it, and I don't understand if it was all

 2  self-financed, if it's from others, what the relationship of

 3  the 500 from Harrington was.  If you can walk through that,

 4  then I think we can see where that takes us and put it more to

 5  bed on a more identified basis on the docket.

 6          MR. HARTMAN:  Certainly.

 7          THE COURT:  So yeah, that's all.

 8          MR. HARTMAN:  So you just want it on regular notice

 9  or how --

10          THE COURT:  Sure.

11          MR. HARTMAN:  Okay.

12          THE COURT:  I think that would be fine.

13          MR. HARTMAN:  Okay.  I'll try and get that on file

14  next week.

15          THE COURT:  All right.  Thank you.

16          MR. HARTMAN:  All right.  Thank you.

17          THE COURT:  For today, then, I don't know if anybody

18  else wants to say anything about that at this time.  I think it

19  can generally probably wait until we get the motion to see on a

20  more informed basis.

21          MR. FOUNTAIN:  That works for the non-parties, Your

22  Honor.

23          THE COURT:  All right.  Thank you.

24          All right, then.  As to the status on the adversary,

25  my understanding is that resulted from the transfer over from
```

1  Southern District of New York.  I don't know why it was put

2  into an adversary, but it was.

3          We've moved it over here now, Mr. Zack.  Are you okay

4  with -- I don't know how you terminate that adversary or what

5  exactly, but it would be terminated as moot in light of the

6  contested matter before us?  And honestly, I guess it's

7  Mr. Hartman, so.

8          MR. ZACK:  Yes, Your Honor.  We were equally

9  surprised that that's how it showed up here.  We were kind of

10 awaiting to see --

11         THE COURT:  How it goes on.

12         MR. ZACK:  -- what would appear on what docket and

13 all that.  If it's something that NASDAQ should take the lead

14 on, some sort of, like, dismissal order, I'm sure we could

15 stipulate to something to wipe it out.

16         THE COURT:  You know, honestly, it might be a

17 stipulation to dismiss as moot in light of the transfer over to

18 the main case.

19         MR. ZACK:  Sure.  We can propose some language in

20 order to the trustee.

21         MR. HARTMAN:  That's acceptable, Your Honor.

22         THE COURT:  I think that would clarify the docket

23 fine.  Thank you very much.

24         MR. ZACK:  Okay.

25         THE COURT:  All right.  I think we've exhausted

```
 1   everything we need to discuss today.  I want to say thank you
 2   for attending.  I do appreciate this.  My sense was that this
 3   was sufficiently significant that it warranted being in person.
 4   I understand people are everywhere here.  So I do understand
 5   the effort and the cost that came.  But I think from time to
 6   time, especially in these large matters, it warrants it to be
 7   in person.  So I did appreciate that, and I think I got, you
 8   know, the benefit of that.
 9            So unless anybody else has anything else to add, that
10   will conclude the hearing for today.  Wish everybody --
11            MR. BURNETT:  Your Honor, I --
12            THE COURT:  Oh, go ahead, Mr. Burnett.
13            MR. BURNETT:  Sorry.  One last thing.  This is David
14   Burnett.  What would you like to do with regard to FINRA?  The
15   latest that I've seen is in the DC matter, there was a docket
16   entry yesterday saying that the case was transferred to the
17   bankruptcy.  But I have not seen that yet on our docket.
18            THE COURT:  Right.  I have not seen it either.  Let
19   me get back to Alaska and let that docket catch up to that.  I
20   can contact the clerk's office, too, to see where that is in
21   the processing.
22            MR. BURNETT:  I can tell you that you asked earlier
23   at the beginning what was done in that case.  In that case, the
24   parties fully briefed the motion to quash issues with lengthy
25   briefs, not just letter briefs.  And then the Court asked for
```

1 supplemental briefings specific to the Rule 45(f) transfer

2 issue.

3          So from our perspective, and counsel for FINRA is not

4 here today, but from our perspective, that issue has been fully

5 briefed.

6          THE COURT:  Okay.  Are you in discussions with

7 opposing counsel on that matter?

8          MR. BURNETT:  We have not spoken to them yet.  We

9 were waiting to see what Your Honor would like to do.

10          THE COURT:  I would be interested in you conferring

11 with them to see how they feel about it.  Unfortunately,

12 they're now one step behind NASDAQ on that and two hearings

13 down.  But my guess is much of the arguments have been made, if

14 not all of them.

15          If there are specific items raised in that instance,

16 I'm not opposed to hearing it, but I would like to, again, keep

17 this moving.  So ultimately, I'll need to hear what FINRA wants

18 to do in regards to bringing it over here if they want their

19 own stand-alone motion or not.  But it is not likely to -- at

20 least my initial thought is, it's not likely to derail this.

21          If it can happen within the next 17, 20 days in light

22 of the supplemental briefing, that's great.  I have some

23 conflicts, like I will be in chambers on Monday.  I will be out

24 of action for the rest of that week.  So I could probably have

25 the chambers get a scheduling order out, but that's about the

1    level I'm going to be at next week, unfortunately.  The week

2    after, possibly, we can do something. So --

3              MR. BURNETT:  Okay.

4              THE COURT:  But if you could coordinate -- if the

5    parties could all coordinate to figure out how it is, it's all

6    the same issues.  So I would like to do it as efficiently as

7    possible so the parties can find out what they need to do and

8    take the appropriate actions any way it goes.

9              MR. BURNETT:  Okay.  Understood, Your Honor.  We'll

10   reach out to FINRA's counsel.

11             THE COURT:  Thank you for bringing that up,

12   Mr. Burnett.

13             All right.  With that, I'll let everyone get to the

14   weekend.  We're adjourned.  I hope you all have a good weekend.

15   Thank you.

16             MR. FOUNTAIN:  Thank you, Your Honor.

17             MR. BURNETT:  Thank you, Your Honor.

18        (Proceedings concluded at 3:57 p.m.)

19                            * * * * *

20

21

22

23

24

25

113

1

2

3                  C E R T I F I C A T I O N

4

5           I, Heidi Jolliff, court-approved transcriber, hereby

6    certify that the foregoing is a correct transcript from the

7    official electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10

11   _____

12   HEIDI JOLLIFF, AAERT NO. 2850      DATE: March 5, 2026

13   ACCESS TRANSCRIPTS, LLC

14

15                  **C E R T I F I C A T I O N**

16

17           I, Alicia Jarrett, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: February 27, 2026

25   ACCESS TRANSCRIPTS, LLC