David S. Norris (Authorized under FRCP 45(f))
SQUIRE PATTON BOGGS (US) LLP
david.norris@squirepb.com
2325 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
Tel. (602) 528-4000 | Fax (602) 253-8129

*Counsel for Nonparty Financial*
*Industry Regulatory Authority, Inc.*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

META MATERIALS INC.,

Debtor(s).

Case No.: 24-50792-gs
Chapter 7

**FINRA'S SUPPLEMENTAL BRIEF ON UNDUE BURDEN**

**Hearing Date**: April 20, 2026
**Hearing Time**: 1:30 PM

### Introduction

The Trustee's Subpoenas seek facially privileged and protected information and would require FINRA to divert hundreds of thousands of dollars and hundreds of thousands of hours of time away from its regulatory mission to respond by putting virtually all of the documents on a privilege log, which would do nothing for the Trustee's investigation.

The Trustee has acknowledged to this Court that requests for documents and communications are burdensome because they require "document-by-document review for relevance and privilege." Transcript of Feb. 20, 2026 Hearing ("Tr.") at 54:13–17. The Trustee told this Court that its subpoenas to Nasdaq are not burdensome because they seek just *one* category of *data*. *Id.* ("And all we're talking about are spreadsheets. We're not asking for emails. We're not asking for letters and PowerPoints. You know, this does not require document-by-document review for relevance and privilege."). The Trustee also told this Court that it would limit its subpoenas to Citadel, Virtu, and Anson to *one* category of *data* for just *160* days "in order to minimize the burden." *Id.* at 67:10–17; *id.* at 65:19–22 ("[W]e'll eliminate email so we can take that out of play because I agree with the Court that that gets a little more burdensome …."). Yet the Trustee continues to insist that nonparty Financial Industry Regulatory Authority, Inc.

-1-

("FINRA") produce **nine** categories of **documents, communications, emails, text messages, instant messages, and data** for a **four-year period**, the vast majority of which are privileged and protected. Subpoenas, Exs. 1–2 to Motion to Quash (Doc. 2622 at 45–47).

The only explanation the Trustee has provided for her vastly disproportionate demands on FINRA is that "FINRA investigated potential Meta Materials stock manipulation …, [so] this situation is distinguishable from the other nonparties." Declaration of David S. Norris in Support of FINRA's Supplemental Brief on Burden ("Suppl. Norris Decl.") ¶ 5. This explanation is without merit because discovery cannot be used to obtain privileged materials, and it is beyond dispute that FINRA's investigative files are privileged. *See, e.g., Gulf Coast Energy LLC v. Bank of America Corp.,* 2014 WL 12616133, at *2 (S.D. Tex. Dec. 2, 2014) ("FINRA is not required to produce documents or responses subject to … the investigative file privilege."); *SEC v. McGinn,* 2011 WL 13136028, at *5–*8 (N.D.N.Y. Jan. 5, 2011) (quashing subpoena; "courts have applied the investigative privilege to FINRA"); *Ross v. Bolton,* 106 F.R.D. 22, 24 (S.D.N.Y. 1985) (investigative files are not "fair game for any of the thousands of private securities fraud litigants across the country who wish to shortcut their own discovery efforts and instead to reap the benefits of [FINRA's predecessor's] ongoing, statutorily governed work"). FINRA has been litigating cases related to Meta Materials, MMTLP, and the trading halt since December 2022, and FINRA's Office of General Counsel has been advising FINRA on such issues throughout the relevant period, so virtually all documents the Trustee seeks are protected by the attorney-client privilege. FINRA Declaration in Support of Supplemental Brief on Burden ("Suppl. FINRA Decl.") ¶ 17.

The Trustee's explanation is also without merit because the Subpoenas call for the production of documents, communications, and data that are not related to FINRA's investigations. For example, the Subpoenas call for the production of Consolidated Audit Trail or "CAT" data, which is not directly related to FINRA's investigations, and is expressly protected from disclosure by federal regulation. *See* 17 C.F.R. § 242.613(e)(4)(i)(A) (CAT data cannot be used "for any purpose other than surveillance and regulatory purposes").

