David S. Norris (Authorized under FRCP 45)
SQUIRE PATTON BOGGS (US) LLP
david.norris@squirepb.com
2325 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
Tel. (602) 528-4000 | Fax (602) 253-8129

*Counsel for Nonparty Financial*
*Industry Regulatory Authority, Inc.*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re:

META MATERIALS INC.,

Debtor(s).

Case No.: 24-50792-gs
Chapter 7

**DECLARATION OF DAVID S. NORRIS IN SUPPORT OF FINRA'S SUPPLEMENTAL BRIEF ON UNDUE BURDEN**

I, David S. Norris, declare as follows:

1.       I am a Partner in the law firm Squire Patton Boggs (US) LLP (the "Firm"), attorneys for nonparty Financial Industry Regulatory Authority, Inc. ("FINRA") in this matter. I make this declaration based upon my personal knowledge and based on information obtained from the Firm's Co-Chair and Director of eDiscovery and Data Management, the Firm's Director of Litigation Support, and from FINRA's Office of General Counsel. If called as a witness, I could and would testify competently to the matters stated herein.

2.       I submit this declaration on behalf of nonparty FINRA's Supplemental Brief on Undue Burden.

3.       I have reviewed the transcript from the February 20, 2026 hearing before this Court (the "Transcript"). A true and correct, excerpted copy of the Transcript that I received from the Trustee's counsel is attached hereto as Exhibit A.

4.       In the Transcript, the Trustee's counsel told the Court that the Trustee was only seeking a single category of data from nonparty The Nasdaq Stock Market LLC ("Nasdaq"). Transcript of Feb. 20, 2026 Hearing ("Tr.") at 54:13–17. The Trustee's counsel also told the Court the Trustee would limit the subpoenas to nonparties Citadel Securities LLC ("Citadel"), Anson Funds Management LP ("Anson") and Virtu Financial, LLC ("Virtu") to seek just one category of

-1-

data for approximately 160 days. *Id*. at 65:19–22; *id.* at 67:10–17.

5.    After reviewing those portions of the Transcript, I asked the Trustee's counsel, Mr. David Burnett, if the Trustee was taking a similar position as to FINRA because the Trustee's requests to FINRA for multiple categories of data, documents, communications, emails,  text messages, instant messages, and other forms of electronically stored information ("ESI") would impose a substantially greater burden on FINRA. The Trustee's counsel responded by saying that "We know that FINRA investigated potential Meta Materials stock manipulation, as reflected in the FAQs and discussed in [the Trustee's] briefs, so this situation is distinguishable from the other non-parties.  The Trustee continues to seek responsive documents." A true and correct copy of my email correspondence with Mr. Burnett is attached hereto as Exhibit B.

6.    Attached hereto as Exhibit C is a true and correct copy of the Motion for 2004 Examination from *In re Sorrento*, No. 23-90085 (Bankr. S.D. Tex. filed Oct. 27, 2023) (Doc. 1473), where a debtor represented by the same special litigation counsel that represents the Trustee in this action—Mr. James Wes Christian—was investigating the same type of claims that the Trustee is investigating in this action, yet the debtor sought only two categories of data from FINRA.

7.    Attached hereto as Exhibit D is a true and correct copy of the Order Limiting 2004 Request from *In re Sorrento*, No. 23-90085 (Doc. 1670), where the debtor agreed to obtain just one-year of one type of data from FINRA as part of its pre-litigation investigation.

8.    I am familiar with the process of collecting, loading, reviewing, and producing ESI in civil litigation, including in response to subpoenas. ESI production is case- and fact-specific and depends on numerous factors. It is difficult to accurately forecast the full costs of ESI collection, ingestion, processing, loading, reviewing, and producing documents before all the ESI has been collected and the scope of ESI production has been established because the full costs depend on factors that are not always apparent at the outset and on factors that may change as ESI is collected and the review is conducted. Below I provide an estimate of the potential time and costs of different components associated with most ESI productions based on the facts currently available and known to me, as well as various assumptions.

-2-

9.      Collection: The first step in an ESI collection is generally the collection of potentially responsive ESI. The time and expense associated with collecting potentially responsive ESI depends on numerous factors, including the source(s) of the ESI collected, the way the ESI is stored, the number of custodian(s), the collection method employed (e.g., in house versus third party), and the volume of potentially responsive ESI at issue. I understand that FINRA has performed a preliminary assessment of the potentially responsive emails and instant messages using keyword searches, which returned 4,916,265 messages, not including attachments and other documents, and a total data volume of 2.56TB. Assuming that it would take a third-party vendor between 40 to 80 hours to collect the 2.56 TBs of email and instant messages at a rate of $250 per hour, it would cost approximately $10,000 to $20,000 to collect the potentially responsive emails and instant messages. This estimate does not include the cost of collecting text messages from cell phones, as such a collection would generally be performed separately from email and instant message collection, and can cost $1,000 to $1,500 per device depending on the type and number of devices. Nor does this estimate include the cost of collecting ESI related to FINRA's examinations or investigations.

10.      Ingestion, Processing, and Loading: After potentially responsive ESI is collected, the ESI generally must be ingested, processed, and loaded to an e-discovery database. I understand that this process involves technical steps like de-duplication, de-NISTing, threading, extraction or decompression, optical character recognition or OCR, and other technical steps that are necessary or useful in loading the ESI into the e-discovery platform in a usable format. This process can be outsourced to a third party or performed by e-discovery engineers or technicians in house. I assume that it would take between 20 to 60 hours to ingest, process, and load the 2.56TB of email and instant messages into an e-discovery platform billed at approximately $350 per hour, for a total cost of $7,000 to $21,000.

11.      ESI Hosting: There are typically monthly hosting costs associated with ESI that is loaded into an e-discovery database. Assuming RelativityOne is the e-discovery database used for ESI hosting, the costs of ongoing hosting would consist of two components.

a.      First, ESI is loaded into an "ECA" database, which is assessed hosting costs

-3-

of \$4 per GB per month. The volume of ESI loaded into the ECA database may differ from the volume of ESI collected, because the ingestion, processing, and loading of ESI can either increase or decrease the size of the ESI at issue. For example, deduplication may reduce ESI volume, while extraction or decompression may increase ESI volume. For purposes of this estimate, I assume there would be no material change to the ESI volume during ingestion and processing.

b.        Second, a subset of ESI loaded into the ECA database is then generally promoted for attorney review and production into a "Review" database. The subset of ESI that is promoted from ECA to Review is generally identified using search terms, date ranges, document type, custodian(s), and/or other criteria. ESI in the Review database is assessed hosting costs of \$8 per GB per month, but is not double charged (*i.e.*, ESI promoted to the Review database is not also assessed hosting costs in the ECA database). The amount of ESI that would need to be promoted from the ECA database to the Review database depends on numerous factors that are not known at this time. For purposes of this estimate, I assume that 30% of data in the ECA database would need to be promoted to the Review database.

c.        Based on these estimates and assumptions, it would cost approximately \$7,168 per month to host the emails and instant messages in the ECA database (2,560GBs x 70% of ESI remaining in ECA database x \$4 per month) and \$6,144 per month too host messages in the Review database (2,560GBs x 30% of ESI remaining in Review database x \$8 per month) for a total hosting cost of \$13,312 per month.

12.    Review: Potentially responsive ESI that is loaded into an e-discovery database then generally must be reviewed for responsiveness and privilege. The cost to perform the review would depend on numerous factors that are not presently known, including the total ESI volume that must be reviewed, the technologies used to assist the review (and the associated cost of those technologies), whether contract attorneys would be used to perform the review, the scope of ESI production required, the number of potentially responsive documents that are actually responsive and non-responsive, the number of potentially responsive documents that are privileged, and more.

-4-

Assuming the review process starts with the 4,916,265 messages—excluding attachments and other documents—initially collected, assuming 30% of those messages (1,474,880) are promoted to the Review database, assuming e-discovery technologies could be used to further reduce the volume of ESI necessitating individual review for responsiveness and privilege by 50%, that would leave 737,440 documents requiring review. Assuming the review was performed by contract attorneys who reviewed 100 documents per hour at $45 per hour, the cost would be $331,848. This estimate excludes additional time and expense that would be associated with this review, including, for example, the attorney and e-discovery technician time and expenses necessary to leverage e-discovery technologies that this estimate assumes would substantially reduce the volume of emails and instant messages requiring individual review.

13. Quality Control (QC): Attorneys generally perform second level or quality control review of a portion of the ESI that is marked responsive, non-responsive, privileged, and not privileged—regardless of what review method or technology is used—to ensure that ESI is being reviewed and marked properly. The total volume of ESI requiring QC is case- and fact- specific and depends on several factors, including the accuracy of the review as determined during the QC process itself. Assuming that QC costs comprised 10% of the review costs, the cost to QC would be $33,185 based on the assumptions and estimates provided above.

14. Privilege Log Preparation: Following QC, documents marked responsive and privileged would have to be included on a privilege log. The cost to perform the privilege log would depend on several factors, including the number of documents marked responsive, the percentage of those documents marked privileged or work product, and the number of documents requiring redactions. Given that Subpoena Request No. 6 seeks documents protected by the investigative file privilege, and given that FINRA's Office of General Counsel expects that most, if not all, documents that would be responsive to Subpoena Request No. 7 are protected by the attorney-client privilege or attorney-work product doctrine, I assume a high percentage of documents marked responsive would also be marked privileged. Assuming that 10% of the documents subject to individualized review were marked responsive, and that 90% of those documents were privileged or work product, FINRA would have to prepare a privilege log with

-5-

approximately 66,370 entries. I assume it would take between 150 to 300 hours of attorney and e-discovery technician time to prepare such a privilege log, which at a blended rate of $500 per hour for attorney and e-discovery technician time results in an estimate of $75,000 to $150,000 to prepare a privilege log.

15.    Total Costs: Based on these estimates and assumptions, the total estimated costs of producing emails and instant messages sought in the Subpoenas would be between $457,033 and $556,033, plus ongoing monthly hosting costs of $13,312 per month.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed March 27, 2026

/s/ David S. Norris
David S. Norris

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

IN RE:                                          .   Case No. 24-50792-gs
                                                .   Chapter 7
META MATERIALS, INC.,                           .
                                                .   300 Booth Street
                                                .   Reno, NV 89509
                        Debtor.                 .
                                                .   Friday, February 20, 2026
. . . . . . . . . . . . . . . . .               .   1:31 p.m.


   TRANSCRIPT OF DOC# 2088 MOTION TO QUASH NON-PARTY CITADEL
SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL,
LLCS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR FOR
 A PROTECTIVE ORDER FILED BY RYAN J. WORKS ON BEHALF OF CITADEL
                        SECURITIES LLC;
 DOC# 2551 MOTION TO QUASH FILED BY JACQUELYN NICOLE SCHELL ON
             BEHALF OF THE NASDAQ STOCK MARKET LLC;
  DOC# 98 STATUS CONFERENCE RE: EX PARTE APPLICATION TO EMPLOY
   CHRISTIAN ATTAR AND KASOWITZ BENSON TORRES LLP AS SPECIAL
  LITIGATION COUNSEL FILED BY JEFFREY L. HARTMAN ON BEHALF OF
                       CHRISTINA W. LOVATO;
            BEFORE THE HONORABLE GARY SPRAKER
            UNITED STATES BANKRUPTCY COURT JUDGE




APPEARANCES CONTINUED.

Audio Operator:         Natalie Clarke, CRD

Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 24-50792-gs |
|  | . | Chapter 7 |
| META MATERIALS, INC., | . |  |
|  | . |  |
|  | . |  |
| Debtor. | . |  |
| . . . . . . . . . . . . . . . . | . |  |
|  | . | Adv. No. 26-05001-gs |
| META MATERIALS, INC., | . |  |
|  | . |  |
| Plaintiff, | . |  |
|  | . |  |
| v. | . | 300 Booth Street |
|  | . | Reno, NV 89509 |
| THE NASDAQ STOCK MARKET, LLC, | . |  |
|  | . | Friday, February 20, 2026 |
| Defendant. | . | 1:31 p.m. |
| . . . . . . . . . . . . . . . . | . |  |

TRANSCRIPT OF DOC# 1 SCHEDULING CONFERENCE RE: ADVERSARY CASE
26-05001. ORDER OF META MATERIALS INC. AGAINST THE NASDAQ STOCK
MARKET LLC. FEE AMOUNT 52.00
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES CONTINUED.

