# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (LAS VEGAS)

|  |  |  |
|---|---|---|
| | . | |
| IN RE: | . | Case No. 24-50792-gs |
| | . | Chapter 7 |
| META MATERIALS INC., | . | |
| | . | 300 Las Vegas Blvd. S. |
| | . | Las Vegas, NV 89101 |
| Debtor. | . | |
| | . | Thursday, October 30, 2025 |
| . . . . . . . . . . . . . . . . | . | 10:36 a.m. |

TRANSCRIPT OF DOC# 2088 MOTION TO QUASH NON-PARTY CITADEL
SECURITIES LLC, ANSON FUNDS MANAGEMENT LP, AND VIRTU FINANCIAL,
LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO QUASH AND/OR
FOR A PROTECTIVE ORDER FILED BY RYAN J. WORKS ON BEHALF OF
CITADEL SECURITIES LLC
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

ZOOM APPEARANCES:

| | |
|---|---|
| For Virtu Financial, LLC: | Davis Wright Tremaine LLP<br>By:  SHANAYE CARVAJAL, ESQ.<br>        MICHAEL V. RELLA, ESQ.<br>1251 Avenue of the Americas<br>21st Floor<br>New York, NY 10020<br>(212) 489-8230 |

ZOOM APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Maria Garrett, ECR |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

2

ZOOM APPEARANCES (Continued):

| | |
|---|---|
| For Anson Funds Management LP: | Greenberg Traurig, LLP<br>By:  MICHAEL R. HOGUE, ESQ.<br>     ALAN J. BRODY, ESQ.<br>     SYLVIA E. SIMSON, ESQ.<br>10845 Griffith Peak Drive<br>Suite 600<br>Las Vegas, NV 89135<br>(702) 792-3773 |
| For Citadel Securities LLC: | McDonald Carano<br>By:  JIMMY F. DAHU, ESQ.<br>2300 West Sahara Avenue<br>Las Vegas, NV 89102<br>(702) 873-4100 |
| | Quinn Emanuel Urquhart & Sullivan LLP<br>By:  PETER H. FOUNTAIN, ESQ.<br>295 Fifth Avenue<br>New York, NY 10016<br>(212) 849-7000 |
| For the Trustee: | Hartman & Hartman<br>By:  JEFFREY L. HARTMAN, ESQ.<br>510 West Plumb Lane<br>Suite B<br>Reno, NV 89509<br>(775) 324-2800 |
| | Christian Attar<br>By:  JAMES W. CHRISTIAN, ESQ.<br>1177 West Loop South<br>Suite 1700<br>Houston, TX 77027<br>(713) 659-7617 |
| | Robinson, Sharp, Sullivan & Brust<br>By:  CLAYTON P. BRUST, ESQ.<br>     HANNAH WINSTON, ESQ.<br>71 Washington Street<br>Reno, NV 89503<br>(775) 329-3151 |
| | Schneider Wallace Cottrell Kim LLP<br>By:  DAVID D. BURNETT, ESQ.<br>1050 30th Street Northwest<br>Washington, DC 20007<br>(415) 421-7100 |

3

(Proceedings commence at 10:36 a.m.)

THE COURT:  Please be seated.

Ms. Mendoza, would you go ahead and call the court to order and get us on record, please?

THE CLERK:  Good morning.  This is Maria speaking from the courtroom.  We are now on record for the Court's 10:30 calendar with the Honorable Gary Spraker presiding.

THE COURT:  Thank you, Madam Clerk.

For the record, this is Judge Spraker, as I just mentioned.  We are on record for the 10:30 miscellaneous hearing this morning arising in Meta Materials, Case Number 24-50792, to hear motion to quash non-party subpoenas.  We'll note for the record that this matter is being conducted remotely via Zoom video conference.  More on that in just a moment, but there are no parties or counsel in the courtroom.

So we'll go ahead and begin appearances.  Again, my apologize [sic] as this is my introduction to the case.  I still don't have names and faces with everyone, and we'll get through that.  But let's just start with counsel for the movant party seeking to quash, and when we get through them after appearances, if you would just kindly let me know who is presenting.

You know, just looking at it since Mr. Fountain is standing at a podium, I'm thinking that that may be a clue.  But whoever would like to lead us off on appearances for the

4

movants, please.

MR. DAHU:  Good morning, Your Honor.  Jimmy Dahu on behalf of Citadel Securities, LLC, local counsel.  Peter Fountain will -- is main counsel.  He'll be presenting for Citadel.  And in the conference room with Mr. Fountain is Michelle Chen from Citadel Securities, LLC.

THE COURT:  Thank you, Mr. Dahu.  Good morning.

MR. DAHU:  Good morning.

THE COURT:  Anyone else --

MR. HOGUE:  Morning, Your Honor.

THE COURT:  Go ahead for the movants.

MR. HOGUE:  Good morning, Your Honor.  Michael Hogue, Greenberg Traurig, on behalf of Anson.  With me today is Sylvia Simpson and Alan Brody, pro hac in.  We also have a client representative in the listen-only room as well.  Mr. Brody will be presenting for Anson.  We also have a client representative in the listen-only room as well.  Mr. Brody will be presenting for Anson.

THE COURT:  Thank you.

All right.  Anyone else on the movants?

MS. SIMPSON:  Judge Spraker, this Sylvia Simson, counsel for Anson.  I just wanted to let you know I understand that counsel for Virtu is having trouble accessing into the Zoom.  They are in a waiting room for the email (indiscernible).

5

THE COURT:  And can you tell me who that counsel is just so I can, you know, look out?

MS. SIMPSON:  Michael Rella, R-E-L-L-A.

THE COURT:  All right.  Thank you.

All right, Madam Clerk, if you can just let us know. I assume that we'll see Mr. Rella when he appears.  Hopefully, he gets that resolved.

Yeah.  Thanks, Ms. Simpson.

And now for the Trustee, Mr. Hartman, do you want to follow Mr. Dahu and, as local counsel, lead us off?

MR. HARTMAN:  Yes.  Good morning, Your Honor.  Jeff Hartman for Trustee Lovato, who is somewhere out there in the ether, I believe.

THE COURT:  I see her.

MR. HARTMAN:  And co-counsel is James Wes Christian. He's located in Texas.  And Clayton Brust and Hannah Winston are here locally in Reno.  I have asked Mr. Brust to take the lead on the procedural issues and Mr. Christian to take the lead on the substantive issues.

MR. CHRISTIAN:  And if I might, Your Honor, Wes Christian.  Also David Burnett, who is another -- from a different law firm, is part of the special counsel hired by Ms. Lovato.  He is also on.  He will not be speaking today, will be observing.

THE COURT:  All right.  Thank you.

6

This raises an interesting procedural point.  You know, taking up your statement, Mr. Hartman, as to the procedural and substantive.  Is that an agreed divide between the parties?  It seems like it could be a useful one, but I don't want to -- I want to see how we are going to proceed.

Mr. Fountain, did you have any thoughts?

MR. FOUNTAIN:  Good morning, Your Honor.  Peter Fountain at Quinn Emanuel for Citadel Securities.

THE COURT:  We're having trouble hearing you.  I don't know if other people on the video are having it, but if you could -- yeah.

MR. FOUNTAIN:  Is this any better, Your Honor?  I apologize.

THE COURT:  What say the panel?  Are you hearing him okay, or --

UNIDENTIFIED:  Not great.

UNIDENTIFIED:  I can barely hear him, Your Honor, so --

THE COURT:  Okay.  Thank you.  Yeah, it's -- it sounds a little fishbowl, unfortunately.  Is there a direct mic or --

MR. FOUNTAIN:  Forgive me, Your Honor.  I am trying to troubleshoot that.  Let me take a look.

MR. HOGUE:  Peter, if your conference room is using a table mic, you can pull it down.  If there's one, look halfway

7

up there.  Yep, there you go.

THE COURT:  Yeah.  Thank you, Mr. Hogue.

MR. FOUNTAIN:  I don't see a microphone in there.

THE COURT:  You know, in this virtual world, there's nothing gained by a podium, so if you want -- if you have earbuds or something else that will be more direct, it would certainly help with the recording.

MR. FOUNTAIN:  Understood, Your Honor.  I will just take a moment to sort this out if -- with the Court's permission.  It will be quick.

THE COURT:  Sure.  We're still waiting for Mr. Rella, apparently, so I don't see that -- and while you do that, I'll offer my apologies and thank you for your patience as we try to get this new platform for this video hearing.  Any time here's something new, there's obviously, you know, adjustments and a learning period.  Hopefully, if we continue to use this, it will get smoother so everybody will be more aware of and more adapt at -- adept at using this platform instead of just regular Zoom, given the number of people that we have listening and, quite honestly, the issues we had with interruptions to the recording at the last hearing in Meta.

So with that, we'll wait just another moment until Mr. Fountain reengages.

If people do have trouble hearing, especially the participants, again, I try to gauge that, but you never know if

8

it's just me or if it's everybody.  So if you just give me a signal, hands up or something, I will try to address that because, you know, of key importance is the quality of the recording and everybody's ability to hear it as we proceed.

MR. DAHU:  And, Judge, on behalf of the movants, we greatly appreciate your -- the (indiscernible) that you're giving us.  Thank you.

UNIDENTIFIED:  And, Judge, may I be excused for about two minutes to get a document down the hall from someone?

THE COURT:  Oh, certainly.

UNIDENTIFIED:  I'll be right back.  Thank you.

THE COURT:  Madam Clerk, I think the fastest way to ensure we get to this quickly is to go off record.  I'm sure that as soon as we do, Mr. Fountain will reappear.  But why don't we go off record until Mr. Fountain reconnects with audio?

THE CLERK:  Thank you.  Off record.

(Recess taken at 10:44 a.m.)

(Proceedings resumed at 10:45 a.m.)

MR. HARTMAN:  I'm still waiting for Trustee Lovato, but we can proceed.

THE COURT:  Oh, she's here.

MR. HARTMAN:  Oh, she is?

MS. LOVATO:  I am here.

MR. HARTMAN:  We can't see her.

9

THE COURT:  Yeah.  She had originally signed in under your name, Mr. Hartman, so yeah.

THE CLERK:  We're on record, Your Honor.

THE COURT:  Thank you, Madam Clerk.

This is Judge Spraker, and we're back on record in Meta Materials as to the motion of quash when we left to adjust some of the audio issues.

Mr. Fountain, do we want to break this up into a procedural and substantive discussion, or do you just want to present on the movants?  And if so, what is the, you know, designation as between you and Mr. Brody?

MR. FOUNTAIN:  Thank you, Your Honor.  I -- with the Court's permission, my plan had been to speak to, first, the Rule 45 subpoenas -- excuse me, first, the Rule 2004 subpoenas and then the Rule 45 subpoenas and to take it -- you know, separate out the two subpoenas.  And that's how we propose to proceed with the Court's permission.  Mr. Brody and Mr. Rella, I think, will handle any specific issues as to their clients that may arise.  But the plan is that I'll give a presentation on behalf of the non-parties.

THE COURT:  Okay.

UNIDENTIFIED:  That is correct, Your Honor.

THE COURT:  We might as well just jump into it. We're at least 15 minutes into it and haven't gotten to anything, the discussion yet, so we might as well just jump

into it.  I do have other matters in two hours.  I am hopeful that this will not take the full, you know, hour and 45 minutes now, but let's see where it takes us and what transpires.

So, Mr. Fountain, why don't you start us off, please?

