RECEIVED
AND FILED

APR 2 7 2026

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                              | Case No.: 24-50792-GS
META MATERIALS INC.,                | (Chapter 7)
                                    |
        Debtor.                     | **PARTY IN INTEREST SCOTT TRAUDT'S**
                                    | **OBJECTION TO EX PARTE MOTION TO FILE**
                                    | **UNDER SEAL DOCUMENTS RELATED TO**
                                    | **PARABELLUM CAPITAL, LLC LITIGATION**
                                    | **FUNDING AGREEMENT**
_____    |

Scott Traudt, shareholder, movant, and party-in-interest, files this objection to the

Trustee's Ex Parte Motion to File Under Seal Documents Related to Parabellum Capital, LLC

Litigation Funding Agreement, Dock. 2679, and states as follows:

The Trustee asks this Court to place under seal the very documents that would reveal who

is financing the estate's most consequential litigation, what recoveries may be pledged, how

litigation economics are structured, and whether hidden relationships or incentives may shape the

estate's decisions. That request should be denied.

Bankruptcy begins from a rule of public access, not private concealment. Section 107

makes filed papers public absent a narrow and proven basis for secrecy. The Trustee's motion

offers no such showing. Instead, it relies on generic assertions of confidentiality, seeks blanket

sealing rather than narrow redaction, and attempts to hide core estate-governance documents

including a UCC security agreement, a Meta-specific litigation budget, a Meta-specific retention

agreement, and a trilateral co-counsel and distribution agreement relating to the Meta litigation.

Dock. 2679, pages 2-3.

From the standpoint of a shareholder and party-in-interest, that is intolerable. The estate

is not private property. It is a fiduciary process conducted in public view, especially where the

Trustee's own papers state the arrangement may yield recoveries "for the benefit of creditors and,

1

potentially, for investors who purchased stock in Meta Materials Inc." Dock. 2683, page 2. Investors cannot be invoked as potential beneficiaries while being denied access to the machinery governing those potential recoveries.

The Court should be particularly skeptical here because the Trustee and her lead counsel have also chosen to operate in proximity to George Palikaras, a former Meta insider who is presently a defendant in the SEC's fraud action arising from the Torchlight-Meta transaction, and whose public conduct toward shareholders Scott Traudt and Danielle Spears has been openly defamatory, hostile, and coercive. His presence around the estate only heightens the need for daylight. He is - incredibly – part of the estate's "litigation team." See Dock. 2265-6, page 11, heading dated 12/03/2024.

For these reasons, and those below, the Court should deny the motion to seal, or at minimum require narrowly tailored public redactions supported by specific evidence.

## II. RELEVANT BACKGROUND

The Trustee's motion states it was filed in connection with the Special Litigation Counsel Application and the disclosure of the funding arrangement at Dock. 98-2. Dock. 2679, page 1. The motion describes the arrangement as a litigation-funding portfolio between certain "Christian Firms" and Project Blazer, LLC, an affiliate of Parabellum. Dock. 2679, page 2.

The Trustee's motion also publicly reveals that the sealed submission includes all of the following:

(1) a Sixth Amended and Restated Prepaid Forward Purchase Agreement;

(2) a UCC security agreement granted by the Seller to the Buyer;

(3) a budget for individual litigations, including the Meta litigation against "DTC, and others, including certain brokers";

2

(4) a separate Meta retention agreement with a budget itemization "up to $11,800,000" (Dock. 2679, page 3); and

(5) a "Trilateral Co-Counsel And Distribution Agreement" among Christian Attar, Schneider Wallace Cottrell & Konecky, and Kasowitz Benson Torres relating to the Meta and Genius litigations. Dock. 2679, page 3.

The supporting declaration for sealing identifies no specific clause constituting a trade secret, no specific term constituting confidential commercial information, and no concrete harm from disclosure. Instead, the Trustee merely states that she "believe[s]" the documentation includes trade secret or confidential research, development, or commercial information. Dock. 2680, page 1.

The ratification papers do not cure that failure. The Trustee states only that she reviewed the documents and confirmed they contain language that Parabellum has "no control whatsoever" over any decision she makes as Trustee to resolve litigation, and that this form of funding is "not uncommon." Dock. 2683, pages 1-2. James W. Christian likewise states that Parabellum has provided "portfolio funding" across several cases. Dock. 2684, page 2.

