UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

RECEIVED
AND FILED

APR 27 2026

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

In re:

META MATERIALS INC.,

Debtor.

| Case No.: 24-50792-GS
| (Chapter 7)
|
| **DECLARATION OF SCOTT TRAUDT IN**
| **SUPPORT OF HIS OBJECTION**
| **TO TRUSTEE'S MOTION TO SEAL**

I, Scott Traudt, declare under penalty of perjury as follows:

1. I am a shareholder, party in interest, and movant in the above-captioned bankruptcy matter. I am over the age of eighteen and competent to testify to the matters stated herein. I have personal knowledge of the facts set forth below, and if called as a witness, I could and would testify competently thereto.

2. Attached as Exhibit A, titled "X Post Accusing Traudt of Extortion," is a true and correct copy of an April 18, 2026 post on X authored by George Palikaras.

3. Attached as Exhibit B, titled "X Post Questioning Spears' Sanity," is a true and correct copy of a post, or posts, on X authored by George Palikaras dated on or about April 18, 2026 through April 21, 2026.

4. Attached as Exhibit C, titled "X Post Implying Walkaway Price," is a true and correct copy of a post, or posts, on X authored by George Palikaras dated on or about April 18, 2026 through April 21, 2026.

5. Attached as Exhibit D, titled "Signal Messages Confirming Valid Demand," is a true and correct copy of a communication dated February 27, 2026 between Scott Traudt and George Palikaras on the Signal Secure Messaging App.

1

6. Attached as Exhibit E, titled "Signal Message Repeating Extortion Accusation," is a true and correct copy of a communication dated March 30, 2026 between Scott Traudt and George Palikaras on the Signal Secure Messaging App.

7. The copies and screenshots attached as Exhibits A through E fairly and accurately depict the communications and posts as I observed, received, or preserved them, and they are authentic to the best of my knowledge.

8. I have never extorted anyone. Any statement or accusation that I extorted any person is false.

9. I further declare that the demand letter addressed to Greg McCabe, dated October 13, 2025, is a true and correct copy of the demand letter I authored and sent.

10. I make this declaration in support of my Objection to Trustee's Motion to Seal (Docket 2679).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 22 day of April, 2026, at 1240 pm in Strafford VT

Scott Traudt
191 Kibling Hill Road
Strafford, VT 05072
Pro Se

2

**Scott Traudt
191 Kibling Hill Rd.
Strafford, VT 05072
SCT545@proton.me
802-318-0429**

October 13, 2025

Greg McCabe
Chairman and Chief Executive Officer
Next Bridge Hydrocarbons, Inc.
500 W. Texas Ave.
Suite 890 Midland
TX 79701

cc: Next Bridge Hydrocarbons, Inc.

Re: Demand for Payment of $80,000 in Settlement of Claims Arising from Defamatory Statements in Attached Email Republished in October 21, 2024, Social Media Post – Notice of Intent to File Suit in United States District Court for the District of Vermont

Dear Mr. McCabe:

This letter serves as a formal demand for payment of $80,000 to resolve claims arising from defamatory statements made about me in your email response to Jen Kapela dated October 10, 2024, which was attached to and republished in a public social media post by Kapela (@JEN_kapela on X, formerly Twitter) on October 21, 2024. The post received over 91,000 views and directly implicated me in connection with my advocacy on behalf of MMTLP and Next Bridge Hydrocarbons, Inc. ("NBH") shareholders. These statements have caused me reputational harm, emotional distress, and interference with my professional opportunities in the investment community.

The relevant portions of your email, as republished in the October 21, 2024, post, stated as follows:

- Regarding my requests: "self-serving requests that could harm NBH shareholders."
- On my actions following rejection: "Since my rejection of these self-serving requests, [I] have gone off the rails and started proposing things that are irrational, spurious, and suspiciously detrimental to the shareholders."
- Implying involvement with Mark Basile: "Mark Basile [is] compromised... [and] you and Mark have both asked for special favors from a CEO... [in ways that] could potentially... damage shareholders."
- On the nature of my efforts: "nefarious efforts" and part of a dynamic where I appear as a "better enemy than an uncertain friend."
- Further characterizing my conduct: "You appear to be more the latter at this point... [with] irrational, spurious, and suspiciously detrimental" proposals.

1

These statements falsely portray me as dishonest, manipulative, and intent on harming other shareholders, when in fact my inquiries were legitimate questions about NBH's operations and governance, raised in good faith as a shareholder advocate. The republication of your email in this public forum extended the reach and impact of these statements. As a result, I have suffered harm to my reputation within the MMTLP and NBH communities, including reduced influence in advocacy efforts, emotional distress from public backlash, and lost professional opportunities. To avoid litigation, I demand payment of $80,000 ($55,000 in compensatory damages and $25,000 in punitive damages). If this demand is not met, I will file suit against you individually and against NBH in the United States District Court for the District of Vermont. Suit will commence on October 21, 2025.

It is obvious that your statements were part of a coordinated plan, and it is also noteworthy that on or about the same time period of your letter another X account (@therealgregmccabe) began to regularly publish defamatory accusations against me, and were later followed up by similar posts by Andrew Yeganeh as well as threats to "destroy" me by James Garcia, another one of your online proxies and agent. Insofar as your actions in concert with Kapela dovetail with other defamatory items online from others on or about the same time, that this was a coordinated activity would seem to implicate US Racketeer Influenced and Corrupt Organizations laws as your actions were designed to intimidate a shareholder advocate and discredit his work to expose the wanton and now easily proven fraud in NBH (there literally was no oil, you lost the University Lands leases, you had a paid consultant falsifying data at the Texas Railroad Commission website, etc., etc.) to shield what was essentially a money laundering operation between and amongst you, John Brda, and others.

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) due to complete diversity of citizenship (you and NBH, a Nevada corporation with its principal place of business in Texas, versus me, a Vermont citizen) and an amount in controversy exceeding $80,000. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Vermont, where my advocacy and related activities are based.

The complaint will include the following claims under Vermont law, with NBH subject to vicarious liability where applicable:

1. **Defamation/Libel**: The statements in your email, as republished, constitute libel per se under Vermont common law, as they impute professional dishonesty and misconduct that presumptively harm my reputation in business dealings. The elements—false statement of fact, publication to third parties, identification of me as the subject, fault (at least negligence, or actual malice given the public context), and damages—are satisfied.
2. **Slander by Implication**: Any implied defamatory meanings from the statements are actionable as slander per se under Vermont law, with a three-year statute of limitations pursuant to 12 V.S.A. § 512(3).
3. **Vicarious Liability/Respondeat Superior Against NBH**: Under Vermont's respondeat superior doctrine, NBH is liable for your statements made in your capacity as CEO addressing company matters.

2

4. **Intentional Infliction of Emotional Distress**: The extreme and outrageous nature of the public accusations, leading to foreseeable distress, supports this claim under Vermont law.

Please respond in writing to confirm settlement or discuss resolution. Failure to do so will result in immediate filing.

Signed,

Scott Traudt

3

# EXHIBIT A

# EXHIBIT A

George Palikaras @pali karas · Apr 18

Replying to @defaultusert @johnbrda and @ocelot

I can get you front row tickets. just DM me your name and address when you are good and ready.

In the meantime stop libelling and spreading your BS, as if you have any clue of moral authority over what actually went down.

You can and will witness firsthand what went down... and I am only getting started so yes... my mouth will get bigger and bigger till I echo in your little brain for the rest of time.

Before addressing me again, I suggest you start with two very BASIC questions and see if you can answer them properly:

1. Was the SEC settlement, the full $1 million or even the first $250,000 installment due in 2024, ever paid by MMAT insiders? If yes, when exactly?

2. If it was not paid, why not? And was there any role played by MMAT insiders in steering the company toward Chapter 7 instead of Chapter 11, whether formally or informally, and how did that occur?

Those are not difficult questions. However, they require facts, dates, and documents, which is usually where the bravado by you and other keyboard warriors starts to fall apart...

Word of advice: bring actual documents, not drama. Oh but wait... you have none... and everyone (including Spears and Traudt) keep knocking on MY door for it... so that they can extort people for money for themselves according to what we learned today. Go ahead and ask them, maybe they should challenge Brda to produce the 408 letters.

I have all the receipts, and I am the ONLY one asking to put NO documents under seal. Citadel WANTS a seal, FINRA, the SEC, everyone else involved want the seal. So is exposing who?

Bud, you and others are so deep in the optics and the narrative you've convinced yourself of... and so I think you have two options: either you're exactly the kind of moron you accuse others of being, or you're just another sheep 🐑 going along for the ride (getting paid or not)... in your case, both are rather baaahd (pun intended).

Even your (🐐) profile picture doesn't match your performance anymore.

Might be time to update it to something a little more... realistic here's one suggestion ⬇️

Disclaimer: no animals were harmed in the making of this message.

# EXHIBIT B

# EXHIBIT B

**George Palikaras** ✅
@palikaras

Mrs Spears,

I do admire the enthusiasm. It's just a shame it's so completely detached from reality.

A settlement with money and a release is, as you surely know, precisely how these matters are typically resolved, at least as far as McCabe, Brda, and NBH were concerned. None of this is novel, however much you may wish it to be.

You might also want to refresh your memory. Your AI should be more than capable of assisting. I've already spoken publicly, at length, about the rather unusual chain of events that led to my laptop returning to Halifax during the Canadian bankruptcy process and over 6 months from my departure from MMAT. You may recall, it contains somewhat more than the "15,000 files" you seem fixated on.

Among other things, I disclosed that both the laptop and server were discovered in a wooden crate in Quebec, far removed from any proper oversight, and were being prepared for sale as part of the Authentix transaction, without any meaningful data sanitisation.

An outcome that would have exposed corporate and personal data to third parties and triggered obvious issues:
1. data breach exposure under NRS 603A,
2. conflicts with an active SEC litigation hold, and        3. serious spoliation concerns in both Canadian and U.S. proceedings.

And yet, with all that context, you've chosen to question my integrity. Interesting.

When those devices came into my possession, I had every opportunity to do exactly what you seem to imply, wipe them, destroy them, or quietly make them disappear etc. Instead, I did the opposite. I ensured the laptop was forensically copied by the trustee and persuaded the purchaser of the server hardware to do the same. In other words, I preserved the record you now appear so eager to speculate about.

While you and others been busy asking "gimme, gimme, gimme" like a bunch of toddlers, I've been focused on protecting the estate from precisely the kind of conduct that tends to surface in situations like this.

Given the circumstances, I'd suggest a bit more caution before throwing around accusations.

As for your $650k figure, I must admit, it's a curiously specific number. One wonders how it was derived, particularly in light of other offers your teammates been associated with. The timing, too, is rather... convenient. Waiting until the eleventh hour, just before dismissal with prejudice, is an interesting negotiating strategy. you can appeal all you want keep that cost going and karma loading up.

And your letter, singling me out by name in a case where I was neither named nor served, while simultaneously seeking my support, was an especially bold touch.

You do seem to have a talent for contradiction.

At this point, it's difficult to tell whether you're simply out of your depth or being led there by the usual suspects. Either way, the result is the same, a great deal of noise, very little substance, disgusting self interest and a steady drain on time and resources.

I have been patient for over a year. That patience is not unlimited.

If this continues, I will recover the costs incurred from those responsible, for the benefit of the actual stakeholders involved

You may want to bear that in mind.

Despite your 62 yrs of age it's never too late to grow some common sense. Listening to the recording today i am genuinely worried that you are experiencing "AI brain fry" showing many of the symptoms mentioned by medical experts, just my humble opinion.

In fact, here is a recent Harvard Business Review article coverage of "AI brain fry" (by the way coffee amplifies it) and related work on AI-driven cognitive fatigue and burnout in knowledge workers and what to do about it, enjoy:

i certainly do NOT speak for the estate or anyone else other than myself, but submitting hundreds of useless AI written pages... you are simply wasting resources and the courts time and you know it... but this is your favorite hobby now isn't it?!



3,021

# EXHIBIT C

# EXHIBIT C



**George Palikaras** ✅ @palikaras · 1d

PLEASE Prove that MMAT ACTUALLY paid a single dollar, just $1, transferred from MMAT to SEC, then let's talk.

Maybe you can ask your new buddies at the SEC to show you their MMAT receipt.

But you are just a foot soldier, aren't you? Hence not so sure that your pay grade could actually get you that kind of records access.

I bet you the record will show they got paid NOTHING from the $1M and buried the disclosure for non payment.

And that, my hairy amigo, would be the best case scenario for them... the other scenario of getting paid is far far worse... given the forms filled by Uzi Sasson in the BK... #perjury

By the way I am the one saying "extortion", it's the people who were asked for this settlement money that said it.

And that, my hairy amigo, would be the best case scenario for them... the other scenario of getting paid is far far worse... given the forms filled by Uzi Sasson in the BK... #perjury

By the way I am the one saying "extortion", it's the people who were asked for this settlement money that said it.

We now have Spears for $650k, so what was YOUR $$$ price?  Care to share?

I bet you it was real low.

In the meantime and from my heart because she is a nice enough lady, please help Mrs Spears with medical support since she is off her marbles, and in my humble opinion, you are 90% responsible for leading her.

