UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

RECEIVED.
AND FILED

APR 2 7 2026

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

In re:
META MATERIALS INC.,

　　　　Debtor.

| Case No.: 24-50792-hlb
| (Chapter 7)
|
| **SCOTT TRAUDT'S RENEWED**
| **MOTION TO ENFORCE THE**
| **FEBRUARY 5, 2026 ORDER,**
| **COMPEL A 7-DAY**
| **SUPPLEMENTAL RULE 2014**
| **DISCLOSURE, REQUIRE IN**
| **CAMERA SUBMISSION OF**
| **RETENTION DOCUMENTS, AND**
| **SUSPEND FURTHER FEES**
| **PENDING COMPLIANCE**
|
|
| Hearing requested.
|

Scott Traudt, appearing *pro se*, moves for a narrow order requiring supplemental disclosure concerning the post-order representation of Next Bridge Hydrocarbons, Inc. ("NBH") and/or Gregory McCabe by James W. Christian and Christian Attar. This motion asks the Court to revisit the factual premise of its February 5, 2026 order on a short record and to require the exact retention dates and documents needed to test continued compliance with 11 U.S.C. §§ 327(e) and 328(c) and Fed. R. Bankr. P. 2014.

1. Standing. Movant Scott Traudt is a party in interest and a party with a claim against the estate arising from the fraudulent sale and creation of MMTLP by Meta Materials Inc., George Palikaras, and John Brda from Torchlight Energy Resources Inc. ("TRCH"). The Bankruptcy Code defines "claim" broadly to include disputed, contingent, and unliquidated rights to payment, 11 U.S.C. § 101(5); a "creditor" is an entity with such a claim, id. § 101(10); a creditor may file a proof of claim, id. § 501(a); and in Chapter 7 every creditor must file a proof of claim

1

for the claim to be allowed, Fed. R. Bankr. P. 3002(a).[1] The Supreme Court has said Congress adopted the broadest available definition of "claim." *Johnson v. Home State Bank* No. 90-693, 501 U.S. 78, 83 (1991).[2] A party with a pecuniary interest or practical stake is a party in interest. *Brown v. Sobczak (In re Sobczak)* 369 B.R. 512, 517-18 (9th Cir. BAP 2007).[3]

2. Why this matters. In its settled June 25, 2024 administrative order against Meta Materials, the SEC found that Meta engaged in a scheme to inflate the price of its stock and defraud investors through material misstatements and omissions concerning the preferred dividend issued in the TRCH/Meta transaction, and that the bankers' valuation supported only $0.03 to $0.83 per share while Meta CEO Palikaras publicly floated $1 to $20. Securities Act Release No. 11292, Admin. Proc. File No. 3-21976, at 1, 8. The SEC order also states that Torchlight had sold off "essentially all" of its revenue-generating oil and gas properties, had "no prospects" to sell the oil and gas assets, that the Preferred Dividend was "designed to cause a 'short squeeze,'" and that Palikaras had "no knowledge of potential buyers." The SEC's civil complaint filed the same day against Brda and Palikaras likewise alleges that the preferred dividend was designed as part of a fraudulent scheme to manipulate Torchlight stock. *SEC v.*

---

[1] Traudt's proof of interest is on file with this court and the Estate has not challenged his standing. See this court's order of February 5, 2026 Dock. 2565.

[2] Congress intended in § 101(5) to incorporate the broadest available definition of "claim," *see Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U. S. 552. As used in § 101(5), "right to payment" and "right to an equitable remedy" mean "nothing more nor less than an enforceable obligation." *Id.* at 501 U. S. 559.

[3] While the term "party in interest" is not defined by the Code, this Court has held that such a party must have a "pecuniary interest" in the outcome of the dispute before the Court. *See In re Simplot*, 2007 WL 2479664 at *9 n.45 (Bankr. D. Idaho Aug. 28, 2007) (citing *In re Elias*, 05.2 I.B.C.R. 41, 42, 2005 WL 4705220 (Bankr. D. Idaho 2005), and *In re Stone*, 03.2 I.B.C.R. 134, 135 (Bankr. MEMORANDUM OF DECISION - 6D. Idaho 2003)). *See also Brown v. Sobczak (In re Sobczak)*, 369 B.R. 512, 517-18 (9th Cir. BAP 2007) (noting that a "party in interest" may be one who has an actual pecuniary interest in the case, one who has a practical stake in the outcome of the case, or one who will be impacted in any significant way in the case).

2

*Brda* No. 1:24-cv-04806, Complaint ¶¶ 1, 29, 112-19 (S.D.N.Y. filed June 25, 2024). Those SEC records supply the basis for Movant's claim against the estate and make the scope and timing of any NBH/McCabe engagement by special counsel material, not collateral.

3. Changed circumstances after the February 5 order. The Court's February 5, 2026 order denied disqualification on the record then before it, but it also made clear that disclosure duties are ongoing and that relief under § 328(c) remains available if adversity later appears. Since that order, NBH filed *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies* Cause No. 2026-18186 (Harris County District Court, filed Mar. 18, 2026), signed by James W. Christian and Casidy R. Newcomer of Christian Attar. That filing is enough to require a fresh Rule 2014 disclosure because it shows current representation of NBH on overlapping subject matter after the Court was told Christian no longer represented NBH.

4. Rule 2014 requires a supplement. Rule 2014 permits employment under § 327 only on the trustee's application and requires disclosure of any proposed compensation arrangement and all connections with the debtor, creditors, and other parties in interest, accompanied by a verified statement from the professional. Fed. R. Bankr. P. 2014(a)(1)-(3). Section 327(e) allows special-purpose employment only if counsel does not represent or hold an interest adverse to the debtor or the estate with respect to the matter of employment. 11 U.S.C. § 327(e). Section 328(c) allows the Court to deny compensation if, at any time during the employment, the professional represents or holds an adverse interest with respect to the matter for which the professional was employed. 11 U.S.C. § 328(c).

5. The exact dates are the point. The Court should require a verified supplement identifying the exact date or dates of: (a) first contact by NBH and/or McCabe; (b) acceptance of the engagement; (c) execution of any engagement letter or retention agreement; (d) first billable

3

work; (e) first invoice; and (f) first payment, retainer, reimbursement, guaranty, or other compensation commitment. The Court should also require identification of the client, the payor, the scope of the engagement, and whether any overlap exists with the matter for which Christian Attar was retained in this Chapter 7 case.

6. Christian Attar's litigation posture for NBH against Davies heightens the need for scrutiny, not lessens it. The March 18, 2026 Davies filing was voluminous and fully developed, which strongly indicates that Christian Attar and James W. Christian were performing substantial work for NBH well before March 18. That timing matters because the estate's interests may run directly against NBH as a corporate entity and Gregory McCabe as its majority owner. The SEC found that Torchlight had sold off "essentially all" of its revenue-generating oil and gas properties, had "no prospects" to sell the remaining oil and gas assets, that the Preferred Dividend was "designed to cause a 'short squeeze,'" and that Palikaras had "no knowledge of potential buyers." If the MMTLP spin-off was built on known absence of meaningful asset value and fraudulent market stimulation, then the estate may have reason to investigate or pursue claims against NBH and McCabe rather than align estate special counsel with them in offensive litigation against Davies.[4] That is precisely why the Court should demand the exact employment timeline and retention documents now. See *In re Congoleum Corp.* 426 F.3d 675, 687-88 (3d Cir. 2005).[5]

---

[4] The Estate may have claims against Special Counsel Wes Christian as of January, 2023, he was employed by TRCH John Brda to "investigate fraud and market manipulation in MMTLP via "Flamethrower LLC" and knew, or should have known (as the SEC determined) that Brda and McCabe had lied about the oil field assets – which the SEC assessed (as did McCabe himself in late 2022 in a filing with the SEC) that these assets were essentially worthless. Christian did nothing with this information, harming investors.

[5] Especially applicable to the instant matter is *Congoleum's* holding regarding informed consent (Traudt argues that it's the same church, but a different pew from the *Meta* case, but still provides guidance) "Given the complexities of the bankruptcy proceeding and the "many hats"

4

More relevant here is the fact that McCabe who is now a decidedly one-man show in Next Bridge Hydrocarbons Inc. cannot be separated via the paper statement that Christian represents the interests "solely" of NBH. NBH has no employees, and McCabe is the majority shareholder of this dried out, fraud-laced husk as per this April 13, 2026 SEC filing by McCabe:

> We operate our business through nine wholly owned subsidiaries, Torchlight Energy, Inc., a Nevada corporation, Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Torchlight Hazel, LLC, a Texas limited liability company, Hudspeth Operating, LLC, a Texas limited liability company, Wolfbone Investments, LLC, a Texas limited liability company ("Wolfbone"), and Wildcat Panther LLC, Wildcat Valentine LLC, Wildcat Cowboy LLC, and Wildcat Packer LLC, all Texas limited liability companies. In addition, we may consider strategic options, including partnering with, or the possible sale of any or all of our assets to, third parties. *We currently have no employees.* We employ consultants for various roles as needed. See *https://www.streetinsider.com/SEC+Filings/Form+S-1A+Next+Bridge+Hydrocarbons/26305564.html (emphasis added)*

In *Blumenthal v. Myers (In re M&M Marketing, LLC)* 426 B.R. 796, 802-04 (B.A.P. 8th Cir. 2010), aff'd, 397 F. App'x 258 (8th Cir. 2010) the court held that "To "hold an interest adverse to the estate" means: "(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate."13 To "*represent* an adverse interest" means to serve as agent or attorney for any individual or entity holding such an adverse interest. Based on this definition, the Petitioning Creditors hold an interest adverse to the estate and therefore Skalka holds an interest adverse to the estate.

---

worn by Gilbert throughout the pre- and post-petition process, we cannot conclude that the purported waivers Gilbert received from Weitz "on behalf of" the individual clients constituted informed, prospective consent. *See Baldasarre v. Butler*, 132 N.J. 278, 625 A.2d 458 (1993) (concluding that informed consent was not sufficient in a complex commercial real estate transaction); *In re Matter of Edward J. Dolan*, 76 N.J. 1, 384 A.2d 1076, 1082 (1978)

5

Traudt argues that there are colorable claims against McCabe, and McCabe has filed a proof of interest in MMAT with this court.[6] But that merely sets the table.

The *Blumenthal* court found that the mere possibility of claims against counsel's client for past transfers removed any pretense of disinterestedness: "The Petitioning Creditors' interests are adverse to the estate because they received transfers from the Debtor in 2007 that could potentially be avoided and recovered by the Trustee. In representing the Petitioning Creditors, Skalka also holds an adverse interest. The affidavits on record establish that the Petitioning Creditors were not the beneficiaries of any transfer within the year prior to the petition date, but that only eliminates liability under 11 U.S.C. § 547. Transfers occurring more than a year before the petition, however, could be subject to avoidance under other provisions of the Bankruptcy Code, such as § 544 (utilizing the Uniform Fraudulent Transfer Act) or § 548. Consequently, Skalka's employment would include investigating the potentially fraudulent transfers his clients received in 2007 – which would create a clear conflict of interest. *Blumenthal* at 9, 10.

*Buckley v. Transamerica Inv. Corp. (In re Southern Kitchens, Inc.)* 216 B.R. 819, 826-27 (Bankr. D. Minn. 1998), the court was similarly strident: "In the process of identification, however, potential conflicts on the subject dispute are just as disqualifying as actual, current ones. *In re Nat'l Distrib. Whse. Co., Inc.,* 148 B.R. at 561. Regardless of whom a trustee has identified as an opponent, if a past or present client of proposed counsel *was involved in any way with the events that gave rise to the dispute* (emphasis added), or could otherwise be the subject of a claim based on those events, the client has an interest adverse to the estate and disqualification results. Buckley, at 826, 827.

---

[6] See Dock. 39, dated October 8, 2024, McCabe owns 120,001 MMAT shares.

7. The SEC's own record materially undermines any premise that NBH was an unrelated third party with "no evident ties" to the Debtor. In the June 25, 2024 order, the SEC found that Torchlight had sold off "essentially all" of its revenue-generating oil-and-gas properties, yet Brda had already begun planning a spin-off into "Next Bridge Hydrocarbons, Inc." as early as December 2020, and Meta paid "consulting fees designed to conceal the recruitment and compensation of a team of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity" while public statements still touted efforts to sell the assets and distribute proceeds to preferred holders. Securities Act Release No. 11292, Admin. Proc. File No. 3-21976 ¶¶ 3-4, 8, 12, at 1-4. The same order found Torchlight had "no prospects" to sell the remaining oil and gas assets, that the Preferred Dividend was "specifically designed to cause a 'short squeeze,'" and that Palikaras had "no knowledge of potential buyers." Id. ¶¶ 2-3, 8-11, at 1-4, 8-10. Those findings do not need to collapse NBH and MMAT into one legal entity for every purpose. They are more than enough to show intertwinement: the same asset package, the same shareholder-facing value story, and the same concealed spin-off plan ran from Torchlight into Meta and then into NBH. The SEC staff later reinforced that continuity point by telling NBH that the separation was "not accurately depicted as an acquisition" and directing NBH to "eliminate the segregation of predecessor and successor activity and the step-up in basis." SEC Comment Letter to Next Bridge Hydrocarbons, Inc. at 2 (Feb. 14, 2025). On this record, Christian Attar's simultaneous representation of NBH and McCabe is not collateral. If the estate has claims arising from the structuring, concealment, transfer, or disposition of those assets, then special counsel's representation of NBH and McCabe places counsel opposite parties the estate may need to investigate or pursue.

7

8. Exhibits. To keep the record clean and surgical, Movant attaches only the public documents necessary to test the continuing accuracy of the February 5 order: Exhibit A, the SEC's June 25, 2024 administrative order against Meta Materials; Exhibit B, the SEC civil complaint in *SEC v. Brda* No. 1:24-cv-04806 (S.D.N.Y. filed June 25, 2024); Exhibit C, the SEC's February 14, 2025 comment letter to NBH; Exhibit D, NBH's March 21, 2025 response letter; and Exhibit E, the petition in *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies* Cause No. 2026-18186 (Harris County District Court, filed Mar. 18, 2026).[7]

9. Judicial notice. Movant requests judicial notice under Fed. R. Evid. 201 of Exhibits A through E as public records and court filings whose existence, dates, contents, and stated positions can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Movant requests judicial notice of the SEC's findings and staff positions as official agency records, and of the Davies petition as a filed pleading showing who appeared for NBH and when. Movant does not ask the Court at this stage to treat every disputed allegation in those materials as finally adjudicated against nonparties; Movant asks only that the Court consider these official records in determining whether the premise of the February 5 order remains sound and whether a renewed Rule 2014 disclosure is required.

10. Requested relief. Movant respectfully asks the Court to enter an order requiring, within seven (7) days: (i) a supplemental Rule 2014 filing by the Trustee; (ii) a supplemental verified statement by James W. Christian and/or Christian Attar; (iii) in camera submission of all documents sufficient to prove the exact NBH/McCabe retention timeline and compensation

---

[7] Movant is only attaching the text of the lawsuit with no exhibits as the only thing that matters for this court is judicial notice of the lawsuit and the signature of Wes Christian as representing NBH. Also, the full case was filed as part of another earlier filing that has not been docketed yet and Movant sees no need to paperwork carpet-bomb this court.

arrangement, including engagement letters, retention agreements, invoices, retainer records, payment confirmations, and communications memorializing retention; (iv) suspension of any further fee allowance or payment to Christian Attar pending full compliance; and (v) release to Movant of verifiable, certified employment dates (start and stop dates for all periods) of Christian Attar and Christian for NBH for any and all times between January 1 2024 and March 27, 2026. If any document is withheld, the withholding party should provide a privilege log. In the alternative, Movant requests limited production under Fed. R. Bankr. P. 2004.

