RECEIVED
AND FILED    AM
APR 27 2026
U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re:                          Case No. 24-50792-gs

META MATERIALS, INC.,            Chapter 7

Debtor

---

**NEW MOTION FOR CLARIFICATION AND SUPPLEMENTAL DISCLOSURE REGARDING CONFLICTS, RULE 2014, AND LITIGATION FUNDING**

---

## TABLE OF CONTENTS

I. INTRODUCTION................................................................. 1

II. RENEWED CONFLICTS OF INTEREST.............................…....................….. 2

III. LITIGATION FUNDING AND DISCLOSURE…..........................…....…............… 6

IV. EVALUATION OF POTENTIAL ESTATE CLAIMS…...................……................. 8

V. PREPETITION INVESTIGATION, PRESERVATION, AND DISCLOSURE....... 9

VI. VERIFIED PETITION…...............…...............................…..................... 12

VII. LIMITED ROLE CLARIFICATION…................................…................….. 13

VIII. REQUEST FOR RELIEF…...............................................…........... 16

IX. CONCLUSION…...........................................................….......... 16

2

1

## I. INTRODUCTION

Movant Danielle Spears, appearing pro se, respectfully submits this Motion for Clarification and Supplemental Disclosure regarding matters that have developed since prior filings and that bear directly on issues currently under advisement by the Court.

This Motion is based on matters already placed in the record through Movant's prior filings, including Docket Nos. 2413 and supporting declarations and appendices, 2414, and 2586 and 2587. Movant does not seek to reargue prior motions or request that the Court adopt Movant's factual conclusions at this stage. This Motion is directed to matters that have developed since those filings and are not presently reflected in the record.

The record reflects developments bearing on Special Counsel's relationships, investigative activities, and litigation funding arrangements that are not presently reflected in the record through supplemental disclosure. These include (i) subsequent representation of NBH following prior withdrawals based on the appearance of a conflict, (ii) the timing and content of Special Counsel's Verified Petition for Permission to Practice, (iii) filings by third parties indicating that preservation demands were issued in connection with prepetition investigative activity, and (iv) representations concerning the timing and basis of such preservation efforts in light of applicable retention periods.

The record further reflects the existence of litigation funding arrangements entered into in connection with the prosecution of potential estate claims. However, the record does not reflect what information, if any, was provided to the Trustee concerning prepetition investigative activity, potential sources of recovery, or the availability of claims prior to entering into such arrangements, or what evaluation was undertaken in determining the necessity, scope, and

structure of such funding. The Court has already recognized uncertainty in the record concerning litigation funding. See Dkt. 2561.

Without such information, the Court cannot evaluate whether disclosures required under Rule 2014 have been satisfied. The record likewise does not permit evaluation of whether decisions concerning litigation strategy and funding were made on a complete and informed factual basis. This Motion is directed solely to obtaining the limited disclosures necessary to permit the Court to evaluate these matters on a complete and reliable record.

Movant further respectfully requests that the Court consider this Motion on shortened notice to the extent appropriate, as the issues presented herein relate directly to matters currently set for hearing on May 7, 2026, including Docket Nos. 2586, 2587, and 2597, and concern matters the Court has already taken under advisement.

## II. RENEWED CONFLICTS OF INTEREST

Developments occurring after Special Counsel's appointment, including renewed representation of Next Bridge Hydrocarbons, Inc. ("NBH") and related transactions, bear directly on potential conflicts and the evaluation of estate claims. The record does not reflect that any supplemental disclosure has been made to address those developments or to reconcile them with prior representations made to this Court.

Information previously documented in prior filings reflects that Movant provided a whistleblower communication to Trustee Lovato and her counsel, Jeffrey L. Hartman, identifying potential conflicts of interest relating to Special Counsel James "Wes" Christian, including his representation of NBH while serving as Special Counsel to the Trustee.

While Mr. Hartman's fee application does not reflect receipt of the April 4, 2025 communication, it includes multiple billing entries between April 4 and April 16 referencing the "Next Bridge

representation issue" and "Next Bridge and McCabe potential conflict issue," or similar descriptions. (Ex. P1–P3) The record, however, does not reflect any documented independent investigation, findings, or conclusions arising from those entries.

The billing records further reflect that communications regarding the alleged conflict were directed to Special Counsel himself. A billing entry dated April 10 reflects an "E-mail to Wes Christian requesting position on the Next Bridge issues and allegations of conflict by possible shareholders." On that same date, Special Counsel authored a letter addressed to Mr. Hartman, later filed on April 16, 2025 as part of Dkt. 1878, in which he responds to the allegations and characterizes Movant as a "perpetrator." The record does not reflect that any independent inquiry or evaluation is documented  outside of communications with Special Counsel concerning the issues raised.

On April 16, 2025, Special Counsel filed Dkt. 1878 stating that, "In the event that the Trustee also opts to pursue any similar actions against NBH, ChristianAttar will withdraw from representation of NBH..." and further stating that "we cannot imagine what claim Meta would ever have against NBH." On April 23, 2025, Special Counsel filed an amended declaration reiterating that he did not believe his representation of NBH constituted a conflict. On May 2, 2025, Special Counsel moved to withdraw from representation of NBH in related litigation, stating that "there is good cause... because there is a potential conflict of interest," while simultaneously reiterating in the attached declaration that such representation did not constitute a conflict. The record does not reflect that any notice was filed on this docket disclosing such withdrawal or reconciling these differing positions, or that any supplemental disclosure was made to this Court addressing those developments as required under Federal Rule of Bankruptcy Procedure 2014.

4

The record further reflects that NBH has since engaged Special Counsel in additional litigation, including *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies*, Cause No. 2026-18186. Public filings by NBH reflect that the company operates without employees and conducts its activities through executive management and contracted services (Ex. J)

The record does not reflect whether the structure, control, or decision-making authority of NBH has been disclosed or evaluated in connection with Special Counsel's obligations in this case, including whether any individuals or entities connected to NBH have interests that intersect with the estate's potential claims. Nor does the record reflect whether the involvement of individuals associated with NBH, including those previously identified in connection with transactions raised in the record, has been considered in any conflict analysis. Specifically, the record does not include disclosure identifying the timing, scope, or terms of Special Counsel's representation of NBH, including engagement agreements, withdrawal or re-engagement documentation, or any analysis of how such representation relates to potential estate claims or parties in interest.

The record reflects repeated internal discussion of issues concerning Special Counsel and matters involving Next Bridge and McCabe, including entries specifically referencing those issues. (Ex. D). While those issues were initially raised through submissions and communications by Movant, the fee application reflects internal discussions, emails, and conferences concerning those topics without corresponding entries documenting review or evaluation of the underlying materials provided. As reflected in Exhibit D, entries relating to Movant and Intervenor Scott Traudt primarily document time spent responding to their filings, rather than analysis of the substance of the issues raised. This disparity in the record, where issues attributed to Special Counsel and related parties are the subject of documented internal discussion, while the originating submissions are not reflected as substantively evaluated, underscores the absence of a

documented record regarding how such information was received, reviewed, and incorporated into the estate's investigation.

The record further reflects a dispute concerning a document described as a "summary contact list" relating to efforts to market or sell Torchlight's oil and gas assets, including outreach to numerous potential counterparties. (Ex. C). Movant and Intervenor Scott Traudt requested this document from the Trustee. (Ex. A). Trustee's counsel declined to provide the requested information absent court intervention. (Ex. B).

In follow-up correspondence, Movant and Mr. Traudt specifically inquired whether Special Counsel James "Wes" Christian participated in or advised on the decision to withhold the requested material. (Ex. B1). The record does not reflect any response to that inquiry or any disclosure identifying whether Special Counsel was involved in that determination.

This issue is material in light of Special Counsel's prepetition representation of META Materials, Inc. and his relationship with its former Chief Executive Officer. To the extent Special Counsel participated in decisions concerning the production or withholding of materials potentially relevant to estate claims, valuation, or prepetition transactions, such involvement bears directly on the adequacy of disclosures required under Federal Rule of Bankruptcy Procedure 2014 and the Court's ability to evaluate disinterestedness and independent professional judgment.

The absence of any record identifying whether Special Counsel participated in that determination prevents the Court from evaluating whether such actions were undertaken independently of any interests or relationships requiring disclosure.

The record further reflects that market participants have stated they received preservation demands issued in connection with prepetition investigative activity involving Special Counsel and associated firms. That subsequent information confirms the existence of prepetition

investigative activity prior to the commencement of this case. While Movant previously raised issues relating to prepetition investigation in Docket No. 2587, the existence of preservation demand letters issued to market participants was not then reflected in the record. However, the record does not reflect whether the Trustee was provided with the identity of the members or participants of Flamethrower, or whether any inquiry was undertaken to determine whether such relationships bear on issues of disinterestedness or potential conflicts of interest involving Special Counsel. Without disclosure of that information, the Court cannot evaluate whether the Trustee satisfied her obligations under Rule 2014 to assess potential conflicts and connections.

Movant does not contend that any specific relationship establishes a disqualifying conflict. However, the absence of supplemental disclosure concerning these developments prevents the Court from determining whether the requirements of disinterestedness and disclosure under Federal Rule of Bankruptcy Procedure 2014 have been satisfied.

## III. LITIGATION FUNDING AND DISCLOSURE

The record reflects that litigation funding arrangements have been entered into in connection with the prosecution of potential estate claims, and that the Court has identified uncertainty concerning their structure and disclosure. See Dkt. 2561.

As summarized in Exhibits F1 and F2, the record does not reflect a single, complete disclosure of the litigation funding arrangements. Instead, information concerning funding has developed over time through successive filings following questions raised by parties in interest and inquiry by the Court. Initial filings described funding in general terms, while later filings identified the involvement of Parabellum Capital, LLC and its affiliate, Project Blazer LLC, and further indicated that the arrangement operates as part of a broader portfolio-based funding structure spanning multiple litigations.

