RECEIVED
AND FILED

APR 29 2026

U.S. BANKRUPTCY COURT
DANIEL S OWENS, CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>META MATERIALS INC.,<br><br>Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**SCOTT TRAUDT'S REPLY IN SUPPORT OF HIS RULE 2004 MOTIONS AND OPPOSITION TO THE TRUSTEE'S OMNIBUS OPPOSITION TO RULE 2004 MOTIONS AND NOTICES** |

Scott Traudt ("Movant" or "Traudt"), appearing pro se, submits this reply in support of his Rule 2004 motions and in opposition to the Chapter 7 Trustee's Omnibus Opposition to Scott Traudt's Rule 2004 Motions and Notices, ECF No. 2723 (the "Opposition"). The Opposition seeks denial of Movant's Rule 2004 motions directed to Sabby Management, LLC, ECF No. 2637; Jane Street Group, LLC, ECF No. 2638; FINRA, Inc., ECF No. 2639; Charles Schwab & Co., Inc., ECF No. 2661; Gregory McCabe, ECF No. 2674; and Trustee Christina Lovato, ECF No. 2675.

Pursuant to Local Rule 9014.2, Movant does not consent to the entry of final orders or judgment by the Bankruptcy Court to the extent it is determined that, absent consent, the Bankruptcy Court cannot enter final orders or judgment consistent with Article III of the United States Constitution. Movant reserves all appellate rights and all objections to constitutional authority, jurisdiction, finality, and standard of review.

**I. INTRODUCTION**

The Trustee's Opposition rests on a contradiction this Court has already exposed. On April 20, 2026, the Court authorized the Trustee to receive subpoenaed records concerning MMTLP trading from FINRA. That ruling necessarily recognizes that MMTLP trading records are relevant to estate claims, estate value, or estate administration. *The Trustee therefore cannot*

1

*tell this Court that MMTLP is estate-relevant when the Trustee seeks trading data from third parties, but estate-irrelevant when an MMTLP holder seeks targeted Rule 2004 discovery.* Either MMTLP trading records matter to this estate or they do not.

The Trustee cannot use MMTLP holder losses, trading records, or share-count data as estate leverage while simultaneously arguing that MMTLP holders have no pecuniary interest and no standing to seek court-supervised discovery. Either MMTLP trading and settlement evidence is irrelevant to the estate, in which case the Trustee has no reason to pursue or use it, or it is relevant to estate claims and estate value, in which case Traudt's Rule 2004 motions are proper.

The Trustee's own declarant confirms why. Georgios Palikaras admits that "MMTLP represented Meta's unlisted Series A Preferred Shares," that MMTLP began trading on the OTC market "without the authorization or request of the Company," and that FINRA assigned the ticker symbol to those Series A Shares. ECF No. 2724, p. 2, ¶ 6. Once the Trustee and Court recognize MMTLP trading records as estate-relevant, Movant cannot be treated as a stranger for seeking discovery into the same security, the same trading, the same U3 halt, the same NBH exchange, and the same estate-value questions. That admission alone establishes that the requested discovery concerns a Meta-created security, Meta's legacy oil-and-gas assets, FINRA's treatment of that security, the U3 halt, market trading, insider transactions, and potential estate claims. Rule 2004 exists to investigate precisely those matters.

The Trustee's no-standing argument also depends on treating MMTLP as cleanly severed from Meta through the NBH spin-off. The record already shows why that cannot be accepted without discovery. The SEC's February 14, 2025 comment letter to Gregory McCabe questioned how Next Bridge could rely on a $79,695,928 valuation as of December 14, 2022 while reporting

2

zero value two weeks later, and further questioned reliance on proved oil-and-gas reserves that did not exist. ECF No. 2674, pp. 54-55. Meta's own filings also show substantial Next Bridge note transactions and McCabe's later purchase of Meta's note rights while Meta was under severe financial distress. *If the asset value supposedly separating MMTLP from Meta was unsupported, illusory, or known to insiders to be impaired, then MMTLP was not economically divorced from Meta.* At minimum, Movant has shown good cause and party-in-interest standing to conduct narrowly staged Rule 2004 discovery before the Trustee asks this Court to deny MMTLP holders a voice in the estate.

## II. THE TRUSTEE'S OWN DECLARATION ESTABLISHES THAT MMTLP WAS A META SECURITY

The Trustee says Movant lacks standing because he held MMTLP, which was later cancelled and exchanged into NBH. ECF No. 2723, pp. 1-2, 5. But Palikaras states that MMTLP was Meta's unlisted Series A Preferred; that the Series A Preferred's economic entitlement depended on Meta's sale or disposition of legacy oil-and-gas assets; that MMTLP began trading without Meta's authorization or request; that FINRA assigned the MMTLP ticker; and that Meta's board approved distribution of Next Bridge, the wholly owned subsidiary that held those legacy assets. ECF No. 2724, p. 2, ¶¶ 5-8.

Those facts do not make Movant an outsider. They make Movant a former holder of a Meta-created equity instrument whose value, cancellation, and replacement are inseparable from Meta's merger, Meta's assets, Meta's board action, Meta's former CEO, and Meta's later financing and note transactions.

## III. THE $79.7 MILLION-TO-ZERO COLLAPSE AND MCCABE NOTE TRANSACTIONS ESTABLISH GOOD CAUSE

3

The Trustee's ring-fence theory assumes the NBH exchange gave MMTLP holders a genuine separate substitute value. The SEC record and the court-filed McCabe materials raise the opposite inference. In the McCabe motion, Movant attached the SEC's February 14, 2025 comment letter to McCabe concerning Next Bridge's 2023 Form 10-K. The SEC questioned how Next Bridge could rely on "a valuation of $79,695,928 as of December 14, 2022 and a valuation of zero two weeks later on December 31, 2022." ECF No. 2674, p. 54. The same letter stated that fair value under FASB ASC 845-10-30-10 must be objectively measurable and clearly realizable in an outright sale at or near the time of distribution. Id. On the next page, the SEC stated that the valuation report on which Next Bridge wished to rely "placed substantial value on proved oil and gas reserves that did not exist on the underlying properties." ECF No. 2674, p. 55. That issue goes directly to standing, good cause, and estate value. If the assets backing the MMTLP-to-NBH exchange were valued at roughly $79.7 million on the distribution date and zero two weeks later, and if the valuation placed substantial value on proved reserves that did not exist, then the Court should not accept the Trustee's separateness theory without discovery. A disputed transaction cannot become a discovery shield merely because the Trustee prefers the corporate label attached to it.

These concerns are further reinforced by the parallel class actions *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203-CBA-JRC (E.D.N.Y.), and *Denton et al. v. Palikaras* et al., No. A-23-878134-C (Eighth Judicial District Court, Clark County, Nevada). Those actions asserted securities-fraud and fiduciary-duty claims arising from the same Torchlight merger, asset representations, and insider conduct that produced Meta's unlisted Series A Preferred (MMTLP) and the later NBH spin-off. The parties in 2024 settled both cases on a in class-wide basis for a combined $3 million cash (primarily insurer-funded) after

4

mediation, with no admission of liability. The settlements confirm that the underlying facts and transactions merit targeted Rule 2004 investigation for potential estate claims concerning reasonably equivalent value, insider benefits, and avoidable transfers.

The SEC's civil complaint (*SEC v. Brda and Palikaras*, 4:24-cv-01048-SDJ; also *In re Meta Materials, Inc. (f/k/a Torchlight Energy Resources, Inc.)*, Securities Act Release No. 11292, Exchange Act Release No. 100415, Administrative Proceeding File No. 3-21976, Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order (SEC June 25, 2024)) (**Exhibit B-1** and **B-2)** further alleges that Torchlight's primary remaining oil-and-gas asset, the Orogrande Project, was undeveloped, had no proven oil-and-gas reserves, and was far removed from existing proven geologic formations. SEC Complaint, ¶ 20. The SEC alleges that on May 13, 2021, Palikaras told selected investors that Torchlight was speaking to "the right potential buyers" and that those buyers were "top tier," while in fact Torchlight had not identified potential buyers and Palikaras admitted in sworn testimony that he had no knowledge of potential buyers or active negotiations. SEC Complaint, ¶ 83. The SEC also alleges that Palikaras had reviewed an investment-bank valuation implying less than $1.00 per preferred share, yet represented that the Preferred Dividend could be worth $1 to $20 per share. SEC Complaint, ¶¶ 84-85. After the merger, Meta II's Vice President of Business Development allegedly told Palikaras and other Meta II leadership that "[t]he dividend was never going to be worth more than $1" and that "[t]he math was not difficult prior to the merger." SEC Complaint, ¶ 87.

Meta's own Q1 2024 Form 10-Q, Note 5, then becomes highly significant. (**Exhibit C)** Meta disclosed that during 2021 and 2022 it loaned money to Next Bridge, which was still a wholly owned Meta subsidiary until the December 14, 2022 spin-off. Those loans consisted of a

5

$15.0 million secured promissory note and a $5.0 million unsecured note receivable. The secured note was partially secured by a combination of Meta common stock and an interest in the Orogrande Project Property. Meta Q1 2024 Form 10-Q, Note 5. In August 2023, Meta sold all rights, titles, interests, and obligations in the Next Bridge Notes Receivable to McCabe for $6.0 million cash consideration against a $24.0 million outstanding balance as of August 7, 2023. Id.

The official record already filed in this case confirms the same transaction. In ECF No. 2674, Movant identified that McCabe purchased from Meta the 2021 Note and certain loans made by Meta to Next Bridge, replaced Meta as lender and secured party under the loan documents, and received Meta's lien on 25% of the Orogrande Prospect. ECF No. 2674, p. 3, ¶ 13. The Next Bridge announcement attached to that motion states that McCabe purchased the 8% Secured Promissory Note dated September 30, 2021, certain loans made under the September 2, 2022 Loan Agreement, and Meta's lien on 25% of the Orogrande Prospect. ECF No. 2674, p. 29.

This is not a side issue. *After the SEC says Palikaras already knew or was severely reckless in not knowing that there were no identified buyers, no active negotiations, and no support for the $1-$20 narrative, Meta loaned approximately $20 million to Next Bridge and later sold the resulting $24.0 million note position to McCabe for a fraction of face value while the asset value was under serious regulatory question.* The estate may have claims concerning reasonably equivalent value, insider or insider-adjacent benefit, collateral transfers, avoidable transfers, fiduciary breaches, and whether the Trustee has adequately investigated the transaction. Rule 2004 is the correct tool to examine those questions before estate claims are lost.

## IV. META'S FINANCIAL DISTRESS MAKES THE MCCABE TRANSACTIONS ESTATE-CRITICAL

Meta's financial condition makes the McCabe transactions even more important. Meta's Q1 2024 Form 10-Q disclosed a $7.5 million net loss for the quarter ended March 31, 2024, a

6

$616.5 million accumulated deficit (page 10 of Meta Q1 2024 Form 10-Q), a $7.9 million working-capital deficit, negative operating cash flow, inability to raise sufficient equity financing because the company lacked enough authorized and unreserved common stock, an 80% workforce reduction approved on May 2, 2024, and substantial doubt about Meta's ability to continue as a going concern. Meta Q1 2024 Form 10-Q, Note 3.[1]

Thus, when Meta sold or released rights tied to a $24.0 million outstanding Next Bridge note balance, the issue was not academic. Meta was a distressed company moving toward bankruptcy. The Court should allow discovery into whether Meta received reasonably equivalent value for the Next Bridge notes, whether the $6.0 million cash and related stock-purchase structure were real consideration or circular paper, whether McCabe's obligations were later reduced or released for inadequate consideration, whether Meta's lien on 25% of the Orogrande Prospect had value, whether the assets had proved reserves, whether insiders knew the asset value was unsupported, and whether the Trustee has viable avoidance or fiduciary-duty claims.

## V. THE SAME FACTS SUPPORT MOVANT'S PARTY-IN-INTEREST STANDING

The Trustee tries to force Movant into a narrow box: current MMAT common shareholder or nothing. The record does not allow that. Movant held MMTLP; Palikaras admits MMTLP was Meta's unlisted Series A Preferred; MMTLP's value was tied to Meta's legacy oil-and-gas assets; Meta's board approved the NBH distribution; the SEC questioned the asset valuation and the lack of proved reserves; Meta loaned approximately $20 million to Next

---

[1] This pattern of repeated dilutive financings is further illustrated by Meta's April 14, 2023 press release announcing a $25 million underwritten public offering of common stock and warrants (with a 30-day overallotment option that could increase gross proceeds to approximately $28.125 million). See **Exhibit G.** These transactions underscore Meta's severe financial distress in 2022–2023, when it was issuing deeply discounted shares and warrants while simultaneously engaging in the McCabe note transactions and the NBH spin-off valuation disputes now at issue.

7

Bridge; McCabe later acquired Meta's note rights and lien position; and Meta was under severe financial distress. ECF No. 2724, p. 2, ¶¶ 5-8; ECF No. 2674, pp. 3, 29, 54-55; Meta Q1 2024 Form 10-Q, Notes 3 and 5.     Those facts support at least four bases for Rule 2004 standing. First, Movant has direct standing as a former holder of a Meta-created equity security. Second, Movant has standing as a party in interest because the requested discovery may reveal estate claims, avoidable transfers, insider claims, trading-counterparty claims, or recoverable assets. Third, Movant has standing under a substance-over-form theory because the Trustee's "not Meta" argument depends on the supposedly separate value of NBH assets, which the SEC record places directly in dispute. Fourth, Movant's prior motions noted that this Court recognized, in ECF No. 2563, that Movant's proof of interest was prima facie valid absent objection. See ECF No. 2637, pp. 5-6; ECF No. 2638, pp. 5-6; ECF No. 2639, pp. 5-6.

Equity also weighs against the Trustee's position. The Trustee asks the Court to treat the NBH exchange as a clean corporate severance while denying Movant the discovery needed to test whether the severance was built on unsupported asset value. That approach would let the disputed transaction prove itself. Rule 2004 is designed to prevent exactly that kind of circularity: the Court may examine the debtor's conduct before accepting the debtor-side narrative as conclusive.

## VI. THE TRUSTEE RISKS DESTROYING ESTATE VALUE BEFORE IT IS INVESTIGATED

The Trustee's opposition to the Schwab subpoena is especially difficult to reconcile with her duty to investigate and maximize estate value. Movant does not ask the Court to adjudicate a securities claim against Schwab. He seeks one specific March 20, 2023 call recording and narrow chain-of-custody records to determine whether the recording exists, whether it was retained, whether it was migrated, and what it says. ECF No. 2661, pp. 1-2.

8

If the recording corroborates Movant's proffer that a TD Ameritrade representative stated MMTLP was trading at extreme multiples of the lit market in dark pools before the U3 halt, then the recording is not merely personal evidence. It may identify estate-relevant third-party claims, settlement leverage, damages evidence, and the market value of the debtor-created Series A Preferred immediately before trading was extinguished. It also bears directly on whether MMTLP holders have a pecuniary interest sufficient to participate in this case.

The Trustee cannot rationally maintain that MMTLP holders have no pecuniary stake while opposing targeted discovery that may prove the opposite. If the Trustee's concern is confidentiality, estate control, or collateral use, the remedy is production under protective order, production first to the Trustee, in camera review by this Court, or staged use restrictions. The remedy is not denial. Denial preserves no estate asset. It merely prevents the estate from learning whether a broker-dealer possesses evidence that a Meta-created security had substantial close-out value before FINRA's U3 halt.

The SEC record makes this inquiry more important, not less. The Commission has alleged and found that the Preferred Dividend was structured and promoted around short-squeeze pressure, including the difficulty short sellers would face obtaining the Preferred Dividend. If the Schwab recording shows that the December 2022 market was experiencing the very close-out pressure embedded in the original merger structure, then the Trustee's attempt to expel MMTLP holders from the bankruptcy courthouse would risk excluding the very parties who can point the estate toward recoverable value. The Trustee may ultimately decide not to pursue claims. But she should not be permitted to block the evidence first and then argue no value exists because no evidence has been obtained.

9

Nor is this a request to let Movant commandeer the estate. If the Court believes the Trustee should control first review, Movant will accept a procedure in which Schwab produces the audio and chain-of-custody materials first to the Trustee and the Court, subject to a protective order, with later access and use determined only after in camera review. That procedure protects confidentiality, preserves estate control, and answers the only factual question that matters now: whether the evidence exists and whether it points to estate value. A blanket denial protects none of those interests. It simply keeps the estate blind.

## VII. THE PENDING-PROCEEDING RULE DOES NOT BAR ESTATE-FOCUSED DISCOVERY

The Trustee claims Movant's motions are a "transparent attempt" to obtain discovery for Vermont litigation. ECF No. 2723, p. 2. That accusation is factually and procedurally wrong.

First, *Traudt v. Rubenstein*, Case No. 2:24-cv-00782-cr, has been dismissed except as to Schwab, and the remaining Schwab dispute is in FINRA arbitration. The Trustee therefore overstates the risk that Movant is using Rule 2004 to conduct broad discovery for an active federal district-court case. Movant's Schwab request is also narrow. It seeks one identified call recording which Movant proffers may corroborate MMTLP's pre-halt dark-pool pricing at approximately $290 per share or higher and related records concerning existence, retention, migration, search, and chain of custody.[2] ECF No. 2661, pp. 1-2. Movant disclosed the FINRA arbitration in that motion, rather than concealing it. ECF No. 2661, p. 2, ¶ 5. Movant also

---

[2] This raises a question for the Trustee and counsel: if the estate was attempting to maximize recovery, *why wouldn't they be seeking this audio dated March 20, 2023?* Embracing MMTLP shareholders as holders of the MMAT shares because the spin off done by Palikaras, McCabe, and Brda was without underlying asset value would lead to a possible far greater recovery than selling off printers and maintenance equipment for both the estate of MMTLP shareholders

10

proposed reasonable limits, including simultaneous production to the Chapter 7 Trustee and restrictions on use outside this bankruptcy case absent further order. ECF No. 2661, pp. 13, 19.

(If the recording is irrelevant, incomplete, nonexistent, or misremembered, in camera review will reveal that. If it corroborates Movant's proffer, the estate should know that before the Trustee asks this Court to exclude MMTLP holders and deny all related discovery.)

Second, Movant's writ-of-mandamus action involving the SEC Chair (*Traudt v. Atkins*, 2:24-cv-01360-cr, US District Ct. VT Dec 16 2024; now at 2nd Circuit as *Traudt v. Atkins,* Case 25-2885 March 31, 2026) cannot be aided by these subpoenas in the way the Trustee suggests. That matter is on appeal, and the appellate record is closed.

Third, overlap itself is not disqualification. The pending-proceeding rule prevents a party from using Rule 2004 to evade discovery limits in an already pending proceeding where there is no legitimate bankruptcy purpose. *It does not bar discovery that independently concerns estate property, estate claims, debtor conduct, insider transactions, administrative conflicts, or the Trustee's investigation.* The Trustee's theory would convert the pending-proceeding rule into an evidence blackout. That is not the rule.

## VIII. PALIKARAS'S APRIL 2026 DECLARATION IS MATERIALLY INCOMPLETE AND MUST BE TESTED AGAINST HIS PRIOR SWORN STATEMENTS

The Trustee relies on Palikaras's April 23, 2026 declaration to create a sanitized corporate history. ECF No. 2724. But that declaration omits the parts of the story that matter most: detailed FINRA malfeasance in the start of trading in MMTLP, the identity of the requester or initiating broker-dealer, the corporate-action process, the U3 halt, investor confusion, and the disputed value of the assets supposedly backing MMTLP.

Movant requests judicial notice under Fed. R. Evid. 201 of the existence and filing of Palikaras's August 15, 2024 sworn affidavit in *Inter-Coastal Waterways LLC v. TradeStation*

11

*Securities, Inc.*, Case No. 0:24-cv-60891-AHS (S.D. Fla.), attached as **Exhibit A**. Movant does not seek judicial notice for the truth of every disputed factual assertion. He seeks notice that Palikaras made prior sworn statements materially different from the narrowed version now offered by the Trustee.

Based on the Florida Affidavit, Palikaras previously swore that FINRA assigned the MMTLP ticker without Meta's authorization, that Meta objected, that FINRA would not identify who requested the symbol or correct critical problems, that corporate-action delays caused confusion in the MMTLP market to the detriment of investors, and that the U3 halt was imposed without proper disclosure to protect shareholders from confusion. **Exhibit A**, ¶¶ 14-20, 25-36. Those statements go directly to Rule 2004 good cause. If FINRA or a market participant caused Meta's unlisted Series A Preferred to begin public OTC trading without Meta's request, and if that same security was later halted and cancelled through a process that left unresolved shorts, settlement questions, asset-value questions, or insider-transaction questions, then Movant's subpoenas are proper estate discovery.[3]

Movant does not seek to strike the Florida Affidavit; he relies on it as a prior sworn statement that impeaches the narrowed April 2026 declaration. If the Trustee wants the Court to rely on Palikaras, the fair result is not to ignore the prior sworn account. The fair result is to require Palikaras to appear and answer questions about both sworn statements.

### IX. THE TRUSTEE'S CASES DO NOT DEFEAT RULE 2004 STANDING

---

[3] Palikaras's credibility on these points is further tested by his central role as a named defendant in the settled federal securities class action and Nevada fiduciary-duty class action referenced above, which arose from the same merger and Series A Preferred structure he now addresses in narrowed form in his April 2026 declaration.

