RECEIVED
AND FILED

MAY 1 1 2026

U.S. BANKRUPTCY COURT
DANIEL S. OWENS, CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                    | Case No.: 24-50792-GS
META MATERIALS INC.,              | (Chapter 7)
                                              |
            Debtor.                        | **PARTY IN INTEREST SCOTT TRAUDT'S**
                                              | **REPLY TO CHARLES SCHWAB & CO.,**
                                              | **INC'S OPPOSITION TO RULE 2004**
                                              | **EXAMINATION**
                                              |
                                              |

Scott Traudt ("Traudt" or "Movant"), appearing pro se and as a party in interest, submits

this reply to Charles Schwab & Co., Inc.'s ("Schwab") opposition to Traudt's motion for a

limited Rule 2004 examination. Schwab's opposition should be denied because the evidence trail

is now narrower, sharper, and more troubling than Schwab admits: TDA and Schwab repeatedly

treated the March 20, 2023 Traudt-Fleming recording as the kind of audio evidence that was

kept, internally reviewable, and accessible for trade disputes, yet Schwab now asserts in

arbitration that its "best understanding" is that no recording was ever made.

## I. INTRODUCTION

The March 20, 2023 Traudt-Fleming call is not speculative, vague, or newly invented.

Traudt placed TDA on MMTLP litigation notice before the call, **Exhibit A.** He publicly

identified the Traudt-Fleming call the same day it occurred, **Exhibit B.** Two days later, he

requested "the audio file (recording)" of the call in writing, ECF No. 2661, p. 23 of 47 (Decl. Ex.

B-1). TDA then responded that "yes, we keep call recordings," that a manager could review the

recording, and that Traudt might possibly listen with the manager, ECF No. 2661, p. 23 of 47

(Decl. Ex. B-2). TDA also stated that it could not provide a recorded copy directly and that it

could submit a manager-review request if Traudt identified the specific section of the call,

1

**Exhibits C-D.** Schwab later confirmed that messages and audio recordings are retained internally and can be accessed for a business need, "such as a trade dispute," **Exhibit E.**

Schwab now tells the arbitration panel a different story. In its April 13, 2026 FINRA discovery response, Schwab states that it searched for call records and recordings "to the extent they exist"; that "Schwab and TDA do not record all telephone calls with customers"; that "many of Claimant's phone calls with Schwab and TDA were not recorded"; that "there is no record of which Schwab is aware" reflecting that any Schwab or TDA employee told Traudt the call was recorded; and that its "best understanding" is that the facts "strongly suggest that no recording was ever made" of any March 20, 2023 call, except for a short CRM note, **Exhibit F.**

Those statements are not a routine discovery disagreement.[1] They create the very need for Rule 2004 relief. Schwab wants this Court to deny bankruptcy discovery because arbitration supposedly provides an adequate forum. But Traudt already requested the recording, metadata, preservation records, deletion records, migration records, and non-preservation records in arbitration, **Exhibit G.** Schwab is resisting, conditioning, narrowing, and effectively denying that discovery there. Worse, arbitration discovery does not close until October 2026, and the FINRA merits hearing is not scheduled until on or about December 8, 2026. The estate, the Trustee, and MMTLP holders cannot wait until late 2026 to learn whether Schwab's changed position is true.

---

[1] Schwab now disavows that its own employee took the call at the trade desk for TDA: "[M]oreover, Traudt's averments…of his purported phone call are meaningless statements such as that the alleged call (purportedly with a *brokerage firm's telephone representative*, three months after a different and unaffiliated entity had halted trading in a series of the debtor's preferred stock) "could sharpen the estate's evaluation of potential third party claims by providing a primary-source account rather than leaving the estate to proceed on summaries, recollections, or hearsay." (ECF No. 2730, p. 4 of 5). Cameron Fleming was their registered representative/employee at the trade desk and a Series 6, 7, and 63 broker-dealer.

2

The requested examination is narrow. Traudt seeks *one* identified recording, related call logs, CRM/Salesforce notes, account-message records, metadata, retention records, migration records, deletion records, recovery records, and chain-of-custody materials. The purpose is not to use Rule 2004 as an arbitration crowbar. The purpose is to determine whether estate-relevant evidence exists, was preserved, was migrated from TDA to Schwab, was deleted, was recovered, or is being withheld.

## II. RULE 2004 IS DESIGNED TO EXPAND ESTATE RECOVERY OPTIONS, NOT TO BLIND THE ESTATE

Rule 2004 permits examination "on motion of any party in interest" and reaches "any matter that may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(a), (b). Its purpose is broad because bankruptcy courts must be able to identify estate assets, potential claims, and recovery paths before they disappear. *In re Mastro*, 585 B.R. 587, 596-97 (B.A.P. 9th Cir. 2018) (Rule 2004 is the basic bankruptcy discovery device and may reach third parties with knowledge of debtor affairs); *In re Duratech Indus., Inc.*, 241 B.R. 283, 289 (E.D.N.Y. 1999) (Rule 2004 examinations are allowed for the "purpose of discovering assets and unearthing frauds").

The cases most directly answering Schwab's "leave it to the Trustee" theme cut in Traudt's favor. In *In re Martino*, No. 11-31115-MER, 2011 WL 5856327, at *2-3 (Bankr. D. Colo. Nov. 17, 2011), the debtor argued that a creditor lacked standing to conduct Rule 2004 discovery into transfers that would normally be pursued by the Chapter 7 trustee. The court rejected that argument, holding that a creditor with a pecuniary interest was a party in interest and explaining that "creditors do not have to rely solely and exclusively on the efforts of the trustee." That is this case. Traudt is not trying to seize estate claims. He is trying to supply the

3

estate another recovery path: the Traudt-Fleming recording, the custody trail, and Schwab/TDA trading records that may reveal estate claims, preservation remedies, or settlement leverage.

Schwab should not be permitted to minimize Traudt's role as a party in interest who is offering the estate an additional path to recovery evidence. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003), is stronger than a mere "locating assets" case. The Third Circuit held that bankruptcy courts may authorize derivative standing where the estate fiduciary unreasonably refuses to pursue estate claims, because the Code and the court's equitable powers permit a remedy when the ordinary estate-protection mechanism breaks down. Id. at 580 ("bankruptcy courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate"). But the opinion also expressly recognizes the narrower and safer point Traudt invokes here: a creditor may assist the estate before any derivative litigation by using Rule 2004 to locate estate property. ("A creditors' committee may certainly assist a debtor in locating property under Bankruptcy Rule 2004") id. at 565.

That is exactly Traudt's posture. He is not asking this Court to authorize him to prosecute estate claims today. He is asking to locate and preserve evidence that may expand the estate's recovery options: the Traudt-Fleming recording, the call logs, CRM/Salesforce notes, retention and migration records, deletion or recovery records, and related Schwab trading records. *Cybergenics* also quoted the older bankruptcy principle that, if a creditor "learns facts which lead him to suppose that property has been concealed, he may, and indeed he should, advise" the estate fiduciary, and if that fiduciary is "slack," the creditor may ask the bankruptcy judge "to stir him to action." Id. at 568 (quoting *In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir. 1931)). Traudt did that. He raised the Traudt-Fleming recording repeatedly with MMTLP-side actors,

4

asked the estate to pursue it, and then discovered that the Trustee's Schwab subpoena did not specifically request it. Under *Cybergenics*, that is not interference with estate administration. It is precisely the kind of court-supervised assistance that can give the estate more recovery options without handing Traudt control of any estate cause of action.

Rule 2004 is also a proper pre-litigation device to test potential causes of action. *In re Washington Mutual, Inc.*, 408 B.R. 45, 53 (Bankr. D. Del. 2009) ("One of the primary purposes of a Rule 2004 examination is as a pre-litigation device"); *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ([Rule 2004] "It is properly used as a pre-litigation device to determine whether there are grounds to bring an action"); *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (Rule 2004 assists a party in interest in determining the estate's nature and extent, "revealing assets, examining transactions and assessing whether wrongdoing has occurred").

The point is especially powerful here because the Trustee already put Schwab/TDA trading records into the Rule 2004 perimeter. On March 6, 2025, the Trustee filed a subpoena to Schwab, ECF No. 1625, seeking MMAT/MMTLP order-routing records, FIX or binary protocol messages, locate/borrow/delivery/FTD records, and position data for September 21, 2020 through August 7, 2024. On March 7, 2025, the Court granted the Trustee's Rule 2004 examination of Schwab's custodian of records, ECF No. 1639. On May 9, 2025, the Trustee filed the stipulated protective order at ECF No. 1921-1, involving Charles Schwab & Co., Inc., TD Ameritrade, TradeStation Securities, Inc., and Think or Swim, and governing confidential trading, transactional, customer, and proprietary information. Those docketed filings prove Schwab/TDA evidence is estate-relevant and manageable under protective order.

## III. THE TRUSTEE'S SUBPOENA MISSED THE FLEMING AUDIO AND CUSTODY TRAIL

5

Schwab argues in substance that Traudt should leave the matter to the Trustee. The problem is that the Trustee's subpoena did not actually request the Traudt-Fleming recording. If Traudt's version of the call proves accurate, then the recording will support the following evidence issues:

1. MMTLP was trading at 100 times its lit-market price in alternative trading systems ("ATS" or "dark pools"), indicating that someone was bidding up the price to buy shares, likely to cover short positions.

2. Schwab (and potentially others) requested the U3 halt.

3. The minimum ATS price per share was $290 and the maximum was $1,250 per share according to Fleming's statements, apparently based on Schwab's access to dark-pool data.

4. Fleming stated that MMTLP's extraordinary share price bore no relationship to its true value.

That is why the estate's failure to secure this recording matters. Traudt asked Trustee's counsel Jeffrey Hartman on January 15, 2026 whether the Trustee's Schwab subpoena requested the Traudt-Fleming recording and offered to supply the relevant materials if it did not, **Exhibit H.** Danielle Spears also raised the same recording with Trustee's counsel as a potential estate-recovery issue, **Exhibit I.** Trustee's counsel had previously stated on or about December 31, 2025 that he believed the recording was included in the Trustee's subpoena. It was not.[2] The result is a gap Schwab now exploits: arbitration has not produced the recording, the Trustee

---

[2] Traudt questioned Hartman about the subpoena for the audio on January 15, 2026 and offered to assist with the relevant files. He did not respond. See **Exhibit H.**

subpoena did not ask for it, and Schwab points to both paths as reasons to deny Traudt's narrow request.

Courts recognize Rule 2004 as proper where discovery is aimed at discovering assets or identifying causes of action that can benefit all creditors. *In re Table Talk, Inc.*, 51 B.R. 143, 145–46 (Bankr. D. Mass. 1985) (allowing Rule 2004 examination to determine whether the estate held equitable title to equipment and to explore antitrust violations that might belong to the debtor); see also *In re Moseley*, No. 24-81498-BPC, slip op. at 4 (Bankr. M.D. Ala. July 22, 2025) (describing *Table Talk* as legitimate Rule 2004 discovery because it was "directly aimed at discovering assets of the estate or identifying potential causes of action that could benefit all creditors"). Traudt's request fits that lane. It may reveal claims or leverage against Schwab/TDA, may test trading evidence already sought by the Trustee, and may preserve the estate's ability to act before evidence decays or is buried under arbitration delay.

## IV. SCHWAB'S ARBITRATION RESPONSE SHOWS WHY ARBITRATION IS NOT AN ADEQUATE SUBSTITUTE

Schwab's April 13, 2026 response to FINRA Discovery Guide List Item No. 8 is the central document. List Item No. 8 required "[a]ll recordings, telephone logs, and notes of telephone calls or conversations about the transactions at issue." Schwab did not simply produce the Traudt-Fleming recording. It wrote that it searched for records of calls with Traudt, "including recordings of calls to the extent they exist." It then conditioned production on a "mutually agreeable Confidentiality Agreement" and immediately began narrowing the field, **Exhibit F.**

Schwab then stated: "there is no regulatory requirement for broker-dealers to record customers' phone calls, or to retain recordings of customer phone calls to the extent such recordings are made." It added: "Schwab and TDA do not record all telephone calls with

7

customers," and claimed that "many of Claimant's phone calls with Schwab and TDA were not recorded." Those statements might be ordinary if TDA had not already told Traudt that "yes, we keep call recordings" and that a manager could review the recording, ECF No. 2661, p. 23 of 47 (Decl. Ex. B-2), and if TDA had not also refused to provide a recorded copy directly while offering manager review of the specific section, **Exhibits C-D.** They might be ordinary if Schwab had not later stated that it retains audio recordings internally and can access them for trade disputes, **Exhibit E.** In that context, Schwab's arbitration response reads less like production and more like a retreat.

The response then becomes worse. Schwab says: "There is no record of which Schwab is aware reflecting any Schwab or TDA employee ever telling Claimant that the call in question was recorded." That sentence conflicts with the March 22, 2023 Wells message stating "yes, we keep call recordings" and explaining manager review. It also conflicts with the March 24, 2023 Rachael Peacock message stating that TDA could submit a request for a manager to review the specific section of the call. Schwab's own response admits it has "identified and recovered recordings of phone calls Claimant made to TDA prior to March 20, 2023," but then says that fact "strongly suggests that no recording was ever made." That is an inference, not evidence. The chain-of-custody records are needed to test it.

