# EXHIBIT 1

# EXHIBIT 1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

CONFIDENTIAL

## Sixth Amended and Restated Prepaid Forward Purchase Agreement

This Sixth Amended and Restated Prepaid Forward Purchase Agreement (as amended and/or restated from time to time, this "Purchase Agreement") is made by and among CHRISTIAN, & SMITH LLP, a Texas limited liability partnership, CHRISTIAN, SMITH & JEWELL, L.L.P., a Texas limited liability partnership, CHRISTIAN LEVINE LAW GROUP LLC, a Texas limited liability company which also sometimes does business as ChristianAttar, and ChristianAttar LLC, a Texas limited liability company (jointly and severally, individually and collectively, "Seller") and PROJECT BLAZER LLC ("Buyer") and is dated as of March 18, 2025 but is effective as of December 23, 2019 ("Effective Date"), and amends and restates in its entirety the Prepaid Forward Purchase Agreement and Amended and Restated Prepaid Forward Purchase Agreement, Second Amended and Restated Prepaid Forward Purchase Agreement and the Third Amended and Restated Prepaid Forward Purchase Agreement (as amended by that certain Amendment Number 1 to Third Amended and Restated Prepaid Forward Purchase Agreement dated effective as of December 14, 2021) and the Fourth Amended and Restated Prepaid Forward Purchase Agreement and the Fifth Amended and Restated Prepaid Forward Purchase Agreement each entered into by and among, *inter alia*, Buyer and Seller dated effective as of December 23, 2019. Seller and Buyer are each, a "Party" and collectively, the "Parties." Terms used herein but not otherwise defined shall be as defined on Schedule I attached hereto.

## RECITALS

WHEREAS, the purpose of this Purchase Agreement and the Security Agreement attached hereto as Exhibit A (the "Security Agreement") is to provide funding to Seller in the Litigations under mutually agreeable terms as set forth herein. The Purchase Agreement and the Security Agreement are collectively referred to as the "Investment Documents"; and

WHEREAS, Seller is co-counsel with WARSHAW BURSTEIN, LLP ("WB") for the plaintiff in the litigation currently styled █████████████████████████████████████████ █████████████████████████████████████████ █ *and John Doe's 1 through 10* (the "████████ Litigation") A true and correct copy of the retention agreement confirming as such is attached hereto as Exhibit C (together with any amendments thereto and related retention agreements in the ████████ Litigation, the "█████████████████"); and

WHEREAS, Seller is or will be co-counsel with █████████████████████████ ("FNF") for the plaintiff in connection with stock fraud and/or manipulation involving the stock of ██████████ █████████████████.(the "███ Litigation"). A true and correct copy of the retention agreement confirming as is attached hereto as Exhibit D as soon as executed (the "████████████████");

WHEREAS, Seller is co-counsel with BT and WB in █████████████████████ to be filed with the U.S. Securities and Exchange Commission (the "████████ Litigation"). A true and correct copy of the retention agreement confirming is attached hereto as Exhibit E (the "████████████████");

WHEREAS, Seller is co-counsel with WB with respect to the Industry Litigations. A true and correct copy of existing retention agreements with respect to the Industry Litigation are attached hereto as Exhibit F and any additional retention agreements will be deemed attached hereto as soon as executed (individually and collectively, the "Industry Retention Agreement");

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 2

WHEREAS, Seller is co-counsel with Gerard Fox Law P.C., Sanchez-Medina, Gonzalez, Quesada, Lage, Gomez & Machado LLP (together with Squire Law Group, P.A, "SGMQ"), Reichard Tornes, PLLC ("RT"), and Botwin Law Firm ("BL") with respect the litigation currently styled ██████████████████████ ████████████████████████████████ (the '████ Litigation"). A true and correct copy of the retention agreement confirming as such is attached hereto as Exhibit G (the '████████████████████");

WHEREAS, Seller anticipates that it will be co-counsel with Bondurant, Mixson & Elmore, LLP with respect to the ████████████ Litigation. A true and correct copy of the retention agreement confirming as such will be attached hereto as Exhibit H as soon as executed (the "████████████████████t");

WHEREAS, Buyer has entered into a separate Prepaid Forward Purchase Agreement with the plaintiff in the ████████ Litigation (the '████████████████████") pursuant to which Buyer is entitled to receive an 'Investment Return' (as defined in the ████████████) (the '████████████████"); and

WHEREAS, Seller is entitled to receive recoveries in the Litigations pursuant to the Retention Agreements (collectively, the "Seller's Interest"); and

WHEREAS, Seller agrees to sell, and Buyer agrees to purchase, such part of the Seller's Interest to which Buyer is entitled as set forth in Section 2 below (collectively, the "Buyer's Interest").

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

1. **Purchase; Purchase Price Payments.**

    a. Purchase of Buyer's Interest. Seller hereby transfers to Buyer the Buyer's Interest, and Buyer hereby accepts the transfer of the Buyer's Interest.

    b. Purchase Price Payments. The purchase price for the Buyer's Interest shall be equal to the following purchase price payments that Buyer makes or is obligated to pay hereunder (each, a "Purchase Price Payment" and collectively, the "Purchase Price Payments"):

        i. $1,350,000 previously requested by Seller and paid by Buyer.

        ii. ████████████████. The Purchase Price Payments in respect of the ████████████ shall be Buyer's obligation to make the ████████████████ to the extent specified in the Budget.[1]

        iii. Buyer shall make further Purchase Price Payments in respect of the other Litigations pursuant to the milestones set forth in the Budget. Seller shall invoice Buyer for the Purchase Price Payments in accordance with and up to the applicable amounts set forth in such Budget. For the avoidance of doubt, the Budget includes 'Flexible Purchase Price Payments' of up to $3,570,000 payable in accordance with Buyer's discretion despite not being earmarked toward any Specific Litigation but which shall still each constitute a Purchase Price Payment under this Agreement.

---

[1] The maximum amount of 'Purchase Price Payments' payable in respect of the ████████ Purchase Agreement is $9,400,000, but which amounts are subject to the qualifications set forth in the Budget.
34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 3

The Purchase Price Payments shall be paid in accordance with and pursuant to the payment instructions provided by Seller on Schedule II attached hereto within thirty (30) days of Seller's valid request. For the avoidance of doubt, Purchase Price Payments, (including without limitation any ███████ Payments) made prior to the execution of this Purchase Agreement shall still be considered Purchase Price Payments under this Purchase Agreement. As of the time of the execution of this Purchase Agreement, Buyer has paid Purchase Price Payments of $9,813,244.98 (not including Due Diligence Costs or payments made in respect of the Key Man Insurance Policy), and Seller acknowledges the prior payment thereof. For the avoidance of doubt, any payments made to third parties at the request of a Seller or otherwise in accordance with the Budget shall still be considered 'Purchase Price Payments' as if the same were paid directly to Seller.

c.  Future Litigation. The Parties agree they will work in good faith to identify, conduct due diligence, and engage plaintiffs in additional litigations (each, a "Future Litigation" and collectively, the "Future Litigations") that meets the due diligence criteria of both Parties on substantially the same terms as herein. Upon identification of any such litigation by Seller, Seller will notify Buyer and Buyer will have the right exercisable within thirty (30) days of such notice, to provide funding to Seller with respect thereto, pursuant to a mutually agree budget, under this Purchase Agreement or another purchase agreement that separately embodies substantially the same terms as herein. For the avoidance of doubt, the Parties expressly agree that failure to agree on a Future Litigation or the budget therefor is not a material term of this Purchase Agreement and, accordingly, the fact that the Parties are agreeing to subsequently agree on Future Litigations and the budgets therefor in no way compromises the enforceability of this Purchase Agreement, and the Parties hereby expressly waive any such argument.

d.  Buyer's ROFO. Seller shall provide Buyer with a right of first offer ("Buyer ROFO") on all Industry Litigations for Buyer or an Affiliate of Buyer to provide funding thereto in accordance with the terms of this Purchase Agreement. The Buyer ROFO for any given opportunity will expire for such opportunity if 90 days have elapsed since the receipt of notice by Buyer from Seller with respect to such opportunity and the Purchase Agreement is not amended to include such opportunity as a Litigation or such other opportunity. In the event that the Buyer ROFO has expired, Buyer shall have a right of first refusal on any financing proposal made to Seller for such Industry Litigations and Buyer (or an Affiliate thereof, as applicable) shall be afforded 30 days to exercise its option to provide additional financing on terms substantially the terms as those offered to Seller in such financing proposal in writing. Buyer and Seller acknowledge that cases alleging damages of $5,000,000 or less shall be excluded from the Buyer ROFO. As of the time of execution of this Purchase Agreement, the Industry Litigations are the Meta Litigation, ████████████████████████████████.

e.

f.

Page 4



2. **Payment of Investment Return**. Immediately upon receipt by Seller of any Law Firm Recoveries, and in no event later than five (5) business days of its receipt thereof, Seller agrees to pay Buyer the Investment Return. All payments to Buyer under this Purchase Agreement (a) shall be paid only if and after such Law Firm Recoveries are received by Seller as a fully earned fee in Seller's proprietary firm account (and not its attorney trust account), as applicable; (b) is free of any claim or encumbrance by Seller's Clients in the Litigations, and (c) can be freely disbursed by Seller. Buyer agrees that, except for any amounts due from Seller under Section 2(c) or Section 5, the Purchase Price Payment is without recourse.

   a. <u>Investment Return</u>. Buyer's investment return shall be an amount equal to the sum of (the "<u>Investment Return</u>"): (i) the Purchase Price Payments incurred (i.e., those paid to Seller or otherwise incurred by Buyer, including, without limitation, all ███████████████ or amounts incurred by Buyer in respect of the ████████████████ or ████████████████, and any other amounts described in Section 1.b of this Purchase Agreement) (collectively, the "<u>Incurred Payments</u>"), (ii) the Due Diligence Costs (together with the Incurred Payments, collectively, the "<u>Principal Amount</u>"); (iii) an additional amount equal to one times (1X) the Incurred Payments; and (iv) an additional amount equal to one-half times (.5X) the Incurred Payments. In the event that there are any outstanding amounts owed to Buyer in respect of the Investment Return as of the date that is two years following the Effective Date, then the one-half times (.5X) described in sub-clause (iv) of the previous sentence shall be increased by an additional one third (.33X), and such amount shall be further increased by an additional .33X each year thereafter capped at a total Buyer's Profit of two and a half times (2.5X), when combined with the additional amount described in (iii) of the previous sentence. The amount described in (iii) and (iv) of this Section 2.a, as modified by the remainder of this paragraph, may be referred to as the "<u>Buyer's Profit</u>." Notwithstanding the foregoing, in the event that all Buyer ROFOs are exercised through Affiliates of Buyer (and not by Buyer) then the Investment Return on the due diligence budget for the Industry Litigation shall be capped at a Buyer's profit of 2X (e.g. 3X total) under this Agreement.

   b. <u>Distribution of Law Firm Recoveries</u>. Any Law Firm Recoveries received by the Seller (and as to the ████████████████, by Buyer) in respect of any Litigation after the Effective Date shall be paid to Buyer in the following manner and priority at the time any such Law Firm Recoveries are received by Seller or otherwise: (i) first in accordance with the Case Waterfall (clause i. and Schedule IV); and (ii) then the Portfolio Waterfall (clauses ii-iv):

      i. All of the Law Firm Recoveries implicated in Schedule IV shall be paid in accordance with Schedule IV (pursuant to the "Case Waterfall");

      ii. Second, 80% of the Law Firm Recoveries shall be paid to Buyer in an amount equal to the aggregate un-reimbursed Principal Amount, until Buyer is reimbursed for the Principal Amount in full (to the extent not already recovered in clause b.i)

      iii. Third, 66.67% of the Law Firm Recoveries shall be paid to Buyer until Buyer has received the amount described in (iii) of the Investment Return in Paragraph 2.a.

      iv. Fourth, 50% of the Law Firm Recoveries shall be paid to Buyer until the Investment Return is satisfied in full.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 5

    c.  Evergreen Collateral Recovery. To the extent after all Litigations are concluded by a non-appealable order or settlement and the Law Firm Recoveries will not earn Buyer an internal rate of return that is equal to 15% per annum, with respect to the aggregate amount of the Principal Amount ("Minimum Return") then Seller agrees to a five (5) year pledge as collateral all its full-contingency or partial contingency cases available to Buyer with 50% of recoveries from any new contingency or partial contingency cases received by Seller from those new cases being paid to Buyer until such time as Buyer earns the Minimum Return. Buyer and Seller acknowledge that cases alleging damages of $5,000,000 or less shall be excluded from this provision. Seller further acknowledges that Alan Pollack of WB will pledge or assign his share of contingency cases to Seller, and that any resulting compensation of proceeds (however so termed) shall be considered as 'Law Firm Recoveries' and distributed in accordance with this Section 2.

    d.  Allocation of Payments to Buyer. Any amounts paid by Seller to Buyer under this Section 2 shall be allocated on a pro-rata basis toward satisfaction of the Principal Amount and the Buyers Profit, with the multiplier on such Buyer's Profit calculated at the time of such payment in accordance with Section 2.a. Any amounts so allocated toward satisfaction of the Principal Amount and Buyer's Profit shall be deemed "Satisfied Principal" and no further Investment Return shall be owed in respect of any such Satisfied Principal.

    e.  Intentionally Omitted.

    f.  Seller acknowledges that it has previously paid the sum of $9,540.00 in respect of legal services incurred by Buyer's transaction counsel in respect of negotiating certain prior drafts of this Purchase Agreement.

