Jeffrey L. Hartman, Esq. – NSB #1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, Nevada 89509
Telephone: (775) 324-2800
notices@bankruptcyreno.com

Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
**SBW LAW GROUP**
3600 Mayberry Drive
Reno, Nevada 89509
Telephone: (775) 299-4051
cbrust@sbwlawgroup.com
hwinston@sbwlawgroup.com

Attorneys for Plaintiff Christina W. Lovato, Trustee

**GRANT & EISENHOFER, P.A.**
Abe A. Alexander, *Pro Hac Vice Pending*
Cecilia E. Stein, *Pro Hac Vice Pending*
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
aalexander@gelaw.com
cstein@gelaw.com

**CHRISTIAN ATTAR**
James W.  Christian, *Admitted Pro Hac Vice*
1177 W.  Loop South, Suite 1700
Houston, Texas 77027
Telephone: (713) 659-7617
jchristian@christianattarlaw.com

**KASOWITZ LLP**
Stephen W. Tountas, *Admitted Pro Hac Vice*
1633 Broadway,
New York, NY 10019
Telephone: (212) 506-1700
stountas@kasowitz.com

Counsel for Plaintiffs Christina W. Lovato, Trustee and Doug Collins

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>META MATERIALS INC.,<br><br>Debtor. | Case No.: 24-50792-gs<br>(Chapter 7) |
| CHRISTINA W. LOVATO, in her capacity as Chapter 7 Trustee of the Bankruptcy Estate of Meta Materials Inc.; META MATERIALS INC.; AND DOUG COLLINS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br>CITADEL SECURITIES LLC, VIRTU AMERICAS LLC, ANSON FUNDS MANAGEMENT LP, and ANSON ADVISORS, INC.,<br><br>Defendants. | Adversary Proc. No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.    PARTIES ......................................................................................................... 5

    **A.**    PLAINTIFFS ........................................................................................... 5

    **B.**    BROKER-DEALER DEFENDANTS................................................................ 7

    **C.**    ANSON FUND DEFENDANTS ..................................................................... 7

III.    JURISDICTION AND VENUE ....................................................................... 8

IV.    Summary of the Fraud ............................................................................... 9

    **A.**    META MATERIALS' BUSINESS.................................................................. 9

    **B.**    META MATERIALS' CLASS PERIOD OFFERINGS ...................................... 11

    **C.**    DEFENDANTS' MANIPULATIVE TRADING PRACTICES ARTIFICIALLY
        DEPRESSED THE PRICE OF META MATERIALS' STOCK ........................... 12

    **D.**    UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAD A DUTY,
        AS MARKET "GATE-KEEPERS," TO MONITOR ORDER FLOW AND TO
        REFRAIN FROM FACILITATING AND EXECUTING ILLEGAL TRADES ........................ 13

    **E.**    REGULATORS FOUND THAT, DURING THE CLASS PERIOD, DEFENDANTS
        VIOLATED SECURITIES LAWS AND REGULATIONS AIMED AT COMBATTING
        MARKET MANIPULATION.................................................................... 15

    **F.**    THE BROKER-DEALER DEFENDANTS' SPOOFING ORDERS MATERIALLY
        DISTORTED MARKET PERCEPTION OF META MATERIALS' SUPPLY AND
        DEMAND ........................................................................................ 17

    **G.**    THE BROKER-DEALER DEFENDANTS SUBMITTED A MASSIVE VOLUME OF
        ILLEGAL SPOOFING ORDERS DURING THE CLASS PERIOD, DESTROYING
        SUBSTANTIAL INVESTOR VALUE........................................................... 20

        1.    Citadel Example 1: June 29, 2021, 11:29:24 to 11:29:29.......................... 23

        2.    Citadel Example Two: September 1, 2021, 15:45:09 to 15:45:11............ 24

        3.    Citadel Example Three: January 4, 2022, 11:01:34................................. 25

        4.    Citadel Example Four: June 1, 2022, 09:57:41 to 09:57:44 ..................... 26

5.      Citadel Example Five: June 24, 2022, 13:23:17 to 13:23:18 .................. 26

6.      Virtu Example 1: January 21, 2022, 11:15:25-11:15:29 .......................... 27

7.      Virtu Example Two: March 1, 2022, 14:44:10-14:44:13 ........................ 28

8.      Virtu Example Three: March 2, 2022, 12:36:49-12:36:50 ....................... 29

9.      Virtu Example Four: May 17, 2022, 11:32:25 .......................................... 29

10.     Virtu Example Five: Regulation SHO Violation — November 27, 2023, Failure to Deliver ................................................................. 30

H.     THE ANSON FUND DEFENDANTS' MANIPULATIVE TRADING AROUND META MATERIALS' OFFERINGS ......................................................... 32

V.      Additional Allegations of Scienter AGAINST THE BROKER DEALER DEFENDANTS .......................................................................................... 33

VI.     Additional Allegations of Scienter Against the Anson Fund Defendants ........................ 43

VII.    Loss Causation .................................................................................................. 45

VIII.   Plaintiffs Are Entitled to a Presumption of Reliance ........................................ 47

IX.     Class Action Allegations ................................................................................ 48

X.      Causes of Action ............................................................................................ 50

COUNT I Violation of Section 10(b) of the Exchange Act Against All Defendants ................... 50

COUNT II Violation of Sections 9(a)(2) and 9(e) of the Exchange Act Against Defendants ............................................................................................................... 52

COUNT III Violation of Section 10(b) of the Exchange Act Against the Anson Fund Defendants (Misappropriation Theory) .............................................................. 54

COUNT IV For Violations of Section 20A of the Exchange Act Against the Anson Fund Defendants ............................................................................................................... 55

XI.     PRAYER FOR RELIEF ................................................................................ 57

1.      Certification of this action as a class action; ........................................... 57

2.      Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law; .................................................................. 57

3.  Awarding Plaintiffs' costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and............................ 57

4.  Awarding such other and further relief as may be just and proper. ........... 57

XII.   Jury Trial Demanded.................................................................................................. 57

Plaintiffs Meta Materials Inc., ("Meta Materials" or "the Company"), by and through Christina W. Lovato its Chapter 7 Trustee ("Plaintiff Lovato"), and Doug Collins, bring this action under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other similarly situated persons who transacted in the securities of Meta Materials between June 28, 2021, and August 20, 2024, inclusive (the "Class Period"), and were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which include, among other things, a review and analysis of publicly available information relating to Meta Materials; and statistical and economic analyses of trading data relating to Meta Materials securities.  Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts supporting these allegations are known only to the Defendants or are exclusively within their custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

## I.   PRELIMINARY STATEMENT

1.      This federal securities class action arises from the Defendants' manipulative and illegal trading in the securities of Meta Materials, a nanomaterial technology company.  For years, Defendants Citadel Securities LLC ("Citadel"), Virtu Americas LLC ("Virtu") (together, the "Broker-Dealer Defendants") and Anson Funds Management LP and Anson Advisors, Inc. (the "Anson Fund Defendants") repeatedly, and on a massive scale, placed and executed manipulative trades that were designed to, and did, artificially deflate the price of Meta Materials stock and

1

expand its bid-ask spread, thereby causing investors to sell their shares at artificially depressed prices while also inflating their transaction costs.  This fraudulent scheme, known as "spoofing" enriched Defendants while devastating Plaintiffs and investors.

2.     As the SEC has explained, "spoofing" is a manipulative and illegal trading practice that involves submitting and then cancelling buy or sell orders without any genuine intent to execute them.  The purpose of these "baiting orders" is to mislead other market participants about the level of supply and/or demand for a security, or about the degree of its price volatility, thereby influencing market prices for that security.  For instance, a large quantity of baiting orders on the "sell-side" misleads investors into believing that there is excess supply for a security, thereby lowering market prices.  Similarly, a manipulator may place and cancel orders on both sides of the order book in order to create the appearance of excessive volatility, and therefore excessive risk, driving prices downwards.  As numerous financial economists have recognized, this latter form of spoofing in particular can have especially long-term and persistent effects on the prices of the manipulated security, while also increasing transaction costs for investors by inflating its bid-ask spread.[1]  As those cited studies demonstrate, market manipulation increases volatility – increased volatility leads to lower returns, and wider "posted and executed bid-ask spreads." With respect to the analyses of trading in Meta Materials securities presented below, "Baiting Orders" are defined

---

[1] *See, e.g.*, Brogaard, et al., *Does High Frequency Market Manipulation Harm Market Quality?* (2022) (market analyses show that increased spoofing – that is the placement of fleeting Baiting Orders on both sides of the order book – "leads to slower price discovery, higher return volatility, and wider posted and executed bid-ask spreads."); Williams, et al., *Spoofing in Equilibrium* (2021) (same); *see also* van Vliet, et al., *Is the Relation between Volatility and Expected Stock Returns Positive, Flat or Negative?* (2011) ("Due to compounding effects, higher volatility leads to lower geometric average returns, especially lowering the returns of the most volatile stocks."); Ang, et al., *High idiosyncratic volatility and low returns: International and further U.S. evidence*, 91 J. of Fin.  Econ.  1 (2009) ("Stocks with recent past high idiosyncratic volatility have low future average returns around the world.").

as those sell-side orders placed within five seconds before an Executing Purchase and canceled no later than two seconds after it; this definition is employed herein in an effort to identify Defendants' most egregious and obvious misconduct.[2]

3.    By manipulating the market price in this manner, the spoofer seeks to benefit his own positions in the security.  For instance, the spoofer may place a large quantity of sell-side Baiting Orders that move the market price down; that downward price movement may benefit the spoofer's pre-existing short positions, or the spoofer may place a number of new buy orders so that he can acquire the stock at the prices artificially depressed by this manipulative conduct.

4.    Additionally, if the spoofer is a large broker-dealer and market maker, like the Broker-Dealer Defendants, it can also use spoofing to manufacture mini "arbitrage opportunities" on incoming order flow in order to profit at its customers' expense.  For example, suppose a customer seeks to sell shares of Meta Materials stock.  A broker-dealer/market-maker could flash sell-side Baiting Orders in a market with faster price feeds to drive the price down, while flashing buy-side orders in a market with a slower price feed to drive the price up.  The broker-dealer/market-maker executes its customer's trades at an inferior price in the market with the faster feed, absorbing the trades as inventory; it then sells the inventory generated from the customer's trade at the higher "spoofed" price in the parallel market for its own account.  Indeed, as discussed below, *the SEC fined Citadel $23 million for engaging in this type of misconduct*.  Moreover, the head of institutional equity sales at Virtu *nicknamed this particular flavor of spoofing the "Three Tick Boogie."*  As discussed further below, market data indicates that Defendants engaged in this type of similar manipulation with respect to Meta Materials stock.

---

[2] *See, e.g.*, Figueiredo, et al., *The Role of Fleeting Orders on Options Expiration* (2021) (explaining that "fleeting orders" are standardly defined as those canceled less than 2 seconds after placement).

5.      Defendants' manipulative spoofing scheme also included an illegal practice known as "naked short selling," which refers to selling short without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period.  SEC Regulation SHO (17 C.F.R. § 242.200 – § 204.204) specifically proscribes this practice.  Under SEC regulations, all sellers of securities must promptly deliver, or arrange for delivery of, the securities that are the subject of the transaction.  Rules requiring prompt delivery of pledged securities are critical to the market's health because large and persistent "failures to deliver" deprive shareholders of the benefits of ownership, such as voting and lending.  Moreover, and particularly relevant to this case, naked short selling facilitates market manipulation by allowing traders to manufacture the appearance of market activity.  Naked short sellers flood the market with shares they neither own nor have borrowed, artificially creating the appearance of excess supply and exerting downward pressure on the stock price.

