Jeffrey L. Hartman, Esq. – NSB #1607
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509
Tel: 775-324-2800
Fax: 775-324-1818
Email: notices@bankruptcyreno.com

Kent R. Robison, Esq. – NSB #1167
ROBISON LAW GROUP
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@robison-law.com

Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
SBW LAW GROUP
3600 Mayberry Drive
Reno, NV 89509
Email: cbrust@sbwlawgroup.com
        hwinston@sbwlawgroup.com

*Attorneys for Christina Lovato, Trustee*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>META MATERIALS INC.,<br><br>Debtor.<br><br>─────────────────────<br><br>CHRISTINA W. LOVATO,<br><br>     Plaintiff,<br>vs.<br><br>AUTHENTIX, INC., a Delaware corporation; AUTHENTIX SOLUTIONS CANADA, INC., a British Columbia corporation; and DOES I-V<br><br>     Defendants. | Case No.: 24-50792-gs<br>(Chapter 7)<br><br><br><br>Adversary No.:<br><br>**ADVERSARY COMPLAINT** |

Christina Lovato, in her capacity as the Chapter 7 Trustee (**"Trustee")** for the Bankruptcy Estate of Meta Materials Inc. ("**Meta**" or "**Debtor**"), sues the Defendants and each of them, jointly and severally, and alleges as follows:

1

# I.
## INTRODUCTION

1. Meta has been victimized by the fraudulent transfer of the assets of its subsidiary, Nanotech Security Corporation ("Nanotech").

2. One of Meta's subsidiary companies, 1315115 B.C. Inc., ("B.C.") was formed in 2021 for the sole purpose of acquiring Nanotech.

3. Armed with appropriate due diligence and independent fairness opinion, Meta commenced negotiations in June of 2021.

4. Meta through its alter ego subsidiary, acquired Nanotech for $72 million (USD).

5. The purchase price was appropriate because at the time Nanotech was a party to a $41.5 million (USD) contract with the United States Government. The financial forecast for Nanotech was promising.

6. On September 30, 2021, days before Meta's acquisition of Nanotech closed, Nanotech renewed its multi-year contract with the United States Government to provide bank note security features, a contract whose value Meta paid to acquire.

7. Nanotech generated over $7 million of revenue for the year 2021.

8. In the summer of 2022, Meta installed its new chairman of the board, John "Jack" Harding.

9. By October of 2022 Meta had moved into its new state-of-the-art headquarters in Halifax, Nova Scotia.

10. By 2023, the relationship between Nanotech and the United States Government was going well. Meta's new Halifax, Nova Scotia facility provided research and development support to Nanotech's operations in Thurso, Quebec and Burnaby, British Columbia.

11. In the fall of 2023, Meta replaced its President and Chief Executive Officer. The

2

maneuver was contrary to the best interests of Meta shareholders and creditors.

12.    George Palikaras, who was the founder of Meta and who was primarily responsible for consummating Meta's acquisition of Nanotech, was removed as President and Chief Executive Officer.

13.    Into 2024, Nanotech and the United States Government were negotiating the extension and renewal of Nanotech's contract. The prospect of renewal created a promising financial forecast for Nanotech and Meta.  Meta controlled every aspect of Nanotech's existence and Meta and Nanotech became one and the same business entity.

14.    However, in 2024 Meta's executives instituted a plan to begin stripping Meta of its valuable assets.  One of the reasons for doing so was to divert Meta assets to various Meta executives thereby depriving Meta of sufficient funds to pay its creditors.

15.    Among those assets was Meta's ownership and control of Nanotech.

16.    By March of 2024, Meta was insolvent. Its liabilities far exceeded the value of its assets and ability to generate revenue. Meta's financial condition was such that the sum of its debts in March of 2024 through and including the August 9, 2024 petition date, was greater than all of Meta's property at a fair market valuation.

17.    From mid-2023 into the Spring of 2024, the Meta Board of Directors and management were investigating the prospects of filing a bankruptcy proceeding on behalf of Meta.

