Jeffrey L. Hartman, Esq. – NSB #1607
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B
Reno, NV 89509
Tel: 775-324-2800
Fax: 775-324-1818
Email: notices@bankruptcyreno.com

Kent R. Robison, Esq. – NSB #1167
ROBISON LAW GROUP
71 Washington Street
Reno, NV 89503
Tel: 775-329-3151
Email: krobison@robison-law.com

Clayton P. Brust, Esq. – NSB #5234
Hannah E. Winston, Esq. – NSB #14520
SBW LAW GROUP
3600 Mayberry Drive
Reno, NV 89509
Email: cbrust@sbwlawgroup.com
          hwinston@sbwlawgroup.com

*Attorneys for Christina W. Lovato, Trustee*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>META MATERIALS INC.,<br><br>Debtor.<br><br>_____<br><br>CHRISTINA W. LOVATO,<br><br>        Plaintiff,<br>vs.<br><br>24M Technologies, Inc., a Delaware corporation.<br><br>        Defendant. | Case No.: 24-50792-gs<br>(Chapter 7)<br><br><br>Adversary No.:<br><br>**ADVERSARY COMPLAINT** |

1

**I.**
**INTRODUCTION**

1. In May 2024, Meta Materials ("Meta") was in the process of selling valuable assets at absurdly low prices. When Meta's founder was removed as President and Chief Executive Officer on October 10, 2023, the Company reported total assets of $121,754,701 and total stockholders' equity of approximately $93.3 million (Form 10-Q for the quarter ended September 30, 2023).

2. The Company's founder (removed as Chief Executive Officer seven months earlier, on October 10, 2023) was writing to the Board about insolvency-zone bonuses, foreclosure notices on their primary laboratory, and a month of unanswered acquisition inquiries from Apple. Outside counsel had begun preparing a Chapter 7 petition.

3. Meta's investment banker, Ducera Partners, valued the Optodot patent estate alone at $19.8 million in marketing materials it had circulated to bidders two months earlier. Internal management projections forecast Optodot revenue of $215.5 million and EBITDA of $58.2 million by 2029.

4. The assets and technology Meta sold to 24M were worth multiples of what Meta ultimately received for that technology.

5. The management had self-serving priorities that were intended to hinder, delay, or defraud, Meta's creditors. Management needed cash, and it needed it fast. The reason was simple. The officers needed liability insurance for their self-dealing and the insurance policy was about to lapse. The Company, by and through its management, had become insolvent by May of 2024. As a result, in part, of the officer's self-dealing activities.

6. By late May, Ducera had built that priority into the structure of its strategic advice. The first node on the strategic decision tree asked whether Meta would "Obtain Renewal of D&O

Insurance." If yes, the going-concern branch remained open. If no, the Company would file. Secondary questions on the going-concern branch began with "How much cash after D&O?" Renewal of the directors' and officers' insurance was now the threshold question on which every other strategic option turned.

7.     The officers of Meta also created self-serving consulting agreements to unjustly enrich themselves with cash payments of $100,000 that further hindered, delayed, or defrauded Meta's creditors.

8.     With no alternative source of capital remaining, the way the management funded that insurance was by fire-selling Meta's operating assets to whichever bidder remained at the table. Central to this action was the Optodot patent estate.

9.     Meta had acquired Optodot technology in June 2022 for $48.5 million in cash and stock. By April 9, 2024, Ducera had opened a single-bidder discussion with Defendant 24M Technologies, Inc. By mid-May, 24M was the only party sought to purchase Meta's Optodot technology.

10.     Meta's management had been offered, and declined, a $33,500 machinery-and-equipment orderly-liquidation-value appraisal from Maynards Industrial Services. No party ever proposed, and Meta never commissioned, any appraisal of its intellectual property; no independent valuation of the Optodot patent estate was ever performed.

11.     On June 13, 2024, with the 24M sale not yet signed and the cash to fund it not yet in hand, Meta's Chief Executive Officer authorized the binding of approximately $4.4 million in D&O coverage.

12.     On June 19, 2024, Meta wired $1,669,863.45 to its insurance carrier.

13.     On June 20, 2024, 24M wired $825,000 to Meta for substantially the entirety of the Optodot patent estate.

14. The cash Meta received for the centerpiece of its battery-technology business was less than one-fifth of what Meta committed *the same week* to insure the directors against the very transactions they were approving.

