Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re:

META MATERIALS INC., Case No. 24-50792-gs

Debtor Chapter 7

---

**DANIELLE SPEARS'S OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS [ECF No. 2966]**

---

Related filings: **ECF Nos. 2932, 2936, 2966, 2967, 2967-1, 2968, 2978, and 2978-1**

Hearing: **October 13, 2026, at 1:30 p.m.**

Appearance: **Remote, as provided in ECF No. 2968**

## I. RELIEF REQUESTED

Danielle Spears ("Objector") objects to the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims, ECF No. 2966 (the "Sale Motion"). The Sale Motion would assign the estate's claims in Adv. Nos. 26-05037 ("Authentix") and 26-05038 ("24M") to BaileyBridge, Inc. ("BaileyBridge"), an entity "owned and controlled by Greg McCabe," for $250,000 plus twenty percent of net recovery. ECF No. 2978 ¶¶ 7–8. The Trustee's own complaints seek not less than $25 million from Authentix and not less than $10 million from 24M. ECF No. 2932 ¶ 136; ECF No. 2936 ¶¶ 105, 131. Those demands are not guaranteed recoveries, but the Sale Motion does not mention them, does not identify any marketing or

competing offers, and does not explain why the proposed terms realize optimal value—while the Trustee separately holds tolled claims against the purchaser's sole owner. ECF No. 2978 ¶ 9.

The specific orders requested appear in Section VIII.

## II. OBJECTOR'S INTEREST

Objector filed Proof of Claim No. 63-1 on December 16, 2025, and filed proof-of-interest materials concerning her MMTLP/Next Bridge holdings. Claim No. 63-1; ECF No. 2414, p. 1. The Trustee represents that these claims hold "the possibility of substantial recovery for creditors and, possibly, equity holders." ECF No. 2966 ¶ 1; ECF No. 2978 ¶ 4. Any discount in the consideration for the estate's most valuable remaining claims directly reduces the fund from which Objector may recover. A party whose distribution is directly affected by the transfer of estate claims has a pecuniary stake in that transfer. *See Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 778–79 (9th Cir. 1999) (upholding a creditor's standing to appeal an assignment of the estates' only significant assets because the transfer directly affected the creditor's pecuniary interests).

Objector acknowledges the Court's prior rulings concerning her participation, including ECF Nos. 2710 and 2896, and appears solely in her own capacity. This objection is limited to the September 2026 Sale Motion. Fed. R. Bankr. P. 6004(b), 9014.

## III. GOVERNING STANDARDS

### A. Section 363(b) requires a business justification and optimal value, with closer scrutiny where competition is constrained.

A sale outside the ordinary course requires a valid business justification and must be proposed in good faith. *240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (9th Cir. BAP 1996). *Wilde Horse* identifies fairness, adequate marketing, good-faith negotiation and proposal, purchaser good faith, and arm's-length dealing as considerations in determining whether a sale serves the estate's best interests. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). The Court's obligation "is to assure that optimal value is realized by the estate under the circumstances," and notice and hearing exist to provide "a means of objecting and a method for attracting interest by potential purchasers." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005). The Trustee quotes this standard and acknowledges the Court's independent responsibility. ECF No. 2966, ECF p. 6 (printed p. 5), lines 11–18. Although the Trustee's business judgment ordinarily receives deference, the Court retains ultimate responsibility for approval, particularly when creditors object. *Lahijani*, 325 B.R. at 289. When competition is constrained, the resulting price may be less reliable and requires closer examination. *Id.* at 289.

**B. Estate claims may be sold, but the sale must be justified by value and process.**

Avoidance claims may be transferred outside a plan. *P.R.T.C.*, 177 F.3d at 781–82; *Lahijani*, 325 B.R. at 288 ("trustee avoiding powers may be transferred for a sum certain"). That distinction does not bar the sale, but the Trustee must still demonstrate how this transaction benefits the estate under the circumstances. *P.R.T.C.* upheld the assignment after comparing alternatives, including a competing transfer to the principal litigation target that would likely leave creditors no benefit. The approved assignee also faced potential estate claims, but the court considered those claims unlikely to produce a recovery. 177 F.3d at 783. The Trustee invokes *P.R.T.C.*'s rationale of a creditor "pursuing interests common to all creditors," then concedes that "[t]he

assignee in *In re P.R.T.C., Inc.* was a creditor: here, BaileyBridge is an entity owned and controlled by Greg McCabe, a shareholder holding approximately 120,000 shares of Meta common stock." ECF No. 2966 at 4–5. That rationale therefore does not supply the justification. The sale must stand on demonstrated value and a sound process.

Where, as here, the consideration includes a percentage of future net recovery, that component must be valued realistically. *Lahijani* found it "debatable" that a fixed cash offer was the high bid in light of a competing percentage-of-proceeds offer, and observed that a trustee's "zero valuation" of such proceeds "does not inspire confidence in his business judgment." *Lahijani*, 325 B.R. at 289. Analogous settlement-review factors include the probability of success, collection difficulties, litigation complexity, expense, inconvenience and delay, and the paramount interest of creditors, with appropriate deference to their reasonable views. *See Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).

**C. A § 363(m) finding requires evidence of the purchaser's good faith.**

An express good-faith finding is not an essential element of approval under § 363(b); it matters because § 363(m) can limit appellate relief affecting the validity of an unstayed sale to a good-faith purchaser. *Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (9th Cir. BAP 2002); 11 U.S.C. § 363(m). Lack of good faith is typically shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992). The requested finding must rest on an evidentiary foundation addressing the purchaser's good faith and the sale process, not merely a conclusion that the transaction benefits the estate. Unsupported boilerplate in a sale order is insufficient. *Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 880–81 (9th Cir. BAP 2010).

## IV. THE RECORD DOES NOT SUPPORT THE CONSIDERATION

### A. The Trustee's complaints allege substantial losses from the underlying asset transfers.

The Trustee alleges that Nanotech assets worth more than $35 million were transferred for $10 million, and that an Optodot patent estate Meta valued at $19.8 million months earlier was transferred for $825,000. ECF No. 2932 ¶¶ 71, 77, 88–91; ECF No. 2936 ¶¶ 3, 9, 13, 35–36, 58. The Sale Motion omits these figures and provides no quantified valuation, litigation budget, or comparison of expected recoveries, costs, and risks supporting the proposed consideration.

The omission matters because the contingent recovery could substantially exceed the fixed payment. By way of illustration only, a $10 million net recovery would produce $2.25 million for the estate, including the purchase price, and leave BaileyBridge $7.75 million after accounting for its $250,000 payment. The Motion also justifies the $250,000 payment as recovering "a very substantial portion" of investigation costs, but never states those costs. ECF No. 2966 at 6–7. Without them, the Court cannot evaluate the stated justification.

### B. The sale papers identify no marketing history, and Traudt reports that he was not solicited.

The Motion proceeds by private sale and describes no solicitation, competing offer, or counteroffer. ECF No. 2966 at 6. Private sales are permissible, Fed. R. Bankr. P. 6004(f)(1), but a single negotiated offer from a connected purchaser is the kind of constrained competition that calls for closer scrutiny. *Lahijani*, 325 B.R. 289; *Wilde Horse*, 136 B.R. at 841. The Trustee's own complaints fault the original Optodot and Nanotech dispositions for limited competition and information advantages. ECF No. 2936 ¶¶ 5–13, 63, 90–98; ECF No. 2932 ¶¶ 27–30, 73–75. The same concerns apply to disposing of the resulting recovery rights.

On April 22, 2026, Scott Traudt sent the Trustee a formal demand to investigate and prosecute the McCabe avoidance claim or, alternatively, an offer to purchase it under § 363(b). ECF No. 2750, Ex. E, pp. 106–109. He offered to bear all litigation costs and pay the estate twenty percent of net recovery after reimbursement of his costs. *Id.* at 108. Anticipating the risk that a defendant or insider might acquire the claim cheaply, he proposed that any competing bid from a defendant or insider include a minimum floor of $9,000,000 payable to the estate. *Id.* He noted the approaching § 546(a) deadline and requested a written response within ten business days. *Id.* at 109. Neither the Trustee nor her counsel responded. Traudt Decl. ¶¶ 3–4.

Instead, on August 7, 2026, the Trustee's counsel wrote to Mr. Traudt, copying the Trustee: "FYI: The Trustee has entered into a tolling agreement with Greg McCabe. Accordingly, you won't see an adversary proceeding on file today." Traudt Decl. ¶ 5 & Ex. 2. Five weeks later, the Trustee moved to sell the Authentix and 24M claims to McCabe-controlled BaileyBridge for $250,000 plus twenty percent of net proceeds. The complaints seek combined recoveries of not less than $35 million. ECF No. 2932, ¶ 136; ECF No. 2936, ¶ 131. Mr. Traudt was not contacted about, or invited to bid on, the Authentix or 24M claims before the Sale Motion was filed. Traudt Decl. ¶¶ 7–8.

The claims and terms differ, and Objector does not contend that Mr. Traudt's proposal was necessarily superior. But the sale papers do not explain why Traudt was not solicited for these claims while the Trustee advanced a sale to an entity controlled by a person against whom potential estate claims remain preserved through tolling. The Sale Motion does not mention Mr. Traudt's proposal, explain how potential purchasers were identified, or state why a party who had already expressed interest in purchasing estate claims was not approached. *See Lahijani*, 325

B.R. at 288–89 (notice and hearing provide "a method for attracting interest by potential purchasers").

**C. The claims should be exposed to competing bids from all parties in interest before any sale is approved.**

Objector requests an opportunity for qualified shareholders, creditors, and third parties to submit competing proposals under consistently applied qualification requirements. The Trustee identifies McCabe's large shareholding as an incentive to prosecute successfully. ECF No. 2978, ¶ 8. Other qualified purchasers may also offer terms benefiting the estate. The record should explain how notice of the Sale Motion allows them to obtain permissible due-diligence access and submit competing proposals before approval. *See Lahijani*, 325 B.R. at 288–89.

A short, structured process could test for improved terms; its cost and delay should be weighed against the potential benefit. BaileyBridge's offer can serve as the opening bid. Qualified prospective bidders should receive notice, a reasonable submission deadline, and comparable access to nonprivileged due-diligence materials, subject to existing protective orders, appropriate confidentiality agreements, and any necessary court-authorized modifications. ECF No. 2978-1, §§ 5.1(f), 6.4. Bids should be compared on their total expected value to the estate—including cash, the percentage of recovery, the definition of "Net Proceeds," proof of funding and counsel, and settlement oversight—rather than on the upfront payment alone. *See Lahijani*, 325 B.R. at 289–90 (requiring appropriate consideration of a competing offer's contingent recovery component). Objector requests that process because the present record does not demonstrate adequate consideration of alternatives.

The cited sale papers describe potential McCabe claims as preserved through tolling but identify neither a prosecution schedule nor the tolling agreement's expiration date. Traudt reports no response addressing his April 22 purchase proposal. ECF No. 2978, ¶ 9; Traudt Decl. ¶¶ 2–6. *Lahijani* directed consideration on remand of allowing objecting creditors to prosecute estate claims in the Trustee's name at their own risk and expense. 325 B.R. at 291–92. Objector does not ask the Court to decide Traudt's rights here. She requests a documented Trustee position on his proposal and the intended treatment of retained McCabe claims, including any material distinction supporting different treatment of the proposals. That information bears on whether the BaileyBridge sale would impair the estate's ability to prosecute or separately assign claims against the purchaser's owner.

### D. The payment terms shift delay risk to the estate.

The $250,000 is payable within twenty days after the Trustee obtains a final, nonappealable approval order, and no advance deposit is required by the agreement. ECF No. 2978-1, § 4.1. Although § 10.9 makes the agreement subject to Court approval, §§ 6.3–6.4 and 11.1 contemplate substitution, file transfer, and other deliverables without clearly making payment a condition of those steps. The approval order should coordinate payment, transfer of control, and file delivery so the estate does not surrender rights or materials before receiving the required consideration.

## V. GOOD FAITH AND THE PURCHASER'S RELATIONSHIP TO THE ESTATE

### A. The estate relies on an undisclosed tolling agreement concerning the purchaser's owner.

The Trustee identifies a tolling agreement with McCabe concerning his 2023 transactions with Meta, including acquisition of Meta's secured lender position in Next Bridge Hydrocarbons

notes and related collateral. ECF No. 2978 ¶ 9. Estate special counsel acknowledged potential avoidance claims against McCabe in April 2025. ECF No. 1878-4, pp. 3, 5. The ordinary two-year period identified in 11 U.S.C. § 546(a)(1)(A) has elapsed, and the Trustee invokes the agreement to preserve potential estate claims. Its scope, duration, termination rights, and any restrictions on prosecution or assignment therefore matter to the estate's retained recovery rights.

Objector raised the McCabe transaction with Trustee's counsel initially in October, 2025 and again in January 2026. Spears Decl. ¶ 6 & Ex. B. In September, Mr. Traudt requested the agreement's duration and filing status; Objector separately requested the executed agreement and a factual chronology. Neither has received the agreement or the requested explanation. Traudt Decl. ¶ 6 & Ex. 3; Spears Decl. ¶¶ 3–5 & Ex. A.

The Trustee calls the agreement "not material to the § 363 analysis" and denies prior relationships or undisclosed connections "between BaileyBridge and me" suggesting self-dealing. ECF No. 2978 ¶¶ 9, 13. Those statements do not disclose the terms governing the estate's continuing dealings with BaileyBridge's owner. The record should establish whether tolling and sale negotiations overlapped, who participated, and whether any release, forbearance, assignment restriction, or other term affects retained claims. The agreement's existence establishes neither liability nor bad faith; its undisclosed terms prevent informed evaluation of this objection. Objector requests deferral of approval pending the targeted disclosure sought in her separate Production and Bidding Motion, including filing the executed agreement and amendments, subject to justified protection under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018.

**B. The potential claims concern substantial transactions requiring independent evaluation.**

Meta's financial statements describe loans made to Next Bridge in 2021 and 2022. On August 7, 2023, Meta sold its lender interests, with $24.0 million outstanding, to McCabe for $6.0 million cash and entered a linked agreement for $6.0 million in purchases of Meta stock. The stock purchases were priced at 120% of the preceding five-day volume-weighted average price. Meta Form 10-K for the year ended December 31, 2023 ("2023 10-K"), Note 5; Meta Form 10-Q for the quarter ended March 31, 2024 ("March 2024 10-Q"), Note 5.

McCabe purchased approximately $0.5 million of stock before the parties terminated the stock purchase agreement on January 21, 2024. The release required $700,000 cash, return of the purchased shares, and another $700,000 if Meta's stock reached a specified value within two years. The March 2024 report confirms receipt of the first $700,000 and return of the shares. March 2024 10-Q, Note 5. The approximately $7.2 million in reported cash receipts spans the note sale, stock purchases, and release. The release of the remaining $5.5 million stock-purchase commitment requires a separate valuation of Meta's contractual rights, accounting for its corresponding stock-issuance obligations, the cash and returned shares, the contingent payment, and enforceability and collectibility.

Meta reported a collateral-dependent carrying value of $0.4 million for the notes on August 7, 2023, and initially valued the stock-purchase premium at $0.9 million. 2023 10-K, Note 5. Neither the $24.0 million outstanding balance nor the accounting carrying value resolves reasonably equivalent value. The acquired rights included Meta's lien on a 25% Orogrande working interest, which Next Bridge's contemporaneous announcement describes as assigned to McCabe. ECF No. 2674, p. 29. The inquiry requires evaluation of the lender rights, collateral, and linked consideration actually transferred.

A qualifying transfer of the debtor's property within two years before the petition may be avoided upon proof of actual fraudulent intent, or less than reasonably equivalent value together with a statutory financial condition, subject to applicable defenses. 11 U.S.C. § 548(a)(1)(A)–(B), (c). Both transactions fall within the lookback period, but financial distress and a discount from face amount alone do not establish avoidability. Objector seeks no determination of McCabe's liability or a fixed recovery amount. The issue is whether assigning litigation control to his company would impair the estate's independent evaluation, prosecution, or separate assignment of potential claims against him. ECF No. 2978 ¶ 9; ECF No. 2978-1 §§ 7.1–7.3.

**C. Purchaser-side relationships and information access require sale-specific clarification.**

McCabe and Palikaras participated in the 2020–2021 merger negotiations, and Palikaras signed the 2023 note sale to McCabe. Torchlight Energy Resources, Inc., Definitive Proxy Statement (Schedule 14A) at 104–07 (May 10, 2021) ("Merger Proxy"); Loan Sale Agreement (Aug. 7, 2023), signature page. The Trustee describes Palikaras as an "invaluable source of historical information." ECF No. 2831, p. 8. Fee records expressly document consultations with him about potential McCabe litigation and the prepetition release. ECF No. 2265-6, pp. 19–20. Those consultations make it important to identify who independently assessed purchaser selection and the retained claims, because an information source participated in the underlying transaction.

Eric Browndorf, BaileyBridge's designated notice contact, previously communicated with estate professionals as Palikaras's counsel. ECF No. 2978-1 § 8; ECF No. 2265-6, p. 6; ECF No. 2265-2, p. 14. The overlap concerns his representation of Palikaras and BaileyBridge, not of the Trustee, whose separate representation is specified in the agreement. ECF No. 2978-1 § 12.1. Billing references to the Meta–Maxwave NDA and a "possible joint privilege agreement" do not identify an executed agreement governing purchaser-side use of estate information. ECF No.

2265-3, p. 8; ECF No. 2265-6, p. 6. Christian Attar's disclosed NBH engagement and acknowledgment that Trustee's counsel advised him of potential McCabe claims add another relationship requiring sale-specific explanation. ECF No. 1878 ¶¶ 5–13; ECF No. 1878-4, p. 3.

These relationships alone do not establish bad faith. *Ewell* addresses the integrity of the sale, including fraud, collusion, or a grossly unfair advantage over other bidders. 958 F.2d at 281. The proponent of § 363(m) protection bears the burden of establishing good faith; a challenged finding requires an evidentiary foundation. *T.C. Investors v. Joseph (In re M Capital Corp.)*, 290 B.R. 743, 747–48, 752 (9th Cir. BAP 2003). The record should therefore address who introduced the opportunity, when BaileyBridge was formed and negotiations began, and what nonpublic estate information purchaser-side participants received and on what terms. These questions concern the fairness of this sale, not reconsideration of prior counsel-retention rulings. Pending that clarification, Objector opposes the requested § 363(m) finding.

**D. The Trustee's treatment of Mr. Palikaras bears on the independence of her evaluation.**

The Trustee's reliance on Mr. Palikaras warrants scrutiny because he signed the note sale underlying the tolled McCabe claims. Mr. Browndorf, identified in estate fee records as Mr. Palikaras's counsel, is now BaileyBridge's designated notice contact. See Sections V.B–C. The following record bears on whether those relationships affected purchaser selection, valuation, or access to estate information:

1. **Reliance as a source and team member.** The Trustee describes Mr. Palikaras as an "invaluable source of historical information" and has stated she has no obligation to explain her reasons for interacting with him. ECF No. 2831, p. 8. Estate fee records go further. Within weeks of the petition, his counsel, Mr. Browndorf, told the Trustee's counsel about "information George

Palikaras would like to provide to Trustee Lovato re: fraudulent transfers." ECF No. 2265-6, p. 4 (Aug. 29, 2024). On December 3, 2024, Mr. Palikaras and Mr. Browndorf participated in the "[f]irst weekly call with litigation team," alongside the estate's special and avoidance counsel. *Id.* at 11. On November 1, 2024, the Trustee, Mr. Browndorf, and Mr. Palikaras conferred about "potential voidable transfers involving 24M and Nanotech/Authentix"—the claims now proposed for sale. *Id.* at 7. Further, the Trustee's counsel received an April 6, 2025 "[l]engthy e-mail from George Palikaras re: potential litigation involving NextBridge and McCabe and potential conflict issues"; held an April 7, 2025 "[l]engthy call with George Palikaras re: . . . potential McCabe litigation and pre-filing settlement and release agreement approved by BoD, potential fraudulent transfer action"; and "[d]iscuss[ed] fraudulent transfer litigation with George Palikaras" on June 19, 2025. *Id.* at 19, 29; *see id.* at 20, 30. These entries establish his participation in discussions of potential claims involving McCabe, but do not identify his role, if any, in the proposed sale.

