Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

*Attorneys for Authentix, Inc. and Authentix Solutions Canada, Inc.*

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

META MATERIALS INC.,

Debtor.

Case No.: 24-50792-gs
Chapter 7

**AUTHENTIX PARTIES' OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS [ECF NO.[1] 2966]**

Hearing Date: October 13, 2026
Hearing Time: 1:30 p.m.

Authentix, Inc. and Authentix Solutions Canada, Inc. (collectively, the "Authentix Parties"), by and through their counsel of record, McDonald Carano LLP, submit this Objection to the *Trustee's Motion For Order Authorizing Sale And Assignment Of Litigation Claims* [ECF No. 2966] (the "Motion to Sell") and the *Declaration of Christina Lovato* filed in support thereof [ECF No. 2967, as amended at ECF No. 2978] (the "Lovato Decl."). This Objection is supported by the following memorandum of points and authorities; the papers and pleadings on file in this case, in Adversary Proceeding Nos. 26-05037-gs and 26-05038-gs, and publicly-filed with the Securities and Exchange Commission ("SEC") for which the Authentix Parties respectfully request the Court take judicial notice under FED. R. EVID. 201; the Declaration of Jimmy F. Dahu ("Dahu Decl.") separately filed in accordance with Local Rule 9014(c)(2) and all attachments thereto; and any argument the Court may entertain at the hearing.

[1] "ECF No." refers to the documents filed in the above-captioned bankruptcy case.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## I. INTRODUCTION

The Trustee asks this Court to approve the private sale of claims in two pending adversary proceedings—which her own complaints value in the aggregate at not less than $35 million—for $250,000 and a contingent interest the proposed purchaser, BaileyBridge, Inc. ("BaileyBridge"), may extinguish at will. She asks the Court to do so on a paper record that contains no valuation of the claims, no marketing of the assets, no competing offers, no overbid procedures, and no evidence from the purchaser. The Trustee also glosses over the unfiled Tolling Agreement with Baileybridge's owner—Greg McCabe—she feels compelled to raise, feels compelled to unilaterally determine raises no conflict concerns, but otherwise does not feel compelled to file with the Court.

The Trustee's arrangement with Mr. McCabe deserves heightened scrutiny. *See Frances Michael Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 883 (B.A.P. 9th Cir. 2010) ("[D]ue to the nature of the parties involved, the $60,000 sale price calls for a higher level of scrutiny, and Trustee bore the burden to examine it more carefully."). Indeed, Mr. McCabe is no outsider to this Debtor, the Trustee, or the Trustee's other special counsel. Mr. McCabe was the Debtor's former chairman[2] and, either individually or through his other companies, engaged in many pre-petition business transactions with the Debtor.[3] Of particular note—which the Trustee fails to raise—is Mr. McCabe's ownership and control of Next Bridge Hydrocarbons, Inc. ("NBH"), a former subsidiary of the Debtor.[4] As the Court may recall, "the Trustee . . . is investigating one or more potential avoidance actions in the future against Mr. McCabe." [ECF No. 1878-4, p. 5 of 279]. Meanwhile, NBH is an entity that Trustee's other special counsel either currently represents or previously represented during this case. [*See id.*, pp. 2-6 of 279]. The Trustee's other special counsel also seems to have made his own unilateral determination that no conflict exists, stating "we cannot imagine

---

[2] https://www.sec.gov/Archives/edgar/data/1431959/000095017021004631/mmat-20210930.htm; Dahu Decl., Ex. 1.

[3] https://www.sec.gov/Archives/edgar/data/1431959/000095017022002601/mmat-20211231.htm. (as one example only, McCabe's business relationships with the Debtor); Dahu Decl., Ex. 1.

[4] https://www.sec.gov/Archives/edgar/data/1431959/000095017022016019/mmat-20220630.htm; Dahu Decl., Ex. 1.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

what claim Meta would ever have against NBH[; i]t simply does not exist." [*Id.*, p. 6 of 279].

Regarding the Trustee's potential avoidance actions against Mr. McCabe (which potentially also implicate NBH), a Prospectus Debtor dated April 13, 2023, with the Securities and Exchange Commission ("SEC") states the following:

> In December 2022, [Debtor] distributed all of our 165,472,241 outstanding shares of common stock of Next Bridge Hydrocarbons Inc. ("Next Bridge") to holders of our Series A Non-Voting Preferred Stock on a pro rata basis ( the "Spin Off"). ***It is possible that an unpaid creditor of Next Bridge or an entity vested with the power of such creditor (such as a trustee or debtor-in-possession in a bankruptcy) could claim under various state and federal fraudulent conveyance laws that the Spin-off left Next Bridge insolvent or with unreasonably small capital or that we intended or believed Next Bridge would incur debts beyond its ability to pay such debts as they mature.*** If a court were to agree with such a plaintiff, then such court could void the Spin-off as a fraudulent transfer and seek recovery of Next Bridge's liabilities from us. No assurance can be given as to what standard a court would apply to determine insolvency or that a court would determine that Next Bridge was insolvent at the time of or after giving effect to the Spin-off. Were a court to decide that the Spin-off was a fraudulent transfer and that we are responsible for any part of Next Bridge's liabilities, our financial condition and results of operations could be materially and adversely affected.[5]

