Scott Traudt, Pro Se
191 Kibling Hill Rd.
Strafford, Vermont 05072
Phone: 802-318-0429
sctraudt@gmail.com
Equity Security Holder and Objector, *Pro Se*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br>**META MATERIALS INC.**<br><br>Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS AND REQUEST TO BE HEARD**<br><br>Hearing Requested |

*Related Docket Nos. 3029, 3029-1, 3029-2, 3029-3, 3030, 3031 and 3032*

## I. Introduction

Scott Traudt ("Objector" or "Traudt"), appearing pro se as an asserted equity security holder and prior competing offeror, objects to the Chapter 7 Trustee's motion to approve the amended assignment of the Authentix and 24M avoidance actions and proposed bidding procedures (ECF No. 3029). Objector does not oppose a properly financed, fairly conducted sale that maximizes estate value. He objects to procedures that declare BaileyBridge, Inc. ("BaileyBridge") qualified "at all times," while imposing substantial additional verification and restrictive declarations on competing bidders. ECF No. 3029-2 at 2–4.

Three related defects call for relief. First, the Court must independently assess value and determine whether the assignment directly or indirectly compromises other estate claims. Second, the bid procedures lack objective and symmetrical criteria. Third, McCabe's historical dealings

with Meta, counsel relationships, and the defectively signed July 17, 2026 tolling agreement require particularized disclosure and safeguards before entry of a good-faith finding, *inter alia.* McCabe's dossier of questionable financial moves, plentiful legal entanglements, catastrophic past litigation failures, forthcoming sanctions in *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies* No. 2026-18186 (Tex. Dist. Ct.), and the fact that a member (George Palikaras) of the Trustee's litigation team has business interests and contracts with McCabe raise stratospheric levels of ethics questions regarding the near pathological attempt by the Trustee to award McCabe avoidance claims. **Exhibit A: *Greg McCabe Litigation, Conflicts, and "No Credibility" Finding by US District Court, TX.***

The Trustee acknowledges that her original private-sale motion was denied after objections concerning valuation, marketing, and competing offers. ECF No. 3029 at 2–3. Those concerns are not cured simply by labeling the new procedure competitive. Objector requests meaningful comparison of bids, equivalent financial qualification standards, protection of independent estate claims and confidential information, and an evidentiary hearing on material disputes.

"The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *In re Lahijani*, 325 B.R. 282, 288 (9th Cir. BAP 2005). Although a trustee ordinarily receives deference, "the requirement of court approval means that the responsibility ultimately is the court's." Id. at 289. A bankruptcy court therefore must independently assess the bidding process, prospective recoveries, purchaser capability, and the transaction's actual economic consequences.

*In re Fitzgerald*, 428 B.R. 872, 883–84 (9th Cir. BAP 2010), applied heightened scrutiny to a sale of claims to a defendant in those very claims. Here, BaileyBridge's principal is not an Authentix or 24M defendant, so that circumstance is distinguishable. But the Trustee separately

acknowledges possible claims against McCabe concerning transactions with Meta. ECF No. 3029 at 4. This overlap warrants inquiry into whether the proposed sale has any effect on those distinct claims as well as necessitating a Rule 9019 "quid pro quo" analysis: is the Trustee washing claims the estate has against McCabe, or even claims McCabe may have against the Estate, with the award of the 24M and Authentix avoidance claims?[1]

## II. Factual and Procedural Background

The proposed transaction transfers the estate's claims in Adv. Nos. 26-05037-gs (Authentix) and 26-05038-gs (24M) for $250,000 and 30% of "Net Proceeds," after litigation costs. BaileyBridge represents that it has allocated at least $1,000,000 to prosecution and agreed to $25,000 of collateralized indemnity. ECF Nos. 3029-1 at 3–4; 3029-3 at 2–3. Those are BaileyBridge's representations. They are not findings.

The Trustee acknowledges a tolling agreement with McCabe concerning certain 2023 transactions but characterizes it as unrelated to the proposed sale. ECF No. 3029 at 4. ECF Nos. 3031-1 and 3031-2 display separate McCabe and Lovato signature counterparts. Section 9 permits counterpart execution, so the absence of both signatures on one sheet does not itself invalidate the agreement. The agreement states a July 17, 2026 effective date and a one-year tolling period; it allows termination notices after April 30, 2027, with an additional 45-day period, but the documents are not identical.[2]

---

[1] Traudt has emailed Atty. Jeff Hartmann regarding the legal status of the "tolling agreement" to make sure that this was not yet another bone thrown legally to McCabe. (**Exhibit C: *Traudt Email***). In that email, Traudt asked Hartman (as per the Court's admonition on October 13th to resolve whether or not the tolling agreement was valid without motion practice) if McCabe would sign a declaration that the separately signed tolling agreement was valid. Hartman has not responded. Traudt contends the Trustee has intentionally left a possibly fatal statute of limitations issue on any claims against McCabe by providing him a convenient out with an improper legal agreement. ECF 3031-1, Exhibit 1 (McCabe version) and ECF 3031-2, Exhibit 2 (Lovato version).

[2] The purported Tolling Agreement contains material discrepancies between the separately executed counterparts. Docket 3031-1 identifies July 17, 2026, as the effective date and provides

Objector made a written demand on April 22, 2026 to investigate and prosecute potential McCabe avoidance claims or sell them under § 363(b). ECF No. 2985 at 54–57. He reports receiving no substantive reply. Id. at 51 ¶ 4. On August 7, 2026, Hartman advised him that the Trustee had entered a tolling agreement with McCabe and therefore no adversary case would be filed that day. Id. at 59. Objector later sought its terms. Id. at 61.

Objector then filed two competing offers. Each provides $100,000 in cash and 50% of defined net recoveries to the estate, and they are mutually exclusive. Decl. of Scott Traudt ¶ 4, ECF No. 2991 at 2; *see id.* at 8–23 (**Exhibits Alpha and Bravo**). The Trustee should compare net expected estate value, executable financing, expenses, time and litigation risk on a consistent basis. The Court must see that comparison before it approves anything.

## III. Independent sale valuation and the potential Rule 9019 compromise

A sale of estate litigation may also constitute a compromise when its substance settles a claim against the purchaser. *In re Lahijani*, 325 B.R. at 290; *In re Fitzgerald*, 428 B.R. at 884. Those cases involved purchases by defendants in the claims being transferred. McCabe is not a defendant in the Authentix or 24M actions. Consequently, Rule 9019 does not automatically govern this assignment merely because the Trustee is investigating separate transactions involving McCabe. The Court should instead determine whether the broad assignment, information rights, side arrangements, or interrelated negotiations would actually settle, release, impair, or materially influence those other estate claims; any such compromise requires

---

McCabe's notice address under Section 13(b). Conversely, Docket 3031-2, executed by Trustee Lovato, leaves both fields blank. Section 13 governs mandatory notice procedures, including termination notices under Section 4. These discrepancies raise questions concerning mutual assent to essential contractual terms and whether effective termination notice could be accomplished. Although counterpart execution is permissible under Section 9, it does not cure materially inconsistent terms. Absent proof of mutual assent, the Agreement's formation, enforceability, and purported tolling effect remain subject to challenge.

independent Rule 9019 review.

The proposed procedures leave the determination whether increased contingent participation is an "equivalent" overbid "solely" to the Trustee. ECF No. 3029-2 at 4. *Lahijani* reversed a sale in which the trustee effectively assigned no value to a competing offer's percentage of litigation proceeds. 325 B.R. at 289–90. Objector does not contend that this Trustee has literally assigned a zero value; he contends the procedure provides no reliable method for preventing that result.

The BAP explained that nonzero probabilities produce some expected and present value, which should be taken into account. *Lahijani*, 325 B.R. at 290. A consistent comparison should measure upfront cash, expected net estate share, collectible outcomes, cost deductions, committed financing, and the probability and timing of recovery. A higher contingent percentage does not automatically defeat a larger cash bid; neither may it be arbitrarily ignored.

