Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
jdahu@mcdonaldcarano.com

*Attorneys for Authentix, Inc. and Authentix Solutions Canada, Inc.*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>META MATERIALS INC.,<br><br>Debtor. | Case No.: 24-50792-gs<br>Chapter 7<br><br>**AUTHENTIX PARTIES' OBJECTION TO TRUSTEE'S MOTION FOR ORDERS (A) APPROVING AMENDED ASSIGNMENT OF LITIGATION AGREEMENT; (B) APPROVING BIDDING PROCEDURES FOR THE SALE OF LITIGATION CLAIMS; (C) APPROVING STALKING HORSE SALE TERM SHEET; AND (4) AUTHORIZING THE SALE OF LITIGATION CLAIMS TO THE SUCCESSFUL BIDDER UNDER THE RELEVANT PROVISIONS OF 11 U.S.C. § 363**<br><br>Hearing Date: December 15, 2026<br>Hearing Time: 1:30 p.m. |

Authentix, Inc. and Authentix Solutions Canada, Inc. (collectively, the "Authentix Parties"), by and through their counsel of record, McDonald Carano LLP, submit this Objection to the *Trustee's Motion For Orders: (A) Approving Amended Assignment of Litigation Agreement; (B) Approving Bidding Procedures for the Sale of Litigation Claims; (C) Approving Stalking Horse Sale Term Sheet; and (D) Authorizing the Sale and Assignment of Litigation Claims to the Successful Bidder Under the Relevant Provisions of 11 U.S.C. § 363* [ECF No.[1] 3029] ("Renewed Motion to Sell"), the *Declaration of Christina Lovato* filed in support thereof [ECF No. 3030 (the "Lovato Declaration")

[1] "ECF No." refers to the documents filed in the above-captioned bankruptcy case. "Dkt. No." refers to the documents filed in the identified adversary proceedings pending before this Court.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

and the *Declaration of Jeffrey Hartman* filed in support thereof [ECF No. 3031] (the "Hartman Decl."). This Objection is supported by the following memorandum of points and authorities, the papers and pleadings on file in this case and in Adversary Proceeding Nos. 26-05037-gs and 26-05038-gs for which the Authentix Parties respectfully request the Court take judicial notice under FED. R. EVID. 201, and any argument the Court may entertain at the hearing.

## I. INTRODUCTION

On October 13, 2026, the Court read an oral ruling into the record denying the *Trustee's Motion For Order Authorizing Sale And Assignment Of Litigation Claims* [ECF No. 2966] (the "Original Motion to Sell") and stating, in pertinent part:

> And I would urge the parties to avoid litigating every tangent of this. The question before the Court are the standards [as identified in] In re Slates[, 2012 WL 5359489 (B.A.P. 9th Cir. Oct. 31, 2012].

[Oct. 13 Hrg. Tr.[2] at 33:12-21; 36:12-14]. Undersigned counsel heard the Court loud and clear and focuses this Opposition on those standards, and the Trustee's failure to satisfy her burden regarding the same. For all the reasons discussed herein, the Renewed Motion to Sell should be denied.

## II. RELEVANT BACKGROUND

### A. The Actions the Trustee Proposes to Sell.

1. In the interest of brevity for the Court—who is intimately familiar with the background of this matter and the parties—the Authentix Parties fully incorporate their prior opposition [ECF No. 2986] to the Original Motion to Sell.

2. On August 7, 2026, the Trustee filed an adversary complaint ("Complaint") denominated Adv. No. 26-05037-gs against the Authentix Parties (the "Authentix Action"), pleading claims for avoidance under 11 U.S.C. §§ 544, 548, 550, 551, NRS 112.180, and NRS 112.190, together with a request for a declaration of alter ego status and substantive consolidation of two non-debtor entities: 1315115 B.C. Inc. and Nanotech Security Corporation ("Nanotech"), both of whom the Debtor has identified as subsidiaries in numerous pre-petition filings with the SEC, in its Schedule A/B, and in its statement of financial affairs.

[2] A copy of the October 13, 2026, hearing transcript is attached hereto as **Exhibit 1**.

3. The Complaint alleges that Nanotech assets "worth more than $35 million" were sold for $10 million, and prays for recovery of "the fair value of the Nanotech assets" in "an amount to be proven at trial, but not less than $25 million." [Complaint, ¶¶ 108, 136].

4. The Trustee separately commenced Adv. No. 26-05038-gs against 24M Technologies, Inc. (the "24M Action," and with the Authentix Action, the "Actions"), pursuant to which the Trustee seeks recovery of "an amount to be proven at trial but not less than $10 million." [24M Action, ¶¶ 105, 131].

5. The Trustee has not yet served the summons and Complaint on the Authentix Parties or 24M, and neither the Authentix Parties nor 24M have answered the Complaint nor entered an appearance in the Actions.

6. Pursuant to the Motion to Sell, the Trustee seeks to sell the Actions.

**B. Trustee's Involvement of George Palikaras and His Attorney, Eric Browndorf of Cooper Levenson, In Privileged Estate Communications Pursuant to an Alleged Joint Common Interest Privilege Agreement**

7. In the time records of counsel for the Trustee, Eric Browndorf, Esq. of Cooper Levenson is identified as counsel for George Palikaras. [ECF NO. 2265 at 3:25-27; *see also* ECF No. 783 (notice of appearance filed by Michael R. Bruney of Cooper Levenson on behalf of Mr. Palikaras)].

8. The billing records of counsel for the Trustee include discussions with both Mr. Browndorf and Mr. Palikaras regarding various aspects of this Chapter 7 case, including, but not limited to, the Actions. [*See*, *e.g.* ECF Nos. 2265-2266].

9. Of particular note is a December 3, 2024, billing entry from counsel for the Trustee identifying the "first weekly call with litigation team" comprising both Mr. Browndorf and Mr. Palikaras discussing various issues including "the Rule 2004 application process" for certain parties and "issue[s] related to identifying affected shareholder body". [ECF No. 2265, p. 67 of 92].

10. In that same time entry, Trustee's counsel also notes a "[f]ollow-up discussion with Clay Brust re: issues with joint common interest privilege agreement." [*Id.*] Other than Will Rubley (of Cooper Levenson), Eric Browndorf (of Cooper Levenson), and George Palikaras, the remainder of the "litigation team" identified in this time entry include counsel to the Trustee. Therefore, it is

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

assumed that the "joint common interest privilege agreement" identified therein refers to one with Mssrs. Rubley, Browndorf, and Palikaras.

11. Mr. Palikaras is the former CEO of the Debtor who is the subject of pending SEC charges regarding his time with the Debtor.[3]

12. Mr. Palikaras was also the CEO and a Board Member of Next Bridge HydroCarbons, Inc. ("NBH").[4]

13. Greg McCabe is the current CEO of NBH. 9011 Motion, ¶ 38 & fn. 53; Dahu 9011 Decl., Ex. 3.

14. According to the opposition filed by Scott Traudt, Mr. Palikaras is also associated with BlueLedger AI, which has recently been engaged by NBH. [ECF No. 3037, at pp. 12-13].

**C. The 9011 Motion.**

15. On August 27, 2026, the Trustee filed the Original Motion to Sell on the docket in the Authentix Action only, and requested a hearing on shortened time. [Authentix Action, Dkt 6-8].

16. On September 1, 2026, the Court entered an order denying a hearing on shortened time on the Original Motion to Sell. [Authentix Action, Dkt 9].

17. On September 1, 2026, counsel for the Authentix Parties participated in a Teams call with counsel for the Trustee and raised various issues under FED. R. BANKR. P. 9011 as it related to the Complaint filed in the Authentix Action. *See* Declaration of Jimmy F. Dahu, Esq. in Support of Defendants' Motion for Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011 [Authentix Action, Dkt. 30] ("Dahu 9011 Decl."), ¶ 12. At the conclusion of the call, counsel for the Authentix Parties emailed a courtesy letter to Trustee's counsel identifying several bases for relief under FED. R. BANKR. P. 9011. [*Id.* at ¶ 13 & Ex. 1].

---

[3] *See* https://www.sec.gov/newsroom/press-releases/2024-77.

[4] sec.gov/Archives/edgar/data/1936756/000119983522000845/form_8-k.htm (stating "[e]ffective immediately following the Spin-Off [of NBH], . . . Ken Rice and George Palikaras, who had been serving as members of the Board, resigned to be directors of the Company"); https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm (identifying Mr. Palikaras as the President/Director of NBH).

18. Trustee's counsel indicated that he was sharing the details of the letter, and any response thereto, with Mr. Browndorf, who—after participating on a "litigation team" with the Trustee on behalf of Mr. Palikaras—is now counsel for BaileyBridge, Inc., an entity owned and controlled by Mr. McCabe. [*See id*. at ¶¶ 17-18].

19. On October 13, 2026, the Court held a hearing on the Original Motion to Sell, concluding with an oral ruling denying the same identifying various evidentiary deficiencies in the record regarding the Trustee's burden to satisfy the *Slates* factors.

## III. DISCUSSION.

### A. The Authentix Parties are Properly Heard, and in Any Event the Court's Obligation is Independent.

Pursuant to the Trustee's allegations in the Authentix Complaint, Authentix has standing as a contingent creditor under 11 U.S,C. §§ 101(10) and 502(h) and pursuant to a breach of contract action under the Asset Purchase Agreement with Nanotech (which would be an obligation of this estate if the Trustee is successful in obtaining a nunc pro tunc order providing for substantive consolidation).