Regardless, two facts are beyond dispute—the Trustee's Subpoenas would impose an enormous burden on nonparty FINRA and that burden is entirely undue. To produce FINRA

-2-

records, FINRA will need to conduct a privilege review to withhold, redact, and log the documents and communications protected from disclosure by the attorney-client privilege, work product doctrine, and the investigative file privilege. Suppl. FINRA Decl. ¶¶ 20-21. The Subpoenas include multiple requests for communications, which would require FINRA to collect, process, and review approximately *5 million* emails and instant messages, totaling over 2.56 *terabytes* of data. *Id.* ¶ 27. In addition, FINRA estimates that the trade data requested in the Subpoenas would require FINRA to collect, process, and review "close to 25 million records." Declaration of Troy Eads ("Eads Decl") ¶ 4 (Doc. 2622 at 91–92). FINRA conservatively estimates that the production of the requested email and instant messages will cost nonparty FINRA between $457,033 to $556,033 in collection, ingestion, processing, loading, review, QC, and privilege log costs, plus an ongoing monthly hosting expense of $13,312 per month. Suppl. Norris Decl. ¶¶ 9–15. Further, FINRA does not have a single, centralized system in which it maintains all of its electronic records. Suppl. FINRA Decl. ¶ 16. Complying with the Subpoenas will thus require FINRA to commit immense time and expense that would detract from FINRA's important self-regulatory mission of protecting investors and safeguarding market integrity. Declaration of Stephanie Dumont ("Dumont Decl.") ¶ 16, Ex. 3 to Motion to Quash (Doc. 2622 at 62).

This enormous burden on FINRA is undue for several reasons. **First**, the Subpoenas demand the production of documents and communications that are protected from disclosure by the attorney-client privilege, the work product doctrine, and the investigative file privilege. *See* Suppl. FINRA Decl. ¶ 17 ("[G]iven the almost immediate commencement of litigation against FINRA related to Meta Materials, MMTLP, and the Trading Halt, FINRA's Office of General Counsel has monitored FINRA's investigation and examination efforts to provide legal advice to those teams, and since that time it has provided legal advice to FINRA leadership regarding the claims being litigated in multiple pending lawsuits, complaints from investors, and inquiries from the SEC and Congress."); *id.* ¶ 24 ("Because of the pending litigations against FINRA at the time the [*Investor Insight*] articles were published, most, if not all, of the documents and communications that are potentially responsive to Request No. 7 were prepared by or at the direction of FINRA's Office of General Counsel, or they involved communications to, from, or

copying attorneys in FINRA's Office of General Counsel."). Courts routinely recognize that it is unduly burdensome to demand a nonparty to undertake an expensive review of facially privileged documents just to place them on a privilege log. *See, e.g.*, *Dell Inc. v. DeCosta*, 233 F. Supp. 3d 1, 3–4 (D.D.C. 2017) ("Such open document requests [for privileged documents] would impose an undue and disproportionate burden on Defendants to prepare a privilege log." (emphasis added)).

**Second**, the burden is undue because the Trustee seeks trade data from FINRA that would not be helpful for the Trustee's stated purpose in obtaining it. The Trustee has told this Court that she is seeking data to identify specific brokers or firms who may have engaged in illegal stock manipulation. Tr. at 60:8–12 ("[W]e have no idea who … counterfeit shares …. We don't know who the parties are that did that."). Virtually none of the trade data the Trustee seeks from FINRA would help her do that, because FINRA "does not possess [this data] at the individual firm or broker level." Dumont Decl. ¶ 20 (Doc. 2622 at 62).

**Third**, the Trustee's Counsel has implored this Court to use the *In re Sorrento* bankruptcy as "a precedent" for the Trustee's use of Rule 2004 in this bankruptcy. Tr. at 60:22–61:7 ("I was a lawyer in the *Sorrento* case … [where we] subpoenaed an endless number of brokers to provide trading data to look at the same type of claim … [and] that order is there as a precedent to look at …."). But the *In re Sorrento* proceeding demonstrates the undue burden and overbreadth of the Trustee's subpoenas to FINRA. In *In re Sorrento*, the debtor was represented by the same special litigation counsel that represents the Trustee in this action—Mr. James Wes Christian—who was investigating the same claims as the Trustee. Yet, in the *Sorrento* case, the debtor agreed that it needed just **one-year** of **one type** of data from FINRA. Order Limiting 2004 Request, *In re Sorrento*, No. 23-90085 (Doc. 1670), Ex. D to Suppl. Norris Decl. The *In re Sorrento* "precedent" thus demonstrates the undue burden of the Trustee's unprecedented demand in this case that FINRA produce nine categories of documents, communications, emails, text messages, instant messages, and data spanning four years.

For these reasons, as set forth more fully below, and for all the reasons set forth in the Motion to Quash and the Reply Brief, the Court should quash the Trustee's Subpoenas to FINRA.