Audio Operator:          Natalie Clarke, CRD

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES:

| | |
|---|---|
| For the Trustee,<br>Christina W. Lovato: | Hartman & Hartman<br>By:  JEFFREY L. HARTMAN, ESQ.<br>510 West Plumb Lane, Ste. B<br>Reno, NV 89509<br>(775) 324-2800 |
| | Schneider Wallace Cottrell Konecky<br>LLP<br>By:  DAVID D. BURNETT, ESQ.<br>1050 30th Street NW<br>Washington, DC 20007<br>(510) 740-2939 |
| | SBW Law Group<br>By:  CLAYTON BRUST, ESQ.<br>3600 Mayberry Drive<br>Reno, NV 89509<br>(775) 299-4051 |
| | Christian Attar<br>By:  JAMES W. CHRISTIAN, ESQ.<br>1177 W. Loop South, Suite 1700<br>Houston, TX 77027<br>(713) 659-7617 |
| | CHRISTINA W. LOVATO, ESQ.<br>P.O. Box 18417<br>Reno, NV 89511<br>(775) 851-1424 |
| For Citadel Securities<br>LLC: | McDonald Carano<br>By:  JIMMY F. DAHU, ESQ.<br>2300 West Sahara Ave. Suite 1200<br>Las Vegas, NV 89102<br>(702) 873-4100 |
| | Quinn Emanuel Urquhart & Sullivan LLP<br>By:  PETER H. FOUNTAIN, ESQ.<br>     CHRISTOPHER D. KERCHER, ESQ.<br>     MADELEINE P. ZABRISKIE, ESQ.<br>295 5th Ave<br>New York, NY 10016<br>(212) 849-7000 |
| | Sullivan & Cromwell LLP<br>By:  C. MICHELLE CHEN, ESQ.<br>1700 New York Ave NW #700<br>Washington, DC 20006<br>(202) 956-7500 |

3

APPEARANCES (Continued):

```
For Anson Funds          Greenberg Traurig LLP
Management LP:           By:  MICHAEL R. HOGUE, ESQ.
                         10845 Griffith Peak Dr, Ste 600
                         Las Vegas, NV 89135
                         (702) 792-3773

                         Greenberg Traurig LLP
                         By:  ALAN J. BRODY, ESQ.
                         500 Campus Drive, Suite 400
                         Florham Park, NJ 07932
                         (973) 443-3543

                         Greenberg Traurig LLP
                         By:  SYLVIA E. SIMSON, ESQ.
                         One Vanderbilt Avenue
                         New York, NY 10017
                         (212) 801-9275

For The NASDAQ Stock     Ballard Spahr
Market LLC:              By:  JAMES B. ZACK, ESQ.
                         1301 2nd Ave #2800
                         Seattle, WA 98101
                         (206) 223-7403

For Virtu Financial      Davis Wright Tremaine
LLC:                    By:  MICHAEL V. RELLA, ESQ.
                         1251 Avenue of the Americas
                         21st Floor
                         New York, NY 10020
                         (212) 880-3973

For Scott Traudt:        SCOTT TRAUDT (PRO SE)
                         191 Kibling Hill Rd.
                         Stafford, VT  05072
                         (802) 318-0429

For Danielle Spears:     DANIELLE SPEARS (PRO SE)
                         12206 W. Harrison St.
                         Avondale, AZ 85323
                         (480) 476-1091
```

53

MR. CHRISTIAN:  I think, let's go to Mr. Burnett because to stay in order, Your Honor, with your permission, NASDAQ stood up first and he's going to do that one.  I'm going to handle the consolidated arguments by Citadel, Virtu, and Anson Funds.

THE COURT:  All right.  Thank you.

Mr. Burnett, if you would.

MR. BURNETT:  Yes.  Yes.  Thank you, Your Honor.

Again, David Burnett from Schneider Wallace on behalf of the trustee.  I will speak specifically to NASDAQ.  I have been involved in the meet and confers with all these parties going back a year.

So, you know, the high-level point here is that everything that NASDAQ's counsel is saying is really disconnected from the facts.  So let me just remind us of where we are.

So we served these subpoenas about a year ago on all these parties.  With NASDAQ, my colleagues and I had productive conversations with NASDAQ's in-house counsel.  The parties, the trustee and NASDAQ, agreed to a protective order last May, which is ECF 1949.  NASDAQ voluntarily agreed to produce six months of trading data with very little fuss.  I mean, it was all done by email and a couple calls.  They produced the data for a six-month time period.  They agreed, they described that as an initial production.

54

There are many emails from Joanne Pedone, the in-house counsel, describing it as just an initial production. Our experts reviewed that data and said it looked fine, with the exception of needing one additional field to identify the order type.  But at that point, NASDAQ hired outside counsel, and they put the brakes on and refused to work with us any further.  And then, as you know, outside counsel filed a motion to quash in New York, which was then transferred here.

So NASDAQ's arguments as to burden and relevance and overbreadth really need to be taken with a heavy grain of salt in the context of the fact that NASDAQ has already produced six months of data.  They agreed to a protective order.  They've shown that they're able to produce that data.  And all we're talking about are spreadsheets.  We're not asking for emails. We're not asking for letters and PowerPoints.  You know, this does not require document-by-document review for relevance and privilege.  You know, it's not --

THE COURT:  I feel like -- if I can interrupt, because my understanding is that the request was for all relevant records regarding orders for Meta, MMTLP, et al.  So is the agreement then the relevant records is limited to what?

MR. BURNETT:  Just spreadsheets.  That is all that we've asked for is just spreadsheets.

THE COURT:  Spreadsheets of trades?

MR. BURNETT:  Spreadsheets of trades.  So the same

55

type of spreadsheets that they've produced for six months, we just want them to expand that to four years and include the order type field.  So we're not asking for emails, letters, you know, memos, things like that are normally a part of document production.

So it's really discreet and narrow.  It's as narrow as a document request could be.  And the burden of producing four years should be identical to the burden of six months, because as we assume, you know, all they have to do is plug the search criteria into their databases of trades and generate a larger spreadsheet.  And, you know, there's -- like I said, there's no individual review of millions of documents or anything.  It should just be a handful of documents like they produced last time.

And, you know, so that's why we're sort of confused by NASDAQ's recalcitrance because it would be so easy for them to just give us the additional spreadsheet.  You know, the initial production was very easy.  A supplemental production of the additional three and a half years' worth would be very easy.

NASDAQ tellingly has not articulated what the burden is exactly.  They haven't said it would cost X number of dollars or, you know, X number of hours.  They just, you know, throw out the boilerplate term burden, which any party objecting to any discovery can say.  But, of course, you know,

56

it can't be that any discovery is burdensome because then there would be no discovery in any case.  So that's the point on burden, Your Honor.

On relevance, as Your Honor has noted, a lot of their arguments and the other non-parties' arguments get into, you know, motion to dismiss, even motion for summary judgment type arguments.  All that we're looking at here is whether the trustee has established good cause for this information, and we believe certainly the trustee has.

So what -- where we are is that the trustee, in consultation with counsel and experts, has determined that it's worth looking into the potential of market manipulation in shares of Meta stock in the years leading up to the bankruptcy.  And that's pursuant to the trustee's duty to investigate the financial affairs of the debtor per 11 U.S.C. 704.

So to carry out that investigation that the trustee has a duty to do, we've determined that it would be helpful to have this discovery from these parties, including NASDAQ.  The reason why NASDAQ is it is a stock trading exchange.  It has market-wide data.  And so for our experts to be able to do a market-wide analysis of stock manipulation, we need market-wide data.

And indeed, even Citadel, Anson, and Virtu, in their opening brief on their motion to quash, they suggested that the trustee should get data from NASDAQ and FINRA.  They said

57

NASDAQ and FINRA function more like centralized repositories for the data the trustee is requesting, and any relevant information, to the extent there is any, would be captured in those other productions.  So we agree with Citadel, Anson, and Virtu that because NASDAQ has market-wide data, that's a great source of information for our experts and counsel to be able to conduct this investigation for the trustee.

We don't need to show at this point who any potential dependents are, what our causes of action are.  That's the point of this investigation, to look into that.  So those arguments are all premature.

And as Your Honor said, if not this case, then when?  You know, we need this data from NASDAQ as a trading exchange that has market-wide data to be able to investigate the financial affairs of the debtor.  And if this very low bar to discovery can't be met here, then I can't see any case where any trustee would be entitled to get discovery from NASDAQ to conduct this sort of investigation.

A lot of NASDAQ's arguments are based on speculation about, you know, what the trustee may find or what it's looking for.  But, you know, with all due respect, that's the trustee and counsel's and expert's role to conduct that investigation.  You know, it's -- that's all subject to attorney work product and privilege, and we don't have to show all our cards to be able to conduct its investigation.

58

NASDAQ's counsel, just like Citadel's counsel referred to a reference to 55 million shares. That was based on a very preliminary early investigation based only on public data. We're looking now for more information to do a more in-depth investigation. We're not saying that the whatever work we did before was sufficient. We're saying that we would like this additional data to be able to do a deeper analysis.

Yeah, finally, Your Honor, it's -- effectively what NASDAQ and the other parties are doing are they are obstructing the trustee's investigation. The trustee has a duty to investigate the financial affairs of the debtor. We're trying to help the trustee do that. And all these parties are obstructing that investigation.

I don't have anything further unless Your Honor has any questions.

THE COURT: No, thank you. I appreciate that.

All right, then. Mr. Christian, I think we're to you.

MR. CHRISTIAN: Yes. Thank you, Judge Spraker. Well, let's -- let me first talk about a couple of white elephants that I think have evolved in this room today.

So one is, it is my understanding, and I can't -- since I'm an officer in court, I can't promise you that that's the case, but it's my understanding that the prospectus and the other documents we filed with you do have sales by the

59

corporation associated with that. But just to put that issue aside, I would ask that the Court take judicial notice of the SEC filings that have been done.

And according to our consulting experts, just to give you specific facts, on June 24th, 2021, the company issued 145,563,667 shares of stock. And in the reposed period, which is five years looking back, the company has issued pre-split, because the company did have a split, but pre-split less than 800 million shares. And if necessary, we'd be happy to provide the Court those documents, but I will tell you they would fill up half your courtroom because those SEC filings are substantial.

But the proposition that the Court -- or that the opposing counsel is making, that we haven't sold shares, is simply not true. So I'd ask the Court to take judicial notice of that. In fact, the Court wants an accurate count of that, which, and I apologize, I did not understand that the Court wanted, you know, all that detail. But we are certainly able to provide it, and I can (audio interference) that your court clerks from Edgar and SEC (indiscernible) get the filings in the past five years, and you'll see hundreds of millions of shares that have been issued that we say are at artificially depressed prices. So that's the first issue in rebuttal to what's been spoken.

Secondly, there's been many discussions about, which

60

really is a motion to dismiss argument, but I want to address it with the Court because I do think it gets to this argument of being reasonable as to this 2004.  I was a party to the investigation that preceded representing the trustee in bankruptcy, and that is true.  We did look at -- but what we looked at, Judge Spraker, at length with numerous experts, is public data.

And yes, we did find disparity in the number of shares the corporation issued, but we have no idea who, I'm going to call them respectfully, counterfeit shares, shares that we believe were sold electronically but not delivered.  We don't know who the parties are that did that.

Twombly and Iqbal requires us as an officer of the Court to actually plead with specificity.  So part of this investigation is to get that level of data because otherwise, why would the trustee hire me and my two colleagues in these other two firms to go file a case if I don't have the facts sufficient to plead with specificity to beat a motion to dismiss?  So that is what that investigation was about, and yes, the public filings that the companies made are in the record.  They are what they are.

I will also bring to the Court's attention, and with all due respect to Mr. Brody and Mr. Zack and Mr. Fountain, I was a lawyer in the Sorrento case who intervened on behalf of an interested party, and I'll represent this Court, and we

61

provided you a copy of the order that Judge Jones in that case subpoenaed an endless number of brokers to provide trading data to look at the same type of claim.  Ultimately, for various reasons, the Court did not pursue those claims.  That firm who handled that portion of that was not me.  I came in later.  But that order is there as a precedent to look at, you know, can you issue this type of discovery in a 2004 situation?

Next, Mr. Fountain brought up another point as it relates to, well, and all the counsel did, and Profilet, I agree in that case, which is clear on standing, as is Northwest Bios, so I hope we're past the standing issue, and for the record, we represent Meta, okay?  That's our client.  That's who's in our fee agreement, and so that should be crystal clear.  These other statements about shareholders and others -- these type of things, I don't really understand the basis for that.

But nonetheless, just to clear the record, that is our client, and that is who we are conducting this investigation for.  But, yes, in the Profilet case, there was a relationship there.

But think about this, Judge Spraker.  So if Mr. Fountain is correct that anybody else who committed market manipulation who had nothing to do with the debtor, you know, could not be culpable for manipulating the issuer's stock who's in bankruptcy, probably because of the manipulation, at least

62

in part.  So I don't believe that applies.

So at the end of the day, I believe that our investigation is to go look at whatever claims are there, and I'm going to articulate what I think specifically some of the claims could be.  That's the key word, could be.  There could be all types of claims here.  I agree with my colleague, Mr. Burnett.