MR. FOUNTAIN:  Thank you, Your Honor, and thanks for the Court's patience as we dealt with our technical issues.

As the Court noted, we're here today on the non-parties' motion to quash, which concerns subpoenas that are both substantively and procedurally defective.  The subpoenas should be quashed because they attempt to do exactly what courts have repeatedly warned against and rejected, which is to use Rule 2004 to circumvent the safeguards and protections otherwise provided under the Federal Rules of Civil Procedure.

And I want to start, Your Honor, with the plain language of Rule 2004.  Rule 2004, by its plain terms, permits examinations relating, quote, "only to the debtor's acts, conduct, or property, the debtor's liabilities and financial condition, matters affecting the administration of the debtor's estate, and the debtor's right to a discharge."

And the keywords of "only" and that limitation, as well as the focus on the debtor, preclude Rule 2004 subpoenas that do not have the requisite connection between the debtor's estate.  Those subpoenas --

THE COURT:  So why isn't a subpoena that is asking for information regarding what appears to be a, if not the,

11

potential primary asset of the estate, fall within acts, conduct, or property?

MR. FOUNTAIN:  There are a few reasons for that, Your Honor.  First, these securities, what the subpoenas seek, are four years of trading records involving Meta Material's stock. But that's --

THE COURT:  Let's get into that too because I'm a little concerned and unfocused as to the specifics of what is being sought versus -- well, in relationship to the objection.

MR. FOUNTAIN:  Absolutely, Your Honor.

THE COURT:  To help you put this into some construct from how I am perceiving it, I am roughly analogizing this, at least initially, as I try to wrap my hands around it, as a subpoena to third parties in a Ponzi scheme case.  At minimum, you send it out to the banks to try to get the actions and the financial transactions, which may implicate the bank, which may implicate the other financial institutions and such.  It's a -- it's not a great analogy, but it seems to at least get me in the door here.

Whereas in the Ponzi, you're asking for the financial transactions, here, you're asking for the trading documents, right?  Is that basically what's being sought?

MR. FOUNTAIN:  Your Honor, let me address both of your questions or attempt to.  What is being sought by the debtor here goes beyond just trading records.  What they've

sought is all communications relating to trades of Meta stock over a four-year period.  And so they acknowledge in their briefing that they're seeking emails and other correspondence. So it isn't so limited, and but even if it were --

THE COURT:  But it's inclusive?

MR. FOUNTAIN:  I'm sorry, Your Honor?

THE COURT:  But it is inclusive in that there is trading materials being sought?

MR. FOUNTAIN:  There are trading materials being sought, that's correct.  And what --

THE COURT:  And you object to that as well?

MR. FOUNTAIN:  We do object to that, and for several reasons.  And one of the key reasons is that the trades in the stock of the debtor is not the debtor's estate.  It is not within the confines of Rule 2004.  These are not trades --

THE COURT:  (Audio interference) -- the first interaction that we've had -- I tend to interrupt.  I apologize.  And look, for everybody here, please don't feel the need to apologize to me, you know, for speaking over.  This is video.  It happens, so just kind of set that up.  So I apologize for interruptions, but I need to get this information out.  You are taking a very, very narrow view of debtor's acts and conduct, and it seems fairly well accepted in the Ninth Circuit and beyond that potential litigation assets fall within, at least, Rule 2004(b)(1)(A) or (B).

13

MR. FOUNTAIN:  Your Honor, respectfully, I would disagree with that.  We are --

THE COURT:  The best case seems to be Transmar for that.

MR. FOUNTAIN:  Transmar is one of the many cases that support that.  I like the In Re GHR case, and would direct you there.  The In Re Lee case, which Your Honor, in fact, decided, also supports our position, and I'll explain why that is.  It is that these are third-party trades on the public market that are not trades involving the debtor.  These are not stock owned by the debtor.  There is no connection that the debtor attempts to articulate between --

THE COURT:  It's not in the debtor?  These trades are not involving in the debtor or MMTPL [sic] or the --

MR. FOUNTAIN:  This is securities that are owned by third parties.  They're not owned by the debtor.  And there is no authority supporting the idea that this third-party trading of equity in a debtor that is no longer owned by the debtor, that the debtor was not on either side of the trade, could be within the confines of Rule 2004.  No case has ever expanded Rule 2004 in that way.

THE COURT:  And what cases rejected that?

MR. FOUNTAIN:  So, Your Honor, cases have rejected -- I wouldn't say that a case has expressly rejected this, but what I would say is every single case that has addressed this

14

issue of the debtor's estate, the debtor's assets, the liabilities, what is Rule 2004 has found a relationship with the debtor to be a necessary condition.  And that's your case, Your Honor, in In Re Lee where, you know, you put it well.  The third parties subject to examination under Rule 2004 are only those persons possessing knowledge of the debtor's acts, conduct, financial affairs, so far as this relates to a debtor's proceeding in bankruptcy.

There is no allegation or articulation of any relationship between our clients and the debtor.  We didn't have contact --

THE COURT:  Isn't this involving the debtor's equity?

MR. FOUNTAIN:  Your Honor, that is -- it is third-party trading in the public market.

THE COURT:  Of the debtor's equity.

MR. FOUNTAIN:  So, Your Honor, that's correct that it's the debtor's equity.  But I think that to expand the concept of Rule 2004 to capture any third-party trading in a debtor's equity would allow Rule 2004 subpoenas to be issued properly to every single market participant who had traded in that stock.  And that cannot be what Congress intended in Rule 2004.  That is precisely why the words "only to" and the limitations of Rule 2004 exist.

Rule 2004 could be broad, but it is broad within the confines of the debtor's estate, and there is no connection

15

that is even attempted to be drawn here between the equity --

THE COURT:  That seems to be self-defeating though, Mr. Fountain, because the debtor's interest in his equity inherently seemed to be part of the debtor's estate.

MR. FOUNTAIN:  I don't think that's what is being articulated by the debtor here, and nor do I think there's any connection between any change in price of these securities.  I mean, there's simply nothing articulated as to why it is the case that a change in the price of security or the --

THE COURT:  Because it gets to litigation, as you said.  Clearly, ambiguously, yes.

MR. FOUNTAIN:  So I think that does bridge the gap a little bit, and we have attempted in the meet-and-confer process to understand what connection the debtor is attempting to find, the Trustee is attempting to find, between third-party trading in a public market that does not involve the debtor and what it's seeking.

We've said, you know, why do you need this information from our clients?  And the response that we've received is that is a work product.  We're not going to articulate the relevance of the Rule 2004 requests because it is a litigation work product that is protected from disclosure.

And I think that's critical, Your Honor, because even if the Court were to find that this is properly within the scope of Rule 2004, and it's not, but even if the Court were to

16

find that, the Trustee would still need to articulate good cause for the Rule 2004 investigation. The burden is on them to articulate the good cause, and, you know, they haven't done that here. Good cause in the Rule 2004 context means either necessity or that the denial of their subpoenas would cause some undue hardship and injustice, and we know that isn't the case here. They have that --

THE COURT: Is that really the standard for overarching 2004?

MR. FOUNTAIN: Your Honor, under the In Re Lee case, which the bankruptcy appellate panel decided, the burden is on the Trustee. So here, there were extraordinary --

THE COURT: What is the quantum of that burden in a 2004 exam?

MR. FOUNTAIN: Okay.

THE COURT: It has to be good cause, but you want to -- you are wanting to drill down. The good cause is this leads us to a potential asset of the estate, which may be significant, may not, but we need to figure it out before we bring lawsuits. Why isn't that sufficient good cause?

MR. FOUNTAIN: Yeah. I would disagree with that respectfully, Your Honor, for a couple of reasons. First, there has to be an articulated connection between the information that is sought and the estate. And here, there hasn't been any. We've attempted to understand what it is, but

17

we've been told in response that it's work product and we don't need to disclose that information.  We won't disclose that information.

But the other reason that that cannot be the case here is because the Trustee is obtaining this information from other parties, and therefore, the information is duplicative and there's nothing that is uniquely necessary from our clients.  The Trustee has obtained information from Nasdaq, from the DTCC, and is seeking information from FINRA.  And so, Your Honor, these are market-wide sources.  Nasdaq is one of the primary exchanges where stocks are traded in the entire country.  The DTCC is a centralized clearinghouse that provides settlement services, and FINRA is a self-regulatory organization for all the broker dealers.

And so this is a way in which the Trustee would be able to obtain market-wide data.  It raises the question of why they would need this information from our clients if they've already obtained market-wide information from these centralized sources.  That's another question that we've asked them, and the answer that the non-parties have received is, we're not going to provide that information to you.

And so they cannot show that they need this information from the non-parties, nor can they show that there'd be some undue, you know, harm to them or prejudice where they did not obtain it from us.  And so, Your Honor, not

18

only is this not within the confines of Rule 2004, they can't show good cause.  And then the case law that we've cited -- and I don't think this point is disputed by the Trustee in her briefing, which is that once you've crossed into the litigation target, Rule 2004 is no longer available.  And --

THE COURT:  And again, I read Transmar as your cite for that proposition most specifically.  Was there another case that had that cross into you are effectively, you know, pending proceeding, in the zone of pending proceeding?

MR. FOUNTAIN:  I would direct Your Honor, to the In Re J&R Trucking case, which also involves those issues.  I believe there's at least one other case in our briefing that raised this specific issue and found that, you know, once you cross -- for example, I think this is the Defoor case, Your Honor, cited in our briefing, which explains that once you've crossed into litigation targets, you can no longer pursue the Rule 2004 subpoenas against those parties.

And I can get into in detail the various ways in which the Trustee has gone far past that question.  And I think there's even some language in her opposition brief that says almost exactly that, which is this wordplay that she hasn't said that the non-parties are litigation targets, but everything that she's done and represented has indicated that she believes that they are litigation targets.

One of the things we point out is that in the FINRA

context, where FINRA has also filed a motion to quash, they're seeking the market-wide data from FINRA, they have said to FINRA, you are not a litigation target.  That is not something they would say to us.  They've obtained $11 million in litigation funding to pursue claims against this -- apparently, against the non-parties that are paying these firms to pursue claims against us.  And there's also the extensive investigation that they've already done where they've analyzed shares and claimed to have identified market manipulation.  All of these establish that they've crossed into litigation target and that they cannot proceed with the Rule 2004 under that circumstance.

Your Honor, I'm happy to proceed or to pause for any questions the Court may have.

THE COURT:  I'm following you so far.

MR. FOUNTAIN:  Thank you, Your Honor.  I want to touch now on some of the procedural deficiencies with the Rule 2004 subpoenas.  The first is just the clear language of the local rule, which says that production of documents may not be obtained via an order under Federal Rule of Bankruptcy 2004.

THE COURT:  And you believe that that modifies Federal Rule of Bankruptcy Procedure 2004 to preclude any document production within the scope of 2004?

MR. FOUNTAIN:  I believe that's the plain and correct reading of Rule 2004.

THE COURT:  I don't read it that way, quite honestly, I can just tell you.  I think that it means that the Rule 2004 order cannot compel the production of documents, that you have to go through a subpoena, as envisioned by Federal Bankruptcy Rule 2004.  I do not believe that District of Nevada precludes any obtaining of documents through any 2004 process.  So if that is the argument, I need a much clearer -- I understand Judge Nakagawa's footnote in the case you cited.  I will talk to him, quite honestly, before I give my opinion.  But I don't -- I think that's an overreach as to the exact language of that local rule.  And quite honestly, I'm concerned about its relationship to the Federal Rule of Bankruptcy Procedure if that is the case.