Thus, the public record already shows that this is not a narrow issue involving an isolated fee arrangement or a harmless confidentiality clause. It is a multi-case portfolio structure involving security interests, budgets, retention terms, and co-counsel distribution mechanics directly tied to estate litigation.

### III. LEGAL STANDARD

Section 107(a) provides that papers filed in a bankruptcy case are public records open to examination. The exceptions in Section 107(b) are narrow and must be proven, not presumed.

3

As the Second Circuit held in *In re Orion Pictures Corp.*, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." 21 F.3d 24, 27 (2d Cir. 1994). The court further explained that commercial information means information that would cause "an unfair advantage to competitors." Id. at 27.

Disclosure duties are especially strict where professional relationships, connections, and incentives are concerned. In *Neben & Starrett, Inc. v. Chartwell Fin. Corp.* (*In re Park-Helena Corp.*), the Ninth Circuit held that "[a] law firm must at least disclose the facts of the transaction, as those facts were known to the firm." 63 F.3d 877, 881 (9th Cir. 1995). The court explained that Rule 2014 "assists the court in ensuring that the attorney has no conflicts of interest and is disinterested," and held that "[e]ven a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees." Id. at 881-82.

Likewise, *Bank Brussels Lambert v. Coan* (*In re AroChem Corp.*) explains that Section 327 is designed to ensure "undivided loyalty" and "untainted advice and assistance in furtherance of their fiduciary responsibilities." 176 F.3d 610, 623 (2d Cir. 1999).

And courts require evidence, not labels. In *Motors Liquidation Co. Avoidance Action Trust v. JPMorgan Chase Bank, N.A.* (*In re Motors Liquidation Co.*), the court held that "[e]vidence-not just argument-is required to support the extraordinary remedy of sealing." 561 B.R. 36, 43 (Bankr. S.D.N.Y. 2016).

These principles govern here. The Trustee had the burden to justify secrecy with particularized facts. She did not do so.

## IV. ARGUMENT

**A. The Motion Is Procedurally Improper, Conclusory, and Unsupported by Competent Evidence.**

4

The motion is ex parte, yet identifies no emergency requiring secrecy without meaningful adversarial testing. It seeks blanket relief over a contract structure that directly affects parties in interest, yet offers only generalized assertions and a conclusory declaration. Dock. 2679, pages 1, 5; Dock. 2680, page 1.

No declaration from Parabellum or Project Blazer identifies which precise clauses are allegedly secret. No competent witness explains what specific injury would result from public disclosure. No one explains why narrow redactions would not suffice. No one explains why shareholders and other parties in interest should be denied access to the identity, economics, and structure of a funding arrangement affecting estate litigation.

That failure is fatal. As *Motors Liquidation* put it, "[e]vidence-not just argument-is required to support the extraordinary remedy of sealing." 561 B.R. at 43. Here the Trustee offered argument, adjectives, and incantation. She did not offer proof.

**B. The Motion Is Facially Overbroad Because It Seeks Blanket Sealing Rather Than Narrow Redaction.**

The Trustee expressly states that she is "not requesting the redaction of any papers filed with the Court." Dock. 2679, page 4. Instead, she seeks to seal the entire agreement and all exhibits. Dock. 2679, page 5. That is a tarp, not a scalpel.

If truly sensitive details exist, they can be redacted. But the Trustee instead seeks to conceal the entire architecture, including a UCC security agreement, a Meta litigation budget, a Meta retention agreement with a budget up to $11.8 million, and a trilateral co-counsel and distribution agreement. Dock. 2679, pages 2-3. Those are precisely the kinds of provisions parties in interest need to assess whether estate recoveries have been pledged away, diluted, cross-collateralized, or influenced by undisclosed incentives.

Blanket sealing is especially improper where the motion itself already describes the nature of the documents. One cannot publicly describe the wiring diagram and then insist the actual wiring must remain secret because someone whispered "commercial information."