# EXHIBIT D

# EXHIBIT D



**GP**  George Palikaras ⊗   🎥 📞 🔍 ⋯

4:12 PM ☑

I heard on the grapevine that you tried to get $70-80k from McCabe or Brda last year I never asked you about it since it's none of my business but I wanted you to know it's out there it typically find out last. In any case it's going to be a crazy year!   4:13 PM

> Of course it is. Only fir defamation.
>
> For
>
> Nothing else
>
> I told them all to fuck themselves
>
> I had to file a claim before I sue.
>
> ⋯ ↩ ♡  But in the end I dont care
>
> SEC OGC has all my evidence. 16 pages from Texas.  4:15 PM ☑

They should have taken their chance

It's much more expensive now  4:16 PM

> Yes, and going to get more  expensive for a.lot of people next week. Harding, Eaton, University. My turn.
>
> Uzi  4:17 PM ☑

Yes!!!

Harding is the king of guy who would easily settle and pay

Uzi is cheap :-)  4:18 PM

> ⌄
>
> They'll see what I am doing.  4:18 PM ☑

# EXHIBIT E

# EXHIBIT E

#MMTLP  #MMTLParmy  #MMTLPfraud
#MMTLPfiasco @spldbrat351964
@fearles59324823 @yoyofakowee
@Mastcab1 The SEC deal with Meta that
forced them to pay a $1 million fine and the...
x.com

Nice work Scott, back with a vengeance.
You need to teach me these mercenary
skills one day. What's the status on your
writ of mandamus vs Gensler? Is that now
concluded? https://x.com/Greenhills303/s
tatus/2038617784133747133?s=20

12:54 PM

Also Quick question, and happy to discuss live if you prefer. You
wrote in your post "don't take my word for it, the SEC says it was
with basically zero assets or assets misrepresented in profound,
shareholder destroying ways" what SEC filing are you referring to?

1:02 PM

George, cannot communicate with you anymore.  1:07 PM

she had some friendly lawyers help her submission. I also learned
that In Q4 you had asked McCabe for $70-80k to do the same (to
walk away). It is none of my business if you or 1209 want to do this
kind of work professionally and serve or extort people for the
highest bid. I am guessing at the time you asked for the money from
McCabe, you were not planning to share that $70-80k with any of
the rest of the 1209. It's also interesting in your post today you not
once mentioned McCabe. I hope I am wrong in thinking of you as
someone who is just another hired gun, for which I would be happy
to apologize, and 1209 becomes known for fighting for real justice.

# EXHIBIT F

# EXHIBIT F



**Dated: December 22, 2022.**

**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-70098-tmd-11 |
| | § | |
| ARABELLA PETROLEUM | § | |
| COMPANY, LLC, | § | |
| | § | |
| | § | |
| Debtor. | § | CHAPTER 11 |

| | | |
|---|---|---|
| MORRIS D. WEISS, CHAPTER 11 | § | |
| TRUSTEE FOR ARABELLA | § | |
| PETROLEUM COMPANY, LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ARABELLA EXPLORATION INC., | § | |
| ARABELLA EXPLORATION LLC, | § | ADVERSARAY NO. 16-07002-tmd |
| ARABELLA OPERATING LLC, | § | |
| TRANS-TEXAS LAND & TITLE, LLC, | § | |
| PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, | § | |
| PLATINUM LONG TERM GRWOTH | § | |
| VIII, LLC, AND JASON HOISAGER, | § | |
| Individually, | § | |
| | § | |
| Defendants. | § | |

1

## MEMORANDUM OPINION

Contents

I.    FACTS...........................................................................................................................3

  A.  Formation of the Debtor and Related Companies ...........................................................3

  B.  Alleged Fraudulent Transfers .........................................................................................4

      1.   Transfers of Properties from the Debtor to AEX..................................................5

      2.   Transfers of Cash from the Debtor to AEX ..........................................................8

      3.   Transfers of Cash from the Debtor to Arabella Operating....................................9

      4.   Transfers of Cash from the Debtor to Jason and Molly Hoisager...........................11

  C.  Breach of Fiduciary Duty to the Debtor ........................................................................16

  D.  Mr. Hoisager Verses the Debtor's Books and Records ..................................................18

II.   ANALYSIS ...................................................................................................................20

  A.  Primer on Fraudulent Transfers.....................................................................................20

  B.  The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive
      Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover
      them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to
      be Recovered ................................................................................................................22

  C.  The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating
      Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager........23

  D.  The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant
      to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims ........................28

  E.  The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent
      Transfers ......................................................................................................................30

      1. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13,
         2013 as Constructively Fraudulent Transfers .................................................................30

      2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013
         as Actual Intent Fraudulent Transfers ......................................................................31

  F.  Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those
      Transfers Cannot be Preferential Transfers ..................................................................35

  G.  Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by
      the Payments Mr. Hoisager Made Back to the Debtor ..................................................35

  H.  Mr. Hoisager Breached his Fiduciary Duty to the Debtor.............................................36

  I.  The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove
      Common Law Fraud by Clear and Convincing Evidence ..............................................40

  J.  The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing ...............41

III.  CONCLUSION ............................................................................................................43

It is common for the owner of a sole proprietorship to use the company's cash as the owner's personal checking account, taking out money when and as available and using that money for personal expenses. And there is nothing wrong with this as long as the company's creditors are being paid. But if the company becomes insolvent, meaning creditors will not be paid, the owner can face liability for those owner distributions under both fraudulent transfer and fiduciary duty law.

## I.   FACTS

### A. Formation of the Debtor and Related Companies

Jason Hoisager formed Arabella Petroleum Company, LLC ("the Debtor") in February 2007 to buy and sell oil and gas properties in West Texas.[1] The Debtor also served as the original operator for the wells on these properties under the governing joint operating agreements.[2] Mr. Hoisager was the Debtor's sole owner and manager.[3]

Mr. Hoisager later formed other companies.[4] He formed Arabella Exploration, LLC ("Arabella Exploration") in December 2008,[5] which began operating in 2011 with the acquisition of properties in the Permian Basin.[6] Arabella Exploration, Inc ("AEX") was formed on December 24, 2013, by the reverse merger of Arabella Exploration and Lone Oak, a Cayman Islands corporation.[7] According to Mr. Hoisager, he formed AEX to raise capital to develop oil and gas properties in the Permian Basin.[8] In January 2014, AEX formed Arabella Operating LLC ("Arabella Operating") to take over operating wells previously operated by the Debtor under the

---

[1] J. Hoisager Decl. 3; B. Crisp Decl. 3.
[2] B. Crisp Decl. 3; J. Hoisager Decl. 34-35.
[3] J. Hoisager Decl. 4.
[4] J. Hoisager Decl. 7.
[5] Arabella Exploration, LLC was a Texas LLC. *See* J. Hoisager Decl. 7.
[6] J. Hoisager Decl. 7.
[7] J. Hoisager Decl. 7.
[8] J. Hoisager Decl. 7.

3

joint operating agreements.[9]

Mr. Hoisager owned 100% of Arabella Exploration until the December 2013 merger, when it became a wholly owned subsidiary of AEX.[10] Mr. Hoisager was the manager of Arabella Exploration and the chief executive officer of AEX following the merger.[11] Arabella Operating was also a wholly owned subsidiary of AEX, and Mr. Hoisager was its sole manager.[12] Mr. Hoisager owned 30.4% of the shares of AEX at the time of the merger, with the remainder owned by public shareholders.[13] The parties stipulated that the Debtor became insolvent no earlier than December 31, 2013, a few days after AEX was formed.[14]

## B. Alleged Fraudulent Transfers

The Trustee alleges that from 2011 to 2015, Mr. Hoisager made many fraudulent transfers from the Debtor to himself, his wife, and other entities that he owned or controlled.[15] These alleged fraudulent transfers fall into four broad categories: (1) transfers of properties from the Debtor to AEX;[16] (2) transfers of cash from the Debtor to AEX; (3) transfers of cash from the Debtor to Arabella Operating; and (4) transfers of cash from the Debtor to Mr. Hoisager and his wife, Molly Hoisager.[17] The Trustee also contends that the fraudulent transfers and self-dealing collectively are a breach of fiduciary duty.[18] Mr. Hoisager disputes that he made fraudulent transfers from the Debtor or breached fiduciary duties to the Debtor.[19] He contends that he acted

---

[9] J. Hoisager Decl. 8.
[10] J. Hoisager Decl. 7.
[11] J. Hoisager Decl. 19.
[12] J. Hoisager Decl. 2, 8.
[13] J. Hoisager Decl. 7.
[14] Joint Pre-Trial Order 35, ECF No. 184.
[15] Pl.'s Post-Trial Br. 1-2, ECF No. 210; B. Crisp Decl. 4.
[16] Hereafter both Arabella Exploration, LLC and post-merger Arabella Exploration, Inc., will be referred to as AEX because the post-merger entity would have assumed all liabilities.
[17] Pl.'s Post-Trial Br. 1-2, ECF No. 210; Def.'s. Post-Trial Br. 3, ECF No. 211. Molly Hoisager's status as Mr. Hoisager's wife was uncontested. *See* Joint Pre-Trial Order 27, ECF No. 184.
[18] Pl.'s Post-Trial Br. 23-24, ECF No. 210.
[19] Def.'s Post-Trial Br. 2, ECF No. 211; J. Hoisager Decl. 67.

in good faith at all times and did what he believed to be in the Debtor's best economic interests under the circumstances.[20]

### 1. Transfers of Properties from the Debtor to AEX

In 2012, the Debtor assembled the "Wolfbone I Prospect," which consisted of several Delaware Basin leases.[21] The Debtor entered into the "Wolfbone I PSA" with the purchasers on August 5, 2012.[22] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 93.35% of the working interest in the Wolfbone I Prospect; AEX purchased the remaining 6.65% of the working interest.[23] The assignments of the Wolfbone I leases were executed on October 15, 2012, and were recorded in Reeves County, Texas, on varying dates from 2013 to 2015.[24]

Next, the Debtor assembled the "Wolfbone II Prospect," a second package of Delaware Basin mineral leases.[25] The Debtor and the purchasers of the Wolfbone II Prospect signed the Wolfbone II PSA on March 1, 2013.[26] Outside investors unrelated to the Debtor or Mr. Hoisager purchased 53.54% of the working interests, while AEX purchased the remaining 46.46% of the working interest.[27] The assignments of the Wolfbone II leases were executed on March 1, 2013, and March 15, 2013, and were recorded in Reeves County, Texas, from 2013 to 2015.[28]

Mr. Hoisager asserts that the Debtor transferred the working interests in the Wolfbone Prospects to AEX for rational business purposes. First, the Debtor could not sell the interests to outside investors for a sufficient price, so AEX acted as a buyer of last resort.[29] Second, Mr.

---

[20] J. Hoisager Decl. 67; Def.'s Post-Trial Br. 2, ECF No. 211.

[21] J. Hoisager Decl. 9.

[22] J. Hoisager Decl. 9.

[23] J. Hoisager Decl. 9.

[24] J. Hoisager Decl. 9; Def.'s Ex. D-16; Def.'s Post-Trial Br. 39-41, ECF No. 211; Pl.'s Ex. 77. Mr. Hoisager asserts that the great bulk of the Assignments in terms of amounts or value were recorded on July 18, 2013, and only the Wolfbone I "Scraps" were recorded in 2015. Def.'s Post-Trial Br. 39-40, ECF No. 211.

[25] J. Hoisager Decl. 10.

[26] J. Hoisager Decl. 10.

[27] J. Hoisager Decl. 10.

[28] J. Hoisager Decl. 10-11; Def.'s Ex. 16; Pl.'s Ex. 77.

[29] J. Hoisager Decl. 10.

Hoisager claims that AEX was in a better position than the Debtor to develop the properties, create value, and pay lease-operating expenses.[30] And finally, according to Mr. Hoisager, AEX had "greater access to capital" than did the Debtor,[31] and there was a need to drill before the leases expired.[32] The "access to capital" claim was decisively refuted (1) on cross-examination,[33] (2) by AEX's 10-K dated December 31, 2014,[34] and (3) because the Debtor expended all its capital, and more, drilling the Wolfbone wells anyway.[35]

The Debtor assigned working interests in the Wolfbone I and II Prospects to AEX on the same terms as it made assignments to outside investors, except in one major respect: how the purchase price was paid.[36] Outside purchasers paid in cash.[37] In contrast, AEX paid no cash consideration for the properties.[38]

According to Brian Crisp, the expert for the Trustee, the Debtor received no consideration for the property transfers to AEX.[39] AEX originally booked an increase in joint interest billings due to the Debtor for the transfers;[40] however, Mr. Hoisager recharacterized this paper obligation in December 2013 as a $3 million equity distribution from AEX to Mr. Hoisager, not the Debtor.[41] AEX also provided Mr. Hoisager, not the Debtor, with a promissory note for an additional $3,007,170.[42]

---

[30] J. Hoisager Decl. 45.
[31] J. Hoisager Decl. 45.
[32] J. Hoisager Decl. 45.
[33] 5/17/22 Trial Tr. 96:18-97:22, ECF No. 204.
[34] Def.'s Ex. D-7, PDF 15. *See also* B. Crisp Decl. 7.
[35] J. Rae Decl. 10; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[36] J. Hoisager Decl. 10.
[37] J. Hoisager Decl. 10.
[38] B. Crisp Decl. 13; J. Hoisager Decl. 21.
[39] B. Crisp Decl. 13.
[40] B. Crisp Decl. 13.
[41] B. Crisp Decl. 13.
[42] B. Crisp Decl. 13; Def.'s Post-Trial Br. 100, ECF No. 211.