11. Narrow request. Movant is not asking the Court in this motion to adjudicate all merits issues arising from MMTLP, NBH, or the SEC litigation. Movant asks only for a clean supplemental record so the Court can determine whether the premise of the February 5 order remains accurate and whether continued employment and compensation of Christian Attar remain proper.

WHEREFORE, Scott Traudt respectfully requests that the Court grant this motion, require the requested seven-day disclosures and in camera production, suspend further fees pending compliance, and award such further relief as is just and proper.

Dated: April 22, 2026

Scott Traudt, *pro se*
Movant
191 Kibling Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named parties and others with interests in this matter and at the addresses delineated below either by 1st Class mail or via email on this 22nd day of April, 2026.

9

Scott Traudt, *pro se*
*Movant*
191 Kibling Hill Road
Strafford, VT 05072

**U.S. Department of Justice** PO Box 18417, Reno, NV 89511
Christina W. Lovato – trusteelovato@att.net ; NV26@ecfcbis.com
**Office of the U.S. Trustee**
U.S. TRUSTEE - RN - 7 USTPRegion17.RE.ECF@usdoj.gov
**Hartman & Hartman** 510 W. Plumb Lane Ste. B, Reno, NV 89509
Jeffrey L. Hartman – notices@bankruptcyreno.com; abg@bankruptcyreno.com
**Perkins Coie LLP** 2525 E. Camelback Road, Suite 500, Phoenix, AZ 85016
Bradley Cosman – bcosman@perkinscoie.com
**ChristianAttar** 1177 W. Loop S., Ste.1700, Houston, TX 77027
James "Wes" Christian – jchristian@christianattarlaw.com
**Kasowitz Benson Torres LLP** 1633 Broadway, New York, NY 10019
Steven Tountas – stountas@kasowitz.com legal-notices@kasowitz.com
**Cooper Levenson** 3016 W. Charleston Blvd. Ste. 195, Las Vegas, NV 89102
Michael R. Brunet – mbrunet@cooperlevenson.com
**Robison, Sharp, Sullivan & Brust** 71 Washington St., Reno, NV 89503
Clayton P. Brust cbrust@rssblaw.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:
META MATERIALS INC.,

          Debtor.

| Case No.: 24-50792-hlb
| (Chapter 7)
|
| **SCOTT TRAUDT'S RENEWED**
| **MOTION TO ENFORCE THE**
| **FEBRUARY 5, 2026 ORDER,**
| **COMPEL A 7-DAY**
| **SUPPLEMENTAL RULE 2014**
| **DISCLOSURE, REQUIRE IN**
| **CAMERA SUBMISSION OF**
| **RETENTION DOCUMENTS, AND**
| **SUSPEND FURTHER FEES**
| **PENDING COMPLIANCE**
|
|
| Hearing requested.
|

**PROPOSED] ORDER GRANTING SCOTT TRAUDT'S RENEWED
MOTION TO ENFORCE THE FEBRUARY 5, 2026 ORDER,
COMPEL A 7-DAY SUPPLEMENTAL RULE 2014
DISCLOSURE, REQUIRE IN CAMERA SUBMISSION OF
RETENTION DOCUMENTS, AND SUSPEND FURTHER FEES
PENDING COMPLIANCE**

The Court, having considered Scott Traudt's Renewed Motion to Enforce the February 5, 2026

Order, Compel a 7-Day Supplemental Rule 2014 Disclosure, Require In Camera Submission of

Retention Documents, and Suspend Further Fees Pending Compliance (the "Motion"), and good

cause appearing, hereby ORDERS:

1. The Motion is GRANTED.

2. Within seven (7) days of entry of this Order, the Trustee shall file a supplemental disclosure

under Fed. R. Bankr. P. 2014 addressing all post-order facts material to the continued

employment of James W. Christian and Christian Attar in this case, including any representation

of Next Bridge Hydrocarbons, Inc. and/or Gregory McCabe.

1

3. Within seven (7) days of entry of this Order, James W. Christian and/or Christian Attar shall file a supplemental verified statement identifying the exact date or dates of: (a) first contact by NBH and/or McCabe; (b) acceptance of the engagement; (c) execution of any engagement letter or retention agreement; (d) first billable work; (e) first invoice; and (f) first payment, retainer, reimbursement, guaranty, or other compensation commitment.

4. The supplemental verified statement shall also identify the client, any payor or source of compensation, the scope of the engagement, and whether any overlap exists with the matter for which Christian Attar was retained in this Chapter 7 case.

5. Within seven (7) days of entry of this Order, the Trustee and James W. Christian and/or Christian Attar shall submit for in camera review all documents sufficient to prove the exact NBH/McCabe retention timeline and compensation arrangement, including engagement letters, retention agreements, invoices, retainer records, payment confirmations, and communications memorializing retention.

6. If any responsive material is withheld, the withholding party shall file a privilege log identifying the withheld document, its date, its author or sender, its recipient, and the basis for withholding.

7. Pending full compliance with this Order, no further fee allowance or payment shall be made to Christian Attar.

8. Release to Movant of verifiable, certified employment dates (start and stop dates for all periods) of Christian Attar and Christian for NBH for any and all times between January 1, 2024 through to March 27, 2026. This is to be inclusive and should show a complete NBH employment history of Christian and Christian Attar by NBH.

2

8. The Court reserves all issues of continued employment, disqualification, and compensation under 11 U.S.C. §§ 327(e) and 328(c) until after review of the required submissions.

**IT IS SO ORDERED.**

Dated: _____

_____
UNITED STATES BANKRUPTCY JUDGE

3

# EXHIBIT A

# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 11292 / June 25, 2024

SECURITIES EXCHANGE ACT OF 1934
Release No. 100415 / June 25, 2024

ADMINISTRATIVE PROCEEDING
File No. 3-21976

| | |
|---|---|
| In the Matter of<br><br>    META MATERIALS, INC.<br>    (f/k/a TORCHLIGHT<br>    ENERGY RESOURCES,<br>    INC.)<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Meta Materials, Inc. ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

1.      In June 2021, Respondent raised $137.5 million in an at-the-market offering (the "ATM Offering"). Leading up to the offering and in connection with a merger, Respondent engaged in a scheme to inflate the price of its stock and defraud investors through numerous material misstatements and omissions about the potential value of a stock dividend to be issued as part of the merger. As a result of its fraudulent conduct, Respondent sold 16.2 million shares during its ATM Offering for tens of millions of dollars more than it could have absent its efforts to inflate its stock price.

2.      Respondent artificially inflated the value of its common stock by structuring a merger between its predecessor entities (Torchlight Energy Resources and Metamaterial Inc.) to include an unregistered preferred stock dividend that would not be immediately publicly tradeable (the "Preferred Dividend"), specifically designed to cause a "short squeeze." Respondent privately and selectively disseminated—through paid consultants, private conversations with investors, and via social-media messages—the theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers in Respondent's stock to cover their positions before Torchlight issued the Preferred Dividend or risk violating their short contracts by having difficulty delivering the Preferred Dividend when the merger closed. But Respondent never disclosed in its public filings its intent to cause a short squeeze, and it waited until the last minute to announce the ATM Offering to capitalize on what Respondent believed would be a short-term price inflation of its stock.

3.      In support of its scheme, Respondent made false and misleading statements about the Preferred Dividend, which entitled its holders to receive the net proceeds of the sale of Respondent's oil and gas assets. In its public filings, Respondent misrepresented the status of its efforts to market and sell those assets while concealing a planned spin-off of the assets into a new entity. Further, in May 2021, Respondent's incoming Chief Executive Officer baselessly claimed that the value of the Preferred Dividend could be between $1 and $20 per share when, in fact, a valuation study by Respondent's investment bankers only supported a per-share value range of $0.03 to $0.83.

4.      Respondent's scheme occurred against the backdrop of a lax internal control environment. Respondent failed to devise and maintain internal accounting controls and make and keep adequate books and records by failing to account properly for the disposition of corporate assets or the recognition of legitimate expenses related to a series of payments made to stock promoters who rendered services to the company without any documentation. In addition, Respondent paid consulting fees designed to conceal the recruitment and compensation of a team

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity at the same time that Respondent touted in its public statements its intention to make efforts to sell the oil and gas assets and distribute the net proceeds to Preferred Dividend holders.

## Respondent

5.      Meta Materials, Inc. ("Meta II" or "Respondent") is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021 through a reverse merger between: (i) Torchlight Energy Resources, Inc. ("Torchlight"), a publicly traded Texas corporation headquartered in Plano, Texas that purported to be in the business of oil and gas exploration and production, then listed on the Nasdaq under the ticker symbol "TRCH"; and (ii) Metamaterial, Inc. ("Meta I"), a Canadian headquartered company then listed on the Canadian Securities Exchange and focused on early-stage applied materials technology research and development. Today, Meta II's common stock, which trades under the Nasdaq ticker symbol "MMAT," is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Concurrent with the merger, Torchlight issued the Preferred Dividend to Torchlight shareholders of record as of June 24, 2021, and Torchlight shares became Class A Preferred Shares of Meta II after the merger closed.

## Other Relevant Individuals

6.      John A. Brda, age 59, resides in St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. Post-merger, Brda held a consulting role with Meta II through late 2022.

7.      Georgios "George" Palikaras, age 42, is a Greek citizen who resides in Halifax, Nova Scotia, Canada. From 2011 to 2021, Palikaras was Meta I's President & CEO. Upon Meta II's creation, Palikaras became President & CEO of Meta II and served on its board of directors ("Board"). In October 2023, Meta II terminated Palikaras and he subsequently resigned from the Board.

## Background

### Torchlight's Plan to Use a Preferred Dividend to Cause a Short Squeeze

8.      In early 2020, after selling off essentially all of its revenue-generating oil and gas properties, Torchlight faced an uncertain future: its stock traded below $1.00 per share, Nasdaq issued a delisting warning, and its auditors issued a going-concern warning. In response to Torchlight's predicament, Brda, Torchlight's CEO, implemented a plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but not its remaining oil and gas assets;

3

- Issue a Preferred Dividend in the form of preferred stock that would not be listed or traded on any exchange as part of the merger structure, ostensibly to allocate proceeds from the sale of Torchlight's remaining oil and gas assets to legacy Torchlight shareholders;

- Market and promote the Preferred Dividend to emphasize to the market that short sellers would have difficulty obtaining the Preferred Dividend without owning Torchlight stock, thus pressuring short sellers to close their positions or obtain Torchlight stock before the record date for the Preferred Dividend ("Record Date"), temporarily inflating the price of Torchlight's common stock;

- Leverage the resulting inflated common stock price to raise capital through an ATM Offering and remove debt through debt conversion; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's remaining oil and gas leases.

9.      Brda explained his plan—including the use of the Preferred Dividend to pressure short sellers—to members of Torchlight's Board of Directors, its investment banker, and several prospective merger partners, including Palikaras and the Meta I Board of Directors. From its earliest conception, in brainstorming the plan with Torchlight's Chairman and its lead banker in June 2020, Brda explained that, "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover." Also in June 2020, Brda explained to a potential merger partner that he expected Torchlight's stock price to increase "temporarily because of the short squeeze" while acknowledging that the resulting price increase would be "unsustainable." In initial merger discussions, Brda explained to Palikaras how the deal structure could create a short squeeze and the plan to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

### Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative

*Brda Caused Torchlight to Make Public Statements to "Play Up" the Preferred Dividend*

10.      Torchlight never directly disclosed in any public filing the full scope of Brda's plan to use the Preferred Dividend to create a short squeeze. In Torchlight's 2020 Form 10-K filed March 18, 2021, Torchlight disclosed that "[t]he market price of our common stock may be influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." However, Torchlight did not publicly disclose that the Preferred Dividend could cause a short squeeze, much less that the Preferred Dividend was designed to create a short squeeze or that the ATM Offering was conducted to "take advantage of the squeeze." Instead, Torchlight's 2020 Form 10-K stated that "we have no reason to believe our shares would be the target of a short squeeze," which was directly contrary to the statements that Respondent and its executives made privately about the Preferred Dividend and the plan to create a short squeeze.

11.     Instead, in reports filed with the Commission and in public statements, Brda and Torchlight focused attention on the Preferred Dividend and the supposed net profits from the sale of Torchlight's oil and gas assets that Preferred Dividend holders could expect to receive, highlighting the Preferred Dividend in the announcement of the merger, the announcement of a final signed merger agreement, and the proxy filings concerning the merger. Torchlight also emphasized in its proxy filings that the Preferred Dividend would not be registered, would not be listed on any national exchange, and would not be "freely transferrable" unless an exemption applied. Brda believed that once short sellers understood it would be difficult acquire the Preferred Dividend in the market, they would be forced to cover their short positions in Torchlight because they would otherwise have difficulty obtaining the Preferred Dividend to comply with the terms of their short contracts, which would require them to deliver the proceeds or equivalent value of an in-kind dividend like Torchlight's Preferred Dividend. The company planned to leverage this short-covering activity by issuing shares via an ATM Offering and removing debt through equity conversions. But neither Torchlight nor Brda explained the full plan in public; rather, they selectively disseminated portions of the plan through consultants, via hints dropped on social media, and to select investors.

*Torchlight and Brda Used Consultants to Spread Their Short Squeeze Theory to Investors*

12.     Torchlight paid individual consultants to communicate with Torchlight's current or potential shareholders. Through these consultants—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated selective information about the merger to investors. For example, Brda emailed two of the consultants a slide presentation containing the plan to "[p]lay up the dividend to make sure the shorts understand their dilemma."

13.     On the day that Torchlight and Meta I announced their letter of intent to merge, Brda forwarded the consultants a draft press release announcing the merger, complaining that the stock price had not moved enough, "I think people don't understand the dividend properly." On September 21, 2020, Brda forwarded to two consultants the press release that Torchlight issued that day, announcing that it had entered into a letter of intent with Meta I to merge, and the following exchange occurred:

> **Brda:** We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.

> **Consultant:** Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?

> **Brda:** I think people don't understand the dividend properly.

> **Consultant:** I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

14.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote, "[w]e all knew [the shorts] would come

5

after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them."

15.     Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Torchlight kept no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative in Communications with Select Investors and Select Prospective Investors*

Virtual Investor Conference

16.     During Spring 2021, Brda and Palikaras conducted meetings with investors through conferences organized by Torchlight's financial advisors. From March 16-18, 2021, Brda and Palikaras met with a series of institutional investors at a virtual investor conference. During these meetings, Brda and Palikaras pitched the justification for the merger to one investor group at a time, and Brda explained to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze and Torchlight's plan to conduct a substantial ATM Offering concurrent with the merger close. In contrast, Torchlight never disclosed in its public filings the Preferred Dividend's potential impact on short sellers, and it waited to publicly disclose the ATM Offering until June 16, 2021.

Italian Investor Call

17.     In May 2021, Torchlight's investor relations firm set up several virtual meetings with a group of Italian shareholders that Torchlight believed held more than one million shares of its common stock. Brda attended one of the meetings, and Palikaras attended another. The stated purposes of the meetings were to solicit the Italian shareholders' proxy votes in favor of the merger and to encourage the investors to hold the common stock of the post-merger company. During his May 13, 2021 meeting with Italian shareholders (the "Italian Investor Call"), Palikaras described the plan to use the Preferred Dividend to create a short squeeze on several occasions, for example:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted ... This deal is set up not to give a [cash] dividend at closing...** As a result, there is **no physical way for the shorts to cover the stock when the time to close,** and we believe ... **the close, it's called a short squeeze...** (emphasis added).

18.     On June 7, 2021, a user posted on social media a screenshot purporting to show that the user recorded the Italian Investor Call. The user claimed they participated in the call and summarized their takeaways, including that the Preferred Dividend would "create a short squeeze as there are many short stocks to cover before the merger!!" Three days later, a Reddit user posted a partial audio recording of Palikaras's comments during the Italian Investor Call, including the plan to create a short squeeze.