At the same time that additional information has been provided incrementally, the Trustee has sought to file the underlying agreements under seal, including substantial materials that are not available on the public record. As a result, the complete terms governing funding, repayment, and allocation of litigation proceeds are not accessible for review. The record does not reflect whether the Court has been provided with sufficient unsealed information to permit meaningful evaluation of those arrangements.

The record further reflects that additional counsel, including Schneider Wallace Cottrell & Konecky LLP ("SWCK"), were employed pursuant to 11 U.S.C. § 328 and Rule 2014, and were represented by the Trustee to be "in all material respects" the same as that of Special Counsel. However, as reflected in Exhibit F2, the record does not contain sufficient disclosure to evaluate that representation. While the filings reflect similarities in contingency structures, they do not identify whether SWCK participates in the same funding arrangement, whether separate funding sources exist, whether distributions are shared among firms or allocated separately, whether multiple firms are compensated concurrently from the same recovery structure, or how recoveries are allocated among multiple firms and any funding entity

More broadly, as reflected in Exhibit F1, the record does not permit determination of key aspects of the litigation funding arrangements, including the allocation of proceeds among the funder, counsel, and the estate; the interaction between funding in this case and other matters within any portfolio-based funding structure; or the basis upon which representations regarding funding structure and similarity were made.

While the Trustee has sought to file the underlying agreements under seal pursuant to 11 U.S.C. § 107, the existence of confidential terms does not eliminate the requirement that sufficient information be disclosed to permit the Court to evaluate disinterestedness, control, and the

allocation of estate recoveries. In the absence of such disclosure, the Court cannot determine whether the requirements of 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014 have been satisfied.

The record further reflects that, in other proceedings, Special Counsel has acknowledged involvement in litigation funding, including statements indicating that he has, at times, personally financed or participated in the funding of litigation matters. (Ex. G). However, the record in this case does not reflect whether Special Counsel holds any direct or indirect ownership, financial interest, or participation in the litigation funding arrangements disclosed herein, including any relationship to the entities identified as providing funding, such as Project Blazer LLC or its affiliates. Nor does the record reflect whether the Trustee undertook any inquiry, investigation, or verification into the ownership, structure, or participants in the funding arrangement to determine whether any such relationships bear on disinterestedness or potential conflicts of interest. Absent such disclosure, the Court cannot determine whether the requirements of 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014 have been satisfied.

## IV. EVALUATION OF POTENTIAL ESTATE CLAIMS

The record reflects that potential sources of recovery were identified relating to prepetition transactions, including the potential for a $17.4 million avoidance action relating to McCabe and NBH, identified in Docket No. 2174 and raised at the hearing on or about October 16, 2025. The issue of the $24M NBH loan purchased by Greg McCabe for $6.7M approximately one year prior to bankruptcy (Ex. I). The potential action was also discussed in subsequent conferences with Trustee's counsel, including in conference on or about October 17, 2025 immediately

following the October hearing and a subsequent conference on or about December 31, 2025, as reflected in contemporaneous written communication with Trustee's counsel (Ex. E).

However, the record does not reflect what evaluation, if any, is documented with respect to such potential claims, including any analysis of avoidance actions, or whether such potential claims were considered prior to or in connection with the decision to proceed with litigation funding. Nor does the record reflect whether such matters were evaluated independently of Special Counsel, whether any measures were taken to assess potential conflicts arising from Special Counsel's relationships with parties connected to those transactions, or whether any independent verification of those matters was undertaken.

The record also does not reflect whether litigation funding arrangements applicable to this case would be utilized in connection with the pursuit of such potential claims, how the costs of such litigation would be allocated as between the estate, retained counsel, or any funding entity, or whether such arrangements affect the prioritization or sequencing of potential claims. In the absence of such information, the Court cannot evaluate whether the availability or structure of litigation funding influenced the evaluation, sequencing, or pursuit of potential estate claims, or whether the decision to proceed with funded litigation affected whether other potential sources of recovery were pursued.

Absent disclosure of what information was considered, what evaluation is documented, and when such determinations were made, the Court cannot assess whether decisions regarding litigation funding and the pursuit of potential estate claims were made on a complete and independently evaluated record.

**V. PREPETITION INVESTIGATION, PRESERVATION, AND DISCLOSURE**

The record reflects that prepetition investigative activity relating to MMAT and MMTLP included the issuance of preservation demands to market participants. Third-party filings, including those by Citadel, indicate that such demands were received, and similar representations were referenced in recent proceedings on or about April 20, 2026. Special Counsel has represented that such preservation efforts were undertaken in light of applicable regulatory retention considerations. However, the record does not reflect the scope of those demands, the custodians to whom they were directed, what information was obtained or preserved as a result of such prepetition activity, or whether such materials were provided to the Trustee upon retention for use in this case.

The record reflects prior communications by Movant concerning the effect of applicable regulatory retention requirements as documented in Docket No. 2587. During communications with Trustee's counsel, Mr. Hartman stated in substance that regulatory document-retention requirements "are flexible and have some give." (Ex. O at p. 4, ¶¶ 14, 16) These communications reflect that Movant specifically raised concerns regarding the timing and necessity of preservation efforts in light of applicable retention periods, including on or about December 31, 2025, marking approximately three years following the December 9, 2022 trading halt of MMTLP. By contrast, the record reflects that Special Counsel, as stated during the hearing on or about April 20, 2026, issued preservation demands based on regulatory retention considerations. However, the record does not reflect how these differing representations were reconciled, or whether the Trustee evaluated the timing and scope of preservation efforts in light of known retention limitations.

Broker-dealers are subject to regulatory record-retention requirements, including those imposed under SEC Rule 17a-4 and FINRA Rule 4511, which generally require the preservation of

customer communications and related records for defined periods, after which such records may no longer be retained in the ordinary course absent preservation measures.

The record further does not reflect whether such preservation efforts were undertaken broadly with respect to all relevant custodians, including approximately 105 broker-dealers involved in MMTLP trading, whether any gaps in preservation may have arisen due to the passage of time, or whether preservation measures were implemented prior to the expiration of applicable retention periods for records relating to the December 2022 trading halt. The record likewise does not reflect whether the Trustee evaluated the risk of loss of such materials in determining the scope and timing of investigative efforts.

Absent disclosure of what prepetition investigative activity occurred, what materials were obtained and provided to the Trustee, and what relationships or funding sources were involved, the Court cannot determine whether the record reflects the information necessary to evaluate the completeness of disclosures or the independence of the estate's investigation. Without disclosure of the individuals or entities involved, the Court likewise cannot determine whether relationships exist that bear on disinterestedness, conflicts of interest, or the evaluation of potential estate claims, or whether the Trustee evaluated potential conflicts arising from those relationships in the administration of the estate.

The record further reflects that subsequent filings by market participants indicate that preservation demands were issued in connection with such prepetition investigative activity, confirming that such investigation progressed to the identification of specific custodians and data sources prior to the commencement of this case. While Movant previously raised issues relating to prepetition investigative activity in Docket No. 2587, the existence of preservation demand letters issued to market participants was not then reflected in the record.

However, the record does not reflect whether that prepetition investigation included any work performed on behalf of, or in connection with, third-party entities such as Flamethrower, or whether any materials, analyses, or information generated through such work were provided to the Trustee upon retention. The record likewise does not reflect whether the Trustee was provided with complete records of any such prepetition investigative activity, including the identity of participants or entities involved, sufficient to permit evaluation of disclosures and potential conflicts of interest under Rule 2014.

## VI. VERIFIED PETITION

Special Counsel's obligations to this Court are not limited to initial disclosures at the time of retention. Under Federal Rule of Bankruptcy Procedure 2014, the duty of disclosure is continuing and requires supplementation when material facts arise that may bear on disinterestedness or potential conflicts. See *In re Park-Helena Corp.*, 63 F.3d 877, 881–82 (9th Cir. 1995); *In re Metropolitan Environmental, Inc.*, 293 B.R. 871, 887 (Bankr. N.D. Ohio 2003).

The record reflects that Special Counsel did not file his Verified Petition for Permission to Practice in this Court until May 21, 2025. See Dkt. 1950. The record further reflects that, in his Verified Petition, Special Counsel responded "N/A" to the question requiring disclosure of prior disciplinary proceedings or sanctions. The record does not reflect whether this response was evaluated or supplemented in light of publicly available information concerning prior proceedings involving Special Counsel, or whether any supplemental disclosure was made to the Court as required under Federal Rule of Bankruptcy Procedure 2014, nor does it reflect whether the Trustee or the Court was provided with sufficient information to assess the completeness of that disclosure.

The record also does not reflect when Special Counsel began directing or participating in litigation or investigative activity in this matter relative to the filing of that Verified Petition, nor does it reflect what disclosures, if any, were provided to the Trustee or the Court prior to that time. Because the Verified Petition forms the basis upon which the Court evaluates disinterestedness and connections under Federal Rule of Bankruptcy Procedure 2014, the absence of a clear record as to the timing of such activity prevents the Court from determining whether those disclosures were made at the time required for proper evaluation.

## VII. LIMITED ROLE CLARIFICATION

The record reflects that Georgios Palikaras, former Chief Executive Officer of META Materials, Inc., is identified in the Trustee's fee application (Ex. D p.5) as participating in the "litigation team," with entries reflecting communications and discussions relating to litigation issues, asset valuation, and investigative matters, including subpoena responses and data. These entries indicate some level of involvement in the estate's investigation and litigation activities. However, the record does not clearly set forth the scope, basis, or limitations of his role or access to estate information, including whether such participation was formal or informal, or the extent to which he participated in investigative or litigation-related decisions

The record further reflects statements indicating that Mr. Palikaras has possessed a substantial volume of documents, described as comprising over 15,000 files, attributed to materials on a personal or previously held device. The record does not reflect whether any estate information was included in those materials, whether such materials were reviewed or incorporated into the estate's investigation, or whether any protocols are reflected in the record to distinguish between personal, prepetition, and estate-controlled information.