12

The Trustee relies on general standing and shareholder-standing cases, including *Warth v. Seldin*, 422 U.S. 490 (1975), *Veal v. American Home Mortgage Servicing, Inc. (In re Veal)*, 450 B.R. 897 (B.A.P. 9th Cir. 2011), *In re Cashion Family Trust*, 2025 Bankr. LEXIS 765 (Bankr. D. Nev. Mar. 28, 2025), *In re Interpictures, Inc.*, 86 B.R. 24 (Bankr. E.D.N.Y. 1988), *In re Dein Host, Inc.*, 835 F.2d 402 (1st Cir. 1987), *In re Transbrasil S.A. Linhas Aereas*, 557 B.R. 240 (Bankr. S.D. Fla. 2016), *In re Acis Capital Management, L.P.*, 604 B.R. 484 (N.D. Tex. 2019), *In re Troutman Enterprises, Inc.*, 286 F.3d 359 (6th Cir. 2002), and *In re AFY*, 734 F.3d 810 (8th Cir. 2013). ECF No. 2723, pp. 3-7. Those cases involve general standing, derivative shareholder injury, appeals by shareholders of insolvent debtors, or attempts to prosecute estate claims. They do not hold that a former holder of the debtor's own Series A Preferred, whose value depended on debtor-administered assets and whose substitute asset is now questioned by SEC filings and court-filed valuation records, lacks standing even to seek Rule 2004 discovery.

And that's the distinction here:

- Movant is NOT seeking to prosecute estate claims — only to investigate whether they exist.
- Investigation targets: estate property transfers, insider benefits, adequacy of Trustee's review, and potential estate recovery.
- Lack of prosecution authority does NOT bar Rule 2004 discovery into debtor conduct and estate administration.
- Trustee's cases do not justify denying discovery before facts are examined.
- Movant is NOT trying to displace the Trustee — just requesting court-supervised discovery that could help the Trustee and establish Movant's own stake and that of 65,000 MMTLP shareholders.
- Trustee's position ignores economic substance: disputed valuations, proved reserves, insider notes, and the former CEO's admission that MMTLP was Meta's unlisted Series A Preferred.
- This is NOT a routine insolvent-shareholder case — it's an investigation into a debtor-created security and recoverable claims.

## X. *In re Martino* Is Dispositive of the Trustee's Attempt to Block Traudt from Investigating Estate Claims

*In re Martino*, No. 11-31115 MER, 2011 WL 5856327, at *2–3 (Bankr. D. Colo. Nov. 17, 2011, Dock. 104, Nov. 17, 2011), is directly on point. (Ruling is attached as **Exhibit H**) There, a

13

creditor sought Rule 2004 discovery into alleged prepetition transfers that could support fraudulent-transfer or avoidance claims, and the debtor objected that any such claims would belong to the Chapter 7 trustee, not the creditor. The court rejected that gatekeeping argument. It held that a creditor with a pecuniary interest affected by the bankruptcy was a "party in interest," explained that proper Rule 2004 purposes include "discovering assets, examining transactions, and determining whether wrongdoing has occurred," and stated the controlling principle for this motion: "The Bank is within its rights to seek information within the scope of Rule 2004, even if such information may ultimately be incorporated in a cause of action exclusive to the trustee." Id. That is exactly this case. Traudt does not ask this Court to authorize him to prosecute avoidance claims, securities claims, or estate claims today.[4] He asks for records to determine whether such claims exist, whether estate value was lost, whether the Trustee should pursue recovery, and whether the estate should preserve claims before they vanish into releases, settlements, inaction, or delay. The McCabe subpoena is the sharpest example: Meta's own Form 10-Q states that Meta sold rights tied to a $24 million outstanding Next Bridge receivable for $6 million cash consideration, *while SEC materials filed in this case question how the underlying asset package could be valued at $79,695,928 on December 14, 2022 and zero two weeks later, and further state that the valuation relied on "proved oil and gas reserves that did not exist."* ECF No. 2674, pp. 54–55; Meta Q1 2024 Form 10-Q, Note 5. Under *Martino*, the Trustee's refusal to pursue or support subpoenas does not strip Traudt of party-in-interest standing to seek targeted Rule 2004 discovery into estate assets, insider-adjacent transactions, reasonably

---

[4] Movant has separately demanded that the Trustee investigate and pursue the McCabe-related estate claims, or seek Court approval to sell, assign, or otherwise authorize their pursuit for the estate's benefit. See **Exhibit E.**

14

equivalent value, and possible clawback claims. See also *Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 474–75 (Bankr. N.D. Ga. 1995) (permitting shareholder Rule 2004 examination concerning whether trustee's proposed settlement benefitted the estate); *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (construing "party in interest" under Rule 2004 broadly and pragmatically where discovery may affect estate value). The same principle applies to all six Traudt subpoenas: McCabe may hold transfer, lien, note-sale, valuation, and clawback evidence; FINRA may hold symbol-origination, blue-sheet, corporate-action, and U3 halt evidence; Schwab may hold audio and chain-of-custody evidence showing market value and broker-dealer knowledge; Sabby and Jane Street may hold trading, settlement, warrant, locate, short-sale, and fail-to-deliver evidence; and the Trustee herself may hold financing, conflict, buyer-list, and estate-administration evidence. *Martino* forbids the Trustee's proposed blackout: Traudt may investigate estate-value facts even if the estate later owns the claims those facts reveal.

## XI. THE REQUESTED DISCOVERY SHOULD BE GRANTED OR STAGED

Movant requests that the Court grant all six Rule 2004 motions. If the Court has burden or sequencing concerns, Movant requests staged discovery. First, authorize FINRA and Palikaras discovery into MMTLP symbol origination, the identity of the requesting or initiating broker-dealer or market participant, OTC profile materials, FINRA communications with Meta, OTC Markets, DTCC, and regulators, December 2022 blue-sheet request metadata, corporate-action processing, and U3 halt records.

Other discovery would follow after that involving McCabe, Sabby, Jane Street, Schwab.

## XII. REQUEST FOR RELIEF

Movant respectfully requests that the Court: (1) overrule the Trustee's Omnibus Opposition, ECF No. 2723; (2) grant Movant's Rule 2004 motions at ECF Nos. 2637, 2638,

15

2639, 2661, 2674, and 2675; (3) authorize subpoenas and examinations under Fed. R. Bankr. P. 2004 and 9016; (4) in the alternative, authorize staged discovery beginning with FINRA, Palikaras, McCabe, NBH asset-value records, and Trustee estate-administration documents; (5) order an evidentiary hearing and require Palikaras to appear for examination if the Court intends to rely on his April 23, 2026 declaration; (6) permit production under an appropriate protective order or in camera review if confidentiality concerns exist; (7) deny the Trustee's request for vexatious-litigant warnings or sanctions-related relief;[5] (8) if the Court intends to rely on Palikaras's April 23, 2026 declaration, require Palikaras to appear for examination concerning his April 2026 declaration, the August 2024 Florida Affidavit, FINRA's assignment of MMTLP, the U3 halt, and the disputed NBH asset valuation; and (9) grant such other and further relief as the Court deems just and proper.

Dated: April 27th, 2026

Scott Traudt, *pro se*
Movant
191 Kibling Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to all named parties and others with interests in this matter and at the addresses delineated below either by 1st Class mail or via email on this 21th day of April, 2026.

---

[5] Or maybe the court should rule on whether Special Counsel Wes Christian committed perjury by lying to this court about his relationship with SEC $4.5 million sanctioned Gary Valinotti, the pump and dump king who Christian claimed in disclosures in this matter that he hadn't spoken to in *15 years* and had no business relationship with this adjudicated con man despite Christian doing a podcast on X with him in June, 2025, and referred to multiple communications with him for years, calling him a "dear friend." The court really ought to take a peek at this little gem before proceeding as Special Counsel will be facing multi-state bar complaints for actions in and out of this proceeding.

16

Scott Traudt, *pro se*
*Intervenor/Movant*
191 Kibling Hill Road
Strafford, VT 05072

**U.S. Department of Justice** PO Box 18417, Reno, NV 89511
Christina W. Lovato – trusteelovato@att.net ; NV26@ecfcbis.com
**Office of the U.S. Trustee**
U.S. TRUSTEE - RN - 7 USTPRegion17.RE.ECF@usdoj.gov
**Hartman & Hartman** 510 W. Plumb Lane Ste. B, Reno, NV 89509
Jeffrey L. Hartman – notices@bankruptcyreno.com; abg@bankruptcyreno.com
**Perkins Coie LLP** 2525 E. Camelback Road, Suite 500, Phoenix, AZ 85016
Bradley Cosman – bcosman@perkinscoie.com
**ChristianAttar** 1177 W. Loop S., Ste.1700, Houston, TX 77027
James "Wes" Christian – jchristian@christianattarlaw.com
**Kasowitz Benson Torres LLP** 1633 Broadway, New York, NY 10019
Steven Tountas – stountas@kasowitz.com legal-notices@kasowitz.com
**Cooper Levenson** 3016 W. Charleston Blvd. Ste. 195, Las Vegas, NV 89102
Michael R. Brunet – mbrunet@cooperlevenson.com
**Robison, Sharp, Sullivan & Brust** 71 Washington St., Reno, NV 89503
Clayton P. Brust cbrust@rssblaw.com

17

## EXHIBIT LIST

**Exhibit A**: August 15, 2024 Affidavit of Georgios Palikaras in *Inter-Coastal Waterways LLC v. TradeStation Securities, Inc.*, Case No. 0:24-cv-60891-AHS (S.D. Fla.)

**Exhibit B:** SEC Complaint and/or SEC Administrative Order concerning Meta Materials Inc., John Brda, and Georgios Palikaras

**Exhibit C:** Meta Materials Inc. Q1 2024 Form 10-Q excerpts, including Note 3 (Going Concern) and Note 5 (Notes Receivable)

**Exhibit D:** Excerpts from ECF No. 2674, including the August 9, 2023 Next Bridge announcement and SEC February 14, 2025 comment letter to Gregory McCabe

**Exhibit E:** Traudt Demand Letter to Lovato Requiring Avoidance Action Against Greg McCabe.

**Exhibit F:** Company press release dated December 21, 2023 announcing the $3 million class action settlement in *In re Meta Materials Inc. Securities Litigation* (E.D.N.Y.) and *Denton v. Palikaras* (Clark Cty., Nev.).

**Exhibit G:** Meta Materials Inc. Press Release dated April 14, 2023, "Meta Materials Announces Pricing of $25 Million Underwritten Public Offering," available at http://metamaterial.com/meta-materials-announces-pricing-of-25-million-underwritten-public-offering/

**Exhibit H:** *In re Martino*, No. 11-31115 MER, 2011 WL 5856327, at *2–3 (Bankr. D. Colo. Nov. 17, 2011, Dock. 104, Nov. 17, 2011)

18

# EXHIBIT A

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| INTER-COASTAL WATERWAYS LLC,<br><br>*Plaintiff,*<br>v.<br><br>TRADESTATION SECURITIES, INC. and DOE DEFENDANTS 1-10,<br><br>*Defendants,*<br>and<br><br>THE FINANCIAL INDUSTRY REGULATORY AUTHORITY,<br><br>*Nominal Defendant.* | CIVIL ACTION NO. 0:24-cv-60891-AHS |

**DECLARATION OF GEORGIOS PALIKARAS IN SUPPORT OF PLAINTIFF INTER-COASTAL WATERWAYS LLC'S OPPOSITION TO DEFENDANT TRADESTATION SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND CROSS-MOTION FOR THE DISQUALIFICATION OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION**

I, Georgios Palikaras, being duly sworn, deposes and says under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I was the President and Chief Executive Officer of Metamaterial, Inc. ("META I") until June 28, 2021, and became President and Chief Executive Officer of Meta Materials Inc. (formerly known as Torchlight Energy Resources, Inc.) on June 28, 2021 after the combination of the two companies.

2. I was the President and Chief Executive Officer of Meta Materials Inc. ("META II") trading on the Nasdaq under symbol MMAT from June 28, 2021 until October 10, 2023, as well as a Board Director until December 4, 2023.

1

3.      On December 14, 2020, Torchlight Energy Resources, Inc. ("Torchlight Energy"), an oil and gas exploration company trading on the NASDAQ under the symbol TRCH and META I, a developer of high-performance functional materials and nanocomposite products trading on the CSE in Canada under symbol MMAT.CN, signed a definitive agreement negotiated at arm's length for a business combination of Torchlight and META I by way of a statutory plan of arrangement (the "Merger").[1]

4.      On June 28, 2021, META I combined with Torchlight Energy, and Torchlight Energy was renamed to Meta Materials Inc. ("META II" or the "Company") and started to trade on the Nasdaq under the symbol MMAT.[2]

5.      Prior to the closing of the Merger transaction, on June 14, 2021, Torchlight Energy declared a Special Dividend of Series A Preferred Stock (the "Dividend" or "Series A Shares") to be issued on a one-for-one basis to Common Stockholders of Record as of the close of market trading on June 24, 2021 to Torchlight Energy shareholders that held shares prior to the merger.[3]

6.      On June 25, 2021, Torchlight Energy announced that it distributed the Dividend to its shareholders of record on June 24, 2021.[4]

7.      The Dividend shares were never intended or authorized to be listed or traded on any exchange, and were created merely to be a dividend placeholder representing the assets of Torchlight Energy that the Company would continue to own as a part of the merger.[5]

---

[1] *See* https://metamaterial.com/metamaterial-and-torchlight-sign-definitive-agreement-for-business-combination/ (last accessed August 15, 2024).

[2] *See* https://metamaterial.com/meta-closes-transaction-and-commences-trading-on-nasdaq/ (last accessed August 15, 2024).

[3] *See* SEC filings, i.e. Torchlight Energy Resources, Inc., Series A Preferred Shares Certificate of Designation (Form 8-K        EX-3.2)        (June        14,        2021),        available        at https://www.sec.gov/Archives/edgar/data/1431959/000119983521000381/ex3-2.htm.

[4] *See* https://finance.yahoo.com/news/torchlight-announces-payment-special-series-203500696.html (last accessed August 15, 2024).

[5] *See* SEC Filings, i.e. Torchlight Energy Resources, Inc. (Schedule 14A) (May 10, 2021), at 50, available at https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm.

8.      On September 30, 2021, pursuant to the closing of the merger with Torchlight Energy, the Company reclassified Torchlight Energy's oil and gas assets as "held for sale" and hired a consultant to help determine the best path to maximize value for Dividend shareholders. The Company informed investors about the ongoing drilling obligations in the Orogrande Project in 2021 to hold the lease for sale or spinout.[6]

9.      On December 3, 2021, the Company announced their intent to spinout or dispose of Torchlight Energy's oil and gas assets in early Q1 2022, pending process approvals by all parties involved.[7]

10.     On January 14, 2022, the Company updated shareholders[8] that it was moving forward in the spinout process of Torchlight Energy's oil and gas assets. This work included, but was not limited to, formal transfer of the assets to OilCo Holdings, Inc. ("OilCo"), a newly formed wholly owned subsidiary of META II, as well as making any necessary filings with the U.S. Securities and Exchange Commission and initiating discussions with FINRA.

11.     On August 31, 2021, OilCo Holdings, Inc. was incorporated in Nevada as a wholly owned subsidiary of META II, and changed its name to Next Bridge Hydrocarbons, Inc. ("Next Bridge") pursuant to an Amended and Restated Articles of Incorporation filed on June 30, 2022.

12.     On July 15, 2022, META II announced that its new, wholly owned subsidiary, Next Bridge, filed a Form S-1 registration statement with the U.S. Securities and Exchange Commission relating to the registration of Next Bridge's common stock. The proposed registration of Next

---

[6] *See* https://metamaterial.com/meta-commences-drilling-operations-in-orogrande-project-to-maintain-lease-compliance/ (last accessed August 15, 2024).

[7] *See* https://metamaterial.com/meta-provides-update-on-the-special-series-a-preferred-stock-dividend/ (last accessed August 15, 2024).

[8] *See* https://metamaterial.com/meta-provides-update-on-the-special-series-a-preferred-stock-dividend-2/ (last accessed August 15, 2024).

3

Bridge's common stock was pursued in connection with a planned share exchange to Dividend shareholders.

13. On November 18, 2022, Next Bridge's Form S-1 became effective. Pursuant to Next Bridge's Form S-1, holders of the Series A Preferred Dividend Shares would receive a 1-for-1 share exchange at a future date where one Series A Preferred Dividend Share would be exchanged for one share of Next Bridge common stock.[9]

14. On October 6, 2021, Mr. Greg West, a Senior Corporate Actions Analyst at the Financial Industry Regulatory Authority ("FINRA") sent a basic "for your information" email to META II at investors@metamaterial.com which included a letter attachment from FINRA notifying the Company that they have assigned the ticker symbol MMTLP to the Series A Shares (the "MMTLP Shares") and the MMTLP Shares may be quoted and traded on the Over-The-Counter Market ("OTC Market").

15. On October 7, 2021, META II's management responded to FINRA's letter via email and strenuously objected to the assignment of this new symbol in light of the false and misleading information regarding it and Meta Materials Inc. that was published on the OTC Market's website. We further requested that FINRA provide the Company with the contact information of the individual(s) or group(s) that requested the assignment of the symbol, and requested that the profile information shown on the OTC Markets site be immediately deleted and corrected to reflect the readily available information for META II which was contained in our Form 10-Q filing for the quarter that has ended June 30, 2021. The Company's financial

---

[9] *See* https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last accessed August 15, 2024). *See also* https://www.sec.gov/Archives/edgar/data/1936756/000119312522238430/d302576dex21.htm (last accessed August 15, 2024).

information provided to FINRA by the **unidentified broker(s)** seeking a listing exemption was incorrect and outdated, containing publicly available Company information from 2012.

16.    On October 7, 2021, the MMTLP shares began trading on the OTC Market without the authorization of the Company. FINRA did not send its notice to the Company until less than 24 hours before the MMTLP Shares began trading on the OTC Market.

17.    FINRA did not halt the trading of MMTLP even after META II's management communicated to Mr. West that the listing included false and outdated information. META II management indicated that the Company did not request for FINRA to assign a ticker symbol to the Series A Shares because the Series A Shares were intended by the Company to be a placeholder dividend representing the assets of Torchlight Energy prior to the asset sale or spin-out.

18.    On October 8, 2021, Mr. West responded to META II's management letter stating he would be escalating the matter to his superiors.

19.    Subsequently, on October 14, 2021, in response to META II's complaint, FINRA's Vice President of Market Operations for FINRA's Market Transparency Services, Ms. Patricia Casimates, left a voicemail for Mr. Ken Rice, META II's Chief Financial Officer, and emailed him asking Mr. Rice to call her regarding the Company's MMTLP complaint.

20.    On or about October 14, 2021, Mr. Rice had a phone call with Ms. Casimates regarding META II's MMTLP complaint. During the call, Mr. Rice reported to me that FINRA refused to provide the identity of the broker(s) or individual(s) that applied for the exemption. Mr. Rice reported to me that FINRA or the related broker(s) or individual(s) who applied for the exemption would not edit, delete or modify the false and outdated Company information that was listed on the OTC Market's website.

21.    Despite the Company actively attempting to communicate its concerns to FINRA regarding the improper quoting and trading of the MMTLP Shares, the MMTLP Shares remained actively listed and trading on the OTC Market until December 9, 2022. During shareholder updates, Company management warned shareholders regarding this matter.

22.    On November 18, 2022, Next Bridge filed a prospectus[10] onto the Securities and Exchange Commission's Electronic Data Gathering, Analysis and Retrieval System informing the public of the summary of the Next Bridge asset spin-off and share exchange.

23.    In the prospectus, Next Bridge noted "at the time of the Spin-Off, Meta will distribute 165,472,241 of the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock and contemporaneously cancel any remaining shares of Common Stock it holds." The prospectus further stated "each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of [Next Bridge] Common Stock."[11]

24.    In conjunction with the prospectus, on November 23, 2022, META II published a press release indicating that, "on December 14, 2022 after the close of the trading markets, ... all of the shares of Series A Preferred Stock will be automatically canceled."[12]

25.    On November 22, 2022, I received email communication from Mr. Lance Cook, the designated representative for Dividend shareholders. Mr. Cook had been communicating with many of the Series A Preferred shareholders, including the largest Dividend shareholder, Mr. Greg

---

[10] *See* SEC filings, *i.e.*, Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2), at 1.

[11] *See* SEC filings, *i.e.*, Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2).

[12] *See* https://www.accesswire.com/728166/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc (last accessed July 31, 2024).

6

McCabe. Mr. Cook discussed that despite the SEC's approval of the S-1 registration statement and FINRA's notification with regard to the publication of a notice of corporate action (after FINRA had received all information requested from the Company in due course to enable the delisting of MMTLP and completion of the spin-out), there were concerns that there was no reason as to why FINRA was delaying in the consent or objection of META II's corporate action. Mr. Cook also reported that a major issue with the delay of formalizing this spin-out was the inability of the Next Bridge to be able to raise funds.