Schwab then attacks Traudt personally: "Rather, Claimant appears at some point to have determined by himself that he had previously been told about the existence of a recording, and then to have told others (including other Schwab employees, the undersigned, and the Panel), that he had been told by Schwab or TDA that a recording was made." But the record shows Traudt asked for the recording two days after the call, TDA did not deny recording, TDA described manager review, and Schwab later confirmed internal audio retention for trade

disputes. Schwab's quote is therefore not just advocacy. It is a factual accusation that makes the underlying audio trail discoverable now.

Finally, Schwab states: "Schwab's best understanding of these facts is that they strongly suggest that no recording was ever made of any telephone call between Claimant and TDA on March 20, 2023, except for the short note in the customer relationship management system being produced pursuant to List Item No. 6." That is the problem. A "best understanding" is not evidence. A CRM note is not the recording. A lawyer's inference is not a retention policy, search log, deletion log, migration record, recovery record, or sworn custodian declaration. The Court should order the limited Rule 2004 discovery needed to determine which version is true.

## V. THE PENDING-PROCEEDING RULE DOES NOT BAR THIS ESTATE-FOCUSED REQUEST

Schwab invokes the pending-proceeding rule, but that rule is not an evidence bunker. It prevents abusive use of Rule 2004 to evade another forum's discovery rules. It does not bar a bankruptcy court from authorizing narrow, estate-focused discovery into preservation, chain of custody, and potential estate claims. *In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002) (pending-proceeding rule addresses the concern that Rule 2004 could circumvent discovery safeguards once formal litigation is pending); *In re Washington Mutual*, 408 B.R. at 51 (the relevant inquiry is whether the Rule 2004 examination seeks evidence related to the pending proceeding or evidence unrelated to it).

*Recoton* is the better analogy. There, former officers and directors argued that Rule 2004 discovery should be denied or stayed because related securities litigation was pending and because Rule 2004 discovery would allegedly evade PSLRA/SLUSA protections. The bankruptcy court rejected that overbroad theory, emphasizing that the discovery was sought to investigate potential estate claims, not to prosecute shareholder securities claims. *In re Recoton*

9

*Corp.*, 307 B.R. 751, 755–58 (Bankr. S.D.N.Y. 2004). The district court likewise refused to treat related securities litigation as a blanket bar to bankruptcy discovery, explaining that if such litigation alone were enough to bar or delay Rule 2004 discovery, "the rights of creditors and debtors would be impaired and the efficient administration of bankruptcy cases impeded." *In re Recoton Corp.*, No. 04 Civ. 2466 (DLC), 2004 WL 1497570, at *3 (S.D.N.Y. July 1, 2004).

*Martino* also answers Schwab. A creditor may conduct Rule 2004 discovery on issues beyond the pending proceeding or beyond what the trustee has already done. *In re Martino*, 2011 WL 5856327, at *3 (a creditor may conduct Rule 2004 examinations regarding issues "in addition to or beyond the scope" of a pending adversary proceeding or trustee proceeding).[3] Traudt's request is beyond the Trustee's subpoena because the Trustee did not ask for the Traudt-Fleming recording or its custody trail. It is also beyond arbitration merits discovery because it asks the bankruptcy court to determine whether estate-relevant evidence exists, was preserved, was migrated, was deleted, was recovered, or is being withheld.

---

[3] See *In re Martino*, No. 11-31115 MER, 2011 WL 5856327, at *2 (Bankr. D. Colo. Nov. 17, 2011) ("the Bank, as a creditor, constitutes a party in interest"; creditor was "within its rights to seek information within the scope of Rule 2004" even where information might support trustee-owned claim); *In re Buick*, 174 B.R. 299, 306 (Bankr. D. Colo. 1994) ("creditors do not have to rely solely and exclusively on the efforts of the trustee"); *Astra Veda Corp.*, No. 25-14283 KHT, slip op. at 2-3 (Bankr. D. Colo. Nov. 6, 2025) ("The plain language of the rule allows any party in interest to examine any person or entity"; "neither this Court nor Creditors are required to take his word for it without any discovery."); *In re Waddell*, No. 24-11769 JLG, slip op. at 12-13 (Bankr. S.D.N.Y. Mar. 28, 2025) ("chapter 7 trustees, creditors, and equity security holders are parties in interest"); *Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995) (applying "common sense" party-in-interest approach); *In re International Fibercom, Inc.*, 283 B.R. 290, 293-94 (Bankr. D. Ariz. 2002) (Rule 2004 proper "to investigate matters that may affect the administration of the debtor's estate"); *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985) ("discovering assets and unearthing frauds"); *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("revealing assets, examining transactions and assessing whether wrongdoing has occurred.").

10

Any concern about arbitration use can be solved without denying the motion. *Recoton* noted that the committee agreed to a protective order prohibiting use of Rule 2004 materials for any purpose other than the bankruptcy proceeding. 307 B.R. at 756. This Court already has the same tool. ECF No. 1921-1 provides a protective-order framework for Schwab/TDA trading, customer, and proprietary information. The Court can order production both to the Trustee and Court for in camera review, and prohibit use outside this bankruptcy case, including in FINRA arbitration, absent further order. Traudt has no issues with that.

## VI. AUDIO RECORDINGS AND CALL METADATA ARE ORDINARY DISCOVERY WHEN THEY BEAR ON THE TRUTH

Federal discovery law treats audio recordings, call logs, CRM entries, audit logs, and metadata as ordinary evidence when they bear on disputed facts. In *Cordero Romero v. Goldman Sachs Bank USA*, No. 1:25-cv-02857-GHW, Dkt. No. 81, at 1-3 (S.D.N.Y. July 17, 2025), the plaintiff sought the "complete call transcript or audio recording," internal notes or CRM entries, and audit-log material. The court granted expedited discovery because those records could "shed light" on gaps in the factual record. That is this case. Schwab's own records are needed to fill gaps created by Schwab's inconsistent positions.

In *A.S. v. Amazon Web Services, Inc.*, 14 OCAHO no. 1381j, at 7 (Sept. 30, 2021), the tribunal ordered production of audio recordings and rejected the idea that transcripts were enough, explaining that the request sought "digital copies of the recordings, not transcripts." The same principle applies here. A Salesforce note is not a substitute for the Traudt-Fleming recording. If the recording exists, the recording is the best evidence. If it no longer exists, the retention, migration, deletion, recovery, and chain-of-custody records are the next-best evidence.

In *In re HomeAdvisor, Inc.*, FTC Docket No. 9407, Order Granting Motion to Compel, at 1-2 (Aug. 16, 2022), the administrative law judge compelled sales-call recordings and

11

recognized that a party resisting relevant discovery bears a "heavy burden." Traudt's request is far narrower. He seeks one identified call and its surrounding records. Schwab's burden argument therefore rings hollow, especially because Schwab already produced or agreed to produce call records in arbitration "to the extent they exist" and already participated in the Trustee's Rule 2004 process under ECF Nos. 1625, 1639, and 1921-1.

## VII. THE TRAUDT-FLEMING RECORDING HAS BEEN IDENTIFIED FOR YEARS, BUT EVERY OTHER CHANNEL MISSED IT

The Traudt-Fleming recording was identified long before Schwab's April 2026 arbitration response. On October 16, 2023, Traudt publicly offered his TDA account number, the date, and the time of the March 20, 2023 Cameron Fleming conversation, and wrote: "He can subpoena this," **Exhibit J.** Traudt raised the recording repeatedly with MMTLP-side actors, including John Brda and Special Counsel Wes Christian, in 2023 and 2024, and again with Trustee's counsel in December 2025 and January 2026. **Exhibits H, I, K–O.**

Even Special Counsel Christian acknowledged the issue in his affidavit filed in *Traudt v. Christian*, No. 01-25-00678-CV (Clerk's Record beginning at page 109). He addressed the Traudt-Fleming recording and stated in substance that his Flamethrower-related effort failed because there was no cooperation and he could not proceed without a subpoena or lawsuit. He also excused not seeking the recording by stating he was waiting for Traudt to provide a copy — even after Traudt had publicly directed counsel to subpoena it:

> *"Communicate to Wes I will give him my account number at TDA, the date, and time for the conversation with Cameron Fleming at TDA on 20 March 2023 wherein he said MMTLP was U3 nuked because it was trading over 100x in dark pools before 8 December 2022. He can subpoena this."* **Exhibit J.**

Yet the recording was never obtained. The Trustee's March 6, 2025 subpoena to Schwab (ECF No. 1625) sought trading records but did not specifically request this audio or its custody

12

trail. Arbitration has likewise produced nothing. That history does not defeat Rule 2004 relief; it confirms the need for it.

A subpoena-capable case later existed. *Next Bridge Hydrocarbons, Inc. v. TradeStation Securities, Inc.*, Cause No. DC-24-05631, was filed in Dallas County District Court on or about April 15, 2024 and appears to have been nonsuited on or about October 16, 2024.[4] The same gap repeated in bankruptcy when the Trustee's March 6, 2025 subpoena to Schwab sought MMAT/MMTLP trading data but not the Traudt-Fleming recording.

## VIII. THE MISSED SUBPOENA CHANNELS CONFIRM WHY RULE 2004 RELIEF IS NECESSARY

The Court need not adjudicate anyone else's motives, Brda's decisions, TradeStation's liability, or the merits of other proceedings. The narrower point is that the Traudt-Fleming recording was identified to MMTLP-side actors (including Special Counsel Christian), tied to FINRA blue sheets and broker-dealer trading data, reinforced by TradeStation's share-imbalance disclosures, and later raised directly with the estate — yet no channel obtained the recording or required Schwab to account for its custody history.

Subpoena-capable pathways existed. TradeStation told customers that its Next Bridge certificate excluded "a large number" of shares lent to other broker-dealers and that some transfer requests could not be honored because shares were not backed by physical certificates.[5]

---

[4] *Next Bridge Hydrocarbons, Inc. v. TradeStation Securities, Inc.* was filed as a Verified Rule 202 Petition—a unique Texas procedural tool used to conduct *pre-suit discovery* to investigate potential claims. However, Next Bridge Hydrocarbons nonsuited the case on or about October 16, 2024, leaving MMTLP shareholders confused about the status of potential claims related to trading imbalances, short positions, and share overselling.

[5] Traudt argues that MMTLP shareholders were victimized by overselling by brokers and naked shorting by the larger players in the market. The subsequent "permanent halt" and then deletion of the MMTLP ticker in violation of Exchange Act § 12(k), 15 U.S.C. § 78l(k) furthers Traudt's arguments that the entire MMTLP trading ecosystem was saturated with bad actors. Moreover,

13

**Exhibit P**. *Inter-Coastal Waterways LLC v. TradeStation Securities, Inc.*, Case No. 0:24-cv-60891-AHS, ECF No. 1 (S.D. Fla. May 24, 2024), pled the same core problem: lent shares, inability to recall shares, refused transfers, and customers without certificate-backed positions. That did not prove Schwab had the recording. It made the recording more important.

Had the recording been subpoenaed and authenticated when first identified, it may have materially changed MMTLP-related litigation, estate recovery analysis, and legal claims for Traudt and approximately 65,000 MMTLP shareholders. Rule 2004 is the proper mechanism to close that gap now.

Federal Rule 27 may have supplied another preservation path. It is not a device to discover whether a claim exists. *Ash v. Cort*, 512 F.2d 909, 912 (3d Cir. 1975). But the Traudt-Fleming recording was already identified. The issue was preservation, authentication, and chain of custody. Christian's five-page resume, filed at ECF No. 1878-1, represented that he had complex-litigation, securities, Texas, and discovery experience. His later statement in *Traudt v. Christian*, No. 01-25-00678-CV, that cooperation required a subpoena or lawsuit identifies the remedy that should have been evaluated or pursued.[6]

---

the halt itself was illegal under US Supreme Court precedent; *SEC v. Sloan* 436 US 103 (1978) which held that *"[T]he (Securities Exchange Commission) Commission does not have the authority under 12 (k), based upon a single set of circumstances, to issue a series of summary orders that would suspend trading in a stock beyond the initial 10-day period, even though the Commission periodically redetermines that such action is required by "the public interest" and for "the protection of investors."* At 110-123. Traudt is attempting to restart trading in MMTLP and challenge the Constitutionality of FINRA itself in *Traudt v. Atkins*, Case 25-2885, 2d. Cir. March 31, 2026.

[6] The same Special Counsel Christian who submitted a 5 page resume as proof of competence said he couldn't do anything...he here stated in that affidavit that *"My co-counsel and I and at least five experts we retained to assist in the investigation attempted to obtain records that would prove market manipulation in the shares of Meta. This effort was not successful as we could not get cooperation from multiple organizations without a subpoena/lawsuit."* Id., page 112, paragraph 11.

14

## IX. REQUESTED RELIEF

Traudt respectfully requests that the Court deny Schwab's opposition and enter a limited Rule 2004 order requiring Schwab to:

1. Produce the March 20, 2023 Traudt-Fleming recording or transcript, if it exists.

2. Produce all call-specific records, including call logs, CRM/Salesforce entries, broker notes, account notes, metadata, account-message records, and internal tickets.

3. Produce all custody and preservation records for the call, including retention, migration, deletion, recovery, archive, search, and chain-of-custody records.