3.  **Seller Representations, Warranties and Covenants**.  Seller expressly makes to Buyer each of the representations, warranties, and covenants set forth on Schedule III hereto.  Seller further covenants that it will not (i) amend the terms of the Retention Agreements in any way that negatively affects the rights of Buyer, nor (ii) assign, transfer, or encumber any of its right, title, or interest in recoveries from the Litigations without Buyer's prior written consent.

4.  **Buyer Representations, Warranties and Covenants**. Buyer hereby represents, warrants and covenants as of the Effective Date that, to the best of Buyer's knowledge:

    a.  Buyer has full authority to enter into this Purchase Agreement and bind Buyer to all of its terms.

    b.  This Purchase Agreement will not (i) violate any other agreement of Buyer, (ii) to its knowledge, violate any applicable law, or (iii) require any notice or approval of any third party.

    c.  Buyer, together with its Affiliates, has sufficient funds to meet the anticipated obligations under this Purchase Agreement as reflected by the Purchase Price Payment, and Buyer's organizational documents do not provide for mandatory redemption/automatic termination within five years of the Effective Date.

    d.  Buyer may assign or otherwise transfer all or any of its rights or obligations under the Investment Documents, provided, however, that Buyer will not assign its rights or obligations under this Purchase Agreement to any Defendant or to another person who would materially and adversely affect the Litigations.

5.  **Breach by Seller**. Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling entities and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Seller's material representations, warranties, covenants or agreements in the Investment Documents, (ii) any obligation of any entity to disgorge, in whole or in part, or otherwise reimburse (by setoff or otherwise) Client or any other entity for any payments, property, setoffs or recoupments received, applied or effected by or for

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 6

the account of Seller under or in connection with the Seller's Interest, (iii) Seller shall be or become insolvent or seek relief under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (iv) the failure of Seller to comply with Rules of Professional Conduct, (v) the misapplication (whether negligent or intentional), misappropriation, conversion or theft of any part of the Collateral by any officer, employee, agent or representative of the Seller or its Affiliates, (vi) the failure to pay and discharge any liens on the Collateral, (vii) fraud or misrepresentation by Seller or any of their Affiliates or any of their officers, employees, agents or representatives, or (viii) any condition which results in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Seller's Interest than anticipated by the Retention Agreements including, without limitation, Seller's withdrawal from, or termination by Client of, its representation in any Litigation. In any such event, Buyer (A) may terminate its funding obligations towards future Purchase Price Payments by written notice (and, if curable, following Seller's failure to cure within thirty (30) days) to Seller and (B) be entitled to recover from Seller an amount equal to the Investment Return plus interest at the rate of prime plus 15% per annum, and (C) any monies distributable to Buyer in respect of the ▮▮▮▮ ▮▮▮▮▮▮ shall no longer be treated as Law Firm Recoveries hereunder or subject to distribution pursuant to Section 2 of this Purchase Agreement but shall instead be retained by Buyer pursuant to the ▮▮▮▮▮▮▮▮. Seller acknowledges that the indemnification obligations set forth in this Section 5 are with full recourse to Seller. The actions or inactions by Seller herein on any one particular Litigation hereunder, by itself, will not impact any other Litigation which is not subject to such action or inaction.

6. **Funding Termination Not Authorized by Section 5.** In the event of a failure to fund in any Litigation other than as authorized by Section 5 (an "Other Termination"), (A) Buyer's Investment Return shall be capped for that Litigation only at an amount equal to the Incurred Payments plus interest at the prime rate, and (B) Seller shall no longer have the obligation to provide additional cases pursuant to Section 2(c) for that Litigation, and (C) any monies distributable to Buyer in respect of the ▮▮▮▮▮▮ shall no longer be treated as Law Firm Recoveries hereunder or subject to distribution pursuant to Section 2 of this Purchase Agreement but shall instead be retained by Buyer pursuant to the ▮▮▮▮▮▮ In this event, Buyer shall subordinate its interest in any Law Firm Recoveries for such terminated Litigations to a new buyer, if any, until such time as such new buyer has received repayment of all out of pocket costs and hourly fees that such new buyer has actually paid to Seller with respect to such Litigation ("New Buyer Law Firm Payments"). After such new buyer has received repayment of the New Buyer Law Firm Payments, Buyer shall next receive an amount equal to equal to the Incurred Payments plus interest at the prime rate. Buyer shall have no liability to any Person with respect to an Other Termination provided that Buyer has satisfied all of its payment obligations to Seller in accordance with this Purchase Agreement that have been incurred through the date of such Other Termination. Any Litigation that is subject to an Other Termination shall not be included for purposes of Section 2.c and calculation of the Minimum Return (unless required by law, rule or regulation) in Section 2.c above.

7. **Confidentiality / Common Interest.**

   a. **Confidentiality.** The Parties agree that any non-public information or document provided before or after the Effective Date by one Party (the "Disclosing Party") and/or its directors, officers, members, employees, parents, subsidiaries, affiliates, agents, attorneys, auditors, or professional financial advisors (its "Representatives") to the other Party (the "Receiving Party") and/or its Representatives shall be "Confidential Information." In addition, "Confidential Information" shall include the Investment Documents and all drafts thereof, the terms of the Investment Documents, and the relationship between the Parties. "Confidential Information" shall not include information that was rightfully known by the Receiving Party or documents that were in the Receiving Party's rightful possession at the time the

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 7

information was provided. Information or documents will no longer be considered "Confidential Information" under this Purchase Agreement to the extent that (a) the information or document becomes generally known to the public, on or after the Effective Date, other than through a breach of this Purchase Agreement, (b) the Receiving Party receives the information or document from a third party that is not subject to non-disclosure obligation owed to the Disclosing Party, or (c) the Disclosing Party agrees in writing that the information or document is no longer confidential. A Receiving Party may disclose such Confidential Information to its or the Disclosing Party's Representatives, provided that the Representative have a need to know such information in connection with the furtherance of the purposes of this Purchase Agreement and the Representative is bound by confidentiality obligations at least as restrictive as those set forth herein. A Receiving Party may not otherwise disclose Confidential Information, except to the extent (a) the Disclosing Party consents to such disclosure in writing, or (b) the Party is seeking to enforce its rights under the Agreement, provided that Confidential Information is filed under seal. In addition, Buyer may disclose Confidential Information to any potential or actual investor, financing source, assignee, transferee, or participant. In addition, a Receiving Party may disclose Confidential Information if such disclosure is necessary to comply with a court order, subpoena, investigation, or other government or legal process (each a "Disclosure Request"), provided that the Party receiving the Disclosure Request shall, to the extent possible, give the Disclosing Party reasonable notice of the Disclosure Request and cooperate with the Disclosing Party in attempting to seek an appropriate order limiting the requested disclosure, at the Disclosing Party's expense. If, in the absence of an order limiting disclosure or a waiver by the Disclosing Party, the Receiving Party is compelled to disclose Confidential Information, the Receiving Party may disclose such Confidential Information that its attorney advises it is necessary to disclose to comply with the Disclosure Request. Should the Disclosing Party not contest the Disclosure Request, the Receiving Party shall not have any obligation to do so. The Receiving Party may, however, contest the Disclosure Request even if the Disclosing Party elects not to do so. Notwithstanding the foregoing, the obligations of the Receiving Party with respect to Disclosure Requests shall not apply with respect to any disclosure of Confidential Information made in connection with any routine governmental or regulatory inquiry, examination, or other request that does not specifically target the Disclosing Party's Confidential Information.

b. **Common Interest**. The Parties recognize that certain Confidential Information may be subject to the attorney-client privilege, the work product doctrine, or other privileges and protections (the "Common Interest Material"). The Parties agree that they share a common legal interest in pending or reasonably anticipated litigation and in pursuing the purposes of this Purchase Agreement and in any subsequent dealings relating thereto. Accordingly, the Parties agree that any Common Interest Material shared between or among them shall be subject to the common interest doctrine to the maximum extent permitted by law and that the disclosure of Common Interest Material under this Purchase Agreement is not intended to, and does not, waive any applicable privilege, protection, immunity, or other legal protection applicable to such information.

8. **Conduct of the Litigations**. Buyer shall not provide legal advice of any kind to Seller or their clients in the Litigations. All legal services that might prove necessary shall be the sole responsibility of the Seller or any other attorney(s) retained by their clients or retained by Seller on their client's behalf (e.g. local counsel). Buyer further acknowledges that it shall issue no instructions of any kind to Seller or to any other attorneys retained and authorized by the Seller or otherwise exercise any influence or control over said attorneys with respect to the representation of the clients or the conduct of any Litigations. By virtue of entering into this Purchase Agreement, Buyer does not become a party to the Litigations or become a client of Seller. Seller and their clients retain the unrestricted right to control or resolve the Litigations. Buyer recognizes that Seller has a duty of loyalty to the Clients in the Litigations and that Seller must satisfy any and all obligations that

34721860v.1

Page 8

it has to the Clients, including, but not limited to, advising such Clients on the prospect of settlement or trial based on the needs and circumstances of those Clients.

9. **Relationship between Buyer and Seller; Income Tax Treatment**. The relationship of the Parties shall be that of seller and buyer, and neither Party shall be considered or act as an agent of or have any fiduciary duties to the other Party. The Purchase Agreement is not intended to create a joint venture, partnership or association between the Parties. The Parties intend that the transactions set forth in this Purchase Agreement shall be treated for income tax purposes as a prepaid forward contract and not as indebtedness, and each Party agrees to report these transactions on its income tax returns in a manner consistent with such intention and to pay any applicable taxes in a similar fashion. This Purchase Agreement creates rights and obligations on the part of each of the Parties. The Parties intend that any rights or obligations created as a consequence of this Purchase Agreement shall terminate (within the meaning of Section 1234A of the Internal Revenue Code) upon Buyer's receipt of the full Investment Return pursuant to this Purchase Agreement. To the maximum extent permitted by law, the payment of the Investment Return shall be treated as the disposition of any assets created or transferred to Buyer as a result of this Purchase Agreement. In the event that, notwithstanding the foregoing, the transactions set forth in this Purchase Agreement is recharacterized, revised or otherwise determined by a court or arbitrator of competent jurisdiction to be in the nature of indebtedness (pursuant to Section 10 or otherwise), or is revised by the parties themselves to one of indebtedness, then it is intended that the interest rate applicable thereto shall never exceed the maximum rate, if any, which may be legally charged in the State of New York for such indebtedness (the "Maximum Rate"), and any amounts which may be deemed interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Buyer, returned to Seller.