6.      In all cases, the spoofer's misconduct leaves innocent market participants, who must trade into a distorted market, holding the bag.

7.      During the Class Period, the Broker-Dealer Defendants repeatedly entered thousands of Baiting Orders and/or naked short sales designed to create the false impression that there was both excess supply and excess volatility in Meta Materials stock.  These manipulative orders were calculated to (and successfully did) deceive or induce other investors to sell their holdings at artificially deflated prices.

8.      Significantly, prior to and during the Class Period, regulators had specifically warned the Broker-Dealer Defendants that the trading platforms they had developed and operated could be—and in fact had been—used to facilitate unlawful trading activity such as spoofing.  For instance, in 2023, the SEC fined Citadel $7 million for order mismarking in violation of Regulation

4

SHO. And in 2017, even prior to the start of the Class Period, the SEC fined Citadel $23 million for "misleading [its retail customers] about the way it priced trades." Unsurprisingly, Citadel CEO Ken Griffin has repeatedly resisted efforts by the SEC to create greater transparency into trading activity, including into short selling.

9. The Anson Fund Defendants engaged in similarly manipulative conduct that included short selling around Meta Materials' securities offerings (a pattern of behavior known as "shorting and distorting"), further detailed below.

10. Like the Broker-Dealer Defendants, the Anson Fund Defendants were also fined for abusive short-selling practices, similar to those alleged in this Complaint during the Class Period. Specifically, on June 11, 2024, the SEC settled charges against the Anson Fund Defendants for issuing misleading disclosures to investors in Anson's co-managed fund concerning the fund's short-selling strategy. The SEC's order found that, from at least 2018 through 2023, Anson's offering documents failed to disclose that Anson's short strategy involved coordinating with activist short-position publishers on the timing of bearish reports and social media posts targeting securities Anson had shorted and sharing a portion of the resulting trading profits with those publishers. Anson Funds Management LP paid a $1,250,000 civil penalty and Anson Advisors Inc. paid a $1,000,000 civil penalty in that settlement.

## II.    PARTIES

### A.    PLAINTIFFS

11. Plaintiff Christina W. Lovato is the duly appointed and acting Chapter 7 trustee (the "Trustee") of the bankruptcy estate of Meta Materials Inc. ("Meta Materials" or the "Debtor"). On August 9, 2024, Meta Materials commenced a voluntary case under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada, captioned *In re Meta*

*Materials Inc.*, Case No. 24-50792-gs.  Plaintiff Lovato was thereafter appointed to administer the bankruptcy estate.

12.    Pursuant to 11 U.S.C. § 323, Plaintiff Lovato is the representative of the Meta Materials bankruptcy estate and has capacity to sue on its behalf. The estate includes Meta Materials' legal and equitable interests existing as of the commencement of the bankruptcy case, including causes of action belonging to Meta Materials, pursuant to 11 U.S.C. § 541.

13.    During the Class Period, and before the commencement of its bankruptcy case, Meta Materials issued, sold, or otherwise transacted in Meta Materials securities at prices adversely affected by Defendants' manipulative conduct, as reflected in the certification attached as **Exhibit 1**. Meta Materials thereby suffered injury from Defendants' violations of the federal securities laws alleged herein. The claims arising from those transactions are property of the bankruptcy estate and are asserted in this action by Plaintiff Lovato solely in her representative capacity.

14.    Plaintiff Lovato brings this action on behalf of the Meta Materials bankruptcy estate and, pursuant to Federal Rule of Civil Procedure 23, as made applicable by Federal Rule of Bankruptcy Procedure 7023, on behalf of all other persons and entities who fall within the Class definition alleged below. Plaintiff Lovato does not purport to assert individual claims belonging exclusively to particular creditors, shareholders, or other persons except through the procedural mechanism of Rule 23.

15.    Plaintiff Doug Collins ("Plaintiff Collins") resides in Lenoir City, Tennessee and was an investor in Meta Materials during the Class Period.  As set forth in the accompanying **Exhibit 2**, Plaintiff Collins sold Meta Materials securities at prices adversely affected by

6

Defendants' manipulative conduct during the Class Period and thereby suffered injury from Defendants' manipulative conduct in violation of the federal securities laws detailed herein.

**B.    BROKER-DEALER DEFENDANTS**

16.    Citadel Securities LLC is a Delaware limited liability company. Citadel is registered with the SEC as a broker-dealer and places and executes trades for both its customers and for its own account. According to Citadel, the company engages in market making in U.S. equities and other securities. According to Citadel, the company trades over 20% of U.S. equities volume and executes approximately 35% of all publicly listed retail volume.

17.    Virtu Americas LLC is a Delaware limited liability company. Virtu is a broker-dealer registered with the SEC and places and executes trades for both its customers and for its own account. According to Virtu, the company engages in market making in U.S. equities and other securities and is responsible for approximately 25% of retail orders placed in the U.S.

**C.    ANSON FUND DEFENDANTS**

18.    Anson Funds Management LP is a Dallas, Texas-based private investment advisory firm, founded in January 2003, specializing in providing investment advisory services to private pooled investment vehicles for sophisticated, qualified investors, including high net worth individuals, pension plans, funds of funds, family offices, endowments, and other institutions. It operates as a registered investment adviser with the SEC, and co-manages funds together with Anson Advisors, Inc. (its Toronto-based affiliate) as co-investment advisor.

19.    Anson Advisors, Inc. is a Toronto-based investment adviser (registered at 181 Bay Street, Suite 4200, Toronto, ON), operating as an SEC exempt reporting adviser. It co-manages a flagship fund together with Defendant Anson Funds Management, LP.

7

## III.    JURISDICTION AND VENUE

20.    This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure in the chapter 7 case entitled *In re Meta Materials Inc.*, Case No. 24-50792-gs, pending before this Court.

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157 because this action is "related to" the pending chapter 7 case. Plaintiff Lovato brings this action on behalf of the bankruptcy estate under 11 U.S.C. §§ 323 and 541, and any recovery obtained by Plaintiff Lovato will constitute property of the bankruptcy estate for distribution pursuant to the Bankruptcy Code.

22.    As required by Federal Rule of Bankruptcy Procedure 7008, and Local Rule of Bankruptcy Procedure 7008, Plaintiff Lovato and Plaintiff Collins consent to entry of final orders or judgment by the bankruptcy court if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

23.    Moreover, this proceeding is a core proceeding under 28 U.S.C. § 157(b) (A) and (O) to the extent it concerns administration of property of the estate and recovery of assets belonging to the estate, and the Class' claims arise from the same alleged conduct. Alternatively, and at a minimum, it is a proceeding related to a case under title 11 because its outcome could materially affect the administration of the bankruptcy estate.

24.    The claims asserted herein arise under §§ 10(b), 9(a), and 9(e) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78i, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157(b) and 1331, LR 1001(b), and § 27 of the Exchange Act, codified at 15 U.S.C. § 78aa.

8

25.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises in, or is related to, the pending bankruptcy case of Meta Materials Inc., which is a Nevada corporation.  Venue is also proper under Section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa because the Company was incorporated in this district and a significant portion of the damages due to Defendants' misconduct were suffered within this District, *i.e.*, Defendants' illegal trading conduct negatively impacted Meta Materials in Reno, Nevada.

26.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## IV.    SUMMARY OF THE FRAUD

### A.    META MATERIALS' BUSINESS

27.    Founded in 2011, Meta Materials was a Nevada corporation that developed, manufactured, and sold a nano-composite and other "smart materials." Nanomaterials are heavily utilized in the aerospace and defense industries.  Prior to going public, Meta Materials was Atlantic Canada's first publicly traded startup valued at more than $1 billion.[3]  During its tenure, Meta Materials worked with some of the world's leading companies in these fields including Airbus, Lockheed Martin, DuPont Teijin Films, PPG, Mitsubishi Electric, and Sekisui.

---

[3] Paul Withers, *N.S. Crown Corporation Made over $100M off Region's First Startup Unicorn,* CBC News (Sept. 21, 2021), https://www.cbc.ca/news/canada/nova-scotia/nova-scotia-innovacorp-meta-materials-unicorn-startup-1.6182912#:~:text=The%20province%20is%20billing%20Meta,at%20more%20than%20%241%20billion.

28.    The Company's products included metaAIR, laser glare protection eyewear for pilots; NANOWEB, a transparent and highly conductive film comprised of nanostructured wire mesh that can be used with glass or plastic surfaces; glucoWISE, a non-invasive, painless device for measuring blood glucose levels; and metaSURFACE, a transparent antenna for prescription lenses using NANOWEB film to facilitate extended reality applications.    Meta Materials also produced nano-optic structures and color-shifting foils for commercial and governmental authentication and brand protection applications, including the currency used by a G-10 central bank.    The Company also developed a ceramic nanoporous membrane separator for lithium-ion batteries used by manufacturers in a range of industries including aerospace, automotive vehicles, consumer electronics, communications, energy, and medical devices.

29.    As Meta Materials' business further expanded in 2020, it entered a reverse merger transaction with Torchlight Resources ("Torchlight"), an oil and gas exploration company based in Plano, TX.    Prior to merging with Meta Materials, Torchlight traded on the NASDAQ under the ticker symbol TRCH.    After the conclusion of the reverse merger transaction, Meta Materials began publicly trading on the NASDAQ on June 28, 2021, under the ticker symbol "MMAT."

30.    After the Merger with Torchlight was completed on June 28, 2021, CEO George Palikaras announced that Meta Materials had over $160 million in cash and a debt-free balance sheet, which would enable the Company to support near and long-term growth initiatives.    Meta Materials was the first nanomaterial company to list on the NASDAQ.    During the Class Period, Meta Materials also announced several strategic acquisitions, which would allow the Company to expand its production capabilities for its cutting-edge products.

31.    As part of the transaction, Torchlight declared a special Series A preferred stock dividend, whereby Torchlight shareholders would receive a share of preferred stock in an entity

10

that would hold Torchlight's oil and gas assets after the merger.  This entity later became Next Bridge Hydrocarbons, which traded under the OTC ticker MMTLP.  Immediately following the merger, Meta Materials stock traded at a high of $9.97 per share.

**B.    META MATERIALS' CLASS PERIOD OFFERINGS**

32.    On June 24, 2022, Meta Materials priced a registered direct offering of 37,037,039 shares of common stock at $1.35 per share, together with warrants to purchase an equal number of shares at an exercise price of $1.75 per share, for gross proceeds of approximately $50 million. Roth Capital Partners and A.G.P./Alliance Global Partners served as co-placement agents on the offering.

33.    Separately, throughout 2023, Meta Materials raised approximately $13 million through an "at-the-market" program, under which the Company sold newly issued shares incrementally into the open market at prevailing prices through a sales agent, rather than in a single negotiated transaction. Sales under this program were among the triggering events for the first downward reset of the Anson Fund Defendants' full-ratchet warrants, as alleged below.

34.    In April of 2023, Meta Materials raised $25 million through a "confidentially marketed public offering" (CMPO) — a public offering where select institutional investors are given private advance notice and "brought over the wall" (*i.e.,* told confidential details under a duty of confidentiality) before the deal is publicly announced and priced. Investors who bought stock in the offering also received attached warrants with a "full ratchet" anti-dilution provision. The warrants distributed through this offering were directly and mechanically indexed to the market of price of Meta Material stock through a "full-ratchet" anti-dilution provision.  That provision automatically resets the warrant's exercise price downward to match the price of any subsequent, lower-priced issuance of the same class of securities by the issuer, without regard to

11

the amount of dilution the new issuance causes. The economic effect is that the lower the issuer's stock price falls in later financings, the more valuable the warrant becomes to its holder. This meant that the more stock Meta Materials sold in future offerings, the more valuable the warrants became for their holders (including the Anson Fund Defendants). In 2023, the Meta Materials strike price reset three times, eventually hitting a contractual floor of $0.076 (set during a 5-trading-day pricing window in early December 2023).