18.    Meta was contacted by Defendant Authentix.  Authentix expressed interest in Meta's authentication assets and technology. Authentix was a participant in the scheme for Meta to dispose of Nanotech assets at a below market fire-sale price.

19.    In the spring of 2024, Authentix was aware of Nanotech's true value.  Authentix had been engaged to provide Meta with services regarding the extremely valuable technology that was a key component of the Nanotech contract with the United States Government.

3

20. In March of 2024, Ducera Partners LLC ("Ducera"), an investment banking and financial advisory firm, was advising Meta concerning the disposition of Meta's assets.

21. In its June 20, 2024 presentation to the Meta Board of Directors, Ducera warned that an unsecured creditors committee, a chapter 7 trustee, or another party could argue that the proposed $10,000,000 sale of the Nanotech assets to Authentix constitutes a fraudulent conveyance.

22. Despite the obvious and notwithstanding the advice from Ducera, specific executives, knowing that Meta was insolvent, sold Nanotech assets to Authentix for an unfair price of $10,000,000.

23. The Asset Purchase Agreement was signed on July 3, 2024, and the sale closed on July 16, 2024, less than one month before Meta filed its petition in Case No. 24-50792-gs (Chapter 7) on August 9, 2024.

24. At the time Meta was negotiating the sale of Nanotech assets to Authentix, Meta had all but secured another contract for Nanotech to provide authentication technology pursuant to a 2024 contract between Nanotech/Meta and the United States Government.

25. Meta received less than a reasonably equivalent value in exchange for its transfer for Nanotech's assets to Authentix. Meta transferred the Nanotech assets to Authentix at a time (July of 2024) when Meta was insolvent.

26. At the time of the July 2024 Meta/Authentix transaction, there was no corporate separateness between Nanotech and Meta. Likewise, there was no corporate separateness between Meta and the original purchaser of Nanotech, 1315115 B.C. Inc. B.C. was a shell entity doing no business whatsoever after the acquisition of Nanotech.

27. However, knowing that the sale of Nanotech would likely be challenged as a fraudulent transfer, Meta executive managers used Meta funds to insure themselves against corporate misconduct.

4

28.     The insurance was funded with Authentix deal money. The $2 million Authentix deposit received on June 17, 2024 was wired into Meta's own bank account, and Meta paid a $1.67 million directors and officers insurance premium from that same account four days later. Following the closing, a $2.9 million six-year "tail" premium was paid from the closing proceeds.

29.     Similarly, as part of the scheme to strip Meta of cash, the management executives gave themselves a "Consulting Agreement" with an upfront payment of $100,000 each.

30.     These executives provided little, if any, consulting services. Instead, these executives merely used cash from the sale of Nanotech's assets to Authentix to fund the consulting agreements they engineered and created on the eve of the bankruptcy filing.

## II.
## BACKGROUND ALLEGATIONS

31.     Metamaterial Inc. ("Meta I") was a CSE listed Canadian corporation that did a reverse merger with Torchlight Energy Resources ("TRCH") on June 28, 2021.

32.     TRCH was a NASDAQ listed energy company and was renamed to Meta Materials Inc., ("Meta II") trading on the NASDAQ as MMAT.

33.     Meta was a leading nanotechnology and advanced materials company with over one hundred (100) patents both pending and issued.

34.     Meta became a publicly traded company in March of 2020.

35.     In the spring of 2021, Nanotech was a technology company that developed nanooptic security foils for bank notes and brand protection applications.

36.     Meta was in negotiations with Nanotech in the spring of 2021 to acquire Nanotech.

37.     Nanotech was a leader in the development of secure visual nanooptics that provide anti-counterfeiting solutions used in the government, bank notes, and brand protection markets.

38.     Nanotech was, at that time, traded on the Toronto Stock Exchange Ventures

5

("TSXV").

39. Meta was, at the time, an early-stage advanced platform company commercializing metamaterials.

40. At the time Nanotech had decades of experience in nanophotonics R&D, high volume roll-to-roll nanoimprint lithography, and nano-coating production. At the time Nanotech had in-house, state-of-the-art electron beam lithography capability and was expected to significantly increase Meta's capacity for new customers' engagement.