15. The Trustee brings this action under 11 U.S.C. §§ 548 and 544(b) to recover the loss.

**II.**
**JURISDICTION**

16. This Bankruptcy Court has jurisdiction over this bankruptcy case and this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

17. This Court has personal jurisdiction over the Defendant pursuant to Fed. R. Bankr. P. 7004(d) and (f). 24M is a Delaware corporation with its principal place of business in Massachusetts.

18. Defendant is notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendant to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

19. The Trustee consents to entry of final orders and judgment by this Court.

**III.**
**FACTUAL BACKGROUND**

**A. $MMAT**

20. Meta Materials Inc. ("Meta" or the "Company") was an advanced materials and nanotechnology company that traded publicly on the NASDAQ stock exchange under the ticker $MMAT.

/ / /

/ / /

4

21.     Founded by Dr. George Palikaras, Meta operated approximately ten facilities across the United States, Canada, and the United Kingdom and employed several hundred scientists, engineers, and technical staff at the height of its operations.

22.     Meta's business was the design and commercialization of metamaterials: a category of engineered materials whose physical properties are determined less by their raw chemical composition than by the precise nanoscale architecture in which they are arranged, and which exhibit electromagnetic, optical, and structural behaviors not available from materials found in nature.

23.     Meta developed proprietary technology platforms across that category, including AR fusion (for augmented-reality eyewear), PLASMA fusion (for high-speed coating of solid materials onto a wide range of substrates), and Rolling Mask Lithography (for high-volume nanostructured manufacturing).

24.     Those platforms, in turn, supported product lines serving the aerospace, defense, consumer electronics, telecommunications, automotive, clean energy, battery, and authentication industries.

25.     Meta's customers and development partners included Airbus, Lockheed Martin, DuPont Teijin Films, PPG, Mitsubishi Electric, and Sekisui, among other global aerospace, defense, materials, and electronics companies.

26.     Meta's research and development was conducted in collaboration with universities and government agencies including but not limited to the United States Department of Energy and the United States Department of Defense.

27.     In 2021, Meta was named Innovator of the Year by Lux Research, an independent research and advisory firm that evaluates emerging technology companies and is widely recognized in the materials-science and clean-technology sectors.

28.     By the end of 2023, Meta had invested more than $290 million in research and development, capital expenditures, and strategic acquisitions to assemble its technology portfolio and bring its products toward commercial scale.

29.     Beginning in late 2023 and continuing through early 2024, Meta's founder, Dr. George Palikaras, was removed from his role as Chief Executive Officer.

30.     Other senior officers and directors who had championed the Optodot acquisition and supported the multi-year Battery Materials Development Plan endorsed by the Board on November 16, 2022, departed or were replaced.

31.     The new management team and Board Chair installed in their place committed the Company to a wind-down and sale of its operating assets, abandoning the commercialization roadmap their predecessors had approved roughly fifteen months earlier.

32.     Between May and August 2024, Meta's reconstituted management caused the Company to dispose of substantially all of its operating businesses, including the sale of the Optodot patent estate to 24M that is the subject of this action.

33.     During the same period, the Company committed approximately $4.43 million to extend and replace its directors-and-officers liability insurance — a twelve-month extension of the existing policy at a premium of $1,612,367, and a six-year run-off tail policy at approximately $2.82 million — and paid its outside investment banker approximately $800,000 in fees on the Company's separate sale of its Authentication business, on top of more than $1.5 million the same banker subsequently submitted as an estate creditor — a combined draw on estate value of approximately $2.5 million from a single advisor.

34.     Among those acquisitions, and central to this action, was Meta's June 2022 acquisition of Optodot Corporation ("Optodot"), a Massachusetts battery technology company whose nano-ceramic separator patents Meta acquired for $48.5 million in cash and stock.

35.    Two years later, Meta's officers caused Meta to sell substantially the entirety of the Optodot patent estate to Defendant 24M Technologies, Inc., for $825,000.

36.    Meta's Optodot technology was transferred to 24M for less than a reasonable equivalent value at a time when Meta was insolvent. The Trustee brings this action to recover the losses to the estate caused by this fraudulent transfer.