2. **Favorable portrayal.** The Authentix complaint credits him with a rejected $45 million rescue offer. ECF No. 2932 ¶¶ 64–68.

3. **Insurance access.** On the Trustee's application, the Court lifted the stay so Meta's D&O insurer could make payments to him under his indemnification agreement. ECF Nos. 116, 120.

4. **Access to estate matters.** Estate fee records reflect communications with his counsel, Mr. Browndorf, concerning potential estate claims and a forensic copy of Mr. Palikaras's laptop, and concerning his possible offer to purchase estate assets in Pleasanton, London, and Athens. ECF No. 2265-6, p. 6; ECF No. 2265-2, p. 14.

**5. Regulatory context.** The SEC matters described in Section V.B bear on evaluating Mr. Palikaras's information and potential estate claims concerning his conduct. The sale record should explain how those matters were considered when assessing his information. The consent order against Meta does not establish Mr. Palikaras's personal liability. Claim No. 70-1, Part 3, at 2 n.1.

**6. Potential claims against Mr. Palikaras.** The cited record does not disclose the Trustee's conclusions regarding potential claims against Mr. Palikaras arising from the August 2023 note sale he signed, or whether any such claims remain preserved. Applicable deadlines depend on nonbankruptcy law, effective tolling, and 11 U.S.C. § 108(a). A September 17, 2024 entry references "potential claims against George Palikaras," without identifying the note sale. ECF No. 2265-2, p. 3. A November 19, 2024 entry mentions "potential of a tolling agreement" in a conference with Mr. Browndorf but identifies neither the counterparty nor the claims. ECF No. 2265-6, p. 10. The sale record should identify whether any claims against Mr. Palikaras are retained and protected from impairment by the assignment.

Cooperation with a former officer and court-authorized insurance payments do not themselves establish purchaser bad faith. Objector challenges this sale, not the prior orders. Under *Ewell*, purchaser bad faith may be shown by fraud, collusion, or an attempt to gain a grossly unfair advantage over other bidders. 958 F.2d at 281. Before making a § 363(m) good-faith finding, the Court should require a record explaining whether Mr. Palikaras's and Mr. Browndorf's relationships affected purchaser selection, information access, valuation, or protection of retained claims.

**E. The Assignment does not expressly require the promised settlement review.**

The Trustee states that she "will comply with F.R.Bankr.P. 9019" if the litigation is resolved. ECF No. 2978 ¶ 12. Yet §§ 7.1–7.2 give BaileyBridge the "exclusive right" to control litigation and "authority to settle the Claims in its sole discretion." Those provisions require notice and good-faith consideration of the Trustee's comments, but do not expressly require her consent or prior court approval. ECF No. 2978-1 §§ 7.1–7.2. *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 420–22 (9th Cir. BAP 2003), addresses a trustee's disposition of estate claims; it does not establish automatic review of a purchaser's later settlements. The Court need not decide Rule 9019's post-assignment reach to address this gap. Any approval should be conditioned on the parties' conforming the Assignment and sale order to require prior court approval of settlements and expressly preserve the estate's unassigned claims. Those protections matter because the estate retains a twenty-percent interest in net recoveries while the purchaser's owner faces potential estate claims. ECF No. 2978 ¶¶ 7–9.

## VI. TERMS THAT PLACE ESTATE RECOVERIES AT RISK

1. **Scope and insurance rights.** Sections 1.1 and 3.1 extend beyond named defendants to unknown defendants and related claims arising from the complaints' allegations. ECF No. 2978-1 §§ 1.1, 3.1. The Authentix complaint names Does I–V, and both complaints allege that later management used asset-sale proceeds for D&O insurance and insider payments. ECF No. 2932 at 1, ¶¶ 28–30; ECF No. 2936 ¶¶ 84, 109. The Assignment could encompass related claims against unnamed insiders or transferees, but that does not establish inclusion of the separate McCabe note-sale claims. Any approval should identify the transferred claims by transaction and defendant category and expressly reserve all estate claims against McCabe, Mr. Palikaras, and current or former officers and directors, whether named or unnamed.

Prior orders authorized insurance payments to Mr. Palikaras and Kenneth Rice and defense-cost advances to McCabe and other Next Bridge insureds. ECF Nos. 116, 120, 1568, 1574. The latter stipulation provides that specified payments reduce the applicable limit and are not estate property. ECF No. 1568 ¶ 12. Objector does not challenge those orders or assume that all D&O proceeds belong to the estate. More directly, § 1.2 expressly includes "insurance recoveries" in "Proceeds," which § 2.1 transfers. ECF No. 2978-1 §§ 1.2, 2.1. Any approval should identify the insurance rights transferred, any overlap with coverage supporting retained claims, and remaining applicable limits, while preserving estate rights supporting retained claims, subject to policy terms and existing orders.

2. **Deductions and reporting.** Section 4.2 deducts reasonable, documented prosecution expenses, including attorneys' fees, before calculating the estate's twenty-percent share. Sections 6.1 and 7.3 require cooperation and information about material developments, but provide no express accounting or audit procedure. Any approval should require disclosure of deductible fee terms, itemized recovery-and-cost statements, access to supporting nonprivileged records, and a procedure to challenge deductions and value noncash recoveries. ECF No. 2978-1 §§ 1.2, 4.2, 6.1, 7.3.

3. **No express diligence or reversion protection.** Sections 7.1–7.3 grant litigation control and require consultation, but specify no prosecution milestones or reversion mechanism. Any approval should be conditioned on agreed diligence standards and a defined reversion procedure for abandonment or unjustified inactivity, with notice and an opportunity to cure. ECF No. 2978-1 §§ 7.1–7.3.

4. **Indemnity security.** Section 5.3 calls for $25,000 security naming the "Assignee" as a beneficiary, although the Assignee owes the indemnity. Any approval should require the actual

instrument and corrected beneficiary terms expressly protecting the Trustee in her representative capacity and the estate, with issuance, duration, and enforceable draw rights established before transfer. ECF No. 2978-1 § 5.3.

## VII. REQUESTED DISCLOSURES AND PROCEDURE

Before any approval, Objector requests that the Trustee file a supplemental declaration, with existing nonprivileged documents, addressing:

1. all solicitations, offers, and counteroffers for the Authentix and 24M claims, including any proposals by Mr. Traudt; separately, the Trustee's consideration of his April 22, 2026 proposal concerning McCabe;

2. the investigation costs, valuation, and assumptions supporting the $250,000 payment and twenty-percent interest;

3. the chronology of the BaileyBridge negotiations and of the McCabe Tolling Agreement—including who initiated each, when BaileyBridge was formed, and whether either was proposed or agreed in connection with the other;

4. the executed McCabe Tolling Agreement, any amendments, and the January 2024 release; and

5. any agreement governing Mr. Palikaras's or Mr. Browndorf's receipt or use of estate information concerning these claims, and the § 5.3 security instrument.

Objector requested these records informally. Spears Decl. ¶¶ 3–5 & Ex. A. Objector has served requests under Fed. R. Bankr. P. 9014(c) and 7034 and seeks expedited response and production deadlines under Fed. R. Civ. P. 34(b)(2)(A), resolution of objections, and a continuance

permitting supplemental briefing after production. Disputed material facts necessary to decide the Sale Motion should be set for an evidentiary hearing under Rule 9014(d)–(e) and LR 9014(a)(7). Privilege and work-product claims should be logged, with redaction or in camera review as ordered. Consistent with LR 9014(i), affirmative relief beyond denial or conditions of approval is requested by separate motion, with a request for shortened time under LR 9006 to be heard with the Sale Motion.

Objector requests judicial notice of the existence, filing dates, and statements made in the SEC filings excerpted in Spears Declaration Exhibits C–F, not the truth of disputed factual assertions. Fed. R. Evid. 201; *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

## VIII. REQUESTED ORDERS

Objector respectfully requests that the Court:

1. Deny the Sale Motion without prejudice on the present record; or, alternatively,

2. Continue the hearing until the Trustee has produced the documents and made the disclosures described in Section VII, and decide the Sale Motion on that record;

3. Before approval, require a competitive process under which: (a) the Trustee files and serves notice of BaileyBridge's proposed terms and the opportunity to overbid on all creditors, equity security holders who have appeared or filed proofs of interest, service-list parties, and known prospective purchasers; (b) public complaints remain freely available, and prospective bidders receive comparable access to nonprivileged diligence materials, subject to existing protective orders and reasonable confidentiality terms; (c) proposals are due no earlier than 90 days after service of notice, allowing time to retain litigation counsel and satisfy reasonable funding and counsel qualifications applied equally; (d) the Trustee reports all proposals and compares cash,

contingent recoveries, costs, risk, and closing certainty; and (e) the Court considers qualified proposals at a continued hearing;

4. On the separately noticed motion, require the Trustee to disclose the McCabe Tolling Agreement's expiration and termination terms and her plan for preserving or prosecuting the claims; if she does not intend to prosecute them before protection ends, require her response to Mr. Traudt's April 22, 2026 proposal and consideration of competing purchase or prosecution proposals, with any transfer or third-party prosecution subject to separate notice and approval;

5. Limit any assignment to identified claims and defendant categories arising from the pleaded transfers in Adv. Nos. 26-05037 and 26-05038; expressly reserve all claims against insiders, McCabe, Mr. Palikaras, and current or former officers and directors, named or unnamed, and all other unassigned claims; and preserve insurance rights supporting retained claims, subject to policy terms and existing orders;

6. Condition approval on an executed amendment requiring the Trustee to seek, and BaileyBridge to obtain, prior court approval of settlements and releases through Rule 9019 procedures; periodic accounting and audit rights covering Net Proceeds deductions and noncash recoveries; agreed diligence standards and reversion for an uncured material default after notice and an opportunity to cure; and issued § 5.3 security protecting the Trustee in her representative capacity and the estate;

7. Decline to make a § 363(m) good-faith finding on the present record and decline to waive the fourteen-day stay under Fed. R. Bankr. P. 6004(h); and

8. Grant such further relief as is just.

## IX. CONCLUSION

The Trustee proposes to sell the Authentix and 24M claims for $250,000 and twenty percent of Net Proceeds. Her complaints seek at least $35 million collectively, but those demands are not a valuation of the claims. The sale papers identify no competitive marketing process or comparison of offers. Mr. Traudt's unanswered April 22 proposal concerned separate claims against McCabe, not the claims now offered. The purchaser's owner faces potential estate claims under an unproduced tolling agreement, and the former officer who signed the note sale underlying those claims has supplied information to the Trustee while his counsel now appears for the purchaser.

These circumstances do not establish misconduct. They warrant a fuller record concerning value, the sale process, retained claims, and the requested § 363(m) finding. *Lahijani*, 325 B.R. at 288–89; *Ewell*, 958 F.2d at 281. Objector therefore requests denial without prejudice or, alternatively, the disclosures, competitive process, and protections described in Section VIII.

Dated: September 28, 2026.

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091
paymmtlpnow@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on September 29, 2026, I served the foregoing Objection, the Declaration of Danielle Spears with exhibits, and the Declaration of Scott Traudt on the following by email and U.S. Mail:

- Jeffrey L. Hartman, Hartman & Hartman, counsel for the Trustee (notices@bankruptcyreno.com)
- Kent R. Robison, Robison Law Group, and Clayton P. Brust, SBW Law Group, counsel for the Trustee
- Christina W. Lovato, Chapter 7 Trustee (trusteelovato@att.net)
- Michael R. Brunet and Eric Browndorf, Cooper Levenson, counsel for BaileyBridge, Inc.
- Nathan G. Kanute, Charles E. Gianelloni, and Alexis R. Wendl, Snell & Wilmer L.L.P., counsel for BaileyBridge, Inc. (nkanute@swlaw.com; cgianelloni@swlaw.com; awendl@swlaw.com)
- Office of the United States Trustee, Region 17 (USTPRegion17.RE.ECF@usdoj.gov)
- All parties registered to receive electronic notice in this case

Danielle Spears

Danielle Spears

9/29/26

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re:

META MATERIALS INC.,

Debtor.

Case No. 24-50792-gs

Chapter 7

Hearing Date: October 13, 2026

Hearing Time: 1:30 p.m.

---

**DECLARATION OF DANIELLE SPEARS IN SUPPORT OF OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS [ECF No. 2966]**

---

I, Danielle Spears, declare as follows:

1. I am the Objector. I am over eighteen years of age and have personal knowledge of the facts stated in this declaration, except where stated to be based on public filings, which I identify. If called as a witness, I could and would testify competently to these facts.

2. I filed Proof of Claim No. 63-1 in this case on December 16, 2025, and filed proof-of-interest materials concerning my holdings. ECF No. 2414. I hold an equity interest in Meta Materials Inc. I filed my proofs of interest for 7300 shares of MMTLP/NBH issued by Meta Materials Inc.

3. On September 25, 2026, I sent an email to Jeffrey L. Hartman, counsel for the Trustee, with copies to Trustee Lovato and Scott Traudt, requesting existing records and brief factual answers concerning the proposed sale, including all solicitations and offers for the claims, the basis for the price, the chronology of the BaileyBridge negotiations and the McCabe tolling agreement, a copy of the executed tolling agreement, and any agreement governing Mr. Palikaras's or Mr. Browndorf's access to estate information. A true and correct copy of that email is attached as **Exhibit A**.

4. As of the date of this declaration, I have received no response.

5. I have not received a copy of the McCabe tolling agreement, and, based on my review of the docket, it has not been filed in this case.

6. On January 3, 2026, following a December 31, 2025 conference call with the Trustee's counsel, I emailed Mr. Hartman identifying "[t]he McCabe transaction" as a potential "'sweetheart' arrangement that may support a clawback of approximately $17 million or more." A true and correct copy of that email is attached as **Exhibit B**.

7. On October 17, 2025, I had an approximately one-hour telephone call with Mr. Hartman, which I previously described under penalty of perjury. ECF No. 2413, pp. 31–35. During that call, I told Mr. Hartman about the sale of Meta's Next Bridge notes to Gregory McCabe and about Wes Christian's ties to Mr. McCabe and Next Bridge Hydrocarbons. *Id.* at 33–34, 55 ¶ 12.

On December 31, 2025, I raised concerns with the Trustee's counsel regarding the estate's reliance on information provided by George Palikaras. ECF No. 2587, pp. 37–44, ¶¶ 27–29.

8. On October 17, 2025, during a telephone conference call with Mr. Hartman, Mr. Hartman described George Palikaras as a "good guy" and asked for my opinion. I expressed to Mr. Hartman that I believed that Mr. Palikaras was pushed out of his own company and at that time, I agreed with Mr. Hartman that Mr. Palikaras was a good guy.

9. Attached are true and correct copies of the following publicly available documents, which I downloaded from the Securities and Exchange Commission's EDGAR database (www.sec.gov):

(a) **Exhibit C**: excerpts of Meta Materials Inc.'s Form 10-Q for the quarter ended June 30, 2023 (cover page; Note 3, "Going concern"; and pages 29–30, "Sale of Next Bridge Notes Receivable");

(b) **Exhibit D**: excerpts of Meta Materials Inc.'s Form 10-Q for the quarter ended March 31, 2024 (cover page and Note 5, "Notes Receivable");

(c) **Exhibit E**: excerpts of Meta Materials Inc.'s Form 10-K for the year ended December 31, 2023 (cover page and Note 28, "Subsequent Event"); and

(d) **Exhibit F**: excerpts of Torchlight Energy Resources, Inc.'s Definitive Proxy Statement on Schedule 14A (Form DEFM14A) dated May 10, 2021, for the June 11, 2021 special meeting of stockholders (cover pages and pages 104–07, from the section titled "Background of the Arrangement").

10. I submit this declaration in support of my objection and do not ask the Court to make any finding regarding any person's intent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2026, at Peoria, Arizona.

Danielle Spears

Danielle Spears, Pro Se

10701 N. 99th Ave. Lot 159

Peoria, AZ 85345

480-476-1091

paymmtlpnow@gmail.com

# SPEARS DECLARATION

# EXHIBIT A

Gmail

Danielle Spears <paymmtlpnow@gmail.com>

# Case No. 24-50792-gs—Proposed Authentix/24M Sale to BaileyBridge—Limited Request for Records and Clarification

1 message

**Danielle Spears** <paymmtlpnow@gmail.com> Fri, Sep 25, 2026 at 4:26 PM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>
Cc: Scott Traudt <sctraudt@gmail.com>, Christina Lovato <trusteelovato@att.net>

Dear Mr. Hartman:

I am writing on my own behalf concerning the proposed sale of the Authentix and 24M litigation claims to BaileyBridge. **I oppose approval on the present record and am preparing a written objection.** Before asking the Court to address the missing information, I request voluntary production of the following limited records and brief factual clarification.

**1. Price and purchaser selection.** Who evaluated and recommended the $250,000 payment plus twenty percent of net recovery, and what factual basis supported those terms? Please identify the professionals consulted, the investigation-expense amount relied upon, and whether any independent valuation or review occurred.

Who else was approached, what actual offers or counter offers were received, and how were they evaluated? Please provide the existing written offers and any nonprivileged valuation or comparison actually relied upon.

**2. Palikaras's confidentiality obligations and information access.** Does an executed NDA, confidentiality, common-interest, or similar agreement govern Palikaras's participation in estate matters or his or Browndorf's receipt and use of estate information concerning Authentix, 24M, or retained estate claims? Please provide the operative agreement and any amendments or waivers affecting its protections. Briefly identify its parties, effective date, information covered, and restrictions on use or onward disclosure.

For identification, the **September 11, 2024 entry at ECF No. 2265-3, page 8**, concerns the Meta–Maxwave NDA and waiver of rights. The **September 27, 2024 entry at ECF No. 2265-6, page 6**, separately mentions a possible joint-privilege agreement. Please identify whether either arrangement presently governs this access. I am not assuming these entries establish a separate agreement signed by Palikaras. If no agreement exists, please identify any existing order or other restrictions relied upon instead.

**3. Tolling agreement and chronology.** Please provide the executed McCabe tolling agreement and operative amendments or extensions. What was the earliest date tolling was proposed or discussed, who initiated contact with whom, when did each party sign, and what is the effective date?

Your **August 7, 2026 email to Scott Traudt, copying Lovato**, states that an agreement had been entered into and that an adversary proceeding would not be filed that day. Please identify who participated in the decision to enter the tolling agreement and when that decision was reached. I am not requesting counsel's assessment of the merits of an unfiled claim. The email establishes that an agreement existed by August 7, but not when discussions began or signatures occurred. Please also provide the earliest existing nonprivileged written tolling proposal or contemporaneous record identifying when those discussions began.

**4. Beginning of acquisition discussions.** What was the earliest date purchasing either the Authentix or 24M claim was proposed or discussed? Who initiated contact, whom did that person approach, and how was the recipient identified—including any introduction or referral?

Please include discussions involving McCabe or intermediaries before BaileyBridge's formation, distinguish the two claims if discussions began separately, and provide the earliest existing written acquisition proposal. If the initial discussion was oral, please identify its approximate date and participants.

**5. Participation and any connection between the decisions.** Please identify whether **James W. Christian, Gregory McCabe, George Palikaras, or Eric Browndorf** participated, directly or through others, in the tolling arrangement or proposed acquisition. If so, approximately when, in what capacity, and what nonprivileged factual contribution or recommendation did each make?

Was any acquisition term, price, funding commitment, indemnity, information access, or other accommodation proposed or agreed in connection with postponing, limiting, releasing, or otherwise treating potential estate claims against McCabe?