(emphasis added). Similar allegations form the basis for the fraudulent transfer claims the Trustee filed against the Authentix Parties. Yet, curiously, the Trustee has decided to target the Authentix Parties (and sought to seek retroactive nunc pro tunc substantive consolidation on the wholly-owned subsidiary that sold its assets to the Authentix Parties) and otherwise hand over the keys to the kingdom to a McCabe-controlled entity pursuant to an agreement filed a mere twenty (20) days after the Complaint was filed—all while providing Mr. McCabe (and presumably entities in which he is involved, including NBH) with a Tolling Agreement regarding the Trustee's potential avoidance actions against him. Like she did with the previously unfiled Litigation Funding Agreement that gave this Court pause, the Trustee again has made the unilateral determination that the Tolling Agreement

[5] https://www.sec.gov/Archives/edgar/data/1431959/000119312523100613/d471321d424b5.htm; Dahu Decl., Ex. 1.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

need not be filed because no conflicts exist.

Yet, the conflicts, and the potential actions against McCabe that the Trustee is foregoing under the Tolling Agreement must be explained in the context of this proposed sale. A review of the Debtor's 10-Q report filed on May 13, 2024, for example, provides:

> During 2021 and 2022, ***META loaned money to Next Bridge Hydrocarbons Inc.*** ("Next Bridge")***, which was previously a wholly-owned subsidiary of META*** until the completion of the spin-off transaction on December 14, 2022, pursuant to a secured promissory note with principal amount of $15.0 million, or the 2021 Note, and unsecured note receivable for principal amount of $5.0 million, or the 2022 Note. The 2021 Note was partially secured by a combination of shares of META's common stock and an interest in the Orogrande Project Property.
>
> In August 2023, we entered into a Loan Sale Agreement with ***Gregory McCabe***, selling all rights, titles, interests, and obligations in the loans previously extended to ***Next Bridge Hydrocarbons Inc*** ("Next Bridge Notes Receivable"). This sale was finalized for cash consideration of $6.0 million, representing $24.0 million outstanding balance of the Next Bridge Notes Receivable as of the closing date, August 7, 2023. Concurrently, ***META and Mr. McCabe agreed on a Stock Purchase Agreement*** ("SPA"), whereby ***Mr. McCabe*** committed to purchasing $6.0 million of shares of our common stock beginning on September 1, 2023, in monthly amounts of $250,000 for the first six months and in monthly amounts of $500,000 for the next nine months thereafter, at a price per share equal to 120% of the 5-day VWAP on the trading day preceding the date of each such purchase. ***Mr. McCabe*** purchased 18,517 shares of our common stock for $0.5 million during the year ended December 31, 2023.
>
> On January 21, 2024, we entered into a Release Agreement with ***Mr. McCabe*** pursuant to which we and ***Mr. McCabe*** agreed to terminate the SPA. Under the terms of the Release Agreement, ***Mr. McCabe*** was relieved of any obligation to make additional stock purchases under the SPA. The terms of the Release Agreement require (i) a payment of $700,000 by ***Mr. McCabe*** to us, (ii) assignment to us of all stock purchases made by ***Mr. McCabe*** under the SPA and (iii) an additional payment of $700,000 by ***Mr. McCabe*** to us if our common stock achieves a certain target value within two years of the effective date of the Release Agreement. We received $700,000 in January 2024 and the 18,517 shares were reassigned to META, for which we recorded $0.1 million of treasury stock as of March 31, 2024.[6]

(emphasis added).

---

[6] https://www.sec.gov/Archives/edgar/data/1431959/000095017024058713/mmat-20240331.htm; Dahu Decl., Ex. 1.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

In sum, the Trustee entered into an unfiled Tolling Agreement with Mr. McCabe (an insider-like actor, if not an actual insider) in conjunction with a potential sale to BaileyBridge (a McCabe-controlled entity) regarding potential avoidance actions that the Trustee has, for reasons currently unknown, decided to defer against Mr. McCabe pending the sale to BaileyBridge. Such transactions—where one hand seemingly washes the other—smell like a Bankruptcy Rule[7] 9019 settlement. Additional evidence, and heightened Court scrutiny, is warranted.

Beyond these seeming conflicts, what the Motion to Sell offers in place of a valuation or detail are conclusory statements, including ones regarding the estate's sunk costs. The Trustee's stated benefit, in part, is that $250,000 "allows the Estate to recover a very substantial portion of the fees and costs incurred in investigating and developing the complex set of facts supporting the allegation in the two adversary proceedings. . . ." [ECF No. 2966 at 7:2-4]. The Ninth Circuit Bankruptcy Appellate Panel ("BAP") has squarely held that this reasoning does not satisfy a trustee's burden. *See Fitzgerald*, 428 B.R. at 883-84. In *Fitzgerald*, the trustee justified a sale of litigation claims on the ground that it "would obviate the estate's need to prosecute them, thereby reducing administrative expenses," and offered "no analysis whatsoever regarding the value of the Cross–Claims or why, in his business judgment, $60,000 was a fair and reasonable price." *Id*. at 883. The BAP held that this "clearly falls short of what is required of a bankruptcy trustee," and reversed. *Id*. at 883–84. The Motion to Sell here contains the same omission, in a case in which the amounts at stake are, according to the Actions, of substantially greater magnitude.