What is the settlement test, if triggered? A genuine compromise must be assessed under *Martin v. Kane* (*In re A & C Properties*), 784 F.2d 1377, 1381 (9th Cir. 1986), considering (1) probability of success, (2) difficulty of collection, (3) complexity, expense, inconvenience and delay, and (4) creditors' paramount interests. The proponent bears the burden of showing fairness and equity. Id. The Supreme Court requires an adequately informed judicial evaluation of the facts bearing on litigation success. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968). Traudt acknowledges that if no indirect compromise exists, these factors remain useful to valuation but are not automatically mandatory as separate Rule 9019 findings.

Authentix has filed a motion to dismiss and a separate Rule 9011 sanctions motion, Adv. No. 26-05037-gs, Dkt. 19. Both remain allegations and requests, not findings. They nonetheless must be considered in evaluating litigation risk, financing and potential net recovery.

The Trustee estimates litigation costs of $1.5 million or more, while BaileyBridge represents that it has allocated at least $1 million. ECF No. 3030 at 3; ECF No. 3029-1 at 4. The Court should require documented financing and a plan for credible overruns.

A bid comparison should account for recoverability and expense controls, not simply assume that upfront consideration provides the greatest value. If the estate proves solvent, residual equity interests may also warrant consideration. See *Fitzgerald*, 428 B.R. at 884. The Court should preserve the estate's ability to prosecute independent claims against McCabe and related parties without interference from this transaction.

The Court should require sufficient evidence to decide whether the proposed sale is economically fair and whether any independent compromise exists. In *Fitzgerald*, the BAP reversed when the record lacked the analysis and findings necessary to evaluate a transaction that was both a sale and a compromise. 428 B.R. at 883–85.

**IV. University Lands litigation and purchaser financial capacity**

The purchaser's principal, Greg McCabe, chairs and leads Next Bridge Hydrocarbons, Inc. ("NBH"), a defendant in a pending suit concerning its Orogrande lease obligations. *University Lands v. Next Bridge Hydrocarbons, Inc.*, Cause No. CV-06244-394 (394th Dist. Ct., Hudspeth County, Tex.), petition reproduced at ECF No. 2991 at 112–25. The suit does not name McCabe, and its allegations have not been adjudicated. The relevance is limited: it provides grounds to test BaileyBridge's proposed litigation funding and financial independence, not proof that BaileyBridge lacks funds. NBH has no employees. It is a one man show with McCabe at the helm.

University Lands alleges missed drilling obligations, failures to provide operational records and well data, unpaid minimum royalties, and failure to release or restore lease property after asserted termination. It identifies at least $1,144,780.09 in minimum royalties, penalties and

interest as of May 3, 2024, and seeks additional damages and performance relief. ECF No. 2991 at 118–24. Those allegations remain contested and are not findings of fact.

McCabe disputes portions of the University Lands account in his sworn affidavit, including the timing of notices and the characterization of NBH's willingness to perform. ECF No. 2991 at 136–39. He reports that the loss of $2 million in financing affected NBH's ability to demonstrate capability to satisfy an extended agreement. Id. at 139 ¶ 61. The Court need not resolve the Texas dispute; it should ask whether BaileyBridge has financing insulated from other obligations and adequate to fund these avoidance actions.

BaileyBridge was registered in Texas effective July 14, 2026, and lists an address also associated with NBH. ECF No. 2991 at 154; id. at 112. Shared leadership or an address does not establish commingling. It does justify verifying capitalization, beneficial ownership, cash availability, and any dependence on NBH or McCabe personally. The $1 million allocation should be supported by the same objective evidence required from competing bidders.

The estate's 30% recovery is calculated after deductions for prosecution expenses. ECF No. 3029-1 § 4.2. The sale order should require periodic reporting, reasonable access to expense records, independent audit rights, controls on related-party expenditures, and an unambiguous definition of "Net Proceeds." These safeguards directly serve the estate even if the purchaser is fully qualified.

A good-faith finding under § 363(m) should rest on an evidentiary foundation. *Fitzgerald*, 428 B.R. at 881. A documented funding source, litigation budget, and safeguards for estate participation would provide much stronger evidence than a recital standing alone.

In the separate *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies* No. 2026-18186 (Tex. Dist. Ct.) litigation, the Texas court dismissed McCabe's/NBH's claims with prejudice and ruled that Davies was entitled to costs, fees, and sanctions. ECF No. 2991 at 151. Its relevance is

confined to any demonstrated effect of financial obligations on the proposed purchaser's resources and also whether anybody with all their faculties would have brought a SLAPP case against a McCabe critic who only commented on public filings and oil field drilling records around NBH and McCabe. In short: McCabe's judgement is horrific. Gregory McCabe's business judgment, managerial competence, and financial capacity to acquire and prosecute valuable avoidance claims belonging to the bankruptcy estate warrant serious scrutiny. NBH, which McCabe chairs and leads as Chief Executive Officer, reported $66,751,970 in total liabilities against only $768,638 in assets, a stockholders' deficit of $65,988,175, and a working-capital deficit of $65,484,738 as of June 30, 2026. NBH further acknowledged substantial doubt concerning its ability to continue as a going concern. These extraordinary financial deficiencies raise substantial questions regarding McCabe's managerial judgment, financial capacity, and suitability to acquire and responsibly prosecute potentially valuable avoidance claims for the benefit of the estate, particularly where McCabe or his affiliates may themselves be implicated in the underlying transactions. *See* NBH, Quarterly Report (Form 10-Q), at 7, 11 (Aug. 11, 2026) (consolidated balance sheet and going-concern disclosure); *see also* SEC EDGAR Filing Record, Accession No. 0001199835-26-000277. The Court should require competent evidence of McCabe's financial resources, litigation funding, independence, and ability to prosecute such claims before approving any transfer of estate causes of action. Traudt suggests a personal financial statement, even if under seal to the court, or maybe – here's an idea -force him to comply with the same rules Lovato wants to apply to other prospective bidders.

**V. The qualification rules crown BaileyBridge and burden every competitor.**

Section 3 of the procedures says it plainly. BaileyBridge "is deemed a Qualified Bidder and its bid a Qualified Bid at all times." ECF No. 3029-2 at 2. At all times. Every competitor gets a different test. Each must provide a $315,000 cash deposit; $1,000,000 of litigation financing in

addition to the cash price; retained counsel satisfactory to the Trustee; indemnity; and binding declarations. *Id.* at 3–4. A stalking-horse floor can promote bidding. But designation is not evidence of actual qualification. It is not a substitute for comparable proof.

Constrained competition draws closer scrutiny, not less. "When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully." *Lahijani*, 325 B.R. at 289. A rule that deems one bidder qualified at all times, and tests every other bidder against a $315,000 deposit, $1,000,000 of additional financing and counsel satisfactory to the Trustee, constrains competition. The Trustee must justify it. *See Fitzgerald*, 428 B.R. at 883 (where competition was constrained, the sale price "calls for a higher level of scrutiny, and Trustee bore the burden to examine it more carefully").

The deposit rationale is also unexplained. The Trustee posits a hypothetical $12 million recovery, $1.5 million of expense and a 30% share of $3.15 million, then uses a 10% formula to arrive at a $315,000 cash deposit. ECF No. 3029 at 7. The arithmetic is sound; the link between uncertain future proceeds and a compulsory present cash deposit is not adequately demonstrated. The Trustee should explain why this threshold is necessary, proportionate, and equally applied, particularly where a bidder offers greater net contingent participation (Traudt's bids).