Additionally, "[t]he requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005). The bidding terms in the Renewed Motion to Sell are a transparent attempt to exclude the three parties[5] who objected to the Original Motion to Sell. [*See* ECF Nos. 2985-2987, 2990-2991]. Indeed, the Trustee and her counsel have not sought all possible avenues to maximize recovery for the estate, such as discussing more favorable sale terms with Scott Traudt (as learned at the October 13 hearing) or discussing the litigation with counsel for the Authentix Parties after receiving a Bankruptcy Rule[6] 9011 letter. The Trustee further seeks to disqualify any interested bidder from conducting effective diligence via provisions barring any diligence contingency or discussions with the Authentix Parties (or any

---

[5] The Authentix Parties' objection to a defective bidding procedures and sale motion does not constitute consent to this Court's jurisdiction in the Authentix Action, where they have only specially appeared to file the 9011 Motion. The Authentix Parties reserve all rights in the Authentix Action.

[6] "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

defendant in actions instituted by the Trustee)—terms which are transparently skewed in favor of ensuring no party wins other than a McCabe-controlled entity, whose law firm (along with its other client, Mr. Palikaras) has apparently been on the Trustee's "litigation team" since 2024. Further, instead of discussing the matter with Authentix counsel upon receiving a Bankruptcy Rule 9011 letter, the Trustee instead sought to burden the estate with $250,000.00 in alleged investigation expenses (which the sale to McCabe reimburses in part based on representations made by the Trustee in her Original Motion to Sell and the Renewed Motion to Sell), indemnification for any individualized Bankruptcy Rule 9011 sanctions the Court may impose against the Trustee and her counsel (and not the estate, as subsequently discussed, thereby creating a disqualifying adverse interest in favor of the Trustee and her counsel under Sections[7] 324 and 327), and the burden of additional administrative expenses to respond to the Authentix Parties' 9011 Motion (with coordination from the "litigation team" member representing both Mssrs. Palikaras and the McCabe-controlled entity). In the face of such facts, the obligation to assure that optimal value is realized is the Court's own, and it does not arise only when an objection appears. *In re Lahijani*, 325 B.R. at 288 ("[T]he requirement of court approval means that the responsibility ultimately is the court's"); *see also Frances Michael Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (B.A.P. 9th Cir. 2010) (the BAP reached the Bankruptcy Rule 9019 defect although it was "not raised precisely" by the appellant, explaining that it had "the discretion, if not the obligation, to ensure that bankruptcy law is properly applied.").

**B. <u>Legal Standard.</u>**

A trustee may sell property of the estate outside the ordinary course of business "after notice and a hearing." 11 U.S.C. § 363(b)(1). "To confirm a sale, the trustee [has the burden to] establish that: (1) a sound business purpose exists for the sale; (2) the sale is in the best interest of the estate, i.e. the sale price is fair and reasonable; (3) notice to creditors was proper; and (4) the sale is made in good faith." *Slates v. Reger (In re Slates)*, 2012 WL 5359489, at *11 (B.A.P. 9th Cir. Oct. 31, 2012).

[7] "Section" refers to 11 U.S.C. § 101 et seq.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

### C. **The Trustee's Bid Procedures are Deficient and the Sale Motion Fails to Satisfy Any of the *Slates* Factors.**

As an initial matter, the Renewed Motion to Sell is premature as the Trustee and her counsel face serious allegations under Bankruptcy Rule 9011 regarding the filing of the Authentix Complaint. *See* Defendants' Motion for Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011 [Authentix Action, Dkt. 29] ("9011 Motion"). Until the 9011 Motion is decided, the record cannot support any Court determination in the Trustee's favor on any of the *Slates* factors. Additionally, bidding will be chilled by parties who have not had the benefit of years that the McCabe-controlled bidder the Trustee has automatically deemed "qualified" has had (by way of his law firm that apparently served as part of the Trustee's "litigation team") to review and analyze the merits of the Authentix Complaint and the 9011 Motion (the allegations of which the Trustee shared, and consulted with, counsel on this "litigation team" after receiving the Bankruptcy Rule 9011 letter from counsel for the Authentix Parties). Beyond these transparently collusive, skewed, and patently unfair circumstances, the Trustee's Renewed Motion to Sell does anything but respond to the Court's concerns in a substantive matter.

*First*, the proposed timeline is incomplete, as it fails to identify a date for bids to be submitted.

*Second*, the timeline is unnecessarily truncated—and apparently designed to get the claims sold specifically to a McCabe-controlled entity[8] before the Court rules on the 9011 Motion—as the Trustee's bid procedures make any attempt to conduct diligence beyond the fast-approaching deadline proposed in the Renewed Motion to Sell automatically disqualifying. *See* ECF 3029-2, p. 26 of 29 (stating that qualified bids cannot have any "diligence contingencies"). It further prevents any party from having had any conversations with any defendants in any action the Trustee has instituted, even in unrelated matters. Meanwhile, the McCabe-controlled entity is automatically deemed a qualified bidder notwithstanding that Mr. McCabe's other company, NBH, appears to continue to maintain a business relationship (and presumably communicate on a regular basis) with a defendant in an action

[8] The Renewed Motion to Sell contends that Mr. McCabe "has a significant ownership interest" in BaileyBridge, which implies that other parties may hold ownership interests in BaileyBridge. [ECF No. 3029 at 2:17-18]. To the extent other parties hold ownership interests in BaileyBridge, the Trustee should disclose those names as well.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

instituted by the Trustee.[9] Additionally, Mr. Palikaras—who appears to have been a business colleague of Mr. McCabe's at both the Debtor and NBH, appears to maintain a business relationship with NBH via BlueLedger AI, and shares the same counsel and/or law firm as BaileyBridge, *see* ECF No. 783—has messaged Alan Newman, the Chief Product Officer at Authentix, regarding this bankruptcy case and the Authentix Action. *See* **Exhibit 2**. Ironically, despite the clearly skewed bidding terms proposed by the Trustee, it appears that individuals who appear to be close to Mr. McCabe (if not behind the scenes on Mr. McCabe's efforts to obtain these claims via BaileyBridge) are assisting him in violating the very independence declaration that was clearly inserted in the Trustee's bidding procedures to exclude bidders other than a McCabe-controlled entity.

*Third*, the Renewed Motion to Sell packages two separate complaints into one sale process, without providing a breakdown of, among other things, how the $250,000.00 sale price or the $1 million (as represented in the Motion without evidence) or the $1.5 million (as represented in the Lovato Declaration without evidence) in anticipated litigation costs are split between the two. The Trustee's bidding procedures do not even contemplate a bidding process on only one of the Actions. Meanwhile, the Trustee continues to fail to provide due process to all parties, having not filed the Renewed Motion to Sell in the 24M Action (where 24M has not yet been served and arguably is unaware of the current adversary action or the Renewed Motion to Sell). This, again, has the affect of chilling bidding and ensuring that any sale ultimately goes to the Trustee's preferred buyer, the McCabe-controlled entity represented by counsel who was apparently on the Trustee's "litigation team".

*Fourth*, the Trustee continues to fail to provide the Court with any analysis regarding the valuation of the Actions and why a $250,000.00 sale price plus a now increased 30% net recovery benefits the estate and is the product of sound business judgment. Instead, the Trustee just assumes that burden has been met and, to further chill any effective overbids, picks a number of out thin air ($12 million), assumes $1.5 million in expenses deducted ($10.5 million), applies a 30% estate

[9] *See* Adv. No. 26-05029-gs, *Lovato v. Equiniti Trust Company, LLC*; sec.gov/Archives/edgar/data/1936756/000119983526000277/nbh-10q.htm (reflecting Next Bridge Hydrocarbons' use of Equiniti Trust Company, LLC's services).

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

recovery from this award ($3,150,000), and applies a 10% formula to this amount to reach her $315,000 overbid for Qualified Bidders. The Trustee provides no objective bases for these numbers, and certainly not the "numbers, spreadsheets" that the Court indicated "would be very helpful for that analysis." [Oct. 13 Hrg. Tr. at 37:14-15]. The Trustee instead continues to assert that the cash "recovers a substantial portion of investigation costs", thereby providing no benefit to anyone other than the Trustee's professionals. [ECF No. 3029 at 9:16-18]. Simply put, the Trustee has put forth no evidence of a sound business purpose, fair price, good faith, or an arms-length transaction. *See In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991).

*Fifth*, the Trustee generically represents that she believes it is in the best interest to have someone else prosecute the claims "[b]ased upon the cash position in the accounts I manage for the Meta Estate[,]" glaringly not stating the "cash position" of the estate. (Lovato Decl., ¶ 8). Indeed, according to the Trustee's Original Motion to Sell and the Renewed Motion to Sell, the $250,000.00 payment from BaileyBridge will recoup some of the expenses spent investigating these claims [*see* ECF No. 3029 at 9:16-18]; therefore, while the "cash position" of the estate warranted expenditure of approximately $250,000.00 in administrative expenses to investigate these claims, pursuing $35 million in claims (or the assumed $12 million in recovery per the Trustee's speculative overbid calculation) is too tall a task for this estate. The Trustee instead seeks to turn over her investigative efforts to a McCabe-controlled entity to take on the task of what the Trustee's own professionals currently know based on the administrative expenses already borne by the estate. This could mean that the Trustee and her counsel see no value in these Actions and seek to recoup wasted time and effort spent that are otherwise unrecoverable as administrative expenses absent this sale (thereby, again, creating a disqualifying adverse interest under Sections 324 and 327). Or, the Trustee and her counsel did not conduct the required diligence and simply relied on the weekly "litigation team" sessions with the law firm/counsel for Mr. Palikaras and the McCabe-controlled entity. Either way, the Renewed Motion to Sell does not address the Court's concerns in any meaningful way but again asks the Court to simply rubberstamp the Trustee's generic and conclusory statements (an attempt the Court has already denied once):

> Fitzgerald v. Ninn Worx Sr Inc. (In re Fitzgerald), 428 B.R. 872, 883 and 84 (B.A.P. 9th Cir. 2010), seems to, you know, hit my concerns that really all I have is the trustee's statement in the motion and the reply that they're satisfied this is in the best interest. That's not enough.