**Argument**

**I.      The Trustee's Subpoenas Would Impose an Enormous Burden on FINRA.**

The Trustee's Subpoenas demand that FINRA produce documents, communications, emails, text messages, instant messages, and other electronically stored information ("ESI") "concerning Meta and/or MMTLP issues and/or the trading of such issues thereof." Subpoenas, Exs. 1–2 to Motion to Quash (Doc. 2622 at 45–47). While FINRA has not yet estimated the potential volume of ESI created or maintained in the multiple systems and repositories used by FINRA's investigation and examination teams, Suppl. FINRA Decl. ¶ 14, FINRA did run searches for six keywords—MMAT, MMTLP, TRCH, "Meta Materials," Meta*, and Torchlight—to estimate the number of emails and instant messages that are potentially responsive to the Subpoenas. *Id.* ¶ 27. These search terms returned hits for 4,916,265 messages—excluding attachments and other documents—and a total volume of 2.56TB. *Id.*

The burden and expense to nonparty FINRA of collecting, processing, loading, and reviewing the emails and instant messages would be enormous. As set forth in greater detail in the concurrently filed declaration:

- Collection: FINRA would first have to collect potentially responsive ESI. It is estimated that collecting just the emails and instant messages potentially responsive to the Subpoenas would take between 40–80 hours and cost FINRA between $10,000 to $20,000. Suppl. Norris Decl. ¶ 9.

- Ingesting, Processing, and Loading: Collected ESI would then be ingested, processed, and loaded into an e-discovery database. It is estimated that ingesting, processing, and loading just the emails and instant messages into an e-discovery database would take between 20 to 60 hours and cost between $7,000 to $21,000. *Id.* ¶ 10.

- ESI Hosting: ESI in an e-discovery database is assessed monthly hosting costs. It is estimated that hosting just the potentially responsive emails and instant messages would cost approximately $13,312 per month. *Id.* ¶ 11.

- Review: Potentially responsive ESI would then need to be reviewed for responsiveness and privilege. It is estimated that reviewing just the emails and instant messages would

cost approximately $331,848 using conservative estimates and assumptions. *Id.* ¶ 12.

- Quality Control: ESI that is reviewed must then be "QC'd" by attorneys. It is estimated that QC'ing the potentially responsive emails and instant messages that were reviewed would cost FINRA another $33,185. *Id.* ¶ 13.

- Privilege Log: FINRA would then have to create a privilege log for documents marked responsive but privileged. Given the facially privileged materials the Trustee seeks in the Subpoenas, FINRA would incur substantial costs, and the emails and instant messages alone are estimated to cost between $75,000 to $150,000. *Id.* ¶ 14.

These estimates demonstrate the enormous costs to FINRA to comply with the Subpoenas. Just the potentially responsive email and instant messages alone are estimated to cost between $457,033 and $556,033, plus ongoing monthly hosting costs of $13,312 per month. *Id.* ¶ 15. And, this estimate excludes numerous other costs that would be necessary to comply with the Subpoenas, including identifying, collecting, processing, and reviewing additional ESI such as text message data and investigation an examination files, as well as the costs of producing the nearly 25 million records representing the requested trade data. *See, e.g.*, *id.* ¶ 9 (noting the costs of collecting text messages, which is not estimated in the declaration); Suppl. FINRA Decl. ¶ 29 (identifying the burden of collecting text messages from personal devices, which "would be unlikely to have significant results as FINRA policies require Staff not to conduct FINRA business via text messages on their personal devices").

These estimates are corroborated by the Trustee's own filings with this Court. In retaining special litigation counsel, the Trustee told the Bankruptcy Court she had secured **$11.8 million** in litigation funding to investigate and prosecute the potential claims. Doc. 98; Doc. 98-2 at Ex. A (Ex. 5 to Motion to Quash (Doc. 2622 at 94–112). More than **$3 million** of this enormous budget was earmarked for discovery alone, including "$1,800,000" for "expanded discovery issues" and "$200,000" for "[**t]hird party data**." Doc. 98-2 at Ex. A (Ex. 5 to Motion to Quash (Doc. 2622 at 111). Incredibly, the Trustee has still not even moved the Court to approve this enormous amount of financing, even though the Court directed the Trustee to file such a motion because the Court did not "have a comfort level as to what the litigation financing is," and even though the Trustee's

counsel's promised over a month ago to file such a motion "next week." Tr. at 106:12–108:12. Regardless, unlike the Trustee's special litigation counsel, nonparty FINRA does not have $11.8 million in litigation funding to shoulder the enormous burden the Trustee seeks to impose on FINRA through the Subpoenas.