Opposing counsel wants to pigeonhole what the claims are.  Well, how can I pigeonhole what the claims are if I don't have the records?  For example, Judge Spraker, as it relates to spoofing, and spoofing essentially for the most part occurs by market makers.  And market makers, Judge Spraker, are supposed to have pretty much as many sales as they do buys.  Look at them as a bookie.  They need to be 50/50.

Well, guess what?  In the cases we've handled, and I can't get into the details of those, but in general, that book is typically grossly imbalanced.  Why?  Because they're not a market maker.  So well, that's the cause of action right there, because if, in fact, a market maker is not a bona fide market maker and they're short selling, then they need to borrow the stock.  The only exemption they have -- they, a market maker, has under Reg SHO, is they're a bona fide market maker.

Well, that's a claim, but I can't understand that claim until I get records.  And for the record, as I sit here today, I cannot assure this Court or my client that we have

63

claims against Citadel, Virtu, and Anson.  What I can tell this Court, which I hope the Court will agree is logical, is that in every case we've handled, including this case, we start with the entities that have traded the most volume of our stock that we believe has been manipulatable.  Guess what?  Citadel, Virtu, and Anson make up a large portion of that number.  Okay?

So at the end of the day, it's my belief that the necessity of getting these records is critical to any claims that the trustee may have, and I don't know what all those claims are.

Another example would be a naked short selling claim, selling shares but not delivering them.  I don't know what shares  Northwest -- I mean, Virtu sold, Citadel sold, as it relates to whether they delivered it or not.  I don't have the records.  The same thing for Anson funds.

Another claim could be that someone has loaned them stock and they haven't returned it, which in effect causes shares to artificially be issued that don't exist and culminates in a fail.

In addition, there is spoofing that we've already talked about, so -- and there's also -- so there's market manipulation claims under 10(b)(5), which the Court can see in Northwest Bio, they can see in the Profilet case and others. That is based on shares sold by the corporation at an artificially depressed price.

64

There may be other claims there.  There could be 9(a) claims for fraud.  There could be other claims.  I don't know. There could be claims, you know, against the directors or whoever.  You know, Mr. Fountain brought that up.  These could be claims that could be pursued by the trustee.

We're not isolating anybody.  We're starting with the entity's, Judge, that traded most of the securities during the relevant time period that sometimes, in my opinion and our consulting expert's opinion, doesn't make sense.  So I think that's a huge issue.

So at the end of the day, it's my belief that also it's not burdensome.  Here's why.  As it relates -- and I'm addressing only Citadel, Virtu, and Anson funds.  Under the consolidated audit trail system, and this docket -- I mean this document can be found as Docket Number 2251 in your court. It's already been filed.

There is a list of items that electronically Citadel and Virtu have to send to the consolidated audit trail entity, which is a separate LLC that is affiliated, I'm going to use that word, with FINRA.  It was created several years ago, but long before this -- the time period in question here.  And in doing So they have to give the very data we're seeking.

For example, Judge, if -- in order to look at a spoofing claim, and does the Court understand what spoofing is or do you not want me to waste time explaining that issue to

65

understand the claim?

THE COURT:  For today, I have a sufficient understanding of it.

MR. CHRISTIAN:  Okay.  All right.  Thank you, Your Honor.

So we would have to see the timestamps on when these sales that were subsequently taken down, basically fraudulent appearing sales to make everybody think there's a run on the bank, on the stock, that are later canceled.

Of course, you know, the spoofer sells at the top before all these sale orders are posted, and they go buy-in once it drops 20 percent and, you know, make the spread.  So there is no way I can get that data from anybody, you know, other than either Consolidated Audit Trail or the records of the Citadel and Virtu themselves.  It can't be burdensome, Judge, if all we're asking them to do is to produce the records they've already produced at Consolidated Audit Trail.

There's a protective order in place.  Simply get us those records, no exceptions.  And for now, to make this less burdensome for the Court, we'll eliminate email so we can take that out of play because I agree with the Court that that gets a little more burdensome.

And the reality is we've spent a year on this, Judge.  Time is ticking.  And so at the end of the day, we'll eliminate that request for now if we can get the Consolidated Audit Trail

data, which has already been sent because they're required to do it by law, Okay, by the rules.  So at the end of the day, I don't think the burdensome argument works either.

So from our perspective, we're at an investigation, Judge.  We need to see what the claims are.  We need this data. Otherwise, we will be prejudiced.

I'm not the expert necessarily in 2004, but I can tell you what happened in <u>Sorrento</u> because I was a lawyer there and we could produce that order from Judge Jones if you wanted. I think you already have it.  And so at the end of the day, any other questions about the bankruptcy law, which, you know, I'm not too good at, frankly, I've handled a bunch of litigation in bankruptcy but not, you know, an expert on 2004, I would ask Mr. Brust or Mr. Hartman to address that.

But -- so if the Court has any questions, I'd be happy to answer them.

THE COURT:  Okay.

MR. CHRISTIAN:  But that -- those are my responses to the Court's questions.

THE COURT:  At the October hearing, I believe that there was a discussion and you made an offer to reduce the scope of the 2004 in duration.  I believe it was 160 days, quite honestly.

MR. CHRISTIAN:  I think that's (audio interference), Judge.  And we would, again, to move this along, Your Honor,

67

(audio interference) and move this forward, we would stick (audio interference) for this round but reserve rights (audio interference) showing good cause of coming back to the Court for (indiscernible).

THE COURT:  Okay.  I think that's a fairly important point that got garbled.  Okay.  Could you -- we had some garble or some interference in the transmission.  Can you just state that again because I think it's an important point I want to make clear?

MR. CHRISTIAN:  Yes, Your Honor.  What I was saying is on behalf of the trustee, we would be happy to stick with those dates that are on the record previously, in our previous hearing.  I think it is around 160 days.  But we would reserve the right, Judge, upon showing good cause, to come back to the Court further and get discovery for additional dates, but again, for good cause.  So we will agree to start with those dates in order to minimize the burden and also move this along.

And I would ask specifically, Judge, if the Court is inclined to go forward, because ultimately, not in the immediate future, but in the -- down the road here, reasonably, quickly, certainly, this year, most likely, we have to look at (audio interference) mid-year.  So at the end of the day, we need this discovery specifically ordered if the Court is inclined to do so by a date certain, because we need that in order to see what claims the estate has.

68

THE COURT:  Mr. Brust?

MR. BRUST:  Yeah, you broke up a little bit there, Mr. Christian.

I think the point that he's trying to make is I think around August 9th would be a deadline for claims to be filed, so we need the information basically as soon as possible so that the experts, Mr. Christian and his firm, can evaluate it. We just wanted to make sure the Court was cognizant of that.

THE COURT:  Do you know the scope of the 160-day duration from when to when?

MR. BRUST:  Mr. Christian, do you know?  Is that -- go ahead.

MR. CHRISTIAN:  I believe it's over a four-year period.  And I apologize, Judge.  I did not come prepared to give you that date, but whatever's on the record previously, which we did articulate in detail, we'll stick with that 100 percent.

THE COURT:  Well, my understanding is you wanted from September 21, 2020, through August 21st, 2024, for Meta and Torchlight, and from June 28th, 2021, through December 14, 2022, as MMTLP.  So I don't know what the 160 days out of those dates are.

MR. CHRISTIAN:  Well, we'll be happy to provide those again to the Court, Judge, but I'll look back at the transcript, and I thought I articulated those before.  But we

69

will get those to you by, you know, Monday or Tuesday at the latest.

THE COURT:  Okay.

MR. CHRISTIAN:  And I will agree that it's around roughly 160 days of that, you know --

THE COURT:  Yeah, you may have said 161 if I'm pushing my memory, but, I mean, around that is correct.  We do not have that, and we did not see that in preparing for this. We saw the offer, but not the date, so I'd appreciate that.

How do you feel about who -- what trades are at issue?  I understand, at least we'll get to a further discussion on Meta.  What about Torchlight?

MR. CHRISTIAN:  Well, here is the way we see it on Torchlight, Judge.  By virtue of the merger, the claims of Torchlight are now owned by the bankruptcy estate.  So ultimately, you're --

THE COURT:  But that's for pre-merger trading in Torchlight, then?

MR. CHRISTIAN:  Yes, sir.  Yes, Your Honor.

THE COURT:  That would not be the same 160 days, then, correct?

MR. CHRISTIAN:  I believe it would, but I'll check that, and if it's different, we will put that in writing to the Court, but I think it is the same 160 days.

THE COURT:  Because I don't understand how you --

70

post-merger, how you get trading in Torchlight and Meta.

MR. CHRISTIAN:  Well, because you get trading in Torchlight pre-merger, which now that claim is owned by Meta, and then after that you get Meta and you get MMTLP, because MMTLP is a shared --

THE COURT:  Is a special dividend of Torchlight, I understood.

MR. CHRISTIAN:  A special dividend if you own one share of Torchlight that -- so in the merger, in the -- if you own one share of Torchlight, you've got a share of Meta, and you got a preferred share of Meta, which converted into this MMTLP, ultimately to a private corporation.  So at the end of the day, that's how that would work.

The shares sold by Torchlight, that claim belongs to Meta within the actionable time period, and then the shares of Meta, which those Torchlight shares were converted into, and the shares of MMTLP would be based on the sale of those shares within the actual time period by the corporation.

THE COURT:  All right.  Mr. Brust, I want to come back to that point with you in a little bit, but I want to go back to what Mr. Christian has been talking about.

Mr. Christian, in your view, are there claims owned by Meta as the bankruptcy estate where there were no sales of stock by Meta as the issuer?

MR. CHRISTIAN:  I would say generally yes, although I

105

the burden comments that were made.  It sounded like there was a, I wouldn't call it a proffer, but something about emails that were said, and so that is something we would like the opportunity to address.

THE COURT:  Yeah.  Let me kind of play with that because as part of the trustee supplement, I think they're going to also give the details as 160, it's 161, whatever that is, whatever the reduced amount of time is, and then also I would ask just to clarify in writing that withdrawing the request for emails from any Rule 2004, that may affect how I see things too.  So your response can address some of that as well within the burden aspect based upon the reduction of the Rule 2004, if you could direct it towards that.

MR. DAHU:  Thank you, Your Honor, and I'm sure you have no doubt we will still address the burden, but I do appreciate that.

THE COURT:  Sure.  Mr. Brody?

MR. BRODY:  Your Honor, I apologize.  I just want to confirm the trustee settlement date.  You said a week, so that would be they have to provide on the 27th, the 28th being a Saturday.

THE COURT:  Yeah, I --

MR. BRODY:  So I want to make sure I have the dates correct, because I know my date.

THE COURT:  The 27th, yeah.  If you want to give them

106

to the 28th, that's unusual to schedule something for a Saturday, but, you know, maybe that's --

MR. BRODY:  Whatever Your Honor wants.

THE COURT:  -- the beginning of the issue.

MR. HARTMAN:  It'll be done by the 27th, Your Honor.

MR. BRODY:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Hartman.

All right.  With that, I think that's all we'll do for today on that.  I may get out of short scheduling order, just to confirm that on Monday.  Let's pick up in the time we have left then the discussion about the litigation financing.

And, Mr. Hartman, I appreciate -- watch you're walking up.  I appreciate your status.  I went back and read the application.  My concern is that while it's referenced in the application and it's actually woven into the terms of employment and the compensation, I still don't have a comfort level as to what the litigation financing is, and quite honestly, within the bankruptcy construct, where it is coming from for purposes of allaying any concerns regarding disinterestedness, adverse interest, and such, if that makes sense.

MR. HARTMAN:  I understand.

THE COURT:  Okay.

MR. HARTMAN:  So I guess the question is, I mean, do you want me to set a hearing on, let's say, I mean, I looked at

it.  It's not a 363 issue because it's not property of the estate.  It's not -- I don't think it's a 364 issue.

THE COURT:  But it's coming from property of the estate to pay it back.

MR. HARTMAN:  Well, if there's a recovery.

THE COURT:  Right.

MR. HARTMAN:  Right.  But that's part of the contingent fee arrangement.

THE COURT:  Right.

MR. HARTMAN:  So I'm happy to file something that addresses your questions.  I just don't know exactly what to call it.

THE COURT:  That's -- my sense is, given what little I've come to appreciate in this case, a motion might be the best way to do it.

MR. HARTMAN:  I'm happy to file a motion.  I might not have any Code section for the authority, but I'll ask anyway.

THE COURT:  No, well, and I think it's complicated in the fact that it was embedded into -- I mean, it was a material part of the employment.

MR. HARTMAN:  Right.

THE COURT:  I just need to understand it better.  And I keep hearing of it, and I don't understand if it was all self-financed, if it's from others, what the relationship of

108

the 500 from Harrington was.  If you can walk through that, then I think we can see where that takes us and put it more to bed on a more identified basis on the docket.

MR. HARTMAN:  Certainly.

THE COURT:  So yeah, that's all.