MR. FOUNTAIN:  And, Your Honor, let me attempt just to expand a little bit on the argument, appreciating where you're coming from.  But Judge Barnes may have viewed it differently because when she received proposed orders from the Trustee that included these document requests under Rule 2004, she struck the document requests from the orders that she actually issued.  And the Trustee, nonetheless, proceeded, not with the orders that had been approved by the Court, but for the orders that they had submitted with the subpoenas that did include the document requests.  And so --

THE COURT:  And they proceeded with subpoenas, not through the order itself.

21

MR. FOUNTAIN:  And so I will touch on that too.

THE COURT:  At which the form which seeks includes a statement, "Are you seeking documents?"

MR. FOUNTAIN:  Your Honor --

THE COURT:  If it was totally prohibited by local rule, why is that language in there?

MR. FOUNTAIN:  Your Honor, I think that, you know, here we're dealing with an express order by Judge Barnes that looked at this issue, and --

THE COURT:  Haven't other orders been -- or haven't other subpoenas been sent under Rule 2004 and complied with?

MR. FOUNTAIN:  My understanding, Your Honor, is that when the Trustee sought renewed subpoenas against certain of the non-parties, she did not go through that process, and so there wasn't the same opportunity.  Those would have been the subpoenas as to Virtu and as to Anson Funds.

But I think, Your Honor, there's one other key point to make here, which is that if it is the case that you could proceed via subpoena, right, that is -- that takes us to where we started, which is that the use of Rule 2004 here the Trustee is trying to employ is an attempt to circumvent the procedural safeguards that Rule 45 and Rule 26 would ordinarily apply to non-party discovery.  And that is an area where once we are dealing with Rule 45 subpoenas, their refusal to articulate the relevance is devastating to their ability to pursue this.

22

Rule 45 provides that the Court must quash a subpoena that subjects a non-party to an undue burden, and it requires a proportionality analysis.  And that would require us here, Your Honor, to analyze the burden of a year, four years, thousand trading days of trading records and the communications related to them against relevance that has not been articulated to us.  Because when we said what is the relevance, we've been told, we won't tell you.

And so, Your Honor, if we're in the world of the Rule 45 subpoenas, the proportionality analysis demands that they be quashed, and that's even more the case because the information that they're seeking is duplicative for the reasons I said before.  They don't need this information from our clients because they're in the process or have already obtained market-wide data, and so there's nothing additive here.

And it leads back to the same question, which is why are they seeking this data from our clients?  And the answer is because they want to pursue litigation against our clients, and that is not a proper use of Rule 2004 given the lack of connection to the debtor's estate, the debtor's property, and also because of the case law that is on all fours and that the Trustee does not even attempt to distinguish in her opposition brief.

And it also means that they fail this proportionality analysis because no balancing can be done.  We can't compare

the burden that we've demonstrated in our papers to the relevance because there's no articulated relevance here.

THE COURT:  While you pause, Mr. Brody has patiently had his virtual hand up.  Do you want to yield the floor to see what co-counsel wishes to raise?

MR. FOUNTAIN:  Please, go ahead.

MR. BRODY:  Thank you.  Thank you, Your Honor.  Thank you, Mr. Fountain.  Your Honor, Alan Brody, Greenberg Traurig, on behalf of Movant Anson Funds Management.  Your Honor, I will not be duplicative of what Mr. Fountain has to say, and, of course, we support his statements on behalf of the movant.  I merely wanted to address a few items that Your Honor had questioned or mentioned.

The first is at the opening, Your Honor said that this was -- and I apologize if I don't have the exact quote, I was trying to write as quickly as I could -- that you view this action similar to a Ponzi scheme, which as bankruptcy attorneys, you know, we see way too often across the country.

This is nothing like a Ponzi scheme because in a Ponzi scheme, the Trustee, whether Chapter 11 or Chapter 7 Trustee or a creditors' committee or whoever it is proceeding on behalf of the creditors of the estate or the estate itself, is usually seeking fraudulent transfers or avoidance of fraudulent transfers.  Fraudulent transfers, of course, occur between the debtor transferring its asset, usually money, to a

24

third party, and now the Ponzi scheme is about bringing that money back.  We do not view this at all like a Ponzi scheme.

THE COURT:  I understand that point very well. That's why I said it was an inept analogy.  It's just a construct.

MR. BRODY:  I appreciate that, Your Honor.  As Mr. Fountain pointed out, Bankruptcy Rule 2004 is quite broad, but it's not unlimited.  And the wording of the -- I'd like to say statute, but the rule deals with debtor's act, debtor's conduct, debtor's property.  So the question, debtor's financial condition, is, is this property of the debtor that we're talking about here?  Stock in the company is not the debtor's property.

And Your Honor pointed out and asked the question, well, it's the debtor's equity.  Isn't the debtor's equity the debtor's property?  And if this was a solvent entity, the debtor would have an interest in that equity.  But it is not a solvent company, hence the Chapter 7 itself, and therefore, the debtor has no interest in that equity.  This is not stock that the debtor owns.  It's third party.

Your Honor, no different than my ownership in Amazon stock.  I trade Amazon stock.  I own Amazon stock.  I don't trade it with Amazon.  I trade it in the open market.  Amazon, but for the fact that it may be solvent, has no interest in that stock that I'm trading.  So it's not an asset of the

25

debtor.

Also, Your Honor then raised, well, isn't this an asset of the estate because the debtor may have some cause of action, may be able to sue on it?  Your Honor, any cause of action with respect to alleged market manipulation of stock traded by third parties is not a cause of action of the estate.

THE COURT:  Am I deciding that here?

MR. BRODY:  No, Your Honor, but you would be deciding whether the document demands that are sought are proper under 2004 and whether those document demands must be limited to debtor's assets.  And they wouldn't be debtor's assets, Your Honor.

THE COURT:  Isn't that deciding that issue?  I mean, I appreciate the --

MR. BRODY:  Well, I (indiscernible) --

THE COURT:  -- argument.

MR. BRODY:  Well, I think you're right, Your Honor.  You are.

THE COURT:  You're saying -- you're basically saying the Court needs to establish who has what rights and what's derivative and what's an asset of the estate.  And because it cannot be an asset of the estate, this 2004 is improper, which would then fall under the harassment aspect of the analysis.

MR. BRODY:  That -- Your Honor, it would fall under harassment because it's not debtor's property, and so --

26

THE COURT:  But if I'm not deciding it, how does that play into this analysis at this time?

MR. BRODY:  Your Honor can decide that this is not property of the debtor or, Your Honor, that the Trustee has the burden to show that it's property of the debtor.  This is stock in the debtor's company that the debtor does not own, so it would be the Trustee's burden to show as part of the good faith that the Trustee needs in order to obtain the Rule 2004.

And as Mr. Fountain had pointed out, we've asked the Trustee's counsel several times exactly how this is property of the debtor.  And all we've received back was the wordage in the Rule 2004 that it has to do with the debtor's property, which is a circular answer, has to do with the debtor's financial condition, circular answer, or that the information is attorney-client privilege, and therefore, they're telling us that we're not entitled to know.  There is no cause of action that would belong to them.

In this Court, not necessarily this Court, the district court in AgriBioTech, in the District of Nevada, you know, looked at what is property of the estate, what is a cause of action that belongs to estate.  When does a bankruptcy Trustee have standing, and that is only when, only when the action belongs to the debtor's estate.

So we're looking at the assets, and right now, Your Honor, if we were to look at the actual document requests

27

themselves, for example, Request 1 takes documents related to shares of Meta and MMTLP, not key Meta --

THE COURT:  Could you -- is that Virtu or Anson, or is it Citadel?

MR. BRODY:  I'm sorry, Your Honor?

THE COURT:  Which Request 1 are you looking at?

MR. BRODY:  Oh, I apologize.  I believe I was looking in the Trustee's opposition.  They list the requests, and I believe that's requests for -- of Citadel, Your Honor, as the example.

THE COURT:  Okay.

MR. BRODY:  I've actually taken it right out of their objection.

THE COURT:  I can get there.

MR. BRODY:  I apologize.  I don't have the exact cite of the page from their objection.

THE COURT:  Page 10.

MR. BRODY:  Page --

THE COURT:  Yeah, I'm there.

MR. BRODY:  Okay.  But if we were to look at Request 1, all messages relating to the routing of orders of any type for shares of Meta and/or MMTLP, Meta and MMTLP are the stock that we're talking about.  Request 2 goes to the shares of Meta.  Request 3 goes to the shares of Meta, and it's just continuously in this.  So it's not Meta's own asset or MMTLP

28

assets.  It's the shares of their stock, which really is what Mr. Fountain and the movants are looking at.

If their -- their requests are not with respect to a property of the debtor or the debtor's estate.  With respect to the local rules, Your Honor, you know, Your Honor, this is very, very special to Nevada.  I clerked for the Chief Bankruptcy Judge in the Eastern District of New York, as well as practicing in New Jersey and the Southern District of New York.  We deal with 2004s quite differently.  We don't have such a local rule, but the local rule is clear, Local Rule 2004(c), that the production of documents may not be obtained by an order of Federal Rule of Bankruptcy Procedure 2004.

I understand Your Honor's point, but this was something that Judge Barnes apparently recognized when the provision for the production of documents was struck.  I'm going to allow the local rules truly to speak for themselves, but the points that I wanted to raise at this juncture, because, again, I promised Your Honor I wouldn't be duplicative with Mr. Fountain, is that the debtor's -- trading in the debtor's equity, particularly since it's an insolvent entity, has no effect on the debtor, is not the debtor's property, and we've asked them several times how this connects, how this relates to the debtor's property.  And the only answer we've received other than it is the debtor's property, period, with no further explanation, is that it's attorney-client privilege,

Your Honor.  Thank you, Your Honor.

THE COURT:  So let's go back to Local Rule 2004(c). Production of documents may not be obtained via an order under Federal Rule of Bankruptcy Procedure 2004.  Production of documents may, however, be obtained via subpoena, as provided by Federal Rule of Civil Procedure 45(a)(1)(C), as adopted by Federal Bankruptcy Rule 9016.  What does that second sentence mean?

MR. BRODY:  Rule 9016, as well as Federal Rule of Civil Procedure 45, I believe, deal with the subpoenas and the way that subpoenas can be served themselves, but yet, it still falls short of saying production of documents may not be obtained by an order under Rule 2004.

THE COURT:  But you can still get the documentation under 45 and 9016.  It's just not going to be under technically 2004(c) then.

MR. BRODY:  Your Honor is correct, and, Mr. Fountain, I'm going to go back to -- cede to Mr. Fountain.

Sorry, Peter.

MR. FOUNTAIN:  No, thank you.

MR. BRODY:  There is a great distinction between discovery under Rule 2004 and discovery under Rule 45.

MR. FOUNTAIN:  And I'll (indiscernible), if I may.

THE COURT:  And I understand that argument.  Let's see.  Mr. Brody, did you have anything else before we shift

back over to Mr. Fountain?

MR. BRODY:  No, and I appreciate you letting me interject in this matter.  Thank you, Your Honor.

THE COURT:  All right.