### C. The Trustee Has Not Shown That the Concealed Material Constitutes "Commercial Information" Under Section 107(b).

Under *Orion*, commercial information is information that would create "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." 21 F.3d at 27. The Trustee has made no showing that disclosure of the funder identity, funding structure, collateral, budget controls, distribution waterfall, reporting rights, or settlement economics would hand a market competitor some unfair business advantage.

At most, the implicit theory seems to be that disclosure would make future funding negotiations or future litigation more uncomfortable. That is not enough. *Ditech* rejected precisely that kind of overreach, holding that "bargaining leverage in future unrelated cases does not rise to the level of 'commercial information' under section 107(b)." 2019 WL 3294684, at *9.

An arrangement affecting estate litigation cannot be hidden simply because scrutiny is inconvenient.

### D. Sealing Improperly Conceals Potential Conflicts and Adverse Interests Involving Special Counsel and the Estate's Litigation Team.

The motion itself admits that the sealed materials include a "Trilateral Co-Counsel And Distribution Agreement" among Christian Attar, Schneider Wallace Cottrell & Konecky, and Kasowitz Benson Torres relating to the Meta and Genius litigations. Dock. 2679, page 3. It also admits that the arrangement is part of a broader litigation portfolio spanning multiple matters. Dock. 2679, pages 2-3; Dock. 2684, page 2.

6

Those facts go directly to disclosure, disinterestedness, and adverse interests. Under *Neben-Starrett*, "[a] law firm must at least disclose the facts of the transaction, as those facts were known to the firm." 63 F.3d at 881. That rule exists because it "assists the court in ensuring that the attorney has no conflicts of interest and is disinterested." *Id.*

The Trustee's assurance in the separate ratification papers that the documents contain language stating the funder has "no control whatsoever" over her litigation decisions, Dock. 2683, page 1, is not a substitute for disclosure. Control can be exerted economically rather than formally, through budgets, default provisions, reporting rights, distribution priorities, consultation rights, and cross-case portfolio incentives, while still disclaiming legal "control."

That is exactly why the actual documents matter.

**E. Blanket Sealing Prevents Parties in Interest from Identifying the Real Counterparty Interests.**

The motion states that the "Buyer" is Project Blazer, LLC, an affiliate of Parabellum, and separately asserts that the agreement contains trade secrets of Project Blazer, LLC. Dock. 2679, pages 2, 4. Blanket sealing prevents parties in interest from understanding who actually stands behind that entity, whether rights have been assigned onward, whether additional participants have beneficial interests, and exactly what interests in litigation proceeds have been pledged.

That is not a side issue. If estate recoveries are the jewels, parties in interest are entitled to know whose hands are already in the box.

This concern is heightened because the motion itself states that the Christian Firms granted a security interest in anticipated recoveries across multiple litigations, including Meta. Dock. 2679, page 2. The Court should not approve a black-box structure affecting estate value while parties in interest are denied access to the underlying terms.

7

**F. The Public Description Already Shows That the Sealed Material Goes to Estate Property and Estate Process, Not Merely a Private Funder's Proprietary Information.**

The Trustee's own motion reveals that the sealed package includes a UCC security agreement, a Meta-specific budget, a Meta-specific retention agreement, and a co-counsel and distribution agreement. Dock. 2679, pages 2-3. Those documents concern litigation proceeds, litigation spending, counsel economics, and recovery allocation.

That means the requested seal extends well beyond private know-how. It reaches the machinery by which estate claims may be financed, governed, and monetized. Section 107 does not permit converting estate-governance documents into a private vault merely because a litigation funder would prefer darkness.

If some exhibits relate to unrelated matters, that only weakens the motion further. The Trustee could have severed or redacted genuinely irrelevant third-party material. Instead, she chose blanket concealment of the entire package.

**G. Other Bankruptcy Cases Do Not Justify This Degree of Secrecy When Litigation Funding Bears Directly on Estate Value.**

When litigation funding bears directly on estate value, courts do not treat it as some mystical artifact that evaporates in sunlight. They often require public disclosure of core terms or at least publicly disclose major funding mechanics.

In *In re Fresh Acquisitions LLC*, the court required the litigation funding agreement to be filed "unsealed and unredacted," stated that "Transparency is a hallmark of bankruptcy," and concluded that the trustee's entry into the agreement was "harmful to the creditors/trust beneficiaries." Case No. 21-30721-sgj11, Dock. 1142, pages 2, 4 (Bankr. N.D. Tex. Aug. 5, 2025).