6

Mr. Hoisager characterizes the consideration received by the Debtor for the properties quite differently. Mr. Hoisager says he personally loaned the Debtor the about $6 million used to purchase the Wolfbone Prospects, and that he got the money from McCabe Petroleum Corporation ("MPC"), under an oral line of credit.[43] The Debtor thus acquired the Wolfbone leases without paying anything for them, according to Mr. Hoisager, except that the Debtor incurred a liability to Mr. Hoisager for the amounts that he lent.[44] Mr. Hoisager claims that because the Debtor could not find an outside buyer for the Wolfbone leases, it sold them to AEX and AEX assumed the Debtor's obligation to Mr. Hoisager in the amount of $6,014,341.[45] The parties do not dispute that Mr. Hoisager later converted this obligation by AEX into a subordinated promissory note payable to Mr. Hoisager and an equity contribution by Mr. Hoisager to AEX.[46]

The alleged loan between Mr. Hoisager and MPC was not documented by a note or a loan agreement.[47] Nor was a debt to Mr. Hoisager ever recorded on the books and records of the Debtor.[48] Instead, the transactions with MPC were reflected on the Debtor's books and records as "Accounts receivable to McCabe Petroleum Corporation."[49] Post-petition, Mr. Hoisager reclassified those accounts receivables to MPC as capital contributions.[50] He concedes that the accounting for this transaction was not correct.[51] Mr. Hoisager contends that this "non-traditional" accounting resulted from the inexperience of Breann Hall, the Debtor's controller at

---

[43] J. Hoisager Decl. 12-13.
[44] J. Hoisager Decl. 13
[45] J. Hoisager Decl. 21; Def.'s Post-Trial Br. 13, ECF No. 211.
[46] J. Hoisager Decl. 22; Joint Pre-Trial Order 31, ECF No. 184.
[47] J. Hoisager Decl. 14; 5/17/22 Trial Tr. 76:23-25; 97:15-22, ECF No. 204.
[48] 5/16/22 Trial Tr. 105:16-22, ECF No. 203.
[49] J. Hoisager Decl. 14; 5/16/22 Trial Tr. 106:1-4, ECF No. 203.
[50] 5/16/22 Trial Tr. 106:1-107:6, ECF No. 203.
[51] J. Hoisager Decl. 22.

the time, and the limitations of the Debtor's accounting software.[52]

## 2. **Transfers of Cash from the Debtor to AEX**

All parties agree that the Debtor made cash payments to AEX of around $6.2 million between September 2011 and the Petition Date, with $4,952,443 paid after December 31, 2013.[53] The parties disagree about how to characterize these payments.

Mr. Hoisager testified that all the cash payments the Debtor made to AEX were under the Debtor's contractual obligations under the joint operating agreements.[54] Under those agreements, the Debtor operated leases in which AEX owned a portion of the working interest.[55] As the Debtor, in its capacity as operator, produced revenues, AEX, in its capacity as working interest owner, earned revenues.[56] By Mr. Hoisager's calculations, AEX earned revenues of $5,619,222 while the Debtor was the operator.[57] According to Mr. Hoisager, the Debtor paid AEX $5,349,334 of the $5,619,222 that it owed AEX in revenue payments, leaving unpaid revenues of $269,888.[58] Bill Heyn, acting chief financial officer of AEX and chair of the audit committee, also testified that the Debtor made no gratuitous payments to AEX and AEX accounted for every dollar it received.[59] This statement is simply not credible in light of the testimony from Mr. Crisp.

Mr. Crisp testified that many of the payments to AEX were not revenue payments.[60] According to Mr. Crisp, the Debtor paid AEX $6.2 million, and total revenues paid after

---

[52] J. Hoisager Decl. 14.
[53] B. Crisp Decl. 4; Pl.'s Post-Trial Br. 13, ECF No. 210; Pl.'s Ex. 78; Joint Pre-Trial Order 35, ECF No. 184.
[54] J. Hoisager Decl. 46; Def.'s Post-Trial Br. 6, ECF No. 211.
[55] J. Hoisager Decl. 19.
[56] J. Hoisager Decl. 19.
[57] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[58] J. Hoisager Decl. 20; Def.'s Ex. D-72.
[59] 5/17/22 Trial Tr. 59:7-60:5, ECF No. 204; 5/19/22 Trial Tr. 5:21-6:17, ECF No. 205.
[60] 5/16/22 Trial Tr. 107:7-108:8, ECF No. 203.

8

accounting for netting (offsetting revenue due against joint interest billings owed) was $3,270,436.55, so "[t]here's almost $3 million paid to AEX mostly in round dollar[] [amounts] that are not revenue payments."[61] Mr. Crisp noted that revenue payments are typically not in round numbers, but "down to the penny."[62]

Mr. Crisp also testified that it is common industry practice for an operator to net the revenues earned on wells against the joint interest billings owed by that same working interest owner.[63] Here, at the time of each payment from the Debtor to AEX, AEX owed substantial amounts to the Debtor for unpaid joint interest billings, ranging from $16 million in June 2014 to $3.2 million on the Petition Date.[64] But based on Mr. Crisp's analysis, the Debtor netted revenue payments against unpaid joint interest billings only three times.[65]

Mr. Hoisager countered that while the joint operating agreements gave the Debtor, as operator, the right to set off joint interest billings receivables against production payments, the decision whether to do so is discretionary.[66] Further, according to Mr. Hoisager, there is no evidence that the Debtor gave AEX more favorable treatment than the other working interest owners, many of whom owed the Debtor hundreds of thousands of dollars.[67]

### 3. Transfers of Cash from the Debtor to Arabella Operating

AEX formed Arabella Operating on January 22, 2014, to take over operating wells that the Debtor had operated under then-existing joint operating agreements.[68] According to Mr. Hoisager, the transfer of lease operations from the Debtor to Arabella Operating helped the

---

[61] 5/17/22 Trial Tr. 45:11-16, ECF No. 204.
[62] 5/16/22 Trial Tr. 109:19-110:1, ECF No. 203.
[63] 5/16/22 Trial Tr. 110:17-23, ECF No. 203.
[64] 5/16/22 Trial Tr. 111:4-9, ECF No. 203; Pl.'s Ex. 12A, 17.
[65] 5/16/22 Trial Tr. 112:16-21, ECF No. 203.
[66] 5/17/22 Trial Tr. 85:7-18, ECF No. 204.
[67] Def.'s Post-Trial Br. 55, ECF No. 211.
[68] J. Hoisager Decl. 8.

9

Debtor because the amount of money the Debtor earned as the operator of the leases was not commensurate with the amount of risk from nonpaying or slow-paying working interest owners.[69] It's too bad Mr. Hoisager didn't think of this before the Debtor took on the task of drilling the Wolfbone I and Wolfbone II wells.[70] As discussed below, taking on the expense of drilling the wells while being unable to collect the corresponding joint interest billings appears to be a big reason the Debtor failed.[71] In any event, Arabella Operating became the operator of the Wolfbone leases under the joint operating agreements on January 1, 2015.[72]

The Debtor made cash payments to Arabella Operating totaling $882,483 after December 31, 2013.[73] Mr. Hoisager testified that the cash payments were simply money held in suspense accounts that were transferred to Arabella Operating when it became operator.[74] So, Mr. Hoisager testified, the money held in those suspense accounts belonged to working interest and royalty interest owners, not the Debtor, meaning that the Debtor had no right to retain that money.[75] Mr. Hoisager also testified that Arabella Operating never made a distribution to him personally, and that, in fact, he loaned Arabella Operating money that it never repaid.[76] This was not refuted by Mr. Crisp.[77] As discussed above, Mr. Crisp offered credible testimony that the transfers to AEX can be distinguished between "round dollar" amounts, which are not revenue payments, and amounts listed to the penny, which are.[78] From this it could be inferred that the round-dollar payments to Arabella Operating are likewise not revenue payments. But despite Mr.

---

[69] J. Hoisager Decl. 8.
[70] See notes 228-234 below and accompanying text.
[71] See notes 228-234 below and accompanying text.
[72] 5/17/22 Trial Tr. 87:2-5, ECF No. 204; Def.'s Post-Trial Br. 4, ECF No. 211.
[73] B. Crisp Decl. 4; Pl.'s Ex. 79 (summary of payments to Arabella Operating).
[74] 5/17/22 Trial Tr. 87:2-9, ECF No. 204.
[75] 5/17/22 Trial Tr. 87:10-18, ECF No. 204.
[76] 5/17/22 Trial Tr. 87:25-88:12, ECF No. 204.
[77] 5/16/22 Trial Tr. 52:2-7, ECF No. 203.
[78] 5/16/22 Trial Tr. 109:19-110:1, 113:15-25, ECF No. 203.

10

Hoisager's overall lack of credibility, the Trustee did bear the burden of proof, Mr. Crisp did not address these transfers, and so Mr. Hoisager's testimony will stand.

If indeed the transfers to Arabella Operating were transfers of revenue proceeds held in suspense accounts for the benefit of royalty and working interest owners from the Debtor as operator to Arabella Operating as successor operator—and the only evidence in the record establishes this—they are not transfers of property of the estate and the Trustee's fraudulent transfer claim for these transfers fails.

### 4.   Transfers of Cash from the Debtor to Jason and Molly Hoisager

The Debtor transferred $6,334,247 to Jason Hoisager and his wife, Molly Hoisager[79] between July 2011 and July 2015; of that amount, $4,180,249 was transferred after December 31, 2012, and $2,803,834 was transferred after December 31, 2013.[80]

The largest distribution to Mr. Hoisager, of $2 million, occurred on June 25, 2014.[81] Mr. Hoisager claims that the Debtor owed him the money from the sale of the Cox Prospect in September 2013.[82] Mr. Hoisager contends that the Debtor had a standard format for every deal with outside promoters who brought in a profitable oil-and-gas deal. Specifically, the party providing the capital would get its money back first, with the profits then split 50/50 between the capital side and the deal side, which was usually the Debtor.[83] According to Mr. Hoisager, he provided the capital to buy the Cox Prospect, so he had a right to recover his capital of $327,964 to repay the loan he had personally borrowed from MPC to purchase the Cox Prospect. Then, the resulting profits were split 50/50 between the Debtor and Mr. Hoisager, with each entitled to

---

[79] Mr. Hoisager testified that he and his wife shared an account. 5/16/22 Trial Tr. 134:22-135:10, ECF No. 203.

[80] J. Hoisager Decl. 48; B. Crisp Decl. 4; Pl.'s Ex. 76.

[81] B. Crisp Decl. 14.

[82] J. Hoisager Decl. 50-52.

[83] J. Hoisager Decl. 50-51.

11

receive $2,236,017.[84] Mr. Hoisager says the Debtor did not pay Mr. Hoisager the profit share in late 2013 or early 2014 because the funds were unavailable.[85] There was no written agreement for this so-called Cox Prospect "profit split."[86]

Mr. Hoisager also describes the $2 million distribution from the Debtor to him as an "integrated transaction" designed to benefit AEX and the Debtor, and help them pay their creditors.[87] According to Mr. Hoisager, AEX needed to raise capital to support its drilling and development activities and to pay debts, and AEX owed the Debtor millions in joint interest billings under joint operating agreements.[88] So Mr. Hoisager says he devised a strategy where the same funds would satisfy multiple debts.[89]

Under the "integrated transaction," AEX sold the Roark Prospect for $2,240,000 on June 24, 2014.[90] The next day, AEX used the money from the Roark sale to pay the Debtor $2,035,915 in outstanding joint interest billing receivables.[91] Immediately thereafter, the Debtor paid Mr. Hoisager the $2 million it purportedly owed him as the profit split from the sale of the Cox Prospect in September 2013.[92] Mr. Hoisager then used the $2-million distribution to buy equity in AEX for $10.50 per share.[93] He says he bought the stock at about $5 per share above market price to help AEX pay its debts and raise additional capital, and to help the Debtor collect joint interest billing receivables from AEX and turn over operator status to Arabella Operating.[94] Once AEX received the $2 million from Mr. Hoisager, AEX paid $2,017,836 back to the Debtor

---

[84] J. Hoisager Decl. 51.
[85] J. Hoisager Decl. 52.
[86] J. Hoisager Decl. 51.
[87] J. Hoisager Decl. 57.
[88] J. Hoisager Decl. 52-53.
[89] J. Hoisager Decl. 55.
[90] J. Hoisager Decl. 55; Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[91] J. Hoisager Decl. 55.
[92] J. Hoisager Decl. 55.
[93] J. Hoisager Decl. 55.
[94] J. Hoisager Decl. 53.

over the next several weeks.[95]

Mr. Hoisager attributes his purchase of AEX stock— made possible by the Debtor's distribution to him of $2 million—as also being partly responsible for AEX obtaining $16 million in outside financing from Platinum Partners.[96] Of the funds received by AEX from the outside financing, the Debtor received $11,244,670, net of fees, to pay its creditors.[97] AEX paid the money directly to the Debtor's vendors.[98]

The Trustee disputes that there was any "integrated transaction."[99] The Trustee notes that Mr. Hoisager originally characterized the transaction—incorrectly—as being started by the Debtor, even though it was AEX, not the Debtor, that was the only entity that had funds to start the transaction.[100] Mr. Crisp also testified that the distribution was made when the Debtor had total assets of about $20 million versus total liabilities of about $31 million and had become unable to pay its vendors.[101] And there were no "profits" earned by the Debtor that could justify the payment as a "performance bonus," as Mr. Hoisager had once contended.[102] Finally, Mr. Crisp testified that payments to the Debtor's creditors were made by AEX to remove liens that those creditors had filed or could file against the working interests owned by AEX and others in the Wolfbone I and II wells, which means the payments were of direct benefit to AEX.[103]

---

[95] J. Hoisager Decl. 56-57.