6

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative, Including on Social Media*

19.     Palikaras and Brda also used Twitter to tout the Preferred Dividend and short squeeze theory. For instance, on June 7, 2021, one week before Torchlight announced the Record Date, Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze…yet. Just my two cents. ***Once it happens*** that's ok as it is fact, but [if you do it] before you are putting yourself at risk for potentially speculative content." (emphasis added).

20.     Six days later, the day before Torchlight announced the Record Date, Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets and public statements designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock:



21.     Palikaras's tweet received several public replies connecting the tweet to the short squeeze theory. For example, one user responded, "You should set the price of the shorts the price of TRCH at the end of the short squeeze." Another wrote, "We definitely get the reference 'Shorts Are Getting Burne[d].'"

22.     The next day, on June 14, 2021, Torchlight issued a press release announcing the Record Date (June 24, 2021), kicking off the sequence of events that culminated in the ATM Offering.

**Torchlight, Brda, and Palikaras Misrepresented the Value of the Preferred Dividend**

23.     To support their efforts to manipulate the market for Torchlight's common stock and encourage investors to buy or hold Torchlight's common stock, Torchlight and Brda misrepresented the likelihood of a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. They encouraged investors to buy or hold Torchlight's common stock by: (1) Torchlight and Brda giving the false impression in public filings and statements that Torchlight would undertake commercially reasonable efforts to sell the oil and gas assets; (2) Torchlight and Brda referencing the net proceeds that would be distributed to Preferred Dividend holders following the sale; and (3) Palikaras providing a wholly unsupported per-share value estimate (between $1 and $20) of net proceeds payable to Preferred Dividend shareholders that became a widely circulated talking point on social media.

*Torchlight and Brda Misrepresented Ongoing "Commercially Reasonable Efforts" to Sell Torchlight's Oil and Gas Assets and Distribute "Net Proceeds" in Proxy Filings and Forms 8-K*

24.     In public filings leading up to the merger, particularly in its preliminary and final proxy materials soliciting shareholder approval, Torchlight bolstered the potential value of the Preferred Dividend by misrepresenting that it would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to Class A Preferred Shareholders within six months of the merger closing. In total, Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets seven or eight times in each version of the proxy filings. And, references to the net proceeds to be distributed to preferred shareholders repeatedly appeared in press releases throughout the period that the merger was pending, including press releases dated April 15, 2021, May 3, 2021, and June 14, 2021 subsequently attached to current reports filed with the Commission.

25.     In reality, Torchlight had no prospects to sell the oil and gas assets. Torchlight made no effort to lay the groundwork for a sale when it made the aforementioned statements. The company's records contain no evidence of any communications with specific prospects from any time in 2020 or 2021. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of very large oil companies would be viable candidates to purchase Torchlight's assets. Even Brda acknowledged that only "very specialized buyers" would be interested in Torchlight's assets and that it would take from up to a year to a year and a half to complete the sale considering the due diligence a specialized buyer would need to undertake. Torchlight's long-time investment banker, who was not retained to sell the oil and gas assets, believed that it could take two to three years to complete such a sale.

26.     To the contrary, as early as December 2020, Brda had already begun planning a spin-off of the oil and gas assets into a new entity. Just days after Torchlight and Meta I signed the definitive agreement for the merger, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity, "Next Bridge Hydrocarbons, Inc." Then, in January 2021, Brda and Torchlight began paying $20,000 a month (through an

8

intermediary who received "consulting fees" for doing no actual work) to individuals who would form the initial management team of Next Bridge Hydrocarbons.

27. By August 17, 2021, less than 60 days after the merger closed, Meta II's board voted to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible. Then, in December 2022, Meta II spun out the oil and gas assets into a new company—Next Bridge Hydrocarbons—the same entity name that Brda identified when he first began to plan for a spin-off transaction in December 2020.

*Palikaras's False Claim About the Value of the Preferred Share Dividend*

28. On the May 13, 2021 Italian Investor Call, where Palikaras described the short squeeze to a select group of investors, he also made false and misleading statements about Torchlight's efforts to sell its oil and gas assets, and the potential values of a cash distribution of the net proceeds from that sale.

29. During the call, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that those buyers were "top tier," when, in fact, Torchlight had not identified any potential buyers and Palikaras admitted that he had no knowledge of potential buyers or active negotiations.

30. Palikaras also mentioned on the Italian Investor Call that, "according to the analysis," the value of the Preferred Dividend could be between $1-$20 per share. The $1-$20 range was wholly unsupported by a valuation study performed by Torchlight's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share. Palikaras's reference to an "analysis" gave investors the misleading impression that his value range was supportable when it was not.

31. These statements by Palikaras quickly became a topic of discussion on social media, continuing to drive mentions throughout the ATM offering period. A common refrain on social media was that the company's CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share.

32. After the merger, Meta II's VP of Business Development emailed Palikaras and other Meta II leadership about an investor complaint citing the $1-$20 dividend range. In the email, the VP stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares."

*Torchlight, Brda, and Palikaras Misled Investors about the Preferred Dividend.*

33. The false and misleading statements by Torchlight, Brda, and Palikaras made investors believe that Meta II could quickly monetize the oil and gas assets and distribute the net proceeds to Preferred-Dividend holders post-merger. This belief incentivized Torchlight shareholders to acquire or hold the common stock through the Record Date so they would be

9

eligible to receive the Preferred Dividend. On July 21, 2021, just weeks after the merger closed, Meta II's CFO emailed Palikaras about the importance of demonstrating to the marketplace that Meta II took steps to diligently pursue a purchaser for the oil and gas assets before proceeding to a spin-off given the "preferred holders who are expecting to see cash for their shares."

34.    As it became clear that Meta II would not immediately pay Preferred Dividend holders any net proceeds and that no Torchlight asset sale (or net proceeds therefrom) were forthcoming, investors began to complain. One investor emailed Palikaras directly on August 15, 2021, suggesting that Meta II issue stock to Preferred Dividend holders "somewhere near the middle of the proposed $1 - $20 dividend range" to "help take the sting away."

### Torchlight's Market Manipulation Scheme Caught Fire

35.    Brda and Palikaras privately celebrated as Torchlight's stock became a hot topic of conversation on social media in the days before the merger. Users on platforms from Twitter to Stocktwits to YouTube to Reddit discussed the merger, the Preferred Dividend, and the short squeeze. On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY," which succinctly summed up the plan: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain, "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras's "shorts-in-flames" tweet from the day before.

36.    Social media users posted the hashtag and versions of the graphic dozens of times in the days surrounding the Record Date announcement. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock by June 22, 2021 to benefit from the supposed short squeeze and the Preferred Dividend worth $1-$20 per share, using other hashtags, subreddits, and iterations on the short squeeze theory.

37.    Palikaras celebrated the "#TORCHDAY" campaign's impact on the price of Torchlight's stock and what it portended for the plan to use the ATM Offering to capitalize on the attention, texting Brda: "To the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." (emphasis in original). Brda agreed: "I think we can get there, just need to have diamond hands."

38.    The trading volume in Torchlight's common stock dramatically escalated as the merger approached. In May 2021, the average trading volume was five million shares per day. But, between the announcement of the Record Date on June 14 and the deadline to purchase Torchlight stock in order to obtain the Preferred Dividend on June 22, the average trading volume exceeded 80 million shares per day.

39.    On June 14, 2021, the day after Palikaras made his "shorts-in-flames" tweet, Torchlight issued a press release, announcing the Record Date of June 24, 2021. Palikaras issued a

10

tweet, linking the press release and promoting the June 24th record date: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Investors following Torchlight understood Palikaras's tweet to mean that the supposed key to ensuring the short squeeze and obtaining the Preferred Dividend that Palikaras touted would be worth $1—$20 per share was to buy or hold Torchlight stock by or through June 22, 2021. Torchlight's stock price immediately reacted, jumping from $3.58 to $5.07. It would reach $10.88 in the days leading up to the June 25 merger close.

### Torchlight Profited from Its Manipulation of Torchlight's Stock Price Using the ATM Offering

40.     Torchlight's Board, Meta I's Board, Brda, and Palikaras discussed their intention to raise funds at artificially inflated prices in a series of exchanges that occurred on the eve of the ATM Offering. As Torchlight's stock price rose after the announcement of the Record Date, Brda demanded a *quid pro quo* from Meta I: Torchlight (and Brda) would not go forward with the long-planned ATM Offering unless a portion of the funds raised by the ATM Offering would go toward drilling oil wells to maintain Torchlight's oil and gas leases.

41.     In a memo to the Meta I team, Brda explained that Torchlight's Board would not agree to conduct the ATM Offering without assurances that they would receive the *quid pro quo* that they requested:

> We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price…* I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… *Otherwise, we have no inclination to raise capital now* as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

42.     Palikaras and Meta I's CFO recommended to Meta I's Board that they approve conducting the ATM Offering, stating "all [Meta's advisers] *strongly recommended we take as much of the money as we can ahead of the closing.*" (emphasis added). And although the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date.*" (emphasis added).

43.     Although Meta I did not formally agree to Brda's demands, Meta II ultimately did enter into an agreement with Brda post-merger regarding an amount to fund drilling for the oil and gas assets—consistent with Brda's original plan and part of his scheme.

44.     The day after Torchlight's stock price increased dramatically in response to the news of the Record Date announcement, Torchlight executed a sales agreement with an investment bank to conduct the ATM Offering. As a result of the ATM Offering, Torchlight sold 16.2 million shares of common stock between June 18 and June 24, at an average price of $8.50 per share,

raising $137.5 million. Over 95% of that volume was sold prior to the "T plus 2" date of June 22, 2021.

45.     Torchlight's stock reached its highest price around the "T plus 2 date" of June 22, 2021 just as Torchlight, Brda, and Palikaras predicted. But after closing at $9.92/share on June 21st, and $7.00/share on June 22nd, the stock price fell dramatically. On June 25, 2021, the Preferred Dividend payment date, the stock closed at $4.95/share. The following Monday (June 28th), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98/share (after accounting for the reverse split, less than half its prior day close).

46.     The communications by Brda and Palikaras during the ATM Offering reflected their intent to take advantage of the manipulated stock price. On Friday, June 18, after Torchlight sold two million shares on the first day of active selling on the ATM Offering, Brda texted Palikaras, "[w]e have two days to take advantage of the squeeze, today should have been a 5 million share day at 6 [dollars per share]..." (emphasis added). Palikaras responded, "[f]ill her up[.]" Another member of Torchlight's Board wrote to Brda, asking his input about transacting in the stock, "I won't move if I have information that isn't public, but if this short squeeze goes high enough I don't want to miss it if I can participate legally." (emphasis added).

## Violations

47.     As a result of the conduct described above, Respondent violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities; Section 17(a)(1) of the Securities Act, which prohibits the use of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of securities; and Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities . . . directly or indirectly . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

48.     As a result of the conduct described above in Paragraphs 24 through 26, Respondent violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities ... directly or indirectly... to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading."

49.     As a result of the conduct described above, Respondent violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit the use of a proxy statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

50.     As a result of the conduct described above, Respondent violated Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-11 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and current reports as the Commission may require, and mandate that the reports contain such further material information as may be necessary to make the required statements not misleading.

51.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

52.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 10b-5(a), 10b-5(c), 12b-20, 13a-11, and 14a-9 thereunder.

B.     Respondent shall pay a civil penalty of $1,000,000 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.  Payment shall be made in the

13

following installments: $250,000 within 30 days after entry of this order; $250,000 within 120 days after entry of this order; $250,000 within 210 days after entry of this order; and the remaining balance within 300 days after entry of this order. Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Meta Materials, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to B. David Fraser, Associate Director, Division of Enforcement, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Unit 18, Fort Worth, TX 76102.

C.     Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change

14

the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

D.      Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $1,000,000 based upon its agreement to cooperate in a Commission investigation and related enforcement action. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

By the Commission.


Vanessa A. Countryman
Secretary


15

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN BRDA,<br>GEORGIOS PALIKARAS,<br><br>Defendants. | Civ. Action No. 1:24-cv-004806<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

The Securities and Exchange Commission ("**SEC**") files this Complaint against John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as follows:

## I.    SUMMARY

1.    Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021, causing the price to increase by over 200% in a single week. Defendants capitalized on their scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.    Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3. To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4. As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5. Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6. As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7. Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8. When Torchlight's stock price began to surge, Brda wrote Palikaras: "***We have two days to take advantage of the squeeze***[.]" (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger—Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9.      By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10.     For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.     JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12.     This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13.     Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

4

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

## III. DEFENDANTS

15. Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

16.    Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

## IV.    RELATED ENTITIES

17.    Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.    Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.    Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

## V.    FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.    In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

6

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.    Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.    Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.    The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.    In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

---

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

7

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position...will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25.    As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

## B. Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.

26.    To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing— Torchlight's primary asset aside from its oil and gas leases.

27.    Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

## C. Defendants Designed And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32.    By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33.    In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

11

34. Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35. Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36. Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

12

37.     Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.     Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.     Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.     Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

were reasons that Brda and Torchlight considered in approving the merger and Preferred Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41. To illustrate, Torchlight's definitive proxy statement described the purported "reasons" and "factors" that Torchlight's board (including Brda) considered in both approving the merger and Preferred Dividend and recommending that shareholders approve the same. The proxy statement repeatedly states that the supposed "reason" for approving and proposing the Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and subsequent public filings that the reason—or at least a reason—that Torchlight and Brda considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze and/or to temporarily increase Torchlight's stock price.

42. Similarly, Torchlight's definitive proxy statement also stated that "[t]he *anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas assets] after the consummation of the [merger]." (emphasis added). Again, this statement was false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

14

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.    Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.    Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45.     The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

17

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.    As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.    Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

### E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

51.    In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.    Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020, Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.    Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

21

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59.    Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60.    For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61.    As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted ... This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close,** and we believe ... there will be **a potential jump towards the close, it's called a short squeeze...** (emphasis added).

22

62. In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63. For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64. On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65.    Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday … flame those shorties…"

- "This week will be epic! Torch the shorts!"

66.    Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67.    As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

> ### i. Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.

68. In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69. Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]...)."

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

26

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company will use commercially reasonable efforts to sell the O&G Assets [within six months of the merger closing]. Torchlight stockholders of record as of the Series A Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of Series A Preferred Stock.... Holders of shares of Series A Preferred Stock may receive Asset Sale Dividends from any Asset Sale Transactions consummated [within six months of the merger closing], and may also receive a Spin-Off Dividend of any Remaining Assets that have not been sold in an Asset Sale Transaction [within six months of the merger closing].

74.    These statements were made repeatedly in Torchlight's proxy materials. The company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.    These statements and representations made by Brda in Torchlight's public filings, proxy statements, and press releases were false and misleading at the time they were made. As Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas assets and had taken no actions to lay the groundwork for a sale when the statements were made. Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise, during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.    Without any identified buyers or ongoing negotiations, Brda knew, or was severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

27

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.     In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.     Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity"**). He did not publicly disclose these plans.

79.     Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80. By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81. Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

### ii. Palikaras made false statements about the value of the Preferred Dividend.

82. On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83.    First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84.    Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85.    As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86.    By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.    After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1... The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.    Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

**G. Defendants Succeeded In Manipulating The Price Of Torchlight Stock.**

89.    As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.    On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

31

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend— which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91. As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92. On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("T+2 Date") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

32

93. Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94. The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95. Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96. Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97. Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

### H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.     Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99.     Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning... up to $100 Million... *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price...* I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]... Say 20% of the amount raised... Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further.... The ducks are quacking, time to feed them!" (emphasis added).

100.    Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101. Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date*." (emphasis added).

102. Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103. More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104. Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… *We have two days to take advantage of the squeeze*, today should have been a 5 million share day at 6[.]" (emphasis added).