The record also reflects communications from Mr. Palikaras describing the existence of a "summary contact list" relating to efforts to market or sell Torchlight's oil and gas assets, including outreach to more than fifty companies. (Ex. C). In subsequent communications, Mr. Palikaras directed Movant to seek that document from the Chapter 7 Trustee, thereby indicating that the Trustee was the appropriate custodian of such material. The document was thereafter requested but not produced. (Exs. A, B). The record does not reflect whether this document exists, whether it was provided to or obtained by the Trustee, or whether it was reviewed in connection with the estate's investigation.

The record does not reflect whether any confidentiality, non-disclosure, or information-control agreements govern such access, or whether any protocols were implemented to regulate the handling, transfer, or use of documents attributed to Mr. Palikaras, including materials described as being maintained on a personal or previously held device. Nor does the record reflect whether such materials were subject to review, segregation, or validation prior to being utilized in connection with the estate's investigation. The record likewise does not identify whether Mr. Palikaras's participation in the "litigation team" was governed by any defined role, authorization, or limitations, or whether his access to estate information was subject to oversight, documentation controls, or confidentiality restrictions. In the absence of such information, the Court cannot evaluate whether appropriate safeguards were in place to ensure the integrity, confidentiality, and independence of materials used in the estate's investigation.

Mr. Palikaras served as Chief Executive Officer during the period in which the transactions underlying this case occurred, including the Torchlight reverse merger and related corporate actions. The record does not reflect whether that prior role, or any relationships or knowledge arising from it, were evaluated in connection with his participation in the litigation team or

access to information relating to potential estate claims. Nor does the record identify whether his participation was formally authorized, disclosed to the Court, or subject to defined roles, limitations, or oversight, or whether any analysis was undertaken to evaluate potential conflicts, confidentiality concerns, or the appropriateness of such participation.

The record further reflects a material disparity in the treatment and documentation of communications involving different parties. As reflected in the fee application excerpts (Ex. D), extensive entries document communications, meetings, and information exchanges with Mr. Palikaras, including discussions relating to asset valuation, litigation strategy, and data. By contrast, entries relating to Movant and Intervenor Scott Traudt primarily reflect time spent responding to their filings, with no corresponding documentation reflecting substantive evaluation of the issues raised in their communications, including communications and submissions raising potential issues.

The record further reflects that issues concerning potential insider-related conduct were expressly raised in communications with Trustee's counsel, including whether insiders may have contributed to the debtor's financial condition. (Dkt. 2413, App. B). Trustee's counsel indicated an understanding of those concerns. However, the record does not reflect what investigation, if any, was undertaken in response, or whether such issues were evaluated in connection with the participation of Mr. Palikaras in litigation-related discussions. In light of Mr. Palikaras's role as former Chief Executive Officer during the relevant period, and his documented involvement in the litigation team, the absence of any record addressing how such insider-related issues were reconciled with his participation further underscores the lack of clarity regarding the scope, oversight, and independence of the estate's investigation.

Absent disclosure of these matters, the Court cannot determine the nature and extent of Mr. Palikaras's involvement, whether estate information has been accessed or utilized outside of defined controls, or whether appropriate safeguards are in place. Clarification of the scope, authorization, and limitations of such access is therefore necessary to permit the Court to evaluate whether estate information and litigation activities are being managed consistent with the Trustee's obligations and this Court's oversight.

## VIII. REQUEST FOR RELIEF

**WHEREFORE,** for the reasons set forth above, Movant respectfully requests that the Court:

1. **Enter** an order directing the provision of limited clarification and supplemental disclosures sufficient to permit the Court to evaluate issues relating to disinterestedness, conflicts of interest, litigation funding, the scope and completeness of the investigation of potential estate claims, preservation of potentially relevant evidence, and the basis for participation in the litigation effort by individuals connected to the underlying transactions, including but not limited to the categories set forth in Exhibit K (Requested Disclosures) attached hereto and incorporated by reference;

2. **Direct** that any responses ordered by the Court be supported by documents, communications, data requests, analyses, and other records sufficient to substantiate such responses, and that any withheld materials be identified together with the basis for withholding and whether such materials have been filed under seal; and

3. **Grant** such other and further relief as the Court deems just and appropriate.

Movant seeks only those disclosures necessary to permit the Court to evaluate the issues presented on a complete and reliable record and does not request findings on the merits at this stage.

## IX. CONCLUSION

For the reasons set forth above, the record does not contain the disclosures necessary for the Court to make determinations on a complete, accurate, and reliable basis.

Movant respectfully requests that the Court grant the relief set forth above.

Respectfully submitted this 22nd day of April, 2026,

Danielle Spears, Pro Se Movant
Peoria, AZ 85345
paymmtlpnow@gmail.com
480-476-1091

18

I hereby certify that a true copy of the foregoing was served by first-class U.S. mail and/or electronic mail to all named parties with interests in this matter and at the addresses delineated below either by first-class mail or by email, this 22nd day of April, 2026.

Danielle Spears, Pro Se Movant
Peoria, AZ 85345
paymmtlpnow@gmail.com
480-476-1091

**US Dept. of Justice PO Box 18417, Reno, NV 89511**

USTPRegion17.RE.ECF@usdoj.gov
cameron.m.gulden@usdoj.gov
trusteelovato@att.net
jlh@bankruptcyreno.com
notices@bankruptcyreno.com
abg@bankruptcyreno.com
nv26@ecfcbis.com
jchristian@christianattarlaw.com
bcosman@perkinscoie.com
docketphx@perkinscoie.com
ajdriggs@hollandhart.com
kroyer@parsonsbehle.com
dburnett@schneiderwallace.com
rhicks@schneiderwallace.com
jkim@schneiderwallace.com
stountas@kasowitz.com
mbrunet@cooperlevenson.com
lbubala@kcnvlaw.com
cdroessler@kcnvlaw.com
kmilks@kcnvlaw.com
mjohnson@mjohnsonlaw.com
annabelle@mjohnsonlaw.com
kristi@mjohnsonlaw.com
kathra@mjohnsonlaw.com
admin@mjohnsonlaw.com
cbrust@rssblaw.com
krobison@rssblaw.com
hwinston@rssblaw.com
rcarr@rssblaw.com

1

## EXHIBIT LIST

## MOTION FOR CLARIFICATION FOR MAY 7, 2026 HEARING

**Exhibit A**  Initial request for list of 50 oil companies (Traudt gmail to Hartman)

**Exhibit B**  Hartman gmail to Traudt refusing to provide list of 50 oil companies

**Exhibit B1** Traudt gmail to Hartman raising question whether Special Counsel participated in decision to withhold list of 50 oil companies

**Exhibit C**  Direct message from Palikaras description of list of 50 prospective purchasers of oil and gas assets

**Exhibit D**  Selected fee application excerpts reflecting references to Spears, Traudt, McCabe, Christian, and Palikaras

**Exhibit E**  Gmail from Spears to Hartman dated January 3, 2026 summarizing issues discussed during a conference call held on December 31, 2025 between Traudt, Spears & Hartman (Trustee Lovato did not attend).

## LITIGATION FUNDING EXHIBITS

**Exhibit F (F1-F2)**  Funding analysis (litigation funding record gaps and unresolved questions regarding litigation and a comparison of the Christian Attar (Project Blazer funding) vs Schneider Wallace Cottrell Konecky litigation funding described by the Trustee as "materially the same."

**Exhibit G** DKT. 868 pp.3-4 Excerpt Christian Declaration in Disney Case

**Exhibit H** Meta Material Press Release - Christian statement on litigation May 20, 2024

## PRAYER FOR RELIEF REQUESTED DISCLOSURES

**Exhibit I -** Requested disclosures

EXHIBIT A

 Gmail

**Danielle Spears <paymmtlpnow@gmail.com>**

## Fwd: Follow up on New Year's Eve talks

**Scott Traudt** <sctraudt@gmail.com>
To: Danielle Spears <paymmtlpnow@gmail.com>

Tue, Jan 20, 2026 at 10:46 AM

---------- Forwarded message ---------
From: **Scott Traudt** <sctraudt@gmail.com>
Date: Tue, Jan 20, 2026, 7:54 AM
Subject: Follow up on New Year's Eve talks
To: Jeffrey L. Hartman <jlh@bankruptcyreno.com>

Jeff:

Please let me know if you are going to supply me with that 150 or so company list supplied to MMAT by McCabe and/or John Brda that provided the validation of the spinoff value. An answer today is needed otherwise I will file a motion to force its release.

I'd also need to know if your records subpoena did include demands from Schwab/TDA for my audio recording with Fleming that took place on March 20, 2023.

Thanks,

Scott Traudt
802-318-0429
Strafford VT

EXHIBIT B

Danielle Spears <paymmtlpnow@gmail.com>

M Gmail

## Fwd: Follow up on New Year's Eve talks

**Scott Traudt** <sctraudt@gmail.com>                                                      Tue, Jan 20, 2026 at 10:47 AM
To: Danielle Spears <paymmtlpnow@gmail.com>

---------- Forwarded message ---------
From: **Jeffrey L. Hartman** <jlh@bankruptcyreno.com>
Date: Tue, Jan 20, 2026, 1:13 PM
Subject: RE: Follow up on New Year's Eve talks
To: Scott Traudt <sctraudt@gmail.com>
Cc: Kent Robison <krobison@rssblaw.com>, Lovato Christina <cwlovato@gmail.com>

Scott:

I have consulted with Trustee Lovato's litigation counsel regarding your request. We have concluded that the Trustee will not provide the information. Should you choose to seek a Court order on this issue, we will oppose the request and ultimately the Court will decide the issue.