26.     Subsequently, on the same day, November 22, 2022, I forwarded Mr. Lance Cook's email to the OTC Markets team, pleading for a timely response and expedited resolution. The notice of corporate action, designated CAS-75631, was being reviewed by Mr. Luis Cantillo in FINRA's corporate action group who was in contact with the Company's counsel. My understanding is that we had provided him with all necessary supplemental information he had requested.

27.     On December 5, 2022, the Company's counsel, together with Next Bridge's counsel drafted and sent a new email requesting escalation of its concerns to FINRA's executive team. This escalation reminded FINRA that through no actions taken by META II, the Company's Series A Preferred Stock began trading in 2021 and was still trading on the OTC Market under the symbol MMTLP. The Company's counsel stated that META II management had notified FINRA of a corporate action (stock dividend) to be taken (FINRA Rule 6490) approximately 3 months prior and, as of that date, we still did not have an answer regarding whether or not FINRA found the request to be deficient. Counsel also noted to FINRA it had become extremely difficult for META II to make plans and, more importantly, could and may be causing confusion in the OTC market of MMTLP to the detriment of META II's investors. Counsel further noted to FINRA that

7

Next Bridge Hydrocarbons and Meta Materials would need to stand on their own and both companies had responsibilities to their respective shareholders. Counsel further noted to FINRA that any further delays would jeopardize the respective companies' abilities to raise capital and to maintain their respective standing in the marketplace which would be a detriment to all shareholders.

28.     Subsequently, on December 5, 2022, in response of the email sent to FINRA's executive team, Ms. Sarah Gill from Office of the Ombudsman responded via email to META II's counsel stating that FINRA's President and Chief Executive Officer, Mr. Robert Cook, had referred the matter to her and a call was scheduled for December 6, 2022 between META II's counsel and Ms. Gill. Following the call, Ms. Gill connected and introduced Ms. Millicent Banks as the contact who leads FINRA's corporate actions team.

29.     From September 2022 to December 6, 2022, the Company had submitted various required documentation and payment to FINRA for the publication of a notice of corporate action announcing the 1-for-1 Series A Preferred share exchange to FINRA's Daily List.

30.     On December 7, 2022, FINRA published a notice that it has processed META II's corporate action and published it onto its Daily List, which stated that "MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. [NO EX-DIVIDEND DATE] MMTLP shares will be *canceled* effective 12/13/22.[13] This language was provided to META II by FINRA's corporate action team.

---

[13] *See* https://metamaterial.com/meta-materials-announces-finra-has-processed-corporate-action-for-exchange-of-series-a-preferred/ (last accessed August 15, 2024).

31. Further, on or about December 8, 2022, FINRA notified the Company that it had unilaterally revised the language of the Company's December 6, 2022 corporate action and required the revised notice to be published on the Daily List. This revision was made without the input or authorization of the Company and took place on or about December 7, 2022, *after* FINRA had a call discussion with DTCC. I was informed that META II and Next Bridge's counsel were not invited to participate in the call between FINRA and DTCC.[14]

32. To facilitate the successful execution of the MMTLP-Next Bridge share exchange, on December 8, 2022, the revised notice of corporate action was published on FINRA's Daily List, changing the language used by META II in the original corporate action to read, "MMTLP will be *deleted* effective 12/13/22."

33. After the revised notice of corporate action was published to FINRA's Daily List, the Company announced via press release that "FINRA [had] revised [the Company's] corporate action for exchange of Series A Preferred."

34. On December 9, 2022, FINRA announced it had enacted a U3 halt on the trading of MMTLP Shares, claiming there was "significant uncertainty in the settlement and clearing process" for the security.

35. Prior to the U3 halt, FINRA never stated in any communications to the Company (or publicly) that they were going to halt the trading as of December 8, 2022. META II's counsel reached out again on the Morning of December 9, 2022 to ask Ms. Gill whether the halt was permanent or temporary. Only *after* the halt, FINRA added a note on their UPC Advisory page.

36. During my own inquiries for several weeks after the halt, as well as through counsel including multiple calls with the Ms. Gill at the Office of the Ombudsman, we never received any

---

[14] *See* https://metamaterial.com/meta-materials-announces-finra-has-revised-corporate-action-for-exchange-of-series-a-preferred/ (last accessed August 15, 2024).

answers for exactly what the "extraordinary event" or reasons were that FINRA relied on to enact the halt.[15] If FINRA had planned the halt all along, it is my opinion that they should have put such information into the announcement in order to fully inform and protect shareholders and avoid shareholder confusion.

37.    On December 13, 2022, FINRA deleted the MMTLP ticker.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2024

Georgios Palikaras

---

[15] *See* ECF 1-6 at 3.

10

# EXHIBIT B-1

# EXHIBIT B-1

Case 4:24-cv-01048-SDJ Document 1 Filed 06/25/24 Page 1 of 46 PageID #: 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JOHN BRDA, <br> GEORGIOS PALIKARAS, <br><br> Defendants. |

Civ. Action No. 1:24-cv-004806

**JURY TRIAL DEMANDED**

**COMPLAINT**

The Securities and Exchange Commission ("**SEC**") files this Complaint against John

Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"), and alleges as

follows:

## I.     SUMMARY

1.     Defendants engaged in a fraudulent scheme to manipulate the price of Torchlight

Energy Resources, Inc. ("**Torchlight**") stock and sell Torchlight stock to investors at inflated

prices. Defendants' scheme artificially inflated the price of Torchlight stock in June 2021,

causing the price to increase by over 200% in a single week. Defendants capitalized on their

scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**") at the

peak of their price manipulation, selling 16.2 million shares at inflated prices.

2.     Brda, as CEO of Torchlight, first devised the scheme in early 2020 in response to

Torchlight's deteriorating financial condition. Torchlight's stock was trading below $1.00 per

share at the time, and Torchlight needed capital to pay its significant debt obligations and to fund

ongoing drilling expenses of its oil and gas assets. Brda hatched a plan to artificially inflate the price of Torchlight's stock and raise capital by selling Torchlight shares at inflated prices.

3. To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("**Preferred Dividend**").[1] Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock.

4. As the first step in his plan, Brda sought a suitable merger partner. He found that partner in Palikaras, the CEO of Metamaterial, Inc. ("**Meta I**"). Brda told Palikaras about the scheme at the outset of negotiations. Palikaras fully embraced and participated in the scheme.

5. Brda and Palikaras initially believed that merely announcing the Preferred Dividend in a press release accompanying the merger's announcement would cause a short squeeze and a resulting surge in Torchlight's stock price. But when the market did not appear to immediately react following that announcement, Defendants took further action and deceptively promoted the Preferred Dividend in hopes of spreading their short squeeze narrative and, consequently, increasing Torchlight's stock price. They did so through, among other means, private communications with select investors and third-party consultants, who they intended to

---

[1] Unless specified otherwise, the term "Preferred Dividend" used in the Complaint generally refers to the corporate dividend and/or the preferred stock issued pursuant to that dividend.

spread the message for them. Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock by: (i) causing short sellers to exit their short positions, and (ii) enticing other investors to acquire or hold Torchlight stock.

6.     As part of their scheme, Defendants also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of Torchlight stock. In Torchlight's public filings and proxy statements, Brda made false and misleading statements and omissions that were intended to create the false impression that Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend holders within six months of the merger, when in fact there were no prospects of that happening. Similarly, Palikaras made statements to a group of investors—which were recorded and later circulated and widely cited on social media—that the net proceeds payable to Preferred Dividend holders could range between $1–$20 per share, which had no basis in fact. Palikaras also told that same group of investors that Torchlight was speaking to "the right potential buyers" and that they were "top tier," when in fact Torchlight had not identified *any* potential buyers at the time.

7.     Defendants succeeded in their aim to manipulate the price of Torchlight stock in the days leading up to the merger closing. Before the merger was announced, Torchlight stock was trading below $1.00 per share. As a result of Defendants' scheme, Torchlight's stock price sharply rose during a ten-day period—between June 14–24, 2021—from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

8.     When Torchlight's stock price began to surge, Brda wrote Palikaras: ***"We have two days to take advantage of the squeeze*[.]"** (emphasis added). Between June 18–24, 2021, Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.

Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average price of $8.50 per share. In total, the ATM Offering raised $137.5 million from investors. These proceeds primarily benefitted the company that resulted from the Torchlight-Meta I merger— Meta Materials, Inc. ("**Meta II**")—which appointed Palikaras as CEO. And for his part, Brda demanded and received a $1.5 million bonus.

9. By engaging in the acts and conduct alleged herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rules 10b-5 and 14a-9 thereunder. Brda also aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

10. For Defendants' violations, the SEC seeks: (i) permanent injunctive relief against both Defendants; (ii) an officer and director bar against both Defendants; (iii) disgorgement of ill-gotten gains and prejudgment interest thereon against Brda; (iv) civil penalties against both Defendants; and (v) such further relief as the Court may deem just and appropriate.

## II.    JURISDICTION AND VENUE

11. The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

12. This Court has jurisdiction over this action pursuant to Sections 20 and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

13. Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce, and/or made use of the mails or means or instruments of transportation or communication, or of facilities of a national securities exchange in interstate

4

commerce, in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

14. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The offer or sale of securities at issue in this case took place in this District, and certain acts, practices, transactions, and courses of business constituting violations of the securities laws alleged herein occurred within this District. At all relevant times in this case, Brda was CEO of Torchlight, which prior to merging with Meta I was traded on the Nasdaq, which is headquartered in this District. As further described in paragraphs 26-28 below, Meta I's primary motivation for entering into the merger at issue with Torchlight was to assume Torchlight's Nasdaq listing. Following the merger, Meta II has traded on the Nasdaq. One or more investors who bought Torchlight stock, and were harmed by the conduct alleged herein, reside in this District. Defendants' false and misleading statements and omissions alleged in paragraphs 38-50 and 67-88 below—which were made in press releases, public filings, and a recording circulated on social media—were published and/or disseminated to investors in this District. Defendants' deceptive marketing efforts, through press releases and social media, alleged in paragraphs 52-54 and 62-66 below were published and/or disseminated to investors in this District.

### III. DEFENDANTS

15. Defendant John Brda is a resident of St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. After the merger, Brda held a consulting role with Meta II through late 2022. During the lead up to the merger, Brda was one of only four employees of Torchlight. As CEO, he had ultimate authority to approve Torchlight's press releases, public filings, and proxy statements discussed herein.

16.     Defendant Georgios Palikaras is a Greek citizen and resident of Halifax, Nova Scotia, Canada. From 2011 until the merger in June 2021, Palikaras was Meta I's President and CEO. Upon Meta II's creation, Palikaras became President and CEO of Meta II and served on its board of directors. In October 2023, Meta II terminated Palikaras as President and CEO, and he resigned from Meta II's Board.

## IV.     RELATED ENTITIES

17.     Torchlight completed a reverse merger with Meta I in June 2021. Prior to the merger, Torchlight was a publicly traded Texas corporation that was listed on the Nasdaq under the ticker symbol "TRCH." Its business was oil and gas exploration and production.

18.     Meta I was a Canadian company listed on the Canadian Securities Exchange prior to its June 2021 merger with Torchlight. Its business focused on research and development of early-stage, applied materials technology.

19.     Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021, through the reverse merger between Torchlight and Meta I. As a result of the merger, Meta II assumed Torchlight's Nasdaq listing and now trades under the ticker symbol "MMAT." Like Meta I, Meta II's business focuses on research and development of early-stage, applied materials technology.

## V.     FACTS

### A. With Torchlight Facing Serious Financial Distress, Brda Hatched A Scheme to Manipulate The Price of Torchlight Stock And Capitalize On That Manipulation.

20.     In early 2020, Torchlight was at a crossroads. It had sold all of its revenue-generating oil and gas assets, leaving Torchlight with oil and gas leases on only a few early-stage, exploratory properties. Torchlight's primary remaining oil and gas asset, the Orogrande Project, was undeveloped, had no proven oil and gas reserves, and covered significant areas of

6

acreage far removed from existing proven geologic formations. Consequently, only a small number of very large and/or specialized oil and gas companies were possible candidates to purchase Torchlight's Orogrande lease interests.

21.     Torchlight required significant capital to maintain its lease interests in the Orogrande project, which were not generating any revenues. The terms of Torchlight's lease obligated it to drill four wells in the Orogrande project before the end of 2021 and an additional five wells in subsequent years.[2] But Torchlight faced an uncertain oil and gas market that made raising capital to pay ongoing drilling expenses challenging.

22.     Torchlight also had significant ongoing debts to pay. In March 2020, Torchlight disclosed, in its 2019 Form 10-K, $25 million in debt and other liabilities. In contrast, Torchlight had less than $1 million in non-oil-and-gas assets and minimal revenue. Torchlight's debt included millions of dollars of convertible promissory notes that Torchlight could avoid paying if its noteholders opted to convert their notes to Torchlight common stock. However, that was unlikely at the low price at which Torchlight common stock was trading in early 2020.

23.     The market for Torchlight stock reflected the company's deteriorating financial condition. The price of Torchlight stock dropped below $1.00 per share in or around October 2019, prompting a delisting notice from Nasdaq that the company announced on November 25, 2019. The stock price continued to fluctuate beneath $1.00 per share during the first quarter of 2020, and the company reiterated its receipt of the delisting notice in its annual financial statement filed March 16, 2020.

24.     In addition, Brda believed that there was a significant volume of short interests in Torchlight stock. In a June 2020 email, Brda wrote that "the short position" in Torchlight stock

_____

[2] Torchlight's drilling obligations for 2020 were suspended following outbreak of Covid-19.

"is quite extensive."[3] In that same email, Brda expressed his belief that, through certain steps that he proposed (as discussed below), Torchlight's "short position…will be forced to cover," which could trigger a short squeeze. A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze.

25. As CEO of Torchlight, Brda was aware of the conditions referenced in paragraphs 20-24 above and the predicament that Torchlight faced. But rather than take steps to improve Torchlight's underlying financial health, Brda hatched a plan to manipulate the price of Torchlight stock and capitalize on that manipulation. Specifically, starting by at least June 2020, Brda began developing the following plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but *not* its oil and gas leases;

- As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange (i.e., the "Preferred Dividend," defined in paragraph 3 above), ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders;

---

[3] A "short seller" sells stock that the short seller does not own (or that the short seller will borrow for delivery) with the goal of repurchasing it or "covering" it later at a lower price. If the price of the stock drops, short sellers buy the stock at the lower price and make a profit. If the price of the stock rises, short sellers incur a loss in buying back the stock at a higher price than the price at which it was sold.

- Market and promote the Preferred Dividend to spread the narrative to select investors that short sellers would not be able to obtain the Preferred Dividend, thus pressuring short sellers to close their positions, leading investors to believe a short squeeze would occur, and artificially inflating the price of Torchlight common stock on a temporary basis;

- Capitalize on Torchlight's inflated common stock price by, among other things, raising capital through an ATM Offering; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's oil and gas leases.

**B. Brda Found A Merger Partner—Meta I And Its CEO, Palikaras—Willing To Help Him Carry Out The Fraudulent Scheme.**

26. To carry out his plan, Brda first sought a suitable merger partner. As further discussed below, Brda's plan to manipulate the market required a merger agreement between Torchlight and another company that included a Preferred Dividend, which would purportedly entitle its owners to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. For such a transaction structure to work, at minimum, Brda needed a merger partner that was *not* interested in Torchlight's oil and gas leases (to provide an excuse to issue the Preferred Dividend), but that nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing— Torchlight's primary asset aside from its oil and gas leases.

27. Meta I, with Palikaras as its CEO, met Brda's threshold criteria. Meta I was a growing Canadian company listed on the Canadian Stock Exchange looking for an opportunity to gain access to U.S. capital markets. Torchlight's Nasdaq listing offered Meta I that opportunity. At the same time, Meta I was an applied materials technology company; it was not in the business of acquiring, developing, or selling oil and gas leases. Thus, although it wanted

9

Torchlight's Nasdaq listing, Meta I had no interest in Torchlight's oil and gas leases, which were not generating revenue and did not fit Meta I's existing business or operations.

28.     Beyond that initial threshold, Brda also sought a merger partner who would allow Torchlight to structure and carry out the transactions and supporting sequence of events as Brda planned. In that regard, Meta I's CEO, Palikaras, went above and beyond what Brda needed, as further described below.

## C. Defendan tsDesigned And Planned The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

29.     The Preferred Dividend was the initial piece in Defendants' scheme to manipulate the price of Torchlight stock. Defendants believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price.

30.     Brda took a number of steps towards designing and implementing a Preferred Dividend that he intended to cause a short squeeze. Specifically, Brda: (1) conceived, designed, and structured the Preferred Dividend in a manner that he intended to increase Torchlight's stock price by forcing shorts to cover; (2) as a member of Torchlight's Board, voted to authorize the transactions and other corporate matters necessary for Torchlight to issue the Preferred Dividend pursuant to his design; (3) proposed the merger and Preferred Dividend to Meta I and then negotiated and secured Meta I's consent to the same; and (4) approved Torchlight's proxy statements, press releases, and public filings in furtherance of proposing the Preferred Dividend to shareholders, soliciting and obtaining shareholder approval, and ensuring the scheme worked as intended.

31.     The design and structure of the Preferred Dividend that Brda devised, proposed, and negotiated with Meta I included as follows. First, the Preferred Dividend would provide

holders of Torchlight common stock one share of preferred stock, purportedly entitling its owner to receive the net proceeds of the sale of Torchlight's remaining oil and gas assets. Second, only the owners of record of Torchlight stock, as of a designated record date (the "**Record Date**"), would be entitled to receive the Preferred Dividend. Third, after its issuance, the Preferred Dividend would purportedly not be registered or made available for trading on any exchange. More precisely, Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—stated: "[t]he Series A Preferred Stock will not be listed or traded on any exchange and will not be registered, and will not be freely transferable unless such shares are thereafter registered or are saleable pursuant to an applicable exemption from registration." Similar statements were made in each of Torchlight's preliminary proxy statements, which Brda approved. By this design, Brda intended to cause a short squeeze because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend (along with the borrowed Torchlight stock) to lenders in the future.

32. By at least June 2020, Brda had conceived of and begun planning the Preferred Dividend with the intent of causing a short squeeze. In June 2020, for example, he wrote to the Chairman of Torchlight's Board of Directors and its primary investment banker: "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover."

33. In September 2020, Brda proposed the Preferred Dividend to Meta I and secured Meta I's initial consent via a letter-of-intent that Torchlight and Meta I announced on September 21, 2020. He subsequently negotiated and secured Meta I's consent via a definitive agreement that included the Preferred Dividend, which both companies announced on December 14, 2020.

11

34. Brda also caused Torchlight to propose and solicit shareholder approval for his intended structure of the Preferred Dividend. This includes, but is not limited to, the shareholder approval that Brda solicited via Torchlight's definitive proxy statement dated May 7, 2021—which Brda approved—and Torchlight's preliminary proxy statements—which Brda approved—on February 4, 2021, March 23, 2021, and April 21, 2021.

35. Palikaras, as CEO of Meta I, shared Torchlight's proposed merger structure, including the plan to use the Preferred Dividend to impact short sellers, with Meta I's Board. In Brda's initial presentation to Meta I's Board of Directors in September 2020—which Palikaras knew about and helped convey to Meta I's Board—Brda presented his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma." In Palikaras' sworn testimony given during the SEC's investigation that preceded the filing of this lawsuit, Palikaras admitted that Brda explained to him, "way back in the beginning that this deal could potentially create a short squeeze."

36. Meta I's Board also communicated with Palikaras about Brda's plan. In a September 6, 2020 email, a member of Meta I's board wrote the other members of Meta I's Board—including Palikaras—to summarize the proposed deal based on calls with Torchlight management (including Brda). In that email, the Meta I board member wrote that a goal of the merger structure was to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt." He also wrote that Torchlight "currently has in place and approved an At-The-Market (ATM) Offering," and that "Torchlight's plan is to use either their ATM, or do a deal with a brokerage firm that they have a relationship with, to raise the capital" in the event of a short squeeze and/or inflation in Torchlight's stock price.

37.    Thus, at the outset of discussions between Torchlight and Meta I, Palikaras knew about Brda's plan and intent. As further described below, Palikaras actively worked with Brda to carry out this plan to manipulate the price of Torchlight stock and defraud Torchlight investors.

**D. Defendants Made Materially False And Misleading Statements And Omissions Regarding Their Plans And Intent To Manipulate The Price Of Torchlight Stock.**

38.    Brda and Torchlight made several public disclosures about the Preferred Dividend, but those disclosures were misleading—and in some instances, false—because Brda omitted material information about the plan to use the Preferred Dividend to manipulate the price of Torchlight stock and defraud investors.

39.    Brda had ultimate authority to approve Torchlight's May 7, 2021 definitive proxy statement and its preliminary proxy statements dated February 4, 2021, March 23, 2021, and April 21, 2021. Pursuant to that authority, Brda approved Torchlight's definitive and preliminary proxy statements. He also signed the cover letter to Torchlight's definitive proxy statement. In those proxy statements, Brda and Torchlight solicited shareholder approval for the merger and Preferred Dividend. Brda and Torchlight publicly disclosed in those proxy statements, among other things, the terms of, the purported reasons for, and the risks associated with the merger and Preferred Dividend. Certain of these disclosures, however, were false or misleading, because Brda knowingly or severely recklessly failed to disclose material information to investors.