4. Identify every system searched, custodian consulted, retention policy applied, and Schwab/TDA department or vendor involved in the search or non-production.

5. Provide a sworn declaration if Schwab contends no March 20, 2023 recording was ever made, explaining that position in light of TDA's March 2023 messages, Schwab's September 2024 message, and Schwab's recovery of other pre-March 20, 2023 TDA recordings.

6. State whether the Traudt-Fleming recording or related call/custody materials were ever produced, withheld, logged, designated, or reviewed in response to the Trustee's March 6, 2025 subpoena, ECF No. 1625.

7. Alternatively, if the Court has concern about arbitration use, produce the materials first to the Trustee and/or Court for in camera review under ECF No. 1921-1 or a substantially similar protective order, with no use outside this bankruptcy case absent further order.

Schwab's opposition should be denied in whole or in part.

Dated: May 2nd, 2026

Scott Traudt, *pro se*
Movant

15

191 Kibling Hill Road
Strafford, VT 05072
802-318-0429
sctraudt@gmail.com

I hereby certify that a true copy of the foregoing was sent to all named parties and others with interests in this matter and at the addresses delineated below either by 1st Class mail or via email on this _____2nd_____ day of May, 2026 via my Certification of Service attached hereto.

Scott Traudt, *pro se*
*Intervenor/Movant*
191 Kibling Hill Road
Strafford, VT 05072

## EXHIBIT LIST

**Exhibit A**
December 20, 2022 TD Ameritrade message from Traudt providing MMTLP litigation notice to TDA.
**Exhibit B**
March 20, 2023 tweet by Scott Traudt concerning Cameron Fleming / TD Ameritrade call.
**Exhibit C**
March 22, 2023 TD Ameritrade response from Michael Vaughn identifying Cameron as a trade-desk specialist with Series 63, Series 7, and Series 9 licenses and stating TDA could not provide a recorded copy.
**Exhibit D**
March 24, 2023 TD Ameritrade response from Rachael Peacock stating TDA could submit a request for a manager to review the specific portion of the call.
**Exhibit E**
September 18, 2024 Schwab response from Stacie Hayden stating Schwab retains messages and audio recordings internally and can access them for a business need such as a trade dispute.
**Exhibit F**
Schwab's April 13, 2026 FINRA arbitration discovery responses and objections, including List Item No. 8.
**Exhibit G**
Traudt's FINRA arbitration discovery request seeking the Traudt-Fleming recording, metadata, preservation records, deletion records, migration records, and non-preservation records. Exhibits listed but not attached for brevity.
**Exhibit H**

16

January 15, 2026 email from Traudt to Trustee's counsel Jeffrey Hartman asking whether the Trustee's Schwab subpoena requested the Traudt-Fleming recording and offering to supply the relevant materials if it did not.

**Exhibit I**

January 3, 2026 email from Danielle Spears to Trustee's counsel Jeffrey Hartman identifying the Traudt-Fleming / TD Ameritrade (now Schwab) audio as a potential estate-recovery issue.

**Exhibit J**

October 16, 2023 X post and reply thread in which Traudt offered to provide his TDA account number plus the date and time of the March 20, 2023 Traudt-Fleming recording and stated that Wes Christian could subpoena it.

**Exhibit K**

October 22, 2023 email thread between Scott Traudt and John Brda concerning Verizon March call logs and TDA's admission that it had the audio recorded.

**Exhibit L**

December 4, 2023 email thread between Scott Traudt and John Brda concerning suing TDA, seeking the audio recording in full, and subpoenaing MMTLP blue sheets.

**Exhibit M**

February 2, 2024 email thread involving Scott Traudt, John Brda, and Wes Christian concerning obtaining the recording and subpoenaing FINRA for MMTLP blue sheets.

**Exhibit N**

February 6, 2024 email thread in which John Brda tells Wes Christian that the issue concerns a recorded conversation between Scott Traudt and his broker regarding advance notice of the halt.

**Exhibit O**

Email from John Brda introducing Scott Traudt to Wes Christian and stating that they could take the issue from there. (August 16, 2024)

**Exhibit P**

TradeStation customer communication or posting concerning Next Bridge certificate limitations, lent shares, and transfer requests not backed by physical certificates.

17

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>META MATERIALS INC.,<br><br>        Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**DECLARATION OF SCOTT TRAUDT**<br>**IN SUPPORT OF REPLY TO SCHWAB'S**<br>**OPPOSITION TO RULE 2004**<br>**EXAMINATION** |

I, Scott Traudt, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the movant and party-in-interest in the above-captioned bankruptcy case and the claimant in FINRA Arbitration No. 25-02608 against Charles Schwab & Co., Inc.

2. On December 20, 2022, I sent TD Ameritrade a written message concerning MMTLP, the U3 trading suspension, synthetic or counterfeit-share concerns, and my intent to name TDA as a defendant in litigation. A true and correct copy of that message is part of the record herein as **Exhibit A.** I made that communication before my March 20, 2023 call with Ron/Cameron Fleming, and I believe it placed TDA on notice that MMTLP-related evidence should be preserved.

3. On March 20, 2023, I had a telephone call with TD Ameritrade representative Ron Fleming, whom I later understood to be Cameron Fleming. The call began at approximately 4:55 p.m. Eastern and ended approximately ten minutes later. I called from my personal cell phone number, 802-318-0429.

4. During that call, after initially discussing tax documents, I asked about MMTLP. Fleming made statements to me concerning MMTLP dark-pool trading, broker-dealer protection, and the reason for the U3 halt.

1

5. On March 20, 2023, shortly after the call, I posted publicly on X/Twitter that TD Ameritrade had just told me during a 4:57 p.m. conversation with Ron Fleming that FINRA halted MMTLP after dark-pool trades hit 100X normal value and because the share price bore no resemblance to actual value. A true and correct copy of that post is part of the record herein as **Exhibit B.**

6. On March 22, 2023, two days after the Fleming call, I sent TD Ameritrade a written message asking for "the audio file (recording)" of my conversation with Ron/Cameron Fleming. I identified the call as occurring on Monday, March 20, 2023, from about 4:55 p.m. to 5:10 p.m. Eastern, from my personal cell phone at 802-318-0429. I also asked TDA to identify Fleming's securities licenses or qualifications. A true and correct copy of the response email from TDA's Michael Vaughn is part of the record herein as **Exhibit C.**

7. On March 22, 2023, Grant Wells of TD Ameritrade Client Services responded to me in writing. He stated, "yes, we keep call recordings," but said that, to his knowledge, TDA could not provide them directly to clients. He further stated that a manager could be requested to go through the recording to establish what was said, and that it might even be possible for me to listen to the call with the manager. A true and correct copy of that message is at **ECF 2661** Page 31.

8. Vaughn on March 22, 2023, stated in writing that TDA could not provide a recorded copy of the call, and identified Cameron as a specialist on the trade desk who held Series 63, Series 7, and Series 9 licenses. A true and correct copy of that message is part of the record herein as **Exhibit C.**

9. On March 24, 2023, Rachael of TD Ameritrade Client Services responded to me in writing. She stated that, if there was a specific section of the call I needed reviewed, TDA would

2

be happy to do so, and that TDA could submit a request to have a manager review the call to answer my concerns. A true and correct copy of that message is part of the record herein as **Exhibit D**.

10. On October 18, 2023, I prepared a letter addressed to John Brda and Wes Christian summarizing the March 20, 2023 recorded phone call with TD Ameritrade representative Ron/Cameron Fleming. In that letter I identified the call date, approximate time, phone number, speaker, and the substance of the statements made to me concerning MMTLP dark-pool trading, broker-dealer protection, and the U3 halt. A true and correct copy of that letter is part of the record herein as **ECF 2661** page 46.

11. On October 22, 2023, I emailed John Brda and told him I was sending records pertaining to the Fleming call, including Verizon March call logs and what I described as TDA's admission that it had the audio recorded. Mr. Brda responded, "Thanks Scott. Will let you know next steps." A true and correct copy of that email thread is part of the record herein as **Exhibit K**.

12. On December 4, 2023, I emailed Mr. Brda again and stated that I was considering suing TDA and immediately asking for the audio recording in full and a third-party subpoena for the MMTLP bluesheets. Mr. Brda responded, "Agreed!" A true and correct copy of that email thread is part of the record herein as **Exhibit L**.

13. On February 2, 2024, I again raised the same issue with Mr. Brda and Wes Christian, stating that my thinking was to do the minimum filing needed to get the recording and then subpoena third-party FINRA for the MMTLP bluesheets. In the same thread, Mr. Brda stated, "Let me send to Wes, and I will let you know." A true and correct copy of that email thread is part of the record herein as **Exhibit M**.

3

14. On January 28, 2024, after the TDA-to-Schwab transition, I again requested playback of the March 20, 2023 conversation with broker Cameron Fleming. I identified the call as starting around 4:55 p.m. Eastern and ending about ten minutes later.

15. On September 18, 2024, Schwab eServices Supervisor Stacie Hayden responded to me concerning messages and audio recordings transitioning from TDA. She stated that Schwab retained messages and audio recordings internally, that such materials were not generally available to clients, and that Schwab could access them if there was a business need, such as a trade dispute. A true and correct copy of that message is part of the record herein as **Exhibit E**.

16. In the FINRA arbitration, I served written discovery requests seeking the complete March 20, 2023 Ron/Cameron Fleming call recording, related call logs, notes, communications, preservation records, and records concerning any deletion, overwrite, migration, loss, destruction, or non-preservation of that recording. A true and correct copy of my discovery request is part of the record herein as **Exhibit G**.

17. Schwab acknowledged and responded to those discovery requests. Schwab did not produce the March 20, 2023 recording. Instead, Schwab stated in its April 13, 2026 discovery responses that it had searched for phone-call records and recordings "to the extent they exist," while asserting that Schwab and TDA do not record all customer calls and that many of my calls were not recorded. A true and correct copy of Schwab's responses is part of the record herein as **Exhibit F**.

18. Schwab further stated that, based on its "best understanding," no recording was ever made of any March 20, 2023 telephone call between me and TDA, except for a short customer relationship management note. That statement appears in and is part of the record herein as **Exhibit F**.

4

19. Those statements are inconsistent with the written messages I received from TDA and Schwab in March 2023 and September 2024.

20. Before the April 6, 2026 preliminary FINRA arbitration hearing, Schwab had not clearly told me that the March 20, 2023 Fleming call was not recorded. At that hearing, Schwab's counsel, Attorney Jeff Goldman, represented in substance that Schwab might be able to locate recordings. I understood that statement to mean Schwab was not committing that the relevant recordings had been preserved, located, reviewed, or would be produced.

21. My full FINRA arbitration hearing on the merits is not scheduled until on or about December 8, 2026. Discovery in that arbitration does not close until October 2026. I believe that schedule makes arbitration discovery inadequate for the estate-related issues raised in my Rule 2004 motion.

22. The estate, the Trustee, and MMTLP holders should not have to wait until late 2026 to determine whether the March 20, 2023 Fleming recording exists, whether it was preserved, whether it migrated from TDA to Schwab, whether it was deleted or recovered, whether it was withheld, or whether Schwab's current position that no recording was ever made is accurate.

23. Before filing my Rule 2004 motion, I tried to have the estate obtain the Fleming recording. I asked the Trustee's team to pursue it because I believed it could benefit the estate, MMAT shareholders, and MMTLP holders. Danielle Spears also asked that the estate pursue or subpoena the Fleming recording. To the extent I was copied on or received those communications, true and correct copies are part of the record herein as **Exhibit I**.

24. On or about December 31, 2025, Trustee's counsel Jeffrey Hartman stated to me in substance that he believed the March 20, 2023 Fleming-Traudt audio recording was included in the Trustee's subpoena to Schwab.

5

25. I later reviewed the Trustee's March 6, 2025 subpoena to Schwab, ECF No. 1625. The subpoena requests MMAT/MMTLP order-routing records, FIX or binary protocol routing messages, locate/borrow/delivery/fail-to-deliver records, and position data. It does not specifically request the March 20, 2023 Fleming audio recording, any transcript of that call, call logs for that call, CRM/Salesforce notes for that call, retention records, migration records, deletion records, recovery records, or chain-of-custody records for that call.

26. These efforts were made in good faith. I was not trying to bypass the Trustee or interfere with estate administration. I was trying to make sure the estate obtained critical evidence concerning MMTLP, the March 20, 2023 Fleming call, broker-dealer knowledge, and preservation of Schwab/TDA audio evidence.

27. Because the Trustee's Schwab subpoena did not actually request the Fleming recording or related preservation and chain-of-custody materials, and because Schwab is now resisting or denying the recording in arbitration, I seek a narrow Rule 2004 examination to determine whether the recording exists, whether it was preserved, whether it migrated from TDA to Schwab, whether it was deleted or recovered, which systems were searched, which custodians were consulted, and why Schwab now claims no recording was made.

28. I seek Rule 2004 relief focused on preservation, migration, deletion, recovery, chain of custody, custodians searched, systems searched, and the factual basis for Schwab's position that the recording does not exist or was never made. I am willing to have Schwab produce the recording and chain-of-custody materials first to the Trustee and Court under protective order, with use outside this bankruptcy case prohibited absent further order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May _2_, 2026, in Strafford, Vermont.