10. **Governing Law, Jurisdiction, and Arbitration**. The Investment Documents and any and all related claims (whether styled or sounding in tort, contract, or any other legal theory arising from, in connection with, or relating to any Investment Document) shall be governed exclusively by New York law without regard to choice-of-law or conflict-of-law principles. ANY AND ALL DISPUTES, CLAIMS, OR CONTROVERSIES BETWEEN THE PARTIES (INCLUDING ANY DISPUTE INVOLVING ANY AFFILIATE OR AGENT OF THE PARTIES) ARISING FROM, IN CONNECTION WITH, OR RELATING TO THE INVESTMENT DOCUMENTS, INCLUDING, WITHOUT LIMITATION, THE ENTRY INTO, BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION, OR VALIDITY THEREOF (COLLECTIVELY, "DISPUTES"), SHALL BE SETTLED BY CONFIDENTIAL BINDING ARBITRATION ADMINISTERED BY JAMS IN THE JAMS OFFICE LOCATED IN NEW YORK, NEW YORK. THE PARTIES INTEND THAT THIS PURCHASE AGREEMENT TO ARBITRATE SHALL BE CONSTRUED AS BROADLY AS POSSIBLE. The Parties shall maintain the confidential nature of the arbitration, including the hearing and the award. All Disputes shall be submitted to a single arbitrator. To the extent the Parties cannot agree on a single arbitrator within seven (7) days of the filing of a demand for arbitration, JAMS shall appoint one. Any final arbitration award shall be non-reasoned. Disputes shall be resolved exclusively as follows: (a) upon appointment, the arbitrator will issue an order requiring all proceedings and any document or information obtained or used in the proceeding to remain confidential; (b) the Parties will not conduct any discovery, including, without limitation, any document discovery or depositions; (c) 14 days from the arbitrator's appointment, the Parties will simultaneously exchange opening briefs, limited to 14,000 words, setting forth their respective positions and specifying the relief sought, and, 14 days after service of opening briefs, will submit answering briefs, limited to 7,000 words, responding to the other Party's brief; (d) the arbitrator may, at its discretion, request supplemental briefing on any issue, but may not hold an evidentiary hearing; and (e) the arbitrator will issue a non-reasoned final arbitration award within 30 days of receiving answering or supplemental briefs, if such briefs are requested. The arbitrator must agree to the foregoing procedures and deadlines before accepting appointment. Failure to meet any of the foregoing deadlines will not render the award invalid, unenforceable, or subject to being vacated. The arbitrator, however, may impose appropriate

34721860v.1

Page 9

sanctions and draw appropriate adverse inferences against the Party primarily responsible for the failure to meet any such deadlines. For all Disputes, the arbitrator shall have exclusive jurisdiction and authority to determine all threshold and gateway issues of arbitrability and jurisdiction. The arbitrator shall strictly enforce the parol evidence rule, and shall not have discretion to consider extrinsic evidence concerning the construction or enforcement of unambiguous contractual provisions. Each Party shall pay its own expenses in such arbitration, including attorneys' fees, except as otherwise expressly provided in the Investment Documents. If requested, the arbitrator shall award pre-judgment interest at the then-prevailing New York statutory rate. An arbitration award may be confirmed in any jurisdiction in which a Party is subject to personal jurisdiction or otherwise possesses assets. Nothing in this provision shall prevent any Party from obtaining preliminary injunctive relief in a court of competent jurisdiction if necessary to prevent irreparable harm pending the conclusion of any arbitration in accordance with this Section 10; PROVIDED THAT FOR ANY SUCH INJUNCTIVE RELIEF (AND ANY OTHER DISPUTE BEFORE A COURT IN THE EVENT THE ARBITRATION PROVISIONS HEREIN DO NOT APPLY OR ARE NOT INVOKED), THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, NEW YORK, AND AGREE THAT ALL SUCH ACTIONS SHALL BE LITIGATED IN SUCH COURTS WAIVING ANY DEFENSE TO LITIGATING IN SUCH FORUMS, INCLUDING *FORUM NON CONVENIENS*. THE PARTIES ACKNOWLEDGE AND ADMIT THAT THE TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS DO NOT SUBJECT ANY PARTY TO PERSONAL JURISDICTION IN ANY STATE OTHER THAN NEW YORK. Any action before any court shall be governed exclusively by New York substantive and procedural law. THE PARTIES WAIVE ANY AND ALL CLAIMS AND ARGUMENTS THAT THE LAWS OR PUBLIC POLICIES OF ANY STATE OTHER THAN NEW YORK SHALL APPLY TO ANY ASPECT OF ANY DISPUTE. For the avoidance of doubt, in the event any Party would like to commence a lawsuit in a court for any claim whatsoever, as an express condition precedent to doing so, it must notify the other Party of its intention to do so and give the adverse Party or Parties five (5) business days to determine and respond as to whether the contemplated lawsuit is within the scope of this arbitration provision. If the Parties cannot resolve the issue of arbitrability within ten (10) business days of when notice is first given to the receiving Party, then the Parties hereby agree to resolve the issue of arbitrability and any related jurisdiction question by submitting to binding arbitration in the JAMS office located in New York, New York. The Parties acknowledge and agree that any Dispute would inevitably involve highly confidential issues of a commercially sensitive nature that, if released, would cause the Parties irreparable harm. Accordingly, to the extent any Party commences any action or proceeding in court, such Party is required to make filings under seal, unless and until ordered by a court to make filings publicly. In the event any Party breaches this agreement to arbitrate, by publicly disclosing information concerning any Disputes or in any other manner, that Party shall be required to pay the other Party for its actual attorneys' fees incurred in enforcing this agreement to arbitrate, without prejudice to the potential payment of judicial or arbitrable sanctions. The Parties recognize that each other's agents and Affiliates are express third-party beneficiaries of this provision and such agents and Affiliates may enforce this provision to arbitrate to the fullest extent. For the avoidance of doubt (and without prejudice to Seller's waiver of claims against Buyer's Affiliates), any Dispute involving any agent or Affiliate of either Party, including, without limitation, Parabellum Capital LLC, shall exclusively be adjudicated pursuant to the binding arbitration provisions set forth in this Section 10. A breach of the arbitration provision outlined in this Section 10 shall also be a breach of the duty of confidentiality set forth in Section 7. In the event any provision of this agreement to arbitrate is deemed to be unenforceable or contrary to public policy, such provision shall be severable, and the remainder of this agreement to arbitrate shall remain in effect and enforceable to the greatest possible extent. The Parties further agree that to the extent any provision in this Section 10 is severed, the Parties will apply the closest analogous provision of the expedited procedures set forth in the JAMS Streamlined Arbitration Rules and Procedures as those Rules exist on the Effective Date.

34721860v.1

Page 10

11. **Condition Precedents to Funding**. Buyer shall not be obligated to make any further Purchase Price Payments until all of the following conditions have been satisfied: (i) Buyer's receipt of the Investment Documents duly executed by Seller; (ii) Buyer's receipt of a certificate of authorization authorizing Seller to engage in the transactions contemplated by the Investment Documents, as executed by Seller's managing partners; (iii) the perfection of Buyer's first priority security interest in the Seller's Interest, as determined by Buyer in its sole discretion; (iv) Buyer's receipt of all retention agreements contemplated by the funding obligations, including, without limitation, the █████████████████, the ██████████████████, the ██ ████████████t, and ████████████████; and (v) Buyer's receipt of the fully executed ████████████████ and (vi) approval by Buyer's affiliated investment committee in its sole and absolute discretion. For the avoidance of doubt, the foregoing conditions precedent are conditions only to Buyer's obligations to make Purchase Price Payments, and are not conditions precedent to contract formation. Notwithstanding that certain condition precedents have not been satisfied, Buyer may opt to make any or all of the Purchase Price Payments and such payment or payments shall not constitute a waiver of any of Buyer's rights under the Investment Documents.

12. **Seller Walkaway.** In the event that Seller or James Wesley Christian ("Key Person") voluntarily ceases active representation of its clients in a Litigation, other than as a result of (a) a withdrawal or termination by the Seller for cause as provided for in the retention agreement for that Litigation, or (b) a withdrawal or termination by the Seller on the grounds that Seller believes that continued pursuit of the Litigation is not economically rational, then Seller and Key Person will be jointly and severally responsible for placing the Litigation with attorneys with at least as much experience representing clients in the assertion of such Litigations, who will agree to assume Seller's obligations under this Purchase Agreement.

13. **General Provisions**.

a. This Purchase Agreement, together with all exhibits, schedules, and attachments hereto, constitutes the entire agreement among the Parties and supersedes any prior understandings and agreements, written or oral between the Parties (for the avoidance of doubt, this Purchase Agreement shall not amend or supersede the ███████████████████ or ██████████████████). No waiver, amendment, or other modification of this Purchase Agreement shall be effective unless in writing. This Purchase Agreement shall be construed and constructed as drafted by each Party equally, notwithstanding any rule of contract construction to the contrary. A waiver of any provision of the Investment Documents by Buyer shall not constitute a continuing or subsequent waiver of such provision or a current or subsequent waiver of any other provision; no failure or delay by Buyer in exercising any right, power or privilege under the Investment Documents shall operate as a waiver of that right, power or privilege or any other such provision of the Investment Documents; and a single or partial exercise of any right, power or privilege shall not preclude any further or other exercise of that or any other right, power or privilege.

b. Any reference to any law or statute shall be deemed to refer to such law or statute as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words include, includes, and including shall be deemed to be followed by without limitation. Pronouns in masculine, feminine, and neutral genders shall be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words herein, hereof, hereby, and hereunder, and words of similar import, refer to this Purchase Agreement as a whole and not to any particular subdivision unless expressly so limited.

c. If any provision hereof cannot be interpreted in accordance with appropriate rule or law (including, attorney ethic codes), the Parties intend that this Purchase Agreement shall remain in effect and enforceable to the greatest possible extent and authorize the arbitrator (or court) to interpret or to revise, the provisions of this Purchase Agreement to bring it into conformity with all applicable law and rules.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Page 11

d.  Buyer shall not be required to (i) demand upon, or pursue or exhaust any of its rights or remedies against Seller, any other obligor, guarantor, or pledgor, or any other Person with respect to the payment of the Seller's obligations under any of the Investment Documents; (ii) pursue or exhaust any of its rights or remedies with respect to any Collateral (as defined in the Security Agreement) therefor or any direct or indirect guarantee thereof; (iii) look first to, enforce, or exhaust any other security, collateral, or guaranties, (iv) marshal the Collateral or any guarantee of such obligations; or (v) effect a public sale of any Collateral. The rights and remedies available to a Party under this Purchase Agreement are cumulative and not exclusive of any rights or remedies otherwise available to that Party.

e.  Any provisions of this Purchase Agreement which were intended by the Parties to survive any termination of this Purchase Agreement, shall survive such termination. All representations, warranties and covenants contained in this Purchase Agreement shall be continuous and survive the execution of this Purchase Agreement.

f.  This Purchase Agreement shall be binding on each of Seller and Buyer and their respective successors and assigns. This Purchase Agreement shall inure to the benefit of each of Seller and Buyer and their respective successors and permitted assigns.

g.  Seller agrees to execute any further documents, and to take any further actions, reasonably requested by Buyer to effectuate the rights granted to Buyer under the Investment Documents.

h.  In the event that any provision or aspect of any of the Investment Documents cannot be interpreted in accordance with applicable law, or is deemed invalid or unenforceable, such provision and the remainder of the Investment Documents shall be interpreted and implemented to the fullest extent permitted by law, as it is the Parties' express intent that the Investment Documents shall remain in full force and effect and enforceable to the greatest possible extent.

i.  This Purchase Agreement may be executed in any number of counterparts and by electronic signature, including without limitation by DocuSign, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. This Purchase Agreement shall become effective upon the execution of a counterpart hereof by each of the Parties hereto.

j.  Notices and other communications shall be given in writing by either electronic mail or overnight courier, to the addresses set forth on the signature page to this Purchase Agreement.

**[SIGNATURE PAGE FOLLOWS]**

34721860v.1

**IN WITNESS WHEREOF**, the Parties hereto have caused this Purchase Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

| **CHRISTIAN, SMITH & JEWELL, L.L.P.** | **PROJECT BLAZER LLC** |
|---|---|
| By: _____ | By: _____ |
| Name: J. Wes Christian | Name: Howard Shams |
| Title:  Managing Member | Title: Authorized Signatory |
| Address: 2302 Fannin, Suite 500 Houston, TX 77002 | Address: 810 Seventh Avenue, 29th Floor New York, NY 10019 |
| Email:  jchristian@csj-law.com | Email: hshams@parabellumcap.com |
| Tel:    713-659-7617 | Tel:    212 726 2640 |
| **CHRISTIAN & SMITH LLP** | **CHRISTIANATTAR LLC** |
| By: _____ | By: _____ |
| Name: J. Wes Christian | Name: J. Wes Christian |
| Title:  Managing Member | Title:  Managing Member |
| Address: 2302 Fannin, Suite 500 Houston, TX 77002 | Address: 2302 Fannin, Suite 500 Houston, TX 77002 |
| Email:  jchristian@csj-law.com | Email:  jchristian@christianattarlaw.com |
| Tel:    713-659-7617 | Tel:    713-659-7617 |

**CHRISTIAN LEVINE LAW GROUP LLC D/B/A CHRISTIANATTAR**

By: _____
Name: J. Wes Christian
Title:  Managing Member
Date:   March 18, 2025
Address: 2302 Fannin, Suite 500
         Houston, TX 77002

Email:  jchristian@csj-law.com

Tel:    713-659-7617

SCHEDULE I

## DEFINITIONS

"Affiliates" shall mean with respect any Person any other Person controlling, controlled by, or under common control with the subject.

"Budget" means the budget for due diligence expenses as set forth on Exhibit B hereto, as may be amended in accordance with Section 1.f of this Purchase Agreement.

"Claims" shall mean any and all causes of action arising out of or related to any of the Litigations, including, without limitation, claims against Defendants. The term 'Litigations' in the prior sentence shall also include each of the Future Litigations to the extent added in accordance with Section 1.c of this Purchase Agreement and any cases pledged in accordance with Section 2.c of this Purchase Agreement.

"Client" shall mean the client or clients, however so described, which are represented by Seller or its co-counsel with respect to any of the Retention Agreements, as applicable, and includes, without limitation, the respective 'Clients' under the ████████████████ and/or the ████████████████ and/or any ████ ████████████ t and/or the ████████████████ and/or any ████████ ████ and/or any Industry Litigation to the extent added in accordance with Section 1.d. of this Purchase Agreement, and/or any Future Litigations to the extent added in accordance with Section 1.c of this Purchase Agreement.