35. In September 2023, Meta Materials entered into a common stock purchase agreement with Lincoln Park Capital Fund, LLC, giving the Company the right, at its sole discretion, to sell up to $50 million of common stock to Lincoln Park over a 30-month period, priced at 97% of the lower of the purchase-date intraday low or the average of the three lowest closing prices over the prior ten trading days — a formula that, like the "at the market" program, tended to sell more shares at lower prices as Meta Materials' stock declined.

36. Finally, on December 4, 2023, Meta Materials announced a registered direct offering of 75,000,000 shares of common stock at $0.08 per share, together with warrants to purchase an equal number of shares at $0.095 per share, for gross proceeds of $6.0 million. This offering's announcement commenced the five-trading-day pricing window which set the Anson Fund Defendants' full-ratchet warrants at their contractual floor, as alleged below.

C. **DEFENDANTS' MANIPULATIVE TRADING PRACTICES ARTIFICIALLY DEPRESSED THE PRICE OF META MATERIALS' STOCK**

37. Due to Defendants' manipulative trading conduct, including pervasive spoofing and illegal and/or abusive naked-short selling, and the Anson Fund Defendants' "short and distort" scheme, detailed further below, the price of Meta Materials shares was highly volatile and depressed throughout the Class Period.

38.    Moreover, the excess volatility resulting from Defendants' misconduct artificially inflated the bid-ask spread for Meta Materials stock, causing Plaintiffs as both purchasers and sellers to incur increased transaction costs when they traded in Meta Materials stock.

39.    Meta Materials ceased all operations and filed for chapter 7 bankruptcy on August 9, 2024. Plaintiff Lovato was then duly appointed as trustee of the bankruptcy estate.

### D.    UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAD A DUTY, AS MARKET "GATE-KEEPERS," TO MONITOR ORDER FLOW AND TO REFRAIN FROM FACILITATING AND EXECUTING ILLEGAL TRADES

40.    Investors cannot place orders on an exchange unless they are members of that exchange.  As broker-dealers, the Broker-Dealer Defendants execute trades and place orders on various exchanges on behalf of investors who do not have direct exchange access.  In addition to routing customer orders, the Broker-Dealer Defendants also trade for their own account and "internalize" customer order flow (*i.e.*, absorb customers' trades in their inventory and then trade that inventory for their own account).  Indeed, as discussed below, market data makes clear that Defendants held substantial proprietary short positions in Meta Materials stock during the Class Period which are connected to Defendants' spoofing activity.

41.    Regulators regard broker-dealers, and investment advisors like the Anson Fund Defendants, as critical "gate-keepers" of market integrity and financial-system stability.  U.S. laws and regulation make broker-dealers responsible for illegal and manipulative trading they facilitate and execute.  In particular, the SEC requires broker-dealers to ensure that all order flow they execute on behalf of customers (and, of course, on their own behalf) complies with applicable laws, rules, and regulations.

42.    For instance, the SEC's Market Access Rule, 17 C.F.R. § 240.15c3-5, requires that broker-dealers establish, document, and maintain supervisory and risk-management systems

designed to identify and control financial, regulatory, and operational risks, and to safeguard the fairness and orderliness of the markets.

43.    The Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization for broker-dealers that operates under SEC oversight and is responsible under federal law for supervising its members, also requires broker-dealers to ensure that orders they execute on their behalf or on behalf of their customers comply with federal securities laws.  For instance, Rule 3110 requires brokerage firms to "establish and maintain a system to supervise the activities of each associated person, (i.e., customers or internal trading desk) that are reasonably designed to achieve compliance with applicable securities laws and regulations[.]"

44.    Registered broker-dealers such as the Broker-Dealer Defendants are also obligated under FINRA and NASDAQ rules to detect and prevent manipulative or fraudulent trading activity, including algorithmic high-speed trading, conducted under their supervision. Additionally, FINRA requires firms to file an Annual Certification of Compliance and Supervisory Processes confirming that they have: (1) implemented and maintained policies and procedures reasonably designed to achieve compliance with applicable FINRA, Municipal Securities Rulemaking Board, and federal securities rules; (2) updated those procedures as business, regulatory, or legislative developments require; and (3) tested their effectiveness periodically to ensure continued compliance.

45.    Defendants expressly recognized and accepted their role as market "gate-keepers" and their obligation to monitor customer order flow and to prevent, rather than facilitate, unlawful trading schemes such as spoofing executed under their Market Participant IDs ("MPIDs"). Defendants maintained written compliance procedures affirming these monitoring obligations.

46.     Investment advisors such as the Anson Fund Defendants are also obligated to assure that brokers placing trades on their behalf do not evade the regulations discussed above, including regulation SHO, which prohibits abusive and manipulative short selling, including "naked" short-sales – *i.e.*, non-bona fide pledges to deliver securities to a counterparty not supported by securities actually available in the market.

47.     As detailed below, regulators have found that Defendants routinely disregarded these obligations.  Indeed, even prior to the start of the Class Period, regulators had warned the Broker-Dealer Defendants that the market-access and trading platforms they had developed and operated could be – and, in fact, had been – used to facilitate unlawful trading activity such as spoofing, and illegal and/or naked short selling and/or illegal abusive short selling.  Registered broker-dealers such as the Broker-Dealer Defendants are liable for their customers' illegal trading activities, if they know of, or recklessly disregard that their customers are engaged in manipulative trading.

E.     **REGULATORS FOUND THAT, DURING THE CLASS PERIOD, DEFENDANTS VIOLATED SECURITIES LAWS AND REGULATIONS AIMED AT COMBATTING MARKET MANIPULATION**

48.     Both before and during the Class Period, the SEC fined Defendants millions of dollars for failing to maintain adequate supervisory systems, recordkeeping, and communication controls over its trade execution.  Regulators – both the SEC and FINRA – found that these deficiencies allowed Defendants to issue false reports and other statements and have repeatedly warned that such deficiencies create precisely the conditions under which manipulative trading can occur.

49.     Significantly, in 2017, the SEC fined Citadel $23 million for violating anti-fraud provisions of the Securities Act of 1933.  Specifically, Citadel used algorithmic trading to identify pricing differences in best bid/offer pricing feeds and exploited those differences to benefit itself

15

at the expense of its customers.  Notably, Citadel's fraudulent scheme involved flashing "non-marketable order[s] to be displayed in the market at a price that was less than the" best bid offer "for up to one to five seconds" – just like the fleeting Baiting Orders at issue here.

50.    Likewise, on September 22, 2023, the SEC ordered Citadel to pay $7 million for widespread and longstanding violations of Regulation SHO.  Regulation SHO prohibits abusive and manipulative short selling, including "naked" short-sales – *i.e.*, non-bona fide pledges to deliver securities to a counterparty not supported by securities actually available in the market. Specifically, the SEC found that from September 2015 to September 2020 the broker-dealer "inadvertently marked certain short sale orders as long sales, and long sales as short sales, while handling orders on behalf of its broker-dealer clients. As a result, an estimated millions of sell orders were mismarked."

51.    The SEC has also fined the Anson Fund Defendants during the Class Period for manipulative "short and distort" practices.  Specifically, the SEC settled charges against Anson Funds Management, LP and Anson Advisors, Inc. on June 11, 2024, for issuing misleading disclosures about the fund's short-selling strategy. Anson Funds Management was fined $1.25 million, and Anson Advisors was fined $1 million — a combined US$2.25 million — for failing to disclose that their short strategy involved coordinating with an activist short publisher on the timing of bearish reports and social media posts and sharing trading profits with that publisher. The SEC alleged that the Anson Fund Defendants concealed payments totaling $1.1 million to the unnamed publisher, with the hedge fund allegedly generating over $4 million in gains in late 2018 by coordinating on timing with the researcher. Anson Advisors was cited for the antifraud provision, while Anson Funds was cited for violations of both the antifraud provisions and the Advisers Act recordkeeping/compliance provisions.

16

**F.      THE BROKER-DEALER DEFENDANTS' SPOOFING ORDERS MATERIALLY DISTORTED MARKET PERCEPTION OF META MATERIALS' SUPPLY AND DEMAND**

52.      In a market free from manipulation, a security's price reflects the natural interplay of supply and demand: when demand increases or supply decreases, the price rises; conversely, when demand falls or supply expands, the price declines.  A stock's price also reflects its volatility – that is, the degree to which that price fluctuates up or down over a given period.  Stocks with greater volatility are associated with greater risk because price is less predictable; accordingly, greater volatility depresses a stock's price.

53.      The purpose of a spoofing scheme is to manipulate publicly available data regarding a security's true supply and demand, or its volatility, by introducing false and deceptive signals into the market that masquerade as genuine buying or selling interest.

54.      A spoofer manipulates market perception by placing deceptive Baiting Orders into the Limit Order Book to fabricate the appearance of heightened supply or demand.[4] These Baiting Orders serve no legitimate economic purpose, and the spoofers never intend to execute them.  Their sole function is to create the illusion of significant market interest, prompting other traders to react to the fictitious buying or selling pressure.  Once these false signals influence the market and alter the trading price, the spoofer cancels the Baiting Orders.  As discussed above, the spoofer can capitalize on the resulting price movement in several ways.  Among other things, the spoofer can purchase shares at artificially depressed prices or sell them at artificially inflated ones; or it can push prices in a direction that accommodates, or enhances the value of, a pre-existing position (for

---

[4] A "Limit Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point.  The Limit Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.

instance, pushing the price of a security above or below the strike price of a corresponding put or call option).[5]

55.     Spoofing can be used to artificially move a security's price in *either* direction – to increase or decrease its price.  As discussed above, if a spoofer's objective is to push the price of a security downward, it may place Baiting Orders to sell that are intended to bait or trick other investors into submitting their own sell orders in an effort to minimize losses or avoid further decline in a perceived falling market. After the spoofer enters the Baiting Orders to sell and those orders have induced other market participants to sell, the spoofer may capitalize on the price movement by executing buy orders, referred to as "Executing Purchases," on the opposite side of the order book. These Executing Purchases are meant to be executed at the artificially deflated prices created by the prior Baiting Orders. Once the Executing Purchase Orders to buy have been executed in the Limit Order Book, the spoofer cancels the Baiting Orders to sell, thereby completing the spoofing cycle.  Moreover, and particularly if the spoofer's aim is to generate a longer-term negative price impact, the spoofer may artificially create the appearance of excessive price volatility by flashing Baiting Orders on *both* sides of the order book.  In either case, once the spoofer's purpose is accomplished, the Baiting Orders, which the spoofer never intended to execute, are canceled.

56.     A spoofing scheme designed to move a security's price upward or downward is often carried out repeatedly within a single trading day and continued over an extended trading period.  Although each individual spoofing event may exert only a limited effect on the market, the cumulative impact of repeated spoofing over time can be substantial, persistent, and enduring

---

[5] Spoofers often use high-frequency trading computer systems that operate algorithmic trading programs to maximize the speed of their market access and the execution of their trading strategies.

because investors' reaction to a given price movement is also a function of their assessment of prior stock movements. Spoofing typically occurs in connection with a corresponding naked short sale. The naked short seller sells at the highest price and then spoofs the price down and arrives at the lower manipulated price and pockets the spread. The market has memory. As such, the market's reaction to seriatim material declines in a stock's price will be different than its reaction to a single decline. Again, empirical evidence shows that the effect of volatility-generating spoofing is particularly long-lasting.