41. Before closing the purchase of Nanotech, the Meta team and its advisors conducted extensive research and due diligence regarding the Nanotech purchase.

42. Meta's President and Chief Executive Officer, George Palikaras ("Palikaras") had been following the progress and development of Nanotech for over five years.

43. Meta I and Meta II merged in June of 2021. Thereafter, the company was referred to as Meta.

44. Meta entered into an Arrangement Agreement to acquire Nanotech on August 4, 2021.

45. Although 1315115 B.C. is identified as a party to the Arrangement Agreement, Meta was solely and exclusively responsible to honor the terms of the purchase, including payment of the purchase price.

46. Meta formed 1315115 B.C. Inc. ("B.C.") for the sole purpose of acquiring Nanotech. B.C. had no realistic or purposeful corporate existence after the acquisition of Nanotech.

47. Meta, through its alter ego subsidiary B.C., acquired all issued and outstanding common shares of Nanotech for $1.25 (CAD) per share (approximately $90.9 million CAD and approximately $72.2 million USD).

48. The purchase price was appropriate and fair according to valuations and opinions

6

generated by third-party valuations.

49.	At the time of the purchase, according to government publications, Nanotech was a party to a government contract which was the source of substantial income. The contract was a multi-year bank note security development program under a frame agreement with a maximum award value of $41.5 million (USD).

50.	On September 30, 2021, immediately before Meta's acquisition of Nanotech closed, Nanotech renewed its frame agreement with the United States Government.

51.	The renewed contract between Nanotech and the United States Government had a maximum value of C$52.7 million (approximately $41.5 million (USD)) over a period of not more than five years, reported as the largest award in bank note security industry history. The ceiling of that contract vehicle now stands at $76.5 million.

52.	Nanotech was no longer operated as a separate distinct corporate entity and was controlled and operated by Meta.

53.	By 2022, Nanotech's assets controlled and operated by Meta were the largest revenue producer for Meta.

54.	Nanotech generated $10.2 million in gross revenue in 2022, a substantial increase over prior years.

55.	In the summer of 2022, Meta searched for and hired a new Chairman of the Board John "Jack" Harding ("Harding") due to the retirement of Meta's former chairman Ram Ramkumar.

56.	Mr. Ramkumar remained with the company as an advisor.

57.	By year end 2022, Nanotech was still the "record" owner of real property and sophisticated state-of-the-art semi-conductor equipment located in Thurso, Quebec and very specialized equipment (nano-imprint lithography and electron-beam lithography tools) located in Vancouver, B.C. Canada.

7

58.    The Thurso, Quebec facility, situated on 11 acres, included a 105,000 square foot building with high-security production areas.

59.    Through Meta's control and use of Nanotech assets, Meta was one of the world's leading high-volume producers of nano-optic films for currency and branding and had the capacity to produce 7 million square meters of nano-optic films.

60.    The e-beam lithography was housed in a $65 million Class 100 clean room facility at Simon Fraser University in Burnaby.

61.    In 2022, Meta launched its new state-of-the-art R&D facility in Halifax, Nova Scotia with 12 semiconductor clean rooms.  Meta's 12 clean room facility provided R&D support to Nanotech in a 68,000 square foot facility.

62.    In 2022 and during the first quarter of 2023, Meta had access to substantial capital and was pursuing acquisition opportunities.

63.    In 2022 Meta acquired technology which included both IP and equipment, further complementing and enhancing the value of Nanotech's core business.

64.    In 2023, Meta was restructured by its CEO, Palikaras, from April to September reducing the operating expenses by 50%, but without affecting the healthy side of the business, which was Nanotech.

65.    By October of 2023, the continuation and extension of the contract with the United States Government was being negotiated. The Nanotech contract with the United States Government that was executed in 2021 was a five-year contract.