**B. Optodot**

37.    Optodot was a Massachusetts-based battery technology company founded in 2000 by Dr. Steven Carlson.

38.    For more than two decades, Optodot developed nano-ceramic separator technology that addresses "thermal runaway," the failure mode behind the lithium-ion battery fires that have caused recalls and injuries across electric vehicles, consumer electronics, and grid-scale energy storage.

39.    Lithium-ion battery technology has emerged as one of the foundational technologies of the global energy transition, and the safety, performance, and cost of the separator inside each cell remain among its most consequential unsolved problems.

40.    Dr. Carlson, the principal inventor on the foundational NPORE patent family, is one of the foremost authorities on battery separator chemistry in the United States. In 2022, he was named Inventor of the Year by the New York Intellectual Property Law Association, one of the oldest and most respected intellectual property bar associations in the country, specifically for his work pioneering safer separators for rechargeable lithium-ion batteries.

41.    Optodot's technology was extensively validated. Its research and development was funded in part by the United States Department of Defense and the United States Navy.

42.    Optodot licensed its first-generation patents to LG Chem in 2016 and, in 2021, sold thirty-nine of those patents to LG Energy Solution for approximately $8 million in cash.

7

43. By the time of the Meta acquisition, Optodot's patent portfolio was already generating revenue under a network of in-force licensing agreements.

44. Those agreements included a June 2009 license with Siemens Healthcare Diagnostics Inc. (the "Siemens License"), which produced approximately $150,000 in annual royalties through patent expiry; the November 2021 Assignment Agreement with LG Energy Solution Ltd. (the "LG License"), under which Optodot retained a license to continue using the assigned patents through their expiration between 2022 and 2026; and two license agreements with Madico, Inc. dating from 2004 and 2011 covering jointly-owned patents.

45. When Meta acquired Optodot in 2022, it acquired both the underlying intellectual property and the continuing revenue stream from those agreements.

46. By the time of the Meta acquisition in 2022, Optodot owned 67 issued and 22 pending patents and operated in a global lithium-ion battery separator market estimated at $5.1 billion and projected to reach $9.0 billion by 2025.

47. Dr. Carlson joined Meta as part of the transaction. He did so because he believed in Meta's platform, its nanofabrication capabilities, and its commitment to scaling the NPORE technology to commercial production. Dr. Carlson believed Meta was the company that would carry his life's work to the next stage.

48. On June 22, 2022, Meta acquired substantially all of the assets and intellectual property of Optodot for total consideration of $48.5 million ("Optodot assets").

49. The acquired assets included Optodot's 67 issued and 22 pending patents, its trademarks (including NPORE), its existing license agreements with LG Energy Solution, Siemens Healthcare, and Madico, its leased facility in Devens, Massachusetts, and its assembled workforce, including Dr. Carlson.

8

50.     Optodot's technology was acquired to integrate directly with Meta's existing PLASMAfusion coating platform and complement Meta's broader battery materials portfolio, which Meta had been assembling over the prior eighteen months through related acquisitions and internal development.

51.     In the eighteen months that followed, Optodot's technology continued to develop on schedule, its licenses with LG Energy Solution and Siemens Healthcare continued to perform.

52.     The patent estate continued to grow.  By early 2024, however, Meta itself had begun to deteriorate. Over the objections of shareholders, Meta's senior officers had made a series of decisions that left the Company short of operating cash, leading to a going concern qualification on Meta's financial statements.

**C. Ducera Partners**

53.     In or around February 2024, Meta engaged Ducera Partners LLC ("Ducera") as Meta's investment banker to identify and execute on "strategic alternatives" to solve Meta's liquidity crisis.

54.     The Ducera deck that accompanied that engagement laid out a "Proposed Strategic Plan" structured as a decision tree. The decision tree presented three preferred paths for Meta: securing long-term financing and continuing as a public company; securing short-term financing to pursue a sale of the entire Company; or selling individual business units to fund a long-term plan. Only if all else failed did the decision tree direct Meta to "Pursue Chapter 11 Protection," with debtor-in-possession financing and asset sales conducted within a bankruptcy proceeding.

55.     Chapter 11 was presented to Meta as the worst-case outcome.

56.     The first deliverable from Ducera was a Confidential Information Memorandum dated March 2024 (the "March 2024 CIM"), which Ducera prepared with Meta's authorization

9

and circulated under a nondisclosure agreement to prospective purchasers as the principal written marketing document for Meta's businesses.

57.     The March 2024 CIM represented to the market that Meta owned approximately 500 active patents totaling over $42 million in value. Optodot's patents were included within that figure.