Please identify who evaluated whether the two arrangements were independent and who made the respective decisions.

**At this stage, I am requesting existing documents and brief factual answers—not sworn declarations, a complete communication history, a billing audit, or privileged legal advice.** Where an answer is no or none, please say so expressly. If a date is approximate, please identify it as approximate.

Exact docket, attachment, and page references will suffice for accessible filed documents. If an item cannot be provided, please identify the item and the reason, including any protection or court order relied upon, and whether a redacted copy or limited factual response would address the concern. If another person holds the responsive records, please identify the appropriate custodian.

Please acknowledge receipt by Monday, September 28, 2026, and provide any readily available responsive documents and factual answers by that date so they can be considered before the September 29 objection deadline. If additional time is needed for particular items, please identify those items and the earliest anticipated production date. Please do not delay available documents while other items are being collected. I am available for a brief telephone conference to narrow any remaining questions about scope, protection, custodians, or timing.

This is a request for voluntary production and clarification, not formal service of discovery. I will continue to observe the applicable court deadlines.

Thank you,

**Danielle Spears**
480-476-1091
paymmtlpnow@gmail.com

# SPEARS DECLARATION

# EXHIBIT B

Gmail **Danielle Spears <paymmtlpnow@gmail.com>**

## Conference call

**Danielle Spears** <paymmtlpnow@gmail.com> Sat, Jan 3, 2026 at 11:02 AM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>

Hi Jeff,

Thank you again for meeting with us. I appreciate the time you took and the opportunity to speak directly.

I recognize that I provided a large volume of information, and I want to acknowledge your point that it can be difficult to be succinct. This matter has unfolded for me over more than three years, largely in real time, and it traces back even further. As a result, I carry a significant amount of detail, context, and chronology that is difficult to condense in a short discussion. I appreciate your patience, and I apologize if the presentation felt fragmented.

I do believe that if there were an opportunity to walk through the full timeline in a more structured setting, the overall picture—and the significance of certain omissions—would become much clearer. There is simply a substantial amount of ground to cover.

I want to clarify one point in particular. My concerns regarding Mr. Christian are not personal in nature. They are directly tied to MMTLP and to specific issues that, in my view, bear directly on potential asset recovery for the estate. When I raise these issues, my intent is not to assign personal fault, but to highlight material avenues that appear not to have been fully pursued or disclosed.

Specifically:

1. **The McCabe transaction** — There appears to be a "sweetheart" arrangement that may support a clawback of approximately $17 million or more.

2. **Broadridge shareholder data** — Subpoenaing this data would, as you know, immediately identify the full shareholder list, enable proper notice, allow for a new bar date, and confirm the extent to which both MMAT and MMTLP were oversold.

3. **Traudt–Fleming / TD Ameritrade (now Schwab) audio** — This recording includes a broker-dealer admission that MMTLP was trading at approximately 100x. Given that MMTLP traded as low as $2.90, that implies at least $290 per share; at higher prices exceeding $12, the implied exposure exceeds $1,200 per share.

While MMAT was undoubtedly manipulated, it is minor by comparison to MMTLP. The scale of MMTLP exposure is where the real recovery potential appears to lie.

From a bankruptcy perspective, if the estate were able to resolve even a portion of this exposure, whether framed as settlement of approximately 165 million shares or a much larger short position potentially exceeding 600 million shares, the financial implications would be extraordinary. At $300–$1,200 per share, the numbers speak for themselves.

In my view, this explains why broker-dealers, and particularly FINRA, have fought so aggressively to prevent this data from being examined. The use of "halted until deleted" effectively allowed short positions to avoid being covered, to the direct detriment of retail investors. If it were established that even a single security was oversold multiple times over and then administratively erased to conceal that fact, the regulatory consequences would be severe.

TradeStation has already publicly acknowledged that it does not possess sufficient shares to cover MMTLP. I also possess FOIA materials reflecting communications between the FIF (a broker consortium) and the SEC in which they expressly stated that they did not have the shares to cover MMTLP either. This is not speculative, it is documented.

This is precisely the data that has remained buried for more than three years.

I look forward to the upcoming conference call with Mr. Brust, as I believe it will provide an opportunity to articulate clearly why FINRA has opposed his efforts. In my assessment, once subpoenas sought MMTLP and Torchlight Energy Resources data, the META bankruptcy became an adversary to regulators and to every major broker-dealer involved in selling MMTLP.

Thank you again for your time and consideration. I appreciate your willingness to engage on these issues, and I look forward to continuing the discussion.

Respectfully,
Danielle

[Quoted text hidden]

# SPEARS DECLARATION

# EXHIBIT C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

## FORM 10-Q

RLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the quarterly period ended June 30, 2023
OR
ION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from __________ to__________
Commission File Number: 001-36247

# Meta Materials Inc.
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Nevada<br>(State or other jurisdiction of incorporation or organization) | 74-3237581<br>(I.R.S. Employer Identification No.) |
| 60 Highfield Park Drive<br>Dartmouth, Nova Scotia, Canada<br>(Address of principal executive offices) | B3A 4R9<br>(Zip Code) |

Registrant's telephone number, including area code: (902) 482-5729

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MMAT | Nasdaq Capital Market |

cate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

cate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☐ No ☐

cate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange

| | | | |
|---|---|---|---|
| ler | ☐ | Accelerated filer | ☐ |
| r | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

n emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

cate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☐

of August 7, 2023, the registrant had 477,261,145 shares of common stock, $0.001 par value per share, outstanding.

**Recently Issued Accounting Pronouncements**

We currently have no material recent accounting pronouncements yet to be adopted.

**3. Going concern**

At each reporting period, we evaluate whether there are conditions or events that raise substantial doubt about our ability to continue as a going concern within one year after the date that the financial statements are issued. Our evaluation entails analyzing prospective operating budgets and forecasts for expectations of our cash needs and comparing those needs to the current cash and cash equivalent balances. We are required to make certain additional disclosures if we conclude substantial doubt exists and it is not alleviated by our plans or when our plans alleviate substantial doubt about our ability to continue as a going concern.

In accordance with Accounting Standards Codification, or ASC, 205-40, *Going Concern*, we evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern within one year after the date that these consolidated financial statements are issued. This evaluation initially does not take into consideration the potential



mitigating effect of management's plans that have not been fully implemented as of the date the financial statements are issued. When substantial doubt exists under this methodology, management evaluates whether the mitigating effect of its plans sufficiently alleviates substantial doubt about our ability to continue as a going concern. The mitigating effect of management's plans, however, is only considered if both (1) it is probable that the plans will be effectively implemented within one year after the date that the condensed consolidated interim financial statements are issued, and (2) it is probable that the plans, when implemented, will mitigate the relevant conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that these condensed consolidated interim financial statements are issued. In performing its analysis, management excluded certain elements of its operating plan that cannot be considered probable.

We have incurred net losses of $312.3 million (including $282.2 million of goodwill impairment) and $79.1 million for the six months ended June 30, 2023 and the twelve months ended December 31, 2022, respectively, and have an accumulated deficit of $521.8 million as of June 30, 2023. Our expectation to generate operating losses and negative operating cash flows in the future and the need for additional funding to support our planned operations, raise substantial doubt regarding our ability to continue as a going concern for a period of one year after the date that these condensed consolidated interim financial statements are issued. Management's plans to alleviate the conditions that raise substantial doubt include reduced spending, and the pursuit of additional capital. On June 6, 2023, our board of directors approved a revised operating plan (the "Realignment and Consolidation Plan") for the remainder of 2023 pursuant to which we have begun, but not yet completed, the process of realigning our corporate structure aimed at reducing our operating expenses and focusing on key applications which represent the greatest near-term revenue potential. As part of this plan, we are exploring alternatives for certain of our technologies including Holography Technology and Wireless Sensing and Radio Wave Imaging Technology. These alternatives may include a divestiture, entering into a joint venture and/or curtailing our investment in these technologies. See Note 20 for details. Management has concluded the likelihood that its plan to successfully obtain sufficient funding from one or more of these sources, or adequately reduce expenditures, while highly possible, is less than probable because these plans are not entirely within our control and/or have not been approved by our board of directors as of the date of these condensed consolidated interim financial statements. If we are unsuccessful in obtaining financing, we will be required to assess alternative forms of action. Accordingly, we have concluded that substantial doubt exists about our ability to continue as a going concern for a period of at least twelve months from the date of issuance of these condensed consolidated interim financial statements.

The accompanying condensed consolidated interim financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the ordinary course of business. The condensed consolidated interim financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might result from the outcome of the uncertainties described above. These adjustments may be material.

**4. Acquisitions**

**Plasma App Ltd Acquisition**

On April 1, 2022, we completed the purchase of 100% of the issued and outstanding shares of PAL, or the PAL acquisition. PAL is the developer of PLASMAfusion®, a proprietary manufacturing platform technology, which enables

The results of the Investigation and the Wells Notice process and any corresponding enforcement action against us or any of the individuals ( SALE OF NEXT 1/1 ., and other potential consequences of responding and complying therewith, including any indemnification obligations of us, are unknown at this time.

Our Board of Directors is reviewing the Wells Notices but has not yet determined its next course of action regarding the Wells Notices. No financial impact of a loss contingency has been recognized in the condensed consolidated interim financial statements, as this matter does not meet the required criteria of being both probable and reasonably estimated at this time.

**Sale of Next Bridge Notes Receivable**

On August 7, 2023, we entered into a Loan Sale Agreement with Gregory McCabe, or Purchaser, under which we sold and assigned to Purchaser all of our rights, title, interests, and obligations in and to those certain loans due from Next Bridge described in Note 6, *Notes receivable,* in exchange for cash consideration of $6.0 million and agreeing to enter into an SPA for an additional $6.0 million of shares of our common stock. Assigned Loan Interests represented $24.0 million of the outstanding balance of the Next Bridge notes receivable as of the Closing Date.

Immediately after the Closing Date and by no later than August 28, 2023, we will negotiate with Purchaser and execute the SPA, escrow agreement and any other required transaction documents pursuant to which: (A) upon a monthly put by us, Purchaser will agree to purchase an aggregate of $6.0 million of shares of our common stock (beginning on September 1, 2023, or as soon as possible after such date if necessary under applicable law, in monthly amounts of $250,000 for the first six months and then in monthly amounts of $500,000 for the next nine months thereafter), at a per share purchase price equal to 120% of the 5-day VWAP of our common stock on



the trading day preceding the date of each such purchase, (B) an escrow agent would hold all of the shares of our common stock that Purchaser has purchased after the Closing Date with any portion of this $6.0 million until the last payment is made, and (C) in the event of a default under such stock purchase agreement, Purchaser will forfeit all of the shares of our common stock described in clause (B) of this paragraph and held by such escrow agent and return such shares to us. In addition, until Purchaser has purchased $6.0 million of shares of our common stock, Purchaser shall have a call option to purchase the then-remaining balance of the $6.0 million of shares of our common stock at a per share purchase price equal to 120% of the 5-day VWAP on the trading day preceding the date of Purchaser's exercise of such call option (subject to compliance with applicable law and subject to compliance with all Nasdaq rules, including the "20% rule").



**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with our condensed consolidated interim financial statements and related notes thereto included in Part I, Item 1 of this Quarterly Report on Form 10-Q. For additional information regarding our financial condition and results of operations, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Part II, Item 7 in the Amendment No. 1 to our Annual Report on Form 10-K/A for the year ended December 31, 2022, filed with the SEC on March 24, 2023, or the Form 10-K/A, as well as our consolidated financial statements and related notes thereto included in Part II, Item 8 of the Form 10-K/A. As discussed in the section titled "Forward-Looking Statements," the following discussion contains forward-looking statements that involve risks and uncertainties. Factors that could cause or contribute to such*

# SPEARS DECLARATION

# EXHIBIT D

sec.gov/Archives/edgar/data/1431959/000095017024058713/mmat-20240331.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

## FORM 10-Q

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2024

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ________ to

Commission File Number: 001-36247

# Meta Materials Inc.
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Nevada**<br>(State or other jurisdiction of incorporation or organization) | **74-3237581**<br>(I.R.S. Employer Identification No.) |
| **60 Highfield Park Drive<br>Dartmouth, Nova Scotia, Canada**<br>(Address of principal executive offices) | **B3A 4R9**<br>(Zip Code) |

**Registrant's telephone number, including area code: (902) 482-5729**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MMAT | Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☐

Cash payments relating to restructuring costs in the three months ended March 31, 2024 were $0.4 million. The costs related to restructuring activities have been recorded in the restructuring expense in the condensed consolidated interim statement of operations and comprehensive loss.

**5. Notes Receivable**

During 2021 and 2022, META loaned money to Next Bridge Hydrocarbons Inc. ("Next Bridge"), which was previously a wholly-owned subsidiary of META until the completion of the spin-off transaction on December 14, 2022, pursuant to a secured promissory note with principal amount of $15.0 million, or the 2021 Note, and unsecured note receivable for principal amount of $5.0 million, or the 2022 Note. The 2021 Note was partially secured by a combination of shares of META's common stock and an interest in the Orogrande Project Property.

In August 2023, we entered into a Loan Sale Agreement with Gregory McCabe, selling all rights, titles, interests, and obligations in the loans previously extended to Next Bridge Hydrocarbons Inc ("Next Bridge Notes Receivable"). This sale was finalized for cash consideration of $6.0 million, representing $24.0 million outstanding balance of the Next Bridge Notes Receivable as of the closing date, August 7, 2023. Concurrently, META and Mr. McCabe agreed on a Stock Purchase Agreement ("SPA"), whereby Mr. McCabe committed to purchasing $6.0 million of shares of our common stock beginning on September 1, 2023, in monthly amounts of $250,000 for the first six months and in monthly amounts of $500,000 for the next nine months thereafter, at a price per share equal to 120% of the 5-day VWAP on the trading day preceding the date of each such purchase. Mr. McCabe purchased 18,517 shares of our common stock for $0.5 million during the year ended December 31, 2023.

On January 21, 2024, we entered into a Release Agreement with Mr. McCabe pursuant to which we and Mr. McCabe agreed to terminate the SPA. Under the terms of the Release Agreement, Mr. McCabe was relieved of any obligation to make additional stock purchases under the SPA. The terms of the Release Agreement require (i) a payment of $700,000 by Mr. McCabe to us, (ii) assignment to us of all stock purchases made by Mr. McCabe under the SPA and (iii) an additional payment of $700,000 by Mr. McCabe to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the 18,517 shares were reassigned to META, for which we recorded $0.1 million of treasury stock as of March 31, 2024.

**6. Inventory**

Inventory consists of photosensitive materials, lenses, laser protection film and finished eyewear, and is comprised of the following:

| | As of March 31, 2024 | As of December 31, 2023 |
|---|---|---|
| Raw materials | $ 512,897 | $ 558,837 |
| Supplies | 10,693 | 10,747 |
| Work in process | 36,999 | 45,912 |
| Finished goods | 42,226 | 43,922 |
| Inventory provision | (478,938) | (490,671) |
| Total inventory | $ 123,877 | $ 168,747 |

# SPEARS DECLARATION

# EXHIBIT E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## FORM 10-K
WASHINGTON, DC 20549

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2023

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM TO

Commission File Number: 001-36247

# Meta Materials Inc.
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Nevada<br>(State or other jurisdiction of incorporation or organization) | 74-3237581<br>(I.R.S. Employer Identification No.) |
| 60 Highfield Park Drive, Dartmouth, Nova Scotia, Canada<br>(Address of principal executive offices) | B3A 4R9<br>(Zip Code) |

Registrant's telephone number, including area code: (902) 482-5729

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | MMAT | Nasdaq Capital Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☐

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for a such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☐ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for a such shorter period that the Registrant was required to submit such files). YES ☐ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging

return.

## 28. Subsequent Events

### Release Agreement with Mr. McCabe

On January 21, 2024, we entered into the Release Agreement with Mr. McCabe pursuant to which we and Mr. McCabe agreed to terminate the SPA. Under the terms of the Release Agreement, Mr. McCabe was relieved of any obligation to make additional stock purchases under the SPA The terms of the Release Agreement require (i) a payment of $700,000 by Mr. McCabe to us, (ii) assignment to us of all stock purchases made by Mr. McCabe under the SPA and (iii) an additional payment of $700,000 by Mr. McCabe to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the shares were reassigned to META and subsequently cancelled.

### Reverse Stock Split

On January 26, 2024, we filed a Certificate of Change with the Nevada Secretary of State to effect the previously announced one-for-one hundred reverse split of the Company's issued and outstanding common stock, and the Reverse Stock Split became effective in accordance with the terms of the Certificate of Amendment at 12:01 a.m. Pacific Time on January 29, 2024. The Reverse Stock Split was approved by the board in accordance with Nevada law.

At the Effective Time, every one hundred shares of common stock issued and outstanding were automatically combined into one share of common stock, without any change in the par value per share. The exercise prices and the number of shares issuable upon exercise of outstanding stock options, equity awards and warrants, and the number of shares available for future issuance under the equity incentive plans have been adjusted in accordance with their respective terms. The Reverse Stock Split affected all stockholders uniformly and will not alter any stockholder's percentage interest in our common stock. We did not issue any fractional shares in connection with the Reverse Stock Split. Instead, fractional shares were rounded up to the next largest whole number. The Reverse Stock Split did not modify the relative rights or preferences of the common stock. The new CUSIP number for the common stock following the Reverse Stock Split is 59134N302.

### February 2024 Offering

On February 19, 2024, we entered into a securities purchase agreement with an institutional investor, providing for the issuance and sale by us, in a registered direct offering, of (i) 600,000 shares of our common stock, par value $0.001, (ii) pre-funded warrants to purchase up to 250,000 shares of Common Stock, and (iii) warrants to purchase up to an aggregate of 850,000 shares of Common

# EXHIBIT F

Torchlight Energy Resources, Inc.
Definitive Proxy Statement on Schedule 14A (Form DEFM14A)
Special Meeting of Stockholders, June 11, 2021
Excerpts: cover pages and pages 104–107
("Background of the Arrangement")

DEFM14A 1 d117540ddefm14a.htm DEFM14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A
**(Rule 14a-101)**
**INFORMATION REQUIRED IN PROXY STATEMENT**
**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**

Filed by the Registrant ☒ Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ **Confidential, For Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a-12

# Torchlight Energy Resources, Inc.
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☒ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount previously paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Table of Contents

*These materials are important and require your immediate attention. They require the stockholders of Torchlight Energy Resources, Inc. to make important decisions. If you are in doubt as to how to make such decisions, please contact your financial, legal or other professional advisor. If you have any questions, you may contact the proxy solicitation agent, D.F. King & Co., Inc., by telephone at 1 (800) 714-3305 (toll-free in North America) or 1 (212) 269-5550 (collect call outside North America), or by email at TRCH@dfking.com.*

**TORCHLIGHT ENERGY RESOURCES, INC.**
**5700 W. Plano Parkway, Suite 3600**
**Plano, Texas 75093**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**
**TO BE HELD JUNE 11, 2021**

We hereby give notice that a Special Meeting of Stockholders of Torchlight Energy Resources, Inc. ("Torchlight") will be held on June 11, 2021, at 9:00 a.m. Central Time (the "Special Meeting"). The purpose of the Special Meeting is to hold a vote of the stockholders of Torchlight regarding:

(1) the issuance of up to approximately 455,000,000 shares of Torchlight common stock, prior to effecting any reverse split of Torchlight's common stock as contemplated herein, in connection with a proposed arrangement (the "Arrangement") with Metamaterial Inc. ("Meta"), pursuant to which Torchlight will acquire Meta, in accordance with the requirements of the NASDAQ Stock Market LLC (the "Arrangement Proposal");

(2) the adoption of an amendment to the Articles of Incorporation of Torchlight (the "Articles Amendment Proposal"), in the form attached hereto as Annex L, to increase the authorized shares of Torchlight's (a) common stock from 150,000,000 shares to 1,000,000,000 shares and (b) preferred stock from 10,000,000 shares to 200,000,000 shares;

(3) the adoption of Amended and Restated Articles of Incorporation, in the form attached hereto as Annex M, in connection with the Arrangement, for the following purposes (the "Articles Amendment and Restatement Proposal"):

(a) to implement a reverse split of Torchlight's common stock within a range from 1-for-2 to 1-for-20, with the exact ratio of the reverse stock split to be determined by the Board of Directors of Torchlight (the "Torchlight Board"); and

(b) to change the name of Torchlight to Meta Materials Inc.