The Motion to Sell further states that "Trustee Lovato . . . sought and obtained approval to employ separate litigation counsel . . . and accounting specialists, to investigate and determine whether there is factual and legal support to pursue" the causes of action sought to be sold. [Motion to Sell, ¶ 3]. The Motion provides no further substantive analysis supporting the Trustee's business judgment or allow this Court to discharge its "independent obligation to ensure the transaction maximizes value and is fair to the estate." [Motion to Sell at 5:11-13]. Instead, the Trustee simply states that she "received an offer" from BaileyBridge, she "believe[s] the up-front acquisition price .

[7] "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

. . is fair value", and there is "no prior relationship or undisclosed connections between BaileyBridge and me" (though there are substantial prior relationships between the Debtor and Mr. McCabe, as previously discussed, which the Trustee does not discuss). [Lovato Decl., ¶¶ 7, 13). The Trustee—who has had the benefit of two (2) years, the Debtor's books and records, and separately-retained professionals—should be able to provide a better explanation to the Court justifying a 0.007% purchase price for causes of action the Trustee deems worth in the aggregate no less than $35 million. Instead, the Trustee makes unilateral, and conclusory, determinations that the ***unfiled*** Tolling Agreement with Mr. McCabe (a litigation target) is of no concern because there is no conflict and that selling off $35 million in asserted claims for $250,000 after a "lengthy [pre-filing] analysis" is warranted because the estate will "recover[] a substantial portion[8] of the investigatory fees and costs incurred in developing a very complex fact scenario." [*Id.* at ¶¶ 6, 9, 11, 13]. As Judge Nakagawa has explained in the Bankruptcy Rule 9019 context, a trustee must "do more than parrot the standards or announce that they are satisfied"; their burden is to "present a cogent and detailed factual explanation," because "[t]o tolerate less would make the Court into a rubber stamp." *In re Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011) (quotations and citation omitted).

Simply put, this sale does not pass the smell test—much less the business judgment standard—and it certainly fails to provide the Court or parties the necessary information to make any reasoned legal or factual determination under Sections[9] 363(b) and/or 363(m). *See Silver State Broad., LLC v. Carmel (In re Silver State Broad., LLC)*, 2024 WL 3877360, at *5 (B.A.P. 9th Cir. Aug. 20, 2024) quoting *Fitzgerald*, 428 B.R. at 881 ("We must look past a boilerplate good faith finding and ascertain whether the finding as an evidentiary foundation.") (quotations omitted). The Trustee's minimalist and conclusory explanations—including the unfiled Tolling Agreement the Trustee nevertheless highlights but concurrently discounts as irrelevant (*see* Motion to Sell, ¶ 6)—feel like a Bankruptcy Rule 9019 settlement that the Trustee and Mr. McCabe seek to sneak through the backdoor without all of the requisite notice and burden requirements associated therewith. The

---

[8] "Substantial portion" implies that not all purported administrative fees will be recouped.

[9] "Section" refers to 11 U.S.C. § 101 et seq.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Motion should be denied on the current record. To the extent the Court advances the sale process, the Authentix Parties desire to bid as well and respectfully submit that any potential sale should be subject to bidding and auction procedures subject to the full transparency that Section 363(m) good faith findings and Section 363(b) sales, including claims the Trustee deems to be worth no less than $35 million, deserve.

## II. RELEVANT BACKGROUND

### A. The Claims the Trustee Proposes to Sell.

1. On August 9, 2024, the Debtor filed its voluntary Chapter 7 petition, thereby commencing the above-captioned bankruptcy case. Christina W. Lovato is the duly appointed chapter 7 trustee ("Trustee").

2. On August 7, 2026, the Trustee filed an adversary complaint ("Complaint") denominated Adv. No. 26-05037-gs against the Authentix Parties (the "Authentix Action"), pleading claims for avoidance under 11 U.S.C. §§ 544, 548, 550, 551, NRS 112.180, and NRS 112.190, together with a request for a declaration of alter ego status and substantive consolidation of two non-debtor entities: 1315115 B.C. Inc. and Nanotech Security Corporation ("Nanotech"), both of whom the Debtor has identified as subsidiaries in numerous pre-petition filings with the SEC, in its Schedule A/B, and in its statement of financial affairs. [ECF Nos. 5-6].

3. The Complaint alleges that Nanotech assets "worth more than $35 million" were sold for $10 million, and prays for recovery of "the fair value of the Nanotech assets" in "an amount to be proven at trial, but not less than $25 million." [Complaint, ¶¶ 108, 136].

4. The Trustee separately commenced Adv. No. 26-05038-gs against 24M Technologies, Inc. (the "24M Action," and with the Authentix Action, the "Actions"), pursuant to which the Trustee seeks recovery of "an amount to be proven at trial but not less than $10 million." [24M Action, ¶¶ 105, 131].

5. The Trustee has not yet served the summons and Complaint on the Authentix Parties, and the Authentix Parties have neither answered the Complaint nor entered an appearance in the Authentix Action.

6. Pursuant to the Motion to Sell, the Trustee seeks to sell the Actions.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**B. <u>The Proposed Purchaser and the Tolling Agreement.</u>**

7. The proposed purchaser of the Actions is BaileyBridge, an entity "owned and controlled by Greg McCabe". [Motion to Sell, ¶¶ 4-5; Lovato Declar., ¶¶ 7-8].