**VI. The no-contact oath is overbroad, and it binds only the competitors.**

Competing bidders must swear under 28 U.S.C. § 1746 that they have had no contact or conversations with broad categories of defendants or other bankruptcy parties. ECF No. 3029 at 8; ECF No. 3029-2 at 3. The rule has no general time limitation. It has no materiality threshold. It has no process for disclosing an innocuous contact. Collusion has a definition. Section 363(n) reaches a sale whose price "was controlled by an agreement among potential bidders." 11 U.S.C. § 363(n).[3]

---

[3] To be sure, Traudt in 2024 contacted counsel for Citadel in Chicago regarding service of a

Now compare BaileyBridge. Its own executed agreement expressly excepts McCabe's 2023 communication with an Anson Fund representative and calls with Uzi Sasson concerning a promissory note. ECF No. 3029-1 at 4. The procedures offer competing bidders no equivalent disclosure-and-review accommodation. One bidder gets exceptions. Everyone else gets an oath. A purchaser who honestly discloses an old investigative inquiry should not be disqualified merely because BaileyBridge was permitted to narrate exceptions.

The Court should replace absolute no-contact language with material-relationship disclosures identifying dates, parties, subjects, financing, communications about the claims, and interests affecting vigorous prosecution; permit reasonable explanations; and apply identical substantive standards to BaileyBridge and competitors. Asymmetry narrows the field, and a narrowed field must be examined "more carefully." *Lahijani*, 325 B.R. at 289. No party should be asked to swear falsely or omit a contact.

## VII. The counsel and funding demands rest on assertion, not evidence.

The procedures exclude bids proposing pro se prosecution and demand a written commitment from qualified counsel. ECF No. 3029-2 at 3. Objector recognizes that corporate litigants ordinarily must appear through counsel and that complex avoidance actions may justify retention requirements. But appearing pro se as an objector is different from proposing to prosecute assigned claims without counsel. The Trustee should not conflate those situations. She should not impose special burdens on an individual bidder without a demonstrated estate purpose.[4]

---

subpoena for MMTLP trading records in *Traudt v. Rubenstein*, No. 2:24-cv-00782-CR (D. Vt.). If the Trustee decides this disqualifies Traudt from bidding, it qualifies the trustee and McCabe for criminal and civil RICO proceedings for fraud, conspiracy, and concealment of assets.

[4] Since multiple law firms refused to answer her call to prosecute the 24M and Authentix claims on contingency, it would appear that litigation costs might be far higher than the $1.5 million she suggests as cocktail napkin planning. Traudt thus argues that despite seeking attorneys for this endeavor, a Plan B involving a determined group of pro se litigators heavily armed with advanced

Requiring completed financing before bidding may be reasonable. But the Trustee must explain why the amount and proof demanded are necessary and applied comparably.

The Trustee estimates prosecution costs may reach $1.5 million or more. ECF No. 3030 at 3. BaileyBridge's represented allocation is $1 million. Competitors must produce statements or binding commitments establishing available funds. ECF No. 3029 at 8. BaileyBridge's corresponding resources should be independently corroborated, including whether additional financing can cover plausible overruns. The same proof should be demanded of every bidder. The collectability and expense factors require it. *A & C Props.*, 784 F.2d at 1381.[5]

**VIII. Counsel relationships and unresolved conflict disclosures**

Wes Christian has represented the Meta estate as special counsel and also represented NBH, whose chairman and chief executive is McCabe. Objector has sought the engagement agreement and further disclosures in connection with ECF Nos. 2743, 2884, 2903 and 2904. Their current procedural status should be confirmed. Traudt merely needs the employment contract between NBH and ChristianAttar, or Christian in his individual capacity, or as part of another law firm (Christian has his name on multiple shingles). Dual representation does not automatically disqualify BaileyBridge as a purchaser; it raises questions about the scope of professional duties, consent, confidentiality, and the independence of estate investigations.

Sections 327(a) and 327(e) govern a bankruptcy trustee's employment of professionals, including the limits on adverse interests in special-purpose representation. They regulate counsel and do not supply an automatic purchaser-disqualification rule. Rule 2014 also requires disclosure of relevant professional connections so that the Court, rather than the applicant alone, can

---

AI's and 2 years of motion practice in US and state courts with decent litigation funding stand an excellent chance of prevailing.

[5] Traudt needs to see what McCabe has had 3 months to review before bidding, and needs at least 60 days for attorney recruitment if Authentix fails to win dismissal of the claim against it.

evaluate the relationships.

Rule 2014(a) requires disclosures of connections with the debtor, creditors, parties in interest, and related professionals. The precise engagement dates and matters undertaken for NBH should be established by the underlying retention materials, subject to appropriate protections. The pending request for the Christian Attar–NBH engagement agreement is relevant to the adequacy of that examination.

The Ninth Circuit recognizes the independent nature of professional disclosure obligations. *Neben & Starrett, Inc. v. Chartwell Financial Corp.* (*In re Park-Helena Corp.*), 63 F.3d 877, 880–82 (9th Cir. 1995), affirmed consequences for inadequate disclosure even where actual disqualification did not necessarily follow.

The March 2026 NBH petition against Jeffrey Davies reportedly bears signatures of Christian Attar lawyers, including Christian. ECF No. 2743 at 3. The nature and continuing scope of representation require confirmation against the engagement agreement and the filed Rule 2014 disclosures. Those facts are relevant to whether estate information relating to McCabe or NBH has been appropriately segregated.

An April 16, 2025 letter filed as ECF No. 1878-4 records counsel's acknowledgment that potential estate claims against McCabe were being considered and addresses the limits of representation involving NBH. That contemporaneous correspondence makes meaningful conflicts disclosure essential before granting any special information or privilege access to a McCabe-controlled purchaser.

Palikaras, Meta's former chief executive, has been identified in estate litigation-team materials and is associated with BlueLedger AI. Public statements in late October 2026 report that NBH engaged BlueLedger for securities-data work to identify shorting and naked shorting.[6]

---

[6] This is something like the 4th merry-go-round by the estate and Wes Christian and Palikaras to

Those relationships, if confirmed, warrant disclosure of overlapping engagements and information access.[7] The estate's continuing drumbeat of attorney fees, investigative expenditures, and requests for trading data raises a fundamental question: **Why is the estate repeatedly spending money pursuing information that Meta Materials itself, its former management, or its previously retained investigators should already possess or be able to identify?** Hartman's August 26, 2025 billing entry concerning ShareIntel's request for DTCC data and the advancement of estate costs illustrates this concern. Equally troubling is the apparent absence of any disclosed contribution from BlueLedger AI (Palikaras) who publicly promoted the venture's purportedly exceptional stock-market analytical capabilities. If Palikaras possesses or controls such technology, why has it not been offered to the estate, whether pro bono or otherwise, to reduce investigative costs and advance recoveries for creditors?

The trustee's tolling arrangement with McCabe and her proposed transfer of extensive litigation, information, and privilege-related rights invite a focused safeguard: identify excluded causes of action, prohibit use of estate information for unrelated disputes, and preserve independent control over investigations of McCabe and related entities. Objector's February 5, 2026 email exchange with Hartman, if authenticated, also documents a prior dispute over access to McCabe-related transaction information. It does not establish that withholding was unlawful.

## IX. Palikaras, the 2023 note transfer, and independent information controls

Palikaras signed Meta's 2023 Loan Sale Agreement with McCabe for Meta; the agreement and subsequent SEC reports are cited at ECF No. 2991 at 39, 44. The trustee's tolling agreement

---

get trading data…and the estate has already paid ShareIntel – Wes Christians associates in several prior "naked shorting" fiascos, to conduct this for the estate and now we are once again going to chase these numbers using Palikaras' latest Three-Card Monte.

[7] Did Palikaras or BlueLedger receive compensation or other economic benefits from McCabe-controlled entities while Palikaras was supplying information to estate professionals concerning transactions involving McCabe, and what safeguards protected the estate's independent interests?

addresses possible claims concerning McCabe's 2023 dealings with Meta. This overlap makes it important to identify the sources and limits of any information Palikaras provided to estate professionals and to determine whether he has participated in decisions relating to McCabe.