(Oct 13 Hrg. Tr. at 35: 4-9).

*Sixth*, the Trustee continues to conveniently ignore binding 9th Circuit precedent (one that affirmed a BAP decision on which your Honor was a panel member) requiring notice to the putative substantively consolidated entity and its creditors. *See Leslie v. Mihranian (In re Mihranian)*, 937 F.3d 1214 (9th Cir, 2019), *aff'g* 2017 WL 6003345 (B.A.P. 9th Cir. Dec. 4, 2017). There, the Ninth Circuit affirmed the bankruptcy court's denial of a motion to substantively consolidate filed in the main case where, among other things, "there is no evidence in the record concerning any attempts Trustee may have made to discover [the putative consolidated debtors' creditors]." 937 F.2d at 1218. Here, the Trustee seeks to substantively consolidate two non-debtors in an adversary proceeding that not only fails to mention the putative consolidated debtors' creditors but otherwise fails to provide them with notice. Indeed, proceeding in such a fashion gives even less notice than deemed insufficient in *Mihranian*.

*Seventh*, and in seeming response to the Court's request "to understand in greater detail why the trustee cannot litigate this case" or obtain counsel via "engagement retention models [or] financing" [Oct. 13 Hrg. Tr. at 33:22-24 & 34:513], the Hartman Declaration represents that Trustee's counsel "contacted Glen Moses at Venable in Washington D.C." (who declined) and "William Hughes at Porzio Bromberg & Newman" (who did not respond). Mr. Moses, however, is in Miami, Florida (not Washington, D.C.),[10] and Mr. Hughes holds offices in New Jersy, Puerto Rico, and New York.[11] Mr. Hartman's attestations create more questions than they answer. Specifically, when did these inquiries occur? Did they occur before or after Mr. Hartman's self-initiated contact with Mr. McCabe to discuss a tolling agreement? [*See* Oct. 13 Hrg. Tr. at 5:23-25] ("I contacted Mr. McCabe,

[10] https://www.venable.com/professionals/m/glenn-d-moses.

[11] https://pbnlaw.com/william-j-hughes-jr.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

asked to speak with him and an attorney.[12] He agreed. We've reached the terms of the tolling agreement."). Did they occur before or after the Court's October 13, 2026, hearing? Why did the Trustee only reach out to two counsel who work on the East Coast (and Puerto Rico) to consider contingency work in a Nevada bankruptcy case, especially when other competent counsel exist closer to home (many of whom the Court is aware)? And critically, since Mr. Browndorf and Cooper Levenson have apparently been part of the Trustee's broader "litigation team"[13] since 2024, why didn't the Trustee simply ask Mr. Browndorf to conduct this litigation on a contingency fee basis or ask Mr. McCabe or his newly formed entity, BaileyBridge, to finance the litigation?[14] These unanswered questions again appear to highlight a process where the Trustee and her counsel provide the barest of information in order to technically tick of the boxes per the Court's inquiries without making a sincere effort to satisfy the substance of the Court's concerns or the mandatory *Slates* factors.

*Eighth*, the indemnification provision reeks of self-interest designed to insulate the Trustee and her counsel from defending what the Trustee claims is a "Rule 11 Motion [that] has no merit. . . ." Even counsel from the Trustee's "litigation team", who know represents BaileyBridge, alluded to this motivation at the October 13, 2026, hearing:

> [N]one of the other offers that are here say anything at all with respect to indemnifying the estate. That becomes particularly relevant here because notwithstanding the request by counsel for the trustee to Authentix counsel to hold off serving a Rule 11

---

[12] Who was McCabe's attorney with whom the Trustee's counsel spoke regarding the Tolling Agreement? Was it someone associated with the Trustee's "litigation team"? These questions remain unanswered. The Hartman Declaration also does not provide any detail into the communications that ultimately resulted in entry of the Tolling Agreement, instead, beginning as of July 16, 2026, the date counsel "emailed a draft Tolling Agreement . . . to Greg McCabe." Hartman Decl., ¶ 2.

[13] Since Mr. Browndorf and Cooper Levenson were apparently part of the Trustee's "litigation team", and presumably part of a joint common defense agreement with the Trustee and her counsel, the McCabe-controlled entity goes beyond the typical stalking horse bidder and should be deemed to be an "insider".

[14] The answer to these questions appears self-evident: assuming the unlikely event that Mr. Browndorf and Cooper Levenson could pass the adverse interest and conflict hurdles, any recovery on these claims would inure solely to the benefit of unpaid *creditor* claims and would not otherwise trickle down to purported *shareholders* like Mssrs. Palikaras and McCabe. And Cooper Levenson's fees (purported to be as high as $1.5 million) would be scrutinized by this Court and the creditor-body under 11 U.S.C. § 330.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

> letter and a draft Rule 11 motion until such time as these issues were resolved, he served it. My understanding is that the trustee has approximately ten days from today to either sell or expose the estate to what . . . Authentix counsel believes is serious exposure. So the indemnification is very relevant. We don't have 30 days. We don't have 60 days.

[Oct. 13 Hrg. Tr. at 23:19-24:4]. A review of the 9011 Motion, however, reflects that sanctions are requested against the Trustee and her counsel on an individual basis, and not against the estate. [*See* 9011 Motion at 33:18-20 ("Defendants request that any monetary sanction be payable personally and not from estate assets. A sanction satisfied out of the estate would be borne by the very creditors Bankruptcy Rule 9011 exists to protect and would deter no one.")]. Consequently, the indemnification injected into the bid procedures is not protecting the estate but is instead designed to shield the Trustee and her counsel from sanctions the Court may impose on them on an individual basis. Such a provision not only reveals the Trustee's and her counsel's adverse interests, but it also serves to chill bidding in favor of a McCabe-controlled entity that seeks to jump the line of unpaid creditors in order to recoup monies for Mr. McCabe (and potentially other undisclosed individuals involved in BaileyBridge) that neither he nor any other shareholder currently expects, or possibly ever expected, to receive. It also chills bidding in favor of a member of the Trustee's "litigation team" who purportedly will incur up to $1.5 million in litigation expenses that will not be subject to scrutiny by the Court or creditors. These conflicts, adverse interests and, at a minimum, appearance of impropriety have distorted the Trustee's business judgment, thereby warranting further scrutiny by the Court under Section 324. *See Dye v. Brown (In re AFI Holding, Inc.)*, 530 F.3d 832 (9th Cir. 2008).[15]

*Ninth*, the Trustee's bidding procedures requiring confidentiality are legally unsupported because the Trustee appears to have waived the estate's attorney-client privilege. In the Trustee's

[15] Had the Trustee and her counsel engaged with Authentix counsel in a substantive manner after receiving the Bankruptcy Rule 9011 letter, the Trustee may have extracted a beneficial settlement for the estate (assuming, of course, she has evidence rebutting the facts identified in the 9011 Motion) or otherwise learned additional information that she could have used to bolster her case. Counsel for Authentix invited the Trustee and her counsel to a conversation. Instead of accepting that invitation, they instead consulted with a member of the Trustee's "litigation team" who now represents BaileyBridge to simply refile a motion to sell and ask counsel for the Authentix Parties to delay any determination on her and her counsels' culpability under Bankruptcy Rule 9011. *See generally* Dahu 9011 Decl.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

counsel's billing records, a joint common interest privilege agreement, seemingly with counsel for Cooper Levenson (including Mr. Browndorf) and client, Mr. Palikaras, is identified. While part of the Trustee's "litigation team", neither counsel for Cooper Levenson nor Mr. Palikaras were employed by the Court and are not, nor will ever be, parties to this litigation. And Mr. Palikaras is, at best, a shareholder in this case with a "rooting" interest in the financial, not legal, result of this matter. Under these circumstances, courts have held that a joint common interest agreement does not preserve the attorney-client privilege:

> It remains clear to the Court that the common interest which the Trustee and FTB Share is financial, not legal. FTB has no legal exposure to the Trustee or Defendants. Instead, FTB sits on the sidelines and hopes that the Trustee, with H & W's help, will achieve success, collect on a judgment, and pay FTB its share of the proceeds. Surely that is a financial interest, not a legal one.

*Stanziale v. Versa Capital Management, LLC (In re Simplexity, LLC)*, 584 B.R. 495, 501 (Bankr. D. Del. 2018) (compelling production of documents in response to a subpoena withheld based on a common interest privilege the Court found did not preserve the attorney-client privilege). Consequently, the Trustee appears to have no basis to require confidentiality, as it appears she waived the attorney-client privilege.