**II.     The Enormous Burden on FINRA Is Entirely Undue.**

   **A.     The Documents and Communications the Trustee Seeks Are Privileged.**

The vast majority of the documents and communications sought by the Trustee are privileged for two reasons.

First, Subpoena Request No. 6 seeks: "**FINRA Investigative Files** (i) All data records, communications, notes, and investigative records associated with any FINRA investigation concerning Meta and/or MMTLP issues and/or the trading of such issues thereof." Subpoenas, Exs. 1–2 to Motion to Quash (Doc. 2622 at 45–47). This request seeks facially privileged documents, because FINRA's investigative files are protected by the investigative file privilege. Dumont Decl. ¶¶ 11–16; *Gulf Coast Energy LLC,* 2014 WL 12616133 at *2 ("FINRA is not required to produce documents or responses subject to … the investigative file privilege."); *McGinn,* 2011 WL 13136028 at *5–*8 (quashing subpoena; "courts have applied the investigative privilege to FINRA"); *Ross v. Bolton,* 106 F.R.D. 22, 24 (S.D.N.Y. 1985) (files of FINRA's predecessor, the NASD, are not "fair game for any of the thousands of private securities fraud litigants across the country who wish to shortcut their own discovery efforts and instead to reap the benefits of [NASD's] ongoing, statutorily governed work"). FINRA already established the investigative file privilege in the underlying briefing and will not repeat those arguments here. *See* FINRA Motion to Quash at 21–23 (Doc. 2622); Reply to Motion to Quash at 18–19 (Doc. 2626).

Documents responsive to this request will also be protected by the attorney-client privilege or work product doctrine. Suppl. FINRA Decl. ¶ 17 ("[G]iven the almost immediate commencement of litigation against FINRA related to Meta Materials, MMTLP, and the Trading Halt, FINRA's Office of General Counsel has monitored FINRA's investigation and examination efforts to provide legal advice to those teams, and since that time it has provided legal advice to FINRA leadership regarding the claims being litigated in multiple pending lawsuits, complaints

from investors, and inquiries from the SEC and Congress relating to Meta Materials, MMTLP, and the Trading Halt.").

Second, Subpoena Request No. 7 seeks: "**FINRA Investigative Files** (i) All data records, communications, notes considered in the preparation of all public communications by FINRA (e.g. Notices, FAQs) concerning Meta and/or MMTLP issues and/or the trading of such issues thereof." Subpoenas, Exs. 1–2 to Motion to Quash (Doc. 2622 at 45–47). This request seeks documents and information relating to two *Investor Insights* articles that FINRA published on its website in March 2023 and November 2023. Suppl. FINRA Decl. ¶ 23. FINRA's Office of General Counsel was responsible for the drafting and preparing both articles because FINRA had been sued multiple times when these articles were prepared and published. *Id.* ¶ 24; *see also, e.g., Tawil v. FINRA*, 4:22-cv-00440 (N.D. Fla. filed Dec. 12, 2022); *Hofman v. FINRA*, No. 2:23-cv-00881 (removed to C.D. Cal. Feb. 6, 2023; filed in L.A. County Superior Ct. Dec. 15, 2022); *Hensley v. TD Ameritrade, Inc*., No. 3:23-cv-05159 (W.D. Wash. filed Feb. 28, 2023); *Khorassani v. FINRA*, No. 153819/2023 (N.Y. Supreme Ct. filed Apr. 26, 2023). "Because of the pending litigations against FINRA at the time the articles were published, most, if not all, of the documents that are potentially responsive to Request No. 7 were prepared by or at the direction of FINRA's Office of General Counsel, or they involved communications to, from, or copying attorneys in FINRA's Office of General Counsel" and protected by the attorney-client privilege and/or the attorney-work product doctrine. Suppl. FINRA Decl. ¶ 24.