MR. HARTMAN:  So you just want it on regular notice or how --

THE COURT:  Sure.

MR. HARTMAN:  Okay.

THE COURT:  I think that would be fine.

MR. HARTMAN:  Okay.  I'll try and get that on file next week.

THE COURT:  All right.  Thank you.

MR. HARTMAN:  All right.  Thank you.

THE COURT:  For today, then, I don't know if anybody else wants to say anything about that at this time.  I think it can generally probably wait until we get the motion to see on a more informed basis.

MR. DAHU:  That works for the non-parties, Your Honor.

THE COURT:  All right.  Thank you.

All right, then.  As to the status on the adversary, my understanding is that resulted from the transfer over from Southern District of New York.  I don't know why it was put into an adversary, but it was.

109

We've moved it over here now, Mr. Zack.  Are you okay with -- I don't know how you terminate that adversary or what exactly, but it would be terminated as moot in light of the contested matter before us?  And honestly, I guess it's Mr. Hartman, so.

MR. ZACK:  Yes, Your Honor.  We were equally surprised that that's how it showed up here.  We were kind of awaiting to see --

THE COURT:  How it goes on.

MR. ZACK:  -- what would appear on what docket and all that.  If it's something that NASDAQ should take the lead on, some sort of, like, dismissal order, I'm sure we could stipulate to something to wipe it out.

THE COURT:  You know, honestly, it might be a stipulation to dismiss as moot in light of the transfer over to the main case.

MR. ZACK:  Sure.  We can propose some language in order to the trustee.

MR. HARTMAN:  That's acceptable, Your Honor.

THE COURT:  I think that would clarify the docket fine.  Thank you very much.

MR. ZACK:  Okay.

THE COURT:  All right.  I think we've exhausted everything we need to discuss today.  I want to say thank you for attending.  I do appreciate this.  My sense was that this

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

was sufficiently significant that it warranted being in person. I understand people are everywhere here.  So I do understand the effort and the cost that came.  But I think from time to time, especially in these large matters, it warrants it to be in person.  So I did appreciate that, and I think I got, you know, the benefit of that.

So unless anybody else has anything else to add, that will conclude the hearing for today.  Wish everybody --

MR. BURNETT:  Your Honor, I --

THE COURT:  Oh, go ahead, Mr. Burnett.

MR. BURNETT:  Sorry.  One last thing.  This is David Burnett.  What would you like to do with regard to FINRA?  The latest that I've seen is in the DC matter, there was a docket entry yesterday saying that the case was transferred to the bankruptcy.  But I have not seen that yet on our docket.

THE COURT:  Right.  I have not seen it either.  Let me get back to Alaska and let that docket catch up to that.  I can contact the clerk's office, too, to see where that is in the processing.

MR. BURNETT:  I can tell you that you asked earlier at the beginning what was done in that case.  In that case, the parties fully briefed the motion to quash issues with lengthy briefs, not just letter briefs.  And then the Court asked for supplemental briefings specific to the Rule 45(f) transfer issue.

111

So from our perspective, and counsel for FINRA is not here today, but from our perspective, that issue has been fully briefed.

THE COURT:  Okay.  Are you in discussions with opposing counsel on that matter?

MR. BURNETT:  We have not spoken to them yet.  We were waiting to see what Your Honor would like to do.

THE COURT:  I would be interested in you conferring with them to see how they feel about it.  Unfortunately, they're now one step behind NASDAQ on that and two hearings down.  But my guess is much of the arguments have been made, if not all of them.

If there are specific items raised in that instance, I'm not opposed to hearing it, but I would like to, again, keep this moving.  So ultimately, I'll need to hear what FINRA wants to do in regards to bringing it over here if they want their own stand-alone motion or not.  But it is not likely to -- at least my initial thought is, it's not likely to derail this.

If it can happen within the next 17, 20 days in light of the supplemental briefing, that's great.  I have some conflicts, like I will be in chambers on Monday.  I will be out of action for the rest of that week.  So I could probably have the chambers get a scheduling order out, but that's about the level I'm going to be at next week, unfortunately.  The week after, possibly, we can do something. So --

112

MR. BURNETT:  Okay.

THE COURT:  But if you could coordinate -- if the parties could all coordinate to figure out how it is, it's all the same issues.  So I would like to do it as efficiently as possible so the parties can find out what they need to do and take the appropriate actions any way it goes.

MR. BURNETT:  Okay.  Understood, Your Honor.  We'll reach out to FINRA's counsel.

THE COURT:  Thank you for bringing that up, Mr. Burnett.

All right.  With that, I'll let everyone get to the weekend.  We're adjourned.  I hope you all have a good weekend.  Thank you.

MR. DAHU:  Thank you, Your Honor.

MR. BURNETT:  Thank you, Your Honor.

(Proceedings concluded at 3:57 p.m.)

* * * * *

113

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

HEIDI JOLLIFF, AAERT NO. 2850    DATE: February 23, 2026

ACCESS TRANSCRIPTS, LLC

# EXHIBIT B

| | |
|---|---|
| **From:** | David D. Burnett <dburnett@schneiderwallace.com> |
| **Sent:** | Thursday, March 5, 2026 9:57 AM |
| **To:** | Norris, David S. |
| **Subject:** | [EXT] Re: Meta Materials |
| **Attachments:** | 20260305 joint letter to Judge Spraker re FINRA.docx |

David:

I will check with my colleagues about a stipulation re the adversary proceeding.  Nasdaq offered to prepare one for its motion but I haven't seen one yet.

We know that FINRA investigated potential Meta Materials stock manipulation, as reflected in the FAQs and discussed in our briefs, so this situation is distinguishable from the other non-parties.  The Trustee continues to seek responsive documents.  That said, we can agree for FINRA to prioritize production of data before documents (which would likely happen regardless, since data can be produced faster).

As for the date range, we are continuing to seek data from Nasdaq for the full date range stated in Nasdaq's subpoenas because Nasdaq has marketwide data.  FINRA also has marketwide data and we continue to seek data from the full date range stated in the FINRA subpoenas, but we can agree to prioritize production of data from the 161 days stated in our February 27 supplemental briefing.  I suspect it would be easier to simply produce all the data at once rather than running queries for 161 individual dates.

Regarding the joint letter, see attached.  I converted my prior draft into this.  There is a placefiller at the end to add FINRA's position.  We believe it's important to file something by tomorrow, since the oral argument was two weeks ago.  If you can add your section and provide any other edits by tomorrow midday, we can plan to submit it tomorrow.  If you'll need more time, I'll convert it back to a letter from the Trustee only and file it today or tomorrow, noting that we have spoken.

Regards,
David



**David D. Burnett**
**Attorney at Law**
1050 30th Street NW
Washington, DC 20007
Main Line: (415) 421-7100
Toll Free:  (800) 689-0024
Direct:      (510) 740-2939
Facsimile: (415) 421-7105
www.schneiderwallace.com
***Admitted in New York and District of Columbia***

**From:** Norris, David S. <david.norris@squirepb.com>
**Sent:** Thursday, March 05, 2026 11:06 AM
**To:** David D. Burnett <dburnett@schneiderwallace.com>
**Subject:** RE: Meta Materials

**Notice:** This email originated from outside of the organization. Please use caution before opening any attached file you did not expect from the sender. Contact support@langtech.com if in doubt.

Hi David,

Thanks for your email. I need to understand the Trustee's position on my second question before I can advise you of our position on whether we need supplemental briefing.  So please let me know when you can on that, and I'll get back to you on your question.

FINRA is open to considering the stipulation you propose on the adversary proceeding. If you send us a draft, we'll review and revert.

Finally, a joint letter is fine with us in concept but depends on us agreeing on the content of the submission. Once you send us a draft, I will review with FINRA.

Thank you.

Regards,
David

**David S. Norris**
Squire Patton Boggs (US) LLP
O  +1 602 528 4013
M  +1 602 999 3483
**david.norris@squirepb.com** | squirepattonboggs.com

---

**From:** David D. Burnett <dburnett@schneiderwallace.com>
**Sent:** Wednesday, March 4, 2026 12:53 PM
**To:** Norris, David S. <david.norris@squirepb.com>
**Subject:** [EXT] Re: Meta Materials

David:

You refer below to a hearing on FINRA's motion but not additional briefing. Please confirm that you agree that additional briefing on the motion is unnecessary.

The Trustee's position that oral argument is unwarranted here is primarily based on what Judge Spraker said at the hearing about the overlap in issues between motions and his desire to "keep it moving."  My impression is that after hearing two arguments on similar motions to quash, after reviewing the voluminous briefing on the other motions, after the supplemental briefing, and after issuing his Partial Tentative Ruling on February 4 (ECF 2560), Judge Spraker does not need additional argument specific to FINRA's motion.  Cumulatively, he seems to now have enough information (once the additional briefs are

2

filed on Monday) to rule.  He seems to want to resolve all of the motions to quash together, and FINRA's motion is now behind.

On your first question below, our position on how FINRA's motion was docketed is the same as with Nasdaq's motion.  We're fine with a stipulation like the Court proposed (pp. 108-09 of the 2/20/26 transcript).

I suggest we file a joint letter this week with a joint introduction describing the procedural history of FINRA's motion and the transfer, followed by the parties' contested positions on whether the Court should order additional argument.  I will convert the letter I sent you today into a joint letter for you to add onto, if that works.  I'll send you the proposed letter and also circle back on your second question below.

David



**David D. Burnett**
**Attorney at Law**
1050 30th Street NW
Washington, DC 20007
Main Line: (415) 421-7100
Toll Free:  (800) 689-0024
Direct:      (510) 740-2939
Facsimile: (415) 421-7105
www.schneiderwallace.com
***Admitted in New York and District of Columbia***

**From:** Norris, David S. <david.norris@squirepb.com>
**Sent:** Wednesday, March 04, 2026 12:39 PM
**To:** David D. Burnett <dburnett@schneiderwallace.com>
**Subject:** RE: Meta Materials

> **Notice:** This email originated from outside of the organization. Please use caution before opening any attached file you did not expect from the sender. Contact support@langtech.com if in doubt.

Thanks David. I am still reviewing the 113-page transcript you sent last week with FINRA. I understand Nasdaq, Citadel, Anson, Virtu, and the Trustee went about 2.5 hours on the record, so I'm sure you appreciate that takes some time.

In the meantime, FINRA will not agree to waive a hearing on its motion. The Court has now held two oral arguments over several hours with the Trustee, Citadel, Anson, Virtu, and Nasdaq, including ordering three rounds of supplemental briefing based on issues identified at those hearings. The idea that every other nonparty is entitled to be heard except FINRA—despite that the Trustee seeks more documents, emails, communications, and data from FINRA than every other nonparty—is a nonstarter.

There are also two other points I wanted to discuss with you from the transcript:

1. The Court suggested the Nasdaq motion had been improperly docketed as an adversary matter. As you know, FINRA's motion has also been docketed as an adversary matter. What is the Trustee's position on that?

2. The Trustee only ever sought a single category of data from Nasdaq and confirmed at the hearing it is no longer seeking documents, communications, or emails from Citadel, Anson, and Virtu and instead is limiting its requests to one category of data for a ~160 day period. Can you advise if the Trustee's position is similar as to FINRA? As you know, the Trustee's subpoena to FINRA seeks 5 separate categories of data; three categories of documents, communications, emails, text messages, instant messages, etc. (many of which are privileged); plus protected CAT data. This obviously comes with a substantially greater burden to FINRA, which the Trustee acknowledged at the hearing.

Thank you.

Regards,

David

**David S. Norris**

Squire Patton Boggs (US) LLP

O  +1 602 528 4013

M  +1 602 999 3483

david.norris@squirepb.com | squirepattonboggs.com

---

**From:** David D. Burnett <dburnett@schneiderwallace.com>
**Sent:** Wednesday, March 4, 2026 7:31 AM
**To:** Norris, David S. <david.norris@squirepb.com>
**Subject:** [EXT] Re: Meta Materials

David:


We're going to file the attached letter today.  If you have any feedback in the meantime, please let me know.


David





**David D. Burnett**

**Attorney at Law**

1050 30th Street NW

Washington, DC 20007

Main Line: (415) 421-7100

Toll Free:  (800) 689-0024

Direct:     (510) 740-2939

Facsimile: (415) 421-7105

www.schneiderwallace.com

***Admitted in New York and District of Columbia***

---

**From:** David D. Burnett <dburnett@schneiderwallace.com>
**Sent:** Monday, March 02, 2026 9:45 AM
**To:** Norris, David S. <david.norris@squirepb.com>
**Subject:** Re: Meta Materials


David:

Thanks.  We'd appreciate hearing from you early this week, so we can get back to Judge Spraker promptly in response to his request at the February 20 oral argument.  From his comments, it appears he is inclined to consider FINRA's motion on the DC papers without argument, given the overlap in arguments between motions and his desire to keep things moving.  The Trustee will take that position.  If FINRA consents we can submit a joint letter stating that, or if you disagree we can submit a joint letter setting forth the parties' contested positions.