MR. FOUNTAIN:  The only thing I'll add on that point, Your Honor, is that if production may be obtained by a subpoena under Rule 45, then the non-parties would be provided the procedural protections of that rule, which, again, goes to the proportionality analysis that we are discussing.  And so we will hear from counsel for the Trustee, that rule for that Rule 2004 is broad, and that they get everything under the sun under Rule 2004.  That will be their articulation.  But this local rule says that if they are seeking documents, the analysis and the proper subpoena would be under Rule 45.  And so that breadth doesn't help them there.  It is the Rule 45 analysis that this Court would need to conduct the proportionality analysis, the burden against the unarticulated relevance.

THE COURT:  Can you explain to me the relationship then between local rule and 2004(c) compelling attendance and production of documents or electronically stored information?  What is -- why is that in there if you don't have to produce documents in 2004?

MR. FOUNTAIN:  I'm sorry, Your Honor, I don't -- where is the reference to electronically stored information?

THE COURT:  To the Federal Rule of Bankruptcy

31

Procedure 2004(c).

MR. FOUNTAIN:  Your Honor, I would think that Rule 2004 of the local rules would be more specific and would govern here.

THE COURT:  Well, that's the relationship between a local rule and the federal rule, right?  I mean, the federal rule gives that right.  How can the local rule take it away completely?

MR. FOUNTAIN:  Well, Your Honor, there are sort of two things I would say there.  The first is that the local rule wouldn't take it away completely because it would permit the process to proceed through Rule 45.  And so the Rule 45 subpoena --

THE COURT:  Then you just altered -- according to you and Mr. Brody's analysis and argument, you know, very well articulated, then you're shifting the burdens and the standards in the applicable analysis, correct?

MR. FOUNTAIN:  You're right, Your Honor.  That is correct.  And I think the other item to think about here is that, you know, Judge Barnes conducted this analysis and issued orders that comply with Local Rule 2004(c) and said that the document production requests are stricken from the Rule 2004 subpoenas.  And so there's just -- there is no valid order from the Court authorizing the Rule 2004 subpoenas with document requests that have been served.  It's just -- it's not in the

32

record. It doesn't exist. They are not valid on their face.

And so, Your Honor, you know, we have our view of the interplay between Rule 2004 and Rule 45, but here that issue has been decided by Judge Barnes, and the Trustees proceeded as they did notwithstanding that order.

THE COURT: Fair enough. Are we moving on to other areas outside of -- does that resolve or conclude the procedural aspect of what you wanted to address?

MR. FOUNTAIN: It does, Your Honor. I may reserve if options or if procedural issues are brought up by the Trustee, but that is what I wanted to raise for now.

THE COURT: I imagine they will be. Do you want to get into the substantive now? Again, it is 11:20. We have until 1:30. So I want to make sure that I reserve sufficient time for the Trustee. But why don't we get into your substantive arguments?

MR. FOUNTAIN: Your Honor, I'm happy to have the Trustee proceed and to respond to that, if that's the preference. I don't want to. I want to be respectful at the time.

THE COURT: All right. No, I appreciate that.

Mr. Brust, was it you that was responding to the procedural?

MR. BRUST: Yeah, Your Honor.

THE COURT: Go ahead.

33

MR. BRUST: Okay. I think that the Trustee is, from what I've heard from the Court, fairly closely aligned with the Court on this. The Trustee does not believe that the Local Rule 2004 was intended to remove any litigant bankruptcy Trustees in the state of Nevada from what 2004 provides. 2004 is broad.

THE COURT: How does that reconcile with what Judge Barnes has ordered and the modification of the proposed orders?

MR. BRUST: The only thing that I can think there is that Judge Barnes recognizes the local rule and did not say that we are not allowed to ask for anything. Just took that out of her 2004 order, knowing that we had the ability to do it under Rule 45, which my understanding is, is the typical way that 2004 requests are sent out in the state of Nevada. There's the 2004 request, and then there's also the Rule 45 subpoena that goes along with it.

There's nothing in that -- in Judge Barnes's order, even though she removed the request for documents out of the proposed order. There's nothing in there saying, and by the way, you are not allowed to ask for documents under the venue and the vehicle that we are providing you through Rule 45. You can guess why does Nevada have the Rule 45 rule? It seems like maybe the only thing I can think of, Your Honor, that makes sense to me, is that the Court understands that when a Rule 2004 examination is done and before a Rule 2004 examination can

34

be asked for, or -- the Trustee may want to get some documents first. So the local rule provides that you can go out and get documents first under Rule 45 and then be better prepared to make your 2004 examination.

Now, I don't know -- I'm just guessing, trying to find a logical reason why Nevada would depart from a rule that is working everywhere else in the country. And they have done that. But I cannot believe that the reason Nevada did that would be to deprive Trustees in the state of Nevada the ability to get documents under the 2004 procedure.

THE COURT: Can you clear up just a historical, you know, hole that I have in trying to put this. My understanding is that the motions for the 2004 and the orders were entered on an ex parte basis, that there was no actual hearing or interplay between the Court. Otherwise, Judge Barnes does not explain the reasoning in any place that I should look at for modifying the proposed order.

MR. BRUST: The only thing that I remember, Your Honor, there was no interplay. You're correct. The only thing I remember is an order saying, your motion is granted, provide a proposed order. And we provided the proposed order.

THE COURT: Did she modify that order or -- because the order answered is different from the proposed. Okay, so it was her modification.

MR. BRUST: Exactly. The proposed order mimicked the

35

Rule 45 subpoena and included the document requests.  And she just took those off.  And she never said, you're not allowed to do this.  And so we proceeded exactly as the statute says and the local rule says and issued it under Rule 45 in conjunction with the order that we had proposed.

THE COURT:  And as to obtaining the documents that you referenced from what you refer to as "the Schwab entities," how was that done?  Was that under 2004?  Was it a straight Rule 45 subpoena?  How was that done?

MR. BRUST:  It was done under the same way that we have obtained them from the parties that are before the Court today.  We got about seven or eight similar 2004 orders and then turned around and sent those seven or eight out in almost identical, except for, you know, some of the requests and the names and that kind of thing, to all of the parties.  And now we have three who are objecting, and they responded.  They did not identify, we're responding to the Rule 45 portion of what you've sent us or the Rule 2004 portion.  They just responded.

THE COURT:  To be clear, Judge Barnes modified all of those orders, though?

MR. BRUST:  I believe so.

THE COURT:  Okay.  Thank you.

MR. BRUST:  Yeah.  One thing that's noteworthy, I believe, is that the cases that were cited by the non-parties, including the one that's been talked about and directly

36

discussed, the J&R Trucking, but even the other cases where there is a finding that the 2004 was overreaching, none of those cases involved a Trustee.  Those cases involve creditors, pro se or pro per litigants, and maybe even the debtor in one or two of them.

And the reason I think that's significant, Your Honor, as Your Honor knows, a Trustee does not come into a case like a normal litigant.  Trustee comes in what's been described to me, and I think it's a good description, as an after-the-fact fiduciary.  The Trustee comes in not like someone who has lived the case, but coming into it and trying to decide what is the scope of this estate.  And part of deciding what the scope of the estate is, is does this estate have any claims, litigation claims?  Has there been theft?  Has there been whatever?  But that's why it's so broad.  And that's why I think Rule 2004 exists.  And if it's ever curtailed, it looks like, from the cases cited by the non-parties, it's curtailed against not the Trustee, but other people who probably should already have this knowledge.

In this case, the Trustee came in and is trying to figure out what is in this estate.  And part of that is trying to figure out what litigation claims the estate may have.  Now, Mr. Christian, I think that gets into the substantive part of the analysis as to how the information that we're seeking could help educate the Trustee as to what claims they have.  But this

37

notion that there's a crossover to we're looking for litigation and who we can litigate against, that is not a bright line. We've cited the Millennial case -- or the Millennium case and several other cases where the Courts have said part of the rule 2004 is to allow a Trustee to investigate what litigation claims they might have.  And that that's what's happening here.

Now, I think that they are overreaching.  And Mr. Christian can talk about this on the invocation of attorney-client privilege or attorney work product.  Sure, some of their questions got into issues that would go into attorney work product.  What are your claims?  What are you thinking about suing our clients for, or something like that.  And we frankly, I don't even think that decision has been made yet. This is still an investigatory process and that's all that's happening here.  So this bright line that somehow if somebody is thinking about litigation 2004 is off the table, that's just not true.

THE COURT:  Well, I think let's back that up into what I think Mr. Fountain described as the articulated connection with the request.  And your opposing counsel has made much of the fact that this is not technically property of the estate that you are investigating as the trading between non-debtor entities in an equity interest of the debtor, which you know, they state, in light of the Chapter 7, is likely insolvent.  So it does wrap in ultimately as to the standing

38

issue and causes of action.  But what is the articulated connection here?  Is it sufficient to just say we're looking for litigation assets?

MR. CHRISTIAN:  Judge, I'd be happy to address that myself.  Could I do that, please?

THE COURT:  I assume Mr. Brust is willing to concede as --

MR. BRUST:  What Mr. Christian is going to say is over my head, Your Honor.  But I won't even try to fake it.

MR. CHRISTIAN:  Just to give this Court some simple examples of the standing issue, Judge, Mr. Fountain is opposing counsel in a case called Northwest Biotherapeutics.  In that case, much like the potential case that we're investigating on behalf of the estate, the issuer sold shares, and the issuer believes, in Northwest Bio, that ultimately they sold those at a depressed price directly attributable to the market manipulation illegal acts that Citadel and others in that case committed.  That case had a very good motion to dismiss filed by Mr. Fountain's firm.  That motion was denied.  We are in discovery in that case.

I'll cite you two other cases, one of which Mr. Fountain is also a opposing counsel on, the Mullen Automotive case.  These are all out of the Southern District of New York, Judge Spraker, similar set of facts.  That motion to dismiss has been denied, and we're in discovery.

39

Another case that is actually the ringleader of these cases is a case called In re: Harrington.  That case is not only passed the motion to dismiss, discovery is complete, Daubert motions have been filed, and we're headed to trial.

THE COURT:  And are those -- the motions to dismiss, did they raise the standing issue?

MR. CHRISTIAN:  I don't recall whether they raised the standing issue, Judge, but needless to say, I'd have to look at those.  I have so many complaints, frankly, in my head, I'd have to look at them just to be honest with the Court.  But I can't imagine that the opposing counsel didn't bring that issue up.  So let me -- if I could --

THE COURT:  They are Chapter 7s involving debtors' causes of action for market manipulation?

MR. CHRISTIAN:  No, Your Honor, the Harrington is a large shareholder case where a large shareholder was selling the shares at a manipulated price.  The Northwest Biotherapeutics is a solvent issuer where they sold shares in the same way into a manipulated market, they're contending. Similarly, Mullen Automotive, too.  There is no case presently that we -- that I've worked on in connection with this litigation space, let's call it the 10(b)(5) market manipulation space.

And I've done -- myself and my colleagues, including Mr. Burnett on the phone and Steve Towntis (phonetic), who's

40

also special counsel in this case, at least to my knowledge, stemmed out of a bankruptcy proceeding, if that's your question.  But nonetheless, the standing issue is the same. What we're contending is that it's possible. -- again, this is an investigative stage.  And Mr. Fountain's correct, I was on some of those meet and confers.  And Mr. Brody's correct, we did not want to give them our work product, or our proprietary methodology.  They wanted to know, you know, what claims we had against their client, what's the basis of them, et cetera.  We had several dialogues, but their answer was, well, we're producing nothing.