8

Likewise, in *In re Islet Sciences, Inc.*, Case No. 19-13366-MKN (640 B.R. 425) the court publicly discussed the filing of the litigation funding document under seal, approval of funding and security agreements, approval of a $3.5 million litigation-funding facility, and a first-priority security interest in litigation proceeds. In that case, a limited litigation funding agreement was sealed, but the length and breadth of the seal request in this matter dwarfs that of *Islet*. Memorandum Decision After Trial, pages 4-5 (Bankr. D. Nev. Mar. 14, 2022).

The point is not that every digit of every agreement must always be public. The point is that high stakes do not weaken the presumption of transparency. They strengthen it.

**H. Secrecy Is Especially Dangerous Here Because Meta May Have Been Shorted and Manipulated into Insolvency, and a Hidden Funder Could Thwart Investigation and Recovery.**

Movant believes Meta may have been shorted and manipulated into ruin.[1] Whether that precise theory is ultimately proven or not, the Trustee's own motion identifies the Meta litigation as involving "DTC, and others, including certain brokers." Dock. 2679, page 3.

If estate litigation may explore market structure abuse, settlement failures, broker misconduct, naked shorting, or related wrongdoing, then the identity and incentives of the funding source matter enormously. A hidden funder with interests adverse to full investigation could prefer narrow claims, weak targets, cheap settlements, selective silence, or delayed discovery.

And that concern is not abstract. The SEC's own public enforcement materials describe a scheme to inflate the stock price, a preferred dividend "specifically designed to cause a 'short squeeze,'" and an ATM offering used to exploit the resulting artificial price spike. *In the Matter*

---

[1] Movant believes the Trustee's Rule 2004 subpoenas to Citadel et. al. are warranted fishing expeditions under Rule 2004 but seems to have missed the forest for the trees when it came to Sabby Management LLC and Jane Street Group. Traudt has filed subpoenas for their trade data.

9

*of Meta Materials, Inc.*, Securities Act Release No. 11292, Exchange Act Release No. 100415, Admin. Proc. File No. 3-21976, at 2-3 (June 25, 2024).[2] The SEC complaint against Brda and Palikaras alleges that they manipulated Torchlight stock, that the stock rose more than 200% in a week, and that Palikaras "fully embraced and participated in the scheme." *Securities and Exchange Commission v. Brda*, No. 4:24-cv-01048-SDJ, Compl. ¶¶ 1-8 (E.D. Tex. June 25, 2024).

If the estate is now supposed to investigate or recover from the wreckage of that episode, parties in interest have every right to know who is financing the investigation and what incentives may be attached to it.

**I. The Trustee's and Her Lead Counsel's Judgment Is Already in Serious Doubt Because They Have Brought George Palikaras into the Estate's Orbit Despite His SEC Fraud Exposure and Obvious Adversity to Shareholders.**

The Court should be especially reluctant to indulge secrecy here because the judgment of the Trustee and her lead counsel, Jeffrey Hartman, is already in serious doubt based on their willingness to operate in proximity to George Palikaras at all.

Palikaras is not a neutral former executive with harmless institutional memory. The SEC's settled order against Meta states that the company "engaged in a scheme to inflate the price of its stock and defraud investors" and imposed a $1 million civil penalty. *In the Matter of Meta Materials, Inc.*, at 2, 15. The parallel SEC complaint alleges that Brda told Palikaras about the scheme at the outset, that "Palikaras fully embraced and participated in the scheme," and that he helped deceptively promote the short-squeeze narrative and related false statements. Brda, Compl. ¶¶ 4-8.

---

[2] See https://www.sec.gov/files/litigation/admin/2024/33-11292.pdf?utm_source=chatgpt.com

10

The complaint further alleges that Palikaras told investors the company was speaking to "the right potential buyers" and that they were "top tier," when in fact no such buyers had been identified, and that he promoted a $1 to $20 per-share narrative that "had no basis in fact." *Brda*, Compl. ¶ 6. The SEC materials also recount that when his private short-squeeze comments began circulating publicly, Palikaras feared the deal would "blow up" if those communications became public. *Brda*, Compl. ¶ 50.