[96] J. Hoisager Decl. 58-59.

[97] J. Hoisager Decl. 58.

[98] J. Hoisager Decl. 58.

[99] Pl.'s Post-Trial Br. 7, ECF No. 210.

[100] Pl.'s Post-Trial Br. 7, ECF No. 210 (In Mr. Hoisager's reply to Trustee's Response to Defendant's MSJ, Mr. Hoisager apologized to the Court for providing an incomplete picture of the transaction. Def.'s Reply Br. in Support 14, ECF No. 171.).

[101] B. Crisp Decl. 14.

[102] B. Crisp Decl. 14.

[103] 5/16/22 Trial Tr. 147:5-148:13, ECF No. 203 (payments were made to lien creditors to assure that AEX could get financing from Platinum). Similarly, the proposed Legacy transaction which Mr. Hoisager and Mr. McCabe held up as a potential benefit to the Debtor would have been of primary benefit to AEX with only an incidental benefit to the Debtor. 5/17/22 Trial Tr. 15:21-19:23, ECF No. 204.

13

Mr. Hoisager categorized much of the remainder of the cash transfers from the Debtor to him as fitting within one of four "buckets": salary, expense reimbursement, performance bonuses, and tax distributions.[104] For the payments categorized as salary, Mr. Hoisager asserts that as the sole executive officer of the Debtor, he was entitled to annual compensation of $300,000.[105] He believed $300,000 to be reasonable based on his board-approved salary with AEX for the same amount.[106] But the Trustee notes that the Debtor's general ledger did not reflect payments to Mr. Hoisager as salary.[107] Instead, substantially all the transfers to Mr. Hoisager were recorded in the Debtor's general ledger as "Owner Distributions."[108] Similarly, in the Statement of Financial Affairs signed by Mr. Hoisager here, the Debtor listed 39 transfers to Mr. Hoisager from August 4, 2014, through May 11, 2015, each with the "Purpose of Withdrawal" description of "Distribution."[109]

Mr. Crisp refuted the idea of a $300,000 annual salary, noting that the payments were made at irregular intervals and in uneven amounts that have no semblance of a regular salary structure.[110] For instance, Mr. Hoisager received $621,415 in cash transfers from the Debtor in 2013, excluding a $535,000 "tax distribution" and a $200,000 "performance bonus" asserted by Mr. Hoisager.[111] And in 2014, Mr. Hoisager received $209,874 in cash transfers from the Debtor, excluding a supposed "performance bonus" of $2,250,000.[112] Given the Debtor's continuing losses, Mr. Crisp found the amounts received by Mr. Hoisager to be outside any reasonable

---

[104] B. Crisp Decl. 15.
[105] J. Hoisager Decl. 62.
[106] J. Hoisager Decl. 62.
[107] B. Crisp Decl. 15.
[108] B. Crisp Decl. 15.
[109] B. Crisp Decl. 15.
[110] B. Crisp Decl. 15; *see also* 5/16/22 Trial Tr. 134:6-37:15, ECF No. 203 (discussing payments made to Mr. Hoisager from April 2013 to May 2015).
[111] B. Crisp Decl. 16.
[112] B. Crisp Decl. 16.

industry average.[113]

Mr. Hoisager acknowledged that the Debtor did not pay his salary at regular intervals or in consistent amounts.[114] According to Mr. Hoisager, this is because the Debtor paid him for his work when funds were available.[115] Additionally, Mr. Hoisager attributed the fact that most payments to him were characterized as "owner distributions," regardless of their specific purpose, to the Debtor's "very basic accounting system."[116]

As for the other three categories of transfers to Mr. Hoisager—expense reimbursement, performance bonuses, and tax distributions—Mr. Crisp noted irregularities for each.[117] First, Mr. Crisp testified that none of the transfers were labeled as expense reimbursements in the Debtor's general ledger, and no supporting documents were identified or provided by Mr. Hoisager.[118] Second, the Debtor had no written or defined bonus program[119] and from 2011 to 2015—the time during which the bonuses were paid—the Debtor recorded cumulative net losses of $2,913,662 from asset sales.[120] Third, there was no provision in the Debtor's company agreement allowing distributions to members for tax purposes.[121]

The Trustee also seeks to recover from Mr. Hoisager $690,260 in preferential transfers made to or for the benefit of Hoisager in the one-year period before the petition was filed.[122] Mr. Hoisager concedes that he received $767,161 from the Debtor during the one-year period before the petition date.[123] He also concedes that he was an insider, and that the Debtor was likely

---

[113] B. Crisp Decl. 15.
[114] J. Hoisager Decl. 62.
[115] J. Hoisager Decl. 62.
[116] J. Hoisager Decl. 62-63.
[117] B. Crisp Decl. 16-17.
[118] B. Crisp Decl. 16.
[119] B. Crisp Decl. 16.
[120] B. Crisp Decl. 17.
[121] B. Crisp Decl. 16.
[122] Pl.'s Proposed Findings of Fact and Conclusions of Law 11, ECF No. 185.
[123] J. Hoisager Decl. 66.

insolvent during that period.[124] But Mr. Hoisager says that after accounting for payments of up to $25,000 per month, which the Debtor could have paid him in the ordinary course for his $300,000-per-year salary, he received only seven payments—totaling $663,901—which are likely preferential transfers.[125] But he says he contributed $67,550 in the period after July 10, 2014, from his own funds back to the Debtor to help the Debtor meet its obligations.[126] Nowhere in his testimony did Mr. Crisp refute this point. So, Mr. Hoisager concludes, after deducting his contributions of $67,550 from his preferential transfers of $663,901, he is liable for preferential transfers in the amount of $596,351.[127]

Included among the payments made by the Debtor to Mr. Hoisager were payments totaling $822,423 that were in some way booked as "Dove Acres, LLC."[128] Testimony revealed that Mr. Hoisager used this money to buy a property, and build a building on that property, that Mr. Hoisager used personally.[129] The Debtor made these payments throughout 2012 and made the last such payment on April 3, 2013.[130]

## C. **Breach of Fiduciary Duty to the Debtor**

The Trustee also alleges that Mr. Hoisager's fraudulent transfers and self-dealing breach his fiduciary duties to the Debtor.[131] According to the Trustee, as the governing person of the Debtor, Mr. Hoisager owed it fiduciary duties, even if the company was a single or multi-member LLC.[132] The Trustee also claims that as a corporate officer, Mr. Hoisager owed duties to

---

[124] J. Hoisager Decl. 66.
[125] J. Hoisager Decl. 66; Def.'s Post-Trial Br. 88-89, ECF No. 211.
[126] J. Hoisager Decl. 66.
[127] Def.'s Proposed Findings of Fact and Conclusions of Law 35-36, ECF No. 179.
[128] B. Crisp Decl. 12.
[129] 5/16/22 Trial Tr. 140:1-141:6, ECF No. 203.
[130] 5/16/22 Trial Tr. 96:12-99:22, ECF No. 203.
[131] Pl.'s Post-Trial Br. 23, ECF No. 210.
[132] Pl.'s Post-Trial Br. 23, ECF No. 210.

creditors at least as of December 31, 2013, the date on which the Debtor became insolvent.[133] Mr. Hoisager allegedly breached his fiduciary duties by engaging in a concerted pattern of making distributions to himself, his wife, and affiliates or insiders while leaving the Debtor insolvent; making excessive distributions that he now contends were salary or undocumented bonuses; transferring assets to AEX for no reasonably equivalent value; and leaving the Debtor unable to pay its debts.[134]

Mr. Hoisager testified that he acted in good faith at all times in his management of the Debtor.[135] He says he never took for himself properties, contracts, or business opportunities that should have been offered to the Debtor.[136] He testified that the Debtor received equivalent value for the transfers of property to AEX in the form of AEX's assumption of the Debtor's obligation to pay Mr. Hoisager for borrowing the money to buy the properties.[137] And Mr. Hoisager claims that though the Debtor worked diligently to satisfy its vendors and other creditors, neither the Debtor nor Mr. Hoisager ever agreed to become a fiduciary for any of its creditors at any time before the Petition Date.[138] Mr. Hoisager notes that the Debtor's company agreement expressly limits managers' and members' potential liability for breach of fiduciary duty to actions not taken in good faith.[139] As a result, he would not be liable for ordinary negligence or bad judgment in his management of the Debtor.[140] Finally, Mr. Hoisager says that he never committed any act of gross negligence, bad faith, or willful misconduct in his management of the Debtor.[141]

---

[133] Pl.'s Post-Trial Br. 24, ECF No. 210.
[134] Pl.'s Post-Trial Br. 23, ECF No. 210.
[135] J. Hoisager Decl. 67-68.
[136] J. Hoisager Decl. 67.
[137] J. Hoisager Decl. 68.
[138] J. Hoisager Decl. 69.
[139] J. Hoisager Decl. 5.
[140] J. Hoisager Decl. 6.
[141] J. Hoisager Decl. 6.

### D. **Mr. Hoisager Verses the Debtor's Books and Records**

As noted in the facts above, the Trustee has consistently relied on the Debtor's books and records to support his position that Mr. Hoisager made many fraudulent transfers from the Debtor to himself and entities that he controlled. Mr. Crisp testified that substantially all the transfers to Mr. Hoisager were recorded in Debtor's general ledger account as "Owner Distributions," despite Mr. Hoisager's later categorization of the payments as "salary & wages," "expense reimbursements," "performance bonuses," and "tax distributions."[142] Similarly, the Trustee refuted Mr. Hoisager's claim that the Debtor transferred its properties to AEX in exchange for assumption of the Debtor's obligation to Mr. Hoisager by noting that the Debtor never booked a loan due to Mr. Hoisager on its books.[143] Finally, Mr. Crisp reached his conclusion that about $3 million of the payments to AEX were not revenue payments by reviewing the Debtor's general ledger, specifically an account titled "revenue" that recorded revenue transfers to AEX.[144]

In contrast, Mr. Hoisager's explanations for the transfers have been changing and often inconsistent with the books and records, as evidenced by the facts above. To summarize these inconsistencies:

- In 2019, Mr. Hoisager's financial expert characterized the "integrated transaction"—which involved a $2 million payment to Mr. Hoisager—as being a "performance bonus" arising from the sales of the Debtor's properties from 2011 to 2014.[145] But in his motion for partial summary judgment, Mr. Hoisager stated that the Debtor paid him the $2 million as compensation for the sale of the Cox Prospect only.[146]

- Mr. Hoisager also claimed that he personally borrowed the funds necessary to purchase the Wolfbone Prospects from McCabe Petroleum Corporation, and that

---

[142] B. Crisp Dec. 15.
[143] B. Crisp Dec. 17.
[144] 5/17/22 Trial Tr. 38:21-39:20, ECF No. 204.
[145] B. Crisp Decl. 14.
[146] B. Crisp Decl. 14; Mtn for Summ. J. 28, ECF No. 161.

18

the Debtor transferred those properties to AEX in exchange for AEX's assumption of the Debtor's obligation to Mr. Hoisager.[147] Even so, Mr. Hoisager concedes that the Debtor did not document the loan from Mr. Hoisager to the Debtor with promissory notes.[148] And AEX's assumption of the obligation to repay Mr. Hoisager was documented on the Debtor's books as an "Owner Distribution" to Mr. Hoisager.[149] He also acknowledges that the Debtor's general ledger booked the transaction with MPC as "Accounts Receivable McCabe Petroleum Corporation," rather than as a loan from MPC to Mr. Hoisager.[150] He maintains that the entries were not receivables but were instead loans, and that this "non-traditional accounting resulted from the inexperience of Breann Hall, the Debtor's Controller at the time, and the limitations of the Debtor's accounting software."[151] Only after the Petition Date did Mr. Hoisager reclassify all of the activity in "Accounts Receivable—McCabe" to an equity account titled "Hoisager (McCabe) Flow-Thru."[152]

- Similarly, Mr. Hoisager categorized the payments the Debtor made to Mr. Hoisager as compensation, expense reimbursements, performance bonuses, and tax payments.[153] Yet Mr. Hoisager conceded that most payments were simply recorded in Debtor's general ledger account as "owner distributions."[154] He attributes this inconsistency to the "Debtor's very basic accounting system."[155]

Mr. Hoisager testified that the Debtor's "books are a mess";[156] he attributed the problems with the Debtor's books and records to Debtor's bookkeeper, who he says was "inexperienced."[157] But the bookkeeper's successors never went back and made the correct corresponding entries on the Debtor's books.[158] Mr. Hoisager also testified that the quality of the books and records was his responsibility, as the sole member and manager of the Debtor.[159]

Ultimately, Mr. Hoisager's inconsistent, self-serving, and undocumented explanations of how the various transactions and payments should be characterized—including his fanciful

---

[147] J. Hoisager Decl. 12-13, 22.
[148] J. Hoisager Decl. 13.
[149] J. Hoisager Decl. 22.
[150] J. Hoisager Decl. 14.
[151] J. Hoisager Decl. 14.
[152] B. Crisp Dec. 17.
[153] B. Crisp Decl. 15.
[154] 5/16/22 Trial Tr. 125:19-128:4, ECF No. 203.
[155] J. Hoisager Decl. 62-63.
[156] 5/16/22 Trial Tr. 159:18-19, ECF No. 203.
[157] 5/16/22 Trial Tr. 159:15, ECF No. 203.
[158] J. Hoisager Decl. 22.
[159] 5/16/22 Trial Tr. 159:20-25, ECF No. 203.