35

105.    Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106.    Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107.    Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

## I.  Brda Profited From The Fraudulent Scheme.

108.    Brda profited off his fraudulent scheme and false and misleading statements to investors.

109.    On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM–raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110.    Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111.    Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

*(Against All Defendants)*

112.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

38

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116. With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]
### *(Against All Defendants)*

118. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119. Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120. Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

39

by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

122.   With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123.   By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]
and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]**

*(Against All Defendants)*

124.   The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

125.   As further described and alleged in paragraphs 39-46 and 67-81 above, Torchlight's proxy statements contained false or misleading statements and/or omissions of material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval via the proxy statements containing false or misleading statements or omissions of material fact.

126.    As further described and alleged in paragraphs 82-88 above, Palikaras solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.    By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.    With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

129.   By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

**FOURTH CLAIM FOR RELIEF**

**Aiding and Abetting Meta II's Violations of Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**

*(Against Brda)*

130.   The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.   At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.   As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.   As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

42

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134. By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("OIP"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135. By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136. By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**
*(Against Brda)*

137. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138. As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

43

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139. As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140. Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141. By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

44

142.    By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143.    By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII.    PRAYER FOR RELIEF

144.    WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

• Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

• Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

• Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

### VIII. JURY DEMAND

145. The SEC demands trial by jury in this action on all issues so triable.

Dated: June 25, 2024                    Respectfully submitted,

                                        /s/ *Patrick Disbennett*
                                        Patrick Disbennett (*pro hac vice* application pending)
                                        Christopher Rogers (*pro hac vice* application pending)

                                        U.S. Securities and Exchange Commission
                                        801 Cherry Street, Suite 1900
                                        Fort Worth, Texas 76102
                                        Tel: 817-978-3821
                                        disbennettpa@sec.gov
                                        rogerschri@sec.gov

# EXHIBIT C

# EXHIBIT C



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

DIVISION OF
CORPORATION FINANCE

February 14, 2025

Gregory McCabe
Chief Executive Officer
Next Bridge Hydrocarbons, Inc.
6300 Ridglea Place, Suite 950
Fort Worth, TX 76116

> **Re: Next Bridge Hydrocarbons, Inc.**
> **Form 10-K for the Fiscal Year ended December 31, 2023**
> **Filed July 17, 2024**
> **Response dated January 15, 2025**
> **File No. 000-56648**

Dear Gregory McCabe:

We have reviewed your January 15, 2025 response to our comment letter and have the following comments.

Please respond to this letter within ten business days by providing the requested information or advise us as soon as possible when you will respond. If you do not believe a comment applies to your facts and circumstances, please tell us why in your response.

After reviewing your response to this letter, we may have additional comments. Unless we note otherwise, any references to prior comments are to comments in our December 20, 2024 letter.

Form 10-K for the Fiscal Year ended December 31, 2023

Financial Statements, page F-1

1.  We note your response to prior comment 3 expressing the view that the separation should be accounted for at fair value because some of the Series A preferred shares had exchanged hands during the period of custodianship and you believe that "reliance on the criteria of the fair value guidance is reasonable" although you have not reconciled the view to having a valuation of $79,695,928 as of December 14, 2022 and a valuation of zero two weeks later on December 31, 2022.

    The criteria in FASB ASC 845-10-30-10 would require the fair value of the nonmonetary asset to be "objectively measurable" and "clearly realizable" in an outright sale at or near the time of the distribution. This criteria is also evident in and

February 14, 2025
Page 2

consistent with the guidance in FASB ASC 845-10-30-3 and 8, covering the basic principle, modification to the basic principle, and its application. However, the value derived in the valuation report upon which you wish to rely placed substantial value on proved oil and gas reserves that did not exist on the underlying properties, and would therefore not provide adequate support relative to this criteria.

As the Series A preferred stock was issued pro rata to the common shareholders of Torchlight Energy Resources, Inc. just prior to the reverse merger, in order for them to secure rights to the oil and gas interests that would later convey either in the form of asset-sale dividends or spin-off dividends, if the interests could not be sold within six months, and because these rights were not shared by the common shareholders of Meta Materials, Inc., the separation is not accurately depicted as an acquisition.

The value ascribed to the oil and gas properties as of March 31, 2021, just prior to the reverse merger, was $31,441,701; and the corresponding value reported in your financial statements as of September 30, 2022 (as provided in your Form S-1 covering the separation) was $47,293,607, which appropriately did not reflect any push-down valuation by the former parent. This balance represents the recorded amount as of the interim date that should be used to comply with GAAP.

Please revise your financial statements to eliminate the segregation of predecessor and successor activity and the step-up in basis. We reissue prior comment 3.

2.      We note that you provide some details in response to prior comment 4, regarding the $21.6 million balance of the 2021 Note and Loan Agreement that Mr. McCabe acquired from Meta Materials, Inc. just after the separation, in exchange for $1.2 million (upon resolving non-performance on a commitment to acquire $6 million in equity). We also understand that Mr. McCabe had provided a 25% interest in the Orogrande Prospect as security for the loan during the period of custodianship.

Please expand your disclosures to provide these contextual details, including the circumstances under which the loan was originally made and under which the security interest was originally provided, reconciled with the motivations described in your earlier response, and providing quantification of the consideration ultimately paid.

3.      We note your response to prior comment 5 regarding the contemporaneous purchase and sale of assets during March 2024, explaining that you do not believe the sale of the two entities provides a basis for valuing the four entities, stating that "the cash selling price is not the best indication of value because the makeup of the assets purchased, and the subsequent assets sold were not the same."

You indicate there were differences in comparing the assets acquired and the assets sold in terms of formation depths, overriding interests, drilling locations, seismic data coverage, and options to participate in future drilling commitments.

February 14, 2025
Page 3

However, the guidance in FASB ASC 805-50-30-2 includes a fair value objective in stating that measurement shall be based on the fair value of the consideration given or the fair value of the net assets acquired, whichever is more clearly evident and therefore more reliably measurable. The guidance in FASB ASC 845-10-30-1 expresses a similiar objective in stating that measurement shall be based on the fair value of the asset received if it is more clearly evident...."

We understand that you valued the four entities acquired at $450,00 based on the 2,500,000 shares that were issued even though received $964,448 in cash in exchange for the two entities sold, which would generally be considered a clear indication of value. Based on the fair value objective and considering the cash sale, we continue to believe that you will need to restate your accounting for this transaction to comply with generally accepted accounting principles. We reissue prior comment 5.

4.  We note your response to prior comment 6 explaining that while your prior management team "believed in the viability of the Orogrande project subsequent to December 31, 2022 as evidenced by the continued exploration," you new management team "could not disregard the evidence in support of a full impairment based on its evaluation of the facts and circumstances," although in your November 13, 2024 response to comment 12, you stated that your new management team "...still strongly believes in the scientific merits of the Orogrande Basin" while also acknowledging that "...exploration requires extensive science wells to gather the appropriate data, as well as multiple drilling and completion attempts to determine best practices."

We understand that your current Chairman was appointed on June 21, 2023 and to the position of CEO on January 18, 2024, along with the appointment of your current CFO. As such, it appears that members of your current management presided over the filing of the Form S-1 on July 26, 2023 and the filing of the Form S-1/A on February 6, 2024, both of which included financial statements reporting significant balances for the oil and gas properties, and disclosures of exploration progress.

For example, stating wells drilled through 2022 "confirmed that there are at least five potential distinct reservoirs under our acreage...[and] we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project," and in the more recent filing, "...progress during 2022 to develop proved producing reserves in the Orogrande Project...[and] costs of $5.8 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands...."

You described the activities of "surveying, permitting, road and pad site work and initial drilling," report that you satisfied your obligations for the 2023 fiscal year, and that you had the "...right to extend the DDU Agreement through December 31, 2029 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration."

February 14, 2025
Page 4

The new perspectives that have been formulated over recoverability of the costs capitalized for the oil and gas properties would be subject to the requirements in FASB ASC 250-10-45-17, regarding a change in accounting estimate, which state "A change in accounting estimate shall be accounted for in the period of change...[and] shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods...."

You may also consider the guidance in FASB ASC 855-10-25-4 which pertains to subsequent events, and states that "an entity shall not recognize events or transactions occurring after the financial statements were issued or were available to be issued in financial statements that are later reissued in comparative form along with financial statements of subsequent periods unless the adjustment [is required by GAAP]."

Based on the information that you have provided, we continue to believe that your decision to eliminate the full balance of the property account in restating the 2022 financial presentation was not properly characterized as an error correction relative to the full cost method, and that you will need to restate your financial statements covering 2022 and subsequent periods to restore the accounting that was applied under the full cost method. We reissue prior comment 6.

Please contact Jenifer Gallagher at 202-551-3706 or Karl Hiller at 202-551-3686 if you have questions regarding comments on the financial statements and related matters.

Sincerely,

Division of Corporation Finance
Office of Energy & Transportation

# EXHIBIT D

# EXHIBIT D

CORRESP 1 filename1.htm

O'Melveny

O'Melveny & Myers LLP
2801 North Harwood Street
Suite 1600
Dallas, TX 75201-2692

T: +1 972 360 1900
F: +1 972 360 1901
omm.com

File Number: 0633831-00003

March 21, 2025

**VIA EDGAR**

U.S. Securities and Exchange Commission
Division of Corporation Finance
Office of Energy & Transportation
100 F Street, N.E.
Washington, D.C. 20549
Attn:    Jenifer Gallagher
         Karl Hiller

Re: **Next Bridge Hydrocarbons, Inc.**
    **Form 10-K for the Fiscal Year ended December 31, 2023**
    **Filed July 17, 2024**
    **Comment letter dated February 14, 2025**
    **File No. 000-56648**

Dear Ms. Gallagher and Mr. Hiller:

On behalf of Next Bridge Hydrocarbons, Inc., a Nevada corporation (the "Company"), set forth below are the Company's responses to the letter dated February 14, 2025 setting forth the text of the comments of the staff (the "Staff") of the Securities and Exchange Commission (the "Commission") on the Company's above-referenced Annual Report on Form 10-K for the fiscal year ended December 31, 2023 filed on July 17, 2024 (the "**Annual Report**"). Capitalized terms used but not otherwise defined in this letter have the meanings ascribed to them in the Annual Report.

This letter is being filed electronically via the EDGAR system today. Capitalized terms used but not otherwise defined in this letter have the meanings set forth in the Annual Report.

Form 10-K for the Fiscal Year ended December 31, 2023

Financial Statements, page F-1

Austin ● Century City ● Dallas ● Houston ● Los Angeles ● Newport Beach ● New York ● San Francisco ● Silicon Valley ● Washington, DC
Beijing ● Brussels ● Hong Kong ● London ● Seoul ● Shanghai ● Singapore ● Tokyo

1. We note your response to prior comment 3 expressing the view that the separation should be accounted for at fair value because some of the Series A preferred shares had exchanged hands during the period of custodianship and you believe that "reliance on the criteria of the fair value guidance is reasonable" although you have not reconciled the view to having a valuation of $79,695,928 as of December 14, 2022 and a valuation of zero two weeks later on December 31, 2022.

The criteria in FASB ASC 845-10-30-10 would require the fair value of the nonmonetary asset to be "objectively measurable" and "clearly realizable" in an outright sale at or near the time of the distribution. This criteria is also evident in and consistent with the guidance in FASB ASC 845-10-30-3 and 8, covering the basic principle, modification to the basic principle, and its application. However, the value derived in the valuation report upon which you wish to rely placed substantial value on proved oil and gas reserves that did not exist on the underlying properties, and would therefore not provide adequate support relative to this criteria.

As the Series A preferred stock was issued pro rata to the common shareholders of Torchlight Energy Resources, Inc. just prior to the reverse merger, in order for them to secure rights to the oil and gas interests that would later convey either in the form of asset-sale dividends or spin-off dividends, if the interests could not be sold within six months, and because these rights were not shared by the common shareholders of Meta Materials, Inc., the separation is not accurately depicted as an acquisition.

The value ascribed to the oil and gas properties as of March 31, 2021, just prior to the reverse merger, was $31,441,701; and the corresponding value reported in your financial statements as of September 30, 2022 (as provided in your Form S-1 covering the separation) was $47,293,607, which appropriately did not reflect any push-down valuation by the former parent. This balance represents the recorded amount as of the interim date that should be used to comply with GAAP.

Please revise your financial statements to eliminate the segregation of predecessor and successor activity and the step-up in basis. We reissue prior comment 3.

Response: In response to the Staff's comment, the Company proposes to amend the Annual Report by (1) eliminating the Predecessor Period beginning January 1, 2022 and ended December 14, 2022 and the Successor Period beginning December 14, 2022 and ended December 31, 2022 and showing the results for the year ended December 31, 2022 and (2) amending Note 1 to the annual financial statements. The restatement of the financial statements for the year ended December 31, 2022 is subject to audit review, which is currently in process by the Company's independent accounting firm.

2.    We note that you provide some details in response to prior comment 4, regarding the $21.6 million balance of the 2021 Note and Loan Agreement that Mr. McCabe acquired from Meta Materials, Inc. just after the separation, in exchange for $1.2 million (upon resolving non-performance on a commitment to acquire $6 million in equity). We also understand that Mr. McCabe had provided a 25% interest in the Orogrande Prospect as security for the loan during the period of custodianship.

Please expand your disclosures to provide these contextual details, including the circumstances under which the loan was originally made and under which the security interest was originally provided, reconciled with the motivations described in your earlier response, and providing quantification of the consideration ultimately paid.

Response: In response to the Staff's comment, the Company proposes to amend the Annual Report as reflected on Schedule 1 attached to this letter.

1

3.    We note your response to prior comment 5 regarding the contemporaneous purchase and sale of assets during March 2024, explaining that you do not believe the sale of the two entities provides a basis for valuing the four entities, stating that "the cash selling price is not the best indication of value because the makeup of the assets purchased, and the subsequent assets sold were not the same."

You indicate there were differences in comparing the assets acquired and the assets sold in terms of formation depths, overriding interests, drilling locations, seismic data coverage, and options to participate in future drilling commitments.

However, the guidance in FASB ASC 805-50-30-2 includes a fair value objective in stating that measurement shall be based on the fair value of the consideration given or the fair value of the net assets acquired, whichever is more clearly evident and therefore more reliably measurable. The guidance in FASB ASC 845-10-30-1 expresses a similar objective in stating that measurement shall be based on the fair value of the asset received if it is more clearly evident.

We understand that you valued the four entities acquired at $450,00 based on the 2,500,000 shares that were issued even though received $964,448 in cash in exchange for the two entities sold, which would generally be considered a clear indication of value. Based on the fair value objective and considering the cash sale, we continue to believe that you will need to restate your accounting for this transaction to comply with generally accepted accounting principles. We reissue prior comment 5.

Response: In response to the Staff's comment, the Company proposes to include the recalculation of per share value of common stock issued in connection with its acquisition of the four Wildcat entities in the Annual Report on Form 10-K for the year ended December 31, 2024. The 2024 financial statements will account for the acquisition on the basis of cash received from the sale of certain properties held by two of the Wildcat entities subsequent to the initial acquisition. The result is no recognition of gain or loss on the subsequent sale of such assets.

2

4.    We note your response to prior comment 6 explaining that while your prior management team "believed in the viability of the Orogrande project subsequent to December 31, 2022 as evidenced by the continued exploration," you new management team "could not disregard the evidence in support of a full impairment based on its evaluation of the facts and circumstances," although in your November 13, 2024 response to comment 12, you stated that your new management team "...still strongly believes in the scientific merits of the Orogrande Basin" while also acknowledging that "...exploration requires extensive science wells to gather the appropriate data, as well as multiple drilling and completion attempts to determine best practices."

We understand that your current Chairman was appointed on June 21, 2023 and to the position of CEO on January 18, 2024, along with the appointment of your current CFO. As such, it appears that members of your current management presided over the filing of the Form S-1 on July 26, 2023 and the filing of the Form S-1/A on February 6, 2024, both of which included financial statements reporting significant balances for the oil and gas properties, and disclosures of exploration progress.