Jeff Hartman

[Quoted text hidden]

EXHIBIT B1

 Gmail

**Danielle Spears <paymmtlpnow@gmail.com>**

## Fwd: Follow up on New Year's Eve talks

**Scott Traudt** <sctraudt@gmail.com>                                      Wed, Jan 21, 2026 at 5:28 AM
To: Danielle Spears <paymmtlpnow@gmail.com>

Jeff: Wes Christian played a role in the litigation counsel decision? I need to be clear. Who exactly is the "litigation counsel"?

Scott

[Quoted text hidden]

EXHIBIT C



a summary contact list of attempts to sell the assets was shared with us by TRCH management and had over 50 extra large, medium and small companies in the summer of 2021. TRCH management had been working on selling the assets for an extended period of time (over a year) including prior to meeting us and during the merger process. there were several people involved and i have names, emails etc. Brda was hired post merger to continue this effort which was part of his role, and of course Lance Cook was the appointed Pref A representative who was aware of all the process and steps since he was a former TRCH board member.

EXHIBIT D

1

## EXHIBIT D

### *Selected Fee Application Entries Referencing Key Parties (Chronological Excerpts)*

Source:

---

### ● A. SPEARS / TRAUDT (Intervention + Response Activity)

**06/03/2025**

- Review 121-page motion to intervene with exhibits filed by Danielle Spears.
- Review 42-page motion to strike attachments.

**06/04/2025**

- Telephone conference with Wes Christian re: responding to Spears motion to intervene.
- Email from Danielle Spears re: motion to intervene, proposed orders, exhibits.

**06/11/2025**

- Team meeting with Trustee Lovato re: Vetriano, Traudt, and Spears filings.

**06/23/2025**

- Conference call with Wes Christian and others to discuss Spears motion to intervene.

**06/24/2025**

- Begin review of 155-page Traudt motion to intervene.

**06/25/2025**

- Continue review of Traudt motion, including dozens of exhibits.

**07/30/2025**

- Work on response to Traudt motion to intervene.

**07/31/2025**

- Work on response to Traudt motion; conference calls with Wes Christian and David Burnett re: Citadel Rule 2004 issues.

- **Note:** While the entries above reflect time billed for responding to filings by Movant and Scott Traudt, the record does not reflect corresponding entries documenting evaluation of the underlying issues raised in those filings or related communications. For example, the record does not identify entries reflecting analysis of whistleblower submissions attributed to Spears, Rolo, or Vetrano, or entries reflecting consideration of communications or conference calls with Movant or Scott Traudt addressing those matters.

## ● B. MCCABE / NBH / POTENTIAL CLAIMS

**11/01/2024**

- Email to Wes Christian re: potential claims against officers and directors, including insider litigation.

**11/01/2024**

- Email re: litigation pending in Federal Court in Texas involving Next Bridge and Greg McCabe.

**04/05/2025**

- Email re: potential litigation involving NextBridge and McCabe and potential conflict issues.

**04/05/2025**

- Call re: NextBridge issue, KPMG Canada issue, potential McCabe litigation, and potential fraudulent transfer action.

## ● C. WES CHRISTIAN (ROLE + LITIGATION CONTROL)

**08/15/2024**

- Review CV of Wes Christian; discussion of potential securities litigation.

**08/23/2024**

- Conference call with Wes Christian, Dan Eaton, and Trustee Lovato re: market manipulation and "naked short selling."

**08/21/2024**

- Review extensive documentation from Wes Christian re: potential litigation.

**09/10/2024**

- Telephone conference with Wes Christian re: list of potential defendants and conflicts check.

**09/23/2024**

- Continue review of stock fraud packet from Wes Christian's office.

**12/03/2024**

- Weekly litigation team call including Wes Christian; discussion of Rule 2004 subpoenas and ShareIntel engagement.

**04/04/2025**

- Telephone conference with Wes Christian re: the Next Bridge representation issue.

**04/08/2025**

- Email to Trustee Lovato re: Christian Attar / NextBridge issue.

**04/09/2025**

- E-mail and telephone exchanges with Wes Christian re: the Next Bridge/McCabe issues.
- Separate e-mail fromWes Christian re: Next Bridge not named as a defendant in the Ventrano litigation pending in Texas federal court. (Vetrano emailed whistleblower 04/09/2025)

**04/10/2025**

- E-mail to Wes Christian requesting position on the Next Bridge issues and allegations of conflict by possible shareholders.

4

**04/15/2025**

- Telephone conference with Eric Browndorf re: the Next Bridge issues with Christian Attar. Letter from Greg McCabe to Trustee Lovato. Another filing objecting to Christian Attar representation of Next Bridge.

**05/21/2025**

- Review Harrington memo re: statute of limitations for SEC actions.

---

 **D. GEORGE PALIKARAS (INSIDER INVOLVEMENT + DECISION INPUT)**

**08/13/2024**

- Conference call with Trustee Lovato, Uzi Sasson, Dan Eaton re: SEC litigation involving George Palikaras, consulting payments, and asset valuation.

**10/22/2024**

- Conference call with Eric Browndorf and George Palikaras; discussion of potential voidable transfers and employment of Christian Attar pending funding disclosure.

**11/05/2024**

- Email from George Palikaras with history of Meta funding beginning in 2017.

**11/06/2024**

- Email exchange between Trustee Lovato and George Palikaras regarding data transfer and asset handling.

**08/14/2024 – 08/26/2024 (multiple entries)**

- Review of SEC v. Brda and Palikaras matters; indemnification agreements; litigation exposure.

**09/04/2024**

- Conference call with Trustee Lovato and George Palikaras re: Canadian payables allegedly owed to U.S. entity.

**09/18/2024**

5

- Conference call re: litigation against George Palikaras and Lambda Guard; injunction issues.

**10/01/2024**

- Email exchange with Trustee Lovato re: contacting Wes Christian and potential litigation impact.

**10/21/2024**

- Conference call with Trustee Lovato and George Palikaras re: asset valuation, records, investor issues, and litigation.

**10/31/2024**

- In-office meeting re: MMTLP background, Torchlight transaction, and investor issues involving Palikaras.

**12/03/2024**

- **First weekly call with litigation team**: Wes Christian, Will Rubley, Steve Tountas, Kent Robison, Clay Brust, Hannah Winston, **George Palikaras** and Eric Browndorf

**02/03/2025**

- Conference call with Trustee Lovato and George Palikaras re: inspection of assets and potential auction.

**04/06/2025**

- Lengthy e-mail from George Palikaras re: potential litigation involving NextBridge and McCabe and potential conflict issues.

**04/05/2025**

- Email from George Palikaras re: potential litigation involving NextBridge and McCabe and conflict issues.

**04/07/2025**

- Lengthy call with George Palikaras re NextBridge issue, KPMG Canada issue, potential McCabe litigation

**06/27/2025**

6

- Extensive email from George Palikaras detailing events leading to Series A Preferred shares and Torchlight merger.

**07/07/2025**

- Conference call with litigation team including George Palikaras regarding subpoena responses and data.

 Gmail

Danielle Spears <paymmtlpnow@gmail.com>

## Conference call

**Danielle Spears** <paymmtlpnow@gmail.com>
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>

Sat, Jan 3, 2026 at 11:02 AM

Hi Jeff,

Thank you again for meeting with us. I appreciate the time you took and the opportunity to speak directly.

I recognize that I provided a large volume of information, and I want to acknowledge your point that it can be difficult to be succinct. This matter has unfolded for me over more than three years, largely in real time, and it traces back even further. As a result, I carry a significant amount of detail, context, and chronology that is difficult to condense in a short discussion. I appreciate your patience, and I apologize if the presentation felt fragmented.

I do believe that if there were an opportunity to walk through the full timeline in a more structured setting, the overall picture—and the significance of certain omissions—would become much clearer. There is simply a substantial amount of ground to cover.

I want to clarify one point in particular. My concerns regarding Mr. Christian are not personal in nature. They are directly tied to MMTLP and to specific issues that, in my view, bear directly on potential asset recovery for the estate. When I raise these issues, my intent is not to assign personal fault, but to highlight material avenues that appear not to have been fully pursued or disclosed.

Specifically:

1. **The McCabe transaction** — There appears to be a "sweetheart" arrangement that may support a clawback of approximately $17 million or more.

2. **Broadridge shareholder data** — Subpoenaing this data would, as you know, immediately identify the full shareholder list, enable proper notice, allow for a new bar date, and confirm the extent to which both MMAT and MMTLP were oversold.

3. **Traudt–Fleming / TD Ameritrade (now Schwab) audio** — This recording includes a broker-dealer admission that MMTLP was trading at approximately 100x. Given that MMTLP traded as low as $2.90, that implies at least $290 per share; at higher prices exceeding $12, the implied exposure exceeds $1,200 per share.

While MMAT was undoubtedly manipulated, it is minor by comparison to MMTLP. The scale of MMTLP exposure is where the real recovery potential appears to lie.

From a bankruptcy perspective, if the estate were able to resolve even a portion of this exposure, whether framed as settlement of approximately 165 million shares or a much larger short position potentially exceeding 600 million shares, the financial implications would be extraordinary. At $300–$1,200 per share, the numbers speak for themselves.

In my view, this explains why broker-dealers, and particularly FINRA, have fought so aggressively to prevent this data from being examined. The use of "halted until deleted" effectively allowed short positions to avoid being covered, to the direct detriment of retail investors. If it were established that even a single security was oversold multiple times over and then administratively erased to conceal that fact, the regulatory consequences would be severe.