40.    Specifically, Brda failed to disclose, and failed to cause Torchlight to disclose, the following in Torchlight's proxy statements and other public filings and statements: (1) that the Preferred Dividend was intended to cause, and to lead investors to believe, that there would be a short squeeze and an increase in Torchlight's stock price; (2) that Brda believed the Preferred Dividend would cause a short squeeze and/or temporarily inflate Torchlight's stock price; (3) that the potential for a short squeeze and/or temporary inflation of Torchlight's stock price

13

were reasons that Brda and Torchlight considered in approving the merger and Preferred Dividend and recommending that shareholders approve the same; (4) Brda's plan to, and/or the potential that Torchlight would, deploy the ATM Offering; and (5) that, in connection with negotiations over the merger and Preferred Dividend, Torchlight and Meta I discussed the Preferred Dividend's potential to cause a short squeeze, its potential to temporarily inflate Torchlight's stock price, and Brda's plan to use an ATM Offering to raise funds from investors.

41.     To illustrate, Torchlight's definitive proxy statement described the purported "reasons" and "factors" that Torchlight's board (including Brda) considered in both approving the merger and Preferred Dividend and recommending that shareholders approve the same. The proxy statement repeatedly states that the supposed "reason" for approving and proposing the Preferred Dividend is that it "provides the current Torchlight stockholders an opportunity to retain their beneficial interest in [Torchlight's oil and gas assets]." These statements were false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement and subsequent public filings that the reason—or at least a reason—that Torchlight and Brda considered was Brda's plan and intention for the Preferred Dividend to cause a short squeeze and/or to temporarily increase Torchlight's stock price.

42.     Similarly, Torchlight's definitive proxy statement also stated that "[t]he *anticipated and intended impact* of the [Preferred Dividend] is to maintain the interest of the Torchlight stockholders as of the [Preferred Dividend] Record Date in [Torchlight's oil and gas assets] after the consummation of the [merger]." (emphasis added). Again, this statement was false, or at least misleading, because Brda and Torchlight failed to disclose in the proxy statement or subsequent filings that an anticipated and intended impact of the Preferred Dividend was that it would cause a short squeeze and/or temporarily increase Torchlight's stock price.

14

Brda also failed to disclose that he and Torchlight planned to conduct an ATM Offering to take advantage of any squeeze or price inflation that took place. Contrary to Brda's and Torchlight's representations that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders, the ATM Offering that they were planning in coordination with the Preferred Dividend—which they failed to publicly disclose—would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market.

43.     Torchlight's definitive proxy statement also incorporated by reference certain public filings that were "considered to be part of this proxy statement," including its 2020 Form 10-K filed March 18, 2021, which Brda signed and approved. In that 2020 Form 10-K, Torchlight disclosed generally that "[t]he market price of our common stock *may be* influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." (emphasis added). However, this generic disclosure made no reference to the Preferred Dividend or the intent or potential for the Preferred Dividend to *cause* a short squeeze. Similarly, Torchlight's definitive proxy statement disclosed several risks that the proposals therein—including the proposed Preferred Dividend—posed to Torchlight and its shareholders. At a minimum, these generic risk disclosures were misleading, because Brda and Torchlight never disclosed in those filings or any subsequent filings the risk that the Preferred Dividend could cause a short squeeze or artificial price increase, much less that the Preferred Dividend *was intended to cause* the same. Nor did Torchlight or Brda disclose their intention to conduct an ATM Offering to take advantage of the squeeze or price inflation.

44.     Torchlight's 2020 Form 10-K further represented to investors that "we have no reason to believe our shares would be the target of a short squeeze." As Brda knew at the time, however, that statement was false, as it was directly contrary to his and other executives'

15

privately stated belief and intention that the Preferred Dividend would cause a short squeeze. In fact, a note-taker at an investor conference on March 17, 2021—the day before Torchlight filed its 2020 Form 10-K—recorded Brda telling an investment firm: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." At a minimum, the representation was misleading, because Brda omitted from the 2020 Form 10-K, proxy statements, and subsequent filings that he and other executives believed the Preferred Dividend could cause a short squeeze or temporary increase in Torchlight's stock, and the plan to use the ATM Offering to take advantage of the squeeze or inflation in Torchlight's stock price.

45. The definitive proxy statement also purported to detail the discussions and negotiations between Meta I and Torchlight concerning the merger and Preferred Dividend, along with each company's purported motivations and reasons for the transactions. For example, the proxy statement stated that Meta I "suggested that the parties structure the transaction so that all of the value of [Torchlight's oil and gas assets] would be allocated to legacy Torchlight stockholders," which Torchlight purportedly found "attractive" and beneficial to its legacy shareholders. As Brda knew at the time, however, these statements and disclosures of Torchlight and Meta I's negotiations were misleading. In the proxy statements and subsequent public filings, Brda and Torchlight never disclosed that they proposed the idea of a Preferred Dividend that they intended to cause a short squeeze and/or artificial increase in Torchlight's stock price. In fact, Brda and Torchlight never disclosed in the proxy statement or other public filings that the short squeeze was even discussed during those negotiations. In addition, the September 6, 2020 email from Meta I's board member—discussed in paragraph 36 above—reveals that during negotiations the two companies discussed: Brda's short squeeze theory, Torchlight management's belief that Torchlight stock would increase following announcement of the

16

Preferred Dividend, and the ATM Offering that Torchlight had available and planned to use to take advantage of a squeeze or price inflation. Brda and Torchlight, however, never disclosed in the proxy statement or other public filings that these discussions took place.

46.     Brda knowingly or severely recklessly made these false and misleading statements and omissions in furtherance of the scheme to manipulate the price of Torchlight stock. As Brda knew or was severely reckless in not knowing, his false and misleading statements and omissions were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

47.     Palikaras was aware of each of the above false and misleading statements and omissions by Brda and Torchlight. He also knew by September 2020—well before the false and misleading statements and omissions in Torchlight's 2020 Form 10-K and proxy statements— about the undisclosed matters referenced in paragraphs 40-45 above. As further described in paragraphs 59-66, 89-93, and 101-105 below, Palikaras also: (a) privately communicated with select groups of investors and/or potential investors about how he believed the Preferred Dividend would cause a short squeeze; (b) knew about a recording of certain of these private communications circulating on social media; (c) indirectly promoted the short squeeze narrative on social media; and (d) coordinated with Brda on these efforts to deceptively promote the short squeeze and on execution of the ATM Offering.

48.     In furtherance of the fraudulent scheme, however, Palikaras never disclosed in any public filings or public statements—and never caused Meta I to publicly disclose—that: (a) he engaged in the aforementioned private communications with select investor groups; (b) he indirectly promoted the short squeeze on social media; (c) he believed the Preferred Dividend would cause a short squeeze or had the potential to do so; (d) that Brda told him and Meta I's

board that Brda believed the Preferred Dividend would cause a short squeeze or inflation of Torchlight's stock price; (e) Brda told him and Meta I's board about plans to conduct an ATM Offering to take advantage of a squeeze and/or price inflation; (f) he coordinated with Brda to deceptively promote the short squeeze and on the execution of the ATM Offering; or (g) any of the other undisclosed matters referenced in paragraphs 40-45 above.

49.     As Palikaras knew or was severely reckless in not knowing, his omissions were misleading and/or rendered Brda's statements in Torchlight's public filings discussed above false and misleading. Palikaras also knew, or was severely reckless in not knowing, that his private communications to select investors, indirect promotion of a short squeeze on social media, and private coordination with Brda—while simultaneously failing to publicly disclose to the market his aforementioned omissions—were deceptive, furthered the fraudulent scheme, and concealed Defendants' scheme, plans, and intentions.

50.     Defendants' communications suggest their intentions and motivations in refusing to publicly disclose the planned short squeeze. For example, on June 7, 2021, an anonymous Stocktwits user ("KingOneFolle") posted about Palikaras' statements on the "Italian Investor Call," which is discussed in paragraph 61 below. In that post, KingOneFolle posted a screenshot from a recording of the call and a synopsis of four takeaways from Palikaras' private statements on the call, including the idea that Torchlight's announcement of the Preferred Dividend Record Date would "create a short squeeze as there are many short stocks to cover before the merger!!" Within three minutes of the Stocktwits post, Palikaras emailed a screenshot of the post to Brda and other members of Meta I's management, angrily demanding that investor relations personnel contact KingOneFolle and insist that the post and recording be deleted. Palikaras confided to

18

Meta I's CFO his concern that the deal would "blow up" if his private communications about the short squeeze became public.

### E. Defendants Deceptively Marketed And Promoted The Preferred Dividend In Furtherance Of The Fraudulent Scheme.

51.     In addition to concealing their scheme from the market through misstatements and omissions, Defendants deceptively marketed and promoted the narrative that the Preferred Dividend would cause a short squeeze in furtherance of their plan to artificially inflate Torchlight's stock price. As further described below, Defendants took steps to market and promote the Preferred Dividend in ways that were intended to: (i) cause short sellers, in the words of Brda, to "understand their dilemma" and trigger a short squeeze; and (ii) increase interest and confidence among legacy and prospective Torchlight shareholders, as well as convertible promissory note holders, in the anticipation of a potential short squeeze, increase in Torchlight's stock price relating to the Preferred Dividend, and/or a purportedly valuable distribution from the Preferred Dividend.

52.     Initially, Defendants believed that they could simply "play up" the Preferred Dividend in press releases to trigger a short squeeze and/or inflate Torchlight's stock price. In a written presentation to Palikaras and Meta I's board in September 2020 ,Brda proposed his plan to emphasize the Preferred Dividend by using merger announcement press releases to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

53.     Likewise, in the September 6, 2020 email from a Meta I board member—first discussed in paragraph 36 above—that board member wrote to his fellow board members, based on "two separate calls" that he and Palikaras had with Torchlight management (including Brda): "Torchlight's well thought out strategy…is to finalize an LOI with [Meta I]…and strategically jointly announce it by way of a joint Press Release after the markets close." The board member

19

wrote that the joint press release "will announce that at closing of the transaction all current shareholders of Torchlight will be issued an equivalent number of Pref Shares." He also explained that, per Brda/Torchlight's strategy, if the two companies agreed on "when the Joint Press Release goes out, the shorts will only have the weekend to come up with their own strategy to cover their short positions." He added that "Torchlight's management [which included Brda] is confident" that Torchlight's stock price would go up following a press release playing up the Preferred Dividend.

54.     Consistent with this plan and proposal, Brda caused Torchlight to issue a press release on September 21, 2020, announcing its merger with Meta I—which Brda participated in drafting and was attached to Torchlight's September 23, 2020 Form 8-K that Brda signed—that emphasized in the release's title: "Special Dividend Intended to be Issued to Torchlight Shareholders at Closing." Similarly, Torchlight's December 14, 2020 press release—which Brda participated in drafting and was attached to Torchlight's December 14, 2020 Form 8-K that Brda signed—announced Meta I and Torchlight's definitive agreement to merge and highlighted in its title: "Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing." As demonstrated by the communications discussed in paragraphs 52-53 above, Brda deceptively highlighted this one aspect of the merger transaction—the Preferred Dividend to be issued at closing—with the intent of causing the shorts to exit their positions (i.e., "make sure the shorts understand their dilemma") and cause Torchlight's stock price to artificially increase.

55.     Following the September 21, 2020 press release announcing the merger and emphasizing the Preferred Dividend, the market did not appear to immediately react the way the Defendants intended. For example, Torchlight's stock price continued to trade well below $1.00. As a result, Brda turned to some consultants that he knew and previously worked with to spread

the short squeeze narrative for Torchlight. Brda caused Torchlight to pay these consultants to communicate with current or potential Torchlight shareholders. Through these individuals—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated information about the Preferred Dividend and short squeeze to shareholders.

56.     For example, on September 21, 2020, Brda forwarded to two consultants Torchlight's press release announcing the merger and Preferred Dividend. As reflected in the below exchange, Brda instructed the consultants on how they should message the Preferred Dividend to investors:

> Brda: We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> Consultant: Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> Brda: I think people don't understand the dividend properly.
>
> Consultant: I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

57.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote: "[w]e all knew [the shorts] would come after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them." Through these and other communications, Brda prompted Torchlight's consultants to explain the Preferred Dividend and its impact on short sellers to investors, without revealing that he and the company were driving that message or disclosing his intention to take advantage of the eventual temporary price inflation by selling Torchlight stock at inflated prices.

58.     To further conceal his deceptive use of stock-support consultants, Brda caused Torchlight to keep inadequate books and records and to maintain inadequate accounting controls

21

concerning these consultants. Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

59. Brda and Palikaras also deceptively had direct communications with select groups of investors where they further played up the short squeeze in furtherance of their scheme.

60. For example, from March 16-18, 2021, Brda and Palikaras met with a series of institutional investors as part of an investment bank's virtual Annual Investor Conference. During these meetings, Brda and Palikaras pitched the justification for the merger and described to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze. A note-taker at the conference also recorded Brda telling an investment firm on March 17, 2021: "15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing." Through these private communications, Defendants intended to drive interest with these investors in the merger and in buying or retaining Torchlight stock, without publicly disclosing their plan or belief that a short squeeze would occur.

61. As another example, on May 13, 2021, Palikaras participated in a virtual meeting with a group of Italian shareholders (the "**Italian Investor Call**") that he believed held a significant number of shares of Torchlight common stock. During that meeting, Palikaras described the plan to cause a short squeeze on several occasions, including in one instance:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted ... This deal is set up not to give a [cash] dividend at closing.** So, in order for the short positions to cover, they have to have the stock on their hand because the dividend will be paid out as a preferred share, not cash. As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe ... there will be **a potential jump towards the close, it's called a short squeeze...** (emphasis added).

62.     In addition, Palikaras and Brda used social media to tout the Preferred Dividend in an indirect manner in furtherance of their market manipulation scheme.

63.     For instance, on June 7, 2021—one week before Torchlight announced the Preferred Dividend Record Date (as defined in paragraph 31 above)—Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze… yet. Just my two cents. Once it happens that's ok as it is fact, but before you are putting yourself at risk for potentially speculative content."

64.     On June 13, 2021—the day before Torchlight announced its Preferred Dividend Record Date—Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock. A true and correct copy of this tweet is depicted below:



65. Palikaras testified during the SEC's investigation that his tweet had nothing to do with the concept of a short squeeze, but the timing, circumstances, and content of his tweet imply that he intended to tout that the Preferred Dividend would set Torchlight's "shorts" on fire by triggering a short squeeze. The reaction of his Twitter followers also belies his testimony. Palikaras' tweet received several comments that made the connection clearly, including:

- "You should set the price of the shorts the price of TRCH at the end of the short squeeze."

- "This is class!!!! burn the shorts"

- "We definitely get the reference "Shorts Are Getting Burner"" [sic]

- "Need a solid PR this Monday ... flame those shorties..."

- "This week will be epic! Torch the shorts!"

66. Palikaras knew or had notice of these comments to his shorts-in-flame tweet. For example, he later posted in response to his tweet, acknowledging that his tweet had over 500 likes in less than an hour. His communications also demonstrate that he was closely monitoring engagement on Twitter around the time of these responses to his tweet. Yet, Palikaras did nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze.

**F. Defendants Made False And Misleading Statements And Omissions Regarding The Value Of The Preferred Dividend In Furtherance Of The Fraudulent Scheme.**

67. As part of their scheme, Defendants also made false and misleading statements and omissions in public filings and public statements to investors about the Preferred Dividend. These misstatements and omissions created false impressions about the value of the Preferred Dividend and the likelihood that holders of the Preferred Dividend would receive a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. As further described below,

Defendants made these statements knowingly or with severe recklessness to induce investors to buy or hold Torchlight common stock in furtherance of their fraudulent scheme.

### i. Brda made false and misleading statements and omissions in Torchlight's proxy filings and Form 8-K filings about ongoing "commercially reasonable efforts" to sell Torchlight's oil and gas assets and plans to distribute "net proceeds" to holders of the Preferred Dividend.

68. In Torchlight's public filings leading up to the merger, Brda bolstered the potential value of the Preferred Dividend through false and misleading statements and omissions. Specifically, Brda misrepresented in Torchlight's public filings that Torchlight would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing. Torchlight claimed that if the efforts to sell were unsuccessful six months after the merger date, it would then consider spinning off the assets. In reality, there were no prospects for selling Torchlight's oil and gas assets within six months of the merger closing, and Brda had started planning to spin off the assets as soon the merger agreement was signed. His misrepresentations and omissions created the false impression about the likelihood that Preferred Dividend holders would receive a return on their investments in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger.

69. Brda, through Torchlight, first made this representation in Torchlight's Form 8-K dated September 23, 2020, announcing the merger, stating that the merged company of Torchlight and Meta I would "use its commercially reasonable efforts to cause the Torchlight oil and gas assets to be sold [within six months of the initial merger date]. Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets (net of [certain debt and holdbacks]…)."

25

Case 24-50782-sps   Doc 2750   Entered 04/29/26 15:23:00   Page 56 of 118 #: 26

70.     Brda repeated a similar version of these false and misleading statements in several of Torchlight's subsequent press releases and Forms 8-K, including most prominently in press releases attached to Torchlight's Forms 8-K filed on April 15, 2021, May 4, 2021, and June 16, 2021. Each of these public filings or press releases stated that Torchlight would distribute "net proceeds" to shareholders who received the Preferred Dividend. A distribution of net proceeds could only happen after Meta II (as successor-in-interest of Torchlight after the merger) made efforts (and succeeded) in selling the oil and gas assets within six months of the merger closing.

71.     As another example, in the press release announcing that Torchlight and Meta I signed a definitive merger agreement, Torchlight's Form 8-K dated December 14, 2020, stated: "[f]ollowing the Reverse Split, and prior to the Effective Time, Torchlight will declare and issue a dividend, on a one-for-one basis, of shares of preferred stock to the holders of its common stock. Following the Effective Time, the holders of preferred stock will be entitled to a dividend based on the net proceeds of the sale of any assets that are used or held for use in Torchlight's oil and gas exploration business…, subject to certain holdbacks."

72.     In Torchlight's proxy statements—which Brda approved—Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets. The proxy statements also contained statements about the distribution of proceeds from the sale of Torchlight's oil and gas assets, as well as statements emphasizing that the Preferred Dividend would not be registered or traded on any exchange (consistent with Brda's plan to cause a short squeeze and lead investors to believe a short squeeze would occur).

73.     By way of example, Torchlight's definitive proxy statement dated May 7, 2021, contained the following false and misleading statements about "commercially reasonable efforts"

26

to sell the company's oil and gas assets and a distribution that "may" be made to holders of the Preferred Dividend:

> The Arrangement Agreement provides that Torchlight and the Combined Company will use commercially reasonable efforts to sell the O&G Assets [within six months of the merger closing]. Torchlight stockholders of record as of the Series A Preferred Record Date, will receive a dividend, on a one-for-one basis, of shares of Series A Preferred Stock.... Holders of shares of Series A Preferred Stock may receive Asset Sale Dividends from any Asset Sale Transactions consummated [within six months of the merger closing], and may also receive a Spin-Off Dividend of any Remaining Assets that have not been sold in an Asset Sale Transaction [within six months of the merger closing].

74.     These statements were made repeatedly in Torchlight's proxy materials. The company touted its "commercially reasonable efforts" to sell all of its oil and gas assets a half dozen times in its May 7, 2021 definitive proxy statement and with similar frequency in its preliminary proxy statements on February 4, 2021, March 23, 2021, and April 21, 2021.

75.     These statements and representations made by Brda in Torchlight's public filings, proxy statements, and press releases were false and misleading at the time they were made. As Brda knew or was reckless in not knowing, Torchlight had no prospects to sell the oil and gas assets and had taken no actions to lay the groundwork for a sale when the statements were made. Brda also knew that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for years. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of companies were possible candidates to purchase Torchlight's assets, and Torchlight's records do not reflect any prospects or discussions with any such candidates in 2020 or 2021. Likewise, during the SEC's investigation, neither Torchlight nor Brda could identify *any* specific prospects that the company had discussions with to sell its oil and gas leases in 2020 or 2021.

76.     Without any identified buyers or ongoing negotiations, Brda knew, or was severely reckless in not knowing, that a sale of Torchlight's oil and gas assets within six months

27

of the merger closing was not possible. As Brda knew or was severely recklessly in not knowing, it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets.

77.     In addition, Brda knowingly or severely recklessly omitted material facts and information that were necessary in order to make his statements in Torchlight's public filings referenced in paragraphs 68-74 not misleading. Among other things, Brda failed to disclose that, at the time of his above-referenced statements, Torchlight had no specific prospects or candidates to buy its largest oil and gas assets, that Torchlight had unsuccessfully tried to sell those asset for years, that Torchlight had no plans in place to use "commercially reasonable efforts" to complete the sale of its assets within six months of the merger closing, or that a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates.

78.     Brda also knowingly or severely recklessly failed to disclose that he had laid the foundation for a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*—mere days after the definitive agreement for the merger between Torchlight and Meta I was signed. In particular, beginning in December 2020, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity (the **"Spin-Off Entity"**). He did not publicly disclose these plans.