6

Scott Traudt

7

# EXHIBIT A

# EXHIBIT A

## Re: Re: Client services - Account history

From: phoenix545
To: Message Center Client Services
Date: 7:22pm ET 12/20/2022

Steve:

Please have TDA contact the DTCC using the WINS system and confirm that my shares are NOT counterfeit in Next Bridge - the CUSIP you have for me is not confirmation I own 305 shares of Next Bridge.

Fidelity has admitted today that there are synthetics (counterfeits) in MMTLP and for TDA to say there are not when other LB trading suspension by FINRA there are STILL shares being borrowed is pure insanity.

Let your legal department know that I'm naming TDA as a defendant in litigation under RICO, FINRA, and CFAA for knowingly supplying me counterfeit shares.... the suit will be after Xmas in US District Court, Burlington, VT.

Thanks,

Scott

# EXHIBIT B

# EXHIBIT B

 **Scott Traudt**
@Greenhills303                                                      •••

#FINRAFRAUD and #MMTLP TD Ameritrade just told me (4:57 pm EST conversation with Ron Fleming, St. L-CC) that FINRA halted MMTLP when dark pool trades had hit 100X normal value and they nuked it with the U3 because "the share price bore no resemblance to the actual value"

5:11 PM · Mar 20, 2023 · **69.8K** Views

# EXHIBIT C

# EXHIBIT C



## Message center

### Client services - Taxes

From: Message Center Client Services
To: scott545303
Date: 8:19am ET 3/22/2023

Dear Scott Traudt,

Thank you for contacting TD Ameritrade! My name is Mike and I hope you are having a good day so far. Your 1099 tax form can be located through the desktop website by going to the left side of the screen to My Account > Tax Center. Through the mobile app, you can download the form by going to Accounts > Docs > Tax Documents. Your tax document was posted online as of February 3, 2023.

In regards to the phone call, we cannot provide a recorded copy of the call. Cameron is a specialist on the trade desk who holds his Series 63, Series 7 and Series 9 licenses. You can review his information on brokercheck.org.

Thank you for your business with TD Ameritrade! Answers to many of your questions might be found by going to Client Services > Help Center. Please reply here, give us a call or if you have additional questions and we would be happy to assist!

Michael Vaughn
Client Services

TD Ameritrade
1-800-669-3900

TD Ameritrade, Inc., member FINRA/SIPC. Not an offer or solicitation to conduct business in any jurisdiction where we are not authorized to do business. Communications may be subject to review.

Original Message Excluded:
--------------------------

(KMM134064794V87508L0KM)

# EXHIBIT D

# EXHIBIT D

 **Ameritrade**

## Message center

### Re: Client services - Taxes

From: Message Center Client Services
To: scott545303
Date: 8:37am ET 3/24/2023

Dear Scott,

Thank you for your response. My name is Rachael and it is my pleasure to look into this for you.

In regards to the call, if there is a specific section you need us to review, we would be happy to do so. We are not able to send audio or transcribe the full call. What specific question in that call do you need more information on? Please let us know and we can submit a request to have a manager review the call to answer your concerns.

You can also call us anytime at 800-669-3900 to request to speak with a manager directly.

It looks like in your previous message, you mentioned that the calls was in reference to accessing tax documents. I have provided general details on how to view those online below also just in case this can assist you with your inquiry.

To access the account documents on the TD Ameritrade mobile application, please follow these steps:

For iPhone -
1. Launch the TD Ameritrade mobile application.
2. From the menu bar located at the bottom of the application screen, select "Accounts".
3. From the Accounts menu at the top of the application screen, select "Docs".
4. The application will default to "Statements", but you can change the type to tax documents.

For Android -
1. Launch the TD Ameritrade mobile application.
2. From the menu bar located at the top of the application screen, select "Accounts".
3. On the Accounts screen, select "Documents".
4. The application will default to "Statements", but you can change the type to tax documents.

To access the account documents on the TD Ameritrade website, please follow these steps:
1. Log in to the TD Ameritrade website.
2. From the main toolbar toward the top of the screen, hover the mouse over "My Account".
3. A submenu will appear with several choices. There are two separate places where you can access historical information: "Tax Center" and "History

3. A submenu will appear with several choices. There are two separate places where you can access historical information: "Tax Center" and "History & Statements".

4. Click Tax Center.

If you have any other questions please let us know. We're always happy to help.

Thank you for your business.

Rachael Peacock
Client Services

TD Ameritrade
1-800-669-3900

TD Ameritrade, Inc., member FINRA/SIPC. Not an offer or solicitation to conduct business in any jurisdiction where we are not authorized to do business. Communications may be subject to review.

Original Message Excluded:
----------------------------

(KMM134110362V61404L0KM)

Back to inbox

🗑 Delete     ↩ Reply

# EXHIBIT E

# EXHIBIT E

## Charles Schwab: Follow up                                           ×

Date: 09/18/2024    Account: Individual ...548    Category: Customer Service

From: Schwab Client Service

Message #: 06919NK6UYEN6YSA

Dear Scott Traudt,

Good morning!

We received your message regarding messages and audio recordings transitioning from TD. I am sorry you were misinformed, but messages were not intended to transfer, and communication was sent to suggest saving them in advance of the transfer.

While we do retain messages and audio recordings internally, they are not generally available for clients. That may be where the miscommunication happened. We could access them if there was a business need, such as a trade dispute.

If you would like to speak to a supervisor over the phone, then you will want to call the main line to be transferred to the Supervisor hotline. Please call 800-435-4000, if you would like to discuss this further.

We are grateful for your business! Know that we are here 24 hours a day to help and please have a wonderful day!

Sincerely,

Stacie Haden
eServices Supervisor
Client Service & Support
1-800-435-4000

All interactions are subject to recordkeeping and monitoring. The Charles Schwab Corporation provides a full range of brokerage, banking and financial advisory services through its operating subsidiaries. Its broker-dealer subsidiary, Charles Schwab & Co., Inc. (Member SIPC), offers investment services and products, including Schwab brokerage accounts. Its banking subsidiaries, Charles Schwab Bank, SSB (Member FDIC and an Equal Housing Lender), Charles Schwab Premier Bank, SSB (Member FDIC) and Charles Schwab Trust Bank (Member FDIC), provide deposit and lending services and products.

# EXHIBIT F

# EXHIBIT F

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**DISPUTE RESOLUTION SERVICES**

SCOTT TRAUDT,

*Claimant,*

vs.

CHARLES SCHWAB & CO., INC.,

*Respondent.*

FINRA Arbitration No. 25-02608

## RESPONDENT'S RESPONSES AND OBJECTIONS TO
## DISCOVERY GUIDE DOCUMENT PRODUCTION LIST NO. 1

Respondent Charles Schwab & Co., Inc. ("Respondent" or "Schwab") provides its Responses and Objections to the FINRA Discovery Guide and Document Production List No. 1 (the "List" and each item a "List Item") pursuant to FINRA Code of Arbitration Procedure Rule 12506 as follows:

### GENERAL OBJECTIONS AND RESERVATIONS

Respondent responds to the List Items detailed below subject to and without waiving the following General Objections and Reservations. Respondent also expressly reserves (a) any objections regarding competency, relevancy, materiality, privilege, and admissibility of any of the documents produced; and (b) the right to object to other discovery procedures involving and relating to the subject matter of the List Items.

1.    Any confidential documents will be produced pursuant to a mutually agreeable confidentiality and non-waiver agreement signed between the parties ("Confidentiality Agreement"). A draft Confidentiality Agreement will be sent to you following this response. The purpose of the Confidentiality Agreement is to ensure that each party's confidential documents will be treated as such and used by the other party only in the prosecution or defense of this

1

arbitration. If the terms of the Confidentiality Agreement are acceptable, we ask that you please promptly sign and return the agreement to us. Once a signed agreement is in place, Respondent will produce copies of any confidential documents that are responsive to the List Items.

2.      Respondent provides these responses and objections based upon the facts, documents, and information currently known and available to Respondent at this stage of the proceeding. Further discovery, independent investigation, legal research, and analysis of the documentary record are ongoing in this arbitration and may disclose the existence of additional facts or documents, add meaning to known facts or documents, establish entirely new factual conclusions or legal contentions, or possibly lead to additions, variations, and/or changes to these responses. Accordingly, Respondent specifically reserves and does not waive the right to make any other or additional responses or objections to these List Items as facts and circumstances warrant.

3.      Respondent objects to the production of material that is protected by the attorney-client privilege, the attorney work product doctrine, or other applicable privileges, rules of law, or statutes, including, without limitation, any federal and/or state privacy laws. Any inadvertent disclosure of documents that are properly the subject of a privilege or immunity from discovery shall not be deemed a waiver, in whole or in part, of any such privilege, and any such documents shall not be used by Claimant in any manner.

4.      To the extent a List Item seeks documents that do not exist, are not in Respondent's possession, custody, or control, or have previously been provided to Claimant, Respondent objects and hereby declines to produce any such documents and/or information.

2

5. To the extent a List Item seeks documents that are irrelevant to the subject matter of this arbitration or not reasonably calculated to lead to the discovery of admissible evidence, Respondent objects and hereby declines to produce any such documents and/or information.

6. To the extent any List Item extends to "All" documents, correspondence, records, reports, or other materials that "relate to" or "concern" a specific topic, Respondent objects to that demand as overbroad, unduly burdensome, and seeking documents that may not be relevant to the instant arbitration. An attempt to identify "All" documents responsive to certain categories or requests would impose a burden that is beyond the pale of any reasonable discovery expectation.

7. Respondent reserves the right to redact any portion of a document it agrees to produce which contains the confidential information of other customers or information that is not related to the specific matter in controversy.

8. Unless otherwise specified, and for purposes of this response, "Claimant" means Scott Traudt, and any other agents, trustees, or persons authorized to act on behalf of Claimant.

9. Unless otherwise specified, this response relates solely to the self-directed brokerage account (ending in -3744 while at TD Ameritrade, Inc. ("TDA"), and ending -6548 while at Schwab) held in the name of Scott Traudt (the "Account").

10. Unless otherwise specified, the relevant time period for purposes of this response is July 6, 2020 through December 19, 2025.

11. These General Objections and Reservations shall be applicable to and incorporated by reference in the following individual responses as if fully set forth therein.

3

## RESPONSES AND OBJECTIONS TO
## DISCOVERY GUIDE DOCUMENT PRODUCTION LIST NO. 1

### LIST ITEM NO. 1:

*(a) The account record information for the customer parties, including the customer parties' name, tax identification number, address, telephone number, date of birth, employment status, annual income, net worth, and the account's investment objectives.*

*(b) All documents concerning the customer parties' risk tolerance.*

*(c) All agreements with the customer parties, including, but not limited to, account opening documents and/or forms; cash, margin, option, and discretionary authorization agreements; trading authorizations; and powers of attorney.*

### RESPONSE:

Subject to and without waiving the General Objections and Reservations above and the reservations and objections within this response, the documents identified are being produced. Schwab's production of any materials to which Claimant would not be entitled absent the existence of litigation is conditioned on, and subject to, Claimant's execution of a mutually agreeable Confidentiality Agreement. Schwab reserves the right to supplement this response as additional materials are located. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

### LIST ITEM NO. 2:

*All correspondence sent to the customer parties or received by the firm/associated persons relating to the claims, accounts, transactions, or products or types of products at issue including, but not limited to, documents relating to asset allocation, diversification, trading strategies, and market conditions; and all advertising materials sent to customers of the firm that refer to the products and/or account types that are at issue or that were used by the firm/associated persons to solicit or provide services to the customer parties. (In addition, if requested, the firm/associated persons shall produce confirmation slips and monthly statements. Even if not requested, the firm/associated persons must produce confirmation slips and monthly statements that have handwritten notations or that are not identical to those the firm sent to the customer parties.)*

4

**RESPONSE:**

Subject to and without waiving the General Objections and Reservations above and the reservations and objections within this response, the documents identified are being produced. For avoidance of doubt, Schwab has searched for, and is producing, emails exchanged between Claimant and Schwab via Claimant's email address of record.[1] Schwab is also producing monthly account statements for the Account and trade confirmations during the relevant time period. Schwab's production of any materials to which Claimant would not be entitled absent the existence of litigation is conditioned on, and subject to, Claimant's execution of a mutually agreeable Confidentiality Agreement. Schwab reserves the right to supplement this response as additional materials are located.

Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome. For instance, while Schwab has searched for any is producing any identified electronic communications directly with Claimant, it would be unreasonable, impossible, and pointless to read this List Item to require Schwab to try to identify any generally disseminated advertising that Claimant might have seen while browsing the Internet or watching television during the relevant time period.

---

[1] Claimant's email address of record is sctraudt@gmail.com. If Claimant used other email addresses to communicate with Respondent, Respondent requests that Claimant please identify those email addresses.