"Costs" shall mean all of the following-described out-of-pocket expenses (and not in-house costs) incurred by Seller in connection with any of the Litigations: (1) fees/costs of consultants, experts, and investigators; provided, however, that counsel is expected to use its expertise and experience to locate expert witnesses and consultants appropriate for the case and, accordingly, expert search firm costs, regardless of fee structure, i.e., if built into the expert's rate, will not be reimbursed; (2) reasonable travel and lodging expenses; provided, however, that only economy airfare will be reimbursed and, for consultants, experts, or investigators, any charge for time spent while traveling shall not exceed 50% of the consultant, expert, or investigator's hourly rate, whenever charges are based on billable hours and may not exceed, under any circumstance, eight hours in a single day; (3) court fees; and (4) litigation support expenses (i.e., e-discovery costs and contract attorneys). Costs shall not include: (a) fees for other legal service providers, other than local counsel; (b) litigation support, secretarial, or clerical overtime; (c) charges for word processing, internet access, or computer time; (d) charges for computerized research (e.g., Westlaw or Lexis research), (e) markups or administrative surcharges on supplies or services procured from third parties; (f) charges for routine photocopying; (g) charges for local meals or taxis; (h) charges for faxes except for long distance telephone charges actually levied for outgoing faxes; or (i) courier service charges (e.g., messenger services, overnight delivery). Costs shall be evidenced by invoices.

"Collateral" shall have the meaning ascribed to it by the Security Agreement.

"████████████████" shall mean all 'Purchase Price Payments' under the ████████████████, including, without limitation, all 'Law Firm Payments' described in the ████████████████, together with all 'Direct Buyer Costs' described in the ████████████.

"Defendants" shall mean those Persons sued in any of the Litigations (as well as in any Future Litigations once such Future Litigations are added in accordance with Section 1.c, or in any of the cases added in accordance with Section 2.c) and the Affiliates of any of the foregoing.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

"Due Diligence Costs" means the actual costs incurred by Buyer, including relating to engaging due diligence counsel, opinions of counsel or taking a security interest, and the reasonable costs of any third-party subpoena issued against Buyer or any related discovery cost that causes Buyer to incur costs, including, without limitation, attorney's fees. If the Due Diligence Costs exceed $150,000, the amount of the Due Diligence Costs shall be deemed to be $150,000.

"███████████" means the litigation to be filed on be behalf of ███████████. against certain broker dealers, market makers, and others, which is anticipated to be filed on of before ninety (90) days from the date of execution of this Purchase Agreement.

"Industry Litigation" shall mean a litigation against multiple defendants concerning industry-wide practices, and any litigations relating to either the False Claims Act and/or class actions alleging fraud or market manipulation (e.g. short selling, stock drop, or spoofing) which result from, or is otherwise related to, the Budget or information uncovered in connection with the expenditures set forth in the Budget. The definition of "Industry Litigation" shall exclude the ███████████, but shall include the Meta Litigation, the ███████████, and the ██████████.

"Key Man Insurance Policy" shall mean a key man insurance policy on the life of James Wesley Christian in the face amount of $5,000,000 for the benefit of Buyer. Seller acknowledges that Buyer will advance premiums for the Key Man Insurance Policy and that such premiums will be treated as Purchase Price Payments.

"Law Firm Recoveries" means collectively the gross total economic value of any compensation (whether tangible or intangible) due to Seller under any of the Retention Agreements or to which Seller (including their Affiliates and successors/assigns) becomes entitled to retain with respect to the Claims, whether as fees, costs, expenses or otherwise, including, without limitation, any expense reimbursement, fee reimbursement, court awarded fees, or negotiated contingency fees, and all proceeds from the Key Man Insurance Policy. All non-monetary compensation shall be valued at fair market value. For the avoidance of doubt, Law Firm Recoveries with respect to the ██████████ ███████████ shall not include amounts paid to ███████████

"Litigations" means the ███████████, the ███████████, the ██████████, the ██████████, the ███████████, the ███████████, the Meta Litigation, the ███████████, and each Industry Litigation to the extent added in accordance wth Section 1.d. of this Purchase Agreement (which currently includes the Meta Litigation, ███████████████████████████), and all Future Litigations to the extent added in accordance with Section 1.c of this Purchase Agreement, together with any appeals therefrom or proceedings in connection therewith and any new or other action(s) or proceeding(s) that may arise from the facts and/or claims underlying such Litigation, or otherwise based on the Claims, including, without limitation, parallel state or federal proceedings.

"Meta Litigation" means the litigation to be filed on be behalf of *Meta Materials, Inc.* against certain broker dealers, market makers, and others, which is anticipated to be filed on of before ninety (90) days from the date of execution of this Purchase Agreement.

"███████████" means the litigation ███████████████████████████ ███████████.

"███████████" means any and all litigations concerning underpayment of royalties due to mineral rights owners, including a qui tam action to be filed on behalf of government entities for underpayment, or which is otherwise related to the Budget or to the software, database, or any other work product created in connection with Budget, or any other case referred by ███████████████████████, or any affiliate thereof.

"Person" shall mean any individual, entity, group or organization.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

"Portfolio Waterfall" means distributions in accordance with Sections 2.b.ii - 2.b.iv of this Purchase Agreement.

"Retention Agreements" shall collectively mean all of those engagement agreements, compensation agreements, retention agreements, or fee agreements for the Litigations referenced in the recitals of this Purchase Agreement, all other retention agreements, joint representation agreements and/co-counsel agreements to which Seller is a party with respect to any of the Litigations, and any court order appointing Seller as counsel in any of the Litigations, and any other pleadings acknowledging the same, whether or not attached hereto. For the avoidance of doubt, the ███████████████████████████████████████████████████████████████████████████████████████, and any agreements with respect to any proceeds of any of the Litigations (whether with WB, FNF, or otherwise), shall each be included in the definition of Retention Agreements.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## Seller Wire Instructions



## ACH INSTRUCTIONS

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

SCHEDULE III

## REPRESENTATIONS, WARRANTIES, AND COVENANTS BY SELLER

Seller hereby represents, warrants and covenants as of the Effective Date and as of the date when any Purchase Price Payment is made that:

1. Seller has the full authority to enter into this Purchase Agreement and bind Seller to all of its terms.

2. To the best of Seller's knowledge, this Purchase Agreement will not (i) violate any other material agreement of Seller, (ii) violate any applicable law, or (iii) require any notice or approval of any third party.

3. Seller is duly authorized and holds all certificates of authority, licenses and permits necessary to carry on its business as presently conducted and as presently proposed to be conducted.

4. There are no actions, suits or proceedings pending or threatened against the Seller or any of its properties before any court or arbitrator, or any governmental department, board, agency or other instrumentality which, if determined adversely to the Seller, would materially affect (i) the Seller's Interest or (ii) any action taken or to be taken by Seller under this Purchase Agreement;

5. Seller is in compliance in all material respects with all statutes and governmental rules and regulations applicable to it (including, without limitation, all Rules of Professional Conduct) in connection with the Litigations.

6. Seller has filed all federal, state and local tax returns or appropriate extensions required to be filed and has paid or made provision for the payment of all taxes due and payable pursuant to such returns and pursuant to any assessments made against it or any of its property and all other taxes, fees and other charges imposed on it or any of its property by any governmental authority. No tax liens have been filed and no material claims are being asserted with respect to any such taxes, fees or charges.

7. All information furnished by the Seller to the Buyer for purposes of or in connection with this Purchase Agreement and all written information hereafter furnished by Seller to the Buyer will be, true and accurate in every material respect to the best of Seller's knowledge on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not materially misleading in light of the circumstances under which made.

8. Seller is the sole legal and beneficial owner of and has good title to the Seller's Interest free and clear of any lien or encumbrance whatsoever. Seller has not received the benefit of any setoff against the Client on account of the Seller's Interest. Seller has not received any notice that the Seller's Interest, or any portion thereof, is void, voidable, unenforceable or subject to any impairment.

9. There is no obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Seller's Interest that Seller is or shall be required to perform that Seller has not performed in full.

10. Seller and each Client are parties to the applicable Retention Agreements, which are each in full force and effect. Seller has not given its consent to change, nor has it waived, any term or provision of the Retention Agreements, including with respect to the amount or time of any payment owed to it. Seller has complied with, and has performed, all obligations required to be complied with or performed by it under the Retention Agreements, and Seller has not breached any of its representations, warranties, obligations, agreements or covenants under the Retention Agreements. Other than the Retention Agreements, there are no other related agreement to which Seller is a party that would impact Seller's Interest.

11. Assuming a positive outcome in the Litigations, Seller will earn a fee from the Client under the Retention Agreements in respect of the Litigations. Such fee will be paid by Client to Seller as required by the

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Retention Agreements or out of the common fund or otherwise, or in the case of a class action upon receipt of proceeds from or on behalf of a defendant in the Litigations.

12. Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller's holding any funds or property of, or owing amounts or property to, Client), that will result in Seller receiving less than would otherwise be owed it pursuant to the Retention Agreements.

13. No broker, finder or other entity acting under the authority of Seller or any of its affiliates is entitled to any broker's commission or other fee in connection with the transaction for which Buyer could be responsible.

14. Seller (i) is a sophisticated entity with respect to the sale of the Seller's Interest, (ii) has adequate information concerning the business and financial condition of the parties in the, and the status of the, Litigations (if any) to make an informed decision regarding the sale of the Buyer's Interest, and (iii) has independently and without reliance upon Buyer, and based on such information as Seller has deemed appropriate, made its own analysis and decision to enter into this Purchase Agreement. Seller acknowledges that Buyer has not given Seller any investment or other advice, or opinion on whether the sale of the Seller's Interest is prudent.

15. Seller will timely respond to requests from Buyer's auditors to confirm the existence of a contract or contracts between Buyer and Seller and the terms, amounts, and commitments therein.

16. To the best of its knowledge, Seller has furnished to Buyer all material information regarding the Litigations, which is not subject to the attorney-client privilege or other similar privilege, is not subject to Seller's duty of confidentiality, is not designated confidential or otherwise protected material of a defendant or third party, and which Seller may lawfully furnish to Buyer. Seller has no knowledge or information with respect to the Seller's Interest that is not available in the public domain that may be material to a decision to sell the Buyer's Interest. Seller will, subject to its duties to the Clients, provide regular status reports concerning each of the Litigations, and shall promptly notify Buyer upon the occurrence of any material events (positive or negative) related to any of the Litigations, including, for the avoidance of doubt, settlement discussions and offers, whether informal or formal.

17. Seller will maintain its corporate or other legal entity existence in good standing and maintain all of its certificates, permits, licenses and agreements of any kind or nature necessary to the operation of its business, including those necessary or desirable for the completion of the Litigations, in full force and effect and in good standing.

18. Subject to its duties to the Clients, Seller will permit any Person designated by the Buyer to visit and inspect any of its properties, corporate books and financial records relevant to the Litigations, to examine and to make copies of its books of accounts and other financial records, and to discuss the affairs, finances and accounts of the Seller relevant to the Litigations with, and to be advised as to the same by, its officers, all to the extent reasonably necessary to ensure compliance with this Purchase Agreement, at such reasonable times and intervals as the Buyer may designate during normal business hours.

19. If Seller substantially modifies its legal entity existence, such as a change of name, entity type, or merger with another law firm, this Purchase Agreement shall become binding on the resulting entity and the resulting entity shall assume any obligations of Seller, and the documents effecting such change shall reflect this requirement.

20. Seller agrees that it will not (i) sell, transfer, assign, lease or otherwise convey all or any substantial part of the Seller's Interest (whether in one transaction or in a series of transactions) to any person other than to Buyer, (ii) create, incur, assume or suffer to exist any lien with respect to the Seller's Interest, except liens in favor of the Buyer, and (iii) will not permit any director, officer, employee, agent, or affiliate to engage in any transaction related to the Seller's Interest that will adversely affect Buyer's rights under this Purchase Agreement. Notwithstanding the foregoing, Seller may be permitted to factor its receivables in

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

the ordinary course of business so long as it does not affect Buyer's Interest and Seller makes a good faith effort to offer the factoring arrangement to Buyer.

21. From and after the Effective Date and subject to Seller's legal and ethical duties to its clients, should Seller enter into a bankruptcy proceeding, (a) Buyer shall have sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents or waivers, and otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Seller's Interest (e.g. trade claims in bankruptcy ) and (b) if for any reason Seller is entitled to exercise any such rights or remedies (including the right to vote) after the Effective Date or by law is the only party that can take such action, Seller (i) shall not take any action with respect thereto other than in accordance with the prior instructions of Buyer and (ii) shall take (or refrain from taking) any action with respect thereto in accordance with the prior instructions of Buyer.