57. Both prior to and during the Class Period, and during the Class Period, Meta Materials released a steady stream of positive news including promising acquisitions in the nanotechnology space. For example, on August 5, 2021, Meta Materials announced that it had entered an agreement to acquire the Nanotech Security Corporation, which was a leader in the development of nano-optic security features providing anti-counterfeiting solutions used in government, banknote, and brand protection markets. The acquisition was considered a strong strategic fit because Nanotech provided both enhanced manufacturing capabilities and an existing customer base. Most importantly, Nanotech had a longstanding contract with a major central bank, which Meta Materials inherited after the acquisition. This contract was the foundation of Meta's banknote security business and the source of the KolourOptik technology that the company later touted as one of its flagship products. The acquisition concluded in October of 2021.

58. During the Class Period, Meta Materials carried out two additional strategic acquisitions. On April 4, 2022, Meta Materials announced that it had acquired Plasma App Ltd., "a developer of high-performance functional materials and nanocomposites." Just two months later, in June 2022, Meta Materials acquired the Opdot Corporation, a lithium-ion battery separator

19

manufacturer. But despite this positive news, Meta Materials stock price declined by *99%* during the Class Period as a direct result of Defendants' manipulative and illegal trading.

### G. THE BROKER-DEALER DEFENDANTS SUBMITTED A MASSIVE VOLUME OF ILLEGAL SPOOFING ORDERS DURING THE CLASS PERIOD, DESTROYING SUBSTANTIAL INVESTOR VALUE

59. Detecting manipulative trading schemes is challenging. This is because, first, participants in such schemes typically use multiple tactics to conceal their unlawful activity, and second, most publicly accessible order flow for listed securities is anonymized, making it difficult to trace specific trading behavior to particular actors.[6]

60. Defendants' spoofing activity was carried out by their own traders, who traded either for Defendants' proprietary accounts or on behalf of Defendants' customers. As "gatekeepers" of market integrity, Defendants were obligated to establish, document, and maintain supervisory controls, policies, and procedures designed to manage risk and prevent fraudulent trading by their customers, as discussed above. In either case, Defendants are liable both for their own traders' actions and for knowingly or recklessly executing massive and widespread manipulative and illegal trades placed by their customers.

61. During the Class Period, the Broker-Dealer Defendants entered thousands of Baiting Orders on U.S. stock exchanges with no purpose but to create the false impression that Meta Materials' stock price was a function of bona fide supply/demand and volatility dynamics.

62. Defendants executed their spoofing schemes through the following steps:

    a. Acting either for their own account or executing customer trades, Defendants inundated exchange Limit Order Books with a large volume of

---

[6] In this regard, public investors are very differently situated from Defendants, who have unfettered access to order and execution data, possess sophisticated monitoring tools, indeed, have a duty to track those data in real-time for manipulative trading, as discussed above. Accordingly, while public investors have an exceedingly difficult time uncovering evidence of manipulative trading, Defendants' execution of those trades was severely reckless, at a minimum.

Baiting Orders. These Baiting Orders were placed solely to deceive and mislead other market participants into believing that the price of Meta Materials shares was moving in a particular direction due to ordinary market forces of supply/demand and price volatility; and

b.  Defendants cancelled and removed all outstanding Baiting Orders from the Limit Order Books within seconds after (or in tandem with) achieving the desired directional price movement.

63.  These steps of Defendants' spoofing scheme, which together constitute a "Spoofing Episode," were repeated numerous times each day, continuing throughout the entirety of the Class Period.

64.  Defendants' continuous placement and cancellation of thousands of Baiting Orders on U.S. stock exchanges served no legitimate market function. Instead, Defendants' trading was intended to transmit false and misleading price signals designed, among other things, to "trick" or "bait" other market participants into placing their own sell orders. Through this scheme, Defendants perpetrated a fraud on the market and created a "pile-on" effect that depressed the price of Meta Materials' shares over time. As discussed, this manipulation benefitted Defendants in multiple ways, including (1) enhancing the value of their pre-existing short positions, allowing Defendants to cover those significant positions at advantageous prices; (2) facilitating what a Virtu senior officer called the "Three Tick Boogie," whereby Defendants absorbed and resold customer order flow at prices that were favorable to Defendants, but unfavorable to their customers. Meanwhile, Plaintiffs and the Class were forced to transact in Meta Materials stock at prices artificially depressed by Defendants' misconduct and at bid/ask spreads materially inflated by their misconduct.

21

65.     During the Class Period, Defendants collectively placed at least 44,002 manipulative Baiting Orders totaling at least 42,058,275 shares on U.S. exchanges.[7] Defendants' manipulative trading was profound and pervasive.   During the Class Period, Defendants orchestrated 21,092 Spoofing Episodes on 730 of the 792 trading days during the Class Period, representing approximately 92% of all trading days – at times placing ***thousands*** of Baiting Orders in the market on a given day.   During the Class Period, Citadel conducted a total of 17,983 Spoofing Episodes averaging 24.7 episodes per trading day and executed as many as 311 Spoofing Episodes on a single day, while Virtu conducted at least 10.2 Spoofing Episodes per day and executed as many as 101 Spoofing Episodes in a single day.

66.     Shortly after flashing these Baiting Orders and achieving the desired price movement (or in tandem therewith), Defendants cancelled all of the fictitious Baiting Orders. Plaintiffs anticipate that discovery will reveal additional Spoofing Events attributable to Defendants.

67.     It is important to note that these figures are conservative because trading data on U.S. exchanges is anonymized, making spoofing activity particularly difficult to detect.   Despite this limitation, Plaintiffs were able to identify Defendants' spoofing activity by matching anonymized transactions from U.S. exchanges (in which Defendants were significant market makers) with Defendants' off-exchange activity and identified trading on the Nasdaq exchange, wherein exchanges were flooded with Baiting Orders that caused significant declines in the price of Meta Materials stock.   Defendants' highly improbable "prescience" with respect to the timing,

---

[7] Again, these Baiting Orders were canceled less than ***seven seconds after they were placed, and 61.4% of them within 100 milliseconds***.  A less conservative definition of "Baiting Order" would identify further instances of spoofing.

scale, and monetization of their short positioning gives rise to a strong inference of market manipulation.

68.    Moreover, Virtu engaged in widespread "naked short selling," in violation of Regulation SHO, during the Class Period, as part of its effort to send false information regarding supply and demand to the market and drive the price of Meta Materials stock down. During the Class Period, SEC data shows a significant amount of "fails-to-deliver" ("FTDs") – *i.e.*, a short sale, in which the shares sold short were never delivered to the counterparty.

69.    Examples from ten days of trading activity during the Class Period help illustrate Defendants' manipulative spoofing scheme.

### 1.    Citadel Example 1: June 29, 2021, 11:29:24 to 11:29:29

70.    On June 29, 2021, at 11:29:24, the best bid and offer for Meta Materials shares on the NASDAQ were $7.48 and $7.49 per share, respectively.  From 11:29:24 to 11:29:27, Citadel placed Baiting Orders totaling 16,000 shares on NASDAQ at prices ranging from $7.49 to $7.48 per share.  During this baiting period, Citadel created a significant sell-side imbalance in the market.

71.    During this period, Citadel did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders.  Citadel's Baiting Orders successfully induced the entry of orders from other market participants, driving the price of Meta Materials shares downward.  Between 11:29:24 and 11:29:29, Citadel took advantage of this artificial downward pressure and made Executing Purchases totaling 3,250 shares (3,020 shares on exchange and 230 shares off-exchange through the FINRA Trade Reporting Facility), at prices ranging from $7.471 to $7.48 per share (volume-weighted average $7.4794), below the prevailing best offer of $7.49 per share.

72. Citadel began to cancel these Baiting Orders within 158 microseconds, and all of its Baiting Orders were cancelled by 11:29:27, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Citadel.

73. Within 40 microseconds of placing the above Baiting Orders on NASDAQ, Citadel also placed 400 shares of correlated Baiting Orders on NYSE Arca. Citadel's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

2. **Citadel Example Two: September 1, 2021, 15:45:09 to 15:45:11**

74. On September 1, 2021, at 15:45:09, the best bid and offer for Meta Materials shares on the NASDAQ were $4.60 and $4.61 per share, respectively. From 15:45:09 to 15:45:11, Citadel placed Baiting Orders totaling 23,000 shares on NASDAQ at prices ranging from $4.61 to $4.60 per share. During this baiting period, Citadel created a significant sell-side imbalance in the market.

75. During this period, Citadel did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders. Citadel's Baiting Orders successfully induced the entry of orders from other market participants, driving the price of Meta Materials shares downward. Between 15:45:09 and 15:45:13, Citadel took advantage of this artificial downward pressure and made Executing Purchases totaling 4,908 shares, at a price of $4.60 per share, below the prevailing best offer of $4.61 per share.

76. Citadel began to cancel these Baiting Orders within 70 microseconds, and all of its Baiting Orders were cancelled by 15:45:13, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Citadel.

24

77.     Within 955 microseconds of placing the above Baiting Orders on NASDAQ, Citadel also placed 59,337 shares of correlated Baiting Orders on the MEMX, BATS, EDGX, EDGA, NYSE Arca, NYSE, BATS Y, XCIS, and XASE exchanges.  Citadel's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

### 3.     Citadel Example Three: January 4, 2022, 11:01:34

78.     On January 04, 2022, at 11:01:34, the best bid and offer for Meta Materials shares on the NASDAQ were $2.67 and $2.68 per share, respectively.  From 11:01:34 to 11:01:34, Defendant Citadel placed Baiting Orders totaling 14,200 shares on the NASDAQ at prices ranging from $2.68 to $2.67 per share.  During this baiting period, Citadel created a significant sell-side imbalance in the market.

79.     During this period, Citadel did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders.  Citadel's Baiting Orders successfully induced the entry of orders from other market participants, driving the price of Meta Materials shares downward.  At 11:01:35 Citadel took advantage of this artificial downward pressure and made Executing Purchases totaling 7,210 shares, at prices ranging from $2.665 to $2.67 per share (volume-weighted average $2.6693), below the prevailing best offer of $2.68 per share.

80.     Citadel began to cancel these Baiting Orders within 101 microseconds, and cancelled all of its Baiting Orders by 11:01:35, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Citadel.

81.     Within 990 microseconds of placing the above Baiting Orders on NASDAQ, Citadel also placed 63,804 shares of correlated Baiting Orders on the BATS, NYSE, NYSE Arca, XCHI, MEMX, EDGX, BATS Y, EDGA, and XCIS exchanges.  Citadel's pattern of placing

25

coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

4.    **Citadel Example Four: June 1, 2022, 09:57:41 to 09:57:44**

82.    On June 01, 2022, at 09:57:41, the best bid and offer for Meta Materials shares on the NASDAQ were $1.95 and $1.96 per share, respectively.  From 09:57:41 to 09:57:42, Citadel placed 16,600 shares of Baiting Orders on NASDAQ at prices ranging from $1.97 to $1.96 per share.  During this baiting period, Citadel created a significant sell-side imbalance in the market.

83.    During this period, Citadel did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders.  Citadel's Baiting Orders successfully induced the entry of orders from other market participants, driving the price of Meta Materials shares downward.  At 09:57:44, Citadel took advantage of this artificial downward pressure and made Executing Purchases totaling 3,700 shares, at a price of $1.96 per share.

84.    Citadel began to cancel these Baiting Orders within 14 microseconds.  By 09:57:44 Citadel had cancelled all of its Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Citadel.