66.    Palikaras was replaced with James Fusaro ("Fusaro"), who resigned within weeks.

67.    Meta's CFO/COO, Uzi Sasson, succeeded Fusaro as Meta's CEO.

68.    In the spring of 2024 Meta continued to experience financial problems.  Former president/CEO Palikaras did however offer the company financial relief in the amount of $45

million.  The offers were rejected.

69.    Meta was considering seeking bankruptcy relief in late 2023 and in the first two quarters of 2024.

70.    Meta engaged the services of Ducera, an investment banking and financial advisory firm, to assist Meta in determining how to proceed in the most financially viable manner.

71.    Ducera provided Meta with valuable and reliable information concerning the value of Nanotech's assets.  The value of the Nanotech assets exceeded $35 million according to the appraisals and valuations in Meta's possession:

      a.    The building and land owned by Nanotech was appraised at a value of $10.5 million (CAD);

      b.    The intellectual property was valued at $11.8 million; and

      c.    The equipment owned by Nanotech was appraised at $20 million (CAD).

72.    When Ducera learned that Meta was considering selling Nanotech for $10 million, Ducera warned Meta and its insiders that a sale of Nanotech for less than its true value would appear to be a fraudulent transfer.

| Description of Key Risks | |
|---|---|
| **Authentix** | **Nanotech** |
| ✗ Subsequent creditor challenges<br>  – Nanotech will be unable to fully protect against this possibility, but a challenge does not seem likely<br>✗ Shareholder lawsuits could create and overhang on post-sale business<br>✗ Authentix bears the cost and risk of operating the Authentication business | ✗ May invite shareholder litigation to the extent shareholders argue Authentication is a material part of Meta Materials and should have required shareholder approval<br>✗ An unsecured creditors committee, chapter 7 trustee, or other party could argue the sale constitutes fraudulent conveyance |

73.    Authentix was one of several bidders for the Nanotech assets.  However, at the time of Authentix' offer, it was a supplier of specialty ink materials to Meta relating to Nanotech's contract with the United States Government.

74.    Upon information and belief, other potential buyers of Nanotech were unaware of

the ongoing negotiations between Nanotech and the United States Government for the extension/renewal of the supply contract.

75. Authentix had entered into a "confidentiality agreement" with Meta on September 19, 2022, which gave Authentix access to proprietary information regarding Nanotech's relationship with the United States Government.

76. In Section 11.14 of the Asset Purchase Agreement, Authentix and Authentix Canada each acknowledged that they had reviewed Meta's Current Reports on Form 8-K dated May 3, 2024, June 11, 2024, and June 21, 2024, and Meta's most recent Quarterly Report on Form 10-Q, each of which disclosed Meta's financial distress and the risk of a bankruptcy filing.

77. Despite being provided with expert and reliable information concerning Nanotech's $35 million value, Meta signed the Asset Purchase Agreement with the Authentix entities on July 3, 2024, and transferred the Nanotech assets at the July 16, 2024, closing for $10 million.

78. Pursuant to Section 8.1(i) of the Asset Purchase Agreement, Meta itself was required to assign to Nanotech, before the closing, all intellectual property owned by Meta and used in the authentication business, and pursuant to Section 8.1(j), Meta assigned to Nanotech its royalty stream under the Master Shim License.

79. Meta-owned patents, design patents, industrial designs, and trademarks were accordingly assigned down to Nanotech on the eve of the closing and were immediately conveyed to Authentix at the closing. These pre-closing assignments were transfers of interests of the Debtor in the Debtor's own property.

80. The $10 million purchase price consisted of the previously announced $4 million in deposits paid by the buyer, which would be applied to the purchase price at closing. An additional $3 million was withheld and escrowed for landlord obligations, taxes, government loans, and liens on the Thurso property.

81. The transfer of Nanotech assets, which were entirely controlled by Meta, to Authentix for the unfair and unreasonable amount of $10 million, occurred when Meta was insolvent as that term is defined in 11 U.S.C. § 101(32). The value and amount of Meta's liabilities far exceeded the value of Meta's assets in July of 2024.