58.     The March 2024 CIM presented Optodot's NPORE technology as part of Meta's battery business unit and included a year-end 2023 balance sheet for that unit reflecting net assets of $29.4 million. The accompanying commentary attributed $19.8 million of that balance specifically to Optodot's NPORE patent portfolio, described as "Various patents and other technology-related intellectual property."

59.     The March 2024 CIM further projected Battery revenue growing to $4.7 million by 2025, with NPORE accounting for $4.0 million of that figure, as Optodot moved toward commercial production.

60.     At the April 11, 2024 Board meeting, Ducera presented management with the option of engaging Maynards Industrial Services to perform a $33,500 machinery-and-equipment orderly-liquidation-value appraisal for the Dartmouth, Thurso, and Pleasanton facilities, deliverable in three to four weeks and tied to Hilco's DIP collateral package — not an appraisal of Meta's intellectual property. Hilco separately advised that it was "unlikely to underwrite META's IP." Meta declined even this equipment appraisal, and no appraisal of the Optodot patent estate itself was ever proposed.

61.     No Maynards appraisal was ever commissioned, and no other third-party valuation of Meta's intellectual property was performed between April 2024 and the closing of the sale to 24M described below.

62. At the April 11, 2024 board meeting, Ducera reported that a "kick-off call" had been held two days earlier, on April 9, 2024, to discuss "potential partnership structures and acquisition of Optodot or the entire battery division" with 24M Technologies, Inc. ("24M").

63. At the same meeting, Ducera presented multiple parallel financing workstreams, and the procedural mechanics of a potential Chapter 11 filing. The Board asked questions, raised concerns about timing and procedure, and engaged in extended discussion of Meta's options. It did not, however, commission the Maynards appraisal, authorize any independent valuation of the Optodot patent estate, or instruct Ducera to expand its discussions with 24M before the April 9 kick-off call ripened into a single-bidder process.

64. Meta's financial situation continued to deteriorate through April and into early May. Other parties contacted by Ducera cited "the risks and uncertainties surrounding Meta's current situation and future prospects" as reasons for declining to even engage with Meta at this time.

65. Cash continued to be depleted. Each successive board meeting addressed a narrower set of options than the one before.

66. By the May 2, 2024 board meeting, Meta and Ducera had agreed that interested parties would be informed Meta was "selling at distressed valuations on an accelerated basis." Maximization of remaining cash, rather than preservation of value for shareholders, had become the Board's stated priority.

67. Meta's management approved a reduction in force that would reduce the workforce to between seventy-five and ninety percent of then-current levels. At the same meeting, the Board began discussing, for the first time, the renewal of Meta's directors-and-officers liability insurance.

68. Also at the May 2, 2024 meeting, Ducera presented a comparison of expected recoveries under two disposition scenarios. Under a Chapter 7 forced liquidation conducted by a bankruptcy trustee, Ducera estimated total proceeds of $5 million to $13 million.

69. Under the distressed sale process Ducera was then running, Ducera estimated total proceeds of $19 million to $50 million.

### Cash and Insurance

70. The May 2, 2024 board meeting marked the moment that the Meta's priorities visibly shifted. At that meeting, the Board agreed that interested parties would be informed Meta was "selling at distressed valuations on an accelerated basis." And, for the first time, the Board began discussing renewal of its directors-and-officers liability insurance.

71. After May 2, 2024 forward, the disposition of Meta's assets and the procurement of insurance for the directors and officers who were authorizing those dispositions proceeded on parallel tracks. Assets were selling at fire-sale prices when Meta was insolvent. Meta's debts exceeded the real and true value of its assets and Meta had little, if any, cash on hand to pay its expenses and bills.

72. While the management was running Meta into the ground, its shareholders organized. On March 25, 2024, a group of confirmed shareholders served the Board with a written Demand for Information invoking the Board's duties of care, good faith, and loyalty. They asked for an accounting of Meta's operational plans, the basis for the recent dilutive offerings, the rationale for Mr. Palikaras' removal, and the status of Meta's patents and facilities. Management ignored the demand.

73. The shareholders then rallied behind Meta's former Chief Executive Officer, George Palikaras. Acting at their behest, Mr. Palikaras wrote to the Chair and the heads of the Human Resources and Governance Committees on May 5, 2024.