(4) the approval of the postponement or adjournment of the Special Meeting to solicit additional proxies if there are not sufficient votes to approve the Arrangement Proposal and/or the Articles Amendment and Restatement Proposal, if deemed necessary or appropriate by the Torchlight Board (the "Adjournment Proposal"); and

(5) the approval, on a non-binding, advisory basis, of certain compensation that will or may become payable to Torchlight's named executive officers that is based on or otherwise relates to the Arrangement (the "Advisory Proposal").

**Each of the Arrangement Proposal, the Articles Amendment Proposal and the Articles Amendment and Restatement Proposal will not be effected, and the Arrangement will not be completed, without the approval by the Torchlight stockholders of all such proposals.** No other business may be transacted at the Special Meeting.

**Due to the public health impact of the COVID-19 pandemic and to support the health and well-being of our employees and stockholders, the Special Meeting will be held in a virtual meeting format at www.virtualshareholdermeeting.com/TRCH2021.**

Table of Contents

In addition to voting by submitting your proxy prior to the Special Meeting, you also will be able to vote your shares electronically during the Special Meeting. Further details regarding the virtual meeting are included in the accompanying proxy statement.

Under Nevada law, only stockholders of record on the record date, which is May 5, 2021, are entitled to notice of, and to vote at, the Special Meeting or any adjournment. It is important that your shares be represented at this meeting so that the presence of a quorum is assured.

The Torchlight Board has unanimously concluded that the Arrangement is in the best interests of Torchlight and its stockholders and has approved and authorized the Arrangement. **The Torchlight Board unanimously recommends that the stockholders vote FOR (a) the Arrangement Proposal, (b) the Articles Amendment Proposal, (c) the Articles Amendment and Restatement Proposal, (d) the Adjournment Proposal and (e) the Advisory Proposal.**

Your vote is important. Even if you plan to virtually attend the Special Meeting, please date and execute the enclosed proxy and return it promptly in the enclosed postage-paid envelope as soon as possible. If you attend the Special Meeting, you may revoke your proxy and vote your shares during the Special Meeting.

If you have any questions or need assistance in your consideration of the Arrangement or with the completion and delivery of your proxy, please contact Torchlight's proxy solicitation agent, D.F. King & Co., Inc., by telephone at 1 (800) 714-3305 (toll-free in North America) or 1 (212) 269-5550 (collect call outside North America), or by email at TRCH@dfking.com.

**IF YOU PLAN TO ATTEND:**

**To be admitted to the Special Meeting at www.virtualshareholdermeeting.com/TRCH2021 you must have your control number available and follow the instructions found on your proxy card or voting instruction form. You may vote during the Special Meeting by following the instructions available on the Special Meeting website during the Special Meeting. Please allow sufficient time before the Special Meeting to complete the online check-in process. Your vote is very important.**

By Order of the Board of Directors,

John A. Brda

May 10, 2021

John A. Brda
President, Chief Executive Officer and Director

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be held June 11, 2021.**

The proxy statement and form of proxy card are available at: ir.torchlightenergy.com

Table of Contents

**Background of the Arrangement**

The Arrangement Agreement is the result of arm's length negotiations among representatives of Torchlight and Meta and their respective legal and financial advisors. The following is a summary of the background leading up to the announcement of the Arrangement Agreement.

On June 2, 2020, the Torchlight Board met and discussed pursuing strategic alternatives for Torchlight in light of the downturn in the oil and gas industry and the COVID-19 pandemic. At this meeting, John Brda, Torchlight's Chief Executive Officer and President, informed the Torchlight Board that he had received calls and inquiries from acquaintances of Mr. Brda and certain major Torchlight stockholders who were aware of the permeating financial climate of the oil and gas industry in 2020 about potential opportunities for Torchlight to engage in a strategic transaction. The Torchlight Board directed management to continue to engage in discussions regarding potential strategic alternatives for Torchlight. The majority of the potential transaction partners were not engaged in the oil and gas business. Prior to engaging in discussions with Meta, Torchlight considered potential strategic opportunities with several companies outlined below. These discussions often overlapped as Torchlight performed due diligence and negotiated with multiple companies concurrently. During the course of discussions with these companies, on July 28, 2020, Torchlight engaged Roth to serve as its financial advisor in connection with a strategic transaction.

***Company A***

On or about May 15, 2020, a representative of Company A called Mr. Brda to discuss a potential strategic transaction between Torchlight and Company A. Prior to this discussion, Torchlight and Company A had never engaged in any prior transactions and there was no relationship between the companies. Company A is involved in the waste recycling business.

On May 22, 2020, Mr. Brda and Gregory McCabe, chairman of the Torchlight Board, held a conference call with the president of Company A and its representative. The discussion involved the merits of a potential reverse acquisition of Torchlight by Company A and how to potentially divest the O&G Assets as part of the transaction process. Torchlight and Company A did not discuss potential valuations.

After reviewing the publicly available technical and corporate information of Company A, the representative of Company A called Mr. Brda and expressed interest in signing a confidentiality agreement to conduct detailed due diligence in furtherance of a potential strategic transaction between Torchlight and Company A.

On May 27, 2020, Torchlight and Company A entered into a confidentiality agreement, which did not include a standstill provision, and made arrangements for the exchange of confidential information.

From May 27, 2020 to approximately July 15, 2020, Torchlight and Company A continued to provide and analyze financial and technical data and evaluate the prospects of a strategic transaction.

On or about July 15, 2020, Mr. Brda informed Company A that a transaction between Torchlight and Company A was not feasible due to the proposed structure, which stemmed from a disagreement as to the value of Company A and Company A's desire that Torchlight divest the O&G Assets prior to consummating the transaction, which Torchlight viewed as inadvisable due to market conditions and timing.

***Company B***

On or about May 22, 2020, a representative of Company B phoned Mr. Brda to discuss a potential transaction between Torchlight and Company B. Prior to this discussion, Torchlight and Company B had never engaged in any prior transactions and there was no relationship between the companies. Company B is involved in the work-from-home industry with a focus on virtual events.

Table of Contents

On May 29, 2020, Mr. Brda and the chief executive officer of Company B met on a videoconference. Mr. Brda requested a follow-up call to include Mr. McCabe, which took place on June 3, 2020. Torchlight executed a confidentiality agreement, which did not include a standstill provision, with Company B on June 3, 2020 and the parties began exchanging due diligence information. The discussion involved the merits of a potential reverse acquisition of Torchlight by Company B and how to potentially divest the O&G Assets as part of the transaction process. Mr. Brda informed the full Torchlight Board of his preliminary discussions with Company B on June 9, 2020, and kept the Torchlight Board informed regarding developments in the discussions and negotiations thereafter.

Negotiations with Company B continued into early August 2020. Multiple draft term sheets were exchanged and discussed. Representatives of Torchlight and Company B also engaged in initial high-level discussions regarding the terms of a potential transaction. Ultimately, Torchlight and Company B ended negotiations due to the failure to agree on the major terms of a transaction and issues relating to the potential sale of the O&G Assets.

***Company C***

On or about August 6, 2020, a representative of Company C phoned Mr. Brda to discuss a potential transaction between Torchlight and Company C. Prior to this discussion, Torchlight and Company C had never engaged in any prior transactions and there was no relationship between the companies. Company C is involved in the merchant services industry with a focus on blockchain settlement.

Torchlight and Company C signed a confidentiality agreement, which did not include a standstill provision, on August 28, 2020 and began sharing due diligence information. After a short period of time, the parties mutually determined not to pursue a strategic transaction due to disagreements between Torchlight and Company C, largely stemming from Company C requesting too high of a valuation of itself from Torchlight and requiring that the O&G assets be sold prior to the consummation of any transaction with Company C, after preliminary discussions regarding their respective valuations.

***Company D***

On or about August 18, 2020, a consultant for Company D called Mr. Brda to discuss a potential transaction between Torchlight and Company D. Prior to this discussion, Torchlight and Company D had never engaged in any prior transactions and there was no relationship between the companies. Company D is involved in the third-party IT maintenance business.

Torchlight and Company D signed a confidentiality agreement, which did not include a standstill provision, on August 18th, 2020 and began sharing due diligence information. After a preliminary due diligence review and initial discussions, Torchlight and Company D ended discussions due to Company D requesting a valuation that would have provided no value, in the eyes of Torchlight's management, for completing the transaction.

***Company E***

On or about August 19, 2020, a representative of Company E phoned Mr. Brda to discuss a potential transaction between Torchlight and Company E. Prior to this discussion, Torchlight and Company E had never engaged in any prior transactions and there was no relationship between the companies. Company E is involved in the electronic vehicle industry.

Mr. Brda and the chief executive officer of Company E held an introductory call on August 20, 2020. After the call, the parties signed a confidentiality agreement, which did not include a standstill provision, and both companies shared due diligence information. On August 24, 2020, principals of Company E, Mr. Brda and Mr. McCabe held a virtual meeting and discussed details of Company E's business plans. The parties planned for Mr. Brda to travel to Company E's headquarters to meet with the principals of Company E and tour their facility.

Table of Contents

On August 25, 2020, Mr. Brda traveled to Company E's headquarters. The visit was productive and the parties agreed to prepare draft terms for a potential business combination transaction. The parties exchanged draft term sheets, but were not able to mutually agree on acceptable terms of a transaction due to an extreme discrepancy between the valuation asked for by Company E and what Torchlight was prepared to provide.

***Transaction with Meta***

In early September 2020, Torchlight's external investor relations representative, who had been monitoring Torchlight's efforts to pursue strategic alternatives, suggested that representatives of Torchlight have a virtual meeting with George Palikaras, the Chief Executive Officer of Meta. Upon notice of interest in a meeting with Meta by Torchlight's management, Torchlight and Meta's investor relations representative's coordinated a virtual meeting, which occurred on September 4, 2020, between Mr. Brda, Mr. McCabe and Mr. Palikaras. Mr. Brda and Mr. McCabe were impressed with the presentation given by Mr. Palikaras, and determined to engage in further discussions with Meta regarding a potential strategic transaction.

Torchlight and Meta signed a confidentiality agreement, which did not include a standstill provision, on September 4, 2020 and performed initial due diligence. The parties also engaged in initial discussions regarding a proposed structure for a potential business combination transaction.

Following these initial discussions, the parties engaged in mutual efforts to prepare a draft letter of intent for a potential strategic transaction with the assistance of their respective legal and financial advisors. The letter of intent was heavily negotiated, as the parties attempted to agree on their respective relative valuations to determine the pro forma post-closing ownership split of the Combined Company between their respective legacy stockholder bases. The parties initially encountered difficulties moving forward with this approach due to Meta's desire that Torchlight divest the O&G Assets, the anticipated impact of that divestiture on Torchlight's market capitalization prior to closing the transaction (which the parties were using to determine Torchlight's valuation), the appropriate method for valuing the O&G Assets, and how the value of the O&G Assets should be allocated between each party's legacy stockholder base. The parties discussed several potential methodologies to address these issues, including a potential waterfall arrangement to allocate the value of the divested O&G Assets, and eventually determined that attempting to arrive at a preemptive solution for these issues without sufficient information about how the divestiture of the O&G Assets would ultimately take place was impeding the transaction process. Meta then suggested that the parties structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy Torchlight stockholders, and on that basis agree on the pro forma ownership percentage of the Combined Company that would be allocated to each party's legacy stockholder base. This proposal was attractive to Torchlight because it provided Torchlight with flexibility with respect to eventual divestiture of the O&G Assets (including the ability to structure and consummate the divestiture after the closing of the transaction with Meta), while also ensuring that the value obtained in the divestiture would benefit investors in Torchlight's legacy oil and gas business, and providing those investors with a substantial ownership percentage of Meta's business on an ongoing basis (which would have a large stockholder base and access to additional capital). The parties agreed to move forward on this basis, and after substantial negotiation, arrived at the 75%/25% ownership split described elsewhere in this proxy statement, with the ultimate Exchange Ratio generally subject to adjustment for shares issued by either company for its own benefit prior to the closing of the transaction to maintain the agreed ownership split.

The parties continued to negotiate other key transaction terms through the first three weeks of September 2020. During this time, the parties gave particular consideration to each party's capital requirements during the period leading up to the consummation of a strategic transaction, as well as the anticipated capital requirements of the Combined Company immediately following the consummation of a strategic transaction. In these negotiations, Torchlight agreed to provide Meta with $1,000,000 of bridge financing to help meet its current cash needs, $500,000 of which would be loaned upon the execution of the letter of intent, and the remaining $500,000 of which would be loaned upon the execution of a definitive agreement for the transaction. Torchlight and Meta also agreed that while one of the key drivers for the transaction was to provide the Combined Company with access to the U.S. capital markets via a NASDAQ listing, the Combined Company would also require capital

Table of Contents

shortly after closing the business combination. To that end, the parties agreed to condition the transaction on Torchlight raising at least $10,000,000 of capital for the benefit of the Combined Company prior to the closing of the transaction, with any Torchlight Shares issued or issuable in such financing diluting the legacy Meta shareholders and legacy Torchlight stockholders in accordance with the agreed 75%/25% pro forma post-closing ownership split. The parties also agreed that Torchlight would be required to settle all of its outstanding indebtedness (other than the Straz Debt), either via repayment in cash or conversion into Torchlight Shares, prior to the consummation of the transaction, with any Torchlight Shares issued in connection therewith diluting only the legacy Torchlight stockholders. The Straz Debt would either be repaid in cash, converted into Torchlight Shares or restructured so that the only recourse of the debtholders after the closing of the transaction would be against the O&G Assets.

On September 14, 2020, the Torchlight Board met, which included representatives of Torchlight's legal advisor and a representative of Roth, and reviewed a substantially final draft letter of intent for a strategic transaction with Meta which included the foregoing key terms. The Torchlight Board authorized Torchlight to enter into the letter of intent, and in connection therewith, Mr. McCabe agreed to provide to Torchlight a convertible bridge loan of $1,500,000, a portion of which would be used to provide the agreed $1,000,000 of bridge financing to Meta. The parties executed and publicly announced the letter of intent on September 21, 2020. Shortly thereafter, Torchlight loaned $500,000 to Meta through the Initial Bridge Note.

After September 21, 2020, Torchlight engaged K&L Gates LLP and Stikeman Elliot LLP as additional legal advisors for the transaction. On October 14, 2020, the parties and their legal and financial advisors held a conference call to initiate the transaction process and discuss details regarding the transaction structure. The parties subsequently agreed to move forward with the Plan of Arrangement and exchangeable share structure described elsewhere in this proxy statement, and commenced their respective due diligence reviews of each other's businesses. On October 28, 2020, Meta's legal advisors circulated an initial draft of the Arrangement Agreement, and subsequently circulated drafts of the other key transaction documents. Meta's initial draft of the Arrangement Agreement included, among other terms: (a) fairly stringent requirements with respect to the process for selling the O&G Assets, including covenants requiring Torchlight to take certain steps in that process prior to the closing of the Arrangement and a June 30, 2021 deadline to complete the divestiture of the O&G Assets; (b) fulsome covenants regarding the operation of Torchlight's business prior to the closing of the Arrangement, including covenants that would prohibit Torchlight from raising equity or debt financing for working capital or other purposes without Meta's consent, without similarly restrictive covenants with respect to the operation of Meta's business during that period; (c) covenants generally prohibiting the parties from engaging in discussions with other interested parties in respect of alternative transactions; and (d) provisions limiting the ability of the parties to terminate the Arrangement Agreement, except in certain limited circumstances in which a termination fee would also be payable. On November 13, 2020, Torchlight's legal advisors provided their initial comments on Meta's draft Arrangement Agreement, which were primarily intended to: (a) provide Torchlight's representatives with additional flexibility, control and time with respect to the process for selling the O&G Assets; (b) modify the covenants regarding the operation of the parties' respective businesses prior to the closing of the Arrangement to provide for more mutual restrictions, and to enable Torchlight to raise equity or debt financing up to a threshold amount without Meta's consent; (c) provide the parties with more flexibility to engage in discussions with respect to alternative transactions; and (d) broaden the circumstances in which the parties would be permitted to terminate the Arrangement Agreement, subject to payment of a termination fee in certain circumstances.

Between November 13, 2020 and December 13, 2020, the parties and their respective legal advisors negotiated these issues and other key points in the Arrangement Agreement. The parties also negotiated the other transaction documents, and held several meetings to discuss the optimal structure to allocate and distribute the value obtained from the sale of the O&G Assets to Torchlight's legacy stockholders, before deciding to move forward with the dividend of Series A Preferred Stock described elsewhere in this proxy statement. On December 3, 2020, Torchlight's legal advisors circulated an initial draft of the Series A Certificate of Designation. Between December 3, 2020 and December 13, 2020, the parties negotiated key issues relating to the

Scott Traudt, Pro Se
191 Kibling Hill Rd.
Strafford, Vermont 05072
Phone: 802-318-0429
sctraudt@gmail.com
Equity Security Holder and Objector, *Pro Se*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br>**META MATERIALS INC.**<br><br>Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**DECLARATION OF SCOTT TRAUDT IN SUPPORT OF DANIELLE SPEARS'S OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS [ECF No. 2966]**<br><br>Hearing Date: October 13, 2026 Hearing Time: 1:30 p.m. |

I, Scott Traudt, declare as follows:

1. I am over eighteen years of age and a shareholder of Meta Materials Inc., holding 80 shares of its common stock (MMAT), and a party in interest in this chapter 7 case. I reside in Strafford, Vermont. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

2. On April 22, 2026, I sent a letter to Christina W. Lovato, Chapter 7 Trustee, in care of her counsel, Jeffrey L. Hartman, titled "Formal Demand to Investigate and Prosecute McCabe Avoidance Claim, or Sell Claim Under 11 U.S.C. § 363(b)." I sent it by email to trusteelovato@att.net, with a copy to notices@bankruptcyreno.com, and by certified mail, return receipt requested. A true and correct copy of that letter is attached as Exhibit 1 and is also on file at ECF No. 2750, Ex. E, pp. 106–109.

3. In that letter, I offered to purchase the estate's potential avoidance claim against Gregory McCabe on the following terms: I would assume all litigation costs, attorneys' fees, and expenses; the estate would receive twenty percent of any net recovery after my costs were reimbursed; and any competing bid from a defendant or insider would be required to include a minimum payment of $9,000,000 to the estate. I requested a written response within ten business days.

4. Neither the Trustee nor her counsel responded to my April 22, 2026, letter, in writing or orally, as of the date of this declaration.

5. On August 7, 2026, I received an email from Mr. Hartman, with a copy to Trustee Lovato, stating: "FYI: The Trustee has entered into a tolling agreement with Greg McCabe. Accordingly, you won't see an adversary proceeding on file today." A true and correct copy of that email is attached as Exhibit 2. That email did not address my purchase offer.

6. On September 6, 2026, I emailed Mr. Hartman asking: "how long is this extension good for? And has it been filed on the docket?" Having received no answer, I followed up on September 10, 2026. I have received no response to either email. True and correct copies are attached as Exhibit 3.

7. At no time before the Trustee filed her Motion for Order Authorizing Sale and Assignment of Litigation Claims on September 15, 2026 (ECF No. 2966) did the Trustee, her counsel, or anyone acting on her behalf contact me about, inform me of, or invite me to bid on the estate's claims against Authentix, Inc., Authentix Solutions Canada, Inc., or 24M Technologies, Inc.