8. Mr. McCabe is the Chairman and Chief Executive Officer of NBH, a former subsidiary of the Debtor.[10]

9. NBH is, in turn, an entity that Trustee's other special counsel either previously represented and/or continues to represent. *See First Amended Declaration of James W. Christian in Support of Application by Chapter 7 Trustee to Employ the Law Firm of Christian Attar as Special Counsel [F.R.Bankr.P. 2014]* [ECF No. 1878] (the "<u>Attar Decl.</u>"), at ¶¶ 5, 9-10.

10. Exhibit D to the Attar Decl. includes a letter from special counsel to Trustee's counsel, dated April 16, 2025, regarding, among other things, what special counsel described as "numerous bizarre and incoherent pro se complaints filed . . . against Meta, NBH, Gregory McCabe, et, [sic] al." [ECF No. 1878-4 at p. 1 of 5]. This letter continued, in pertinent part, as follows:

> As ***<u>you</u>*** ***[i.e. Trustee's counsel]*** are aware, at the outset of retaining my firm, I advised you that I would not represent Mr. McCabe individually in any matter (as ***<u>you</u>*** advised me that Meta might be investigating potential claims against him). At that time, I advised you I was representing NBH in a defamation, business disparagement, and tortious interference suit that will be pursued against some of the members of the same group referred to above that (a) have complained to the court; and (b) filed frivolous pro se complaints against many parties. . . .
>
> . . .
>
> ***We are aware that the Trustee for Meta is investigating one or more potential avoidance actions in the future against Mr. McCabe. If that occurs, we will not be representing Mr. McCabe.***[11] In the event that the Trustee also opts to pursue any similar actions against NBH, ChristianAttar will withdraw from representation of NBH in the Pro Se Lawsuits and in the other matters for which it is investigating potential claims of business disparagement, tortious interference with the Orogrande Lease, and tortious interference with prospective relations.

---

[10] <u>https://www.sec.gov/Archives/edgar/data/1936756/000119983526000176/nbh-s1a.htm</u>; Dahu Decl., Ex. 1.

[11] An odd statement considering the letter previously stated that special counsel was not currently representing Mr. McCabe.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

*Id*. at pp. 2-4 (emphasis added).

11. The Trustee conveniently ignores this history in the Motion to Sell, instead spending a paragraph discussing an unfiled Tolling Agreement with Mr. McCabe that the Trustee unilaterally determined "creates [no] conflict and is not material to the § 363 analysis":

> 6. On a separate matter, the Trustee has entered into a tolling agreement with Mr. McCabe (the "McCabe Tolling Agreement") concerning transactions between **Mr. McCabe** and Meta in 2023, including his acquisition of Meta common stock and his purchase of Meta's secured lender position in certain **Next Bridge Hydrocarbons** notes and related collateral. . . . In January 2024, **McCabe** and Meta executed a Board-approved release agreement addressing the stock purchase arrangement. Out of an abundance of caution, the Trustee has entered into the McCabe Tolling Agreement to preserve any claims the Estate may hold against **Mr. McCabe**. The Trustee does not believe that the Tolling Agreement creates a conflict and is not material to the § 363 analysis.

[Motion to Sell, ¶ 6 (emphasis added); *see also* Lovato Decl., ¶ 9].

12. Neither the Motion to Sell nor the Lovato Decl. attach the Tolling Agreement or otherwise disclose the date of the Tolling Agreement, its scope, the transactions or dollar amounts it covers, when it expires, or what investigation the Trustee has undertaken into the claims it preserves—all issues which are relevant in analyzing the Trustee's purported business judgment.

13. Neither BaileyBridge nor Mr. McCabe have filed a declaration or any other evidence in support of the Motion to Sell. The only evidence before the Court are the generic and conclusory statements made in the Lovato Decl., including the paragraph on the unilaterally determined insignificant, and unfiled, Tolling Agreement. [Lovato Decl., ¶ 9]. It is on this scant record—which avoids the history of which this Court is already aware regarding Mr. McCabe—in asking for a Section 363(m) good faith finding.

**C. <u>The Terms of the Proposed Assignment.</u>**

14. The Trustee attests, under penalty of perjury, that she "sought and obtained approval to employ separate litigation counsel . . . and accounting specialists, to investigate and determine whether there is factual and legal support to pursue" the Actions. [Lovato Decl., ¶ 6]. The Trustee continues that "[f]ollowing a lengthy analysis, which included, among other things, determinations related to solvency, I filed" the Actions. [*Id*.].

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

15. The Trustee then jumps into an attestation that she "received an offer to acquire" the Actions, providing no further details as to when and how this offer came into fruition. [*See id*. at ¶ 7]. The Trustee concludes that selling claims she alleges are worth in the aggregate of not less than $35 million for $250,000.00 to a McCabe-controlled entity satisfies her business judgement because the estate will "recover[] a substantial portion of the investigatory fees and costs incurred in developing a very complex fact scenario" and because the McCabe-controlled entity "will bear the fees and costs on a going-forward basis" with the estate sharing 20% of any net recovery in the Actions. [*Id*. at ¶ 11].

16. The Litigation Claims Agreement ("Agreement") defines "Net Proceeds" as "gross Proceeds actually received by BaileyBridge less reasonable and documented costs and expenses of prosecution, including attorneys' fees, expert fees, court costs, discovery and e-discovery costs, and collection expenses." [ECF No. 2978-1, § 4.2].