Meta's public reporting describes the sale of its NBH loan position for $6 million with roughly $24 million outstanding and identifies related stock-purchase arrangements. ECF No. 2991 at 39–46.

Another objector (Spears) has identified estate professional time entries reflecting discussions with Palikaras about possible 24M and Authentix transfers and potential claims relating to NBH and McCabe. ECF No. 2985 at 11–14 (citing ECF No. 2265-6). The actual time entries and relevant privileges should be reviewed if material.

The same objection reports that Eric Browndorf was identified in time records as counsel associated with Palikaras; the proposed agreement identifies Browndorf as counsel for BaileyBridge. ECF Nos. 2985 at 11, 21; 3029-1 § 8. This entire bankruptcy case is a Sargasso Sea of conflicts. The Court should ask who represented whom, on what subjects, and whether protections exist for confidential information.

The Court should require focused sworn disclosure regarding the roles of Palikaras and Browndorf, agreements controlling access to estate materials, and any arrangements with NBH or the proposed purchaser. These are questions for an evidentiary record, not a charge of collusion.

**X. Purchaser representations and prior litigation history**

BaileyBridge's ability to fund the litigation requires independent evidence. The University Lands allegations and McCabe's affidavit, discussed above, concern NBH rather than BaileyBridge. An SEC staff letter to NBH about identified internal-control weaknesses also raises questions about financial reporting. ECF No. 2991 at 51.

In *Weiss v. Arabella Exploration Inc.* (*In re Arabella Petroleum Co., LLC*), Adv. No. 16-

07002 (Bankr. W.D. Tex.), the court stated that McCabe's testimony was not credible. Memorandum Opinion at 20 n.160, ECF No. 2991 at 87. That finding concerns testimony in a separate case and is not proof any present declaration is false. The verified opinion nonetheless supplies a legitimate reason to require independent corroboration of material representations concerning purchaser funding, independence and good faith.

Other matters should receive weight. *Next Bridge Hydrocarbons, Inc. v. TradeStation Securities, Inc.*, No. DC-24-05631 (Tex. Dist. Ct.), ended after nonsuit and dismissal for want of prosecution by McCabe. *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies*, No. 2026-18186 (Tex. Dist. Ct.), ended in a September 24, 2026 dismissal with prejudice and an entitlement determination concerning fees and sanctions, and Davies now seeks $311,368.75 in fees and sanctions from McCabe and Wes Christian in his victory lap in Houston.[8] ECF No. 2991 at 151. Neither proceeding establishes a judgment against BaileyBridge or an inability to fund this litigation.

Objector offers this record solely to support verifiable qualifications and expense-accounting protections, not to request punishment for unrelated proceedings.

## XI. The Court should not enter good-faith and sale findings on this record.

The motion requests favorable findings under 11 U.S.C. § 363(m) and § 363(n), and waiver of the Rule 6004(h) stay. ECF No. 3029 at 5, 10–13. The record must independently support good faith, noncollusion and fair value. Neither finding is a formality. Section 363(m) protects only "an entity that purchased or leased such property in good faith." 11 U.S.C. §

---

[8] On October 22, 2026, Jeffrey Davies filed his *Submission in Support of Attorney's Fees and Sanctions and Motion for Entry of Final Judgment* in *Next Bridge Hydrocarbons, Inc. v. Davies*. Following the court's September 24, 2026 dismissal of Next Bridge's claims with prejudice under the Texas Citizens Participation Act (TCPA), Davies requested **$311,368.75 in total monetary relief**, consisting of $75,118.75 in incurred attorney's fees, $136,250 in conditional appellate attorney's fees, and $100,000 in sanctions against Next Bridge Hydrocarbons.

363(m). Section 363(n) addresses a sale whose price "was controlled by an agreement among potential bidders." *Id.* § 363(n).

The Ninth Circuit identifies lack of purchaser good faith by fraud, collusion with other bidders or the trustee, or attempts to gain grossly unfair advantage. *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992). Automatic qualification, nonuniform historical-contact requirements, unresolved financial representations and information access require an evidentiary determination before the Court makes a finding with potential consequences under § 363(m).

In *Fitzgerald*, the court rejected a boilerplate § 363(m) finding unsupported by adequate evidence. 428 B.R. at 881. The Court should also consider the requested waiver of the 14-day stay under Rule 6004(h), including whether parties need time to seek appellate relief.

The November 6 papers left the competing-bid deadline to be determined, while listing December 9 for the sale hearing and December 17 for any auction. ECF No. 3032 at 2. Bidders cannot reasonably secure counsel, binding funds and due diligence against an unspecified deadline. The Court should establish a fixed, workable schedule before approving procedures.

Finally, the agreement includes known and unknown related claims and potential privilege rights. ECF No. 3029-1 §§ 1–3, 12. Any sale order should define precisely what is included, exclude unrelated claims against McCabe and related persons unless separately noticed and valued, and preserve independent estate control of unrelated privileged material.

## XII. The Rule 9011 motion, sale risks, and indemnification

The Authentix Rule 9011 record supplies an additional, concrete valuation concern. The defendants filed a sanctions motion on October 23, 2026, seeking dismissal, defense fees and individual responsibility of the Trustee or the professionals who continued to pursue the complaint. *Lovato v. Authentix, Inc.*, Adv. No. 26-05037-gs, Dkt. 19, at 1, 33. Authentix contends that Nanotech, rather than Meta, owned the transferred assets, that the requested consolidation

lacked notice to affected creditors, and that the insolvency allegations were inconsistent with the debtor's schedules. Id. at 1–5, 25–31. The Trustee disputes these contentions, and the Court has not decided them. The estate and all bidders should nevertheless have the same information regarding the asserted pleading defects, pending motions, litigation budget and exposure to fees.

Authentix asks that the sale be deferred pending the sanctions and dismissal proceedings. Adv. Dkt. 19 at 33. Objector does not adopt Authentix's requested dismissal, nor does he ask the Court to decide sanctions in this objection. His competing bids presuppose that these claims may possess value. His point is that their value and litigation risk cannot be assessed competently if legal deficiencies, indemnification allocation and financing assumptions are not disclosed and modeled consistently. Objector agrees with Authentix that there should be no bidding process until the motion to dismiss filed by Authentix is decided, if only in the interests of judicial economy.

The proposed assignment and procedures use broadly worded indemnification terms, including sanctions and legal expenses associated with prosecution. ECF Nos. 3029-1 § 5.4 and 3029-2 at 3. The Court should distinguish liabilities arising from a purchaser's later conduct from possible Rule 9011 liability for pleadings filed or maintained by the Trustee and her counsel before assignment. The proposed purchaser should not be insulated from its own future conduct, nor should a bidder be required, without an articulated estate purpose, to assume preexisting personal exposure of estate professionals. Clarity on the precise indemnified risks is essential to obtaining genuinely comparable bids.

**XIII. October 13–14 public disclosure concerning forensic laptop and server records**

A publicly accessible October 13–14, 2026 post by former Meta chief executive George Palikaras describes a forensic copy of his former corporate laptop and the movement of equipment said to contain corporate history and personnel records from Halifax to Meta's Quebec

facility before its sale to Authentix. The screenshot displays an October 13, 2026 timestamp.

**Exhibit B:** ***Palikaras States Meta Server is Missing After Statute of Limitations Tolled.*** Palikaras states that "All my laptop contents are with the trustee in a forensic copy readily accessible." He further describes seeking preservation in early 2024, offering approximately $1,500 for forensic copying, and having the laptop moved from outside counsel's offices to the Quebec facility. Most importantly, he reports that an entire corporate server system was moved from Halifax to that facility and that he and the Canadian trustee discovered the transfer before the Authentix transaction closed.