*Tenth*, for all the reasons stated herein and in the Authentix Parties objection to the Original Motion to Sell [ECF Nos. 2986-2987], BaileyBridge—represented by counsel that was apparently part of the Trustee's "litigation team"—should be treated as an insider and subjected to heightened scrutiny. *See U.S. Bank, N.A. v. The Village at Lakeridge, LLC (In re The Village at Lakeridge, LLC)*, 814 F.3d 993, 1001 (9th Cir. 2016) ("A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length."). Additionally, at the October 13 hearing, Mr. Browndorf represented that "Mr. McCabe personally agreed to indemnify the estate." [Oct. 13 Hrg. Tr. at 24:19-20] Consequently, McCabe is BaileyBridge, and BaileyBridge is McCabe. But even if BaileyBridge is not an insider, the reason insider sales draw heightened scrutiny—that the ordinary assumption of arm's-length dealing does not hold—is present in substance herein. *See Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887 (Bankr. D. Alaska 2018) ("Sales to an insider are subjected to heightened scrutiny."). And *Lahijani* and *Fitzgerald* require

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

heightened scrutiny on an independent ground that plainly applies: competition continues to be constrained for all the reasons previously stated.

*Finally*, for all the reasons stated herein, there remains no evidentiary support justifying a finding of good faith—and lack of collusion—under 11 U.S.C. § 363(m), including, but not limited to, the absence of any declaration from Mr. McCabe or anyone associated with BaileyBridge. The Trustee has found a preferred litigation partner—one who was apparently on her "litigation team" since 2024 and for which the Trustee has apparently not requested be employed by the estate on a contingency fee basis—and with whom she and her counsel presumably shared a joint common interest privilege agreement that arguably waived the estate's attorney-client privilege. Counsel for the Trustee consulted with this preferred litigation partner after receiving a Bankruptcy Rule 9011 letter and negotiated an indemnification provision to insulate the Trustee and her counsel from personal liability under Bankruptcy Rule 9011. The Trustee's bid procedures also require, for a qualified bid other than this McCabe-controlled entity, proof of $1,000,000.00 to fund litigation expenses (whereas neither the Trustee, her counsel, nor Mr. McCabe attest that such proof was provided by BaileyBridge). Instead, at the October 13, 2026, hearing before this Court, Mr. Browndorf appeared to indicate that such proof had not yet been provided by BaileyBridge, stating "[s]o I believe Mr. McCabe is going to have this entity raise some dollars and something in that regard." [Oct. 13 Hrg. Tr. at 24:12-18].

According to Mr. Browndorf, the Trustee has "discretion to pick the person that he wants to litigate with." *Id.* at 25:13-14. As the Court noted, any such discretion must be tied to the *Slates* factors and is not unfettered. On this record, there is no close call based on Trustee discretion, and a Section 363(m) finding is unwarranted. *See Silver State Broad., LLC v. Carmel (In re Silver State Broad., LLC)*, 2024 WL 3877360, at *5 (B.A.P. 9th Cir. Aug. 20, 2024) quoting *Fitzgerald*, 428 B.R. at 881 ("We must look past a boilerplate good faith finding and ascertain whether the finding as an evidentiary foundation.") (quotations omitted).

**IV. CONCLUSION.**

For all these reasons, the Authentix Parties respectfully request a Court order denying the Renewed Motion to Sell and granting such other and further relief that may be appropriate.

DATED this 25th date of November, 2026

McDONALD CARANO LLP

*Jimmy F. Dahu*_________
Ryan J. Works (NSBN 9224)
Jimmy F. Dahu (NSBN 17061)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

*Attorneys for Authentix, Inc. and Authentix Solutions Canada, Inc.*

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

# EXHIBIT 1

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE: | Case No. 24-50792-gs |
| | Chapter 7 |
| META MATERIALS, INC., | |
| | 300 Booth Street |
| | Reno, NV 89509 |
| Debtor. | |
| | Tuesday, October 13, 2026 |
| . . . . . . . . . . . . . . . . | 1:37 p.m. |

TRANSCRIPT OF DOC# 2966 MOTION TO SELL FILED BY JEFFREY L. HARTMAN ON BEHALF OF CHRISTINA W. LOVATO
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Bailey Bridge: Cooper Levenson, Attorneys at Law
By: ERIC A. BROWNDORF, ESQ.
3016 W. Charleston Blvd.
Suite 195
Las Vegas, NV 891029
(702) 366-1125

APPEARANCES CONTINUED.

Audio Operator: Jamile Vazquez/Maribel Rowa, CRD

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA (RENO)

| | |
|---|---|
| IN RE: | Case No. 24-50792-gs |
| | Chapter 7 |
| META MATERIALS, INC., | |
| Debtor. | |
| CHRISTINA W. LOVATO, | Adv. No. 26-05037-gs |
| Plaintiff, | |
| v. | 300 Booth Street |
| | Reno, NV 89509 |
| AUTHENTIX INC., et al., | |
| | Tuesday, October 13, 2026 |
| Defendants. | 1:37 p.m. |

TRANSCRIPT OF DOC# 4 TRUSTEES MOTION TO SELL FILED BY JEFFREY L. HARTMAN ON BEHALF OF CHRISTINA W. LOVATO
BEFORE THE HONORABLE GARY SPRAKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Bailey Bridge: Cooper Levenson, Attorneys at Law
By: ERIC A. BROWNDORF, ESQ.
3016 W. Charleston Blvd., Suite 195
Las Vegas, NV 891029
(702) 366-1125

APPEARANCES CONTINUED.

Audio Operator: Jamile Vazquez/Maribel Rowa, CRD

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (Continued):

| | |
|---|---|
| For the Trustee, Christina W. Lovato: | Hartman & Hartman<br>By: JEFFREY L. HARTMAN, ESQ.<br>510 West Plumb Lane, Ste. B<br>Reno, NV 89509<br>(775) 324-2800 |
| | Robison Sharp Sullivan & Brust<br>By: KENT R. ROBISON, ESQ.<br>71 Washington Street<br>Reno, NV 89503<br>(775) 329-3151 |
| For Authentix: | McDonald Carano<br>By: JIMMY DAHU, ESQ.<br>RYAN WORKS, ESQ.<br>2300 West Sahara Ave.<br>Suite 1200<br>Las Vegas, NV 89102<br>(702) 873-4100 |
| For Scott Traudt: | SCOTT TRAUDT (PRO SE)<br>191 Kibling Hill Rd.<br>Strafford, VT 05072 |
| For Danielle Spears: | DANIELLE SPEARS (PRO SE)<br>10701 N. 99th Ave. Lot 159<br>Peoria, AZ 85345 |

(Proceedings commence at 1:37 p.m.)

THE COURT: -- the calendar that is in Meta Materials, Inc. as to the motion to sell at ECF 296 and the related Item 4 on the calendar today in Lovato v. Authentix Inc. on the trustee's motion to sell.

Why don't we go ahead and take appearances on both matters, as they kind of overlap?

And Mr. Hartman, I'll let you lead off the appearances and the introductions.

MR. HARTMAN: Thank you, Your Honor. Jeff Hartman and Kent Robison on behalf of Trustee Lovato.

THE COURT: Thank you. And then for Authentix -- might as well get it for both Meta and the adversary.

Mr. Dahu?

MR. DAHU: Good afternoon, Your Honor. Jimmy Dahu and Ryan Works. We are only making an appearance in 24-50792. We are not entering an appearance in the adversary proceeding.

THE COURT: Understood. Well stated.

MR. DAHU: Thank you, Your Honor,

THE COURT: Mr. Traudt, would you like to make an appearance?

MR. TRAUDT: Yeah, Scott Traudt, pro se.

THE COURT: All right. And again, I'm assuming that that is in, well --

MR. TRAUDT: I'm objecting.

THE COURT: -- Meta.

MR. TRAUDT: Yeah, in Meta. I'm objecting to the sale.

THE COURT: All right. And, Ms. Spears.

MS. SPEARS: Danielle Spears, I am also objecting to the sale, pro se.

THE COURT: All right. Other parties or counsel wish to make an appearance?

Then we -- Mr. Browndorf, you're still muted, unfortunately.

MR. BROWNDORF: Oh. Sorry about that.

THE COURT: There you go. No problem.

MR. BROWNDORF: It happens. Eric Browndorf from Cooper Levenson on behalf of Bailey Bridge, the purchaser.

THE COURT: Thank you very much.

All right. Unless I've missed anyone, I believe we have our appearances then.

Okay. Mr. Hartman, I am familiar with most of the pleadings to various degrees of familiarity. Why don't you go ahead and lead us off in your presentation?

MR. HARTMAN: Well, thank you, Your Honor. In preparation for the hearing today, I went and took a look at the claims register, and although the number seems high, the claims register shows $52 million in unsecured claims and $2.1 million in priority claims. To me, there's some importance to

those numbers because no creditor has filed an objection to the trustee's motion.

What we have are the two pro se individuals and of course, counsel for Authentix opposing the sale. And I -- I'm going to go through each one individually at a high level. And then if there's questions, I'm happy to answer them.

Obviously, the motion has been set on a proper notice, and it's supported by appropriate declarations. And the trustee has decided in the exercise of her business judgment to ask the Court to approve the offer by Bailey Bridge. And the -- just so the Court is aware, as I put in my papers, Mr. McCabe has deposited the $250,000 into my trust account and I've confirmed that it is there.

The transaction, of course, contemplates, you know, normal language in the assignment. And if there are specific questions on that, I can address them. But importantly, there's an indemnification by Bailey Bridge of the bankruptcy estate for Meta with respect to anything that might arise in connection with the litigation against Authentix.

And overlaying all this to try and allay everybody's concerns, we filed the tolling agreement that was entered into with Mr. McCabe separately and in advance of and not really knowing what was going to come about with this litigation. I contacted Mr. McCabe, asked to speak with him and an attorney. He agreed. We've reached the terms of the tolling agreement.