In the underlying briefing, the Trustee tried to justify her attempt to obtain facially privileged documents by arguing "FINRA could withhold privileged documents, produce a privilege log, and the parties could confer about its contents." Opposition to FINRA's Motion to Quash at 6–7 (Doc. 2624). But privileged documents are outside the scope of discoverable information. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any ***nonprivileged*** matter that is relevant to any party's claim or defense and proportional to the needs of the case …."). Rule 45 expressly requires courts to quash subpoenas that seek privileged information. Fed. R. Civ. P. 45(d)(3) (a court "must quash" a subpoena that "requires disclosure of privileged or other protected matter"). And Courts routinely recognize that requiring parties or nonparties to

review and log facially privileged documents is the epitome of an undue burden. *See, e.g.*, *DeCosta*, 233 F. Supp. 3d at 3–4 (quashing subpoena that would require non-party to review thousands of documents "most of which would be protected by the attorney-client privilege or attorney work-product doctrine"); *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 60–61 (D.D.C. 2023) ("[M]any of the responsive documents here likely contain privileged attorney-client communications and/or attorney work product … and would impose an undue and disproportionate burden on [nonparty] to prepare a privilege log."); *Menashe v. Covington & Burling LLP*, 552 F. Supp. 3d 35, 44 (D.D.C. 2021) (denying motion to compel; requiring privilege log creation "would trigger the very burdensome obligation to prepare a privilege log that the objection would be intended to avoid"); *Garrity v. Governance Bd. of Carinos Charter Sch.*, 2021 WL 3033278, at *7 (D.N.M. July 19, 2021) (quashing subpoena that sought "such broad swaths of potentially privileged and protected documents that even producing a responsive privilege log would impose an undue burden."); *Hall v. Baltimore Police Dep't.*, 2025 WL 509130, at *12 (D. Md. Feb. 13, 2025) ("requiring a privilege log first would impose the burden of 'laborious privilege review' that would 'far exceed any likely benefit, in terms of relevant documents that for some reason escape privilege or work product protection.'") (quoting *Aetna Inc. v. Mednax, Inc.*, 2019 WL 6250850, at *7 (E.D. Pa. Nov. 22, 2019)).

The enormous burden of creating a privilege log is set forth in detail in the concurrently filed declaration. *See* Suppl. Norris Decl. ¶¶ 9–14. That is because FINRA cannot create a privilege log without first incurring the expense of collecting millions of documents and terabytes of data; ingesting, processing, and loading those privileged documents into an e-discovery database; paying to host those privileged documents in an e-discovery database; conducting document-by-document review to identify privileged documents; QC'ing the review to ensure responsive and privilege tags are marked properly, and then preparing the privilege log. *Id.*

**B.    The Data the Trustee Seeks Is Unhelpful.**

The enormous burden on FINRA from the Trustee's data requests is also undue because the requested trade data would not be helpful to the Trustee's stated purpose.

FINRA previously demonstrated that the Trustee sought unhelpful data because FINRA did not possess the trade data "at the individual firm or broker level" to be used to identify firms or brokers allegedly involved in market manipulation. Dumont Decl. ¶ 20 (Doc. 2622 at 62). At the time, the Trustee responded by arguing that FINRA could not say the data was unhelpful because "FINRA is not privy to the Trustee's confidential investigation and that investigation is left to the Trustee's business judgment." Opposition at 5 (Doc. 2624).

The Trustee has now represented to this Court that it is pursuing Rule 2004 discovery to identify "who the parties are" that engaged in the potential manipulation. Tr. at 60:8–12. Specifically, the Trustee's special counsel told this Court that he was involved in an "investigation that preceded representing the trustee in bankruptcy." *Id.* at 59:25–60:12. That pre-petition investigation supposedly identified "over 55 million shares of MMAT and 92 million shares of TRCH that were impacted by this fraudulent activity." Doc. 98-1 at 2. The Trustee's counsel nonetheless told this Court that despite this pre-petition investigation, the Trustee still needs to pursue Rule 2004 requests because while "we did find disparity in the number of shares the corporation issued, [] **we have no idea who** … counterfeit shares …. **We don't know who the parties are that did that**." Tr. at 60:8–12 (emphases added).

The Trustee's latest representations to the Court demonstrate what FINRA told the D.C. District Court months ago—the Trustee is seeking to impose an enormous burden on FINRA to produce trade data that will not even help the Trustee identify potential wrongdoers. As FINRA established previously, "FINRA generally does not possess several of the categories of data sought in the Subpoenas at the individual firm or broker level." Dumont Decl. ¶ 20 (Doc. 2622 at 62). For example, the short interest reporting data sought in Request 1 of the Subpoenas is reported to FINRA by clearing firms, and it is not available, publicly or otherwise, at the individual firm or broker level." *Id.* "Similarly, the Trade Reporting Facility data sought in Request 2 of the Subpoenas is collected at the market participant level and does not contain account level details." *Id.* Further, "the Weekly OTC Summary Report data sought in Request 5 of the Subpoenas can be derived or summarized utilizing data that FINRA already makes publicly available." *Id.* The trade data the Trustee seeks from FINRA thus will not help the Trustee do what the Trustee's counsel

has told the Court it intends to do with the requested data—identify "who the parties are" that manipulated the market—and is otherwise publicly available, demonstrating the undue burden of the Trustee's requests.