Regards,

David



**David D. Burnett**

**Attorney at Law**

1050 30th Street NW

Washington, DC 20007

Main Line: (415) 421-7100

Toll Free:  (800) 689-0024

Direct:     (510) 740-2939

Facsimile: (415) 421-7105

www.schneiderwallace.com

***Admitted in New York and District of Columbia***

---

**From:** Norris, David S. <david.norris@squirepb.com>
**Sent:** Friday, February 27, 2026 6:40 PM
**To:** David D. Burnett <dburnett@schneiderwallace.com>
**Subject:** RE: Meta Materials

6

**Notice:** This email originated from outside of the organization. Please use caution before opening any attached file you did not expect from the sender. Contact support@langtech.com if in doubt.

Thanks David. I will review with my client and get back to you.

Have a good weekend.

Regards,

David

**David S. Norris**

Squire Patton Boggs (US) LLP

O  +1 602 528 4013

M  +1 602 999 3483

david.norris@squirepb.com | squirepattonboggs.com

---

**From:** David D. Burnett <dburnett@schneiderwallace.com>
**Sent:** Wednesday, February 25, 2026 3:56 PM
**To:** Norris, David S. <david.norris@squirepb.com>
**Subject:** [EXT] Re: Meta Materials

David:

Yes, the transcript from last Friday's hearing is attached.  I just received it.  Pages 110-12 are the relevant discussion with Judge Spraker about how to handle FINRA's motion vis-a-vis the other motions to quash.  Those pages are what I summarized below based on my notes.  FINRA is also mentioned a couple other times earlier in the transcript.

David



**David D. Burnett**

**Attorney at Law**

1050 30th Street NW

Washington, DC 20007

Main Line: (415) 421-7100

Toll Free:  (800) 689-0024

Direct:     (510) 740-2939

Facsimile: (415) 421-7105

www.schneiderwallace.com

*\*Admitted in New York and District of Columbia*

---

**From:** Norris, David S. <david.norris@squirepb.com>
**Sent:** Wednesday, February 25, 2026 5:33 PM
**To:** David D. Burnett <dburnett@schneiderwallace.com>
**Subject:** RE: Meta Materials

**Notice:** This email originated from outside of the organization. Please use caution before opening any attached file you did not expect from the sender. Contact support@langtech.com if in doubt.

Hi David – Thanks for your email and for the update on last Friday's hearing before Judge Spraker. Do you have a transcript of that hearing you can provide? I need to see a transcript of what was said

regarding FINRA's motion to quash before FINRA submits a joint letter to the court in response to comments at that hearing.

Thank you.

Regards,

David

**David S. Norris**

Squire Patton Boggs (US) LLP

O  +1 602 528 4013

M  +1 602 999 3483

**david.norris@squirepb.com** | squirepattonboggs.com

---

**From:** David D. Burnett <dburnett@schneiderwallace.com>
**Sent:** Monday, February 23, 2026 11:48 AM
**To:** Norris, David S. <david.norris@squirepb.com>
**Subject:** [EXT] Meta Materials

David:

As you know, Magistrate Judge Harvey granted the Trustee's request to transfer FINRA's motion to quash to Nevada, and a February 19 docket entry on the D.C. docket states "Case transferred to the USDC for the District of Nevada pursuant to [23] Order Transferring Case."  The filings have not appeared on the bankruptcy docket yet.

We had a second hearing on Friday before Judge Spraker in Nevada on motions to quash filed by Citadel, Anson, Virtu, and Nasdaq. The Court directed those parties and the Trustee to submit supplemental briefing on discrete topics covered at the hearing.  The Court will be issuing a scheduling order with the details.  Judge Spraker said he will likely not schedule additional argument following the supplemental briefing.

9

The Court also issued a Partial Tentative Ruling, ECF 2560, and Amended Partial Tentative Ruling, ECF 2569, partially denying the motions to quash.

I mentioned the D.C. court's ruling to Judge Spraker during Friday's hearing.  He was not yet aware of it.  He asked me to speak with FINRA's counsel (you) on how to proceed.  He said he "wants to hear what they want to do."  He asked whether FINRA would like to maintain a standalone motion to quash or consolidate its motion with those filed by the other non-parties.  The Court noted that the non-parties' arguments on motions to quash are similar—he said "much of the arguments have been made, if not all," and he expressed a desire to "keep this moving."  He noted that FINRA's motion is behind the other non-parties' motions.

Since FINRA's motion to quash was fully briefed in D.C., the legal arguments overlap with the other motions to quash, the Court has heard two oral arguments on those motions, procedurally FINRA's motion is behind, and given the Court's comments on Friday, we'd like to ask the Court to evaluate FINRA's motion to quash on the D.C. briefs without argument.  We are agnostic as to whether FINRA's motion should be formally consolidated with the other motions to quash.  I suggest a joint letter to Judge Spraker explaining the plan, once you and I have discussed.

Let me know when you're free for a call.

Thanks

David



**David D. Burnett**

**Attorney at Law**

1050 30th Street NW

Washington, DC 20007

Main Line: (415) 421-7100

Toll Free:  (800) 689-0024

Direct:      (510) 740-2939

Facsimile: (415) 421-7105

www.schneiderwallace.com

*Admitted in New York and District of Columbia*

Over 40 Offices across 4 Continents

This message is confidential and may be legally privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system; you must not copy or disclose the contents of this message or any attachment to any other person.

For information about how Squire Patton Boggs processes personal data that is subject to the requirements of applicable data protection laws, please see the relevant Privacy Notice regarding the processing of personal data about clients and other business contacts at www.squirepattonboggs.com.

Squire Patton Boggs (US) LLP is part of the international legal practice Squire Patton Boggs, which operates worldwide through a number of separate legal entities. Please visit www.squirepattonboggs.com for more information.

#US

11

# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SORRENTO THERAPEUTICS, INC., *et al.*[1] | ) | Case No. 23-90085 (DRJ) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**SCILEX HOLDING COMPANY'S <u>EMERGENCY</u> MOTION FOR ENTRY OF AN
ORDER COMPELLING THE PRODUCTION OF BOOKS AND RECORDS FROM THE
BROKERAGE FIRMS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE**

> **Emergency relief has been requested. Relief is requested not later than November 10, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Scilex Holding Company ("<u>Scilex</u>"), by and through their undersigned counsel, as party in interest in the above-captioned case, hereby respectfully moves this Court for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") compelling written responses to certain Information Requests (as defined below) from the brokers, dealers, banks and other nominees listed on <u>Exhibit A</u> hereto (the "<u>Brokerage Firms</u>"), and third parties including the Depository Trust Clearing Corporation ("<u>DTCC</u>"), Broadridge Financial Solutions Inc ("<u>Broadridge</u>") and the Financial Industry Regulatory Authority ("<u>FINRA</u>") listed on <u>Exhibit A</u>. In support of this motion (the "<u>Motion</u>"), Scilex respectfully states as follows:

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

**Jurisdiction**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief sought herein are 11 U.S.C. § 105(a), Bankruptcy Rules 2004 and 9016, and Federal Rules of Civil Procedure 30, 31 and 45.

3.     Pursuant to this *Court's Order Granting Debtors' Motion to Quash Notice of Examination of Sorrento Therapeutics, Inc. Pursuant to Bankruptcy Rule 2004* [Docket No. 161], Scilex is seeking this relief by motion, in strict compliance with Bankruptcy Rule 2004.  Given the Court's temporary suspension of Bankruptcy Local Rule 2004-1, the Debtors did not seek to meet-and-confer with the Brokerage Firms prior to filing the Motion.

**Background**

4.     On February 13, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Mohsin Meghji, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions* [Docket No. 5] (the "First Day Declaration").

5.     The Debtors' most significant and valuable asset was and is an equity interest in Scilex Holding Company ("Scilex"), which is a publicly traded company on the NASDAQ.  On February 10, 2023, the last business day before the Petition Date, Scilex had a closing trading price of $9.61 which made Sorrento's approximately 59 million shares of common stock of Scilex (the "Scilex Common Stock") and approximately 29 million shares of Scilex Series A Preferred Stock (the "Scilex Preferred Stock") worth a combined total of approximately $850 million.  (First Day

**PAGE 2 OF 25**

Declaration ¶ 12 [Docket No. 5].)  Immediately following a merger involving Scilex in November 2022, Sorrento owned 96.2% of Scilex Common Stock, which was subject to a 180-day lock-up agreement.  Pursuant to the terms of the Amended and Restated Registration Rights Agreement of Scilex, dated November 10, 2022, Sorrento was restricted from transferring its shares of Scilex Common Stock until May 11, 2023, subject to certain exceptions specified therein (including dividends).

6.       On January 23, 2023, the Debtor distributed a dividend to its shareholders of 76,000,000 shares of Scilex Common Stock (the "Scilex Dividend Shares" or "Dividend Shares").  The issuance of the Dividend Shares reduced Sorrento's ownership interest in Scilex Common Stock from 96.2% to 42.5%.  The Dividend Stock was received by each "record owner," who were brokers, dealers, banks and other nominees acting as agents for the shareholders (*e.g.*, the "Beneficial Owners").  The Brokerage Firms held, in the aggregate, approximately 89.5% of the shares of Dividend Stock that were transferred to the Sorrento shareholders pursuant to the Sorrento Dividend.  The Brokerage Firms, as record owners, held the shares of Scilex distributed under the Sorrento Dividend in custody as agents for the Sorrento shareholders, who were the Beneficial Owners.   Sorrento shareholders who received the Dividend Stock were similarly restricted from transferring the Dividend Stock until May 11, 2023.

7.       In anticipation of its annual shareholder meeting which was to occur on April 6, 2023, Scilex determined that the record date for the shareholders entitled to receive notice of and vote at the annual shareholder meeting was March 6, 2023 (the "Meeting Record Date").  Scilex filed proxy materials with the Securities and Exchange Commission ("SEC"), in compliance with its obligations under the federal securities laws.  Contrary to normal practice, however, the proxy materials mandated to be delivered to the Beneficial Owners of more than 44,000,000 shares of

PAGE 3 OF 25

Scilex Common Stock had not been delivered.  The brokers, dealers, banks and other nominees that act as agents for the Sorrento shareholders had failed to report the ownership of such shares to Broadridge Financial Solutions, Inc. ("Broadridge"), the entity designated to collect, verify, and tabulate shareholder votes for the annual meeting.  *See* Scilex Press Release dated March 27, 2023.[2] Sorrento, as the owner of a majority of shares of Scilex, after taking into account the voting power of the Scilex Preferred Stock that is held by Sorrento, was therefore faced with a corporate governance dilemma—a substantial number of minority shareholders of Scilex may have been disenfranchised by the inexplicable failure of the Brokerage Firms to report all holdings of Scilex Common Stock (notwithstanding their obligation to do so) and to deliver proxy materials in compliance with federal securities laws, thereby impairing the ability to operate (and thus the value) of Sorrento's largest asset.

8.      On March 31, 2023, the Debtor filed *Debtors' Emergency Motion for Entry of an Order Compelling Written Responses from Brokerage Firms Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* [Docket No. 330] (the "Rule 2004 Motion"). The Rule 2004 Motion sought, *inter alia*, an order compelling Brokerage Firms[3] to provide written responses to Information Requests (as defined below) on or before April 5, 2023. The Information Requests sought information regarding which the Brokerage Firms had failed to report, or had underreported, the ownership of Scilex Common Stock so that they may seek to remedy such failure and its effect on Scilex's stock value. As the Rule 2004 Motion explains, the Debtors

---

[2]      Available at https://www.scilexholding.com/scilex-holding-company-reports-substantial-underreporting-of-more-than-44-million-shares-of-its-common-stock-by-brokerage-firms-for-the-upcoming-annual-meeting-of-stockholders-scheduled-for-april-6-2/.

[3] The Brokerage Firms listed herein is more expansive than the Brokerage Firms listed in the prior Rule 2004 Motion, as such reference made to the prior Rule 2004 Motion Brokerage Firms refers to some but not all of the Brokerage Firms listed in the present motion.

believed that a substantial number of minority shareholders of Scilex may have been actually or functionally disenfranchised by the Brokerage Firms' failure to report all holdings of Scilex Common Stock and to deliver proxy materials in compliance with federal securities laws. On April 11, 2023, the Court entered an order approving the Rule 2004 Motion. *See Amended Order Granting Debtors' Rule 2004 Motion* [Dkt. No. 395].