So I understand, you know, that's their position. They're entitled to whatever position they want to make.  What we believe.  Your Honor, based on the team that we put together -- and just briefly, it's not only three of the top securities litigation firms on this -- in this market manipulation in the United States, but also some of the best consulting experts. This Court, I'm sure, recognizes Judge Spraker, that Twombly and Iqbal require very detailed, a heightened level of articulation of your claim based on the Private Litigation Securities Reform act, the PSLRA.  And that's a very serious act where you better have your facts together.

That, frankly, takes a lot of analytics.  And in that vein, I agree with my colleague, Mr. Brust.  We are investigating this.  Do we have suspicions that the company's

been manipulated?  Yes, the company has articulated that.  But that means nothing in the context of bringing a 10(b)(5) market manipulation claim against a defendant pursuant to the Private Securities Litigation Reform Act.  It must be detailed.

For the record, Your Honor, the records we are requesting are the similar records that these defendants -- and I should -- I'm sorry, not the Anson Funds.  The Anson Funds, just for, you know, division here, are a investment advisor.  They have a certain set of rules.  Virtue and Citadel are market makers.  And if they're trading on their own behalf, brokers.  They are required by 8 a.m. the next day, pursuant to 17 C.F.R. 242.613, referred to as the consolidated audit trail.  And I believe Mr. Hartman was kind enough to put that in the record so the Court would have reference to it, but let me just summarize what it says.

Essentially, all aspects of the trading records which are specifically defined on Pages 7 -- I'm sorry, 8, 9 and 10, if you print out the article for the Consolidated Auto Trail, they're required to give that information to the regulatory authorities.  And in doing so, that's the same information we're requesting.  Give us what you have to report every day by 8 a.m. the following day, which is the nature of the trade.  Was it short?  Was it long.  Was it proprietary?  Did you do the trade on your own behalf?  Were you doing it on behalf of a customer?  Where was it routed through?

42

And as you could imagine, Judge Spraker, the complexity of these market manipulation cases in connection with how this stock trades is very complex. And in essence, what we're looking for is those trading records that they already have to produce in electronic form, I might add, Judge; and secondly, the communications associated with it. And to put this in context, these cases, again, 20 or 21 of them and the past four that are pending in New York with one or more components of the same team that Ms. Lovato has hired, the Trustee has hired in this case, are about really three groups of bad acts.

One is in this market, Judge Spraker, you sell shares electronically, but many times the delivery of those shares does not occur. In many instances, those shares are marked long, but really they're mark -- they're really short sales. A short sale, if the Court's not familiar, is when you want to -- you're going to bet the company's not doing -- going to do well. You sell it at 100. The action -- the bad acts of the defendants ultimately cause the price to go down and they cover at a lesser price and make the spread, that's referred to in a vernacular, of a naked short sale.

Unfortunately for issuers in the United States of America, if you're a bona fide market maker, you don't have to borrow anything. The key is bona fide. What we're experiencing in these cases, frankly, we do not know if that

43

exists today with these parties on the phone.  We suspect it, but we don't know it.  We suspect they're abusing that.  And why would we suspect that?  Because we believe the sell side of their business daily versus the buy side is grossly disproportionate.

If you're a market maker, Judge, in this market, you are supposed to create activity.  You're supposed to create sales and buys.  And in theory, at the end of the day, in theory, you're supposed to end up with the broker even, 50/50.  Okay?  Your purpose is to generate activity.  That's not what we're seeing in the marketplace.  We're seeing that the market maker exception is being abused.  That's number one.  Number two, we're seeing spoofing in the market.  The cases I cited, you, Northwest Biotherapeutics, Mullen Automotive, and also Harrington, are spoofing cases.

Spoofing is something that we're accusing market makers of doing and others in these cases.  And a spoofing, essentially, Judge, is again the injection of false information into the marketplace.  Because under 10(b)(5), it must be in connection with the sale or purchase of securities, and it must be basically something that ultimately causes the price to decline in these cases.

So what's happened here in Meta's case is we're contending, we believe, that the shares that Meta Materials sold ultimately was negatively impacted.  They sold at a price

44

greater -- much less than the price they could have sold it at. So instead of selling it at $50 a share, they had to sell it at $20 a share, directly and causationally attributable to whoever the defendants are in this potential cause of action. That delta is their damage model. That damage model belongs to the estate. It belongs to the issuer. It is a cause of action of the issuer. Why? Because it's the issuer that sold the shares. They are the seller in this case, which is one of the predicates that you must prove.

So back to spoofing. So spoofing is also injection of false information in that all these sell orders are posted. So the perpetrator sells at the highest price of 100. They post all these sell orders, which really are fake sell orders, Judge, and it goes down to 90. They then execute, maybe through another party, maybe it's routed a different way, so you have to track all this to figure it out, and then ultimately those sell orders are pulled down. They're fake. They were never intended to be legitimate. They're there to show the market there's so much selling going on, there must be something wrong. This is my simple version. And hence that's called "spoofing." You can look at the SEC's website and see it is the topic of -- currently of much concern. That's number -- the second group of bad acts.

The third group of bad acts is lending shares that, for the most part, you don't own. That's not necessarily what

45

we're looking at in this case, but those are the three groups of bad acts.  Ultimately, all those bad acts are dissemination of false information in the marketplace and ultimately can act as a predicate act to fuel a 10(b)(5) case.

I also want to touch on Mr. Fountain's comment regarding, oh, we can get these records from somewhere else. That's really not accurate because ultimately we're asking for their communications.  Here's what those communications look like, Judge.  For every seller, there's a buyer.  If the buyer's broker doesn't get his shares, he's going to be communicating to the seller that sold them those shares, hey, where are my shares?  I owe them to my client.  I gave you the money.  That's referred to in this litigation space as a fail to deliver.

In this case, we believe whoever the defendants are sold shares that they did not deliver, either through naked short selling or some other means.  We believe there are large fails to deliver in the marketplace.  And are they attributable to these defendants?  We don't know.  We suspect some are.  How many?  We don't know.  But ultimately those fail to delivers, you used a Ponzi scheme.  This case and this group of cases is really about a counterfeiting scheme.  Only the issuer has the right to issue real shares that are traded in the marketplace. When these shares are issued electronically by perpetrators, they are in essence acting like an issuer.  Well, guess what?

46

They're not.

You know, and ultimately what that causes, Judge, it causes a disproportionate share of sale orders versus buy orders. The simplest version of the case we're pursuing is all these acts are to artificially create artificial supply in the marketplace to drive the price down and, in essence, rig the market. Rig the market. And what we've experienced is the broker dealers participating this, the market makers participating this, make more money ultimately killing the company by injection of these fake shares, these fake sell orders into the marketplace that ultimately drives the price down because demand simply cannot keep up.

So at the end of the day, also on the magnitude of the information, and I talked to my colleagues about this before this call, if it is true, even though they submit this information every day to the regulatory authorities that we're seeking, we would be happy to take the 1,300 days of information, roughly four years we're asking, and reduce it to 161 days of information. Why? Because in our analytics, we believe some of the most actionable time periods are within this 161 days. We think that that is a big compromise on our part, that we're going to save the Court time. We're going to advance it now and not wait till later. But this information is critical to this estate, Judge.

It is critical because we're not going to get

communications on these issues from anybody else other than these parties on the phone. Number two, while Nasdaq may have some of the same information, first Nasdaq is fighting us on this, as the Court may already know. And also, it's not the same information, for example, that's on the books of these parties. These parties are obligated to show what shares have they not delivered, what shares have they purchased that they haven't bought the other party in, have they done spoofing in connection with their trading activity on a daily basis, and this type of thing.

And it's not just that Judge, just to give you the Court some example, and there's many enforcement actions against Virtue and many enforcements actions against Citadel that you can your law clerks and the Court can go to, you know, SEC's website, Defender's website. But just to cite two: December 23rd, 2004, Citadel, according to the enforcement action, the fine they paid, failed to report to CAT. That's Consolidated Audit Trail, which is, in essence, an affiliate of FINRA, Judge, a financial regulatory organization. They failed to report billions, not millions, of shares to CAT. And they're not the only unique one that did that

On October 9th of 2024 and different --

MR. BRODY: Your Honor, I'm going to object to all of this evidence that Mr. Christian is putting in with respect to Citadel and Anson unrelated to this case unless he wants to put

48

this in by declaration and be a witness.  This is the first we're hearing about this coming from him.  There's no bearing to this case.

MR. CHRISTIAN:  This isn't evidence.  These are facts.  This is a governmental document that is self-authenticating.  I'm not even proffering it as evidence.  I'm communicating to the Court to put this in context.

MR. BRODY:  Your Honor, he's proffering evidence that has nothing to do with this motion.

THE COURT:  All right.

MR. CHRISTIAN:  If you provide me --

THE COURT:  First of all, it's not evidence because I haven't opened evidence.  All right.  Closest that I can see is that he is asking quite honestly for judicial notice of other matters of record that may be taken of judicial notice.  I don't know what that's going to play out.  I am considering the matter at hand.  If you want to expand it, we can talk about whether we want to expand it to allow a declaration to give me that information.  You're right, it's not in the record.  It is more for context, if anything, at this point.  Unless you want to supplement and then you can argue then so --

MR. BRODY:  Your Honor, my point is that he is not -- this is the first that's coming up so we've never had an opportunity to even look at the veracity of what Mr. Christian is saying.  And again, it's nothing to do with the matter at

49

hand.

Mr. Fountain also -- I believe the whole point, Your Honor, and I apologize, but I believe the point of bifurcating the procedural and the substantive part of this was that Mr. Brust was responding to Mr. Fountain and my issues regarding the procedural, and then it was going to turn back over to Mr. Fountain with respect to the substance.  But Mr. Christian seemed to have gone down that route already.

THE COURT:  Again, to be fair, you know, look, that was the part and problem with bifurcating this at all.  I asked for the articulated connection of which much was made by both you and Mr. Fountain.  Now he has given you the articulated connection.  I understand this may or may not be what you heard when you asked for the causes of action.  You will have a chance to respond to that, but he's laying out the causes of action that he believes may be pursued and why this is needed.

So as to the quandary of raising a objection to evidence during argument that -- those two don't match up.  All I can tell you is I am hearing argument.  If you want to ask for supplement to address that at the risk of placing even more emphasis on it, we can talk about that.  You know, I am taking all this information in.  We'll see where it leads.  So I understand your point.  And if you're concerned about that, we can't talk about whether we want to require, you know, the full and fulsome citation to those matters, and you'll be able to

50

respond.

That will eventually raise a question of all parties telling me the priority of this decision because you are shoveling a lot into my processor at the moment, and I will need time to go back on both procedural and as now we tilt over to the substantive to figure that out. So you may want to go that route, you may not. But there is no objection to be made to evidence because I am not taking evidence. Question is, having raised that, is that being brought in through judicial notice. We'll leave that for later discussion or resolution.

But to the extent I have to or need to make a ruling on objection, it's overruled because it is not evidence. Evidence is not -- evidence before the Court has been presented. This is nothing more than case citation effectively so --

MR. CHRISTIAN: May I proceed, Your Honor?

THE COURT: You may, but we do need to hew it to the procedural because we did bifurcate this. Mr. Brust did yield time. I appreciate it. Again, I am taking on the articulated connection. Maybe that's a segue if Mr. Brust wants to conclude the procedural to get us into the substantive.

MR. BRUST: Your Honor, I think that on the procedural side that was the end of the procedural was the segue into the substantive because that's really where this goes.

51

THE COURT:  Well, and that leads us to another because I focused on the articulated.  But when we were there, when the objection was made, really we were focused upon the argument that this is unnecessary and again gets to the harassment aspect or limitation of Rule 2004 because the estate has already obtained all of the information needed.