A trustee and estate counsel are supposed to bring distance, disinterestedness, and disciplined judgment. They are not supposed to draw close to one of the principal public figures from the underlying SEC fraud case and then ask the Court to trust them with sealed funding documents, sealed economic relationships, and sealed litigation architecture.

Section 327 is designed to ensure "undivided loyalty" and "untainted advice and assistance in furtherance of their fiduciary responsibilities." *In re AroChem Corp.*, 176 F.3d at 621. Bringing Palikaras into the estate's orbit cuts in the opposite direction. He has every reason to prefer some narratives over others, some defendants over others, some investigations over others, and some recoveries over others. That is not neutrality. That is material adversity.

This background matters directly to sealing. A Court might be more willing to trust fiduciaries who have earned unusual confidence. But where the Trustee and her counsel have chosen to work alongside or rely upon a figure like Palikaras, while simultaneously asking the Court to hide the funding structure, budgets, distribution agreements, and co-counsel arrangements, the case for public access becomes stronger, not weaker.

**J. Palikaras's Public Accusations Against Traudt and Spears Are Facially Defamatory, Show Knowing Falsehood or Reckless Disregard for the Truth, and Further Prove He Is a Bad-Faith Actor in This Case.**

11

Palikaras's public attacks on Scott Traudt and Danielle Spears are not merely crude social-media outbursts. They are further evidence of personal animus toward shareholders demanding transparency, and they reinforce why neither the Trustee nor her counsel should be trusted to place him anywhere near the estate's litigation efforts.

Most serious of all, Palikaras publicly accused Traudt and Spears of "extortion:"

> Word of advice: bring actual documents, not drama. Oh but wait... you have none... and everyone (including Spears and Traudt) keep knocking on MY door for it... so that they can extort people for money for themselves according to what we learned today. Go ahead and ask them, maybe they should challenge Brda to produce the 408 letters.

See full Exhibit A. Those are not vague insults. They are direct accusations of criminal conduct against identifiable individuals. He then (this excerpt is from Exhibit B) accuses Spears of mental illness – though he isn't a doctor:

> Despite your 62 yrs of age it's never too late to grow some common sense. Listening to the recording today i am genuinely worried that you are experiencing "AI brain fry" showing many of the symptoms mentioned by medical experts, just my humble opinion.
>
> In fact, here is a recent Harvard Business Review article coverage of "AI brain fry" (by the way coffee amplifies it) and related work on AI-driven cognitive fatigue and burnout in knowledge workers and what to do about it, enjoy:
> hbr.org/2026/03/when-u...

He, then (Exhibit C) states "what was your $$$ price? Care to share? I bet it was real low." He knew this accusation, in and of itself, was libelous as he knew exactly what I asked for, had seen my demand letter to McCabe for defamation, knew it had nothing to do with MMTLP or NBH shares. But here's Exhibit D, clearly showing his snakelike, forked-tongue behavior on

February 27, 2026 (Traudt texts are in green/right margin aligned), and clearly *Palikaras is aware that Traudt's offer on the defamation was valid*:



Last but not least, Palikaras shows he can't remember what lies he's telling and at what time because on March 30, 2026, he sends (to Traudt E) another text via Signal stating that Traudt was shaking down McCabe "for $70-80k to do the same [as Spears] (to walk away)." He knew this was a lie, and he once again alleges extortion:

> she had some friendly lawyers help her submission. I also learned that In Q4 you had asked McCabe for $70-80k to do the same (to walk away). It is none of my business if you or 1209 want to do this kind of work professionally and serve or extort people for the highest bid. I am guessing at the time you asked for the money from McCabe, you were not planning to share that $70-80k with any of the rest of the 1209. It's also interesting in your post today you not once mentioned McCabe. I hope I am wrong in thinking of you as someone who is just another hired gun, for which I would be happy to apologize, and 1209 becomes known for fighting for real justice.

This all matters here because a person who publicly brands shareholders as extortionists after being expressly told the issue concerning a defamation claim is not merely intemperate. He is willing to distort facts to damage opponents. That is precisely the sort of actor whose proximity to the estate's litigation efforts makes transparency more important, not less, and calls into question the Trustee's judgement and especially whether she should be trusted to call balls and strikes with a litigation funding contract/agreement of *War and Peace* size.