19

"integrated transaction"—are not credible;[160] instead, the contemporaneously recorded treatment of these transactions in the Debtor's books and records, for which Mr. Hoisager was responsible, should control.

## II.    ANALYSIS

### A. Primer on Fraudulent Transfers

The Trustee seeks to avoid transfers made by the Debtor under both section 548, which allows the Trustee to avoid transfers that satisfy the elements set forth in that section, and section 544, which allows the Trustee to avoid transfers that satisfy the elements of a fraudulent transfer under state law, here, the Texas Uniform Fraudulent Transfer act, or TUFTA.[161] TUFTA was modeled on section 548, and in their application to the facts here, the two statutes are for all practical purposes identical.[162]

The statutes allow the Trustee to avoid two basic types of fraudulent transfers.[163] The first, which can be called constructively fraudulent transfers, are transfers made by a debtor in exchange for less than reasonably equivalent value at a time when the debtor was either (1) insolvent (meaning the fair salable value of its assets was less than its liabilities), (2) unable to pay its debts as they came due, or (3) had an unreasonably small capital.[164]

---

[160] Indeed, they call into question Mr. Hoisager's overall credibility. A further blow to Mr. Hoisager's credibility happened when he maintained at trial that the Debtor had substantial properties left after the transfers to AEX even though he testified to the opposite during his Rule 2004 exam. 5/16/22 Trial Tr. 131:20-133:18, ECF No. 203. As Mr. McCabe's testimony largely parrots that of Mr. Hoisager, Mr. McCabe was not credible, either.

[161] 11 U.S.C. §§ 548(a), 544(b); Tex. Bus. & Com. Code § 24.005 ("TUFTA").

[162] *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013) ("UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore, cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent.").

[163] 11 U.S.C. § 548(a)(1)(A), (B); TUFTA §§ 24.005(a)(1), (a)(2), 24.006(a).

[164] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a); *see also Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 437 (5th Cir. 2013) (applying § 24.005(a)(2) and § 24.006(a) as parts of the "constructive fraud prong").

20

The second basic type, which can be called actual intent fraudulent transfers, are transfers made with actual intent to delay, hinder, or defraud creditors.[165] The intent in question is determined by circumstantial evidence, usually with reference to what are called the "badges of fraud," which will be detailed below.[166]

Two finer points must also be made. First, under these fraudulent conveyance statutes, the Trustee not only can "recover" property fraudulently transferred; he can also "avoid" an obligation fraudulently incurred.[167] Second, a transfer made for or on account of an antecedent debt is by definition for a reasonably equivalent value,[168] and so cannot be a constructively fraudulent transfer, though it might still be an actual intent fraudulent transfer.[169] Thus, if a debtor signs an agreement to make a transfer, the obligation to make the transfer can be avoided as fraudulently incurred, if the other elements are present. But when that debtor makes the transfer under that agreement, that transfer is made for an antecedent debt—the obligation to make the transfer—and so cannot be a constructively fraudulent transfer.

And while transfers made to satisfy antecedent debts cannot be constructively fraudulent transfers, they can be preferences under either section 547 or under TUFTA.[170] That said, the Trustee did not seek to avoid insider preferences under TUFTA, and in the Joint Pre-Trial Order

---

[165] 11 U.S.C. § 548(a)(1)(A); TUFTA § 24.005(a)(1).

[166] *See, e.g., Cipolla v. Roberts (In re Cipolla)*, 541 Fed. App'x. 473, 477 (5th Cir. 2013) ("Among the circumstantial evidence of intent to defraud that a court may look to are the 'badges of fraud' in state fraudulent conveyance laws, including the Texas Uniform Fraudulent Transfer Act ('TUFTA')."); *see also* TUFTA § 24.005(b) (listing factors for "determining actual intent under Subsection (a)(1)").

[167] 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . .or any obligation . . ."); 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law...."); TUFTA § 24.005(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . .if the debtor made the transfer or incurred the obligation . . .").

[168] 11 U.S.C. § 548(d)(2)(A) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor . . .").

[169] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp. (In re IFS Financial Corp.)*, 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [Dean] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

[170] 11 U.S.C. §§ 548(d)(2)(A), 547(b); TUFTA § 24.006(b).

21

he limited his section 547 action to payments made to Mr. Hoisager.[171]

Finally, once a transfer is avoided, the thing avoided, or the value of that thing, can be recovered from the transferee,[172] or from the entity for whose benefit the transfer was made.[173]

**B.** **The Trustee Cannot Recover the Properties Transferred by the Debtor to AEX as Constructive Fraudulent Transfers Because the Transfers were for an Antecedent Debt And He Cannot Recover them as Actual Intent Fraudulent Transfers Because he Failed to Show the Value of the Property to be Recovered**

A "transfer" of property occurs under fraudulent transfer law when "such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee...."[174] Here, that date of perfection occurred, under Texas law, when each assignment was properly recorded.[175] And so, these transfers were made for or on account of an antecedent debt—specifically, the obligation to make the assignments in the Wolfbone I and Wolfbone II assignment agreements—and so cannot be constructively fraudulent transfers.[176] Still, the Trustee might have avoided these transfers as actual intent fraudulent transfers.[177]

But even if the Trustee could avoid the property transfers as actual intent fraudulent transfers, there is a problem of proof. Nowhere does the Trustee list each property transfer he

---

[171] Joint Pre-Trial Order 13, ECF No. 184.

[172] 11 U.S.C. § 550(a)(1).

[173] *Id.* Interestingly, TUFTA does not appear to allow recovery from "the entity for whose benefit the transfer was made." *See* TUFTA §§ 24.008, 24.009. However, section 550(a) comes into play once a transfer is avoided under section 544, and so the "to or for the benefit of" language applies to transfers avoided under TUFTA as well.

[174] 11 U.S.C. § 548(d)(1).

[175] *Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234, 1237 (5th Cir. 1987) ("For purposes of § 548(d)(1), state law on time of perfection controls."); *Osherow v. Wolf (In re Wolf)*, 2016 WL 4940198, at *22 (Bankr. W.D. Tex. Sept. 15, 2016) (citing numerous cases), *aff'd*, 697 F. App'x 317 (5th Cir. 2017).

[176] 11 U.S.C. § 548(d)(2)(A).

[177] *Dean v. Davis*, 242 U.S. 438, 444 (1917). *See also Brown v. Gen. Elec. Capital Corp. (In re IFS Financial Corp.)*, 417 B.R. 419, 439-40 (Bankr. S.D. Tex. 2009) ("The [Dean] Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer."). *But see In re Foxmeyer Corp*, 296 B.R. 327, 337-38 (Bankr. D. Del. 2003) (calling into question the validity of *Dean* today).

22

seeks to avoid together with the value he seeks to recover and the basis of that value.

Mr. Crisp's declaration at pages 13-14 highlights the lack of specificity.[178] Mr. Crisp says, based on an AEX 10-K, that AEX sold properties in 2014 for $5.6 million, made a profit of more than $3 million, and that the sold properties "include" some of the properties transferred by the Debtor to AEX.[179] Which properties? Mr. Crisp doesn't say. And does the Trustee seek to recover the value of the properties or just the profit collected by AEX? The Trustee doesn't say. The only specific properties discussed are the Johnson 44 and the Roark, and with these, the Trustee mentions only the profit earned by AEX.[180] There may be a chart somewhere in the Trustee's exhibits, or information in those exhibits from which such a chart could be constructed, but absent a concise presentation of that information in Mr. Crisp's declaration,[181] there is no basis on which to establish a fraudulent-transfer damage award based on the property transfers.

## C. The Trustee Cannot Recover Transfers Made by the Debtor to AEX and Arabella Operating Because He Failed to Show that the Transfers were "to or for the Benefit of" Mr. Hoisager

At trial, the Trustee sought recovery of transfers made by the Debtor to AEX and Arabella Operating, not from those entities, but instead from Mr. Hoisager as "the entity for whose benefit" those transfers were made.[182] The transfer beneficiary[183] is a person who, while not the initial transferee, nonetheless receives a benefit as a result of the transfer.[184] The "quintessential" example is when a third-party guarantor has its liability reduced when the debt it

---

[178] B. Crisp Decl. 13-14.

[179] B. Crisp Decl. 13.

[180] B. Crisp Decl. 13-14.

[181] Mr. Crisp does reference Exhibit 31, which lists the properties assigned to AEX, but this exhibit provides no values. B. Crisp Decl. 4. He also references Exhibit 71, but this is a summary of the Debtor's balance sheets. *Id.*

[182] Pl.'s Post-Trial Br. 19-21, ECF No. 210; 11 U.S.C. § 550(a)(1).

[183] Coined by Judge Wedoff in *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005).

[184] *Schechter v. 5841 Bldg. Corp (In re Hansen)*, 341 B.R. 638, 644 (Bankr. N.D. Ill. 2006) (quoting *Bonded Fin. Serv, Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988)).

23

guaranteed is paid through an avoidable transfer from the debtor to the lender.[185] "Benefit occurs without the beneficiary ever holding the money or property, precisely because someone else received it."[186] "The benefit must be 'direct, ascertainable and quantifiable' and must correspond to, or be commensurate with, the value of the property that was transferred."[187] Even with these limitations, courts have found many examples of recoverable benefits beyond the guarantor-guarantee context.[188]

But the Trustee must prove the benefit and must prove that the benefit was quantifiable and commensurate with the property transferred.[189] And here, as discussed below, the Trustee has proven no direct benefit to Mr. Hoisager, and any indirect benefits to Mr. Hoisager as a shareholder, director, or officer, resulting from the transfers of property to AEX and cash to Arabella Operating, without more, are not enough. And because the entity must actually receive a benefit from the transfer, intent to benefit alone is insufficient for recovery under 550(a), contrary to the Trustee's assertions.[190]

---

[185] *Sec. Inv'r Prot. Corp. v. Stratton Oakmont*, 234 B.R. 293, 314 (citing *Bonded Fin. Serv, Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988) (considering a guarantor or debtor to be the "paradigm 'entity for whose benefit such transfer was made'")).

[186] *Id.* at 313.

[187] *Enron Creditors Recovery Corp v. J.P. Morgan Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17, 33 (Bankr. S.D. N.Y. 2009) (citing *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005)), *rev'd on other grounds,* 422 B.R. 423 (S.D. N.Y. 2009); *see also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning benefit of continued business operations was "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received" and so was unrecoverable under Bankruptcy Act); *Faulkner v. Kornman (In re The Heritage Corp)*, 413 B.R. 438, 495 (Bankr. N. D. Tex. 2009) ("Nor is an unquantifiable advantage the sort of 'benefit' contemplated by § 550.").

[188] *See, e.g., Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1313-1315 (11th Cir. 2012) (recipients of loan proceeds benefited from transfer of liens securing the loan); *Gibbons v. Stemcor USA, Inc. (In re B.S. Livingston & Co., Inc.)*, 186 B.R. 841, 864 (D. N.J. 1995) (permitting case to proceed under theory that the promise of lucrative positions at new company in exchange for transfers of debtor's assets was a benefit for purpose of 550(a)); *Merrill. v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 127 (D. Utah 1986) (finding a benefit where debtors' funds used to retain an attorney to form a new company for defendant).

[189] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d at 1293 (Corporation's purchase of likely worthless stock from one shareholder leaving second shareholder as sole owner did not benefit second shareholder enough to impose transfer beneficiary liability because it was not "a quantifiable benefit or one bearing the necessary correspondence to property transferred," citing *Mack v. Newton*, 737 F 2d at 1359-60).

[190] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF 212. For cases rejecting the Trustee's position, see *Terry v. Meredith (In re Meredith)*, 527 F.3d 372, 376-77, n.5 (4th Cir. 2008) (finding that the transferor's "subjective intent

24

First, the Trustee has not shown a "direct, ascertainable and quantifiable" benefit to Mr. Hoisager.[191] The Trustee did not establish that the salary paid by AEX to Mr. Hoisager was tied to, or the result of, or in any other way commensurate with the transfers from the Debtor.[192] The Trustee also did not prove that the note and equity distributions given to Mr. Hoisager by AEX, although possibly direct, were ascertainable or quantifiable.[193] On the contrary, Mr. Hoisager testified that the note was essentially worthless and that the equity transfer did not increase his holdings in the post-merger AEX.[194] And this testimony is corroborated by the going-concern qualification in AEX's 20-F.[195]

And so, if the Trustee is to recover from Mr. Hoisager, the Trustee must do so based on Mr. Hoisager's status at AEX or Arabella Operating.[196] The court in *In re Hansen* addressed recovery under section 550(a)(1) from shareholders, directors, and officers.[197] Citing "fundamentals" of American corporate law, the *Hansen* court reasoned that "shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property (in which case they would be subsequent transferees under section 550(a)(2)), or a showing can be made to pierce the corporate veil."[198]

---

to benefit . . . is not determinative" and recognizing that "fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but received no benefit from it") (quoting *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570,591 (N.D. Ill. 2005)) and *Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008) (same). *See also Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984) (reasoning the same under the Bankruptcy Act).