For example, stating wells drilled through 2022 "confirmed that there are at least five potential distinct reservoirs under our acreage...[and] we plan to use the results from these wells to determine our drilling plans for future wells, including well locations, target depths and designated acreage, in the Orogrande Project," and in the more recent filing, "...progress during 2022 to develop proved producing reserves in the Orogrande Project...[and] costs of $5.8 million in relation to certain drilling activity carried out to remain in compliance with all aspects of our lease obligations and to satisfy the continuous drilling clause under the agreement with University Lands."

You described the activities of "surveying, permitting, road and pad site work and initial drilling," report that you satisfied your obligations for the 2023 fiscal year, and that you had the "right to extend the DDU Agreement through December 31, 2029 if compliance with the DDU Agreement is met and the extension fee associated with the additional time is paid. The Company expects to exercise its option to extend the term under the DDU Agreement prior to its expiration."

The new perspectives that have been formulated over recoverability of the costs capitalized for the oil and gas properties would be subject to the requirements in FASB ASC 250-10-45-17, regarding a change in accounting estimate, which state "A change in accounting estimate shall be accounted for in the period of change...[and] shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods."

You may also consider the guidance in FASB ASC 855-10-25-4 which pertains to subsequent events, and states that "an entity shall not recognize events or transactions occurring after the financial statements were issued or were available to be issued in financial statements that are later reissued in comparative form along with financial statements of subsequent periods unless the adjustment [is required by GAAP]."

Based on the information that you have provided, we continue to believe that your decision to eliminate the full balance of the property account in restating the 2022 financial presentation was not properly characterized as an error correction relative to the full cost method, and that you will need to restate your financial statements covering 2022 and subsequent periods to restore the accounting that was applied under the full cost method. We reissue prior comment 6.

Response: In response to the Staff's comment, the Company proposes to amend the Annual Report by eliminating the impairment that was originally presented in the restated financial statements for the fiscal year ended December 31, 2022. The restatement of the financial statements for the year ended December 31, 2022 is subject to audit review, which is currently in process by the Company's independent accounting firm.

3

If you have any questions or wish to discuss any matters with respect to this letter, please do not hesitate to contact me by telephone at (972) 360-1914 or by email at jacobsen@omm.com.

Respectfully submitted,

/s/ O'Melveny & Myers

O'Melveny & Myers LLP
Jack Jacobsen, Partner

c:
Gregory McCabe
Chairman and Chief Executive Officer
Next Bridge Hydrocarbons, Inc.
500 W. Texas Ave., Suite 890
Midland, Texas 79701

Cameron Taber, P.C.
1502 Augusta Drive, Suite 320
Houston, Texas 77057

4

## Schedule 1

The 2021 Note

Prior to the date on which our shares of common stock were distributed to the holders of Series A Preferred Stock of Meta (the "Spin-Off"), on October 1, 2021, we issued a secured, revolving promissory note in an original principal amount of up to $15 million in favor of Meta (as amended to date, the "2021 Note"). The 2021 Note was issued to provide capital to engage certain consultants and satisfy the minimum drilling requirements under the DDU Agreement, which was necessary to preserve our interests in the oil and gas properties. Though Meta had no intentions to operate the oil and natural gas assets as an independent business, Meta would need to maintain the oil and natural gas interests until a sale of such assets or the Spin-Off could be consummated as it was obligated to do under its charter documents. The 2021 Note bears interest at 8% per annum, computed on the basis of a 360-day year, and matures March 31, 2023 (the "2021 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2021 Note Maturity Date, the 2021 Note Maturity Date will be extended to September 30, 2023. If an event of default has occurred and is continuing, interest on the 2021 Note may accrue at the default rate of 12% per annum. The outstanding principal of the 2021 Note, together with all accrued interest thereon, becomes due on the 2021 Note Maturity Date.

The 2021 Note is secured by a security interest in (a) pursuant to a Stock Pledge Agreement dated as of September 30, 2021 between Gregory McCabe (the "Pledgor" or "Mr. McCabe") and Meta (the "Stock Pledge Agreement"), 1,515,000 shares of Meta's common stock that are owned directly and beneficially by the Pledgor, and (b) pursuant to a Deed of Trust, Mortgage, Security Agreement, Fixture Filing, Financing Statement and Assignment of Production dated as of September 30, 2021 made by Wolfbone (an affiliate of the Pledgor) for the benefit of Meta (the "Security Agreement"), a 25% working interest beneficially owned by the Pledgor in the Orogrande Project as defined in the Security Agreement. Following the Merger, we expect Wolfbone to become an indirect subsidiary of the Company and the Security Agreement to remain in place.

The 2021 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2021 Note.

Upon the occurrence and during the continuance of an event of default under the 2021 Note, Meta as the lender may declare all outstanding principal and accrued and unpaid interest under the 2021 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2021 Note, and may exercise the other rights and remedies provided for under the 2021 Note and related security documents. The events of default under the 2021 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, an event of default under the Stock Pledge Agreement or the Security Agreement, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

On June 28, 2022 and in August 2022, we borrowed $1.9 million and $2.7 million as an advance from Meta to be treated as an unsecured term loan, in addition to $441,000 previously advanced, under a Loan Agreement with Meta as the lender (the "Loan Agreement"), the proceeds of which are available for our working capital and general corporate purposes. As of the date of this report, we had an aggregate principal amount outstanding of $5.0 million, which is the maximum amount available under the Loan Agreement. The loans were due and payable on March 31, 2023 (the "Maturity Date"), unless extended as described in the following sentence. Under the Loan Agreement, if we raise $30 million or more in capital through debt or equity or a combination thereof by the Maturity Date, the Maturity Date will be extended to October 3, 2023 and the 2021 Note plus the loans under the Loan Agreement would be amortized in six equal monthly installments. Loans under the Loan Agreement bear interest at a fixed rate of 8% per annum if no event of default exists, and at a fixed rate of 12% per annum if an event of default exists.

We have the right to prepay the loans under the Loan Agreement in whole or in part at any time without penalty. Amounts repaid or prepaid may not be reborrowed. We will be required to prepay the loans upon an asset disposition (other than permitted asset sales), certain equity issuances (other than permitted equity), debt issuances (other than permitted debt), and certain extraordinary receipts. We are required to prepay the loans from our annual excess cash flow, if any.

5

The Loan Agreement includes customary representations and covenants that, subject to certain exceptions and qualifications, restrict our ability to do certain things, such as: incur additional indebtedness; incur liens; engage in mergers, acquisitions, and asset sales; make loans and investments; declare dividends or redeem or repurchase equity interests; transact with affiliates on a non-arm's length basis; and enter into certain restrictive agreements. In addition, the Loan Agreement contains customary affirmative covenants, including covenants regarding the payment of taxes and other obligations, maintenance of insurance, maintenance of our existence and material properties, customary visitation rights, reporting requirements, compliance with applicable laws and regulations, and formation or acquisition of new subsidiaries.

Upon the occurrence and during the continuance of an event of default, Meta as the lender has the right to declare all outstanding principal and accrued and unpaid interest under the Loan Agreement immediately due and payable and exercise certain other rights and remedies. The events of default under the Loan Agreement include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants or representations and warranties, a change in control or a material adverse change defined in the Loan Agreement, material judgments and attachments, cross defaults with certain other material indebtedness, and bankruptcy and insolvency events with respect to the Company and our subsidiaries.

See the discussion under the caption "Recent Developments" and Note 5 of the notes to our financial statements as of and for the year ended December 31, 2023 included in this report for information about the amendments to the 2021 Note and the Loan Agreement entered into subsequent to the end of fiscal year 2022.

*The 2022 Note*

On December 22, 2022, we issued an unsecured promissory note in the principal amount of up to $20 million in favor of Mr. McCabe (the "2022 Note"). The 2022 Note bears interest at 5% per annum, computed on the basis of a 365-day year, and matures on June 30, 2024 (the "2022 Note Maturity Date"); provided, however, if we raise $30 million or more in capital through debt or equity or a combination thereof by the 2022 Note Maturity Date, the 2022 Note Maturity Date will be extended to October 3, 2023. The outstanding principal of the 2022 Note, together with all accrued interest thereon, becomes due on June 21, 2023. The revolving commitment under the 2022 Note expires on 2022 Note Maturity Date. As of December 31, 2022, we had $2 million principal amount outstanding and $18 million of available borrowings under the 2022 Note.

The 2022 Note includes a restrictive covenant that, subject to certain exceptions and qualifications, restricts our ability to merge or consolidate with another person or entity, or sell or transfer all or substantially all of our assets, unless we are the surviving entity or the successor entity assumes all of obligations under the 2022 Note.

Upon the occurrence and during the continuance of an event of default under the 2022 Note, Mr. McCabe as the lender may declare all outstanding principal and accrued and unpaid interest under the 2022 Note immediately due and payable, may terminate any remaining commitment to make advances under the 2022 Note, and may exercise the other rights and remedies provided for under the 2022 Note. The events of default under the 2022 Note include among other things, subject to grace periods in certain instances, payment defaults, breaches of covenants, bankruptcy and insolvency events with respect us or our subsidiaries, cross defaults with certain of our other material indebtedness, and material judgments against us.

Following the Spin-Off, our board of directors considered ways to mitigate certain risks of having its indebtedness held by a third party lender following the Spin-Off and retain some flexibility in respect of negotiating the terms of the 2021 Note and Loan Agreement. Our board of directors believed that having all of the corporate debt transferred to Mr. McCabe was in the best interest of the Company and its stockholders. In light of Mr. McCabe acting as a guarantor of the obligations of the 2021 Note, consolidating the debt with Mr. McCabe would also mitigate any risks that the lender would seek recourse against Mr. McCabe in the event we were unable to satisfy our obligations thereunder. On August 7, 2023, Mr. McCabe and Meta entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 2021 Note and (ii) all outstanding loans made to us by Meta pursuant to the Loan Agreement (the "Loan Purchase"). As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and a secured party under the 2021 Note and the Loan Agreement. As consideration for the Loan Purchase, Mr. McCabe agreed to pay to Meta $6,000,000 in cash and agreed to purchase shares of common stock of Meta in the amount of $6,000,000 over a period of time at a price per share equal to a 120% premium to the Meta's common stock price as of closing on the last trading day of each quarter. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe the lien on 25% of the Orogrande Prospect. After Mr. McCabe purchased $500,000 worth of shares of Meta's common stock (in two equal tranches), Mr. McCabe and Meta came to an agreement to settle the Loan Purchase by allowing Mr. McCabe to make one additional $700,000 cash payment to Meta and surrender the shares of common stock he previously acquired, while retaining the rights as lender under the 2021 Note and the Loan Agreement. Our obligations and responsibilities under the 2021 Note, the Loan Agreement and the 2022 Note remain unchanged following the Loan Purchase. Mr. McCabe acquired the Notes thereby replacing Meta as the lender and secured party under the 2021 and 2022 Notes. The Company's obligations under the 2021 and the 2022 Notes remain unchanged. Following certain amendments entered into, the 2021 and 2022 Notes mature on September 30, 2024.

6

# EXHIBIT E

# EXHIBIT E

3/18/2026 1:01 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 112571685
By: Julio Garcia
Filed: 3/18/2026 1:01 PM

## 2026-18186 / Court: 61

CAUSE NO. _____

| | | |
|---|---|---|
| **NEXT BRIDGE HYDROCARBONS, INC.** | § § § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § § | |
| **v.** | § § | **HARRIS COUNTY, TEXAS** |
| **JEFFREY DAVIES** | § § | |
| *Defendant.* | § § § | **_____ JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION

Comes now Plaintiff, Next Bridge Hydrocarbons, Inc. who files this Original Petition against Defendant Jeffrey Davies and in support thereof would respectfully show the Court as follows:

### INTRODUCTION

1. This case arises from Defendant Jeffrey Davies's sustained campaign to disparage Plaintiff Next Bridge Hydrocarbons, Inc. ("Next Bridge" or the "Company") and undermine the Company's principal oil and gas assets and contractual relationships. For several years, Davies has used online platforms, including X (formerly known as Twitter), to publish statements accusing Next Bridge and its management of fraud, sham transactions, and other misconduct relating to the Company's projects. Holding himself out as an online commentator and oil and gas expert, Davies repeatedly disseminated these false accusations to his followers and to investors and industry participants in the energy sector, despite the existence of publicly available records that directly contradict his claims.

2. Davies's objective was clear: to destabilize Next Bridge by eliminating its most significant asset – its contractual relationship with University Lands of Texas ("UL") for a drilling

---

PLAINTIFF'S ORIGINAL PETITION                                                    Page 1 of 33

and development unit in the Orogrande Basin. Davies understood that public accusations questioning the legitimacy of Next Bridge's operations would predictably erode confidence among the broader public, including investors, industry participants, and contractual counterparties.

3.      Davies did not confine his campaign to online publications. Fully aware of Next Bridge's contractual relationship with UL governing the drilling and development unit, Davies directly contacted representatives of UL and repeated his false accusations that Next Bridge had engaged in fraud and sham transactions relating to its oil and gas assets and operations. Davies further amplified this interference by encouraging other Next Bridge investors to contact UL based on those same baseless accusations. These coordinated communications were intended to, and did, call into question the legitimacy of Next Bridge's operations, disrupt its contractual relationship with UL, and diminish the value of the Company's principal oil and gas assets.

4.      As a direct and proximate result of Davies's disparaging statements and tortious interference, Next Bridge lost its contractual relationship with UL and suffered significant economic harm.

## REQUEST FOR RELIEF

5.      Plaintiff seeks monetary relief over $1,000,000.

## PARTIES

6.      Plaintiff Next Bridge Hydrocarbons, Inc. is a limited liability company incorporated in Nevada, with its principal place of business in Midland County, Texas.

7.      Defendant Jeffrey Davies is an individual who is a resident of the state of Texas. He can be served with process at 1223 Heath Hollow Drive, Spring, TX 77379, or anywhere else he may be found.

## DISCOVERY CONTROL PLAN

8.    Pursuant to Rule 190.3 of the Texas Rules of Civil Procedure, Plaintiff requests that all discovery for this matter be conducted pursuant to a Level 2 Discovery Control plan.

## JURISDICTION AND VENUE

9.    Pursuant to Article V, Section 8 of the Texas Constitution and Section 24.007 of the Texas Government Code, this Court has jurisdiction over Defendant as this is a civil suit in which the amount in controversy exceeds $500, excluding interest.

10.    This Court has personal jurisdiction over Defendant because he is a Texas resident.

11.    Venue is proper in Harris County, Texas, under Texas Civil Practice & Remedies Code Section 15.002 because all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County and Defendant Davies resides in Harris County.

## FACTUAL BACKGROUND

### A. Overview of Next Bridge Hydrocarbons, Inc.

12.    Next Bridge is an independent public reporting energy company incorporated in Nevada on August 31, 2021. The Company is engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Next Bridge currently holds minor well interests on the eastern edge of the Midland Basin in Texas, two minor well interests in Oklahoma, and exploration prospect leaseholds in onshore south Louisiana. The Company has also entered into an agreement to participate in the Imperial Gas Project located in the western Rocky Mountain region of the United States.

13.    Next Bridge conducts its operations through nine wholly owned subsidiaries: Torchlight Energy, Inc. ("TEI"), Hudspeth Oil Corporation ("Hudspeth"), Torchlight Hazel, LLC ("Torchlight Hazel"), Wolfbone Investments, LLC ("Wolfbone Investments"), Hudspeth

Operating, LLC ("Hudspeth Operating"), Wildcat Panter, LLC ("Panther"), Wildcat Valentine, LLC ("Valentine"), Wildcat Cowboy, LLC ("Cowboy"), and Wildcat Packer, LLC ("Packer").