TradeStation has already publicly acknowledged that it does not possess sufficient shares to cover MMTLP. I also possess FOIA materials reflecting communications between the FIF (a broker consortium) and the SEC in which they expressly stated that they did not have the shares to cover MMTLP either. This is not speculative, it is documented.

This is precisely the data that has remained buried for more than three years.

I look forward to the upcoming conference call with Mr. Brust, as I believe it will provide an opportunity to articulate clearly why FINRA has opposed his efforts. In my assessment, once subpoenas sought MMTLP and Torchlight Energy Resources data, the META bankruptcy became an adversary to regulators and to every major broker-dealer involved in selling MMTLP.

Thank you again for your time and consideration. I appreciate your willingness to engage on these issues, and I look forward to continuing the discussion.

Respectfully,
Danielle

[Quoted text hidden]

EXHIBIT F1

EXHIBIT F1

**RECORD GAPS AND UNRESOLVED QUESTIONS REGARDING LITIGATION FUNDING**

---

## I. PURPOSE

This summary identifies information reflected in the record concerning litigation funding and highlights areas where the record does not permit determination of material terms.

## II. TIMING AND DEVELOPMENT OF DISCLOSURES

The record reflects that information concerning litigation funding was not presented in a single, comprehensive disclosure, but instead developed over time through multiple filings, including:

- Initial disclosure in connection with Special Counsel employment (Dkt. 98 and related exhibits);

- Subsequent filings referencing litigation funding in summary form;

- Later filings providing additional information regarding the structure of the funding arrangement (including Dkts. 2596, 2679–2684); and

- Submission of underlying agreements under seal.

The sequence of filings reflects that additional details regarding litigation funding were provided after initial disclosures, and following questions raised in the record and by the Court.

## III. NATURE OF DISCLOSURES PROVIDED

The record reflects that:

- Initial filings described litigation funding in general terms;

- Later filings identified a portfolio-based funding arrangement extending beyond this case;

- Subsequent filings indicated that underlying agreements contain additional terms not reflected in earlier summaries; and

- The complete agreements have been submitted under seal.

## IV. MATTERS NOT ASCERTAINABLE FROM THE RECORD

Based on publicly available filings, the following cannot be determined:

1. The complete economic terms governing repayment to the litigation funder;

2. The total amount of funding committed, advanced, and subject to repayment;

3. The relationship between funding in this case and funding across other litigations within the portfolio structure;

4. The allocation of litigation proceeds among:

    o   the funder,

    o   multiple law firms, and

    o   the estate;

5. The priority and sequencing of distributions among participating law firms;

6. Whether compensation structures differ between firms or are applied concurrently;

7. The extent to which funding terms may affect litigation strategy, claim selection, or settlement decisions; and

8. The full terms reviewed by the Trustee prior to representations made to the Court regarding the structure of the arrangements.

## V. EFFECT OF SEALED FILINGS

The record reflects that the underlying funding agreements have been filed under seal.

As a result, the Court and parties in interest do not have access to the full terms governing:

- repayment obligations;

- allocation of proceeds;

- relationships among participating entities; and

- any provisions bearing on control or financial interests.

## VI. SUMMARY

The record reflects the existence of litigation funding and subsequent expansion of disclosures over time.

However, the current record does not permit a complete understanding of the structure, operation, or economic effect of the funding arrangements.

This summary is provided solely to identify areas where clarification may be required for the Court's evaluation.

EXHIBIT F2    F2

1

**EXHIBIT F2**

**COMPARISON OF LITIGATION FUNDING AND CONTINGENT FEE STRUCTURES**

---

**I. PURPOSE**

This summary compares the structures reflected in the employment of:

- Christian Attar and Kasowitz Benson Torres LLP; and

- Schneider Wallace Cottrell Konecky LLP ("SWCK"),

**II. REPRESENTATION IN THE RECORD**

The Trustee represented that the SWCK engagement was:

"in all material respects" the same as that of Special Counsel.

**III. STRUCTURES REFLECTED IN PUBLIC FILINGS**

| Category | Special Counsel (Dkt. 98-2) | SWCK (Dkt. 1956-1) |
|---|---|---|
| Employment Basis | Contingency | Contingency |
| Funding Identified | Yes (~$11.8M) | Not separately identified |
| Funding Source | Parabellum / affiliate | Not independently disclosed |
| Distribution Structure | Multi-tiered | Similar multi-tiered structure |
| Participating Firms | Limited group | Expanded multi-firm structure |
| Portfolio Funding | Disclosed in later filings | Not separately addressed |

Underlying                Later filed under seal              Not independently disclosed

Agreements

## IV. MATTERS NOT DETERMINABLE FROM THE RECORD

The record does not permit determination of:

1.  Whether SWCK participates in the same funding agreement or a separate arrangement;

2.  Whether multiple firms share recoveries concurrently or sequentially;

3.  Whether distribution percentages are shared among firms or applied independently;

4.  Whether additional funding sources apply to SWCK;

5.  How funding obligations are allocated across multiple firms;

6.  Whether the same funding pool is used for multiple engagements; and

7.  Basis upon which the Trustee determined that the agreements are "materially the same."

## V. BASIS FOR "MATERIAL SIMILARITY"

The record does not reflect:

- what documents were reviewed by the Trustee in making the representation;

- whether complete funding agreements were available at the time; or

- what analysis was undertaken to determine material similarity.

## VI. SUMMARY

While the record reflects structural similarities in contingency arrangements, it does not contain sufficient information to determine whether the funding structures, economic terms, and allocation of recoveries are materially the same.

This summary is provided solely to assist the Court in evaluating whether additional disclosure is necessary.

EXHIBIT G

in Defendants' Motion for Sanctions (DE 829), to file a declaration under penalty of perjury concerning my role and involvement in this litigation "including but not limited to whether each counsel reviewed and approved pleadings, motions, applications, and briefs filed in the case." DE 867. The Order cites *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1153 (9th Cir. 2024) ("*Caputo*"). As I interpret the Court's Order, it is important for me to read and familiarize myself with that decision, and I have carefully done so.

5. I understand that the Court has set a deadline of September 5, 2025, at 12:00 p.m. for these submissions. I respectfully submit the following in compliance with the Order. In doing so and in light of *Caputo*, I respectfully invite the Court's attention to the fact that the proceedings there involved the appointment of a Special Master and a three-day evidentiary hearing, underscoring the judiciary's recognition of the need to safeguard privileged communications in similar circumstances and the unique circumstances of that case which necessitated sanctions against certain attorneys based on the facts of the case and each of their respective roles in the case. Consistent with that recognition, and although I have gone out of my way herein to avoid disclosures violative of applicable privileges and confidentiality obligations related to certain discovery, I wish to make clear that nothing stated herein is intended, nor should it be construed, as a waiver of any applicable privilege or protection or violation of any confidentiality obligations. This includes, without limitation, the attorney-client privilege, the attorney work product doctrine, and any other legal privilege. All such privileges and protections are expressly preserved notwithstanding my compliance with the Court's order.

### A. Role and Scope of Engagement

6. My role in representing Buck G. Woodall with respect to his copyrighted work, *Bucky*, mirrors the role I have played for the better part of two decades in other significant litigation across the United States. That role has two primary components. First, I personally finance, and when appropriate secure third-party financing, to litigate complex cases against powerful corporate or individual opponents. Second, my law firm provides litigation support to a team of trial lawyers serving as lead counsel and handling the day-to-day operations of these cases. In practice, this support often requires me to appear as one of many counsel of record, since effective assistance in document-heavy litigation—often involving millions of pages—cannot always be given without conducting selected depositions or performing other supportive tasks. In these cases, my firm has not assumed responsibility for drafting or filing pleadings and motions. Where multiple counsel are of record, I have reasonably relied on lead counsel to review, finalize, and file all such papers and to instruct me regarding important evidentiary developments in the matters. My appearances have been limited to attending selected proceedings to remain informed and to assist when lead counsel's schedules or emergent circumstances have created gaps.

7. The present case is a classic example of that litigation model, both in its complexity and in the magnitude of its challenges alongside my involvement. Over the past several years, my understanding of the facts and procedural posture came at all times from lead trial lawyers who kept me apprised of material developments. In what follows, I recount the circumstances as they were conveyed to me, and—given the importance of the Court's Order—I include citations to the record where appropriate to show that the information conveyed to me by lead counsel has at all times been corroborated by the record evidence and the docket before this Court.

8. For instance, Defendants' production of documents was delayed and contested from the outset and one of my first litigation roles was to assist in the initial motion to compel before this Court. Actually, Plaintiff twice moved to compel production, and on both occasions the Court ordered Defendants to produce *all* requested documents. (DE 147; DE 252 ("To the extent, if any, Defendants still have not completed their belated efforts to comply with the Minute Order, filed

Declaration of James Wesley Christian Compliant With Court Order, DE 867

← → C ⛓ nasdaq.com/press-release/meta-materials-announces-update-on-naked-short-selling-investigation-2024-05-20

𝑵 Nasdaq    Market Activity    Insights    Solutions    About

# Meta Materials Announces Update on Naked Short Selling Investigation

PUBLISHED
MAY 20, 2024 4:14PM EDT



**HALIFAX, NS / ACCESSWIRE / May 20, 2024** / Meta Materials Inc. (the "Company" or "META") (NASDAQ:MMAT), an advanced materials and nanotechnology company, today announced an update on the short selling investigation undertaken in June of 2023.

In an initial press release from late June 2023, META outlined its preliminary analysis of potential naked short selling, and retained well-known analytics firm, Shareholder Intelligence Services, LLC to review trading patterns of the Company's common stock. Based on this analysis, and with zero tolerance for illegal naked short selling and other stock manipulation, META employed the services of law firms, Christian Attar and Warshaw Burstein (collectively "Lawyers") to determine merit of such claims.