79.     Additionally, Brda knowingly or severely recklessly failed to disclose that, starting in January 2021, he caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity. To conceal his plans, Brda caused Torchlight to make these monthly payments through an intermediary who received "consulting fees" for doing no actual work. He further caused Torchlight to keep inadequate books and records, and/or caused it to maintain insufficient controls, to document

28

why Torchlight was making these monthly payments to this intermediary. Brda did not publicly disclose these payments or his fully-formed spin-off plans before the merger closing.

80.     By August 2021—just six weeks after the merger closed—Brda sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called "efforts" to sell the assets and, instead, to spin off the assets into the Spin-Off Entity—which had the same name as the Spin-Off Entity that Brda identified in his presentation to Torchlight's board back in December 2020—with a specific management team that Brda and Torchlight had been paying clandestinely through an intermediary since January 2021. Consistent with Brda's recommendation, by August 17, 2021—less than 60 days after the merger closed—Meta II's Board voted to "discontinue" any so-called "effort" to sell the assets and, instead, to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible.

81.     Thus, Brda knew, or was severely reckless in not knowing, that no "commercially reasonable efforts" would be undertaken to sell Torchlight's assets, that the assets could not be sold within six months of the merger closing, and that no distribution from such a sale would occur. And he knowingly or severely recklessly made false and misleading statements and omissions to the contrary in furtherance of his scheme to manipulate Torchlight's stock price.

### ii. Palikaras made false statements about the value of the Preferred Dividend.

82.     On May 13, 2021, Palikaras participated in the Italian Investor Call, as described and alleged in paragraph 61 above. Palikaras believed that the investors on the Italian Investor Call held a significant number of shares of Torchlight common stock. The stated purposes of the Italian Investor Call were to: (a) solicit the Italian shareholders' proxy votes in favor of the merger between Torchlight and Meta I, and (b) encourage the investors to hold the common

stock of the post-merger company. During the Italian Investor Call, as discussed in paragraphs 83-88 below, Palikaras made false and misleading statements regarding at least two topics.

83.     First, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that the buyers were "top tier." However, as Palikaras knew or was severely reckless in not knowing, Torchlight had not identified *any* potential buyers. In fact, Palikaras admitted in sworn testimony during the SEC's investigation that, at the time he made the statement, he had no knowledge of potential buyers or active negotiations.

84.     Second, Palikaras claimed that, based on "the analysis," the value of the Preferred Dividend could be between $1–$20 per share.

85.     As Palikaras knew or was severely reckless in not knowing, the $1–$20 per share range that he identified was wholly unsupported. Likewise, there was no "analysis" supporting his statement. Indeed, by the time he made this statement, he had reviewed the investment bank's third-party asset valuation, which implied an estimated asset value of less than $1.00 per share. Palikaras' reference to an "analysis" also gave investors the misleading impression that his value range was supportable, when it was not.

86.     By at least June 11, 2021, a partial audio recording of the Italian Investor Call had been posted to social media, which included Palikaras' false and misleading statements referenced above. Palikaras' statements quickly became a topic of discussion on social media in the days leading up to the merger closing. A common refrain on social media was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share. Palikaras and Brda were aware of the discussions on social media and the existence of the recording, but neither one made any effort to correct or clarify Palikaras'

misstatements that, at that time, they knew, or were severely reckless in not knowing, were materially false or misleading and that investors were relying on.

87.     After the merger, Meta II's VP of Business Development emailed Palikaras and other members of the Meta II management team about an investor complaint citing the $1–$20 dividend range. Meta II's VP of Business Development stated plainly, "[t]he dividend was never going to be worth more than $1… The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares." In other words, as Meta II's VP of Business Development confirmed, Palikaras' $1–$20 estimate never had any basis in fact.

88.     Defendants' false and misleading statements gave investors the false impression that Torchlight had made some progress toward selling its oil and gas assets, and that Meta II would be able to quickly monetize Torchlight's oil and gas assets and distribute the net proceeds to shareholders post-merger. This false impression incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend. Torchlight legacy shareholders who believed Defendants' misrepresentations about the value of the Preferred Dividend were incentivized not to sell before the Record Date, and thus, missed the opportunity to sell when Torchlight's stock price increased leading up to the merger. In turn, this false impression furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock.

**G. Defendants Succeeded In Manipulating The Price Of Torchlight Stock.**

89.     As a result of their fraudulent scheme and through the use of false and misleading statements and omissions, Defendants artificially inflated the price of Torchlight stock in the days and weeks leading up to the merger closing in June 2021.

90.     On June 14, 2021—just a day after Palikaras made his "shorts-in-flames" tweet mentioned in paragraph 64 above—Torchlight issued a press release announcing the Preferred

Dividend Record Date of June 24, 2021. That same day, Palikaras issued a tweet, linking the press release and stating: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day."[4] Posts and content from other users on social media on or around June 14–22, 2021 show that investors following news about Torchlight and/or Meta I understood Palikaras' tweet to mean that the key to obtaining the benefits of the short squeeze and the Preferred Dividend—which Palikaras had led investors to believe was worth $1–$20 per share—was to buy or hold Torchlight stock through June 22, 2021 (the T+2 Date).

91.     As Defendants intended, users on Twitter, Stocktwits, YouTube, Reddit, and other social media platforms discussed the merger, the Preferred Dividend, and the short squeeze in the days leading up to the merger and Record Date.

92.     On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY." An anonymous user created a graphic that conveyed the precise message that Defendants privately hoped to spread: "Post and educate people about our short squeeze … #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras' "shorts-in-flames" tweet from the day before.

---

[4] The "T plus 2 rule" mentioned in Palikaras' tweet is the rule, in place at the time, under which the settlement cycle—the time between the transaction date and the settlement date—for most securities transactions was two business days. Thus, per this rule, investors generally had to either hold or place an order to buy Torchlight stock by June 22, 2021 ("**T+2 Date**") to ensure they were Torchlight shareholders of record as of the June 24, 2021 Record Date.

93. Social media users posted the hashtag and versions of the graphic dozens of times over a few days around June 14-16, 2021. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock to benefit from the supposed short squeeze by June 22 (the T+2 Date), using other hashtags, subreddits, and iterations discussing the Preferred Dividend, the Record Date, the expected $1–$20 dividend, and the short squeeze.

94. The trading volume of Torchlight stock dramatically surged as the merger approached. In May 2021, the average trading volume was 5 million shares per day. But, between the announcement of the Record Date on June 14, 2021 and the T+2 Date (June 22, 2021), the average trading volume exceeded 80 million shares per day.

95. Likewise, following the announcement of the Record Date on June 14, 2021, the price of Torchlight stock surged. The price at closing jumped from $3.58 per share on June 14 to $5.07 per share on June 15 to $5.99 per share on June 16. Torchlight stock price peaked at $10.88 per share on June 21—an increase of over 200% from its price at closing on June 14.

96. Torchlight's stock price artificially increased as a result of Defendants' scheme. However, the evidence available at this time is inconclusive as to whether, or to what extent, the trading volume was attributable to short sellers covering their positions versus defrauded investors purchasing Torchlight's stock to "burn the shorts" or obtain the Preferred Dividend that they believed was worth $1–$20.

97. Regardless, at the time that Torchlight's stock price was surging in June 2021, Brda and Palikaras believed that a short squeeze was driving the surge. For example, as further discussed in paragraph 104 below, on June 18, 2021—after Torchlight's stock price began to increase—Brda told Palikaras that they needed "to take advantage of the squeeze," which they

33

did through an ATM Offering that they had discussed and planned as early as September 2020. Through their deceptive marketing and promotion discussed in paragraphs 51-66 above, Defendants also led retail and other investors to believe that a short squeeze would occur and drive the surge in Torchlight's stock price. Also, the aim of Defendants' scheme was to manipulate the market by artificially increasing Torchlight's stock price. Defendants achieved that aim when Torchlight's stock price suddenly and temporarily surged in June 2021 as a result of Defendants' plans and intent to manipulate the price of Torchlight stock. And as discussed below, Defendants achieved the other aim of their scheme through an ATM Offering conducted at the height of their price manipulation.

## H. Brda Deployed An ATM Offering To Capitalize On The Fraudulent Scheme.

98.    Upon successfully manipulating the market for Torchlight common stock, Brda set in motion the next phase of the scheme: the ATM Offering. His plan— which was not disclosed in any public filings or statements—sought to capitalize on what he knew or expected to be a temporary artificial increase in Torchlight's stock price.

99.    Before executing the ATM Offering, Brda sought a formal agreement from Meta I to use some of the funds raised by the ATM Offering toward drilling oil wells to maintain Torchlight's oil and gas leases. In an email to Palikaras dated June 16, 2021, Brda wrote:

> "We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price…* I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

100.    Although Palikaras knew from the outset of negotiations about Brda's plan to use an ATM Offering to capitalize on their scheme to manipulate the price of Torchlight stock—as discussed, among other places, in paragraph 36 above— Brda waited to make this request to use

34

funds from the ATM Offering to pay Torchlight's drilling expenses until June 16, 2021—less than ten days before the Torchlight-Meta I merger was set to close. At that point in time, Brda had leverage over Palikaras and Meta I, who stood to reap the benefit of the ATM Offering for Meta II's post-merger operations.

101.    Palikaras and Meta I's CFO recommended to Meta I's Board that they take the deal proposed by Brda, writing on or around June 18, 2021: "all [Meta I's advisers] strongly recommended we take as much of the money as we can ahead of the closing." And while the ATM Offering would be "[d ]ilutive to Torchlight [common  and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date.*" (emphasis added).

102.    Despite Palikaras' recommendation, Meta I did not formally agree to Brda's demands. Nonetheless, Torchlight ultimately did vote to proceed with the ATM Offering, and later Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets—consistent with Brda's original plan and scheme.

103.    More importantly, Brda and Torchlight went forward with the ATM Offering as Defendants had planned while Torchlight's stock price was at its height. Specifically, Brda caused Torchlight, through an investment bank, to commence the ATM Offering starting on June 18, 2021—just days after the June 14 announcement of the Record Date.

104.    Brda intended the ATM Offering to capitalize on Defendants' price manipulation. On June 18, 2021—after the ATM Offering had commenced—Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… *We have two days to take advantage of the squeeze*, today should have been a 5 million share day at 6[.]" (empha sis added).

105. Palikaras knew about and agreed with Brda's plan to use the ATM Offering to capitalize on their market manipulation efforts. On June 16, 2021—as Torchlight's stock price continued to rise following the June 14 announcement of the Record Date—Palikaras wrote Brda to express his agreement with taking advantage of the inflated value of Torchlight's stock: "[t]o the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." Then, on June 18, 2021, in response to Brda's above-cited message that "[w]e have two days to take advantage of the squeeze" through the ATM Offering, Palikaras wrote Brda: "Go ahead to $5.75. 5m shares. Fill her up[.]"

106. Ultimately, Torchlight, through an investment bank, conducted the ATM Offering over a five-day period between Friday, June 18, 2021, and Thursday, June 24, 2021. In the middle of that offering period, on June 21, 2021, Torchlight's stock price reached a record high of $10.88 per share and closed at $9.92 per share. Overall, Torchlight sold 16.2 million shares during the ATM Offering at an average price of $8.50 per share. Over 95% of that volume was sold prior to the T+2 Date. In total, Torchlight raised $137.5 million through the ATM Offering.

107. Torchlight's stock price fell dramatically after the T+2 Date and Torchlight's completion of the ATM Offering. On June 22, 2021, the T+2 Date, the stock closed at $7.00 per share. By June 25th—after Torchlight had completed its ATM Offering—the stock had dropped to $4.95 per share at closing. The following Monday (June 28, 2021), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98 per share (after accounting for the reverse split, less than half its prior-day closing price). Investors who purchased or held Torchlight common stock during the course of Defendants' fraudulent scheme suffered pecuniary harm.

## I. Brda Profited From The Fraudulent Scheme.

108. Brda profited off his fraudulent scheme and false and misleading statements to investors.

109. On June 24, 2021, immediately after the ATM Offering and one day before the merger closed, Brda urged Torchlight's Compensation Committee to award him a $1.5 million bonus. He presented the Committee with a "Top Ten + 2 Reasons to Pay Bonus to John Brda," which touted his achievements in conceiving and executing the Torchlight-Meta I merger. He specifically pointed out that he "[m]anaged the entire merger process with [Meta I] leading to a market cap increase from $30 million to nearly $1.44 billion." He also wrote that he "[c]onceived the timing of the shareholder meeting with windows to raise additional equity and filing of the shelf S3 for $240 million along with the ATM—raising full amount of $133 million on ATM." He explained that he "[h]andled all investor calls and fund calls during the process." For these reasons, Brda requested a "bonus of $1.5 million in cash."

110. Meta II paid Brda the $1.5 million bonus in two $750,000 increments—half before closing on June 25, 2021, and the other half after the merger closed.

111. Brda received his $1.5 million bonus as a result of the funds he raised through his market manipulation scheme and his false and misleading statements and omissions. Had he not engaged in this fraudulent scheme, he would not have received the bonus. Indeed, to his request to the Compensation Committee, Brda attached a spreadsheet reflecting Torchlight's remaining obligations, which makes clear that the company would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering.

37

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

***(Against All Defendants)***

112.   The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

113.   Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

114.   Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

115.   By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

- employed a device, scheme, or artifice to defraud; and/or

- obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

38

- engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

116.    With regard to the violations of Section 17(a)(1), Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the violations of Sections 17(a)(2) and 17(a)(3), Defendants acted at least negligently.

117.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

*(Against All Defendants)*

118.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

119.    Between at least June 2020 and June 25, 2021, Defendants planned and perpetrated a scheme to manipulate the market by artificially increasing the price of Torchlight's stock on a temporary basis and capitalizing on that artificial increase through the ATM Offering. As further described and alleged in paragraphs 20-107 above, Defendants knowingly and/or severely recklessly engaged in deceptive and/or manipulative acts in furtherance of the fraudulent scheme.

120.    Defendants also knowingly and/or severely recklessly made false and misleading statements or omissions of material fact, as further described and alleged in paragraphs 38-50 and 67-88 above.

121.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities,

by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

- employed a device, scheme, or artifice to defraud; and/or

- made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

- engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

122. With regard to the violations of Section 10(b) and Rule 10b-5, Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

123. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)]**
**and Rule 14a-9 thereunder [17 C.F R. § 240.14a-9]**
*(Against All Defendants)*

124. The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

125. As further described and alleged in paragraphs 39-46 and 67-81 above, Torchlight's proxy statements contained false or misleading statements and/or omissions of material fact. Brda solicited and/or permitted the use of his name to solicit shareholder approval via the proxy statements containing false or misleading statements or omissions of material fact.

126.     As further described and alleged in paragraphs 82-88 above, Palikaras solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call that contained statements that, at the time and in the light of the circumstances under which those statements were made, were false or misleading with respect to a material fact, and/or that omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

127.     By engaging in the acts and conduct alleged herein, each Defendant, directly or indirectly, singly or in concert with others, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise, solicited and/or permitted the use of his name to solicit a proxy or consent or authorization with respect of securities; and such solicitation was made by means of a proxy statement or other communication, written or oral, that contained false or misleading statements with respect to a material fact and/or omitted to state a material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

128.     With regard to the violations of Section 14(a) and Rule 14a-9, Defendants acted at least negligently.

129.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Meta II's Violation s of Sectio n 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11]**

*(Against Brda)*

130.    The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

131.    At the time of the conduct alleged herein, including the statements, omissions, and periodic securities filings described above, Torchlight was an issuer of securities registered under Section 12 of the Exchange Act that filed required reports with the SEC under Section 13(a) of the Exchange Act and related rules and regulations. Torchlight subsequently merged with Meta I to become Meta II.

132.    As further described and alleged in paragraphs 67-71 and 75-81 above, Torchlight made untrue statements of material fact without adding such further material information as may be necessary to make the statements not misleading in its periodic securities filings, including but not limited to the false and/or misleading statements and/or omissions in its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021.

133.    As further described and alleged in paragraphs 15, 67-71, and 75-81 above, Brda knew or was severely reckless in not knowing that Torchlight's periodic securities filings, including but not limited to its press releases attached to its Forms 8-K filed with the SEC on December 14, 2020, April 15, 2021, May 4, 2021, and June 16, 2021, contained untrue statements of material fact without adding such further material information as may be necessary

42

to make statements not misleading in its periodic securities filings. Brda also, among other things, signed, approved, drafted or helped draft, and caused Torchlight to file such press releases and/or periodic securities filings.

134.     By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Meta II has consented to the entry of the SEC's Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("**OIP**"), finding that Meta II violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

135.     By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by knowingly or recklessly providing substantial assistance to Meta II in violating Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

136.     By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Meta II's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**
*(Against Brda)*

137.     The SEC re-alleges and incorporates paragraphs 1-111 above by reference as if fully set forth hereunder.

138.     As further described and alleged in paragraphs 55-58 and 78-80, Meta II (then Torchlight) failed to implement internal accounting controls and maintain adequate books and

43

records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to stock-support consultants who rendered services to the company without sufficient documentation.

139.     As further described and alleged in paragraphs55-58 and 78-80, Meta II (then Torchlight) also failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses through a series of payments made to an intermediary who received "consulting fees" without documentation reflecting the services this intermediary purportedly provided (such fees were ultimately paid by the intermediary to individuals who would form the initial management team of the Spin-Off Entity, but Torchlight did not maintain records reflecting the same). During the SEC's investigation, Meta II failed to provide documents or information to SEC staff describing Torchlight's internal accounting controls related to payments to consultants. If Torchlight had such internal accounting controls, they were either insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses.

140.     Torchlight's stock support consultants, and the consultant used to funnel $20,000 per month to the Spin-Off Entity management, provided no evidence to Torchlight of services rendered other than generic consulting contracts. This expense represented a substantial portion of Torchlight's overall expenses in the first half of 2021.

141.     By engaging in the acts and conduct alleged herein, Meta II—as the successor-in-interest of Torchlight—violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Meta II has consented to the entry of the SEC's OIP, finding that Meta II violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

44

142. By engaging in the acts and conduct alleged herein, Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by knowingly or recklessly providing substantial assistance to Meta II in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

143. By reason of the foregoing, Brda, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet—and/or should be restrained from further aiding and abetting—violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## VII.   PRAYER FOR RELIEF

144. WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

- Permanently restraining and enjoining Defendant Brda from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder, and from aiding and abetting future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder;

- Permanently restraining and enjoining Defendant Palikaras from violating, directly or indirectly, Section 17(a) of the Securities Act and Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder;

- Permanently barring each Defendant, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, from acting or serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

- Permanently restraining and enjoining each Defendant from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account;

- Ordering Defendant Brda to disgorge all ill-gotten gains received as a result of the violations alleged herein, together with pre-judgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

- Ordering each Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

- Granting such other and further relief as this Court may deem appropriate, just, equitable, and/or necessary.

## VIII.  JURY DEMAND

145.    The SEC demands trial by jury in this action on all issues so triable.


Dated:  June 25, 2024                    Respectfully submitted,


/s/ *Patrick Disbennett*
Patrick Disbennett (*pro hac vice* application pending)
Christopher Rogers (*pro hac vice* application pending)

U.S. Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

46

JS 44C/SDNY
REV.
05/28/2024

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

DEFENDANTS

JOHN BRDA
GEORGIOS PALIKARAS

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER

Patrick B. Disbennett
801 Cherry St, Suite 1900, Fort Worth, TX 76102 - 817-978-3821

ATTORNEYS (IF KNOWN)

Jason Lewis, 1900 Pearl St., Ste 2200, Dallas, TX 75201, 214-743-4548
Jessica B. Magee, 1722 Routh St., Ste1500, Dallas, TX 75201, 214.969.1375

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
Section 17(a) of the Securities Act of 1933, 10(b) & 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9 thereunder, 13(a), 13(b)(2)(A), & 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Violations of Securities.

Has this action, case, or proceeding, or one essentially the same, been previously filed in SDNY at any time? No [✓] Yes [ ] _____

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE? No [X] Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)* **NATURE OF SUIT**

TORTS

ACTIONS UNDER STATUTES

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**

[ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING

[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**

[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**

[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**IMMIGRATION**

[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS    [ ] 880 DEFEND TRADE SECRETS ACT
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**

[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 485 TELEPHONE CONSUMER PROTECTION ACT
[ ] 490 CABLE/SATELLITE TV
[X] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE_____ DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: x YES    NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

Case 24-50782-sgj  Doc 2750  Entered 04/29/25 15:22:00  Page 78 of 118

*(PLACE AN x IN ONE BOX ONLY)*  **ORIGIN**

[X] 1 Original Proceeding  [ ] 2 Removed from State Court  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation (Transferred)  [ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. all parties represented

[ ] b. At least one party is pro se.

[ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN x IN ONE BOX ONLY)*  **BASIS OF JURISDICTION**

[X] 1 U.S. PLAINTIFF  [ ] 2 U.S. DEFENDANT  [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)  [ ] 4 DIVERSITY

***IF DIVERSITY, INDICATE CITIZENSHIP BELOW.***

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [X] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry St., Suite 1900
Fort Worth, TX 76102

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

John Brda, Saint Louis, MO 63122
Georgios Palikaras, Nova Scotia, Canada B3M 2Z8

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I have reviewed Rules 18(a) and 20(a) of the Rules for the Division of Business Among District Judges, Southern District of New York, and I hereby certify that this case should be assigned to the courthouse indicated below pursuant thereto.