5

**LIST ITEM NO. 3:**

*All documents evidencing any investment or trading strategies utilized or recommended in the customer parties' accounts, including, but not limited to, options programs, and any supervisory review of such strategies.*

**RESPONSE:**

Claimant's Account was self-directed, and there is no allegation in the Statement of Claim that Schwab or TDA ever recommended any investment or trading strategies to Claimant. As Claimant's Account was self-directed, there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 4:**

*For claims alleging unauthorized trading, all documents the firm/associated persons relied upon to establish that the customer parties authorized the transactions at issue, all documents relating to the customer parties' authorization of the transactions at issue, and all order tickets for the customer parties' transactions at issue.*

**RESPONSE:**

This arbitration does not involve any claim of unauthorized trading. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 5:**

*(a) All materials the firm and/or associated persons prepared or used and/or provided to the customer parties relating to the transactions or products at issue, including research reports, sales materials, performance or risk data, prospectuses, other offering documents, and copies of news*

6

*articles or outside research, including documents intended or identified as being "for internal use only."*

*(b) All worksheets or notes indicating that the associated persons reviewed or read such documents.*

### RESPONSE:

This arbitration does not involve any claim that Schwab recommended to Claimant any "transactions or products." Nor does this arbitration involve any allegations involving purchases of newly offered securities (such as initial public offerings) or products such as mutual funds for which prospectuses are distributed. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

### LIST ITEM NO. 6:

*All notes the firm/associated persons made relating to the customer parties and/or the customer parties' claims, accounts, transactions, or products or types of products at issue, including, but not limited to, entries in any diary or calendar, relating to the claims or products at issue.*

### RESPONSE:

Subject to and without waiving the General Objections and Reservations above and the reservations and objections within this response, Schwab has searched for, and is producing insofar as identified through that search, its records of customer relationship management notes (*i.e.*, Salesforce) relating to Claimant or the Account. As these are materials to which Claimant would not be entitled absent the existence of litigation, Schwab's production is conditioned on, and subject to, Claimant's execution of a mutually agreeable Confidentiality Agreement. While Schwab reserves the right to supplement this response as additional materials are located, it does not understand this List Item to be otherwise implicated by Claimant's self-directed trading

7

account. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

## LIST ITEM NO. 7:

*(a) All notes or memoranda evidencing supervisory, compliance, or managerial review of the customer parties' accounts or transactions therein or of the associated persons assigned to the customer parties' accounts for the period at issue.*

*(b) All correspondence between the customer parties and firm/associated persons relating to the customer parties' claims, accounts, transactions, or products or types of products at issue bearing indications of managerial, compliance, or supervisory review of such correspondence.*

### RESPONSE:

Subject to and without waiving the General Objections and Reservations above and the reservations and objections within this response, Schwab has searched for, and is producing insofar as identified through that search, its records of customer relationship management notes (*i.e.*, Salesforce) relating to Claimant or the Account. As these are materials to which Claimant would not be entitled absent the existence of litigation, Schwab's production is conditioned on, and subject to, Claimant's execution of a mutually agreeable Confidentiality Agreement. Schwab is also producing the materials discussed in response to List Item No. 1. While Schwab reserves the right to supplement this response as additional materials are located, it does not understand this List Item to be otherwise implicated by Claimant's self-directed trading account. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

## LIST ITEM NO. 8:

*All recordings, telephone logs, and notes of telephone calls or conversations about the transactions at issue that occurred between the associated persons and the customer parties (and*

8

*any person purporting to act on behalf of the customer parties), and/or between the firm and the associated persons.*

**RESPONSE:**

Subject to and without waiving the General Objections and Reservations above and the reservations and objections within this response, Schwab has searched for, and is producing insofar as identified through that search, its records of phone calls with Claimant, including recordings of calls to the extent they exist. As these are materials to which Claimant would not be entitled absent the existence of litigation, Schwab's production is conditioned on, and subject to, Claimant's execution of a mutually agreeable Confidentiality Agreement. It is important to keep in mind that there is no regulatory requirement for broker-dealers to record customers' phone calls, or to retain recordings of customer phone calls to the extent such recordings are made. Consistent with this, Schwab and TDA do not record all telephone calls with customers. Based on a comparison between its notes reflecting conversations with Claimant and the results of its search of available phone recordings, it is plainly apparent that many of Claimant's phone calls with Schwab and TDA were not recorded.

Claimant has stated to the Panel that Schwab "told me" that it recorded a specific phone call on March 20, 2023. While Schwab reserves the right to supplement this response as additional materials are located, Claimant previously made the same statement to the undersigned. While Schwab reserves the right to supplement this response as additional materials are located, based on a thorough review of all records of communications with Claimant, Schwab understands Claimant's statement to be inaccurate. There is no record of which Schwab is aware reflecting any Schwab or TDA employee ever telling Claimant that the call in question was recorded. Further, while, again, there is no regulatory retention period for phone recordings, the fact that Schwab has identified and recovered recordings of phone calls Claimant made to TDA *prior* to

9

March 20, 2023, strongly suggests that no recording was ever made.  Rather, Claimant appears at some point to have determined by himself that he had previously been told about the existence of a recording, and then to have told others (including other Schwab employees, the undersigned, and the Panel), that he had been told by Schwab or TDA that a recording was made.  Schwab's best understanding of these facts is that they strongly suggest that no recording was ever made of any telephone call between Claimant and TDA on March 20, 2023, except for the short note in the customer relationship management system being produced pursuant to List Item No. 6, above, subject to a mutually agreeable Confidentiality Agreement.

Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 9**:

*All writings reflecting communications between the associated persons assigned to the customer parties' accounts at issue during the time period at issue and members of the firm's compliance department relating to the securities/products at issue and/or the customer parties' claims, accounts or transactions.*

**RESPONSE**:

Claimant's account was self-directed, and there were no associated persons assigned to the Account.  Consistent with that, Schwab has not identified any documents responsive to this List Item.  Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 10**:

*All Forms RE-3, U-4, and U-5 and Disclosure Reporting Pages, including all amendments, for the associated persons assigned to the customer parties' accounts at issue during the time period at issue, redacted to delete associated persons' Social Security numbers, all customer complaints identified in such forms, and all customer complaints filed against the associated persons that were generated not earlier than three years prior to the first transactions at issue through the filing of the Statement of Claim, redacted to prevent the disclosure of non-public personal information of the complaining customers.*

10

**RESPONSE:**

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 11:**

*All sections for all of the firm's manuals and all updates thereto relating to the claims alleged in the Statement of Claim for all years in which the Statement of Claim alleges that the conduct occurred, including separate or supplemental manuals governing duties and responsibilities of the associated persons and supervisors, all bulletins (or similar notices) the firm issued for all years in which the Statement of Claim alleges that the conduct occurred, and the entire table of contents and index to each such manual or bulletin. In responding to this request, the firm must provide a list of all of its manuals and bulletins which may contain directives related to the conduct, claims, or product or types of products at issue in the claim.*

**RESPONSE:**

Respondent is willing to meet and confer with Claimant to determine which compliance or oversight functions are at issue in this arbitration in order to identify which firm manuals, if any, may be relevant to the claims. Such manuals, or their table of contents, will then be produced pursuant to the parties' mutually agreeable Confidentiality Agreement. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 12:**

*All analyses and reconciliations of the customer parties' accounts prepared during the time period at issue, including, without limitation, those relating to reviews of the customer parties' claims, accounts, transactions, or the product or types of products at issue.*

11

**RESPONSE:**

Claimant's Account was self-directed, and there is no allegation in the Statement of Claim that Schwab or TDA ever made any recommendations to Claimant. Consistent with that, Schwab has not identified any documents responsive to this List Item other than periodic account statements being produced in connection with List Item No. 2, above. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome, including, for example, any reading that would encompass any materials that Schwab might prepare in the process of defending Claimant's claims that are protected by the attorney-client privilege and/or the attorney work product doctrine.

**LIST ITEM NO. 13:**

*(a) All exception reports, supervisory activity reviews, concentration reports, active account runs and similar documents produced to review for activity in the customer parties' accounts related to the allegations in the Statement of Claim or in which the claims, transactions, products or types of products at issue are referenced or listed.*

*(b) For claims alleging failure to supervise, all exception reports, supervisory activity reviews, concentration reports, active account runs, and similar documents produced to review for activity in customer accounts handled by associated persons and related to the allegations in the Statement of Claim that were generated not earlier than one year before or not later than one year after the transactions at issue.*

**RESPONSE:**

Claimant's Account was self-directed, and there is no allegation in the Statement of Claim that Schwab or TDA ever made any recommendations to Claimant. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

12

## LIST ITEM NO. 14:

*Those portions of internal audit reports for the branch in which the customer parties maintained accounts that:*

*(a) concern associated person or the accounts or transactions at issue; and*

*(b) were generated not earlier than one year before or not later than one year after the transactions at issue, and discussed alleged improper behavior in the branch against other individuals similar to the improper conduct alleged in the Statement of Claim.*

### RESPONSE:

Claimant's account was self-directed and not "maintained" at any "branch," and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

## LIST ITEM NO. 15:

*Records of disciplinary action taken against associated persons by any regulator (state, federal or self-regulatory organization) or employer for all sales practice violations or conduct similar to the conduct alleged in the Statement of Claim.*

### RESPONSE:

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

## LIST ITEM NO. 16:

*All investigations, charges, or findings by any regulator (state, federal or self-regulatory organization) and the firm/associated persons' responses to such investigations, charges, or findings for the associated persons' alleged improper behavior similar to that alleged in the Statement of Claim.*

13

**RESPONSE:**

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 17:**

*Those portions of examination reports or similar reports following an examination or an inspection conducted by any regulator (state, federal or a self- regulatory organization) that focused on the associated persons or the customer parties' claims, accounts or transactions, or the product or types of products at issue or that discussed alleged improper behavior in the branch against other individuals similar to the conduct alleged in the Statement of Claim, for the period one year before the transactions at issue through the filing of the Statement of Claim.*

**RESPONSE:**

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 18:**

*All documents related to the case at issue that the firm/associated persons received by subpoena under Rule 12512 or by List Item directed to third parties at any time during the case.*

**RESPONSE:**

Respondent has not served any subpoenas in this arbitration. All documents received by Respondent pursuant to a subpoena will be handled consistently with FINRA's Code of Arbitration Procedure for Customer Disputes.

**LIST ITEM NO. 19:**

*For all transactions at issue in the Statement of Claim, documentation showing the compensation, gross and net, to the associated persons for such transactions. In the event accounts at issue are*

14

*the subject of fee arrangements that are not based on remuneration per trade, a record showing compensation earned by period on the accounts.*

**RESPONSE:**

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 20:**

*(a) For claims related to solicited trading activity, a record of all compensation, monetary and non-monetary, including, but not limited to, monthly commission runs for the associated persons, listing the securities traded, dates traded, whether the trades were solicited or unsolicited, and the gross and net commission from each trade. The firm shall provide this information for a period of time beginning three months before and ending three months after the trades at issue in the customer parties' accounts.*

*(b) The firm may redact names and other non-public personal information concerning customers who are not parties to the claim, but should provide sufficient information to identify:*

*(1) the non-party customers' accounts, including the last four digits of the non-party customers' account numbers;*

*(2) the associated persons' own and related accounts, including the last four digits of the associated persons' account numbers; and*

*(3) the type of account (IRA, 401(k), etc.).*

**RESPONSE:**

This List Item is inapplicable, as Claimant does not contend that Schwab or TDA ever solicited him to make any transaction. Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

15

**LIST ITEM NO. 21:**

*(a) A record of all agreements pertaining to the relationship between the associated persons and the firm, summarizing the associated persons' compensation arrangement or plan with the firm, including:*

- *Commission and concession scheduled;*
- *Bonus or incentive plans including those relating to deferred compensation; and*
- *Schedules showing compensation received or to be received based upon volume, type of product, nature of trade (agency v. principal), etc.*

*(b) To the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation was determined.*

### RESPONSE:

Claimant's account was self-directed, and there were no associated persons assigned to the Account. Consistent with that, Schwab has not identified any documents responsive to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

**LIST ITEM NO. 22:**

*If the Statement of Claim includes allegations regarding an insurance product that includes a death benefit, the firm and/or associated persons must provide all information concerning the customer parties' insurance holdings and the recommendations, if any, to the customer parties regarding insurance products.*

### RESPONSE:

The Statement of Claim does not reference any "insurance product that includes a death benefit." Accordingly, there are no responsive materials to this List Item. Responding further, Schwab objects to any reading of this List Item that would render it unreasonable, overbroad, or unduly burdensome.

16

Dated: April 13, 2026

**CHARLES SCHWAB & CO., INC.**

By its attorneys,

*/s/ Jeff Goldman*

Jeff Goldman
L. Felipe Escobedo
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110
jeff.goldman@morganlewis.com
felipe.escobedo@morganlewis.com
Tel: (617) 341-7700
Fax: (617) 341-7701

17

## CERTIFICATE OF SERVICE

I hereby certify that that a copy of the foregoing document was filed on the DR Portal on April 13, 2026.

/s/ L. Felipe Escobedo
L. Felipe Escobedo

18

# EXHIBIT G

# EXHIBIT G

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**DISPUTE RESOLUTION SERVICES**

SCOTT TRAUDT,

    *Claimant*

vs.                                                                    FINRA ARBITRATION NO. 25-02608

CHARLES SCHWAB & CO., INC.,

    *Respondent.*

## CLAIMANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS PURSUANT TO FINRA RULES 12506, 12507, AND THE DISCOVERY GUIDE

Claimant Scott Traudt hereby requests that Respondent Charles Schwab & Co., Inc. produce the following documents and electronically stored information in native electronic format, or in a reasonably usable electronic format, within sixty (60) days of service of this request unless the Panel directs otherwise. These requests seek materials in Respondent's possession, custody, or control and relate to the matters in controversy in this arbitration, including Claimant's purchase and handling of MMTLP shares through his TD Ameritrade/Schwab account and Claimant's subsequent communications with Respondent concerning MMTLP and the March 20, 2023 telephone call.