22. Seller will promptly notify Buyer (and in no event less than three business days and in the case of clause (ii) in no event less than 48 hours) in writing any time there is a change in circumstances or facts relating to the Seller that would (i) implicate any representation, warranty or covenant, (ii) materially affect the value of Seller's Interest (including developments in the Litigations) or (iii) prevent or materially inhibit Seller from performing its obligations under the Investment Documents. Seller further covenants that it will provide Buyer with monthly updates regarding the Seller's business operations (as reasonably relevant to Seller's obligations hereunder) and status of the Litigations.

23. Seller will not merge with any law firm until such successor or acquiring law firm agrees in writing to assume all of Seller's obligations under this Purchase Agreement.

24. Seller may not assign or otherwise transfer any or all of its rights or obligations under the Investment Documents without the prior written consent of Buyer, and any such assignment without the prior written consent of Buyer shall be null and void.

25. Seller will cooperate in good faith with Buyer to procure the Key Man Insurance Policy. Seller acknowledges that it shall be a breach of this Purchase Agreement if James Wesley Christian dies before Seller has procured the Key Man Insurance Policy.

26. Seller has entered into an agreement with WB pursuant to which WB has assigned all of its interests in Law Firm Recoveries to Seller for distribution in accordance with the waterfalls specified herein

27. Seller's principals caused the formation of ChristianAttar LLC in Texas in February 2023 but ChristianAttar LLC is not used as a law firm, and instead CHRISTIAN LEVINE LAW GROUP LLC filed for a certificate of assumed business name to do business as "ChristianAttar".

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## SCHEDULE IV

**Case Waterfall For Specific Litigations**

A. **Industry Litigation** (for information purposes)[2] (terms used in this Schedule IV.A but not defined in this Purchase Agreement shall have the meaning set forth in the Trilateral Co-Counsel and Distribution Agreement by and among Seller, Schneider Wallace Cottrell Konecky LLP ("SW") and KASOWITZ BENSON TORRES LLP ("KBT")):

      i.      100% of Law Firm Recoveries shall be distributed to Seller until such time as as Seller has been paid an amount equal to its principal investment plus three times (3X) the amount of the Incurred Expenses.

      ii.     *Second*: 15% of the remaining Law Firm Recoveries shall be allocated and distributed to Seller.

      iii.    *Third*: all remaining Law Firm Recoveries shall be allocated and distributed to Seller, SW, and KBT on a pro-rata basis based upon their respective Lodestar.

Seller acknowledges that its portion of the Litigation Proceeds outlined in this Schedule IV.A shall be treated solely as Law Firm Recoveries and will be solely distributed in accordance with the Portfolio Waterfall structure outlined in Sections 2.b.ii - 2.b.iv of the Purchase Agreement.

B.



---

[2] This subsection IV.A does not set forth the waterfall for all Industrty Litigations and only sets forth a waterfall with respect to the Meta and ████ (and only with respect to the portion allocable to law firms and not payable to the client(s)). The waterfall for the ████ is set forth in subsection IV.D below.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA



C.

D.

---

[3] And at least 27% of the gross recovery.
34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA



E.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA



F.

# EXHIBIT A

# EXHIBIT A

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

EXHIBIT A
(Security Agreement)

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## SECURITY AGREEMENT

This Security Agreement (as amended and/or restated from time to time, this "Security Agreement") is entered into effective as of December 23, 2019, by and among PROJECT BLAZER LLC (hereinafter referred to as "Buyer" or "Secured Party"), CHRISTIAN, & SMITH LLP, a Texas limited liability partnership, CHRISTIAN, SMITH & JEWELL, L.L.P., a Texas limited liability partnership, CHRISTIAN LEVINE LAW GROUP LLC, a Texas limited liability company which  also sometimes does business as ChristianAttar, and ChristianAttar LLC, a Texas limited liability company (hereinafter collectively  referred to as "Seller" or "Debtor").

**WHEREAS**, Seller and Buyer have entered into that certain Sixth Amended and Restated Prepaid Forward Purchase Agreement, dated effective as of December 23, 2019 (as amended and/or restated from time to time, the "Purchase Agreement"; capitalized terms used but not defined herein shall have the meanings given to them in the Purchase Agreement) whereby Buyer is providing consideration to Seller to allow Buyer to receive a portion of the Law Firm Recoveries in accordance with the Purchase Agreement; and

**WHEREAS**, in order to secure the payment, fulfillment and performance by Seller of its obligations under the Investment Documents, Debtor has agreed to grant to Secured Party a continuing first priority security interest in and to all of the Collateral (as hereinafter defined) pursuant to this Security Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1. **Definitions**. For purposes of this Security Agreement, the following terms shall have the following meanings:

"Bankruptcy Code" means the United States Bankruptcy Code Title 11, U.S. Code, as the same may be amended from time to time.

"Collateral" means all right, title and interest of Seller in and to the following property of Seller, now owned or hereafter acquired, and wherever located:

(a)    All amounts due to Seller in consideration for services rendered and to be rendered by Seller as counsel to the present and future plaintiffs in the Litigations and in any and all causes of action arising out of or related to the Litigations, including all "Law Firm Recoveries" as defined in the Purchase Agreement, whether in the form of cash or other consideration, and whether characterized as an 'Account' or otherwise, and for any and all other obligations of any kind at any time due and/or owing to Seller pursuant to, in connection with, arising out of, or related to, any of the Litigations, whether pursuant to invoices, contract rights, accounts receivable, or otherwise, in whatever form owing to Seller, provided, however, that the Collateral shall not include  any payments made directly by clients of Seller in respect of any hourly fees incurred on behalf of such client ; and

(b)    The Key Man Insurance Policy

(c)    All 'Proceeds' (as defined in the UCC) and products of the foregoing in any form (including, without limitation, 'Cash proceeds' and insurance proceeds).

"Encumbrance" means any existing or prospective mortgage, pledge, lien, security or ownership interest, charge, hypothecation, or other encumbrance, option agreement, transfer, termination, compromise, set-off right, security or subordination arrangement, adverse claim, or other similar interest or arrangement of any kind.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

"Litigations" has the meaning set forth in the Purchase Agreement, and includes, without limitation, the ███████████████████████████████████████████████████████████████ , each Industry Litigation to the extent added in accordance with Section 1.d. of the Purchase Agreement (which includes the Meta Litigation, ██████████████████████████████ ), and all Future Litigations to the extent added in accordance with Section 1.c of the Purchase Agreement.

"Obligations" means all present and future obligations of Seller to Buyer of any kind or nature, including, without limitation: (i) Seller's obligations to Buyer under the Investment Documents, including payment of the Investment Return, and any claims for breach of any of the Investment Documents; (ii) the repayment of (a) any reasonable amounts that Buyer may advance or spend for the maintenance, preservation or enforcement of the Collateral and Buyer's rights under the Investment Documents, and (b) any other reasonable expenditures that Buyer may make under or in connection with this Security Agreement and the enforcement thereof; (iii) all amounts owed under any modifications, renewals or extensions of any of the foregoing obligations; and (iv) any of the foregoing that arises after the filing of a petition by or against Seller under the Bankruptcy Code (including, without limitation, any amounts which would accrue and become due but for the commencement of such petition).

"UCC" means the Uniform Commercial Code in effect in the State of New York, as may be amended from time to time; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in the Collateral or the availability of any remedy is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, then UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof related to such perfection, effect of perfection or non-perfection or priority or availability of such remedy, as the case may be.

In addition, the following terms shall have the respective meanings provided for in the UCC, except as otherwise provided herein: "Accounts" and "Cash Proceeds," and "Proceeds."

2.  **Grant of Security**: As collateral security for the payment and performance of the Obligations, Debtor hereby grants and conveys to Secured Party a first priority continuing lien and security interest in and to the Collateral. Debtor hereby authorizes Secured Party to file financing statements (and any amendments thereto) in such jurisdictions as may be designated by Secured Party and to take such other steps and make such other filings as Secured Party may determine to perfect Secured Party's lien in and to the Collateral (collectively, the "UCC Financing Statements"), and approves, authorizes, and ratifies any UCC Financing Statements filed prior to the execution of this Security Agreement. Debtor will do all things necessary so that at all times Secured Party will have a valid, first-priority continuing lien and security interest in and to the Collateral. Debtor agrees that it will not sell, transfer, lease, assign or otherwise dispose of any of the Collateral or grant or permit to exist any Encumbrance in or on the Collateral, except as created hereunder.

3.  **Remedies**. Upon (a) any breach or default by Debtor of any representation, warranty, covenant or agreement under any provision of this Security Agreement or the Purchase Agreement, or (b) Debtor voluntarily or involuntarily becoming subject to any proceeding under the Bankruptcy Code or any similar proceeding under statutory or common law of any applicable jurisdiction, Secured Party may (i) take any action available at law or in equity against the Debtor to collect payment of the Obligations, whether or not due and owing at such time, and (ii) pursue any remedy available at law (including all those rights and remedies that are available to a 'secured party' under the provisions of Article 9 of the UCC, or otherwise) to foreclose against the Collateral. All rights and remedies existing under this Security Agreement are cumulative to, and not exclusive of, any other rights or remedies otherwise available to Secured Party. The Dispute resolution provision set forth in the Purchase Agreement shall apply to any dispute concerning this Security Agreement; *provided, however*, that Buyer, and Buyer only, may elect for the resolution of disputes concerning this Security Agreement in any state or federal court located in New York, New York.

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

4. **Attorney in Fact**. Each Debtor appoints Secured Party as such Debtor's attorney-in-fact with full irrevocable power and authority in its place and stead and in its name or otherwise, from time to time in Secured Party's sole discretion, to do all things in its name and on its behalf which Secured Party may deem reasonably necessary or advisable to create and perfect, and to continue and preserve, an indefeasible continuing first priority continuing lien and security interest in and to the Collateral in favor of Secured Party and to accomplish the purposes of this Security Agreement in connection with Secured Party's exercise of rights and remedies hereunder.

5. **Seller's Representations and Covenants**. Each Debtor represents and warrants that (a) it is company of the type set forth in the recitals to this Security Agreement, duly organized, validly existing and in good standing under the laws of the state of such Debtor as set forth in the recitals to this Security Agreement; (b) Debtor owns, with exclusive rights to control, all of the Collateral, free and clear of all Encumbrances, except as created by this Security Agreement, and has the power to transfer and grant the security interests hereunder; (c) Secured Party's security interest in the Collateral is a valid, first-priority security interest, and (d) no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or other person or entity is required for the grant by Debtor of the first priority security interest granted hereby or for the execution, delivery and performance of this Security Agreement by Debtor other than (i) any such authorizations, approvals, actions, notices or filings that have been obtained or made, or (ii) the filing by Secured Party of the UCC Financing Statements. Debtor (or any predecessor by merger or otherwise) has not, within the four (4) month period preceding the date hereof, had a different name or address from the name and address of Debtor listed on the signature page hereof. Each Debtor covenants that it shall not change in its name or form of organization, or take any other action that results in a change of the jurisdiction of organization of Debtor, or change its chief executive office, without giving Secured Party at least thirty days' prior written notice of any such action.

6. **Further Assurances**. Each Debtor agrees to execute any further documents, and to take any further actions, reasonably requested by Secured Party to evidence, maintain the first priority of or perfect the security interest granted herein, or to effectuate the rights granted to Secured Party under the Investment Documents.

7. **Governing Law**. This Security Agreement and related claims shall be governed by the laws of the State of New York without regard to choice of law.

8. **Release of Security Interest**. Within five (5) business days after all of the Obligations have been indefeasibly paid in full to Secured Party, Secured Party shall cause to be filed a release of Secured Party's filed UCC Financing Statements; provided, that, if Secured Party fails to release its filed UCC Financing Statements within five (5) business days after all of the Obligations have been indefeasibly paid in full to Secured Party, Debtor shall have the right to file a release of such filed UCC Financing Statements. Notwithstanding the foregoing, Debtor shall not have any right to file a release of Secured Party's filed UCC Financing Statements prior to the indefeasible payment in full of all of the Obligations to Secured Party.

9. **Counterparts**. This Security Agreement may be executed by electronic signature and in counterparts.