5.    **Citadel Example Five: June 24, 2022, 13:23:17 to 13:23:18**

85.    On June 24, 2022, at 13:23:17, the best bid and offer for Meta Materials shares on the NASDAQ were $1.58 and $1.59 per share, respectively.  From 13:23:17 to 13:23:18, Citadel placed 6,700 shares of Baiting Orders on NASDAQ at $1.59 per share.  During this baiting period, Citadel created a significant sell-side imbalance in the market.

86.    During this period, Citadel did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders.  Citadel's Baiting Orders successfully induced the entry of orders from other market participants, driving the price of Meta Materials

26

shares downward.    Between 13:23:18 and 13:23:20, Citadel took advantage of this artificial downward pressure and made Executing Purchases totaling 3,020 shares (420 shares on exchange and 2,600 shares off-exchange through the FINRA Trade Reporting Facility), at prices ranging from $1.5706 to $1.5801 per share (volume-weighted average $1.5754), below the prevailing best offer of $1.59 per share.

87.    Citadel began to cancel these Baiting Orders within 55 microseconds, and all of its Baiting Orders were cancelled by 13:23:18, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Citadel.

88.    Within 400 microseconds of placing the above Baiting Orders on NASDAQ, Citadel also placed 6,004 shares of correlated Baiting Orders on XASE, NYSE Arca, BATS, EDGX, and MEMX exchanges.  Citadel's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

6.    **Virtu Example 1: January 21, 2022, 11:15:25-11:15:29**

89.    On January 21, 2022, at 11:15:25, the best bid and offer for Meta Materials stock on the NASDAQ were $1.83 and $1.84 per share, respectively. From 11:15:25 to 11:15:25, Defendant Virtu placed 2,500 shares of Baiting Orders on NASDAQ at $1.84 per share. During this baiting period, Virtu created a significant sell-side imbalance in the market.

90.    During this period, Virtu sold 20 shares of Meta Materials stock.  At 11:15:29 Virtu made Executing Purchases totaling 3,000 shares (all off-exchange through the FINRA Trade Reporting Facility), at a price of $1.8302 per share, below the prevailing best offer of $1.84 per share. Measured from the final execution, the midpoint price of Meta Materials shares declined 54 basis points over the following minute and 54 basis points over the following five minutes.

27

91.     Virtu began to cancel these Baiting Orders within 3.6 seconds, and all of its Baiting Orders were cancelled by 11:15:29, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Virtu.

92.     Within 824 microseconds of placing the above Baiting Orders on NASDAQ, Virtu also placed 4,900 shares of correlated Baiting Orders on NYSE, NYSE Arca, EDGX, BATS, and BATS Y exchanges. Virtu's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

### 7.     **Virtu Example Two: March 1, 2022, 14:44:10-14:44:13**

93.     On March 01, 2022, at 14:44:10, the best bid and offer for Meta Materials on the NASDAQ exchange were $2.09 and $2.10, respectively. From 14:44:10 to 14:44:10, Virtu placed 2,700 shares of Baiting Orders on NASDAQ at $2.10 per share. During this baiting period, Virtu created a significant sell-side imbalance in the market.

94.     During this period, Virtu sold 100 shares of Meta Materials stock.  At 14:44:13 Virtu made Executing Purchases totaling 4,630 shares, at prices ranging from $2.09 to $2.095 per share (volume-weighted average $2.0902), below the prevailing best offer of $2.10 per share. Measured from the final execution, the midpoint price of Meta Materials declined 95 basis points over the following minute and 143 basis points over the following five minutes.

95.     Virtu began to cancel these Baiting Orders within 2.9 seconds, and all of its Baiting Orders were cancelled by 14:44:13, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Virtu.

96.     Within 696 microseconds of placing the above Baiting Orders on NASDAQ, Virtu also placed 4,100 shares of correlated Baiting Orders on the NYSE Arca, BATS Y, and BATS exchanges. Virtu's pattern of placing coordinated orders across multiple exchanges within

28

microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

### 8.   Virtu Example Three: March 2, 2022, 12:36:49-12:36:50

97.   On March 02, 2022, at 12:36:49, the best bid and offer for Meta Materials shares on the NASDAQ exchange were $1.69 and $1.70 per share, respectively. From 12:36:49 to 12:36:49, Virtu placed 2,800 shares of Baiting Orders on NASDAQ at $1.70 per share. During this baiting period, Virtu created a significant sell-side imbalance in the market.

98.   During this period, Virtu did not sell any shares of Meta Materials stock, consistent with the fictitious nature of Baiting Orders.  At 12:36:50, Virtu made Executing Purchases totaling 2,970 shares of Meta Materials stock (all off-exchange through the FINRA Trade Reporting Facility), at a price of $1.695 per share, below the prevailing best offer of $1.70 per share. Measured from the final execution, the midpoint price of Meta Materials declined 59 basis points over the following minute and 59 basis points over the following five minutes.

99.   Virtu began to cancel these Baiting Orders within 2 milliseconds, and all of its Baiting Orders were cancelled by 12:36:50, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Virtu.

100.   Within 707 microseconds of placing the above Baiting Orders on NASDAQ, Virtu also placed 4,600 shares of correlated Baiting Orders on NYSE Arca, BATS, BATS Y, and EDGX exchanges.  Virtu's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

### 9.   Virtu Example Four: May 17, 2022, 11:32:25

101.   On May 17, 2022, at 11:32:25, the best bid and offer for Meta Materials stock on the NASDAQ were $1.61 and $1.62 per share, respectively.  From 11:32:25 to 11:32:25,

29

Defendant Virtu placed 1,300 shares of Baiting Orders on NASDAQ at $1.62 per share. During this baiting period, Virtu created a significant sell-side imbalance in the market.

102.    During this period, Virtu sold 178 shares of Meta Materials stock. At 11:32:25 Virtu made Executing Purchases totaling 8,500 shares (all off-exchange through the FINRA Trade Reporting Facility), at a price of $1.61 per share, below the prevailing best offer of $1.62 per share. Measured from the final execution, the midpoint price of Meta Materials declined 62 basis points over the following minute.

103.    Virtu began to cancel these Baiting Orders within 13 milliseconds. By 11:32:25 Virtu had cancelled all of its Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed to the market by Virtu.

104.    Within 807 microseconds of placing the above Baiting Orders on NASDAQ, Virtu also placed 4,500 shares of correlated Baiting Orders on NYSE Arca, NYSE, EDGX, BATS, and BATS Y exchanges. Virtu's pattern of placing coordinated orders across multiple exchanges within microseconds is indicative of an automated trading strategy designed to maximize the manipulative impact of the Baiting Orders across the national market system.

105.    The trading patterns employed by the Broker-Dealer Defendants, discussed in the examples above, whereby Defendants artificially depressed the price of Meta Materials stock by creating an artificial sell-side imbalance in the market and subsequently made Executing Purchases of Meta Materials shares at depressed prices, can be seen repeatedly during the Class Period.

10.    **Virtu Example Five: Regulation SHO Violation — November 27, 2023, Failure to Deliver**

106.    Unlike the Spoofing Episodes described above, this example concerns Virtu's separate and independent violation of Regulation SHO's locate and close-out requirements, evidenced by Virtu's own produced trading and clearing records.

107.    On November 27, 2023, Virtu had a 401,693-share failure to deliver in Meta Materials stock, of which 377,586 shares (the "aged core") remained undelivered past the default close-out deadline that Rule 204 imposes on short-sale fails. That fail arose from a day on which 99.3% of the selling that settled into Virtu's account was short marked.

108.    Once the default deadline passed, Rule 204 left Virtu exactly two routes to timeliness, both running to the third settlement day: the "long sale" allowance, which the origin day's marking record caps at no more than 3.7% of the aged lot, and the bona fide market-making allowance, which the allegations above show Virtu cannot establish for Meta Materials. Because neither escape covers the aged core of this fail, the November 27, 2023, fail violated Rule 204's close-out requirement.

109.    The November 27, 2023, fail is not an isolated occurrence. Evaluating Virtu's aged Meta Materials delivery obligations on an obligation-by-obligation basis — crediting each delivery against the oldest open obligation first, the method most favorable to Virtu — Virtu incurred aged failures to deliver, past the applicable Rule 204 close-out deadline, on at least seven settlement dates spanning three calendar years: (i) February 25, 2022 (104,188-share fail; 471 shares aged past deadline); (ii) November 22, 2022 (21,632-share fail; 21,632 shares aged past deadline); (iii) June 20, 2023 (33,780-share fail; 21,768 shares aged past deadline); (iv) November 2, 2023 (271,657-share fail; 59,233 shares aged past deadline); (v) November 27, 2023, the exhibit described above (401,693-share fail; 377,586 shares aged past deadline); (vi) April 30, 2024, in post-split units (14,603-unit fail; 3,267 units aged past deadline); and (vii) June 28, 2024, in post-split units (2,945-unit fail; 1,066 units aged past deadline).

110.    In total, these seven dates account for 480,690 pre-split shares plus 4,333 post-split units (each unit equaling 100 pre-split shares) of aged, unresolved delivery obligations, with 78%

31

of the pre-split total concentrated in the November 27, 2023, example alone. Their significance lies in both size and repetition: the same close-out clock ran out the same way on seven dated occasions across three years, before and after the exhibit, in both the pre-split and post-split eras — a sustained pattern rather than an isolated lapse.

### H.   THE ANSON FUND DEFENDANTS' MANIPULATIVE TRADING AROUND META MATERIALS' OFFERINGS

111.   In addition to the misconduct alleged above, the Anson Fund Defendants engaged in a related pattern of short selling around Meta Materials' securities offerings, a pattern of behavior known as "shorting and distorting."  Among other things, the Anson Fund Defendants traded on material nonpublic information relating to nonpublic offerings of Meta Materials securities in order to enrich themselves at the Class' expense.

112.   For instance, on or before April 3, 2023, the Anson Fund Defendants privately received from Meta Materials confidential advance notice of the April 14, 2023 nonpublic offering of discounted Meta Materials securities discussed above, which included warrants carrying full-ratchet anti-dilution provisions.[8] Notwithstanding its obligations to keep information concerning the imminent discounted offering confidential, the Anson Fund Defendants recognized that they would be able to reap significant profits in two ways by trading on this material nonpublic information.  First, they could sell Meta Materials stock short, knowing they could later replace the shorted shares with discounted securities purchased in the offering.  Second, the Anson Fund Defendants' short-selling activity would depress the exercise price of the warrants they acquired

---

[8] For instance, an Anson document dated January 31, 2023, references an imminent capital raise at Meta Materials, correctly stating it would occur on terms "similar to the June 2022 financing where common shares were issued at a 30% discount."

through the offering and dramatically increasing their value.  And this is exactly what the Anson Fund Defendants did.

113.    On April 3 and 4, 2023, the Anson Fund Defendants sold 1,252,570 shares short (at approximately $0.51) via a desk their own records labeled "***Deal-Equity***" – a reference to the imminent nonpublic offering.  Then, in the April 14, 2023 offering, the Anson Fund Defendants purchased 17,333,335 shares of Meta Materials common stock directly from the Company — approximately 20.8% of the offering — at $0.30 per share, together with 17,333,335 warrants to purchase Meta Materials common stock, and, in the same settlement cycle, closed their April 3–4 short position in the identical amount, fund by fund, at $0.269 per share. Between April 14 and May 10, 2023, the Anson Fund Defendants resold 8,587,606 of the shares purchased in the offering (approximately 49.5%) at an average price of approximately $0.2035 per share.