82. On June 12, 2023, Colliers International appraised the land and building in Thurso, Quebec for $10.5 million (CAD).

83. On June 12, 2023, Colliers International valued Nanotech's equipment at $20 million (CAD).

84. In addition to the values for the equipment located in Thurso, Quebec, Nanotech also owned sophisticated technical (electron-beam lithography) equipment in Burnaby, B.C. with an estimated fair market value in excess of $5 million (CAD).

85. The Authentix purchase of Nanotech did not value the Thurso building and improvements at or near the $10.5 million, as of June 2023, subject of the Colliers appraisal. Instead, the Authentix purchase price allocated only $2.5 million (USD) for the Thurso building and improvements.

86. At the time of the Authentix purchase, Meta's management was in possession of the Colliers appraisal.

87. At the time of the Authentix sale, Authentix paid only $500,000 (USD) for the Thurso land.

88. Despite Colliers's having valued Nanotech's equipment in Thurso at $20 million (CAD), Authentix was allowed to purchase all of Nanotech's equipment for only $5 million (USD).

89. In approximately September of 2023, Nanotech's IP was appraised and valued by a third-party, Patsnap, at the market value of $11.8 million. Authentix, however, was allowed to purchase Nanotech's IP for only $921,593.77.

11

90.     The value of the intellectual property and the associated United States Government contract is confirmed by public records. Following the closing, Nanotech's contract with the United States Government was novated to Authentix. At the time of the closing, approximately $53.8 million of contract ceiling remained available under that contract. In March 2025, the United States Government awarded Authentix a task order under the novated contract that now totals approximately $10.54 million, an amount that alone exceeds the entire $10 million purchase price and is more than *eleven times the amount* allocated to the intellectual property.

91.     Meta received far less than a reasonably equivalent value in exchange for transferring Nanotech's assets to Authentix.  The value of the Nanotech assets sold to Authentix for $10 million (USD) including the land, building, IP, and equipment had a value in excess of $35 million.

92.     The Ducera June 2024 PowerPoint presentation to the Meta Board of Directors warned the Board of Directors that the Authentix purchase of Nanotech assets for $10 million could be viewed as a fraudulent transfer.

93.     Knowing that Meta would be filing a petition for Chapter 7 Bankruptcy protection, the executives of Meta created self-serving "consulting agreements" by which they were paid over $200,000 (USD).

94.     The subsidiary entity that purchased Nanotech stock in 2021 is Meta's alter ego. According to the August 4, 2021, Arrangement Agreement, the purchaser of Nanotech stock was B.C.  B.C.'s existence was solely for the purpose of purchasing Nanotech and performed no other business activities.

95.     Meta agreed to purchase Nanotech in August of 2021.  Thereafter, in October of 2021, the purchase closed and Nanotech became controlled and operated by Meta.  After October of 2021, Nanotech had no separate corporate existence.  Nanotech and Meta issued a single set of

financial statements under the name Meta. Meta and Nanotech did not have a separate and independent board of directors. The operations of Nanotech were consolidated entirely under Meta and were reported under the Meta financials. Meta controlled the operation and existence of Nanotech from October of 2021 until July of 2024. Nanotech stock was not sold to Authentix, but Meta does not identify Nanotech as a subsidiary in any of its filings in Bankruptcy Case No. 24-50792-gs.

96.    By fraudulently transferring the Nanotech assets, the management of Meta acted adversely to Meta. They also engaged in self-dealing in such a way as to hinder or delay creditors' claims or defraud creditors.

### III.
### PARTIES

97.    The Trustee is the Chapter 7 Bankruptcy Trustee for the Debtor. The Trustee has capacity to commence this action by way of, among other things, 11 U.S.C. § 323.

98.    Meta is a Nevada corporation.

99.    Authentix, Inc. ("Authentix") is a Delaware corporation with its principal place of business in Addison, Texas.

100.    Authentix Solutions Canada, Inc. ("Authentix Canada") is a corporation formed under the laws of the Province of British Columbia, Canada.

101.    The true names and capacities of DOES I-V are unknown to the Trustee. The Trustee will seek leave to amend this Complaint to allege their true names and capacities when ascertained.