74.    Dr. Palikaras raised three specific concerns: that Meta's Halifax headquarters had been subjected to a second foreclosure notice by its landlord; that Meta's CEO had approved and disbursed more than $150,000 in employee bonuses through payroll while the Company sat in the zone of insolvency, where Meta's fiduciary duties ran to Meta's creditors; and that Apple had spent a month unsuccessfully attempting to reach someone at Meta about its holographic assets.

75.    Meta's only response was to consult with counsel on how to keep its largest shareholder in the dark under Regulation FD. Chair Jack Harding sent his own reply at 2:12 a.m. on May 7, 2024, writing that he was "not clear about the underlying motivation for this note," and that "[i]t seems to be a procedural box checker as opposed to a request for more time."

76.    The underlying motivation was not hard to identify.

77.    Its shareholders were losing everything. The bonuses, the foreclosure, the lost Apple inquiry, and the proposed financing plan went unaddressed. At the May 17, 2024 board meeting, Ducera advised that the Palikaras-Esousa proposal was "not actionable." The meeting then took up D&O renewal quotes.

78.    By late May 2024, Ducera had built D&O renewal into the structure of its strategic advice. The slide deck Ducera presented that day included a decision tree whose first node, situated before any going-concern alternative, asked whether Meta would "Obtain Renewal of D&O Insurance." If the answer was yes, the tree branched into the going-concern path. If the answer was no, the tree directed Meta to file for bankruptcy. Subsidiary questions for the management to consider on the going-concern branch began with "How much cash after D&O?" Renewal of the directors' and officers' insurance was no longer an administrative item. It was the threshold question on which every other strategic option turned.

79.    While the management procured D&O coverage to shield its officers from suit, it was also arranging cash payouts to its insiders. These officers knew that doing so would hinder and delay creditor's claims.

80.    On May 14, 2024, Meta's Human Resources and Compensation Committee convened to discuss "severance and retention arrangements" for employees. Counsel was asked to brief the committee on "legal requirements and issues related to payment of employee wages and benefits in financially distressed circumstances, including a situation where a company could be seeking bankruptcy protection." That briefing occurred three months before Meta filed Chapter 7. Meta's own minutes record that severance and retention payments were being structured in contemplation of bankruptcy.

81.    On May 27, 2024, outside counsel wrote to Meta's Chief Executive Officer and its Chief Legal Officer to describe a proposed retention plan. Counsel stated that "the Board is concerned that your departure at this critical time might jeopardize the Company's ability to consummate a transaction... As such, the Board has proposed the retention bonus plan for the two of you."

82.    In the same email, counsel confirmed that neither a Chapter filing nor the then-pending asset sale would independently trigger contractual severance under the existing employment agreements. The retention bonuses and the consulting fees that followed were structured precisely because the existing contracts did not require them.

83.    By July 23, 2024, Meta, through its management and executives, had begun documenting "employee consulting agreements" and "payments owed to the Board" as milestones on a Chapter 7 timeline. Seventeen days later, the Board approved lucrative consulting agreements for the CEO and CLO. Three days after that, Meta filed Chapter 7.

14

84.     Within the ninety days before filing, Meta paid its five directors $106,686 in director fees. One day before filing, Meta wired its CEO $301,320.18 in salary, severance, and vacation cash-out; its CLO $205,047 in the same category plus another $100,000 in consulting fees; and another $100,000 to an insider-owned LLC.

85.     The Chapter 7 filing did not arise from a failed turnaround in Meta's final weeks. It was being prepared by Meta's outside counsel for at least five months before the petition. On March 8, 2024, outside counsel wrote to the CEO and the Chief Legal Officer that "if Meta files bk, we have to file an application to approve the retention of Ducera, including Ducera's comp structure. Parties, including creditors, will have an opportunity to object and try to retrade terms."

86.     On April 19, 2024, the CEO countersigned the engagement letter of Stretto, a bankruptcy claims agent retained for Chapter 7 and Chapter 11 cases.

87.     On May 11, 2024, the same week 24M emerged as the only remaining bidder for the Optodot patent estate, outside counsel convened a meeting captioned "Meta Materials – Chapter 7 Preparations," attended by the CEO, the Chief Legal Officer, and other Company personnel.