8. I first learned that those claims were being offered for sale when the Sale Motion was filed on the docket.

9. I have now submitted offers to compete with McCabe's that include a specified percentage of net proceeds paid to the estate after reasonable court costs and attorney fees are recovered and to also purchase any avoidance claims the estate may have against McCabe.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2026, at Strafford, Vermont.

[signature]

Scott Traudt

# TRAUDT DECLARATION

# EXHIBIT 1

Case 24-50792-gs Doc 2750 Entered 04/29/26 15:22:00 Page 106 of 118

EXHIBIT 1

**Scott Traudt**
191 Kibling Hill Rd.
Strafford VT 05072
cell: 802-318-0429
email: sctraudt@gmail.com

April 22, 2026

Christina Lovato, Chapter 7 Trustee
c/o Atty. Jeff Hartman
Hartman & Hartman
510 W. Plumb Lane, Suite B
Reno, NV 89509

**Subject: Formal Demand to Investigate and Prosecute McCabe Avoidance Claim, or Sell Claim Under 11 U.S.C. § 363(b)**

To: trusteelovato@att.net
Cc: notices@bankruptcyreno.com

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Dear Trustee Lovato:

I write as a shareholder and party-in-interest in the above-referenced Chapter 7 case to protect the estate's assets and to ensure the Trustee fully discharges her fiduciary duty to maximize value for creditors and equity holders.

This letter constitutes (1) a formal demand that the Trustee immediately investigate and commence an adversary proceeding to recover a documented, colorable McCabe avoidance claim and related estate claims, and (2) an alternative offer to purchase that claim under 11 U.S.C. § 363(b) should the Trustee decline to act.

## I. FORMAL DEMAND - MCCABE AVOIDANCE CLAIM AND RELATED ESTATE CLAIMS

The Debtor's own March 31, 2024 Form 10-Q, Note 5, discloses a facially colorable avoidance issue requiring immediate investigation. Meta reported that it sold loan interests with a $24.0 million outstanding balance to Gregory McCabe for $6.0 million in cash, coupled with a separate stock-purchase arrangement later modified by release. At a minimum, these facts warrant investigation into whether the estate received reasonably equivalent value for the assigned rights when the transaction is viewed as a whole, including the collateral, integrated transaction documents, and subsequent unwinding of the stock-purchase arrangement. The estate may also pursue the claim, or related transfers, under 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b), and applicable state law.

Case 24-50792-gs Doc 2750 Entered 04/29/26 15:22:00 Page 107 of 118

The estate's knowledge of potential McCabe claims is not new. In a letter dated April 16, 2025 and filed on April 23, 2025 as Doc. 1878-4, James Wes Christian wrote to Trustee's counsel: "As you are aware, at the outset of retaining my firm, I advised you that I would not represent Mr. McCabe individually in any matter (as you advised me that Meta might be investigating potential claims against him)." Doc. 1878-4, p. 3. Christian then wrote: "We are aware that the Trustee for Meta is investigating one or more potential avoidance actions in the future against Mr. McCabe. If that occurs, we will not be representing Mr. McCabe." Doc. 1878-4, p. 5. These statements show that, by April 23, 2025 at the latest, the estate and its own special litigation counsel were already aware of potential claims against Mr. McCabe, including possible avoidance actions. Yet, based on the record materials provided here, no such avoidance action has been pursued, despite the Debtor's earlier March 31, 2024 Form 10-Q disclosure describing the McCabe transaction and the Trustee's later request for approval of an expensive, heavily front-loaded litigation-funding structure for other estate claims. This history raises a serious concern of delay or inattention with respect to an identified estate asset, rather than any lack of notice or newly discovered issue.

Mr. McCabe is also a repeat player in US bankruptcy court and has previously been found "not credible" by a federal bankruptcy judge. See *Weiss v. Arabella Exploration Inc. et al.*, Adversary No. 16-07002-tmd (Bankr. W.D. Tex. Dec. 22, 2022). In addition, Mr. McCabe served as Chairman of Torchlight Energy Resources, Inc. ("TRCH") and was a long-time business partner of its former CEO John Brda. In the weeks leading up to the December 9, 2022 trading halt and spin-off to Next Bridge Hydrocarbons, Mr. McCabe sold approximately 6.7 million shares of MMTLP Series A Preferred Stock, generating proceeds estimated in excess of $58 million. In light of Mr. McCabe's senior insider position, his close relationship with Mr. Brda, and the estate's own prior focus on possible claims involving him, the estate should also investigate potential direct claims for breach of fiduciary duty, insider-related misconduct, and unjust enrichment.

At a minimum, these claims appear materially more straightforward and less capital-intensive than the speculative market-manipulation litigation the estate is now seeking to finance through the Parabellum structure.

**Contrast with Current Priorities.** On April 3, 2026, you filed Dkt. 2682 seeking court ratification of an $11.8 million litigation-funding arrangement with an affiliate of Parabellum Capital, LLC. That motion expressly relies on the Trustee's "sound business judgment" under 11 U.S.C. § 363(b) and states that, absent such funding, the estate "would simply have to abandon a potential recovery." Dkt. 2682, p. 4. Yet the estate simultaneously holds a separately identified McCabe-related asset that appears to require no comparable funding structure and no similar front-loaded economic dilution. See Dkt. 2682, p. 3.

The public record in this very case makes the economic consequences unmistakable. In Dkt. 2682, the Trustee expressly seeks ratification of the Parabellum litigation funding arrangement and sets forth the repayment waterfall on page 3. Under the hypothetical $50 million recovery scenario presented by the Trustee herself, the estate would receive only $23,772,000 for the benefit of creditors and shareholders. The litigation funder would take

Case 24-50792-gs Doc 2750 Entered 04/29/26 15:22:00 Page 108 of 118

$19,670,000 off the top, and special litigation counsel would receive an additional $6,588,000. Dkt. 2682, p. 3.

The footnote to that same chart on Dkt. 2682, page 3, confirms the multi-tiered structure: the funder first recovers its $7 million principal plus a full 1x return, followed by an additional 1.25x multiple of the $7 million commitment, with the split among funder, client, and counsel shifting only after those thresholds are met. Dkt. 2682, p. 3. This front-loaded waterfall is not an abstract risk. It is the precise economic deal the Trustee is asking the Court to bless. By contrast, the McCabe avoidance claim, and the related direct claims discussed above, would deliver any recovery to the estate free of the Parabellum waterfall if pursued independently.

Failing to pursue or monetize these lower-cost, identified assets while committing the estate to an $11.8 million funded litigation program therefore has a readily quantifiable cost: it forces creditors and shareholders to surrender nearly $20 million out of the first $50 million of any larger recovery simply to finance speculative market-manipulation claims. This is difficult to reconcile with the Trustee's fiduciary duty to maximize value and to exercise sound business judgment under 11 U.S.C. § 363(b). *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887-890 (Bankr. D. Alaska 2018).

## II. ALTERNATIVE OFFER TO PURCHASE THE AVOIDANCE CLAIM UNDER 11 U.S.C. § 363(b)

If you are unwilling or unable to prosecute the McCabe avoidance action, I hereby offer to purchase the claim, and all related avoidance powers to the extent transferable, from the estate on the following terms, which are fair, reasonable, and in the best interest of the estate:

1. I will assume 100% of all litigation costs, attorneys' fees, and expenses. The estate incurs zero financial risk or out-of-pocket cost.
2. The estate will receive 20% of any net recovery after my costs are reimbursed.
3. To deter any bad-faith attempt by Mr. McCabe or an affiliate to purchase and extinguish the claim for a nominal sum, any competing bid from a defendant or insider must include a minimum floor bid of $9,000,000, payable to the estate.

This structure is expressly authorized by *In re Lahijani*, 325 B.R. 282 (9th Cir. BAP 2005), and *Silverman v. Birdsell*, 774 F. App'x 380 (9th Cir. 2019), which recognize the sale of avoidance actions under 11 U.S.C. § 363(b) and contemplate derivative standing where a trustee declines to act. The elevated floor of $9 million is by my design only to insure that some of the more unsavory creatures in the MMTLP/MMAT/Next Bridge Hydrocarbons Inc. ecosystem are not allowed to safeguard McCabe's haul from the MMAT BOD and George Palikaras.

## III. REQUEST FOR TRANSPARENCY AND DISCLOSURE

Your pending motion at Dkt. 2682, and the estate's reliance on the Parabellum funding arrangement, heighten the need for full disclosure consistent with *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995). The presumption of public access to bankruptcy proceedings remains

strong. *In re Orion Pictures Corp.*, 21 F.3d 24 (2d Cir. 1994); *In re Motors Liquidation Co.*, 561 B.R. 36 (Bankr. S.D.N.Y. 2016).

**IV. DEADLINE AND NEXT STEPS**

You are approaching the 11 U.S.C. § 546(a) limitations deadline in August 2026. I respectfully request a written response to this Demand and Purchase Offer within ten (10) business days of receipt.

Should you decline to act or fail to respond, I will interpret that as unjustified inaction and will promptly seek derivative standing under 11 U.S.C. § 503(b)(3)(B), together with any other appropriate relief, to protect the estate's assets.

I remain available to discuss this matter at your earliest convenience.

Sincerely,

/s/ Scott Traudt
Scott Traudt
Pro Se, Shareholder and Party-in-Interest
Strafford VT

# TRAUDT DECLARATION

# EXHIBIT 2

Gmail

Danielle Spears <spldbrat351964@gmail.com>

## Scott Traudt reply to Docket #'s 2903 and 2904 in In Re Meta Materials Inc. case

**Scott Traudt** <sctraudt@gmail.com> Mon, Aug 17, 2026 at 12:31 PM
To: Danielle Spears <spldbrat351964@gmail.com>

---------- Forwarded message ---------
From: **Jeffrey L. Hartman** <jlh@bankruptcyreno.com>
Date: Fri, Aug 7, 2026 at 5:22 PM
Subject: RE: Scott Traudt reply to Docket #'s 2903 and 2904 in In Re Meta Materials Inc. case
To: Scott Traudt <sctraudt@gmail.com>
Cc: Christina Lovato <cwlovato@gmail.com>

FYI: The Trustee has entered into a tolling agreement with Greg McCabe. Accordingly, you won't see an adversary proceeding on file today.

Jeff Hartman

[Quoted text hidden]

# TRAUDT DECLARATION

# EXHIBIT 3

Gmail **Danielle Spears <paymmtlpnow@gmail.com>**

**Fwd: McCabe statute of limitations extension on possible avoidance claims**
1 message

**Danielle Spears** <spldbrat351964@gmail.com> Wed, Sep 23, 2026 at 8:26 PM
To: paymmtlpnow@gmail.com

---------- Forwarded message ---------
From: **Scott Traudt** <sctraudt@gmail.com>
Date: Wed, Sep 23, 2026 at 6:06 PM
Subject: Fwd: McCabe statute of limitations extension on possible avoidance claims
To: Danielle Spears <spldbrat351964@gmail.com>

---------- Forwarded message ---------
From: **Scott Traudt** <sctraudt@gmail.com>
Date: Thu, Sep 10, 2026, 12:13 AM
Subject: Re: McCabe statute of limitations extension on possible avoidance claims
To: Jeffrey L. Hartman <jlh@bankruptcyreno.com>

Jeff - ?

On Sun, Sep 6, 2026, 6:14 AM Scott Traudt <sctraudt@gmail.com> wrote:

Jeff - how long is this extension good for? And has it been filed on the docket?

Thanks,

Scott

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

META MATERIALS INC., Case No. 24-50792-gs

Debtor Chapter 7

---

**MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION**

---

Hearing Date: OST Requested
(Oct. 13, 2026, 1:30 p.m. proposed)

Danielle Spears ("Movant"), appearing pro se, moves for an order (1) requiring the Chapter 7 Trustee to produce, on an expedited basis, the emails, messages, call records, and meeting notes and minutes described in Exhibit 2, and to file the executed McCabe Tolling Agreement; (2) establishing competitive bidding procedures for the estate's claims in Adv. Nos. 26-05037 ("Authentix") and 26-05038 ("24M"); (3) requiring the Trustee to file a statement regarding the tolled estate claims against Gregory McCabe; (4) requiring estate special counsel Christian Attar to file a supplemental Rule 2014 statement and limiting the sharing of nonpublic estate information with former CEO George Palikaras and his counsel; and (5) continuing the hearing

on the Sale Motion until the documents are produced, so that the Sale Motion is decided on a documented record. Movant has objected to the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966) (the "Sale Motion"). Because Local Rule 9014(i) does not permit countermotions, the affirmative relief requested here is presented by this separate motion. Movant requests that it be heard on shortened time with the Sale Motion on October 13, 2026, at 1:30 p.m.

This motion is supported by the following points and authorities; the Declaration of Danielle Spears and the Declaration of Scott Traudt filed with Movant's objection to the Sale Motion, which are incorporated by reference; the proposed order attached as **Exhibit 1**; Movant's First Requests for Production to the Trustee, served concurrently and attached as **Exhibit 2**; and the papers on file in this case, of which Movant requests the Court take judicial notice. Fed. R. Evid. 201.

## I. JURISDICTION AND CONSENT

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), and (O). Pursuant to Local Rule 9014.2, Movant consents to the entry of final orders or judgment by the bankruptcy judge in this contested matter.

## II. BACKGROUND

The Trustee seeks to sell the Authentix and 24M claims by private sale to BaileyBridge, Inc., an entity "owned and controlled by Greg McCabe," for $250,000 plus twenty percent of net recovery. ECF No. 2978 ¶¶ 7–8. The Trustee's own complaints seek not less than $25 million from Authentix and not less than $10 million from 24M. ECF No. 2932 ¶ 136; ECF No. 2936 ¶¶

105, 131. The Sale Motion identifies no marketing, solicitation, or competing offer. ECF No. 2966.

The Trustee has entered into a tolling agreement with McCabe concerning his 2023 transactions with Meta, including his purchase of Meta's secured lender position in the Next Bridge Hydrocarbons notes. ECF No. 2978 ¶ 9. The agreement has not been filed. The two-year period under 11 U.S.C. § 546(a)(1)(A) has run from the August 9, 2024 petition date, so the tolling agreement is what preserves those claims. The Trustee characterizes the agreement as immaterial to the sale. *Id.*

On April 22, 2026, Scott Traudt offered to prosecute the McCabe avoidance claim at his own expense, for twenty percent of net recovery to the estate, and proposed a $9,000,000 minimum for any competing bid by a defendant or insider. ECF No. 2750, Ex. E, pp. 106–109; Traudt Decl. ¶¶ 2–3. He received no response. Traudt Decl. ¶ 4. On August 7, 2026, the Trustee's counsel informed him that the Trustee had entered into a tolling agreement with McCabe. *Id.* ¶ 5 & Ex. 2. His September 2026 inquiries about the agreement's duration and whether it had been filed went unanswered. *Id.* ¶ 6 & Ex. 3. He was not invited to bid on the Authentix or 24M claims. *Id.* ¶¶ 7–8. Movant's informal request for the tolling agreement and related information has likewise not been fulfilled. Spears Decl. ¶¶ 3–5 & Ex. A.

## III. ARGUMENT

### A. The Trustee should be required to produce the communications, call records, and meeting notes behind the sale, and to file the McCabe Tolling Agreement.

In a sale under 11 U.S.C. § 363(b), the Court's obligation "is to assure that optimal value is realized by the estate under the circumstances," and the requirement of notice and a hearing provides "a means of objecting and a method for attracting interest by potential purchasers."

*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005). When an objection is made, "the responsibility ultimately is the court's." *Id.* The Court must find a sound business purpose, a fair and reasonable price, adequate marketing, and good faith. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). A § 363(m) good-faith finding concerns the purchaser's conduct, including the absence of collusion with the trustee. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992).

The Court cannot make those findings on the present record. The purchaser's sole owner is a potential estate defendant whose claims are preserved only by an unfiled agreement; the Sale Motion discloses no valuation, no investigation-cost figure supporting the $250,000 price, and no marketing; and the estate's information about these claims came in part from a former officer whose counsel now appears for the purchaser. ECF No. 2978-1 § 8; ECF No. 2265-6, pp. 4, 7, 11, 19. The Trustee's own time records show that these facts are documented: calls with Mr. Palikaras's counsel about "information Palikaras would like to provide re: fraudulent transfers" (ECF No. 2265-6, p. 4); calls about the 24M and Authentix transfers (*id.* p. 7); discussion of "the potential of a tolling agreement" (*id.* p. 10); a "[f]irst weekly call with litigation team" that included Mr. Palikaras and Mr. Browndorf (*id.* p. 11); and calls with Mr. Palikaras about the McCabe litigation and release (*id.* p. 19). The emails, call records, and meeting notes behind those entries are the best evidence of who proposed the sale and the tolling agreement, what information was shared, and whether the terms were negotiated at arm's length. Movant is not asking the Trustee to answer questions. She is asking for the documents.

This is a contested matter, in which the discovery rules apply, including the rule governing requests for production. Fed. R. Bankr. P. 9014(c), 7034. Movant has served the requests attached as Exhibit 2. The documents are relevant to the findings the Trustee asks the Court to

make, Fed. R. Civ. P. 26(b)(1), and the Court may order a shorter response time. Fed. R. Civ. P. 34(b)(2)(A). Expedited production is necessary because the default thirty-day period would expire after the October 13 hearing, leaving the Court to make its good-faith and value findings without the record that bears most directly on them.

Communications between the Trustee and McCabe, BaileyBridge, Mr. Palikaras, or their counsel are not privileged. The Trustee controls the estate's attorney-client privilege, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358 (1985), but voluntary disclosure to a third party waives it, *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012), and work-product protection is waived by disclosure that substantially increases the opportunity for an adversary to obtain the information, *United States v. Sanmina Corp.*, 968 F.3d 1107, 1121 (9th Cir. 2020). Mr. Palikaras was identified as the subject of "potential claims" early in the case, ECF No. 2265-2, p. 3, and McCabe is the counterparty to preserved estate claims. Anything withheld should be identified on a privilege log. Fed. R. Civ. P. 26(b)(5)(A). Confidentiality concerns can be addressed by redaction or filing under seal. 11 U.S.C. § 107; Fed. R. Bankr. P. 9018. The Tolling Agreement itself, an agreement between the estate and a potential defendant, should be filed.

Because the documents cannot be produced and reviewed before October 13 unless the Court acts now, and because the § 363(m) finding the Trustee seeks may foreclose later review, the hearing on the Sale Motion should be continued until at least fourteen days after production, with leave for parties in interest to supplement their objections.

**B. The claims should be exposed to competing bids before any sale is approved.**

The Trustee proposes to sell to BaileyBridge because McCabe is a large shareholder with "an incentive to successfully prosecute" the claims. ECF No. 2978 ¶ 8. That rationale applies equally

to other equity holders and creditors, who share the same interest in maximizing recovery but, unlike McCabe, hold no preserved liability to the estate. A private sale to a single, connected buyer is constrained competition that warrants closer scrutiny, and percentage-of-recovery consideration must be valued realistically rather than treated as worthless. *Lahijani*, 325 B.R. 282. Movant does not ask the Court to decide which proposal is best. She asks that the Court give the estate the benefit of a structured process in which BaileyBridge's offer serves as the opening bid, bidders have 90 days to retain counsel and submit proposals, other parties receive notice and the same nonprivileged information BaileyBridge received, ECF No. 2978-1 §§ 5.1(f), 6.4, and the Trustee reports every proposal and her comparison of their total expected value.