17. BaileyBridge obtains "the exclusive right to control, direct, and manage the Litigation," including "selection and engagement of counsel, experts, or other professionals." [*Id.* at § 7.1]. BaileyBridge "shall have authority to settle the Claims in its sole discretion," subject only to "reasonable advance notice of any proposed settlement that would materially affect Trustee's contingent interest and consider in good faith Trustee's timely written comments." [*Id.* at § 7.2].

18. The Trustee agrees to take further actions to perfect the assignment, "including stipulations or motions for substitution of party or party in interest," and to accomplish "an expeditious removal of [her counsel] as counsel of record." [*Id.* at § 6.3].

19. The Trustee agrees to "instruct litigation counsel to transfer" case files [*id.* at § 6.4], to "cooperate to allow BaileyBridge to obtain the benefit of privileges relating to the Claims" [*id.* at § 12.2], and that the parties "may enter into a common interest or joint defense arrangement as appropriate" [*id.* at § 6.2]. The assignment expressly includes "evidentiary privileges as applicable to the Claims." [*Id.* at § 2.1].

20. The Motion to Sell further states that Trustee's counsel "will participate in the adversary proceeding as necessary to represent the Estate's interest in the litigation." [Motion to Sell, ¶ 8]. It is unclear how Trustee's counsel will be compensated for this participation.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**D. <u>The Trustee Previously Sought to Sell the Claims With No Notice to Any Party, Which Further Drives The Need for Heightened Scrutiny.</u>**

21. On August 27, 2026 [20 days after filing the Complaint], the Trustee filed the Motion to Sell in the Authentix Action seeking to have the same heard on shortened time. [Dkts[12] 4-8].

22. The Attorney Information Sheet identified Jared A. Day with the U.S. Department of Justice, Office of the U.S. Trustee, Region 17, as the only party whom the Trustee sought to obtain consent for shortened time, with a notation indicating that Mr. Day did not respond. [Dkt 8].

23. No parties (including, but not limited to, Mr. Day) were served with the Motion to Sell, the request for shortened time, or any related documents. [*See generally* Authentix Action Docket reflecting no certificate of service]. Indeed, both the motion for order shortening time and the declaration filed in support of shortened time expressly state that the Authentix Parties had not yet been served with the summons and Complaint. [Dkt 6, ¶ 2; Dkt 7, ¶ 5].

24. The asserted basis for shortened time was the necessity for the Trustee to serve Authentix Canada—a Canadian entity—under the Hague Service Convention in the timeframe imposed under FED. R. BANKR. P. 7004(a)(1). [Dkt 6, ¶¶ 3-6; Dkt 7, ¶¶ 6-9].

25. According to the motion for shortened time and the declaration filed in support thereof, "[t]here is no prejudice to any party or any party in interest[13] by a reduction in the notice period for seeking approval of the Sale and Assignment Motion." [Dkt 6, ¶ 7; Dkt 7, ¶ 10].

26. On September 1, 2026, the Court entered its Order Denying Motion for Order Shortening Time [Dkt 9] ("<u>OST Order</u>"), pursuant to which the Court denying shortened time on the Motion to Sell. In the OST Order, the Court made the following pertinent remarks:

- "The Trustee has filed the underlying motion to sell in the adversary proceeding rather than the main bankruptcy case. It is unclear why the motion to sell the litigation claim was not filed in the main case, or how the Trustee intended to give notice of the sale. 11 U.S.C. § 363(b); Fed. R. Bankr. P. 2002(a)(2)." [OST Order at p. 2 n.2].

---

[12] "Dkt" refers to the documents filed in the Authentix Action.

[13] None of whom were served.

- "It is unclear why the Trustee believed that service on a foreign defendant constituted cause to shorten time to hear a proposed sale of litigation claims to a company owned and controlled by Greg McCabe. But Rule 4(m), and the cases construing it, seem clear that the 90 day limitation does not apply to service on a foreign defendant." [OST Order, p. 3].

## III. DISCUSSION.

### A. The Authentix Parties are Properly Heard, and in Any Event the Court's Obligation is Independent.

The Motion to Sell asks for a determination of "the validity of the assignment to BaileyBridge by private sale" [Motion to Sell at 7:12]—a determination the assignee will assert against the Authentix Parties when it seeks substitution under Bankruptcy Rule 7025. It seeks approval of an agreement that obligates the Trustee to obtain "an expeditious removal" of counsel of record in that proceeding, to transfer the litigation file, and to cooperate in transferring "evidentiary privileges as applicable to the Claims." [ECF No. 2978-1 §§ 2.1, 6.3, 6.4, 12.2]. It would transfer control of a pleading by private sale to an entity controlled by an insider-like entity without any evidentiary basis for that sale, any disclosure of the unfiled Tolling Agreement[14], and any analysis regarding the propriety of the sales price. And on this record, it further asks the Court to waive the fourteen-day stay of Bankruptcy Rule 6004(h) and to essentially rubberstamp a Section 363(m) finding.