The timing matters. Meta filed Chapter 7 on August 9, 2024. The two-year period ordinarily implicated by 11 U.S.C. § 546(a) approached in August 2026, and August 9 fell on a Sunday; Rule 9006(a) may affect computation of applicable deadlines. The Authentix complaint was filed August 7, 2026, and the 24M complaint August 10. Palikaras's October public explanation postdates those complaints, but the statement itself suggests that at least some persons knew of the equipment movement before the July 2024 Authentix closing. Thus October was not necessarily the first discovery of the movement. The unresolved material questions are who held the server and laptop, what forensic images and chain-of-custody records exist, whether Canadian and U.S. trustees obtained or reviewed them, whether any responsive corporate information was lost or withheld, and how that affected prefiling investigation and valuation. The Objector requests a narrowly tailored preservation and sworn-status inquiry, not a finding of concealment based on the post alone.

## XV. Relief requested

Objector respectfully requests that the Court:

(1) deny approval of the bidding procedures as presently written, without prejudice to revised procedures supported by an adequate record;

(2) require an objective and uniformly applied means of qualifying all bidders, verifying funding and counsel arrangements, and comparing cash and contingent recoveries;

(3) require a fixed, reasonable bid deadline and material-conflict disclosures;

(4) require comparable financial documentation, adequate plans for litigation-cost overruns, verifiable indemnity, and accounting and audit protections for the estate's net-proceeds share;

(5) preserve independently any possible estate claims against McCabe, NBH or other related persons, and expressly exclude unrelated claims from the assignment;

(6) impose appropriate limits on transfer and use of estate confidential or privileged information and require disclosures concerning overlapping counsel and information-access arrangements;

(7) clarify the status and scope of the tolling agreement;

(8) correct the record concerning contingency-fee counsel contacts, including the difference between a refusal and no response;

(9) consider pending Authentix dismissal and Rule 9011 proceedings in valuation and sequencing and preserve any pre-assignment liabilities attributable to earlier conduct;

(10) order an appropriate inquiry into the existence, location, chain of custody, forensic preservation and availability of the laptop and corporate server records identified in **Exhibit B**;

(11) reserve findings under 11 U.S.C. §§ 363(m) and (n) and any waiver of Rule 6004(h) until supported by an adequate evidentiary record;

(12) conduct an evidentiary hearing on material disputes and, if the transaction is found to compromise other estate claims, apply Rule 9019 and the *A & C Properties* fairness factors;

(13) require clarification of any outstanding Rule 2014 disclosure issues material to the proposed sale, including the relevant NBH engagement documents subject to appropriate

# EXHIBIT A

EXHIBIT A

Topic-Organized Fact File of Court Outcomes, Regulatory Scrutiny, Related-Party Transactions, Financial Disclosures, and Preservation Activity

*December 2022 through November 11, 2026*

This fact file examines adverse court outcomes, regulatory scrutiny, insider transactions, financial deterioration, and unresolved disclosure and preservation concerns involving Gregory McCabe and Next Bridge Hydrocarbons. It emphasizes the adverse implications of the described events while distinguishing court findings, regulatory staff comments, company disclosures, allegations, and inferences. The organization is topical rather than strictly chronological.

## I. Related-Party Transactions Involving Gregory McCabe

August 7, 2023. McCabe purchased from Meta Materials the 8% Secured Promissory Note dated September 30, 2021, and certain loans under the Loan Agreement dated September 2, 2022. Meta assigned its lien on 25% of the Orogrande Prospect to McCabe. Next Bridge consented to the assignment. This transaction is the primary subject of the July 17, 2026 tolling agreement between the Meta Materials trustee and McCabe. The acquisition placed McCabe on the creditor side of obligations involving the company he led, creating an evident tension between personal

scrutiny.

Wolfbone Investments merger. Under the Agreement and Plan of Merger, Wolfbone Investments, LLC (owned by McCabe) assigned its remaining working interest in the Orogrande properties. Next Bridge issued 56,297,638 shares of common stock to McCabe. The merger became effective April 25, 2023. Issuing more than 56 million shares to a company insider concentrated ownership in McCabe and exposed other holders to dilution, making the valuation and fairness of the exchange central concerns.

July 25, 2023. Contribution Agreement among Next Bridge, McCabe, and McCabe Petroleum Corporation

-in after-payout working interest in Orogrande and interests held by McCabe Petroleum Corporation in the Bronco Prospect. The transaction again placed McCabe and his controlled company on the other side of a corporate asset exchange, raising questions about independent valuation, approval, and whose interests the terms served.

Johnson Prospect. Participation Agreements allowed participants to convert interests into Next Bridge common stock at $1.20 per share. Effective December 30, 2024, shares were issued. The Form 4 filed by McCabe on June 4, 2025 reports that McCabe Petroleum Corporation acquired 981,372 shares through exercise of the conversion right. The conversion added nearly one million shares to a McCabe-

s equity transactions.

Common-stock purchase agreement with Meta Materials for up to $6 million. Subsequent sworn statements describe partial purchases totaling $500,000, termination of the agreement, and resolution involving $700,000 cash and return of shares. The contemplated $6 million purchase arrangement yielded only $500,000 in described purchases before termination and a cash-and-
another source of transaction friction.

Ownership snapshots. SEC ownership tables in the November 18, 2022 prospectus reported McCabe beneficially owning 19,605,348 Series A preferred shares of Meta Materials. Subsequent post-spin-off ownership tables reported approximately 12.8 million shares of Next Bridge common stock. The reduction of approximately 6.7 million shares is documented in the filings. Exact trade dates relative to the December 9, 2022 FINRA U3 halt are not established by the ownership snapshots alone. The approximately 6.7 million-share decline warrants close examination because of its magnitude and the surrounding market disruption. McCabe profited (estimate based on average share process for MMTLP) between $20 million and $70 million from these sales.

## II. SEC Staff Comments, Restatements, and Accounting Matters

September 20, 2024. SEC staff issued accounting comments questioning impairment methodology, a $12,428,719 share-valuation adjustment, $1,141,142 cash-flow classification, and disclosure controls. Comments were

addressed to CEO Gregory McCabe. The breadth and dollar amounts of these questions cast doubt on the reliability of

October 31, 2024. SEC staff issued follow-up questions on cash-flow classification, spin-off valuation, lease-extension narratives, related-party debt acquisition, and full-cost versus successful-efforts accounting. The follow-up round shows that significant accounting and related-party disclosure issues remained unresolved after the initial comments.

December 20, 2024. SEC staff questioned property valuation methods and historical-cost accounting treatment, including the retroactive write-down of the full property balance and McCabe debt disclosure. A proposed retroactive write-down of the full propert

February 14, 2025. <u>SEC staff stated that the valuation relied on proved reserves that did not exist and called for historical-cost treatment and further explanation of the McCabe-related debt transaction.</u> The absence of the proved reserves used in the valuation exposed a fundamental weakness in the asset-value premise, accompanied by continuing questions about an insider debt acquisition.

April 9, 2025. SEC staff requested revised annual and quarterly statements, amended 2022 and 2023 financial statements, and Form 8-K non-reliance reporting. The requested revisions and non-reliance reporting brought the reliability of previously issued financial information directly into question.

June 11, 2025. SEC staff indicated Next Bridge appeared delinquent in filing the Item 4.02 Form 8-K and demanded further explanations of impairment and restatement errors. <u>The apparent delinquency compounded the restatement problems with a separate concern about timely notice to investors that earlier financial information could not be relied upon.</u>

October 1, 2025. Next Bridge announced resolution of comments on the amended 2023 annual report. Resolution followed a prolonged correction process; the announcement does not erase the earlier valuation, restatement, and disclosure-control problems.

February 16, 2026. Next Bridge reported another round of SEC staff comments on its amended S-1 registration statement. Another comment round extended the pattern of regulatory scrutiny and additional disclosure work into 2026, although the existence of comments alone is not an enforcement finding.

-1 effective. Effectiveness marked a procedural milestone, but it did not resolve the adverse financial conditions and prior accounting concerns described elsewhere in this record.