And although I don't think the trustee had an obligation to file the tolling agreement with the Court, I think any trustee can do that in conjunction with their exercise of their business judgment. But nevertheless, I went ahead and put it on the record so that everybody could see it and there's no secrets there.

And part of the reason why -- and Mr. Robison and I have talked about this at length -- the facts as we understand them, and based upon the fact that the board of directors for Meta Materials approved and entered into the settlement agreement with Mr. McCabe back in early 2024, certainly suggested that the trustee would be bound by the terms of that settlement agreement.

Nevertheless, in talking with Mr. McCabe and his counsel, we reached the agreement that that would be put in abeyance, and the terms of the extension are set forth in the record now. So I can answer any more specific questions about that.

But not everything that looks like a lawsuit is a good thing to pursue. And so once you have the background information and understand the history, you can make a better informed decision on whether or not to proceed with that. But in this particular instance, we basically put it on ice. It's completely separate and has nothing to do with the agreement by the trustee and Bailey Bridge with respect to the assignment of

the litigation rights against Authentix.

So on that particular piece of this puzzle, if there's any questions that I can answer, I'm happy to do that at this point.

THE COURT: I appreciate it. I think I'd rather hear from everybody, and then if I have questions, we can get into it.

MR. HARTMAN: Okay. Very quickly, with respect to Ms. Spears' objections -- and I don't -- there was something that she filed very recently. I think it was last week. And I don't know if -- I don't think it's under consideration because it was so late. But if it is, I'll have to address it. Ms. Spears doesn't provide a competing offer of any kind. She has nothing that would suggest a higher and better offer. She concedes in her papers that these kinds of claims can be sold and assigned by a bankruptcy trustee. So I just believe, to the extent that she's articulated a reasonable objection, I think it should be overruled.

Next, I'm just going to touch lightly on Authentix. In the brief that I filed, the reply, I set forth simple case law from the Ninth Circuit that suggests that Authentix doesn't have standing because they're not an aggrieved party. And cited, I think, the Venegas decision for that proposition.

So I don't think that there's -- it's necessary to go through and respond to each of the attacks that Authentix makes

with respect to how the trustee has gone about this because it doesn't really have standing to be heard on the issue.

So, you know, and I have to just point out that -- and I have a great deal of respect for Mr. Dahu and Mr. Works. However, it should be noted that that's the same law firm that represents Citadel and Vertu in the class action litigation that we've been fighting over the last 18 months with respect to discovery under the Rule 2004 process, so I'm not at all surprised that that is an effort that will be supportive of Citadel and Vertu in addition to Authentix.

And finally, it comes to Mr. Traudt and his efforts, and the Court will recall that very early on, Mr. Traudt was pushing the trustee to pursue litigation against Mr. McCabe, and I don't think I need to say anything more about that now that the tolling agreement is in place. Again, I -- if there are specific questions on that, I can answer them.

And the two, I guess, counter offers or opposing offers that Mr. Traudt has made aren't really apples and oranges -- they're really apples and oranges, I guess, because they don't match or better the terms of the Bailey Bridge offer. And although Mr. Traudt is critical of Bailey Bridge and its recent organization, he has an unknown LLC that would be -- or an undisclosed LLC that would be, I guess, party to and funding whatever litigation that they would pursue against McCabe and 24M and Authentix. The -- I guess -- I mean, I can

go further in this -- like, for example, in Mr. Traudt's papers, he does a -- what I consider a reach by bringing in litigation that's pending in Texas over the oil field leases involving Next Bridge Hydrocarbons and Mr. McCabe and his company.

I think if I recall correctly, Mr. Traudt is a shareholder of Next Bridge Holding and don't know why he maybe is not pursuing litigation in Texas against Next Bridge and Mr. McCabe. So it's almost as if he's asking the trustee to pursue that claim, which would provide an indirect benefit for him. So his offer of $100,000 plus 50 percent, in the trustee's mind, is simply not close to being something that should be considered in light of the Bailey Bridge terms. And the Bailey Bridge offer includes a limitation from the standpoint that any settlement agreement that might be reached is subject to bankruptcy court approval. So the trustee does have input and the ability to assert some type of control over any settlement that might be reached with Authentix because it has to come before this Court ultimately for 9019 approval.

So with that said, I won't go any further. I can respond after we hear from the other parties.

THE COURT: Certainly. Thank you, Mr. Hartman.

Mr. Dahu, why don't you lead us off?

MR. DAHU: Thank you, Your Honor. Jimmy Dahu on behalf of the Authentix parties.

And as an initial matter, we also have deep respect for Mr. Hartman as well. And so any implication that this motion is somehow motivated by Citadel is not valid, is unwarranted. Those are two separate cases. They're not coordinated. So I just wanted to just put that out there.

Mr. Hartman doesn't want to address the merits in Authentix's objection. He wants to say that we're not a creditor and that proper notice was provided and we would -- we respectfully push back on both of those arguments, and we'd welcome the opportunity for supplemental briefing.

Regarding standing, if you look at the trustee's complaint, they are alleging an avoidance action. Under 11 U.S.C. 101(10)(B), a creditor is defined as, quote, "an entity that has a claim of a kind specified in Section 502(h)." And Section 502(h) says that a claim of that kind acts as if it arises prior to the petition date. So we are a creditor. We do have standing to be heard. The trustee just doesn't want to address the merits.

Authentix is also a contingent creditor based on a potential breach of the prepetition asset purchase agreement it entered into with the debtor's wholly-owned subsidiary Nanotech. That APA contained multiple representations and warranties including that debtor was the affiliate of Nanotech, that no affiliate of Nanotech owned any of Nanotech's assets, and so on and so forth.

After that cell closed, the debtor filed Chapter 7 and then filed schedules and filed statement of financial affairs. Neither those schedules nor the statement of financial affairs identified Authentix, the sale to Authentix, or anything to give Authentix notice that it would be a party to this case.

In fact, what the schedules and the SOFA actually did was identify Nanotech as a wholly-owned subsidiary in which the debtor owned 100 percent of the stock. Further, Authentix was not listed as a noticed party on the creditor matrix, but if you look at the trustee's counsel's time records, the trustee was discussing potential avoidance actions against Authentix in 2024 with Mr. Browndorf, who currently is counsel for Mr. McCabe's entity, Bailey Bridge, but in those time entries he was identified as counsel for George Palikaras, which this Court may recall is the subject of an SEC -- he's been charged by the SEC for securities fraud violations.

As one example at ECF 2265-6, Page 7 of 33, Mr. Hartman has a November 1, 2024, time entry that states, quote, "Conference call with Trustee Lovato, Eric Browndorf, and George Palikaras regarding assets in Canada, potential avoidable transfers involving 24M and Nanotech Authentix," end quote. Indeed, Mr. Browndorf and his client Mr. Palikaras were, according to a December 3rd, 2024, time entry from Mr. Hartman at ECF Number 2265-2, Page 11 of 33, part of a,

quote, "litigation team," end quote, for which the trustee's counsel had a, quote, "weekly call," end quote.

The trustee also received emails and calls from Mr. Palikaras regarding not only the 24M and Authentix matters -- and I will note for the Court, by the way, the motion to sell wasn't even filed in the 24M matter. That's not on your calendar for today, so that -- the additional notice issue -- so those emails and calls from Mr. Palikaras also included, quote, "potential litigation involving Next Bridge and McCabe," end quote, as reflected in April 6th and April 7th time entries at ECF Number 2265-6.

These communications occurred close in time to an April 4th, 2025, quote, "telephone conference with Wes Christian regarding Next Bridge representation issue," end quote, as reflected in ECF Number 2265-6.

As the Court may recall, Mr. Christian is not only the trustee's counsel, but was and may continue to be counsel for Mr. McCabe's entity, Next Bridge. Consequently the trustee has been in correspondence with Bailey Bridge's current counsel, Eric Browndorf, and his other client, Mr. Palikaras, regarding both the Authentix/24M matters and the Next Bridge/McCabe matters for which his other counsel Mr. Christian also previously represented or currently represents.

None of this is discussed by the trustee in her motion. Indeed, Mr. Palikaras's name first appears in the

trustee's reply and the trustee notes therein that Mr. Palikaras was one, the reason Mr. McCabe entered into the transaction for which the tolling agreement relates, and two, Mr. Palikaras's departure from the debtor is the reason Mr. McCabe wanted to extricate himself from that agreement. Meanwhile, while Mr. Palikaras and Mr. Browndorf were presumably encouraging the trustee to pursue Authentix and 24M and presumably minimizing any action against Mr. Palikaras's colleague and Mr. Browndorf's client, Mr. McCabe and his entities, the trustee did not amend the schedules, the SOFA, or the creditor matrix to provide any notice to Authentix.

Authentix wasn't even provided notice of the complaint or this motion to sell. It happened to learn of it via its own diligence. The trustee also, as you recall, Your Honor, sought to avoid providing any notice of the proposed sale to anyone, first filing it in the adversary proceeding.

When Your Honor denied an order shortening time, the trustee finally filed that motion to sell in this case. But even this motion -- pushing back on Mr. Hartman's comment that proper notice has been provided -- this motion fails to provide requisite notice pursuant to a B.A.P. decision in which Your Honor participated.