**C.    The Trustee's Reliance on the *In re Sorrento* Proceeding Demonstrates the Undue Burden.**

The enormous and undue burden the Trustee's Subpoenas would impose on FINRA is established by the very proceeding the Trustee's counsel has told this Court to apply to the Trustee's Rule 2004 requests.

Specifically, the Trustee's counsel has implored this Court to look to the *In re Sorrento* bankruptcy proceeding "as a precedent" for the Trustee's Rule 2004 requests in this action. Tr. at 60:22–61:7. The Trustee's counsel told this Court, "I was a lawyer in the *Sorrento* case … [where we] subpoenaed an endless number of brokers to provide trading data **to look at the same type of claim** … [and] **that order is there as a precedent to look at**." *Id.* (emphases added); *see also id.* at 66:7–9 ("I can tell you what happened in *Sorrento* because I was a lawyer there and we could produce that order from Judge Jones if you wanted.").

The *In re Sorrento* proceeding, however, is directly contrary to the Trustees' Subpoenas to FINRA in this bankruptcy. In *In re Sorrento*, the debtor used Rule 2004 to obtain just ***one-year*** of ***one type*** of data from FINRA and only after first seeking that data from the financial firms at issue. Order Limiting 2004 Request, *In re Sorrento*, No. 23-90085 (Doc. 1670), Ex. D to Suppl. Norris Decl. Specifically, the debtor in *In re Sorrento* initially sought just two categories of data from FINRA—short interest data and CAT data—and no documents or communications. *See* Motion for 2004 Examination at 19, *In re Sorrento*, No. 23-90085 (Bankr. S.D. Tex. filed Oct. 27, 2023) (Doc. 1473), Ex. C to Suppl. Norris Decl. After FINRA (properly) objected to producing CAT data because it is protected from disclosure by federal regulation, 17 C.F.R. § 242.613(e)(4)(i)(A), the debtor agreed to drop that request, and FINRA agreed to produce the requested short interest data for one year to avoid litigation. Order Limiting 2004 Request, *In re Sorrento*, No. 23-90085 (Doc. 1670), Ex. D to Suppl. Norris Decl. The *In re Sorrento* proceeding thus, at most, could arguably suggest a limited request for ***one year*** of ***one type*** of data was not an undue burden, but

only after first seeking that data from the financial firms at issue. *In re Sorrento* provides no authority or support for the Trustee's unduly burdensome demands in this bankruptcy that nonparty FINRA produce ***nine categories*** of documents, communications, emails, text messages, instant messages, and data covering a ***four-year period***. Subpoenas, Exs. 1–2 to Motion (Doc. 2622).

### Conclusion

Subpoena Requests 1–5 would require FINRA to produce "close to 25 million records" that would not help the Trustee's investigation because the trade data is not maintained "at the individual firm or broker level" and thus cannot be used to identify firms or brokers allegedly involved in market manipulation. Eads Decl. ¶ 4 (Doc. 2622 at 91–92); Dumont Decl. ¶ 20 (Doc. 2622 at 62). Subpoena Requests 6–8 would require FINRA to shoulder an enormous expense—at a minimum between $457,033 and $556,033, plus ongoing hosting costs of $13,312 per month— just to produce a privilege log of the facially privileged documents the Trustee seeks, which would not further the Trustee's investigation, either. Suppl. FINRA Decl. ¶¶ 11–27; Suppl. Norris Decl. ¶¶ 9–15. Subpoena Request 9 seeks CAT data that FINRA cannot produce because it is expressly protected by federal regulation. 17 C.F.R. § 242.613(e)(4)(i)(A); Motion to Quash at 23–24 (Doc. 2622); Reply to Motion to Quash at 20–21 (Doc. 2626).

For these reasons, and for all the reasons set forth in the Motion to Quash and the Reply Brief, the Court should quash the Trustee's Subpoenas to FINRA.

Respectfully submitted March 27, 2026.

/s/ *David S. Norris*
David S. Norris (Authorized under FRCP 45(f))
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
Tel.: (602) 528-4013 | Fax: (602) 253-8129
david.norris@squirepb.com

*Counsel for Nonparty Financial Industry Regulatory Authority, Inc.*