9. The Debtors received few responses to their Information Requests from the Brokerage Firms. On May 11, 2023, the Official Committee of Equity Securities Holders (the "Equity Committee") of the Debtors filed *Official Committee of Equity Securities Holders' Emergency Motion Seeking to Compel Certain Brokerage Firms' Compliance with Various Regulatory Requirements* [Docket No. 594] ("Equity Committee's Motion"), stating that, based on information provided by the Debtors, it "understands that nearly all responses were inadequate, incomplete, and/or did not resolve the uncertainties surrounding the reporting of Scilex Common Stock." ¶ 10. The Equity Committee's Motion sought to compel the Brokerage Firms to ensure Scilex stock was properly recorded and segregated in their customers' accounts in compliance with applicable regulatory requirements. *See id.* ¶ 12. On May 12, 2023, the Court entered an order granting, in part, the Equity Committee's Motion. *See Order Compelling Brokerage Firms' Compliance with Various Regulatory Requirements* [Docket No. 609]. Following this Order, the Brokerage Firms still have not provided sufficient responses, as explained in more detail below, and uncertainties surrounding the reporting of Scilex Common Stock still remains.

10. On September 21, 2023, the Debtors filed their *Notice of Closing of Scilex Stock Sale and Related Definitive Documentation* [Docket No. 1356] confirming the sale of 60,068,585 shares of Scilex Common Stock, 29,057,097 shares of Scilex Series A Preferred Stock, and 1,386,617 in exercisable warrants of Scilex common stock to Scilex for the aggregate purchase of

$100,000,000.00 (through an assumption of the Oramed debtor in possession financing), credit bid pursuant to section 363(k) of the Bankruptcy Code, $5 million dollars as an advance of payment, and additional $5 million dollars to be paid at closing (the "Scilex Transaction"). The value of Scilex stock as contemplated through the Scilex Transaction was $1.23/share. Accordingly, Scilex stock, Debtor's most significant asset, lost $8.38 per share, or about 87% of its value from the Petition Date to the date the stock was sold in the Scilex Transaction. Scilex believes that this loss resulted from the Brokerage Firms naked short selling Scilex stock and the Scilex Transaction was made into a manipulated market. This significantly damaged Scilex and Debtor's bankruptcy estate and the damage is at least partially attributable to Brokerage Firm's illegal acts.

11. By this motion, Scilex, as a party in interest, renews the requests for information from Brokerage Firms that were sought in the Rule 2004 Motion and Equity Committee Motion, and already ordered by this Court to be provided, to obtain information sufficient to determine whether Brokerage Firms participated in naked short selling that damaged Scilex and Debtor's bankruptcy estate.[4] Debtors and Equity Committee have no objection to the present motion.

### a. *Short Selling*

12. There is a fundamental difference between naked short selling and short selling. Short selling is a legitimate trading strategy that is regulated by the SEC. Short selling occurs when a market participant, who does not own any shares of a company, believes that the security is overpriced and is on the verge of declining in price. In order to lawfully profit from the projected drop in share price, the short seller will place an order to sell with its broker, shares that it does not own.

---

[4] On information and belief, Debtors lacked the funding to continue the pursuit of information from Brokerage Firms, so Scilex, by and through its attorneys, brings the present motion as a party in interest.

**PAGE 6 OF 25**

13.     After locating and selling the shares that it has borrowed, the short seller will "cover" the sale by buying in the open market the same amount of shares it originally borrowed and sold, at a market price that is lower than the price it paid to the lender to borrow the shares, and return the shares to the lender.  The profit a short seller earns is the difference between the price at which it sold the borrowed shares and the price it paid to repurchase the shares that are returned to the lender, net of borrowing costs and commissions paid to the lender.

14.     The SEC describes short selling as follows:

> A short sale is the sale of a security that the seller does not own and any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, usually from a broker-dealer or an institutional investor. Typically, the short seller later closes out the position by purchasing equivalent securities on the open market and returning the borrowed security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of an economic long position in the same security or in a related security.[5]

### b.     Regulation SHO

15.     As trading technology and strategies evolved and became more sophisticated, the SEC adopted Regulation SHO in 2004 ("Reg SHO"), it went into effect January 1, 2005.[6]  The primary impetus for the adoption of Reg SHO was to address the SEC's concerns regarding persistent fails to deliver and abusive naked short selling caused by those fails to deliver.[7] Reg SHO adopted a multi-faceted approach for dealing with manipulative naked short selling. Reg SHO Rule 203 (b)(i) prohibits a broker from accepting a short sale order of an equity security unless the broker has 1) borrowed the security; 2) entered into a bona-fide arrangement to borrow

---

[5] S.E.C., Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO, https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

[6] See Regulation SHO, Exchange Act Release No. 50,103, 69 Fed. Reg. 48,008, 48,008 (Aug. 6, 2004) (codified at 17 C.F.R. §242.200-.203); S.E.C., Key Points About Regulation SHO, https://www.sec.gov/investor/pubs/regsho.htm.

[7] See S.E.C., Key Points About Regulation SHO, https://www.sec.gov/investor/pubs/regsho.htm.

the security, or 3) has reasonable grounds to believe that a security can be borrowed so it can be timely delivered on the delivery date ("Locate Requirement"). Additionally, Reg SHO requires that if the seller fails to deliver the shares to the buyer, by a certain date, the short sale transaction is to be "closed out."

### c. Naked Short Selling

16. Naked short selling is an unlawful form of market manipulation where a short seller does not borrow or arrange to borrow the securities in time to make delivery within the standard two day settlement period (known as "failure to deliver" or "fail").[8] The naked short seller fails to deliver the shares to the buyer within two days and never purchases the shares in the market to cover their position and deliver the shares to the buyer. Rather, in a naked short selling scheme, "Phantom" or "Counterfeit" shares are essentially being sold to an unsuspecting buyer. As explained *infra*, prolonged failures to deliver caused by manipulative naked short selling violate federal securities laws.[9]

17. By failing to deliver the stock for a prolonged period, the buyer is prevented from actually owning shares. The buyer instead receives an electronic book entry denoting ownership of the shares, but no actual shares support the entry. This also allows millions of shares to be sold that are not real, and in fact, are unregistered and counterfeit.

18. In November of 2007, former SEC Chairman Harvey Pitt derided the practice of naked short selling, stating: "Phantom shares created by naked shorting are analogous to counterfeit money." Similarly, during a February 14, 2008 Senate Banking Committee Hearing, Senator Robert Bennett commented that through naked short selling it is becoming "increasingly

---

[8] *See* S.E.C., *Key Points About Regulation SHO*, https://www.sec.gov/investor/pubs/regsho.htm.

[9] *Id.*

. . . easier in this electronic world to give you counterfeit shares." The SEC also reaffirmed its ". . . zero tolerance for abusive naked short selling" by strengthening investor protection. Indeed, the SEC has recognized that "selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the security's price" constitutes a "manipulative activity" that "in general, would violate various securities laws."[10]

19.     The pernicious effects of naked short selling have been described by the SEC as follows:

> [W]e are concerned that large and persistent fails to deliver may have a negative effect on the market in these securities. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership, such as voting and lending. In addition, where a seller of securities fails to deliver securities on trade settlement date, in effect the seller unilaterally converts a securities contract (which should settle within the standard 3-day settlement period) into an undated futures-type contract, to which the buyer may not have agreed, or that may have been priced differently. Moreover, sellers that fail to deliver securities on trade settlement date may enjoy fewer restrictions than if they were required to deliver the securities within a reasonable period of time, and such sellers may attempt to use this additional freedom to engage in trading activities that deliberately and improperly depress the price of a security.
>
> In addition, many issuers and investors continue to express concern about extended fails to deliver in connection with "naked" short selling. To the extent that large and persistent fails to deliver might be indicative of manipulative "naked" short selling, which could be used as a tool to drive down a company's stock price, fails to deliver may undermine the confidence of investors. These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct. In addition, issuers may believe that they have suffered unwarranted reputational damage due to investors' negative perceptions regarding large and persistent fails to deliver. Any unwarranted reputational damage caused by large and persistent fails to deliver might have an adverse impact on the security's price . . . .[11]

20.     In other words, a prolonged failure to deliver shares effectively allows the naked short seller to deliver the shares at a future date that is in its best interest, rather than settle within

---

[10] *Id.*; *see also* SEC Release No. 34-.57511, p. 3, File No. S7-08-08 (Mar. 17, 2008).

[11] *See* SEC Release No. 34-56212, *available at*: https://www.sec.gov/files/rules/final/2007/34-56212.pdf.

two days (as now required by delivery obligations, with certain exceptions). Naked short selling also allows manipulative traders to flood the market with sales of a targeted company's shares which can drive the price of a stock down. Published academic research has shown that stocks with high and/or persistent fails-to-deliver tend to experience depressed stock prices in the form of negative abnormal returns.[12] The rules of supply and demand dictate that if there is a constant supply of short sales without any corresponding limit on the supply, caused by traders short selling "naked" or without any corresponding locate of shares, then the apparent number of trading shares will increase, and the price of the shares will drop. Doing so also allows the naked short seller to cover its short at a profitable price.

21. Naked short selling activity can specifically impact a company and its shareholders by increasing manipulative power for naked short sellers, resulting in a significant decrease in a company's stock price, and by causing corporate governance issues and dilution of a shareholder's governance rights. For shareholders, a depressed share price may cause the company to reduce or eliminate dividend payments, damage retirement savings and pension funds, make it more difficult to use stock portfolio as collateral to secure loans or increase the interest rate charges, or force a borrower to liquidate those or other assets if stock portfolios are used as collateral to avoid defaulting on a loan.[13]

22. Recognizing the pernicious effect that naked short selling has on the marketplace, the SEC has brought enforcement actions against some of the largest brokers in the U.S. and Canada. The following are examples of these enforcement actions:

---

[12] Stratmann and Welborn, 2016, "Informed short selling, fails-to-deliver, and abnormal returns," *Journal of Empirical Finance* 38.

[13] Robert Shapiro, *Memorandum on the Impact of a Falling Stock Price on Shareholders* (May 27, 2021), https://nakedtruth.info/wp-content/uploads/2021/09/How-a-Manipulated-Stock-Affects-a-Company-and-Its-Shareholders-Shapiro-Sonecon-May-27-2021.pdf.

(1) In 2023, Citigroup Global Markets Inc. ("Citigroup") agreed to pay a fine of $1,500,000 to settle charges by FINRA contending that since at least January 1, 2014, Citigroup violated Regulation SHO and FINRA rules by improperly including securities positions of non-broker-dealer affiliates in two of its aggregation units when calculating the net positions of the aggregation units, and failing to establish, maintain, and enforce, a supervisory system reasonably designed to achieve compliance with Regulation SHO.[14]

(2) In 2020, Morgan Stanley & Co. LLC ("Morgan Stanley") agreed to pay a $5,000,000 penalty for Reg SHO violations.[15] Per the SEC, Morgan Stanley hedged synthetic exposure to swaps by purchasing or selling the securities referenced in the swaps, and it separated its hedges into two aggregation units – one holding only long positions, and the other holding only short positions.[16] According to the order, Morgan Stanley was able to sell its hedges on the long swaps and mark them as "long" sales without concern for Reg SHO's short sale requirements.[17] Morgan Stanley improperly marked certain sell orders in violation of Reg SHO.[18] The Chief of the Complex Financial Instruments Unit of the SEC stated: "For many years, Morgan Stanley has improperly relied on Reg SHO's aggregation unit exception, resulting in orders being mismarked for countless transactions."[19]

(3) In 2022, UBS Securities, LLC ("UBS") was fined $2.5 million by FINRA for Regulation SHO violations and supervisory failures spanning a period of nine years.[20] FINRA found that from 2009 to 2018, UBS failed to timely close out

---

[14] Financial Industry Regulatory Authority Letter Of Acceptance, Waiver, And Consent, No. 2018057494001, Citigroup Global Markets Inc. to Department of Enforcement Financial Industry Regulatory Authority (December 8, 2022), *available at:* https://www.finra.org/sites/default/files/fda_documents/ 2018057494001%20Citigroup%20Global%20Markets%20Inc.%20CRD%20%207059%20AWC%20gg%20%2820 23-1673741994821%29.pdf.