Mr. Christensen -- Mr. Christian, I'm sorry, was explaining that no, the this gets to the actual entities and their activities within that market as to the nature of the trades, you know, and the fail to deliver and all of that.  So it is substantive, but again it illustrates that's tied to the procedural.  But I just want on the record that I don't think we strayed unnecessarily into that discussion.  I'm looking at my notes to see if there were any other aspects of the procedure that I wanted to address.

I do want to, before -- if that is it, Mr. Brust, I do want to close with reply on the procedural before we actually get into the substantive.  I think those are big items that I wanted to address was the articulated connection and the obtained from and also the trigger into when, quite honestly, the interest -- the matter on the procedural that I am most interested in, which also gets into substantives, when, if at all, does a use of 2004 change from the more generic information gathering, the wide net, into litigation preparation and when, if ever, that becomes improper under

52

2004.  If you care to address that issue, Mr. Brust, before we go to reply, I would be interested in that.

MR. BRUST:  Yeah.  Your Honor, I guess I would just -- I would posit that it becomes -- maybe it starts to cross the line, although I don't think that line has ever been articulated in the cases.  But maybe it become -- it crosses the line when a decision is made by the Trustee to start pursuing a particular defendant for particular claims for relief.

THE COURT:  Isn't that -- I can -- I anticipate that Mr. Fountain and Mr. Brody are going to say that is only known by the target of the 2004 through the actions of the estate.  Right?

MR. BRUST:  That is.  Yeah, but that's true.  The only person who's going to know when that line is crossed is the Trustee, essentially.  But this is the very first thing that's being done.  Seeking these documents is the very beginning of the examination.  Having suspicions is not the same as litigation activity, especially in light of the heightened standards for pleadings that are required by these claims.  So this is the very beginning of the spectrum.

And the case law, the Millennial Holdings that says 2004 motion seeks regarding prospective claims that a Trustee may bring in the future is allowed by 2004.

THE COURT:  Again, in analogy, if you're after a

53

preference, sure.  You go and you get the financial transaction.  To the extent, though, that, you know, play it out for me.  Do you get to bring in the recipient of that alleged preference and start asking about ordinary course and other matters?

MR. BRUST:  Well, I think that's going to depend on the context, and I think that that is -- potentially yes, because it's not even necessarily true that the information from -- that's being sought by these subpoenas only relate to the recipients of these subpoenas.  These subpoenas could show that there are other parties that need to be sought.  And --

THE COURT:  Would that go into the routing information and the failure to deliver that Mr. Christian was discussing?  But put a much more finer point, is that information directed to the -- you know, Citadel and Virtu, or could it, in your mind, expose other potential parties that may then be wrapped in within this investigation?

MR. BRUST:  Absolutely.  Absolutely it could lead to other parties.

THE COURT:  And why is that?

MR. BRUST:  Because -- and I'm going to have to let Mr. Christian speak to it, but I can speak to it generally, Your Honor.  The information that comes in identifies the parties and who's doing what.  And it's that information that shows where Mr. Christian, in these types of lawsuits, goes for

54

targets.  And I'll let him talk to it a little bit, because a lot of the substantive part of this is part of the procedural part of it.  So I hate to blur the line there, but sometimes there isn't a line there in this analysis.

THE COURT:  If think -- you know, so I think I made that pretty clear that I want more information on that. Mr. Christian, we'll come back to you on the substantive side because I think we're just about to transition.

MR. CHRISTIAN:  All right, Judge.  Thank you.

THE COURT:  All right.  Mr. Brust, anything else then on the procedural aspect?

MR. BRUST:  No, Your Honor.

THE COURT:  All right.  Mr. Fountain?

MR. FOUNTAIN:  Your Honor, would it make sense for us to respond now on the issues?

THE COURT:  On the procedural issues, yes.

MR. FOUNTAIN:  Yes, of course.  So, you know, I'll start with the procedural, Your Honor.  I -- essentially, there's been an admission by counsel for the Trustee that Judge Barnes's order was disregarded and that they served Rule 45 subpoenas to attempt to solve what they saw as the issue with either the Court's order or the local rule.  They obtained documents through Rule 45 subpoenas.  And because there is this admission that the Rule 2004 subpoena document requests were not validly issued by the Court, the analysis that this Court

would need to do is within the lens of Rule 45, giving the non-parties here the procedural protections, the requirement that those subpoenas must be quashed if there's an undue burden and an analysis of relevance.

And while we've heard today, for the very first time, a lot of arguments about purported relevance, none of those were previously articulated by counsel for the Trustee.  None of those were briefed before the Court.  And the non-parties would, of course, be -- you know, should have an opportunity to respond to that, whether it's through additional briefing or whatever manner, you know, the Court, you know, may direct.

I'd like to spend some time on the allegations that Mr. Christian said, which I think support the arguments that the non-parties advanced here in several ways.  If there was any doubt before Mr. Christian's speech that the non-parties had been identified as litigation targets by the Trustee, that doubt has evaporated.  He has talked about the case that they're pursuing against the non-parties.  He talks about an obligation that the non-parties purportedly have to show whether they've manipulated the market, what fails to deliver their --

THE COURT:  No.  No.  No, stop.  I mean, I appreciate that.  I appreciate the argument.  I get your part.  But there's a subtle but very important difference here of underlying information and targeting.  All right?  And that's

56

really what you're asking me, is to draw that line. All right. So just because this information may implicate you, yes, that's the purpose of discovering litigation assets. All right? The question is whether it is proceeding toward -- I mean, as if a litigation. And to Mr. Brust's point, you do have an after-the-fact fiduciary who needs to get knowledge before filing lawsuits or even assessing whether to proceed with a lawsuit. How does that person get that in that situation but for 2004, which is why it is a fishing expedition?

MR. FOUNTAIN: Your Honor, I want to respond to that point. And also this idea that this is the property of the estate, you know, the property of the --

THE COURT: The cause of action would be the property of the estate. Now, I've raised that and I've heard your argument that they do not have standing. I don't know. That is not the primary focus of this. So unless the parties are going to make it the primary focus, which to your point, has not really been raised, the question of standing is out there, but it is not developed that I have any ability or willingness to opine at this point in juncture as to who owns what cause of action.

MR. FOUNTAIN: And, Your Honor, I think it's very important to note that Mr. Christian talked to you about these cases that he says supports their theory of standing, and they support the opposite facts. The Northwest Biotherapeutics case

57

that he talked about, he said there was a motion to dismiss opinion. That is correct. And the Court, in the motion to dismiss opinion, said that the plaintiff only had a cause of action for the trades that it was actually engaged in, its own sales of stock that were not only its sales, but temporally tied to the purported spoofing.

And so not only do they have to be, A, the trades that were done, you know, by analogy by the debtor, but they also had to be narrow in time to the alleged market manipulation, and that refutes and rejects the subpoena and the information that they're seeking in several ways. They're trying to cast this broad net --

THE COURT: But you understand, Mr. Fountain, this is clearly a horse-and-cart, cart-and-horse situation. The problem is the distance between the horse and the cart are miles. When you start giving that information, as Mr. Brody, you know, raised in his objection, this is not briefed. I don't know all these things. I have not -- you know, it has not been discussed.

Now, we can get to the additional briefing, but to tell me about the specifics of Northwest and the other matters, it's not moving the needle on oral argument, because I have no way to ascertain, sitting here today, what that means.

MR. FOUNTAIN: I understand that and appreciate that, Your Honor. We, of course, would be happy to brief, you know,

58

any issues.  I'm hearing Mr. Christian's characterization of these cases, which I think is incomplete and not quite right. And so I wanted to provide that context.  The Court, happy to do so on the papers, but I think one of the key things here, Your Honor, is that in every single one of these cases, it is a distinction as to here.  Right?

They cite the In re Millennium case.  All of these involved a direct relationship between the harm and the debtor. In the Millennium case that they cite, there was a contract that the -- you know, they were seeking Rule 2004 discovery from a party to an agreement with the debtor.  And here there's nothing like that.  There's no relationship between our clients and the debtor.  It proves the point that there has to be, under Rule 2004, that connection to the debtor's estate.  That is entirely lacking here.

And I think that's one of the critical takeaways from the argument that we've heard from Mr. Brust and Mr. Christian. You know, I can speak to Your Honor to this idea that, you know, how do we know when they've crossed into having identified litigation targets.  And we heard Mr. Brust say they're at the very beginning of the investigation.  But we heard something very different from Mr. Christian.

In fact, we heard for the very first time today they've identified apparently 161 days on which they think there was alleged market manipulation or what they want to

59

focus on.  They have secured $11 million in litigation funding. That is not something you do without viable claims against identified defendants.  They've selectively identified our clients to subpoena out of what they admit is more than 3,000 possible entities that traded the stock.  All of these -- this is the clearest evidence that they've gone far past the line. And, you know, I think again, Your Honor, there's not a dispute between the parties that once you cross the line, Rule 2004 is no longer available to you.  That's something that they don't dispute in their briefing.  And so the only question --

THE COURT:  Again, you do -- all right.  So there's the pending proceeding rule.  That's obviously the line.  You are pushing it back to when it coalesces.  And, you know, they've tried to distinguish J&R Trucking.  You know, you have the -- I think it's Transmar, as I said.  Transmar, as I understand, is not even a Westlaw case.  It was, you know, you cite the transcript.  So when you say it's well established --

MR. FOUNTAIN:  And Your Honor, I think what I would say to that is there is authority supporting our worldview and no authority supporting the position that the Trustee's counsel is articulating.  You know, the In re: Transmar case.  You're correct, it is a transcript, but it is a transcript of an oral decision that the Court gave and was transcribed.  So it --

THE COURT:  You need to provide that to me.  I mean, I did not see that as an -- you need to supplement, please.

60

MR. FOUNTAIN: Of course. And I believe that was Exhibit 16 to our motion, but we'll make sure that the Court gets a copy.

THE COURT: Okay. If it is, that helps. When I was reviewing it again, you know, I just saw the citation to the ECF number to the New York, you know, case, so

MR. FOUNTAIN: Of course, Your Honor, we'll make sure that that reaches your chambers. There's the J&R Trucking case, as mentioned. There's the Defoor case. And all of these cases stand for the proposition that once you cross the line, that is too far. And here, you know, there is an incredible set of facts. And I think comparing these cases to the authority -- comparing the facts here, comparing what is in our briefing with the $11 million of litigation funding, there was a reference today to the consultants that they have analyzing these trades. There's a tremendous amount that they already have that would allow them to satisfy the pleading requirements and bring these claims against us.

Mr. Christian has said he's suing Citadel Securities all over the place for these claims. And it brings us back to the key point of all of this, which is that this is an attempt to use Rule 2004 to obtain, from non-parties, discovery that they would otherwise not be entitled without the procedural protections that would be provided by Rule 45. And that's another thing that goes to the procedural issue as well, Your

61

Honor.  We're entitled to these Rule 45 protections, but they're trying to get unfair pre-litigation discovery against us in contradiction of the rules and the case law.

Your Honor, there's a couple of other items that were raised that I'm happy to address if that's okay with the Court.

THE COURT:  Yeah, let's go ahead and run through the rest of procedural and we'll take a five-minute break so people can stretch their legs.