**K. The Estate Is Running Out of Time on a Record Already Showing That the TRCH/MMAT/MMTLP/Next Bridge Structure Was Tainted From the Start (and the Entire Litigation Funding Request Was Moot From the Jump Because the Estate Could Have Brought an Avoidance Action Against Greg McCabe)**

The public record already in hand is more than sufficient to justify immediate estate action against Gregory McCabe, the controlling figure of Next Bridge Hydrocarbons, Inc. ("Next Bridge"), and it also implicates George Palikaras as an executive who helped carry the narrative

14

across the merger and into the preferred-dividend and spin-off structure. The Estate is now moving toward the August 2026 limitations wall under 11 U.S.C. § 546(a) while sitting on a record showing fraudulent-transfer taint, false sale narratives, concealed spin-off planning, and a later sweetheart debt deal for Gregory McCabe.

The Arabella record is the right place to start. In *In re Arabella Petroleum Company, LLC,* Case No. 15-70098, Doc. 419 and Doc. 419-1 (Bankr. W.D. Tex.), the record reflects Chapter 11 Trustee fraudulent-conveyance claims against McCabe Petroleum Corporation over Orogrande transfers for no apparent consideration, along with a $2.1 million settlement that purchased a § 550 subsequent-transferee release covering Torchlight and Next Bridge. It also reflects allegations of multiple Hoisager fraudulent transfers and a proceeding that, on Movant's understanding, was never disclosed in Next Bridge SEC filings despite its apparent materiality. The point is straightforward: the Orogrande chain of title underlying the legacy-asset story was already clouded by fraudulent-transfer allegations before it was repackaged for the TRCH/MMAT/MMTLP/Next Bridge structure. McCabe Petroleum Corporation paid $2.1 million not because the title had been judicially vindicated, but to buy peace and protection for later transferees. Put plainly, the title was not adjudicated clean.

The Arabella materials therefore show why the TRCH legacy-asset narrative was compromised from inception. If McCabe Petroleum Corporation obtained the Orogrande lease transfers for no apparent consideration, and if the resulting settlement expressly purchased protection for later transferees such as Torchlight and Next Bridge, then Torchlight's title position was not vindicated by adjudication. It was stabilized by settlement money. When that same compromised title path later became the backbone of MMTLP and Next Bridge, the spin-off began to look like the repackaging of a tainted asset story for public consumption.

15

That point sharpens further when paired with the direct judicial credibility finding against Gregory McCabe. In *Weiss v. Arabella Exploration Inc. et al.*, Adversary No. 16-07002-tmd (Bankr. W.D. Tex. Dec. 22, 2022), Bankruptcy Judge Tony M. Davis stated: "As Mr. McCabe's testimony largely parrots that of Mr. Hoisager, Mr. McCabe was not credible, either." (Footnote 160, page 20 of Exhibit F.) Gregory McCabe is therefore not merely a counterparty whose account can be weighed neutrally. He is a central actor in the same Orogrande orbit, and a federal bankruptcy judge has already found him not credible.

The public record also includes *Quilling v. Cupini and Cadet Holdings, Inc.*, Civil Action No. 3:00-CV-2258-M (N.D. Tex.), arising out of *SEC v. Funding Resources Group, et al.*, Case No. 3:98-CV-2689-M (N.D. Tex.), where the Court issued an asset freeze order on July 22, 1999, and *Armstrong et al. v. American Pallet Leasing, Inc. et al.*, Case No. 5:2007-cv-04107 (N.D. Iowa), which resulted in a $900,000 RICO/fraud default judgment against John Brda. Those matters further undermine any claim that Brda entered the TRCH/MMAT structure with clean hands.