[191] *Reily v. Kapila (In re Int'l. Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir. 2005).

[192] *Id.*

[193] *Id.*

[194] J. Hoisager Decl. 25-27.

[195] Def.'s Ex. D-6, 11-12, 123. A form 20-F is used by foreign companies for filing annual reports and other disclosures.

[196] At the time of the transfers and equity contribution, Mr. Hoisager owned 100% of the equity interest in Arabella Exploration. J. Hoisager Decl. 25; Def.'s Ex. D-21. After the merger with Lone Oak, Mr. Hoisager owned 30.4% of the stock in the new AEX. J. Hoisager Decl. 26. Arabella Operating was a wholly owned subsidiary of AEX. J. Hoisager Decl. 8; Def.'s Ex. D-7, 12.

[197] *Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 644-46 (Bankr. N.D. Ill. 2006).

[198] *Id.* at 645-46 (explicitly rejecting *In re McCook*'s holding to the contrary).

25

*Hansen* accords with the Fifth Circuit's discussion in *Mack v. Newton*[199] (a Bankruptcy Act case) and is therefore persuasive.[200]

But here, the Trustee did not prove that Mr. Hoisager actually received direct distributions of the cash transferred to AEX or Arabella Operating. And the Trustee did not preserve veil-piercing theories through the Joint Pre-Trial Order. Even if he had, the Trustee has shown no cause to pierce the corporate veil because he has not shown that Mr. Hoisager was the alter ego of AEX or Arabella Operating,[201] that AEX or Arabella Operating was Mr. Hoisager's "mere instrumentality,"[202] that AEX or Arabella Operating was a "sham" or "shell" corporation,[203] or that Mr. Hoisager otherwise abused the corporate form.[204]

The cases cited by the Trustee as authority for recovering from Mr. Hoisager are not persuasive. In *In re TOUSA*, debtors transferred liens to new lenders who then paid off old lenders.[205] When the liens were avoided, the court found that the paid lenders were the entities

---

[199] *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[200] *Mack v. Newton* denied recovery because the court found the alleged benefit conferred on partners from using proceeds of fraudulent transfer to operate their business to be "an incidental, unquantifiable, and remote benefit bearing no necessary correspondence to the value of the property transferred or received." 737 F.2d at 1359-60. In accord is *Oscherow v. Nelson & Hensley Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253, 276-78 (Bankr. W.D. Tex. 2011), which cited *Hansen* favorably but found a basis to pierce the veil.

[201] *U.S. v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) (explaining the "alter ego" theory as an exception to limited liability and noting "our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil").

[202] *Lubrizol Corp. v. Cardinal Const. Co.*, 868 F.2d 767, 769 (5th Cir. 1989) (outlining three elements for finding liability under an "instrumentality" theory: "[the] complete domination of the other corporate entity;" "the control must be wrongful;" and "the control must proximately cause the injury complained of").

[203] *Ledford v. Keen*, 9 F.4th 335, 340-42 (5th Cir. 2021) (denying veil-piercing in part because plaintiff did not rebut directors' evidence that they did not "form [corporation] to avoid liability, use it as a shell to avoid liability, or otherwise abuse the corporate form for their personal benefit;" and explaining that, to support a "sham theory," the plaintiff needed evidence of the directors using the corporation to "perpetrate a fraud, evade an existing obligation . . . circumvent a statute, protect a crime, or justify wrong"); *see also West v. Seiffert (In re Houston Drywall, Inc.)*, 2008 WL 2754526 at *32 (Bankr. S.D. Tex. 2008) (finding general partner, an LLC, to be a "sham corporation" because there was "no separateness" between the LLC and its members, and because allowing the member who directed the malfeasance to hide behind the corporate veil "would unjustly benefit" him).

[204] *See Schechter v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 646 (Bankr. N.D. Ill. 2006) ("Most cases in which shareholders or officers have been found responsible under section 550(a)(1) as beneficiaries of corporate transfers have involved some veil-piercing aspect.").

[205] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1301-1302 (11th Cir. 2012).

"for whose benefit the transfer [of the liens] was made."[206] But this is no different from the guarantor situation in that the new lenders received a dollar-for-dollar benefit from the transfers. Mr. Hoisager did not receive a dollar-for-dollar benefit. The Trustee also cites *In re Green Field Energy*,[207] but in *Green Field*, the court held that neither the defendant's position as owner nor as manager of the entity receiving the transfer was enough to confer transfer beneficiary liability.[208]

The Trustee cites *In re Buckhead America Corp*[209] for the proposition that "controlling person of an entity can be the party for whose benefit the transfer was made."[210] But the Buckhead court was considering a motion to dismiss, and so the court did not need to consider "the issue of the precise facts which must be proven in order for plaintiff to prevail."[211] Here, however, the dispute went to trial, and so "the precise facts which must be proven" were at issue.

In his reply brief, the Trustee cites *In re Universal Clearing House.*[212] But *Universal Clearing House* actually agrees with *Hansen* that absent cause to pierce the veil, a shareholder, director, or officer, is not subject to 550(a)(1) liability because of their status alone.[213] The Trustee also argues that Mr. Hoisager's salary, and the fact that the transfers kept Mr. Hoisager's "pyramid" afloat (presumably, AEX and Arabella Operating), establishes benefit to Mr. Hoisager.[214] But *Bonded Financial Services*[215] rejects the former, and *Mack*, the Fifth Circuit

---

[206] *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1314 (11th Cir. 2012).

[207] *Halperin v. Moreno (In re Green Field Energy Services, Inc.)*, 594 B.R. 239 (Bankr. D. Del. 2018).

[208] *Id.* at 288 (Bankr. D. Del. 2018) (finding the trustee's argument insufficient by itself to prove the defendant "received an actual benefit from the . . . transfers").

[209] *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead America Corp.)*, 178 B.R. 956 (D. Del. 1994).

[210] Pl.'s Post-Trial Br. 21, ECF No. 210.

[211] *Buckhead*, 178 B.R. at 963, n.11.

[212] Pl.'s Reply to Def.'s Post-Trial Br. 8, ECF No. 212; *Merrill. v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D. Utah 1986).

[213] *Id.* at 127-29 (finding that initial-transferee corporations were not "sham[s]" or "mere conduit[s]" such that the defendant, who took for value transfers from those corporations, would fall within section 550(a)(1)).

[214] Pl.'s Reply to Def.'s Post-Trial Br. 8-9, ECF No. 212.

[215] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a

27

Bankruptcy Act case, rejects the latter.[216] At most, the Trustee may have recovered the salary and distributions from Mr. Hoisager as a subsequent transferee under section 550(a)(2);[217] however, the Trustee did not argue this.

And so, the Trustee cannot recover either the property or cash transfers made to AEX or the cash transfers made to Arabella Operating from Mr. Hoisager. The cash paid to Mr. Hoisager directly is another matter.

### D. The Financial Condition of the Debtor and the Reasons for the Debtor's Insolvency are Relevant to both the Fraudulent Transfer and Breach of Fiduciary Duty Claims

As noted above, the Debtor's insolvency, undercapitalization, or inability to pay debts forms one element of a constructively fraudulent conveyance.[218] In addition, the Debtor's overall financial condition can be important in determining whether the Debtor, through its agent, Mr. Hoisager, had an intent to delay, hinder, or defraud creditors.[219] Indeed, insolvency is one of the enumerated "badges of fraud."[220] Finally, the Debtor's financial condition forms an important backdrop against which to consider the Trustee's breach of fiduciary duty claim.

The parties have stipulated that the Debtor was insolvent as of December 31, 2013.[221] At trial, Mr. Hoisager testified that the Debtor became unable to pay its debts as they came due in early 2014,[222] and this is generally corroborated by the dates of service for the creditors filing vendor liens against the Debtor's properties,[223] as well as by Mr. Crisp's analysis of proofs of

---

benefit from the initial transfer is within this language."); *see also Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009) (dismissing plaintiff's section 550(a)(1) claim that, by pledging company assets to secure DIP financing, former directors benefitted by continuing to receive compensation from the debtor) (citing to *Bonded*).

[216] *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988); *Mack v. Newton*, 737 F.2d 1343, 1357-60 (5th Cir. 1984).

[217] *Bonded*, 838 F.2d at 895 (explaining that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made").

[218] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).

[219] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[220] TUFTA § 24.005(b)(9).

[221] Joint Pretrial Order 35, ECF No. 184.

[222] 5/16/22 Trial Tr. 133:19-23, ECF No. 203.

[223] B. Crisp Decl. 9; Pl.'s Ex. 62.

28

claim filed against the Debtor.[224] Jason Rae, the Trustee's accounting expert, testified to an analysis of the Debtor's capitalization performed by his firm, which concluded that there was a working capital shortfall from December 31, 2013 to June 30, 2015.[225]

So all the available evidence establishes that the financial condition element for a constructively fraudulent transfer is satisfied on the date stipulated for the Debtor's insolvency, or December 31, 2013, and only transfers that took place after that date can be avoided as such.[226] An earlier cut-off date for actual intent fraudulent transfers might be established, if enough badges of fraud (other than insolvency) can be established at the earlier date.

But how did the Debtor slide into this state of insolvency on December 31, 2013? Mr. Crisp included two charts in his declaration,[227] but neither revealed anything about what was happening to the Debtor during 2013. More helpful was Exhibit D-11, a chart prepared by Mr. Crisp, but adopted by Mr. Hoisager in his declaration.[228] Exhibit D-11 reveals a shocking fact: The Debtor's income was over $800,000 for each of 2011 and 2012, but fell to a negative $4.6 million in 2013, and the Debtor continued to lose money thereafter.[229]

Mr. Hoisager's timeline reveals that the Debtor's drilling operations on the Wolfbone I and II wells began in late 2012 and ramped up in 2013.[230] That the Debtor had trouble collecting the joint interest costs of this drilling activity is evident from the bankruptcy schedules.[231] And Mr. Rae testified that the Debtor over spent the approved budget on the first three wells drilled by almost $14 million, $8 million over the amounts committed by the working interest owners.[232]

---

[224] B. Crisp Decl. 9.
[225] J. Rae Decl. 15; Pl.'s Ex. 70.
[226] 11 U.S.C. § 548(a)(1)(B); TUFTA §§ 24.005(a)(2), 24.006(a).
[227] B. Crisp Decl. 6, 8.
[228] J. Hoisager Decl. 4.
[229] Def.'s Ex. D-11.
[230] Def.'s Post-Trial Br. Ex. A, 1-7, ECF No. 211.
[231] B. Crisp Decl. 5.
[232] J. Rae Decl. 10.

29

The following chart, created from the Debtor's balance sheets, makes it painfully clear that the combination of the Debtor's Wolfbone I and II drilling activities—with the high costs[233] and inability to collect the corresponding joint interest billings—and absurdly large owner distributions, were the biggest contributors to the Debtor's insolvency at the end of 2013.[234]

| Year | Equity | Accounts Receivable | Unbilled Joint Interest Billings | Owner Distributions |
|------|--------|---------------------|----------------------------------|---------------------|
| 2012 | $654,468 | $877,173 | $3,590,262 | –$2,307,685 |
| 2013 | –$12,930,875 | $5,329,376 | $11,550,407 | –$9,589,296 |

### E. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager As Fraudulent Transfers

#### 1. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after December 13, 2013 as Constructively Fraudulent Transfers

Exhibit 1 to the Trustee's Post-Trial Brief shows all payments made by the Debtor to Mr. Hoisager between December 31, 2013, and the Petition Date.[235] These payments total $2,803,834.[236] Mr. Crisp testified that each payment was reflected in the Debtor's books and records as an "owner distribution," and opined that the Debtor did not receive reasonably equivalent value in exchange.[237] While, the "Dove Acres" distributions[238] about which the Trustee complains were made while the Debtor was financial healthy, and so were perfectly benign,[239] owner distributions made while a company is insolvent are quintessential constructively fraudulent transfers.[240] And as noted above, the Debtor's books and records which

---

[233] J. Rae Decl. 10.

[234] Pl.'s Ex. 8, 1-4.

[235] Pl.'s Post-Trial Br. Ex. 1, ECF No. 210.

[236] Pl.'s Ex. 60, 76; B. Crisp Decl. 12.

[237] B. Crisp Decl. 14-20. As noted earlier, Mr. Hoisager's attempts to recharacterize these payments were not credible.

[238] Pl.'s Post-Trial Br. 19, ECF No. 210.

[239] The Debtor was financially healthy, so the distributions are unassailable if ratified by a majority of shareholders. See, e.g., Gearhart Industries Inc. v. Smith Intern., Inc., 741 F.2d 707, 720 (5th Cir. 1984) ("A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by a majority of disinterested directors or the majority of the stockholders.").

[240] See Mancuso v. Champion (In re Dondi Financial Corp.), 119 B.R. 106, 111-13 (Bankr. N. D. Tex. 1990), and cases cited therein.