14.     Gregory McCabe ("McCabe") serves as the Company's Chairman of the Board of Directors and Chief Executive Officer. McCabe was appointed Chairman in June 2023 and agreed to serve as the Company's unpaid Chief Executive Officer in January of 2024. Unless otherwise stated, references to McCabe's actions in this Petition refer to actions taken in his capacity as Chief Executive Officer of Next Bridge.

15.     Although Next Bridge's shares of common stock are not traded on any public stock exchange or market, the Company is a public reporting company subject to the periodic and current reporting requirements of the Securities Exchange Act of 1934.

### a.  FINRA's U3 Trading Halt of Predecessor Company of Next Bridge

16.     While incorporated in 2021, Next Bridge is an indirect successor to Torchlight Energy Resources, Inc. ("Torchlight") and Meta Materials, Inc. ("Meta II"). Torchlight was an oil and gas company based in Plano, Texas, became a publicly traded company on the OTC[1] in 2010 and was uplisted to NASDAQ on December 16, 2013. Meta II is a public company that was trading under the ticker symbol MMAT.[2]

17.     Effective June 28, 2021, Torchlight completed a reverse merger with Meta II that resulted in the issuance of a Series A Preferred Share ("Dividend") in a 1:1 distribution to holders of Torchlight's common stock TRCH. That Dividend was not intended to be tradeable in the public markets. Instead, the intent was that each Dividend would be a placeholder for the eventual sale of

---

[1] Over-the-Counter (OTC) markets serve as decentralized platforms where securities are traded directly between two parties via broker-dealer networks rather than a centralized exchange like the New York Stock Exchange.

[2] On August 9, 2024, Meta II ceased operations and filed for voluntary Chapter 7 bankruptcy. Upon filing for bankruptcy, MMAT was delisted to the OTC Markets where it trades under the ticker symbol MMATQ.

oil and gas assets or spun off into an independent company. Ultimately, a spin-off occurred, and the Dividends were exchanged for Next Bridge's shares.

18.     For reasons Next Bridge does not understand, in October of 2021, the OTC markets began to allow the Dividend to be traded (separately from the MMAT shares) under the ticker symbol MMTLP.

19.     On December 9, 2022, FINRA halted trading of MMTLP shares (the preferred dividend shares that are now Next Bridge common stock), citing an "extraordinary event" code "U3 Halt."[3] This action was taken ahead of the planned spinoff of Next Bridge, which was to receive the assets associated with the preferred shares.

20.     On December 14, 2022, Meta II completed the spin-off and exchange of MMTLP for common shares of Next Bridge, resulting in Next Bridge becoming an independent, privately held company.[4]

21.     Before and after the spin-off of Next Bridge, the Company and its operations became the subject of substantial online commentary among retail investors on social media platforms. FINRA's abrupt trading halt, two days before the intended end of trading, and cancellation of MMTLP shares without prior notice, led to significant investor frustration. FINRA's trading halt of MMTLP prevented shareholders from selling their publicly traded shares before their cancellation and exchange for shares of Next Bridge – which are not listed or traded on any public exchange or market and are therefore illiquid.

---

[3] FINRA is a self-regulatory organization that regulates U.S. broker-dealers and operates to protect investors and maintain the integrity of the U.S. securities markets. FINRA's Uniform Practice Advisory Notice regarding the trading halt is publicly available at: https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf

[4] Next Bridge's press release announcing the completion of the spin-off is publicly available at: https://cdn.prod.websitefiles.com/6169e69d0075ec7c66221a8b/63a376a38add926dd316f36a_NBH%20News%20Release%2012-20-2022%20.pdf

**B. Next Bridge's Drilling and Development Contract with University Lands**

22.    Next Bridge's most significant asset was the Orogrande Basin Prospect ("Orogrande" or "Orogrande Prospect"), situated in Hudspeth County, Texas, approximately 40 miles east of El Paso. The Orogrande Prospect consists of more than 134,000 acres of land owned by UL, which manages lands belonging to the Permanent University Fund of the State of Texas. UL regularly leases these lands to energy companies for exploration and development of oil and natural gas resources.

23.    On August 7, 2014, Torchlight (Next Bridge's predecessor) acquired a 100% working interest in approximately 172,000 predominantly contiguous acres within the Orogrande Prospect. Following the natural expiration of certain leases, Torchlight retained interests in 192 leases covering approximately 134,000 acres.

24.    Effective March 27, 2017, the Orogrande Prospect was consolidated by UL through Development Unit Agreement #2837 (the "Orogrande D&D Unit"). The Orogrande D&D Unit combined the 192 leases into a single drilling and development unit, enabling more efficient exploration and operations. The Orogrande D&D Unit's initial term was set to expire on December 31, 2024, with drilling activities permitted through that date. Critically, it provided for a five-year extension through December 31, 2029, contingent on satisfying compliance requirements (including drilling obligations).

25.    One of Next Bridge's top priorities in 2024 was securing this contemplated five-year extension of the Orogrande D&D Unit. Next Bridge and its predecessors invested more than $65 million in the project's development. The 134,000 drillable acres—representing the vast majority of Next Bridge's portfolio—held billions of barrels of potential reserves according to third-party geological estimates.

## C. Overview of Davies's Platform and Influence

26.    Davies is an online personality who operates the X account @EnergyCredit1 under the display name "Jeff Davies, the Energy OG." Through that platform, he distributes commentary about the energy industry to more than 39,000 followers and positions himself as an authoritative voice on oil and gas operations, market developments, and industry practices. Although Davies identifies his professional background as financial services rather than upstream oil and gas operations, he nevertheless holds himself out as an energy-sector "expert" and frequently opines on companies and projects within the industry, including Next Bridge. In addition to his social media presence, Davies published a newsletter titled *"EnerWrap"* from 2022 through 2025, which purported to provide data-driven insights across oil and gas, renewables, and energy policy.[5] Through these platforms, Davies has cultivated a sizable audience and the ability to rapidly disseminate his views within the energy community and beyond.

27.    Davies has even boasted that his audience includes senior executives within the energy industry, stating "I have CFOs. I have CEO's of the biggest oil and gas companies on my list. 'Cause they care what Jeff Davies says." By Davies's own account, his publications reach not only retail investors but also industry participants whose positions allow them to influence commercial relationships, capital investment and market perceptions within the energy sector.

28.    Notably, Davies has no ownership interest in Next Bridge. He is not a shareholder, investor, employee, or business partner of the Company. Nevertheless, for several years Davies has used his platforms to repeatedly target Next Bridge and its current and former management with a sustained pattern of disparaging and misleading statements concerning the Company's former and current management teams, operations and assets. These posts go far beyond

---

[5] Upon information and belief, the online newsletter *"EnerWrap"* has approximately 5,000 subscribers, including both free subscribers and paid subscribers who receive premium content.

generalized industry commentary or protected opinion. Instead, Davies publishes specific factual assertions concerning Next Bridge's financial condition, operational status, management decisions, and business practices that are false or materially misleading. Davies presents these statements to his tens of thousands of followers as insider or expert analysis, thereby amplifying their reach and credibility and influencing the perception of Next Bridge among the broader public, including investors, contractual counterparties, and other participants in the energy sector.

29.    Prior to FINRA's U3 trading halt of MMTLP shares (the Dividends that are now Next Bridge stock) in December 2022, Davies had already established a pattern of publicly attacking corporate management teams through social media. On X, he routinely accused corporate leaders, including current and former officers and directors associated with MMTLP and its affiliates, of participating in Ponzi schemes, fraudulent conveyances, and so-called "pump and dump" operations. These statements were presented as factual allegations of misconduct and were directed to Davies's audience of investors and industry participants in the energy sector.

30.    After FINRA's U3 trading halt, Davies shifted the focus of his commentary to the value and legitimacy of Next Bridge's principal asset, the Orogrande D&D Unit. Throughout 2023, he published multiple posts on X asserting that the asset was "worthless." He accused Next Bridge's former parent company MMAT of "cover[ing] up worthless assets" and claimed that "Meta is telling everyone they are worthless." Davies also accused the Company of acquiring the Orogrande D&D Unit through a fraudulent conveyance and asserted that the Orogrande D&D Unit was "the only asset Next Bridge has."[6]

---

[6] Next Bridge references these prior publications by Davies in ¶29 and ¶30 solely as background evidence of Davies's course of conduct, motive, and actual malice. While Next Bridge does not seek recovery for these statements as they are outside the limitations period, these prior posts are probative of Davies's knowledge, state of mind, and intent with respect to the actionable conduct alleged herein.

31. Against this backdrop of sustained attacks, Davies escalated his conduct in 2024 by taking direct action that injured Next Bridge and forms the basis of the claims asserted herein. Rather than confining his efforts to posts on X, Davies intentionally contacted representatives and agents of UL and communicated false and misleading information concerning Next Bridge's financial condition and operational capabilities. Davies did so for the purpose of influencing UL's decisions regarding Next Bridge's contractual rights under the Orogrande D&D Unit, including UL's consideration for extensions or renewal of that agreement, and thereby interfering with Next Bridge's contractual rights and prospective business relationship with UL.

32. Davies's persistent focus on Next Bridge—despite having no stakeholder interest or involvement with the Company—reflects the deliberate and sustained nature of his campaign of public accusations directed at Next Bridge and its economic interests.

### D. Davies Interference with the Orogrande D&D Unit and Next Bridge's Relationship with UL

33. Beginning in January 2024, Next Bridge's economic interests in the Orogrande D&D Unit became engulfed in an unusually hostile and public online environment tied to the broader "MMTLP" dispute and FINRA's U3 trading halt. At the forefront of these attacks, Davies leveraged his platform and public persona to lead and amplify false and disparaging statements about Next Bridge's economic and commercial interests, setting the tone for others and focusing online criticism squarely on Next Bridge's key asset and operations related to the Orogrande D&D Unit. The online stated goal of these attacks was to pressure UL to deny Next Bridge an extension for the Orogrande D&D Unit.

34. In furtherance of that campaign, Davies used his platform on X to intensify attacks on Next Bridge and its Orogrande D&D Unit. Through a series of posts, he publicly questioned the legitimacy and value of the acreage, suggested that no credible operator would lease

surrounding lands, and accused management of concealing well results and misleading stakeholders about the Company's operations and prospects.

35.     The sustained harassment and pressure directed at Next Bridge and its management contributed to significant disruption in corporate governance of the Company, including the resignation of the entire management team and nearly all members of the board of directors. While certain directors cited personal reasons, the escalating pressure campaign surrounding Next Bridge and its operations was a contributing factor in their departures. In the aftermath of these departures, McCabe agreed to serve as CEO on an unpaid basis to maintain continuity and sustain Next Bridge's operations.

36.     On January 19, 2024, Davies stated on X, "I personally doubt UL will be friendly this go around based on conversations i [sic] had with them," indicating that he had direct communications with representatives of UL regarding Next Bridge. The day before, Davies publicly implied that Next Bridge had failed to produce meaningful drilling results despite purported obligations to do so and was concealing that information from investors. Upon information and belief, Davies conveyed these same unfounded accusations to representatives of UL in an effort to influence their decisions regarding Next Bridge's contractual relationship.

37.     Around this same time, UL initiated discussions with Next Bridge regarding the anticipated 2024 drilling plans for the Orogrande D&D Unit.

### i.     Davies's Public Campaign Falsely Portraying the Orogrande D&D Unit and Next Bridge's Business as Fraudulent

38.     Throughout March 2024, at the same time Next Bridge was actively seeking an extension of the Orogrande D&D Unit, Davies intensified his efforts to damage Next Bridge by repeating false factual assertions concerning the Company's assets and operations to third parties beyond his online audience. He publicly stated that he had initiated communications with a

congressional staffer regarding Next Bridge and then published a multi-post thread on X characterizing Next Bridge as a "scam" and suggesting that its management had misled stakeholders. Davies further referenced a purported congressional "memo" concerning Next Bridge and later publicly aligned himself with litigation efforts against the Company, despite having no ownership interest or other stake in the Company. Davies further publicly claimed on X that he had long-standing communications with federal regulators, boasting to his followers that he had "the email of people at [the] SEC investigating TRCH/MMTLP for years." These actions demonstrate a deliberate effort by Davies to legitimize and amplify his accusations, expand their reach to governmental and legal actors, and intensify pressure on Next Bridge as UL approached a decision on whether to extend the Orogrande D&D Unit for another five-year term.

39.    On March 19, 2024, Davies published a post on X accusing Next Bridge and its CEO of fraud in connection with the Orogrande D&D Unit. In that post, Davies wrote that "The Arabella fraud is where Orogrande came from," and claimed the asset "was fraudulently conveyed to McCabe." Davies further suggested that McCabe had engaged in business ventures with an individual he described as a "proven fraudster." These statements falsely accused McCabe of acquiring the Orogrande D&D Unit through fraud and implied that the Orogrande Prospect itself was the product of fraudulent conduct. Davies published these accusations to his followers and the broader public (including investors, industry participants, and contractual counterparties), despite the fact that the Orogrande D&D Unit was acquired through documented transactions and publicly recorded agreements with UL.

40.    On March 22, 2024, against this backdrop, McCabe travelled to Houston and met with UL's CEO, William Murphy ("Murphy"), to address the situation directly. During the meeting, McCabe explained that UL was being targeted and pressured by outside actors, including

Davies and other individuals amplifying his accusations online, and that an online campaign was actively urging UL not to renew the Orogrande D&D Unit. McCabe showed Murphy a series of harassing and threatening emails he received and advised that allowing the Orogrande D&D Unit to lapse would predictably be weaponized against Next Bridge by those orchestrating the campaign. Murphy confirmed that UL received an unusually high volume of calls from third parties concerning the Orogrande D&D Unit and explained that UL had implemented a plan to direct all such communications to its Chief Legal Officer, Kate Champion ("Champion"). McCabe left the meeting with the understanding that UL recognized both the economic significance of the Orogrande D&D Unit and the unusual external pressure being exerted on UL concerning the asset.

41.    At the end of the meeting, Murphy proposed that UL conduct a technical review of the Orogrande D&D Unit. McCabe sent follow-up emails to Murphy in late March and April regarding that proposal, but those communications received no response.

42.    On April 1, 2024, Next Bridge publicly announced the acquisition of four drilling prospects located in southern Louisiana. In connection with that announcement, Next Bridge issued a press release explaining that, while the Orogrande asset remained the Company's primary focus, Next Bridge had elected— with full support from its Board of Directors— to expand into additional exploration opportunities it believed to be world-class.

43.    Following this announcement, Davies seized upon Next Bridge's expansion into additional exploration prospects as a basis to intensify his public attacks on the Company and its management.

44.    As part of his ongoing effort to portray Next Bridge as engaged in improper insider transactions and stock-promotion schemes, Davies publicly accused the Company of manipulating its stock through dealings with family members of its Chief Executive Officer. On April 8, 2024,

Davies published another false and disparaging post on X claiming that Next Bridge had "borrowed money from Greg McCabe's sons" and asserting that the Company was "paying his sons to promote the stock" and "pump the stock." Davies further mocked the transaction as "Totally normal and legit," a sarcastic remark intended to imply unlawful insider self-dealing and stock manipulation. These false statements were published by Davies to his followers and the broader public (including investors, industry participants, and contractual counterparties), despite the absence of any factual basis for such accusations.[7]

45.    On April 10, 2024, Davies published another false and disparaging post on X accusing Next Bridge of fraudulent conduct in connection with the Orogrande D&D Unit. In that post, Davies claimed that the "largest onshore oil discovery in 30yr in the US was stolen from a former public company...for $0," falsely asserting that the Orogrande D&D Unit was unlawfully obtained. Davies attached a screenshot of a bankruptcy filing but mischaracterized it as proof of theft, when the document merely referenced a trustee's allegation concerning potential claims. In the same thread, Davies doubled down on these accusations, stating: "Clarification Arabella was private when the Orogrande was fraudulently conveyed to McCabe, Hoisager went on to run another Arabella entity as a public company after stealing everything from the private entity."