Since June 2023, the Lawyers have conducted an exhaustive investigation and undertaken in-depth due diligence. The Lawyers have now concluded that META has meritorious claims for market manipulation against several parties. "I believe META has an actionable case in connection with its MMAT/MMTLP claims. We look forward to working with the company," noted James "Wes" Christian, partner with Christian Attar.

Noted META Board Chairman, Jack Harding, "We needed all available data (unearthed by these esteemed securities law firms) at our disposal to delineate stock manipulation, and by which parties. We are now equipped with the necessary information to act and will be further sharing these findings with regulatory agencies. Simultaneously, we expect to file legal proceedings in the coming quarters against the responsible financial service firms." META looks forward to releasing additional press releases as more information becomes available.

EXHIBIT H

EXHIBIT I

the amounts and classification of liabilities that might result from the outcome of the uncertainties described above. These adjustments may be material.

## 4. Realignment and Consolidation Plan

As of March 31, 2024, as a result of the Realignment and Consolidation Plan approved by our board of directors on June 6, 2023, substantial progress has been made in restructuring our corporate structure to decrease operating expenses and concentrate on key areas with significant revenue potential, such as authentication, wide area motion imagery, battery materials, and transparent conductive films.

During the three months ended March 31, 2024, we recognized $0.3 million of restructuring expense in relation to the plan, which consisted of severance payments for actual terminations under the Realignment and Consolidation Plan. The total expenses incurred from the plan's inception through March 31, 2024 amounted to $4.1 million. We accrue costs in connection with ongoing restructuring actions. These accruals include estimates primarily related to employee headcount, local statutory benefits, and other employee termination costs. We calculate severance obligations based on standard practices or the contractual obligations if applicable. As of March 31, 2024, we recorded $1.0 million in provisions for severance payments and contract termination costs when probable and estimable since we committed to the Realignment and Consolidation Plan. These accruals have been reviewed on a quarterly basis and changes to restructuring actions are appropriately recognized when identified. We also have one-time benefit arrangements with certain employees, which have been recorded in accordance with ASC 420 where a one-time termination benefit is accrued when the terms of the benefit arrangement is communicated to the affected employees and may be spread over a future service period through the termination date.

Cash payments relating to restructuring costs in the three months ended March 31, 2024 were $0.4 million. The costs related to restructuring activities have been recorded in the restructuring expense in the condensed consolidated interim statement of operations and comprehensive loss.

## 5. Notes Receivable

During 2021 and 2022, META loaned money to Next Bridge Hydrocarbons Inc. ("Next Bridge"), which was previously a wholly-owned subsidiary of META until the completion of the spin-off transaction on December 14, 2022, pursuant to a secured promissory note with principal amount of $15.0 million, or the 2021 Note, and unsecured note receivable for principal amount of $5.0 million, or the 2022 Note. The 2021 Note was partially secured by a combination of shares of META's common stock and an interest in the Orogrande Project Property.

In August 2023, we entered into a Loan Sale Agreement with Gregory McCabe, selling all rights, titles, interests, and obligations in the loans previously extended to Next Bridge Hydrocarbons Inc ("Next Bridge Notes Receivable"). This sale was finalized for cash consideration of $6.0 million, representing $24.0 million outstanding balance of the Next Bridge Notes Receivable as of the closing date, August 7, 2023. Concurrently, META and Mr. McCabe agreed on a Stock Purchase Agreement ("SPA"), whereby Mr. McCabe committed to purchasing $6.0 million of shares of our common stock beginning on September 1, 2023, in monthly amounts of $250,000 for the first six months and in monthly amounts of $500,000 for the next nine months thereafter, at a price per share equal to 120% of the 5-day VWAP on the trading day preceding the date of each such purchase. Mr. McCabe purchased 18,517 shares of our common stock for $0.5 million during the year ended December 31, 2023.

On January 21, 2024, we entered into a Release Agreement with Mr. McCabe pursuant to which we and Mr. McCabe agreed to terminate the SPA. Under the terms of the Release Agreement, Mr. McCabe was relieved of any obligation to make additional stock purchases under the SPA. The terms of the Release Agreement require (i) a payment of $700,000 by Mr. McCabe to us, (ii) assignment to us of all stock purchases made by Mr. McCabe under the SPA and (iii) an additional payment of $700,000 by Mr. McCabe to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the 18,517 shares were reassigned to META, for which we recorded $0.1 million of treasury stock as of March 31, 2024.

## 6. Inventory

Inventory consists of photosensitive materials, lenses, laser protection film and finished eyewear, and is comprised of the following:

|  | As of March 31, 2024 | | As of December 31, 2023 |
| --- | --- | --- | --- |
| Raw materials | $ | 512,897 | $ | 558,837 |
| Supplies | | 10,693 | | 10,747 |
| Work in process | | 36,999 | | 45,912 |

**NEXT BRIDGE HYDROCARBONS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2024**
**(Unaudited)**

## 1. NATURE OF BUSINESS

Next Bridge Hydrocarbons, Inc. (the "Company") was incorporated in Nevada on August 31, 2021, as OilCo Holdings, Inc. and changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022. The Company spun off from Meta Materials, Inc. ("Meta") on December 14, 2022, resulting in the Company becoming an independent company (the "Spin-Off"). Prior to the Spin-Off, the Company was a wholly-owned subsidiary of Meta. Meta became the parent of the Company's subsidiaries in June 2021 in a merger transaction with Torchlight Energy Resources, Inc. ("Torchlight"), the previous parent of the subsidiaries and developer of the properties from their inception up to June 2021.

The Company is an energy company engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties in the United States. The Company's primary focus has been the development of interests in an oil and natural gas project the Company holds in the Orogrande Basin in West Texas in Hudspeth County, Texas (the "Orogrande Project"). In addition, the Company has minor interests in the Eastern edge of the Midland Basin in Texas (the "Hazel Project"), and two minor well interests in the Hunton wells located in Oklahoma (the "Oklahoma Properties"). The Company currently has no full-time employees, and the Company employs consultants for various roles as needed.

The Company operates its business through nine wholly owned subsidiaries Torchlight Energy, Inc., a Nevada corporation ("TEI"), Hudspeth Oil Corporation, a Texas corporation ("Hudspeth"), Torchlight Hazel, L.L.C., a Texas limited liability company ("Torchlight Hazel"), Wolfbone Investments, LLC, a Texas limited liability company ("Wolfbone"), Hudspeth Operating, LLC, a Texas limited liability company and wholly owned subsidiary of Hudspeth ("Hudspeth Operating"), Wildcat Panther, LLC, a Texas limited liability company ("Panther"), Wildcat Valentine, LLC, a Texas limited liability company ("Valentine"), Wildcat Cowboy, LLC, a Texas limited liability company ("Cowboy"), Wildcat Packer, LLC, a Texas limited liability company ("Packer"). All intercompany transactions have been eliminated in the consolidated financial statements.

## 2. GOING CONCERN

At September 30, 2024, the Company had not yet achieved profitable operations. The Company had a net loss of $1,417,903 for the nine months ended September 30, 2024. The Company expects to incur further losses in the development of its business. The Company had a working capital deficit as of September 30, 2024, of $50,038,916. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company's ability to continue as a going concern is dependent on its ability to generate future profitable operations or to obtain the necessary financing to meet its obligations and repay its liabilities arising from normal business operations when they come due. Management's plan to address the Company's ability to continue as a going concern includes: (1) obtaining debt or equity funding from private placement, institutional, or public sources, (2) obtaining loans from financial institutions, where possible, or (3) participating in joint venture transactions with third parties. Although management believes that it will be able to obtain the necessary funding to allow the Company to remain a going concern through the methods discussed above, there can be no assurances that such methods will prove successful.

These consolidated financial statements have been prepared assuming that the Company will continue as a going concern and therefore, the financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amount and classifications of liabilities that may result from the outcome of this uncertainty.

## 3. SIGNIFICANT ACCOUNTING POLICIES

The Company maintains its accounts on the accrual method of accounting in accordance with accounting principles generally accepted in the United States of America. Accounting principles followed and the methods of applying those principles, which materially affect the determination of financial position, results of operations and cash flows are summarized below:

*Use of estimates* – The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and certain assumptions that affect the amounts reported in these consolidated financial statements and accompanying notes. Actual results could differ from these estimates.

12

EXHIBIT J

## EXHIBIT K - REQUESTED DISCLOSURES

The following requests are narrowly tailored to obtain information necessary to permit the Court to evaluate the issues identified in the Motion, including disinterestedness, compliance with Federal Rule of Bankruptcy Procedure 2014, litigation funding, the scope and completeness of the investigation of potential estate claims, and the adequacy of notice. These requests are not intended to impose undue burden or to duplicate discovery beyond what is reasonably necessary for the Court's evaluation of these matters, but rather to ensure that the record contains sufficient information to permit informed judicial oversight.

All requests include, where applicable, identification of whether such matters were evaluated, investigated, or verified, and the production of documents reflecting such evaluation.