Check one:  THIS ACTION SHOULD BE ASSIGNED TO:  [ ] WHITE PLAINS  [X] MANHATTAN

DATE 06/25/2024    s/Patrick B. Disbennett

SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[X] NO
[ ] YES (DATE ADMITTED  Mo. _____  Yr. _____)
Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Daniel Ortiz, Acting Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# EXHIBIT B-2

# EXHIBIT B-2

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 11292 / June 25, 2024

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 100415 / June 25, 2024

**ADMINISTRATIVE PROCEEDING**
File No. 3-21976

| | |
|---|---|
| In the Matter of<br><br>**META MATERIALS, INC. (f/k/a TORCHLIGHT ENERGY RESOURCES, INC.)**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Meta Materials, Inc. ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      In June 2021, Respondent raised $137.5 million in an at-the-market offering (the "ATM Offering"). Leading up to the offering and in connection with a merger, Respondent engaged in a scheme to inflate the price of its stock and defraud investors through numerous material misstatements and omissions about the potential value of a stock dividend to be issued as part of the merger. As a result of its fraudulent conduct, Respondent sold 16.2 million shares during its ATM Offering for tens of millions of dollars more than it could have absent its efforts to inflate its stock price.

2.      Respondent artificially inflated the value of its common stock by structuring a merger between its predecessor entities (Torchlight Energy Resources and Metamaterial Inc.) to include an unregistered preferred stock dividend that would not be immediately publicly tradeable (the "Preferred Dividend"), specifically designed to cause a "short squeeze." Respondent privately and selectively disseminated—through paid consultants, private conversations with investors, and via social-media messages—the theory that the Preferred Dividend would cause a short squeeze by forcing short-sellers in Respondent's stock to cover their positions before Torchlight issued the Preferred Dividend or risk violating their short contracts by having difficulty delivering the Preferred Dividend when the merger closed. But Respondent never disclosed in its public filings its intent to cause a short squeeze, and it waited until the last minute to announce the ATM Offering to capitalize on what Respondent believed would be a short-term price inflation of its stock.

3.      In support of its scheme, Respondent made false and misleading statements about the Preferred Dividend, which entitled its holders to receive the net proceeds of the sale of Respondent's oil and gas assets. In its public filings, Respondent misrepresented the status of its efforts to market and sell those assets while concealing a planned spin-off of the assets into a new entity. Further, in May 2021, Respondent's incoming Chief Executive Officer baselessly claimed that the value of the Preferred Dividend could be between $1 and $20 per share when, in fact, a valuation study by Respondent's investment bankers only supported a per-share value range of $0.03 to $0.83.

4.      Respondent's scheme occurred against the backdrop of a lax internal control environment. Respondent failed to devise and maintain internal accounting controls and make and keep adequate books and records by failing to account properly for the disposition of corporate assets or the recognition of legitimate expenses related to a series of payments made to stock promoters who rendered services to the company without any documentation. In addition, Respondent paid consulting fees designed to conceal the recruitment and compensation of a team

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

of individuals that were retained to spin-off Respondent's oil and gas assets into a new entity at the same time that Respondent touted in its public statements its intention to make efforts to sell the oil and gas assets and distribute the net proceeds to Preferred Dividend holders.

## Respondent

5.      Meta Materials, Inc. ("Meta II" or "Respondent") is a Nevada corporation headquartered in Dartmouth, Nova Scotia, Canada. Meta II was created on June 28, 2021 through a reverse merger between: (i) Torchlight Energy Resources, Inc. ("Torchlight"), a publicly traded Texas corporation headquartered in Plano, Texas that purported to be in the business of oil and gas exploration and production, then listed on the Nasdaq under the ticker symbol "TRCH"; and (ii) Metamaterial, Inc. ("Meta I"), a Canadian headquartered company then listed on the Canadian Securities Exchange and focused on early-stage applied materials technology research and development. Today, Meta II's common stock, which trades under the Nasdaq ticker symbol "MMAT," is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Concurrent with the merger, Torchlight issued the Preferred Dividend to Torchlight shareholders of record as of June 24, 2021, and Torchlight shares became Class A Preferred Shares of Meta II after the merger closed.

## Other Relevant Individuals

6.      John A. Brda, age 59, resides in St. Louis, Missouri. Brda served as Torchlight's CEO from 2014 through its merger with Meta I on June 28, 2021. Post-merger, Brda held a consulting role with Meta II through late 2022.

7.      Georgios "George" Palikaras, age 42, is a Greek citizen who resides in Halifax, Nova Scotia, Canada. From 2011 to 2021, Palikaras was Meta I's President & CEO. Upon Meta II's creation, Palikaras became President & CEO of Meta II and served on its board of directors ("Board"). In October 2023, Meta II terminated Palikaras and he subsequently resigned from the Board.

## Background

### Torchlight's Plan to Use a Preferred Dividend to Cause a Short Squeeze

8.      In early 2020, after selling off essentially all of its revenue-generating oil and gas properties, Torchlight faced an uncertain future: its stock traded below $1.00 per share, Nasdaq issued a delisting warning, and its auditors issued a going-concern warning. In response to Torchlight's predicament, Brda, Torchlight's CEO, implemented a plan:

- Find a merger partner who desired Torchlight's Nasdaq listing but not its remaining oil and gas assets;

3

- Issue a Preferred Dividend in the form of preferred stock that would not be listed or traded on any exchange as part of the merger structure, ostensibly to allocate proceeds from the sale of Torchlight's remaining oil and gas assets to legacy Torchlight shareholders;

- Market and promote the Preferred Dividend to emphasize to the market that short sellers would have difficulty obtaining the Preferred Dividend without owning Torchlight stock, thus pressuring short sellers to close their positions or obtain Torchlight stock before the record date for the Preferred Dividend ("Record Date"), temporarily inflating the price of Torchlight's common stock;

- Leverage the resulting inflated common stock price to raise capital through an ATM Offering and remove debt through debt conversion; and

- Use capital raised through the ATM Offering to drill wells required to maintain Torchlight's remaining oil and gas leases.

9.    Brda explained his plan—including the use of the Preferred Dividend to pressure short sellers—to members of Torchlight's Board of Directors, its investment banker, and several prospective merger partners, including Palikaras and the Meta I Board of Directors. From its earliest conception, in brainstorming the plan with Torchlight's Chairman and its lead banker in June 2020, Brda explained that, "[b]y issuing a Pref to [Torchlight] shareholders of record at closing, and announcing it as part of the [merger agreement], the short position which is quite extensive will be forced to cover." Also in June 2020, Brda explained to a potential merger partner that he expected Torchlight's stock price to increase "temporarily because of the short squeeze" while acknowledging that the resulting price increase would be "unsustainable." In initial merger discussions, Brda explained to Palikaras how the deal structure could create a short squeeze and the plan to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma."

**Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative**

*Brda Caused Torchlight to Make Public Statements to "Play Up" the Preferred Dividend*

10.    Torchlight never directly disclosed in any public filing the full scope of Brda's plan to use the Preferred Dividend to create a short squeeze. In Torchlight's 2020 Form 10-K filed March 18, 2021, Torchlight disclosed that "[t]he market price of our common stock may be influenced by many factors," including among "many" other factors, "actual or purported 'short-squeeze' trading activity." However, Torchlight did not publicly disclose that the Preferred Dividend could cause a short squeeze, much less that the Preferred Dividend was designed to create a short squeeze or that the ATM Offering was conducted to "take advantage of the squeeze." Instead, Torchlight's 2020 Form 10-K stated that "we have no reason to believe our shares would be the target of a short squeeze," which was directly contrary to the statements that Respondent and its executives made privately about the Preferred Dividend and the plan to create a short squeeze.

4

11.     Instead, in reports filed with the Commission and in public statements, Brda and Torchlight focused attention on the Preferred Dividend and the supposed net profits from the sale of Torchlight's oil and gas assets that Preferred Dividend holders could expect to receive, highlighting the Preferred Dividend in the announcement of the merger, the announcement of a final signed merger agreement, and the proxy filings concerning the merger. Torchlight also emphasized in its proxy filings that the Preferred Dividend would not be registered, would not be listed on any national exchange, and would not be "freely transferrable" unless an exemption applied. Brda believed that once short sellers understood it would be difficult acquire the Preferred Dividend in the market, they would be forced to cover their short positions in Torchlight because they would otherwise have difficulty obtaining the Preferred Dividend to comply with the terms of their short contracts, which would require them to deliver the proceeds or equivalent value of an in-kind dividend like Torchlight's Preferred Dividend. The company planned to leverage this short-covering activity by issuing shares via an ATM Offering and removing debt through equity conversions. But neither Torchlight nor Brda explained the full plan in public; rather, they selectively disseminated portions of the plan through consultants, via hints dropped on social media, and to select investors.

*Torchlight and Brda Used Consultants to Spread Their Short Squeeze Theory to Investors*

12.     Torchlight paid individual consultants to communicate with Torchlight's current or potential shareholders. Through these consultants—two of whom Brda introduced to Palikaras as his "guys on stock support"—Brda communicated selective information about the merger to investors. For example, Brda emailed two of the consultants a slide presentation containing the plan to "[p]lay up the dividend to make sure the shorts understand their dilemma."

13.     On the day that Torchlight and Meta I announced their letter of intent to merge, Brda forwarded the consultants a draft press release announcing the merger, complaining that the stock price had not moved enough, "I think people don't understand the dividend properly." On September 21, 2020, Brda forwarded to two consultants the press release that Torchlight issued that day, announcing that it had entered into a letter of intent with Meta I to merge, and the following exchange occurred:

> **Brda:** We need your guys to embrace it. IMO, you get the [Torchlight] value up to $1 and then the 25% of META is free. Lots of room to build a nice position.
>
> **Consultant:** Agreed, Everyone I've spoke [sic] to today love it and are buying more and are long term investors! TONS of volume but not moving up?
>
> **Brda:** I think people don't understand the dividend properly.
>
> **Consultant:** I agree, I'm explaining it and I can hear the light come on while I'm talking to people.

14.     In January 2021, Brda emailed information about the outstanding short position in Torchlight to the stock-support consultants and wrote, "[w]e all knew [the shorts] would come

after us one more time. They are creating a massive bubble, IMO, that is going to slingshot in our favor. The dividend is going to be a huge problem for them."

15.     Other than generic contracts obligating the consultants to "introduce" the company to potential investors, Torchlight kept no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants for their services.

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative in Communications with Select Investors and Select Prospective Investors*

Virtual Investor Conference

16.     During Spring 2021, Brda and Palikaras conducted meetings with investors through conferences organized by Torchlight's financial advisors. From March 16-18, 2021, Brda and Palikaras met with a series of institutional investors at a virtual investor conference. During these meetings, Brda and Palikaras pitched the justification for the merger to one investor group at a time, and Brda explained to at least one investment firm the potential for the Preferred Dividend to cause a short squeeze and Torchlight's plan to conduct a substantial ATM Offering concurrent with the merger close. In contrast, Torchlight never disclosed in its public filings the Preferred Dividend's potential impact on short sellers, and it waited to publicly disclose the ATM Offering until June 16, 2021.

Italian Investor Call

17.     In May 2021, Torchlight's investor relations firm set up several virtual meetings with a group of Italian shareholders that Torchlight believed held more than one million shares of its common stock. Brda attended one of the meetings, and Palikaras attended another. The stated purposes of the meetings were to solicit the Italian shareholders' proxy votes in favor of the merger and to encourage the investors to hold the common stock of the post-merger company. During his May 13, 2021 meeting with Italian shareholders (the "Italian Investor Call"), Palikaras described the plan to use the Preferred Dividend to create a short squeeze on several occasions, for example:

> And there is one more element to add here, which is the, let's call the x-factor. If you notice the **Torchlight stock is massively shorted ... This deal is set up not to give a [cash] dividend at closing...** As a result, there is **no physical way for the shorts to cover the stock when the time to close**, and we believe ... **the close, it's called a short squeeze...** (emphasis added).

18.     On June 7, 2021, a user posted on social media a screenshot purporting to show that the user recorded the Italian Investor Call. The user claimed they participated in the call and summarized their takeaways, including that the Preferred Dividend would "create a short squeeze as there are many short stocks to cover before the merger!!" Three days later, a Reddit user posted a partial audio recording of Palikaras's comments during the Italian Investor Call, including the plan to create a short squeeze.

6

*Torchlight, Brda, and Palikaras Promoted the Short Squeeze Narrative, Including on Social Media*

19.     Palikaras and Brda also used Twitter to tout the Preferred Dividend and short squeeze theory. For instance, on June 7, 2021, one week before Torchlight announced the Record Date, Brda posted on Torchlight's Twitter account a video discussing short squeezes in the context of other stocks. After viewing the tweet, Palikaras texted Brda, advising caution: "I don't think you should be sharing posts on the short squeeze…yet. Just my two cents. ***Once it happens*** that's ok as it is fact, but [if you do it] before you are putting yourself at risk for potentially speculative content." (emphasis added).

20.     Six days later, the day before Torchlight announced the Record Date, Palikaras tweeted a graphic of shorts-in-flames, kicking off a series of tweets and public statements designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock:



21.     Palikaras's tweet received several public replies connecting the tweet to the short squeeze theory. For example, one user responded, "You should set the price of the shorts the price of TRCH at the end of the short squeeze." Another wrote, "We definitely get the reference 'Shorts Are Getting Burne[d].'"

22.     The next day, on June 14, 2021, Torchlight issued a press release announcing the Record Date (June 24, 2021), kicking off the sequence of events that culminated in the ATM Offering.

7

**Torchlight, Brda, and Palikaras Misrepresented the Value of the Preferred Dividend**

23.     To support their efforts to manipulate the market for Torchlight's common stock and encourage investors to buy or hold Torchlight's common stock, Torchlight and Brda misrepresented the likelihood of a distribution of the "net proceeds" from the sale of Torchlight's oil and gas assets. They encouraged investors to buy or hold Torchlight's common stock by: (1) Torchlight and Brda giving the false impression in public filings and statements that Torchlight would undertake commercially reasonable efforts to sell the oil and gas assets; (2) Torchlight and Brda referencing the net proceeds that would be distributed to Preferred Dividend holders following the sale; and (3) Palikaras providing a wholly unsupported per-share value estimate (between $1 and $20) of net proceeds payable to Preferred Dividend shareholders that became a widely circulated talking point on social media.

*Torchlight and Brda Misrepresented Ongoing "Commercially Reasonable Efforts" to Sell Torchlight's Oil and Gas Assets and Distribute "Net Proceeds" in Proxy Filings and Forms 8-K*

24.     In public filings leading up to the merger, particularly in its preliminary and final proxy materials soliciting shareholder approval, Torchlight bolstered the potential value of the Preferred Dividend by misrepresenting that it would make "commercially reasonable efforts" to sell its oil and gas assets and distribute the net proceeds to Class A Preferred Shareholders within six months of the merger closing. In total, Torchlight repeated the claim that it would make "commercially reasonable efforts" to sell the oil and gas assets seven or eight times in each version of the proxy filings. And, references to the net proceeds to be distributed to preferred shareholders repeatedly appeared in press releases throughout the period that the merger was pending, including press releases dated April 15, 2021, May 3, 2021, and June 14, 2021 subsequently attached to current reports filed with the Commission.

25.     In reality, Torchlight had no prospects to sell the oil and gas assets. Torchlight made no effort to lay the groundwork for a sale when it made the aforementioned statements. The company's records contain no evidence of any communications with specific prospects from any time in 2020 or 2021. Due to the size and unproven state of Torchlight's oil and gas assets, only a small number of very large oil companies would be viable candidates to purchase Torchlight's assets. Even Brda acknowledged that only "very specialized buyers" would be interested in Torchlight's assets and that it would take from up to a year to a year and a half to complete the sale considering the due diligence a specialized buyer would need to undertake. Torchlight's long-time investment banker, who was not retained to sell the oil and gas assets, believed that it could take two to three years to complete such a sale.

26.     To the contrary, as early as December 2020, Brda had already begun planning a spin-off of the oil and gas assets into a new entity. Just days after Torchlight and Meta I signed the definitive agreement for the merger, Brda circulated to Torchlight's Chairman and other insiders presentations outlining capital formation plans for a spin-off entity, "Next Bridge Hydrocarbons, Inc." Then, in January 2021, Brda and Torchlight began paying $20,000 a month (through an

8

intermediary who received "consulting fees" for doing no actual work) to individuals who would form the initial management team of Next Bridge Hydrocarbons.

27.     By August 17, 2021, less than 60 days after the merger closed, Meta II's board voted to drill wells required to maintain the leases, with a goal of spinning off the assets into a separate company as soon as possible. Then, in December 2022, Meta II spun out the oil and gas assets into a new company—Next Bridge Hydrocarbons—the same entity name that Brda identified when he first began to plan for a spin-off transaction in December 2020.

*Palikaras's False Claim About the Value of the Preferred Share Dividend*

28.     On the May 13, 2021 Italian Investor Call, where Palikaras described the short squeeze to a select group of investors, he also made false and misleading statements about Torchlight's efforts to sell its oil and gas assets, and the potential values of a cash distribution of the net proceeds from that sale.

29.     During the call, Palikaras claimed that Torchlight was speaking to "the right potential buyers" and that those buyers were "top tier," when, in fact, Torchlight had not identified any potential buyers and Palikaras admitted that he had no knowledge of potential buyers or active negotiations.

30.     Palikaras also mentioned on the Italian Investor Call that, "according to the analysis," the value of the Preferred Dividend could be between $1-$20 per share. The $1-$20 range was wholly unsupported by a valuation study performed by Torchlight's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share. Palikaras's reference to an "analysis" gave investors the misleading impression that his value range was supportable when it was not.

31.     These statements by Palikaras quickly became a topic of discussion on social media, continuing to drive mentions throughout the ATM offering period. A common refrain on social media was that the company's CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share.

32.     After the merger, Meta II's VP of Business Development emailed Palikaras and other Meta II leadership about an investor complaint citing the $1-$20 dividend range. In the email, the VP stated plainly, "[t]he dividend was never going to be worth more than $1... The math was not difficult prior to the merger: value of O&G assets / number of pre-existing TRCH shares."

*Torchlight, Brda, and Palikaras Misled Investors about the Preferred Dividend.*

33.     The false and misleading statements by Torchlight, Brda, and Palikaras made investors believe that Meta II could quickly monetize the oil and gas assets and distribute the net proceeds to Preferred-Dividend holders post-merger. This belief incentivized Torchlight shareholders to acquire or hold the common stock through the Record Date so they would be

9

eligible to receive the Preferred Dividend. On July 21, 2021, just weeks after the merger closed, Meta II's CFO emailed Palikaras about the importance of demonstrating to the marketplace that Meta II took steps to diligently pursue a purchaser for the oil and gas assets before proceeding to a spin-off given the "preferred holders who are expecting to see cash for their shares."

34.    As it became clear that Meta II would not immediately pay Preferred Dividend holders any net proceeds and that no Torchlight asset sale (or net proceeds therefrom) were forthcoming, investors began to complain. One investor emailed Palikaras directly on August 15, 2021, suggesting that Meta II issue stock to Preferred Dividend holders "somewhere near the middle of the proposed $1 - $20 dividend range" to "help take the sting away."

**Torchlight's Market Manipulation Scheme Caught Fire**

35.    Brda and Palikaras privately celebrated as Torchlight's stock became a hot topic of conversation on social media in the days before the merger. Users on platforms from Twitter to Stocktwits to YouTube to Reddit discussed the merger, the Preferred Dividend, and the short squeeze. On June 14, 2021, Brda sent Palikaras an image of an online campaign promoting the short squeeze theory using the hashtag "#TORCHDAY," which succinctly summed up the plan: "Post and educate people about our short squeeze ... #TORCHDAY" and "Post and educate people about our dividend ranging from $1 - $20 (deadline 06/22)." The graphic went on to explain, "[Torchlight] is a heavily shorted stock, and due to the fact a preferred share dividend is being granted to stockholders SHORTS HAVE TO COVER which can lead to a short squeeze of the stock." The Torch Day graphic also explicitly referenced Palikaras's "shorts-in-flames" tweet from the day before.

36.    Social media users posted the hashtag and versions of the graphic dozens of times in the days surrounding the Record Date announcement. And users on many other social-media platforms picked up on the basic gist of the scheme to promote purchasing Torchlight common stock by June 22, 2021 to benefit from the supposed short squeeze and the Preferred Dividend worth $1-$20 per share, using other hashtags, subreddits, and iterations on the short squeeze theory.

37.    Palikaras celebrated the "#TORCHDAY" campaign's impact on the price of Torchlight's stock and what it portended for the plan to use the ATM Offering to capitalize on the attention, texting Brda: "To the moon! We are happy to take $100-200m at a 20% PREMIUM TO THE MARKET and a minimum of $7 whatever is largest." (emphasis in original). Brda agreed: "I think we can get there, just need to have diamond hands."

38.    The trading volume in Torchlight's common stock dramatically escalated as the merger approached. In May 2021, the average trading volume was five million shares per day. But, between the announcement of the Record Date on June 14 and the deadline to purchase Torchlight stock in order to obtain the Preferred Dividend on June 22, the average trading volume exceeded 80 million shares per day.