These requests are grounded in FINRA Rule 12506 and the FINRA Discovery Guide, including List 1, Items 6 through 9, and in FINRA Rule 12507, which permits specific written discovery requests that relate to the matter in controversy. The requests for MMTLP trading, position, stock-loan, fail, and ledger data also seek categories of records that broker-dealers are required to make and preserve in the ordinary course, including customer ledger accounts, securities borrowed and securities loaned records, fail-to-receive and fail-to-deliver records,

1

securities records or ledgers reflecting all long and short positions, and order memoranda. See 17 C.F.R. sections 240.17a-3(a)(3) through (6), 240.17a-4, and Rule 17a-25. SEC enforcement proceedings involving deficient blue-sheet submissions further confirm that EBS data is a routine regulatory record category. See *Citigroup Global Markets, Inc.*, Exchange Act Release No. 78291 (July 12, 2016) (Exhibit A); *Citadel Securities LLC*, Exchange Act Release No. 84759 (Dec. 10, 2018)(Exhibit B).

## DEFINITIONS

1. "Respondent" or "Schwab" means Charles Schwab & Co., Inc., together with all predecessors, divisions, branches, desks, call centers, departments, and affiliated entities whose records are within Schwab's possession, custody, or control, including responsive TD Ameritrade and TD Ameritrade Clearing records now held by, maintained by, or reasonably retrievable by Schwab.

2. "MMTLP" means Meta Materials Inc. Series A Preferred Shares trading under ticker MMTLP, CUSIP 59134N203, and any alternate, temporary, liability, or internal identifier used by Respondent for the same security.

3. "Document" and "electronically stored information" are used in the broadest sense permitted by the Code and include audio files, emails, texts, chats, instant messages, notes, logs, databases, exports, spreadsheets, reports, supervisory materials, and metadata associated with the foregoing.

## REQUESTS

### REQUEST NO. 1

Produce the complete, unaltered, unredacted original digital audio recording of the telephone call on or about March 20, 2023 between Claimant Scott Traudt and TD

2

Ameritrade/Schwab registered representative Cameron Fleming, together with any other person who participated in, monitored, transferred, reviewed, or handled that call. The recording shall be produced in its original native electronic format with all metadata intact, or, if the original format is not reasonably producible, in a Mac-compatible format that plays natively in QuickTime Player, including .m4a, .mp4 (audio), .mp3, .wav, .aiff, or .mov. The recording shall be produced without redactions, edits, re-recording, compression that materially degrades audio quality, or stripping of metadata.

## REQUEST NO. 2

Produce all documents, communications, notes, memoranda, emails, chat messages, instant messages, logs, reports, supervisory notes, compliance alerts, transcriptions, summaries, or other records created by, sent to, or received by any Schwab or TD Ameritrade employee, supervisor, compliance officer, manager, or other personnel that relate to, refer to, reflect, or evidence Claimant's oral or written requests for playback, review, preservation, transcription, or production of the March 20, 2023 recording described in Request No. 1. This request covers the period from March 20, 2023 through the present.

## REQUEST NO. 3

Produce documents sufficient to identify or show: (a) the specific office, branch, call center, trade desk, or other location to which Cameron Fleming was assigned, or from which he was working, on or about March 20, 2023; (b) the name, exact title, office location, and job function of Cameron Fleming's immediate supervisor or supervisors on or about March 20, 2023, including whether the supervisor worked at a call center, trade desk, branch, or other business unit; and (c) whether Cameron Fleming is currently employed by Schwab or any affiliate and, if so, his current office location, department, title, and role.

3

## REQUEST NO. 4

Produce, in native electronic format with data dictionaries and field definitions, all records sufficient to reproduce, generate, or show MMTLP trading, order, execution, allocation, position, stock-loan, fail, and related activity from the first date on which any Schwab or TD Ameritrade entity executed, cleared, carried, allocated, borrowed, loaned, or booked MMTLP activity through December 8, 2022, inclusive. This request includes, without limitation, the following categories, to the extent maintained by, submitted by, received by, or reasonably retrievable by Respondent:

(a) all Electronic Blue Sheet or Rule 17a-25 data, submissions, reports, exports, or data sufficient to generate the same for every Schwab-affiliated broker-dealer entity, including customer accounts, proprietary accounts, market-making accounts, omnibus accounts, correspondent accounts, average-price accounts, and error accounts;

(b) all Consolidated Audit Trail data, submissions, corrections, allocation records, and account-linkage data for MMTLP, including the fields necessary to tie each order, execution, route, or allocation to the originating account and account type;

(c) all Rule 17a-3 securities records, stock records, or securities ledgers showing daily long and short positions, by account and by settlement date, for MMTLP;

(d) all customer ledger records or customer position files showing purchases, sales, receipts, deliveries, journal entries, transfers, and end-of-day positions for each MMTLP customer account;

(e) all securities borrowed, securities loaned, stock-loan, fail-to-receive, fail-to-deliver, locate, pre-borrow, and close-out records for MMTLP; and

4

(f) all account-master, desk-master, security-master, branch-master, or entity-mapping records sufficient to identify which Schwab or TD Ameritrade entity, desk, business unit, or participant number booked, cleared, carried, allocated, or executed the MMTLP activity.

## REQUEST NO. 5

For the records requested in Request No. 4, include, where applicable, the following fields: security identifiers, including ticker, CUSIP, OCC or DTC identifiers, and any alternate internal security identifier; trade date, settlement date, booking date, and allocation date; quantity, price, net amount, buy or sell code, short-sale indicator, short-sale-exempt indicator, execution venue, contra party, and transaction-type identifier; account number, firm-designated account identifier, account type, customer-versus-proprietary designation, market-making designation, riskless-principal designation, and introducing or correspondent relationship; long position, short position, location of long shares, offsetting source for shorts, borrowed shares, loaned shares, fail-to-deliver quantity, and fail-to-receive quantity; and locate or close-out details, including locate source, borrow source, locate timestamp, pre-borrow records, close-out date, and close-out quantity.

## REQUEST NO. 6

Produce any existing summary reports, calculations, compilations, reconciliations, dashboards, exception reports, or other summaries, whether maintained in the ordinary course of business or prepared for compliance, supervisory, operational, risk, stock-loan, settlement, audit, regulatory, or management purposes, showing, by day and in aggregate for the full period covered by Request No. 4: (a) total gross shares purchased for customer accounts; (b) total gross shares sold for customer accounts; (c) total gross shares sold short for customer accounts; (d)

5

total net increase in customer long positions, calculated from position records rather than trade records alone; (e) end-of-day aggregate customer long positions for each settlement date through December 8, 2022; (f) end-of-day aggregate customer short positions for each settlement date through December 8, 2022; and (g) total proprietary short sales by Schwab or any Schwab-affiliated entity, broken out separately by market-making, other proprietary trading, riskless principal, and any other internal proprietary category used by Respondent.

If no such summary, calculation, compilation, reconciliation, dashboard, exception report, or other summary exists in the ordinary course of business, then produce all documents and electronically stored information sufficient to show the foregoing information, including but not limited to underlying trade, order, allocation, position, stock-loan, fail, ledger, and account-classification records in native electronic format, together with any data dictionaries, field definitions, formulas, mapping tables, coding references, or other materials necessary to interpret and calculate the requested totals.

**REQUEST NO. 7**

Produce documents sufficient to show the total number of MMTLP shares issued, allocated, distributed, credited, or delivered to Charles Schwab & Co., Inc., TD Ameritrade, TD Ameritrade Clearing, and any affiliate, subsidiary, or related entity for trading, clearing, carrying, settlement, or customer-account purposes, including any DTC participant reports, NSCC files, issuer or transfer-agent communications, stock-record reconciliations, internal allocation reports, exception reports, or other records in Respondent's possession, custody, or control sufficient to show the number of MMTLP shares credited or available to those entities during the relevant period.

**INSTRUCTIONS**

6

1. Produce the audio recording requested in Request No. 1 in its original native format with metadata intact or, if that is not reasonably possible, in one of the Mac-compatible formats identified in Request No. 1, without substantive alteration.

2. Documents and ESI shall be produced as kept in the ordinary course of business or organized and labeled to correspond to the numbered requests above. Database information may be produced in CSV, pipe-delimited text, XLSX, or another reasonably usable electronic format, together with data dictionaries and field definitions sufficient to interpret the production.

3. If any responsive document, audio file, or data source has been deleted, overwritten, lost, destroyed, migrated, or is otherwise no longer available, produce all documents concerning its disposition, including retention schedules, preservation notices, litigation-hold notices, disposition logs, and communications regarding deletion, overwrite, migration, or non-preservation.

4. If any responsive material is withheld in whole or in part on the basis of privilege, work product, privacy, burden, or any other objection, provide a privilege or objection log identifying the item, date, author, recipient, general subject matter, basis for withholding, and the specific request to which the objection relates.

5. If any responsive record exists in multiple forms, including native format and image format, produce the native format. If any redaction is made, label the redacted page or file as redacted and identify the basis for the redaction.

6. The term possession, custody, or control includes documents and ESI that Respondent can obtain from its own systems, archives, vendors, affiliates, or agents in the ordinary course of business.

7

## ARGUMENT

This is not fairly described as a routine bad-trade dispute. FINRA publicly stated that, as of December 12, 2022, there remained an aggregate short interest position in MMTLP of approximately 2.65 million shares in accounts held at broker-dealers, and FINRA further stated that broker-dealers adjusted MMTLP short positions into equal-sized short positions in Next Bridge Hydrocarbons Inc. after the corporate action.[1] That matters because it shows that unresolved short exposure remained a real broker-dealer and customer-account issue after the halt and conversion. On that public record, requests for Schwab's trade records, daily position records, stock-loan records, fail records, and allocation records are directed to a concrete settlement and exposure question, not to speculation. They seek to determine whether Schwab's own books and records reflected excess customer long positions, unresolved customer or proprietary short exposure, or other account-level imbalances in MMTLP (FINRA, *Supplemental FAQ: MMTLP Corporate Action and Trading Halt*, Nov. 6, 2023 https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt)(Exhibit C)

The public enforcement record also shows that MMTLP-related issues remain active at the regulatory level. On June 25, 2024, the SEC announced charges against Meta Materials and its former CEOs, John Brda and Georgios Palikaras, and expressly stated that a separate Commission investigation regarding subsequent events related to Meta Materials, involving

---

[1] MMTLP was technically the "Meta Materials Series A Preferred Shares" formed from the merger of Torchlight Energy Resources Inc. and Meta in 2021 whereby MMTLP shares would be swapped out as Next bridge shares in a 1 for 1 transaction after the anticipated December 14, 2022 close of trading in MMTLP and its shares transferring into NBH for shareholders. Claimant has never transferred his shares and they are still in his Schwab account as CUSIP position holders.

8

MMTLP, remains ongoing. The SEC's litigation release identified the federal action as *Securities and Exchange Commission v. John Brda and Georgios Palikaras*, No. 1:24-cv-04806, filed in the Southern District of New York on June 24, 2024. Public court filings also show that the case later proceeded in the Eastern District of Texas as *Securities and Exchange Commission v. John Brda and Georgios Palikaras*, No. 4:24-cv-1048-SDJ (Exhibit D). That procedural history supports the narrower point relevant here: MMTLP-related trading and post-corporate-action events remain the subject of live regulatory and judicial scrutiny, rather than a closed episode involving only disappointed retail trading. (SEC, *SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations*, June 25, 2024 see https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26035, Litigation Release No. 26035, June 25, 2024 (Exhibit E); *Securities and Exchange Commission v. John Brda and Georgios Palikaras*, No. 4:24-cv-1048-SDJ, E.D. Tex., *Order Instituting Cease and Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease and Desist Order*, Order No.'s 11292, 100415, Administrative Proceeding No. 3-21976, June 25, 2024.)(Exhibit F)

It's worth noting that Meta paid $1 million in fines from the SEC regarding Brda and Palikaras' actions. (No. 3-21976, above.)

That same Texas docket is useful for an additional reason. In a March 19, 2025 filing, the SEC told the Eastern District of Texas that it had issued administrative subpoenas in the MMTLP investigation, that the details of that investigation remained non-public, and that it reserved the right to institute a subpoena-enforcement action to obtain information in that separate investigation. That does not prove wrongdoing by Schwab, and it should not be overstated. But it does reinforce that public authorities themselves are treating MMTLP-related

9

customer orders in the ordinary course or instead carried exposure, imbalances, stock-loan support, fail activity, or proprietary participation that bears directly on Claimant's account and damages theory. (*Securities and Exchange Commission v. John Brda and Georgios Palikaras*, No. 4:24-cv-1048-SDJ, Plaintiff's Response in Opposition to Defendant John Brda's Motion to Exclude Improperly Obtained Evidence, Mar. 19, 2025; SEC, *SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations*, June 25, 2024.)

Please serve your response and any objections on the undersigned and file any required response with FINRA Dispute Resolution Services.