**[SIGNATURE PAGE FOLLOWS]**

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

**IN WITNESS WHEREOF**, the Parties hereto have caused this Security Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

| CHRISTIAN, SMITH & JEWELL, L.L.P. | PROJECT BLAZER LLC |
|---|---|
| By: _____<br>Name: J. Wes Christian<br>Title:  Managing Member<br><br>Address: 2302 Fannin, Suite 500<br>　　　　　 Houston, TX 77002<br><br><br>Email:   jchristian@csj-law.com<br><br>Tel:      713-659-7617 | DocuSigned by:<br>*Howard Shams*<br>By: _____<br>　　　　 7AA26F2A419E4F4...<br>Name: Howard Shams<br>Title: Authorized Signatory<br><br>Address:<br><br>810 Seventh Avenue, 29th Floor<br>New York, NY 10019<br><br>Email:  hshams@parabellumcap.com<br><br>Tel:      212 726 2640 |
| **CHRISTIAN & SMITH LLP**<br><br>By: _____<br>Name: J. Wes Christian<br>Title:  Managing Member<br><br>Address: 2302 Fannin, Suite 500<br>　　　　　 Houston, TX 77002<br><br>Email:   jchristian@csj-law.com<br><br>Tel:      713-659-7617 | |
| **CHRISTIAN LEVINE LAW GROUP LLC**<br>**D/B/A CHRISTIANATTAR**<br><br>By: _____<br>Name: J. Wes Christian<br>Title:  Managing Member<br><br>Address: 2302 Fannin, Suite 500<br>　　　　　 Houston, TX 77002<br><br>Email:   jchristian@csj-law.com<br><br>Tel:      713-659-7617 | **CHRISTIANATTAR LLC**<br><br>By: _____<br>Name: J. Wes Christian<br>Title:  Managing Member<br><br>Address: 2302 Fannin, Suite 500<br>　　　　　 Houston, TX 77002<br><br>Email:   jchristian@christianattarlaw.com<br><br>Tel:      713-659-7617 |

# EXHIBIT B

# EXHIBIT B

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

**Exhibit B**

Budget

1)　██████ Litigation



34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA



2) ██████████ Litigation

██████████████████████████████████████

3) Industry Litigation / Due Diligence and Consulting Services (including specific items for the Meta Litigation and the ████████████ )

Preliminary Pre-litigation Budget
Against DTC/NSCC and/or certain Prime Brokers

- Average hourly rate of $300/hour

*Pre-litigation*

| Task | Cost |
|---|---|
| 1. Meetings/Telephone calls to determine:<br>a. Legal theories;<br>b. Defendants to sue;<br>c. Standing issues; | $224,781.08<br>[Already paid] |

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

| | |
|---|---|
| d. Damage theories; <br> e. jurisdiction; <br> f. Conspiracy theories; <br> g. Statute of limitations; <br> h. Limited immunity issues; <br> i. Damage caps, if any. | |
| 2. Review of all initial material, including audits, balance sheets, fail data, comparative analysis between DTC/NSCC and brokers filing with SIFMA. | $67,000 <br> [Already paid] |
| 3. Detailed research on all items in (1) above, including with memos on each topic with summaries of supporting cases. | $75,000 <br> [Already Paid] |
| 4. Liability/Consulting Experts – analysis of data, theories, facts to support theories, preliminary consulting report. | $125,000 <br> [Already paid] |
| 5. Damages Consulting Expert – analysis of data to support damage. Calculate various damage theories, including but for share price and disgorgement damages, etc. | $153,575 <br> [Already Paid] |
| 6. Contingency | $20,000 <br> [Already Paid] |
| **TOTAL:** | **$665,356.08** <br> **[Already Paid]** |

*Additional Costs for Meta Litigation and* ▉▉▉▉ *Litigation:*

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

| | |
|---|---|
| Meta – Consulting Services Agreement | Up to $390,000 (Up to $315,000 plus an optional $75,000) |
| Filing of complaint in the Meta Litigation | $100,000.00 |
| ██████ Consulting Services Agreement | Up to $440,000 (Up to $365,000 plus an optional $75,000) |
| Filing of complaint in the ████████ | $100,000.00 |

The total Purchase Price Payments payable for Pre-litigation and the additional costs for the Meta Litigation and the ██████ Litigation shall be up to $1,695,356,08 (e.g. $665,356.08 for Pre-litigation, plus up to $490,000 for the Meta Litigation, ██████████████████████████████).

4) ████████████

████████████████████████████████████████

5) ████████████ Litigation

████████████████████████████████████████

6) ████ Litigation



34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA



*Notwithstanding the foregoing amounts and Milestones, all Purchase Price Payments shall be purely discretionary by Buyer, and may be paid from the 'Flexible Purchase Price Payments' described below.

***



Within five (5) days following the satisfaction of the conditions precedent described in Section 11 of this Agreement, Buyer shall make the following Purchase Price Payments as Flexible Purchase Price Payments:

34721860v.1

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

1) $680,000 to Seller as reimbursement and payment in respect of the Industry Litigation ($315k for the Meta Litigation and ██████████████████████ ).

***

For the avoidance of doubt, the maximum amount of Purchase Price Payments to be paid by or on behalf of Buyer (not including Due Diligence Costs or payments made in respect of the Key Man Insurance Policy) shall be $14,787,767.72[4] in the aggregate, which maximum amount shall be automatically adjusted in accordance with Section 1.f.

---

[4] $9,813,244.98 has been paid on or prior to the execution of this Agreement, and remaining amounts consist of (i) up to $963,672.74 toward Costs ████████ Litigation, (ii) up to $11,906.49 payable toward invoiced costs from experts in Phase Two of the ████ Litigation, (iii) up to $3,070,850 of Flexible Purchase Price Payments, and (iv) up to $1,030,000 in respect of the Industry Litigation (specifically the Meta Litigation ████████████████ ).

34721860v.1

# EXHIBIT C

**Remains Redacted**

# EXHIBIT C

# EXHIBIT D

**Remains Redacted**

# EXHIBIT D

# EXHIBIT E

**Remains Redacted**

# EXHIBIT E

# EXHIBIT F

# EXHIBIT F

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Exhibit F

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## THIS CONTRACT IS SUBJECT TO ARBITRATION
## UNDER THE TEXAS GENERAL ARBITRATION STATUTE

### POWER OF ATTORNEY
### AND CONTINGENT FEE CONTRACT

This agreement ("Agreement" or "Retention Agreement") is made by and between Christina W. Lovato in her capacity as chapter 7 trustee for the estate of META MATERIALS INC. pending in the United States Bankruptcy Court, District of Nevada as case no. 24-50792-hlb (referred to as "Client", and "Plaintiff") on the one hand, and James W. Christian of CHRISTIAN ATTAR and Stephen W. Tountas of KASOWITZ BENSON TORRES LLP, (referred to as "Attorneys") on the other hand.

In consideration of the mutual promises herein contained, the parties hereto agree as follows:

### I. PURPOSE OF REPRESENTATION

1.01    The Client hereby retains and employs Attorneys to investigate and, if appropriate, sue for and recover all damages and compensation due Client, under any and all claims and\or causes of action Client may have against all culpable defendants (the "Defendants" and each, individually, a "Defendant") as reasonably determined by Attorneys in connection with stock fraud and\or manipulation by Defendants involving the stock of META MATERIALS INC. (hereafter referred to as "the Litigation"). Client further retains and employs Attorneys to compromise and/or settle the Claims and causes of action that may be asserted on behalf of the Client, which compromise or settlement will be subject to Bankruptcy Court approval.

1.02    It is specifically agreed and understood that Attorneys' representation is limited to the Client, and that Attorneys are not representing nor expect to represent any other person or entity other than the Client, except future clients that may join in Plaintiff's shareholder action. It is expressly agreed and understood that Attorneys' obligations are limited to representing Client in the specific matters described in Paragraph 1.01, and Client does not expect Attorneys to perform any other duties or to take any other action except as specified in Paragraph 1.03.

1.03    It is specifically agreed and understood that Attorneys are not representing Client with regard to any claim that may be brought against it and Client is not aware of any counterclaims that could be brought against Client. Related Litigation includes a separate lawsuit brought by the Defendants in other forums or jurisdictions that would be a compulsory counterclaim if filed in the Litigation. If the Client wishes Attorneys to represent it with regard to any other lawsuit or with regard to any counterclaim, then Client agrees that she must execute a new or separate Power of Attorney and Fee Contract pertaining to such representation.

1.04    It is specifically agreed and understood that Attorneys' representation is limited to legal representation only. Attorneys are not responsible for providing business, insurance, tax, or accounting advice, even if related to the Claims or Litigation Proceeds.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## II. FEES, EXPENSES, AND LITIGATION PROCEEDS

2.01   The estimated budget for the expenses of the Litigation is $11,800,000 (the "Commitment"). Exhibit A is a general estimate of the expenses anticipated to be incurred in litigating these cases. Attorneys shall operate on a partial contingency and shall arrange for payment of third-party expenses related to the Litigation up to the amount of the Commitment. Client understands and agrees that Attorneys intend to seek financing for all or any portion of the Commitment from the Funder, and Attorneys anticipate Funder to be an affiliate of Parabellum Capital LLC. Client acknowledges that the Attorneys are operating on a partial contingency and arranging for payment of expenses related to the Litigation is not possible without financing from Funder, and Client shall execute any documents reasonably requested by Attorneys in connection with the financing of the Commitment, including, without limitation, a Litigation Proceeds Distribution Agreement. In consideration of the services rendered and to be rendered to Client by Attorneys, Client does hereby assign, grant and convey to Attorneys the following present undivided interests in all Litigation Proceeds and all of Client's Claims and Causes of Action for and as a reasonable fee for Attorneys' services, and said contingent attorneys' fee will be figured as follows on any recovery, settlement, or other receipt of Litigation Proceeds (collectively, the "Compensation"):

(i)   *First*, (A) 90% of Litigation Proceeds shall be distributed to Attorneys and (B) 10% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to the Commitment.

(ii)   *Second*, (A) 60% of Litigation Proceeds shall be distributed to Attorneys and (B) 40% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one times (1X) the amount of the Commitment.

(iii)   *Third*, (A) 50% of Litigation Proceeds shall be distributed to Attorneys and (B) 50% of Litigation Proceeds shall be distributed to Client, until such time as Attorneys have received an amount from Litigation Proceeds equal to an additional one and one quarter times (1.25X) the amount of the Commitment.

(iv)   Fourth, (A) 30% of all remaining Litigation Proceeds shall be distributed to Attorneys and (B) 70% of all remaining Litigation Proceeds shall be distributed to Client.

In the event that the legal fees and expenses of the Litigation are anticipated to exceed $11,800,000, Client and Attorneys shall work together in good faith to agree on the financing of such additional amounts. The Client shall have no liability to the Funder in the event the Litigation is unsuccessful.

2.02   Intentionally Omitted.

2.03   Client acknowledges that $500,000 of the Commitment is allocated to this matter from the Harrington case and deemed spent as of the date hereof on account of methodologies

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

learned in the Harrington case with respect to illegal methods used by Defendants to manipulate the stock.

2.04    A settlement or recovery may involve (in addition to a cash payment) other matters received by or obtained for Client. Just as one example, Client may recover or obtain shares of stock already issued or transferred to one or more Defendants. As another example, Client may be compensated by means of stock issued by certain publicly traded defendants. All such amounts constitute Litigation Proceeds which are distributable in accordance with Section 2.01 above.

2.05    It is further agreed that the Compensation as set forth and calculated in Paragraph 2.01 and assignment of undivided interest set forth in Paragraph 3.01 shall not be offset, reduced nor affected by any judgment, if any, rendered against Client by any counterclaim or otherwise.

2.06.    The budget set forth above excludes appeals and judgment enforcement proceedings, budgets for which shall be negotiated by the Parties if necessary.

2.07.    The Compensation is not set by law but is negotiable between an attorney and client. The Attorneys acknowledge that the potential Compensation constitutes fair and adequate consideration to compensate the Attorneys for its representation of Client in the Litigation and its obligation to bear the risk of the Commitment in accordance with this Retention Agreement.

2.08    Attorneys may enter into one or more separate agreements pursuant to which Attorneys allow Funder to obtain a portion of the Litigation Proceeds distributable to Attorneys under this Paragraph 2.01.

## III.  ASSIGNMENT OF INTEREST

3.01    In consideration of Attorneys' services, the Client hereby conveys and assigns to Attorneys and agrees to pay to Attorneys an undivided interest in and to all of Client's claims and causes of action to the extent of the percentages set out in Paragraph 2.01 resulting in a net contingency fee of not more than 30% to Attorneys after payment of all other amounts contemplated by Paragraph 2.01.

3.02    If there is any type of settlement whereby the Client is to receive or be paid future payments, then the settlement will be reduced to present value, and the settlement will be arranged whereby there will be sufficient cash at the time of the settlement to pay the attorneys' fees which will be figured on the present value of the settlement or recovery including the present value of future payments. Such discounting will be computed at a market discount rate.

3.03    All sums due and to become due are payable at the office of ChristianAttar in Harris County, Texas. Client hereby authorizes the Attorneys to endorse and negotiate any check, draft, or negotiable instrument on behalf of the Client, to deposit the same in Attorneys' trust account, and to distribute such funds pursuant to the terms of this Agreement.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## IV.  APPROVAL NECESSARY FOR SETTLEMENT

4.01  No settlement of any nature shall be made without Client's approval. Attorneys shall have full authority to sign papers or documents regarding a settlement after Client's and Bankruptcy Court approval.  Client will consult with Attorneys and Attorneys will keep Client fully advised of all settlement offers and counteroffers.