114.    As alleged above, the warrants the Anson Fund Defendants received in the April 2023 offering carried the only full-ratchet anti-dilution provision in Meta Materials' capital structure, with a strike price that reset downward three times during 2023 before reaching a contractual floor of $0.076 on December 6, 2023. That final reset was fixed by reference to the lowest daily volume-weighted average price of Meta Materials stock during the five trading days inclusive of and following the Company's December 4, 2023, offering announcement. The Anson Fund Defendants' own trading blotter reflects that they covered short positions in Meta Materials on December 4, 5, 6, and 7, 2023 — inside that precise five-day window — covering 5,269,484 shares at an average price of approximately $0.0662 per share.

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER AGAINST THE BROKER DEALER DEFENDANTS

115.    Numerous allegations set forth above and summarized below give rise to the strong inference that the Broker-Dealer Defendants knowingly, or at least recklessly, engaged in, or

facilitated, spoofing activity that was designed to, and in fact did, deceive, manipulate, and defraud investors in Meta Materials stock.  These allegations include the following:

116.    *First*, the volume of the Baiting Orders placed by the Broker-Dealer Defendants supports scienter.  During the Class Period, the Broker-Dealer Defendants collectively placed 44,002 Baiting Orders totaling at least 42,058,275 shares that were never intended to be executed.  By placing such a high volume of Baiting Orders, Defendants intentionally sent a false and misleading pricing signal to the marketplace.  Defendants' spoofing scheme successfully induced the entry of sell orders from other market participants.  Citadel's Baiting Orders caused the price of Meta Materials shares to plummet by 5.43 basis points on average, while Virtu's Spoofing Episodes drove down price of Meta Materials shares by 0.74 basis points on average.  During the same period, Defendants made Executing Purchases totaling 31,621,469 shares at these depressed prices.  Shortly thereafter, Defendants cancelled all of their Baiting Orders.

117.    *Second*, the Broker-Dealer Defendants collectively placed at least 90,134,395 shares of correlated Baiting Orders on other U.S. exchanges within one millisecond of their NASDAQ/PSX/BX orders. Defendants' placement of these correlated Baiting Orders also supports scienter.

118.    *Third*, the brief duration between Broker-Dealer Defendants' placement and cancellation of Baiting Orders further supports an inference of scienter.  In each Spoofing Episode, Defendants entered and cancelled their Baiting Orders within seconds, and Citadel frequently within microseconds.  Defendants' pattern, repeated thousands of times throughout the Class Period, demonstrates that Defendants had no intention of executing the Baiting Orders.

119.    *Fourth*, the volume of Baiting Orders placed by Broker-Dealer Defendants within short time periods during each Spoofing Episode also supports an inference of scienter.  In each

34

Spoofing Episode, Defendants cancelled all of their Baiting Orders, sometimes totaling thousands of shares, within seconds and often within milliseconds or microseconds--after placing them only moments earlier.

120.    *Fifth*, the Broker-Dealer Defendants executed tens of thousands of Spoofing Episodes during the Class Period – indeed, on nearly every trading day during the Class Period. Moreover, Defendants often executed dozens – and sometimes hundreds– of Spoofing Episodes over the course of a single trading day.  The repeated pattern of placing Baiting Orders to create artificially deflated prices and then cancelling all of the Baiting Orders supports an inference of scienter.

121.    *Sixth*, the Broker-Dealer Defendants developed and deployed algorithmic trading programs that carried out the Spoofing Episodes.  Citadel's algorithms were programmed to—and did, during the Class Period—generate trading patterns that involved the placement and cancellation of tens of thousands of Baiting Orders.  During the Class Period, Citadel placed 38,737 orders totaling 39,455,163 shares, while Virtu placed 5,265 orders totaling 2,603,112 shares to sell that were never intended to be executed.  Consistent with this, the Broker-Dealer Defendants placed and cancelled tens of thousands of Baiting Orders to sell in rapid succession, none of which were intended to be executed.  Furthermore, the Broker-Dealer Defendants are sophisticated market participants utilizing advanced technology, and continuously monitored, modeled, and analyzed the performance and effects of their algorithmic trading systems.

122.    *Seventh*, during Spoofing Episodes, the Broker-Dealer Defendants generated far greater artificial sell-side order flow before buying shares than during non-spoofed trading periods, as reflected by both the volume of sell-side orders entered and the rate of their cancellation.  For example, Citadel submitted Baiting Orders totaling, on average, 2,194 sell-side shares per

Spoofing Episode, which were subsequently cancelled.  By contrast, during non-spoofing periods, Citadel submitted orders averaging only 545 sell-side shares, which were subsequently cancelled—a difference of 303%.  Meanwhile, Citadel's purchase of shares at prices artificially depressed by Spoofing Episodes far exceeded its behavior in ordinary market activity.  Virtu behaved similarly, submitting new sell-side orders totaling, on average, 1,062 shares per executing purchase during Spoofing Episodes and only submitting new sell-side orders for an average of 332 shares per purchase during non-spoofing periods.  Among the Spoofing Episodes, during the cancellation period following the Executing Purchases, Virtu cancelled an average of 838 shares in sell-side orders, or 78.92% of the created volume.  During the same time window following non-spoofed purchases, Virtu cancelled an average of only 123 shares in sell-side orders, or 37.21% of the created volume.  The imbalance between Defendants' sell-side order volume during Spoofing Episodes versus non spoofing periods supports an inference of scienter.

123.    *Eighth*, during period preceding the execution of purchases during Spoofing Episodes, Citadel submitted new sell-side orders averaging 2,741 shares per executing purchase, over twice the number of sell-side orders Citadel placed during non-spoofing periods, which averaged only 1,115 shares per executing purchase.  Among the Spoofing Episodes, during the cancellation period following its Executing Purchases, Citadel cancelled an average of 2,194 shares in sell-side orders, or 80.03% of the created volume.  During the same time window following non-spoofed purchases, Citadel only cancelled an average of 545 shares in sell-side orders, or 48.83% of the created volume.  Virtu behaved similarly and submitted new sell-side orders for an average of 1,062 shares per executing purchase during Spoofing Episodes, nearly three times the amount of new sell-side orders Virtu submitted during non-spoofing periods, which averaged only 332 shares per purchase.

124. In other words, during Spoofing Episodes, the Broker-Dealer Defendants created more artificial sell-side order flow than during non-spoofing periods prior to buying shares, as measured by Defendants' (1) increased volume of sell-side order flow (Citadel's sell-side order flow volume was 146% higher and Virtu's sell-side order flow volume was 220% higher); (2) the cancellation of that order flow (Citadel cancellation rate was 303% higher, Virtu's was 579% higher); and (3) the greater share of cancelled sell-side order flow (Citadel 80.03% vs. 48.83%; Virtu 78.92% vs. 37.21%).

125. **_Ninth_**, that Broker-Dealer Defendants purchased far more shares at depressed prices during the minutes following the spoofing window supports scienter. Specifically, during the five minutes following Spoofing Episodes, Citadel purchased an average of 24,141 shares but only purchased 7,103 shares during non-spoofing periods. Similarly, Virtu purchased an average of 20,244 shares during Spoofing Episodes, but only purchased an average 4,336 shares following non-spoofing periods.

126. **_Tenth_**, the relative size of the cancelled Baiting Orders compared to the bona fide sell-side orders actually executed by the Broker-Dealer Defendants further supports an inference of scienter. During each Spoofing Episode, Citadel placed and subsequently cancelled an average of 2,491 shares in baiting orders while executing an average of 169 sell-side shares and Virtu placed and subsequently cancelled an average of 880 shares in Baiting Orders and executed zero sell-side shares during each Spoofing Episode. The stark contrast between the share volume of baiting orders and executed sell-side orders during each Spoofing Episode indicates that Citadel was manipulating the market by using baiting orders as tools to generate artificial prices rather than making a genuine attempt to sell Meta Materials shares. Sell-side order cancellation rates of

37

93.6% and 100% are a strong indication that Citadel and Virtu, respectively, never intended to execute those Baiting Orders.

127.    ***Eleventh***, the number of sell-side orders executed by the Broker-Dealer Defendants as compared to the number of purchases executed by Defendants during Spoofing Episodes also supports scienter.  In an average Spoofing Episode, Citadel executed 1,563 shares in executing purchases but only executed 169 sell-side shares (i.e., on average, Citadel executed 9 times more purchases than sales of Meta Materials shares during Spoofing Episodes).  Virtu behaved similarly and made purchases of 1,128 shares but executed zero sell-side shares. The stark imbalance between the size of the Broker-Dealer Defendants executing purchases and sell-side orders further demonstrates that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices at which to place executing purchases at favorable prices.

128.    ***Twelfth***, Citadel carried out 17,983 Spoofing Episodes during the Class Period, and often multiple episodes per trading day (averaging 24.7 Spoofing Episodes per day, with as many as 311 in a single day).  Virtu carried out 3,109 Spoofing Episodes during the Class Period (averaging 10.2 per day, with as many as 101 in a single day).  Defendants' pattern of placing fictitious Baiting Orders which created an artificially deflated share price subsequently executing purchases at the artificially deflated price—and then almost immediately cancelling all of its baiting orders—supports scienter.

129.    ***Thirteenth***, the Broker-Dealer Defendants' order cancellation rates, which were inconsistent with bona fide market-making (which involves purchases and sales in roughly comparable amounts to provide liquidity) are also indicative of scienter.  During spoofing episodes, Citadel cancelled 80.0% of the sell-side orders, but only 62.1% of the buy-side orders and Virtu cancelled 78.9% of the sell-side orders, but only 46.4% of the buy-side orders.

130.    *Fourteenth*, even prior to the start of the Class Period, regulators had warned the Broker-Dealer Defendants that the market-access and trading platforms they had developed and operated could be—and in fact had been—used to facilitate unlawful trading activity such as spoofing and had cited Defendants for failure to exercise the required degree of supervision over order flow. Indeed, as discussed above, Citadel was fined $23 million for using algorithmic trading to identify price differences in market feeds and exploit those differences to benefit itself at the expense of its customers. Again, Citadel's fraudulent scheme involved flashing "non-marketable order[s] to be displayed in the market at a price that was less than the" best bid offer "for up to one to five seconds" – just like the fleeting Baiting Orders at issue here. Accordingly, given the scope and breadth of the spoofing activity that occurred during the Class Period, Defendants' years- long placement and execution of hundreds of thousands of trades whose manipulative character would have been readily apparent to them was, at a minimum, reckless.

131.    *Fifteenth*, the SEC and other regulators specifically found that, during the Class Period, the Broker-Dealer Defendants failed to maintain adequate supervisory systems, recordkeeping, and communications controls—deficiencies that regulators have repeatedly warned create precisely the conditions under which manipulative trading can occur – and that, as a result, Defendants reported false information to regulators and market participants. Indeed, in 2023, Citadel was specifically fined for widespread and longstanding violations of Regulation SHO's proscription on abusive and manipulative short selling, including "naked" short sales. Significantly, the SEC found that Citadel "failed to timely and/or accurately report data for tens of billions of equities and option order events." That regulators specifically found during the Class Period that, at a minimum, Defendants abdicated their responsibilities as market gatekeepers to monitor the order flow they place (whether for their customers' account or their own) gives rise to

39

a strong inference that Defendants' placement and execution of the manipulative trades discussed herein was at least severely reckless.

132.     *Sixteenth*, the Broker-Dealer Defendants had a strong financial incentive to engage in spoofing of Meta Materials stock.  By placing fictitious Baiting Orders, Defendants were able to drive the price of Meta Materials stock down over the long term, thereby benefitting their pre-existing short positions and allowed Defendants to advantageously "internalize" customer order flow using the deceptive practice Virtu's own senior officer called the Three Tick Boogie.