### IV.
### JURISDICTION

102.    This Bankruptcy Court has jurisdiction over this bankruptcy case and this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§

13

157(b)(2)(A), (H) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

103.    This Court has personal jurisdiction over the Defendants pursuant to Fed. R. Bankr. P. 7004(d) and (f). Authentix is a Delaware corporation with its principal place of business in Texas and has continuous and systematic contacts with the United States, including its own contracts with the United States Government.

104.    Authentix Canada participated with Authentix in a single, integrated transaction to acquire the Nanotech assets, acted through a joint deal team in the United States, and otherwise Authentix Canada has sufficient contacts with the United States for this Court to exercise personal jurisdiction over it.

105.    The Trustee consents to entry of final orders and judgment by this Court.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FRAUDULENT TRANSFER  11 U.S.C. § 548(a)(1)(B)
### (Against Authentix and Authentix Canada)

106.    The Trustee alleges and incorporates herein all prior allegations and paragraphs as though fully set forth herein.

107.    The Nanotech assets were, at the time of the transfer, the property and interest of Meta within the meaning of 11 U.S.C. § 548. The Nanotech assets were intertwined with the assets of Meta.

108.    The Debtor made the transfer of Meta assets and those held in the name of Nanotech within two years before the Chapter 7 Petition was filed in Case No. 24-50792-gs. The Debtor received less than the reasonably equivalent value in exchange for having transferred Nanotech assets worth more than $35 million to the Authentix entities for $10 million.

109.    At the time of the transfer, the Debtor was insolvent.

14

110. At the time of the transfer, the Debtor (Meta) was insolvent within the meaning of 11 U.S.C. § 101(32) on the date of the transfer in that the total amount of Meta's debts exceeded the fair value of its assets from at least March of 2024 through the August 9, 2024, petition date.

111. Meta's transfer of the assets it controlled, which were the property of Meta through its control and substantive consolidation, is avoidable under 11 U.S.C. § 548 (a)(1)(B). Meta was insolvent as defined by Section 548 at the time of the transfer.

112. In addition, and independently of the alter ego status of Nanotech and B.C., Meta's pre-closing assignments of its own intellectual property and royalty rights to Nanotech pursuant to Sections 8.1(i) and 8.1(j) of the Asset Purchase Agreement were transfers of interests of the Debtor in property, made within two years before the petition date, for which the Debtor received less than a reasonably equivalent value while insolvent, and each such transfer is avoidable under 11 U.S.C. § 548(a)(1)(B).

113. Meta is entitled to recover its costs and, to the extent permitted by law, its attorney's fees for pursuing this fraudulent transfer claim.

**SECOND CLAIM FOR RELIEF**
**FRAUDULENT TRANSFER 11 U.S.C. § 548(a)(1)(A)**
(Against Authentix and Authentix Canada)

114. The Trustee realleges and incorporates herein all prior allegations and paragraphs as though fully set forth herein.

115. The transfers described herein were made within two years before the petition date with the actual intent to hinder, delay, or defraud creditors of the Debtor.

116. Actual intent is evidenced by badges of fraud including, without limitation: the Debtor was insolvent at the time of the transfers; the Debtor's own financial advisor had warned the Board of Directors that the sale could be attacked as a fraudulent conveyance; the transfers comprised substantially all of the assets of the Debtor's most valuable business; the consideration

15

received was a fraction of the assets' appraised values; the transfers occurred weeks before a planned bankruptcy filing; insiders benefited from the proceeds, including through the payment of directors and officers insurance premiums and prepaid consulting agreements; and the pending renewal of the United States Government contract was not disclosed to other potential bidders. All of the forgoing hindered and delayed the creditors' claims and rights and were committed in such a way as to defraud Meta's creditors.

117. The transfers are avoidable under 11 U.S.C. § 548(a)(1)(A).

**THIRD CLAIM FOR RELIEF**
**FRAUDULENT TRANSFER UNDER NRS 112.180(1)(a)**
**(Against Authentix and Authentix Canada)**

118. Meta alleges and incorporates herein all prior paragraphs and allegations as though fully set forth herein, including the allegations in the first claim for relief.