88.     On May 20, 2024, outside counsel advised the Chair and the Board on whether the asset sales then being arranged required a shareholder vote under Nevada law. Counsel's written response advised that under "the plain reading" of NRS 78.565, only the sale of "all of [the] property and assets" of the Company would require a stockholder vote, but cautioned that the plain reading "does not mean stockholders won't challenge the sale." The Chair's same-day reply: "Personally, I'm comfortable we can proceed without a shareholder vote and should do so sooner than later. We don't have the time to consider issues that are important but not deal breakers."

89.     No vote was held.

15

90. On June 18, 2024, two days before the 24M sale closed, Ducera presented the Board with the final 24M Transaction Overview. The risk slide in that deck included Ducera's own footnote: "Ducera has not conducted any formal or informal valuation analysis for the NPORE assets."

91. Meta's investment banker, which had marketed the same NPORE patent portfolio in the March 2024 CIM at $19.8 million of intangible-asset value, disclaimed any valuation work in connection with the sale of those same assets for $825,000.

92. On June 4, 2024, a sitting Meta director circulated a written summary of the deal timeline to the CEO, outside counsel, and the Board. He wrote: "Assuming we want to file no less than 7 days before our D&O coverage runs off by Thu 6/27 end of day (or 6/28 at 12:01am), we need to make sure we can close (with funds in the banks) the Authentix transaction by Thu 6/20." He then asked: "We discussed the wisdom of trying to purchase at least one year of extended discovery from our current D&O carriers... this would require us to find $1.8M of additional bridge funding. Do we need such an extended recovery period, which would detract from proceeds to **creditors** and shareholders?" (bold emphasis added). The same email noted that "the board has not seen the terms of the definitive bridge funding or approved any related resolution yet." That is a director admitting, in writing, that the closing schedule for the Authentix transaction was being run backward from D&O expiry, that the extended D&O premium would come out of creditor and shareholder recoveries, and that the bridge financing on which the entire schedule depended had not been approved.

93. Meta's cash position continued to deteriorate. The Optodot patent estate was now being marketed for sale on the timeline described above; Meta's other major asset, its Authentication Business Unit, was being marketed in parallel and on similarly distressed terms.

Together, those two transactions were the cash-generating events on which both Meta's runway for the D&O renewal would depend.

94. The officers of Meta knew, at all relevant times, that Optodot was worth substantially more than $825,000.

95. On the evening of June 13, 2024, with the 24M sale not yet signed, Meta's CEO authorized the binding of approximately $4.4 million in D&O coverage and run-off. A twelve-month extension of the existing policy was bound at a premium of $1,612,367. A six-year tail policy was bound at 175 percent of the annualized premium, an additional approximately $2.82 million. The full set of commitments was confirmed by 11:24 AM the following morning. The 24M Asset Purchase Agreement had not yet been executed; the cash to fund the D&O commitments was not yet in hand.

96. On June 19, 2024, Meta wired $1,669,863.45 to fund the twelve-month D&O extension. The wire went out the day before the 24M sale closed. On June 20, 2024, 24M wired $825,000 to Meta for the entire Optodot patent estate.

97. By July 1, 2024, Meta's management had committed approximately $4.43 million to insurance premiums to protect its own officers and directors. Meta then sold the Optodot patent estate — an asset Meta had acquired for $48.5 million in cash and stock — for $825,000.

98. The managerial decision to sell Optodot technology for $825,000 resulted in Meta not receiving a reasonable equivalent value for the technology and was done with the intent to hinder, delay, or defraud Meta's creditors so that insiders could prosper.

**IV.**
**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**11 U.S.C. § 548 (a) (1) (B) FRAUDULENT TRANSFER**

17

99.    The Trustee incorporates by reference each preceding paragraph as though fully set forth herein.

100.    On or about June 18–20, 2024, Meta transferred to 24M the NPORE patent estate, including the associated patents and applications, trademarks, technology and know-how, and Meta's rights under the LG License, the Siemens License, and the Madico Agreements (collectively, the "Transfer"). The Transfer constitutes a transfer of an interest of the Debtor in property within the meaning of 11 U.S.C. § 548(a). The Transfer occurred within two years before the Petition Date.

101.    Meta received less than a reasonably equivalent value in exchange for the Transfer. The consideration Meta received — $825,000 — was less than one-fifth of the $19.8 million intangible-asset value Meta's own investment banker had ascribed to the same NPORE patent portfolio three months earlier, and less than two percent of the $48.5 million Meta had paid to acquire substantially the same asset set two years earlier.