**C. The Trustee should state whether and when she will prosecute the tolled McCabe claims.**

A trustee must collect and reduce to money the property of the estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). The McCabe claims are estate property. The Trustee has not filed them, has not disclosed when the tolling period ends, and has not responded to an offer to prosecute them at no cost to the estate. Where a trustee does not pursue an estate claim, the Court may consider permitting an interested party to prosecute it for the estate's benefit. *Lahijani*, 325 B.R. 282 (directing consideration on remand of permitting objecting creditors to sue in the name of the trustee at their own risk and expense); *see also* 11 U.S.C. § 503(b)(3)(B). Movant does not ask the Court to adjudicate Mr. Traudt's rights on this motion. She asks that the Trustee be required to disclose the tolling agreement's expiration and her intentions, and, if she will not prosecute the claims, to respond to Mr. Traudt's offer and entertain competing offers on the record. This disclosure bears directly on the Sale

Motion: the estate should not transfer its other principal claims to McCabe's company while the claims against McCabe remain unfiled and unexplained.

**D. Estate special counsel should file a supplemental Rule 2014 statement addressing its connections to McCabe and Next Bridge.**

A professional employed by the estate must disclose "all of the person's connections with the debtor, creditors, any other party in interest," and their attorneys. Fed. R. Bankr. P. 2014(a). The duty is continuing, and the professional may not decide for itself which connections matter. *See In re Park-Helena Corp.*, 63 F.3d 877, 881–82 (9th Cir. 1995); *In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252–53 (9th Cir. BAP 1987).

Christian Attar was employed as special litigation counsel on a declaration stating that it had no connections with the estate's shareholders or other parties in interest "related to this matter." ECF No. 99 ¶ 4; ECF No. 118. In April 2025, Mr. Christian disclosed that his firm represents Next Bridge Hydrocarbons, Inc., of which McCabe is chairman and chief executive officer, and wrote that "at the outset of retaining my firm" he told the Trustee's counsel he was representing Next Bridge and would not represent McCabe individually because, he was told, "Meta might be investigating potential claims against him." ECF No. 1878-4, p. 3. He stated that his firm would file a new case for Next Bridge concerning the Orogrande Lease. ECF No. 1878 ¶¶ 10–13. A 25% Orogrande working interest beneficially owned by McCabe was part of the collateral for the Next Bridge note that McCabe bought from Meta, which is the transaction underlying the tolled McCabe claims. Spears Decl. Ex. C.

On August 7, 2026, the same day the Trustee filed the Authentix and 24M complaints and informed Mr. Traudt of the McCabe tolling agreement, the Trustee applied to approve a revised contingent-fee contract with Christian Attar and to add Grant & Eisenhofer, again representing

that the firms have "no present connections" with any party in interest. ECF No. 2933 ¶ 9. Mr. Christian's accompanying declaration makes no disinterestedness statement and says nothing about the Next Bridge engagement or its status. ECF No. 2934. The application was granted ex parte. ECF No. 2958. McCabe is now the proposed purchaser of the estate's principal claims. Whether estate counsel has an ongoing attorney-client relationship with the purchaser's company, and what role, if any, counsel played in the tolling agreement or the sale, bears directly on the good-faith inquiry under *Ewell*, 958 F.2d at 281. Movant asks only that the facts be disclosed under oath.

**E. Nonpublic estate information about these claims should not be shared with Mr. Palikaras or his counsel while the sale is pending.**

The Securities and Exchange Commission found that Mr. Palikaras, while Meta's chief executive officer, provided a "wholly unsupported" per-share value estimate to investors, and he later signed the Next Bridge note sale to McCabe. Claim No. 70-1; Spears Decl. Ex. C. The Trustee's professionals identified "potential claims against George Palikaras" early in the case, ECF No. 2265-2, p. 3, yet he and his counsel, Eric Browndorf, participated in the estate's weekly "litigation team" calls. ECF No. 2265-6, p. 11. Mr. Browndorf is now the purchaser's designated notice contact. ECF No. 2978-1 § 8. Pending the Court's decision on the Sale Motion, the Trustee should not share nonpublic information about the Authentix, 24M, or McCabe claims with Mr. Palikaras or his counsel except as required by law or court order, and should disclose any agreement governing information already shared. 11 U.S.C. §§ 105(a), 704(a)(1). This relief does not prevent the Trustee from receiving information from Mr. Palikaras. It prevents estate information from flowing to the purchaser through a potential defendant's counsel.

## IV. RELIEF REQUESTED

Movant respectfully requests entry of an order substantially in the form attached as Exhibit 1:

1. Requiring the Trustee, within seven days, to produce to Movant all documents responsive to Requests 1 through 12 of Exhibit 2, including all emails, text and other messages, call logs and records, calendar entries, and meeting agendas, notes, and minutes reflecting communications with Gregory McCabe, BaileyBridge, Inc., George Palikaras, or their counsel, together with a privilege log for anything withheld;

2. Requiring the Trustee, within seven days, to file the executed McCabe Tolling Agreement, any amendments, and the January 21, 2024 Release Agreement, with any justified redactions under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018;

3. Establishing the following procedures before any sale of the Authentix and 24M claims is approved: (a) the Trustee shall serve and file notice, to all creditors, equity security holders who have appeared or filed proofs of interest, and all parties on the service list, that the claims are available for purchase and that BaileyBridge's offer is the opening bid; (b) any interested party may obtain the complaints and the nonprivileged materials made available to BaileyBridge upon signing a reasonable confidentiality agreement; (c) competing proposals shall be due no earlier than 90 days after service of the notice, so that interested parties, including Movant and Scott Traudt, may retain litigation counsel, subject to reasonable qualification requirements such as proof of funding and identified litigation counsel; (d) the Trustee shall file a report identifying every proposal received and her comparison of their total expected value to the estate; and (e) all qualified proposals shall be considered at a continued hearing;

4. Requiring the Trustee, within seven days, to file a statement disclosing the expiration date of the McCabe Tolling Agreement and whether and when she intends to prosecute the tolled McCabe claims; and, if she does not intend to prosecute them before that date, to respond on the record to Mr. Traudt's April 22, 2026 offer and to entertain competing offers to purchase or prosecute those claims for the estate's benefit, without prejudice to any motion by any party for authority to do so;

5. Requiring Christian Attar, within seven days, to file a supplemental verified statement under Fed. R. Bankr. P. 2014(a) disclosing: (a) every engagement since January 1, 2023, by Next Bridge Hydrocarbons, Inc., Gregory McCabe, BaileyBridge, Inc., or any entity McCabe controls, with its dates, scope, and status, including any litigation concerning the Orogrande Lease and any award of fees, costs, or sanctions in it; (b) all communications with any of them or their counsel concerning Meta, the estate, the Authentix or 24M claims, the McCabe claims, the tolling agreement, or the sale; (c) whether the firm advised the Trustee concerning the tolling agreement or the sale; and (d) any agreement to share fees with any other attorney, and the litigation expenses incurred to date for which any firm employed under ECF No. 2958 will seek reimbursement;

6. Directing that, pending the Court's ruling on the Sale Motion, the Trustee shall not share nonpublic estate information concerning the Authentix, 24M, or McCabe claims with George Palikaras or his counsel except as required by law or court order, and shall disclose any agreement governing such information previously shared;

7. Continuing the hearing on the Sale Motion to a date not less than fourteen days after the Trustee completes the production required by paragraphs 1 and 2 and

Christian Attar files the statement required by paragraph 5, and permitting parties in interest to file supplemental objections no later than seven days before the continued hearing; and

8. Granting such further relief as is just.

Dated: September 28, 2026.

Danielle Spears, Pro Se

10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091
paymmtlpnow@gmail.com

EXHIBIT 1 [PROPOSED] ORDER

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re:

META MATERIALS INC., Case No. 24-50792-gs

Debtor Chapter 7

---

**[PROPOSED] ORDER GRANTING MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION**

---

The Court, having considered the Motion for Order (1) Requiring Expedited Production of Documents and Filing of McCabe Tolling Agreement, (2) Establishing a 90-Day Competitive Bidding Period for the Authentix and 24M Claims, (3) Requiring Trustee's Statement Regarding Tolled McCabe Claims, (4) Requiring Supplemental Rule 2014 Disclosures by Special Counsel and Limiting Sharing of Estate Information with Former CEO, and (5) Continuing Hearing on Sale Motion Pending Production (ECF No. ____) filed by Danielle Spears, the papers filed in support and in opposition, and the arguments presented at the hearing, and good cause appearing,

IT IS ORDERED that the motion is GRANTED as set forth below.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall produce to Danielle Spears all documents responsive to Requests 1 through 12 of Danielle Spears's First Requests for Production of Documents to Chapter 7 Trustee (ECF No. ____, Ex.

2), and shall serve a privilege log complying with Fed. R. Civ. P. 26(b)(5)(A) for any document withheld. Communications between the Trustee or her professionals and Gregory McCabe, BaileyBridge, Inc., George Palikaras, or their counsel shall not be withheld as privileged communications between the Trustee and her counsel.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall file the executed McCabe Tolling Agreement, any amendments, and the January 21, 2024 Release Agreement, subject to any redactions permitted under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018.

IT IS FURTHER ORDERED that, before any sale of the claims in Adv. Nos. 26-05037 and 26-05038 is approved: (a) the Trustee shall serve and file notice, to all creditors, equity security holders who have appeared or filed proofs of interest, and all parties on the service list, that the claims are available for purchase and that the offer of BaileyBridge, Inc. is the opening bid; (b) any interested party may obtain the complaints and the nonprivileged materials made available to BaileyBridge, Inc. upon signing a reasonable confidentiality agreement; (c) competing proposals shall be due ninety (90) days after service of the notice; (d) the Trustee shall file a report identifying every proposal received and comparing their total expected value to the estate; and (e) all qualified proposals shall be considered at a continued hearing on ______________________, 2026, at _______ __.m.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall file a statement disclosing the expiration date of the McCabe Tolling Agreement and whether and when she intends to prosecute the tolled claims against Gregory McCabe, and, if she does not intend to prosecute them before that date, shall respond on the record to Scott Traudt's April 22,

2026 offer. Nothing in this order determines the rights of any party to seek authority to prosecute or purchase those claims.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, Christian Attar shall file a supplemental verified statement under Fed. R. Bankr. P. 2014(a) disclosing: (a) every engagement since January 1, 2023, by Next Bridge Hydrocarbons, Inc., Gregory McCabe, BaileyBridge, Inc., or any entity controlled by Gregory McCabe, with its dates, scope, and status, including any litigation concerning the Orogrande Lease and any award of fees, costs, or sanctions in it; (b) all communications with any of them or their counsel concerning Meta Materials Inc., the estate, the claims in Adv. Nos. 26-05037 and 26-05038, any claim against Gregory McCabe, the McCabe Tolling Agreement, or the proposed sale; (c) whether the firm advised the Trustee concerning the McCabe Tolling Agreement or the proposed sale; and (d) any agreement to share fees with any other attorney, and the litigation expenses incurred to date for which any firm employed under ECF No. 2958 will seek reimbursement.

IT IS FURTHER ORDERED that, pending the Court's ruling on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966), the Trustee shall not share nonpublic estate information concerning the claims in Adv. Nos. 26-05037 and 26-05038 or any claim against Gregory McCabe with George Palikaras or his counsel except as required by law or court order, and shall file, within seven (7) days, a statement identifying any agreement governing such information previously shared.

IT IS FURTHER ORDERED that the hearing on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966) is CONTINUED to ____________________, 2026, at ______ __.m. Any party in interest may file a supplemental objection no later than seven (7) days before the continued hearing.

Respectfully submitted September 28, 2026:

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091

paymmtlpnow@gmail.com

**EXHIBIT 2**

**FIRST REQUESTS FOR PRODUCTION TO CHAPTER 7 TRUSTEE**

## DANIELLE SPEARS'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO CHAPTER 7 TRUSTEE

Pursuant to Fed. R. Bankr. P. 9014(c) and 7034 and Fed. R. Civ. P. 34, Danielle Spears requests that Christina W. Lovato, Chapter 7 Trustee, produce the following Documents in connection with the contested matter on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966), by delivery to Danielle Spears at the address and email shown below, within thirty days of service or such shorter time as the Court orders. Fed. R. Civ. P. 34(b)(2)(A).

**DEFINITIONS**

(a) "Trustee" means Christina W. Lovato, Chapter 7 Trustee, and every attorney, accountant, special counsel, consultant, or other person employed by or acting for her in this case, including Hartman & Hartman, Robison, Sharp, Sullivan & Brust, and James W. Christian and his firm.

(b) "McCabe Parties" means Gregory McCabe, BaileyBridge, Inc., Next Bridge Hydrocarbons, Inc., any other entity owned or controlled by Gregory McCabe, and every attorney or other person acting for any of them, including Cooper Levenson, P.A., Michael R. Brunet, Eric Browndorf, and Snell & Wilmer L.L.P.

(c) "Palikaras Parties" means George Palikaras and every attorney or other person acting for him, including Eric Browndorf.

(d) "Communication" means any transmission of information by any means, including email, text or instant message (SMS, iMessage, WhatsApp, Signal, Teams, Slack, or similar), letter, voicemail, telephone call, video conference, or meeting.

(e) "Document" has the broadest meaning permitted by Fed. R. Civ. P. 34(a)(1)(A) and includes electronically stored information, calendar entries, call logs, telephone and video-conference records, time and billing entries, notes, minutes, agendas, memoranda, summaries, drafts, and attachments.

(f) "Claims" means the estate's claims asserted in Adv. Nos. 26-05037 (Authentix) and 26-05038 (24M); "McCabe Claims" means any claim of the estate against Gregory McCabe, including claims arising from the 2023 sale of the Next Bridge Hydrocarbons notes and the January 21, 2024 Release; and "Tolling Agreement" means any tolling, standstill, or similar agreement between the Trustee and any McCabe Party, with all amendments and extensions.

**INSTRUCTIONS**

1. Unless otherwise stated, each request covers August 9, 2024, to the date of production.

2. If any Document is withheld in whole or part under a claim of privilege or work-product protection, provide a privilege log identifying, for each Document, its date, author, all recipients, general subject matter, and the privilege claimed, as required by Fed. R. Civ. P. 26(b)(5)(A). Communications with any McCabe Party or Palikaras Party are not privileged communications between the Trustee and her counsel and should be produced.

3. Produce Documents as they are kept in the usual course of business, with emails in their native or searchable PDF form including attachments and header information (sender, recipients, date, and time).

**DOCUMENTS REQUESTED**

1. All Communications between the Trustee and any McCabe Party concerning the Claims, the McCabe Claims, the Tolling Agreement, the proposed sale to BaileyBridge, Inc., or the Assignment Agreement filed at ECF No. 2978-1, including the Communication by which the sale or the Tolling Agreement was first proposed.

2. All Communications between the Trustee and any Palikaras Party concerning the Claims, the McCabe Claims, the Next Bridge notes, the January 21, 2024 Release, the Tolling Agreement, BaileyBridge, Inc., any potential claim against George Palikaras, or the prosecution of any estate litigation.

3. All Documents recording or summarizing any telephone call, video conference, or meeting in which any McCabe Party or Palikaras Party participated, including calendar entries, call logs, telephone and video-conference records, notes, and summaries, and including the calls and meetings reflected in the time entries at ECF No. 2265-2, p. 3 (Sept. 17, 2024) and ECF No. 2265-6, pp. 4 (Aug. 29, 2024), 7 (Nov. 1, 2024), 10 (Nov. 19, 2024), 11 (Dec. 3, 2024), 19 (Apr. 6–7, 2025), and 29 (June 19, 2025).

4. For every call or meeting of the "litigation team," including the "[f]irst weekly call with litigation team" on December 3, 2024 (ECF No. 2265-6, p. 11): all agendas, minutes, notes, attendee lists, recordings, and Documents circulated to any participant who was not the Trustee.

5. The executed Tolling Agreement; every draft exchanged with any McCabe Party; and all Communications concerning its negotiation, terms, duration, extension, or expiration.

6. The January 21, 2024 Release Agreement and all Documents concerning the August 2023 sale of the Next Bridge notes to Gregory McCabe that the Trustee received from any McCabe Party or Palikaras Party.

7. All Documents the Trustee provided to any McCabe Party concerning the Claims or the McCabe Claims, including materials provided under §§ 5.1(f) and 6.4 of the Assignment Agreement, and any nondisclosure, confidentiality, or access agreement governing those materials.

8. Every nondisclosure, confidentiality, common-interest, joint-prosecution, cooperation, or indemnity agreement between the Trustee and any McCabe Party or Palikaras Party.

9. All Documents the Trustee received identifying the owners, officers, directors, members, and sources of funding of BaileyBridge, Inc., and its date of formation.

10. All solicitations, offers, proposals, term sheets, and counteroffers for the purchase, assignment, or prosecution of the Claims or the McCabe Claims, from any person, and all Communications concerning Scott Traudt's April 22, 2026 offer (ECF No. 2750, Ex. E, pp. 106–109).

11. All nonprivileged Documents supporting the proposed consideration of $250,000 plus twenty percent of net recovery, including any valuation, estimate of litigation cost or duration, or analysis of collectability shared with any person other than the Trustee.

12. Documents sufficient to identify each person the Trustee or any McCabe Party has identified or contemplated as a "Doe" defendant in Adv. Nos. 26-05037 or 26-05038, or as an "unknown" defendant within §§ 1.1 or 3.1 of the Assignment Agreement.

Dated: September 28, 2026.

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

## CERTIFICATE OF SERVICE

I certify that on September 29, 2026, I served the foregoing Objection, the Declaration of Danielle Spears with exhibits, and the Declaration of Scott Traudt on the following by email and U.S. Mail:

- Jeffrey L. Hartman, Hartman & Hartman, counsel for the Trustee (notices@bankruptcyreno.com)
- Kent R. Robison, Robison Law Group, and Clayton P. Brust, SBW Law Group, counsel for the Trustee
- Christina W. Lovato, Chapter 7 Trustee (trusteelovato@att.net)
- Michael R. Brunet and Eric Browndorf, Cooper Levenson, counsel for BaileyBridge, Inc.
- Nathan G. Kanute, Charles E. Gianelloni, and Alexis R. Wendl, Snell & Wilmer L.L.P., counsel for BaileyBridge, Inc. (nkanute@swlaw.com; cgianelloni@swlaw.com; awendl@swlaw.com)
- Office of the United States Trustee, Region 17 (USTPRegion17.RE.ECF@usdoj.gov)
- All parties registered to receive electronic notice in this case

Danielle Spears

**EXHIBIT 3**

**(September 28, 2026 Consultation Email)**

Gmail

Danielle Spears <paymmtlpnow@gmail.com>

**Case No. 24-50792-gs – Request for Consent to Hearing on Shortened Time (Oct. 13, 2026)**

1 message

**Danielle Spears** <paymmtlpnow@gmail.com> Mon, Sep 28, 2026 at 4:40 AM
To: "Jeffrey L. Hartman" <jlh@bankruptcyreno.com>, jchristian@christianattarlaw.com, mbrunet@cooperlevenson.com, krobison@rssblaw.com, cbrust@sbwlawgroup.com, ebrowndorf@cooperlevenson.com, "nkanute@swlaw.com" <nkanute@swlaw.com>, cgianelloni@swlaw.com, awendl@swlaw.com
Cc: Christina Lovato <trusteelovato@att.net>, notices@bankruptcyreno.com
Bcc: Scott Traudt <sctraudt@gmail.com>

Dear Mr. Hartman:

Under Local Rule 9006(a), I am writing to ask whether the Trustee consents or objects to having my motion heard on shortened time.

I am filing a separate motion requesting an order (1) requiring expedited production of documents and the filing of the McCabe Tolling Agreement; (2) establishing a 90-day competitive bidding period for the Authentix and 24M claims; (3) requiring the Trustee's statement regarding the tolled McCabe claims; (4) requiring supplemental Rule 2014 disclosures by special counsel and limiting the sharing of estate information with former CEO George Palikaras; and (5) continuing the hearing on the Sale Motion pending production. Local Rule 9014(i) does not permit countermotions, so I am filing it separately from my objection to the Sale Motion (ECF No. 2966).

Because the motion concerns the same transaction, I will ask the Court to hear it on October 13, 2026, at 1:30 p.m., together with the Sale Motion. I intend to propose that oppositions be due October 8 and replies October 9, 2026.