In all events, the obligation to assure that optimal value is realized is the Court's own, and it does not arise only when an objection appears. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) ("[T]he requirement of court approval means that the responsibility ultimately is the court's"). In *Fitzgerald*, the BAP reached the Bankruptcy Rule 9019 defect although it was "not raised precisely" by the appellant, explaining that it had "the discretion, if not the obligation, to ensure that bankruptcy law is properly applied." 428 B.R. at 884. Consequently, even in the absence of an objection, the Court has an independent obligation to ensure a sale satisfies Sections 363(b) and (m).

[14] As Judge Klein aptly stated, "[w]hat is in a name? Sometimes a lot—of misinformation." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 284 (B.A.P. 9th Cir. 2005). Without an unredacted copy of the Tolling Agreement filed on the docket, the Court, creditors, and parties-in-interest are left to surmise whether misinformation is also lurking behind the name of this document.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Additionally, "[t]he requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers." *Lahijani*, 325 B.R. at 288-89. Consequently, in the event a sale proceeds, the Authentix Parties want to participate, and the Trustee should be required to move for bidding and auction procedures. It will be ironic indeed for a Trustee, proceeding in good faith and seeking to maximize estate recoveries, to eschew a process that is designed to achieve such goals. It would be further ironic (and potentially telling) considering that the backbone of the Trustee's Complaint alleges lack of good faith pursuant to the Authentix Parties' participation in a competitive bidding process with "several bidders" with the assistance of Ducera Partners LLC, an investment bankruptcy and financial advisory firm (Complaint ¶¶ 20, 73), whereas here the Trustee contends that a private sale to a McCabe-controlled entity without disclosure of an unfiled Tolling Agreement and not otherwise subject to transparent bidding and auction procedures warrants a good faith finding under Section 363(m).

**B. <u>Legal Standard.</u>**

A trustee may sell property of the estate outside the ordinary course of business "after notice and a hearing." 11 U.S.C. § 363(b)(1). Proposed sales "are reviewed to determine whether they are within the best interests of the estate resulting from a fair and reasonable price, are supported by a valid business judgment and proposed in good faith." *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887 (Bankr. D. Alaska 2018) (Spraker, J.).

The Authentix Parties acknowledge at the outset that a trustee's business judgment "is to be given 'great judicial deference.'" *Id.* at 889-90. Deference, however, presupposes a judgment to which the Court can defer. The Court's role is not to second-guess a reasoned analysis but to ensure that one exists:

> The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition . . . the requirement of court approval means that the responsibility ultimately is the court's.

*Lahijani*, 325 B.R. at 288–89. Where the price is not the product of genuine competition, the Court must look harder at it. "The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders. When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully." *Id.* at 289; *see also Fitzgerald*, 428 B.R. at 883. Reciting the standard is not enough. *See Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. at 536 (Bankr. D. Nev. 2011) (quotations and citation omitted); *Silver State Broad., LLC v. Carmel (In re Silver State Broad., LLC)*, 2024 WL 3877360, at *5 (B.A.P. 9th Cir. Aug. 20, 2024).

**C. <u>The Motion to Sell Contains No Valuation of the Asset Being Sold.</u>**

The central defect is simply stated. The Motion to Sell never says what the Actions are worth, or why $250,000 is a fair price for them. What the Motion to Sell offers instead is a measure of the estate's expenditures. The first of the "two significant ways" the estate is said to benefit is that "the purchase price of $250,000 allows the Estate to recover a very substantial portion of the fees and costs incurred in investigating and developing the complex set of facts supporting the allegation in the two adversary proceedings." [ECF No. 2966 at 7:1-4]. That is a statement about what the estate has spent. It says nothing about what the estate is giving up.

*Fitzgerald* holds that this is insufficient. There, as here, the trustee justified the sale of litigation claims on the ground that it would relieve the estate of the burden of prosecuting them and would cover administrative expenses. The BAP held:

> Other than Trustee's contention that selling the Cross–Claims would obviate the estate's need to prosecute them, thereby reducing administrative expenses, and his declaratory statement that he "reviewed the docket and certain key pleadings in the [State Court Action]," Trustee offered no analysis whatsoever regarding the value of the Cross–Claims or why, in his business judgment, $60,000 was a fair and reasonable price. This clearly falls short of what is required of a bankruptcy trustee under *Lahijani*.

428 B.R. at 883–84. The BAP added that "it is not enough for Trustee to have stopped his inquiry when he determined that the sale price was adequate as long as it covered administrative expenses and the claims of non-insider creditors." *Id.* at 884.

The showing here is thinner than the one reversed in *Fitzgerald* in two respects. The Trustee

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

does not state what the fees and costs were, so the Court cannot test whether $250,000 is "a very substantial portion" of them, or a modest one. And unlike the trustee in *Fitzgerald*, who at least attested that he had reviewed the docket and key pleadings, the Lovato Decl. offers no description of the investigation as it bears on *value*—it generically mentions an investigation directed at whether claims existed, not at what they are worth. [ECF No. 2967, ¶¶ 6, 11]. The absence is conspicuous because the Trustee has already committed to a figure. Her Actions allege assets worth an aggregate of not less than $35 million. The Authentix Parties dispute those allegations as it relates to the Complaint and will contest them. But the Trustee pleaded them. A sale of claims she values at not less than $35 million for less than one percent of that figure requires an explanation. Either the claims are worth materially more than $250,000, in which case the price is not optimal value; or they are worth materially less, in which case the Court and the estate's creditors are entitled to know that the Trustee has so concluded before the Court is asked to bless a transaction premised on a McCabe-controlled entity's "incentive to successfully prosecute" them. [ECF No. 2966, ¶ 5]. The Motion to Sell does not take either position.