June 30, 2026. <u>-capital deficit of approximately $64.87 million, no proved reserves, and zero net capitalized oil-and-gas properties.</u> These figures depict acute financial weakness: minimal cash against a massive working-capital deficit, with neither proved reserves nor net capitalized oil-and-gas properties supporting the balance sheet.

## III. Court Outcomes and Litigation

December 22, 2022. <u>In *Weiss v. Arabella Exploration Inc. (In re Arabella Petroleum Company, LLC)*, the bankruptcy court stated in footnote 160 of the memorandum opinion that McCabe was not credible.</u> The finding addressed particular testimony in that fraudulent-transfer litigation. This is a direct adverse judicial assessment of

about disputed transactions. Its scope remains the testimony addressed by that court.

March 15, 2024. Shareholders filed a Securities Act complaint concerning alleged inaccuracies in the Next Bridge registration statement and asset valuations used in the spin-off. McCabe was named among the individual defendants. The complaint put the integrity of the spin-

in issue. Those accusations remain allegations unless established by a ruling or other competent evidence.

June 26, 2026. In *Targgart v. Next Bridge Hydrocarbons, Inc.*, No. 25-10879 (5th Cir.), the Fifth Circuit

1933. Plaintiffs alleged that the registration statement and prospectus for the spin-off contained material misstatements and omissions concerning oil and gas asset values. The district court had dismissed the claims with prejudice on the

ground that the exchange of Meta Materials Series A preferred shares for Next Bridge common shares did not The Fifth Circuit held that, under circuit precedent, the stock-for-stock exchange constitutes a purchase for purposes of the Securities Act, and remanded the case. The reversal stripped Next Bridge of its dismissal victory and restored exposure to investor claims challenging the spin- It reopened the litigation without deciding that the alleged misstatements were proved.

March 18, 2026. Next Bridge filed *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies*, Cause No. 2026-18186, 61st Judicial District Court, Harris County, Texas, asserting business disparagement and interference with its University Lands relationship. University Lands relationship a strategy that must be assessed against the later dismissal and fee-and-sanctions ruling described below.[1]

September 24, 2026. In the *Davies*

. The result was a decisive litigation defeat: Next

sanctions rather than obtaining relief against him.

March 18, 2026. Peter Bartok filed a derivative action, *Bartok v. McCabe*, No. 7:26-cv-00096 (W.D. Tex.), on behalf of Next Bridge Hydrocarbons, Inc. against Gregory McCabe, John Brda, and other officers and directors, with Next Bridge named as nominal defendant. The complaint asserts claims under the federal securities laws. The court

than supplying a merits vindication.

April 15 October 17, 2024. Next Bridge filed a Texas Rule 202 petition seeking pre-suit discovery concerning MMTLP positions at TradeStation. A notice of nonsuit was filed October 16; the case was dismissed for want of prosecution October 17. The proceeding ended without the requested discovery relief being obtained through a completed adjudication, leaving another company litigation initiative terminated without the stated information objective being demonstrated in this record.

June 3, 2024. Next Bridge announced resolution of Cordax-related litigation. The announcement supplies no terms here from which to measure cost, recovery, or concessions, leaving the financial consequences of this litigation episode opaque in this account.

## IV. University Lands and Orogrande Prospect

May 3, 2024. University Lands alleged that Next Bridge-related entities owed at least $1,144,780.09 in minimum royalties, penalties, and interest and had failed to provide required operational records. The allegations

performance toward its land counterparty under serious challenge.

October 8, 2024. Next Bridge disclosed that University Lands would not extend the Orogrande Development Unit Agreement. Later filings reported a $56.19 million impairment. The refusal to extend the agreement and the ensuing $56.19 million impairment represent a major deterioration in the economic position associated with Orogrande.

July 9, 2025. University Lands issued a formal termination demand regarding expired interests and surviving contractual obligations. A formal termination demand escalated the dispute beyond an extension problem to loss of interests and continuing obligations after expiration.

September 1, 2026. University Lands filed *University Lands v. Next Bridge Hydrocarbons, Inc., et al.*, Cause No. CV-08244-394 (Hudspeth County, Tex.), against Next Bridge Hydrocarbons, Inc., Hudspeth Operating, and

[1] As Wes Christian was working for McCabe/NBH in February, 2025, it stands to reason that McCabe

currently on appeal to the 1st Court of Appeal in Houston, Texas, where the outcome of *NBH v. Davies* and the voluminous evidence showing NBH/TRCH/MMTLP were essentially pump and dumps in that matter provided to the Court will render the SLAPP case DOA should the 1COA not reverse.

Hudspeth Oil, alleging drilling shortfalls, unpaid amounts exceeding $1 million (including minimum royalties, penalties, and interest), records deficiencies, and failure to release or remediate expired leases, and seeking damages plus declaratory and performance relief. The complaint broadens the adverse picture from unpaid money to alleged drilling failures, deficient records, and unaddressed lease obligations, with exposure to both monetary and ation.

## V. Meta Materials Bankruptcy Proceedings and BaileyBridge Proposal

July 17, 2026. The Meta Materials trustee and McCabe exchanged signed counterparts of a tolling agreement

purchase of the Next Bridge secured not
transactions as subjects of potential estate claims and preserves scrutiny rather than providing a release or merits clearance. The executed counterpart chain remains important to evaluating

July 14, 2026. BaileyBridge, Inc. was registered in Texas. Subsequent bankruptcy filings identify

his controlled vehicle, bringing his personal transactional interests directly into the claims-sale process rather than providing an independent buyer.

August 7, 2026. The Meta estate filed an avoidance action against Authentix. The filing confirms that the estate was pursuing a disputed transaction through litigation; the later proposed transfer of that claim therefore concerned an active estate recovery effort, not merely an abstract possibility.

August 27 September 2026. The trustee proposed selling Authentix and 24M avoidance claims to BaileyBridge for $250,000 plus a share of future net litigation recoveries. The initial sale request was denied; later amended terms increased contingent participation from 20% to 30%. The proposal would place estate recovery claims in a McCabe- s for a limited upfront payment and contingent proceeds. The denial and later increase in estate participation underscore controversy over whether the original bargain adequately protected the estate.

October 6, 2026. McCabe submitted a declaration in the Meta bankruptcy describing the 2023 debt acquisition, the stock-purchase dispute and settlement, and his intended role in a potential avoidance-
own account connects his earlier transactions and disputes with his proposed role as a claims buyer, highlighting overlapping interests that warrant independent examination rather than reliance solely on his characterization.

October 13, 2026. At the Meta bankruptcy sale hearing, the court denied the originally proposed private sale and called for further evaluation and process. The denial was a concrete setback to the proposed private transfer and required additional evaluation before the buyer could obtain the claims on the original proposal.

October 23, 2026. Authentix sought Rule 9011 sanctions, dismissal, and fees in the adversary proceeding, criticizing the proposed sale to a McCabe-
demands for sanctions, dismissal, and fee shifting, while directly challenging the proposed buyer arrangement. A request for sanctions is not an award or a finding of misconduct.

November 6, 2026. An amended BaileyBridge proposal in the Meta bankruptcy designated BaileyBridge as qualified at all times while imposing deposit, resource, counsel, and independence requirements on competing bidders. This differential treatment favors the McCabe-controlled bidder on the face of the described proposal, while competitors must clear financial, representation, and independence hurdles a substantial concern for meaningful competitive bidding.

April 1, 2026. In Meta Materials bankruptcy Dkt. 2674, Scott Traudt sought Rule 2004 documents regarding

estate claims had already prompted a formal demand for documents, sharpening the need for a transparent transaction record. Filing the request does not itself prove wrongdoing or nonproduction.