If you recall, In Re Mihranian, M-I-H-R-A-N-I-A-N, 2017 WL 6003345 (9th Cir. B.A.P. Dec. 4, 2017), affirmed by the Ninth Circuit at 937 F.3d 1214 (9th Cir. 2019),

both the B.A.P. and the Ninth Circuit held that notice of a requested substantive consolidation, which the trustee's adversary complaint against Authentix seeks, must be provided to all creditors of the entities for which substantive consolidation is requested. The trustee has not informed the Court or told the Court that it's made an effort to identify Nanotech creditors and provide notice to them.

As noted in the prepetition asset purchase agreement between Nanotech and Authentix, Nanotech had its own unique creditors, including the U.S. government versus a -- with a contract, a landlord, Authentix, and other parties. The trustees provided none of them with notice. I made the trustee's counsel aware of deficiencies in the complaint and this case law, and the trustee's counsel responded to me by email that he consulted with Mr. Browndorf and that they both disagreed with my points. They didn't specifically identify that case, but they disagreed with all the points that I raised regarding the complaint, which included this case and the lack of notice.

Meanwhile, what we learned from the opposition is that, one, Mr. Traudt made an offer to purchase any claims the estate may have against Mr. McCabe. Two, the trustee who was holding weekly meetings with a litigation team that involved Mr. Palikaras and Mr. Browndorf did not engage with Mr. Traudt regarding that purchase. And three, Mr. Browndorf, now

representing Mr. McCabe's entity, and the trustee decided to pursue a cell of claims regarding 24M and Authentix to Bailey Bridge and temporarily forego any litigation against Mr. McCabe, and presumably not even pursue a potential sale of any McCabe claims to Mr. Traudt or others.

On the one hand, the trustee has a potential avoidance action regarding Mr. McCabe's purchase of stock, and on the other hand, the trustee is utilizing Mr. McCabe's status as a stockholder as justification for this sale. Not only are there substantial connections indicating collusion and lack of good faith not discussed by the trustee or Mr. McCabe, including potential collusion with Mr. Palikaras, again, an individual the SEC has charged with the securities violations regarding this very debtor, there's also a whiff that this is a disguised 9019 settlement that rests control in favor of insiders that arguably contributed to debtors' downfall.

The chronology itself, Your Honor, invites further scrutiny. Mr. Hartman's declaration states he sent an email on June 25th, 2026, to Mr. McCabe about entering into a tolling agreement. The email correspondence that eventually led to that tolling agreement should be in the record. It's not in the record, though.

Meanwhile, Bailey Bridge was formed on July 14th, 2026. That's approximately less than three weeks from when Mr. Hartman states he sent an email about the tolling

agreement. And that's available at Exhibit H to the declaration of Mr. Traudt at ECF Number 2991. Three days later, on July 17th, 2026, Mr. McCabe and the trustee entered into the tolling agreement. Three weeks later, the trustee filed her complaint against Authentix. Less than three weeks later, the trustee filed the motion to sell in the adversary proceeding.

The tolling agreement, frankly, if you look at it, Your Honor, it addresses potential claims allegedly Mr. McCabe has against the estate. It reads like a 9019 settlement agreement. The current record just does not contain sufficient evidence supporting the trustee's business judgment or -- and most definitely does not contain sufficient evidence supporting a Section 363(m) good faith finding.

Again, pursuant to the In Re Mihranian decision, this transaction also suffers from a lack of due process. Notice needs to be provided to creditors of Nanotech. On this record, the motion should be denied, Your Honor, or at a minimum continue to coincide with additional bidding and auction procedures to ensure any sale is transparent and free from collusion and lack of good faith.

And if you have any questions, Your Honor, I'm available to answer them.

THE COURT: I think I'll reserve until we complete the -- these rounds. So thank you, Mr. Dahu.

MR. DAHU: Thank you, Your Honor.

THE COURT: Mr. Traudt, you're on the top line. So let you have the next say.

MR. TRAUDT: Okay. All right. Good afternoon. I think if we go down memory lane here and look at the earlier filings in this bankruptcy, we'll see that we are literally putting the cart before the horse here.

In November of 2024, it was identified that this estate had claims possibly for avoidance against Greg McCabe for the Meta transactions. And we've been -- we've flogged those at length. The issue I have is that we're going to talk about business judgment in a fair and due process and getting a bidding process in which I think we're all owed, we need to look back and say that if the trustee had actually pursued the avoidance claims against McCabe, it would have obviated the needs for us in this entire bankruptcy proceeding to go through the entire litigation.

THE COURT: We're not we're not here to litigate the claims against Mr. McCabe, though. We're here to decide whether or not the sale should be approved based upon the standards that the parties have set forth. So I think we need to direct it as to that.

MR. TRAUDT: Okay. Well, then I would fall back on this position, Your Honor. There was no notice that the desire to sell these claims to Mr. McCabe, I believe, happened on

September 15th. It appears to me had advanced notice that this was going to go down by forming his LLC on June 14th, the Bailey Bridge. It smacks to me of a very unfair process. And the last legal document that I believe the trustee filed with Jeff Hartman's name on it said that I needed to act now.

Well, I did act as quickly as I could and put in a counteroffer for both of these, which I believe are better for the estate and for shareholders down the line than what Mr. Hartman represented. I'm asking for -- to put up a hundred thousand dollars, and then have a 50/50 split. And that could even go 60/40 down the line, depending on how we get to a bidding process.

Overall, if you contrast what I offered versus what Mr. McCabe and Bailey Bridge offered, I'm saying the trustee would have the final say. I would have full accounting. And I also believe that I would be in a position where I'm not going to compromise by being the guy who's the outsider. I would not compromise any further future possible avoidance claims, however unlikely they are pursued by the staff against McCabe, because I'm not going to have a mixing of the books.

If McCabe is allowed to have this avoidance action against 24M and Authentix, these two separate actions, he's going to be able to get into the books and I think it's going to muddy the waters in terms of the estate possibly being able to go after him because he'll have access to insider

information, the books, the records.

And I believe that's one of the reasons why myself, I'm at a disadvantage right now, you know, in trying to pursue and propose an avoidance action, because I was never given any notice. I mean, let's look at it this way. In April of 2026, Your Honor, I did file to have an avoidance action -- to pay for an avoidance action against Greg McCabe. I find it somewhat literally dubious that first of all, it was never acknowledged or responded to. And then second of all, there was a tolling agreement signed between McCabe and the trustee, even after there'd been a proposal by myself to chase Mr. McCabe on avoidance action. I think that's improper. I'm not exactly sure exactly what bankruptcy law would attack that. But I'm saying at the very least, I'm raising it as an issue to preserve the record for the Court.

Now, in terms of where we stand on objecting to how this is all going to shake out, I'm just saying that I think the best way to go forward was for a bid process, whatever, 60 days, 30 days, 60 days, whatever the Court chooses, for all of us to have the same information that was made available to McCabe, the same books and records, the same trustee documents, the same issues that have been raised by their George Palikaras, as their -- part of their litigation team, his infamous laptop that supposedly has all the data on it. I'd like to see George Palikaras' laptop. And again, this is a guy

who's facing some serious issues with the SEC, along with other folks associated with this.

So anyways, to keep it as short as possible, Your Honor, I also think that in an issue of fairness, not just the time allotment, but also the idea that, you know, I have to suddenly put up a hundred thousand dollars, like, on the eve of this proceeding when McCabe had almost 60 days, maybe even more, depending on who alerted him.

So I have verbal commitments to put the money in. I have verbal commitments to eventually get on the line and get a real legitimate law firm. I'm not going to pursue this myself. My goal is to actually create an LLC, if necessary, or not, a pot of people that have made some verbal commitments to finance this and then get the shareholders paid. Because with McCabe gaining 80 percent of the take with what is considered not, in my contrast, if I look at it, he gets 80 percent, the estate gets 20. He puts up 250,000. I put up a hundred, the estate gets 50/50, or depending on what numbers come out, maybe it goes 60/40, but I think we need to have a fair bid process. It's a better deal for the estate and potentially for shareholders if one of my -- either my Alpha or my Bravo are assumed.

Now, I also know they're only talking about Authentix and 24M, but the Bravo proposal that I put in, Your Honor, was global. It allowed me to go after Authentix, 24M, and the

McCabe avoidance if that deal between the trustee and McCabe was voided for the tolling agreement. I think there's a lot of reasons to void the tolling agreement.

But anyways, in closing, Your Honor, I think the estate gets a better deal if we go my way with this.

THE COURT: Thank you very much.

Ms. Spears?

MS. SPEARS: Good morning. Oh, good afternoon, I guess.

First, Your Honor, there's a threshold problem with the tolling agreement. The copy that was placed before the Court that Mr. Hartman referred to does not contain the trustee's signature, and Mr. McCabe's signature is not dated. And I don't know if there is a second agreement out there. In one document, they refer to the tolling agreement being signed July 7th. In a different document, they refer to the tolling agreement having been signed on July 17th. I don't know if one was a typo, but I think that needs to be cleared up in the record.

And as always, I repeatedly have asked for documentation. I think Mr. Dahu and Mr. Traudt have really articulated the bottom line of my argument and what I have been saying for nearly two years. There are conflicts of interest, in my opinion, all over the place. How is it that we have avoidance claims against multiple insiders, but not the CEO,

where --

THE COURT: Oops. Ms. Spears, I think that you froze. And still frozen.

All right. Well, hopefully, Ms. Spears will reconnect or be able to get the WiFi back.

Let me ask. I assume that is -- with Ms. Spears -- the end of the opposition to the motion. Did any other party have opposition to present?

Okay. I think we've dropped Ms. Spears, so hopefully she'll reconnect here in a second.