[15] *In the Matter of Morgan Stanley & Co. LLC*, Administrative Proceeding File No. 3-20103, Release No. 90046, September 30, 2020, Order Instituting Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, *available at:* https://www.sec.gov/files/litigation/admin/2020/34-90046.pdf; *Morgan Stanley Agrees to Pay $5 Million for Reg SHO Violations in Prime Brokerage Swaps Business*, September 30, 2020, https://www.sec.gov/news/press-release/2020-238.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Financial Industry Regulatory Authority Letter Of Acceptance, Waiver, And Consent, No. 2018059146501, UBS Securities LLC to Department of Enforcement Financial Industry Regulatory Authority (September 7, 2022), *available at:* https://www.finra.org/sites/default/files/2022-10/UBS-Securities-AWC-100422.pdf; *FINRA Fines UBS Securities $2.5 Million for Regulation SHO Violations and Supervisory Failures*, Ray Pellecchia, October 4, 2022, https://www.finra.org/media-center/newsreleases/2022/finra-fines-ubs-securities-25-million-regulation-sho-violations#:~:text=WASHINGTON%E2%80%94FINRA%20announced%20today%20that,a% 20period%20of%20nine%20years.

at least 5,300 failure to deliver positions and routed or executed more than 73,000 short sales in securities with an unsatisfied close-out requirement without first borrowing or arranging to borrow the shares.[21] FINRA also found that from 2009 to August 2022, UBS's supervisory systems, including its written procedures, were not reasonably designed to achieve compliance with Rule 204 of Regulation SHO.[22]

(4) In 2016, Goldman, Sachs & Co. ("Goldman") was fined $15 million by the SEC for allowing short sale locate requests to be handled by an automated model that either would unreasonably grant, in whole or in part, the locates on an automated basis.[23] Goldman employees could (and 98% of the time did) simply by-pass the locate requirements of Regulation SHO by simply hitting "F3" to autolocate the shares—even if they had no reasonable basis for believing the shares were actually located.[24] The auto-locates reached more than 20,000 locates (not shares) per day.[25] The Director of the SEC's Enforcement Division stated: "The requirement that firms locate securities before effecting short sales is an important safeguard against illegal short selling… Goldman Sachs failed to meet its obligations by allowing customers to engage in short selling without determining whether the securities could reasonably be borrowed at settlement."

(5) In 2023, Goldman was fined $3,000,000 by FINRA for mismarking short sale orders.[26] FINRA contended that from October 2015 to April 2018, Goldman mismarked around 60 million short sale orders, totaling more than 14 billion shares, as long sales, with nearly 8 million of those orders, totaling more than a billion shares, being executed.[27]

(6) In 2015, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corporation ("Merrill Lynch") were fined $9 million by the SEC, and were required to pay $1,566,245.67 in disgorgement and

---

[21] *Id.*

[22] *Id.*

[23] *In the Matter of Goldman, Sachs & Co.*, Administrate Proceeding File No. 3-17053, Release No. 76899, January 14, 2016, Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, *available at:* https://www.sec.gov/files/litigation/admin/2016/34-76899.pdf; *SEC Charges Goldman Sachs With Improper Securities Lending Practices*, January 14, 2016, https://www.sec.gov/news/press-release/2016-9.

[24] *Id.*

[25] *Id.*

[26] Financial Industry Regulatory Authority Letter Of Acceptance, Waiver, And Consent, No. 2018059146501 from Goldman Sachs & Co. LLC to Department of Enforcement Financial Industry Regulatory Authority (April 4, 2023), *available at:* https://www.finra.org/sites/default/files/fda_documents/2018059146501%20Goldman%20Sachs%20%26%20Co.%20LLC%20CRD%20361%20AWC%20lp%20%282023-1683246001785%29.pdf.

[27] *Id.*

$334,564.65 in prejudgment interest.[28] Merrill Lynch unreasonably relied on "Easy-to-Borrow" lists as a reasonable basis for locating securities even when Merrill Lynch knew such lists were outdated or countervailing factors had changed whether the shares would be easy-to-borrow.[29] As such, Merrill Lynch provided millions of locates for short sales without a reasonable basis for believing that the shares would be available for deliver.[30] This, in effect, caused its customers' short sales (as well as Merrill Lynch's own proprietary trading) to be "naked."

(7) Again in 2021, Merrill Lynch, Pierce, Fenner & Smith Incorporated was fined $850,000.00 for Regulation SHO violations.[31] FINRA found that from September 2013 until July 2016, Merrill violated Regulation SHO by improperly netting the trading activity of five affiliated broker-dealer customers when determining their close-out obligations and claiming pre-fail credit to eliminate fails to deliver.[32] FINRA also found that from January 2005 until January 2015, Merrill violated Regulation SHO by including securities positions held by Merrill's foreign and non-broker-dealer affiliates when calculating the net positions of two independent trading units.[33]

(8) In 2023, the SEC settled charges against Citadel Securities LLC ("Citadel") for violating Regulation SHO, the regulatory framework designed to address abusive short selling practices.[34] Specifically, Regulation SHO requires broker-dealers to mark sale orders as long, short, or short-exempt.[35] Mark Cave, Associate Director of the SEC's Division of Enforcement said about this

---

[28] *In the Matter of Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corporation*, Administrative Proceeding File No. 3-16567, Release No. 75083, June 1, 2015, Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, *available at:* https://www.sec.gov/files/litigation/admin/2015/34-75083.pdf & https://www.sec.gov/news/press-release/2015-105.

[29] *Id*.

[30] *Id*.

[31] Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 2016050801702, Re: Merrill Lynch, Pierce, Fenner, & Smith Inc. (Respondent) (Oct. 6, 2021), *available at:* https://www.finra.org/sites/default/files/fda_documents/2016050801702%20Merrrill%20Lynch%2C%20Pierce%2C%20Fenner%20%26%20Smith%20Inc.%20CRD%207691%20AWC%20jlg%20%282021-1636158009040%29.pdf.

[32] *Id*.

[33] *Id*.

[34] *In the Matter of Citadel Securities, LLC*, Administrative Proceeding File No. 3-21703, Release No. 98482, September 22, 2023, Order Instituting Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, *available at:* https://www.sec.gov/files/litigation/admin/2023/34-98482.pdf; *SEC Charges Citadel Securities for Violating Order Marking Requirements of Short Sale Regulations*, September 22, 2023, https://www.sec.gov/news/press-release/2023-192.

[35] *Id*.

requirement: "Compliance with the order marking requirements of Reg SHO is a key component of regulatory efforts to curtail abusive market practices, including 'naked' short selling."[36] The SEC contends that from September 2015 through September 2020 Citadel incorrectly marked millions of orders, marking short sales as long and vice versa.[37] Citadel agreed to a cease-and-desist order imposing a censure and a $7,000,000 penalty.[38]

### d.      *Recent Decision Concerning Broker Liability*

23.      In a recent decision issued by Judge Lorna Schofield of the Southern District of New York, entitled *Harrington Global Opportunity Fund, Limited v. CIBC World Markets Corp., et al.*, No. 21 CIV. 761 (LGS), 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023), the court viewed brokers as gatekeepers of the markets who have an obligation to monitor, surveille, and prevent their customers from engaging in fraudulent trading conduct. The court held that if a broker either knowingly or recklessly ignores the unlawful conduct of their customers, they can be held primarily liable. This decision strips the brokers of the affirmative defense that they are not liable for their customer's fraudulent conduct.

### e.      *Limited and Incomplete Responses by Brokerage Firms Indicate Potential Regulatory Violations*

24.      In response to the prior motions, certain Brokerage Firms appear to have coordinated their responses and produced incomplete, non-responsive, illegible, non-ESI documents, thereby necessitating the instant Rule 2004 Motion. The documents produced by the majority of the Brokerage Firms contained only limited positions in Scilex stock, with no explanation of how to interpret this data. The Brokerage Firms were required to produce the data in the aggregate which they failed to provide. No other data responses were provided, including stock loan data.

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

25.     Based upon the limited and incomplete information and data that has been produced by the Brokerage Firms and from publicly available data, it appears that restricted shares were either sold (long or short) or lent by the Brokerage Firms and others. Under either circumstance, a violation of SEC Rule 144 and/or Reg SHO may have occurred. Through the Information Requests, material facts will be ascertained that will resolve this issue as a matter of law. Brokerage Firms are primarily liable for the unlawful use of these and any restricted shares. Under no circumstance can restricted shares be used for regular trading or lending purposes. Additionally, an important issue with the production by the Brokerage Firms is that the production is mixing CUSIPs. Some provide data on 808CNT018 (SCLXZZZ—which are the restricted dividend shares), while others provide data on 80880W106 (SCLX—which are the unrestricted common shares). The Brokerage Firms must produce data that specifically delineate between the restricted dividend shares and the unrestricted common shares.

26.      Specifically, a review of the information provided by the Brokerage Firms to date showed the following:

- Merrill Lynch, Pierce, Fenner & Smith Incorporated provided their entire stock record, rather than just the customer positions requested, and defined nothing in the record. This makes it impossible to determine what was a position long or short and what is a firm offset account like DTCC, CNS or the Transfer agent account holding the restricted shares.

- Morgan Stanley & Co., LLC provided a document for what appears to be Morgan Stanley & Co.'s participant numbers 50 and 7309, with a summary including a short position total and a stock borrow total, which it claims was to cover the shorts. However, this apparent short and borrow should not be possible as the shares were restricted.

- Morgan Stanley Smith Barney provided a spreadsheet which contained a total of 558,888 shares on March 6, 2023, but their participant entry for that date was for 483,428 shares--which is 75,460 shares less than what their position report states.

- JP Morgan Clearing provided information that revealed it has negative entries that total 2,120,947, but these do not balance with the long of 961,386 shares.

**PAGE 15 OF 25**

- Interactive Brokers LLC provided positions for restricted and unrestricted, trades for unrestricted and the initial positions from the dividend. The anonymized accounts do not match each different file, as if each was anonymized stand alone and not done a common conversion.

27. Further, the information provided by some Brokerage Firms to date demonstrates that Brokerage Firms were showing short Scilex dividend shares due to failing to receive those shares from some counter party. While some fail-to-receive ("FTR") positions were documented, no corresponding fail-to-deliver ("FTD") positions were documented in the original production by Brokerage Firms. The FTRs indicate that Brokerage Firms were lending Sorrento stock over the record date. When Sorrento shares were lent over the record date, Scilex dividend shares could not arrive in the account(s) of the true beneficial owners. The restricted Scilex dividend shares would be delivered to the holder of record on the record date of January 9. Sciliex believes the lending of Sorrento shares over the record date created naked short positions of Scilex stock.

28. Both the Debtor and Scilex are interested parties in discovering documents and other information that may lead to establishing liability against the Brokerage Firms and others, thereby realizing a financial recovery for the damages suffered as a result of this unlawful conduct.

29. Scilex verily believes that as a result of the Brokerage Firms' market manipulation schemes, the value of Debtor's largest and most valuable asset, Scilex stock, has been damaged. The information requested from Brokerage Firms by this Motion would confirm whether Brokerage Firms possess the Scilex Common Stock, and if not, would demonstrate Brokerage Firms' participation in illegal market manipulation, resulting in a loss of value of Scilex stock and substantial damage to Scilex, Debtors, and Debtors' bankruptcy estate. Specifically, Scilex stock lost $8.38 per share, or about 87% of its value from the Petition Date to the date the stock was sold in the Scilex Transaction. Scilex believes this sale was made into a manipulated market and that

the loss resulted from, and is at least partially attributable to, the Brokerage Firm's naked short selling of Scilex stock.

## Relief Requested

30.     Scilex seeks entry of an order, substantially in the form attached hereto (the "Proposed Order"), compelling the Brokerage Firms and other third parties to provide written responses to the requests set forth below (collectively, the "Information Requests") on or before November 10, 2023.

31.     The Information Requests are intended to provide Scilex with information regarding which Brokerage Firms have failed to report or have underreported the Scilex Common Stock, so that they may seek to remedy such failure, and its effect on the value of Scilex stock and Scilex's ability to operate, in the near term.  The Information Requests are as follows:

**To Brokerage Firms:**

Request 1: State the aggregate number of shares of Scilex Common Stock, reported daily since January 9, 2023 (the "Dividend Record Date"), held by the Brokerage as record owner, beneficial owner, or in any other capacity, each reported separately.  As to each customer or client account, state the number of shares of Scilex Common Stock held by the Brokerage, reported daily, by account, on an anonymized basis (referencing each account by a new alpha-numeric name), since the date of the Sorrento Dividend.

Request 2: As to each customer or client account, by account, on an anonymized basis, using the same anonymized alpha-numeric name above state: (1) the number of shares of Scilex Common Stock on the Dividend Record Date, and the number of shares of Dividend Stock such account is eligible to receive (based on pending trades or dividends); and (2) on March 6, 2023 (the "Scilex Shareholder Meeting Record Date"): (a) the number of shares of Dividend Stock held in the account; (b) the total number of shares of Scilex Common Stock held in the account; (c) the number of shares of Dividend Stock that the account is eligible to receive (based on pending dividends); and (d) the number of shares of Scilex Common Stock that the account is eligible to receive (based on pending trades or other dividends).

Request 3: State the aggregate number of shares of Scilex Common Stock, reported separated on a daily basis, traded by or within the Brokerage, (1) on behalf of customers or beneficial owners, and, separately, and (2) as principal, for the

**PAGE 17 OF 25**

Brokerage's own account, or otherwise, between the Dividend Record Date and the present.

Request 4: As to each customer or client account, on an anonymized basis, using the same alpha-numeric name above, state the number of shares of Scilex Common Stock purchased on or after the Record Date.

Request 5: As to each such customer or client account, on an anonymized basis, using the same alpha-numeric name above, (1) state whether the account is part of a stock loan program or whose shares are otherwise eligible to enter into stock loan transactions, and (2) state the number of shares of Scilex Common Stock loaned attributed to such account on a daily basis from the Record Date to the present.