MR. FOUNTAIN:  Thank you, Your Honor.  So one of the things we heard from counsel for the Trustee is this idea that there is a special duty afforded to the Trustee.  The opposite is true, Your Honor.  Section 704 provides that the -- it actually cabins what the Trustee's investigation is supposed to look like.  I believe it's 704(1)(a)(4) provides the Trustee's duty is to investigate the financial affairs of the debtor.  And in that way, it works hand in hand with the limitations we spoke about in the context of Rule 2004.  Both of them expressly limit the investigation that can be adopted to the affairs, the conduct, the liabilities of the debtor.  And they're far afield from that.

Rule 2004 also speaks to a party in interest.  It doesn't distinguish between the powers or the opportunities that the Trustee might have.  It -- Rule 2004 treats any individual, any party in interest the same, which refutes their idea that there is a some special authority that we're talking

62

about.

You know, one other item I just want to flag for the Court, which is that, you know, what I heard from Mr. Christian is an admission that they are seeking communications and there was some dispute about this.  You know, they had said at one point it's -- maybe it's just trading records.  Oh, well, yes, maybe we ask for communications.  It goes to the massive burden associated with this.

I think he said there was something like 1,300 trading days; we heard for the first time, 161.  They're seeking every communication related to every single one of these trades under all of these various causes of action that Mr. Christian is talking about indicates and I think proves that the non-parties need the protections of the procedural rules, Federal Rules of Civil Procedure here.  They're on a, you know, a wild goose chase for a cause of action that they think they've identified, and it's simply not proper under the rules.

THE COURT:  All right.  Thank you.

MR. FOUNTAIN:  Yeah.  The last thing, Your Honor, and forgive me, but you know, we obviously reject the characterization of our client's actions.  And you know, we'd appreciate the opportunity to respond to that in more detail if the Court would want to hear it.

THE COURT:  I think that's the segue into the

63

substance.  So why don't -- we've been going for now over an hour and a half.  Let's take a five-minute break so people can stretch and do whatever they'd like for a few minutes.  And then we'll come back and we'll move on to the subset of arguments regarding the Rule 2004 and Rule 45 subpoenas.  Thank you.

(Recess taken at 12:08 p.m.)

(Proceedings resumed at 12:16 p.m.)

THE CLERK:  You're on.

MR. FOUNTAIN:  Yes, on behalf of the --

THE CLERK:  We're on record.

THE COURT:  All right.  Madam Clerk, I'm sorry.  Did you just say we're back on record?

THE CLERK:  Yes.  We're back on record.

THE COURT:  All right.  Thank you.  This is Judge Spraker again.  We are back on record in the Meta Materials' oral argument regarding the motion to quash.  We'll now move to the, I guess, remainder of the substantive arguments as to the motion to quash, noting that it is now 12:17.  We have additional hearings at 1:30.  So what I would like to do is kind of roughly divide the time between the parties.

And so, Mr. Fountain, if you could just keep that -- or I see Mr. Brody -- if you would just keep that in mind for your presentation.  I'll try to signal if we're getting past roughly the halfway mark.  All right.

64

MR. FOUNTAIN:  Thank you, Your Honor.  That works for us.  I believe it'll be over to counsel for the Trustees.  I would just make one remark if I may, which is that we've identified the LEXIS cite for the Transmar case, and we're happy to provide that to the Court.  And it's 2018 Bankr. LEXIS 2473.

THE COURT:  2473.

MR. FOUNTAIN:  And I won't respond further here, Your Honor, to, you know, the comments that Mr. Christian made about other cases and their effect on this, but we do think they raise some threshold issues of what causes of action actually belong to the debtor, and that's an issue we would appreciate the opportunity to brief.

THE COURT:  All right.  So are we moving to Mr. Brody for more substance?

MR. BRODY:  Your Honor, I have no substance.  I just, on behalf of Anson, want to echo what Mr. Fountain said, that whether or not the deputy Trustee has the ability to use Rule 2004, certainly only -- can only impact the debtor's estate, and what we've heard from the Trustee is that she believes that there's a cause of action here against whoever, but that there's a cause of action.  And Your Honor even mentioned when the -- at the beginning, when did that cause of action belong to the estate?  That is a threshold, threshold requirement under Rule 2004.  And since our questions to the Trustee as to,

you know, what they were look -- what -- why they believed it was property of the estate or a financial condition went unanswered for all these months, and now we're hearing from Mr. Christian, I would echo what Your Honor even mentioned, which is we need to brief this.

If that's -- you know, there's a question of whether the Trustee even has standing to commence any action. We would think that any of those actions belong to the investors, and I -- I'm not going to go any further than -- deeper than that because Your Honor even recognized that that does not -- the brief -- that is not before -- has not been -- we thought we put that before Your Honor in the -- in our motion by stating that this was not property of the estate. Again, threshold question. We would ask that Your Honor set up a briefing schedule for all parties and -- because I don't know how we go forward without that question being answered.

THE COURT: Understood. Well, thank you. Appreciate that, and we will certainly pick that up.

I don't know, Mr. Christian, if you want to address that at the beginning or at the end of your comments.

MR. CHRISTIAN: It's up to you, Judge Spraker. I'm happy to address that particular issue now or wait. Which would you prefer, Your Honor?

THE COURT: Well, the question really is just do we open it back up for some more supplemental briefing on the

66

three pending matters that you have raised to put it more properly before the Court as to, you know, identification of those matters, the decisions, what was raised by whom in what regard, and the outcome. To the extent that it is a standing issue, again, going back to my Ponzi scheme, there are always questions of standing. There's a number of cases out there that address those, you know, the in pari delicto matters and all of that. And again, this is a rough analogy just to a significant, sophisticated litigations. I think one of the counsel used as schemes that bring these materials out, and whether it is property of the estate, whether it's property of the investors, when it shifts -- I get that.

All of that is out there, but we're here, technically, from the Trustee's vantage point, on a Rule 2004 endeavor, which has expanded to the subpoenas, which have been challenged, and whether there's really, truly now under 45. I get all of that, but at the core of it from the Trustee is we're at the lowest end of the entry pool wading in. So we haven't gotten to these, you know, on a motion to dismiss the case actually filed as to standing. I expect beefy, long, detailed, heavy citations in the briefing as to the standing. Their role in a 2004/Rule 45 subpoena, I have to think about. You did raise the matters. So it kind of opens the door. I guess pointedly, do -- does the Trustee want to pursue a supplemental briefing on those topics?

67

MR. CHRISTIAN:  I would say not, Your Honor, and simply because I think it's more appropriate for a 12(b) motion, a motion to dismiss.  We're not talking about whether we're even going to sue these parties.  So why are we talking about standing?  But just for the record, for clarity purposes, there's enormous case law on 10b-5 litigation in connection with market manipulation.  That's -- that rule under the Securities Exchange Act talks about misrepresentation and fraud, and it talks about manipulation.

These cases are more about manipulation.  All of that has to be done in connection with the sale or purchase of securities.  The only party who we represent who was selling securities is the issuer, the issuer, and that's the case with all the other cases I cited.  I would like to add another case that is also in a bankruptcy context that I failed to mention.  It is In re Sorrento, S-O-R-R-E-N-T-O.  We can provide you the orders in the context of a 2004 examination -- so this is not on the standing issue; it's on the 2004 issue -- issued by and signed by Judge Jones here in Houston, Texas, before he was -- left the bench in the Southern District here in Houston, and I participated in that case in part.  And we can provide you the orders of Judge Jones requiring brokers under 2004 to produce documents, et cetera, et cetera.

So that may aid the Court on that issue, but on standing, I think unless my co-counsel disagrees with me,

Mr. Brust or Mr. Hartman, that we think that's more appropriate on a motion to dismiss, Judge, not on an investigation. How can you -- how can the Court even deal with standing when we don't even know who the parties are? So I get their point. If you don't have standing, then you shouldn't be entitled to a 2004. I don't think that's the case. How can you know what you're entitled to until you do an investigation and obtain the documents necessary to see if you even have claims? That's the problem.

MR. BRODY: Your Honor, it's a question of whether it's property of the debtor, and Mr. Christian just -- really just proved my point because Sorrento Therapeutics, which was the case that Mr. Christian just spoke about, that was before Judge Jones. In Sorrento, the debtor sought information regarding the debtor's assets. In that one, the debtor's 52 percent equity interest in Scilex Holding Company, a whole other company, was the issue. It was about trading in an asset owned by the debtor, not the debtor's stock, but stock that the debtor actually owned, and that does -- that's not here.

You also have, for example, another case that the Trustee relies on when they talk about investigations, securities, you know, and litigation, the Profilet v. Cambridge Financial Corp. heavily relied on by the Trustee. In that case, the issue was about the debtor's stock issuance, the actual stock issuance, and the reckless and willful

69

misrepresentations at the time of the stock issuance.  Your Honor, Mr. Christian likes to say about -- that the debtor is the issuer.  That stock is out the door.  The horse is out the barn I think is the old expression.  They were talking about the trading that has occurred way past that issuance here.

So those cases don't apply.  Whether or not this is property of the debtor may or may not be a -- it is -- and since -- is the threshold issue because the debtor -- the Trustee is telling us that they're looking at potential causes of action, to be property of the debtor, in order to have standing, it has to be property of the debtor.  That's AgriBioTech in the District of Nevada.

THE COURT:  And just to (indiscernible) --

MR. BRUST:  Your Honor, Your Honor --

THE COURT:  -- Mr. Brody is --

MR. BRUST:  Oh.  Go ahead.

THE COURT:  Hold on.  (Indiscernible)--

MR. BRUST:  Sorry, Mr. Brody.

THE COURT:  Yeah.  Let -- let's let one side --

MR. BRUST:  Sure.

THE COURT:  -- speak.

MR. FOUNTAIN:  Yeah.  Thank you, Your Honor.

And thank you, Mr. Brust.

Just to briefly add on to what Mr. Brody said, you know, the decisions that Mr. Christian was referring to, this

70

Northwest Biotherapeutics case, the Mullen Auto case, the Harrington case, they do involve these issues, and the facts of those cases are very different from what was described here in court.  And so, you know, we should have an opportunity to explain why the application of those cases, you know, relate to this fundamental threshold issue of whether any cause of action is in fact property of the estate of the debtor.

THE COURT:  All right.  Now Mr. Brust.

MR. BRUST:  I just turned myself off.  Yeah, Your Honor.  I concur with Mr. Christian.  This is -- this has the cart way before the horse.  Standing is not an issue --

THE COURT:  (Indiscernible) you raised it by bringing it up with three cases.

MR. BRUST:  Well, but the issue here is we are still trying to discover who potential targets could be.  That discovery is -- you -- we can't now stop in time and say, are one of these three nonparties who are being subpoenaed appropriate targets?  And then even if you go further and say, well, we don't care about the parties who are being targeted here, we're talking about the information you're seeking could never be used to assert a claim on behalf of the Trustee.  That is not the case.  That's self-evident by Mr. Christian's practice where he does sue parties who are involved in market manipulation on behalf of companies.  There are cases like --

THE COURT:  After the initial stock has been issued

71

from -- which is what I believe, you know, your opponents are arguing so that the debtor is not the issuing entity at that time as it's being traded by non-debtor entities in a market manipulation. What is that case?

MR. BRUST: So the market -- I'll let Mr. Christian talk to it, but the 30,000 view is that market manipulation affects the price of the stock that would then be issued by the company. And then when the company goes to sell its stock, the market manipulation has depressed its stock price.

And sorry, Mr. Christian. Go ahead. You can --

MR. CHRISTIAN: (Indiscernible) --

THE COURT: I know that's your bailiwick.