The later SEC enforcement record then ties that compromised asset story directly to the MMTLP and Next Bridge structure. In *In the Matter of Meta Materials, Inc.*, the SEC found that Meta engaged in a scheme to inflate the price of its stock and defraud investors, that the preferred dividend was designed to cause a short squeeze, that Meta misrepresented its efforts to market and sell the oil-and-gas assets, and that it concealed a planned spin-off into a new entity. In the parallel case, *Brda/Palikaras*, the SEC alleged that Orogrande was undeveloped, had no proven reserves, had unsuccessfully been marketed for years, and could not realistically be sold on the timeline being represented to investors; that Brda had already begun planning the spin-off in December 2020; that he secretly started funding the spin-off management team in January

16

2021; and that Palikaras helped carry forward the false valuation, buyer, and short-squeeze narrative. *On the SEC's theory, MMTLP was the preplanned residual vessel for assets that could not be sold as represented while the market was simultaneously being manipulated through the preferred-dividend and short-squeeze story.*

That is why this is not merely a disclosure problem. It is a fraudulent spin-off problem. When the federal enforcement record is laid over the Arabella record, the picture that emerges is of a tainted title chain, a fraudulent-conveyance settlement protecting later transferees, a federal judicial credibility rebuke against Gregory McCabe, and a later SEC fraud case saying the spin-off itself was secretly being built while the market was being sold a false story. On this record, MMTLP was not a clean spin-off that later went bad. It was a fraudulent spin-off by Meta.

Meta's own March 31, 2024 Form 10-Q then makes the McCabe issue concrete. Meta disclosed that it had loaned Next Bridge $15.0 million under the 2021 Note and $5.0 million under the 2022 Note, then sold those notes receivable to Gregory McCabe for only $6.0 million cash despite stating that the receivables carried a $24.0 million outstanding balance as of August 7, 2023. Thus, on Meta's own numbers, the transaction reflected an immediate $18.0 million haircut to the debtor's stated receivable position. Even crediting the additional fixed consideration later identified by Meta, namely the $0.5 million stock purchase McCabe made before termination of the SPA and the $0.7 million payment Meta says it received in January 2024 under the Release Agreement, the disclosed consideration totals only $7.2 million, still leaving a $16.8 million gap against the stated $24.0 million balance. Even if the contingent extra $0.7 million were later paid, the gap would still be $16.1 million. This is not a routine arm's-length workout. It is a facially extraordinary insider-adjacent transfer in favor of Gregory McCabe, the same Gregory McCabe already found "not credible" in the Arabella litigation.

17

No serious Chapter 7 fiduciary could look at that sequence and remain passive. The Estate has before it a fraudulent-conveyance record tied to the Orogrande transfers, a federal judge's credibility rebuke against Gregory McCabe, SEC findings that Meta concealed the spin-off while falsely touting a sale path, SEC allegations that Brda and Palikaras orchestrated the fraudulent merger, preferred-dividend, and spin-off structure, and a later Meta filing showing Gregory McCabe receiving an extraordinary discount on Meta's Next Bridge receivables. That is more than enough to justify immediate investigation and litigation under 11 U.S.C. §§ 544, 548, and 550, as well as any available state-law fraudulent-transfer theories. If the Estate allows the August 2026 limitations period to close without bringing or at least fully developing claims against Gregory McCabe and the Brda/Palikaras/McCabe network, that will not look like caution. It will look like abdication.

Bottom line: Lovato could have sought the $14 million to $18 million McCabe walked away with under terms beneficial only to himself as early as fall 2024. She did not. This litigation-funding ordeal would have been unnecessary.

**L. The Trustee Cannot Invoke Investors as Potential Beneficiaries While Simultaneously Denying Them Transparency.**

In the separate ratification papers, the Trustee expressly states that the funding arrangement presents an opportunity to recover substantial monies "for the benefit of creditors and, potentially, for investors who purchased stock in Meta Materials Inc." Dock. 2683, page 2.

That admission matters. Investors cannot be invoked as possible beneficiaries when the Trustee seeks approval or ratification, then treated as outsiders when they ask to see the terms that may shape recoveries, distributions, settlement pressure, and counsel incentives.

If the funding arrangement is truly sound, sunlight should strengthen it, not destroy it.