30

listed these payments as "owner distributions" to Mr. Hoisager must control in the face of Mr. Hoisager's inconsistent and self-serving testimony. Thus, the $2,803,834 in distributions made to Mr. Hoisager after December 31, 2013, are recoverable and the Trustee is entitled to a judgment of at least this amount.

But was there a date earlier than December 31, 2013, on which the Debtor formed an actual intent to delay, hinder, or defraud creditors, so that cash payments made to Mr. Hoisager before December 31, 2013, could be avoided?

### 2. The Trustee Can Recover the Cash that the Debtor Transferred to Mr. Hoisager after July 1, 2013 as Actual Intent Fraudulent Transfers

As is typical with actual intent fraudulent transfers, there is no direct evidence that Mr. Hoisager intended[241] to delay, defraud, or hinder creditors with the payments of cash to Mr. Hoisager. Mr. Hoisager testified, of course, that the Debtor made no transfers or payments with actual intent to hinder, delay, or defraud any creditor.[242]

Because a debtor will seldom admit that he intended to defraud creditors, intent may also be inferred and established by circumstantial evidence, including analysis of the "badges of fraud."[243] The badges of fraud under the Texas Uniform Fraudulent Transfer Act include

> (1) Whether the transfer was to an insider;
> (2) Whether the debtor retained possession or control of the property after the transfer;
> (3) Whether the transfer was concealed;
> (4) Whether the debtor had been sued or threatened with suit before the transfer;
> (5) Whether the transfer was substantially all of the debtor's assets;
> (6) Whether the debtor absconded after the sale;
> (7) Whether the debtor removed or concealed assets;
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset or obligation incurred;
> (9) Whether the debtor was insolvent or became insolvent shortly after the sale;
> (10) Whether the transfer occurred shortly before or shortly after the debtor incurred a

---

[241] It is the Debtor's intent that matters. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008). But the intent of a transferee in control of the debtor will be imputed to the debtor. *Id.* at 269-70.

[242] J. Hoisager Decl. 5-6.

[243] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1066-67 (5th Cir. 2008).

31

"substantial debt;" and

(11) Whether the debtor transferred essential assets to the business to a lienor who transferred the assets to an insider or seller.[244]

The Fifth Circuit has articulated a similar list of "badges" applicable to transfers under the Bankruptcy Code:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of events and transactions under inquiry.[245]

The Trustee seems to suggest a static construct where a badge once present is presumed to have existed for all relevant times. For example, the Trustee makes much of the Dove Acres payments, even though these occurred long before the Debtor had trouble paying creditors. But how can you have an intent to delay, hinder, or defraud creditors who are getting paid? And this is a problem with all multi-factor tests, of which the badges-of-fraud test is just one example. A wooden application of each factor or badge in isolation, without considering how each factor plays out and relates to the other factors over the relevant time period, brings the trier of fact no closer to an understating of the ultimate issue: here, the Debtor's intent, as held by Mr. Hoisager.

This analysis will focus on the last three of the Fifth Circuit's factors for four reasons. First, they encapsulate the other badges of fraud, including the TUFTA badges. Second, they offer a more dynamic construct than that offered by the Trustee, one where timing matters. Third, they compel an inquiry into all the facts and circumstances. Finally, and most importantly,

---

[244] Tex. Bus. & Com. Code §24.005(b).

[245] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th. Cir. 1989) in turn quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

they invite the trier of fact to knit together all the badges that apply into a coherent narrative that examines how Mr. Hoisager's motives were likely affected by the changing financial fortunes of the Debtor over the course of 2013.

To that end, post-trial instructions included a request for a timeline,[246] which would have been responsive to the fourth and sixth of the Fifth Circuit's elements. The Trustee declined this request, possibly because it would undermine his static construct, under which a badge once present is present for all times. Mr. Hoisager did include one,[247] and it has been helpful. It shows:

- that the discussions that ultimately led to establishing AEX as a public company started in July 2013;[248]
- that several leases were assigned by the Debtor to AEX on August 30, 2013;[249]
- that the merger agreement between AEX and Lone Oak was signed in October 2013;[250]
- that the transaction in which AEX "recognized" an equity contribution by Mr. Hoisager happened in December 2013;[251]
- that a re-entry failure involving the SM Prewitt lease—described as "disastrous"—happened on December 11, 2013;[252]
- that the valuable Johnson 44 well assignment to AEX was recorded one day later;[253] and
- that the merger was completed 12 days after that.[254]

In short, the latter half of 2013 was eventful for Mr. Hoisager, the Debtor, and AEX. But what other indicators of intent are there from this time?

First, the Debtor made its first six-digit distribution to Mr. Hoisager in July 2013.[255]

Next, on top of distributions to Mr. Hoisager, the Debtor made large expenditures,

---

[246] 5/19/2022 Trial Tr. 33:16-34:1, ECF No. 205.
[247] Def.'s Post-Trial Br. Ex. A, ECF No. 211.
[248] *See also* W. Heyn Decl. 2.
[249] *See also* Pl.'s Ex. 77.
[250] *See also* W. Heyn Decl. 3.
[251] *See also* Def.'s Ex. 19, PDF 7; B. Crisp Decl. 13.
[252] *See also* J. Hoisager Decl. 38.
[253] *See also* Pl.'s Ex. 77.
[254] *See also* W. Heyn Decl. 3.
[255] Pl.'s Ex. 60, 2.

including substantial cost overruns, on the Wolfbone I and II wells[256]—wells in which the Debtor no longer owned a working interest—leading to the Debtor's slide into insolvency. This ship was clearly sinking in 2013, and no one would know that better than Mr. Hoisager.

Next, the Debtor transferred almost 5 million dollars to AEX. These transfers were included on Exhibit 85, used by Mr. Crisp to exclude revenue payments, which would be due under the joint operating agreement, from the claim for cash transfers from the Debtor to AEX.[257] While the parties spent much time debating the accuracy of four entries on Exhibit 85, of far, far more relevance to the timeline analysis is this: by juxtaposing the revenue payments[258] against the joint interest billing receivable owed by AEX to the Debtor,[259] we learn that, beginning in July 2013 (again), the Debtor made substantial revenue payments to AEX at times when the AEX joint interest billings due to the Debtor were substantial, and mostly past due. No prudent operator would have failed to offset those revenue payments against the past due joint interest billings.

Finally, there is Mr. Hoisager's audacious attempt to transition from his role as a sole proprietor, engaging in undocumented transactions with Mr. McCabe, and using the Debtor as his private checking account, to a role as the chief executive officer of a public company.[260]

Taking all these facts together leads to the inescapable conclusion that starting in July 2013, Mr. Hoisager knew the Debtor was foundering, and he was, at the same time, enticed by the prospect of running AEX, a public company. Preferring his new enterprise over the Debtor, Mr. Hoisager emptied the Debtor of available cash and valuable properties, and diverted it all to

---

[256] J. Rae Decl. 10.

[257] 5/17/22 Trial Tr. 46:1-50:17, ECF No. 204.

[258] Pl.'s Ex. 85.

[259] Pl's. Ex. 12B, 74, 260, 456.

[260] *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014) (fraudulent transfer under TUFTA) ("This list [of badges] is not exclusive and a court may also consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.") (citations omitted).

himself, AEX, or later, Arabella Operating. And this, at the least, constitutes an intent to delay, hinder, or defraud the creditors of the Debtor, and so the cutoff date for cash transfers to Mr. Hoisager can be moved back to July 1, 2013. Doing so adds $377,535 to the judgment.[261]

### F. Because the Cash Transfers Made to Mr. Hoisager were Made for No Consideration, those Transfers Cannot be Preferential Transfers

The Trustee alternatively seeks to recover the cash paid by the Debtor to Mr. Hoisager within one year of the petition date as preferential transfers. But a preferential transfer must be made "for or on account of an antecedent debt,"[262] and as previously discussed, those cash transfers were made for no consideration.

### G. Under the One Satisfaction Rule, the Trustee's Fraudulent Transfer Judgment Must be Reduced by the Payments Mr. Hoisager Made Back to the Debtor

In the Joint Pre-Trial Order, Mr. Hoisager raises the one satisfaction rule of section 550(d) and claims that payments received by the Trustee under a settlement entered into with the estate of AEX,[263] and payments made pre-petition by Mr. Hoisager to the Debtor, should be credited against any fraudulent transfer award.[264]

More specifically, Mr. Hoisager says the Trustee received $4.8 million from the sale of the Samson Tag Along, $2 million from the sale of the Brigham Tag Along, and $1.4 million from the sale of Wolfbone I and II working interests.[265] But as noted by Judge Hale in In re Provident Properties,[266] "section 550(d) must be applied on a transfer-by-transfer basis...." Here, since the Trustee did not establish a right to recover any of the property transfers, there is nothing against which to credit his recoveries from the AEX estate.

---

[261] Pl.'s Post-Trial Br. Ex 2, ECF No. 210.
[262] 11 U.S.C. § 547(b).
[263] Joint Pre-Trial Order 35, ECF No. 184.
[264] Joint Pre-Trial Order 43-44, ECF No. 184.
[265] Joint Pre-Trial Order 23, ECF No. 184.
[266] *Segner v. Ruthven Oil & Gas (In re Provident Royalties, LLC)*, 581 B.R. 185, 195 (Bankr. N.D. Tex. 2017).

35

But Mr. Hoisager's payments to the Debtor after July 1, 2013 should reduce his fraudulent transfer liability under section 550(d). The Fifth Circuit held strongly in favor of this offset in *In re DeBerry*.[267] And while the facts there differed materially, the opinion gives no hint that a different set of facts would yield a different result.[268] Mr. Hoisager's uncontroverted testimony is that he contributed $67,550 after July 10, 2014, to support the Debtor's operations, and so this will serve as a credit to the fraudulent transfer judgment.[269]

## H. **Mr. Hoisager Breached his Fiduciary Duty to the Debtor**

The Debtor was a Texas limited liability company.[270] Mr. Hoisager was the sole member and manager, and as manager he appointed himself president, secretary, and treasurer.[271] Thus, he owed a fiduciary duty to the Debtor.[272] Texas law allows an LLC to limit this duty to some extent,[273] and the Debtor's company agreement does just that, relieving Mr. Hoisager from "any action taken (or any failure to act) by [him] in good faith on behalf of the company and reasonably believed by [him] to be authorized or within the scope of [his] authority, unless that action (or failure to act) constitutes fraud, gross negligence, bad faith or willful misconduct...."[274]

---

[267] *Whitlock v. Lowe (In re DeBerry),* 945 F. 3d 943, 947 (5th Cir. 2019).

[268] *Id.* ("In matters of statutory interpretation, the text is always the alpha. Here, it's also the omega.").

[269] J. Hoisager Decl. 69.

[270] Def.'s Ex. 2.

[271] Def.'s Ex. 2, PDF 15.

[272] *Katz v. Intel Pharma, LLC,* 2020 WL 3871493 at *2 (S.D. Tex. July 9, 2020) (finding managing member "owed [LLC] fiduciary duties based on agency-law principles") (citing *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex. 2002)); *see also ETRG Invest. v. Hardee (In re Hardee),* 2013 WL 1084494 at *9 (Bankr. E.D. Tex. 2013) ("Though limited liability companies are not corporations in the strictest sense, and though Texas law implies, but does not explicitly state, that the fiduciary status of corporate officers and directors and the corresponding three broad duties of such corporate officers and directors—the duty of due care, loyalty, and obedience—applies to managers and/or members governing the activities of a limited liability company, the imposition of those duties upon the management of a limited liability company under Texas law is appropriate and warranted.").

[273] Tex. Bus. Org. Code Ann. §§ 7.001(d)(3), 101.401.

[274] Def.'s Ex 2, PDF 8.

36

Mr. Hoisager argues that he owes no duties to creditors unless the company stops operating.[275] The cases cited support this notion, but they also affirm that the duty runs to the corporation and none suggest that the trustee cannot enforce the duty on behalf of the corporation.[276] It seems most likely that Texas would ultimately adopt the Delaware view that the fiduciary duties are always owed to the corporation, but can be enforced by the residual stakeholder.[277] Here, in any event, the creditors are not seeking to enforce the fiduciary duty owed to the corporation. Instead, a trustee has been appointed and stands in the shoes of the Debtor,[278] with the ability to sue to enforce the fiduciary duties owed to the corporation and recover on behalf of the residual stakeholder.[279] And plainly, with the Debtor hopelessly insolvent,[280] the residual stakeholders are the creditors.

The duty imposed on Mr. Hoisager includes a duty of care and a duty of loyalty.[281] The duty of loyalty also includes a duty not to engage in self-dealing.[282] Although Mr. Hoisager has

---

[275] Def.'s Post-Trial Br. 107, ECF No. 211.

[276] *Floyd v. Hefner*, 2006 WL 2844245 at *16-24, *31 (S.D. Tex. 2006) (discussing at some length the tension between circuit and district court cases on the issue, and the confusion introduced by *Credit Lyonnais*; and yet allowing the trustee to pursue the breach of duty claims on behalf of the corporation); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *31 (Bankr. N.D. Tex. 2020) (stating the duty always runs to corporation but allowing successor to trustee to recover for breach of duty); *Tow v. Bulmahn (In re ATP Oil & Gas Corp.)*, 711 Fed. App'x. 216 (5th Cir. 2017) (stating the same as *Floyd*, but neither the Fifth Circuit nor the District Court appears to have had any issue with the trustee asserting the claims on behalf of the corporation, instead dismissing the claims on other grounds).