46.    By portraying those allegations as established fact, Davies falsely accused Next Bridge of theft and fraud and further disparaged the Company's economic interests and the legitimacy of the Orogrande D&D Unit. In truth, the interests comprising the Orogrande D&D Unit were acquired and owned by Next Bridge's predecessor, Torchlight, prior to the Arabella

---

[7] As clearly demonstrated by publicly available regulatory records, Next Bridge has not been indicted for fraud, charged with fraud, or found liable for fraud or securities violations by any court or governmental authority. Further, Next Bridge has not been named as a respondent or defendant in any public enforcement action brought by the United States Securities and Exchange Commission ("SEC"), FINRA, or any other federal or state securities regulator alleging fraud or securities-law violations.

Petroleum Company, LLC bankruptcy proceedings. The subsequent bankruptcy settlement did not effectuate any transfer of those interests to Next Bridge; rather, the settlement agreement, as approved by the United States Bankruptcy Court for the Western District of Texas, Midland Division, recognized and left undisturbed Torchlight's preexisting ownership interests. Neither the settlement agreement nor the bankruptcy court's approval of it supports Davies's assertion that the asset was "fraudulently conveyed" or otherwise improperly obtained. Davies nevertheless mischaracterized the publicly available bankruptcy filings to falsely portray a court-approved settlement reaffirming Torchlight's preexisting ownership interests as evidence that the asset had been "stolen."

### ii. Davies's Series of X Posts Falsely Accusing Next Bridge of Sham Transactions and Ongoing Corporate Fraud

47.     On April 12, 2024, Davies published a multi-post thread on X accusing Next Bridge and its management of engaging in a long-running oil-and-gas fraud. Throughout the thread, Davies advanced several related accusations presented as purported factual findings from his claimed "forensic work." First, Davies asserted that McCabe and Clifton Dubose[8] had "stole[n] the Hazel Prospect" from Torchlight/Next Bridge, thereby accusing the Company's management of misappropriating corporate assets. Second, Davies alleged that the Hazel asset had been removed from the Company through "a series of sham transactions" involving an entity referred to as Masterson Hazel Partners ("MHP"). Third, Davies broadly characterized Next Bridge as an ongoing fraud, stating that management had "stole[n] assets from their own company," describing the Company as "a ShitCo wrapped in fraud run by criminals," and claiming there had been "massive huge ongoing fraud…for years." Davies further tagged regulators and asserted that Next

---

[8] Clifton Dubose served as Next Bridge's CEO from December 2022 until his resignation in January 2024. He also served as Chairman of the Board from December 2022 until June 2023, and remained a member of the Board until January 2024.

Bridge's upcoming SEC filings and reserve reports would be "fraudulent." Davies published these accusations to his followers and the broader public (including investors, industry participants, and contractual counterparties) while presenting them as documented and substantiated conclusions, thereby falsely portraying Next Bridge and its management as engaged in criminal conduct and ongoing corporate fraud.

48.    In that same series of posts, Davies also directed readers to a Google Drive link containing a document he authored. The file was identified in the link as "Masterson Hazel.pdf," however when opened the document itself bears the title "Anatomy of a Shitco: The Torchlight / Next Bridge Hazel Prospect Crime Scene."[9] In the opening line of that document, Davies declares that *"there is and continues to be ongoing fraud at Next Bridge Hydrocarbons."* (emphasis added). The document proceeds to repeat and expand upon the accusations Davies previewed in his posts on X, including claims that Next Bridge's management had "fraudulently stole wells from the company," that transactions involving Masterson Hazel Partners were a "sham," and that Next Bridge's SEC filings, financial disclosures, and reserve reports were "fraudulent." Davies presented the document as a substantiated investigative report supported by purported data and regulatory filings, thereby lending an appearance of credibility to his accusations. By publishing the document and directing the broader public (including investors, industry participants, and contractual counterparties) to review it, Davies disseminated additional false and disparaging statements portraying Next Bridge and its management as engaged in criminal conduct and an ongoing corporate fraud.

49.    Public regulatory records directly contradict Davies's accusations concerning the Hazel wells. Records maintained by the Texas Railroad Commission confirm that the Hazel 4H

---

[9] Attached hereto as *Exhibit B* is a copy of the document entitled "Anatomy of a ShitCo: The Torchlight / Next Bridge Hazel Prospect Crime Scene," that Davies authored and referred to within his posts on X on April 12, 2024.

well was properly permitted, drilled, and completed as a horizontal kickout from an existing vertical wellbore. Despite referencing these same records in his posts and in the 'Anatomy of a Shitco' documents he circulated online, Davies nevertheless claimed that the well had never been drilled and suggested that Next Bridge had misappropriated millions of dollars in drilling funds. Public filings and title records likewise confirm that the Hazel wells were not "stolen" and that the governing agreements provide that revenues ultimately accrue to Next Bridge after the recovery of limited drilling costs. Davies's accusations therefore contradict the very public records he purported to analyze.

50.    As Davies's online campaign intensified, Next Bridge was actively working with UL regarding an extension of the Orogrande D&D Unit.

51.    On April 15, 2024, McCabe contacted UL's Senior Vice President of Operations, Richard Brantley ("Brantley"), to explain the coordinated online attacks and external efforts to influence UL's decision-making, and to clarify questions raised by Next Bridge's auditors concerning the status of negotiations for an extension of the Orogrande D&D Unit. Notably, Brantley never responded to McCabe's email.

52.    The following day, on April 16, 2024, McCabe emailed UL's Chief Legal Officer, Kate Champion ("Champion"), seeking clarification for the Company's auditors as to whether UL would engage in good-faith negotiations concerning a potential extension of the Orogrande D&D Unit. Champion responded two days later stating that UL would be in touch shortly, but she failed to address the substance of McCabe's inquiry or provide any clarification regarding UL's position on a potential extension.

53.    While Next Bridge was attempting to engage UL regarding the extension of the Orogrande D&D Unit, Davies continued publishing false and disparaging statements about the

Company. Between April 18 and April 20, 2024, Davies published multiple statements on X accusing Next Bridge and its management of being a fraud, including the following:

- "It's a fraud my man. Pure corporate fraud. Tell your boy McCabe I'm saying it publicly. I know people who know him, they all tell me its [sic] a fraud."

- "Could care less than the naked short BS, never been my focus. I just know the company is a fraud, there is no commercial oil and the assets are worthless."

54.   On April 22, 2024, Davies published a series of false and disparaging posts on X accusing a Next Bridge consultant of fabricating government regulatory records to promote the Company's oil and gas production. In those posts, Davies asserted that screenshots displaying oil production data from the Texas Railroad Commission's Oil & Gas Query System were "photoshopped" and "Fake, never happened." The screenshots Davies referenced, however, were not newly created materials but images originally posted on April 20, 2022 – nearly two years before the individual depicted in the screenshots, Clint Plant, had any employment, affiliation, or relationship with Next Bridge. Davies nevertheless publicly suggested that Clint Plant had falsified government data at the Company's behest, stating, "This dude gotta be in on it." Davies further characterized Next Bridge as a "social media pump-and-dump job," a scheme the SEC considers securities fraud. He then tagged regulators, including @SEC_Enforcement, thereby publicly suggesting that Next Bridge was engaged in criminal conduct. In a follow-up reply, Davies doubled down on the accusation by stating, "yeah, doctoring official government records no bueno," again implying that the data had been falsified. In reality, the screenshots were simply images of data displayed by the Texas Railroad Commission's publicly available Oil & Gas Query System and were not manipulated, falsified, or created at the direction of Next Bridge or its management.

55.   In February 2024, Clint Plant provided approximately $2 million in financing to Next Bridge through his company CAPCO Holding, Inc. After Davies publicly accused Plant of falsifying government regulatory data and participating in a fraudulent "pump-and-dump" scheme,

Plant became the target of harassment and reputational attacks online. As a result of those accusations and the resulting harassment, Plant declined to provide additional financing to the Company. This deprived Next Bridge of a willing source of additional capital at a time when the Company was actively seeking funding for ongoing operations and development.

### iii. Davies Mobilizes Shareholders to Pressure UL

56.     On April 23, 2024, Davies appeared as a featured speaker in a live "X Spaces"[10] audio broadcast involving numerous Next Bridge shareholders discussing the Company's recent SEC filings and the status of the Orogrande D&D Unit. During the broadcast, Davies repeatedly asserted that Next Bridge had likely forfeited its leases with UL and represented that his statements were based on recent communications with UL's Chief Legal Officer Kate Champion. Davies used the platform to rally listeners to contact UL directly and challenge the validity of Next Bridge's leases. Representative statements from the recorded broadcast include the following:

- "Anybody can reach out to University Lands because University Lands is a public entity. There's phone numbers, there's emails.

- "I've reached out to them this week. I have high confidence that their leases are no longer f****** valid."

- "Based on my communications with University Lands, yes, that's what I'm saying."

- "Call them."

- "Ask for Katy Champion"

57.     Other participants on the broadcast immediately challenged Davies and warned him that publicly claiming the leases had been forfeited could subject him to legal liability. Davies nevertheless doubled down on his statements, responding: "They can bring it." Davies further

---

[10] An "X Spaces" call is a live audio conversation feature on the social media platform X. It functions as a real-time, public or semi-public audio discussion where a host initiates a virtual "room," participants speak via voice through the X mobile app, and listeners join to hear the conversation.

asserted that Next Bridge had not drilled required wells, had no proven reserves, and was likely winding down toward bankruptcy.

58.     Despite repeatedly invoking his communications with UL to bolster the credibility of his statements, Davies later acknowledged during the broadcast that UL had never actually told him the leases had been forfeited and that his conclusion was based only on his own "interpretation" of their responses. Davies nevertheless continued encouraging listeners to contact UL and repeat his allegations. By publicly urging listeners to contact UL – including directing them to UL's Chief Legal Officer – while simultaneously asserting that Next Bridge's leases had been forfeited – Davies used the broadcast to rally investors and other listeners to direct calls and complaints toward UL concerning the Orogrande D&D Unit.

59.     Davies did not limit his accusations to public posts and broadcasts but also repeated them in private communications with Next Bridge shareholders. The following day, on April 24, 2024, Davies escalated his conduct during a private message exchange with a Next Bridge investor by making threatening statements concerning Next Bridge's past and current Chairman and Chief Executive Officers. In that exchange, Davies stated, "I know what McCabe and Dubose are up to behind the scenes. I know it's a fraud," and further remarked, "A lot of mother fu***** want to see these guys take dirt naps."[11] By invoking language suggesting that individuals wanted McCabe and Dubose dead, Davies further intensified the hostility surrounding his ongoing campaign against Next Bridge and its management and contributed to an increasingly hostile environment directed at the Company.

---

[11] Public court records reflect that Davies was charged with assault of a family member in October 2023 in Harris County, Texas.

### E. Next Bridge's Efforts to Secure an Extension of the Orogrande D&D Unit Amid Davies's Continued Public Attacks

60.    Concerned that Davies's public statements and calls to action were prompting third parties to contact UL, McCabe requested and obtained an in-person meeting with UL that took place in Houston on April 29, 2024. The meeting was attended by UL's Chief Legal Officer Champion, Senior Staff Landman J. Thompson ("Thompson"), Senior Vice President of Land Brian Owen ("Owen"), and Senior Vice President of Operations Brantley. During the meeting, McCabe informed the UL representatives that Davies had publicly claimed that Champion had indicated the Orogrande D&D Unit was already in default and no longer valid. Champion confirmed that several individuals had contacted UL regarding Next Bridge and that those inquiries had been directed to her. UL's representatives also discussed certain drilling and well completion data that lessees were required to report. McCabe requested a list of the requested data and affirmed that Next Bridge would promptly provide the information.

61.    Although UL's representatives stated that no determination had been made regarding default or renewal of the Orogrande D&D Unit, the tone of the meeting indicated that UL was shifting to a more formal posture and limiting discretionary dialogue amid the ongoing external pressure.

62.    On May 3, 2024, a mere four days after the April 29th meeting, UL Senior Staff Landman Thompson sent Next Bridge a written notice asserting that the Company was in non-compliance with certain contractual and statutory obligations under the Orogrande D&D Unit. The notice stated, among other things, that it was issued "[w]ithout limiting any future claims or demands related to non-compliance." This was the first time UL asserted that Next Bridge was in default under the Orogrande D&D Unit.

63.    Later that same day, Thompson sent a second written notice asserting that Next Bridge had failed to pay certain minimum royalties under the Orogrande D&D Unit. The notice stated that the minimum royalty payments for the preceding five years totaled approximately $670,000 but, with interest and penalties, demanded approximately $1.14 million plus continuing interest. This was the first time anyone at Next Bridge had been informed that UL was claiming unpaid minimum royalties under the Orogrande D&D Unit.

64.    On May 8, 2024, UL Chief Legal Officer Champion provided Next Bridge with responses to the audit questions regarding the extension of the Orogrande D&D Unit. Among those responses, Champion stated that "UL **may** renegotiate" the Orogrande D&D Unit. Despite the change in UL's amenability, Next Bridge continued to engage with UL in good faith regarding a potential extension and expressed its willingness to address and resolve any perceived compliance or operational issues raised by UL.

65.    During this same period, Davies also publicly claimed to be communicating with the SEC regarding Next Bridge. On May 17, 2024, Davies informed a user on X that his "meeting with SEC went pretty good this week." Davies later publicly asserted that he personally facilitated communications between the SEC and UL. For example, during a March 11, 2025, recorded X Space, Davies repeatedly claimed that he put the SEC in contact with UL, stating: "So, when people tell you, like, the SEC talk to University [Lands], YES, they did, because I put them in touch on behalf of Busy Brands." In a separate exchange on March 7, 2025, Davies likewise admitted to a Next Bridge shareholder that he had put the SEC in touch with UL.

66.    In the months that followed, Davies continued publishing statements on X concerning Next Bridge and the Orogrande D&D Unit. On July 18, 2024, Davies posted the following on X: "They literally just told you in the 10-K there is no oil and no value to the leases.

Black and white. Confirmed what many of us have been saying." Next Bridge's Form 10-K states that the Company impaired the value of the Orogrande D&D Unit due to the "potential expiration of the underlying mineral lease." Davies nevertheless intentionally characterized the filing as confirming that the leases contained "no oil and no value," further misleading the Company's stakeholders and fueling the ongoing campaign against Next Bridge.

67.     Despite Davies's continuing public accusations concerning Next Bridge and the Orogrande D&D Unit, Next Bridge continued working with UL in preparation for the annual technical review of the project. Between July 22, 2024, and August 12, 2024, McCabe worked with UL Senior Staff Landman Thompson to coordinate and prepare for the annual technical review of the Orogrande D&D Unit, which UL scheduled for August 27, 2024.

68.     During this same period, the effects of the false and misleading public statements concerning Next Bridge extended beyond UL and into the Company's banking relationships. On August 26, 2024, Hudspeth Operating, a wholly owned subsidiary of Next Bridge, received a letter from JPMorgan Chase Bank, N.A. stating that the bank had "decided to close your account because of your connection to a publicly reported financial investigation."[12]

69.     On August 27, 2024, UL conducted the scheduled technical review of the Orogrande D&D Unit. At the meeting, McCabe presented the development work performed by Next Bridge on the project, including the drilling of two vertical wells with casing set to facilitate future horizontal testing across key target intervals. McCabe also described the capital, technical analysis, and operational efforts Next Bridge had invested in evaluating and developing the

_____

[12] Meta Materials Inc. and certain of its officers were the subject of a publicly reported investigation and enforcement action. Next Bridge, which was spun off from Meta Materials in December 2022 and operates as an independent company, has not been identified as a subject or target of that investigation or any other publicly reported financial investigation.