### 1. Disinterestedness and Rule 2014 Disclosures

Direct Special Counsel, James "Wes" Christian, to provide information sufficient to supplement the record, consistent with 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014, to permit the Court to evaluate disinterestedness, including:

(a) The current and prior scope of representation of META Materials, Inc., Next Bridge Hydrocarbons, Inc., Torchlight Energy Resources, Inc., Flamethrower, LLC, and any related entities connected to securities issued or derived from those entities, including preferred equity or derivative securities such as MMTLP, together with the scope of representation of their respective principals and the nature of any litigation, investigation, or related matters;

**(b)** The dates on which Special Counsel was retained by, withdrew from, or was terminated from, and thereafter resumed or was re-engaged in representation of any entity or principal identified in subsection (a), including any engagement agreements, termination or withdrawal records, re-engagement documentation, and any confidentiality or non-disclosure agreements reflecting or governing such representations, and whether any such representations occurred concurrently with his employment in this case;

**(c)** The identity of all members, owners, beneficial owners, and persons or entities exercising direct or indirect control over any entity identified in subsection (a), together with information sufficient to identify their relationships, if any, to Special Counsel, litigation funding entities, or parties connected to the estate;

**(d)** Whether all disclosures required in connection with Special Counsel's employment, including those made in verified filings in this case or incorporated by reference, were complete and accurate when made, and whether such disclosures were supplemented as required in light of subsequent developments reflected in the record;

**(e)** The existence and nature of any relationships between Special Counsel and any litigation funding entities or their principals, including any relationships arising from prior representations, funding arrangements, or other professional or financial dealings, and whether Special Counsel, directly or through any affiliated entity, has provided, arranged, or participated in providing litigation funding in any matter involving the entities, principals, or securities identified in subsection (a);

**(f)** Whether any relationships, representations, activities, or other information relevant to disinterestedness existed but were not disclosed in connection with Special Counsel's

employment, and if so, whether such information was identified, evaluated, or considered in any conflict-of-interest or disinterestedness analysis.

2. **Direct** Trustee Lovato and her counsel, Jeffrey L. Hartman, to provide information sufficient to permit the Court to evaluate whether they fulfilled their obligations under 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014 in evaluating, approving, and continuing the employment of Special Counsel, including:

(a) The disclosures, information, and materials they required from Special Counsel, James "Wes" Christian, in connection with his application for employment and continued service, including disclosures relating to prior or current representations, relationships, financial interests, litigation activities, or other matters bearing on disinterestedness or potential conflicts of interest;

(b) The disclosures, information, and materials provided by Special Counsel in response to the requirements identified in subsection (a), including:

   i. the dates on which such disclosures were provided; and

   ii. any additional or supplemental disclosures, information, or materials requested or required by the Trustee or her counsel following receipt of objections, whistleblower submissions, or other information raising issues relating to disinterestedness or conflicts of interest;

together with:

(i) the nature of any such objections, submissions, or information considered;

(ii) the steps taken by the Trustee or her counsel to review, evaluate, or investigate such matters;

(iii) any additional disclosures, information, or materials requested from Special Counsel, including the dates of such requests and the dates and content of any responses; and

4

(iv) whether Special Counsel provided all requested or required disclosures, information, or materials in response to such requests;

(c) Whether any independent review, investigation, or verification was undertaken by the Trustee or her counsel in response to objections, whistleblower submissions, or other materials placed on the record raising issues relating to Special Counsel's disclosures, disinterestedness, or potential conflicts of interest, and if so:

(i) the issues or matters evaluated, including any relationships, funding activities, prior proceedings, or other disclosures bearing on disinterestedness;

(ii) the identity of the person or persons who conducted or directed such review;

(iii) any additional or supplemental disclosures, information, or materials requested from Special Counsel as a result of such review, including the dates of such requests;

(iv) the dates and content of any responses provided by Special Counsel;

(v) whether Special Counsel provided all requested or required disclosures, information, or materials in response to such requests; and

(vi) the results or conclusions of any such review, investigation, or verification.

(d) Whether the Trustee was aware, at the time of Special Counsel's retention, that any litigation funding arrangement:

(i) pre-dated the commencement of this case;

(ii) extended back to 2019;

(iii) operated across multiple matters or litigations; or

(iv) involved multiple law firms or a portfolio-based funding structure;

and, if not, the date on which such information was first disclosed to the Trustee;

5

**(e)** Whether the Trustee independently verified, investigated, or evaluated any disclosures made by Special Counsel relating to litigation funding, including:

**(i)** the existence, scope, and structure of any funding arrangement;

**(ii)** the relationship between Special Counsel and any litigation funding entity; and

**(iii)** whether such arrangements affected litigation strategy, control, or allocation of recoveries;

**(f)** Whether any discrepancies, omissions, or delayed disclosures were identified by the Trustee in connection with Special Counsel's disclosures, including whether any material information relating to litigation funding or prior investigative activity was not disclosed at the time of retention;

**(g)** Whether the Trustee undertook any independent review, investigation, or verification in response to:

**(i)** objections filed on the record;

**(ii)** filings raising issues relating to litigation funding or conflicts; or

**(iii)** inquiries by the Court regarding such matters;

and if so:

**(i)** the issues evaluated;

**(ii)** the identity of the person or persons conducting such review;

**(iii)** the materials considered; and

**(iv)** the conclusions reached;

**(h)** The identification of all communications between the Trustee, her counsel, and Special Counsel relating to litigation funding, including:

**(i)** the timing of such communications relative to filings raising litigation funding issues;

**(ii)** whether such communications occurred prior to or after Court inquiry; and

**(iii)** whether any such communications resulted in additional disclosures or revisions to prior representations;

**(i)** Whether the Trustee evaluated whether litigation funding arrangements or related disclosures were complete and accurate prior to filing pleadings or representations with the Court, and whether any subsequent disclosures were required to correct or supplement prior filings;

**(j)** Whether the Trustee evaluated whether Special Counsel's recommendations regarding:

**(i)** claim selection;

**(ii)** prioritization of litigation;

**(iii)** pursuit or non-pursuit of potential estate claims; or

**(iv)** the need for litigation funding

were based on complete and independently verified information, and the basis for any such evaluation;

**(k)** The production of all documents, communications, analyses, notes, or other records reflecting:

**(i)** disclosures received from Special Counsel;

**(ii)** requests for additional information;

**(iii)** internal evaluation of such disclosures; and

**(iv)** any conclusions reached by the Trustee or her counsel regarding disinterestedness, litigation funding, or conflicts of interest.

(l) Whether Special Counsel James "Wes" Christian participated in, advised on, or was consulted regarding any decision to withhold or decline production of documents requested by parties in interest, including but not limited to materials described as a "summary contact list" relating to Torchlight Energy Resources, Inc. assets, together with the production of all communications reflecting such involvement.

## 3. Litigation Funding Disclosure

The following requests are limited to information necessary to clarify disclosures and representations already reflected in the record and are not intended to expand beyond the scope of issues raised in the Motion.

**Direct** the Trustee to provide information and documents sufficient to permit the Court to evaluate the structure, control, and effect of any litigation funding arrangements on estate administration, including the following:

(a) The identity of any person or entity employed by or acting on behalf of the estate, including the Trustee, her counsel, or any retained professional, who identified, sourced, negotiated, or entered into any litigation funding arrangement on behalf of the estate;

(b) The identity of all persons or entities that have provided, committed to provide, arranged, or otherwise supplied litigation funding in connection with any litigation, investigation, or other activity undertaken on behalf of the estate or involving the entities, principals, or securities identified in Item 1(a), together with the identity of the party, law firm, or litigation effort for which such funding was provided;

**(c)** The extent to which any litigation funding arrangement affects or influences litigation strategy, settlement decisions, selection of claims, or allocation of recoveries, including whether any party other than the Trustee has the ability to influence, approve, or restrict such decisions;

**(d)** Whether the Trustee has evaluated such litigation funding arrangements for consistency with her duties under 11 U.S.C. §§ 323 and 704, including whether such arrangements affect the Trustee's independent judgment in administering the estate and pursuing potential claims;

**(e)** Whether any litigation funding arrangement applicable to this case forms part of a broader portfolio or multi-case funding agreement, including agreements entered into prior to the commencement of this case, and the identity of all matters or litigations included within such portfolio;

**(f)** The extent to which recoveries, proceeds, or obligations arising from this case are combined with, offset against, or otherwise affected by recoveries or obligations arising from other litigations subject to any such funding arrangement;

**(g)** Whether multiple litigation funding arrangements are in effect involving different law firms or litigation efforts, and if so, whether such arrangements operate concurrently or sequentially, and how recoveries are allocated among them;

**(h)** The priority, sequence, or methodology by which litigation funding entities are repaid from any recoveries, including whether any funder is entitled to repayment prior to distributions to the estate, creditors, or other parties;

**(i)** Whether Special Counsel or any affiliated entity has any direct or indirect financial interest in any recovery, distribution, or funding-related return arising from any litigation funding arrangement, including any interests arising from portfolio agreements or cross-case funding structures;

**(j)** The complete distribution structure governing litigation proceeds, including all stages or tiers of allocation of recoveries among litigation funding entities, attorneys, and the estate, and the percentage or portion of recoveries allocated at each stage;

**(k)** Whether any funding, costs, or expenses associated with this case have been derived from, allocated from, or otherwise connected to any other litigation or matter, including the identity of such matters and the amounts involved;

**(l)** Whether any litigation funding arrangement or related agreement grants any security interest, assignment, or other ownership interest in litigation proceeds or claims to any litigation funding entity or affiliated party;

**(m)** Whether any litigation funding arrangement permits the receipt, allocation, or distribution of non-cash consideration, including equity, stock, or other assets, and the manner in which such consideration is valued and distributed;

**(n)** The extent to which multiple law firms or litigation teams participating in this case operate under coordinated, shared, or portfolio-based funding arrangements, including any agreements—whether entered into by the estate or by law firms or third parties—that govern allocation of proceeds, responsibilities, or decision-making authority affecting estate claims or recoveries;

**(o)** The legal basis upon which any litigation funding arrangement has been approved or ratified, including whether such arrangement was evaluated or approved pursuant to 11 U.S.C. § 364, § 363, or any other provision of the Bankruptcy Code, and any court orders relating to such approval, and whether the Trustee evaluated the applicability of financing requirements governing post-petition funding;