39.    On June 14, 2021, the day after Palikaras made his "shorts-in-flames" tweet, Torchlight issued a press release, announcing the Record Date of June 24, 2021. Palikaras issued a

10

tweet, linking the press release and promoting the June 24th record date: "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Investors following Torchlight understood Palikaras's tweet to mean that the supposed key to ensuring the short squeeze and obtaining the Preferred Dividend that Palikaras touted would be worth $1—$20 per share was to buy or hold Torchlight stock by or through June 22, 2021. Torchlight's stock price immediately reacted, jumping from $3.58 to $5.07. It would reach $10.88 in the days leading up to the June 25 merger close.

**Torchlight Profited from Its Manipulation of Torchlight's Stock Price Using the ATM Offering**

40.     Torchlight's Board, Meta I's Board, Brda, and Palikaras discussed their intention to raise funds at artificially inflated prices in a series of exchanges that occurred on the eve of the ATM Offering. As Torchlight's stock price rose after the announcement of the Record Date, Brda demanded a *quid pro quo* from Meta I: Torchlight (and Brda) would not go forward with the long-planned ATM Offering unless a portion of the funds raised by the ATM Offering would  go toward drilling oil wells to maintain Torchlight's oil and gas leases.

41.     In a memo to the Meta I team, Brda explained that Torchlight's Board would not agree to conduct the ATM Offering without assurances that they would receive the *quid pro quo* that they requested:

> We have the ATM that will be in play by Thursday morning… up to $100 Million… *Raising money prior to the dividend record date, IMO, is the best way to get maximum money and at the best price…* I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]… Say 20% of the amount raised… *Otherwise, we have no inclination to raise capital now* as it only dilutes our oil and gas assets further…. The ducks are quacking, time to feed them!" (emphasis added).

42.     Palikaras and Meta I's CFO recommended to Meta I's Board that they approve conducting the ATM Offering, stating "all [Meta's advisers] *strongly recommended we take as much of the money as we can ahead of the closing.*" (emphasis added). And although the ATM Offering would be "[d]ilutive to Torchlight [common and preferred] shareholders, before Ex-Dividend date *however it also takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date.*" (emphasis added).

43.     Although Meta I did not formally agree to Brda's demands, Meta II ultimately did enter into an agreement with Brda post-merger regarding an amount to fund drilling for the oil and gas assets—consistent with Brda's original plan and part of his scheme.

44.     The day after Torchlight's stock price increased dramatically in response to the news of the Record Date announcement, Torchlight executed a sales agreement with an investment bank to conduct the ATM Offering. As a result of the ATM Offering, Torchlight sold 16.2 million shares of common stock between June 18 and June 24, at an average price of $8.50 per share,

11

raising $137.5 million. Over 95% of that volume was sold prior to the "T plus 2" date of June 22, 2021.

45.    Torchlight's stock reached its highest price around the "T plus 2 date" of June 22, 2021 just as Torchlight, Brda, and Palikaras predicted. But after closing at $9.92/share on June 21st, and $7.00/share on June 22nd, the stock price fell dramatically. On June 25, 2021, the Preferred Dividend payment date, the stock closed at $4.95/share. The following Monday (June 28th), after Torchlight announced a 2-for-1 reverse stock split and the completion of its merger with Meta I, the company's new ticker (MMAT) closed at $3.98/share (after accounting for the reverse split, less than half its prior day close).

46.    The communications by Brda and Palikaras during the ATM Offering reflected their intent to take advantage of the manipulated stock price. On Friday, June 18, after Torchlight sold two million shares on the first day of active selling on the ATM Offering, Brda texted Palikaras, "[w]e *have two days to take advantage of the squeeze*, today should have been a 5 million share day at 6 [dollars per share]…" (emphasis added). Palikaras responded, "[f]ill her up[.]" Another member of Torchlight's Board wrote to Brda, asking his input about transacting in the stock, "I won't move if I have information that isn't public, but *if this short squeeze goes high enough I don't want to miss it* if I can participate legally." (emphasis added).

## Violations

47.    As a result of the conduct described above, Respondent violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities; Section 17(a)(1) of the Securities Act, which prohibits the use of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of securities; and Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities … directly or indirectly … to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

48.    As a result of the conduct described above in Paragraphs 24 through 26, Respondent violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities … directly or indirectly… to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading."

49.    As a result of the conduct described above, Respondent violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibit the use of a proxy statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

12

50.     As a result of the conduct described above, Respondent violated Section 13(a) of the Exchange Act and Rules 12b-20, and 13a-11 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission information, documents, and current reports as the Commission may require, and mandate that the reports contain such further material information as may be necessary to make the required statements not misleading.

51.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(A) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

52.     As a result of the conduct described above, Respondent violated Section 13(b)(2)(B) of the Exchange Act, which requires issuers with a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act and Rules 10b-5(a), 10b-5(c), 12b-20, 13a-11, and 14a-9 thereunder.

B.     Respondent shall pay a civil penalty of $1,000,000 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.  Payment shall be made in the

13

following installments: $250,000 within 30 days after entry of this order; $250,000 within 120 days after entry of this order; $250,000 within 210 days after entry of this order; and the remaining balance within 300 days after entry of this order. Payments shall be applied first to post order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Meta Materials, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to B. David Fraser, Associate Director, Division of Enforcement, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Unit 18, Fort Worth, TX 76102.

C.     Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change

14

the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

D.      Respondent acknowledges that the Commission is not imposing a civil penalty in excess of $1,000,000 based upon its agreement to cooperate in a Commission investigation and related enforcement action. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay an additional civil penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

By the Commission.

Vanessa A. Countryman
Secretary

15

# EXHIBIT C

# EXHIB T C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

## FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2024

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to

Commission File Number: 001-36247

# Meta Materials Inc.
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Nevada** | **74-3237581** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **60 Highfield Park Drive** | |
| **Dartmouth, Nova Scotia, Canada** | **B3A 4R9** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (902) 482-5729

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MMAT | Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**3. Going Concern**

At each reporting period, we evaluate whether there are conditions or events that raise substantial doubt about our ability to continue as a going concern within one year after the date that the financial statements are issued. Our evaluation entails analyzing prospective operating budgets and forecasts for expectations of our cash needs and comparing those needs to the current cash and cash equivalent balances. We are required to make certain additional disclosures if we conclude substantial doubt about our ability to continue as a going concern exists and it is not alleviated by our plans or when our plans alleviate substantial doubt about our ability to continue as a going concern.

In accordance with Accounting Standards Codification, or ASC, 205-40, *Going Concern*, we evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern within one year after the date that these condensed consolidated interim financial statements are issued. This evaluation initially does not take into consideration the potential mitigating effect of management's plans that have not been fully implemented as of the date the financial statements are issued. When substantial doubt exists under this methodology, management evaluates whether the mitigating effect of our plans sufficiently alleviates substantial doubt about our ability to continue as a going concern. The mitigating effect of management's plans, however, is only considered if both (1) it is probable that the plans will be effectively implemented within one year after the date that the condensed consolidated interim financial statements are issued, and (2) it is probable that the plans, when implemented, will mitigate the relevant conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that these condensed consolidated interim financial statements are issued. In performing its analysis, management excluded certain elements of its operating plan that cannot be considered probable.

We have incurred net losses of $7.5 million and $398.2 million for the three months ended March 31, 2024 and the twelve months ended December 31, 2023, respectively, and have an accumulated deficit of $616.5 million as of March 31, 2024. As of March 31, 2024, we had a working capital deficit of $7.9 million (As of December 31, 2023 – working capital deficit of $6.2 million). In addition, we have incurred negative cash flows from operating activities of $5.9 million and $42.2 million for the three months ended March 31, 2024 and the twelve months ended December 31, 2023, respectively. Additionally, we did not receive stockholder approval to increase the number of common stock authorized and available for issuance during the Special Meeting of Stockholders held on April 15, 2024. As a result, we do not have a sufficient number of authorized, available and unreserved common stock for issuance, to raise additional funds through equity financing. Our expectation of incurring operating losses and negative operating cash flows in the future, the need for additional funding to support our planned operations, and the risk that we may not receive approval to increase the number of common stock authorized and available for issuance raise substantial doubt regarding our ability to continue as a going concern for a period of one year after the date that these condensed consolidated interim financial statements are issued.

Management's plans to alleviate the events and conditions that raise substantial doubt include reduced spending, the pursuit of additional financing, and other measures to increase cash inflows. On June 6, 2023, our board of directors approved a revised operating plan (the "Realignment and Consolidation Plan") pursuant to a process for increased focus on key applications with the greatest near-term revenue potential, and of realignment of our resources and structure for reduced operating expenses. See Note 4 for further details regarding the Realignment and Consolidation Plan. While the Realignment and Consolidation Plan improved operational efficiency and significantly reduced our costs, we have been unable to secure additional financing, which necessitated further measures to improve cash flow.

On May 2, 2024, our board of directors approved a reduction in our workforce by approximately 80% of our employees (the "Workforce Reduction") in order to preserve cash resources. The Workforce Reduction is expected to be completed over the next few weeks. We estimate that we will incur aggregate charges in connection with the Workforce Reduction of approximately $1.5 million, which relate to severance payments, benefits and related costs. The estimate of the charges that we expect to incur in connection with the Workforce Reduction, and the timing thereof, are subject to several assumptions and the actual amounts incurred may differ materially from these estimates. In addition, we may incur other charges or cash expenditures not currently contemplated due to unanticipated events that may occur, including in connection with the implementation of the Workforce Reduction.

Management has concluded the likelihood that our plan to successfully obtain sufficient funding, or adequately reduce expenditures, while possible, is less than probable because these plans are not entirely within our control. We continue to evaluate all available strategic alternatives including, but not limited to, the divestiture of assets, additional financing security and/or the sale of the Company. There can be no assurance regarding the outcome of this process. Without an influx of cash to support operations, the Company faces financial hardship that may result in bankruptcy proceedings. Accordingly, we have concluded that substantial doubt exists about our ability to continue as a going concern for a period of at least twelve months from the date of issuance of these condensed consolidated interim financial statements.

the amounts and classification of liabilities that might result from the outcome of the uncertainties described above. These adjustments may be material.

**4. Realignment and Consolidation Plan**

As of March 31, 2024, as a result of the Realignment and Consolidation Plan approved by our board of directors on June 6, 2023, substantial progress has been made in restructuring our corporate structure to decrease operating expenses and concentrate on key areas with significant revenue potential, such as authentication, wide area motion imagery, battery materials, and transparent conductive films.

During the three months ended March 31, 2024, we recognized $0.3 million of restructuring expense in relation to the plan, which consisted of severance payments for actual terminations under the Realignment and Consolidation Plan. The total expenses incurred from the plan's inception through March 31, 2024 amounted to $4.1 million. We accrue costs in connection with ongoing restructuring actions. These accruals include estimates primarily related to employee headcount, local statutory benefits, and other employee termination costs. We calculate severance obligations based on standard practices or the contractual obligations if applicable. As of March 31, 2024, we recorded $1.0 million in provisions for severance payments and contract termination costs when probable and estimable since we committed to the Realignment and Consolidation Plan. These accruals have been reviewed on a quarterly basis and changes to restructuring actions are appropriately recognized when identified. We also have one-time benefit arrangements with certain employees, which have been recorded in accordance with ASC 420 where a one-time termination benefit is accrued when the terms of the benefit arrangement is communicated to the affected employees and may be spread over a future service period through the termination date.

Cash payments relating to restructuring costs in the three months ended March 31, 2024 were $0.4 million. The costs related to restructuring activities have been recorded in the restructuring expense in the condensed consolidated interim statement of operations and comprehensive loss.

**5. Notes Receivable**

During 2021 and 2022, META loaned money to Next Bridge Hydrocarbons Inc. ("Next Bridge"), which was previously a wholly-owned subsidiary of META until the completion of the spin-off transaction on December 14, 2022, pursuant to a secured promissory note with principal amount of $15.0 million, or the 2021 Note, and unsecured note receivable for principal amount of $5.0 million, or the 2022 Note. The 2021 Note was partially secured by a combination of shares of META's common stock and an interest in the Orogrande Project Property.

In August 2023, we entered into a Loan Sale Agreement with Gregory McCabe, selling all rights, titles, interests, and obligations in the loans previously extended to Next Bridge Hydrocarbons Inc ("Next Bridge Notes Receivable"). This sale was finalized for cash consideration of $6.0 million, representing $24.0 million outstanding balance of the Next Bridge Notes Receivable as of the closing date, August 7, 2023. Concurrently, META and Mr. McCabe agreed on a Stock Purchase Agreement ("SPA"), whereby Mr. McCabe committed to purchasing $6.0 million of shares of our common stock beginning on September 1, 2023, in monthly amounts of $250,000 for the first six months and in monthly amounts of $500,000 for the next nine months thereafter, at a price per share equal to 120% of the 5-day VWAP on the trading day preceding the date of each such purchase. Mr. McCabe purchased 18,517 shares of our common stock for $0.5 million during the year ended December 31, 2023.

On January 21, 2024, we entered into a Release Agreement with Mr. McCabe pursuant to which we and Mr. McCabe agreed to terminate the SPA. Under the terms of the Release Agreement, Mr. McCabe was relieved of any obligation to make additional stock purchases under the SPA. The terms of the Release Agreement require (i) a payment of $700,000 by Mr. McCabe to us, (ii) assignment to us of all stock purchases made by Mr. McCabe under the SPA and (iii) an additional payment of $700,000 by Mr. McCabe to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the 18,517 shares were reassigned to META, for which we recorded $0.1 million of treasury stock as of March 31, 2024.

**6. Inventory**

Inventory consists of photosensitive materials, lenses, laser protection film and finished eyewear, and is comprised of the following:

|  | As of March 31, 2024 | As of December 31, 2023 |
|---|---|---|
| Raw materials | $          512,897 | $          558,837 |
| Supplies | 10,693 | 10,747 |
| Work in process | 36,999 | 45,912 |

# EXHIB T D

# EXHIB T D

# NEXT BRIDGE HYDROCARBONS, INC. ANNOUNCES DEBT TO META MATERIALS, INC. HAS BEEN PURCHASED BY GREGORY MCCABE

NEWS PROVIDED BY
**Next Bridge Hydrocarbons, Inc.** →
Aug 09, 2023, 17:41 ET

FORT WORTH, Texas, Aug. 9, 2023 /PRNewswire/ -- **Next Bridge Hydrocarbons, Inc.** ("Next Bridge", "our", "we", or the "Company"), a private oil and gas exploration and production company with interests in Texas and Oklahoma, announced today that Gregory McCabe and Meta Materials, Inc. ("Meta") entered into a Loan Sale Agreement whereby Mr. McCabe purchased from Meta (i) the 8% Secured Promissory Note dated September 30, 2021, originally issued by the Company in favor of Meta (the "2021 Note") and (ii) certain Loans made to the Company by Meta pursuant to the Loan Agreement dated September 2, 2022 between Meta and the Company (the "Loan Agreement", and together with the 2021 Note, the "Loan Documents"). The Company consented to the purchase by Mr. McCabe of the 2021 Note and the Loans under the Loan Agreement (the "Loan Purchase").

As a result of the Loan Purchase, Mr. McCabe replaced Meta as the lender and secured party under the Loan Documents. Additionally, as part of the Loan Purchase, Meta assigned to Mr. McCabe its lien on 25% of the Orogrande Prospect. The Company's obligations and responsibilities under the Loan Documents remain unchanged.

Mr. McCabe is the Company's largest shareholder and Chairman of the Board of Directors. Mr. McCabe also holds a 5% unsecured Note for a principal amount of up to $20,000,000 issued by the Company.

As the Company's Chairman of the Board, Mr. McCabe had this to say regarding the Loan Purchase:

"The Company's management team has been working hard to find financing solutions for the short-term and long-term capital needs of Next Bridge. I was pleased to be able to purchase the debt of Next Bridge from Meta Materials. I believe in this management team and the long-term upside in the Company and its assets."

Chief Executive Officer Clifton DuBose addressed the Loan Purchase by Mr. McCabe:

"We are pleased to have our Chairman and largest stockholder assume all of the material indebtedness for Next Bridge. This is a great development for our company and further enhances our capacity and flexibility to source capital in the future that will continue to strengthen near-term opportunities and the long-term outlook for our Company and shareholders."

About Next Bridge Hydrocarbons

Next Bridge Hydrocarbons, Inc. is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project consisting of 134,000 contiguous gross acres we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas. In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas, and two minor well interests in Oklahoma. Please visit **www.nextbridgehydrocarbons.com** for more information.

These statements may contain "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described herein. Although the Company believes the expectations in such statements to be reasonable, there can be no assurance that such expectations will prove to be correct. Information concerning the assumptions, uncertainties and risks that may affect the actual results can be found in the Company's filings with the SEC available on the Company's website or the SEC's website at **www.sec.gov**.

Contact:
Dennard Lascar Investor Relations
**NextBridge@dennardlascar.com**

SOURCE Next Bridge Hydrocarbons, Inc.

February 14, 2025
Page 2

consistent with the guidance in FASB ASC 845-10-30-3 and 8, covering the basic principle, modification to the basic principle, and its application. However, the value derived in the valuation report upon which you wish to rely placed substantial value on proved oil and gas reserves that did not exist on the underlying properties, and would therefore not provide adequate support relative to this criteria.

As the Series A preferred stock was issued pro rata to the common shareholders of Torchlight Energy Resources, Inc. just prior to the reverse merger, in order for them to secure rights to the oil and gas interests that would later convey either in the form of asset-sale dividends or spin-off dividends, if the interests could not be sold within six months, and because these rights were not shared by the common shareholders of Meta Materials, Inc., the separation is not accurately depicted as an acquisition.

The value ascribed to the oil and gas properties as of March 31, 2021, just prior to the reverse merger, was $31,441,701; and the corresponding value reported in your financial statements as of September 30, 2022 (as provided in your Form S-1 covering the separation) was $47,293,607, which appropriately did not reflect any push-down valuation by the former parent. This balance represents the recorded amount as of the interim date that should be used to comply with GAAP.

Please revise your financial statements to eliminate the segregation of predecessor and successor activity and the step-up in basis. We reissue prior comment 3.

2. We note that you provide some details in response to prior comment 4, regarding the $21.6 million balance of the 2021 Note and Loan Agreement that Mr. McCabe acquired from Meta Materials, Inc. just after the separation, in exchange for $1.2 million (upon resolving non-performance on a commitment to acquire $6 million in equity). We also understand that Mr. McCabe had provided a 25% interest in the Orogrande Prospect as security for the loan during the period of custodianship.

Please expand your disclosures to provide these contextual details, including the circumstances under which the loan was originally made and under which the security interest was originally provided, reconciled with the motivations described in your earlier response, and providing quantification of the consideration ultimately paid.

3. We note your response to prior comment 5 regarding the contemporaneous purchase and sale of assets during March 2024, explaining that you do not believe the sale of the two entities provides a basis for valuing the four entities, stating that "the cash selling price is not the best indication of value because the makeup of the assets purchased, and the subsequent assets sold were not the same."

You indicate there were differences in comparing the assets acquired and the assets sold in terms of formation depths, overriding interests, drilling locations, seismic data coverage, and options to participate in future drilling commitments.

February 14, 2025
Page 2

consistent with the guidance in FASB ASC 845-10-30-3 and 8, covering the basic principle, modification to the basic principle, and its application. However, the value derived in the valuation report upon which you wish to rely placed substantial value on proved oil and gas reserves that did not exist on the underlying properties, and would therefore not provide adequate support relative to this criteria.

As the Series A preferred stock was issued pro rata to the common shareholders of Torchlight Energy Resources, Inc. just prior to the reverse merger, in order for them to secure rights to the oil and gas interests that would later convey either in the form of asset-sale dividends or spin-off dividends, if the interests could not be sold within six months, and because these rights were not shared by the common shareholders of Meta Materials, Inc., the separation is not accurately depicted as an acquisition.

The value ascribed to the oil and gas properties as of March 31, 2021, just prior to the reverse merger, was $31,441,701; and the corresponding value reported in your financial statements as of September 30, 2022 (as provided in your Form S-1 covering the separation) was $47,293,607, which appropriately did not reflect any push-down valuation by the former parent. This balance represents the recorded amount as of the interim date that should be used to comply with GAAP.

Please revise your financial statements to eliminate the segregation of predecessor and successor activity and the step-up in basis. We reissue prior comment 3.

2.    We note that you provide some details in response to prior comment 4, regarding the $21.6 million balance of the 2021 Note and Loan Agreement that Mr. McCabe acquired from Meta Materials, Inc. just after the separation, in exchange for $1.2 million (upon resolving non-performance on a commitment to acquire $6 million in equity). We also understand that Mr. McCabe had provided a 25% interest in the Orogrande Prospect as security for the loan during the period of custodianship.

Please expand your disclosures to provide these contextual details, including the circumstances under which the loan was originally made and under which the security interest was originally provided, reconciled with the motivations described in your earlier response, and providing quantification of the consideration ultimately paid.