Dated: April 8, 2026

Respectfully submitted,

Scott Traudt, Claimant Pro Se
[Mailing Address]
[Email Address]
[Telephone Number]

## CERTIFICATE OF SERVICE

I certify that on April 8, 2026, a true and correct copy of this Claimant's First Request for Production of Documents and Things was served through the FINRA DR Portal and by email or other agreed means on counsel for Respondent.

Scott Traudt

10

## List of Cases and References

**Exhibit A**

*Citigroup Global Markets, Inc.,* Exchange Act Release No. 78291, July 12, 2016.

**Exhibit B**

*Citadel Securities LLC*, Exchange Act Release No. 84759, December 10, 2018.

**Exhibit C**

*FINRA, Supplemental FAQ: MMTLP Corporate Action and Trading Halt,* November 6, 2023.

**Exhibit D**

*Securities and Exchange Commission v. John Brda and Georgios Palikaras,* originally filed as No. 1:24-cv-04806 in the Southern District of New York on June 24, 2024, and later proceeding in the Eastern District of Texas as No. 4:24-cv-1048-SDJ.

**Exhibit E**

*SEC Charges Meta Materials and Former CEOs With Market Manipulation, Fraud and Other Violations,* June 25, 2024, Litigation Release No. 26035, available at https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26035.

**Exhibit F**

*Order Instituting Cease and Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease and Desist Order,* Order Nos. 11292 and 100415, Administrative Proceeding No. 3-21976, June 25, 2024.

# EXHIBIT H

# EXHIBIT H

## New Years Eve call ⊃

 **Scott Traudt** <sctraudt@gmail.com>    Thu, Jan 15, 5:40 PM    ☆    ☺    ↩    ⋮
to Jeffrey ▾

Jeff: Can you release to me that list of 150 +/- companies McCabe created at TRCH ostensibly to show to the Meta BOD and GP that there was legitimate interest in the Orogrande and other leased land?

GP says he has the list and will release if you say so.

Also: did your subpoena to Schwab ask for my audio with Fleming dated March 202, 2023 regarding the U3 halt and the share price for MMTLP?

I will send what I have if you didn't and request that you seek a subpoena for it, please.

Scott Traudt
802-318-0429

↩ Reply    → Forward    ☺

# EXHIBIT I

# EXHIBIT I

 Gmail

Danielle Spears <paymmtlpnow@gmail.com>

## Conference call

Danielle Spears <paymmtlpnow@gmail.com>
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>

Sat, Jan 3, 2026 at 11:02 AM

Hi Jeff,

Thank you again for meeting with us. I appreciate the time you took and the opportunity to speak directly.

I recognize that I provided a large volume of information, and I want to acknowledge your point that it can be difficult to be succinct. This matter has unfolded for me over more than three years, largely in real time, and it traces back even further. As a result, I carry a significant amount of detail, context, and chronology that is difficult to condense in a short discussion. I appreciate your patience, and I apologize if the presentation felt fragmented.

I do believe that if there were an opportunity to walk through the full timeline in a more structured setting, the overall picture—and the significance of certain omissions—would become much clearer. There is simply a substantial amount of ground to cover.

I want to clarify one point in particular. My concerns regarding Mr. Christian are not personal in nature. They are directly tied to MMTLP and to specific issues that, in my view, bear directly on potential asset recovery for the estate. When I raise these issues, my intent is not to assign personal fault, but to highlight material avenues that appear not to have been fully pursued or disclosed.

Specifically:

1. **The McCabe transaction** — There appears to be a "sweetheart" arrangement that may support a clawback of approximately $17 million or more.

2. **Broadridge shareholder data** — Subpoenaing this data would, as you know, immediately identify the full shareholder list, enable proper notice, allow for a new bar date, and confirm the extent to which both MMAT and MMTLP were oversold.

3. **Traudt–Fleming / TD Ameritrade (now Schwab) audio** — This recording includes a broker-dealer admission that MMTLP was trading at approximately 100x. Given that MMTLP traded as low as $2.90, that implies at least $290 per share; at higher prices exceeding $12, the implied exposure exceeds $1,200 per share.

While MMAT was undoubtedly manipulated, it is minor by comparison to MMTLP. The scale of MMTLP exposure is where the real recovery potential appears to lie.

From a bankruptcy perspective, if the estate were able to resolve even a portion of this exposure, whether framed as settlement of approximately 165 million shares or a much larger short position potentially exceeding 600 million shares, the financial implications would be extraordinary. At $300–$1,200 per share, the numbers speak for themselves.

In my view, this explains why broker-dealers, and particularly FINRA, have fought so aggressively to prevent this data from being examined. The use of "halted until deleted" effectively allowed short positions to avoid being covered, to the direct detriment of retail investors. If it were established that even a single security was oversold multiple times over and then administratively erased to conceal that fact, the regulatory consequences would be severe.

TradeStation has already publicly acknowledged that it does not possess sufficient shares to cover MMTLP. I also possess FOIA materials reflecting communications between the FIF (a broker consortium) and the SEC in which they expressly stated that they did not have the shares to cover MMTLP either. This is not speculative, it is documented.

This is precisely the data that has remained buried for more than three years.

I look forward to the upcoming conference call with Mr. Brust, as I believe it will provide an opportunity to articulate clearly why FINRA has opposed his efforts. In my assessment, once subpoenas sought MMTLP and Torchlight Energy Resources data, the META bankruptcy became an adversary to regulators and to every major broker-dealer involved in selling MMTLP.

# EXHIBIT J

# EXHIBIT J



← **Post**

**John Brda** ✓ @johnbrda · Oct 15, 2023
For clarity, this is what I said, in a DM to the person who asked me about Wes and flamethrowers involvement.

Not at all. Meta has the ball as all of this happened on their watch. Wes is working hard with them and doing work behind the scenes. We continue to provide support. If
Show more

♡ 65    ⟲ 208    ♡ 483    ılıı 68K    🔖    ⬆

**Scott Traudt** ✓ @

Communicate to Wes I will give him my account number at TDA, the date, and time for the conversation with Cameron Fleming at TDA on 20 March 2023 wherein he said MMTLP was U3 nuked because it was trading at over 100X in dark pools before 8 December 2022. He can subpoena this.

**14.3K**

💬 7    ⟲ 113    ♡ 266    🔖 12    ⬆

Relevant ⌄                                View activity ›

Post your reply

**John Brda** ✓ @johnbrda · Oc
Will do, Scott please DM me your contact info

# EXHIBIT K

# EXHIBIT K



← **Post**

**John Brda** ✓ @Johnbrda · Oct 15, 2023

For clarity, this is what I said, in a DM to the person who asked me about Wes and flamethrowers involvement.

Not at all. Meta has the ball as all of this happened on their watch. Wes is working hard with them and doing work behind the scenes. We continue to provide support. If
Show more

♡ 85          ⟲ 208          💬 430          📊 83K          🔖  ⤴

**Scott Traudt** ✓
@Greenmills303

Communicate to Wes I will give him my account number at TDA, the date, and time for the conversation with Cameron Fleming at TDA on 20 March 2023 wherein he said MMTLP was U3 nuked because it was trading at over 100X in dark pools before 8 December 2022. He can subpoena this.

4:51 AM · Oct 16, 2023 · 14.3K Views

⟲          ⟲ 3          ♡ 100          🔖 12          ⤴

Relevant .                                        View activity ›

**Post your reply**

**John Brda** ✓ @johnbrda · Oct 16, 2023
Will do, Scott please DM me your contact info

# EXHIBIT L

# EXHIBIT L



From   sct545 <SCT545@proton.me>                    ☆ ⊲ Dec 4, 2023
To     john brdallc.com

John - is Wes going to use my info?

Scott

Sent from Proton Mail mobile

From   sct545 <SCT545@proton.me>                    ☆ ⊲ Dec 4, 2023
To     john brdallc.com

Ok. I am still considering suing TDA and immediately asking for the audio recording in full and a 3rd party subpoena for the MMTLP bluesheets.

Need one more week to get clear of other issues then I think a complaint in US District Court (Burlington VT) may be in the cards.

I think the more we stay on the attack, the more the pressure builds.

Be cool,

Scott

# EXHIBIT M

# EXHIBIT M

From   sct545 . . . . . . . . . . . . .                    ☆ ⇗ Feb 2, 2024

To     john brdallc.com,   James Wes Christian                         ⌄

My thinking is to do the minimum filing needed to get the recording and then subpoena 3rd party FINRA for the MMTLP bluesheets.

Vermont has super liberal judges.


Sent from Proton Mail mobile



--------- Original Message ---------
On Feb 2, 2024, 2:36 PM, john brdallc.com < john@brdallc.com> wrote:



Let me send to Wes, and I will let you know.  I saw your post.


JB



**From:** SCT <SCT545@proton.me>
**Date:** Friday, February 2, 2024 at 1:14 PM
**To:** john brdallc.com <john@brdallc.com>
**Subject:** Vermont filing

# EXHIBIT N

# EXHIBIT N



From  sct545 <SCT545@proton.me>                    Feb 6, 2024
To    john.brdallc.com

John:

If anybody wants to weigh in, today is the day.

Scott


Sent from Proton Mail mobile


From  john.brdallc.com <john@brdallc.com>          Feb 6, 2024
To    sct545,  James Wes Christian

Scott, let me see if I can get Wes to chime in.  Wes, this is in regard to a recorded conversation that Scott had with his broker, where they told him they got advanced notice of the halt.


JB

# EXHIBIT O

# EXHIBIT O



## [8] introduction

From   john brdallc.com ... @brda ...     ☆ ✉ @ Aug 16, 2024

To   sct545, James Wes Christian

Scott, meet Wes. Wes meet Scott Traut.

You guys can take it from here.

JB

**John A. Brda**

**Managing Member**

**BRDA & COMPANY**

*314-920-0890*

*john@brdallc.com*

*https://calendly.com/john-brda*

# EXHIBIT P

# EXHIBIT P

# Tradestation 12/29/2023

Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security. This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate. If the Registration Statement is declared effective by the SEC, TradeStation will fulfill its obligation to transfer the current list of clients who own NBH of record to AST. In the meantime, we must decline your request to transfer a physical certificate reflecting your ownership interest to AST.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                    | Case No.: 24-50792-GS
META MATERIALS INC.,                      | (Chapter 7)
                                          |
              Debtor.                     |
                                          |
                                          |

## CERTIFICATE OF SERVICE

1.  On May 2, 2026, I served the following document

**PARTY IN INTEREST SCOTT TRAUDT'S REPLY TO CHARLES SCHWAB & CO., INC'S OPPOSITION TO RULE 2004 EXAMINATION**

2.  I served the above-named document by the following means to the persons as listed below:

a.  EMAIL from sctraudt@gmail.com:

ABRAN E. VIGIL
vigila@ballardpahr.com

MATHEW Z. ZIRZOW on behalf of Jane Street Group LLC
mzirzow@lzlawnv.com

MICHAEL R. BRUNET on behalf of Creditor GEORGIOS PALIKARAS
mbrunet@cooperlevenson.com

CLAYTON BRUST on behalf of Trustee CHRISTINA W. LOVATO
cbrust@sbwlawgroup.com, iesguerra@rssblaw.com

DAVID ERNESTO CHAVEZ on behalf of Defendant THE NASDAQ STOCK MARKET
LLC   chavezd@ballardspahr.com, LitDocket_West@ballardspahr.com

DAVID ERNESTO CHAVEZ on behalf of Interested Party THE NASDAQ STOCK MARKET LLC   chavezd@ballardspahr.com, LitDocket_West@ballardspahr.com

BRADLEY A. COSMAN on behalf of Debtor META MATERIALS INC.
bcosman@perkinscoie.com

JIMMY F. DAHU on behalf of Other Prof. CITADEL SECURITIES LLC
jdahu@mcdonaldcarano.com, sbettinger@mcdonaldcarano.com

KAWA FOAD on behalf of Creditor BRAD DAVIS  kfoad@kf-law.com

KAWA FOAD on behalf of Creditor DANIEL R. AUXIER  kfoad@kf-law.com

KAWA FOAD on behalf of Creditor Marcos Monteiro  kfoad@kf-law.com

JEFFREY L HARTMAN on behalf of Trustee CHRISTINA W. LOVATO
notices@bankruptcyreno.com, abg@bankruptcyreno.com

MICHAEL R. HOGUE on behalf of Other Prof. Anson Funds Management LP
hoguem@gtlaw.com, michael-hogue-0383@ecf.pacerpro.com; flintza@gtlaw.com;
JavieAnne.Bauer@gtlaw.com; andersonel@gtlaw.com; navarrom@gtlaw.com

MATTHEW L. JOHNSON on behalf of Creditor David Chester
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

MATTHEW L. JOHNSON on behalf of Creditor David Sokolove
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

MATTHEW L. JOHNSON on behalf of Creditor Jonathan Edwards
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

CHRISTINA W. LOVATO  trusteelovato@att.net, NV26@ecfcbis.com

DAVID S. NORRIS on behalf of Interested Party FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.
david.norris@squirepb.com, tanya.skeet@squirepb.com,sarah.conley@squirepb.com,
phx_dckt@squirepb.com

JARROD L RICKARD on behalf of Interested Party VIRTU FINANCIAL LLC
jlr@semenzarickard.com, oak@semenzarickard.com,alb@semenzarickard.com

I declare under penalty of perjury that the foregoing is true and correct.

Dated May 2, 2026.