4.02    Attorneys are authorized and empowered to act as Client's sole negotiator in any and all settlement negotiations concerning this case, but it is expressly agreed and understood that no settlement of Client's Claim shall be made by Attorneys without Client's approval.  Client shall immediately notify in writing Attorneys of any settlement offer or proposal or "feeler" made to Client by anyone other than Attorneys.  Client agrees not to engage in any settlement discussion with any Defendant or its insurer or attorney or representative except by and through Attorneys. There will be no talk about settlement unless Attorneys are present and doing the talking for Client. Whenever a settlement offer is made by or on behalf of any Defendant, Client agrees to strongly consider in good faith the opinions and recommendations of Attorneys before accepting or rejecting the settlement offer, whether such settlement offer was made to Client through the Attorneys or in some other way. Client agrees not to unreasonably withhold consent to a settlement offer, which in the judgment of Attorneys is a fair and reasonable basis for the disposition of Client's Claim or else Attorneys shall have the right to withdraw pursuant to Paragraph 9 from further representing Client.  In deciding whether to consent or not to a settlement offer, Client agrees never to ask, insist or seek that Attorneys cut or reduce their fees or expenses to which Attorneys are entitled to receive under this Agreement, and such conduct will constitute unreasonably withholding consent.

4.03    Attorneys are hereby granted a power of attorney so that they may have full authority to prepare, sign and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to conclude this representation including settlement and\or reducing to possession any and all monies or other things of value due to the Client under his claim as fully as the Client could so do in person.  Attorneys are also authorized and empowered to act as Client's negotiator in any and all settlement negotiations concerning the subject of this Agreement.

## V.  REPRESENTATIONS, WARRANTIES, AND COVENANTS

5.01    It is understood and agreed that Attorneys cannot warrant or guarantee the outcome of the case and Attorneys have not represented to the Clients that the Client will recover all or any of the funds so desired.  Further, Attorneys cannot warrant or guarantee they can procure a Funder to fund the Litigation Expenses. In the event Attorneys are not successful in procuring a Funder, Client and Attorneys will sit down and determine how the matter can move forward. Client realizes that Attorneys will be investigating the law and facts applicable to Client's Claim and\or Causes of Action, on a continuing basis and should Attorneys learn something which in the opinion of Attorneys make it impractical for Attorneys to proceed with the handling of Client's Claim or the Litigation, if any, then Attorneys may withdraw from further representation of Client by sending written notice to Client's last known address.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

5.02    In addition to any other representations and warranties in this Agreement, Client hereby represents and warrants that:

i.      Client legally and beneficially owns 100% of the Claims and has not assigned, transferred, or encumbered any right, title, or interest in or to the Claims other than as set forth in this Agreement.

ii.     Client has the unfettered right to pursue the Claims against Defendants, including, but not limited to, the exclusive right to (a) prosecute litigation, (b) enforce all rights, and (c) recover all damages in connection with the Claims, subject to possible setoff by Defendants.

iii.    Client is not aware of any other claims the Meta Materials Inc. estate may have against Defendants that arise from the transactions and occurrences underlying the Litigation, other than the Claims disclosed to Attorneys to be asserted in the Litigation.

iv.     Client did not intentionally omit any material information she possesses with respect to the Claims in connection with the Attorneys' analysis thereof.

v.      Subject to Bankruptcy Court approval, Client has full authority to enter into this Agreement and bind Client to all of its terms, none of which will (a) violate any other agreement of Client, (b) violate any applicable law, or (c) require any notice or approval of any third party.

vi.     Other than those claims disclosed to Attorneys to be asserted by Defendants against Client as of the Effective Date, Client is not aware of any compulsory or permissive claims that could be brought by one or more of the Defendants against Client, and Client has used reasonable best efforts to disclose in writing to the Attorneys all transactions or agreements she currently has or has had with any Defendant.

vii.    Client has consulted with independent legal counsel (separate from the Attorneys) regarding this Agreement and is fully advised with respect to Client's obligations and rights with respect hereto. Client acknowledges that Client has had sufficient time to review and consult with other attorneys considering this Agreement.

viii.   Client acknowledges that litigation is unpredictable and the Attorneys make no assurances as to any results or outcome of the Claims or Litigation.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

ix.     Client acknowledges that, although the Attorneys may offer opinions concerning the possible results of the Litigation, the Attorneys cannot guarantee any particular result. Client acknowledges that the Attorneys have made no promises on such a subject and that any opinion offered by the Attorneys in the future will not constitute a guarantee.

5.03     In addition to the covenants set forth elsewhere in this Agreement, Client hereby covenants that so long as this Agreement remains in effect:

i.     Client shall not assign, transfer, or encumber any right, title, or interest in the Litigation Proceeds without the prior written consent of Attorneys.

ii.     Client shall (a) fully comply with all reasonable requests of the Attorneys in the pursuit of recovery in the Litigation, and (b) reasonably seek to maximize the monetary value of the Claims; *provided that* Client may defer to the advice of Attorneys, including with respect to settlement. For example, and without limitation, Client agrees (a) to allow the Attorneys reasonable and timely access to Client and his records to facilitate the provision of legal services by the Attorneys, (b) to use reasonable best efforts to provide the Attorneys with all information and documents in the possession of Client or any entities or persons affiliated with Client, (c) to fully cooperate with the Attorneys in the prosecution of the Claims and Litigation, (d) to appear on reasonable notice, and at Client's expense, for any and all depositions and court appearances at which Client's attendance is reasonably required or ordered, and (e) to comply with all reasonable requests of the Attorneys in connection with the preparation and presentation of the Claims and Litigation.

iii.     Client shall not knowingly, without the prior written consent of the Attorneys, which consent may be withheld in the Attorneys' sole and absolute discretion, take any action or inaction or permit any Person controlling, controlled by, or under common control with him ("Affiliates") or his agents, to take any action or inaction that will in any way create any circumstance which may or could: (a) interfere with the Attorneys' ability to pursue the Claims, (b) diminish the expected recovery of the Claims, or (c) provide, either directly or indirectly, a defense to the Claims.

iv.     Client shall not accept any proposed compromise or settlement of the Claims with any individual, entity, group, or organization ("Person") without first consulting with and making full disclosure to the Attorneys. Client shall cooperate in good faith regarding any proposed compromise or settlement of the Claims. Client and the

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

Attorneys shall not offer or accept a settlement without one another's mutual discussion.

## VI.    INTENTIONALLY OMITTED

## VII.  COOPERATION OF CLIENT

7.01    Client agrees to cooperate with Attorneys at all times and to comply with all reasonable requests of Attorneys.  Client further agrees to keep Attorneys advised of his/her whereabouts at all times, and to provide Attorneys with any changes of address, phone number or business affiliation.

7.02    Attorneys or either of them may, at his/her option, withdraw from the case and cease to represent the Client should Client fail to comply with any portion of this Agreement or should Attorneys or either of them decide that he or she cannot continue to be involved in this case.  Such withdrawal will be effective by mailing written notice to Client's last known address.

## VIII. ASSOCIATION OF OTHER ATTORNEYS

8.01    Attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client.  Client understands that Attorneys are limited liability partnerships with a number of attorneys.  Several of those attorneys may work on Client's case.

## IX.  WITHDRAWAL OR REPLACEMENT OF ATTORNEYS

9.01    Attorneys accept employment on the condition that if, after investigation, research, and analysis, it ever appears to Attorneys that (a) Client's Claim is probably not recoverable, or (b) the pursuit of Client's Claim is no longer economically feasible or advisable, the Attorneys may with withdraw (such withdrawal, a "Reduced Success Withdrawal"),. Attorneys may also withdraw if (1) Client fails to reasonably assist and cooperate with Attorneys or Client's conduct makes it unreasonably difficult for Attorneys to carry out their representation effectively; (2) Client fails or refuses to comply with this Agreement; (3) Client fails or refuses to comply with a matter regarding settlement set out in Paragraph 4, including, without limitation, its obligation to act in good faith in settlement discussions or when making settlement decisions; (4) sues Attorneys or threatens to do so or files a grievance or threatens to do so; (5) Client abandons prosecution of the Claims other than on account of the reasons set forth in (a) and (b) of the previous sentence, or (6) a legally prohibited conflict of interest has arisen; each of the foregoing (1) – (6) shall constitute "Good Reason". Attorneys may withdraw from the representation of Client without further obligation or liability by first sending Client written notice by U.S. Mail, Certified Return Receipt, to Client's last known address that personally gives Client 30 days to hire new attorneys.  The act of firing, replacing, or terminating Attorneys Cause is the equivalent of withdrawal for Good Reason.

9.02    Since Attorneys will quite likely have done much work and\or paid or incurred liability for huge amounts of Litigation Expenses should Attorneys be fired or replaced by Client other than for Cause or should Attorneys withdraw for Good Reason, there must be fair provisions

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

for repayment to Attorneys its hard dollars and/or time spent developing the case. If Attorneys withdraw for Good Reason or are replaced other than for Cause, Client will hire another law firm ("new attorneys") to handle their claims by an agreement that the Client or new attorneys shall first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; and the Attorneys will be paid as attorneys' fees at the time of settlement or recovery a percentage of the contingent fees provided for in Paragraph 2.01 above (with credit applied to avoid double recovery) with the new attorneys to share in the portion of Litigation Proceeds allocated to Client pursuant to Paragraph 2.01. In the event Attorneys withdraw other than for Good Reason or should Client replace or fire Attorneys for Cause, Client will hire a new attorney to replace Attorneys and to handle Client's Claim by an agreement that requires new attorneys and\or Client to first promptly repay and reimburse Attorneys for all Litigation Expenses that Attorneys paid or incurred responsibility to pay; or else Attorneys will have a first lien on any settlement or recovery requiring that all Litigation Expenses that Attorneys paid or incurred liability to pay are to be repaid and reimbursed first out of any settlement or recovery and that, as attorney fees, Attorneys will be paid at the time of settlement or recovery all of its Litigation Expenses included the reasonable value of the legal services it provided to Client; and any further recovery under 2.01(ii)-(iv) shall be proportionally reduced.. For the avoidance of doubt, if Attorneys are terminated (whether or not for Cause) or withdraw (whether or not for Good Reason) Attorneys shall have no further obligations toward the Commitment or the funding of any Litigation Expenses.

9.03    Notwithstanding Paragraph 9.02 or anything herein to the contrary, in the event of a Reduced Success Withdrawal, then the amounts and percentages distributable to the Attorneys under Paragraph 2.01 shall be proportionally reduced to reflect the percentage that the Litigation Expenses at the time of such Reduced Success Withdrawal bears against the Commitment.

## X.  TEXAS LAW TO APPLY

10.01    This Agreement shall be construed under and in accordance with the laws of the State of Texas, and the rights, duties and obligations of Client and of Attorneys regarding Attorneys' representation of Client and regarding anything covered by this Agreement shall be governed exclusively by the laws of the State of Texas law without regard to choice-of-law or conflict-of-law principles.

## XI.  ARBITRATION

11.01    Any and all disputes, controversies, claims or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by Attorneys to Client or (4) the relationship between Attorneys and Client, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association. Client shall not file a class action against Attorneys or seek to assert any claim or demands against Attorneys by or through a class action, either as the named plaintiff or as a member of the class, but rather shall submit his/her claims or demands to binding arbitration pursuant to the provisions of this ARTICLE XI. For the avoidance of doubt, any and all gateway issues of arbitrability are delegated to the arbitrators. Any such arbitration

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

proceeding shall be conducted in Harris County, Texas. This arbitration provision shall be enforceable in either federal or state court in Harris County, Texas pursuant to the substantive federal laws established by the Federal Arbitration Act. Any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered by any federal or state court in Harris County, Texas having jurisdiction.

## XII. BANKRUPTCY PROVISIONS

12.01   All parties acknowledge that Client is the chapter 7 trustee under Case No. 24-50792 in Reno, Nevada. As such, all obligations hereunder are conditioned on the Bankruptcy Court approving all terms and conditions.

## XIII. PARTIES BOUND

13.01   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representative, successors and assigns.

## XIV. LEGAL CONSTRUCTION

14.01   In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. Capitalized Terms used but not defined herein shall have the meanings set forth on Schedule I hereto.

## XV. DISPOSITION OF FILES

15.01   The files of the Client will be retained for two (2) years after Attorneys' representation has been completed, and then will be discarded, except for information that Attorneys may need in the future. Client shall, however, promptly pick up all material furnished to Attorneys, and Attorneys shall have no responsibility for retaining Client's information and documents after the case has been closed for forty-five (45) days.

15.02   If the arrangement between Attorneys and Client is terminated for any reason, then Client shall be entitled to all or any part of Client's papers and property that Client desires. Attorneys shall be entitled to a copy of all or part of the file, at Attorneys' expense.