133.     *Seventeenth,* Virtu's naked short selling also gives rise to an inference that Virtu was engaged in an effort to mislead the market about genuine supply for Meta Materials stock. Both the timing and volume of Virtu's FTDs give rise to a strong inference that they were not the product of bona fide market making activity, but rather a deliberate effort to deceive the market into falsely believing there was excess supply for Meta Materials stock, thereby depressing its price to benefit Virtu's short positions.  That Virtu's shorting activity was inconsistent with bona-fide market making in violation of Regulation SHO supports Virtu's scienter.

134.     *Eighteenth,* because a bona fide market maker fills both buy and sell orders, its inventory should remain roughly balanced. But Virtu's inventory of Meta Materials shares never did — 99.91% of its sales of Meta Materials Securities were marked short or "short exempt" during the Class Period.  Moreover, Virtu ended up owing shares to the clearing house on 202 out of 776 settlement days.

135.     *Nineteenth,* Virtu's pervasive mismarking of its sales of shares of Meta Materials as "short exempt" during the Class period, discussed in ¶144-150 below, is probative of Virtu's scienter.

40

136.   A sale may only be marked short-exempt mark under Rule 200(g)(2) where a gateway under Rule 201(c) or (d) is satisfied, and each such gateway—including the riskless-principal basis Virtu's own systems relied upon—opens only following an effective Rule 201 circuit-breaker determination. 17 C.F.R. §§ 242.200(g)(2), 242.201(c)–(d).

137.   In other words, a sale may be marked "short exempt" only when a Rule 201 circuit breaker — triggered by a 10% or greater intraday decline from the prior day's closing price — is in effect; a sale cannot be marked as short exempt on a day when no circuit breaker has been triggered.

138.   Virtu's own reported trade data reveal that Virtu's marking systems did not, in fact, apply this rule. Instead, Virtu marked a short sale "short exempt" whenever, and only whenever, the trade was executed in a riskless-principal capacity—irrespective of whether a circuit breaker was in effect that day. Comparing every one of Virtu's short-marked shares against these two fields (execution capacity and short-exempt mark), Virtu's mark followed capacity alone: of 584,826,790 short-marked shares from August 13, 2021, until the end of the Class Period, only 154 shares departed from that pattern.

139.   On the 530 regular-trading-hours sessions[9] during the Class Period, on which no Rule 201 circuit breaker was in effect for Meta Materials—a determination made and published by the NASDAQ—Virtu nonetheless marked 105,344,538 shares "short exempt." No valid basis for that mark existed on any of those 530 sessions, because the short-exempt gateways under Rule 201(c)–(d) simply did not open on days without a circuit-breaker determination.

---

[9] There were 608 unrestricted trading hours sessions during the 792 trading days of the Class Period.

140.   Virtu's unconditional short-exempt marking on non-circuit-breaker days constitutes a per se violation of Rule 200(g) and Rule 201, and, because the configuration was implemented as a dated, deliberate system choice and maintained for approximately three years notwithstanding Virtu's affirmative surveillance obligations under Rule 201(c)(2), it is probative of Virtu's scienter with respect to its Regulation SHO violations more broadly.

141.   On January 16 and 17, 2024—with no circuit breaker in effect in MMAT, and in the days immediately preceding public announcement of Meta Materials' reverse stock split—Virtu marked 24,607,043 shares "short exempt," representing 98.4% of all short-exempt marking in the entire market in Meta Materials shares during those two trading sessions. Virtu recorded its three largest Meta Materials settlement fails during the days immediately following, including a settlement date on which Virtu alone accounted for 100% of the market-wide Meta Materials' failure to deliver reported by the Commission's public fails-to-deliver data.

142.   Because Virtu was not entitled to rely on the bona fide market-making exception for the reasons alleged above, Rule 203(b)(1) required Virtu to locate securities before every short sale in Meta Materials throughout the Class Period. Virtu's assumption that it was categorically excused from this requirement means that, on information and belief, no locate records exist for the great majority of Virtu's Meta Materials short sales during the Class Period — an absence that is itself probative of scienter.

143.   *Twentieth*, Virtu's repeated failure to timely close out aged failures to deliver, as detailed in Virtu Example Five above, further supports scienter. The same close-out clock ran out the same way on seven dated settlement occasions across three calendar years — before and after the November 27, 2023, example, and in both the pre-split and post-split eras.

144.    *Twenty-first*, Virtu's firm-wide short marking and inventory posture runs through Virtu's own written Rule 200(f) aggregation plan, a document within Virtu's exclusive possession and control. Virtu's maintenance of a persistently short inventory posture across three years, notwithstanding whatever aggregation methodology that plan specifies, further supports an inference that Virtu's claimed reliance on the bona fide market-making exception was not made in good faith.

145.    Viewed collectively, as they must be, these allegations yield a strong inference that the Broker-Dealer Defendants either knew, or recklessly disregarded the fact that they placed and executed trades that were intended to, and in fact did, unlawfully manipulate the market in violation of federal securities laws, applicable industry regulations, and Defendants' own internal policies.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER AGAINST THE ANSON FUND DEFENDANTS

146.    Numerous allegations set forth above give rise to the strong inference that the Anson Fund Defendants knowingly, or at least recklessly, engaged in the manipulative and deceptive trading scheme alleged herein. These allegations include the following:

147.    *First*, the Anson Fund Defendants had a direct and continuing financial motive to depress the price of Meta Materials stock. As alleged above, the warrants the Anson Fund Defendants received in the April 2023 offering carried the only full-ratchet anti-dilution provision in Meta Materials' capital structure, under which the exercise price automatically fell each time Meta Materials sold stock at a lower price. The lower Meta Materials' stock price fell, the more valuable the Anson Fund Defendants' warrants became.

148.    *Second*, the Anson Fund Defendants' own trading blotter shows them covering short positions in Meta Materials on December 4, 5, 6, and 7, 2023, inside the precise five-trading-

day window that fixed the final and lowest reset of that ratchet at its contractual floor. This alignment between the Anson Fund Defendants' trading and the exact window that determined the value of their own warrant holdings supports a strong inference of scienter.

149.    ***Third***, the sequence of the Anson Fund Defendants' trading around the April 2023 offering supports scienter. The Anson Fund Defendants built a short position primarily through a distinctly labeled "Deal-Equity" desk in the days immediately preceding the offering, halted that shorting activity precisely at the start of the Rule 105 restricted period, and closed the short position on the offering date in the exact number of shares purchased in the offering. This pattern — a short position built, halted at a regulatory line, and closed in an amount matching a subsequent purchase — is not consistent with ordinary, unconnected trading decisions.

150.    ***Fourth***, the Anson Fund Defendants' pattern of coordinating with short-position publishers, as found by the SEC in its June 2024 settled order, supports scienter as to their conduct in Meta Materials stock as well. The SEC found that, from at least 2018 through 2023 — a period overlapping the conduct alleged herein — the Anson Fund Defendants coordinated with activist short-position publishers on the timing of bearish reports and social media posts targeting securities they had shorted, and shared trading profits with those publishers. The February 14, 2023, email described above, presenting Meta Materials' chief executive officer with an Anson-attributed bearish thesis on the Company, is consistent with that established pattern.

151.    Viewed collectively, as they must be, these allegations yield a strong inference that the Anson Fund Defendants either knew, or recklessly disregarded the fact, that their trading and related conduct was intended to, and in fact did, unlawfully manipulate the market for Meta Materials securities in violation of federal securities laws.

## VII.    LOSS CAUSATION

152.    Plaintiffs and other class members were damaged as a result of Defendants' fraudulent conduct alleged herein.  During the Class Period, Defendants engaged in a trading scheme to deceive investors by flashing massive blocks of Baiting Orders in shares of Meta Materials stock, only to cancel these orders after other market participants sold their shares.

153.    As a direct result of Defendants' scheme, the price of Meta Materials' stock was artificially depressed during the Class Period, while artificially inflating Plaintiffs' transaction costs with respect to both purchases and sales.

154.    Each Spoofing Episode was designed to and did have an immediate and significant effect on the market price of Meta Materials' shares, while the cumulative impact of Defendants' manipulative trading activities persisted for a much longer period.

155.    Defendants' manipulative trading practices artificially lowered the prices at which Plaintiffs were able to transact in Meta Materials securities shares throughout the Class Period.

156.    During the Class Period, spoofing activity took place on 730 of the 792 trading days, representing approximately 92% of all trading days.

157.    During the Class Period, at least 2,871,047 orders were flashed to the market at or better than the best price in the market and canceled within 100 milliseconds without execution, strongly indicative of an active spoofing operation in the marketplace.

158.    These flashed orders were part of a multi-market sweep strategy where orders with the same size and quantity were sent to multiple exchanges at the same time and then the orders were canceled shortly thereafter, also at the same time.  The market impact of this is that it triggers significantly more reaction from market participants when multiple venues demonstrate a change in apparent buy or sell interest.  These effectively created artificial price action consistent with aggressive spoofing activity.

159.   The distribution of non-bona fide orders by month shows that, as discussed above, large spikes in these orders occurred on major days during the Class Period where significant price action and volume occurred.  Furthermore, these non-bona fide orders were posted in lots of 100, which is the typical lot size for market makers such as Defendants.

160.   Throughout the Class Period, Plaintiffs issued and sold their shares for value, as detailed in Exhibits 1 and 2 to this Complaint.  Because Plaintiffs sold their shares on days when Defendants engaged in manipulative trading, and because that manipulative trading artificially depressed the price of Meta Materials stock, Plaintiffs sold their shares for value at artificially depressed prices and were damaged thereby.  Moreover, the excess volatility resulting from Defendants' misconduct artificially inflated the bid-ask spread for Meta Materials stock, causing Plaintiffs, as both purchasers and sellers, to incur inflated transaction costs when they traded in Meta Materials stock.

161.   The ongoing, repetitive, and continuous nature of Defendants' spoofing activity – which occurred on nearly every trading day during the Class Period – exerted a prolonged negative effect on the price of Meta Materials' shares.

162.   Throughout the Class Period, Defendants' Spoofing Episodes occurred on over 92% of all trading days in Meta Materials shares, and on those days the stock closed lower far more often than not, executing at artificially lowered prices than would otherwise have occurred. Moreover, on 47% of all trading days, the adverse price impact persisted in a manner that resulted in a close-to-close daily price loss of more than 1% in Meta Materials stock. The impact was even greater on certain days—for example, for 39 trading days, the Spoofing Episodes accompanied one-day price declines in Meta Materials stock of over 10%.  Defendants deliberately concealed their spoofing scheme to accomplish their unlawful objective of manipulating the price of Meta

46

Materials shares. The resulting and sustained decline in Meta Materials' share price confirms that Defendants' manipulative activity was effectively hidden from the market.

163. Class members unknowingly, and in reliance on Defendants' false signals, transacted in Meta Materials stock at artificially depressed prices on the NASDAQ and incurred inflated transaction costs as Defendants' misconduct caused the bid-ask spread for Meta Materials stock to artificially expand.

## VIII.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

164. At all relevant times, the market for the Meta Materials stock at issue in this case was an efficient market because, among other things:

(i) The Meta Materials stock at issue in this case met the requirements for listing, was actually listed and actively traded on the NASDAQ, a highly efficient and automated market.