119. As of the date Meta's petition was filed in Case No. 24-50792-gs, there existed one or more creditors holding allowed unsecured claims against Meta who could have avoided the transfer of Nanotech assets under applicable law, and the Trustee is therefore empowered to avoid the transfers or recover the reasonable value of the assets under 11 U.S.C. § 544(b).

120. At the time of the transfer of the Nanotech assets, Meta was insolvent because the total of Meta's debts was greater than the total value of Meta's assets at fair valuation.

121. At the time of the transfer, Meta was not generally paying its debts.

122. Neither Authentix entity paid a reasonably equivalent value for the assets each purchased from Meta in July of 2024.

123. Neither Authentix entity was a good faith purchaser without knowledge that their payment did not constitute reasonably equivalent value for the assets acquired.

124. Any subsequent transferee of the Nanotech assets described herein is liable for the fraudulent conveyance described herein.

16

125.    This adversary complaint has been filed within two years from the date the Petition was filed for bankruptcy relief in Case No. 24-50792-gs.

126.    This action has been brought within four years after the transfer of Nanotech's assets was made to the Authentix entities.

127.    Pursuant to NRS 112.180(1)(a), the transfer of Nanotech's assets is fraudulent as to Meta's creditors because Meta made the transfer with the actual intent to hinder, delay, or defraud creditors as shown by the badges of fraud alleged with particularity herein, including that the transfer was made for less than a reasonably equivalent value, while the Debtor was insolvent, and within weeks of the bankruptcy filing.

### FOURTH CLAIM FOR RELIEF
**FRAUDULENT TRANSFER UNDER NRS 112.180(1)(b) AND NRS 112.190(1)**
(Against Authentix and Authentix Canada)

128.    The Trustee alleges and incorporates herein all prior allegations and paragraphs as though fully set forth herein.

129.    The transfers described herein were made without the Debtor receiving a reasonably equivalent value in exchange, at a time when the Debtor was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or when the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, in violation of NRS 112.180(1)(b).

130.    The transfers described herein were also made without the Debtor receiving a reasonably equivalent value in exchange at a time when the Debtor was insolvent, or the Debtor became insolvent as a result of the transfers, and the claims of creditors described herein arose before the transfers were made, in violation of NRS 112.190(1).

131.    At the time of the transfers, the Debtor was not generally paying its debts as they

became due, and the Debtor is therefore presumed to have been insolvent pursuant to NRS 112.160(2).

132.   The Trustee may avoid the transfers pursuant to 11 U.S.C. § 544(b), NRS 112.180(1)(b), and NRS 112.190(1).

**FIFTH CLAIM FOR RELIEF**
**RECOVERY OF AVOIDED TRANSFERS - 11 U.S.C. §§ 550 AND 551**
(Against Authentix and Authentix Canada)

133.   The trustee incorporates all prior allegations as though fully set forth herein.

134.   To the extent the transfer is avoided under 11 U.S.C. §§ 544 or 548, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property under 11 U.S.C. § 550(a).

135.   Authentix is the initial transferee of the Nanotech intellectual property, or the entity for whose benefit that transfer was made, under 11 U.S.C. § 550(a)(1). Authentix Canada is the initial transferee of the remaining Nanotech assets, or the entity for whose benefit those transfers were made, under 11 U.S.C. § 550(a)(1).

136.   The Trustee is entitled to recover the fair value of the Nanotech assets conveyed to Authentix and to Authentix Canada together with the difference between the value of the assets transferred and the consideration paid, an amount to be proven at trial, but not less than $25 million.

137.   Each transfer avoided herein is preserved for the benefit of the estate pursuant to 11 U.S.C. § 551.

138.   The Trustee is entitled to recover its costs incurred in prosecuting this action and, to the extent permitted by law, its attorney's fees.