102.    At the time of the Transfer, Meta (a) was insolvent, or became insolvent as a result of the Transfer; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Meta was an unreasonably small capital; and (c) intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

103.    Meta management was not acting in the shareholders' and creditors' interests when the sale to 24M occurred. The sale of the Optodot assets to 24M was part of a plan to generate funds to pay self-serving and unearned fees to Meta executives, causing those executives to act in a manner adverse to the interests of Meta.

104.    The Transfer is avoidable by the Trustee under 11 U.S.C. § 548(a)(1)(B), and should be set aside as void under 11 U.S.C. § 550(a).

18

105.    In the alternative to voiding the Transfer, the Trustee is entitled to a judgment requiring 24M to pay the fair value of the Optodot assets as that value existed at the time of the Transfer, an amount to be proven at trial but not less than $10 million.

106.    The sale of the Optodot assets to 24M was part of a corrupt plan to generate funds to pay self-serving and unearned fees to Meta executives causing these executives to act in a manner adverse to the interests of Meta. For the reasons stated, 24M was not a good faith purchaser. Further, 24M was not without knowledge that its payment did not constitute reasonably equivalent value for the assets acquired.

/ / /

/ / /

/ / /

## SECOND CLAIM FOR RELIEF
### FRAUDULENT TRANSFER 11 U.S.C. § 548(a)(1)(A)

107.    The Trustee realleges and incorporates herein all prior allegations and paragraphs as though fully set forth herein.

108.    The transfers described herein were made within two years before the petition date with the actual intent to hinder, delay, or defraud creditors of the Debtor.

109.    Actual intent is evidenced by badges of fraud including, without limitation: the Debtor was insolvent at the time of the transfers. Financial advisors had warned Meta that below market sales of Meta's assets could be attacked as fraudulent conveyances. The transfer comprised a large component of Meta's assets. The consideration received was a fraction of the assets' actual values. The transfers occurred weeks before a planned bankruptcy filing. Insiders benefited from the proceeds. The proceeds were used for insurance premiums, bonuses, and prepaid consulting agreements. Part of the assets sold to 24M included the Siemens Healthcare Diagnostics license

19

and infrared security-marking technology, both licensed at below-market terms without separate valuation or allocation of purchase price. All the forgoing hindered and delayed the creditors' claims and rights and were committed in such a way as to defraud Meta's creditors.

110. 24M was not a good faith purchaser without knowledge that their payment did not constitute reasonably equivalent value for the assets acquired.

111. The transfers are avoidable under 11 U.S.C. § 548(a)(1)(A).

## THIRD CLAIM FOR RELIEF
### FRAUDULENT TRANSFER UNDER NRS 112.180(1)(a)

112. Meta alleges and incorporates herein all prior paragraphs and allegations as though fully set forth herein, including the allegations in the first claim for relief.

113. As of the date Meta's petition was filed in Case No. 24-50792-gs, there existed one or more creditors holding allowed unsecured claims against Meta who could have avoided the transfer of the Optodot technology under applicable law, and the Trustee is therefore empowered to challenge and avoid the transfers or recover the reasonable value of the Optodot technology and patent estate under 11 U.S.C. § 544(b).

114. At the time of the transfer of the Optodot technology and patent estate, Meta was insolvent because the total of Meta's debts was greater than the total value of Meta's assets at fair valuation. To the extent Meta's marketing or bid materials attributed value to Meta's net operating loss carryforwards in assessing Meta's solvency or asset base, that attribution was materially misleading: under 26 U.S.C. § 382, the post-transaction usability of a net operating loss carryforward following an ownership change is capped by reference to the debtor's equity value at the time of the change, and Meta's equity value in mid-2024 was negligible. Meta's net operating loss carryforwards therefore contributed little or no realizable value to an insolvency analysis,

20

notwithstanding any gross carryforward balance reflected on Meta's books.  Meta's executives and management purposefully failed to disclose all potential assets to which Meta was entitled.

115.    At the time of the transfer, Meta was not generally paying its debts.

116.    24M failed to pay a reasonably equivalent value for the assets it purchased from Meta on or about June 20, 2024.

117.    24M was not a good faith purchaser without knowledge that their payment did not constitute reasonably equivalent value for the assets acquired.