Please let me know by 5:00 p.m. Pacific Time today, Monday, September 28, 2026, whether the Trustee consents to or opposes a hearing on shortened time. If I do not hear back by then, I will tell the Court that I requested consent and did not receive a response.

I am copying the Trustee's co-counsel; special counsel Mr. Christian; and counsel for BaileyBridge, Inc., Mr. Brunet and Mr. Browndorf of Cooper Levenson and Mr. Kanute, Mr. Gianelloni, and Ms. Wendl of Snell & Wilmer, who appeared on September 24, 2026 (ECF No. 2982). I request their positions as well. Counsel for BaileyBridge: please confirm whether you also represent Gregory McCabe individually in connection with the tolling agreement and potential estate claims against him. If not, please identify his counsel so that I may consult them as well.

Thank you,

Danielle Spears, Pro Se
480-476-1091
paymmtlpnow@gmail.com

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:
META MATERIALS INC.,
Debtor.

Case No. 24-50792-gs
Chapter 7

Hearing Date: OST Requested
Hearing Time: OST Requested

**EX PARTE MOTION FOR ORDER SHORTENING TIME TO HEAR DANIELLE SPEARS'S MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION CONCURRENTLY WITH THE OCTOBER 13, 2026 HEARING ON THE TRUSTEE'S SALE MOTION [ECF No. 2966]**

Danielle Spears ("Movant"), appearing pro se, moves under Local Rule 9006 and Fed. R. Bankr. P. 9006(c)(1) for an order shortening time so that her concurrently filed Motion for Order (1) Requiring Expedited Production of Documents and Filing of McCabe Tolling Agreement, (2) Establishing a 90-Day Competitive Bidding Period for the Authentix and 24M Claims, (3) Requiring Trustee's Statement Regarding Tolled McCabe Claims, (4) Requiring Supplemental Rule 2014 Disclosures by Special Counsel and Limiting Sharing of Estate Information with Former CEO, and (5) Continuing Hearing on Sale Motion Pending Production (the "Production and Bidding Motion") may be heard on **October 13, 2026, at 1:30 p.m.**, together with the

Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966) (the "Sale Motion"). This motion is supported by the Declaration of Danielle Spears below, the Information Sheet attached as **Exhibit 1**, a copy of the Production and Bidding Motion attached as **Exhibit 2**, and the papers on file in this case.

## I. RELIEF REQUESTED

Movant requests an order (a) setting the Production and Bidding Motion for hearing on October 13, 2026, at 1:30 p.m., the date and time already set for the Sale Motion; (b) setting a deadline for any opposition and any reply; and (c) setting a deadline for service of the order shortening time. Movant proposes that oppositions be due October 8, 2026, replies be due October 9, 2026, and service of the order be completed within one business day of its entry. LR 9006(b), (e).

## II. CAUSE EXISTS TO HEAR THE MOTION ON SHORTENED TIME

The Sale Motion asks the Court to approve the private sale of the estate's Authentix and 24M avoidance claims to BaileyBridge, Inc., an entity owned and controlled by Gregory McCabe, and to find BaileyBridge a good-faith purchaser under 11 U.S.C. § 363(m). ECF Nos. 2966, 2978. Movant has filed a timely objection. Under LR 9014(i), however, affirmative relief may not be sought by countermotion and must be requested by separate motion. Movant's Production and Bidding Motion seeks that relief: expedited production of the Trustee's communications, call records, and meeting notes and minutes involving McCabe, BaileyBridge, Mr. Palikaras, and their counsel, and the filing of the McCabe Tolling Agreement; notice and procedures permitting creditors, equity holders, and other qualified parties to submit competing proposals for the claims; a statement of whether and when the Trustee will prosecute the tolled McCabe claims; a

supplemental Rule 2014 statement by estate special counsel concerning its connections to McCabe and Next Bridge; limits on sharing nonpublic estate information with former CEO George Palikaras and his counsel while the sale is pending; and a continuance of the Sale Motion hearing until those documents are produced. Without an order shortening time, the thirty-day response period for Movant's document requests would expire after the October 13 hearing.

That relief is inseparable from the Sale Motion and loses its value if heard afterward. Once the sale is approved and the § 363(m) finding is entered, competing bids can no longer be considered, the claims pass to BaileyBridge, and appellate relief may be foreclosed absent a stay. 11 U.S.C. § 363(m). The Court's obligation to "assure that optimal value is realized by the estate under the circumstances" can be met only if the competing-bid and disclosure issues are before it when it rules. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005). The October 13 hearing is fifteen days away, fewer than the days required for regular notice of a new motion. LR 9014(b); Fed. R. Bankr. P. 9006(d).

Hearing both matters together also conserves the resources of the Court and the parties. The issues overlap entirely, the Trustee is already preparing for the October 13 hearing, and a single hearing avoids the need for a continuance of the Sale Motion or a second hearing on the same record. No party will be prejudiced: the Production and Bidding Motion seeks information and procedures within the Trustee's control, and the proposed schedule gives the Trustee and BaileyBridge an opportunity to respond in writing.

## III. COMPLIANCE WITH LOCAL RULE 9006

The information required by LR 9006(a)(1)–(6) is set forth in the Information Sheet attached as Exhibit 1. A proposed order shortening time and notice of hearing will be submitted

through the Court's electronic order program in accordance with LR 9006(d). If the order is entered, Movant will serve it and the Production and Bidding Motion by email within one business day, in accordance with LR 9006(e).

## IV. CONCLUSION

Movant respectfully requests that the Court enter an order shortening time and setting the Production and Bidding Motion for hearing on October 13, 2026, at 1:30 p.m., together with the Sale Motion.

Dated: September 28, 2026.

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091
paymmtlpnow@gmail.com

**DECLARATION OF DANIELLE SPEARS IN SUPPORT OF EX PARTE MOTION FOR ORDER SHORTENING TIME**

I, Danielle Spears, declare as follows:

1. I am the Movant. I have personal knowledge of the facts stated in this declaration and could testify competently to them.

2. The Trustee filed the Sale Motion (ECF No. 2966) on September 15, 2026, and it is set for hearing on October 13, 2026, at 1:30 p.m. (ECF No. 2968). Oppositions were due September 29, 2026.

3. I filed my objection to the Sale Motion by the September 29, 2026 deadline. Because LR 9014(i) does not permit countermotions, I am filing my Production and Bidding Motion as a separate motion together with this motion. A copy is attached as Exhibit 2.

4. The relief requested in the Production and Bidding Motion must be decided before or together with the Sale Motion. If the Sale Motion is approved first, the claims will be transferred to BaileyBridge and competing proposals could no longer be considered.

5. On September 28, 2026, I emailed Jeffrey L. Hartman, counsel for the Trustee; the Trustee's co-counsel Kent R. Robison and Clayton P. Brust; special counsel James W. Christian; and counsel for BaileyBridge, Inc., Michael R. Brunet and Eric Browndorf of Cooper Levenson and Nathan G. Kanute, Charles E. Gianelloni, and Alexis R. Wendl of Snell & Wilmer L.L.P., which appeared for BaileyBridge, Inc. on September 24, 2026 (ECF No. 2982), with copies to Trustee Lovato. I asked whether they consent to having the Production and Bidding Motion heard on October 13, 2026, requested a response by 5:00 p.m. Pacific Time that day, and asked counsel for BaileyBridge to identify counsel for

Gregory McCabe individually. As of the date of this declaration, I have not received a response. A true and correct copy of my email is attached as **Exhibit 3**.

6. I estimate that the Production and Bidding Motion will require approximately 20 minutes of hearing time, in addition to the time required for the Sale Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2026, at Peoria, Arizona.

Danielle Spears

**EXHIBIT 1**

**INFORMATION SHEET FOR PROPOSED ORDER SHORTENING TIME AND NOTICE OF HEARING (LR 9006(a))**

Motion: Danielle Spears's Motion for Order (1) Requiring Expedited Production of Documents and Filing of McCabe Tolling Agreement, (2) Establishing a 90-Day Competitive Bidding Period for the Authentix and 24M Claims, (3) Requiring Trustee's Statement Regarding Tolled McCabe Claims, (4) Requiring Supplemental Rule 2014 Disclosures by Special Counsel and Limiting Sharing of Estate Information with Former CEO, and (5) Continuing Hearing on Sale Motion Pending Production.

(1) **Were opposing counsel and other interested parties consulted?** Yes. Jeffrey L. Hartman, Kent R. Robison, and Clayton P. Brust (counsel for the Trustee); Trustee Christina W. Lovato; James W. Christian (special counsel to the Trustee); Michael R. Brunet and Eric Browndorf (counsel for BaileyBridge, Inc., who were also asked to identify counsel for Gregory McCabe); and Nathan G. Kanute, Charles E. Gianelloni, and Alexis R. Wendl of Snell & Wilmer L.L.P. (counsel for BaileyBridge, Inc.).

(2) **Do they consent to a hearing on shortened time?** No response had been received as of the date of filing.

(3) **Date consulted:** September 28, 2026.

(4) **How consultation was accomplished:** By a single email on September 28, 2026, to jlh@bankruptcyreno.com, krobison@rssblaw.com, cbrust@sbwlawgroup.com, jchristian@christianattarlaw.com, mbrunet@cooperlevenson.com,

ebrowndorf@cooperlevenson.com, nkanute@swlaw.com, cgianelloni@swlaw.com, and awendl@swlaw.com, with copies to trusteelovato@att.net and notices@bankruptcyreno.com. Spears Decl. ¶ 5 & Ex. 3.

(5) **Estimated time for hearing:** Approximately 20 minutes, to be heard with the Sale Motion (ECF No. 2966).

(6) **Date beyond which relief would no longer be necessary:** October 13, 2026, the hearing date on the Sale Motion. If the Sale Motion is decided first, the requested relief will be moot.

# EXHIBIT 2

## (Copy of Production and Bidding Motion)

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

META MATERIALS INC., | Case No. 24-50792-gs

Debtor | Chapter 7

**MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION**

Hearing Date: OST Requested
(Oct. 13, 2026, 1:30 p.m. proposed)

Danielle Spears ("Movant"), appearing pro se, moves for an order (1) requiring the Chapter 7 Trustee to produce, on an expedited basis, the emails, messages, call records, and meeting notes and minutes described in Exhibit 2, and to file the executed McCabe Tolling Agreement; (2) establishing competitive bidding procedures for the estate's claims in Adv. Nos. 26-05037 ("Authentix") and 26-05038 ("24M"); (3) requiring the Trustee to file a statement regarding the tolled estate claims against Gregory McCabe; (4) requiring estate special counsel Christian Attar to file a supplemental Rule 2014 statement and limiting the sharing of nonpublic estate information with former CEO George Palikaras and his counsel; and (5) continuing the hearing

on the Sale Motion until the documents are produced, so that the Sale Motion is decided on a documented record. Movant has objected to the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966) (the "Sale Motion"). Because Local Rule 9014(i) does not permit countermotions, the affirmative relief requested here is presented by this separate motion. Movant requests that it be heard on shortened time with the Sale Motion on October 13, 2026, at 1:30 p.m.

This motion is supported by the following points and authorities; the Declaration of Danielle Spears and the Declaration of Scott Traudt filed with Movant's objection to the Sale Motion, which are incorporated by reference; the proposed order attached as **Exhibit 1**; Movant's First Requests for Production to the Trustee, served concurrently and attached as **Exhibit 2**; and the papers on file in this case, of which Movant requests the Court take judicial notice. Fed. R. Evid. 201.

## I. JURISDICTION AND CONSENT

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), and (O). Pursuant to Local Rule 9014.2, Movant consents to the entry of final orders or judgment by the bankruptcy judge in this contested matter.

## II. BACKGROUND

The Trustee seeks to sell the Authentix and 24M claims by private sale to BaileyBridge, Inc., an entity "owned and controlled by Greg McCabe," for $250,000 plus twenty percent of net recovery. ECF No. 2978 ¶¶ 7–8. The Trustee's own complaints seek not less than $25 million from Authentix and not less than $10 million from 24M. ECF No. 2932 ¶ 136; ECF No. 2936 ¶¶

105, 131. The Sale Motion identifies no marketing, solicitation, or competing offer. ECF No. 2966.

The Trustee has entered into a tolling agreement with McCabe concerning his 2023 transactions with Meta, including his purchase of Meta's secured lender position in the Next Bridge Hydrocarbons notes. ECF No. 2978 ¶ 9. The agreement has not been filed. The two-year period under 11 U.S.C. § 546(a)(1)(A) has run from the August 9, 2024 petition date, so the tolling agreement is what preserves those claims. The Trustee characterizes the agreement as immaterial to the sale. *Id.*

On April 22, 2026, Scott Traudt offered to prosecute the McCabe avoidance claim at his own expense, for twenty percent of net recovery to the estate, and proposed a $9,000,000 minimum for any competing bid by a defendant or insider. ECF No. 2750, Ex. E, pp. 106–109; Traudt Decl. ¶¶ 2–3. He received no response. Traudt Decl. ¶ 4. On August 7, 2026, the Trustee's counsel informed him that the Trustee had entered into a tolling agreement with McCabe. *Id.* ¶ 5 & Ex. 2. His September 2026 inquiries about the agreement's duration and whether it had been filed went unanswered. *Id.* ¶ 6 & Ex. 3. He was not invited to bid on the Authentix or 24M claims. *Id.* ¶¶ 7–8. Movant's informal request for the tolling agreement and related information has likewise not been fulfilled. Spears Decl. ¶¶ 3–5 & Ex. A.

## III. ARGUMENT

### A. The Trustee should be required to produce the communications, call records, and meeting notes behind the sale, and to file the McCabe Tolling Agreement.

In a sale under 11 U.S.C. § 363(b), the Court's obligation "is to assure that optimal value is realized by the estate under the circumstances," and the requirement of notice and a hearing provides "a means of objecting and a method for attracting interest by potential purchasers."

*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005). When an objection is made, "the responsibility ultimately is the court's." *Id.* The Court must find a sound business purpose, a fair and reasonable price, adequate marketing, and good faith. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). A § 363(m) good-faith finding concerns the purchaser's conduct, including the absence of collusion with the trustee. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992).

The Court cannot make those findings on the present record. The purchaser's sole owner is a potential estate defendant whose claims are preserved only by an unfiled agreement; the Sale Motion discloses no valuation, no investigation-cost figure supporting the $250,000 price, and no marketing; and the estate's information about these claims came in part from a former officer whose counsel now appears for the purchaser. ECF No. 2978-1 § 8; ECF No. 2265-6, pp. 4, 7, 11, 19. The Trustee's own time records show that these facts are documented: calls with Mr. Palikaras's counsel about "information Palikaras would like to provide re: fraudulent transfers" (ECF No. 2265-6, p. 4); calls about the 24M and Authentix transfers (*id.* p. 7); discussion of "the potential of a tolling agreement" (*id.* p. 10); a "[f]irst weekly call with litigation team" that included Mr. Palikaras and Mr. Browndorf (*id.* p. 11); and calls with Mr. Palikaras about the McCabe litigation and release (*id.* p. 19). The emails, call records, and meeting notes behind those entries are the best evidence of who proposed the sale and the tolling agreement, what information was shared, and whether the terms were negotiated at arm's length. Movant is not asking the Trustee to answer questions. She is asking for the documents.

This is a contested matter, in which the discovery rules apply, including the rule governing requests for production. Fed. R. Bankr. P. 9014(c), 7034. Movant has served the requests attached as Exhibit 2. The documents are relevant to the findings the Trustee asks the Court to

make, Fed. R. Civ. P. 26(b)(1), and the Court may order a shorter response time. Fed. R. Civ. P. 34(b)(2)(A). Expedited production is necessary because the default thirty-day period would expire after the October 13 hearing, leaving the Court to make its good-faith and value findings without the record that bears most directly on them.

Communications between the Trustee and McCabe, BaileyBridge, Mr. Palikaras, or their counsel are not privileged. The Trustee controls the estate's attorney-client privilege, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358 (1985), but voluntary disclosure to a third party waives it, *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012), and work-product protection is waived by disclosure that substantially increases the opportunity for an adversary to obtain the information, *United States v. Sanmina Corp.*, 968 F.3d 1107, 1121 (9th Cir. 2020). Mr. Palikaras was identified as the subject of "potential claims" early in the case, ECF No. 2265-2, p. 3, and McCabe is the counterparty to preserved estate claims. Anything withheld should be identified on a privilege log. Fed. R. Civ. P. 26(b)(5)(A). Confidentiality concerns can be addressed by redaction or filing under seal. 11 U.S.C. § 107; Fed. R. Bankr. P. 9018. The Tolling Agreement itself, an agreement between the estate and a potential defendant, should be filed.

Because the documents cannot be produced and reviewed before October 13 unless the Court acts now, and because the § 363(m) finding the Trustee seeks may foreclose later review, the hearing on the Sale Motion should be continued until at least fourteen days after production, with leave for parties in interest to supplement their objections.

**B. The claims should be exposed to competing bids before any sale is approved.**

The Trustee proposes to sell to BaileyBridge because McCabe is a large shareholder with "an incentive to successfully prosecute" the claims. ECF No. 2978 ¶ 8. That rationale applies equally

to other equity holders and creditors, who share the same interest in maximizing recovery but, unlike McCabe, hold no preserved liability to the estate. A private sale to a single, connected buyer is constrained competition that warrants closer scrutiny, and percentage-of-recovery consideration must be valued realistically rather than treated as worthless. *Lahijani*, 325 B.R. 282. Movant does not ask the Court to decide which proposal is best. She asks that the Court give the estate the benefit of a structured process in which BaileyBridge's offer serves as the opening bid, bidders have 90 days to retain counsel and submit proposals, other parties receive notice and the same nonprivileged information BaileyBridge received, ECF No. 2978-1 §§ 5.1(f), 6.4, and the Trustee reports every proposal and her comparison of their total expected value.

**C. The Trustee should state whether and when she will prosecute the tolled McCabe claims.**

A trustee must collect and reduce to money the property of the estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). The McCabe claims are estate property. The Trustee has not filed them, has not disclosed when the tolling period ends, and has not responded to an offer to prosecute them at no cost to the estate. Where a trustee does not pursue an estate claim, the Court may consider permitting an interested party to prosecute it for the estate's benefit. *Lahijani*, 325 B.R. 282 (directing consideration on remand of permitting objecting creditors to sue in the name of the trustee at their own risk and expense); *see also* 11 U.S.C. § 503(b)(3)(B). Movant does not ask the Court to adjudicate Mr. Traudt's rights on this motion. She asks that the Trustee be required to disclose the tolling agreement's expiration and her intentions, and, if she will not prosecute the claims, to respond to Mr. Traudt's offer and entertain competing offers on the record. This disclosure bears directly on the Sale

Motion: the estate should not transfer its other principal claims to McCabe's company while the claims against McCabe remain unfiled and unexplained.

**D. Estate special counsel should file a supplemental Rule 2014 statement addressing its connections to McCabe and Next Bridge.**

A professional employed by the estate must disclose "all of the person's connections with the debtor, creditors, any other party in interest," and their attorneys. Fed. R. Bankr. P. 2014(a). The duty is continuing, and the professional may not decide for itself which connections matter. *See In re Park-Helena Corp.*, 63 F.3d 877, 881–82 (9th Cir. 1995); *In re Film Ventures Int'l, Inc.*, 75 B.R. 250, 252–53 (9th Cir. BAP 1987).

Christian Attar was employed as special litigation counsel on a declaration stating that it had no connections with the estate's shareholders or other parties in interest "related to this matter." ECF No. 99 ¶ 4; ECF No. 118. In April 2025, Mr. Christian disclosed that his firm represents Next Bridge Hydrocarbons, Inc., of which McCabe is chairman and chief executive officer, and wrote that "at the outset of retaining my firm" he told the Trustee's counsel he was representing Next Bridge and would not represent McCabe individually because, he was told, "Meta might be investigating potential claims against him." ECF No. 1878-4, p. 3. He stated that his firm would file a new case for Next Bridge concerning the Orogrande Lease. ECF No. 1878 ¶¶ 10–13. A 25% Orogrande working interest beneficially owned by McCabe was part of the collateral for the Next Bridge note that McCabe bought from Meta, which is the transaction underlying the tolled McCabe claims. Spears Decl. Ex. C.