**D. <u>The Actions Were Never Exposed to the Market, and No Overbid Procedure Is Proposed.</u>**

*Lahijani* instructs that "[t]he requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers." 325 B.R. at 288-89. The Trustee attempted to foreclose any attempt to attract potential purchasers by initially filing the Motion to Sell in the Authentix Action, on shortened time, with no notice of same provided to any party (other than arguably the U.S. Trustee). Only after the Court entered its OST Order did the Trustee finally file and serve the Motion to Sell in the manner required. Nevertheless, the Motion to Sell continues to foreclose "the method for attracting potential purchasers" as it identifies a single purchaser, a fixed price, and no mechanism by which any other party could improve on either.

The Motion describes no marketing effort. It does not say that the Actions were offered to any other person, that any other person was contacted, or that any market check of any kind was performed. It states only that the Trustee "has received an offer." [ECF No. 2966, ¶ 4]. The constrained-competition principle applies *a fortiori* here. In *Lahijani* there were two bidders at a live

auction, and the BAP still held the price required careful examination; in *Fitzgerald* there were three bidders and an auction, and the Panel reversed. 325 B.R. at 289; 428 B.R. at 883. Here there is one offer and no auction. The structural reason to distrust a thin market applies with full force to a market of one, especially when that one is an entity controlled by Mr. McCabe.

**E. <u>The Relationship Between the Estate and the Purchaser Requires Heightened Scrutiny and an Evidentiary Record.</u>**

The Trustee is proposing to transfer Actions she has plead aggregate to no less than $35 million in potential recovery, together with the estate's litigation file and the benefit of its privileges, to an entity owned and controlled by a person against whom she has been investigating and taken the formal step of preserving the estate's claims. Based on Mr. McCabe's history with the Debtor (and indeed with the Trustee's other special counsel), it is not unreasonable to inquire whether he qualifies as a non-statutory insider. *See U.S. Bank, N.A. v. The Village at Lakeridge, LLC (In re The Village at Lakeridge, LLC)*, 814 F.3d 993, 1001 (9th Cir. 2016) ("A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length."). But even if he is not, the reason insider sales draw heightened scrutiny—that the ordinary assumption of arm's-length dealing does not hold—is present in substance herein. *See Alaska Fishing Adventure, LLC*, 594 B.R. at 887 ("Sales to an insider are subjected to heightened scrutiny."). And *Lahijani* and *Fitzgerald* require heightened scrutiny on an independent ground that plainly applies: competition was constrained. Three features of the Agreement give the concern practical content, and none is addressed in the Motion.

**The litigation file and privilege.** The Trustee agrees to transfer case files, to cooperate so that BaileyBridge may "obtain the benefit of privileges relating to the Claims," and to entertain "a common interest or joint defense arrangement." [ECF No. 2978-1, §§ 6.2, 6.4, 12.2]. The assignment itself conveys "evidentiary privileges as applicable to the Claims." [*Id.*, § 2.1]. The Motion to Sell does not say whether any part of that work product bears on the transactions covered by the Tolling Agreement, or what safeguards, if any, will separate the two. The Motion to Sell also does not state if this information has already been shared with Mr. McCabe and BaileyBridge, which would

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

necessarily defeat the privilege altogether.

**Continued participation by estate counsel.** The Motion represents that Trustee's counsel "will participate in the adversary proceeding as necessary to represent the Estate's interest." [ECF No. 2966, ¶ 8]. The Agreement requires the opposite—"an expeditious removal" of Trustee's counsel—and gives BaileyBridge the exclusive right to select counsel. [ECF No. 2978-1, §§ 6.3, 7.1]. These provisions cannot both be given effect. If estate counsel does continue to participate, the Motion does not identify who pays for it; the representation that "BaileyBridge will bear the fees and costs on a going-forward basis" [ECF No. 2966 at 5:8] is not matched by any term of the Agreement addressing the estate's own continued involvement. To the extent the estate bears administrative costs to bolter a McCabe-controlled entity's litigation beyond the $250,000 price, that needs to be disclosed.

**The Tolling Agreement is not before the Court.** Its date, scope, covered transactions, and expiration are undisclosed, and the agreement is not attached. The Court is asked to accept that it is immaterial without being shown what it is. Given that the Trustee has identified it as the one matter requiring disclosure on the question of conflict, that is a vital document the record should contain.

**F. <u>The Estate's Contingent Twenty Percent Is Unvalued and Structurally Uncertain.</u>**

The Trustee treats the twenty percent as the second of the estate's two principal benefits, describing it as "a potential 20% upside recovery at little to no expense or risk to the Estate." [ECF No. 2967, ¶ 13]. The characterization is incomplete in three respects that the Court should require the Trustee to address.

*First*, the estate's share is calculated after deduction of "reasonable and documented costs and expenses of prosecution, including attorneys' fees, expert fees, court costs, discovery and e-discovery costs, and collection expenses." [ECF No. 2978-1, § 4.2]. BaileyBridge selects counsel and negotiates their compensation. [*Id.* § 7.1]. The party that controls the deductions is the party adverse to the estate on the size of the residue, and the Agreement gives the estate no approval right, no audit right, no books-and-records access, and no floor.