## VI. Preservation Notices and Document-Related Activity

February 28, 2025. Counsel for Next Bridge (James Wes Christian) sent a seven-page pre-litigation preservation demand to Scott Traudt. The letter stated that Next Bridge was investigating possible claims including

harassment, business disparagement, libel, slander, tortious interference, conspiracy, obstruction of justice, and Administrative Procedures Act violations. It demanded preservation of communications, social-media posts, direct messages, account activity logs, metadata, and communications with regulators and law enforcement from January 1, 2018 onward, and urged forensic imaging of storage devices. It warned of possible spoliation sanctions and sought confirmation by March 14, 2025. The recipient reported that comparable notices were sent to Danielle Spears, Jeffrey Davies, and additional critics. The breadth of the demand, its reach back to 2018, and its threat of sanctions placed substantial preservation pressure on a critic and reportedly others. That breadth supports concern about the burden and

August 11, 2025. In an email exhibited in federal litigation (W.D. Tex. No. 7:24-cv-00325, Dkt. 63-5), McCabe asked a recipient to disregard and delete a message sent less than twenty minutes earlier. A request to delete a recently sent message creates an obvious preservation concern and warrants examination of the message, context, and any applicable preservation duty.

November 18, 2024 and August 10, 2025. Shareholder Jennifer Vetrano requested corporate books and governance records. These were incoming requests to Next Bridge. Repeated shareholder demands for books and governance records highlight pressure for greater transparency; this account does not establish how Next Bridge responded or whether it violated an inspection obligation.

## VII. Additional Reported Events

December 9, 2022. FINRA halted quotation and trading in MMTLP under Rule 6440(a)(3), citing uncertainty over clearance and settlement ahead of cancellation and the distribution of private Next Bridge shares. The halt cut off trading at a critical point before cancellation and distribution, leaving holders unable to use that market to exit during the halted period. The stated clearance-and-settlement concern underscores the fragility of the transition.

December 14, 2022. Meta Materials completed the spin-off, distributing one share of Next Bridge common stock for each Series A preferred share held as of the December 12 record date. 165,472,241 shares of Next Bridge common stock were distributed. The distribution moved a large shareholder base into private-company equity after the

described in this record.

August 26, 2024. McCabe later described in an affidavit that Chase notified Hudspeth Oil Corporation of a forthcoming bank-account closure citing an association with a publicly reported financial investigation. The reported account closure points to disruption of banking access and reputational exposure associated with the cited

October 13 14, 2026. Former Meta CEO George Palikaras stated publicly that a forensic image of his laptop was available to the trustee and described corporate server hardware moved from Halifax to a Quebec facility. The public description raises unresolved questions about custody, preservation, accessibility, and timely examination of potentially relevant corporate data.

October 26, 2026. BlueLedger announced Next Bridge as an issuer client. George Palikaras has been publicly associated with BlueLedger. The commercial relationship warrants scrutiny of potentially overlapping interests where Palikaras-

disqualifying conflict or improper information sharing.

# EXHIBIT B

EXHIBIT B

**George Palikaras**
@palikaras

All my laptop contents are with the trustee in a forensic copy readily accessible. As a reminder, when the company asked me to deliver my laptop in q1 2024 (several months after my departure), I asked them to do a forensic copy of all its contents. The MMAT management were refusing this.

After having lawyers involved I managed to "convince THEM" that I would pay $1500 to have my laptop contents forensically copied... now consider how INSANE is it for a former CEO who has the highest exposure, to be the one asking the company to keep the data intact and then having to offer to pay to FORENSICALLY keep ths data within the corporation, eh?

What's more than insane, is that instead of having my laptop stored safely, they SHIPPED my laptop from the outside Counsel's offices to our factory in Quebec which a few weeks later was SOLD TO AUTHENTIX, placed inside a wooden crate (photo for proof)... along with the entire Server hardware with all personnel files and corporate history records that was REMOVED from Halifax HQ and shipped over to the same Quebec factory location...

And we only found out because the Canadian Trustee with my help found out that the server got removed in the process... just in time before the Authentix deal. Imagine opening these crates expecting to find the server... and the FIRST item on top is the CEO's laptop...



And we only found out because the Canadian Trustee with my help found out that the server got removed in the process... just in time before the Authentix deal. Imagine opening these crates expecting to find the server... and the FIRST item on top is the CEO's laptop...



10:48 PM · Oct 13, 2026 · **13.4K** Views

# EXHIBIT C

EXHIBIT C

# Tolling agreement

**Scott Traudt** <sctraudt@g... Mon, Oct 26, 1:29 PM
to Jeffrey

Jeff:

I need a fully executed tolling agreement or an affidavit from Greg McCabe that he accepts all terms and conditions in the tolling agreement you filed with the court to clear up whether he escaped the statute of limitations issues inherent with unsigned legal documents.

My fear is he will reneg and cite defects.

End of the week is fine. Judge Spraker said solve it quickly to Spears in the hearing on the 13th.

As I filed a request and offer to chase McCabe's $21 million ish loan proceeds and was ignored, if the tolling agreement is not defended and legally binding to my satisfaction I'll be bringing a negligence action against the trustee and others.

Thanks,
Scott
802 318 0429

Scott Traudt, Pro Se
191 Kibling Hill Rd.
Strafford, Vermont 05072
Phone: 802-318-0429
sctraudt@gmail.com
Equity Security Holder and Declarant, *Pro Se*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br>**META MATERIALS INC.**<br><br>Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**DECLARATION OF SCOTT TRAUDT IN SUPPORT OF OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS AND PROPOSED BIDDING PROCEDURES**<br><br>Related ECF Nos. 3029, 3030, 3031, 3032 |

I, Scott Traudt, declare as follows:

1. I am over eighteen years old, competent to make this declaration, and appear pro se in my individual capacity as an equity security holder of Meta Materials Inc. as well as MMTLP and I am a prior competing offeror. Except where I identify the contents of a court filing, document, or statement by another person, the facts stated here are based on my personal knowledge.

2. On May 16, 2026, I acquired 80 shares of MMATQ through a private sale. I filed documentation concerning that acquisition at ECF No. 2828. I refer to that already-filed record without attaching it again.

3. I submit this declaration in support of my objection to the Trustee's amended motion and proposed bidding procedures at ECF No. 3029, including ECF Nos. 3029-1 through 3029-3 and the related declarations at ECF Nos. 3030 and 3031. The amended bidding proposal followed the October 13, 2026 hearing concerning the earlier proposed sale at ECF No. 2966.

4. I submitted two mutually exclusive written offers, denominated Alpha and Bravo, to

purchase estate litigation rights. Each offered $100,000 cash plus fifty percent of defined net recoveries to the estate. The offers were alternatives, not a combined $200,000 offer, and are already included in my prior declaration and exhibits filed at ECF No. 2991.

5. On April 22, 2026, I submitted a written demand requesting that the Trustee investigate potential claims concerning Gregory McCabe's acquisition of Meta's Next Bridge-related lender position, or consider transferring claims under 11 U.S.C. § 363(b). My demand appears in the existing record at ECF No. 2985, pages 54–57. I did not receive a substantive written response to the proposal before the Trustee advised me of the tolling arrangement.

6. On August 7, 2026, I received an email from Trustee's counsel Jeffrey Hartman stating that the Trustee had entered a tolling agreement with McCabe and that no adversary proceeding would be filed that day. The email is in Spears' filing at ECF No. 2985, page 59. I later requested information about the term and filing status of the tolling agreement. The related correspondence is included at ECF No. 2985, page 61. There was no answer from Hartman.

7. I filed a motion at ECF No. 2743 concerning compliance with the Court's February 5, 2026 order and later submitted supplemental materials at ECF No. 2884. Those filings concerned additional disclosure of the nature and scope of Christian Attar's representation of Next Bridge Hydrocarbons, Inc. and relationships relevant to the estate. I rely on the already-filed materials rather than reproduce them as new exhibits.