Let's just hold off on -- just -- for just a moment, please.

All right. Well, Mr. Hartman, we can't wait forever. I mean, I think that we give Ms. Spears an opportunity to conclude her remarks when she rejoins. But I don't know if you want to fill that time with reply.

MR. HARTMAN: Yeah, I'd -- I -- if it's acceptable for the Court, I'd like Mr. Browndorf to weigh in, just because he's here on behalf of Bailey Bridge.

THE COURT: Certainly.

Mr. Browndorf?

MR. BROWNDORF: Yes, Your Honor. Thank you for admitting -- appear before Your Honor by Zoom. Much, much appreciated.

You know, I have practiced in the last 46 years in

some of the nastiest places imaginable in New York, in Delaware, with some of the nastiest attorneys. But I have never in those 46 years had anybody bring up my name and suggest that I'm involved in some collusion. I've represented clients that have done all kinds of things, both positive and negative, been accused of different things. But I do take, notwithstanding how politely it was said, the idea that just because I represented George Palikaras previously that somehow we're in collusion and that somehow -- you know, it was directed specifically to me. So that's not necessarily relevant. I have thick skin. I can deal with allegations of collusion.

We don't represent George. We do represent the purchaser here. This is -- what is relevant, one of the things that was misspoken, we agreed with the trustee that any settlement is contingent upon his approval and Your Honor's approval. I believe Mr. Hartman just mentioned your approval as a 9019, but we also would not settle without him.

Number two, none of the other offers that are here say anything at all with respect to indemnifying the estate. That becomes particularly relevant here because notwithstanding the request by counsel for the trustee to Authentix counsel to hold off serving a Rule 11 letter and a draft Rule 11 motion until such time as these issues were resolved, he served it. My understanding is that the trustee has approximately ten days

from today to either sell or expose the estate to what Mr. -- what the -- what Authentix counsel believes is serious exposure. So the indemnification is very relevant. We don't have 30 days. We don't have 60 days.

THE COURT: So let me jump in with my first questions.

Ms. Spears, welcome back. We're going to circle back around to you, but we started with Mr. Browndorf.

Maybe it's just the bankruptcy in me, but when I hear a newly created business coming in and offer to indemnify, I have capability concerns.

MR. BROWNDORF: Well, let me be very clear with that, Your Honor. Mr. McCabe personally is indemnifying it. We formed a separate entity with which to take the assignment and to pursue it because we anticipate high seven-figure litigation expenses in pursuing this. So I believe Mr. McCabe is going to have this entity raise some dollars and something in that regard.

Well, let there be no ambiguity, Mr. McCabe has personally agreed to indemnify the estate.

THE COURT: All right. We'll get to that in just a moment. Let me let you continue that. I appreciate the explanation.

MR. BROWNDORF: Yeah. And the only thing I wanted to make clear was there's a difference, you know, between a

circumstance where we have an experienced law firm that is prepared to move forward, and we have one of the shareholders -- I've heard from anywhere from the second to the third largest shareholders of Meta who clearly has the most interest in acquiring the most money for the estate as well behind and fully funded to collect it.

So if, you know, we find somebody on the street that is prepared not to even hire counsel to appear before Your Honor and is now going to take on this case, I think the trustee, in a reasonable exercise of his discretion can say, I'm very comfortable with the ability of Cooper Levenson to pursue these type of claims. They've pursued them before in multi eight- and nine-figure cases. It's certainly his discretion to pick the person that he wants to litigate with.

And the -- and, Your Honor, I don't know if it's in the papers and if it's not, I'll -- we put up our $250,000 right away. The trustee has in his possession $250,000.

THE COURT: Thank you.

MR. BROWNDORF: Thank you.

THE COURT: All right. Ms. Spears, we're going to circle back around to you. Glad you could rejoin us and let you continue.

MS. SPEARS: Thank you. Yeah, I have connectivity problems here.

I am not sure where I left off, but I will go back to

the tolling agreement and point out that I would like -- since now I'm raising the question of the tolling agreement and the tolling agreement that is on the record is unsigned and undated, I think it is fair to ask that the record be supported by other contemporaneous evidence of what was the date it was signed. Be that emails back and forth, something else besides a newly, freshly dated copy of the tolling agreement, and certainly it'd clear up what the date of the tolling agreement was. Was it the 7th or the 17th? And I think a date matters, them saying which date it was.

The other thing I wanted to get into was that in this process, there was no bidding procedure. There was no diligence process. There was no comparable access to information. There was no meaningful period to formulate a bid. So the trustee coming on the record now and saying -- Mr. Hartman saying to me, well, you haven't put a bid up, well, yeah, I didn't even know that we were taking bids. I didn't have any information how to bid, what the other bids were, what was I competing with, what information is -- what information was made available to Mr. McCabe that's not being made available to Mr. Traudt and myself and anybody else who wants to?

Unless I misunderstood case law, there is supposed to be a proper bidding notice to at least the investors. There might be creditors or investors besides the people who have

placed a bid on the record who might also want to do that. And her job is to get the greatest value for the estate. So I would think she would want there to be a bidding process.

And my other issue is the valuation. Are -- am I supposed to take everybody's word for it that it was properly valued? How did she arrive at the point that 250,000 and 20 percent was a fair offer? Whether you want -- comparing -- Mr. Hartman saying that Mr. Traudt, his bid wasn't equal, I'm not sure what the exact word he used, but it -- but that the trustee would choose Mr. McCabe's over Mr. Traudt's. 50 percent of a million dollars is a heck of a lot more than 20 percent of a million dollars. And how the -- how there was a determination that 250,000 was the correct amount to pay to put into the account to get the claim, and that -- because 250,000 is more than 100,000 -- I'm sorry, if I just do some math here, Mr. Traudt's proposal of 100,000 and 50 percent is far greater. And one of the things I think I've repeatedly argued is that I'm here to make sure that the most money gets put forward for creditors and investors. So that's been my concern.

My other concern has been the conflict of interest. We have a CEO who when I raised this issue last time of a conflict of interest, what the trustee stated was that he's used as a historical source. That's not accurate. I'm not going to repeat everything I wrote in the filing. Mr. Dahu said it all beautifully.

There are more than just the SEC case against Mr. Palikaras. The Targgart case, which was just remanded by the Ninth Circuit of Appeals back to the district court, names Mr. McCabe, Mr. Palikaras, and Next Bridge Hydrocarbons. So kind of acting like it's no big deal that these people are being charged with securities fraud and securities issues, I should say, and it's not that they've been litigated and decided, they haven't, but certainly that they're out there should be taken into account.

Yeah, I think that is overall -- I'm asking -- you always ask me at the end, well, what is it you want? I want a proper bidding process. I want the same available information to make a decision about whether I want to get counsel, whether I want to form an LLC, what my offer would be, whether Mr. Traudt has the best offer.

I think it should be fair. It seems to me that there's some selective treatment going on. And frankly, I think it's pretty obvious that there is selective treatment. She formed all of these adverse claims against insiders, but not Mr. Palikaras. And she has an adverse claim for potentially $17 million. Had that been gone after, had that claim come even close, we wouldn't have even needed to talk about the litigation funding that we were arguing over a few months back, which suddenly got retracted at the last minute.

I have issues with all of the conflicts of interest.

I have an issue that I feel like there's a lot of selective treatments. The trustee, in her document, raised my Texas litigation. Kind of, it seemed to me what you were saying, well, don't listen to Ms. Spears, she's already litigating against Mr. McCabe. Yeah, I am. Did she go through my claims? Did she review the evidence? Did she take that into account when she was offering Mr. McCabe the opportunity to make more money out of the investors' and creditors' pocket?

That -- those are the issues I have. I feel like this is becoming more and more unfair as time goes on. And I just have a problem with money being taken out of the estate, or less money coming into the estate, because as we discussed before, none of the investors have even gotten notice of the bankruptcy yet, because her comment was, well, if there's money left over.

Well, yeah, that's the whole point. Hopefully, for there to be money left over for all the investors who lost a lot of money investing in this company. So I think hopefully I've articulated my points clearly.

THE COURT: Thank you.

All right. Mr. Hartman, we're going to circle back to you one more time, in case you want to offer any overall reply.

MR. HARTMAN: Well, Your Honor, I suppose that -- just a couple of points. Number one, those of us in the

bankruptcy arena have been exposed to these transactions where there is a process for soliciting bids or advertising an asset for sale. I don't recall in my years of experience there being a market, so to speak, for litigation claims. It likely would be with respect to somebody who has inside knowledge of the background of all the issues, just not somebody that's out there shopping for lawsuits, not that I've run into anyway.

And I do think it's relevant, going to Ms. Spears' comments for a moment, that the magistrate report and recommendation in the Texas litigation that I referenced in my papers, the R&R was accepted by the district court judge and found that there was not one indication that Ms. Spears had met her burden under Rule 9 to establish her allegations of fraud, and that's why the case was dismissed.

Finally, with respect to Mr. Palikaras, in a case of this wide-ranging complexity, with this many wholly-owned subsidiaries operating on two continents, there was one person that was available to the trustee with a background of knowledge to help figure out what had happened in this case. The fact of the trustee having had to sue the two principal officers and directors -- or I should say officers -- in the company for avoidance actions, those would be Mr. Sasson and Mr. Eaton, they were running the company during this period of time. They're the ones that entered into the settlement agreement with Mr. McCabe. They're the ones that acquired a

five-year tail policy on the DNO coverage for officers and directors at a time when there were millions of dollars of unsecured creditors unpaid.