Request 6: Order and Trade data: Should include, but not be limited to records reflecting the original order and subsequent changes and/or trade executions with all the required information (ie: sell short, agency/principal, Solicited/unsolicited, all timestamps, etc.)

Request 7: Stock Locate records: Should include, but not be limited to records reflecting the stock locates provided by the stock loan desk on short sales and the required documents reflecting the locate requested by the trade originator. These records should include the time of entry and in the case of locates, the expiration time of the availability of the stock to be borrowed.

Request 8: Affirmative Determination records: Should include, but not be limited to records reflecting affirmative determination as to the location of the stock being sold as required in a long sale.

Request 9: Stock Record: Should include, but not be limited to records reflecting the daily positions and control locations of all accounts within the firm (i.e. firm, control, operations, customer, fail, suspense accounts etc.). These records would reflect the full daily two-sided debit/credit balancing of the stock.

Request 10: Stock Record Debit/Credit Journals: Should include, but not be limited to journal records reflecting both the debit and credit non-trade movements of cash and securities between stock record accounts. These records should reflect both the debit and credit sides in a single offsetting entry.

Request 11: Stock Loan/Borrow records: Should include, but not be limited to records that reflect the borrowing and lending of securities, including the borrow/lend rate, the date of the loan or borrow and the closeout date. These records should also include any and all records that source the borrow or loans back to customer accounts or other source accounts with a full accounting of the stock movements.

Request 12: Easy to Borrow/Hard to Borrow records: Should include, but not be limited to the daily list generally created by Stock Loan Departments reflecting

**PAGE 18 OF 25**

stocks that were either easy to borrow or hard to borrow. This could potentially be two separate lists depending on firm procedures.

Request 13: Produce all records evidencing loans and borrows by and to Brokerage Firms in Sorrento stock (SRNEQ) over the record date of January 9, 2023.

## To the DTCC:

Request 1: CNS Accounting Summary: Records reflecting daily fail to deliver and fail to receive positions by participant (broker).

Request 2: Consolidated Trade Summary: Records reflecting daily bought and sold share totals for each exchange by participant(broker).

Request 3: Correspondent Clearing Data: Records reflecting daily bought and sold transactions between for each exchange by and between participants(brokers) utilizing the Correspondent Clearing system to transfer shares and money between participants(brokers).

Request 4: DTCC Participant Daily Activity Statement: Records reflecting all movements and activities of shares and money by and between participants(brokers) at DTCC.

## To FINRA:

Request 1: FINRA CAT Data: Consolidated Audit Trail ("CAT") data records reflecting the lifespan transactions of orders from origination to completion capturing all relevant information (i.e. broker info, customer info, long or short indicators, unique ID etc.), with precision timestamps. These records will also reflect but are not limited to cancel/replaces, order forwarding, executions, and expired orders etc.

Request 2: Short Interest Data (Broker Level): Records reflecting the total short interest shares reported to FINRA, twice a month, with broker level detail.

### Basis for Relief

32.     Bankruptcy Rule 2004(b) provides that, upon the motion of any party in interest, this Court may order the examination of any person relative to (a) the acts, conduct, property, liabilities or financial condition of the Debtors, (b) any matter that may affect the administration of the Debtors' estates, (c) the operation of the Debtors' businesses and the desirability of its continuance, (d) the source of money or property acquired or to be acquired for the purpose of

consummating a plan of reorganization and the consideration given or offered therefor, and (e) any other matter relevant to the case or to the formulation of a plan of reorganization. *See* Fed. R. Bank. P. 2004.

33.     Under Section 105 of the Bankruptcy Code, the Court possesses broad equitable powers to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.  In a reorganization case under chapter 11 of the Bankruptcy Code, Rule 2004 authorizes this Court, on motion of any party in interest, to order the examination of "any . . . matter relevant to the case or to the formulation of a plan."  Fed. R. Bankr. P. 2004(b). The scope of a Rule 2004 examination is "unfettered and broad."  *In re Washington Mut., Inc.,* 408 B.R. 45, 49 (Bankr. D. Del. 2009); *see also In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (noting Rule 2004 examinations may be "very broad"). "Legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred."  *Washington Mut., Inc.,* 408 B.R. at 50 (citation omitted).  "Potential examinees include third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate."  *In re DeWitt*, 608 B.R. 794, 797 (Bankr. W. D. Pa. 2019) (citation omitted). It is well established that a debtor may take a Rule 2004 examination of third parties.  *See, e.g.*, *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) (noting that Rule 2004 "may properly extend to creditors and third parties who have had dealings with the debtor"); *see also In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation.").

34.     Federal Rule of Bankruptcy Procedure 2004(c) provides that compliance may be compelled through Federal Rule of Bankruptcy Procedure 9016, which allows issuance of a

subpoena under Federal Rule of Civil Procedure 45 and a subpoena compelling a deposition through written examination may be issued under Federal Rule of Civil Procedure 45. *See* Fed. R. Bank. Pro. 2004, 9016; Fed. R. Civil Pro. 31, 45. At a hearing in these cases held on March 29, 2023, the Court expressed a willingness to permit the Debtors to request written responses from the Brokerage Firms with respect to requests relating to the shares of Scilex Common Stock, which will be a much more efficient process than seeking oral examination and/or the production of documents relating to the topics of the Information Requests.

35. Scilex's requests fall squarely within the scope of a Bankruptcy Rule 2004 examination, are fully consistent with the Court's authority under section 105(a) of the Bankruptcy Code, and are supported by the foregoing authorities:

a. Sorrento's most significant asset is its majority of the common shares in Scilex. The value of the shares of Scilex Common Stock and Scilex Preferred Stock is intertwined with the ability of Scilex to govern itself and operate as a legal entity. Thus, information regarding the impediments to that governance relates to "property . . . of the Debtors."

b. Further, to the extent Sorrento may seek to monetize its shares of Scilex Common Stock and/or Scilex Preferred Stock, either through a sale pursuant to section 363 of the Bankruptcy Code or through a plan of reorganization, information bearing on the potential depression of the value of Scilex Common Stock resulting from not knowing who owns and can vote a substantial number of shares of such stock, certainly constitutes a "matter that may affect the administration of the Debtors' estates," relates to a "source of money or property acquired or to be acquired for the purpose of consummating a plan of reorganization and the consideration given or offered therefor," and is "relevant to the case or to the formulation of a plan of reorganization."

c.  Moreover, due to the restriction prohibiting the actual transfer by Sorrento shareholders of the Dividend Stock, the Brokerage Firms should still retain such shares within their platform.  Their failure to report such shares to Broadridge may result in a failure to deliver proxy materials to Scilex shareholders in violation of federal securities laws and applicable regulations that require the delivery of such proxy materials.  The information requested herein thus assists the goal of "determining whether any wrongdoing has occurred."

d.  Finally, each Brokerage Firm that has received at least 500,000 shares of Scilex Common Stock pursuant to the Sorrento Dividend, have a pre-existing relationship with Sorrento, given that they are the custodians for shareholders of Sorrento and, in that capacity, received the Dividend Stock that has remained un-reported or under-reported.

36.  For the foregoing reasons, Scilex requests that this Court (a) enter the Proposed Order compelling written responses to the Information Requests from the Brokerage Firms, without prejudice to Scilex's rights to seek further and other forms of discovery from the Brokerage Firms, and (b) grant such other and further relief as this Court deems just and proper under the circumstances.

<u>**Emergency Consideration**</u>

37.  The Debtor's bankruptcy exit plan is to be confirmed on or about November 20, 2023. Therefore, Scilex respectfully requests emergency consideration of this Motion on or before November 10, 2023. Recovery of the value inherent in the shares that have been requested to be produced will directly impact the value of the Debtor's estate. Scilex is funding all expenses and costs associated with this Motion, and therefore, the Debtor's estate will not be responsible or burdened with funding this undertaking.

**Notice**

38.     Scilex will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) counsel to the Unsecured Creditors' Committee; (c) counsel to the Ad Hoc Equity Committee; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorney generals for states in which the Debtors conduct business; (f) the Internal Revenue Services; (g) the Securities and Exchange Commission; (h) the Environmental Protection Agency; (i) other governmental agencies having a regulatory or statutory interest in these cases; (j) the Brokerage Firms; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

Scilex respectfully requests that the Court enter the Proposed Order granting the relief requested

in this Motion and such other and further relief as may be just and proper.


Dated:   October 27, 2023                              By:   /s/ *James Wes Christian*
                                                              James Wes Christian, Esq.
                                                              State Bar No. 04228700
                                                              Ardalan Attar, Esq.
                                                              State Bar No. 24113538
                                                              CHRISTIANATTAR
                                                              2302 Fannin, Suite 500
                                                              Houston, Texas 77002
                                                              Tel: (713) 659-7617
                                                              jchristian@christianattarlaw.com
                                                              aattar@christianattarlaw.com

                                                              Alan M. Pollack, Esq.
                                                              (Pro Hac application to be filed)
                                                              WARSHAW BURSTEIN, LLP
                                                              575 Lexington Avenue, 7th Floor
                                                              New York, New York 10022
                                                              Tel:  212-984-7700
                                                              apollack@wbny.com

                                                              *Counsel for Scilex*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ James Wes Christian*
James W. Christian

## Certificate of Service

I certify that on October 27, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James Wes Christian*
James W. Christian

**PAGE 25 OF 25**

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*[1] | ) ) ) | Case No. 23-90085 (CML) |
| Debtors. | ) ) ) ) | Jointly Administered |

**ORDER**
**[Ref. Dkt. Nos. 1473]**

CAME ON *Scilex Holding Company's Emergency Motion for Entry of an Order Compelling the Production of Books and Records from the Brokerage Firms Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (the "Motion")(Doc. No. 1473),[2] and Scilex Holding Company ("Scilex" or "the Requesting Party") and the Financial Industry Regulatory Authority ("FINRA" or "the Producing Party") (collectively "the Parties") having reached an agreement to resolve the Motion and to avoid further expenditure of resources in connection with this litigation, it is now:

ORDERED, that the following agreement is hereby approved, and it resolves all requests in the Motion directed to FINRA:

1. On or before January 15, 2024, FINRA will produce electronically stored information ("ESI") in FINRA's possession, custody, and control reflecting the gross short interest positions reported to FINRA as required by FINRA Rule 4560, for the following:

   a. Sorrento Therapeutics (Symbols SRNE/SRNEQ) from November 1, 2022 through January 31, 2023;

   b. Scilex commons shares (Symbol SCLX) from December 1, 2022 through September 30, 2023; and

   c. Scilex Warrants (Symbol SCLXW) from December 1, 2022 through September 30, 2023.

---

[1]   The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

[2]   At the initial Rule 2004 Hearing on November 15, 2023, Scilex agreed that, as an initial matter, it would limit its information requests to FINRA and DTCC (before determining whether it would renew its application as to the brokers).

2. FINRA will produce responsive ESI in a reasonably useable format. In the event that the ESI produced by FINRA is not reasonably usable by the Requesting Party, the Requesting Party may request that FINRA make the production in a different format, and FINRA will attempt to reasonably accommodate such request.

3. The Requesting Party will safeguard the ESI produced by FINRA, will keep it non-public, and will use the ESI produced only in connection with this proceeding.

4. The Parties understand, acknowledge, and agree that FINRA's production of ESI in this case does not obligate FINRA to produce the same or similar data in response to requests in other proceedings.

It is further ORDERED that the Court retains jurisdiction over any dispute regarding the subject of this Order.


Signed:  December 15, 2023

_____
Christopher Lopez
United States Bankruptcy Judge


AGREED TO BY:

THE PROBUS LAW FIRM

/s/ Matthew B. Probus
Matthew B. Probus
Tex. Bar No. 16341200
Fed. ID No. 10915

10497 Town and Country Way, Suite 930
Houston, Texas 77024
(713) 258-2700 (Telephone)
(713) 258-2701 (Facsimile)
matthewprobus@theprobuslawfirm.com

OF COUNSEL:

/s/ James Wes Christian
James Wes Christian, Esq.
State Bar No. 04228700 Ardalan Attar, Esq.
State Bar No. 24113538 CHRISTIANATTAR
2302 Fannin, Suite 500
Houston, Texas 77002
Tel: (713) 659-7617
jchristian@christianattarlaw.com aattar@christianattarlaw.com

Alan M. Pollack, Esq.
(Pro Hac Vice)
WARSHAW BURSTEIN, LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel: 212-984-7700
apollack@wbny.com
*ATTORNEYS FOR MOVANT,*
*SCILEX HOLDING COMPANY*


PORTER HEDGES LLP:

*/s/ Eric M. English*
Eric M. English, Esq.
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel: 713-226-6612
eenglish@porterhedges.com
*ATTORNEYS FOR FINRA*