MR. CHRISTIAN: -- (indiscernible) think that it's that simple, Judge, but I think in addition to that, that's just one group of claims. There are other claims in cases that aren't just 10b-5 claims. So at the end of the day, it -- it's back to Mr. Brust's point. What are the claims? Because in order to determine whether we have standing, you've got to figure out what your claims are. Well, we suspect what they are, but what they end up may be -- that may happen is a different matter. So we can't be relegated to not getting the discovery to figure out what are the claims, and we have to prove standing first. How can we prove standing until we know what the claims are? I mean, that's --

THE COURT: I understand that. You -- the -- let's

72

kind of -- again, all of this is narrowing down.  You're arguing to a bankruptcy judge about sophisticated market manipulation, securities issuance, and depressing prices that you are telling me will lead to a cause of action that it hurt the debtor as Meta Materials as opposed to the individual investors involved in those trades or not involved in those trades.  So, you know, what Mr. Fountain and Mr. Brody have articulated is the connection.  You know, I understand fraud claims.  I understand the Ponzi scheme, all of that, but the -- you are arguing more esoteric, specific causes of action on behalf of the debtor.  You know, I don't want to get into attorney-client.  I don't want to get into work product, but generically, I need to know what those causes of actions might be, a wish list of causes of actions that a debtor has for market manipulation of its stocks where the securities have already been issued by the debtor.

MR. CHRISTIAN:  Yeah.  I'd think we'd be happy to brief that, which Mr. Fountain has already alluded to, but just in its simplest form, you can't even bring a claim under 10b-5 for manipulation unless you are a seller or a purchaser of securities.  That seller was the issuer, and again, I'm going to be clear.  I'm not saying that's the only claims we can bring, Judge Spraker, but just on that specific claim.  The --

THE COURT:  The original issuer.

MR. CHRISTIAN:  The original issuer is the only party

who can bring that claim because they're the only seller, Judge Spraker.  There is no other seller, and what we're alleging potentially as a claim -- not the only claims -- is that the manipulative acts of certain defendants out there in the marketplace are the causational link that caused the issuer to sell its stock at $0.05 versus a hundred dollars.  And therefore, in fact, it probably causationally -- this may be a stretch -- it caused the whole company to go into bankruptcy because as the Court knows, the currency of an issuer is its stock.  If you impair their currency, they are going to be out of business.  And so we would have to prove in a court of law and a jury charged that ultimately, the causational link between the depression in that price at the time that that seller, the issuer issued those shares was directly an attribute to this defendant this much, this defendant this much, and this defendant this much.  That is the long and short of how that 10b-5 market manipulation claim works.  So it's only attributed to the seller, and there is only one seller, Judge, in this -- in the concept we're pursuing is the issuer, who is our client in this case.

MR. FOUNTAIN:  All right.  Your Honor, if I --

THE COURT:  Mr. Fountain, I -- from your reactions during that -- during Mr. Christian's discussion, I could tell you have a strong disagreement to that.  I think that is convincing me that I would like some briefing on that.  Look, I

74

am well aware that this is not a 12(b) motion.  We are not there.  Whether I -- first question I have to analyze is whether this is a 2004 or solely a 40 -- Rule 45 situation.  Right?

After that, I have to analyze -- you know, the movants have articulated that this will never inure to the debtor's benefit, and they have raised a standing issue -- raised.  It wasn't really developed anywhere in where we are now or where I expect I guess we'll get if I allow the supplemental briefing.  But I -- having traveled this road this far, I think it's important to get that clarity to see where that road ends for this motion.  Whether I use it or not, that's on me, and quite honestly, I couldn't give you an answer even if I wanted to at this point in time.  And I want to have the benefit of that to be able to articulate -- because, again, as I've kind of alluded to, I am really leaning towards the harassment aspect of the concerns of 2004 and Rule 45, which branches off the undue hardship, as Mr. Fountain has argued.

If there is -- if it is abundantly clear beyond purview at this point that there can never be an asset for the estate given the structure of where the debtor was during this timeframes -- these timeframes, that's one thing.  But as Mr. Brust indicated, if there's a possibility, even if it may never come to be a fruition, if there's a possibility, then I think this is an appropriate exercise.  So I need that more

clarity.  I need the parties to go into it explaining it from that vantage point of what the debtor could possibly have, you know, under whatever may be discovered if it went their way in light of what is being asked.

So yeah.  I don't think keep throwing more cases at me.  The parties obviously have a better control and understanding because you're involved with them throughout the country.  It's really fruitful here, but I do think giving some additional time for that to tie it back into could it ever be something that results in a permissible exercise of the Trustee's discretion at this point.  So I think I will take up the offer for the supplemental briefing.

MR. CHRISTIAN:  I think that's a good thing, Judge. We'd appreciate that.

THE COURT:  All right.  In light of that, Mr. Fountain -- you know, quite honestly, Mr. Brody, Mr. Christian, Mr. Brust, do we continue, or do we wait to get that supplemental briefing and come back for a more targeted discussion on the substance?

MR. CHRISTIAN:  I think the briefing, Your Honor, first because I think that's going to give the accord to be able to make a more educated and comprehensive decision as opposed to slicing this pie up.  I think that answering those questions is going to really aid the Court and, frankly, everybody on the call to get the right decision.

76

THE COURT: Okay.

MR. FOUNTAIN: Your Honor --

MR. BRODY: Your Honor, I actually agree with Mr. Christian. I -- because it's -- because this a threshold issue, I don't even think you get to the substance if they can't pass the muster under Rule 2004 of being a debtor's asset.

MR. FOUNTAIN: Your Honor, I -- on behalf of Citadel Securities, you know, we agree as well, and we're happy to confer with Counsel for the Trustee as to a briefing schedule. I think one additional item that might be helpful to have is guidance from the Court as to -- you know, you've heard a lot from us today about how we've asked, you know, why do you need this information, what are you looking for, and if, you know, that's work product. You know, if it -- I think it would be more productive in the context of, you know, what are these issues, who do these claims belong to, could there ever permissibly be a cause of action if the Trustee is -- will share with us, you know, why it is they're looking for these documents, what causes of action they think they're pursuing. I've heard some of that today from Mr. Christian. I think it would be helpful for us to have that for the supplemental briefing.

MR. CHRISTIAN: And from our perspective, Judge, that's too much of an ask. How can I determine what the cause

of action are when I don't have the underlying documents to support the causes of action?  So I mean (indiscernible) --

THE COURT:  Yeah.  And that's why I think really -- there's a fine line here, but it's all the -- this entire argument really is in the fine line and drawing -- you know, drawing that line as between what is the Trustee's generalized exercise of Rule 2004 versus, you know, litigation preparation. So I really would like to keep it in the generic, you know, informed by the context of where the debtor was and then is now in bankruptcy.  All right?  And, you know, taking your point, Mr. Fountain, in that this is not the issuer.  There's a fundamental disagreement of whether the debtor is the issuer for the cause of action.  You know, that needs to get played out a little bit in this discussion because that -- that's just too fundamental to the causes of actions as I see it.

Now, you know, the specifics -- you know, I think you've gotten quite a bit from Mr. Christian's discussion about the routing.  We'll ultimately work back to the targets of the discovery's involvement and potential exposure.  I mean, that's abundantly clear from this.  So I think that's the predicate. If those transactions might lead to a cause of action held by the estate, that's all I need at this point.  So subject to your undue hardship that this is going to create all of that, which we can get into a little more detail at the next session, but, you know, at that point, to the extent that there is any

78

viable cause of action out there for the estate as the estate, then I think, you know, some preliminary use of pre-discovery, you know, availability, whether it is 2004 or 45, as Rule 45 is likely going to be warranted.

MR. HARTMAN: (Indiscernible) what does your calendar look like for December?

THE COURT: I think it's generally open, Mr. Hartman. It's just that at some point I shut down for the year. So I think I'll go -- I think the last matter I have -- yeah. We are certainly open through the 19th and, you know, maybe through the 22nd. And then back on January 6th, I believe.

MR. DAHU: Your Honor, not to drive the schedule off, I personally have a trial beginning of December and then a preliminary injunction hearing on December 18th, but I'm happy to confer with Counsel for the Trustees about dates and come back to the Court with a joint proposal if that would be workable for the Court or however you'd like to proceed.

THE COURT: Certainly. Yeah. The -- so I don't really see anything dominating the calendar yet, Mr. Hartman. So that's -- and January is fairly -- I have a couple things, but nothing that suggests unavailability.

MR. HARTMAN: I think we'll be able to reach an agreement with co-counsel and Mr. Fountain.

THE COURT: Yeah. All right. And I look forward to that.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

79

MR. HARTMAN:  (Indiscernible) --

THE COURT:  Do you -- do we want to leave it in your hands, or do we want to set a quick scheduling or status conference just to keep some thumb on the scale here?

MR. HARTMAN:  It -- it's up to the Court, Your Honor. To keep control of your calendar, we can meet -- subject to Mr. Fountain's trial schedule, we can meet, you know, most any timeframe you set.

THE COURT:  Yeah.  I -- I'd let the parties figure it out, how and when and what order, if you want blind or if you want staged.  So while I -- let's see.  What do we have?  The 30th.

MR. BRODY:  Your Honor, if I could make a suggestion.

THE COURT:  Sure.  Go ahead, Mr. Brody.

MR. BRODY:  I am confident that the parties can reach an agreement on a briefing schedule and then work with your chambers on a hearing date, but if for some reason the parties believe that somebody's dragging their feet, which I don't believe anybody will, I think we could always come back to Your Honor to force a --

THE COURT:  Yeah.

MR. BRODY:  -- a status conference or whatever Your Honor needs -- or wants.

THE COURT:  And it's not -- I'm not even concerned about dragging the feet.  Just sometimes, it's helpful to have

80

a date, and sometimes, it's just better to get back in front of the Court. But to your point, you can always -- if both parties ask, I can set a status and scheduling, you know, within a day or so. So just let me know if that would be helpful if you can't figure it out between yourselves. So --

MR. BRODY: (Indiscernible) --

THE COURT: -- we'll leave it to the parties.

MR. BRODY: Thank you.

MR. FOUNTAIN: Thank you, Your Honor.

THE COURT: All right. Well, thank you for a very interesting morning here. I am getting a note from my law clerk. Mr. Hartman, Mr. Brust, you're aware that currently there are no hearing on Fridays.

MR. HARTMAN: That is correct.

THE COURT: So who knows how long that will happen, you know. Some of the parties that appear for me, I do generally set hearings on Fridays fairly frequently, but -- again, I don't see anything dominating the Court's calendar in the upcoming weeks that should be a problem. So we should be able to find you something very easily.

MR. HARTMAN: Thank you.

MR. CHRISTIAN: All right. Thank you, Your Honor.

MR. HARTMAN: (Indiscernible) --

MR. BRUST: Thank you.

MR. BRODY: Thank you, Your Honor.

81

THE COURT:  Thank you very much.  Unless there's anything else, that will conclude the hearing for today, and we'll be adjourned until the 1:30 calendar.

MR. FOUNTAIN:  Thank you.

MR. CHRISTIAN:  Thank you, Your Honor.

THE COURT:  Off record.

THE CLERK:  Thank you.  Off record.

(Proceedings concluded at 12:44 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Alicia F. Jarrett*

_____

ALICIA JARRETT, AAERT NO. 428     DATE: November 3, 2025

ACCESS TRANSCRIPTS, LLC