18

**M. At Minimum, the Court Should Require Public Filing with Narrowly Tailored Redactions.**

If the Court determines that some protection is warranted, the remedy should be narrow redaction rather than blanket sealing. At minimum, the public record should disclose:

- The state Project Blazer LLC registered.
- The identity of all counterparties and affiliates with economic interests in the agreement;
- Any security interests, liens, or assignments affecting Meta litigation proceeds;
- Any provisions bearing on control, consultation, consent, termination, budgets, reporting, settlement economics, or default;
- Any co-counsel or distribution provisions allocating recoveries or fees in the Meta matter; and
- Any provisions reflecting cross-collateralization or portfolio treatment tying Meta recoveries to unrelated litigations.
- If specific banking details or proprietary pricing formulas truly warrant protection, those can be redacted. But the structure itself should not be hidden.

## V. CONCLUSION

On the Trustee's own papers, this is not sound business judgment. It is value destruction dressed up as necessity. The Trustee now asks the Court to ratify an $11.8 million Parabellum funding structure on the theory that, absent that arrangement, the estate 'would simply have to abandon a potential recovery.' But that claim is impossible to square with the simultaneously identifiable McCabe-related asset gap of approximately $16 million to $18 million, which appears to have required no comparable funding architecture and no comparable front-loaded dilution. *McCabe's wildly indefensible loan deal was such low-hanging fruit that one needed to step over it rather than duck...* worse, the Trustee's own waterfall shows just how punishing the Parabellum deal is to the estate: out of a hypothetical $50 million recovery, the estate would receive only $23,772,000, while the funder would take $19,670,000 off the top and special litigation counsel would receive another $6,588,000. In other words, before creditors and shareholders see even half of the first $50 million, roughly $26.2 million is already diverted

19

away from the estate under the very arrangement the Trustee asks this Court to bless. When that dilution is contrasted with the unpursued $16 million to $18 million McCabe asset gap, the resulting economic harm is staggering: approximately $42.2 million to $44.3 million in lost value or forced dilution. That is not prudent estate administration. It is a decision to bypass a plainly identified, lower-cost source of recovery and instead burden the estate with a deal that enriches the funder and the lawyers first.

For the foregoing reasons, Scott Traudt respectfully requests that the Court:

1. Deny the Ex Parte Motion to File Under Seal, Dock. 2679;

2. Order the Trustee to file the litigation funding agreement and exhibits publicly; or, alternatively,

3. Require the Trustee to submit a narrowly tailored proposed redaction set, supported by competent evidence identifying each redaction, the legal basis for it, and the concrete harm from disclosure;

4. Remove George Palikaras from the "litigation team" and bar him from contact from data, files, and access to Estate legal and fiduciary operations.

5. Grant such other and further relief as the Court deems just and proper.

Dated: April 22, 2026

Scott Traudt, *pro se*
Movant
191 Kibling Road
Strafford, VT 05072

20

I hereby certify that a true copy of the foregoing was sent to all named parties and others with interests in this matter and at the addresses delineated below either by 1st Class mail or via email on this ⟋⟋ⁿᵈ day of April, 2026.

Scott Traudt, *pro se*
*Intervenor/Movant*
191 Kibling Hill Road
Strafford, VT 05072

**U.S. Department of Justice** PO Box 18417, Reno, NV 89511
Christina W. Lovato – trusteelovato@att.net ; NV26@ecfcbis.com
**Office of the U.S. Trustee**
U.S. TRUSTEE - RN - 7 USTPRegion17.RE.ECF@usdoj.gov
**Hartman & Hartman** 510 W. Plumb Lane Ste. B, Reno, NV 89509
Jeffrey L. Hartman – notices@bankruptcyreno.com; abg@bankruptcyreno.com
**Perkins Coie LLP** 2525 E. Camelback Road, Suite 500, Phoenix, AZ 85016
Bradley Cosman – bcosman@perkinscoie.com
**ChristianAttar** 1177 W. Loop S., Ste.1700, Houston, TX 77027
James "Wes" Christian – jchristian@christianattarlaw.com
**Kasowitz Benson Torres LLP** 1633 Broadway, New York, NY 10019
Steven Tountas – stountas@kasowitz.com legal-notices@kasowitz.com
**Cooper Levenson** 3016 W. Charleston Blvd. Ste. 195, Las Vegas, NV 89102
Michael R. Brunet – mbrunet@cooperlevenson.co m
**Robison, Sharp, Sullivan & Brust** 71 Washington St., Reno, NV 89503
Clayton P. Brust cbrust@rssblaw.com

21