[277] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 102-03 (Del. 2007) (holding that creditors have no direct claim, but stating that they can assert a derivative claim if the entity is insolvent); *Torch Liquidating Trust ex rel. Bridge Associates LLC v. Stockstill*, 561 F.3d 377, 385-86 (5th Cir. 2009) (same); *Floyd v Hefner*, 2006 WL 2844245 at *24 (reasoning that the trustee must show both a violation of a legal obligation and harm *to the corporation* stemming from that violation).

[278] 11 USC § 323 (a), (b) (trustee represents estate and can sue and be sued); 11 USC § 541(a)(1) (estate includes legal or equitable interests of the debtor).

[279] 11 U.S.C. § 323; *Torch*, 561 F.3d at 385-87 (explaining how a trustee in bankruptcy has standing to bring on behalf of the estate a direct suit for breach of fiduciary duties owed to the corporation). The Trustee's standing here is stronger than was the liquidating trustee's standing in *Torch* because the Trustee's standing exists automatically under the Bankruptcy Code, whereas in Torch the liquidating trustee had to satisfy the requirements of section 1123).

[280] B. Crisp Decl. 5.

[281] *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W. 2d 624, 628 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ).

[282] *Lowry v. Tarbox*, 537 S.W.3d 599, 615 (Tex. App.—San Antonio 2017) (explaining that fiduciaries are

37

raised the defense of the business judgment rule, that rule does not apply to self-dealing[283] or interested party transactions.[284] Instead, the fiduciary has the burden of proving that the transaction was fair to the corporation.[285]

The actions taken by Mr. Hoisager to drain the Debtor of cash and properties through transfers to himself and AEX are the very epitome of self-dealing[286] and interested party transactions.[287] That Mr. Hoisager took these actions with full knowledge of the Debtor's deteriorating financial condition establishes both bad faith and willful misconduct.

The only real question concerns the measure of damages. According to the Trustee's Post-Trial Brief, Mr. Crisp measured the damages as the unpaid claims against the estate of $11.9 million.[288] But Mr. Crisp does not "measure damages" in his declaration. And such a measure of damages would be speculative—it would require the unlikely finding that but for the transfers, all creditors would have been paid in full, and the record supports no such finding.[289]

But the corporation was certainly damaged by losing the cash transferred with the actual intent to delay, hinder, or defraud creditors. This amount includes not only the amounts of cash

---

not to benefit themselves at the expense of the corporation).

[283] *Lowry v. Tarbox*, 537 S.W.3d 599, 616 (Tex. App.—San Antonio 2017).

[284] *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) (interested party transactions include those where the fiduciary profits personally and those where the fiduciary's corporation transacts with another corporation in which the fiduciary has a significant financial interest).

[285] *Id.* at 110.

[286] *Id.* at 110-11 (director's failure to market company's assets on the open market and subsequent sale to second company in which he had a financial interest was a breach of his duties of loyalty and care).

[287] *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 577 (Tex. 1963) ("A director who diverts profits from the corporation in violation of his fiduciary relationship is personally liable even though the profits are acquired by an agency controlled by the director."); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *30-31 (Bankr. N.D. Tex. 2020) (defendant breached fiduciary duty by diverting opportunity from one company to another in which the fiduciary had an interest); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 275 (Bankr. N.D. Ill. 2003) (liquidating a company while transferring business to a new company owned by the fiduciary was a breach of fiduciary duty).

[288] Pl.'s Post-Trial Br. 25, ECF No. 210 (citing Pl.'s Ex. 61 and B. Crisp Decl. 5).

[289] To similar effect is *H. King & Assocs.*, 295 B.R. at 276 (finding that the proper measure of damages for breach of fiduciary duties does not necessarily equal the claims filed in the bankruptcy case).

transferred to Mr. Hoisager after July 1, 2013, but also the non-revenue cash transferred to AEX after July 1, 2013. These amounts are recoverable because, even though the cash transfers to AEX cannot be said to be "for or to the benefit of" Mr. Hoisager for purposes of fraudulent conveyance law, they fall squarely within the proscription on unfair interested party transactions.[290]

As noted above, although the parties debated the accounting for revenue v. non-revenue payments to AEX, the payments of revenue to AEX after July 1, 2013, are also damages for breach of fiduciary duty because those payments should have been retained and set off against the outstanding joint interest billings owed by AEX to the Debtor. Non -revenue cash and revenues paid to AEX after July 1, 2013, total $5,542,596.[291]

Finally, although the Trustee failed in his burden to prove the avoidance of the payments to Arabella Operating, Mr. Hoisager failed, in part, to carry his burden to prove the overall fairness of all of the cash payments to Arabella Operating. Mr. Hoisager's testimony that money paid to Arabella Operating was revenue owned by others is credible, without contrary evidence, but only for payments made in uneven amounts, and not for payments made in round dollar

---

[290] *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 514 B.R. 790, 815 (Bankr. N.D. Tex. 2014) (explaining that "'interested' transactions are subject to a higher level of scrutiny); *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC.*, 566 B.R. 815, 849-50 (W.D. Tex. 2017) (allegation of fraudulent transfers by co-CEOs to themselves and others states a claim for breach of fiduciary duty); *Randall v. Erstmark Capital Corp. (In re Erstmark Capital Corp.)*, 2002 WL 1792213 at *5 (N.D. Tex. 2002) (fraudulent transfers are a breach of fiduciary duty); *Valley Ridge Roofing and Constr., LLC v. Silver State Holdings, Assignee—7901 Boulevard 26 LLC (In re Silver State Holdings, Assignee—7901 Boulevard 26 LLC)*, 2020 WL 7414434 at *26, 30 (Bankr. N.D. Tex. 2020) (finding that defendant manager breached his duty of loyalty by causing a fraudulent transfer between two commonly owned companies); *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999) ("The duty of loyalty holds officers and directors to an 'extreme measure of candor, unselfishness and good faith,' particularly where there is an interested transaction.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 274-75 (Bankr. N.D. Ill. 2003) (fiduciaries' steering of commercial opportunities from Debtor to new corporation, in which they were financially interested, was a breach of their fiduciary duties).

[291] Pl.'s Ex. 85. The actual total is $5,883,150, but based on rebuttal testimony by Mr. Hoisager, 5/19/22 Trial Tr. 11:3-25:25, ECF No. 205, and Mr. Crisp, *Id.* at 26:12-30:7, the Court believes Ex. 85 overstates the correct numbers by $340,554, consisting of a $107,607 transfer that reversed a mistaken payment, and a $232,947 transfer that was later voided.

amounts.[292]

And so, the Trustee can recover an addition $153,500 from Mr. Hoisager for breaching his fiduciary duties to the Debtor.

## I.    The Trustee's Request for Exemplary Damages Must be Denied as the Trustee Did Not Prove Common Law Fraud by Clear and Convincing Evidence

The Trustee also asks for recovery of exemplary damages under Section 41.003 of the Texas Civil Practice & Remedies Code.[293] That section permits exemplary damages where the claimant can prove by clear and convincing evidence that the harm arose from fraud, malice, or gross negligence.[294] Here, the Trustee seeks to prove that the harm arose from fraud.[295] If fraud is proven under section 41.003, section 41.008 permits recovery of up to two times economic damages, with the amount left to the fact finder's discretion.[296] The case cited by the Trustee discusses punitive damages for breach of fiduciary duty under Illinois law and is thus inapposite.

The problem here is that the Trustee neither pleaded nor proved fraud.

> To state a claim for common law fraud in Texas, Plaintiffs must prove that: (1) Defendants made a material representation that was false; (2) Defendants knew that the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Defendants intended to induce Plaintiffs to act upon the representation; and (4) Plaintiffs actually and justifiably relied upon the representation and thereby suffered injury. *In re ACM–Texas, Inc.*, 430 B.R. 371, 410 (Bankr. W.D. Tex. 2010) (citing *Ernst*, 51 S.W.3d at 577); *see also Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) ("A common-law fraud claim requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.") (citations omitted).[297]

---

[292] Of the $882,483 transferred to Arabella Operating after December 31, 2014, $153,500 were payments made in round dollars and $728,983 were payments made in uneven amounts. Pl.'s Ex. 79. *See also* B. Crisp Decl. 4, 15.

[293] Pl.'s Post-Trial Br. 26, ECF No. 210.

[294] Tex. Civ. Prac. & Rem. Code § 41.003.

[295] Pl.'s Post-Trial Br. 26, ECF No. 210 (citing *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 276-77 (Bankr. N.D. Ill. 2003)).

[296] Tex. Civ. Prac. & Rem. Code § 41.008.

[297] *Patek v. Alfaro (In re Primera Energy, LLC)*, 579 B.R. 75, 144 (Bankr. W.D. Tex. 2017), *aff'd sub nom. Alfaro v. Reiley*, 2019 WL 4765385 (W.D. Tex. 2019).

What the trustee has proven is "actual intent to hinder, delay, or defraud" creditors, and has done so by a preponderance of the evidence with reference to badges of fraud. This in no way equates to satisfying the elements of common law fraud by clear and convincing evidence, and so the request for exemplary damages is denied.[298]

## J.    The Trustee's Request for Attorney's Fees Awaits More Proof and Briefing

The Trustee preserved a request for attorney's fees incurred under TUFTA in the Joint Pre-trial order.[299] Under section 24.013 of the Texas Business and Commerce Code, "the court may award costs and reasonable attorney's fees as are equitable and just."[300] The Fifth Circuit has recently discussed awarding fees and costs in a TUFTA cases that involved other issues:

> Under Texas Business and Commerce Code § 24.013, courts presiding over TUFTA cases are empowered to "award costs and reasonable attorney's fees as are equitable and just." On appeal, Hughes concedes that if Pearcy and Thomas prevail on their TUFTA claims, they are entitled to attorney's fees and costs under § 24.013. However, Hughes maintains that Pearcy and Thomas failed properly to segregate recoverable fees, stemming from their attorneys' work on their TUFTA claims, from unrecoverable fees, incurred as a result of their other claims.
>
> Under Texas law, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). However, segregation is not necessary "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are '[intertwined] to the point of being inseparable.'" *Id.* at 311 (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11–12 (Tex. 1991)). This exception is met only where the relevant "legal services advance both recoverable and unrecoverable claims." *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007).[301]

---

[298] Although *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022) could be read to the contrary, there the clear and convincing standard was met, unlike here. Also, in *Husky Int'l Elect., Inc. v Ritz*, 578 U.S. 356, 361-62 (2016) the Supreme Court determined that "actual fraud" as used in 11 U.S.C. § 523 can include fraudulent conveyance schemes that do not require a false representation. But the fraud in section 523 is not the same as Texas common law fraud and so *Husky* is inapposite.

[299] Joint Pre-Trial Order 10, ECF No. 184.

[300] Tex. Bus. & Com. Code § 24.013.

[301] *Thomas v. Hughes*, 27 F.4th at 1019-20.

41

42

Here, the Trustee has unsuccessfully pursued avoidance of the property transfers and transfers to AEX and Arabella Operating, but successfully pursued avoidance of the cash transfers to Mr. Hoisager as constructive and actual intent fraudulent conveyances. The Trustee has also successfully pursued a breach of fiduciary duty claim that was dependent on the same facts that were proven to support the avoidance of the cash transfers as actual intent fraudulent conveyances.

To recover fees or costs, then, the Trustee generally must separate time spent on the (1) avoidance of the property transfers, (2) avoidance of transfers to AEX and Arabella, and (3) any transfers before July 1, 2013, from time spent on (4) avoidance of cash transfers, and (5) breach of fiduciary duty claims. It seems possible that time spent on categories (4) and (5) may in part be inseparable from time spent on categories (1) and (2). How this happens as a practical matter will depend on how detailed the time records of the Trustee and his counsel have been. And neither side has had an adequate opportunity to brief this somewhat complicated issue, the nature of the judgment is just now becoming known, and the Trustee has not yet proposed a division of time. And so, the Court will enter an order with this memorandum opinion containing a schedule for submitting time records, responses to the time records, and a briefing schedule. Entry of the final judgment will await the outcome of this dispute.

42

## III.    CONCLUSION

Thus, the Trustee shall recover these amounts on his fraudulent transfer and breach of fiduciary duty claims.

|  | Fraudulent Transfer | Breach of Fiduciary Duty |
|---|---|---|
| Properties to AEX | -0- | -0- |
| Cash to AEX | -0- | $5,542,596 |
| Cash to Arabella Operating | -0- | $153,500 |
| Cash to Mr. Hoisager after 12/31/13 | $2,803,834 | $2,803,834 |
| Cash to Mr. Hoisager from 7/1/13 to 12/31/13 | $377,535 | $377,535 |
| Credit | <$67,550> | -0- |
| Attorney's Fees | TBD | -0- |
| Judgment |  | $8,887,465 |

Obviously, the awards are duplicative to the extent of the cash paid to Mr. Hoisager, and the Trustee cannot recover those amounts twice.

A briefing schedule will be entered for the attorney's fees issue. After the Court determines the attorney fee issue, it will enter a final judgment. All other relief requested will be denied.

43