Orogrande D&D Unit. UL's technical personnel did not ask substantive technical questions regarding the data presented or the development work described.

70.     Following the technical review, Next Bridge continued its efforts to preserve and develop the Orogrande D&D Unit. On September 4, 2024, the Company submitted a proposal to UL seeking an extension of the Orogrande D&D Unit. The proposal offered a ten-fold increase in annual minimum royalties, totaling approximately $1.34 million per year regardless of production, an additional $1 million plugging bond beyond Texas Railroad Commission bonding requirements, and an opportunity to integrate geothermal development with existing gas reserves.

71.     On September 11, 2024, and again on September 18, 2024, McCabe requested meetings with Champion to discuss Next Bridge's extension proposal for the Orogrande D&D Unit. UL declined both requests and informed McCabe that it would not meet to discuss the proposal.

72.     On October 2, 2024, UL notified Next Bridge that it had rejected the Company's proposal to extend the term of the Orogrande D&D Unit. As a result, UL took the position that the Orogrande D&D Unit expired and Next Bridge lost the opportunity to continue development of the project.

73.     On October 8, 2024, Next Bridge sent UL an evidence preservation letter requesting that UL preserve documents and communications relating to the Orogrande Basin, including materials concerning UL's decision to purportedly deny the extension of the Orogrande D&D Unit.

### F. Davies's Continued Public Attacks on Next Bridge and Its Financing Efforts

74.     Davies's public attacks on Next Bridge continued into 2025. For example, on August 9, 2025, Davies posted on X that "McCabe quit" and that "it's over," asserting the information was based on his "sources." At the time of the post, McCabe had not resigned from

Next Bridge and continues to serve as the Company's Chief Executive Officer and Chairman.

75. Later, on August 21, 2025, Davies published another post on X attacking the legitimacy of Next Bridge's recent financing efforts and questioning the legitimacy of a transaction involving the "Wildcat Panther" project. In that post, Davies suggested that searches of Louisiana land records would show no transactions involving "McCabe, Next Bridge or Wildcat Panther," implying that the financing and related transactions had not occurred. Next Bridge's public filings confirm that the Wildcat Panther transaction did in fact occur. Davies made these statements to his followers on X while Next Bridge was actively pursuing financing, impeding their efforts by casting doubt on the legitimacy of those efforts.

76. On December 11, 2025, Davies continued publishing statements on X concerning Next Bridge's operations. In response to a Next Bridge press release[13], Davies asserted that the Company was "lying," claimed that the Valentine prospect in Lafourche Parish was not drilling, and stated that Next Bridge "had one dry hole" and was "now doing absolutely nothing." At the time Davies made these statements, drilling activity at the Valentine prospect in Lafourche Parish was ongoing. Davies nevertheless published these accusations to his followers and the broader public, continuing his pattern of falsely portraying Next Bridge's operations and assets as nonexistent or fraudulent.

77. The publications and communications described above reflect a sustained course of conduct by Davies accusing Next Bridge of fraud and mischaracterizing the Company's operations, assets, and business activities. These statements were disseminated to Davies's followers and the broader public (including investors, industry participants, and contractual

---

[13] The Next Bridge press release referenced in this paragraph is publicly available at: https://cdn.prod.website-files.com/6169e69d0075ec7e66221a8b/693af089d4b04ba43475a6c5_NBH%20Completion%20of%20amended%20filings%20vF%2012-11-25.pdf

counterparties) and caused harm to Next Bridge's reputation and business relationships. As a direct and proximate result of Davies's conduct described above, Next Bridge has suffered damages and brings the following causes of action.

## CAUSES OF ACTION

### COUNT 1: TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

78.     Plaintiff hereby incorporates by reference all preceding paragraphs of this petition as if fully set forth herein.

79.     Next Bridge had a valid and enforceable contract with University Lands, specifically the Development Unit Agreement #2837 which has been referred to throughout this petition as "Orogrande D&D Unit. The Orogrande D&D Unit consisted of approximately 192 oil and gas leases covering Permanent University Fund lands and provided for a five-year primary term with potential five-year extensions.

80.     Defendant knew of Next Bridge's contractual relationship with UL and its interest in the Orogrande D&D Unit. Defendant repeatedly posted on X about the Orogrande D&D Unit and its expiration date, demonstrating detailed knowledge of the agreement and its terms. For example, on March 3, 2024, Defendant posted: "The lease expires 12/31/24 unless they pay more money they currently do not have."

81.     Defendant intentionally interfered with Next Bridge's contractual relationship with UL. Defendant publicly accused Next Bridge of fraud in connection with the Orogrande D&D Unit, encouraged stakeholders to contact UL regarding the validity of the leases, and communicated directly with UL officials (including the Chief Legal Officer Kate Champion) concerning the Orogrande D&D Unit. During the same period, Defendant continued publishing

false statements about the Orogrande D&D Unit and about Next Bridge's business, operations, and economic interests. Defendant's conduct was intentional and without justification or privilege.

82.     Defendant's conduct proximately caused injury to Next Bridge. Defendant's statements and communications directed at UL and the broader public (including investors, industry participants, and contractual counterparties) were a substantial factor in UL's refusal to extend the Orogrande D&D Unit and UL's taking of the position that the agreement was terminated. The harm to Next Bridge was a foreseeable result of Defendant's interference.

83.     As a direct and proximate result of Defendant's conduct, Next Bridge suffered damages, including the purported loss of the Orogrande D&D Unit, the Company's principal development asset, and the economic value associated with that project. Next Bridge seeks recovery of its actual damages within the jurisdictional limits of this Court.

84.     Exemplary damages. Defendant's conduct was committed with malice and/or actual fraud, entitling Next Bridge to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

### COUNT 2: BUSINESS DISPARAGEMENT

85.     Plaintiff hereby incorporates by reference all preceding paragraphs of this petition as if fully set forth herein.

86.     Defendant published numerous false and disparaging written statements concerning Next Bridge's operations, principal assets, and the character of its business. Representative examples of those statements are identified in *Exhibit A*, which catalogs the disparaging statements published by Defendant on the social media platform X. Defendant also authored and publicly circulated a document containing additional disparaging statements through an online Google

Drive link published on April 12, 2024. A true and correct copy of that document is attached hereto as *Exhibit B.*

87.    In those publications, Defendant accused Next Bridge of fraud and market manipulation, asserted that the Company lacked legitimate assets or oil production, claimed that Next Bridge had fraudulently acquired or mismanaged key development projects (including the Orogrande D&D Unit, the Hazel Prospect, Louisiana Prospects and other oil and gas development activities), and accused the Company and its associates of falsifying regulatory records related to oil production. Defendant also attacked the legitimacy of Next Bridge's financing transactions and ongoing drilling operations. These statements targeted the legitimacy and economic value of Next Bridge's assets and operations and were disseminated to the broader public (including current and prospective investors, industry participants, and contractual counterparties) through the social media platform "X," thereby calling into question the value of Next Bridge's assets, its business operations, and its ability to conduct legitimate oil and gas exploration and development activities.

88.    Defendant's statements were false. As described in the factual allegations above and summarized below, Defendant's accusations contradicted publicly available regulatory records, court records, and Next Bridge's public filings.

## A. False Statements Concerning the Orogrande D&D Unit.

89.    Defendant published statements asserting that Next Bridge fraudulently obtained the Orogrande D&D Unit. In posts published on X on March 19, 2024, and April 10, 2024, Defendant challenged Next Bridge's ownership of its principal development asset. By publicly asserting that Next Bridge had obtained the Orogrande D&D Unit through fraud, Defendant sought to undermine confidence in Next Bridge's integrity and ability to operate the asset in compliance with its contractual obligations.

90.    Defendant's statements were false. The interests comprising the Orogrande D&D Unit were acquired and owned by Next Bridge's predecessor, Torchlight Energy Resources, Inc., prior to the bankruptcy proceedings for Arabella Petroleum Company, LLC. The subsequent settlement agreement, as approved by the United States Bankruptcy Court for the Western District of Texas, Midland Division, did not transfer those interests but instead recognized Torchlight's preexisting ownership. Neither the settlement agreement nor the bankruptcy court's approval of it supports Defendant's assertions that the asset was "fraudulently conveyed" or otherwise improperly obtained. The objective falsity of Defendant's statements was readily ascertainable from the publicly available bankruptcy filings and the court's approval of the settlement, yet Defendant nevertheless mischaracterized those materials to convey that the asset had been "stolen," thereby acting with knowledge of falsity or, at a minimum, reckless disregard for the truth.

### B. False Statements Concerning the Hazel Prospect.

91.    On April 12, 2024, Defendant published a series of statements accusing Next Bridge and its management of fraudulent conduct relating to the Hazel Prospect. In posts published on X and in a written report authored by Defendant and publicly circulated through an online Google Drive Link, Defendant asserted that Next Bridge's predecessor company, Torchlight, engaged in sham transactions to remove producing wells from the Company, that the Hazel Prospect had been stolen from a prior entity, and that these events constituted ongoing fraud involving Next Bridge's assets and operations. Defendant also accused Next Bridge of misconduct relating to the Hazel 4H well, including claims that the well had not been drilled and that Next Bridge had misappropriated drilling funds associated with the project. These statements accused Next Bridge of fraud and theft of producing oil and gas assets and directly challenged the

legitimacy and economic value of the Hazel Prospect and the producing wells associated with that development.

92. These statements were false. Public records maintained by the Texas Railroad Commission confirm that the Hazel 4H well was permitted, drilled, and completed. Those same records demonstrate that drilling activity occurred in accordance with the regulatory filings governing the well. Defendant's statements were also misleading because they focused on the well's completion date rather than the governing development requirement. The applicable development obligation required only that the well be spudded by the specified deadline. Public records confirm that the Hazel 4H well was timely spudded and drilled in compliance with the applicable agreements.

93. Defendant purported to rely on regulatory filings and Texas Railroad Commission records in support of his accusations while simultaneously mischaracterizing those records to his audience. By presenting himself as analyzing those records while drawing conclusions that directly contradicted them, Defendant knew, or recklessly disregarded, that the statements he published concerning the Hazel Prospect were false.

## C. False Statements Concerning Next Bridge's Financing and Operations.

94. Defendant published statements attacking the legitimacy of Next Bridge's financing transactions and ongoing operations. In particular, on August 21, 2025, Defendant published statements on X asserting that a transaction involving the "Wildcat Panther" project had not occurred and claiming that searches of Louisiana land records would reveal no transactions involving "McCabe, Next Bridge or Wildcat Panther." These statements were false. Next Bridge's public filings confirm that the Wildcat Panther transaction did in fact occur. Defendant nevertheless represented to his followers that no such transaction existed, thereby casting doubt on

the legitimacy of Next Bridge's capital-raising efforts while the Company was actively pursuing additional investment. Defendant knew, or recklessly disregarded, that these statements were false when he published them.

95.    In a post published on X on December 11, 2025, Defendant falsely claimed that Next Bridge was not conducting drilling operations and had "one dry hole" and was "now doing absolutely nothing." These statements were false. At the time Defendant made those statements, drilling activity at the Valentine prospect in Lafourche Parish was ongoing. Defendant knew, or recklessly disregarded, that these statements misrepresented Next Bridge's operations and the status of its development activities, thereby casting doubt on the legitimacy of the Company's ongoing oil and gas operations.

## D. False Accusations of Falsifying Government Regulatory Records

96.    In a series of posts published on X on April 22, 2024, Defendant accused Next Bridge and individuals associated with the Company of falsifying government regulatory records relating to oil production. In those publications, Defendant asserted that production data displayed through the Texas Railroad Commission's Oil & Gas Query System had been fabricated or manipulated and suggested that individuals associated with Next Bridge had created false regulatory records to promote the Company's oil and gas operations. These accusations also implied that Next Bridge was engaged in a fraudulent "pump-and-dump" scheme involving falsified regulatory data. Defendant's statements accused Next Bridge of falsifying government records and engaging in criminal misconduct.

97.    These statements were false. The screenshots referenced in Defendant's publications were simply images of production data displayed through the Texas Railroad

Commission's publicly available Oil & Gas Query System. The images were not manipulated or falsified and were not created at the direction of Next Bridge or its management.

### E.  False Accusations of Fraud and Market Manipulation.

98.    Defendant published statements that accused Next Bridge of engaging in fraudulent conduct, securities fraud, pump-and-dump schemes, and other forms of unlawful market manipulation. Defendant also published statements that accused Next Bridge of operating a fraudulent oil and gas enterprise and called into question the legitimacy of the Company's business and assets. Defendant's statements were false. Next Bridge has never been indicted for fraud, charged with fraud or market manipulation, found liable for securities fraud or market manipulation, or named as a respondent or defendant in any public enforcement action brought by the Securities and Exchange Commission, FINRA, or any other federal or state securities regulator.

99.    Defendant published the disparaging statements with malice. Defendant knew the statements were false or acted with reckless disregard for their truth or falsity. In several instances, Defendant referenced or relied upon the same publicly available records that contradicted his accusations.

100.    Defendant published the statements without privilege. The statements were not made in the performance of official governmental duties, during a legislative proceeding, or in connection with any judicial or quasi-judicial proceeding.

101.    Defendant's false and disparaging statements were a producing cause of injury to Next Bridge's economic interests and business relationships. As a direct and proximate result of Defendant's conduct, Next Bridge suffered special damages, including: (a) the purported loss of the Orogrande D&D Unit, the Company's principal development asset, and the economic value associated with that project; (b) the closure by JPMorgan Chase Bank of a bank account held by

Hudspeth Operating, LLC, a wholly owned subsidiary through which Next Bridge conducted oil and gas operations; and (c) the loss of additional financing from an existing investor after Defendant publicly accused the investor and the Company of falsifying government regulatory records and participating in a fraudulent "pump-and-dump" scheme.

102. Next Bridge seeks damages within the jurisdictional limits of this Court.

103. Exemplary damages. Next Bridge's injury resulted from Defendant's malice or actual fraud, which entitles Next Bridge to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

## JURY DEMAND

104. Plaintiff demands that all causes of actions alleged herein be tried before a jury. The jury fee is being paid with the filing of this Original Petition.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Next Bridge Hydrocarbons, Inc., respectfully prays that Defendant Jeffrey Davies be cited to appear and answer herein, and that upon final hearing or trial, Plaintiff recovers the following from Defendant, in the alternative or cumulatively as follows:

    a. Actual Damages;

    b. Exemplary Damages;

    c. Pre-judgment and post-judgment interest as provided by law;

    d. Court Costs;

    e. All other relief to which Plaintiff may be entitled in equity or law.

Respectfully submitted,

**CHRISTIANATTAR**

*/s/ James W. Christian*
James W. Christian
State Bar No. 04228700
jchristian@christianattarlaw.com
Casidy R. Newcomer
State Bar No. 24121033
cnewcomer@christianattarlaw.com
1177 West Loop S, Suite 1700
Houston, Texas 77027
(713) 659-7617 telephone
(713) 659-7641 fax

**ATTORNEYS FOR PLAINTIFF**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Micaela Johnson on behalf of James Christian
Bar No. 4228700
mjohnson@christianattarlaw.com
Envelope ID: 112571685
Filing Code Description: Petition
Filing Description: 2026-03-18 - Plaintiffs Original Petition
Status as of 3/18/2026 2:22 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cole Zimmerman | | czimmerman@christianattarlaw.com | 3/18/2026 1:01:26 PM | NOT SENT |
| Casidy Newcomer | | cnewcomer@christianattarlaw.com | 3/18/2026 1:01:26 PM | NOT SENT |
| Micaela Johnson | | mjohnson@christianattarlaw.com | 3/18/2026 1:01:26 PM | NOT SENT |
| James W. Christian | | jchristian@christianattarlaw.com | 3/18/2026 1:01:26 PM | NOT SENT |