**(p)** The existence of any provisions in any litigation funding agreement or related contract that designate a forum, jurisdiction, or venue outside of this Court for resolution of disputes arising from such agreements, and whether the Trustee evaluated the effect of any such provisions on this Court's jurisdiction over estate property, claims, or recoveries;

**(q)** Whether any litigation funding arrangement, portfolio agreement, or related structure involves the pooling, holding, or centralized administration of litigation proceeds or receivables across multiple matters, and the identity of any person or entity exercising control over such structure, together with the extent to which such structure affects the Trustee's control over estate claims and recoveries;

**(r)** The nature, source, and treatment of any funds, credits, or allocations derived from other matters or litigations and applied to this case, including any amounts described as allocated from another case or "deemed spent," the basis for such allocation, the identity of the matter from which such amounts were derived, and the extent to which such amounts affect funding commitments, repayment obligations, or distributions of litigation proceeds in this case;

**(s)** Whether any such allocated or "deemed spent" amounts were reviewed, approved, or authorized by the Trustee or the Court, and whether such amounts were treated as expenses, funding contributions, or otherwise in the administration of the estate;

**(t)** The production of all written agreements, orders, consents, or other documentary evidence authorizing the use, transfer, allocation, or application of any funds, credits, or value derived from another litigation or matter to this case, including any amounts described as allocated or "deemed spent," together with identification of the court, client, or entity granting such authorization;

**(u)** The production of all documents reflecting the Trustee's review, approval, or verification of such authorization, including any communications, analyses, or records demonstrating that the Trustee confirmed compliance with applicable legal, ethical, or court-ordered requirements governing the use of such funds;

**(v)** The identification of the location, custody, and status of any funds, credits, or value described as allocated or "deemed spent," including the identity of any account or account holder, whether such amounts were actually transferred, remain held in any trust, escrow, or other account, were previously expended, or are reflected solely as accounting allocations within any funding arrangement;

**(w)** The manner in which any such funds, credits, or allocations are treated for purposes of calculating funding commitments, repayment obligations, or distributions of litigation proceeds, including whether such amounts reduce or affect the portion of recoveries payable to the estate;

**(x)** The identity of all members, owners, beneficial owners, and persons or entities exercising direct or indirect control over any litigation funding entity involved in this case, including Project Blazer LLC and any affiliated entities, together with disclosure of any relationship between such persons or entities and Special Counsel.

## 4. Record of Investigation and Data Considered

**Direct** the Trustee to provide information sufficient to permit the Court to determine whether the record reflects a complete and independent investigation of potential estate claims, including:

(a) The categories of data requested, obtained, or reviewed in connection with investigation of market activity, including the identity of the source of such data, the dates on which such data was requested or obtained, and the nature and scope of the data received;

12

(b) Whether broker-dealer, transfer agent, regulatory, or third-party data was sought, obtained, or analyzed, including the identity of any entities from whom such data was requested, the dates of such requests, and the results of such efforts;

(c) Whether any data, analyses, or investigative materials obtained prior to the commencement of this case, including materials developed in connection with prior representations, third-party funding arrangements, or prepetition investigations, were provided to the Trustee or relied upon in the investigation conducted in this case, and the identity of the source of such materials;

(d) Whether Special Counsel provided all data, records, analyses, or investigative materials in his possession relating to MMAT, MMTLP, Torchlight Energy Resources, Inc., and/or Next Bridge Hydrocarbons, Inc., including materials obtained prior to his employment in this case, and whether such materials were provided in complete and unredacted form, together with the dates and manner in which such materials were provided to the Trustee;

(e) The process by which decisions were made regarding the scope of investigation and the selection of entities from whom data was sought, including the identity of the person or persons who made or directed such decisions, and whether such decisions were made by the Trustee, Special Counsel, or other members of the litigation team;

(f) Whether any limitations were placed on the scope of investigation, including limitations on the number or identity of broker-dealers or other entities from whom data was sought, the number of subpoenas issued, and the basis for any such limitations;

(g) Whether any categories of data, records, or information relevant to potential estate claims were identified but not requested, obtained, or analyzed, and the basis for any such determination;

(h) Whether the Trustee or Special Counsel were aware of any specific sources of information relating to potential market activity, including broker-dealer communications, recorded calls, or publicly reported admissions identified by parties in interest, and whether such sources were pursued, requested, or analyzed, and if not, the identity of the person or persons who made the decision not to pursue such sources and the basis for that decision;

(i) Whether determinations regarding potential claims were made on the basis of complete and available information, including identification of any limitations, gaps, or unavailable data that affected such determinations;

(j) Whether any inconsistencies exist between representations made in the record regarding the availability or use of data, including statements concerning whether such data could be obtained or analyzed, and the data identified in subsections (a) through (i), and the basis for any such inconsistencies;

(k) Whether the Trustee possesses, has possessed, has had access to, or was informed of the existence of any document or compilation identifying prospective purchasers or entities contacted regarding Torchlight Energy Resources, Inc. and its reverse merger with Meta Materials, Inc., including any "summary contact list" or "list of oil and gas companies to contact for sale of oil and gas assets" as described in communications from Georgios Palikaras, and if so, the production of such documents, together with:

(i) the date such material was received;

(ii) the source from whom it was obtained;

(iii) whether it was reviewed, analyzed, or relied upon in connection with the estate's investigation; and

14

## 5. Preservation of Potentially Relevant Evidence

**Direct** the Trustee to provide information sufficient to permit the Court to determine whether reasonable steps have been taken to preserve records relevant to shareholder identification, trading activity, and potential estate claims, including:

(a) Whether any preservation instructions, litigation hold notices, or other directives were issued to broker-dealers, transfer agents, data providers, regulatory entities, or other custodians of potentially relevant records, including the identity of the recipients, the dates on which such instructions were issued, and the scope of records covered;

(b) Whether any steps were taken to preserve records subject to regulatory or internal retention limits, including communications, trading data, or account records held by broker-dealers or other market participants, and the timing of any such preservation efforts relative to known retention periods;

(c) Whether any records relevant to shareholder identification, trading activity, or potential estate claims were not preserved, are no longer available, or may have been lost due to the passage of time or the absence of preservation measures, and the circumstances relating thereto, including whether any such loss was identified or evaluated during the course of the investigation;

(d) Whether the Trustee evaluated the need for preservation of records relating to prepetition investigations, third-party data sources, or materials previously obtained by Special Counsel, and if so, the steps taken in response to such evaluation;

## 6. Access to Estate Information and Participation in Litigation Team

Direct the Trustee to provide information sufficient to permit the Court to evaluate the basis for granting access to estate information and participation in the litigation team to individuals connected to the underlying transactions, including:

15

(a) The basis upon which Georgios Palikaras was included in or permitted to participate in the "litigation team," including the scope of his role, responsibilities, and any functions performed in connection with the estate's investigation or litigation;

(b) Whether any agreements, including non-disclosure agreements or confidentiality agreements, were executed in connection with such participation, and the terms, scope, and limitations of any such agreements;

(c) The nature and scope of any access provided to estate documents, data, or materials, including the categories of information made available, the extent of such access, and whether such access included estate-controlled or postpetition materials;

(d) Whether any restrictions, limitations, or safeguards were imposed on such access, including limitations on the use, disclosure, or sharing of information, and whether any restrictions were imposed regarding communications with third parties, including individuals connected to the underlying transactions;

(e) Whether such access or participation was reviewed, approved, or authorized by the Trustee or the Court, and the basis for any such determination, including whether any such authorization was documented;

(f) Whether any investigation, analysis, or evaluation was conducted by the Trustee or her counsel regarding potential conflicts of interest, confidentiality concerns, or the appropriateness of granting such access to an individual connected to the underlying transactions, and the conclusions of any such evaluation;

(g) Whether the Trustee or her counsel considered any pending or prior litigation, regulatory proceedings, or involvement in the underlying transactions in evaluating whether such access or participation was appropriate;

(h) The identity of the person or persons who authorized such access or participation, the timing of such authorization, and the basis for that decision.

These requests are directed solely to information necessary to complete the record before the Court and are not intended to seek merits determinations.

1

**EXHIBIT LIST**

**MOTION FOR CLARIFICATION FOR MAY 7, 2026 HEARING**

**Exhibit A** Initial request for list of 50 oil companies (Traudt Email to Hartman)

**Exhibit B** Hartman Email to Traudt refusing to provide list of 50 oil companies

**Exhibit B1** Traudt Email to Hartman raising question whether Special Counsel participated in decision to withhold list of 50 oil companies

**Exhibit C** Direct message from Palikaras description of list of 50 prospective purchasers of oil and gas assets

**Exhibit D** Selected fee application excerpts reflecting references to Spears, Traudt, McCabe, NBH, Christian, and Palikaras

**Exhibit E** Email from Spears to Hartman dated January 3, 2026 summarizing issues discussed during a conference call held on December 31, 2025 between Traudt, Spears & Hartman (Trustee Lovato did not attend).

**Exhibit F (F1-F2)** Funding analysis (litigation funding record gaps and unresolved questions regarding litigation and a comparison of the Christian Attar (Project Blazer funding) vs Schneider Wallace Cottrell Konecky litigation funding described by the Trustee as "materially the same."

**Exhibit G** DKT. 868 pp.3-4 Excerpt Christian Declaration in Disney Case

**Exhibit H** Meta Material Press Release - Christian statement on litigation May 20, 2024

2

**Exhibit I** NBH Loan of $24M purchased by Greg McCabe for $6.7M approximately one year prepetition.

**Exhibit J** NBH SEC filing showing they have no employees and operate only through executive and consultants.

### PRAYER FOR RELIEF REQUESTED DISCLOSURES

**Exhibit K -** Requested disclosures