3.    We note your response to prior comment 5 regarding the contemporaneous purchase and sale of assets during March 2024, explaining that you do not believe the sale of the two entities provides a basis for valuing the four entities, stating that "the cash selling price is not the best indication of value because the makeup of the assets purchased, and the subsequent assets sold were not the same."

You indicate there were differences in comparing the assets acquired and the assets sold in terms of formation depths, overriding interests, drilling locations, seismic data coverage, and options to participate in future drilling commitments.

February 14, 2025
Page 4

The new perspectives that have been formulated over recoverability of the costs capitalized for the oil and gas properties would be subject to the requirements in FASB ASC 250-10-45-17, regarding a change in accounting estimate, which state "A change in accounting estimate shall be accounted for in the period of change...[and] shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods...."

You may also consider the guidance in FASB ASC 855-10-25-4 which pertains to subsequent events, and states that "an entity shall not recognize events or transactions occurring after the financial statements were issued or were available to be issued in financial statements that are later reissued in comparative form along with financial statements of subsequent periods unless the adjustment [is required by GAAP]."

Based on the information that you have provided, we continue to believe that your decision to eliminate the full balance of the property account in restating the 2022 financial presentation was not properly characterized as an error correction relative to the full cost method, and that you will need to restate your financial statements covering 2022 and subsequent periods to restore the accounting that was applied under the full cost method. We reissue prior comment 6.

Please contact Jenifer Gallagher at 202-551-3706 or Karl Hiller at 202-551-3686 if you have questions regarding comments on the financial statements and related matters.

Sincerely,

Division of Corporation Finance
Office of Energy & Transportation

# EXHIBIT E

# EXHIBIT E

**Scott Traudt**
191 Kibling Hill Rd.
Strafford VT 05072
cell: 802-318-0429
email: sctraudt@gmail.com

April 22, 2026

Christina Lovato, Chapter 7 Trustee
c/o Atty. Jeff Hartman
Hartman & Hartman
510 W. Plumb Lane, Suite B
Reno, NV 89509

**Subject: Formal Demand to Investigate and Prosecute McCabe Avoidance Claim, or Sell Claim Under 11 U.S.C. § 363(b)**

To: trusteelovato@att.net
Cc: notices@bankruptcyreno.com

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Dear Trustee Lovato:

I write as a shareholder and party-in-interest in the above-referenced Chapter 7 case to protect the estate's assets and to ensure the Trustee fully discharges her fiduciary duty to maximize value for creditors and equity holders.

This letter constitutes (1) a formal demand that the Trustee immediately investigate and commence an adversary proceeding to recover a documented, colorable McCabe avoidance claim and related estate claims, and (2) an alternative offer to purchase that claim under 11 U.S.C. § 363(b) should the Trustee decline to act.

## I. FORMAL DEMAND - MCCABE AVOIDANCE CLAIM AND RELATED ESTATE CLAIMS

The Debtor's own March 31, 2024 Form 10-Q, Note 5, discloses a facially colorable avoidance issue requiring immediate investigation. Meta reported that it sold loan interests with a $24.0 million outstanding balance to Gregory McCabe for $6.0 million in cash, coupled with a separate stock-purchase arrangement later modified by release. At a minimum, these facts warrant investigation into whether the estate received reasonably equivalent value for the assigned rights when the transaction is viewed as a whole, including the collateral, integrated transaction documents, and subsequent unwinding of the stock-purchase arrangement. The estate may also pursue the claim, or related transfers, under 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b), and applicable state law.

1

The estate's knowledge of potential McCabe claims is not new. In a letter dated April 16, 2025 and filed on April 23, 2025 as Doc. 1878-4, James Wes Christian wrote to Trustee's counsel: "As you are aware, at the outset of retaining my firm, I advised you that I would not represent Mr. McCabe individually in any matter (as you advised me that Meta might be investigating potential claims against him)." Doc. 1878-4, p. 3. Christian then wrote: "We are aware that the Trustee for Meta is investigating one or more potential avoidance actions in the future against Mr. McCabe. If that occurs, we will not be representing Mr. McCabe." Doc. 1878-4, p. 5. These statements show that, by April 23, 2025 at the latest, the estate and its own special litigation counsel were already aware of potential claims against Mr. McCabe, including possible avoidance actions. Yet, based on the record materials provided here, no such avoidance action has been pursued, despite the Debtor's earlier March 31, 2024 Form 10-Q disclosure describing the McCabe transaction and the Trustee's later request for approval of an expensive, heavily front-loaded litigation-funding structure for other estate claims. This history raises a serious concern of delay or inattention with respect to an identified estate asset, rather than any lack of notice or newly discovered issue.

Mr. McCabe is also a repeat player in US bankruptcy court and has previously been found "not credible" by a federal bankruptcy judge. See *Weiss v. Arabella Exploration Inc. et al.*, Adversary No. 16-07002-tmd (Bankr. W.D. Tex. Dec. 22, 2022). In addition, Mr. McCabe served as Chairman of Torchlight Energy Resources, Inc. ("TRCH") and was a long-time business partner of its former CEO John Brda. In the weeks leading up to the December 9, 2022 trading halt and spin-off to Next Bridge Hydrocarbons, Mr. McCabe sold approximately 6.7 million shares of MMTLP Series A Preferred Stock, generating proceeds estimated in excess of $58 million. In light of Mr. McCabe's senior insider position, his close relationship with Mr. Brda, and the estate's own prior focus on possible claims involving him, the estate should also investigate potential direct claims for breach of fiduciary duty, insider-related misconduct, and unjust enrichment.

At a minimum, these claims appear materially more straightforward and less capital-intensive than the speculative market-manipulation litigation the estate is now seeking to finance through the Parabellum structure.

**Contrast with Current Priorities.** On April 3, 2026, you filed Dkt. 2682 seeking court ratification of an $11.8 million litigation-funding arrangement with an affiliate of Parabellum Capital, LLC. That motion expressly relies on the Trustee's "sound business judgment" under 11 U.S.C. § 363(b) and states that, absent such funding, the estate "would simply have to abandon a potential recovery." Dkt. 2682, p. 4. Yet the estate simultaneously holds a separately identified McCabe-related asset that appears to require no comparable funding structure and no similar front-loaded economic dilution. See Dkt. 2682, p. 3.

The public record in this very case makes the economic consequences unmistakable. In Dkt. 2682, the Trustee expressly seeks ratification of the Parabellum litigation funding arrangement and sets forth the repayment waterfall on page 3. Under the hypothetical $50 million recovery scenario presented by the Trustee herself, the estate would receive only $23,772,000 for the benefit of creditors and shareholders. The litigation funder would take

2

$19,670,000 off the top, and special litigation counsel would receive an additional $6,588,000. Dkt. 2682, p. 3.

The footnote to that same chart on Dkt. 2682, page 3, confirms the multi-tiered structure: the funder first recovers its $7 million principal plus a full 1x return, followed by an additional 1.25x multiple of the $7 million commitment, with the split among funder, client, and counsel shifting only after those thresholds are met. Dkt. 2682, p. 3. This front-loaded waterfall is not an abstract risk. It is the precise economic deal the Trustee is asking the Court to bless. By contrast, the McCabe avoidance claim, and the related direct claims discussed above, would deliver any recovery to the estate free of the Parabellum waterfall if pursued independently.

Failing to pursue or monetize these lower-cost, identified assets while committing the estate to an $11.8 million funded litigation program therefore has a readily quantifiable cost: it forces creditors and shareholders to surrender nearly $20 million out of the first $50 million of any larger recovery simply to finance speculative market-manipulation claims. This is difficult to reconcile with the Trustee's fiduciary duty to maximize value and to exercise sound business judgment under 11 U.S.C. § 363(b). *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887-890 (Bankr. D. Alaska 2018).

## II. ALTERNATIVE OFFER TO PURCHASE THE AVOIDANCE CLAIM UNDER 11 U.S.C. § 363(b)

If you are unwilling or unable to prosecute the McCabe avoidance action, I hereby offer to purchase the claim, and all related avoidance powers to the extent transferable, from the estate on the following terms, which are fair, reasonable, and in the best interest of the estate:

1. I will assume 100% of all litigation costs, attorneys' fees, and expenses. The estate incurs zero financial risk or out-of-pocket cost.
2. The estate will receive 20% of any net recovery after my costs are reimbursed.
3. To deter any bad-faith attempt by Mr. McCabe or an affiliate to purchase and extinguish the claim for a nominal sum, any competing bid from a defendant or insider must include a minimum floor bid of $9,000,000, payable to the estate.

This structure is expressly authorized by *In re Lahijani*, 325 B.R. 282 (9th Cir. BAP 2005), and *Silverman v. Birdsell*, 774 F. App'x 380 (9th Cir. 2019), which recognize the sale of avoidance actions under 11 U.S.C. § 363(b) and contemplate derivative standing where a trustee declines to act. The elevated floor of $9 million is by my design only to insure that some of the more unsavory creatures in the MMTLP/MMAT/Next Bridge Hydrocarbons Inc. ecosystem are not allowed to safeguard McCabe's haul from the MMAT BOD and George Palikaras.

## III. REQUEST FOR TRANSPARENCY AND DISCLOSURE

Your pending motion at Dkt. 2682, and the estate's reliance on the Parabellum funding arrangement, heighten the need for full disclosure consistent with *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995). The presumption of public access to bankruptcy proceedings remains

3

strong. *In re Orion Pictures Corp.*, 21 F.3d 24 (2d Cir. 1994); *In re Motors Liquidation Co.*, 561 B.R. 36 (Bankr. S.D.N.Y. 2016).

## IV. DEADLINE AND NEXT STEPS

You are approaching the 11 U.S.C. § 546(a) limitations deadline in August 2026. I respectfully request a written response to this Demand and Purchase Offer within ten (10) business days of receipt.

Should you decline to act or fail to respond, I will interpret that as unjustified inaction and will promptly seek derivative standing under 11 U.S.C. § 503(b)(3)(B), together with any other appropriate relief, to protect the estate's assets.

I remain available to discuss this matter at your earliest convenience.

Sincerely,

/s/ Scott Traudt
Scott Traudt
Pro Se, Shareholder and Party-in-Interest
Strafford VT

4

# EXHIBIT F

# EXHIBIT F

# META MATERIALS ANNOUNCES PROPOSED CLASS ACTIONS SETTLEMENT

**HALIFAX, NS / ACCESSWIRE / December 21, 2023** / Meta Materials Inc. (the "Company" or "META") (NASDAQ:MMAT), an advanced materials and nanotechnology company, today announced a proposed settlement in two class action cases, following a successful mediation.

As previously disclosed, both a consolidated securities class action lawsuit, captioned *In re Meta Materials Inc. Securities Litigation*, No. 1:21-cv-07203, pending in the United States District Court for the Eastern District of New York ("Federal Class Action"), and a breach of fiduciary duty class action lawsuit, captioned *Denton v. Palikaras, et al.*, No. A-23-878134-C, pending in the Eight Judicial District Court Clark County, Nevada ("Nevada Class Action") were filed against the Company and certain of our former officers and directors.

On December 20, 2023, the parties in these actions reached an agreement to settle both cases on a class-side basis for a combined $3 million, of which at least $2.85 million will be paid by the Company's insurers ("Proposed Class Actions Settlement"). The terms of the Proposed Class Actions Settlement, do not include or constitute any admission of liability, wrongdoing, or fault on behalf of the Company. The Proposed Class Actions Settlement will be subject to execution of a final settlement agreement, the court's preliminary approval, and, following notice to the class, final approval.

The Company, its board of directors, and its management team believe the Proposed Class Actions Settlement is in the best interests of our shareholders. Upon approval by the court, it removes uncertainty related to the Federal Class Action and Nevada Class Action and allows the Company to move forward in achieving its business objectives.

**About Meta Materials Inc.**

Meta Materials Inc. (META) is an advanced materials and nanotechnology company. We develop new products and technologies using innovative sustainable science. Advanced materials can improve everyday products that surround us, making them smarter and more sustainable. META® technology platforms enable global brands to develop new products to improve performance for customers in aerospace and defense, consumer electronics, 5G communications, batteries, authentication,

Archives

2024

2023

2022

2021

2020

2019

2018

2017

2016

2014

RSS



# EXHIBIT G

# EXHIBIT G

# META MATERIALS ANNOUNCES PRICING OF $25 MILLION UNDERWRITTEN PUBLIC OFFERING

**HALIFAX, NS / ACCESSWIRE / April 14, 2023 /** Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT)(FSE:MMAT), a developer of high-performance functional materials and nanocomposites, today announced that it has priced an underwritten public offering of 83,333,334 shares of its common stock and warrants to purchase up to an aggregate of 83,333,334 shares of common stock at a combined public offering price of $0.30 per share and accompanying warrant. META has granted the underwriters a 30-day overallotment option to purchase up to an additional 12,500,000 shares of its common stock and/or warrants to purchase up to an additional 12,500,000 shares of common stock at the public offering price, less the underwriting discount. Each warrant is exercisable immediately at an exercise price of $0.375 per share and will expire five years following the date of issuance. All of the securities are to be sold by META. The gross proceeds of the offering are expected to be approximately $25 million before deducting the underwriting discount and estimated offering expenses payable by META, assuming no exercise of the underwriters' overallotment option. The offering is expected to close on or about April 18, 2023 subject to satisfaction of customary closing conditions.

Ladenburg Thalmann & Co. Inc. and A.G.P./Alliance Global Partners are acting as joint bookrunning managers for the offering.

META intends to use the net proceeds from the offering for working capital and general corporate purposes, which include, but are not limited to: on-going development of our existing and future products, (such as our advanced materials NPORE® and NCORE™ for Li-ion battery applications, electro-optical devices, the expansion of our manufacturing facilities and capital equipment purchases), as well as general and administrative expenses.

META filed a shelf registration statement on Form S-3 relating to the shares of common stock offered in the public offering described above with the Securities and Exchange Commission (the "SEC") on

Archives

2024

2023

2022

2021

2020

2019

2018

2017

2016

2014

RSS



# EXHIBIT H

# EXHIBIT H

Case: 11-31115-MER Doc #: 104 Filed: 11/17/11 Entered: 11/17/11 10:59:46 Page 1 of 4



| Signed/Docketed |
| --- |
| November 17, 2011 |

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re:                                    )
                                          )   Case No. 11-31115 MER
THOMAS GERARD MARTINO                     )
                                          )   Chapter 7
            Debtor.                       )

## ORDER

This matter comes before the Court on the *Debtor's Motion for Protective Order Pursuant to F.R.C.P. 26(c)* (Docket No. 60) (the "Protective Order Motion"), and *International Bank's Response to Motion for Protective Order Pursuant to F.R.C.P. 26(c)* (Docket No. 76) (the "Response"). The Court has reviewed the pleadings and the record in this case, and hereby finds and concludes as follows.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), as it relates to the administration of the estate.

## BACKGROUND FACTS

According to the Protective Order Motion, Creditor International Bank (the "Bank") filed an action in the District Court for Douglas County on June 7, 2011, alleging claims against the Debtor and against his non-filing spouse concerning the deficiency balance alleged after the foreclosure sale on a commercial property owned by Parker Tech Center, LLC, and asserting the Debtor's non-filing spouse received fraudulent transfers pursuant to COLO. REV. STAT. § 38-8-105. Following the Debtor's bankruptcy petition, the Bank filed *Ex Parte Motions for Examination Pursuant to Bankr.R. 2004* for both Debtor and his non-filing spouse (the "2004 Motions"). In Paragraphs 8 of each of the 2004 Motions, the Bank states it "believes that the Debtor transferred the Assets to Ms. Martino with the actual intent to hinder, delay or defraud the Bank and other creditors and/or without receiving reasonably equivalent value in exchange for the transfer of the Assets." The Court granted the 2004 Motions on September 28, 2011.

The Debtor argues under 11 U.S.C. § 544[1] [2] that the allegations made by the Bank regarding any fraudulent transfers pursuant to COLO. REV. STAT. § 38-8-105 belong exclusively to the Chapter 7 trustee. The Debtor concedes the Bank has standing to inquire about the possibility of a fraud claim pursuant to §§ 523 and 727, but lacks standing as to the trustee's fraudulent conveyance claim. Further, the Debtor points out he filed Adversary Proceeding No. 11-1703 MER alleging violation of the automatic stay to the extent the Bank may be proceeding against an asset of the estate. Therefore, the Debtor contends FED. R. BANKR. P. 2004 ("Rule 2004") is not available to the Bank, because the discovery rules in FED. R. BANKR. P. 7001, *et. seq.* control.

The Bank alleges Rule 2004, designed as a broad investigative tool, constitutes an appropriate avenue for examining potential fraudulent transfers and whether certain transfers comprise property of the estate, as well as for determining facts concerning discharge and dischargeability. It contends the adversary proceeding pending against it does not relate to the issues underlying its request for Rule 2004 examinations.

## DISCUSSION

Rule 2004 "is a basic discovery device used in bankruptcy cases."[3] It states in relevant part:

> (a) Examination on Motion. On Motion of any party in interest, the court may order the examination of any entity.

> (b) Scope of Examination. The examination of an entity under this rule or of the debtor under section 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate or to the debtor's right to a discharge.

The first question raised by the Debtor is whether the Bank has standing to conduct a Rule 2004 examination regarding prepetition transfers recoverable under § 544, since actions to recover such transfers would normally be brought by the Chapter 7 trustee, not a creditor. However, a party in interest for purposes of Rule 2004 is one "whose pecuniary interest is

---

[1] 11 U.S.C. § 544 (b)(1) provides, in relevant part: "[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."

[2] Unless otherwise noted in the text, statutory references are to Title 11 of the United States Code.

[3] *In re Blinder, Robinson & Company, Inc.*, 127 B.R. 267, 275 (D. Colo. 1991).

Page 2 of 4

directly affected by the bankruptcy proceeding."[4]  Accordingly, the Bank, as a creditor, constitutes a party in interest.

Rule 2004 has been likened to a "fishing expedition," although its use is not unlimited.[5] Proper purposes for a Rule 2004 examination include "discovering assets, examining transactions, and determining whether wrongdoing has occurred."[6]  As noted by Judge Sidney B. Brooks of this Court:

> [I]n addition to the right to commence an adversary proceeding to determine dischargeability, the Bankruptcy Code provides significant other or supplemental rights to creditors.  Indeed, while some of these rights may, and sometimes must, be pursued by the trustee on behalf of the estate, the creditors do not have to rely solely and exclusively on the efforts of the trustee.  For example, 11 U.S.C. § 503 provides for compensation to creditors who recover assets for the estate.[7]

The Court agrees with this observation.  The Bank is within its rights to seek information within the scope of Rule 2004, even if such information may ultimately be incorporated in a cause of action exclusive to the trustee.

The second issue raised by the Debtor is whether the Bank may conduct a Rule 2004 examination since it is a party to an adversary proceeding.  "One of the primary purposes of a Rule 2004 examination is as a pre-litigation device."[8]  Once an adversary proceeding has been commenced, discovery generally proceeds under FED. R. BANKR. P. 7026 *et seq.*[9]  Again, as discussed by Judge Brooks:

> [A] creditor who has commenced an adversary proceeding should be limited to discovery, in that proceeding, pursuant to the Federal Rules of Civil Procedure as to: (1) entities affected by the pending adversary proceeding(s) and (2) issues addressed

---

[4]  *In re Aronson*, 1994 WL 497541 at *6 (E.D. Pa. 1994)(quoting *In re Kutner*, 3 B.R. 422, 425 (N.D.Tex.1980)).  *See also Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1994) (a corporation's sole shareholder qualified as a party in interest for purposes of Rule 2004); *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (holding that a bidder on assets of a corporation in bankruptcy was a party in interest for purposes of Rule 2004)).

[5]  See *Blinder*, 127 B.R. at 274; *In re Buick*, 174 B.R. 299, 305 (Bankr. D. Colo. 1994).

[6]  *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)).  See also *In re Strecker*, 251 B.R. 878 (Bankr. D. Colo. 2000).

[7]  *Buick*, 174 B.R. at 306.

[8]  *Washington Mut.*, 408 B.R. at 53 (citing *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)).

[9]  *Id.*, 408 B.R. at 50.

Page 3 of 4

in its pending adversary proceeding(s). Additionally, however, a creditor may conduct Rule 2004 examinations regarding issues in addition to or beyond the scope of its pending adversary proceeding(s), or the trustee's pending adversary proceeding(s).[10]

Here, the Debtor commenced an adversary proceeding against the Bank. The Court agrees with the holding of *Buick*, and concludes it is appropriate to limit a Rule 2004 examination to only those issues outside of the adversary proceeding.

For these reasons,

IT IS ORDERED the *Debtor's Motion for Protective Order Pursuant to F.R.C.P. 26(c)* is GRANTED to the extent inquiry is sought on issues within the scope of the adversary proceeding between the parties. Such inquiries should be brought pursuant to the appropriate provisions of the Federal Rules of Bankruptcy Procedure. The *Debtor's Motion for Protective Order Pursuant to F.R.C.P. 26(c)* is DENIED to the extent the Bank seeks to inquire into all other matters authorized by Rule 2004.

Dated November 17, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

---

[10] *Buick, supra*, at 306; *see also In re Southeastern Materials, Inc.*, 2010 WL 5128608, *4 (Bankr. M.D.N.C. 2010) (slip copy).