SCOTT TRAUDT
PRO SE

Scott Traudt
191 Kibling Hill Rd.
Strafford VT 05072
sctraudt@gmail.com
802-318-0429

May 2, 2026

U.S. Bankruptcy Court District of Nevada
C. Clifton Young Federal Building & U.S. Courthouse,
300 Booth St, Reno, NV 89509

Dear Clerk of the Court:

Enclosed please find a Motion filing in 24-50792-GS entitled: **PARTY IN
INTEREST SCOTT TRAUDT'S REPLY TO CHARLES SCHWAB & CO., INC'S
OPPOSITION TO RULE 2004 EXAMINATION.**

Sincerely,

SCOTT TRAUDT

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:
META MATERIALS INC.,

        Debtor.

| Case No.: 24-50792-GS
| (Chapter 7)
|
|
| **DECLARATION OF SCOTT TRAUDT**
| **IN SUPPORT OF REPLY TO SCHWAB'S**
| **OPPOSITION TO RULE 2004**
| **EXAMINATION**

I, Scott Traudt, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the movant and party-in-interest in the above-captioned bankruptcy case and the claimant in FINRA Arbitration No. 25-02608 against Charles Schwab & Co., Inc.

2. On December 20, 2022, I sent TD Ameritrade a written message concerning MMTLP, the U3 trading suspension, synthetic or counterfeit-share concerns, and my intent to name TDA as a defendant in litigation. A true and correct copy of that message is part of the record herein as **Exhibit A**. I made that communication before my March 20, 2023 call with Ron/Cameron Fleming, and I believe it placed TDA on notice that MMTLP-related evidence should be preserved.

3. On March 20, 2023, I had a telephone call with TD Ameritrade representative Ron Fleming, whom I later understood to be Cameron Fleming. The call began at approximately 4:55 p.m. Eastern and ended approximately ten minutes later. I called from my personal cell phone number, 802-318-0429.

4. During that call, after initially discussing tax documents, I asked about MMTLP. Fleming made statements to me concerning MMTLP dark-pool trading, broker-dealer protection, and the reason for the U3 halt.

1

5. On March 20, 2023, shortly after the call, I posted publicly on X/Twitter that TD Ameritrade had just told me during a 4:57 p.m. conversation with Ron Fleming that FINRA halted MMTLP after dark-pool trades hit 100X normal value and because the share price bore no resemblance to actual value. A true and correct copy of that post is part of the record herein as **Exhibit B**.

6. On March 22, 2023, two days after the Fleming call, I sent TD Ameritrade a written message asking for "the audio file (recording)" of my conversation with Ron/Cameron Fleming. I identified the call as occurring on Monday, March 20, 2023, from about 4:55 p.m. to 5:10 p.m. Eastern, from my personal cell phone at 802-318-0429. I also asked TDA to identify Fleming's securities licenses or qualifications. A true and correct copy of the response email from TDA's Michael Vaughn is part of the record herein as **Exhibit C**.

7. On March 22, 2023, Grant Wells of TD Ameritrade Client Services responded to me in writing. He stated, "yes, we keep call recordings," but said that, to his knowledge, TDA could not provide them directly to clients. He further stated that a manager could be requested to go through the recording to establish what was said, and that it might even be possible for me to listen to the call with the manager. A true and correct copy of that message is at **ECF 2661** Page 31.

8. Vaughn on March 22, 2023, stated in writing that TDA could not provide a recorded copy of the call, and identified Cameron as a specialist on the trade desk who held Series 63, Series 7, and Series 9 licenses. A true and correct copy of that message is part of the record herein as **Exhibit C**.

9. On March 24, 2023, Rachael of TD Ameritrade Client Services responded to me in writing. She stated that, if there was a specific section of the call I needed reviewed, TDA would

2

be happy to do so, and that TDA could submit a request to have a manager review the call to answer my concerns. A true and correct copy of that message is part of the record herein as **Exhibit D**.

10. On October 18, 2023, I prepared a letter addressed to John Brda and Wes Christian summarizing the March 20, 2023 recorded phone call with TD Ameritrade representative Ron/Cameron Fleming. In that letter I identified the call date, approximate time, phone number, speaker, and the substance of the statements made to me concerning MMTLP dark-pool trading, broker-dealer protection, and the U3 halt. A true and correct copy of that letter is part of the record herein as **ECF 2661** page 46.

11. On October 22, 2023, I emailed John Brda and told him I was sending records pertaining to the Fleming call, including Verizon March call logs and what I described as TDA's admission that it had the audio recorded. Mr. Brda responded, "Thanks Scott. Will let you know next steps." A true and correct copy of that email thread is part of the record herein as **Exhibit K**.

12. On December 4, 2023, I emailed Mr. Brda again and stated that I was considering suing TDA and immediately asking for the audio recording in full and a third-party subpoena for the MMTLP bluesheets. Mr. Brda responded, "Agreed!" A true and correct copy of that email thread is part of the record herein as **Exhibit L**.

13. On February 2, 2024, I again raised the same issue with Mr. Brda and Wes Christian, stating that my thinking was to do the minimum filing needed to get the recording and then subpoena third-party FINRA for the MMTLP bluesheets. In the same thread, Mr. Brda stated, "Let me send to Wes, and I will let you know." A true and correct copy of that email thread is part of the record herein as **Exhibit M**.

3

14. On January 28, 2024, after the TDA-to-Schwab transition, I again requested playback of the March 20, 2023 conversation with broker Cameron Fleming. I identified the call as starting around 4:55 p.m. Eastern and ending about ten minutes later.

15. On September 18, 2024, Schwab eServices Supervisor Stacie Hayden responded to me concerning messages and audio recordings transitioning from TDA. She stated that Schwab retained messages and audio recordings internally, that such materials were not generally available to clients, and that Schwab could access them if there was a business need, such as a trade dispute. A true and correct copy of that message is part of the record herein as **Exhibit E**.

16. In the FINRA arbitration, I served written discovery requests seeking the complete March 20, 2023 Ron/Cameron Fleming call recording, related call logs, notes, communications, preservation records, and records concerning any deletion, overwrite, migration, loss, destruction, or non-preservation of that recording. A true and correct copy of my discovery request is part of the record herein as **Exhibit G**.

17. Schwab acknowledged and responded to those discovery requests. Schwab did not produce the March 20, 2023 recording. Instead, Schwab stated in its April 13, 2026 discovery responses that it had searched for phone-call records and recordings "to the extent they exist," while asserting that Schwab and TDA do not record all customer calls and that many of my calls were not recorded. A true and correct copy of Schwab's responses is part of the record herein as **Exhibit F**.

18. Schwab further stated that, based on its "best understanding," no recording was ever made of any March 20, 2023 telephone call between me and TDA, except for a short customer relationship management note. That statement appears in and is part of the record herein as **Exhibit F**.

4

19. Those statements are inconsistent with the written messages I received from TDA and Schwab in March 2023 and September 2024.

20. Before the April 6, 2026 preliminary FINRA arbitration hearing, Schwab had not clearly told me that the March 20, 2023 Fleming call was not recorded. At that hearing, Schwab's counsel, Attorney Jeff Goldman, represented in substance that Schwab might be able to locate recordings. I understood that statement to mean Schwab was not committing that the relevant recordings had been preserved, located, reviewed, or would be produced.

21. My full FINRA arbitration hearing on the merits is not scheduled until on or about December 8, 2026. Discovery in that arbitration does not close until October 2026. I believe that schedule makes arbitration discovery inadequate for the estate-related issues raised in my Rule 2004 motion.

22. The estate, the Trustee, and MMTLP holders should not have to wait until late 2026 to determine whether the March 20, 2023 Fleming recording exists, whether it was preserved, whether it migrated from TDA to Schwab, whether it was deleted or recovered, whether it was withheld, or whether Schwab's current position that no recording was ever made is accurate.

23. Before filing my Rule 2004 motion, I tried to have the estate obtain the Fleming recording. I asked the Trustee's team to pursue it because I believed it could benefit the estate, MMAT shareholders, and MMTLP holders. Danielle Spears also asked that the estate pursue or subpoena the Fleming recording. To the extent I was copied on or received those communications, true and correct copies are part of the record herein as **Exhibit I**.

24. On or about December 31, 2025, Trustee's counsel Jeffrey Hartman stated to me in substance that he believed the March 20, 2023 Fleming-Traudt audio recording was included in the Trustee's subpoena to Schwab.

5

25. I later reviewed the Trustee's March 6, 2025 subpoena to Schwab, ECF No. 1625. The subpoena requests MMAT/MMTLP order-routing records, FIX or binary protocol routing messages, locate/borrow/delivery/fail-to-deliver records, and position data. It does not specifically request the March 20, 2023 Fleming audio recording, any transcript of that call, call logs for that call, CRM/Salesforce notes for that call, retention records, migration records, deletion records, recovery records, or chain-of-custody records for that call.

26. These efforts were made in good faith. I was not trying to bypass the Trustee or interfere with estate administration. I was trying to make sure the estate obtained critical evidence concerning MMTLP, the March 20, 2023 Fleming call, broker-dealer knowledge, and preservation of Schwab/TDA audio evidence.

27. Because the Trustee's Schwab subpoena did not actually request the Fleming recording or related preservation and chain-of-custody materials, and because Schwab is now resisting or denying the recording in arbitration, I seek a narrow Rule 2004 examination to determine whether the recording exists, whether it was preserved, whether it migrated from TDA to Schwab, whether it was deleted or recovered, which systems were searched, which custodians were consulted, and why Schwab now claims no recording was made.

28. I seek Rule 2004 relief focused on preservation, migration, deletion, recovery, chain of custody, custodians searched, systems searched, and the factual basis for Schwab's position that the recording does not exist or was never made. I am willing to have Schwab produce the recording and chain-of-custody materials first to the Trustee and Court under protective order, with use outside this bankruptcy case prohibited absent further order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 2, 2026, in Strafford, Vermont.

6

Scott Traudt

7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

In re:                                      | Case No.: 24-50792-GS
META MATERIALS INC.,                        | (Chapter 7)
                                            |
                Debtor.                     |
                                            |
                                            |
_____|

### CERTIFICATE OF SERVICE

1.  On May 2, 2026, I served the following document

**PARTY IN INTEREST SCOTT TRAUDT'S REPLY TO CHARLES SCHWAB &
CO., INC'S OPPOSITION TO RULE 2004 EXAMINATION**

2.  I served the above-named document by the following means to the persons as
listed below:

a.  EMAIL from sctraudt@gmail.com:

ABRAN E. VIGIL
vigila@ballardpahr.com

MATHEW Z. ZIRZOW on behalf of Jane Street Group LLC
mzirzow@lzlawnv.com

MICHAEL R. BRUNET on behalf of Creditor GEORGIOS PALIKARAS
mbrunet@cooperlevenson.com

CLAYTON BRUST on behalf of Trustee CHRISTINA W. LOVATO
cbrust@sbwlawgroup.com, iesguerra@rssblaw.com

DAVID ERNESTO CHAVEZ on behalf of Defendant THE NASDAQ STOCK
MARKET
LLC  chavezd@ballardspahr.com, LitDocket_West@ballardspahr.com

DAVID ERNESTO CHAVEZ on behalf of Interested Party THE NASDAQ STOCK
MARKET LLC  chavezd@ballardspahr.com, LitDocket_West@ballardspahr.com

BRADLEY A. COSMAN on behalf of Debtor META MATERIALS INC.
bcosman@perkinscoie.com

JIMMY F. DAHU on behalf of Other Prof. CITADEL SECURITIES LLC
jdahu@mcdonaldcarano.com, sbettinger@mcdonaldcarano.com

KAWA FOAD on behalf of Creditor BRAD DAVIS   kfoad@kf-law.com

KAWA FOAD on behalf of Creditor DANIEL R. AUXIER   kfoad@kf-law.com

KAWA FOAD on behalf of Creditor Marcos Monteiro   kfoad@kf-law.com

JEFFREY L HARTMAN on behalf of Trustee CHRISTINA W. LOVATO
notices@bankruptcyreno.com, abg@bankruptcyreno.com

MICHAEL R. HOGUE on behalf of Other Prof. Anson Funds Management LP
hoguem@gtlaw.com, michael-hogue-0383@ecf.pacerpro.com; flintza@gtlaw.com;
JavieAnne.Bauer@gtlaw.com; andersonel@gtlaw.com; navarrom@gtlaw.com

MATTHEW L. JOHNSON on behalf of Creditor David Chester
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

MATTHEW L. JOHNSON on behalf of Creditor David Sokolove
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

MATTHEW L. JOHNSON on behalf of Creditor Jonathan Edwards
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;
kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

CHRISTINA W. LOVATO   trusteelovato@att.net, NV26@ecfcbis.com

DAVID S. NORRIS on behalf of Interested Party FINANCIAL INDUSTRY
REGULATORY AUTHORITY, INC.
david.norris@squirepb.com, tanya.skeet@squirepb.com,sarah.conley@squirepb.com,
phx_dckt@squirepb.com

JARROD L RICKARD on behalf of Interested Party VIRTU FINANCIAL LLC
jlr@semenzarickard.com, oak@semenzarickard.com,alb@semenzarickard.com

I declare under penalty of perjury that the foregoing is true and correct.

Dated May 2, 2026.

SCOTT TRAUDT
PRO SE