15.03   Independent Determination of Fairness and Reasonability. Client acknowledges that (a) Attorneys did not act as counsel to Client in preparing or negotiating this Agreement; (b) Client has made sufficient investigation to determine that this Agreement is fair and reasonable; (c) this Agreement was the subject of arm's length negotiation between Client and Attorneys; (d) Client has had ample opportunity to review the Agreement independently and with separate counsel; and (e) Client is entering into this Agreement freely and voluntarily.

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## XVI.  PRIOR AGREEMENTS SUPERSEDED

16.01   This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreement between the parties respecting the within subject matter.

I certify and acknowledge that I have had the opportunity to read this Agreement.  I further state that I have voluntarily entered into this Agreement fully aware of its term and conditions.

Signed and accepted this 30th day of October, 2024.

CLIENT: META MATERIALS INC.

BY: _/s/ Christina W. Lovato_
　　Christina W. Lovato, Trustee

CHRISTIANATTAR

James. W. Christian

KASOWITZ BENSON TORRES LLP

Stephen W. Tountas

## SCHEDULE I TO RETENTION AGREEMENT

### DEFINITIONS

"Business Deal" shall mean any agreement involving the Claims entered into by Client and any Person, whereby such Person provides a direct or indirect benefit to Client including, without limitation, any transaction with any Defendant.

"Cause" shall mean either (a) the Attorneys are in material breach of any material term of the Retention Agreement, which is not cured within fourteen (14) calendar days after the Attorneys' receipt of written notice from Client (such written notice must set forth with specificity such breach), or (b) the Attorneys have has committed gross negligence or willful misconduct in pursuit of the Claims.

"Claims" shall mean all current and future claims, suits, causes of action, and other rights of Client which are or may be asserted or alleged in the Litigation, or arising from, relating to, or based on the Litigation or any transactions or occurrences underlying the Litigation.

"Litigation Expenses" means any out-of-pocket expenses (and not in-house costs) incurred by any of the Attorneys in connection with the Litigation, or otherwise reflected in the budget, as well as the hourly fees of the Attorneys (based on lodestar).

"Litigation Proceeds" shall mean the gross total economic value of any compensation (whether tangible, intangible, monetary, or otherwise) to which Client or Client's Affiliates, successors, and/or assigns (including any party on behalf of any of the foregoing) become entitled, receive, or are relieved from making related to the Claims (including, without limitation, any Business Deal, and/or Court-awarded fees/costs). For the sake of clarity, Litigation Proceeds shall not be offset, without limitation, due to taxes and tax withholding. All non-cash Litigation Proceeds shall be valued based on their fair market value as determined by a third-party appraiser.

# EXHIBIT A
## Budget

| Milestone (Hourly Fees) | Law Firm Payment (flat fees) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Payment at closing for all research, memo, due diligence: | $250,000.00 | | | | | | | $250,000.00 |
| Filing of complaint: | $150,000.00 | | | | | | | $150,000.00 |
| Draft reply, Sur-reply, research, attend hearing, etc. (motion to dismiss) | $200,000.00 | | | | | | | $200,000.00 |
| Commencement of discovery (provided that MTD is at least partially successful): | $150,000.00 | | | | | | | $150,000.00 |
| Various motions to compel, objections, hearings, etc. | $75,000.00 | | | | | | | $75,000.00 |
| Taking all depositions, motions to compel, etc. Meet and Confer | $150,000.00 | | | | | | | $150,000.00 |
| Completion of general discovery | $200,000.00 | | | | | | | $200,000.00 |
| Amount of expert discovery, including discovery preparation, draft reports, review evidence, etc | $200,000.00 | | | | | | | $200,000.00 |
| Completion of all discovery, including experts. | $300,000.00 | | | | | | | $300,000.00 |
| Commencement of summary judgment briefing and motions: | $300,000.00 | | | | | | | $300,000.00 |
| After successful ruling on motion for summary judgment | $200,000.00 | | | | | | | $200,000.00 |
| Prepare witnesses. | $200,000.00 | | | | | | | $200,000.00 |
| Draft direct and cross examination questions | $200,000.00 | | | | | | | $200,000.00 |
| Prepare exhibit list | $100,000.00 | | | | | | | $100,000.00 |
| Draft all briefs | $150,000.00 | | | | | | | $150,000.00 |
| Prepare for and attend pre-trial hearings | $100,000.00 | | | | | | | $100,000.00 |
| Prepare jury charge and charge conference: | $50,000.00 | | | | | | | $50,000.00 |
| Attend trial (3 associate lawyers): | $510,000.00 | | | | | | | $510,000.00 |
| Additional fees for expanded discovery issues | $1,800,000.00 | | | | | | | $1,800,000.00 |
| **TOTAL HOURLY FEES:** | **$5,285,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$5,285,000.00** |

| Milestone (Costs) | Law Firm Payment (capped amount) | 4/1/2024 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | 0/0/24 | Balance |
|---|---|---|---|---|---|---|---|---|
| Court reported deposition experts | $250,000.00 | | | | | | | $250,000.00 |
| Flights, hotels, meals, etc | $175,000.00 | | | | | | | $175,000.00 |
| Liability experts: Spoofing and NSS | $2,500,000.00 | | | | | | | $2,500,000.00 |
| Damage experts | $2,000,000.00 | | | | | | | $2,000,000.00 |
| Two focus groups: | $150,000.00 | | | | | | | $150,000.00 |
| Special master for discovery/Mediator | $200,000.00 | | | | | | | $200,000.00 |
| Third party data. | $200,000.00 | | | | | | | $200,000.00 |
| SEC/DTC expert: | $150,000.00 | | | | | | | $150,000.00 |
| Consulting | $100,000.00 | | | | | | | $100,000.00 |
| Multi-media preparation | $40,000.00 | | | | | | | $40,000.00 |
| Contingency for expenses | $750,000.00 | | | | | | | $750,000.00 |
| **TOTAL COSTS (CAP):** | **$6,515,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$6,515,000.00** |
| **TOTAL COSTS (CAP):** | **$11,800,000.00** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | **$11,800,000.00** |

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

## TRILATERAL CO-COUNSEL AND DISTRIBUTION AGREEMENT

**THIS TRILATERAL CO-COUNSEL AND DISTRIBUTION AGREEMENT** (as amended from time to time, this "Agreement") is entered into effective as of February 12, 2025 by and among CHRISTIAN LEVINE LAW GROUP LLC d/b/a ChristianAttar ("CA"), Schneider Wallace Cottrell Konecky LLP ("SW") and KASOWITZ BENSON TORRES LLP ("KBT") collectively (the "Firms").

WHEREAS, CA, SW, and KBT will represent the client in the Litigation[1] and/or be entitled to receive recoveries in respect of the Litigation (collectively, "Law Firm Recoveries");

WHEREAS, CA, SW, and KBT desire to set forth their agreement regarding how the Law Firm Recoveries shall be allocated and distributed;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Payment of Expenses</u>.  CA shall be responsible for payment of all third-party costs and expenses incurred in the Litigation ("Incurred Expenses") through the motion to dismiss stage. Thereafter, the parties will work to either secure funding or agree amongst themselves who shall fund the Incurred Expenses.

2.    <u>Allocation. and Distribution of Law Firm Recoveries</u>. Law Firm Recoveries shall be allocated and distributed as follows:

   (A) *First,* 100% of the Law Firm Recoveries shall be allocated and distributed to CA (or whoever funds them after the motion to dismiss) until such time as CA has been paid an amount equal to its principal investment plus three times (3X) the amount of the Incurred Expenses;

   (B) *Second,* 15% of the remaining Law Firm Recoveries shall be allocated and distributed to CA;

   (C) *Third,* all remaining Law Firm Recoveries shall be allocated and distributed to CA, SW, and KBT on a pro-rata basis based upon their respective Lodestar[2];

3.    <u>Governance</u>. In the event of a disagreement regarding strategy in the Litigation, each of CA, SW, and KBT shall get a single vote and a decision shall be made by simple majority.

4.    <u>Other Agreements</u>. Each of CA, SW, and KBT has and may enter into financing arrangements with third party lenders or funders, and in any such event each of CA, SW, and KBT has full authority to pledge in connection with such funding facilities all of its applicable portion of the Law Firm Recoveries set forth above in Section 2; provided, however, that no such pledge by KBT, SW, or CA shall impair in any way the other's interests or rights to their respective portion of the Law Firm Recoveries set forth above in Section 2. Any such funder shall be deemed an intended third-party beneficiary of this Agreement, entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto. No law firm shall cede any control to a third-party funder.

---

[1] As used herein, the term "Litigation" shall mean the Meta Materials, Inc. and ▮▮▮▮▮▮▮▮▮▮ potential stock manipulation lawsuit together with any appeals therefrom or proceedings in connection therewith and any new or other action(s) or proceeding(s) that may arise from the facts and/or claims underlying such Litigation, or otherwise based on the claims made therein, including, without limitation, parallel state or federal proceedings.

[2] As used herein, the term "Lodestar" shall mean the Firms shall share the proceeds in 2(c) above based upon hours each firm has spent in connection with the Litigation; such hours to be approved by the Firms.

*It is understood that Lodestar is defined as lawyer/staff rates x hours of work. PS*

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

5.      Distribution Report. All Law Firm Recoveries will be made available to CA which will prepare a distribution statement for SW and KBT's review, and absent any objection CA will distribute the amounts so distributable. In the event of an objection the parties acknowledge that CA will distribute portions of the Law Firm Recoveries to which there is no dispute.

6.      Wrong Pockets. If KBT, SW, or CA receive any contingent recovery or other Law Firm Recoveries payable in connection with the Litigation in contravention of the amounts payable under Section 2 of this Agreement, KBT, SW, or CA, as the case may be, shall be deemed to receive and hold the same in trust as trustee for the benefit of the proper recipient and shall forthwith deliver such payment, distribution, or proceeds to the proper party or entity to whom such distribution should have been made in accordance with Section 2 of this Agreement in precisely the form received (except for the endorsement or assignment by KBT, SW, or CA where necessary).

7.      Dispute Resolution. This Agreement and any and all related claims (whether styled or sounding in tort, contract, or any other legal theory arising from, in connection with, or relating to this Agreement) shall be governed exclusively by New York law without regard to choice-of-law or conflict-of-law principles. ANY AND ALL DISPUTES, CLAIMS, OR CONTROVERSIES BETWEEN THE PARTIES (INCLUDING ANY DISPUTE INVOLVING ANY AFFILIATE OR AGENT OF THE PARTIES) ARISING FROM, IN CONNECTION WITH, OR RELATING TO THIS AGREEMENT OR THE RETENTION AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE ENTRY INTO, BREACH, TERMINATION,    ENFORCEMENT,    INTERPRETATION,    OR    VALIDITY    THEREOF (COLLECTIVELY, "DISPUTES"), SHALL BE SETTLED BY CONFIDENTIAL BINDING ARBITRATION ADMINISTERED BY JAMS IN THE JAMS OFFICE LOCATED IN NEW YORK, NEW YORK. THE PARTIES INTEND THAT THIS AGREEMENT TO ARBITRATE SHALL BE CONSTRUED AS BROADLY AS POSSIBLE. The arbitration shall be conducted pursuant to the F.A.A. and the JAMS Commercial Arbitration Rules in effect at the time of the arbitration. The tribunal shall consist of one arbitrator that the Parties will seek to agree on within fourteen (14) days of the request for arbitration and if no such agreement is reached JAMS shall appoint such arbitrator within seven (7) days thereafter.

8.      Miscellaneous. (A) This Agreement, together with the exhibits and attachments hereto, represents the entire agreement between the parties with respect to the transactions explicitly  contemplated hereby and supersedes all prior agreements between the parties with respect thereto, whether written or oral; (B) This Agreement may not be amended or modified other than by an agreement in writing signed by each party hereto; (C) Each signatory hereto certifies that such party has all necessary authority to execute this Agreement and that this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; (D) No waiver shall be effective unless it is in writing and is signed by the party against whom such waiver is sought to be enforced; (E) The validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of New York, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York; (F) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement, and a signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission (including by means of email transmission or in .pdf or similar format, in each case, complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[signature page follows]

Docusign Envelope ID: 9970DD6A-AEE4-4FB9-B387-AD6ED830E4AA

IN WITNESS WHEREOF, the parties have executed this Trilateral Co-Counsel and Distribution Agreement as of the date first set forth above.

**CHRISTIAN LEVINE LAW GROUP LLC**
**d/b/a CHRISTIANATTAR**

By: _____
Name: _____
Title: _____

**KASOWITZ BENSON TORRES LLP**

By: _____
Name: Stephen W. Tountas
Title: Partner

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

By: _____
Name: PETE SCHNEIDER
Title: PARTNER

# EXHIBIT G

**Remains Redacted**

# EXHIBIT G