(ii) According to the Company's most recent Form 10-Q filed with the SEC on May 13, 2024, Meta Materials had 6,695,536 outstanding shares of stock, demonstrating a broad market for Meta Materials stock;

(iii) As a registered and regulated issuer of securities, Meta Materials filed periodic reports with the SEC and NASDAQ, in addition to the Company's frequent voluntary dissemination of information; and

(iv) Meta Materials regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

47

165.    The market for Meta Materials shares promptly digested current information regarding Meta Materials from all publicly available sources and reflected such information in the price of Meta Materials shares.  Under these circumstances, all sellers of Meta Materials shares during the Class Period who relied upon the integrity of the market price of Meta Materials shares, including Plaintiffs, suffered similar injury through their sale of Meta Materials shares at artificial prices and increased transaction costs due to the inflated bid-ask spread, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## IX.    CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that transacted in the publicly traded securities of Meta Materials between June 28, 2021, and August 20, 2024, inclusive.

167.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Defendants, members of Defendants' Board, and members of their immediate families (as defined in 17 C.F.R.  § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Defendants.

168.    The members of the class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of Meta Materials stock were actively traded on the NASDAQ.  While the exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed class.  Class members may be identified from corporate records and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

169.    Plaintiffs' claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

170.    Plaintiffs will fairly and adequately protect the interests of the class members and have retained counsel competent and experienced in class and securities litigation.

171.    Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members.  Among the questions of law and fact common to the class are:

(i)  whether Defendants' acts as alleged herein violated the federal securities laws;

(ii) whether trades placed in securities exchanges by Defendants were manipulative or deceptive, in that they sent false pricing signals to other market participants;

(iii) whether Defendants' acts were committed with scienter;

(iv) whether Defendants' violations of federal securities law caused the Class' losses; and

(v) the extent to which the members of the Class have suffered damages, as well as the proper measure of damages.

172.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    CAUSES OF ACTION

<u>COUNT I</u>
**Violation of Section 10(b) of the Exchange Act Against All Defendants**

173.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This Count is asserted on behalf of all members of the Class against Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C.  § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R.  § 240.10b-5.

174.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to engage in the manipulative and deceptive trading scheme alleged herein.  Accordingly, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (i) employed the device, scheme, or artifice to defraud alleged herein; (ii) made materially false or misleading statements and omissions of material fact, including regarding market supply and demand for Meta Materials securities, alleged herein; (iii) engaged in the acts, practices, and courses of business alleged herein, which operated as a fraud or deceit upon Plaintiffs and upon members of the Class.   The manipulative and deceptive conduct, and misleading statements and omissions complained of herein, were designed to, and did: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of Meta Materials shares to trade below its true value; and (iii) cause Plaintiffs as well as other class members to sell or otherwise dispose of Meta Materials shares at artificially deflated prices that did not reflect the stock's true value during the Class Period, while also incurring increased transaction costs, as Defendants' misconduct artificially expanded the bid-ask spread for Meta Materials stock.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

175.    Defendants acted with knowledge or a reckless disregard for the truth of the trading activities alleged herein in that they failed to monitor and/or prevent these activities even though such activities were readily apparent to them, if not known.  Defendants' actions or inactions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Meta Materials' share price action, and the supply and demand for Meta Materials securities, thereby supporting the artificially deflated price of Meta Materials stock.

176.    Defendants are liable for orchestrating and executing the Spoofing Episodes alleged herein, which operated as a scheme to manipulate the market price of Meta Materials shares of stock.

177.    As set forth more fully above, strong circumstantial evidence exists that Defendants' conduct reflects the intentional or reckless nature of their unlawful scheme and course of conduct to defraud the market for Meta Materials securities.

178.    Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder are designed to ensure that Meta Materials securities trade in a fair and orderly market free of manipulation.  Defendants' scheme to manipulate the price of Meta Materials stock was structured in a manner that concealed their unlawful intentions and made it extremely difficult for a reasonably diligent market participant—like Plaintiffs—to discover the operative facts constituting the market manipulation scheme, much less the identities of the perpetrators of these schemes.

179.    During the Class Period, despite Plaintiffs' diligence, Plaintiffs did not discover— nor could a reasonably diligent plaintiff have discovered—the facts constituting the market manipulation claims or the identities of the perpetrators of these market manipulation schemes.

180.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in that Plaintiffs sold and/or issued for value Meta Materials shares at manipulated prices, in reliance on an assumption of a market free from manipulation.  Plaintiffs and the Class also incurred increased transaction costs when purchasing, acquiring, selling, or otherwise disposing of Meta Materials shares as Defendants' misconduct inflated the bid-ask spread for Meta Materials stock.

181.     Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the sellers of the Company's shares in an effort to maintain artificially low market prices for Meta Materials  shares, in violation of § 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

182.     By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other class members suffered damages in connection with their transactions in the Company's securities during the Class Period.

## COUNT II
### Violation of Sections 9(a)(2) and 9(e) of the Exchange Act Against Defendants

183.     Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to § 9(a)(2) of the Exchange Act, 15 U.S.C.  § 78i.

184.     Based upon the conduct described above, Defendants' manipulative scheme violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage

52

in a series of manipulative transactions "in any security...creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

185.    In their respective roles, Defendants directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to effect—alone or with one or more other person—a series of transactions in Meta Materials shares that created actual or apparent trading in such shares, raising or depressing the price of such shares for the purpose of inducing the sale of such shares by others.  Defendants accomplished this by means of the market manipulation strategy of spoofing which artificially affected the prices of Meta Materials shares that Plaintiffs sold or issued for value.

186.    Defendants' conscious misbehavior or recklessness artificially affected the price of Meta Materials shares that Plaintiffs sold and/or issued for value during the Class Period. Defendants' conscious misbehavior or recklessness thus caused injury to Plaintiffs.

187.    Pursuant to § 9(e), 15 U.S.C.  § 78i(e), Plaintiffs and the members of the Class who sold or issued Meta Materials securities at prices affected by Defendants' manipulative conduct were injured and have a private right of action to recover the damages sustained as a result.

188.    Plaintiffs and the Class seek damages as provided by law, together with interest, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper.

189.    As a direct and proximate result of Defendants' culpable conduct, Plaintiffs and other class members suffered damages in connection with their transactions in Meta Materials' securities during the Class Period.

## COUNT III
### Violation of Section 10(b) of the Exchange Act Against the Anson Fund Defendants
### (Misappropriation Theory)

190.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This Count is asserted on behalf of all members of the Class against the Anson Fund Defendants only for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, under the misappropriation theory of insider trading.

191.    Under the misappropriation theory, recognized by the Supreme Court in *United States v. O'Hagan*, 521 U.S. 642 (1997), a person violates Section 10(b) of the Exchange Act and Rule 10b-5 by trading in securities on the basis of material nonpublic information in breach of a duty of trust or confidence owed to the source of that information, regardless of whether any duty is owed to the trading counterparty. SEC Rule 10b5-2(b)(1), 17 C.F.R. § 240.10b5-2(b)(1), provides that such a duty of confidence exists whenever a person agrees to maintain information in confidence, an undertaking that wall-crossing agreements customarily include.

192.    As alleged above, on information and belief, the Anson Fund Defendants were brought over the wall with confidential advance notice of Meta Materials' April 2023 offering on or before April 3, 2023. Trading while in possession of that information, before its public announcement, is the factual predicate of the misappropriation theory asserted in this Count.

193.    The Meta Materials bankruptcy estate was the Anson Fund Defendants' direct counterparty on the 17,333,335 shares the Anson Fund Defendants purchased in the April 2023 offering, and the duty of confidence alleged in this Count would run to the Company or to the placement agents acting on the Company's behalf — the same party whose claims Plaintiff, as Trustee, now asserts — supplying both standing and a loss measure for this Count.

54

194.   As alleged above, the Anson Fund Defendants sold short 1,252,570 shares of Meta Materials stock on April 3 and 4, 2023, primarily through a trading desk that their own records label "Deal-Equity," ceased all further Meta Materials short sales for the remainder of the five-business-day period preceding the offering's pricing, and, on the date the offering closed, purchased 17,333,335 shares directly from the Company while closing their short position in the identical amount that same day.

195.   The Anson Fund Defendants, directly or indirectly, in connection with the purchase or sale of securities, with scienter as alleged above, by use of the means or instrumentalities of interstate commerce or of the mails, employed a device, scheme, or artifice to defraud, and engaged in an act, practice, or course of business that operated as a fraud or deceit, by trading Meta Materials securities on the basis of material nonpublic information concerning the April 2023 offering in breach of a duty of trust or confidence owed to the source of that information.

196.   By reason of the foregoing, the Anson Fund Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

197.   As a direct and proximate result of the Anson Fund Defendants' wrongful conduct alleged in this Count, Plaintiffs and other class members suffered damages in connection with their transactions in the Company's securities during the Class Period.

## COUNT IV
### For Violations of Section 20A of the Exchange Act Against the Anson Fund Defendants

198.   Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. §78t-1, on behalf of Plaintiffs, and all other members of the Class, who transacted in Meta Materials securities contemporaneously with the Anson Funds Defendants' short sales of Meta

Materials securities, while they were in possession of material, nonpublic information, as alleged herein, including information concerning Meta Materials' pending April 2023 offering.

199.    Section 20A(a) of the Exchange Act provides that: "Any person who violates any provision of the Exchange Act or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class."

200.    As alleged herein, the Anson Fund Defendants violated §10(b) of the Exchange Act for the reasons stated in Counts I-III above.  The Anson Fund Defendants also violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. §240.10b5-1) by selling short shares of Meta Materials on April 3 and 4, 2023, and subsequently purchasing 17,333,335 shares directly from the Company on the date the offering closed on April 14, 2023, while in possession of material, nonpublic information regarding the Company's impending April 2023 offering.

201.    Contemporaneously with the Anson Fund Defendants' short sales, Plaintiff Lovato, and other Class members transacted in Meta Materials securities in an open and efficient market, while the Anson Fund Defendants were in possession of material, nonpublic information, as alleged herein, including information concerning the Company's pending April 2023 offering.

202.    Plaintiff Lovato, and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

203.    By reason of the violations of the Exchange Act alleged herein, the Anson Fund Defendants are liable to Plaintiff Lovato, and the other members of the Class who sold shares of Meta Materials securities contemporaneously with the Anson Fund Defendants' April 14, 2023 purchases during the Class Period.

56

204.    Plaintiff Lovato, and the other members of the Class, who transacted in Meta Materials securities contemporaneously with the Anson Fund Defendants, seek disgorgement by the Anson Fund Defendants of profits gained or losses avoided from the Anson Fund Defendants' transactions in Meta Materials securities contemporaneous with Plaintiff Lovato's sales and the sales of other members of the Class.

205.    This Action was brought within five years after the date of the last transaction that is the subject of the Anson Fund Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Counts I-III above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Anson Fund Defendants.

## XI.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding Plaintiffs' costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

4.    Awarding such other and further relief as may be just and proper.

## XII.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

57

DATED: August 6, 2026               Respectfully submitted,

/s/ *Jeffrey L. Hartman*

**HARTMAN & HARTMAN**
Jeffrey L. Hartman Esq.
Nevada Bar No. 1607
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com
*Attorney for Plaintiff Christina W. Lovato,*
*Trustee*

**GRANT & EISENHOFER, P.A.**
Abe A. Alexander
Cecilia E. Stein
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
aalexander@gelaw.com
cstein@gelaw.com
*Counsel for Plaintiffs Christina W. Lovato,*
*Trustee and Doug Collins*

**CHRISTIAN ATTAR**
James W. Christian
1177 W. Loop South, Suite 1700
Houston, Texas 77027
Telephone: (713) 659-7617
Facsimile: (713) 659-4641
jchristian@christianattarlaw.com
*Counsel for Plaintiffs Christina W. Lovato,*
*Trustee and Doug Collins*

**KASOWITZ LLP**
Stephen W. Tountas
1633 Broadway,
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
stountas@kasowitz.com
*Counsel for Plaintiffs Christina W. Lovato,*
*Trustee and Doug Collins*

58