**ALTER EGO/ SUBSTANTIVE CONSOLIDATION ALLEGATIONS**

139.    The Trustee incorporates herein as though fully set forth all prior allegations.

140.   The Trustee is a duly appointed and acting Chapter 7 Trustee and the representative

18

of the Debtor's estate under 11 U.S.C. § 323 with authority and capacity to commence and prosecute this adversary proceeding to avoid and recover transfers under 11 U.S.C. §§ 544, 548, and 550.

141.    The Debtor formed 1315115 B.C. Inc. ("B.C.") in 2021 for the sole purpose of acquiring Nanotech.  B.C. conducted no business of its own, had no employees or independent operations, observed no corporate formalities, maintained no separate books, records, or bank accounts, and is not identified as a separate entity in the Debtor's filings with the Securities and Exchange Commission or in this bankruptcy case.

142.    Although B.C. was nominally identified as the acquiring party in the Arrangement Agreement, the Debtor was solely and exclusively responsible for the acquisition of Nanotech, including payment of approximately $72 million (USD).

143.    At all times from July of 2021, through the filing of the Chapter 7 Petition, Nanotech was controlled, governed, influenced, and dominated by Meta.

144.    Following the October 2021 closing, Nanotech ceased to operate as a separate corporate entity.  Meta controlled and directed every aspect of Nanotech's operations, finances, governance, and existence from October 2021 through July 2024.

145.    From July 2021 through July of 2024, there existed a complete unity of interests and ownership between Meta and Nanotech resulting in the entities being inseparable from each other.

146.    The Debtor (Meta) and Nanotech reported a single, consolidated set of financial statements under the Debtor's name, shared common management and a common board of directors, did not maintain separate corporate governance, and held themselves out to creditors and the public as a single, integrated enterprise.

147.    There existed such a unity of interest and ownership between Meta, on the one hand, and B.C. and Nanotech, on the other, that the separate personalities of those entities no longer

existed and each was inseparable from the others.

148. B.C. and Nanotech were at all relevant times influenced, dominated, and governed by the Debtor.

149. The Trustee is entitled to a finding of substantive consolidation nunc pro tunc for the purpose of preserving the Trustee's avoidance powers. The consolidation should be determined effective as of the August 9, 2024, petition date, thereby confirming Meta acquired all property interests and assets of Nanotech.

150. Nanotech and Meta had a common Board of Directors, and the financial records of Nanotech were merged and combined with those of Meta.

151. Adherence to the notion that Nanotech was a separate corporate entity from Meta would sanction fraud or promote a manifest injustice.

152. Nanotech comingled its funds and assets with Meta. Meta treated all assets owned by Nanotech as its own.

153. Nanotech did not observe corporate formalities.

154. Nanotech was utilized by Meta as a mere conduit.

### PRAYER FOR RELIEF

**WHEREFORE**, The Trustee respectfully requests the Court enter judgment against the Defendants and each of them as follows:

1. A judgment avoiding the transfer of Nanotech assets to Authentix and Authentix Canada pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B);

2. A judgment avoiding the transfer of Nanotech assets under 11 U.S.C. § 544(b), NRS 112.180, and NRS 112.190;

3. A judgment under 11 U.S.C. § 550 recovering the fair value of the Nanotech assets, or the assets themselves, for the benefit of the estate, and preserving each avoided

20

transfer for the benefit of the estate under 11 U.S.C. § 551;

4. For a finding that B.C. and Nanotech are the alter egos of Meta and that the Nanotech assets are property of the estate, and an order under 11 U.S.C. § 105 substantively consolidating the assets and liabilities of B.C. and Nanotech with Meta's estate;

5. For prejudgment interest;

6. For the Trustee's costs of suit and, to the extent permitted by law, attorney's fees;

7. For such and other further relief as the Court determines to be appropriate.

DATED this 7th day of August, 2026.

ROBISON LAW GROUP
71 Washington Street
Reno, NV 89503

/s/ Kent R. Robison
KENT R. ROBISON, ESQ.

CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.
SBW LAW GROUP
3600 Mayberry Drive
Reno, NV 89509

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite b

*Attorneys for Christina Lovato, Trustee*

21