118.    Any subsequent transferee of the Optodot technology and patent estate described herein is liable for the fraudulent conveyance described herein.

119.    This adversary complaint has been filed within two years from the date the Petition was filed for bankruptcy relief in Case No. 24-50792-gs.

120.    This action has been brought within four years after the transfer of Meta's assets were made to 24M.

121.    Pursuant to NRS 112.180(1)(a), the transfer of the Optodot technology and patent estate is fraudulent as to Meta's creditors because Meta made the transfer with the actual intent to hinder, delay, or defraud creditors as shown by the badges of fraud alleged with particularity herein, including that the transfer was made for less than a reasonably equivalent value, while the Debtor was insolvent, and within weeks of the bankruptcy filing.

**FOURTH CLAIM FOR RELIEF**
**FRAUDULENT TRANSFER UNDER NRS 112.180(1)(b) AND NRS 112.190(1)**

122.    The Trustee alleges and incorporates herein all prior allegations and paragraphs as though fully set forth herein.

123.    The transfers described herein were made without the Debtor receiving a reasonably equivalent value in exchange, at a time when the Debtor was engaged or was about to

engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or when the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, in violation of NRS 112.180(1)(b).

124. The transfers described herein were also made without the Debtor receiving a reasonably equivalent value in exchange at a time when the Debtor was insolvent, or the Debtor became insolvent as a result of the transfers, and the claims of creditors described herein arose before the transfers were made, in violation of NRS 112.190(1).

125. At the time of the transfers, the Debtor was not generally paying its debts as they became due, and the Debtor is therefore presumed to have been insolvent pursuant to NRS 112.160(2).

126. 24M was not a good faith purchaser without knowledge that their payment did not constitute reasonably equivalent value for the assets acquired.

127. The Trustee may avoid the transfers pursuant to 11 U.S.C. § 544(b), NRS 112.180(1)(b), and NRS 112.190(1).

## FIFTH CLAIM FOR RELIEF
### CLAIMS PURSUANT TO 11 U.S.C. §§ 550 AND 551

128. The trustee incorporates all prior allegations as though fully set forth herein.

129. To the extent the transfer is avoided under 11 U.S.C. §§ 544 or 548, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property under 11 U.S.C. § 550(a).

130. 24M is the initial transferee of the Optodot technology and patent estate, or the entity for whose benefit that transfer was made, under 11 U.S.C. § 550(a)(1). 24M is the initial

22

transferee of the Optodot technology and patent estate, or is the entity for whose benefit the transfers were made.

131.   The Trustee is entitled to recover the Optodot technology and patent estate, or, at the Trustee's election, its value less the consideration paid, an amount to be proven at trial but not less than $10 million.

132.   Each transfer avoided herein is preserved for the benefit of the estate pursuant to 11 U.S.C. § 551.

133.   24M was not a good faith purchaser without knowledge that their payment did not constitute reasonably equivalent value for the assets acquired.

134.   The Trustee is entitled to recover its costs incurred in prosecuting this action and, to the extent permitted by law, its attorney's fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, The Trustee respectfully requests the Court enter judgment against the Defendants and each of them as follows:

1.   A judgment avoiding the transfer of the Optodot technology and patent estate to 24M pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (B);

2.   A judgment avoiding the transfer of the Optodot technology and patent estate under 11 U.S.C. § 544(b), NRS 112.180, and NRS 112.190;

3.   A judgment under 11 U.S.C. § 550 recovering the fair value of the Optodot technology and patent estate or the assets themselves, for the benefit of the estate, and preserving each avoided transfer for the benefit of the estate under 11 U.S.C. § 551;

4.   For prejudgment interest;

5.   For the Trustee's costs of suit and, to the extent permitted by law, attorney's fees;

6.   For such and other further relief as the Court determines to be appropriate.

23

DATED this 10th day of August, 2026.

ROBISON LAW GROUP
71 Washington Street
Reno, NV 89503


*/s/ Kent R. Robison*
KENT R. ROBISON, ESQ.

CLAYTON P. BRUST, ESQ.
HANNAH E. WINSTON, ESQ.
SBW LAW GROUP
3600 Mayberry Drive
Reno, NV 89509

JEFFREY L. HARTMAN, ESQ.
HARTMAN & HARTMAN
510 W. Plumb Lane, Suite B

*Attorneys for Christina W. Lovato, Trustee*

24