On August 7, 2026, the same day the Trustee filed the Authentix and 24M complaints and informed Mr. Traudt of the McCabe tolling agreement, the Trustee applied to approve a revised contingent-fee contract with Christian Attar and to add Grant & Eisenhofer, again representing

that the firms have "no present connections" with any party in interest. ECF No. 2933 ¶ 9. Mr. Christian's accompanying declaration makes no disinterestedness statement and says nothing about the Next Bridge engagement or its status. ECF No. 2934. The application was granted ex parte. ECF No. 2958. McCabe is now the proposed purchaser of the estate's principal claims. Whether estate counsel has an ongoing attorney-client relationship with the purchaser's company, and what role, if any, counsel played in the tolling agreement or the sale, bears directly on the good-faith inquiry under *Ewell*, 958 F.2d at 281. Movant asks only that the facts be disclosed under oath.

**E. Nonpublic estate information about these claims should not be shared with Mr. Palikaras or his counsel while the sale is pending.**

The Securities and Exchange Commission found that Mr. Palikaras, while Meta's chief executive officer, provided a "wholly unsupported" per-share value estimate to investors, and he later signed the Next Bridge note sale to McCabe. Claim No. 70-1; Spears Decl. Ex. C. The Trustee's professionals identified "potential claims against George Palikaras" early in the case, ECF No. 2265-2, p. 3, yet he and his counsel, Eric Browndorf, participated in the estate's weekly "litigation team" calls. ECF No. 2265-6, p. 11. Mr. Browndorf is now the purchaser's designated notice contact. ECF No. 2978-1 § 8. Pending the Court's decision on the Sale Motion, the Trustee should not share nonpublic information about the Authentix, 24M, or McCabe claims with Mr. Palikaras or his counsel except as required by law or court order, and should disclose any agreement governing information already shared. 11 U.S.C. §§ 105(a), 704(a)(1). This relief does not prevent the Trustee from receiving information from Mr. Palikaras. It prevents estate information from flowing to the purchaser through a potential defendant's counsel.

## IV. RELIEF REQUESTED

Movant respectfully requests entry of an order substantially in the form attached as Exhibit 1:

1. Requiring the Trustee, within seven days, to produce to Movant all documents responsive to Requests 1 through 12 of Exhibit 2, including all emails, text and other messages, call logs and records, calendar entries, and meeting agendas, notes, and minutes reflecting communications with Gregory McCabe, BaileyBridge, Inc., George Palikaras, or their counsel, together with a privilege log for anything withheld;

2. Requiring the Trustee, within seven days, to file the executed McCabe Tolling Agreement, any amendments, and the January 21, 2024 Release Agreement, with any justified redactions under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018;

3. Establishing the following procedures before any sale of the Authentix and 24M claims is approved: (a) the Trustee shall serve and file notice, to all creditors, equity security holders who have appeared or filed proofs of interest, and all parties on the service list, that the claims are available for purchase and that BaileyBridge's offer is the opening bid; (b) any interested party may obtain the complaints and the nonprivileged materials made available to BaileyBridge upon signing a reasonable confidentiality agreement; (c) competing proposals shall be due no earlier than 90 days after service of the notice, so that interested parties, including Movant and Scott Traudt, may retain litigation counsel, subject to reasonable qualification requirements such as proof of funding and identified litigation counsel; (d) the Trustee shall file a report identifying every proposal received and her comparison of their total expected value to the estate; and (e) all qualified proposals shall be considered at a continued hearing;

4. Requiring the Trustee, within seven days, to file a statement disclosing the expiration date of the McCabe Tolling Agreement and whether and when she intends to prosecute the tolled McCabe claims; and, if she does not intend to prosecute them before that date, to respond on the record to Mr. Traudt's April 22, 2026 offer and to entertain competing offers to purchase or prosecute those claims for the estate's benefit, without prejudice to any motion by any party for authority to do so;

5. Requiring Christian Attar, within seven days, to file a supplemental verified statement under Fed. R. Bankr. P. 2014(a) disclosing: (a) every engagement since January 1, 2023, by Next Bridge Hydrocarbons, Inc., Gregory McCabe, BaileyBridge, Inc., or any entity McCabe controls, with its dates, scope, and status, including any litigation concerning the Orogrande Lease and any award of fees, costs, or sanctions in it; (b) all communications with any of them or their counsel concerning Meta, the estate, the Authentix or 24M claims, the McCabe claims, the tolling agreement, or the sale; (c) whether the firm advised the Trustee concerning the tolling agreement or the sale; and (d) any agreement to share fees with any other attorney, and the litigation expenses incurred to date for which any firm employed under ECF No. 2958 will seek reimbursement;

6. Directing that, pending the Court's ruling on the Sale Motion, the Trustee shall not share nonpublic estate information concerning the Authentix, 24M, or McCabe claims with George Palikaras or his counsel except as required by law or court order, and shall disclose any agreement governing such information previously shared;

7. Continuing the hearing on the Sale Motion to a date not less than fourteen days after the Trustee completes the production required by paragraphs 1 and 2 and

Christian Attar files the statement required by paragraph 5, and permitting parties in interest to file supplemental objections no later than seven days before the continued hearing; and

8. Granting such further relief as is just.

Dated: September 28, 2026.

Danielle Spears, Pro Se

10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091
paymmtlpnow@gmail.com

EXHIBIT 1 [PROPOSED] ORDER

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re:

META MATERIALS INC.,

Debtor

Case No. 24-50792-gs

Chapter 7

**[PROPOSED] ORDER GRANTING MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION**

The Court, having considered the Motion for Order (1) Requiring Expedited Production of Documents and Filing of McCabe Tolling Agreement, (2) Establishing a 90-Day Competitive Bidding Period for the Authentix and 24M Claims, (3) Requiring Trustee's Statement Regarding Tolled McCabe Claims, (4) Requiring Supplemental Rule 2014 Disclosures by Special Counsel and Limiting Sharing of Estate Information with Former CEO, and (5) Continuing Hearing on Sale Motion Pending Production (ECF No. ____) filed by Danielle Spears, the papers filed in support and in opposition, and the arguments presented at the hearing, and good cause appearing,

IT IS ORDERED that the motion is GRANTED as set forth below.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall produce to Danielle Spears all documents responsive to Requests 1 through 12 of Danielle Spears's First Requests for Production of Documents to Chapter 7 Trustee (ECF No. ____, Ex.

2), and shall serve a privilege log complying with Fed. R. Civ. P. 26(b)(5)(A) for any document withheld. Communications between the Trustee or her professionals and Gregory McCabe, BaileyBridge, Inc., George Palikaras, or their counsel shall not be withheld as privileged communications between the Trustee and her counsel.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall file the executed McCabe Tolling Agreement, any amendments, and the January 21, 2024 Release Agreement, subject to any redactions permitted under 11 U.S.C. § 107 and Fed. R. Bankr. P. 9018.

IT IS FURTHER ORDERED that, before any sale of the claims in Adv. Nos. 26-05037 and 26-05038 is approved: (a) the Trustee shall serve and file notice, to all creditors, equity security holders who have appeared or filed proofs of interest, and all parties on the service list, that the claims are available for purchase and that the offer of BaileyBridge, Inc. is the opening bid; (b) any interested party may obtain the complaints and the nonprivileged materials made available to BaileyBridge, Inc. upon signing a reasonable confidentiality agreement; (c) competing proposals shall be due ninety (90) days after service of the notice; (d) the Trustee shall file a report identifying every proposal received and comparing their total expected value to the estate; and (e) all qualified proposals shall be considered at a continued hearing on ______________________, 2026, at _______ __.m.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, the Trustee shall file a statement disclosing the expiration date of the McCabe Tolling Agreement and whether and when she intends to prosecute the tolled claims against Gregory McCabe, and, if she does not intend to prosecute them before that date, shall respond on the record to Scott Traudt's April 22,

2026 offer. Nothing in this order determines the rights of any party to seek authority to prosecute or purchase those claims.

IT IS FURTHER ORDERED that, within seven (7) days of entry of this order, Christian Attar shall file a supplemental verified statement under Fed. R. Bankr. P. 2014(a) disclosing: (a) every engagement since January 1, 2023, by Next Bridge Hydrocarbons, Inc., Gregory McCabe, BaileyBridge, Inc., or any entity controlled by Gregory McCabe, with its dates, scope, and status, including any litigation concerning the Orogrande Lease and any award of fees, costs, or sanctions in it; (b) all communications with any of them or their counsel concerning Meta Materials Inc., the estate, the claims in Adv. Nos. 26-05037 and 26-05038, any claim against Gregory McCabe, the McCabe Tolling Agreement, or the proposed sale; (c) whether the firm advised the Trustee concerning the McCabe Tolling Agreement or the proposed sale; and (d) any agreement to share fees with any other attorney, and the litigation expenses incurred to date for which any firm employed under ECF No. 2958 will seek reimbursement.

IT IS FURTHER ORDERED that, pending the Court's ruling on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966), the Trustee shall not share nonpublic estate information concerning the claims in Adv. Nos. 26-05037 and 26-05038 or any claim against Gregory McCabe with George Palikaras or his counsel except as required by law or court order, and shall file, within seven (7) days, a statement identifying any agreement governing such information previously shared.

IT IS FURTHER ORDERED that the hearing on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966) is CONTINUED to ____________________, 2026, at ______ __.m. Any party in interest may file a supplemental objection no later than seven (7) days before the continued hearing.

Respectfully submitted September 28, 2026:

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091

paymmtlpnow@gmail.com

# EXHIBIT 2

# FIRST REQUESTS FOR PRODUCTION TO CHAPTER 7 TRUSTEE

# DANIELLE SPEARS'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO CHAPTER 7 TRUSTEE

Pursuant to Fed. R. Bankr. P. 9014(c) and 7034 and Fed. R. Civ. P. 34, Danielle Spears requests that Christina W. Lovato, Chapter 7 Trustee, produce the following Documents in connection with the contested matter on the Trustee's Motion for Order Authorizing Sale and Assignment of Litigation Claims (ECF No. 2966), by delivery to Danielle Spears at the address and email shown below, within thirty days of service or such shorter time as the Court orders. Fed. R. Civ. P. 34(b)(2)(A).

## DEFINITIONS

(a) "Trustee" means Christina W. Lovato, Chapter 7 Trustee, and every attorney, accountant, special counsel, consultant, or other person employed by or acting for her in this case, including Hartman & Hartman, Robison, Sharp, Sullivan & Brust, and James W. Christian and his firm.

(b) "McCabe Parties" means Gregory McCabe, BaileyBridge, Inc., Next Bridge Hydrocarbons, Inc., any other entity owned or controlled by Gregory McCabe, and every attorney or other person acting for any of them, including Cooper Levenson, P.A., Michael R. Brunet, Eric Browndorf, and Snell & Wilmer L.L.P.

(c) "Palikaras Parties" means George Palikaras and every attorney or other person acting for him, including Eric Browndorf.

(d) "Communication" means any transmission of information by any means, including email, text or instant message (SMS, iMessage, WhatsApp, Signal, Teams, Slack, or similar), letter, voicemail, telephone call, video conference, or meeting.

(e) "Document" has the broadest meaning permitted by Fed. R. Civ. P. 34(a)(1)(A) and includes electronically stored information, calendar entries, call logs, telephone and video-conference records, time and billing entries, notes, minutes, agendas, memoranda, summaries, drafts, and attachments.

(f) "Claims" means the estate's claims asserted in Adv. Nos. 26-05037 (Authentix) and 26-05038 (24M); "McCabe Claims" means any claim of the estate against Gregory McCabe, including claims arising from the 2023 sale of the Next Bridge Hydrocarbons notes and the January 21, 2024 Release; and "Tolling Agreement" means any tolling, standstill, or similar agreement between the Trustee and any McCabe Party, with all amendments and extensions.

**INSTRUCTIONS**

1. Unless otherwise stated, each request covers August 9, 2024, to the date of production.

2. If any Document is withheld in whole or part under a claim of privilege or work-product protection, provide a privilege log identifying, for each Document, its date, author, all recipients, general subject matter, and the privilege claimed, as required by Fed. R. Civ. P. 26(b)(5)(A). Communications with any McCabe Party or Palikaras Party are not privileged communications between the Trustee and her counsel and should be produced.

3. Produce Documents as they are kept in the usual course of business, with emails in their native or searchable PDF form including attachments and header information (sender, recipients, date, and time).

**DOCUMENTS REQUESTED**

1. All Communications between the Trustee and any McCabe Party concerning the Claims, the McCabe Claims, the Tolling Agreement, the proposed sale to BaileyBridge, Inc., or the Assignment Agreement filed at ECF No. 2978-1, including the Communication by which the sale or the Tolling Agreement was first proposed.

2. All Communications between the Trustee and any Palikaras Party concerning the Claims, the McCabe Claims, the Next Bridge notes, the January 21, 2024 Release, the Tolling Agreement, BaileyBridge, Inc., any potential claim against George Palikaras, or the prosecution of any estate litigation.

3. All Documents recording or summarizing any telephone call, video conference, or meeting in which any McCabe Party or Palikaras Party participated, including calendar entries, call logs, telephone and video-conference records, notes, and summaries, and including the calls and meetings reflected in the time entries at ECF No. 2265-2, p. 3 (Sept. 17, 2024) and ECF No. 2265-6, pp. 4 (Aug. 29, 2024), 7 (Nov. 1, 2024), 10 (Nov. 19, 2024), 11 (Dec. 3, 2024), 19 (Apr. 6–7, 2025), and 29 (June 19, 2025).

4. For every call or meeting of the "litigation team," including the "[f]irst weekly call with litigation team" on December 3, 2024 (ECF No. 2265-6, p. 11): all agendas, minutes, notes, attendee lists, recordings, and Documents circulated to any participant who was not the Trustee.

5. The executed Tolling Agreement; every draft exchanged with any McCabe Party; and all Communications concerning its negotiation, terms, duration, extension, or expiration.

6. The January 21, 2024 Release Agreement and all Documents concerning the August 2023 sale of the Next Bridge notes to Gregory McCabe that the Trustee received from any McCabe Party or Palikaras Party.

7. All Documents the Trustee provided to any McCabe Party concerning the Claims or the McCabe Claims, including materials provided under §§ 5.1(f) and 6.4 of the Assignment Agreement, and any nondisclosure, confidentiality, or access agreement governing those materials.

8. Every nondisclosure, confidentiality, common-interest, joint-prosecution, cooperation, or indemnity agreement between the Trustee and any McCabe Party or Palikaras Party.

9. All Documents the Trustee received identifying the owners, officers, directors, members, and sources of funding of BaileyBridge, Inc., and its date of formation.

10. All solicitations, offers, proposals, term sheets, and counteroffers for the purchase, assignment, or prosecution of the Claims or the McCabe Claims, from any person, and all Communications concerning Scott Traudt's April 22, 2026 offer (ECF No. 2750, Ex. E, pp. 106–109).

11. All nonprivileged Documents supporting the proposed consideration of $250,000 plus twenty percent of net recovery, including any valuation, estimate of litigation cost or duration, or analysis of collectability shared with any person other than the Trustee.

12. Documents sufficient to identify each person the Trustee or any McCabe Party has identified or contemplated as a "Doe" defendant in Adv. Nos. 26-05037 or 26-05038, or as an "unknown" defendant within §§ 1.1 or 3.1 of the Assignment Agreement.

Dated: September 28, 2026.

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on September 28, 2026, I served the foregoing Motion, with Exhibits 1 and 2, by email and U.S. Mail on: Jeffrey L. Hartman (jlh@bankruptcyreno.com; notices@bankruptcyreno.com), Kent R. Robison (krobison@rssblaw.com), and Clayton P. Brust (cbrust@sbwlawgroup.com), counsel for the Trustee; Christina W. Lovato, Chapter 7 Trustee (trusteelovato@att.net); James W. Christian (jchristian@christianattarlaw.com); Michael R. Brunet and Eric Browndorf (mbrunet@cooperlevenson.com; ebrowndorf@cooperlevenson.com), counsel for BaileyBridge, Inc.; Nathan G. Kanute, Charles E. Gianelloni, and Alexis R. Wendl, Snell & Wilmer L.L.P. (nkanute@swlaw.com; cgianelloni@swlaw.com; awendl@swlaw.com), counsel for BaileyBridge, Inc.; Gregory McCabe, c/o BaileyBridge, Inc., 500 W. Texas Avenue, Suite 890, Midland, TX 79701; the Office of the United States Trustee (USTPRegion17.RE.ECF@usdoj.gov); and Scott Traudt (sctraudt@gmail.com).

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091
paymmtlpnow@gmail.com

**EXHIBIT 3**

**(September 28, 2026 Consultation Email)**

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
Tel: 480-476-1091
paymmtlpnow@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:
META MATERIALS INC.,
Debtor.

Case No. 24-50792-gs
Chapter 7

**ORDER SHORTENING TIME AND NOTICE OF HEARING ON DANIELLE SPEARS'S MOTION FOR ORDER (1) REQUIRING EXPEDITED PRODUCTION OF DOCUMENTS AND FILING OF MCCABE TOLLING AGREEMENT, (2) ESTABLISHING A 90-DAY COMPETITIVE BIDDING PERIOD FOR THE AUTHENTIX AND 24M CLAIMS, (3) REQUIRING TRUSTEE'S STATEMENT REGARDING TOLLED MCCABE CLAIMS, (4) REQUIRING SUPPLEMENTAL RULE 2014 DISCLOSURES BY SPECIAL COUNSEL AND LIMITING SHARING OF ESTATE INFORMATION WITH FORMER CEO, AND (5) CONTINUING HEARING ON SALE MOTION PENDING PRODUCTION**

The Court has considered the Ex Parte Motion for Order Shortening Time filed by Danielle Spears (ECF No. ____), the supporting declaration, and the Information Sheet. Good cause appearing,

IT IS ORDERED that the motion is GRANTED.

IT IS FURTHER ORDERED that the hearing on Danielle Spears's Motion for Order (1) Requiring Expedited Production of Documents and Filing of McCabe Tolling Agreement, (2) Establishing a 90-Day Competitive Bidding Period for the Authentix and 24M Claims, (3)

Requiring Trustee's Statement Regarding Tolled McCabe Claims, (4) Requiring Supplemental Rule 2014 Disclosures by Special Counsel and Limiting Sharing of Estate Information with Former CEO, and (5) Continuing Hearing on Sale Motion Pending Production (ECF No. ____) will be held on ____________________, 2026, at ______ __.m., in the United States Bankruptcy Court, 300 Booth Street, Reno, Nevada 89509.

IT IS FURTHER ORDERED that any opposition to the motion must be filed and served no later than ____________________, 2026.

IT IS FURTHER ORDERED that any reply must be filed and served no later than ____________________, 2026.

IT IS FURTHER ORDERED that Danielle Spears must serve this order and the motion on all parties entitled to notice no later than ____________________, 2026, by email or other expeditious means.

NOTICE IS FURTHER GIVEN that if you object to the relief requested, you must file a WRITTEN response to this pleading with the court. You must also serve your written response on the person who sent you this notice.

If you do not file a written response with the court, or if you do not serve your written response on the person who sent you this notice, then:

- The court may refuse to allow you to speak at the scheduled hearing; and,
- The court may rule against you without formally calling the matter at the hearing.

###

Submitted by:

[signature]

Danielle Spears, Pro Se
10701 N. 99th Ave., Lot 159
Peoria, AZ 85345
480-476-1091 | paymmtlpnow@gmail.com