*Second*, BaileyBridge "shall have authority to settle the Claims in its sole discretion." [*Id.* § 7.2]. The estate's only protection is notice and an undertaking to "consider in good faith" the

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Trustee's comments. A purchaser with a large equity stake in the Debtor and a disclosed relationship with the estate may have reasons to resolve these Actions that are not measured by the size of the recovery. The Motion does not address that possibility.

*Third*, the interest has never been valued. *Lahijani* addressed the valuation of exactly this kind of consideration, criticizing a trustee who "in effect . . . valued the fixed percentage at zero," and explaining that "so long as the pertinent probability is not zero, the expected and present value calculation will yield some value. Any such value should be taken into account." 325 B.R. at 289–90. That reasoning is not confined to overbids. If the estate's twenty percent has value, the Trustee should be able to say approximately what it is; if she cannot, the Court cannot weigh it, and the transaction reduces in substance to $250,000 in cash (which presumably is $125,000 in cash for each of the Actions).

**G. <u>The Transaction Adjusts the Estate's Position With a Potential Defendant, and the McCabe Tolling Agreement Must Be Placed in the Record.</u>**

The Trustee attests that the estate holds claims against Mr. McCabe arising from his 2023 acquisition of Meta common stock and his purchase of Meta's secured lender position in certain NBH notes and related collateral. [Lovato Decl., ¶ 6]. Mr. McCabe owns and controls the proposed purchaser. And the proposed purchaser will receive, along with the Actions, the Trustee's litigation file, her counsel's cooperation, and the benefit of the estate's privileges.

Taken together, those facts describe a transaction between the estate and a party the estate may sue. *Lahijani* addresses that situation as follows: when "a cause of action is being sold to a present or potential defendant," a bankruptcy court must, "in addition to treating it as a sale, independently evaluate the transaction as a settlement under the prevailing 'fair and equitable' test." 325 B.R. at 284. The Authentix Parties acknowledge the distinction: Mr. McCabe is not a defendant in the Actions themselves, and the Authentix Parties do not contend that *Lahijani*'s rule applies mechanically to a purchaser who is a potential defendant on other claims. But the reason for the rule is that where value moves between an estate and a party it may sue, the transaction cannot be evaluated as though the claims between them did not exist. That reason applies here, and the Motion does not engage it.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

If the Tolling Agreement contains any release, forbearance, or exchange of value, then it is a compromise of estate claims. A compromise requires a motion under Bankruptcy Rule 9019, notice to creditors under Bankruptcy Rule 2002(a)(3), and a determination that the compromise is fair and equitable under the *A & C Properties* factors, with the burden of persuasion on the Trustee. *See, e.g.*, *Fitzgerald*, 428 B.R. at 884 citing *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986). And if the Tolling Agreement is connected in any way to the BaileyBridge transaction, then the consideration the estate receives for the Actions cannot be measured in isolation from what the estate is giving up, or forbearing, on its claims against McCabe. A transaction that in substance resolves or defers the estate's claims against a party, while presenting itself as an unrelated sale of different claims to that party's company, delivers none of the notice, none of the findings, and none of the record that the Code and Rules require of a compromise.

Finally, the Trustee's own description of the agreement invites the concern rather than allaying it. She entered into it "[o]ut of an abundance of caution . . . to preserve any claims the Estate may hold against Mr. McCabe." [ECF No. 2966, ¶ 9]. That phrasing suggests the estate's claims against Mr. McCabe have not yet been investigated or valued. If so, the Trustee cannot presently know what the estate risks when it delivers its investigative file and the benefit of its privileges to his company, and neither can the Court.

**H. There Is No Evidentiary Basis for a Finding of Good Faith Under Section 363(m).**

The Motion to Sell requests a finding of good faith under 11 U.S.C. § 363(m) without any evidentiary support for all the reasons stated herein, including, but not limited to, the absence of any declaration from the proposed purchaser. The Trustee declares that "[t]he transaction was negotiated at arm's length, with no prior relationship or undisclosed connections between BaileyBridge and me that would suggest self-dealing," and in the next sentences discloses the Tolling Agreement with BaileyBridge's owner. [ECF No. 2967, ¶ 13]. Again, the Trustee ignores the substantial prior relationships this Debtor, and this estate, have with Mr. McCabe and his entities. *See Silver State Broad., LLC v. Carmel (In re Silver State Broad., LLC)*, 2024 WL 3877360, at *5 (B.A.P. 9th Cir. Aug. 20, 2024) quoting *Fitzgerald*, 428 B.R. at 881 ("We must look past a boilerplate good faith finding and ascertain whether the finding as an evidentiary foundation.") (quotations omitted).

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## IV. CONCLUSION.

The Authentix Parties respectfully request that the Court deny the Motion to Sell; or, in the alternative, require the Trustee to file a copy of the Tolling Agreement, supplement the record regarding the proposed sale to BaileyBridge, and establish bidding and auction procedures to allow the Authentix Parties to participate in any such sale. The Authentix Parties further request such other and further relief to which they may be entitled.

DATED this 29th date of September, 2026.

McDONALD CARANO LLP

By: */s/ Jimmy F. Dahu*

Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

*Attorneys for Authentix, Inc. and Authentix Solutions Canada, Inc.*