8. I reviewed the two separately signed tolling-agreement counterparts filed as ECF Nos. 3031-1 and 3031-2. The McCabe-signed version specifies July 17, 2026 as the effective date and provides a mailing address for McCabe in Section 13(b); the Lovato-signed version leaves those fields blank. Both versions contain Section 9 permitting execution in counterparts. My statements describe visible differences in the filed documents; I do not assert personal knowledge of the parties' private assent or whether the agreement is enforceable.

9. I reviewed public filings concerning Meta's August 2023 sale of its Next Bridge-related lender interests to McCabe, including the loan and collateral information reproduced in the record at ECF No. 2991. My knowledge of the accounting, transfer terms, and consideration comes from those documents, not from participation in the transaction.

10. I obtained and reviewed the SEC Division of Corporation Finance comment letters concerning Next Bridge, including letters dated September 20, 2024, December 20, 2024, February 14, 2025, and June 11, 2025, attached to ECF No. 2991. These are staff comments and disclosure requests, not judicial findings or enforcement determinations against McCabe personally.

11. I reviewed the December 22, 2022 memorandum opinion in *Weiss v. Arabella Exploration Inc. (In re Arabella Petroleum Company, LLC)*, reproduced at ECF No. 2991. I rely on the opinion for its actual contents, including footnote 160 concerning testimony by McCabe. The opinion arose in a different proceeding and does not determine the truth of any representation in this bankruptcy.

12. I obtained and reviewed the September 1, 2026 University Lands petition against Next Bridge and related defendants, reproduced at ECF No. 2991, pages 112–125. I understand the petition contains disputed allegations, not adjudicated findings. I also reviewed the affidavits of Gregory McCabe included in that filing.

13. I obtained and reviewed the September 24, 2026 dismissal order in *Next Bridge Hydrocarbons, Inc. v. Jeffrey Davies*, certified document number 128965775, included at ECF No. 2991, page 151. The order dismisses Next Bridge's claims with prejudice and states Davies is entitled to court costs, reasonable attorney's fees, and sanctions. The order does not itself fix the monetary amount or adjudicate McCabe's personal liability.

14. On September 26, 2026, I obtained a Texas Comptroller public entity record showing BaileyBridge, Inc.'s effective Texas registration date as July 14, 2026. That record is filed at ECF No. 2991, page 154. I rely on it as a dated public record, not as proof of BaileyBridge's capitalization or the identity of every beneficial owner.

15. I reviewed the October 13–14, 2026 public statement attributed to George Palikaras concerning a forensic copy of his laptop and the movement of corporate server equipment to the Quebec facility associated with the Authentix transaction. I rely on the screenshots included with my objection for the fact that the statement was publicly made; I have no personal knowledge of the server's current location, completeness, or chain of custody.

16. Based on my own bid submissions and the proposed terms of ECF No. 3029-2, I request that the Court consider my existing offers and require materially equivalent standards for all prospective bidders; then I will happily comply with communications disclosures if only to remove the conspiracy theories about me widely promoted by Litigation Team George Palikaras (and which have reached defamatory status with me possibly having new defamation claims against the Estate for his unfounded allegations.)

17. I respectfully request permission to appear and be heard in connection with the Court's consideration of the amended bidding procedures and sale motion, presently set for December 9, 2026, subject to any later scheduling order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 17, 2026, at Strafford, Vermont.

Scott Traudt

Scott Traudt, Pro Se

Scott Traudt, Pro Se
191 Kibling Hill Rd.
Strafford, Vermont 05072
Phone: 802-318-0429
sctraudt@gmail.com

Equity Security Holder and Objector, Pro Se

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

| | |
|---|---|
| In re<br>**META MATERIALS INC.**<br><br>Debtor. | Case No.: 24-50792-GS<br>(Chapter 7)<br><br>**CERTIFICATE OF SERVICE OF OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS AND REQUEST TO BE HEARD**<br><br>Hearing Requested |

## CERTIFICATE OF SERVICE

1. On November 17, 2026, I served the following documents:

   **a. OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS AND REQUEST TO BE HEARD;**

   **b. DECLARATION OF SCOTT TRAUDT IN SUPPORT OF OBJECTION TO TRUSTEE'S MOTION FOR ORDER AUTHORIZING SALE AND ASSIGNMENT OF LITIGATION CLAIMS AND REQUEST TO BE HEARD.**

2. I served the above-named documents by email from sctraudt@gmail.com to the persons listed below:

**JAMES WESLEY CHRISTIAN on behalf of Next Bridge Hydrocarbons Inc. and**

**Greg McCabe**

JChristian@christianattarlaw.com

**ABRAN E. VIGIL**

vigila@ballardpahr.com

**MICHAEL R. BRUNET on behalf of Creditor GEORGIOS PALIKARAS**

mbrunet@cooperlevenson.com

**CLAYTON BRUST on behalf of Trustee CHRISTINA W. LOVATO**

cbrust@sbwlawgroup.com, iesguerra@rssblaw.com

**DAVID ERNESTO CHAVEZ on behalf of Defendant THE NASDAQ STOCK MARKET LLC**

chavezd@ballardspahr.com, LitDocket_West@ballardspahr.com

**BRADLEY A. COSMAN on behalf of Debtor META MATERIALS INC.**

bcosman@perkinscoie.com

**JIMMY F. DAHU on behalf of AUTHENTIX**

jdahu@mcdonaldcarano.com, sbettinger@mcdonaldcarano.com

**KAWA FOAD on behalf of Creditor BRAD DAVIS**

kfoad@kf-law.com

**KAWA FOAD on behalf of Creditor DANIEL R. AUXIER**

kfoad@kf-law.com

**KAWA FOAD on behalf of Creditor Marcos Monteiro**

kfoad@kf-law.com

**JEFFREY L HARTMAN on behalf of Trustee CHRISTINA W. LOVATO**

notices@bankruptcyreno.com, abg@bankruptcyreno.com

**MICHAEL R. HOGUE on behalf of Other Prof. Anson Funds Management LP**

hoguem@gtlaw.com, michael-hogue-0383@ecf.pacerpro.com; flintza@gtlaw.com; JavieAnne.Bauer@gtlaw.com; andersonel@gtlaw.com; navarrom@gtlaw.com

**MATTHEW L. JOHNSON on behalf of Creditor David Chester**

mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com;

kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

**MATTHEW L. JOHNSON on behalf of Creditor David Sokolove**

mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com; kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

**MATTHEW L. JOHNSON on behalf of Creditor Jonathan Edwards**

mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com; kristi@mjohnsonlaw.com; admin@mjohnsonlaw.com

**CHRISTINA W. LOVATO**

trusteelovato@att.net, NV26@ecfcbis.com

**DAVID S. NORRIS on behalf of Interested Party FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.**

david.norris@squirepb.com, tanya.skeet@squirepb.com,sarah.conley@squirepb.com, phx_dckt@squirepb.com

**JARROD L RICKARD on behalf of Interested Party VIRTU FINANCIAL LLC**

jlr@semenzarickard.com, oak@semenzarickard.com,alb@semenzarickard.com

**CHARLES E. GIANELLONI, Snell & Wilmer LLP on behalf of Bailey Bridge LLC**

1700 South Pavilion Center Dr., Suite 700, Las Vegas, NV 89135

cgianelloni@swlaw.com

I declare under penalty of perjury that the foregoing is true and correct.

Dated November 17, 2026.

Scott Traudt

**SCOTT TRAUDT**

PRO SE

Scott Traudt
191 Kibling Hill Rd.
Strafford VT 05072
sctraudt@gmail.com
802-318-0429

November 17, 2026

U.S. Bankruptcy Court District of Nevada
C. Clifton Young Federal Building & U.S. Courthouse,
300 Booth St, Reno, NV 89509

Dear Clerk of the Court:

Enclosed please find an objection to docket number 3029 in the *In Re Meta Materials Inc.* bankruptcy case number 3:24-cv-50792-GS.

Sincerely,

SCOTT TRAUDT