Trustees look at the whole body of evidence, so to speak, and say, who am I going to get reliable information from with respect to investigating a case that this -- that's this complicated? And the trustee had some initial conversations with Mr. Eaton and Mr. Sasson, but the transactions that happened in the 90-day preference period cast a lot of suspicion on those characters.

And so Mr. Palikaras basically lost all of his investment in this company. He has -- you know, he's -- he hasn't received anything of value since he walked out the door after they terminated him. So he may have issues with the SEC. They haven't -- they've got the -- the prosecution of that litigation is on ice. It's not moving forward. It's just sitting there. He's innocent until he's not proven innocent.

So he was the best source of information for the trustee in this case to find exactly what had happened and during which time frames. And so there's -- I have no issues with the trustee having relied upon the most knowledgeable source of information to try and get her arms around this case and how to proceed.

With respect to the current issue, do we have a timing problem? Candidly, we haven't served the complaint yet

on the Canadian arm of Authentix. And the time for doing so, I think, expires on November 5th there or abouts. So if the Court were to consider continuing the hearing to have a higher and better bidding process, we would need to request and obtain an order extending the time for service on the Canadian entities. And if that's how this unfolds, we're happy to do that. If there's a better offer out there, then it needs to come forward.

There's no way in my opinion to advertise it though. It just has to be the people who are close to the case and have an opportunity to do a small bit of due diligence and come in and take the risk that Mr. McCabe is taking.

THE COURT: All right. Thank you.

No, Mr. Traudt, I've heard enough.

Thank you for the argument. I think we'll just cut to the chase. The Court is going to deny the motion. I do not believe that there has been a sufficient predicate to give the Court the ability to understand and evaluate the overall best interest of the estate in this sale.

I understand why it was done this way and as Mr. Hartman has alluded to, generally these things are not contested. They make sense. They're required. There's a limited market and they move on. This case is repeatedly demonstrated that there are several groups here that have interest in this bankruptcy, both the records, and now the

causes of actions, for a variety of reasons, not all of which align with the best interest of the bankruptcy estate, but serve other interests of their own. This seems to be in furtherance of that.

Now, you know, as Mr. Hartman also alluded to, this isn't unusual. There's often times when parties that are deeply involved in the bankruptcy are also involved in either financing or purchasing assets in the bankruptcy.

Madam Clerk, can we go ahead and mute that line, please? Thank you.

THE CLERK: Yes, Your Honor.

THE COURT: Thank you. So the standards are always what -- you know, what the Court has to turn to, and to approve a sale outside the ordinary course of business under 363, it -- "Trustee must establish a sound business purpose exists for the sale. The sale is in the best interest of the estate, i.e. the sale price is fair and reasonable. The creditor has received proper notice, and the sale is properly negotiated and proposed in good faith." And that's the In Re Slates decision out of 9th Circuit B.A.P. on October 31st, 2012, 2012 WL 5359489. And these are well-established standards.

The sound business purpose exists, I believe, I would like to understand in greater detail why the trustee cannot litigate this case. I have my suspicions. They've been alluded to. Mr. Browndorf indicated that he believes there'll

be seven figures to -- in cost to pursue this. Okay. The only frame of reference that I have is that the trustee is seeking $35 million in recovery. That's not a bad, you know, return on investment.

The Court is also well aware that there are definitely retained, you know, engagement retention models that allow for that. There's also financing available for that. That's not before the Court. I don't know if they've been explored. I don't know. And honestly, there's no evidence before the Court in the form of evidence as to what those costs will be, except a reference in the motion that by the proposed sale to Bailey Bridge, a receipt of 250 will come close to the costs incurred.

I don't know. I don't know. I believe currently counsel for the trustee is retained on an hourly basis. Don't know what the estimated costs are to pursue that on hourly. Don't know why a contingency isn't a possibility. I just don't have enough in the way of fleshing this out to understand why a lawsuit for $35 million and substantive consolidation of an affiliate is worth 250,000 with a potential for 20 percent net of recovery, whatever those net recovery may be. I can't evaluate that within this record. There's just too many unknowns other than this is what needs to happen. And it may well be -- and it may well be that Bailey Bridge is the entity that needs to happen, but it is not established.

So the second ground, the sales and the best interest, which generally goes to optimizing the return for the estate. It's just unknown. I'm just shooting in the dark in that regard. The case cited by Authentix, Fitzgerald v. Ninn Worx SR Inc. (In Re Fitzgerald), 428 B.R. 872, 883 and 84 (B.A.P. 9th Cir. 2010), seems to, you know, hit my concerns that really all I have is the trustee's statement in the motion and the reply that they're satisfied this is in the best interest. That's not enough.

It overlaps some of the concerns as to Item 4, the sale is properly negotiated, proposed in good faith. It may well be, but given the swirl of allegations surrounding Mr. McCabe and those discussions culminating in the discussion we're hearing on the tolling agreement, I need more detail. I need more flesh on that bone to be able to adjudicate that, especially if you want a good faith determination under 363(m). So I can't find that that has been satisfied.

And it brings us back to Item 3, which is the creditors received proper notice. Technically, they received the notice as required, but there is interest in seeing if there's competing bids. I take Mr. Hartman's position and the trustee's position that nine and a half times out of ten, these litigation claims only involve the parties involved. That's part of the problem here is the parties involved are also involved in many other litigations throughout the country. So

there is a wider range of potential bidders.

Mr. Traudt has tried to provide some back of the napkin kind of discussion and approaching an offer. There really has not been much discussion in weighing that as to the apples to oranges, as Mr. Hartman says. The 50 percent revenue split, again, depending upon the cost of litigation, the anticipated realistic valuation of the litigation would have significant relevance in that discussion. And I just do not have enough information to make that discussion.

So that said, I do think this desire to place the tolling agreement under the microscope, while relevant, is not dispositive. And I would urge the parties to avoid litigating every tangent of this. The question before the Court are the standards I just mentioned. Sound business purpose, sales in the best interest, creditors receive proper notice, the sale was properly negotiated, proposed in good faith, does not preclude a sale to an insider, even if there is a conflict.

That's -- you know, that happens all the time in bankruptcy, where it's a two-party dispute. One party goes into bankruptcy, the other party will buy that interest. It just has to be in the best interest of the bankruptcy estate. And the Court has a firm conviction that there is not enough detail and explanation as to the valuation of the asset, the cost to pursue that asset, the ability to fund that internally versus the benefits of externally, and the terms explored.

Then adding that -- the additional interest that may be out there regarding the purchase or competing bids to be made.

Mr. Hartman seemed to be heading towards a suggestion of continuing this to another time for that process to play that out.

Again, Madam Clerk, would you go ahead and mute? Thank you.

I understand that that may well be how we need to proceed, but I'd need to have a better handle on why this makes sense and why the trustee cannot pursue this for the benefit of the estate, whereas she is proposing to give Mr. McCabe 80 percent of that value net of cost. And quite honestly, I'm not even sure how the net of cost is calculated between the 80/20. So those numbers, spreadsheets, would be very helpful for that analysis.

I appreciate the desire and the concern about the time to serve the complaint. There's nothing stopping the trustee from serving that complaint. So I will leave that to the trustee to decide how she wants to proceed with the actual administration of the adversary versus the sale of this, recognizing that they are overlapping to a certain degree. And more so depending on how she wants to proceed.

But for today, the Court finds that the motion is deficient in critical aspects to advise the Court and make a reliable determination as to the best interest of the sale.

Again, I would just note that most of the declarations I received, especially ones lately, detail the tolling agreement, not the underlying agreement for the sale and the reasons there for. So that will constitute the Court's ruling.

Mr. Hartman, if you need to file a motion for extension to serve, then I urge the trustee to do so, and we'll take that up as it appears.

MR. HARTMAN: Thank you, Your Honor.

THE COURT: So unless there are any questions about the Court's ruling, the Court will get out its own order simply denying this for the reasons stated in this hearing. And we'll get that out due to travel obligations probably at the beginning of next week.

MR. HARTMAN: Thank you, Your Honor.

THE COURT: All right? Thank you. That'll conclude the hearing for today. I appreciate your attendance and go off record.

MR. DAHU: Thank you, Your Honor.

THE CLERK: Off record.

MR. BROWNDORF: Thank you.

(Proceedings concluded at 2:40 p.m.)

* * * * *

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Heidi Jolliff

HEIDI JOLLIFF, AAERT NO. 2850 DATE: November 5, 2026

ACCESS TRANSCRIPTS, LLC

# EXHIBIT 2

EXHIBIT 2

8:57 92

Newman Alan
2 Photos

George Palikaras

Today

I saw the submission by the trustee today. McCabe was the second largest shareholder and has enormous capital and backers and will be a difficult negotiator. I saw the LinkedIn post and glad despite all this you are all doing well and progressing. I am not your enemy. 03:04

For whatever reason your management chose to hire the exact Citadel lawyer who represented them for about two years vs the trustee in the stock manipulation case and lost the motion to quash. This IMO is unfortunate given how McCabe feels about the market manipulation case against Citadel Anson and Virtu. 03:08

By the way, Canada right now has some insane incentives for modernization of businesses for example : 04:01

Canada announces 100% depreciation for more assets.

For context, if you buy $100 of equipment for your business, you generally cannot deduct the whole $100 right away. You write it off slowly:

Year 1: $30
Year 2: $14 (20% of the $70 left over)
Year 3: $11 ((20% of the $56 left over)
And so on, for years.

You've spent the money today, but the tax savings come over many years.

8:54 AM

13:54 74